**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 91-1362 C (Judge Lettow) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION, AND MEMORANDUM IN SUPPORT OF CROSS-MOTION, FOR SUMMARY JUDGMENT**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

JOHN A. KOLAR
DONALD WILLIAMSON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 305-9301
Attorneys for Defendant

Dated: July 27, 2006

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT . . . . . . . . . . 1

QUESTIONS INVOLVED . . . . . . . . . . 4

STATEMENT OF THE CASE . . . . . . . . . . 5

A. The June 6, 1989 FBI/EPA Raid and DOE Headquarters' Response Thereto . . . . . . . 5

B. The 89/1 Award Fee Decision . . . . . . . . . . 10

C. The 89/2 Award Fee Decision . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . 16

A. DOE Headquarters's Actions Did Not Constitute a Breach . . . . . . . . . . 16

B. The Award Fee Determinations and Subsequent Amounts Paid to Rockwell Were Entirely Within the Discretion of the Government and Cannot Be Reviewed by The Court . . . . . . . . . . 25

C. Rockwell Cannot Demonstrate an Entitlement to Damages, Even if DOE Headquarters Breached the Contract, Because Rockwell Received That For Which It Bargained, i.e., A Review by Officials with Local, On-the-Ground Information About Its Performance . . . . . . . . . . 28

D. The Affirmative Defense of Waiver is Encompassed within the Affirmative Defense of Estoppel, and Therefore the Government Should Be Permitted to Assert Waiver . . . . . . . . . . 32

E. The Uncontroverted Facts Establish the Government's Affirmative Defense of Waiver as a Matter of Law . . . . . . . . . . 34

CONCLUSION . . . . . . . . . . 38

## TABLE OF AUTHORITIES

**Page**

Cases:

*AFSCME, Council 4, Local 704 v. Department of Public Health*, 866 A.2d 582 (Conn. 2005) . . . . . 31-32

*A Olympic Forwarder, Inc. v. United States*, 33 Fed. Cl. 514 (1995) . . . . . 32

*Avtel Services, Inc. v. United States*, 70 Fed. Cl. 173 (Fed. Cl. 2006) . . . . . 26-27

*Brazos Elec. Power Co-op., Inc. v. United States*, 52 Fed. Cl. 121 (Fed. Cl. 2002) . . . . . 28

*Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854 (Fed. Cir. 1997) . . . . . 26, 27

*Cherokee Nation v. United States*, 355 F.2d 945 (Ct. Cl. 1966) . . . . . 32

*Climatic Rainwear Co. v. United States*, 88 F. Supp. 415 (Ct. Cl. 1950) . . . . . 18, 20

*G.L. Christian & Associates v. United States*, 312 F.2d 418 (Ct. Cl. 1963) . . . . . 28

*George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229 (2005) . . . . . 26

*Goodwin v. Hartford Life Ins. Co.*, 491 F.2d 332 (3rd Cir. 1974) . . . . . 32

*Hanson v. Fidelity Mut. Ben. Corp.*, 13 A.2d 456 (Del. Super. 1940) . . . . . 33-34

*Hirsch v. United States*, 499 F.2d 1248 (Cl. Ct. 1974) . . . . . 26

*In re Briggs Transp. Co.*,
780 F.2d 1339 (8th Cir. 1985) . . . . . . . . . . 29

*Kline v. San Francisco Unified School Dist.*,
104 P.2d 661 (Cal. App. 1940) . . . . . . . . . . 32

*Massachusetts Bay Transportation Authority v. United States*,
129 F.3d 1226 (Fed. Cir.1997) . . . . . . . . . . 28

*Matter of Garfinkle*,
672 F.2d 1340 (11th Cir.1982) . . . . . . . . . . 34

*Moncel Realty Corp. v. Whitestone Farms*,
68 N.Y.S.2d 673 (N.Y. Sup. 1947) . . . . . . . . . . 31

*N.Y. Shipbuilding Corp. v. United States,*
385 F.2d 427 (Ct. Cl. 1967) . . . . . . . . . . 18, 28

*Orange Cove Irrigation District v. United States*,
28 Fed. Cl. 790 (1993) . . . . . . . . . . 28

*Pacific Architects & Eng's, Inc. v. United States*,
491 F.2d 734 (Ct. Cl. 1974) . . . . . . . . . . 19

*Reliance Ins. Co. v. United States*,
20 Cl. Ct. 715, 723 (1990), aff'd, 931 F.2d 863 (Fed. Cir.1991) . . . . . . . . . . 32-33, 37

*United States v. Adams*,
74 U.S. 463 (1868) . . . . . . . . . . 24, 25

*Wright v. Wagner*,
34 A.2d 441 (Md. 1943) . . . . . . . . . . 34

*Youngdale & Sons Constr. Co. v. United States*,
22 Cl. Ct. 345 (1991) . . . . . . . . . . 34

**Statutes:**

Department of Energy Organization Act,
Pub. L. 95-91 § 20, 91 Stat. 565 (1977) . . . . . . . . . . 20

18 U.S.C. § 1510(a) . . . . . . . . . . 23

42 U.S.C. § 7131 . . . . . 20

42 U.S.C. § 7231(a) . . . . . 21

42 U.S.C. 7252 . . . . . 21

42 U.S.C. §7253(a) . . . . . 21

42 U.S.C. 7256(a) . . . . . 21

**Regulations:**

48 C.F.R. §§ 1.602-2 (b) . . . . . 23

48 C.F.R. § 3.101-1 . . . . . 22

**Other:**

*Blacks Law Dictionary* 1580 (6th ed.1990) . . . . . 32

2 Jacob, *Law Dictionary* 439 . . . . . 32

Prosser, *Torts*, § 105 (4th ed.) . . . . . 32

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 91-1362 C (Judge Lettow) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION, AND MEMORANDUM IN SUPPORT OF CROSS-MOTION, FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), defendant ("the Government") respectfully submits this memorandum in opposition to plaintiff The Boeing Company, Successor-In-Interest To Rockwell International Corporation's ("Rockwell") Motion For Summary Judgment, served on May 25, 2006. The Government's opposition is based upon this memorandum, the accompanying Defendant's Proposed Findings Of Uncontroverted Fact, the accompanying Declaration of John A. Kolar In Opposition To Rockwell's Summary Judgment Motion And In Support Of The Government's Cross-Motion, and the exhibits submitted with that Declaration. The Government also cross-moves for summary judgment pursuant to RCFC 56(b) based on the same accompanying materials.

## I. PRELIMINARY STATEMENT

The Government is entitled to judgment as a matter of law that it did not breach the Rockwell-DOE contract when the Secretary of Energy, in view of a criminal investigation implicating DOE's then Manager of the Albuquerque Operations Office, Mr. Bruce Twining,

removed Mr. Twining from substantive decision-making over Rockwell's award fee determinations, and exercised that authority himself and through DOE Headquarters' officials of his choosing. By statute, the Secretary of Energy was vested with plenary authority over personnel, organizational and contracting decisions within the Department of Energy. Mr. Twining's authority was based upon a chain of delegations from the Secretary in which the Secretary retained authority to act directly on delegated matters whenever he determined that doing so was necessary or appropriate.

The Secretary's actions did not breach the contract, because the contract permitted any contracting officer "acting as the Manager of Albuquerque Operations" to decide the award fee. The Secretary acted legally when he, in his capacity as the paramount contracting officer of DOE, "act[ed] as the Manager of Albuquerque Operations" in deciding Rockwell's award fees. Consequently, the Government is entitled to judgment as a matter of law that there was no breach of the contract.

Moreover, the contract placed the decision regarding award fees within DOE's sole discretion. Pursuant to the contract's terms, DOE had authority to issue an award in any amount, or no amount, based upon DOE's subjective determination. In the absence of an allegation that the award fee amounts decided by DOE's Headquarters were arbitrary or capricious–something

Rockwell has not alleged[1]--DOE's decision on the award fees is not subject to review by this Court.

Alternatively, if there was a breach and DOE's fee decision could be subject to review, Rockwell suffered no legal damages. Rockwell simply bargained for the right to have an award fee determined by a person or persons with adequate on-the-ground knowledge regarding the quality (or lack of quality) of its performance. Upon taking over substantive oversight of Rocky Flats, DOE's Secretary implemented measures which ensured that Headquarters had full information when it evaluated Rockwell for purposes of determining the award fees. Therefore, since Rockwell received a fully informed evaluation, Rockwell suffered no legal damages, and this case should be dismissed.

Finally, the uncontroverted facts demonstrated that Rockwell waived any purported right to have Mr. Twining decide the award fee.[2] Rockwell, through its highest corporate officials,

---

[1] In the complaint, Rockwell did allege that "[b]y abdicating his discretion to make award-fee determinations to his DOE superiors in Washington, D.C., the AFDO abused the discretion provided him under the Contract in determining Rockwell's award fee." Complaint, ¶¶ 32, 36. Rockwell does not allege, however, that DOE Headquarters acted arbitrarily or capriciously regarding the amounts of fee it ultimately awarded to Rockwell. Headquarters did not for the reasons set forth in Section C of the Argument, below. As for the allegation about Mr. Twining, the uncontroverted facts demonstrate that it was the Secretary of Energy who removed authority from Mr. Twining in view of Mr. Twining's status as a subject of the criminal investigation; it was not Mr. Twining's decision. Pursuant to law, Mr. Twining would have had to recuse himself in any event. The uncontroverted facts set forth below demonstrate that the Secretary acted properly, and consistently with the terms of Rockwell's contract, in deciding to remove Mr. Twining.

[2] In its Opinion and Order of March 10, 2006, the Court precluded the Government from amending its answer to add the affirmative defense of waiver. The Court ruled, however, that the Government "may pursue its theory that estoppel embraces . . . waiver." Rockwell's Ex. 32 at 14. We demonstrated in Section D of the Argument, below, that the affirmative defense of estoppel does encompass the defense of waiver.

acquiesced in DOE Headquarters' assumption of the award fee process. Accordingly, Rockwell is barred by the affirmative defense of waiver from recovering on its claim.[3]

II. QUESTIONS INVOLVED

1. Whether DOE acted in accordance with the terms of the contract when the Secretary of Energy, pursuant to his reservation of authority as DOE's principal contracting officer, took over substantive oversight of Rocky Flats, including the determination of Rockwell's award fees, after the nominal Manager of Albuquerque Operations, Mr. Bruce Twining, became a subject of an investigation of possible environmental crimes by Rockwell at the site?

2. Whether DOE's decisions regarding Rockwell's award fees are subject to review by this Court where the contract committed those decisions to the discretion of the contracting officer, and Rockwell has not alleged that the decisions were arbitrary or capricious?

3. Whether, even if DOE Headquarters' actions breached the contract, Rockwell suffered no legal damages because it received the benefit of its bargain in the form of award fee decisions by officials who were fully informed regarding its performance?

[3] Rockwell annexes to its motion an excerpt from the Federal Register in which DOE took the position that an extension or modification of a Management and Operations contract is "substantively and legally . . . an award of a new contract." See Rockwell's Memorandum at 33. Following receipt of Rockwell's motion, defendant's counsel of record confirmed with DOE that this continues to be DOE's view. DOE's position, as applied to this case, suggests that the 1986 contract under which Rockwell was found liable for violations of the False Claims Act, is a different contract than the 1989 Contract, which is the one at issue in this case. We do not concede that point. However, in light of DOE's position, the Government will not pursue the affirmative defenses of prior material breach and the Special Plea in Fraud, and the Court need not reach Rockwell's primary argument that these defenses are barred by res judicata or collateral estoppel.

4. Whether the theory that Rockwell waived its purported right to an award fee determination by Mr. Twining is embraced within the Government's affirmative defense of estoppel such that the Government may assert waiver notwithstanding the Court's denial of the Government's motion to amend its answer?

5. Whether Rockwell's claim is precluded by the affirmative defense of waiver?

## III. STATEMENT OF THE CASE

### A. The June 6, 1989 FBI/EPA Raid and DOE Headquarters' Response Thereto

On June 6, 1989, approximately 70 agents of the FBI and EPA served a search warrant on the Rocky Flats Plant looking for evidence with respect to alleged environmental crimes being committed by Rockwell and possibly by DOE officials.[4] At the same time, federal agents also came to the Albuquerque Operations Office to search for documents.[5]

Shortly prior to the raid, the Department of Justice informed Secretary of Energy Watkins, Deputy Secretary W. Henson Moore, and Under Secretary John Tuck-collectively known as "DOE's Secretariat"–about the upcoming raid on the condition that they not inform field officials lest the investigation be stymied.[6] Mr. Twining, the Manager of Albuquerque Operations, was not to be told in advance.[7]

---

[4] Ex. 9, Deposition of Ed Goldberg in *Stone v. Rockwell*, 4/23/98, pp. 12-14; Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, p. 16; Ex. 11, Search Warrant Affidavit, pp. 1, 14-15, 65, 96 and 100.

[5] Ex. 15, Deposition of Bruce Twining in *Stone v. Rockwell*, Vol. I, 4/7/98, p. 20.

[6] Ex. 12, Deposition of James D. Watkins in *Stone v. Rockwell*, 4/29/94, pp. 104-105; Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 11, 13-14; Ex. 13, Deposition of John C. Tuck in *Stone v. Rockwell*, 4/27/98, pp. 14, 23-24.

[7] Ex. 14, Deposition of Troy Wade in this proceeding, 9/21/94, p. 28.

Secretary Watkins was briefed on the contents of the search warrant affidavit by the Justice Department.[8] The search warrant affidavit alleged, among other things, that there was probable cause to believe that DOE officials and/or Rockwell had committed environmental crimes, and had concealed and made false statements about those violations.[9] Deputy Secretary Moore was aware that DOE field employees faced the risk of indictment after the raid. Those employees were very concerned about potential exposure, and some threatened to retire from DOE due to their concern.[10] Albuquerque's Manager Bruce Twining was personally concerned that he might be indicted.[11]

Secretary Watkins concluded that, because Mr. Twining was a potential "party" to the investigation underway at Rocky Flats, DOE Headquarters would have to bypass the Albuquerque Office and "take more positive control of the situation."[12] Accordingly, Secretary Watkins removed Mr. Twining from substantive oversight responsibility with respect to the Rockwell.[13]

Secretary Watkins appointed Ed Goldberg as Acting Manager of the Rocky Flats Office in order to have someone in charge there who was not a "party" to the criminal investigation, and who would not be perceived by the FBI as interfering with the investigation. Watkins wanted

---

[8] Ex. 12, Deposition of James D. Watkins in *Stone v. Rockwell*, 4/29/94, p. 119.

[9] Ex. 11, Search Warrant Affidavit, pp. 14-15, 65, 96, and 100.

[10] Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 33-35.

[11] Ex. 16, Deposition of Bruce Twining in *Stone v. Rockwell*, Vol. II, 4/8/98, p. 272.

[12] Ex. 17, Deposition of James D. Watkins in this proceeding, 4/29/94, pp 27-29.

[13] Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/93, p. 68; Ex. 15, Deposition of Bruce Twining in *Stone v. Rockwell*, Vol. I, 4/7/98, p. 115; Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 42-43.

Goldberg to report directly to DOE Headquarters outside "the Twining circuit."[14] Under Secretary Tuck issued a memorandum on the day of the raid so directing. Thereafter, Mr. Twining's only role was the ministerial task of continuing to provide administrative assistance to Mr. Goldberg.[15]

At the same time, Secretary Watkins took measures to ensure that DOE Headquarters had in-depth knowledge regarding environmental conditions at the plant, and the quality (or lack thereof) of Rockwell's performance.[16] For example, when Mr. Goldberg arrived at Rocky Flats on June 6, 1989, Mr. Goldberg brought with him a team of 50 or so experts to establish an environmental, safety and health baseline for Rocky Flats Plant. This team presented Mr. Goldberg and DOE management officials with information on a daily and weekly basis.[17] Mr. Goldberg reported to Secretary Watkins on a daily basis, mostly through the Under Secretary John Tuck and a special assistant to the Secretary named Leo Duffy.[18] Beginning as early as June 16, 1989, the Rocky Flats Office began sending daily report memorandum, as well as

---

[14] Ex. 17, Deposition of James D. Watkins in this proceeding, 4/29/94, pp 27-29; Ex. 18, June 6, 1989 Memorandum from John C. Tuck to Bruce Twining and E.S. Goldberg.

[15] Ex. 18, June 6, 1989 Memorandum from John C. Tuck to Bruce Twining and E.S. Goldberg; Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 36-37. Subsequently, Under Secretary Tuck revised the reporting arrangement so that the Rocky Flats Area Office reported to the Assistant Secretary for Defense Programs in DOE Headquarters, instead of directly to him. Ex. 29, July 21, 1989 Memorandum from John C. Tuck to Bruce Twining and E.S. Goldberg.

[16] Ex. 23, Trial Testimony of James D. Watkins in *Stone v. Rockwell*, 3/16/99, pp. 3369-3370.

[17] Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 55-56; Ex. 19, Trial Testimony of Ed Goldberg, 3/22/99, p. 4410.

[18] Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 103-104; Ex. 19, Trial Testimony of Ed Goldberg in *Stone v. Rockwell*, 3/22/99, p. 4411.

bi-weekly reports and weekly highlights of the operations at the Rocky Flats Office, to DOE Headquarters.[19] Mr. Goldberg found there was considerable evidence of a lack of clear lines of responsibility for safe operations, a lack of adequate procedures to assure safe operations, and a lack of conformance to procedures.[20]

Deputy Secretary Moore accompanied the FBI and EPA agents onto the Rocky Flats site on the day of the raid, June 6, 1989, and remained there for two weeks personally observing conditions at the plant. Moore visited Rocky Flats again for another week a month or two later. Within a couple of days after the raid, Deputy Secretary Moore became aware of many important infractions that were not being resolved.[21]

Also on the day of the raid, DOE Headquarters formed a "special assignment team," later referred to as a "Tiger Team," to provide DOE Headquarters with an independent evaluation of operations and practices at the Rocky Flats Plant. The Tiger Team included approximately 50 skilled personnel, including DOE officials and contractor personnel from all over the country. The team began gathering data regarding the Rocky Flats Plant operations in early June and was onsite from June 19 through July 14, 1989.[22] On August 19, 1989, the Tiger Team issued its final written report titled, "Assessment of Environmental Conditions at the Rocky Flats Plant.[23]

---

[19] Ex. 24, Samples of Reports.

[20] Ex. 25, June 22, 1989 draft Memorandum from Edward S. Goldberg to John Tuck.

[21] Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 11, 20, 24.

[22] . Ex. 26, Assessment of Environmental Conditions at the Rocky Flats Plant, August 1989 (hereinafter "Tiger Team Report"), Introduction, pp. 1-1 - 1-5.

[23] Exs. 26 through 26-E. We have divided the Tiger Team Report into parts under different exhibit numbers due to its volume. Exhibit 26 consists of the title page, the Executive Summary, the Introduction (Section 1.0), and the audit findings on air (Section 2.0). Exhibit 26-

The Tiger Team report assessed Rockwell's environmental, safety and health deficiencies in far greater detail than had Albuquerque's May 1989 award fee evaluation.[24]

Prior to the issuance of the Tiger Team's formal report, Deputy Secretary Moore was receiving verbal briefings from the Team.[25] Deputy Secretary Moore believed that the Tiger Team was looking more deeply into Rockwell's ES&H deficiencies than Mr. Goldberg had been able to do, and that DOE Headquarters acted on Rockwell's award fee with better information than Goldberg had available.[26]

B. The 89/1 Award Fee Decision

Prior to the raid, Mr. Twining had submitted his recommendation that Rockwell receive an award fee of $5,176,482 for plant operations for the 89/1 period to Mr. Troy Wade, DOE Headquarters' Acting Assistant Secretary for Defense Programs, and asked for Mr. Wade's concurrence.[27] Mr. Twining was comfortable with that recommendation based on the

---

A consists of the audit findings on surface water (Section 3.0), and groundwater (Section 4.0). Exhibit 26-B consists of the findings on waste management (Section 5.0). Exhibit 26-C consists of the findings regarding toxic and chemical materials (Section 6.0) and radiation (Section 7.0). Exhibit 26-D contains the findings on quality assurance (Section 8.0) and inactive waste sites and releases (Section 9.0). Finally, Exhibit 26-D contains the audit findings on the National Environmental Policy Act. Pages of the report which the writers intentionally left blank have been omitted from the copy submitted herewith.

[24] Compare Exs. 26 through 26-E, The Tiger Team Report to Ex. 30, (the PERB's May 17, 1989 Award Fee Performance Review.

[25] Deposition of Henson Moore in this proceeding, 4/29/94, pp. 42, 45; Deposition of Henson Moore in *Stone v. Rockwell*, pp. 67-68.

[26] Ex. 31, Deposition of Henson Moore in this proceeding, 4/29/94, pp. 41-43; Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 67-68.

[27] Plaintiff's Ex. 5, Stipulation ¶ 1; Ex. 32, May 31, 1989 Memorandum from Bruce Twining to Troy E. Wade, II.

information he had up to that point.[28] At the time he received Mr. Twining's recommendation, however, Mr. Wade was aware of the criminal investigation underway at Rocky Flats and the upcoming raid. Mr. Wade had been asked not to inform Mr. Twining of the criminal investigation. Mr. Wade concluded that it would be prudent to make a final award fee determination for Rockwell based on Mr. Twining's recommendation in view of the ongoing investigation.[29]

After the raid, DOE Headquarters asked Mr. Goldberg to review Mr. Twining's recommendation in light of new information that was being uncovered by the team performing the detailed review of Rocky Flats.[30] In July 1989, Mr. Goldberg made a recommendation to Mr. Twining of an award fee of $3,628,622 for plant operations for the 89/1 period.[31]

Mr. Twining believed Mr. Goldberg was more fully informed about Rockwell's performance than he had been when he made his initial May 1989 recommendation of an award fee of $5,176,482 for plant operations.[32] Mr. Twining felt there were many more DOE people looking at the plant in intimate detail than there had been before the raid.[33] Mr. Twining

---

[28] Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/93, p. 53.

[29] Ex. 14, Deposition of Troy Wade in this proceeding, dated 9/21/94, pp. 28-29.

[30] Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 40-42, 45-46, 66.

[31] Plaintiff's Ex. 5, Stipulation, ¶ 5; Ex. 8, Deposition of Bruce G. Twining in this proceeding, 2/23/93, pp. 69-70, 76, 93.

[32] Ex.8, Deposition of Bruce Twining in this proceeding, 2/23/93, pp. 69-70, 76, 93.

[33] Ex.8, Deposition of Bruce Twining in this proceeding, February 23, 1993, p. 90.

concluded that he and the PERB had graded Rockwell too high on Environmental, Safety and Health (ES&H) performance in May 1989.[34]

In August 1989, Mr. Twining modified his original May 1989 recommendation to reflect the input by Mr. Goldberg, and recommended to DOE headquarters that Rockwell receive an award fee of $3,628,622--the same amount recommended by Mr. Goldberg--for plant operations for 89/1. Mr. Twining was comfortable with the lower grade of 79 for ES & H that Goldberg gave Rockwell.[35]

DOE Headquarters subsequently lowered further Rockwell's grade for ES & H performance. Admiral Jon Barr, DOE's Deputy Assistant Secretary Military Applications, was involved in deciding that DOE Headquarters would lower the grade during the 89/1 award fee period, and later for the 89/2 period.

Admiral Barr assumed the position of Deputy Assistant Secretary for Military Applications beginning in June 1989, contemporaneous with the FBI/EPA raid.[36] During the latter half of 1989, Admiral Barr traveled to Rocky Flats once per month. Beginning in early 1990, he traveled there once every two or three months.[37] Admiral Barr also received information from people in his office who made trips to Rocky Flats, and from on-site people

---

[34] Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/93, pp. 73, 111-112; Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, p. 61.

[35] Ex. 8, Deposition of Bruce G. Twining in this proceeding, 2/23/93, pp. 69-70, 76, 91, 93, 111.

[36] Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 7-9. Prior to taking the position at DOE, Admiral Barr had served in the Navy Nuclear Power Program for 27 years. Id.

[37] Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, p. 40.

like Mr. Goldberg. Those reports reflected things that had occurred at the plant during the 89/1 award fee grading period from October 1, 1988 through March 31, 1989.[38]

In August 1989, a DOE Headquarters Criticality Assessment Team completed a review of the Rocky Flats Plant Criticality Safety Program.[39] This team was to determine whether criticalities–uncontrolled nuclear chain reactions–had occurred at Rocky Flats. If a criticality did occur under certain conditions, it could send fission fragments into a local area and thereby harm people in the location.[40]

The experts found that none had occurred, but they also found that there were "multi-tens" of kilograms of plutonium in the duct-work in several buildings at Rocky Flats, and that this plutonium had gotten into the duct-work through long-term improper operation of glove boxes at the site. They further found that there was a disturbing lack of knowledge on the part of Rockwell people regarding the form or amount of plutonium in the duct-work, and a lack of adequate concern for the problem by Rockwell.[41]

Another serious deficiency in Rockwell's performance was the "chromic acid spill." Admiral Barr believed the seriousness of the "chromic acid spill," although known to Albuquerque officials when they were evaluating Rockwell's award fee, was not adequately appreciated by those officials. In Admiral Barr's opinion, the spill was not an isolated

---

[38] Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 18-19, 98.

[39] Ex. 28, August 17, 1989 Bi-Weekly Report from Edward S. Goldberg to John L. Meinhardt.

[40] Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 20-23.

[41] Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 20-21.

deficiency, but rather it was indicative of systematic weakness on Rockwell's part toward safety alarm systems.[42]

Admiral Barr believed there was a fundamental philosophy of operating a nuclear facility which would minimize the likelihood of serious problems. He had lived that philosophy during his 27 years in the Navy Nuclear Power Program. Admiral Barr concluded that this philosophy had never been present at Rocky Flats, and that Rockwell's overall running of the plant fell below a standard that was appropriate given the potential for serious accidents.[43] Indeed, the more Admiral Barr learned about conditions at Rocky Flats, the lower the award fee he believed Rockwell should receive.[44]

On September 20, 1989, John L. Meinhardt, the Acting Assistant Secretary for Defense Programs in DOE Headquarters advised Albuquerque Operations that the award fee should be downwardly adjusted in the area of ES&H. Meinhardt indicated that Rockwell's performance warranted an ES & H grade of 65.25, resulting in an award fee of $2,716,307 for plant operations, plus $186,591 for PRMP/PROVE, totaling $2,902,898.[45]

Mr. Meinhardt's September 20, 1989 to Mr. Twining also attached a draft letter for Mr. Twining to send to Rockwell informing them of the award fee and a draft Performance

---

[42] Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 34-37.

[43] Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 37-38, 40, 86-88.

[44] Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, p. 98.

[45] Ex. 33, September 20, 1989 Memorandum from John L. Meinhardt to Bruce Twining.

Evaluation Report for the 89/1 period.[46] Mr. Twining was comfortable with the 65.25 grade Meinhardt gave Rockwell for ES & H.[47]

In deciding what award fee DOE Headquarters felt should be awarded to Rockwell, Deputy Secretary Moore took into account the Tiger Team report.[48] Moore believed that the Tiger Team was looking more deeply into Rockwell's ES&H deficiencies than Goldberg had been able to do, and that DOE Headquarters acted on Rockwell's award fee with better information than Goldberg had available.[49] Deputy Secretary Moore believed that the decision Headquarters made on the award fee fairly reflected Rockwell's performance given all of the deficiencies he had observed and that the Tiger Team had reported.[50]

C. The 89/2 Award Fee Decision

On September 12, 1989, Secretary Watkins announced the appointment of David P. Simonson as Manager of the Rocky Flats Office of DOE.[51] In November1989, DOE Headquarters sent a team of around 50 people to take another comprehensive look at Rocky Flats. Admiral Barr led one branch of the team, and Mr. Starostecki, another Headquarters official, led the other. The team spent four days at the plant. This review discovered numerous deficiencies in virtually all areas. The review indicated poor performance by Rockwell across

---

[46] Ex. 33, September 20, 1989 Memorandum from John L. Meinhardt to Bruce Twining.

[47] Deposition of Bruce Twining in this proceeding, 2/23/94, p. 111.

[48] Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 133-134.

[49] Ex. 31, Deposition of Henson Moore in this proceeding, 4/29/94, pp. 41-43; Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 67-68.

[50] Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, p. 138.

[51] Ex. 34, September 12, 1989 DOE News Release.

the board, and led to a halt of weapons production. DOE subsequently discovered that it was very difficult to effect corrections to the identified problems, because Rocky Flats operational capabilities had become so flawed during Rockwell's management.[52]

On December 6, 1989, Mr. Simonson, the Manager of the Rocky Flats Area Office, forwarded a memorandum to DOE Headquarters containing his preliminary view of Rockwell's performance, and recommending an award fee for the April 1, 1989 through September 30, 1989 of $3,114,245, plus $628,982 for PRMP/PROVE, for a total payment of $4,176,077.[53]

Following this recommendation, Secretary Watkins, Under Secretary Tuck, and Admiral Barr made the decision to appoint Nelson as Rocky Flats Area Manager in place of Mr. Simonson. Mr. Nelson, like Admiral Watkins and Admiral Barr, was a veteran of the Navy's Nuclear Power Program.[54] On February 26, 1990, Mr. Nelson wrote to Rockwell and informed it that DOE had determined that Rockwell earned an award fee of $1,579,639, plus a base fee of $432,850, for a total payment of $2,012,489.[55]

## IV. ARGUMENT

The Government is entitled to summary judgment because the actions by Secretary Watkins and DOE Headquarters following the FBI/EPA raid did not breach the contract; the award fees determined by DOE's Headquarters are not reviewable by this Court; Rockwell did not suffer legal damages even if Headquarters's conduct constituted a breach and the award fees

---

[52] Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 151-152.

[53] Ex. 35, December 6, 1989 Memorandum from David P. Simonson to John C. Tuck.

[54] Ex. 36, Deposition of Robert Nelson in this proceeding, 11/9/92, pp. 22-23, 27.

[55] Ex. 37, February 26, 1990 Letter from Robert M. Nelson, Jr. To Dominick J. Sanchini.

are reviewable; and, finally, Rockwell waived its right to insist upon an award fee determined by DOE Manager Twining in view of acquiescence by Rockwell's highest corporate officials in having the award fees determined by DOE's Headquarters.

A. DOE Headquarters's Actions Did Not Constitute a Breach

Rockwell's breach of contract claim is premised upon a fundamental misreading of the contract. Rockwell asserts that DOE improperly "removed decision-making authority from the AFDO [Award Fee Determination Official] and placed it instead in top DOE officials in Washington, D.C." (Complaint ¶¶ 31, 35). Rockwell's claim is without a basis in fact or law. Nothing in the contract restricts the inherent authority of the Secretary of the Department of Energy from administration of the personnel of that Department nor limits the right of the Government to protect itself from conflicts of interest in the administration of its contracts. The fact that DOE Headquarters removed Mr. Twining from substantive authority over the award fee determinations, and made the decision itself, does not establish a breach of the contract. Furthermore, Rockwell relies upon cases involving contracts which are clearly distinguishable from this contract and otherwise inapposite.

Rockwell attempts to characterize the contract as requiring one and only one DOE official, Mr. Twining as the titular Manager of Albuquerque Operations, to make the subjective determination of the amount of the award fee. Rockwell's characterization is wrong. First, the contract does not identify Mr. Twining by name, nor any other Government official by name. Second, the pertinent language does not require the Manager of Albuquerque Operations to be the Award Fee Determination Official (AFDO). Rather, the contract provision reads:

> The amount of the award fee actually paid to the Contractor shall be determined by the Award Fee Determination Official (Manager, **or anyone acting as Manager**, Albuquerque Operations) in

> accordance with the provisions of subparagraph (b)(2) of this clause.

Rockwell's Ex. 1, Mod M124 clause 62(b)(1), pp. 130-31 (emphasis added). Thus, the contract provision merely establishes an AFDO and provides only parenthetical guidance on the officials who could serve as the AFDO. The guidance provided in the clause expressly permits an individual other than the person holding the manager title to "act as the manager."

"Anyone acting as Manager, Albuquerque" means any official of DOE carrying out the same functions as Mr. Twining with respect to the subject matter in question. There is nothing in this language prohibiting the Secretary of Energy from withdrawing the contracting officer authority he had delegated to Mr. Twining for purposes of deciding Rockwell's award fee, and investing that authority in himself pursuant to his reservation of contracting officer authority, or in others of his choice. This is what Secretary Watkins did in this case for a good and sufficient reason, i.e., that Mr. Twining, and potentially his subordinates at Albuquerque, were subjects of the criminal investigation of environmental crimes at Rocky Flats.

The language of the Contract provision at issue in this case is different than the provisions in the cases upon which Rockwell relies for support. The contract provisions in those cases singled out **one and only one** Government official by title or by name who, consistent with the contract, was authorized to make a contract determination. For example, in *Climatic Rainwear Co. v. United States*, 88 F. Supp. 415 (Ct. Cl. 1950), the contract identified a Captain Ely R. Callaway as the Contracting Officer. *Id.* at 419. The Court found that Callaway had nothing to do with the decision challenged by the contractor. The Court stated "[n]o one other than Capt. E.R. Callaway had been designated in Contract 20481 as the Contracting Officer." *Id.* at 420. The Court contrasted the provision limiting the Contracting Officer authority to

Callaway with the provision in another contract at issue in the case which defined "Contracting Officer" to

> include any and all Contracting Officer, acting within the scope of the orders appointing them Contracting Officers and their duly appointed successors or representatives.

*Id*. at 420-21.

Similarly, in *N.Y. Shipbuilding Corp. v. United States*, 385 F.2d 427 (Ct. Cl. 1967), the pertinent language provided:

> Authority to give directions under this contract and to approve for the Government actions taken by the Contractor in the performance of the contract work shall be vested in . . . the Nuclear Projects Officer of the Maritime Administration.

*Id.* at 429. The court noted this language was

> [u]nlike the usual Government construction contract, which vests in an official designated in the contract as the "contracting officer" both the authority to act for the Government in the day-to-day administration of the contract and the quasi-judicial function of deciding disputes concerning questions of fact arising under the contract, [because] this agreement did not contain any reference to a "contracting officer."

*Id*.

The language of the contract at issue here is **not** like the language in the cases cited by Rockwell: it expressly contemplated that other contracting officers, acting within the scope of their authority, could act in place of Manager Twining in determining Rockwell's award fees.[56]

---

[56] The other decisions cited by Rockwell all involved contracts which vested decision-making authority in "the contracting officer,"*see, e.g., Pacific Architects & Eng'rs, Inc. v. United States*, 491 F.2d 734, 744 (Ct. Cl. 1974), without additional language analogous to that in the instant contract, such as "or anyone acting as the contracting officer," indicating that other persons could serve in place of the usual contracting officer for purposes of performing the function in question. For this reason, those decisions are inapposite.

This Contract states that the award fee is to be decided by a contracting officer:

> Payment for the allowable costs as hereinafter defined and of the base fee and so much, if any of **the award fee as may be determined by the Contracting Officer**, as hereinafter provided, shall constitute full and complete compensation for the performance of the work and furnishing of services under this contract.

Rockwell Ex. 1, Mod. M124 clause 62(a), p. 130 (emphasis added). In another clause, the contract provides:

> If performance of the work under this contract is terminated in whole by the Government, the base fee and award fee of the Contractor shall be prorated to and including the effective date of such termination. The **Contracting Officer** shall then determine the portion, if any, of the prorated maximum available award fee which shall be awarded to the Contractor for the evaluation period, or part thereof, which ends on the effective date of the termination.

Ex. 6, Mod M124, clause 84(b)(5) (emphasis supplied). The Contract defines "Contracting Officer" as

> **a** person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings.

Rockwell Ex. 1, Mod M124, clause 1(b), p. 2 (emphasis supplied)

Therefore, it is clear that the term, as used in this contract, taken together with the language "anyone acting as Manager, Albuquerque," means that the award fee could be determined by any duly designated contracting officer(s) acting in the function of Manager, Albuquerque--not one official only, Mr. Twining. *Climatic Rainwear Co. v. United States* at 420-21. The Secretary of Energy acted properly under the circumstances of this case, and in light of the language appearing in the instant contract, in removing the award fee authority from Mr. Twining, and "acting as Manager, Albuquerque" in his own right, once Mr. Twining came

under investigation for possible complicity with Rockwell in committing environmental criminal offenses.

Pursuant to statute and regulation, the Secretary, as the head of the agency, had plenary authority over personnel, organizational, and contracting decisions within the Department of Energy, and the authority of all lesser Department officials, including Mr. Twining flowed down from the Secretary through a chain of delegations. Those delegations reserved to the Secretary the authority to exercise all delegated authority directly whenever in his judgment the exercise of that authority was necessary or appropriate to administer the functions vested in him.

In establishing the Department of Energy, Congress provided that "[t]he Department shall be administered . . . under the supervision and direction of the Secretary." Department of Energy Organization Act, Pub. L. 95-91 § 201, 91 Stat. 565, 569 (1977), codified as 42 U.S.C. § 7131. Congress authorized the Secretary to "appoint and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out such functions." 42 U.S.C. § 7231(a). The Secretary was empowered to "establish, alter, consolidate or discontinue such organizational units or components with the Department as he may deem to be necessary or appropriate." 42 U.S.C. § 7253(a). The Secretary was given authority to

> enter into and perform such contracts . . . with private organizations and persons, and to make such payments (in lump sum or installments, and by way of advance or reimbursement) as he may deem to be necessary or appropriate to carry out functions now or hereafter vested in the Secretary.

42 U.S.C. 7256(a). Finally, Congress provided that the Secretary

> may delegate any of his functions to officers and employees of the Department as he may designate, and may authorize such successive delegations of such functions within the Department as he may deem to be necessary or appropriate."

42 U.S.C. 7252.

Through a series of delegation and redelegations orders, the Secretary vested certain of his authority in subordinate officials, and those officials in turn delegated authority to the Manager of Albuquerque, Mr. Twining. The Secretary, however, expressly retained the authority to exercise the delegated functions directly "whenever in his judgment the exercise of such authority is necessary or appropriate to administer the functions vested in him."[57]

Importantly, these delegations were made with the express proviso that the delegated authority could only be exercised consistently with " the rules and regulations of DOE and the policies and procedures prescribed by the Secretary or his delegate." See, e.g., Delegation Order

---

[57] The Secretary in Delegation Order No. 0204-98 delegated authority over personnel decisions and contracting decision, including the designation of contracting officers, to the Assistant Secretary, Management and Administration. See Delegation Order No. 0204-98 (June 14, 1982). The Delegation Order provided, however, that

> In exercising the authority delegated by this Order the delegate shall be governed by the rules and regulations of DOE and the policies and procedures prescribed by the Secretary or his delegate.

Delegation Order No. 0204-98 at 5. Finally, the order contained a reservation of authority:

> Nothing in this Order shall preclude the Secretary from exercising any of the authority so delegated whenever in his judgment the exercise of such authority is necessary or appropriate to administer the functions vested in him.

Delegation Order 0204-98 at 6. The Assistant Secretary, in Redelegation Order No. 0204-98.1, redelegated authority over contracts to the Director, Procurement and Assistance Management, with a reservation of authority "whenever in his judgment the exercise of such authority is necessary or appropriate to administer the functions vested in him." See Redelegation Order 0204-98.1. Finally, by memorandum dated July 8, 1986, the Director, Procurement and Assistance Management delegated authority over contracts to the Manager of the Albuquerque Operations Office, with a similar reservation of authority.

0204-98 at 5. Any exercise by Mr. Twining of substantive authority over Rocky Flats following the raid would not have been consistent with Government rules and regulations. Government regulations prohibit a contracting officer from acting either when he cannot remain impartial or where there is an actual or apparent conflict of interest. 48 C.F.R. § 3.101-1 provides that

> Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships. While many Federal laws and regulations place restrictions on the actions of Government personnel, their official conduct must, in addition, be such that they would have no reluctance to make a full public disclosure of their actions.

*See also* 48 C.F.R. §§ 1.602-2 (b) ("Contracting officers shall– . . . [e]nsure that contractors receive impartial, fair, and equitable treatment . . . .").

Here, it is undisputable that Mr. Twining had an actual or apparent conflict of interest or otherwise could not remain impartial. The investigation commenced by the June 6, 1989 raid was focused, among other things, on possible complicity between Rockwell and DOE's field officials in committing criminal environmental offenses. Mr. Twining knew that he, and possibly his subordinates at Albuquerque, were subjects of the criminal investigation. Any fee awarded by Mr. Twining to Rockwell might have been construed as a favor to keep Rockwell from implicating him in criminal wrongdoing. *See* 18 U.S.C. § 1510(a) (prohibiting willfully endeavoring by means of bribery to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator). In such extraordinary circumstances, DOE's Secretary acted

appropriately, and fully in compliance with the clear and unambiguous language of the contract, when he removed award fee decision-making authority over Rockwell from "the Twining circuit," and exercised it himself in conjunction with other DOE officials whom he designated.

The legal authority rested with the head of the agency, and it was entirely proper for him to make the award fee determination, especially where, as here, the head of the agency concluded that any decision by Mr. Twining and others in "the Twining circuit" might be tainted by a real or apparent conflict of interest or lack of impartiality. As the Court declared in *United States v. Adams*, 74 U.S. 463, 477 (1868):

> . . . [W]hether [the Secretary] makes the contracts himself, or confers the authority upon others, it is his duty to see that they are properly and faithfully executed; and if he becomes satisfied that contracts . . . are being unfaithfully executed, it is his duty to interpose, arrest the execution, and adopt effectual measures to protect the government against the dishonesty of subordinates. This duty is too plain and imperative to call for comments. As the head of the department under whose charge the contracts were made and were being carried into execution, and over which he had the superintendence and control, he was responsible to the government for any detriment to its interests which it was reasonably within his power to prevent or remedy. We do not agree, therefore, that there was anything unusual, harsh, or unjustifiable on the part of the secretary, if there existed well-grounded suspicions or facts unexplained, tending strongly to the conclusion that contracts had been entered into, and debts incurred . . . in disregard of the rights of the government, in issuing the order to suspend the payment of all claims against it. . . . He would have been recreant in his duty if he had acted otherwise.

Rockwell itself recognized that, in light of the extraordinary events surrounding Rocky Flats, Secretary Watkins acted reasonably and properly in taking Mr. Twining out of the loop. Following the raid, Rockwell's highest corporate officials bypassed Mr. Twining completely, and communicated directly with Secretary Watkins about management oversight of Rocky Flats. When DOE Headquarters made it clear to Rockwell's corporate officials that the award fee was

under consideration at Headquarters, Rockwell's officials acquiesced in Headquarters' role in the process.[58]

In summary, where, as here, there were apparently "well-grounded suspicions or facts unexplained" tending to indicate that Mr. Twining might have been acting dishonestly in the administration of Rockwell's contract, the Secretary of Energy " would have been recreant in his duty," had he not transferred Mr. Twining's substantive oversight of Rocky Flats, including the determination of the award fee, to others "acting as Manager, Albuquerque" for that limited purpose. *United States v. Adams*, 74 U.S. at 477. Because the express language of the contract allowed the award fee to be determined by "anyone acting as Manager, Albuquerque," Secretary Watkins' actions in so doing did not breach the contract.

B. The Award Fee Determinations and Subsequent Amounts Paid to Rockwell Were Entirely Within the Discretion of the Government and Cannot Be Reviewed by The Court

The award fee determinations made by the DOE officials who were duly managing Rocky Flats following the FBI/EPA raid are not reviewable by this Court given that the decision on the amount of the award fee to be paid was entirely within the Government's discretion. The contract provides as follows:

> Payment for the allowable costs as hereinafter defined and of the base fee and **so much, if any of the award fee as may be determined by the Contracting Officer**, as hereinafter provided, shall constitute full and complete compensation for the performance of the work and furnishing of services under this contract.

Mod. M124 clause 62(a) (emphasis added). The Termination Clause of the contract states:

[58] See the facts set forth in detail with citations to the evidence in Section E, below, at 35-38.

> If performance of the work under this contract is terminated in whole by the Government, the base fee and award fee of the Contractor shall be prorated to and including the effective date of such termination. The Contracting Officer shall then determine the portion, **if any**, of the prorated maximum available award fee which shall be awarded to the Contractor for the evaluation period, or part thereof, which ends on the effective date of the termination.

Mod M124, clause 84(b)(5). Thus, the contracting officer is authorized by the contract to award as much of the award fee as the contracting officer determines, **including no amount**.

Moreover, the amount of the award fee is determined by the Government upon an entirely subjective basis. The contract provides that "[t]he award fee shall be determined subjectively by the Award Fee Determination Official based on the Contractor's performance in accordance with the Award Fee Plan set forth in Appendix D." Mod M124, clause 62(b)(2). Appendix D provides:

> The Award Fee Determination Official (Manager or anyone acting as Manager, Albuquerque Operations) (AFDO) shall evaluate the Contractor's performance during each evaluation period and will determine the amount of award fee to be paid the Contractor for that evaluation period.

Appendix D, 2. Introduction.

Because the fees are at the Government's option, the merits of award fee decisions are not reviewable. *See George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 305 (2005) (*citing Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854, 859-60 (Fed. Cir. 1997)). "The courts cannot substitute their judgment for those in the Executive Branch entrusted with . . . discretionary duties." *Hirsch v. United States*, 499 F.2d 1248, 1250 (Cl. Ct. 1974). *See also Avtel Services, Inc. v. United States*, 70 Fed. Cl. 173, 190 (Fed. Cl. 2006) ("[T]he court must not substitute its own judgment for that of the agency or contracting officer provided that decision is founded on a reasonable basis, even if reasonable minds might reach different results.").

In *George Sollitt Constr. Co.,* a construction contract provided that the contractor could receive award fees, but the payment of the fees under the terms of the contract was "unilateral" and "discretionary" on the Government's part. The contractor complained that the award fees for some time periods were "unfairly and improperly evaluated." The Court held that "the government's award fee determination is not reviewable on the merits." *Citing Burnside-Ott*, 107 F.3d at 860. In *Burnside-Ott*, the Federal Circuit held that a board of contract appeals could not reverse a contracting officer's affirmance of a Fee Determining Official's exercise of discretion unless it were the result of an arbitrary or capricious decision. *Burnside-Ott* at 859-860. Rockwell has not alleged in its complaint that DOE acted arbitrarily or capriciously in determining Rockwell's award fee for the 89/1 and 89/2 periods. Therefore, those decisions are unreviewable by the Court.

Indeed, as demonstrated below, the award fee was based upon repeated very detailed reviews of all aspects of Rockwell's performance. Thus, there is no basis upon which it can be found that the fee decision was either arbitrary or capricious. Even if the fees are subject to review on the merits, the results of Government's detailed surveys of Rockwell's performance support the Government's decisions to reduce the fees, as shown in the next section.

C. Rockwell Cannot Demonstrate an Entitlement to Damages, Even if DOE Headquarters Breached the Contract, Because Rockwell Received That For Which It Bargained, i.e., A Review by Officials with Local, On-the-Ground Information About Its Performance

Assuming, *arguendo*, that Rockwell could demonstrate that the actions of DOE Headquarters breached the contract (which it cannot–see section A, above), and that the amounts of the award fees granted by DOE is reviewable on the merits (which they are not–see section B, above), Rockwell cannot demonstrate an entitlement to damages. Even if DOE Headquarters's

actions in determining the award fees constituted a breach because Mr. Twining was the one and only DOE official permitted to decide the award fees under the contract, Rockwell nonetheless received the benefit of its bargain through the process DOE Headquarters applied in assessing the award fees.

"The basic purpose in awarding damages for breach of contract, recognized by this court and its predecessor, the Court of Claims, is to place the injured party in as good a position as it would have been in had the contract been fully performed." *Brazos Elec. Power Co-op., Inc. v. United States*, 52 Fed. Cl. 121, 125 (Fed. Cl. 2002), *citing Orange Cove Irrigation District v. United States*, 28 Fed. Cl. 790, 801 (1993); *G.L. Christian & Associates v. United States*, 312 F.2d 418, 423 (Ct. Cl. 1963); *Massachusetts Bay Transportation Authority v. United States*, 129 F.3d 1226, 1232 (Fed. Cir.1997). In bargaining for a provision in the Contract specifying that a local DOE official would decide the award fee utilizing that official's subjective discretion, Rockwell did not bargain for an award fee in any particular amount.[59] Rockwell bargained for a particular process rather than a particular outcome.

The rationale of the process for which Rockwell bargained was to have award fees determined by persons with close, on-the-ground knowledge of Rockwell's performance. As the Court explained in *N.Y. Shipbuilding Corp. v. United States* at 434, the "only rational purpose" of bargaining for a contract provision limiting decision-making to a specified, local government official, is so that the contractor can be assured that the decision is made by

> an official who presumably would know more about the local matter than [an agency's] top officers, with their manifold

---

[59] As noted above, the contract permitted an award in any amount, or in no amount, if that was what the official decided in the exercise of discretion.

> responsibilities and the varied demands on their time and attention . . . a decision rooted in concentration, not in dilution.

The contract language recognizes that ordinarily this will be the individual holding the title of Manager of Albuquerque Operations, **or anyone** acting in that capacity.

Here, notwithstanding DOE Headquarters' involvement after June 6, 1989, Rockwell received exactly what it bargained for: a decision on the award fees for the 89/1 and 89/2 periods by DOE officials who were exercising localized oversight of, and were armed with full knowledge regarding, its performance at Rocky Flats. Rockwell indeed did receive a decision that was "rooted in concentration, not in dilution."[60] Rockwell's complaint in essence is that when DOE, acting through experts dispatched from Headquarters to Rocky Flats, shined a more intense light upon Rockwell's performance, its performance was found to be more deficient than originally thought.

In this regard, Rockwell certainly did not bargain for a decision made by an **uninformed** local official. But, by proposing that damages be measured simply by computing the difference between Mr. Twining's May 1989 recommendation and Headquarters lower, more informed determination, Rockwell is claiming entitlement to a decision made under a veil of ignorance. That is not a reasonable expectation which ought to be enforceable on a breach claim. *In re Briggs Transp. Co.*, 780 F.2d 1339, 1349 (8th Cir. 1985) (what constitutes the bargain whose benefit should be protected turns on factors which reveal the parties' reasonable expectations).

The uncontroverted facts support the conclusion that Mr. Twining's May 1989 recommendation was made without access to all of the facts that later turned up as a result of Headquarters' more intense scrutiny of Rockwell's performance. Following the June 6, 1989

---

[60] See the facts cited above at pages 10-15 of the Statement of the Case.

raid, scores of Headquarters officials swarmed over the plant pro-actively looking for evidence whether Rockwell's management of the operation was up to par. Deputy Secretary Moore and Deputy Assistance Secretary Barr made personal visits and concluded that Rockwell had failed to manage the plant in such a manner as to minimize the risk of serious accidents including possibly nuclear criticalities. DOE found considerable evidence of a lack of clear lines of responsibility for safe operations, a lack of adequate procedures to assure safe operations, and a lack of conformance to procedures. Barr determined that Rockwell was guilty of systematic failure to maintain adequate safety alarm systems. These deficiencies had existed during the 89/1 rating period, and the more Admiral Barr learned about conditions at Rocky Flats, the lower the award fee he believed Rockwell should receive.

Mr. Twining felt his May 1989 "recommendation" (this conclusion by Mr. Twining never became a final "determination") was appropriate based on the information available to him before the FBI/EPA raid. Mr. Twining subsequently acknowledged, however, that after the raid there were many more DOE people looking at the plant in more intimate detail than there had been before the raid, and that these people had more information than Mr. Twining did when he was deliberating over Rockwell's award fees in May 1989. Mr. Twining testified that he was comfortable with the grade Headquarters decided to give Rockwell for ES & H performance based on the fuller information known to Headquarters. In short, Mr. Twining felt he was the less informed official, and that Headquarters acted with more accurate information about the true state of Rockwell's performance.

Indeed, the facts suggest that, had Mr. Twining been able to drill down to the level of detail in reviewing Rockwell's performance as Headquarters had been able to do, and had Mr. Twining received Headquarters' input on the matter, Mr. Twining would have come out the

same way as Headquarters on the final award fee determinations. In July 1989, when Ed Goldberg, the Acting Manager at the Rocky Flats DOE Office, came up with his own lower award fee recommendation, Mr. Twining revised downward his earlier May 1989 recommendation, and made a recommendation which matched Mr. Goldberg's. Mr. Twining believed Mr. Goldberg had access to more information about conditions at Rocky Flats than he had when, in May 1989, he had recommended the $5,176,482 figure for the 89/1 period.

Thus, Rockwell's proposed measure of damages–simply calculating the difference between what less informed field officials "recommended" and what more fully informed Headquarters officials "determined"–lacks logical or legal sense in view of the rationale behind the kind of contract provision for which Rockwell says it bargained. To the contrary, Rockwell did not suffer any legally cognizable damages inasmuch as it received award fee determinations that were the results of the Government's detailed surveys of Rockwell's performance. The fees awarded are the only expectation it reasonably could have harbored given the terms of the contract.

### D. The Affirmative Defense of Waiver is Encompassed within the Affirmative Defense of Estoppel, and Therefore the Government Should Be Permitted to Assert Waiver

In its Opinion and Order of March 10, 2006, the Court precluded the Government from amending its answer to add the affirmative defense of waiver. The Court ruled, however, that the Government "may pursue its theory that estoppel embraces . . . waiver." Rockwell's Ex. 32 at 14.

The term "estoppel" as a matter of law does encompass waiver. "A waiver is in the nature of an estoppel . . . [they] have some elements in common, are maintained on similar principles, and generally the relief asked under each doctrine is the same, i.e., preclusion . . .

'[w]aiver belongs to the family of 'estoppel.'" *Moncel Realty Corp. v. Whitestone Farms*, 68 N.Y.S.2d 673, 677 (N.Y. Sup. 1947). "Waiver is based upon a species of the principle of estoppel and where applicable it will be enforced as the estoppel would be enforced." *AFSCME, Council 4, Local 704 v. Department of Public Health*, 866 A.2d 582, 585 (Conn. 2005). "Estoppel is a species of waiver and where a public official may not waive a public right he cannot be estopped from asserting that right on the part of the general public." *See also Kline v. San Francisco Unified School Dist.,* 104 P.2d 661, 663 (Cal. App. 1940).

The doctrine of "equitable estoppel," or "estoppel in pais," has been defined as "an impediment or bar, by which [someone] is precluded from alleging, or denying, a fact, in consequence of his own previous act, allegation or denial to the contrary." Prosser, *Torts* § 105, at 691 (4th ed.), *quoting* 2 Jacob, *Law Dictionary* 439 (1811). It has two branches. The first is based on a misrepresentation of fact which induces detrimental reliance by another. The second branch

> does not depend upon positive misrepresentation, but is based upon a mere failure to take action. It arises where the party 'stands by' and allows another . . . to incur some liability toward him without informing the other of his mistake.

Prosser, *Torts* at 691.

A waiver is an intentional relinquishment of a known right. *Blacks Law Dictionary* 1580 (6th ed.1990); *see, e.g.*, *Cherokee Nation v. United States*, 355 F.2d 945 (Ct. Cl. 1966); *A Olympic Forwarder, Inc. v. United States*, 33 Fed. Cl. 514, 521 (1995). Thus, waiver is the underlying event upon which estoppel is created. A party's "standing by" while another incurs legal liability to him, which supports an estoppel where it is detrimentally relied upon by the other, *see, e.g., Goodwin v. Hartford Life Ins. Co.*, 491 F.2d 332, 333-34 (3rd Cir. 1974), supports

the defense of waiver if is "voluntary, knowing and intelligent . . . [and] done with sufficient awareness of the relevant circumstances and likely consequences.' " *Reliance Ins. Co. v. United States*, 20 Cl. Ct. 715, 723 (1990), *aff'd*, 931 F.2d 863 (Fed. Cir.1991) (alterations in original) (citations omitted).

As the court explained in *Hanson v. Fidelity Mut. Ben. Corp.*, 13 A.2d 456, 460 (Del. Super. 1940):

> Generally where one in the possession of a right has waived it, he is precluded from afterwards claiming anything by reason of it; and when once waived the right is gone forever. In like manner where one, by his acts or conduct, has estopped himself from the assertion of a right, the right, for the purpose of the particular action, has ceased to exist. Courts, especially in insurance cases, have frequently treated the terms, "waiver" and "estoppel," as convertible terms. While there are essential differences, there is a certain kinship between the two doctrines. **A waiver operates as an estoppel on the party who waives**. *Loftis v. Pacific Mutual Life Ins. Co.*, 38 Utah 532, 114 P. 134. (emphasis added)

Another court explained the interrelationship as follows:

> It is well settled that, at any rate, the same conduct may constitute both an implied waiver and an estoppel, and there may be an estoppel by waiver (Benson v. Borden, supra), it being also well settled that where a party to a transaction induces another to act on the reasonable belief that he has waived, or will waive, certain rights or remedies which he is entitled to assert, he will be estopped to insist on such rights or remedies to the prejudice of the one misled.

*Wright v. Wagner,* 34 A.2d 441, 446 (Md. 1943).

Because waiver is encompassed within the defense of estoppel, the Government should be permitted to assert its affirmative defense of waiver under the Court's ruling of March 10. 2006.

E. The Uncontroverted Facts Establish the Government's Affirmative Defense of Waiver as a Matter of Law

"Waiver requires (1) the existence at the time of the waiver a right, privilege, advantage or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit." *Youngdale & Sons Constr. Co. v. United States*, 22 Cl. Ct. 345, 346 (1991) (*citing Matter of Garfinkle*, 672 F.2d 1340, 1347 (11th Cir.1982)).

In this case, the uncontroverted facts establish the three elements of waiver. At the time of its waiver, Rockwell claims to have had a right to insist upon an award fee decision by the nominal Albuquerque Manager, Mr. Twining. Rockwell was a party to the contract which supposedly created that right, and, therefore, Rockwell actually or constructively knew of the existence of its purported right. Rockwell also acted intelligently and voluntarily to relinquish its right.

On June 13, 1989, a week after the FBI/EPA raid, Rockwell's Board Chairman and Chief Executive Officer (CEO) Donald Beall initiated contact with DOE at the highest level by writing directly to Secretary Watkins, bypassing the Manager of Albuquerque Operations, Bruce Twining. Mr. Beall wrote that the criminal investigation was of serious personal concern to him, and requested an opportunity to discuss Rockwell's management of Rocky Flats personally with Secretary Watkins.[61]

Secretary Watkins made it clear to CEO Beall throughout the June through September 1989 time period that DOE Headquarters was taking over oversight and management of Rocky

[61] Ex. 38, Letter from D.R. Beall to The Honorable James D. Watkins; Ex. 39, Deposition of Donald Beall in this proceeding, 7/18/94, pp. 8-11.

Flats in lieu of Mr. Twining. Indeed, Secretary Watkins encouraged Mr. Beall that Rockwell's corporate management similarly should take a more direct role in Rockwell's oversight of the plant, and Mr. Beall took measures to do so. The two officials exchanged correspondence discussing the management situation at Rocky Flats on June 15, June 28, August 14, August 25, and September 28, 1989. In addition, they spoke in person or on the phone a number of times during the June-September 1989 time frame.[62]

In his correspondence, Secretary Watkins advised CEO Beall that he had effected significant changes in DOE's management of Rocky Flats.[63] Secretary Watkins specifically advised Mr. Beall in August 1989 that he had reorganized the line management to provide that the Rocky Flats Area Office would report directly to the Assistant Secretary for Defense Programs, rather than to Albuquerque, so that DOE Headquarters could more effectively oversee Rocky Flats operations.[64] Mr. Beall testified at his deposition in this proceeding that he did not object when so advised by the Secretary. Beall testified that he believed DOE could "organize their staff as they see fit."[65]

---

[62] Ex. 40, June 15, 1989 Letter from James D. Watkins, Admiral, U.S. Navy (Retired) to Mr. Donald R. Beall, Chairman and Chief Executive Officer, Rockwell International Corporation; Ex. 43, June 28, 1989 Letter from Mr. Beall to Admiral Watkins; Ex. 46, August 14, 1989 Letter from Mr. Beall to Admiral Watkins; Ex. 47, August 25, 1989 Letter from Admiral Watkins to Mr. Beall; Ex. 49, September 20, 1989 Letter from Admiral Watkins to Mr. Beall; and Ex. 48, September 18, 1989 Memorandum to File from Stephen A. Wakefield.

[63] Ex. 40, June 15, 1989 Letter from AdmiralWatkins to Mr. Beall; Ex. 47, August 25, 1989 Letter from Admiral Watkins to Mr. Beall.

[64] Ex. 39, Deposition of Donald Beall in this proceeding, 7/18/94, pp. 35-36.

[65] Deposition of Donald Beall in this proceeding, 7/18/94, pp. 35-36.

Repeatedly during Secretary Watkins' conversations and correspondence with CEO Beall, he complained that Rockwell had not been managing Rocky Flats with sufficient attention to ES & H compliance. Secretary Watkins advised Mr. Beall that he was implementing a new "culture" which placed ES&H compliance on a par with weapons production. He requested that Rockwell submit within 60 days a comprehensive plan indicating how Rockwell would implement the new culture.[66] Mr. Beall testified that he had no problem with Secretary Watkins' changes to the priorities at Rocky Flats to have greater emphasis on ES & H.[67]

In addition to informing Rockwell that oversight of Rocky Flats was being exercised by DOE Headquarters, Deputy Secretary Moore made it clear that Headquarters had assumed control over the award fee determination process. In June 1989, Deputy Secretary Moore publicly announced that DOE was suspending bonus payments for good performance by Rockwell at Rocky Flats.[68] Moore followed up by advising Sam Iacobellis, Rockwell's Executive Vice-President, that DOE was suspending the award fee determination for two to three weeks pending the investigation by the DOE Tiger Team. By letter dated June 20, 1989, Moore confirmed this conversation.[69]

On July 13, 1989, Deputy Secretary Moore informed Rockwell's Mr. Iacobellis that DOE Headquarters was further delaying the pending award fee determination until August 1989, inasmuch as additional time was needed for the Tiger Team to prepare a written report. By letter

---

[66] Ex. 40, June 15, 1989 Letter from AdmiralWatkins to Mr. Beall;

[67] Deposition of Donald Beall in this proceeding, 7/18/94, pp. 28-30.

[68] Ex. 39, Deposition of Donald Beall in this proceeding, 7/18/94, pp. 17-18; Ex. 41, June 17, 1989 New York Times article.

[69] Ex. 42, June 20, 1989 Letter from W. Henson Moore to Mr. Sam Iacobellis.

dated July 14, 1989, Deputy Secretary Moore confirmed this conversation.[70] Mr. Iacobellis testified at deposition in this proceeding that he acquiesced in DOE Headquarters' decision to delay the award fee determination until sometime in August 1989.[71]

This culminated in a September 20, 1989 letter from Secretary Watkins to CEO Beall, in which the Secretary advised Mr. Beall that the award fee determination for the 89/1 period was undertaken at his direction and to expect the award fee to reflect 40 percent of the total possible award fee. In the letter, Secretary Watkins reflected the fact that Mr. Beall had long known that the award fee was being determined by "the Department" at his direction.[72]

Thus, the uncontroverted facts demonstrate that Rockwell waived its purported right to have Manager Twining decide its award fees and that Rockwell did so through its highest corporate officials. The facts show that Rockwell's waiver was "voluntary, knowing and intelligent . . . [and] done with sufficient awareness of the relevant circumstances and likely consequences.' " *Reliance Ins. Co. v. United States*, 20 Cl. Ct. 715, 723 (1990), *aff'd*, 931 F.2d 863 (Fed. Cir.1991) (alterations in original) (citations omitted). Accordingly, the Government is entitled to entry of judgment as a matter of law against Rockwell on the affirmative defense of waiver.

V. <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Rockwell' s motion for summary judgment, and grant defendant's cross-motion.

---

[70] Ex. 44, Memorandum for The File from W. Henson Moore.

[71] Ex. 45, Deposition of Sam Iacobellis in this proceeding, 7/19/94, pp. 28-29, 60-61.

[72] Ex. 49, September 20, 1989 Letter from Admiral Watkins to Mr. Beall.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

s/ John A. Kolar

JOHN A. KOLAR
DONALD WILLIAMSON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 305-9301
Attorneys for Defendant

Dated: July 27, 2006