IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 91-1362 C (Judge Lettow) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h) (1) of the Rules of the United States Court of Federal Claims ("RCFC"), Defendant United States of America submits the following Proposed Findings of Uncontroverted Fact in support of its opposition to Plaintiff Rockwell's Motion for Summary Judgment, and its Cross-Motion for Summary Judgment. These Proposed Findings Of Uncontroverted Fact are based upon the exhibits submitted with the Declaration Of John A. Kolar In Opposition To Rockwell's Summary Judgment Motion.

To assist plaintiff in preparing its response to the requested findings pursuant to RCFC 56(h) (2), Defendant will provide Plaintiff with an electronic copy of this document.

THE SECRETARY OF ENERGY’S AUTHORITY

1. In establishing the Department of Energy, Congress provided that “[t]he Department shall be administered . . . under the supervision and direction of the Secretary.” Exhibit (“Ex.”) 1, Pub. L. 95-91, Title II, § 201 (August 4, 1977), 91 Stat. 565, 569, codified as 42 U.S.C. § 7131.

2. Congress authorized the Secretary to “appoint and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out such functions.”

Ex. 1, 42 U.S.C. § 7231(a).

3. The Secretary was empowered to "establish, alter, consolidate or discontinue such organizational units or components with the Department as he may deem to be necessary or appropriate." Ex. 1, 42 U.S.C. § 7253(a).

4. The Secretary was given authority to

> enter into and perform such contracts . . . with private organizations and persons, and to make such payments (in lump sum or installments, and by way of advance or reimbursement) as he may deem to be necessary or appropriate to carry out functions now or hereafter vested in the Secretary.

Ex. 1, 42 U.S.C. 7256(a).

5. Congress provided that the Secretary

> may delegate any of his functions to officers and employees of the Department as he may designate, and may authorize such successive delegations of such functions within the Department as he may deem to be necessary or appropriate."

Ex. 1, 42 U.S.C. 7252.

<u>THE SECRETARY'S DELEGATION TO THE MANAGER OF ALBUQUERQUE</u>

6. The Secretary in Delegation Order No. 0204-98 delegated authority over personnel decisions and contracting decision, including the designation of contracting officers, to the Assistant Secretary, Management and Administration. Ex. 2, Delegation Order No. 0204-98 (June 14, 1982).

7. Delegation Order 0204-98 provided that

> In exercising the authority delegated by this Order the delegate shall be governed by the rules and regulations of DOE and the policies and procedures prescribed by the Secretary or his delegate.

Ex. 2, Delegation Order No. 0204-98 at 5.

8. Delegation Order 0204-98 also provided that

> Nothing in this Order shall preclude the Secretary from exercising any of the authority so delegated whenever in his judgment the exercise of such authority is necessary or appropriate to administer the functions vested in him.

Ex. 2, Delegation Order 0204-98 at 6.

9. In Redelegation Order No. 0204-98.1, the Assistant Secretary, Management and Administration, redelegated authority over contracts to the Director, Procurement and Assistance Management, with a reservation of authority "whenever in his judgment the exercise of such authority is necessary or appropriate to administer the functions vested in him." Ex. 3, Redelegation Order 0204-98.1.

10. By memorandum dated July 8, 1986, the Director, Procurement and Assistance Management delegated authority over contracts to the Manager of the Albuquerque Operations Office, with a similar reservation of authority. Ex. 4, July 8, 1986 Memorandum from Burton J. Roth to the Manager of the Albuquerque Operations Office.

11. 48 C.F.R. § 3.101-1 provides that

> Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships. While many Federal laws and regulations place restrictions on the actions of Government personnel, their official conduct must, in addition, be such that they would have no reluctance to make a full public disclosure of their actions.

Ex. 5, 48 C.F.R. § 3.101-1.

12. 48 C.F.R. § 1.602-2 (b) provides, among other things, that "[c]ontracting officers

shall– . . . [e]nsure that contractors receive impartial, fair, and equitable treatment." Ex. 5, 48 C.F.R. § 1.602-2 (b).

CONTRACT PROVISION ON TERMINATION

13. The Termination Clause of the contract, clause 84(b)(5) of Mod M124, states:

> If performance of the work under this contract is terminated in whole by the Government, the base fee and award fee of the Contractor shall be prorated to and including the effective date of such termination. The Contracting Officer shall then determine the portion, **if any**, of the prorated maximum available award fee which shall be awarded to the Contractor for the evaluation period, or part thereof, which ends on the effective date of the termination.

Ex. 6, Mod M124, clause 84, p. 178.

THE AWARD FEE PROCESS FOR ROCKY FLATS PRE-JUNE 6, 1989

14. During the period prior to June 6, 1989, the purpose of the award fee process was to make sure that the people most knowledgeable about the performance of the contractor during the relevant time period were given substantial weight in assessing the award fee. Ex. 7, Trial Testimony of Bruce Twining in *Stone v. Rockwell*, 3/15/99, p. 3253.

15. DOE's Area Manager at Rocky Flats would prepare a draft "award fee report" and provide it to Albuquerque Operations officials sitting on a board called the Performance Evaluation Review Board (PERB). Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/89, pp. 16-18. It was appropriate that DOE people at Rocky Flats prepare the initial draft of the award fee report because they were on site and could see first-hand Rockwell's operations. Ex. 7, Trial Testimony of Bruce Twining in *Stone v. Rockwell*, pp. 3137-3138.

16. The PERB would then provide a report to the Manager of Albuquerque Operations, Bruce Twining, and he would make an award fee determination. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/89, p. 18.

17. At some point after Admiral James D. Watkins became Secretary of Energy, that is sometime in early 1989, Mr. Twining received a directive from DOE Headquarters requiring him to obtain formal Headquarters concurrence before issuing an award fee. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/89, pp. 21-24.

18. However, prior to that directive, Mr. Twining typically called DOE Headquarters to get their input as part of the process of determining the award fee. The members of the PERB also typically obtained input from DOE Headquarters in arriving at a recommended award fee, inasmuch as Albuquerque was meeting a Headquarters program. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/89, pp. 23-25.

<u>THE FBI/EPA RAID AND DOE HEADQUARTER's RESPONSE THERETO</u>

19. On June 6, 1989, approximately 70 agents of the FBI and EPA served a search warrant on the Rocky Flats Plant looking for evidence of alleged environmental crimes being committed by Rockwell and possibly by DOE officials. Ex. 9, Deposition of Ed Goldberg in *Stone v. Rockwell*, 4/23/98, pp. 12-14; Ex. 10, Deposition of W. Henson Moore ("Henson Moore") in *Stone v. Rockwell*, 4/15/98, p. 16; Ex. 11, Search Warrant Affidavit, pp. 1, 14-15, 65, 96 and 100.

20. Shortly prior to the raid, the Department of Justice informed Secretary of Energy Watkins, Deputy Secretary W. Henson Moore, and Under Secretary John Tuck-collectively known as "DOE's Secretariat"–about the upcoming raid. Ex. 12, Deposition of James D. Watkins in *Stone v. Rockwell*, 4/29/94, pp. 104-105; Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 11, 13; Ex. 13, Deposition of John C. Tuck in *Stone v. Rockwell*, 4/27/98, pp. 14, 23-24.

21. DOE's Secretariat was informed about the raid ahead of time on the condition that

they not inform anyone else lest the investigation be stymied. Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, p. 14. Mr. Twining was not to be told in advance. Ex. 14, Deposition of Troy Wade in this proceeding, 9/21/94, p. 28.

22. Secretary Watkins was briefed on the contents of the search warrant affidavit by the Justice Department. Ex. 12, Deposition of James D. Watkins in *Stone v. Rockwell*, 4/29/94, p. 119.

23. The search warrant affidavit alleged, among other things, that there was probable cause to believe that DOE officials and/or Rockwell had committed environmental crimes, and had concealed and made false statements about those violations. Ex. 11, Search Warrant Affidavit, pp. 14-15, 65, 96, and 100.

24. Approximately concurrently with the raid at Rocky Flats, pursuant to the criminal investigation, federal agents came to the Albuquerque Operations Office to search for documents. Ex. 15, Deposition of Bruce Twining in *Stone v. Rockwell*, Vol. I, 4/7/98, p. 20.

25. Deputy Secretary Moore was aware that DOE field employees faced the risk of indictment as a result of the raid. Those employees were very concerned about potential exposure, and some threatened to retire from DOE due to their concern. Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 33-35.

26. Albuquerque Manager Twining himself was personally concerned that he might be indicted. Ex. 16, Deposition of Bruce Twining in *Stone v. Rockwell*, Vol. II, 4/8/98, p. 272.

27. Secretary Watkins believed that Mr. Twining was a potential "party" to the investigation underway at Rocky Flats. Ex. 17, Deposition of James D. Watkins in this proceeding, 4/29/94, at 27.

28. Secretary Watkins believed that when a superior in the chain of command (Mr.

Twining) is potentially involved, you have to "bypass that system" and "take more positive control of the situation." And that is what he decided to do in regard to Mr. Twining and the Albuquerque office. Ex. 17, Deposition of James D. Watkins in this proceeding, 4/29/94, pp 27-29.

29. Secretary Watkins appointed Ed Goldberg as Acting Manager of the Rocky Flats Office in order to have someone in charge there who was not a "party" to the criminal investigation, and who would not be perceived by the FBI as interfering with the investigation. Watkins wanted Goldberg to report directly to DOE Headquarters outside "the Twining circuit." Ex. 17, Deposition of James D. Watkins in this proceeding, 4/29/94, pp 27-29.

30. Accordingly, on June 6, 1989, the day of the raid, Under Secretary John C. Tuck issued a memorandum to Bruce Twining and Ed Goldberg, who theretofore had been Deputy Manager of DOE's Richland, Washington Office. Mr. Tuck's memorandum designated Mr. Goldberg as Acting Manager of the Rocky Flats Office. Mr. Tuck's memorandum further stated that Mr. Goldberg would report directly to DOE Headquarters regarding plant operations, rather than to Mr. Twining. Ex. 18, June 6, 1989 Memorandum from John C. Tuck to Bruce Twining and E.S. Goldberg.

31. One of Mr. Goldberg's tasks when he arrived at Rocky Flats was to try to calm concerns about DOE Rocky Flats employees that they might be arrested. Goldberg communicated to DOE Headquarters that field employees had this concern. Ex. 19, Trial Testimony of Ed Goldberg in *Stone v. Rockwell*, 3/22/99, pp. 4409-4411.

32. On June 9, 1989, Under Secretary Tuck designated an interim organization, known as the Rocky Flats Area Office, which would report directly to DOE Headquarters, and not to Albuquerque Operations. Ex. 20, June 9, 1989 Memorandum from John Tuck to Edward

Goldberg. There was a substantial infusion of people into the Rocky Flats Area Office in an effort to bring up the level of technical expertise overseeing Rockwell. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 42-43.

33. After Mr. Goldberg's appointment, Mr. Twining's substantive oversight responsibilities for Rocky Flats ended. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/93, p. 68; Ex. 15, Deposition of Bruce Twining in *Stone v. Rockwell*, Vol. I, 4/7/98, p. 115; Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 42-43. Thereafter, Mr. Twining's only role was the ministerial task of continuing to provide administrative assistance to Mr. Goldberg. Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 36-37.

34. Secretary Watkins took measures after the June 6, 1989 raid to ensure that DOE Headquarters had in-depth knowledge regarding environmental conditions at the plant, and the quality (or lack thereof) of Rockwell's performance. Ex. 23, Trial Testimony of James D. Watkins in *Stone v. Rockwell*, 3/16/99, pp. 3369-3370.

35. For example, when Mr. Goldberg arrived at Rocky Flats on June 6, 1989, Mr. Goldberg brought with him a team of 50 or so experts to establish an environmental, safety and health baseline and give him an idea of what was going on at the Rocky Flats Plant. This team presented Mr. Goldberg and DOE management officials with information on a daily and weekly basis. Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 55-56; Ex. 19, Trial Testimony of Ed Goldberg, 3/22/99, p. 4410.

36. After his arrival at the plant, Mr. Goldberg reported to Secretary Watkins on a daily basis, mostly through the Under Secretary John Tuck and a special assistant to the Secretary named Leo Duffy. Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 103-104; Ex. 19, Trial Testimony of Ed Goldberg in *Stone v. Rockwell*, 3/22/99, p. 4411.

37. Beginning as early as June 16, 1989, the Rocky Flats Office began sending daily report memorandum, as well as bi-weekly reports and weekly highlights of the operations at the Rocky Flats Office, to DOE Headquarters. Ex. 24, Samples of Reports.

38. On June 22, 1989, Rocky Flats Area Office Manager Goldberg wrote a memorandum to Under Secretary Tuck stating that DOE lacked confidence in Rockwell management's ability to manage the facility because there was considerable evidence of a lack of clear lines of responsibility for safe operations, a lack of adequate procedures to assure safe operations, and a lack of conformance to procedures at the plant. Ex. 25, June 22, 1989 draft Memorandum from Edward S. Goldberg to John Tuck.

39. Also on the day of the raid, June 6, 1989, DOE Headquarters formed a "special assignment team," later referred to as a "Tiger Team," to provide DOE Headquarters with an independent evaluation of operations and practices at the Rocky Flats Plant. The Tiger Team included approximately 50 skilled personnel, including DOE officials and contractor personnel from all over the county. The teams began gathering data regarding the Rocky Flats Plant operations in early June and were onsite from June 19 through July 14, 1989. Ex. 26, Assessment of Environmental Conditions at the Rocky Flats Plant, August 1989 (hereinafter "Tiger Team Report"), Introduction, pp. 1-1 - 1-5.

40. Deputy Secretary Moore accompanied the FBI and EPA agents onto the Rocky Flats site on the day of the raid, June 6, 1989, and remained there for two weeks personally observing conditions at the plant. Moore visited Rocky Flats again for another week a month or two later. Within a couple of days after the raid, Deputy Secretary Moore became aware of many important infractions that were not being resolved. Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 11, 20, 24.

41. Beginning about July 5, 1989, DOE Headquarters also conducted an audit of the Rocky Flats Plant compliance with the National Environmental Policy. Ex. 27, July 7, 1989 Bi-Weekly Report from D.J. Sanchini to S.F. Iacobellis, p. 3.

42. On July 21, 1989, Under Secretary Tuck issued a memorandum directing that the Area Manager of the Rocky Flats Area Office would report to the Assistant Secretary for Defense Programs in DOE Headquarters, as opposed to being a direct report to the Under Secretary. Ex. 29, July 21, 1989 Memorandum from John C. Tuck to Bruce Twining and E.S. Goldberg.

43. On August 19, 1989, the Tiger Team appointed by DOE Headquarters issued its final written report titled, "Assessment of Environmental Conditions at the Rocky Flats Plant." Exs. 26 through 26-E.[1]

44. The Tiger Team report assessed Rockwell's environmental, safety and health deficiencies in far greater detail than had Albuquerque's May 1989 award fee evaluation. Compare Exs. 26 through 26-E, The Tiger Team Report to Ex. 30, (the PERB's May 17, 1989 Award Fee Performance Review.

45. Also in August 1989, a DOE Headquarters Criticality Assessment Team completed a review of the Rocky Flats Plant Criticality Safety Program. Ex. 28, August 17, 1989 Bi-Weekly Report from Edward S. Goldberg to John L. Meinhardt.

---

[1] We have divided the Tiger Team Report into parts under different exhibit numbers due to its volume. Exhibit 26 consists of the title page, the Executive Summary, the Introduction (Section 1.0), and the audit findings on air (Section 2.0). Exhibit 26-A consists of the audit findings on surface water (Section 3.0), and groundwater (Section 4.0). Exhibit 26-B consists of the findings on waste management (Section 5.0). Exhibit 26-C consists of the findings regarding toxic and chemical materials (Section 6.0) and radiation (Section 7.0). Exhibit 26-D contains the findings on quality assurance (Section 8.0) and inactive waste sites and releases (Section 9.0). Finally, Exhibit 26-D contains the audit findings on the National Environmental Policy Act. Pages of the report which the writers intentionally left blank have been omitted from the copy submitted herewith.

46. Mr. Twining himself believed that Mr. Goldberg and the teams of experts from DOE Headquarters learned of conditions at Rocky Flats that Twining did not know about, and that they had gone down to a deeper level of detail than Twining and the PERB had in assessing ES&H performance there. Ex. 7, Trial Testimony of Bruce Twining in *Stone v. Rockwell*, 3/15/99, pp. 3283-3284.

47. Prior to the issuance of the Tiger Team's formal report, Deputy Secretary Moore was receiving verbal briefings from the Team. Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 67-68.

48. Moore believed that the Tiger Team was looking more deeply into Rockwell's ES&H deficiencies than Goldberg had been able to do, and that DOE Headquarters acted on Rockwell's award fee with better information than Goldberg had available. Ex. 31, Deposition of Henson Moore in this proceeding, 4/29/94, pp. 41-43; Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 67-68.

49. In deciding what award fee DOE Headquarters felt should be awarded to Rockwell, Deputy Secretary Moore took into account the Tiger Team report. Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 133-134.

50. Moore believed that the decision Headquarters made on the award fee fairly reflected Rockwell's performance given all of the deficiencies he had observed and the Tiger Team had reported. Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, p. 138.

<u>THE 89/1 AWARD FEE DECISION</u>

51. On May 31, 1989, prior to the FBI/EPA raid, Bruce G. Twining, DOE's Manager of the Albuquerque Operations Office, had submitted his recommendation that Rockwell be awarded an award fee of $5,176,482 for plant operations for the 89/1 period. Ex. 32, May 31,

1989 Memorandum from Bruce Twining to Troy E. Wade, II.

52. Mr. Twining submitted his recommendation to Mr. Troy Wade, DOE Headquarters' Acting Assistant Secretary for Defense Programs, and asked for Mr. Wade's concurrence. Plaintiff's Ex. 5, Stipulation ¶ 1; Ex. 32, May 31, 1989 Memorandum from Bruce Twining to Troy E. Wade, II.

53. Mr. Twining was comfortable with that recommendation based on the information he had up to that point. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/93, p. 53.

54. At the time he received Mr. Twining's May 31, 1989 award fee recommendation for Rockwell, Mr. Wade was aware of the criminal investigation underway at Rocky Flats that was to lead in the June 6, 1989 raid. Mr. Wade had been asked not to inform Mr. Twining of the criminal investigation. Ex. 14, Deposition of Troy Wade in this proceeding, dated 9/21/94, pp. 28.-29

55. Mr. Wade concluded that it would be prudent to make a final award fee determination for Rockwell based on Mr. Twining's recommendation in view of the ongoing investigation. Mr. Twining's May 31, 1989 recommendation never became a final award fee determination. Ex. 14, Deposition of Troy Wade in this proceeding, 9/21/94, pp. 28-29.

56. Sometime during the early period after the raid, DOE Headquarters asked Mr. Goldberg to review Mr. Twining's recommendation for the award fee for the 89/1 period in light of new information that was being uncovered by the team he had brought to Rocky Flats. Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 40-42, 45-46, 66.

57. In July 1989, Mr. Goldberg made a recommendation to Mr. Twining of an award fee of $3,628,622 for plant operations for the 89/1 period. Plaintiff's Ex. 5, Stipulation, ¶ 5; Ex. 8, Deposition of Bruce G. Twining in this proceeding, 2/23/93, pp. 69-70, 76, 93.

58. Mr. Twining believed Mr. Goldberg was more fully informed about Rockwell's performance than Mr. Twining had been when Twining made his initial May 1989 recommendation of an award fee of $5,176,482 for plant operations. Ex.8, Deposition of Bruce Twining in this proceeding, 2/23/93, pp. 69-70, 76, 93.

59. Mr. Twining felt there were many more DOE people looking at the plant in intimate detail than there had been before the raid. Ex.8, Deposition of Bruce Twining in this proceeding, 2/23/93, p. 90.

60. Mr. Twining concluded that he and the PERB had graded Rockwell too high on Environmental, Safety and Health (ES&H) performance in May 1989. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/93, pp. 73, 111-112; Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, p. 61.

61. In August 1989, Mr. Twining modified his original May 1989 recommendation to reflect the input by Mr. Goldberg, and recommended to DOE headquarters that Rockwell receive an award fee of $3,628,622--the same amount recommended by Mr. Goldberg--for plant operations for 89/1. Mr. Twining was comfortable with the lower grade of 79 for ES & H that Goldberg gave Rockwell. Ex. 8, Deposition of Bruce G. Twining in this proceeding, 2/23/93, pp. 69-70, 76, 91, 93, 111.

62. Admiral Jon Barr assumed the position of Deputy Assistant Secretary for Military Applications beginning in June 1989, contemporaneous with the FBI/EPA raid. Prior to taking the position at DOE, Admiral Barr had served in the Navy Nuclear Power Program for 27 years. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 7-9.

63. During the latter half of 1989, Admiral Barr traveled to Rocky Flats approximately once per month. Beginning in early 1990, he traveled there once every two or

three months. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, p. 40. Admiral Barr also received information from people in his office who made trips to Rocky Flats, and from on-site people like Mr. Goldberg. Those reports reflected things that had occurred at the plant during the 89/1 award fee grading period from October 1, 1988 through March 31, 1989.[2]

64. In Admiral Barr's judgment, prior to Mr. Goldberg's arrival along with his team of experts, the people in DOE's Rocky Flats Office had very little technical acumen, and were effectively an administrative office. They lacked the ability to be pro-active in looking for problems. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, p. 33

65. Although technical expertise existed in the Albuquerque Operations Office, that office was hundreds of miles away from Rocky Flats, and although there were periodic visits by Albuquerque personnel, Albuquerque did not exercise sufficiently close scrutiny over Rocky Flats due to distance. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 33-34.

66. During the period August through November 1989, Admiral Barr received information from people in his office who made trips to Rocky Flats, and from on-site people like Mr. Goldberg. Those reports reflected things that had occurred at the plant during the 89/1 award fee grading period from October 1, 1988 through March 31, 1989. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 18-19, 98.

67. Shortly after Admiral Barr arrived at DOE, DOE sent a group of experts to Rocky Flats to determine whether there had been any uncontrolled nuclear criticalities at the plant. If a criticality occurred under certain conditions, it could send fission fragments into a local area and thereby harm people in the location. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 20-23.

---

[2] Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 18-19, 98.

68. The experts found that no criticalities had occurred, but they also found that there were "multi-tens" of kilograms of plutonium in the duct-work in several buildings at Rocky Flats, and that this plutonium had gotten into the duct-work through long-term improper operations of glove boxes at the site. They further found that there was a disturbing lack of knowledge on the part of Rockwell people regarding the form or amount of plutonium in the duct-work, and a lack of adequate concern for the problem by Rockwell. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 20-21.

69. Admiral Barr believed the seriousness of the "chromic acid spill," although known to Albuquerque officials when they were evaluating Rockwell's award fee, was not adequately appreciated by those officials. In Admiral Barr's opinion, the spill was not an isolated deficiency, but rather it was indicative of systematic weakness on Rockwell's part toward safety alarm systems. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 34-37.

70. Admiral Barr on a visit to Rocky Flats personally noted a situation where switching off an alarm on one tank would disable a series of alarms on other tanks. Rockwell had not put in place any meaningful additional procedures to ensure that the function of the alarms was carried out. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 37-38, 40.

71. Admiral Barr believed there was a fundamental philosophy of operating a nuclear facility which would minimize the likelihood of serious problems. He had lived that philosophy during his 28 years in the Navy Nuclear Power Program. Admiral Barr concluded that this philosophy had never been present at Rocky Flats, and that Rockwell's overall running of the plant fell below a standard that was appropriate given the potential for serious accidents. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 37-38, 40, 86-88.

72. The more Admiral Barr learned about conditions at Rocky Flats, the lower the award fee he believed Rockwell should receive. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, p. 98.

73. On September 20, 1989, John L. Meinhardt, the Acting Assistant Secretary for Defense Programs in DOE Headquarters advised Albuquerque Operations that the award fee should be downwardly adjusted in the area of ES&H. Meinhardt indicated that Rockwell's performance warranted an ES & H grade of 65.25, resulting in an award fee of $2,716,307 for plant operations, plus $186,591 for PRMP/PROVE, totaling $2,902,898. Ex. 33, September 20, 1989 Memorandum from John L. Meinhardt to Bruce Twining.

74. Mr. Twining was comfortable with the 65.25 grade Meinhardt gave Rockwell for ES & H. Deposition of Bruce Twining in this proceeding, 2/23/94, p. 111.

75. Mr. Meinhardt's September 20, 1989 to Mr. Twining also attached a draft letter for Mr. Twining to send to Rockwell informing them of the award fee and a draft Performance Evaluation Report for the 89/1 period. Ex. 33, September 20, 1989 Memorandum from John L. Meinhardt to Bruce Twining.

<u>THE 89/2 AWARD FEE DECISION</u>

76. On September 12, 1989, Secretary Watkins announced the appointment of David P. Simonson as Manager of the Rocky Flats Office of DOE. Ex. 34, September 12, 1989 DOE News Release.

77. Shortly before Thanksgiving of 1989, DOE Headquarters sent a team of around 50 people to take another comprehensive look at Rocky Flats. Admiral Barr led one branch of the team, and Mr. Starostecki, another Headquarters official, led the other. The team spent four days at the plant. This review discovered numerous deficiencies in virtually all areas. The review

indicated poor performance by Rockwell across the board, and led to a halt of weapons production. DOE subsequently discovered that it was very difficult to effect corrections to the identified problems, because Rocky Flats operational capabilities had become so flawed during Rockwell's management. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 151-152.

78. On December 6, 1989, Mr. Simonson, the Manager of the Rocky Flats Area Office, forwarded a memorandum to DOE Headquarters containing his preliminary view of Rockwell's performance, and recommending an award fee for the April 1, 1989 through September 30, 1989 of $3,114,245, plus $628,982 for PRMP/PROVE, for a total payment of $4,176,077. Ex. 35, December 6, 1989 Memorandum from David P. Simonson to John C. Tuck.

79. Secretary Watkins, Under Secretary Tuck, and Admiral Barr made the decision to appoint Nelson as Rocky Flats Area Manager in place of Mr. Simonson. Mr. Nelson, like Admiral Watkins and Admiral Barr, was a veteran of the Navy's Nuclear Power Program. Ex. 36, Deposition of Robert Nelson in this proceeding, 11/9/92, pp. 22-23, 27.

80. On February 26, 1990, Mr. Nelson wrote to Rockwell and informed it that DOE had determined that Rockwell earned an award fee of $1,579,639, plus a base fee of $432,850, for a total payment of $2,012,489. Ex. 37, February 26, 1990 Letter from Robert M. Nelson, Jr. To Dominick J. Sanchini.

ROCKWELL'S ACQUIESCENCE IN DOE HEADQUARTER'S ACTIONS

81. On June 13, 1989, Rockwell's Board Chairman and Chief Executive Officer (CEO) Donald Beall initiated contact with DOE at the highest level by writing directly to Secretary Watkins, bypassing the Manager of Albuquerque Operations, Bruce Twining. Mr. Beall wrote that the criminal investigation was of serious personal concern to him, and that he

would welcome an opportunity to discuss Rockwell's management of Rocky Flats personally with Secretary Watkins. Ex. 38, Letter from D.R. Beall to The Honorable James D. Watkins; Ex. 39, Deposition of Donald Beall in this proceeding, 7/18/94, pp. 8-11.

82. On June 15, 1989, Secretary Watkins wrote back to CEO Beall, advising that a special departmental team, headed by Deputy Secretary Moore, had visited Rocky Flats in conjunction with the criminal investigation. He advised Mr. Beall that he had effected significant management changes there and that others would follow once his team completed its review. He expressed concern that Rockwell's management did not sufficiently understand the importance of complying with ES&H requirements, and stated that needed to be a new "culture" which placed ES&H compliance on a par with weapons production. He requested that Rockwell submit within 60 days a comprehensive plan indicating how Rockwell would provide satisfactory assurance that management shortcomings would not occur. Ex. 40, June 15, 1989 Letter from James D. Watkins, Admiral, U.S. Navy (Retired) to Mr. Donald R. Beall, Chairman and Chief Executive Officer, Rockwell International Corporation.

83. On or about June 16, 1989, Deputy Secretary Moore publicly announced that DOE was suspending bonus payments for good performance by Rockwell at Rocky Flats. Ex. 39, Deposition of Donald Beall in this proceeding, 7/18/94, pp. 17-18; Ex. 41, June 17, 1989 New York Times article.

84. In mid-June 1989, DOE Deputy Secretary Henson Moore told Sam Iacobellis, Rockwell's Executive Vice-President, that DOE was suspending the award fee determination for two to three weeks pending the investigation by the DOE Tiger Team. By letter dated June 20, 1989, Deputy Secretary Moore confirmed that conversation. Ex. 42, June 20, 1989 Letter from W. Henson Moore to Mr. Sam Iacobellis. This letter placed Rockwell on notice about DOE

Headquarters' role in the award fee process. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 52, 56.

85. On June 28, 1989, CEO Beall again wrote to Secretary Watkins expressing appreciation for the opportunity to discuss Rocky Flats personally with DOE Headquarters officials. Mr. Beall stated that he would personally ensure that Rockwell's employees at Rocky Flats fully implemented the new culture instituted by Secretary Watkins. He advised that Rockwell's Headquarters was establishing a "Corporate Rocky Flats Overview Board" to increase senior Rockwell management oversight of all aspects of the Rocky Flats Plant including ES&H compliance. He was also instituting a requirement for bi-weekly management reports from Rocky Flats that would go to the Rockwell Overview Board and to Secretary Watkins via Rocky Flats Area Manager Goldberg. CEO Beall expressed his desire for a further meeting with Secretary Watkins on Rocky Flats oversight. Ex. 43, June 28, 1989 Letter from D.R. Beall to Admiral James D. Watkins.

86. On July 13, 1989, Deputy Secretary Moore informed Rockwell's Mr. Iacobellis that DOE Headquarters was further delaying the pending award fee determination until August 1989, inasmuch as additional time was needed to permit the Tiger Team to prepare a written report. Ex. 44, Memorandum for The File from W. Henson Moore. Mr. Iacobellis acquiesced in DOE Headquarters' decision to delay the award fee determination until sometime in August 1989. Ex. 45, Deposition of Sam Iacobellis in this proceeding, 7/19/94, pp. 28-29, 60-61.

87. On August 14, 1989, CEO Beall submitted to Secretary Watkins the Management Plan Watkins had requested in his June 15, 1989 letter. The Plan was intended to assure that compliance with ES & H requirements would not be subordinated to the Plant's production mission. Ex. 46, August 14, 1989 Letter from Donald R. Beall to Admiral James D. Watkins.

88. On August 25, 1989, Secretary Watkins wrote back to CEO Beall stating that DOE Headquarters did not believe Rockwell's Management Plan adequately addressed the issue of the management problems at Rocky Flats. Secretary Watkins also advised Mr. Beall that he had reorganized the line management to provide that the staff of the Rocky Flats Area Office would report directly to the Assistant Secretary for Defense Programs so that DOE Headquarters could more effectively oversee Rocky Flats operations. Ex. 47, August 25, 1989 Letter from Admiral Watkins to Mr. Donald R. Beall. Mr. Beall did not object. Beall felt that DOE could "organize their staff as they see fit." Ex. 39, Deposition of Donald Beall in this proceeding, 7/18/94, pp. 35-36.

89. On September 18, 1989, CEO Beall spoke with Secretary Watkins regarding Rockwell's continued operations of the Rocky Flats Plant. Secretary Watkins stated he was concerned that Rockwell was not acknowledging his directives regarding new culture which would place ES & H on a level equivalent to production. Mr. Beall agreed with the Secretary's views and stated he was committed to bringing that new culture to Rocky Flats. Ex. 48, September 18, 1989 Memorandum to File from Stephen A. Wakefield. Mr. Beall had no problem with Secretary Watkins' changes to the priorities at Rocky Flats to have greater emphasis on ES & H. Deposition of Donald Beall in this proceeding, 7/18/94, pp. 28-30.

90. On September 20, 1989, Secretary Watkins wrote a letter to CEO Beall, informing him that the award fee determination for the 89/1 period was undertaken at his direction and to expect the award fee to reflect 40% of the total possible award fee. Secretary Watkins stated:

> As you know, the Department has had under advisement the question of the proper award fee determination to be made for the management and operation of the Department's Rocky Flats plant for the period October 1, 1988, through March 31, 1989. Because of the importance of this facility's operations to DOE's ability to

> carry out its missions and the environmental sensitivity presented by its activities, at my direction the Department has considered with special care the proper fee for this period, particularly as it reflects Rockwell's performance in environment, safety and health.
>
> * * * *
>
> . . . this determination was made under an award fee plan as it existed before the recent revisions to award fee plans enable more stringent downward adjustments in the event of deficiencies in contractor performance for environment, safety and health.

Ex. 49, September 20, 1989 Letter from Admiral Watkins to Mr. Donald R. Beall.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

s/ John A. Kolar

JOHN A. KOLAR
DONALD WILLIAMSON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 305-9301
Attorneys for Defendant

Dated: July 27, 2006