# EXHIBIT 6

350340

CONTRACT DE-AC04-76DP03533

BETWEEN

UNITED STATES DEPARTMENT OF ENERGY

AND

ROCKWELL INTERNATIONAL CORPORATION

MODIFICATION NO. M124

EFFECTIVE JANUARY 1, 1989

RI 4305765

SUBPOENA 1005 AND 1013 ITEM 1

performance of this contract, the Contractor agrees to assign such employees to fill these positions as are satisfactory to the Contracting Officer. Once assigned, the Contractor agrees not to reassign or remove any such employees without the consent of the Contracting Officer. Whenever, for any reason, one or more of the aforementioned employees is to be reassigned, removed, or transferred, or is otherwise unavailable for continuing assignment, the Contractor shall, with the approval of the Contracting Officer, replace such employee with an employee of substantially equal abilities and qualifications.

83. 970.5204-43 OTHER GOVERNMENT CONTRACTORS (APR 1984)

The Government may undertake or award contracts for work or services. The Contractor agrees to fully cooperate with such other contractors and Government employees and carefully fit its own work to such other work as may be directed by the Contracting Officer. The Contractor shall not commit or permit any act which will interfere with the performance of work by any other contractor or by Government employees.

84. 970.5204-45 TERMINATION (APR 1984) (DEVIATION)

(a) This contract shall continue until December 31, 1993 unless sooner terminated in accordance with the provisions which follow:

(1) The performance of work under this contract may be terminated by the Government in whole, or from time to time in part, (i) whenever the Contractor shall default in performance, and shall fail to cure the fault or failure within such period as the Contracting Officer may allow after receipt from the Contracting Officer or a notice specifying the fault or failure, or (ii) whenever, for any reason, the Contracting Officer shall determine any such termination is for the best interest of the Government. Termination of the work hereunder shall be effected by delivery of a notice of termination



RI 4505945
SUBPOENA 1005 AND 1013 ITEM 1

specifying whether termination is for default of the Contractor or for the convenience of the Government, the extent to which performance of work under the contract shall be terminated, and the date upon which such termination shall become effective. Any such termination shall be without prejudice to any claim which either party may have against the other. If, after notice of termination under the provisions of (a)(1)(i) above, it is determined for any reason that the Contractor was not in default, such notice of default shall be deemed to have been issued pursuant to (a)(1)(ii) above, and the rights and obligations of the parties hereto shall in such event be governed accordingly.

(2) Upon receipt of notice of termination, in accordance with (1) above, the Contractor shall, to the extent directed in writing by the Contracting Officer, discontinue the terminated work and the placing of orders for materials, facilities, supplies, and services in connection therewith, and shall proceed, if, and to the extent required by the Contracting Officer, to cancel promptly and settle with the approval of the Contracting Officer, existing orders, subcontracts, and commitments insofar as such orders, subcontracts, and commitments pertain to this contract.

(b) Upon the termination of this contract, full and complete settlement of all claims of the Contractor and of DOE arising out of this contract shall be made as follows:

(1) The Government shall have the right in its discretion to assume sole responsibility for any or all obligations, commitments, and claims that the Contractor may have undertaken or incurred, the cost of which are allowable in accordance with the provisions of this contract; and the Contractor shall, as a condition of receiving the payments mentioned in this article,



FI 4505946
SUBPOENA 1005 AND 1013 ITEM 1

execute and deliver all such papers and; take all such steps as the Contracting Officer may require for the purpose of fully vesting in the Government any rights and benefits the Contractor may have under or in connection with such obligations, commitments, or claims.

(2) The Government shall treat as allowable costs all expenditures made in accordance with and allowable under the clause entitled "Allowable Costs, Base Fee and Award Fee," not previously so allowed or otherwise credited for work performed prior to the effective date of termination, together with expenditures as may be incurred for a reasonable time thereafter with the approval of, or as directed by, the Contracting Officer.

(3) The Government shall treat as allowable costs, to the extent not included in (b)(2) above, the costs of settling and paying claims arising out of the termination of work under orders, subcontracts, and commitments as provided in (a)(2) above.

(4) The Government shall treat as allowable costs the reasonable costs of settlement, including accounting, legal, clerical, and other expenses reasonably necessary for the preparation of settlement claims and supporting data with respect to the termination of the contract and for the termination and settlement of orders and subcontracts thereunder, together with such further expenditures made by the Contractor after the date of termination for the protection or disposition of Government property as are approved or required by the Contracting Officer; provided, however, that if the termination is for default of the Contractor, there shall not be included any amount for preparation of the Contractor's settlement proposal.



FI 4505947
SUBPOENA 1005 AND 1013 ITEM 1

(5) If performance of work under this contract is terminated in whole by the Government, the base fee and award fee of the Contractor shall be prorated to and including the effective date of such termination. The Contracting Officer shall then determine the portion, if any, of the prorated maximum available award fee which shall be awarded to the Contractor for the evaluation period, or part thereof, which ends on the effective date of termination. In addition, if the termination is for the convenience of the Government, the Contractor shall be paid a base fee and award fee in an amount to be agreed upon as compensation for its services in closing out the work under this contract after the effective date of such termination. The additional base fee and award fee is to be negotiated as soon as practicable after service of notice of termination, shall take into account the estimate of the cost of the services and managerial effort to be rendered under this clause after the effective date of termination, and shall be provided for in a supplement or amendment to this contract prior to final settlement hereunder. Pending agreement as to the amount of such additional base fee and award fee, the Contractor shall diligently proceed with the performance of the services required under this clause. No additional base fee and award fee will be paid if the contract is terminated due to the default of the Contractor. In the event of a partial termination by the Government, an equitable adjustment shall be made in the base fee and award fee if such termination results in a material decrease in the level of the Contractor's management effort. Any failure to agree on the proration or equitable adjustment of the base fee and award fee, or, in the event of termination for convenience of the Government, on the right to or the amount of additional base fee and award fee shall be deemed a dispute within the purview of the clause hereof entitled "Disputes."



RI 4305943
SUBPOENA 1005 AND 1013 ITEM 1

(6) The obligation of the Government to make any of the payments required by this clause or any other provisions of this contract shall be subject to any unsettled claims in connection with this contract which the Government may have against the Contractor.

(c) Prior to final settlement, the Contractor shall furnish a release as required in the clause entitled "Payments and Advances" and account for Government-owned property as may be required by the Contracting Officer; provided, however, that unless the Contracting Officer requires an inventory, the maintenance and disposition of the records of Government-owned property in accordance with the clause entitled "Accounts, Records and Inspection" shall be accepted by the Contracting Officer as full compliance with all requirements of this contract pertaining to an accounting for such property.

85. 970.5204-50 COST AND SCHEDULE CONTROL SYSTEMS (APR 1984) (DEVIATION)

Whenever a Major System Acquisition or comparable type project is assigned to the Contractor, the Contractor shall establish, maintain and use a cost and schedule control system for such acquisition or project in accordance with the DOE's Cost and Schedule Control Systems Criteria as prescribed by the Contracting Officer.

86. 970.5204-52 FOREIGN TRAVEL (APR 1984)

(a) Foreign travel, when charged directly, shall be subject to the prior approval of the Contracting Officer for each separate trip regardless of whether funds for such travel are contained in an approved budget. Foreign travel is defined as any travel outside of Canada and the United States and its territories and possessions.

(b) Request for approval shall be submitted at least 45 days prior to the planned departure date, be on a Request for Approval of Foreign



RI 4305949
SUBPOENA 1005 AND 1013 ITEM 1

EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA and
UNITED STATES OF AMERICA, ex rel.
JAMES S. STONE,

Plaintiffs,

vs. ) 89 M 1154

ROCKWELL INTERNATIONAL CORPORATION, et al.,

Defendants.

---

TRIAL TO JURY - DAY 14
TRANSCRIPT OF PROCEEDINGS

---

Proceedings held before the HONORABLE RICHARD P. MATSCH, U.S. District Judge for the District of Colorado, beginning at 8:55 a.m. on the 15th day of March, 1999, in Courtroom C-204, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs:

Maria T. Vullo, Esq.
Jeannie S. Kang, Esq.
Matthew Chevez, Esq.
Robert E. Montgomery, Jr., Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
Suite 2607
New York, New York 10019

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q To your knowledge, have any programmatic audits been done, for example, with respect to the waste operations costs reflected in the VANEA's?
A I don't have any knowledge of any of those audits.
Q Thank you, sir.
THE COURT: Anything else of this witness?
MR. CARROLL: No further questions, Your Honor.
THE COURT: Is he excused?
MR. WILLIAMSON: Yes, he is, Your Honor.
THE COURT: Agreed?
MR. CARROLL: Thank you very much.
THE COURT: You may step down, you're excused.
Next, please?
MR. KOLAR: Plaintiffs call Bruce Twining.

BRUCE TWINING,

called as a witness on behalf of the plaintiffs, having been first duly sworn, was examined and testified as follows:

THE CLERK: Would you have a seat, please? Would you state your first--or your full name for the record and spell your last name?
THE WITNESS: Bruce Twining, T-W-I-N-I-N-G.
THE CLERK: Thank you. These are your exhibits.

DIRECT EXAMINATION

BY MR. KOLAR:
Q Good morning, Mr. Twining. Where do you presently work?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q So would you agree with me, sir, that as of the time you made a decision on the award fee, you had information indicating that Rockwell's pondcrete performance had been inadequate?
A Try that again.
Q Okay. Would you agree with me, sir, that by the time you made the decision as to the amount of an appropriate award fee for Rockwell, namely, $4.7 million, you had gotten a report that Rockwell's pondcrete process controls had been inadequate, that its inspection procedures had been inadequate, that its storage procedures had been inadequate, that there had been multiple spills out on the pads?
A Yes.
Q Okay. And you factored that information into your decision in terms of what would be an appropriate award fee for Rockwell?
A Yes.
Q Now, if I could just explore with you, just briefly, the nature of the proceedings that resulted in the award fee being determined. It was actually a multi-step process, was it not?
A Yes, it was.
Q And you relied heavily on the people on site, to begin with?
A Well, the people on site actually prepared the draft

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

performance evaluation report and submitted that to the performance evaluation board.

Q Okay. And that was appropriate because they were on site and could see exactly the conditions that Rockwell was operating under?

A Yes.

Q And would have a sense of what constraints they might be operating under, whether it's funding or whether anything else?

A Yes.

Q And then those people reported up to Mr. Whiteman who prepared a draft report?

A Yes.

Q And, of course, you trusted his abilities and you relied heavily on that report?

A Yes, I did.

Q Then he submitted that for review by a lot of your people at Albuquerque, division directors and so on, and they gave input?

A We had what was called a performance evaluation board. I'm not sure that was the exact title then, but it was the functional managers from Albuquerque who also had interest in the various things that went on at Rockwell, at Rocky Flats, taking the input from the area manager and testing it against what they knew and also testing it against what was going on

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Meinhardt. I know that I talked to him fairly frequently, but I don't remember specific discussions of award fees.
Q Then do you see he goes on in the bottom paragraph to say that the "right grade was 79"--I apologize, I kind of cut that off--"for its performance under the ES&H category, that that should be downgraded to a grade of 65.25"--
A Yes.
Q --"and the effect of that is to cut Rockwell's award fee further, and now it's down to $2.9 million." Do you see that?
A Yes.
Q And he says at the end, "Admiral Watkins concurs in this recommendation."
A Yes.
Q Now the whole idea of the award fee process was to make sure that the people most knowledgeable about the performance of the contractor during the relevant time period were given substantial weight on the assessment of the award fee.
A That's right.
Q And the people most knowledgeable--had Admiral Watkins been out there? He wasn't even the Secretary of Energy at that time, was he--the time of the award fee?
A I believe he was Secretary of Energy toward the end of that period, but I'm not sure.
Q Do you recall whether he had visited the plant at all

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

new to Rockwell; is that right?
A Sure. Yes. That's right.
Q We talked some about Mr. Goldberg and I think you said that Mr. Goldberg was brought in--was started at Rocky Flats as manager about the day of the FBI raid; is that right?
A I believe that's when he came in, yes.
Q And, you know whether--how he got that assignment?
A Not in detail. I assume Admiral Watkins --
THE COURT: No, don't assume.
THE WITNESS: All right. I don't know.
Q (by Mr. Kolar) Do you know whether Mr. Goldberg when he became manager of Rocky Flats brought a team--brought teams of experts with him to assist him in evaluating how things have been going at the plant?
A I believe there was a fairly sizable group of people that came in at the same time.
Q These were DOE people?
A Yes.
Q And, after the FBI raid on June 6, 1989 did headquarters send out Tiger Teams and other people from headquarters to work with Mr. Goldberg in looking at conditions of the plant?
A Yes.
Q I think you said something about you believed that when Mr. Goldberg sent you some input on the award fee determination, that Mr. Goldberg had learned of conditions at

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Rocky Flats that you feel you had not known about--that there was information that was new?

A There was information that I wasn't in a position to refute, really. There was--they looked at a level of detail that I wasn't normally familiar with.

Q So, they went down to a lower level of details; is that fair?

A Yes.

Q And, so, when you received input from him and then subsequently from headquarters, was it your understanding that that input, now, this is vis a vis the award fee determination, was to a lower level of detail than you had been able to take into account?

A Yes.

Q Let me ask you to look back at Tab 3 of the defendant's binder. This is Exhibit--it looks like A300. It's a little difficult to read. Do you have that open?

A Yes.

Q And, this I think you said was one of the--is a report that Mr. Whiteman had sent you on August 3rd, 1988 about Rocky Flats?

A Yes.

Q And, Mr. Koenigs directed you to a statement in the second paragraph on the first page that says, "Pondcrete blocks spilled on 904 Pad on July 22nd, 1988. The State of

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

EXHIBIT 8

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROCKWELL INTERNATIONAL CORPORATION, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 91-1362 C (Judge Yock) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

CERTIFIED COPY

DEPOSITION OF:

BRUCE G. TWINING

Tuesday, February 23, 1993

10:00 A.M.

Reported by:

BARBARA K. HARRIS

CSR # 93

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025
310/477-8867 FAX 310/478-8412

Q. Generally the PERB was perfectly free to deviate from the letter of this handbook.

MR. KOLAR: Objection on grounds of vagueness.

Q. That's fine. You may answer.

A. I would view that handbook as a guidance document, that laid out the process. My opinion on where we were in this process is that this handbook, which was dated 1977, was likely becoming obsolete, and led to this 1990 revision.

Q. Would you, Mr. Twining, describe for me how the award fee process worked at Albuquerque. Take your time and go from step one to the issuance of the actual fee to the M & O contractor.

A. Well, again, I said the award fee process has been evolving.

Q. Let's start with 1988 when you first arrived here.

A. In general, my view of how that award fee process worked at that time is that the area manager was responsible for pulling together the award fee report.

Q. Now, the area manager in connection with Rockwell would be the manager at the Rocky Flats facility in Colorado?

A. Yes. The area manager actually pulled together the report. In pulling together a report, he would have

considered input from the people in his area office. He would have also been expected to consider input from people in functional divisions in Albuquerque.

For example, he would get input from the Weapons Quality Division that would deal with the quality of the product that Rockwell was producing in the plant. He would have been expected to get input from our ES & H people to reflect the kind of reviews and appraisals that had been done by both our people and headquarters people. And then he would incorporate that into a draft report.

He would then come to the PERB meeting, and be prepared to talk to that report. The other members of the PERB, which were -- and I'm not sure whether at this time the PERB was chaired by Jim Culpepper or Charlie Troell, but there was a chairman and other functional assistant managers on the PERB, and the PERB as a whole would listen to what the area manager had to say, make an assessment on whether it fairly characterized the input from their own functional people, as well as whether it, you know, fairly characterized Rockwell's performance from their point of view.

Q. Who were the members of the PERB?

A. Well, typically it would be the chairman, and I'm not sure whether at that time it was Charlie Troell or Jim Culpepper; the assistant manager for Operations and Weapons

would be on the PERB, the assistant manager for ES & H, all of our assistant managers that have a functional interest in what went on at the site.

There is, I believe, a PERB secretariat which is from the Contracts Division, but the board itself is the decision-making body. I think we probably have an attorney advisor to the PERB. Again, that was changed over time, I think.

But the PERB reviews what the area manager has to say, changes it if appropriate, and then I was given and am still given a report with a proposed award fee determination and a briefing. I look through that, ask my questions. If my concerns haven't been reflected, the PERB may or may not meet again to reflect the input I have or the questions I ask. But when we are all finished, I make an award fee determination.

And at the time of this award fee, we had just gotten into a process of formally sending those proposed determinations to headquarters for concurrence.

Now, over time, we have gotten much more formalized about determining what the performance objectives are that we are going to be interested in in the award fee process, and I am not sure what the practice was back in this period, but today we review those performance objectives, or performance criteria, the PERB agrees to them, they run them

Albuquerque who was the contracting officer --
A. Yes, it does.
Q. -- during 1989 you were the manager; is that correct?
A. Yes.
Q. If you would turn to the following page, page number E 001040, there is a schematic of the award fee evaluation review process, showing how it starts and ends. Take a moment to review that.
A. Yes.
Q. Now, does the paragraph that you read on the role of the contracting officer, as well as the schematic, do they comport with your understanding of how the process worked?
A. Well, as I mentioned, during this period, there had been another step in the process, and that was getting concurrence from headquarters, which is not included in this --
Q. Which is not mentioned here in this chart, is it?
A. That's right. Again, the other thing is I am not sure at this point that we had PERBs. Maybe we did, maybe we didn't.
MR. KOLAR: For the record, this document is dated in 1977.
MR. NYE: That's in the record, yes.

Q. If you would look at the handbook that superseded the 1977 handbook, which is Exhibit 30, if you would look at page Roman III-10, it bears Bates number E 001096, and is entitled, there is a paragraph entitled, "Role of Fee Determination Official," and I would ask that you read that, Mr. Twining.

A. Yes.

Q. And on the following page there is a summary of the steps involved in the award fee process, and I would ask if you would look at that.

A. Yes.

Q. Now, does that paragraph comport to your understanding of how the process worked as well as the summary?

A. I think that paragraphs is fairly consistent with what I said.

Q. All right. So that the handbook, as it existed prior to the February 16, 1990 edition, makes no reference to headquarters' concurrence.

A. That's right.

Q. And the February 16, 1990 edition, which is Exhibit 30, does make explicit reference to headquarters' concurrence.

A. Yes.

Q. And I believe you have testified that the process

of headquarters' concurrence was an evolving one; is that fair?

A. Yes. Basically there was a task force that looked at the whole award fee process. One of their recommendations was that there ought to be a formalized headquarters' input, and it was not unusual for me to call and get input or the PERB to call and get input from headquarters before. But a formalized headquarters' input, I don't know exactly when we got guidance from headquarters that said, "From here forward you will send these forward for concurrence." But once we got that guidance, we did it. The handbook revision would have come later.

Q. So at some point before the February 1990 handbook, you would have received some directive from headquarters saying that award fee recommendations would have to go to headquarters for concurrence; is that correct?

A. I believe that's the case.

Q. Now, let's go back to 1988 when you arrived on the scene in Albuquerque, and I believe you testified you were involved in both award fee determinations for the six months of fiscal year '88. At that point in time, was there a formal requirement for headquarters' concurrence?

A. I don't recall, but I don't think so. I can't be absolutely sure. I do not believe that first award fee determination went to headquarters.

Q. In '88.
A. The determination that would have been made right after I got there, which would have been for the period that ended in March of '88.
Q. And what about the second half of 1988, that would be the award fee going from April 1 through September 30, 1988, did that go to headquarters for concurrence?
A. I don't recall. I don't know. I don't know for sure. I would say no because the task force was really started under the new administration, which came in in January of '89.
Q. As of the time that Admiral Watkins became the Secretary.
A. Yes.
MR. KOLAR: Give me a second, please.
(WHEREUPON, there were proceedings held off the record.)
Q. Now, it's your testimony, or your recollection, that for the two award fee periods in 1988, concurrence from headquarters is not required. Was headquarters informed at some point of the determinations that were being made for Rockwell, as well as the other M & O contractors under the supervision of Albuquerque?
A. It was not -- before I came to Albuquerque, there had been a technical safety appraisal at Rockwell, at Rocky

Flats, that was very critical, and so one of the real high visibility issues after I got to Albuquerque was radiation protection and the response to the rest of that technical safety appraisal. And I believe there were follow-up appraisals that were done during the early period that I was there.

So there were other headquarters people that had insight and opinions on what was going on at the plant, and on a number of occasions I remember talking to Rich Sterasteci, for example, to get his input in the ES & H area.

Those kind of inputs could also have typically been developed by individuals on the PERB, in areas that were of interest to headquarters, because, of course, what we were doing in the plants was to meet a headquarters program. That process was not formalized.

Q. And that response was in the context of 1988, I take it?

A. Yes.

Q. So that in an informal way, either you or others involved in the process, would elicit input from headquarters as well as, I assume, other sources.

A. Yes.

Q. Getting back to my question, though, in 1988, the PERB would make its recommendation to you and you would

being changed at all by headquarters?

A. No.

Q. And that question covers not just Rockwell but the other M & O contractors under Albuquerque's control.

A. I don't recall that happening.

Q. Do you recall headquarters ever changing an award fee determination decision while you were at Savannah?

A. No, but headquarters wouldn't have been very interested in a security contract, really, at that point.

Q. What about San Francisco?

A. No.

Q. Now you testified that when the new administration came in in January, 1989, at some time after that headquarters became more involved in the award fee process; is that a fair statement?

A. Yes.

Q. And do you recall how that came about?

A. Well, it was like I said, there was a task force formed to look at the whole award fee process and make recommendations, and Jim Culpepper, who was my deputy, was one of the people on that task force, who was both field and headquarters people, and the purpose was to deal with what were perceived as being a number of weaknesses in the process.

Q. And that task force came up with recommendations?

A. Yes.
Q. Did it come up with a written report?
A. I would assume so, but I don't -- I wouldn't guaranty it.
Q. You don't have a recollection?
A. Task forces usually come up with written reports and recommendations.
Q. You don't have a recollection today of ever seeing this particular task force report?
A. No. I probably did, but it's not something that I focused on.
Q. And the task force, its report then went to headquarters?
A. Yes, it was chartered by headquarters and the report went to headquarters, would have.
Q. And at some point in time after that the word went to you that concurrence was required?
A. I can't be sure of the exact timing. I'm not sure the task was completely finished before we got word that the package would go to headquarters for concurrence.
Q. Do you remember what form that word took?
A. No, I don't.
Q. Could it have been oral?
A. A what?
Q. Was it verbal?

A. It could have been.
Q. Do you know if the M & O contractors were notified that, beginning in 1989, headquarters' concurrence was required on award fees?
A. No, I don't.
Q. You never notified the contractors.
A. I don't know whether I did or not.
Q. You don't recall, is your testimony.
A. No.
Q. Let me show you what has been marked as Deposition Exhibit 1, which is entitled United States Department of Energy Supplemental Agreement Modification Number M-128, and it is supplemental agreement to contract DE-AC04-76DP03533. Have you ever seen Modification Number 128 before, Mr. Twining?
A. Yes.
Q. And what is this modification?
A. It's a fee and scope modification to the contract.
Q. And this is the contract with Rockwell?
A. Yes.
Q. And on page 4, is that your signature?
A. Yes, it is.
Q. What was the purpose of this modification? I know you used the words "fee and scope," but could you elaborate a little bit more on that?

MR. KOLAR: I would like a chance to look at Exhibit 5.

Q. Do you know what this document is?

A. It appears to be the transmittal of that draft performance evaluation report that was put together by the area manager.

Q. So in this case it would be the draft award fee recommendation put together by the Rocky Flats area office; is that correct?

A. Yes.

Q. And this would then be forwarded to Albuquerque.

A. Yes.

Q. If you would just bear with me, Mr. Twining, and we will walk quickly through this document.

A. Okay.

Q. If we go to page 1, there is something entitled -- a three page document entitled "Performance Evaluation," and how would you characterize this document? And I don't mean what it says, but is this supposed to be a summary of the particular contractor's performance, or what is its purpose?

A. I would say it's a summary of what the body of the report has to say.

Q. Would a document like this accompany your award fee determination when you would send it ultimately to the contractor?

MR. KOLAR: Objection. The question is not clear. This particular document, when you say "a document like this?"

MR. NYE: A document that is entitled "Performance Evaluation."

MR. KOLAR: Not this particular one, necessarily.

A. Again, that has evolved over time. Today we send the whole PERB report to the contractors.

Q. Do you recall in 1989?

A. I believe in 1989, and this might have been the summary level evaluation that we would have sent to the contractor. Again, this is a draft, it had not been dealt with by the PERB process.

Q. I understand, and as we walk-through this, I fully understand that this is the area office recommendation to Albuquerque.

A. Okay.

Q. If we move on, following the performance evaluation, there is a document entitled "Performance Appraisal."

A. Yes.

Q. And is it my understanding that this -- this particular document deals with the FPAs or the functional performance areas that we were talking about earlier?

A. I believe both documents probably did that.
Q. Okay.
A. This document that you are referring to now covers them in much more detail.
Q. And indeed gives an adjectival grade; is that right?
A. Yes.
Q. Along with a listing of achievements, deficiencies, and pertinent observations.
A. Yes.
Q. What was the grade for Rockwell under Plant for general management in this document?
A. Excellent.
MR. KOLAR: And again, just for clarity, this is a draft.
MR. NYE: I will stipulate to that. I am not trying to trick anybody. This is a draft that came from the area office that went to Albuquerque.
MR. KOLAR: All right.
Q. If we could move on to page 5, I think the next functional performance area is cost management, and what was the grade there?
A. Excellent.
Q. And then the next page is quality control, and the grade?

Can you tell?

MR. KOLAR: Objection, calls for speculation.

Q. If you know.

A. It appears to be somebody's opinion on the area we discussed before of translating the number of achievements and deficiencies and significant achievement and significant deficiencies into an adjectival grade.

Q. So somebody is questioning whether the numbers of deficiencies and sufficiencies equal the defined grade?

MR. KOLAR: Again, I object. It calls for speculation, lack of foundation, because he has testified he doesn't know whose handwriting that is.

Q. Is that what your understanding is?

A. Yes.

Q. Let me show you a document that has been marked as Plaintiff's Deposition Exhibit 6, and ask if you have ever seen it before.

A. I don't think so.

Q. Let me show you what has been marked as Deposition Exhibit 91. It's a two-page document entitled Award Fee Recommendation, Bates numbers are E 000973, 974, and it is signed by, it would appear to be Charles Troell.

A. Yes.

Q. Is that his signature?

A. I believe so.

Q. Now, would this be the recommendation of the PERB after it did its review of the Rocky Flats area office draft recommendation?

MR. KOLAR: If you know.

A. I would say it appears to be part of the recommendation. The report isn't here.

Q. I'll show you -- unfortunately it wasn't -- the report that was produced wasn't in discovery, it came in different pieces, and this was one of the pieces. I will get to a bigger piece in a moment. So that the PERB recommended what score on the plant?

A. There is no date on this document on when this PERB response was forthcoming. The score on here is 91.2.

Q. 91.2. It does say at the top it's for the period October 1 1988 through March 31, 1989.

A. Yes.

MR. KOLAR: I think what he meant is there is no date on the document as to when this was done, this document was issued.

MR. NYE: Okay.

Q. But the grade is 91.2.

A. Yes, it is.

Q. And what is the award fee, recommended award fee?

A. It appears to be, and this is not clear to me right now, because it doesn't have the base fee, but it

Q. You don't remember one way or the other?
A. I don't remember.
Q. Do you remember if you asked the PERB to go back and redo its report?
A. No.
Q. Have you ever asked the PERB at Albuquerque to go back and redo its report?
A. I have asked questions that have caused the PERB to redo their report.
Q. Do you recall whether that happened in this case?
A. No, I don't.
Q. And you believe in this instance you would have sent a recommendation to headquarters, is that correct, for this award fee period?
A. I believe this is the first cycle that we did that.
Q. And that recommendation would have reflected your review of the PERB's recommendation to you?
A. Yes.
Q. And possibly changes that you made on your own.
A. Yes.
Q. And you would have been comfortable with that recommendation prior to sending it to headquarters?
A. Based on the information I had up to that point.
Q. Which would have come from the PERB?

experience with Rocky Flats prior to June 6, 1989?
A. Mr. Goldberg was in the plutonium business at Richland. There was a lot of interaction among all the plutonium facilities in the department. From that standpoint, Mr. Goldberg would have been familiar with Rocky. I don't think he had personal day-to-day knowledge of what went on there, at the time he entered.
Q. Subject to dealing with Rocky Flats in his position at Hanford, do you have any information as to any other personal knowledge Mr. Goldberg would have concerning the Rocky Flats operations prior to June 6?
A. No.
Q. And how long did Mr. Goldberg serve as area manager?
A. I don't recall.
Q. A year?
A. I would say most of a year, but I don't know.
Q. Do you know who replaced him?
A. I would say either Dave Nelson or --
Q. Simonson?
A. Dave Simonson or Bob Nelson.
Q. After Mr. Goldberg became acting area manager at Rocky Flats, did you have a lot of dealings with him?
A. Not very many, but as this memo points out, we were expected to continue to support the office, and we did

reporting directly to headquarters?
A. Yes.
Q. After Mr. Goldberg's appointment, did you consider Rocky Flats still to be under the supervision of Albuquerque?
A. I considered this memo to be the effective document. That office reported to headquarters, and we were to do everything we could to help make things work.
Q. So the answer is no, you did not consider --
A. No, I did not --
Q. -- Rocky Flats to be under your jurisdiction.
A. No.
Q. Let me show you a document that has been marked as Plaintiff's Exhibit 49. It's a memorandum from Mr. Troell directed to you, dated July 10, 1989.
A. Okay.
Q. Have you seen this memorandum before?
A. Yes, I think I have.
Q. Why did Mr. Troell draft this memorandum?
MR. KOLAR: Objection, lack of foundation. It calls for testimony about what was in Mr. Troell's mind.
Q. Go ahead. You can answer.
A. As I recall this process, we got a recommendation from Mr. Goldberg based on the period of time that he had been at Rocky Flats, and we also had the nonconcurrence from

headquarters. I believe there was a PERB meeting, or Mr. Troell talked to the PERB members, about Mr. Goldberg's input.

Q. So you are testifying that sometime before July 10, the date on this memorandum, Mr. Goldberg, or somebody acting for Mr. Goldberg, would have communicated to Albuquerque that Mr. Goldberg was proposing an award fee of 87.

A. That's right.

Q. Do you recall what form that communication took?

A. I believe there was a letter.

Q. Let me show you a document that was previously marked Exhibit 14. I will ask you if that is the letter that you believe you received.

A. Yes.

Q. I note that letter is dated July 27.

A. Yes.

Q. Mr. Troell's memorandum is dated July 10th.

A. Mr. Troell's memorandum is also not signed.

Q. Mr. Troell, in his memorandum of July 10th, had knowledge that Mr. Goldberg was recommending a grade of 87; is that right?

A. Yes.

Q. Do you recall how Mr. Troell obtained that knowledge?

MR. KOLAR: Objection; again calls for speculation, lack of foundation.

MR. NYE: Well, the foundation is Mr. Troell's memorandum that refers to a grade of 87 and I'm asking how he learned -- if he knows. He either does or doesn't --

MR. KOLAR: I will limit my objection to calls for speculation because it's asking how Mr. Troell knew.

Q. If you have knowledge. Don't speculate. If you know.

A. I cannot explain the date on this memo being July 27 and the date on Mr. Troell's memo being July 10th. My recollection of this process is we got a recommendation from Goldberg, the PERB considered that recommendation, and we went into headquarters with a modified proposal.

Q. Did you have conversations with Mr. Goldberg on the subject of his recommendation of '87?

A. I don't think so before we got the letter.

Q. Okay.

A. The conversations that I had with Mr. Goldberg, after he took over at Rocky Flats, were trying to have us continue to provide support in areas that he wasn't equipped to deal with in this new management arrangement that had been implemented by the Tuck memo.

anybody.

Q. Did you do any form of an analysis as to how Mr. Goldberg came up with the grade of 87?

A. No, I didn't. My recollection, and I cannot explain the dates, my recollection is we got a recommendation from Goldberg, the PERB looked at it, the PERB advised me that there was much more in what was going on at Rocky Flats than we had been able to provide, and that we had no basis, really, to argue with the kind of findings that were coming out of Rocky Flats after those first several days and weeks and months of the raid.

Q. What findings were those?

A. The levels of detail, changing filters with significant safety implications without having building managers know about it; just the -- we had been focusing on really radiological protection, and around this time, mostly around 771, and I don't believe my staff was aware of the magnitude of some of the other issues that came out right after the raid.

Q. So, it's your testimony that, while you don't understand the dates, you believe that the PERB, prior to its memorandum to you of July 10, had received some form of rationale from Goldberg on the 87?

A. I'm quite sure they must have.

Q. Did the PERB ever change its report to you on the

Q. Have you seen this document before?
A. Yes.
Q. Is that your signature on it?
A. Yes.
Q. You note that in the third paragraph it states that, "As stated in my draft memorandum to John C. Tuck dated July 10, '89"?
A. Yes.
Q. Does that refresh your recollection that that memorandum, indeed, went to Mr. Tuck?
A. I would say that's one way to interpret that. I'm a little surprised that we reference a draft memorandum as an official memorandum, but that...
Q. You state that, "I am not" -- you being Mr. Twining -- "am not in a position to offer an informed alternative to his proposal, especially in view of our changing philosophy in the application of Department of Energy performance standards and level of DOE expectations."
What do you mean by that, that you were "not in a position to offer an informed alternative"?
A. What I meant is at this point there were many more people looking at that plant in intimate detail than there had been before the raid, and that since Albuquerque was no longer in the loop and we didn't have access to the site, I didn't have any way to validate what they are finding. So I

was accepting what other federal employees, who were on site, were discovering during this period after the raid.

Q. What is the purpose of this memorandum to Mr. Meinhardt?

A. Well, the purpose of this memorandum was to respond to the nonconcurrence around my prior recommendation, and to provide a new recommendation for headquarters' consideration, and this new recommendation reflected the input from Ed Goldberg who was the acting area manager of Rocky Flats.

Q. At the time you sent this memorandum, did you have any information that headquarters was considering an even lower award fee?

A. No.

Q. Let me show you a document that has been marked Plaintiff's Deposition Exhibit 150.

A. Okay.

Q. Who would have prepared this letter?

A. Well, I can't tell because there is not an organizational code on it, but probably our contracts people.

Q. Did they have forms in their word processor for these award fee letters to contractors?

A. I don't know.

Q. Do you know when this letter was prepared?

Q. But in Mr. Goldberg's July 27 letter to you, he attached a performance evaluation report?
A. Okay.
Q. Do you believe that would have been the report that would have been attached to Exhibit 150 --
MR. KOLAR: Assuming one was attached to that exhibit. It was just a draft of the document.
A. The best that I recall is that in some form our PERB reflected on Goldberg's input. I don't know whether they accepted his performance evaluation report or not.
Q. Let me show you a document that has been marked Plaintiff's Exhibit 84.
A. Okay.
Q. Have you seen this document before today, sir?
A. No.
Q. It's entitled "Executive Summary."
A. It is -- on contract actions that I get, I have a memo to file, and a summary of what we are doing by whatever it is they are asking me to decide. This could well have been that description that went along with the letter to Meinhardt.
Q. So this, "Executive Summary," would not have gone from Albuquerque to headquarters; is that right?
A. No, I don't think so. Is there an addressee on this?

the Meinhardt letter?

Q. Will you show that to me?

A. The zero that I'm talking about are the words that says if you get an unsatisfactory in any future award fee periods, you can get a zero award fee.

Q. What grade did Meinhardt give Rockwell for ES & H?

A. 65.25.

Q. And what grade did Goldberg give Rockwell? I believe it's referred to right in the Meinhardt memo.

MR. KOLAR: Yes, either that or --

A. Seventy-nine, I guess.

MR. KOLAR: You're asking for Goldberg now?

MR. NYE: Yes.

MR. KOLAR: This discusses Goldberg.

THE WITNESS: It doesn't have the details.

A. Goldberg gave Rockwell a 79 ES & H.

Q. And you were comfortable with the 79 that Mr. Goldberg gave?

A. Yes.

Q. And you were comfortable with the 65.25 that headquarters gave?

A. Yes.

Q. And you were comfortable with the 81 that was recommended by your PERB for ES & H?

A. Again, there was a lot of additional information

on the table.

Q. At the time. At the time you were comfortable with the 81?

A. Yes.

MR. KOLAR: Let me just clarify something. Is there a similar proviso to the other two answers you gave, that you were comfortable, at the time?

THE WITNESS: Based on the information that was coming out around Rocky Flats, I believe our PERB graded Rockwell too high on the ES & H when they met the first time.

Q. What input, or new information, was provided by Mr. Meinhardt as compared to Mr. Goldberg on his ES & H reduction?

A. Just his letter.

(THEREUPON, Deposition Exhibit Number 176 was marked for identification.)

Q. I will mark this as 176.

A. Okay.

Q. Have you seen this fax before?

A. Not the fax.

Q. Who is Mr. Cone?

A. I believe he was one of our contracts people.

Q. And who is Mr. Larry Oliver?

A. I don't know him. I think this indicates that he