EXHIBIT 9

00001

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

-oOo-

UNITED STATES OF AMERICA and UNITED STATES OF AMERICA, ex rel. James M. Stone,

Plaintiffs,

-vs- Case No. 89-M-1154

ROCKWELL INTERNATIONAL CORPORATION, et al.,

Defendants.

______________________________________/

DEPOSITION OF EDWARD S. GOLDBERG

called for examination by counsel for defendants pursuant to Notice, at the offices of Sierra Nevada Reporters, 332 Ryland Street, Reno, Nevada, at 9:00 a.m., Thursday, April 23, 1998, before Kristine A. Bokelmann, a certified court reporter.

APPEARANCES: (See Separate Page.)

Reported by: Kristine A. Bokelmann, CCR #165

00012

Congress or any administrative body concerning matters relating to Rocky Flats Plant?

A To my recollection, I did not testify before Congress or any administrative type tribunal, council, or so on. My dealings with Rocky were direct with my superiors in Washington, D.C.

Q I'd like to take you back to your first day at the plant. Do you recall what day that was?

A Could have been D-Day, June the 6th. I don't remember exactly. I think that was the date, June the 6th, 1989.

Q Why do you refer to that as D-Day?

A Because that is D-Day. That's when we invaded Europe. That's why it stuck in my mind. Was that the right date? Do you remember?

MS. HEJAZI: I'm not sure.

BY MR. PLISSEY:

Q It might be.

A Just seemed to stick in my mind.

Q Right.

A It happened to be a coincidence.

Q Do you recall what you did that day?

MR. HESCH: Objection. Form.

THE WITNESS: I got up in the morning and was picked up at my hotel by a car and driven with the deputy

00013

secretary, Mr. Henson Moore, Mr. Leo Duffy and others, to the Rocky Flats Plant.

BY MR. PLISSEY:

Q And do you remember any of the others you were driven with to the Rocky Flats Plant?

A I don't remember their names, no.

Q What happened when you arrived at the plant?

A We were met at the gate by the manager of Rocky Flats.

Q And who was that?

A Mr. Earl Whiteman, who rode in the car with Mr. Henson Moore into the plant, itself, while I remained in the car with Mr. Leo Duffy.

Q Was Earl Whiteman the manager of Rocky Flats Plant as of June 6, 1989, or was it Rush Inlow?

A Ah, Rush Inlow. Now you're -- it was Rush Inlow, yeah. My memory is not serving me well. Earl Whiteman was the previous manager. At the time I came there it was Mr. Rush Inlow. You're right.

Q And what happened after you picked up and were met by Mr. Inlow?

A We went to the Rocky Flats office building, went into the conference room where a member of the FBI, don't remember his name, asked me if I was the manager of Rocky Flats and I said I was, and he handed me a search warrant. Rush

00014

Inlow. The name never did sit there, okay.

Q What did you do next? You've been served with a subpoena. What occurs after that?

A I go into shock. No, the FBI explained what they wanted and how they were going to do it, and I had to, of course, meet with the staff for the first time and inform them what was going on and then get organized.

Q Was this the first time you had received notice that the FBI would be out at the plant that day serving the manager of the plant with a subpoena?

A No.

Q When is the first you heard about that?

A The day before.

Q And where was that at?

A In Denver, Colorado.

Q And who was there for that?

A Deputy DOE secretary Mr. Henson Moore, Mr. Leo Duffy, and others.

Q And you don't remember the names of the others at this point?

A No, I do not.

Q Did you ever have any discussions with anyone concerning the first notice DOE had received that the FBI would be serving a subpoena out at the Rocky Flats Plant?

A Not before June the 5th, if that was the day

# EXHIBIT 10

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

------------------------------------X
UNITED STATES OF AMERICA, EX REL; :
:
Plaintiff, : Civil Action
: No. 89-M-1154
-vs- :
:
ROCKWELL INTERNATIONAL CORP., : PAGES 1 - 155
ET AL, :
:
Defendants. :
------------------------------------X

Deposition of W. HENSON MOORE

Washington, D.C.

Wednesday, April 15, 1998

Reported by: Nancy Bond Rowland

JOB NO. 106926

ESQ.COM Esquire Communications Ltd.
Court Reporting Worldwide

Sherry Roe & Associates, Inc.
1825 K Street, N.W., Suite 1212 • Washington, D.C. 20006
202 429-0014 • Fax 202 296-8652

A I was there on the day of the raid and then for two weeks and then went back for another week as I remember within a month or two after that.

Q And during that time frame did you deal with Rockwell as well as DOE personnel on site?

A Yes.

Q Does the term secretariat mean anything to you?

A Yes.

Q Does that consist of the secretary, the deputy secretary, and the under secretary?

A Yes. I think that's kind of -- I'm not sure those are the official written in the law books anywhere definition, but that's how we understood it.

Q Can you tell me the reporting relationship or other relationship between the deputy secretary and the under secretary while you were there?

A The under secretary was almost the personal assistant of the secretary and the admiral to assist him in what we call running the bomb factory which included Rocky Flats. That's why the president had selected Admiral Watkins. He was a nuclear engineer.

virtually everything in the department other than what we call defense programs which has the assistant secretary over it. Nuclear, all the rest, came under me.

Q And when you refer to the legal arm, is that correct, that's what you said?

A Yes.

Q Is that a reference to the general counsel and his work?

A Yes.

Q They reported to you?

A Uh-huh.

Q Is that yes?

A Yes.

Q Do you recall how long before the FBI raid it was that you learned that the raid would occur?

A It was only a matter of weeks, maybe a month at the outside. And I don't remember exactly how it was we learned about it enough to approach the attorney general, but Admiral Watkins, myself, Polly Gault, the chief of staff, met with the attorney general where we learned or confirmed that there was in fact going to be

a raid, a joint raid by EPA enforcement and by the FBI on Rocky Flats.

I don't know how we had heard about it. Maybe the admiral had heard about it something in passing from the attorney general. I'm not sure how we got the word, but we asked to meet with him or he asked to meet with us -- I've forgotten -- in a very, very small meeting.

It was revealed to us what was going on on the condition that we would not in turn let anybody else know so that records or documents or bad practices wouldn't be cleaned up, covered up, and ruin the whole investigation.

Our concern was the fact that I think the biggest private army in the country was stationed there with heavy weaponry compared to FBI agents, machine guns, automatic weapons. And there was a distinct possibility in our minds, because security was extremely high at Rocky Flats, that the FBI wouldn't be let in. And that if somebody started drawing guns and started brandishing guns, we didn't know but what something really bad might happen.

terms of recognition, you're supposed to be able to recognize the person and allow them in. So I had the proper clearances. And the admiral and attorney general both felt I could get in and could bring in whomever with me I wished, whereas an FBI agent trying to get in might well not have gotten in.

Q So literally when the FBI caravan -- Was it a caravan of vehicles coming in?

A Yes. As I remember about 70 agents between the FBI and EPA.

Q On that first day you were kind of the head vehicle?

A I was the first person up to the gate. They all were behind me, yes. Funny feeling.

Q I can imagine.

A Guns in front of me and guns behind me.

Q Great place to be.

A Funny place to be, right. I've never been in a position like that before.

Q But when you were referring to a military presence, was it your understanding those were at Rocky Flats or simply a military base?

incinerators there illegally, another one was midnight dumping of toxic materials illegally.

Q And both of those were proved not to be true?

A Both of those proved not to be true. There was a third one, and I don't remember what it was. When I went out there, the admiral sent with me the best people we had in the department, some career and some we brought in who were real experts, and we spent two weeks there.

The minute we went inside with the FBI agents, the DOE personnel went in with me and immediately started doing their own investigation. We knew within a matter of two or three days that the sensational allegations being made were just not true. However, we began to find what we considered important infractions that were not being followed and not being done, and those were of greater concern to us than were these wild allegations quite frankly.

Q The people who came in with you, were those the members of what's called the Tiger Team?

A Ultimately they became called the Tiger Team. That was the first one. We developed that based

on that experience at Rocky Flats and the admiral's experience in the Navy of surprise inspection teams. We took that format we used at Rocky Flats, called them a Tiger Team, and sent them in to every single facility DOE had over the next three or four years to go in and do a surprise inspection that lasts as long as two or three weeks and then do a report.

Q The Tiger Teams, was that an area in which you had responsibility?

A It depended. On this one, yes. The first one, yes. I was the point man of the secretariat and the administration in dealing with the point team, the Tiger Team at Rocky Flats and the whole Rocky Flats proposition.

After that we kind of split them up. If it was one of our laboratories that answered to me, the Tiger Team would report to me. If it was one of the other bomb complex facilities which the laboratories were certainly connected with but one of the other facilities where you assembled or disassembled nuclear weapons, generally that Tiger Team would report to either Tuck or the admiral.

out, our people found out that was not the case.

There were lots of other infractions found, and some of those mentioned by Mike Norton here, alluded to him having mentioned them, we did find as being true.

Q The next one on the list of that I just quoted was false certification of federal environmental reports. Do you recall whether that allegation proved true?

MR. HESCH: Same objection.

A No, I don't. We'd have to go back and look in the Tiger Team report because that's a technical thing. In other words, if somebody reported something or didn't report something, we took a pretty harsh view of that, and that could well have happened because a number of things we saw there were fairly loose in terms of the handling of waste.

Q But allegations of false certification and concealment of environmental contamination, those were allegations that DOE took seriously?

A Certainly. Took all of this seriously. I don't remember whether that was found to be the case or

not. I do remember because in the two weeks I was there, I would go on the inspection trips into the various buildings at Rocky Flats with our DOE people, and they were teaching me what to look for. We'd walk along in protective suits, and they'd say "We're looking for this. We're looking for that."

I could see what it was they were finding, we were finding, before the EPA, before the FBI agents found it, whatever. I remember distinctly we found waste containers improperly stacked and stored. We found waste containers improperly labeled. We found waste containers that had not gone through a radioactive measuring test to determine the level of radioactivity as I remember. We found people walking around with their protective head gear off. We found things that hadn't been cleaned properly, ventilation systems that would allow potentially radioactive dust to escape.

Those are the kind of things that I remember, all of which are considered extremely important, but I'm not sure how much weight the press put on that. It doesn't sound very sensational.

What that shows is the fact that people weren't following rules and regulations in the handling of nuclear material. And when you find that, that in turn shows you a culture that's lax, and that lax culture can ultimately lead to a Three Mile Island kind of event which, by the way, we predicted something like that was going to happen because of the fact that the civilian work force whether they were at a nuclear power plant or at one of our facilities didn't follow the same level of cultural commitment to environment, safety, and health in the handling of nuclear materials that the Navy did.

Q You referred to some infractions that you yourself observed as you walked through. Did you find any evidence that those infractions were concealed from the DOE people on site?

A No.

Q And indeed, you were able to observe those infractions simply by walking by the relevant locations, is that right?

A With experts who could tell me what I was looking at.

health, and the Court ruled we were not.

So when we got there, two things had happened. That court case had settled the law that we were not exempt because we were top-secret installations.

Number two, the prior Secretary Herrington just as he left office revealed to the world what a bad state of repair the bomb complex was in. And so what he said was they cannot live up to what the law requires, and you just won't believe what's out there, folks. See you later.

So we walked in with the mandate that we had to obey the law, and that we had a complex that had never had to obey the law and really probably weren't up to it at that point in terms of the physical changes we had to make in the facilities and the training and the cultural change we had to make.

So we embarked upon that cultural change, and we were already into this when Rocky Flats happened.

Q Do you recall whether any DOE employees faced the risk of indictment as a result of the raid?

A Yes, and that risk went on for some years

afterwards, not just Rocky Flats. There was a case while we were on our watch, the first one I think where I guess the Justice Department or somebody went after civilian employees at a military fort right here in Maryland for, as I remember it, intentionally filing wrong records, misleading records, on environmental compliance, and they were found to be criminally liable and actually received I think jail sentences.

So with the new requirements that we had to be subject to all these environmental laws, likewise came the criminal prosecution like in the civilian sector, and suddenly we had a real chill. And I remember personally meeting with a number of -- I interceded with the Justice Department for some time trying to get some ground rules over who they're going to prosecute and who they're not because we were faced with a substantial walkout of our own DOE personnel at these sites, and there was a real feeling of unease among our contractors as well.

Q When you say a substantial walkout, you mean people actually left?

A People were saying "I'm going to retire. I'm

leaving. I am not going to run this plant on behalf of the government and do what I'm asked to do and go to jail. I'm not going to do that." These people were very concerned, very worried. I remember meeting with them.

Q Their concern was in part that if they ran the plant, they ran a risk of going to jail for circumstances out of their control?

MR. HESCH: Objection.

A That was their way of looking at it, and the Justice Department in talking to me said no. We're never going to go after somebody that something bad happened unless he intentionally did it or covered it up or misled people. So that was the negotiations I was in with the Justice Department at that point. Give me some guidelines because we're about to have the people running the bomb factory walk off, leave.

And after the Fort Detrick, Maryland case, I guess that's where it was after that case came out because these two things had happened. Suddenly we were not exempt from the law because we were top-secret, and suddenly in a short time thereafter the

at that time. Had that been the case, it would have been handled totally differently.

Q Meaning?

A There would have been no mutuality. It would have been "You're out of here" and a press conference and probably turned over to the Justice Department. We wouldn't have tolerated for one minute had we had any knowledge of anything being fraudulently or illegally or purposefully being done to mislead us. We did not know anything about that at that time.

Q You still don't?

A Still don't. Had we, it would have been handled differently, I can assure you of that. I can just see the admiral. I just know him too well. We're still social friends. I would not have been able to get him off the ceiling for days had he had knowledge of that.

Q By the time a decision was made or communicated to you, do you recall whether the Tiger Team had issued its report?

A Yes. I think we knew enough. Whether we had the written report in or not, we would very often get

briefings, and I was getting briefings as well as the admiral probably receiving them together. For the most part Leo Duffy or Ray Berube or both would come in and say here's what we have learned up to this point and keeping us briefed. In all probability the admiral probably conferred with Leo before he finally made the decision because this was not done lightly.

This was the admiral and I was there strictly as his special assistant or lead on this part of the Rocky Flats thing. As I say, it wasn't my daily chore to worry about the bomb factory. It seemed like the longer I was at DOE, the more and more I became enmeshed, the more and more he would throw things at me, pick up and do this. By the time I left there, I was doing as much of the bomb factory as I was anything else.

But this was something that he was torn, it was a tar baby, between this twin duty of we had to -- At that point remember the Berlin Wall hadn't fallen. Glasnost hadn't happened. We were still building nuclear weapons perceiving the potential threat of a war with the Soviet Union.

percent weighting factor being new, then it was sent to headquarters for us to approve or disapprove or change it. That was new.

And when it came to headquarters, I think it officially came to Defense Programs. I'm not sure which. I've forgotten what our procedure called for. But in reality Nancy would get it and would go over it and would come in and sit down with me and go over it, and we made a decision whether we agreed or disagreed with the finding of the Operations Office.

Q So you and Nancy would review these for all the award fee contracts held by DOE or all within the weapons complex?

A I think they were pretty much all of them there for a time period.

Q And how long was the time period roughly?

A I think a year or two. The idea was just to be sure that the changes we were making was being followed.

Q And during this time frame, one of the things you'd take into account is data that was gathered not merely by the Operations Office but by say Tiger Teams?

A Yes, absolutely.

Q So if you had data from the Tiger Team report of a particular facility and you subsequently got an award fee report, you would take into account does this report accurately reflect the problems found by the Tiger Team?

A Yes. As a matter of fact, I can remember on the Rockwell case conferring with Leo Duffy about it. You know, Nancy and I and Leo would sit down and look it over about what the Tiger Team knew about how Rockwell had performed. We certainly took that into account.

Q Now, at the time period following the raid, do you recall that there was interest in the press and in Congress about the award fees being paid?

A Yes.

Q What do you recall about that?

A Well, as evidenced by the question you asked me previously about the report to Congress, once the Rocky Flats raid hit, there was a lot of interest in the Congress all on Rocky Flats, the whole contracting system, the whole award fee system, the IG report

that it wasn't a matter of picking out a defenseless contractor. It wasn't a matter of trying to look good in the press. It was a matter of trying to change the culture, trying to make a change, trying to have people understand it.

So yes, they made that argument. Yes, I heard that argument and listened to it from, as I remember, two executives of the corporate office that came to see me. But at the end of the day, we determined having heard it, we still felt the decision we made was the right decision.

Q And did you believe the decision you made on the amount of the award fee you ultimately awarded fairly reflected Rockwell's performance given all of the deficiencies you had observed and the Tiger Team had reported?

A From what we knew at that point, yes.

MR. KOENIGS: I have nothing further. Thank you.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. HESCH:

Q I just have a few questions. When you were

EXHIBIT 11

# United States District Court

DISTRICT OF COLORADO

In the Matter of the Search of

(Name, address or brief description of person or property to be searched)

The Rocky Flats Plant
United States Department of Energy
Rockwell International Corporation
Highway 93
Golden, Colorado 80402

## SEARCH WARRANT

CASE NUMBER: 89-730M

TO: Federal Bureau of Investigation Special Agent Jon S. Lipsky and any Authorized Officer of the United States

Affidavit(s) having been made before me by FBI SA Jon S. Lipsky (Affiant) who has reason to believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

The Rocky Flats Plant, U.S. Department of Energy, Rockwell International Corporation, Highway 93, Golden, Colorado 80402 (as more particularly described on Attachment 1, incorporated here by reference)

in the State and District of Colorado there is now concealed a certain person or property, namely (describe the person or property)

various property which is evidence or the means or instrumentalities of, or the fruits or other results of, criminal violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6928(d), the Federal Water Pollution Control Act, 33 U.S.C. §§ 1311(a) and 1319(c), and 18 U.S.C. §§ 1001 and 2, as further described in Attachments 2 and 3 (incorporated here by reference).

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search the place named above for the person or property specified, on or before June 15, 1989 (including multiple and nighttime entries), serving this warrant and making the search ~~(in the daytime — 6:00 A.M. to 10:00 P.M.)~~ (at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to UNITED STATES MAGISTRATE (U.S. Judge or Magistrate) as required by law.

June 6, 1989 8: A.M. (Date and Time Issued) at Denver, Colorado (City and State)

Hilbert Schauer UNITED STATES MAGISTRATE (Name and Title of Judicial Officer)

[signature] (Signature of Judicial Officer)

FI 431469

SUBPOENA 1995 ITEM 1

permitted to discharge pollutants from its sewage treatment plant directly into the creek.

2.9. All of the above are apparent violations of the CWA, which provides criminal penalties for the knowing or negligent discharge of pollutants without a permit or in violation of permit conditions. See 33 U.S.C. §§ 1311(a) and 1319(c).

False Statements and Concealment

2.10. Consistent with their efforts to keep the public from knowing "just how really bad the site is," July 1986 DOE Memorandum (emphasis added), there is probable cause to believe that Rockwell and DOE officials have knowingly and falsely stated Rocky Flats' compliance with environmental laws and regulations, and concealed Rocky Flats' "serious contamination." Id.

2.11. While DOE concluded in December 1988 that groundwater contamination at Rocky Flats was the greatest single environmental hazard at all of DOE's nuclear weapons facilities, there is probable cause to believe that Rockwell and DOE officials falsely certified in November 1985 that Rocky Flats was "in compliance with all applicable [RCRA] groundwater monitoring [requirements]." In fact, and contrary to such certification, various Rockwell and DOE officials were aware of serious contamination and were informed that the monitoring system was deficient, did not comply with

RCRA, and produced data of limited (or questionable) validity.

2.12. *In or about May 1987, DOE awarded Rockwell a performance bonus of approximately $8.6 million, based on Rockwell's alleged "excellent" management at Rocky Flats.* DOE officials rated the health and safety programs at Rocky Flats "very good" and said that the plant's programs to manage radioactive and toxic wastes were "excellent," despite other DOE findings that some of Rocky Flats' waste facilities were "patently 'illegal,'" that Rockwell had significant problems in controlling radioactive contamination at the plant and that Rockwell provided DOE with erroneous and incomplete reports on environmental, health and safety matters. In addition, three separate DOE inspections at Rocky Flats since 1986 have noted serious health and safety problems and severely criticized Rocky Flats' management.

2.13. In December 1988, Rocky Flats officials failed to report two discharges from Rocky Flats in November 1988 into creeks crossing the Rocky Flats property and leading to metropolitan Denver drinking water supplies, which contained chemical pollutants not authorized by Rocky Flats' CWA permit. Rocky Flats also failed to disclose at least three illegal discharges in December 1988 (¶ 2.8) from the plant's sewage treatment facility.



RI 421508
SUBPOENA 1005 ITEM 1

regulatory personnel to conduct the necessary permit analysis. In its response dated May 2, 1989, DOE indicated its willingness to request a continuance "until such time [as] CDH [can] enhance Q-cleared staff and review, to its satisfaction, information relative to the issuance of a final permit."

5.55. *In sum, the investigation to date shows a substantial history of RCRA issues and alleged violations at Rocky Flats, and establishes DOE's and Rockwell's clear knowledge of federal environmental law and regulation. Rocky Flats does not have a RCRA permit and several enforcement proceedings are ongoing. There is probable cause to believe that hazardous and mixed wastes have been illegally treated, stored and disposed of at Rocky Flats, in violation of 42 U.S.C. § 6928(d)(2); that DOE and Rockwell have repeatedly failed to provide EPA and CDH with complete and accurate waste information necessary to proper regulation; that wastes have been improperly mixed, contrary to 42 U.S.C. § 6928(d)(2); and that false statements and concealment of material facts have occurred, in violation of 42 U.S.C. § 6928(d)(3) and 18 U.S.C. § 1001. In conjunction with ¶¶ 1.18 - 1.22, there is probable cause to believe that evidence of such crimes is located at Rocky Flats, in Buildings 111, 115, 122, 123, 706 and 776, as well as the Wind Systems Building.*



RI 421558
SUBPOENA 1005 ITEM 1

004-007. Outfall 001, for instance, may only discharge into South Walnut Creek if weather conditions cause flows into Pond B-3 which (a) exceed its capacity and (b) cannot be handled by the plant's spray irrigation system.

9.14. Additionally, "[a]ny anticipated facility expansions, production increases, or process modifications which will result in new, different, or increased discharges of pollutants must be reported ..." Permit No. CO-0001333, at 17. Failure to give such notice violates the permit.

9.15. One of the other conditions or requirements of Rocky Flats' NPDES permit is that the facility submit a Discharge Monitoring Report ("DMR") to EPA each month. A DMR is required to describe the amount and source of all discharges from the plant's permitted outfalls, as well as the concentrations of pollutants limited by the permit.

9.16. During the period from March 1987 through May 1988, DOE Area Manager Albert E. Whiteman reported several violations of Rocky Flats' NPDES permit. With the exception of the March 1987 violation, all of these Clean Water violations were reported in the plant's DMRs, as summarized below:

| Date of Violation | Limitation Exceeded | Location of Violation |
|---|---|---|
| March 1987 | unauthorized discharge of process wastewater | Pond B-3 (which discharges to Walnut Creek) |



RI 421589

SUBPOENA 1005 ITEM 1

1001.

9.24. In February 1989, your affiant's investigation monitored another discharge from Rocky Flats into Walnut Creek, which DOE failed to report to EPA in its daily monitoring reports.

9.25. There is probable cause to believe that DOE and/or Rockwell have made false statements to or concealed material facts from the EPA concerning discharges from Rocky Flats to "navigable waters", in violation of 18 U.S.C. § 1001, and has criminally violated the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c), by negligently or knowingly discharging pollutants, into Walnut and Woman Creeks since at least 1987, without a permit or in violation of Rocky Flats' permit conditions.

9.26. There is also probable cause to believe that evidence of such crimes is located at Rocky Flats, in Buildings 998 and 995, and at or about North and South Walnut Creeks (including the A and B series ponds and related conveyances) and also at Woman Creek (including the C series ponds and related conveyances), as well as Buildings 111, 115, 122, 123, 706 and 776, and the Wind Systems Building, where relevant documents are likely to be maintained.

EXHIBIT 12

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

----------------------------------X
UNITED STATES OF AMERICA, EX REL., :
:
Plaintiff, : Civil Action
: No. 89-M-1154
-vs- :
:
ROCKWELL INTERNATIONAL CORP., : PAGES 1 - 187
ET AL, :
:
Defendants. :
----------------------------------X

Deposition of JAMES D. WATKINS

Washington, D.C.

Tuesday, April 28, 1998

Reported by: Nancy Bond Rowland

JOB NO. 106928

did, and that was the government.

Q And that was the feeling that existed prior to the time you started making changes to your understanding?

MR. KOLAR: Objection to form and foundation.

MR. KOENIGS: I'll withdraw the question.

A No, I don't think so.

Q Sir, do you recall how long before the FBI raid it was that you learned about the Department of Justice's intent to raid Rocky Flats?

A As I recall it was about five days, but I don't -- Something like that. Maybe three days. It wasn't very many days. It was within the week before. If I knew the date -- the day of the week of the raid, I could probably go back and recall specifically, but it was around I think three to five days ahead of time as I recall. It might have been two days. I don't know. It was shortly before the raid.

And it took me time to get the team ready without any advice given to the field commander, yet in

Washington to pull together a quiet team of people to be on site for security purposes because I felt that there would be a potential conflict between the FBI and the security force at Rocky Flats were there to be any unannounced attempt to enter the complex.

Q I wonder if --

A It would have been a very unusual situation. We've never had that before that I know of, and I thanked Thornburgh, the then Attorney General, for letting me know ahead of time because we might have had a serious confrontation. That was my biggest concern.

Q Right.

A And no alert was given to the site. I can assure you of that.

Q I wonder, sir, if you could look at Exhibit 1438 which I believe was your testimony before Congress in October of 1989.

A Yes.

Q And page 118 under the heading Senator Bingaman, rather, was inquiring about the Department of Justice criminal investigation. Do you see that?

A Uh-huh.

Q Do you recall whether you read the search warrant affidavit?
A I read -- I was briefed on it before the fact by the Attorney General by his representative in his office at the Justice Department a few days before they went in. So I already had that.
Q You had had a briefing on the contents of the affidavit?
A Right.
Q Do you recall whether at any time you actually read the search warrant affidavit?
A I might have read portions of it that were highlighted to me in briefings within the Department of Energy by the various people involved, but I probably did not read the entire report.
Q Do you recall whether either in your briefing from the Department of Justice or otherwise you learned that among the allegations made by the Department of Justice were allegations of alleged concealment or misstatements by either DOE personnel or Rockwell personnel?
MR. KOLAR: Objection to form and