EXHIBIT 13

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL., Plaintiff, -vs- ROCKWELL INTERNATIONAL CORP., ET AL, Defendants. | Civil Action No. 89-M-1154<br>PAGES 1 - 179 |

Deposition of JOHN TUCK

Washington, D.C.

Monday, April 27, 1998

Reported by: Nancy Bond Rowland

JOB NO. 107316

Foundation. The witness may answer to the extent he can.

A I am vaguely aware of events that happened in 1989 relating to Rockwell but not to any great specific detail. I remember that early on in our tenure at the Department of Energy under the Bush administration that there was a raid scheduled by the FBI to go into Rocky Flats, which was then being managed by Rockwell, on a number of concerns.

And that there was a great deal of discussion back and forth between the Department of Energy and the Department of Justice and the FBI about how that raid might actually take place for fear that there would be federal officers of one sort conflicting with federal officers of another sort both concerning jurisdiction, and there was a great deal of concern about miscommunication at that particular time.

That's my recollection of events in the late spring, early summer of 1989.

Q As you sit here today are you aware of any facts indicating that Rockwell defrauded the government in connection with its operation at Rocky Flats?

early months at the department was the water hammer incident at a decayed reactor in Savannah River. One of the three reactors that at one time had been in the production of tritium for the Department of Energy, tritium being a component of a nuclear weapon, one of the reactors in Savannah River, the then remaining reactor that was in service, had a water hammer incident. A portion of the cooling for the reactor was not functioning properly.

And there was concern -- Admiral Watkins being a nuclear Navy-trained individual was much more current and familiar with the reactor operations than I was. And the way this one was handled and the fact that it took so long to get to the attention of leadership of the department very much concerned him.

So I would think that my early impressions about the nuclear weapons complex related mostly to the Savannah River site.

Q Do you recall when you first learned about the impending raid of Rocky Flats?

A April or May of '89.

Q And how did you learn about it?

A The FBI told us.
Q And did they tell you in particular or did they tell --
A No. I think they were briefing different lawyers from the General Counsel's Office at that time, and they wanted to make sure that the secretary was aware of their plan.
Q Did you have any particular responsibilities upon learning that the FBI was planning to raid Rocky Flats?
A No. No. At that time we were organized in a fashion that the secretary would be informed. And the secretary was a box that contained the secretary, the deputy secretary, and the under secretary. And at that time the field operation reported directly to the secretariat, and it was in that capacity that I learned broadly of these events that were unfolding.
In other words, Rocky Flats coming under the Albuquerque operations office or field office, problems about that would be coming to the attention of the secretary from the Albuquerque field operations office.
Q Once the raid occurred, did you have any

particular responsibilities with respect to Rocky Flats?

A No, not until later that year did I have specific defense programs responsibilities.

Q Do you recall whether a man named Ed Goldberg was assigned as area manager of Rocky Flats at about the time of the FBI raid?

A That's correct.

Q And did Mr. Goldberg report to you?

A He reported to the secretary at that time. What we did was -- Again, the secretary was the box with the three individuals I specified in it. What we did was take the Rocky Flats component of the defense complex and not have it report through Albuquerque but rather report directly to the department. It was a similar arrangement that was established with regard to Savannah River.

The model that Admiral Watkins established was that when we had serious problems, he didn't want a whole lot of layers between he and the people who were managing the problem. So Ed Goldberg was picked to become the area manager for Rocky Flats, and then he

reported directly to the department to the secretary.

Q Did you visit Rocky Flats at any time say during the first year of your tenure as under secretary?

A No. I visited in the second year. I did not visit in the first year.

Q Do you recall when in -- You're talking about 1990 now?

A 1990, exactly.

Q Do you recall when in 1990 you visited Rocky Flats?

A No, I don't, but I have the impression it was late winter or early spring time frame. I'm not really sure though. It was not during 1989. It was during 1990.

Q You have the impression that it was early 1990?

A I would say early to mid 1990 is my impression.

Q How long did you -- was your visit to Rocky Flats?

A Two days I think.

EXHIBIT 14

UNITED STATES COURT OF FEDERAL CLAIMS

COPY

| | |
|---|---|
| ROCKWELL INTERNATIONAL | : |
| CORPORATION, | : |
| Plaintiff(s), | : No. 91-1362 C |
| v. | : Judge Yock |
| UNITED STATES OF AMERICA, | : |
| Defendant(s). | : |

Wednesday, September 21, 1994

Washington, D.C.

Deposition of:

TROY E. WADE,

a witness, called for examination by counsel for the plaintiff, pursuant to Notice, at 9:53 o'clock a.m., at the offices of the U.S. Department of Justice, 10th and Constitution, N.W., Washington, D.C., before Diane Shaw, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties.

boxes, in "concur." Is that right?

A It would appear so, yes.

Q Is that your signature below?

A That is my signature.

Q What is the handwriting just above your signature read?

A "With the exception of Rockwell."

Q Is that your handwriting?

A Yes, it is.

Q Did you check the box "concur"?

A Yes, I did -- to the best of my knowledge I did. Certainly that is my signature.

Q What did you mean to indicate by checking that box, and writing that handwriting, and signing your name?

A I was aware of the criminal investigation that was underway at Rocky Flats, and that was to result in an FBI raid on the plant in June. Mr. Twining was not aware of that. I had been instructed to not make Mr. Twining aware of the impending investigation. My memory is that because of those things it clearly was not prudent

to allow this award-fee determination to proceed until that issue had been resolved.

Q Is it fair to say that you were concurring in Mr. Twining's award-fee determination for every contractor except Rockwell?

A It would appear so.

Q And this concurrence or nonconcurrence was made prior to issuance of the award fee to the contractors. Is that correct?

A Let's be -- let me ask you a question here, if I may. It is my belief that the award fee had not been made to Rockwell. Now, whether or not Rockwell was aware of the specifics in this document regarding their performance, I can't comment.

Q So it was your understanding that you were giving your concurrence or nonconcurrence prior to issuance of the award fees to the contractors?

A That is correct.

Q I believe you testified earlier that

EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA ex rel. James S. Stone,

Plaintiff,

v. No. 89-M-1154

ROCKWELL INTERNATIONAL CORPORATION, THE BOEING CORP., BOEING NORTH AMERICAN, INC.,

Defendants.

VIDEO DEPOSITION OF BRUCE TWINING
VOLUME I
April 7, 1998
9:00 a.m.
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. CHRISTOPHER J. KOENIGS
ATTORNEY FOR THE DEFENDANTS

REPORTED BY: MARY ABERNATHY SEAL, RDR, CRR, NM CCR #69
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

5434-2 MAS

00020

things, just answer the questions, and those kind of things.

Q. Do you recall when you heard about the raid, when you first learned about the raid?

A. I was informed of the raid possibly the day before, but it wasn't a long time before.

Q. The agents of the FBI came to the Albuquerque Operations Office simultaneously with the raid on Rocky Flats?

A. I don't remember exactly what the timing was, but they came to Albuquerque.

Q. At approximately the same time of day?

A. Approximately the same time.

Q. Did they come into your office to look for documents?

A. I don't believe so.

Q. Do you recall whether they came into the offices of other Albuquerque operations personnel to look for documents?

A. Well, I believe they did, but I don't know whose.

Q. Were the only occasions that you visited Rocky Flats after the raid the one occasion you just mentioned, namely the day or two after the raid?

A. I have been back one or two times since then for other DOE-related meetings.

Q. But in the period when Rockwell was operating the plant, June 6, 1989, to the end of December 1989, do you believe that you visited Rocky Flats only the one occasion that you mentioned?

00115
received widespread press coverage, to your recollection?
A. Yes, they did.
Q. And to your recollection, did they harm DOE's reputation?
MR. HESCH: Objection. Foundation, form.
A. I think they hurt DOE's reputation.
Q. (By Mr. Koenigs) Do you think they also hurt Rockwell's reputation?
MR. HESCH: Objection. Form, foundation.
A. Yes.
Q. (By Mr. Koenigs) After the raid I think you indicated that your oversight responsibilities with respect to Rocky Flats were either diminished or eliminated. I don't mean to characterize it, but is that correct?
A. I think "eliminated" is closer than "diminished."
Q. Do you recall how you learned that that was going to be the case?
A. John Tuck, who was the under secretary at the time, telephoned me either the day before the raid, or the morning of the raid, and told me that the raid was going to happen, and told me about how they were going to rewire the organizational chart.
Q. By rewiring it, you're referring to placing Mr. Goldberg as area manager of the plant and having him report directly to headquarters?

Exhibit 16

00204

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA ex rel. James S. Stone,

Plaintiff,

v. No. 89-M-1154

ROCKWELL INTERNATIONAL CORPORATION, THE BOEING CORP., BOEING NORTH AMERICAN, INC.,

Defendants.

VIDEO DEPOSITION OF BRUCE TWINING
VOLUME II
April 8, 1998
9:10 a.m.
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. CHRISTOPHER J. KOENIGS
ATTORNEY FOR THE DEFENDANTS

REPORTED BY: MARY ABERNATHY SEAL, RDR, CRR, NM CCR #69
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

5434-7 MAS

00272

A. Yes.
Q. Now, there was a point in the criminal investigation of Rocky Flats in which some DOE officials were concerned that they, in fact, might be indicted; is that right?
A. Yes.
Q. Did you yourself have that concern?
A. For a while, yes.
Q. Do you recall when it was that you realized that you would not face personal criminal exposure as a result of the Rocky Flats investigation?
A. No, I don't really recall.
Q. Do you believe you came to that understanding before Rockwell pled guilty?
A. I don't remember the timing.
Q. Do you remember how you learned that you would not face personal criminal exposure as a result of activities at Rocky Flats?
A. No, I don't.
Q. Were you advised in that meeting back at headquarters that one form of personal exposure was fines, criminal fines?
A. To individuals?
Q. Yes.
A. No, I don't recall that part of it.
Q. Were you aware of the possibility that an operator of a DOE weapons facility might face criminal fines for

Exhibit 17

0001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------ x
ROCKWELL INTERNATIONAL :
CORPORATION, :
:
Plaintiffs, :
: No. 91-1362C
v. : Judge York
:
THE UNITED STATES, :
:
Defendants. :
--------------------------------x

Friday, April 29, 1994
Washington, D.C.

DEPOSITION OF:

JAMES D. WATKINS,

a witness, called for examination by counsel for the Plaintiff, pursuant to notice of counsel, held at Cadbourne & Parke, 1101 Vermont Street, N.W., Washington, D.C. at 1:30 p.m. on Friday, April 29, 1994, before Thomas R. McPhail, CSR, Notary Public when were present on behalf of the parties:

when I answered back, I think on this 51 percent fee.

Q. But in addition to the 51 percent, did you require award fees to come from the field to headquarters --

A. To be reviewed.

Q. -- before going out to the contractor?

A. For their efficacy, yes.

Q. Was that done early on in your term; do you recall?

A. I can't remember when it was done. There is a good paper trail on that when that was put into effect. I don't remember the dates of it. We generally tried not to interfere with existing contracts. That is my belief that we should not do that, so we did not interfere with existing contracts where we didn't have authority within the contract to renegotiate certain sections of it. I didn't believe in that. I thought, you know, so the first major contractor where we did a complete review of everything in the contract was Martin Marietta; that was later on. That was

0027

a two year effort to go through that.

But in the process, there were certain things that I felt we could do within the contract renegotiations and award fees was one of them. Now, the process that we followed there, in my opinion, was in large measure, again, triggered, I don't think it would come as fast if we hadn't had Rocky Flats with the FBI. That accelerated that aspect of it because I felt in our own review of our Tiger Team in parallel to the FBI agents, there was sufficient grounds in my mind, sufficient grounds in my mind to raise serious questions as to the potential outcome of any Grand Jury or any other thing on that case.

And that is why I took a new area officer and put him in, had him report directly into us, and outside the Twining circuit, because Twining in my opinion was a potential party to the investigation underway. And in view of the severe problems that we found, other than that which was allocated by the FBI that brought them in in the first place on the incinerator issue.

0028

My own experience has been when you have a situation where the superiors in the chain of command are potentially involved, you have to bypass that system without jeopardy at the time and take more positive control of the situation. And that is what I did.

Q. Mr. Goldberg, is he the new person you put in at Rocky Flats?

A. Yes. And he later had to be moved because of high blood pressure and potential heart problems and we had to get another alternative who we basically had nothing but acting area officers in there for a period of time even when Rockwell International left.

Q. Mr. Goldberg came in simultaneously on the day of the FBI raid; is that right?

A. Yes, that was my idea, to make sure that we had a new and totally independent DOE official in charge of that site. Because, again, without any jeopardy to incumbents or any other personnel in there, we had to have somebody who could talk to the FBI without any perception that we were

0029

interfering with the investigation in any way, or
a person could be party to that investigation.

Q. Did Mr. Goldberg have direct access to you
after he became appointed?

A. He did. He was directed to either call
me, at the outset, daily or to write me
frequently, frequently was daily for a while.
And then later on came later, and there should be
a paper trail on that.

Q. So he had very active contact with you?

A. Very active contact with me and we almost
had daily meetings at the Department of Energy
with Henson Moore, Duffy, the other experts that
I brought in to oversee, particularly for
environment safety and health issues.

Q. Did the --

A. And which started a daily reporting system
that triggered off the whole daily operation
reporting system from the field. And we brought
in teams of people that had knowledge of the
field to come into the office and rotate on a
three month basis and start reporting to me daily

Exhibit 18

Department of Energy
Washington, DC 20585

June 6, 1989

MEMORANDUM FOR: BRUCE TWINING
MANAGER
ALBUQUERQUE OPERATIONS OFFICE

E. S. GOLDBERG
DEPUTY MANAGER
RICHLAND OPERATIONS OFFICE

SUBJECT: TEMPORARY DUTY -- ROCKY FLATS

Effective 9:00 a.m. MDT June 6, 1989, E. S. Goldberg is designated Acting Manager of the Rocky Flats Area Office. Mr. Goldberg will report to the Under Secretary of Energy, John C. Tuck, with regard to operations of the Rocky Flats facility. This assignment is to continue through the current investigation period and until specifically reassigned by the Under Secretary. Mr. Goldberg will relieve the current Acting Area Manager without prejudice so that Mr. Rush Inlow can assist the Department of Justice in the evaluation of allegations concerning the Rocky Flats facility.

Mr. Goldberg will assess plant status and conduct reviews and inspections to insure that the facility can be maintained operational during the current facility investigation. Mr. Goldberg shall determine what additional actions must be taken, working with the Department of Energy team under the direction of the Special Assistant to the Secretary, Mr. Leo P. Duffy. Mr. Goldberg will advise the Deputy Secretary, Henson Moore, or his designated on-site representative of his recommendations to insure continuity of facility safety.

The Manager of the Albuquerque Operations office is to provide continued support to the Acting Area Manager of the Rocky Flats Facility, Mr. E. S. Goldberg.

John C. Tuck

JOHN C. TUCK
UNDER SECRETARY

EXHIBIT 48 GOLDBERG 11-10-92