EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA and
UNITED STATES OF AMERICA, ex rel.
JAMES S. STONE, )
)
Plaintiffs, )
)
vs. ) 89 M 1154
)
ROCKWELL INTERNATIONAL CORPORATION, et al., )
)
Defendants. )

---

TRIAL TO JURY - DAY 19
TRANSCRIPT OF PROCEEDINGS

---

Proceedings held before the HONORABLE RICHARD P. MATSCH, U.S. District Judge for the District of Colorado, beginning at 8:33 a.m. on the 22nd day of March, 1999, in Courtroom C-204, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs: Maria T. Vullo, Esq.
Jeannie S. Kang, Esq.
Matthew Chevez, Esq.
Robert E. Montgomery, Jr., Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
Suite 2607
New York, New York 10019

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A The first I had heard about it was the Sunday night, the Monday before. I was notified on Friday by the undersecretary of energy, Mr. John Tuck, and asked if I could be in Denver, Colorado Sunday night or Monday. I said "What's going on?" He said "You'll find out when you get back." And so I went on to Denver, Colorado and was briefed by the deputy secretary as to what the problems were, what my role was going to be, and we went from there.

Q And the deputy secretary again is Henson Moore?

A That was his name, Henson Moore.

Q And you were briefed by deputy secretary Moore the day before the raid?

A Essentially.

Q Right.

A I don't recall--it could have been that Sunday night, day before the raid, but it was right in that vicinity.

Q And he told you that there would be a number of FBI and EPA agents searching the plant on the 6th of June?

A Yes.

Q From that day and for the next few weeks I take it the FBI raid occupied a great deal of your time out at the plant.

A Almost 100 percent, but not quite.

Q What did that work entail during those several weeks following the day of the raid?

A I needed to talk with the various staff members of the

Department of Energy there and let them know what was going on, try to provide a calming influence to this traumatic incident. I talked with the contractor also and tried to do the same for him. I had various meetings with the FBI and the EPA to assure that their work went on unimpeded and with the greatest of cooperation. And we had several meetings during the day where they told me what they--they being the FBI and the EPA, mostly FBI who was the lead force--what they wanted and how they wanted to do it. Some things were negotiable, which we did, and it required quite a bit of work on my part and that of the immediate staff that came to the plant with me, to adjudicate.

The other part of the time I was occupied with doing what I call a baseline of activities on the plant. I had to establish where the plant was with regard to safety, environment, management and audit their controls. And for that I brought in another team of maybe 50 or more people from outside the plant to help me establish these baselines.

Q Those people worked under your direction?

A Yes.

Q You mentioned a calming influence, talking about among others the DOE people on-site. Do you recall concern on the part of those DOE people that they might be arrested?

A Absolutely.

Q What do you recall about that subject?

A They wanted to know from me if they were going to be arrested and charged with criminal activity.
Q These are the DOE people that were already there.
A These are DOE people, and the only thing I could tell them was I did not know, but they needed to approach the coming weeks as calmly as they could and continue on with their work. It was a very traumatic experience for them.
Q Did you communicate this concern on the part of DOE people about being arrested to your headquarters personnel?
A Yes.
Q Now were you in regular contact with people back at DOE headquarters in the period following the raid?
A Yes, on a daily basis.
Q And with whom in particular?
A My two main contacts were the undersecretary, Mr. John Tuck, and special assistant to the admiral, to the secretary, Leo Duffy.
Q Were there particular allegations that were made in connection with the FBI raid that related to the use of incinerators?
A As I recall there was a section that dealt with an incinerator, yes.
Q And did you investigate--you or the people working under your direction investigate that allegation?
A We looked at it, but mostly we let the FBI do their job.

EXHIBIT 20

**Department of Energy**
Washington, DC 20585

June 9, 1989

MEMORANDUM TO: Edward Goldberg
Acting Area Manager - Rocky Flats Area Office

FROM: John Tuck, Under Secretary of Energy

SUBJECT: Interim Organization

The attached interim organization for the Rocky Flats Area Office is approved.

cc: Bruce Twining




INTERIM ROCKY FLATS AREA OFFICE ORGANIZATION
FOR OPERATIONS

Rocky Flats Area Office - Interim Organization

- The existing Operations and Compliance groups are responsible for managing day-to-day business at the Rocky Flats Plant.
- The Safety and Environment groups are new parts of the organization designed to strengthen the line management and oversight functions of the Area Office in carrying out its responsibility to assure safe, environmentally sound operations.
- The Environment group will be responsible for assessing the environmental acceptability of Rocky Flats Operations on a continuous basis. It will be staffed with personnel who have strong backgrounds in environmental science and nuclear facility operations.
- The new components of the Rocky Flats Area Office will assure that operations are being conducted properly, that any improvements are pursued in operational performance.
- The Acting Manager of the Rocky Flats Area Office and the Manager of the Albuquerque Operations Office will jointly coordinate all production activities at the Rocky Flats Plant that would affect the integrated weapons production complex.

EXHIBIT 21

UNITED STATES CLAIMS COURT

COPY

| | |
|---|---|
| ROCKWELL INTERNATIONAL CORPORATION, Plaintiff, -vs- UNITED STATES OF AMERICA, Defendant. | No. 91-1362-C |

September 23, 1994
10:00 A.M.

DEPOSITION OF:

ADMIRAL JON MICHAEL BARR

CENTRAL VIRGINIA REPORTERS
PO BOX 12628
ROANOKE, VIRGINIA 24027
(703) 380-5017

Q Since graduating from the Naval Academy, have you been continuously in the service, in the United States Navy?

A I have.

Q At some point, you were assigned to the Department of Energy. Is that true?

A That's correct.

Q When was that?

A My first day on the job was the 5th of July 1989. I had before that in about the previous month visited, as I recall, the office for one reasonably brief period to talk to the officer I was relieving, who was going to retire before I got there and had made a tour of several facilities during one of my four-day off periods in my previous job.

Q Who was the person you were replacing?

A A Brigadier General, Paul Cavanare.

Q What position did you first take with the Department of Energy?

A Deputy Assistant Secretary for Military Application.

Q Prior to being assigned to the Department of Energy, could you briefly describe your career in the United States Navy.

A Certainly. Upon graduation, went through the Nuclear Power Training Pipeline, which lasted a year, then submarine school for six months, then I was assigned to the Submarine Snook (phonetic) in San Diego for almost three years.

Then I was an Instructor at the Navy Nuclear Power School for several years, two years, then I went through training of several months prior to becoming Navigator on the U.S.S. Tecumseh, which I was there for approximately four years. Then I went to the Executive Officer on the Submarine Barb (phonetic) in Pearl Harbor.

From there I went to be the Commanding Officer of the Navy Nuclear Power School at Cambridge, Maryland. Subsequently during my tour, I moved to Orland, California. After that I went through Prospective Training Officer at pipeline, which lasts about six months, and then was with the Navy Skipper, and from there the ship was transported home to Connecticut. Following that, which lasts about two years, again, a brief period of training at Naval Reactors in Washington D.C. and assigned as Prospective Commanding Officer, and after commissioning as Commanding Officer of the Attack Submarine Boston.

Following that and a period of training of several months, I was Commanding Officer of the U.S.S.

Ohio, a ballistic missile submarine out of Bangor, Washington. About a year and-a-half following that, I was commander of Submarine Squadron 17, which is the Trident Squadron in Bangor, Washington. During that period for a period of about six weeks also Commander of Submarine Group 9.

Following the tour of Squadron 17, I went to Washington D.C. and first was the Deputy Director of the Attack Submarine Drins (phonetic) and Officer of Chief of Naval Operations.

Q About what year was that?

A That was 1986. Got there in March. I left there in the very, I guess it was January of 1988 after having been selected for flag rank, and was until I went to DOE Deputy Director for Operations in the National Military Command Center, which means basically you are watch standard in the Chairman of the Joint Chiefs Command Center. And I went to the OE the 5th of July.

Q In any of those positions before you went to DOE, did your duties ever include the administration of contracts?

A No.

Q Did it ever involve procurement?

A No, from the standpoint of other than

the context of those specific 230. But I could answer the question if you would like me to in the context of deficiencies in general.

I mean, the deficiencies that we are talking about here, first, were before I got there, and we had other deficiencies from other appraisals, and so they somewhat run together, and to be able to answer your question specifically for these 230, I just couldn't do it.

Q What was your source for deficiencies, other than the 230 raised by these Technical Safety Appraisal Team?

A There were on site, I think it mentions in there environment, safety, health, ES&H people from Headquarters, who wrote up deficiencies. There were deficiencies which came to my attention through, I believe at this time there was a Colorado Department of Health person on site.

Q What time are you referring to now?

A Well, I'm trying to remember in the context of my very early time there, in the August, September, October fall time frame of 1989. My personal on-site looks during that period, specifically a trip made in November, a criticality inspection investigation conducted based on some concerns at Rocky Flats that was done in, as I recall,

happened very shortly after I got there, and I think the report out was, I think, in August. Not completely sure of the date. And reports that would come from people in my office who had made trips to Rocky Flats and from people in the on-site office there, particularly Mr. Goldberg after he arrived there.

Q Were any of these trips or reports or on-site visits or observations that you have mentioned made during the time period October 1st, 1988 through March 31st, 1989?

A No. But if I could add, they certainly reflect the things that had gone on during that period.

Q Were these things separate and different from the concerns raised by the Technical Safety Appraisal Team?

A I mean, I would have to review all 230 deficiencies. I suspect that they are, but I can't, without reviewing those 230 deficiencies, be absolutely certain. For example, in the criticality investigation that was done at Rocky Flats, if the issue was raised at all in that Technical Safety Appraisal. And it may have been. I just don't know.

It was certainly looked at in much greater detail by the subsequent focused investigation.

Q What was the criticality study about?

A A concern was raised by some Rockwell

employees on the on-site, and I think this had come up previously -- it was not the first time that it had come up -- that there had been uncontrolled criticalities at the plant.

Very shortly after I got there, and this had been apparently in the works before I arrived, a group of non-DOE experts were brought in to conduct a review of what had gone on at Rocky Flats with a view to determining whether or not there had been any uncontrolled criticalities of the plant. Their findings were there had not been, and they were able to back that up with some reasonable technical documentation.

But what they did find was that there was a disturbing amount, initial estimates in the multi-tens kilograms of plutonium in the ductwork in several of the buildings in Rocky Flats, and that this plutonium had gotten into the ductwork through improper, long-term improper operation of glove boxes, which are pieces of equipment where work is done where you don't want workers' hands to actually come in contact with the material, and that in particular a lot of this material had apparently gotten into the ducts because of workers defeating filter apparatus, which may, although I couldn't be certain of it, may have contained within the glove box area some or most

of that plutonium.

Additionally their finding was that there was a disturbing lack of knowledge on the part of the appropriate Rockwell people for the form or amount of plutonium in the ductwork and a lack of what the criticality experts would agree, felt was inadequate concern over the possibility of plutonium in the ductwork.

For example, if you are not certain of the composition of the plutonium in the ductwork, if it is in such a position that it could become suspended in water should that ductwork be flooded, there is a likelihood that due to the difference in neutrons slowing down, characteristics of water versus nonwater, therefore, that you could have had a criticality, which could have caused substantial problems.

Q What do you mean by "criticality"?

A Criticality is, for plutonium or anything really, when you have a self-sustaining chain reaction, that is that if you go through a cycle, a neutron life cycle, if you will, a neutron or several neutrons are produced by fission, and that those neutrons are lost through a number of features, such as leakage out of the area where the criticality could occur, absorption into nonfissionable materials, absorption into fissionable

material that does not cause fission, and finally absorption into fissionable material that does cause fission. So finally you have a criticality. Every one of those neutrons will produce subsequent fissions, so the fissions remain constant.

Normally if you have criticality, you would not end up at that exact criticality. You would end up at what is called supercriticality, and that means that you would have more than one neutron after the life cycle for each.

The problem is, because that life cycle is extremely short, in the microseconds, that you can get an exceptionally rapid increase in the fission rate, and, of course, each of these fissions gives you neutrons, which are not only problems from the standpoint of fission, but particularly those ones that leak out are hazardous to people, and other radiation such as gamma radiation, which is also a problem to people at relative distances. So criticality is something which one avoids at all costs.

Just talking about this, I remember a few other things that came out of that report. There are in the glove box lines which worked the plutonium material criticality limits, which say you cannot put more than so much material into a given vessel to insure the criticality

does not occur because of an inordinately large concentration of fissionable material.

There have been accidents, not that I know of at any of our plants, but accidents have occurred because people did not adequately understand or implement or follow procedures to keep the amount of fissionable material low. You got a critical mass.

The limits that we would put in the glove box lines at Rocky Flats in particular were designed to prevent that from happening. There were findings that those limits had been exceeded periodically.

Q Would you consider that a criticality of that poses an imminent threat of harm to people or to the environment?

A Certainly to people in the location, and it could be to the environment, should the criticality -- for example, one could come up with another rationale, scenario, that a criticality occurs in a water environment, and, of course, with criticality comes a great deal of fission fragments, comes a great deal of heat.

That heat could, in fact, result in steam formation, and should that result in breaking whatever the container was, then you could send fission fragments into the local area and could conceivably get out into the

atmosphere. It would have to be a pretty bad criticality accident for that to happen, but it is conceivable.

Q Do you know if the Technical Safety Appraisal Team or any other DOE team prior to the beginning of your tenure at DOE raised the concern about glove box procedures at Rocky Flats?

A I don't know specifically, but I would be very surprised if they hadn't. I mean, glove box procedures are reasonably complex, and if anybody is looking, I would be very surprised if over a reasonable lengthy period they wouldn't find at least some deficiencies.

Q Would you please read the paragraph under Deficiencies on page Bates labeled E002355 on Exhibit 93.

A The Technical Safety Appraisal Team at the plant to follow up on previous concerns reviewed the operation at the entire plant site against those concerns. Thirty new concerns were identified, of which six were Category II concerns. These concerns involve training, radiological protection, fire protection, electrical safety and operator response alarms.

Q Are those concerns listed under deficiencies?

A They are.

Q Would you please read aloud the next paragraph also listed under deficiencies.

A I guess I would have to say I can't specifically recall ever seeing that report, so I guess not.

(Discussion off the record.)

BY MR. KELLEY:

Q Mr. Barr, I am showing you a document that has previously been marked as Plaintiff's Exhibit Number 5, which is a memorandum with attachments from Albert E. Whiteman to Thetis V. Hill dated April 9, 1989. Have you ever seen this document before?

A No, I haven't seen this. I guess I would point out that it does not appear that any of these came, as I recall from looking at any of the others, that any of these ever came to anybody in Headquarters, which is a problem.

Q Why do you say that's a problem?

A Well, I say that's a problem because one of the significant issues that existed, and as my tenure continued there it was very clear it had existed for a long time, particularly in Rocky Flats, ut not solely in Rocky Flats, was an inadequate oversight of contract or

operations by DOE personnel.

And when I say that, what I mean, and particularly in the Rocky Flats context, is that the people who were in the Rocky Flats office, area office, until Mr. Goldberg took over as a separate office with adequate -- shouldn't say adequate -- with more technical support, people at the area office had very little technical acumen. They were effectively an administrative office. Their ability to get into the Rocky Flats Plant to oversee in a meaningful way what was going on in the Rocky Flats Plant was very suspect.

For example, in my operating, which is a Navy Nuclear Power Program, a key to determining whether or not operations are being done satisfactorily is, you get out and you look, you find problems basically before they find you. That philosophy, that ability at the Rocky Flats area and, as I said, others was not present. They didn't have, they didn't do it, and they didn't really have the ability to do it. That's admittedly judgmental, but I believe it to be correct.

Q Is that judgment based on your observations?

A Yes.

Q Or what you learned during your tenure?

A Based on my observation, personal and direct,

and also what I learned from people. I mean, such things as the less than professional approach to the criticality issue, the plutonium in the ductwork, which I previously have discussed, could not go on if there was an adequate oversight by the government. Other things that I observed, such as a failure to calibrate gauges on a periodic basis, gauges which could be used for safety related items, indicates that nobody is looking.

And I could go on with others, the chromic acid spill and the way that it was reported. Although it was reported as a serious incident, it was clearly not analyzed from the standpoint of the number of fundamental operating practices, safely practices, which had to break down in order for that to occur.

Whatever technical expertise existed at the Albuquerque Operations Office five or six hundred miles away, the day-to-day interaction between the Rocky Flats Area Office and the Albuquerque Operations Office was not adequate to conduct the kind of oversight that I am talking about, and while there were periodic visits from the Albuquerque Operations Office to Rocky Flats, it was not adequate to get the kind of oversight you would need in a plant of the technical sophistication and the potential for problems that Rocky Flats had.

Second, even when the Albuquerque Operations Office applied their technical acumen to the problems at Rocky Flats, they were, in my opinion -- and it is judgmental -- inadequately forceful in noting to the contractor and making the contractor understand that his performance was not good.

For example, I am sure we will get around to it eventually. A moderately good evaluation in adjectival assigned to environment, safety and health for the period we are discussing was not appropriate.

Q Based on the things that had gone on and the things that we knew, particularly in the criticality area, which may not have been available to the early authors of the documents, that that occurred, but indicated that there was an ongoing and I recall unsatisfactory performance by the contractor from the standpoint of environment, safety and health.

I look at that from a different culture, and the problem that DOE had and may well still have is that the culture of the organization was such that the ability to identify, explain, follow up on and insure correction of deficiencies was in many cases just not that good. So it's a very great concern.

Q And you are looking at it from the culture of,

you are looking at it from the Naval nuclear standpoint?

A The direct answer to that is yes, because that's how I know, and the success of that program is such that one could reasonably infer, if others follow it, they would also be successful.

Would you like me to go into what the differences are?

Q Well, let me ask you. Did you have any first-hand knowledge of the oversight of the Albuquerque office over the Rocky Flats Area Office during the period October 1st, 1988, through March 31, 1989?

A Only as I was just talking about, that there were periodic inspections, and there was not continuous on-site presence by the technical experts from Albuquerque, and that the performance, the problems clearly indicated that there was not adequate oversight. So specifically was I there? No, I was not.

Q When you say there was insufficient oversight by either the Rocky Flats Area Office or the Albuquerque Operations Office, you are speaking about your opinion; is that correct?

A Oh, and my judgment, clearly. Yes, of course. I mean, but there are I think what most reasonable people would call substantial evidence for that.

For example, in the chromic acid spill, if you look at what were the fundamental problems that went into that, there is an inoperative alarm which had been allowed to remain inoperative. There were no special precautions taken because of that inoperative alarm for more frequent monitoring to insure that the function of the alarm was carried out in some other manner. So that shows an approach to alarms, to safety features, which I would call inadequate.

Subsequent to that and in other times when I was present at Rocky Flats, similar items were noted. For example, I noted in one, personally, one case where alarms which dealt with levels of tanks were defeated because the alarm system, when one tank alarmed, you couldn't stop the alarm without defeating all of the alarms. So it was a very poor design. But, again, no meaningful additional procedures were put in place to insure that the function of the alarm was carried out.

And there are other instances that other people have found, and it became forcefully to my attention in my tour about alarms, cut out alarms, set points changed without authorization.

Another thing that contributed to the chromic acid spill was an improper valve manipulations system set

up in such a way that that particular problem could occur.

Q Now, the chromic acid spill, the events surrounding it leading up to it were identified in Exhibit 99 as a notable deficiency; is that right?

A Exactly. But my point is that, while they are quite correct in saying it was a notable deficiency, I believe they miss the point by just concentrating on that spill in isolation, because you had an improper approach to alarms and what you do to keep them operating and what you do if they are not operating. It showed an improper approach to how you operate valves, how you conduct procedures.

Even after all of that happens, you have a spill which has to fill up a bermed area which was intended to capture some spills, some of the spills, and then overflow into such an area that could get into the waste water area. As I previously mentioned, there was no security adequate to go around and make periodic visual or other inspections to insure that the plant was safe.

Now, these items, while the example is the chromic acid spill and while it is serious in and of itself, show that the whole plant was run that way. The criticality issue was another one which indicated the kinds of things.

In another personal observation, I observed a mechanic repairing a pump in a waste water area that this pump, as I recall, its function was to transfer water around to various tanks. And he had several red tags on valves and the pump was in a semidisassembled condition.

I asked him, how do you know which valves to shut in order to completely isolate this pump so that you won't have a flow of water out when you take the pump out? Do you have any verified schematics of the systems attached to this pump. His answer was no.

Well, how do you know?

He said, I know because I have been here for 30 years.

Well, when do you use red tags?

Oh, I just tag them.

Do you have a red tag sheet on which you fill out where you are going to hang these red tags which are used, to say Danger, Do Not Operate These Valves? Do you have this authorized, this red tag authorized, verifiable by anybody?

The answer was no.

How do you know you are putting the right parts into the pump? This is a fairly significant pump. How do you know you are using the right parts? And, again,

the answer to my judgment was not satisfactory.

And while that is an isolated case, I think that, along with other things, indicates that the plant was just not operated at a standard which in my judgment is appropriate for something with that degree of potential severity.

If you want to run a potable water distribution system like that, I guess that's okay. But when you are dealing with environmental issues which could result in violations of law, it would appear that would be a little more careful.

Q How frequently did you visit the Rocky Flats Plant?

A Probably until about March time frame I would go up there once a month. I think that's fair.

Q That's from July of 1989 to March of 1990?

A Let's start with, -- okay. July, August. So it would have been an average of about once a month. After that, early in 1989, it was a little less frequent, because of Mr. Stello took over more concentrated Headquarters oversight of Rocky Flats.

But still I was out there at least once every two or three months the whole time I was there, and probably actually more than that.

before.
A This whole thing or just the part you have?
Q The whole document.
A Okay. No, I haven't seen it.
Q This document is entitled Award Fee Performance Evaluation Review Board Recommendation for the period October 1st, 1988, through March 31, 1989. Have you ever heard of the Performance Evaluation Review Board at the Albuquerque Operations Office?
A I am sure I have. I mean, I just read it to refresh my memory, yes.
Q Did you ever discuss Rockwell's award fee with the Albuquerque Performance Evaluation Review Board regarding Rocky Flats?
A No, I did not. But I would point out that effectively, as soon as I got there, by the time I had gotten there the Albuquerque Operations Office no longer had responsibility for oversight of the Rocky Flats Plant.
Q They had been cut out of the loop?
A They had been cut out of the loop, and that is true, with exceptions.
Q Is that true with respect to the award fee process?
A Subsequent to next, I believe the one that

ends up in March of 1990, you will see Mr. Simonson's signature on that. The Rocky Flats Office changed from the Rocky Flats Area Office to the Rocky Flats Office.

Mr. Goldberg was the first manager of the Rocky Flats Office, subsequently Mr. Simonson, subsequently Mr. Nelson. And from the time I was there, I think it is fair to say that all of the substantive oversight of the Rocky Flats Plant was accomplished by the Rocky Flats Office. There was a substantial infusion of people trying to bring up that level of technical expertise that we mentioned and a substantial investment in training people to oversee.

There still was use of some Rocky Flats -- excuse me -- some Albuquerque expertise in specific areas. The decision was made not to make Rocky Flats a full operations office, which would have taken all areas, and some areas, such as safety and security -- I think I remember correctly -- remained with the Albuquerque Operations office.

Q Any other areas?

A Some of the administration, I think. As I say again, I believe safety and security. I can't recall any others. But the effort, the thrust was to provide on-site capability to adequately oversee the contractor.

moving, and, you know, I don't know that those kind of questions are necessary, asking him to report what the document says, since it's a part of the record. I am just concerned about the time.

MR. KELLEY: I believe it is important.

BY MR. KELLEY:

Q I am showing you a document that has previously been marked as Exhibit 64, which is Bates labeled E001524, a letter from Mr. Moore to Mr. Iacobellis dated June 20, 1989. Have you ever seen that document before?

A I think I have, but I don't think this one I saw until I got this package.

Q So you did not see this document in 1989?

A I mean, I was aware that the Rocky Flats Award Fee Determination for that period had not been finalized. But as to actually having seen this particular, I don't think I did.

Q Were you aware of any contractual obligations for a time in which DOE was required to determine Rockwell's award fee?

A Yes. But, again, I am not sure I was aware of them in the July or August time frame. It became an issue

Q Yes.

A Oh, yes. I mean, now, to the degree -- and I don't recall when. It was very clear, as you can see from the material that you have been providing to me, that Headquarters had inserted itself into the Rockwell award fee process for the two periods we are interested in. And, as I previously mentioned, that procedure got formalized more, as I think I answered in the question concerning time frame. So yes.

Now, can I point to a specific piece of paper? I mean, I'm sure there was one. I don't recall the specific piece of paper that would have come around and said here is exactly how we are going to be involved. But it was certainly in practice well understood by the people at Headquarters and the people in the field.

Q To your knowledge, was Rockwell ever informed of Headquarters' insertion into the award fee process?

A Well, I mean, I can only, I can point to this letter to Mr. Iacobellis, which certainly, unless he's a lot denser than I think he is, clearly indicated that Headquarters was getting involved.

Q Do you know if Rockwell was ever notified in any way prior to that letter?

A I don't know. I have no knowledge of that. I

opinion had existed in the plant for a long, long time.

It was not something that happened yesterday nor was it something unfortunately to be corrected tomorrow. It took a long time. And, as you know, we eventually did have the plant shut down.

Q When did that happen?

A December. Well, actually as a result of the trip that I took out there with Mr. Starostecki just before Thanksgiving.

Q 1989?

A Correct. This was basically concurrent with the transfer of responsibility from Rockwell International to EG&G. Secretary Watkins determined that Rockwell International could no longer adequately perform the duties of the contract.

Q Let me ask you whether in August of 1989 you believe the conditions at Rocky Flats were such that they posed a threat to public health or the environment within a month?

A I can't answer that question. I mean, you know, I can't answer that question.

Look, the issue here, the fundamental issue, as far as I'm concerned, is there is a philosophy of operations, there is a philosophy of how you run a complex

hazardous plant which minimizes the likelihood of serious problems. I know that philosophy because I have lived it for thirty-some years. That philosophy was not present at Rocky Flats, nor do I expect had it ever been.

So, therefore, my opinion was that the likelihood of a problem was greater than it would be had the, basically it's the Navy Nuclear Power Program approach to things been adopted, had the culture been changed.

Does that mean that I would predict, based on what I saw in the first month that I was at Rocky Flats, that there would be a serious, life-threatening to public health and safety in a month? No, I wouldn't say that. I wouldn't say there would be in a year. I wouldn't say there would be in ten years.

As a matter of fact, the plant had operated for a lot of years with only one, that I can recall, problem, the fire, whatever, in the late 1960's, which was a major concern. But we are dealing here with the likelihood. We are dealing with, is the probability one in a hundred years or one in a million years? And the effort is to make the probability one in a million, not one in a hundred.

So in trying to answer your question, as you cannot answer just because the penny has flipped up tails

20 times what it is going to come up the next time. The probability is still 50/50. What the effort is is to reduce the probabilities, to make the likelihood of the problem acceptably small.

In my opinion, all that could have been done to reduce the likelihood or that reasonably could have been done over the years to reduce the likelihood of the problem had not been done. I mean, evidence the approach to alarms, the approach to valve operations, the approach to training that I mentioned in the pump replacement issue. Evidence the lack of a gauge calibration program. Evidence procedures which were there but not used, and if tried to use they wouldn't have worked.

All those things, while no one, no one can point to it and say the lack of a procedure will result in a problem, what they can say is the lack of an adequate properly documented, properly trained on, and properly used procedure decreases the likelihood of a problem. That you can say, and that's all you can say.

Imminent in that context, what the lack of an imminent problem means is that, instead of the likelihood being one in a hundred versus one in a million, you are now getting down to the likelihood of one in two of having the problem, and the danger level gets to the point where, hey,

based on my subsequent observations, all of the review time in the world would not have changed that in any way except down, because as I learned more and more about what had gone on at Rocky Flats, and I think I make the statement with good reliability, that I did find out more about what had gone on at Rocky Flats. Based on what was currently there, a reasonable projection could be made backwards and say this was going on during this period, award period, period two.

So the fact that the time was limited and the resources were limited only worked in Rockwell's favor, because I would have probably suggested further reductions, although I didn't get a chance to do it. So what I really would have done is hard to say.

Q What did you mean by limited staff?

A The way that my staff was organized at that time in the defense programs area and in the production area, the staff was reasonably small. The guy who had been the DP-23, Mr. Erickson, incorrectly called Mr. Spence earlier, was at Rocky Flats as Mr. Goldberg's assistant. So I didn't have the benefit of my senior guy in that area.

And the organization was such that it worked across functional lines as opposed to sites, so I couldn't put my finger on somebody and say you are the Rocky Flats

there from previous documents is not clear.

Q Did you ever hear that someone in the Rocky Flats Office, one or more individuals, had to come up with sufficient deficiencies to correspond with the award fee that had been determined at Headquarters?

A No, I wouldn't say that. The number of deficiencies available to select from was so large that that just wasn't an issue.

One of the things I think you ought to recognize here is that a very important event occurred during this process, and that was the dispatch from Headquarters of a team just before Thanksgiving that I mentioned previously of Mr. Starostecki leading one branch of this team and myself leading the other. We were there at Rocky Flats for approximately four days, and we probably had in our total grouping about 50 people. I think that's fair, 50 people between the two of us.

It was a comprehensive look at Rocky Flats. The decision had been made at that point to replace Rockwell. EG&G was going to come in, and the feeling was that we needed to have another look, and I agree with this, another look at how Rocky Flats was doing. And that look turned up numerous deficiencies in virtually all areas, some of which are enumerated or are similar to the ones

that have been indicated in this letter.

But the numbers scope, the implications for the method of operation of the plant were serious and indicated poor performance by Rockwell across the board, and additionally, as I have also said, I think the lack of ability of DOE to, on a continuing basis, oversee the contract radically.

Now, we were changing that. It was a Rocky Flats Office in the last three months of that July, August, September. The last three months of that period was being beefed up. It had not completed being beefed up yet. So there were still some very serious concerns.

The upshot of that review was to stop weapons production at Rocky Flats. We thought at the time that weapons production could probably be reestablished in a few months. To my knowledge, production has never been. reestablished for a combination of reasons, not the least of which was that as we got further and further into trying to correct the deficiencies, the underlying, the underpinning, Rocky Flats' operational capability, which had been under Rockwell direction for some years, was so flawed that it was not, we were not able to make corrections, despite a whole lot of efforts in a short period of time time.