# EXHIBIT 26

83001
T.H.

# Assessment of Environmental Conditions at the Rocky Flats Plant

**Golden, Colorado**
**August 1989**

**U.S. Department of Energy**
**Special Assignment Environmental Team**

SUBPOENA 1063RF EGG ITEM 15 5140623

# PREFACE

This document was developed to be used as a tool by the Department of Energy to improve the environmental program at the Rocky Flats Plant. Potential problem areas and recommended courses of action to resolve these situations have been identified. The scope of this effort specifically excluded investigation of allegations included in the affidavit used by the U.S. Department of Justice and U.S. Environmental Protection Agency in securing a search warrant for the Rocky Flats Plant.

It is not within the scope of this document to provide the reader with a comprehensive understanding of the nature of the environmental activities and programs performed at the plant.



SUBPOENA 1063RF EGG ITEM 15 5140633

# CONTENTS


**SECTIONS**

PREFACE

EXECUTIVE SUMMARY

1.0 Introduction

2.0 Air

3.0 Surface Water

4.0 Groundwater

5.0 Waste Management

6.0 Toxic and Chemical Materials

7.0 Radiation

8.0 Quality Assurance

9.0 Inactive Waste Sites and Releases

10.0 National Environmental Policy Act

**APPENDICES**

A. Environmental Team Organization

B. Operational Evaluation of the Rocky Flats Sewage Treatment Plant

C. Waste Stream Characterization Evaluation

D. Compilation of Data on VOC Emissions to the Atmosphere From Rocky Flats Plant

E. Action Plan Outline

F. Agreement in Principle

G. Weekly Agendas

H. List of Site Documents

I. Contacts/Interviews

J. Acronyms and Abbreviations

K. Rocky Flats Plant Maps and Buildings List




SUBPOENA 1063RF EGG ITEM 15 5140624

# EXECUTIVE SUMMARY

## OBJECTIVES:

The Environmental Team has undertaken audit and sampling/monitoring activities to perform an assessment of environmental conditions at the Rocky Flats Plant (RFP). The assessment was conducted from June 6, through July 21, 1989.

The objectives of these activities were to determine: whether or not any imminent threat exists to public health or the environment as a result of RFP activities; if RFP operations are being conducted in accordance with applicable environmental requirements and best management practices; and the current status of previously identified environmental problems. In addition, existing environmental management programs at RFP were evaluated. Weaknesses or gaps in the programs were identified and recommendations developed.

## ACTIONS TAKEN:

An environmental audit was performed and recommendations were provided to be used as a basis for improvements in areas such as:

- environmental monitoring
- site remediation
- waste management
- quality assurance
- sewage treatment plant operation
- waste stream characterization
- environmental impact analysis

A supplemental environmental monitoring program was implemented to better characterize and monitor materials released to the environment from the Plant (e.g., sewage treatment plant influent/effluent, site boundary drainage sediment, outdoor storage pad drainage, ambient air monitoring for organics, stack/vent monitoring for organics). Results of the analyses will be provided in separate reports.

The aerial surveys previously scheduled for 1991 were performed to determine if the environmental radioactivity had changed since 1981 and to provide additional information on the interaction of groundwater and surface water. Results of the surveys will be provided in separate reports.

## OBSERVATIONS:

- No situations which pose an imminent threat to public health or the environment were observed.

- Implementation of the environmental programs lacks coordination and is hindered by poor communication. The lines of authority and responsibility are fragmented and not clearly defined. A strategy that integrates the existing management and information systems needs to be developed and implemented.

- Environmental monitoring programs require improvements to more accurately characterize and monitor plant-related emissions, discharges, and ambient conditions.



SUBPOENA 1063RF EG&G ITEM 15 5140625

- Effective implementation of the site remediation program has been adversely impacted by poor communications, coordination, planning and scheduling.

- Implementation of an effective waste management program has been severely hindered by site waste storage constraints, conservative waste classification practices, and a lack of options for treatment and final disposition of waste.

- The quality and reliability of sample collection, laboratory analyses, and other information generated in support of the environmental monitoring and restoration programs are not adequate to achieve program goals.

- Management and maintenance of the sewage treatment plant (STP) has received low priority resulting in inefficient operation which could create problems in meeting future permit requirements.

- The 1987 Waste Stream Characterization Study, which is used to support waste management activities (e.g., permits and waste classification), does not reflect current waste processes at the plant. The study has never been fully reviewed. Consequently, internal inconsistencies exist. The scope of the study was not broad enough to serve as an effective waste management tool.

- A comprehensive strategy needs to be developed and implemented for performing activities required by the National Environmental Policy Act.



SUBPOENA 1063RF EGG ITEM 15 5140626

# Section 1.0

# Introduction

## 1.0 - INTRODUCTION

On June 6, 1989, agents of the U.S. Department of Justice and the U.S. Environmental Protection Agency entered the U.S. Department of Energy's Rocky Flats Plant (RFP) to execute a search warrant. The search warrant was issued on the basis of an affidavit which alleged possible regulatory and criminal violations of environmental law at the plant site. In the process of collecting evidence, the agents seized records and obtained numerous environmental samples.

On June 6, in a separate but parallel effort, the Secretary of Energy, Admiral James D. Watkins (U.S. Navy, Retired) mobilized a "Special Assignment Team" to provide the Department with an independent evaluation of operations and practices at the Rocky Flats Plant.

The Special Assignment Team was divided into four groups to perform the various aspects of the evaluation. The four groups were concerned with 1) Management and Operations, 2) Safety, 3)Environment, and 4) Legal Matters. This document is the report of the Environmental Team.

### Description of the Rocky Flats Plant

The RFP is a government-owned, contractor-operated facility that is part of the nation-wide nuclear weapons complex. The plant has been operated since 1952 by the U.S. Department of Energy (DOE) and its predecessor agencies. The management and operations contractor was Dow Chemical Company until 1975 when it was succeeded by Rockwell International.

The primary mission of the plant is the development and production of nuclear weapons components fabricated from plutonium, uranium, beryllium and stainless steel. The principal operations performed are metal forging, fabrication, assembly and chemical processing. There is heavy emphasis on production-related research. The plant's capabilities are unique in the nuclear weapons production complex.

The plant is located in northern Jefferson County, Colorado about 16 miles northwest of Denver. Other nearby communities include Boulder, Arvada, Westminster, Broomfield and Golden. The 364 acre manufacturing complex, located in the center of a 6500 acre buffer zone, consists of over 100 buildings with over 2.7 million square feet of building space.

The RFP has an annual operating budget of about $480 million including an annual construction budget of about $60 million. It employs approximately 6000 persons and annually spends about $156 million with approximately 10,000 vendors. Total capital investment has been $757 million and the estimated replacement cost is $4 billion. The DOE modernization study identified the relocation of the RFP's operations as a long term objective. Plant operation is expected to extend over 20 years as transition of the operations to a new site (or sites) is completed.

### Purpose of the Assessment of Environmental Conditions

The purpose of the assessment of environmental conditions was to determine: whether or not any imminent threat exists to public health or the environment as a result of RFP activities; if RFP operations are being conducted in accordance with applicable environmental requirements and best management practices; and the current status of previously identified environmental problems. In addition, existing environmental



SUBPOENA 1063RF EGG ITEM 15 5140623

management programs at RFP were evaluated. Weaknesses or gaps in the programs were identified and recommendations developed.

Scope of Assessment of Environmental Conditions

The scope of the assessment of environmental conditions was governed by an action plan outline (Appendix E) which was developed during the first week of the assignment. The action plan outline is consistent with the "Agreement in Principle" between the United States Department of Energy and the State of Colorado which was available in draft during the development of the action plan outline and which was signed on June 28, 1989 by Secretary Watkins and Governor Romer (Appendix F). The outline is also supportive of Secretary Watkins' Ten Point Plan for Environmental Protection and Waste Management announced on June 27, 1989. The action plan outline identified action to be taken in the short term, mid term and long term and identified general actions as well as actions related to specific environmental media: surface water, groundwater, air and soil/sediment. Actions included not only audits and reviews but also initiation of substantial supplementary environmental monitoring, surveillance and modeling. Every effort was made to involve personnel from the Environmental Protection Agency and the Colorado Department of Health in planning and observing the work of the team.

General items included a determination of any actual or potential threats to public health or environment, a comprehensive environmental audit, a review of potential environmental exposure pathways, a review of the waste stream characterization program (Appendix C), a review of waste management tracking systems, and a verification of quantities of mixed transuranic and hazardous wastes stored on the site.

Actions related to surface water included initiation of additional surface water monitoring, an evaluation of the sewage treatment plant and the lines feeding it, providing support for the issuance of a new National Pollution Discharge Elimination system (NPDES) permit, identification of potential upgradient, off-site sources of surface water pollution and an evaluation of the interaction of groundwater and surface water.

Actions related to air quality included verification of the inventory of volatile organic compound (VOC) sources (Appendix D), a modification of the site-specific atmospheric dispersion model to allow prediction of ambient VOC concentrations, initiation of ambient sampling for VOC's, conducting stack monitoring at the principle VOC emission points, and expansion of the radiological air monitoring program to include americium-241 as well as plutonium.

Actions related to groundwater included review of the existing groundwater monitoring program, identification of potential pollution sources which may impact groundwater, review of well construction, identification of seeps and springs, assessment of the interaction of surface water and groundwater, and review and identification of potential contamination from sources hydraulically upgradient from the Plant.

Actions related to soil and sediment included review of existing data, sediment sampling at perimeter surface water influent and effluent locations, use of aerial and ground radiological monitoring for identification of contaminated soil on and around the plant, evaluation of existing protocols for radiological soil sampling, and initiation of a radiological soil monitoring program for key areas within the security zone.



SUBPOENA 1065RF EGG ITEM 15 5139629

Methodology

The team's work was accomplished using a variety of resources selected on the basis of expertise. The environmental audit was directed by staff from the DOE Headquarters Office of Environmental Audit and conducted with the staff from other DOE elements and contractor personnel experienced in the audit process. Most of the sampling and analysis was conducted by contractors with experience in the DOE Environmental Survey Program. The aerial survey was conducted by a DOE contractor responsible for that function. Rockwell International was assigned certain tasks, for example the expansion of the meterological dispersion model to include VOC's and determining the feasibility of analyzing the ambient air samples for americium as well as plutonium.

One of the first actions of the environmental team was to obtain splits of the samples obtained from the Environmental Protection Agency National Environmental Investigation Center. These split samples were received, packaged according to Department of Transportation regulations and shipped to analytical laboratories from June 10 through June 21. One hundred and twenty-three samples of water, sludge, sediment, and soil were obtained. Typically 10 analyses per sample are being run according to Environmental Protection Agency protocols. The laboratory results are tentatively scheduled for completion by September, 1989.

Additional samples were obtained at the initiative of the environmental team from June 22 through June 28 and from July 12 through July 14. These samples included influent and effluent site drainage sediments at the buffer zone boundary, sewage treatment plant liquids and sludges, and liquids and sediments from drainage ditches, seeps, and drainage pipes. Forty Five samples were taken. Typically ten analyses per sample will be performed using Environmental Protection Agency protocols. Results are expected to be available by September, 1989.

Sampling for ambient volatile organic compounds was performed at four stations according to Environmental Protection Agency methods. Two samplers were located near the buffer zone boundary, one in the predominantly upwind (NW) direction and one in the predominantly downwind (SE) direction. Two other samplers were located, about 400 yards apart, at the plant fence boundary in the general downwind direction. Eight-hour samples were collected on June 25, June 28, and July 13. An effort was made to sample when the wind was blowing in the predominant direction. Appropriate meteorological data were collected and will be used in data evaluation. Colorado Department of Health and Environmental Protection Agency personnel participated in the planning process, were provided with the sampling plan and were invited to observe the sampling. Results are expected by the end of August, 1989.

Stack sampling for volatile organic compounds was performed at the major sources of emission from July 11 through July 19. Stacks were sampled at Buildings 444, 774, 460, 707, and 776/777 during actual or simulated normal operating conditions. Environmental Protection Agency sampling and analysis protocols were followed where possible. Colorado Department of Health personnel observed the sampling and were provided with duplicate samples. A draft report on the stack sampling is expected by the end of August, 1989.

A comprehensive review of the sewage treatment plant (STP) was initiated. This effort included evaluations of the STP's overall capacity to meet NPDES permit limitations, the operational efficiency of the STP as currently operated, the sampling and analysis activities relative to STP operation and NPDES compliance, and the STP effluent discharge pathway. In conjunction with this effort, a comprehensive sampling and

analysis program to characterize the influents and effluents to and from the STP is currently underway. Results of these efforts will be used to support any recommendations for operational changes. Depending on the sampling and analysis results, the STP review could continue for an extended period. The draft report on the STP is included in Appendix B.

A comprehensive aerial survey of the Rocky Flats Plant was conducted. A survey using normal and infrared photography and a multi-spectral scanner carried in a fixed-wing aircraft was flown from June 26 through June 30. A radiological survey using helicopter-mounted gamma-ray spectroscopy equipment was flown from July 8 through July 14. The photographic and scanner data will be useful for defining groundwater and surface water interactions, wetlands surveys, and identifying any stressed vegetation. The results of the radiological survey will be compared to the results of a similar 1981 survey to identify any possible changes in the environmental radioactivity. Preliminary reports of both surveys are expected by the end of August, 1989.

The Environmental Audit Team consisted of seven technical specialists managed by a Team Leader from DOE's Office of Environmental Audit. The technical specialists were selected on the basis of their expertise and experience in eight major media or regulatory-related technical areas: 1) Air, 2) Radiation, 3) Quality Assurance, 4) Waste Management, 5) Surface Water; 6) Groundwater; 7) Inactive Waste Sites and Releases; and 8) Toxic and Chemical Materials. The Audit Team was supported by DOE Special Assistants and other members of the Environmental Team. In addition, there was a six member team auditing site conformance with the requirements of the National Environmental Policy Act (NEPA). The names, audit functions and organizational affiliation of the team members are provided in Appendix A.

The audit scope was broad, encompassing all media and major applicable environmental regulations. Environmental programs, activities, and conditions at the RFP were assessed against the applicable requirements of Federal and Colorado Department of Health environmental regulations, DOE orders, RFP-specific permit conditions, and best management practices (BMPs). BMPs were defined using accepted industry practices and the professional judgement of the technical specialists. Specific Federal environmental regulations considered during the audit included: 1) Clean Air Act; 2) Clean Water Act; 3) National Emission Standards for Hazardous Air Pollutants (NESHAP); 4) Resource Conservation and Recovery Act (RCRA); 5) Toxic Substances Control Act (TSCA); 6) Superfund Amendments and Reauthorization Act (SARA); 7) Comprehensive Environmental Response, Compensation and Liability Act (CERCLA); 8) Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA); and 9) National Environmental Policy Act (NEPA).

Formal audit protocols were used as guidance in conducting this assessment. Among the protocols used were: 1) Draft DOE RCRA Audit Protocol; 2) NEIC Multi-media Compliance Procedures; 3) U.S. Air Force Environmental Compliance Assessment and Management Program, Guidance Manual; 4) U.S. EPA TSCA Inspection Manual; 5) U.S. DOE Environmental Survey Manual; 6) U.S. EPA Multi-media Compliance Inspection Manual; 7) Draft Multi-media Environmental Compliance Inspection Manual (U.S. General Services Administration; 8) U.S. EPA RCRA Inspection Manual; and 9) U.S. DOE, NEPA Compliance Audit Protocol.

Audit activities were initiated during the week of June 12, 1989, before the team arrived at the RFP. The pre-arrival activities included review of available documentation to allow the specialists to gain familiarity with the RFP, preparation of site-specific audit scopes



SUBPOENA 1063RF EG&G ITEM 15 5140631

for each technical speciality, and preparation of draft agendas. The audit scopes are presented in the beginning of the individual technical discipline sections.

On-site audit activities were conducted from June 19 through July 14, 1989. June 19 and 20 were devoted to respirator fit testing, site health, safety, and security briefings, site environmental briefings and an audit kick-off meeting to discuss with RFP personnel the on-site audit process, introduce the team members to site personnel, and establish procedures for coordinating daily activities. A copy of the weekly agendas for individual technical specialists is included in Appendix G. The on-site audit activities included field inspections of RFP facilities, properties, and waste sites, reviews of site records and files, interviews with site personnel, and observation of selected activities. A "List of Site Documents" and "Contacts/Interviews", utilized as references by the Audit Team, are included in Appendices H and I., respectively Using information gathered from these sources, the audit team evaluated whether activities and conditions at the RFP satisfied applicable environmental orders, regulations, and best management practices; identified potential environmental problems; and made recommendations for improvement. The Audit Team also made note of site practices, activities, and programs that were considered to be exceptional and warranted documentation for purposes of information transfer to other DOE facilities.

Representatives of the Colorado Department of Health and the U.S. EPA, Region VIII were invited to participate in the audit, joining team members on facility inspections and during personnel interviews. In addition, they were invited to attend daily team debriefings along with representatives of Rockwell International and the Rocky Flats Office. During these meetings, individual team members reported on the day's activities, significant observations and potential findings.

Prior to leaving the RFP on July 14, 1989, the technical specialists prepared draft findings for submission to the Audit Team Leader. During the weeks of July 17 and July 24, 1989, these findings were incorporated into this report as presented in Sections 2 through 10. "Acronyms and Abbreviations" used in this assessment are included in Appendix J.

Audit observations have been organized in this report within the eight technical areas evaluated, and categorized as Audit Findings, Best Management Practices, or Noteworthy Practices. The specific format of the observations varies with the type of category. The formats are detailed on the following pages.



SUBPOENA 1065RF EGG ITEM 15 5140632

## AUDIT FINDINGS

This section contains the audit findings identified by the audit team. Audit findings are activities or conditions which, in the judgment of the audit team, may not satisfy applicable environmental regulations, DOE Orders (including draft orders and internal memoranda, where referenced), consent orders, agreements with regulatory agencies, or permit conditions. These findings may be indicative of actual or potential regulatory compliance problems or inadequacies in the site's approach to achieving the performance objectives associated with regulatory requirements.

The audit findings are presented by audit discipline. There is no significance to the ordering of the findings within each audit discipline.

Each audit finding will be presented in the following format:

| | |
|---|---|
| Audit Discipline | Environmental media and/or statute |
| Audit Finding Number | The sequential number assigned to each audit finding within an audit discipline |
| Audit Finding Title | The title of the audit finding to which the finding pertains |
| Audit Finding and Applicable References | Description of the activity or condition which did not satisfy an applicable environmental regulation or DOE Order requirement |
| Applicable Citation and Requirements | The regulation or requirement audited proceeded by the appropriate citation |
| Recommendations | Recommendations may include both immediate actions taken to correct a specific condition observed to be unsatisfactory, and comprehensive, long-term actions designed to address a broad category of problems or the potential root causes of the finding. |



SUBPOENA 1063RF EGG ITEM 15 5140633

# BEST MANAGEMENT PRACTICES FINDINGS

This section contains the Best Management Practice (BMP) finding identified by the audit team. BMP findings involve activities or conditions where, in the judgment of the audit team, BMPs could and should be employed.

BMPs are derived from regulatory agency guidance, accepted industry practices, and professional judgment. BMP findings are generally not indicative of regulatory compliance problems.

BMPs are typically used when regulations, which are usually minimum requirements for a particular practice or activity, do not apply, go far enough, or exist. Most BMPs complement existing regulations and provide an added degree of protection when prudently employed. Unlike regulations, with which compliance is a must, compliance with BMPs is optional. The decision to employ a BMP is based on professional judgment, common sense, and available resources.

BMP findings are presented by audit discipline. There is no significance to the ordering of the findings within each audit discipline.

Each BMP finding will be presented in the following format:

| | |
|---|---|
| Audit Discipline | Environmental media and/or statute |
| BMP Finding Number | The sequential number assigned to each BMP finding within an audit discipline |
| BMP Finding Title | The title of the BMP finding to which the finding pertains |
| BMP Finding | Description of the activity or condition to which a BMP could and should be employed |
| Applicable BMP and Recommendation | Description of the BMP applicable to the findings, rationale for why the BMP could and should be employed, and specific recommendations for implementation. Include as a reference the source from which the BMP was derived. |



SUBPOENA 1063RF EGG ITEM 15 5140634

## NOTEWORTHY PRACTICES

This section contains descriptions of practices which, in the judgment of the audit team, are noteworthy. Noteworthy practices include practices, activities, or programs which have general application to DOE facilities and are so exceptional that they warrant documentation for the purposes of information transfer among DOE facilities. A practice may be noteworthy because of its design or execution. The presence or absence of noteworthy practices at a facility should not be viewed as a measure of a facility's environment performance.

Noteworthy practices are presented by audit discipline. Each noteworthy practice will be presented in the following format:

| | |
|---|---|
| Audit Discipline | Environmental media and/or statute |
| Noteworthy Practice (NP) Number/Title | A sequential number assigned to each NP within an audit discipline. Each number is followed by a descriptive title |
| Noteworthy Practice | Description of the noteworthy practice. |

# Section 2.0

## Air

# 2.0 - AIR

## SCOPE OF AUDIT

1. Review conformance with criteria pollutant requirements (EPA and CDH)
   - a. CDH air-emission permits
   - b. Source emission quantification
   - c. Ambient-air monitoring
2. Review conformance with CDH regulations regarding volatile organic compounds
   - a. Emission limits
   - b. Disposal by evaporation or spillage
   - c. Degreaser/cleaner requirements
   - d. Storage and transfer requirements
   - e. Storage and transfer-gasoline
3. Review uses of volatile organic compounds, locating and correlating major usage points and vents that emit volatile organics to the atmosphere.
4. Review conformance with Federal NESHAP and CDH Hazardous Air Pollutant Regulations
   - a. Radionuclides
   - b. Beryllium
   - c. Asbestos



SUBPOENA 1065-85 EGG ITEM 15 5135550

# AIR FINDINGS

**AUDIT FINDINGS:**

| | |
|---|---|
| AIR/AF-1 | Monitoring of Exhaust Vents for Beryllium |
| AIR/AF-2 | Effluent Air Monitoring Program |
| AIR/AF-3 | Radioactive Ambient Air Monitoring Program |
| AIR/AF-4 | Air Pollutant Emission Notices |
| AIR/AF-5 | VOC Losses From OASIS Feed Tanks |

**BEST MANAGEMENT PRACTICES:**

| | |
|---|---|
| AIR/BMP-1 | Minimization of Solvent Use |



SUBPOENA 1363FF EGG ITEM 15 [illegible]

**Audit Discipline** Air

**Audit Finding Number** Air/AF-1

**Audit Finding Title** Monitoring of Exhaust Vents for Beryllium

**Audit Finding and Applicable Reference**

The Rocky Flats Plant (RFP) procedure for monitoring beryllium emissions does not adhere to the requirements of the National Emission Standards for Hazardous Air Pollutants (NESHAP) and the Colorado Air Pollution Control Regulations. The U.S. EPA has specified an emission standard for beryllium from stationary sources of not more than 10 grams per 24-hour period, and a stack sampling requirement and methodology for emission testing as part of the NESHAP. Also, the Colorado Air Pollution Control Regulations limit beryllium emissions from machining operations to not more than 10 grams per 24-hour period. Exhaust vents at the RFP are continuously sampled for emissions of particulate beryllium. The standard operating procedure (A-19) being used results in two filters being collected per week at each sampling location. These filters are composited over a one month period, and analyzed for beryllium, with results reported in grams per month and a concentration expressed in units of micrograms per cubic meter.

**Applicable Citation and Requirements**

40 CFR 61.32(a): Emission Standard for Beryllium
40 CFR 61.33(a): Stack Sampling Requirement

Section 61.32(a) established an emission limitation for beryllium from stationary sources of not more than 10 grams over a 24-hour period.

Section 61.33(a) requires that emissions tests be conducted according to Method 104, or if approved by the EPA, according to Method 103.

Colorado Regulation 8 - III.A.2: Applicability to Machine Shops
Colorado Regulation 8 - III.B.1.a: Emission Standard for Beryllium

Section III.A.2 specifies that machine shops that process beryllium, beryllium oxide, or any alloy containing more than 5% beryllium are subject to the emission standard for beryllium, which is established in Section III.B.1.a at not more than 10 grams over a 24-hour period.

**Recommendations**

1) Supplement the existing monitoring program by conducting exhaust emission testing (one-time test) to accurately determine the maximum emissions that will occur in any 24-hour period at vents serving beryllium machining and processing areas as specified in 40 CFR 61, Appendix B, Method 104 or Screening Method 103, which would produce results that could be compared to the prescribed standards.



SUBPOENA [illegible] EGG ITEM 15 [illegible]

2) Seek a waiver of emissions testing under 40 CFR 61.13(i). The requirement to conduct emission testing by Method 104 or Method 103 can be waived by the EPA Administrator if, in the Administrator's judgement, the source is meeting the standard. An application for waiver should be accompanied by the source reporting information required in 40 CFR 61.10.

3) As an alternate to recommendation 2, seek written approval of the current emissions testing methodology from CDH per Regulation 8-III-C-4.

**Audit Discipline** Air

**Audit Finding Number** Air/AF-2

**Audit Finding Title** Effluent Air Monitoring Program

**Audit Finding and Applicable Reference**

Deficiencies in Rocky Flats Plant's (RFP) effluent air monitoring program may adversely affect determination of radioactive materials released to the atmosphere. These deficiencies include:

1) Uncertainty about the volumetric flow rate of effluent air in the exhaust ducts. In plutonium exhaust ducts, Eastech vortex shedding flowmeters are used to produce a direct read-out of the volumetric air flow through the duct; however, no suitable method exists for calibrating the Eastech flowmeters over the anticipated operating range. To calibrate the Eastech flowmeters, it would be necessary to remove the apparatus to a test laboratory where the duct would need to be simulated. These units have not been calibrated by the RFP since their installation in the mid-1970s. Calibration accuracy at the time of installation was estimated by the manufacturer at ± 20 percent (A-24). There are no flow measuring devices located in ducts exhausting uranium processing areas, where fan velocities and duct dimensions are used to calculate flow rates. To quantify emissions based on the sample determinations, it is necessary to have accurate data on the flow rate of the effluent stream being exhausted.

2) Short duct runs do not provide for acceptable mixing length requirements for locating sampling ports. Sampling probes are located in the exhaust ducts downstream of the final stage of HEPA filtration to sample the effluent stream prior to discharge to the atmosphere. The duct lengths are not sufficiently long to allow probe placement in accordance with 40 CFR 60, Appendix A, Reference Method 1.

3) Sampling is not isokinetic (i.e., sampling in which the linear velocity of the gas entering the sampling nozzle is equal to that of the undisturbed gas stream at the sample point). The sampling probes are of fixed internal diameter, and sampling is conducted at a constant volume-flow rate of two cubic feet per minute. Therefore, isokinetic sampling is achieved only if the effluent air velocity in any duct happens to match the air velocity being drawn into the sampler nozzle.

4) No records have been identified that demonstrate that sampling probes have been regularly inspected to determine if the nozzle tip is in good physical condition and clean, and to assure that the probe has not suffered damage. Site personnel were not able to identify the most recent inspection date of the probes (I-RAD-20).

5) Calibration stickers are not being properly used. Calibration of the samplers is conducted quarterly (I-A-30). Stickers on the samplers showed that calibration had been accomplished during the week following July 1, 1989. Two samplers (371-2 and 102-3) could not be calibrated, although they were both affixed with



SUBPOENA 1063RF EGG ITEM 15 5140644

signed and dated calibration stickers. This incorrectly implies that the samplers are in calibration.

6) Sampler flow calibration requirements are not clearly written. The vacuum gauges used on the particulate samplers in Building 707 are U-tube manometers. The calibration stickers and the calibration procedure (RAD-44) state that the level of the top of the oil in the manometer be recorded for the flow calibration. This is ambiguous with respect to U-tube type manometers, since each leg of the "U" has a level. The level of the higher leg was observed to be consistently approximately one-half of the value recorded on the calibration sticker. This suggests that the vacuum was adjusted to obtain the desired value by reading the distance between the high and low oil legs in the tube. While the apparent method used is valid, it appears to conflict with the procedural instructions and this inconsistency may lead to incorrect adjustment of the sampler flow rate.

7) There is lack of a system to identify out-of-service instruments. In Building 707, several inoperable tritium monitors were observed. RFP personnel reported that these had been removed from service but they did not have "out-of-service" tags or any similar notation.

8) There are delays in submission of calibration worksheets to Environmental Management. The calibration worksheets are to be used by the Radiation Monitor to record any difficulties encountered during calibration or the existence of any systems requiring repair. The worksheets are transmitted to Environmental Management personnel who initiate work orders for system repairs. According to RFP personnel, it may require two to four weeks before Environmental Management receives the worksheet because of the time needed for the Radiation Monitor to prepare the document and internal mailing time (I-RAD-27). Consequently, repairs of systems may be unnecessarily delayed.

9) Calibration worksheets are not properly completed. A calibration worksheet (A-25) for samplers in Buildings 371 and 374 was reviewed: the sheet was not dated as required and one column on the form that requires a yes/no response had a numerical entry. This may be an indication that calibration personnel may not fully understand the calibration procedures or requirements.

10) There is no prohibition in the RFP procedures against using data from sampling systems that are out of calibration. This may result in the use of inaccurate monitoring data.

11) The actual flow through the sampler cannot be determined with existing equipment. The air-flow rates are checked and reset twice per week when filters are changed; however, there is no means to determine that the air flow rate through the sampler was constant throughout the sampling period and the sample collector is not required to record any flow-rate deviations. Thus, it is assumed that a constant air flow rate of two cubic feet per minute occurred over the entire period.

The RFP has recognized many of the deficiencies in the effluent monitoring program and has requested funds for upgrades to the system (RAD-42). The project includes:

1) Improved air-flow measurement devices;



SUBPOENA 1063RF EGG ITEM 15 5140645

2) Improved sampling probes and associated instrumentation conforming to ANSI N13.1 - 1969; and

3) Improved alarming air monitors.

In addition, RFP personnel have made other recommendations to improve the effluent monitoring program. These are identified below in the Recommendations section.

Applicable Citation and Requirements

DOE Order 5400.1: General Requirements for Effluent Monitoring.

40 CFR 61 Subpart H: National Emission Standards for Radionuclide Emissions from Department of Energy (DOE) Facilities. Section 61.92 sets an emission standard based on dose assessments. Section 61.92 requires the determination of radionuclide emissions and the calculation of dose equivalents based on the measured emissions.

Performance and Design Criteria for Systems used in DOE Facilities to Sample and Measure Airborne Radionuclide Emissions to comply with 40 CFR 61, Subpart H, January 1986, DOE/EH ______ (issued for comment).

Recommendations

1) Install sampling ports in exhaust ducts in accordance with 40 CFR 60, Appendix A, Reference Method 1.

2) Conduct measurement of exhausted air using new sampling ports to obtain:

- Multi-point velocity profile of air flowing through exhaust duct.
- Temperature of air flowing through exhaust duct.
- Static pressure of exhaust duct.
- Moisture content of exhaust air stream.

3) Use the following methodologies from 40 CFR 60, Appendix A:

Reference Method 1, Sample and velocity traverses for stationary sources.

Reference Method 2, Determination of stack gas velocity and volumetric flow rate.

Reference Method 2A, Direct measurement of gas volume through pipes and small ducts.

Note: The RFP has submitted an Engineering Job Order (A-23) which when implemented, will allow determinations of exhaust flow rates per above recommendations 1, 2, and 3.

4) Develop and implement a program for periodic inspection of effluent sampling probes to assure that they remain in acceptable physical condition. The RFP has prepared a draft procedure (A-26) that deals with this issue.

5) Improve effluent sampling equipment to provide for:

- continuous record of sampler air flow rate
- integrated flow measurement over sampling period

Note: The need for these improvements is recognized in a Sample Improvement Plan in the Air Effluent Monitoring Charter (A-27).

6) Develop and implement a program of periodic refresher training for radiation monitoring personnel who perform effluent monitoring system calibrations, filter change-out, and re-set of sampler air flow control.

7) Revise the effluent calibration procedures (RAD-44) to specifically define the method of recording the manometer readings.

8) Institute "tag-out" procedures for out-of-service monitoring equipment such as the tritium monitors.

9) Revise procedures to require "tag-out" of systems in need of repair, and the immediate notification of the party responsible for repair initiation.

10) Develop guidelines to expedite transfer of calibration worksheets to Environmental Management personnel.

11) Expedite implementation of the effluent monitoring upgrades already proposed by RFP (RAD-42).



SUBPOENA 1063RF EGG ITEM 15 514064?

**Audit Discipline** Air

**Audit Finding Number** Air/AF-3

**Audit Finding Title** Radioactive Ambient Air Monitoring Program

**Audit Finding and Applicable Reference**

There are deficiencies in the ambient air monitoring program for radionuclides. As a consequence, the accuracy of measured concentrations of plutonium in ambient air are questionable. These data are reported monthly and annually, and are used in calculating annual radiation dose to the public to confirm dose calculations that are made based on radioactive effluent emission data. Deficiencies identified by the audit team include:

1) The present ambient air samplers in the onsite, perimeter, and community sampling network may not be capable of maintaining constant air flow rates within the 25 to 35 cubic feet per minute specified in the RFP procedures (A-20). An examination of data reported for January 1989 showed that 13 of 33 samplers had operated at average volumetric flow rates below the desired range of 25 to 35 cubic feet per minute (A-20). A sampler operating at a low volumetric flow rate, which equates to a low air-flow velocity, will tend to capture only small diameter particles, while another sampler at higher volumetric flow rate and velocity will capture larger particles. The different particle sizes may show different activity levels.

2) Particulates may be lost to sampler interior surfaces. The present sampler design presents a surface area inside the sampler that is 2 to 3 times larger than the 8 by 10 inch filter. Particles of dust entering the sampler can impact this surface and/or settle before they reach the filter with the result that particles may be lost to the sampler cabinet and never counted.

3) The sampling equipment is more than 15-years-old, and component parts break down frequently (I-RAD-33).

4) Samplers may not be properly located. The existing radioactive ambient air monitoring network was established following limited siting criteria which used a Colorado State University wind tunnel study (A-21) as a basis; however, the exact locations of these samplers have not been recently documented to be representative for the Rocky Flats area. Relocation of the monitors may be warranted to reflect more recent knowledge of local meteorological conditions, new facilities on the RFP, and recent development of nearby communities (RAD-42).

5) The RFP does not analyze ambient air samples for americium-241. For preparing the dose assessments, it is assumed that the americium-241 activity is 20 percent of the alpha-emitting plutonium activity because this is the maximum americium-to-plutonium ratio that may be present in RFP plutonium from the decay of plutonium-241. However, it is not clear that this assumption is valid because some processes at the RFP separate plutonium and americium and the latter may be released independently of the former. In addition,



SUBPOENA 1063RF EGG ITEM 15 5140643

because of chemical dissimilarities, these elements may separate in the environment.

6) The ambient air monitoring samples are not analyzed for uranium.

7) Many of the ambient air samples are analyzed only for total long-lived alpha; it has been assumed by the RFP that this would be adequate to show any increases of the plutonium-in-air concentration. A recent examination of air monitoring data failed to show any correlation between total long-lived alpha and plutonium-in-air concentrations (RAD-53).

The RFP has recognized deficiencies described above and recommended improvements in a Self Improvement Plan that is included in the Environmental Management Charter, Radionuclide Ambient Air Monitoring Program (A-20), in Conceptual Design Report - Health Physics Projects for the Rocky Flats Plant (RAD-42), and in Evaluation of On-site Ambient Air Sampler Long-lived Alpha Data (RAD-53).

## Applicable Citation and Requirements

DOE Order No. 5400.1, General Environmental Protection Program.

DOE Order No. 5480.1B, Environment, Safety, and Health Program for Department of Energy Operations.

"Clarification of Applicable Radiation Protection Standards for the Public and the Environment," Memorandum to Distribution from John Tseng, Acting Director, Office of Environmental Guidance and Compliance, U. S. Department of Energy, November 4, 1987.

"Radiation Standards for Protection of the Public in the Vicinity of DOE Facilities," Memorandum to Distribution from W. A. Vaughan, Assistant Secretary, Environment, Safety, and Health, U. S. Department of Energy, August 5, 1985.

DOE Order 5484.1, Chapter 3 (Draft).

These documents establish the requirements for environmental radiation protection programs, including the need to perform dose assessments and the requirement that they be as accurate and as realistic as is feasible.

## Recommendations

1) Design and install new samplers configured to minimize internal surface area to limit particulate losses within the samplers. The conventional high-volume sampler for total suspended particulates as described in 40 CFR 50, Appendix A, would provide a better sampler design; however, a new blower design would be required to permit continuous operation.

2) Incorporate a flow-control system that will maintain a constant air flow rate over the sampling period. Such a system would automatically adjust the flow rate as the filter load builds up, and at the same time adjust the flow rate to accommodate changes in atmospheric temperature, barometric pressure, and line voltage.



SUBPOENA 1063RF EGG ITEM 15 5140649

3) Replace the total long-lived alpha analysis of ambient air samples with radionuclide specific analyses. Analyze samples for plutonium, americium-241, and uranium.

4) Expedite an air-dispersion modeling study to verify present sampler locations or design a new ambient air sampling network.

| | |
|---|---|
| Audit Discipline | Air |
| Audit Finding Number | Air/AF-4 |
| Audit Finding Title | Air Pollutant Emission Notices |

## Audit Finding and Applicable Reference

The Rocky Flats Plant (RFP) has not filed Air Pollutant Emission Notices (APEN) for all potential sources. Over its operating history, the RFP has applied for and obtained from the Colorado Department of Health (CDH) the following air emission permits:

| | |
|---|---|
| Permit No. C-12931 | Incinerator at Building 122, for Classified Waste Paper |
| Permit No. C-12932 | Multiple chamber incinerator at Building 771 for plutonium-contaminated plastic, paper, rubber, and cloth |
| Permit No. C-13032 | Demonstration-scale and pilot-scale fluidized-bed incinerators in Building 776 |
| Permit No. 87JEO84L | Land development of 300 acres; overlot grading and associated grading of area south and east of RFP in Jefferson County |

Air Pollutant Emission Notices (APEN) have been provided to CDH for only 58 sources, 50 of which describe potential beryllium sources (I-A-32). CDH indicates that APENs are needed for essentially all vents except cafeteria vents and plumbing vents. It has been estimated by RFP that APENs are needed for about 4000 vents and tanks (I-A-32). Many of these vents serve areas where toxic, hazardous, or odorous substances can be emitted.

The RFP and the CDH have met and are negotiating a schedule to provide the required information.

## Applicable Citation and Requirements

Colorado Regulation 3 - II.A: Air Pollutant Emission Notice Requirements.

> A general requirement that states that no person shall permit emission of air pollutants unless and until an Air Pollutant Emission Notice has been filed with the CDH.

## Recommendations

Develop and implement a program to conduct a comprehensive survey of facilities to compile the information necessary to complete the required APENs.

The necessary information required for preparation of the APENs can be obtained by conducting a building-by-building survey to locate exhaust vents or stacks, and to identify sources of pollutants being exhausted. Engineering drawings of ventilation systems can assist in the correlation of sources of pollutants with emission control



SUBPOENA 1063RF EGG ITEM 15 5140653

systems and exhaust points. The following information sources can be helpful in this effort:

Information on ducts/plenums potentially emitting radionuclides and/or beryllium:

Environmental Management Charter, Air Effluent Monitoring, by M. R. Boss, Rockwell International, Environmental Management, March 10, 1989 (Draft).

Radionuclide Source Report for Rocky Flats Plant, National Emission Standard for Radionuclide Emissions from Department of Energy (DOE) Facilities (40 CFR 61, Subpart H), by M. R. Boss, Rockwell International, Environmental Management, December 1988 (Unpublished).

Information on chemical use areas:

Computerized chemical inventory database for 1988/89, A. J. Petrocchi, Rockwell International, Industrial Hygiene.

Information on volatile organic compound emissions:

Compilation of Data on VOC Emissions to the atmosphere from Rocky Flats Plant, DOE Environmental Audit, June 19 - July 14, 1989 (Appendix D).



SUBPOENA 1063RF EG&G ITEM 15 5140653

**Audit Discipline** Air

**Audit Finding Number** Air/AF-5

**Audit Finding Title** VOC Losses from OASIS Feed Tanks

**Audit Finding and Applicable Reference**

Volatile organic compounds (VOC), including carbon tetrachloride, 1,1,1-trichloroethane, and Freon-113, are being lost to the atmosphere from tanks T-13 and T-14 at the Organic and Sludge Immobilization System (OASIS) in Building 774 as a result of inappropriate tank filling and agitation techniques (I-A-36). Waste oil/solvent mixtures from Buildings 707 and 777 are transferred to these two tanks (about 350-gallon capacity each), which serve as feed tanks to OASIS. The waste oil/solvent enters the tanks through fill pipes located about 12 inches from the tank top which exposes a greater surface area for vaporization than would occur with submerged or bottom fill. The solvent vapor (VOC) is displaced through vent lines to the atmosphere during tank fill. Additional solvent (VOC) is vented to the atmosphere during air sparging of the tank contents, which is practiced to prevent separation of the waste oil and solvent. Although the stated purpose of sparging is to achieve mixing, the practice also accelerates losses of VOC through vaporization.

**Applicable Citation and Requirements**

Colorado Regulation 7 - III.B: Transfer of Volatile Organic Compounds

Colorado Regulation 7 - V: Disposal of Volatile Organic Compounds

Section III.B requires that all VOCs (except petroleum distillates) transferred to any tank or container larger than 56 gallons (212 liters), shall be transferred using submerged or bottom filling equipment. Section V prohibits disposal of VOCs by evaporation if the quantity exceeds 10 gallons per day in an ozone non-attainment area. The Rocky Flats Plant is located in an ozone non-attainment area.

**Recommendations**

1) Repipe tank fill system for tanks T-13 and T-14 to provide submerged fill or bottom fill.

2) Replace air sparging with mechanical agitation to reduce vaporization losses.



SUBPOENA 1063RF EGG ITEM 15 5140654

**Audit Discipline** Air

**BMP Finding Number** AIR/BMP-1

**BMP Finding Title** Minimization of Solvent Use

**BMP Finding**

The potential exists for the RFP to further reduce its emissions of hydrocarbons to the environment. Production operations at the Rocky Flats Plant (RFP) presently require the use of large volumes of three halogenated hydrocarbons for cleaning oil and grease from machined parts, machinery, and machine chips. In calendar year 1988 for example 186,816 pounds of carbon tetrachloride, 36,893 pounds of Freon-113, and 47,630 pounds of 1,1,1-trichloroethane were used (A-1). These substances, when released to the atmosphere, are considered to be harmful to the protective ozone layer. In addition, carbon tetrachloride is likely to be controlled as a hazardous air pollutant under the National Emission Standards for Hazardous Air Pollutants (NESHAP) regulations because it is a suspected human carcinogen. Colorado Department of Health (CDH) regulates emissions of these substances under rules controlling releases of volatile organic compounds.

The RFP addressed the need to reduce, or eliminate, the use of chlorinated hydrocarbon solvents in 1986 (A-17) and established a Halogenated Solvents Task Team about a year later (A-4). Through the efforts of this team, several solvent uses have been eliminated and aqueous-based cleaners have been successfully substituted (A-4 and A-5). A Hazardous Material Procurement Policy has been put into place to restrict and control the use of these types of materials (A-6). Substitution of Freon-TF in place of carbon tetrachloride has been considered, but would only represent a stop-gap measure (A-17).

Several techniques that would allow continued use of carbon tetrachloride have been considered over the years, including vapor recovery by chilling the saturated gas stream to condense the carbon tetrachloride vapor to liquid for recovery (A-17) and absorption of the carbon tetrachloride vapor on a carbon bed. To date, no suitable substitute for carbon tetrachloride has been developed, nor has a system for emission control been successfully demonstrated (I-A-38).

**Applicable BMP and Recommendations**

1) Continue efforts of Halogenated Solvents Task Team to eliminate halogenated hydrocarbons by restricting uses and by substituting aqueous-based cleaners where possible.

2) Replace present carbon tetrachloride hose nozzles in glove boxes with flow restricting nozzles to reduce the rate of solvent usage. Reconsider a vapor recovery system to condense the solvent vapor to liquid to minimize emissions to the atmosphere.

3) Expand scope of Halogenated Solvents Task Team to address all solvents.