Exhibit 26-A

# Section 3.0

## Surface Water

## 3.0 - SURFACE WATER

## SCOPE OF AUDIT

1. Review Issues Related to NPDES Permit

   a. Conformance record under existing permit

   b. Impact of proposed agreement on satisfying requirements

   c. Sampling & monitoring review

   d. Water analysis provisions - Quality Assurance/Quality Control

   e. Review procedure for notification of permit violations

2. Sewage Treatment Plant Issues

   a. Adequacy of present system (weekdays vs. weekends)

   b Review process waste water sources and pretreatment systems for possible minimization or modification

   c. Recommend possible improvements to operating procedures

   d. Investigate possible additions to retention basins to contain spills or unusual occurrences

   e. Spray irrigation and its impact on groundwater/surface water issues

3. Spill prevention and control measures

   a. Review for adequacy and completeness

   b. Investigate potential for eliminating pathways to sanitary sewer collection system

   c. Consider additional monitor/alarm systems for tanks

4. Drinking water issues

   a. Backflow prevention measures - installation and inspection

   b. Potable water treatment records, including testing



SUBPOENA 1063FF EGG ITEM 15 5140660

# SURFACE WATER FINDINGS

## AUDIT FINDINGS:

| | |
|---|---|
| SW/AF-1 | Discharge Monitoring Report Deficiencies |
| SW/AF-2 | Need for Certified Operators at Sewage Treatment Plant |
| SW/AF-3 | Unpermitted Discharges from East and West Gate Guard Posts |
| SW/AF-4 | Quality Assurance - Surface Water Sample Collection, Handling, and Documentation |
| SW/AF-5 | Sewage Treatment Plant Deficiencies |
| SW/AF-6 | Work Order Lag Time |
| SW/AF-7 | Deficiencies at the Spray Irrigation Site |

## BEST MANAGEMENT PRACTICES:

| | |
|---|---|
| SW/BMP-1 | Deficiencies in Draft Best Management Practice Spill Prevention Containment and Control (BMP/SPCC) Plan |
| SW/BMP-2 | Lack of Flow Measurement at C-1 Pond |
| SW/BMP-3 | Inadequate Protocols for Timely Identification of Pollutant Releases to Sewage Treatment Plant |
| SW/BMP-4 | Cooling Tower Blowdown at Building 774 |
| SW/BMP-5 | Dam Inspection Reports |
| SW/BMP-6 | Laundry Operations |

## NOTEWORTHY PRACTICE:

| | |
|---|---|
| SW/NP-1 | Utilities Operations at Buildings 371 and 374 Complex |



SUBPOENA 1S6 ... ITEM 15 ... S1-6083

**Audit Discipline** Surface Water

**Audit Finding Number** SW/AF-1

**Audit Finding Title** Discharge Monitoring Report Deficiencies

**Audit Finding and Applicable Reference**

Monitoring of flow rates and oil and grease concentrations is not being performed in the manner defined in NPDES Permit Number CO-0001333. For outfall 001 (B-3 pond discharges), the permit requires that, "The dates, duration, and approximate volume discharged for each discharge shall be reported." Currently the plant reports only the dates of discharge, the average daily flow for the month, and the maximum daily flow during the month. For outfall 002 (A-3 pond discharge) the permit requires daily monitoring, "when there is a discharge and/or a bypass." The plant reports outfall 002 flows in the same manner as 001. Flows for outfalls 005, 006, and 007 are correctly reported once a year in the formats required by the permit.

The deficiency in reporting oil and grease concentrations is caused by an apparent anomaly in the permit for outfall 001. Page 4 of the permit requires that, "The concentration of oil and grease shall not exceed 10 mg/l in any grab sample nor shall there be a visible sheen or floating oil in the discharge." However, on Page 6, where the self-monitoring requirements for outfall 001 are listed, the oil and grease frequency was listed only as a daily visual observation, with no reference to the grab sample cited on Page 4. The plant has only reported visible sheen observations on its Discharge Monitoring Reports.

**Applicable Citation and Requirements**

U.S. EPA NPDES Permit No. CO-000133, dated 11/26/84: Flow Measurements: Outfall 001, Section A, Paragraph 2, Item b, Page 7, specifies requirements for flow monitoring at Outfall 001.

U.S. EPA NPDES Permit No. CO-000133, dated 11/26/84: Flow Measurements: Outfall 002, Section A, Paragraph 3, Item a, Page 8, specifies requirements for flow monitoring at Outfall 002.

Oil and Grease Concentrations: Outfall 001, Section A, Paragraph 1, Page 4, sets concentration limits for oil and grease at Outfall 001.

Oil and Grease Visual Sheen: Outfall 001, Section A, Paragraph 2, Page 6, sets a visual inspection requirement for oil and grease sheen at Outfall 001.

**Recommendations**

Even though the revised permits (currently being negotiated) may change certain of these requirements, the plant should report flow volumes for each discharge from outfalls 001 or 002 as required by the permit currently in effect. Provisions should also be made to collect, analyze, and report concentrations of oil and grease in the discharge from outfall 001 to measure compliance with the maximum concentration limit of 10 mg/l in any grab sample as stated on Page 4 of the permit.



SUBPOENA 1063RF EGG ITEM 15 5140664

**Audit Discipline** Surface Water

**Audit Finding Number** SW/AF-2

**Audit Finding Title** Need For Certified Operators at Sewage Treatment Plant

**Audit Finding and Applicable Reference**

Existing labor agreements, may cause uncertified operators to be assigned to control sewage treatment plant operations. This would be inconsistent with Colorado Department of Health requirements. The present certified operator may be bumped by any candidate senior to him who wants the steady daytime schedule. This would be inconsistent with state certification requirements for sewage treatment plant operators.

**Applicable Citation and Requirements**

Colorado Department of Health Water Quality Control Regulations as provided in Article 9, Title 25, C.R.S. 1973, 25-9-101 at paragraph 100.9.5 and 100.10 indicate the requirements for certification of sewage treatment plant operators at municipal and industrial sites, and describes the qualifications for certification.

**Recommendations**

1) Require certification of all candidates for sewage treatment plant operator positions.

2) Negotiate with union to ensure that potential candidates for the sewage treatment plant operator position be limited to certified operators.

**Audit Discipline** Surface Water

**Audit Finding Number** SW/AF-3

**Audit Finding Title** Unpermitted Discharges from East and West Gate Guard Posts

**Audit Finding and Applicable Reference**

Treated sewage from the East and West Gate Guard Posts is released to the subsurface near each facility; the leach fields are inadequate and sewage emerges on the surface, flowing to nearby streams under some conditions. Neither of these sources is currently covered by the NPDES permit. The practice was questioned during the DOE Environ-mental Survey but the site responded that neither source discharged, "to any navigable stream or water body and therefore are not regulated or required to be regulated under the NPDES permit program" (SW-24). However, the definition of navigable stream has been interpreted by U.S. EPA Region VIII to include all tributaries of streams which could be considered navigable. Under this interpretation, Woman Creek and Walnut Creek, and their tributaries may be considered navigable. Also, a report titled, Scope for East/West Gate Septic Systems, November 1988, (SW-23) reads, "The facilities are currently discharging to tributaries of Woman Creek/Standley Reservoir (West Guard Post/120) and to Walnut Creek/Great Western Reservoir (East Guard Post/920). These flows do not reach the reservoirs by surface flow unless the flow is enhanced by precipitation/run-off.

**Applicable Citation and Requirements**

The General Provisions for requiring an NPDES permit are given in 40 CFR 401. Specific definitions of "point source" and "navigable water" are given at 40 CFR 401.11(d) and (l), respectively. The DOE Environmental Survey cited above is the Environmental Survey Preliminary Report on Rocky Flats Plant, Golden, Colorado, dated June 1987. The specific reference to this finding occurs in Section 3.3.4.4.1, Page 3-68. The site's response was found in the "Implementation Plan for Environmental Survey Findings, Revision 1.0, Rocky Flats Plant, Golden, Colorado, February 1988, Page 2.3.2. The discussion regarding destination of flows from the guard posts is found in the "Scope for East/West Gate Septic Systems" prepared by RFP's Facilities Engineering Department in November 1988, Page 3.

**Recommendations**

The sewage should be collected in tanks and then transported to an available manhole for transfer to the sanitary sewage collection system while planned modifications are being investigated. During this period no permit is necessary since the existing sewage plant operations are covered by the current NPDES permit. At such time as improved package treatment systems may be installed at the guard posts, steps will have to be taken to apply for appropriate permits. It may be in the best interests of RFP to continue collecting the sewage rather than assuming the cost of replacing the existing system. These actions would preclude the need for capital expenditures to replace the existing systems, and alleviate the need for permits to discharge from these sources.



SUPERSEDED 1985 EGG ITEM 15 51 48663

**Audit Discipline** Surface Water

**AF Finding Number** SW/AF-4

**AF Finding Title** Quality Assurance - Surface Water Sample Collection, Handling, and Documentation

**AF Finding and Applicable Reference**

Sample collection, handling and documentation procedures with regards to the surface water samples are inadequate and could potentially introduce contaminants into samples, or result in inaccurate analytical data. The following were noted during a review of surface water sampling procedures:

1) The sampling technician was not working from written procedures. The written procedures for the acquisition,handling, and preservation of surface water samples are being revised and are not available to the sample technician (I-SW-12).

2) EPA sample handling and preservation procedures require that samples be kept cool after acquisition (4 degrees C). The cooler which contained the surface water samples acquired during the review did not contain ice or any other refrigerant, and temperatures were well above 4 degrees C.

3) The sample bottle caps were not lined with Teflon as recommendations by EPA sampling procedures.

4) Composite samples were not thoroughly mixed prior to splitting into individual sample bottles. Failure to properly mix composite samples would adversely affect such analyses as total suspended solids (TSS), biochemical oxygen demand (BOD), and chemical oxygen demand (COD).

5) Sample pH is measured in the field and subsequently checked by a sample receiving clerk after addition of preservation reagents (acids). Both measurements were done by immersing the pH test strip into the sample and reading the color change. This method of pH measurement has the potential to introduce contaminants directly into the samples.

6) The parameters of interest for a sample are not noted on the sample container. The parameters are noted on the sample label which is placed in a clear plastic envelope and attached to the neck of the sample bottle with a rubber band. If the rubber band breaks and/or the sample label is lost, the intended parameters would not be known and the sample invalidated.

7) The chain-of-custody is signed and dated by the sample technician upon receipt of the sample by the laboratory instead of when the actual sample was collected. The intent of chain-of-custody is to document the custody or possession of samples from the time of acquisition until transfer to the laboratory.



SUBPOENA 1063RF EG&G ITEM 15 51406?0

## Applicable Citation and Requirements

1) 40 CFR 136.3, Surface Water Sample Preservation, Table II - Required Containers, Preservation Techniques, and Holding Times presents the sampling handling and preservation requirements for NPDES samples. A footnote to the table says that "sample preservation should be performed immediately upon sample collection." The majority of the preservation requirements indicate "Cool to 4 degrees C."

## Recommendations

1) A written procedure for the acquisition, handling, and documentation of surface water samples should be developed. The procedure should follow the EPA sample acquisition protocols with respect to sample refrigeration and preservation, sample bottles and caps, and chain-of-custody. Refer to the Handbook for Sampling and Sample Preservation of Water and Wastewater, EPA-600/4-82-029, 1982, for details on these protocols.

2) The parameters of interest should be noted on the sample container in order to eliminate confusion or misidentification of intended parameters.

3) Composite samples should be thoroughly mixed prior to splitting into separate sample bottles.

4) pH should be measured on an aliquot of the sample and not directly from the sample bottle.



SUBPOENA 1963RF EG&G ITEM 15 5140671

**Audit Discipline** Surface Water

**AF Finding Number** SW/AF-5

**AF Finding Title** Sewage Treatment Plant Deficiencies

**Audit Finding and Applicable Reference**

The Sanitary Wastewater Collection System and Treatment Facility at RFP has several deficiencies which prevent it from achieving optimum efficiency in purifying wastewater. These are described in detail in a separate report included as Appendix B. The major deficiencies may be summarized as follows:

1) The cyclic nature of the influent flow to the sewage treatment plant at RFP inhibits efficient operations of the plant Surges in flow occur in late afternoon with minimum flows (and incoming organic matter) throughout the night and on weekends or holidays.

2) The collection system may have undetected pathways whereby toxic or hazardous liquids may enter the system and poison the organisms on which the treatment plant relies (e.g., the accidental release of chromic acid solutions in February 1989 through the 444 Building foundation drain connected to the sanitary sewer system).

3) The sludge drying beds, with one exception, rest on a tamped soil base rather than an impervious foundation. This may afford a pathway for the sludge liquids to penetrate the soil and potentially contaminate the groundwater.

4) Monitoring alarms and remote control equipment are inadequate to operate the STP in the most safe and efficient manner. Alarms currently installed are not routinely tested and maintained. No method of off-shift personnel alarm notification exists.

5) Operator coverage is not provided nearly three-fourths of the time. A full-time certified operator is available only during the day shift Monday through Friday. The rest of the cycle is covered by water treatment plant operators on a very limited basis, no more than 1 or 2 hours per shift.

6) The operator is often forced to do without equipment necessary for effective treatment due to long turn-around times for maintenance on work order requests. See related finding, SW/AF-6.

7) There is insufficient analytical data on sewage treatment plant influents to properly modify operating procedures to ensure most effective treatment.

8) The present aeration basin mixers may not be providing sufficient agitation of the basin volumes to ensure complete treatment. Inspections during the audit indicated that there are poorly mixed areas within each basin.

**Applicable Citation and Requirements**

The current NPDES Permit Number CO-0001333 requires at Part II, Section A (Management Requirements) paragraph 3 (Facilities Operation), Page 17, that "The



SUBPOENA 1063RF EGG ITEM 15 5140672

permittee shall at all times maintain in good working order and operate as efficiently as possible all treatment or control facilities or systems installed or used by the permittee to achieve compliance with the terms and conditions of this permit."

## Recommendations

Several specific recommendations are included as part of the separate report attached. With respect to the deficiencies cited above, the following options should be considered:

1) The current flow minimization effort at washrooms, showers and toilets which has reduced flows at B-371/374 by 12-18% should be expanded facility wide. The remote controller for the flow restriction valve at B-990 should be repaired. The influent organic loading should be definitively determined and supplemented as necessary.

2) An ongoing project designed to identify all connections to the sanitary sewers should be completed as soon as possible.

3) The remaining six sludge drying beds should be replaced with facilities having impervious bases and more efficient dewatering arrangements.

4) Water level detectors alarmed to Building 995 should be installed. A hydrogen-sulfide alarm should be installed in Building 995 to ensure operator safety. The Building 995 remote controller for the flow equalization valve should be repaired. The automatic backwash sequence on the filters should be repaired. Status alarms or additional gas cylinders should be installed in the chlorination/dechlorination system. All alarms should be subject to routine inspection and maintenance. An alarm paging system for off-shift personnel should be investigated. The air lift blowers should be equipped with a power failure alarm.

5) Consideration should be given to increasing the amount of State certified operator coverage to the sewage treatment plant. See related Finding SW/AF-2.

6) Operators should request that priority attention to be given to maintenance workorders to expedite repair/replacement of defective equipment. The Maintenance Procedures Manual defines Suffix Code 550 as applying to "Essential repairs, revisions and/or additions required for fire, safety, health or ecology", and assigns this code to the highest priority category.

7) The near-term program to gather influent data has been initiated and will be completed in September 1989. Appropriate parts of this program should be continued in the future to gather supplemental data.

8) If additional study of sewage treatment plant operations warrant, replacement of the existing aeration basin mixers may be necessary.



SUBPOENA 1063RF EGG ITEM 15 5140673

**Audit Discipline** Surface Water

**AF Finding Number** SW/AF-6

**AF Finding Title** Work Order Lag Time

**Audit Finding and Applicable Reference**

The inadequate use of the priority system for work order requests for the waste water system results in inefficient operations. Delay in completing work order requests were observed at a number of different facilities associated with surface water control and treatment. On some occasions, several months elapsed until the work order request was fulfilled. Examples may be found in sewage treatment plant operator logbooks, building utilities manager's records, environmental analysis and control record surface water and NPDES logbooks, and personal interviews with RFP staff. There is a maintenance work order priority system on-site, but it appears most requesters are not aware of how it functions.

Specific examples of delays in responding to work order requests include, but are not limited to the following:

1) Automatic blowdown control for Building 559 cooling tower has been inoperative since February 2, 1988. Work orders were submitted 17 months ago, and again 10 months ago. No action yet.

2) There are at least 11 outstanding work orders for maintenance items at Building 990 and 995, the sewage treatment plant. Work order numbers range from #561245 (relocate sludge sprinklers) to #573460 (install comminutor at Building 990). Several requests were for items designed to improve plant efficiency.

3) Requests for maintenance and cleanup of the site's ponds and dams typically take months to fulfill. For example, inspection at C-1 Pond revealed an inoperative pump in July, and a work order repair request was submitted on July 30, 1987. The pump was not repaired, but was eventually replaced on October 8, 1987.

4) Six months elapsed between acquisition and installation of several flow meters for the pond systems. On February 3, 1987, plans were " to install flow meters as soon as manpower and weather permit" (notes in surface water/NPDES logbook). Actual installation occurred late in July of that year.

5) A request for sand bags to prevent pond waters from overflowing was made on March 9, 1987. A repeat request on March 31, 1987 received no response. By April 8, 1987 water began to flow over the spillway, so there was immediate action to the request that day.

**Applicable Citation and Requirements**

RFP's NPDES permit no. CO-0001333 at Part II, Section A, (Management Requirements), paragraph 3 (Facilities Operation) requires that "The permittee shall at all times maintain in good working order and operate as efficiently as possible all treatment or control facilities or systems installed or used by the permittee to achieve compliance with the terms and conditions of this permit."

## Recommendations

In the RFP Maintenance Procedures Manual, Section 3.1, Appendix II, page 1, there are Labor Suffix Code Definitions which would allow for prioritizing essential repairs required for fire, safety, health, or ecology above routine maintenance activities. Since most of the above work orders are for items essential to maintaining compliance with environmental regulations, they should qualify for priority processing. If the requesters are not aware that such a priority system exists within the Maintenance Department, they should be informed of the availability of reasonable ways to get prompt action. Discussions with users familiar with the system indicate priority repairs are typically accomplished within a few days to one week, so the system does work.



SUBPOENA 1063RF EGG ITEM 15 5140675

**Audit Discipline** Surface Water

**AF Finding Number** SW/AF-7

**AF Finding Title** Deficiencies at the Spray Irrigation Site

**Audit Finding and Applicable Reference**

The Spray Irrigation Site is not operated in accordance with good engineering practices. There are instances of ponding or sheet flow from the spray irrigation areas used to dispose of treated sewage plant effluents from B-3 Pond, indicating that the system does not have the capacity to retain all the water released there. The area is underlain by an impervious, tightly cemented caliche layer which will not permit rapid downward migration of water. The natural vegetation presently encouraged to grow on the site is not suitable for optimum evapotranspiration of water to the air. As a result, only a limited volume of water (less than the amount actually discharged there) can be expected to penetrate the soil or be evaporated/transpired to the air.

**Applicable Citation and Requirements**

The current NPDES Permit No. CO-000133 at Part I, Section A, paragraph 1 states that..."spray irrigation (must be ) done in accordance with good engineering practices with the existing facilities.

**Recommendations**

1) The spray field area capacity should be improved by fracturing the caliche layer that is impeding infiltration. The alluvial soils in the spray field areas are underlain by a tightly cemented caliche layer, a naturally occurring mineral precipitate that forms in shallow soils in arid climates. Observations of test pit trenches in the area by the Audit Tem indicate the caliche layer is between the depths of one to five feet. The shallow depth of the layer allows access by heavy earth work equipment to breakup the caliche by ripping or by explosives. The preferred method is ripping by using a large crawler tractor with long shank single ripper. This method would likely provide higher production than blasting, and far less disruption to traffic and plant operations than blasting from a construction safety standpoint. Additionally, the spray field area could be ripped in one area while other areas are operated, and workmen reposition the effluent plumbing lines in other areas near the ripping operation. Blasting operations would require periodic disruptions to the spray field operation and reduction of non-blasting personnel in the work area would be required for safety reasons.

2) The area should then be seeded with a sacrificial crop such as alfalfa or corn to optimize the evapotranspiration of water to the air and minimize the potential for any runoff from the area.



SUBPOENA 1063RF EGG ITEM 15 5140676

**Audit Discipline** Surface Water

**BMP Finding Number** SW/BMP-1

**BMP Finding Title** Deficiencies in Draft Best Management Practice/Spill Prevention Containment and Control (BMP/SPCC) Plan

**BMP Finding**

The draft (second revision May 1989) of the BMP/SPCC Plan is an improvement over the certified 1985 revised plan. Several of the sections contain inadequacies which could be considered deficient by the regulator and the user. For example: 1) instead of showing a certification page with an imprinted professional engineer's (P.E.) seal, the revised draft merely contains the statement that the plan was reviewed by a P.E.; 2) Sections 7.0 - Equipment, and 8.0 - Materials, refer to the Fire Department as custodian and provider of such necessities, without identifying just what is considered essential to the program; 3) Sections 11.0, Good Housekeeping, and 12.0, Environmental Management Surveys and Inspections, are completely missing from the draft copy reviewed.

**Applicable BMP and Recommendations**

1) Include a certification page whereon the registered professional engineer who reviewed the plan could imprint his seal and signature.

2) Provide lists of Equipment and Materials for use in emergencies for Sections 7.0 and 8.0, respectively.

3) Incorporate missing sections 11 - Good Housekeeping and 12 - Environmental Management Surveys and Inspections after appropriate review.

Basic requirements for developing a BMP/SPCC Plan are stated in 40 CFR 125.104, paragraph (c). There are two sets of guidance for preparing BMP/SPCC Plans, namely Publication PB-88-239/73, U.S. EPA Region X Guidance Manual for Development of an Acceptable Spill Prevention Program, dated February 1986, and U.S. EPA Publication EPA-600/9-79-045, the NPDES BMP Guidance Document, dated December 1979. Also, in RFP's NPDES Permit, No. CO-0001333, Part III, Other Requirements, a Management Practices Plan section provides an outline of the Plan required to be submitted along with the NPDES permit renewal application. One of the missing sections, Section 11.0, Good Housekeeping, is a required part of the Plan. Additional versions of SPCC and BMP Plans have been developed by RFP staff. Refer to CERCLA Finding CERCLA/BMP-1.

**Audit Discipline** Surface Water

**BMP Finding Number** SW/BMP-2

**BMP Finding Title** Lack of Flow Measurement at C-1 Pond

**BMP Finding**

A Flow meter at outfall of C-1 Pond was inoperative when observed on June 28, 1989. It is not an NPDES Permit requirement to monitor flow at C-1 pond, but RFP has indicated an intention to measure and report flow whenever water is leaving the C-1 Pond. The sampling crew leader requested repair of the flow meter, but flows continued for several days without knowledge of the flow being discharged (I-SW-12).

**Applicable BMP and Recommendations**

Flow measurements are essential, to completely document water releases.

1) Until the meter is repaired/replaced, water height measurement should be taken manually to give some estimate of daily flow at the time of sampling.

2) Repair/replacement of the meter should be expedited and spare parts should be kept on hand to speed up future repairs. See related Finding SW/AF-6.



SUBPOENA 1063RF EGG ITEM 15 51486589

**Audit Discipline** Surface Water

**BMP Finding Number** SW/BMP-3

**BMP Finding Title** Inadequate Protocols for Timely Identification of Pollutant Releases to Sewage Treatment Plant

**BMP Finding**

RFP does not have an adequate protocol to expedite analysis and confirm the source of an unplanned pollutant release to the sewage treatment plant. For example, the time elapsed from first notice of the greenish effluents at the sewage treatment plant on February 23, 1989, until positive identification of the spill as chromium at 13 mg/l on March 1, 1989. Despite the fact that potassium dichromate was listed among the initial possible constituents on the first day (SW-13), samples were first analyzed for organic compounds and other chemical parameters before analyses for chromium were conducted. Even though a weekend intervened, the emergency nature of the release should have been sufficient cause to expedite analyses and confirm the source within a shorter time period.

**Applicable BMP and Recommendations**

1) Develop an analytical screening protocol for rapid turn-around of results in the event of such emergencies. Include qualitative screening procedures for metals, organics and radioactive constituents.

2) Provide for priority handling of samples taken during emergencies, including coverage on weekends and holidays.



SUBPOENA 1063RF EGG ITEM 15 5140682

**Audit Discipline** Surface Water

**BMP Finding Number** SW/BMP-4

**BMP Finding Title** Cooling Tower Blowdown at Building 774

**BMP Finding**

The current practice of disposal of the cooling tower blowdown at Building 774 may result in contaminants migrating into the groundwater. A cooling tower on the roof of Building 774 (Marley Iso-Temp) discharges its blowdown to the courtyard between Building 774 and the detached Room 309 immediately west of the building. While this practice is not specifically prohibited, the discharge results in a pool of standing water in the courtyard. Eventually this water percolates into the ground, carrying with it any contaminants which may be present in the blowdown.

**Applicable BMP and Recommendations**

Provide a connection from the Building 774 cooling tower blowdown to convey that flow to the sewer collection system for treatment.



SUBPOENA 1063RF EGG ITEM 15 5140684

**Audit Discipline** Surface Water

**BMP Finding Number** SW/BMP-5

**BMP Finding Title** Dam Inspection Reports

**BMP Finding**

No clarification was sought on the inconsistency in the hazard potential rating assigned to Dam C-2 in the report prepared by the Corps of Engineers (COE). The annual report prepared by the COE's covering their inspection of all 12 dams at RFP continually lists Dam C-2 as having a "Significant Hazard Potential", even though the text of the reports and the summary of deficiencies never provide a rationale for such listing. Individual COE inspection forms show that C-2 has "Low Hazard Potential" with respect to structural integrity and general safety.

In an effort to resolve this apparent anomaly, the DOE Audit Team contacted a COE inspector (I--SW-23). The "Significant Hazard Potential" rating for Dam C-2 has no relationship to the dam's structural integrity, safety, or general characteristics. It reflects the proximity of the downstream community.

**Applicable BMP and Recommendations**

In order to avoid confusion regarding COE's rating for Dam C-2, RFP should request written clarification of the rating in the next annual inspection report, due within the next month. Otherwise, the public or news media may incorrectly infer that Dam C-2 is in imminent danger of collapse.



SUBPOENA 1063RF EG&G ITEM 15 5140686

**Audit Discipline** Surface Water

**BMP Finding Number** SW/BMP-6

**BMP Finding Title** Laundry Operations

**BMP Finding**

The current large volume of waste water from washing uncontaminated or slightly contaminated laundry being directed to Building 374 evaporator may be unnecessary.

The concentration of activity in the waste water may be low enough for the water to be discharged to the sanitary sewer system. The practice of directing the water to the Building 374 evaporator is a carryover when both low-level contaminated laundry and highly contaminated laundry were washed in the same facility.

**Applicable BMP and Recommendations**

A new laundry for uncontaminated/low-contamination items is scheduled to go on-line in the fall or winter of 1989. This facility will be detached from the process buildings in a separate structure. The RFP should investigate making use of this segregation to reduce water usage and wastewater volumes and consequently the load on the Building 374 evaporator. Possible actions include:

- Use of a cascade rinsing system where final rinses are re-used to make up wash solutions.

- Use of Equipment designed to use lower flow rates/volumes of wash-water and rinse-water.

- Further separation of articles by radiological surveys in an attempt to have the least contaminated articles yield wastewaters which do not have to be evaporated or treated as a radwaste, and which could be released directly to the sanitary drain.



SUBPOENA 1063RF EG&G ITEM 15 5140688

**Audit Discipline** Surface Water

**Audit Finding Number** SW/NP-1

**Audit Finding Title** Utilities Operations at Building 371/374 Complex

**Noteworthy Practice**

Building utilities management and operators at Building 371/374 complex have made extensive use of effective computer techniques to monitor all aspects of utilities operations. Water flows can be adjusted automatically or manually at the touch of a button. Alarm systems give immediate warning of unusual conditions. Sensors located at the floor of pump rooms monitor for moisture indicating a leak. Routine maintenance schedules are computerized to remind operators when to do preventive maintenance. Extensive records of operating conditions are maintained in a ready for use mode, and mylar copies of all drawings are modified to always be showing the current layout of the utility lines. Operators were able to answer all questions about their systems and provide these answers without delay or confusion, indicating a high level of training and attention to detail.

There is an ongoing program at RFP to incorporate such practices at other utilities operations, but formal written procedures have not yet been finalized. Efforts to complete these tasks in a timely fashion should be encouraged, not only at RFP, but also at other DOE facilities.



SUBPOENA 106SRF EGG ITEM 15 5140690

# Section 4.0

# Groundwater

# 4.0 - GROUNDWATER

## SCOPE OF AUDIT

1. Review hydrogeologic setting and physical conditions
2. Review current monitoring system for the following items
   a. Well construction design and as-built details
   b. Well locations, numbers, and depths, etc.
   c. Sampling procedure and chain-of-custody observations
3. Review Remedial Investigation and Feasibility Study and reports for:
   a. High priority sites
   b. Intermediate Priority sites
   c. Low priority sites
4. RCRA Post Closure Permit Application for Current Landfill, Solar Evaporation Ponds, West Spray Field, and old Process Waste Lines relative to:
   a. Conformance to consent order and "approved" closure plans, etc.
   b. Rationale of plans
5. Review groundwater and soil monitoring, record handling and data reporting to regulatory agencies
6. Evaluate groundwater pathways, Background Geochemical Investigation Plan, and Geophysical Study Plans



SUBPOENA 1063RF EGG ITEM 15 5140694

# GROUNDWATER FINDINGS

## AUDIT FINDINGS:

| | |
|---|---|
| GW/AF-1 | Uncharacterized Extent of Soil and Groundwater Contamination at Inactive Waste Sites |
| GW/AF-2 | Lack of Adequate Upgradient Background Monitoring Wells |

## BEST MANAGEMENT PRACTICES:

| | |
|---|---|
| GW/BMP-1 | Use of Groundwater Monitoring Wells of Unknown Construction |
| GW/BMP-2 | Lack of Comprehensive Organized Groundwater Data Database |
| GW/BMP-3 | Deficiencies in Groundwater Sampling Procedures |
| GW/BMP-4 | Lack of Adequate Quality Assurance/Quality Control of Work Products |
| GW/BMP-5 | Deficiencies in Well Filter Construction |

## NOTEWORTHY PRACTICES:

| | |
|---|---|
| GW/NP-1 | Implementation of the Use of Advanced Geophysics |



SUBPOENA 1063RF EG&G ITEM 15 5148696

**Audit Discipline** Groundwater

**Audit Finding Number** GW/AF-1

**Audit Finding Title** Uncharacterized Extent of Soil and Groundwater Contamination at Inactive Waste Sites

**Audit Finding and Applicable Reference**

The horizontal and vertical extent of soil and groundwater contamination has not been completely characterized at known and suspected inactive waste sites. The Rocky Flats Plant (RFP) has subdivided the areas of suspected contamination into groups of three priorities for investigation and remediation. At the time of the audit, none of the investigations had been completed. In addition, the current investigation plans do not appear to include provisions for the complete characterization of the horizontal and vertical extent of contamination. Progress made at the time of the audit and examples of deficiencies are as follows:

**High Priority Sites:**

881 Hillside Area: Soil contamination source terms are not well enough defined horizontally and vertically to permit an adequate assessment of the volume and area of contamination if the need for removal, as a remedial action, becomes warranted. A "Final Draft" Remedial Investigation (GW-1), Environmental Assessment (IWS-13), and a Feasibility Study (IWS-9) have been performed. An Interim Remedial Action is also planned (GW-65). However, at the time of the Audit, there were no wells north of three Solid Waste Management Units (SWMUs), (119.1, 119.2, and 130) to characterize the horizontal and vertical extent of contamination in those areas. Analysis of samples from wells in and near the areas of these SWMUs indicate contamination exists in the groundwater and/or soil from semi-volatiles, volatile organic compounds, and possibly metals. Analysis of samples from wells located downgradient of these areas have indicated no contaminants have migrated to them.

**Medium Priority Sites:**

903 Pad, Mound, and East Trenches Areas: The horizontal and vertical extent of contamination was not completely defined during the initial phases of the investigation (GW-19 and GW-22). A "Draft" Remedial Investigation (GW-19 and GW-22), and Sampling Plan for Phase II (GW-20) have been completed. Currently available data indicates soil contamination from semi-volatiles, acetone, and plutonium and groundwater contamination from volatile organic compounds. The Sampling Plan for Phase II (GW-20) appears to adequately describe the work necessary to define the extent of contamination. However, the plan has not been fully implemented.

**Low Priority Sites:**

Several low priority sites have been identified, but have not been investigated (GW-42). This group of sites includes such areas as the A, B, and C Ponds, inactive landfill, ash pits, and numerous small spill areas. Concern raised by the Audit Team during review of the initial sampling plans are that the field investigations are not intensive enough in areas of known source terms to detect all areas of contamination and provide adequate



SUBPOENA 1063RF EGG ITEM 15 5140698

information for planning of follow-on investigations. Examples of insufficiently detailed sample plans include:

1) All the plans do not provide the rationales for only sampling the groundwater in the alluvium.

2) The sample plan for C Ponds does not explain why no new well is being installed in the area.

3) The sample plan for the Group D wells does not indicate whether wells to be installed are for alluvial or bedrock groundwater sampling.

4) The sample plan for B Ponds indicates that only three new alluvial wells are being installed and does not explain why no bedrock boring or wells are planned. Both the sediments and water in these ponds are known to be contaminated.

Refer to related finding , IWS/AF-5, for additional discussion of these areas.

**Applicable Citation and Requirements**

Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA (GW-66) require the vertical and horizontal extent of contamination be characterized.

**Recommendations**

1) Provide additional borings and wells in order to completely characterize the source(s) and extent of contamination in the 881 Hillside Area. Particular areas include north of SWMUs 119.1, 119.2, and 130. The Interim Remedial Action should be adequate to intercept the known contamination should it migrate from the area in a downgradient direction.

2) Expedite the remedial investigation efforts in the 903 Pad, Mound, and East Trenches Areas and provide additional investigations as needed to clarify extent of contaminated areas.

3) Re-evaluate the Low Priority Sites Sample Plans to ensure that the planned investigation activities adequately addresses potential contamination in these areas as required by CERCLA . See related Finding IWS/AF-5.



SUBPOENA 1063RF EGG ITEM 15 5140693

**Audit Discipline** Groundwater

**Audit Finding Number** GW/AF-2

**Audit Finding Title** Lack of Adequate Upgradient Background Monitoring Wells

**Audit Finding and Applicable Reference**

There are no groundwater monitoring wells upgradient of Solid Waste Management Units (SWMUs) 119.1, 119.2, and 130, that can provide either background data relative the those SWMUs or define the upgradient extent of contamination. See related Finding GW/AF-1. There are presently several SWMUs within the 881 Hillside Area that have apparent groundwater contamination relative to constituent levels in the "background" area, west of the plant. Groundwater analyses for wells in the vicinity, and downgradient, of SWMUs 103, 106, and 107 indicate possible contamination from selenium, strontium and uranium SWMUs 119.1, 119.2, and 130 may be contaminated with nickel, selenium, strontium, and uranium. Twenty-eight groundwater monitoring wells have been installed as part of the remedial investigation of the 881 Hillside Area. However, only one shallow alluvial well (1-87) is presently capable of providing SWMU specific upgradient groundwater background data near SWMUs 103, 106, and 107. The 881 Hillside Area Remedial Investigation report has failed to adequately explain the elevated metal concentrations (GW-12) relative to distant background wells. It does not provide adequate numbers and locations of nearby background wells to substantiate the claim that these values are due to a different local geochemical environment (GW-1, pg. 5-55).

The ability to accurately and confidently discriminate between natural concentrations of groundwater constituents and man-made impacts is based on the knowledge of background values relative to the specific area of suspected contamination. Upgradient background groundwater monitoring wells located near these areas are needed for such a comparison. However, such wells have not been installed. In the case of the 881 Hillside Area, the lack of adequate upgradient groundwater data has prevented Rocky Flats Plant (RFP) from defining the risks which are associated with the levels that contaminants are elevated above background levels (i.e., man-made impacts). Current remedial action plans include treatment for metals which are thought to be elevated relative to concentrations of metals found in distant background monitoring wells, but which may not be elevated relative to natural occurring local conditions.

**Applicable Citation and Requirements**

Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA, Interim Final (GW-66).

Section 3.2.4.1, Groundwater provides guidance that upgradient background water quality in an area near the suspected contaminant source should be determined.

**Recommendations**

RFP should supplement their existing groundwater monitoring program to provide upgradient background groundwater monitoring wells and soil borings that are located in areas which would allow background conditions to be characterized for each SWMU, or area of suspected contamination, rather than distant wells or borings that may not be representative of the true conditions at the units.

Case 1:91-cv-01982-CFL Document 195-10 Filed 07/27/2006 Page 28 of 37

Two areas where additional upgradient groundwater monitoring wells should be installed are as follows:

1) SWMUs 103, 106, and 107 have only one well located to the west the units. Additional wells should be installed to the north of the units, adjacent to B-881.

2) SWMUs 119.1, 119.2, and 130 do not have any local upgradient wells. These areas should have wells installed in the hillside area north of each SWMU.

RFP is currently in the process of installing additional groundwater monitoring wells in the 903 Pad, Mound, and East Trenches Areas (GW-19) and RCRA interim monitoring areas (GW-47). The Low Priority Sites Remedial Investigations Plan (GW-42) had not been implemented at the time of the Audit. Since these projects were in the early stage of completion, they have been excluded from this finding. Refer to Finding GW/AF-1 for a discussion of those projects.



SUBPOENA 1063RF EGG ITEM 15 5149791

**Audit Discipline** Groundwater

**BMP Finding Number** GW/BMP-1

**BMP Finding Title** Use of Groundwater Monitoring Wells of Unknown Construction

**BMP Finding**

Groundwater monitoring wells (approximately 56) of unknown construction have been installed in several areas of the site since the late 1960's and prior to the current Environmental Restoration Well Installation Program (IWS-1). These wells are currently being used in the groundwater monitoring program. No information exists as to the as-built construction. It is unclear whether these wells can produce representative groundwater samples. Problems can occur from improperly constructed wells such as: 1) allowing surface water to enter the sampling zone through infiltration along an unsealed casing, 2) allowing mixing of groundwater from different water bearing zones, thus either cross-contaminating zones or diluting constituent concentrations from the more contaminated zones with less contaminated water, and 3) improperly selected well construction materials may interfere with groundwater chemistry through leaching or absorption of contaminants of concern.

During sampling of well 10-81, the Audit Team observed that the well was not locked, did not have a protective outer casing, and did not have a concrete pad at the surface. The casing was in a depression approximately three inches deeper than the surrounding area, allowing purge water to flow back into the well head. Since there is no as-built record of the construction of this and other wells, it is not known if the casing is sealed in the borehole to prevent surface water from flowing down along the well casing and entering the groundwater sampling zone. Well 10-81 is within approximately fifty feet of well 7-82 which is of similar construction, and does not yield enough water to allow a complete set of sample containers to be filled from it. These older wells (10-81 and 7-82) have been replaced with two new wells (48-86 and 49-86) which were constructed in accordance with RCRA construction guidelines and installed approximately 250 feet away. This is an acceptable distance since they are background wells.

The Rocky Flats Plant (RFP) currently uses older wells for groundwater monitoring even though replacement monitoring wells of known and documented quality have been installed to replace them. Analytical data and inferences drawn from the older wells is considered in some of the RI/FS process (GW-1, GW-18, and GW-22). It is possible that errant inferences and subsequent planning and decisions may be drawn as a result of use of the analytical data drawn from these wells.

**Applicable BMP and Recommendations**

Groundwater monitoring wells of unknown construction should be properly abandoned (RCRA, Technical Enforcement Guidance Document, Section 3.7). RFP should commence this activity as soon as practical. Although it is a low priority item relative to other Environmental Restoration program activities, it is a simple process that does not require intensive efforts in sampling, data reduction, or evaluation. A report of each abandonment, including observations of as-built construction, should be produced.

Unused wells, piezometers, or soil borings should be abandoned by over-drilling the existing casing to remove it, then grouting the boring with a nonshrink grout mixture



SUBPOENA 1065RF EGG ITEM 15 5149702

(using a tremie pipe), starting from the bottom of the hole and pumping grout until it reaches the surface.
(Blank)

**Audit Discipline** — Groundwater/Best Management Practices Plan

**BMP Finding Number** — GW/BMP-2

**BMP Finding Title** — Lack of Comprehensive Organized Groundwater Data Database

**BMP Finding**

Analytical data produced by the 881 Quality Laboratory, and two offsite contract analytical laboratories in conjunction with the Environmental Restoration Program are not organized in an efficient and useful manner. RCRA facility interim status monitoring (GW-46) data reported to the state on March 1, 1989 for the preceding calendar year is incomplete for some of the wells and not sorted by well identification number. Statistical calculations are not performed to evaluate potential contaminant releases. Other site areas being monitored, such as the background areas, 881 Hillside Area, 903 Pad, Mound, and East Trenches Areas, are not reported and an organized data table for all areas was not available.

RFP is currently in the process of entering into a database and restructuring previous groundwater data reported from the laboratories used in the remedial investigations, and RCRA Closure Program (I-GW-25). The database program, written by a contractor for the site Environmental Restoration Program, as presently configured is specifically oriented to pre-selected well groups and one reporting format. At present, there is no in-house capability to selectively manipulate the sorting and reporting formats, and the data input process requires certain data fields to be sorted in sequence. The project is incomplete, and the database system is not capable of directly interfacing with the 881 Laboratory systems.

**Applicable BMP and Recommendations**

The quantity of analytical data generated through the remedial investigation and RCRA Closure Process needs to be managed in an orderly manner for easy reference and evaluation (RCRA Technical Enforcement Guidance Document, pg. 171). Data should be maintained through database systems that permit selection and sorting of several parameters such as the contaminant, well identifier, date of sample, values greater or less than detection limits, contaminant concentration, data qualifiers, etc. Data listings should be available in an organized, tabulated output relative to each of the specific SWMUs or Operable Units and sorted by well or contaminant.

The use of computerized databases also allows efficient and rapid evaluation of analytical data for detection and assessment of contamination migration from hazardous waste management facilities (RCRA Technical Enforcement Guidance Document, pg. 170).

There are numerous computer data management packages available that are easy to use and can be specifically addressed for the needs of the Environmental Restoration Program. The users and suppliers of analytical groundwater monitoring data (as well as soil and sediment data) should install a database system, and incorporate current and valid analytical data from all of the site programs in one central, mutually accessible, system that can be used by the laboratory, consultants, and program personnel.

**Audit Discipline** Groundwater

**BMP Finding Number** GW/BMP-3

**BMP Finding Title** Deficiencies in Groundwater Sampling Procedures

**BMP Finding**

Groundwater sampling procedures (GW-61) used by the 881 Laboratory sampling team include practices that do not follow recommended regulatory guidance or standard industry practices. Those practices observed include the following:

1) Indicator parameters (pH, temperature, specific conductivity, and dissolved oxygen) are not monitored before or during the process of purging to ensure that all stagnant water has been removed from the well casing and that the sample being taken is representative of the in situ water quality.

2) The samplers were not aware of the formal written Chain-of-Custody procedure (I-GW-17 and I-GW-21). They had been verbally instructed in the procedures. The chain-of-custody was broken when the samples were delivered to the laboratory. Prior to the transfer of custody, a laboratory technician was observed performing a pH check on the preserved solutions in the samples. The technician was not authorized to take receipt of the samples. See related Finding SW/AF-4. Another lab person, authorized to receive samples, had to be located for the custody transfer; transfer took place after the technician checked the pH.

3) No formal training program or refresher training is provided to the groundwater sampling team (I-GW-17 and I-GW-24) by their supervisor or division to ensure that the samplers understand the procedures and perform them correctly.

4) Equipment procurement, assembly, or repairs may take months to be completed. Delays in obtaining equipment repairs have caused quarterly scheduled or required sampling to be missed (I-GW-17). A trailer, procured to carry equipment used for purging deeper wells has experienced delays in assembly (I-GW-17).

5) A sampler touched the retainer ball in the bailer with his finger in order to pour sample water from the bottom of the bailer into the VOA vials thereby potentially introducing contaminants into the sample. Other opportunities for sample contamination include: 1) storage and subsequent reuse of bailers with only field decontamination rather than a more thorough laboratory decontamination;
2) overnight storage of bailers following purging of a well and use of that bailer to collect samples from the well without prior decontamination; and 3) contact between the bailer and the protective steel casing during sampling; this occurs because the top of the inner well-casing is greater than 7 inches below the protective casing, as originally designed, and the bailer may swing freely during sampling.

**Applicable BMP and Recommendations**

The sampling procedures should be amended to be consistent with regulatory guidance. The following recommendations should be implemented:

1) The effectiveness of well purging should be evaluated so that any irregularities in analytical results cannot be suspected as having been caused by stagnant water in the well. Although pH, specific conductivity and temperature are monitored four times during sampling for all non-VOA analytes, RCRA guidance (RCRA Technical Enforcement Guidance Document) is to monitor these indicators plus dissolved oxygen during purging. The initial version of the procedures required this practice (I-GW-26), but monitoring during purging was removed from the subsequent version of the procedures (I-GW-26). Purge monitoring is not currently in the procedures (GW-61).

2) The Chain-of-Custody description in the sampling procedures should be expanded to more fully document the process. In addition, current written procedures explaining the use of the form, and individual responsibility need to be updated to include sample tracking in the Laboratory. Procedures should be established which allow for immediate transfer of custody from the field sampling team to the analytical team upon sample receipt at the Laboratory. Laboratory personnel should not work with the samples until custody has been transferred.

3) The sampling team, and their alternates, should be provided with formal training that includes such items as written procedures familiarization, field methods, documentation requirements, and equipment use instruction. Periodic refresher courses that include updates and changes in methods should also be conducted.

4) Procurement of supplies and equipment, repair of damaged or malfunctioning equipment, and assembly of new equipment should be dealt with in a more expeditious manner.

5) Sampling procedures and equipment, such as closed-top Teflon bailers, for collection of samples to be analyzed for volatile organics should be developed to eliminate sampler contact with water and equipment surfaces. Procedures should also require more thorough decontamination of bailers, and wells should be modified to minimize contact with the steel casings.

**Audit Discipline** Groundwater

**BMP Finding Number** GW/BMP-4

**BMP Finding Title** Lack of Adequate QA/QC of Work Products

**BMP Finding**

Work products associated with the CEARP process and CERCLA program remedial investigations have had errors in the construction of geologic cross-sections and graphical representation of geologic logs. Analytical data and boring logs have been omitted from appendices. Many of these deficiencies have been noted in document review comments from regulatory agencies (GW-6 and GW-12), and the DOE (GW-8).

Examples of quality problems observed by the Audit Team are listed below. This is not a comprehensive list of all quality problems observed or present in the documents, and it is presented only for the purpose of providing examples. These examples were observed during a review of the Remedial Investigation Report for the 903 Pad, Mound, and East Trenches Areas (GW-19 and GW-22). Problems observed are as follows:

1) A geologic cross section on Plate 5-6 has the east and west directions reversed.

2) Plate 5-4 shows cross sections E-E' and F-F' that cross east of BH36-87 and southeast of well 20-87BR. The sections are not consistent relative to the subsurface materials shown. Section F-F' shows a sandstone layer to extend below borings BH35-87 and BH36-87 and continue to the east past the point where the two sections cross. Section E-E' shows only claystone between well 20-87BR and 18-87BR in the area where the two sections cross, not sandstone as shown in the other cross section.

3) On cross section E-E' and G-G', the graphic log of well 18-87BR is plotted differently. Likewise, well 23-87BR is shown in two different cross sections with different screened depths. The text on pages 5-8 and 5-9 discusses correlations between these two borings. It is unclear from the cross sections what the true subsurface conditions are, and it is also unclear how a correct technical conclusion could be drawn from these conflicting inferences.

4) On page 5-20, well 20-87BR was reported to have no data available, and a conclusion was made that bedrock contamination did not exist. However, data for one quarter is listed in the data appendix as sample 20-87-10-26-87 and indicates low level (single digit ppb level) of Volatile Organic Compounds (VOCs) were present. Furthermore, well 1-74 (an older well of unknown construction) located adjacent to well 20-87, shows contamination of VOCs. It is unclear how the conclusion that there was no contamination in that area was arrived at, and why a technical review did not detect this discrepancy.

   The cause for these problems is unclear, but the aggressive schedule in the July 1986 Compliance Agreement that did not allow adequate time for thoughtful reviews is suspected by the Audit Team as a principal contributor. Adequate reviews are now incorporated in the report process by some of the site environmental program contractors (GW-60), and scheduled as specific activities in the draft Five Year Plan (I-GW-15).

Applicable BMP and Recommendations

Current industry practice requires in-house peer review of work products prior to release or transmittal to clients, including draft work products. The existing Basic Ordering Agreement (BOA) in use by RFP includes a clause in the General Provisions that requires the contractor to perform according to industry standards.

No specific language exists in either the BOA or the Task Statements of Work (SOW) that require a QA/QC program. Although RFP has contracted for field oversight and independent technical review, there should also be requirements in the contract that incorporate in-house peer review. Contract requirements should be incorporated into each SOW requiring that QA/QC plans be developed that are relative to the specific items within the SOW. The QA/QC plans should be reviewed by the site along with the technical proposal for adequacy and completeness.

Items included in the peer review should not be confused with laboratory QA for analytical work, but should deal with issues such as checking the accuracy of drawings, calculations, appropriate technical conclusions, support, and basis in fact, completeness of appendices, and transcription of data from boring logs, field tests, and laboratory analyses.

| | |
|---|---|
| Audit Discipline | Groundwater |
| BMP Finding Number | GW/BMP-5 |
| BMP Finding Title | Deficiencies in Well Filter Construction |

BMP Finding

The groundwater monitoring wells have been constructed using a single sized filter sand (GW-16, and GW-47). In some cases this construction practice has allowed fine particles to enter through the well screen and cause the wells to silt-up (I-GW-21). These wells may not be capable of providing the sample volumes required for groundwater analyses. Environmental Restoration (ER) Program personnel reported that some of the monitoring wells have required re-development in order to maintain them (I-GW-21).

Applicable BMP and Recommendations

All future monitoring wells should be constructed using a filter sand which has been selected based on the grain size of the specific formation being monitored. The well screen slot size should then be selected based on the filter sand size (RCRA, Technical Enforcement Guidance Document, and CERCLA Compendium of Field Operations Methods). Because of the continuing maintenance required on the current wells, the site should review the well filter sand design for individual wells and determine on a case-by-case basis whether or not they need to be replaced.

**Audit Discipline** Groundwater

**Audit Finding Number** GW/NP-1

**Audit Finding Title** Use of Advanced Geophysics

**Noteworthy Practice**

All DOE facilities which are in the process of planning the investigation of actual or potential pathways of contaminant migration should consider using indirect testing methods (i.e., geophysics, soil gas analysis) in the early stages of the investigation to assure that more expensive techniques such as monitoring well installation and sampling are used effectively. The Rocky Flats Plant (RFP) has introduced the use of High Resolution Geophysical Seismic Reflection methods to assist in defining sand lenses within the Arapaho Formation. Implementation of this process will save time and money in both the investigation and design phases of the Environmental Restoration Program by locating the potential contaminant migration channels. Sandstone lenses within the Arapaho Formation claystone and siltstones are the result of depositional processes in an ancient fluvial-lacustrine environment. The sand lenses occur as buried channels of fine-grained silty or clayey sand within bedded or interlayered claystone and siltstone. The channels occur randomly and range in size from a few feet to several feet in thickness and hundreds of feet in length. Since most of the areas to be investigated are beneath five to forty feet of Pleistocene Rocky Flats Alluvium, remote methods to locate the channels are required.

The process of implementing this method has been composed of a series of planned steps: 1) evaluation of the potential cost of conventional drilling investigation techniques versus seismic methods to target sand lenses drilling targets (GW-62), 2) performance of a numerical modeling evaluation to determine the physical conditions under which the method would perform, and if it could be applied successfully at the site (GW-63), and 3) development of a work plan to perform a field test program to evaluate and calibrate the testing (GW-64). The field program for testing has been completed, and initial screening indicates the method will work successfully. As a result of these operations, a program has been implemented to use the method in the Remedial Investigations associated with the 903 Pad, Mound, and East Trenches Areas. Field production seismic investigations are scheduled to commence in August 1989 as part of the remedial investigation process.