# Exhibit 26-D

# Section 8.0

# Quality Assurance

# 8.0 - QUALITY ASSURANCE

## SCOPE OF AUDIT

1. Determine if the Quality Assurance (QA) program in place conforms to the applicable DOE Orders.
2. Determine if laboratory practices conform to documented QA programs.
3. Review the sample handling and analysis sequence in the laboratories.
4. Determine the QA requirements for offsite laboratories and if the laboratories satisfy these requirements.
5. Determine if the activities in the laboratories conform to Good Laboratory Practices.
6. Coordinate with water specialists to evaluate the field sampling quality assurance/ quality control practices.
7. Evaluate laboratory quality control measurements.
8. Review laboratory data management systems.
9. Evaluate the organizational structure of the laboratory QA program.



SUBPOENA 1083RF EGG ITEM 15 5140832

# QUALITY ASSURANCE FINDINGS

## AUDIT FINDINGS:

| | |
|---|---|
| QA/AF-1 | Laboratory Quality Assurance Program/Practices Building 881 - General Laboratory |
| QA/AF-2 | Laboratory Quality Assurance Program/Practices Building 123 - HS&E Laboratory |

## BEST MANAGEMENT PRACTICES:

| | |
|---|---|
| QA/BMP-1 | Data Management System for Environmental Monitoring QA/QC Data |
| QA/BMP-2 | Provisions for Transmission of Updated Laboratory Procedures |

## NOTEWORTHY PRACTICES:

| | |
|---|---|
| QA/NP-1 | Progression Training for Laboratory Technicians |

**Audit Discipline** Quality Assurance (QA)

**Audit Finding Number** QA/AF-1

**Audit Finding Title** Laboratory Quality Assurance Program/Practices - Building 881 General Laboratory

**Audit Finding and Applicable Reference**

The programs and practices associated with the quality assurance and quality control for the environmental analyses conducted at the Building 881 General Laboratory are not adequate to document the validity of the analytical data. Valid data are necessary to provide a defensible basis for remedial actions and assessments of environmental impacts. Deficiencies noted during the audit include:

1) There is no single document that describes in detail the program, organization, procedures, and responsibilities associated with the quality assurance/quality control for environmental monitoring analyses. The Building 881 General Laboratory is in the Quality Laboratories Division, which also includes the Plutonium Operations Support Laboratory, the Production Support Laboratory, and the Chemical Standards Laboratory. The quality assurance program for the Quality Laboratories is presented in Quality Assurance Program, Quality Laboratories, July 1988. Due to the wide spectrum of activities that this quality assurance document covers, there is a lack of information specific to the quality assurance program in place at the Building 881 General Laboratory.

2) The Quality Assurance/Quality Control Coordinator (QA/QCC) for the General Laboratory reports directly to the Manager of the General Laboratory and does not have the organizational freedom to report quality problems to upper management and independently pursue corrective actions. The QA organization, as it is currently set up, presents the potential for conflict between quality assurance needs and production needs in the General Laboratory. This potential conflict also exists for the Lead Chemists who are responsible for the monitoring of quality control work performed in their respective areas and are also responsible for the timely production of analytical data. When the situation arises that data is to be transmitted to the client but adequate quality control has not been performed, the decision to provide the data or complete the quality control rests with the Area Chemist (I-QA-4).

3) The position of Quality Assurance Officer, with overall responsibility solely for the maintenance of quality assurance/quality control programs for all laboratories in the Quality Laboratories Division, does not exist. As a result, the environmental monitoring quality assurance/quality control program for the Quality Laboratories is fragmented, with responsibilities for various aspects of the program delegated to personnel who do not directly report to the same management level and are not organizationally linked.

4) Environmental monitoring analyses are performed at Rocky Flats Plant (RFP) by two laboratory groups, Building 881 General Laboratory and Building 123 Health, Safety, and Environment (HS&E) Laboratory. The Building 881 General Laboratory is responsible for the analysis of volatile organics, semi-volatile organics, PCBs, HSL metals, water quality parameters, and radiochemical



SUBPOENA 1063RF EGG ITEM 15 5140836

parameters for groundwater samples, selected surface water samples, and waste characterization samples. The two laboratories do not coordinate with one another to maintain consistency between their respective procedures and quality assurance programs.

5) Laboratory audits or "Self Evaluations" of the Building 881 General Laboratory are performed by the Division Quality Assurance Coordinator (QAC) for the Quality Laboratories Division, and laboratory personnel who in some cases have not taken an in-house auditing training course entitled "Basic Quality Assurance Auditing" (I-QA-13). The Self Evaluation report, "Evaluation of the Chain-of-Custody Records and the Sample Storage Parameters of Groundwater Samples" (March 28, 1989) was reviewed. This report did not include documentation of the close-out or post audit meeting that is required to be conducted by the Quality Laboratories Division audit procedure L-1005. There is no formal tracking system for following findings through corrective actions and close-out.

6) The report of an audit of the Building 881 General Laboratory and the Building 123 HS&E Laboratory performed by the Rocky Flats Area Office (RFAO) Safety and Environmental Evaluations Branch in October 1988 stated that "the current auditing system does not provide adequate evaluation of overall laboratory performance" and recommended that "NEIC audit protocols should be used as a basis for developing an audit system that frequently evaluates the laboratories entire QC program".

7) The laboratory refrigerator in which volatile organic analysis (VOA) samples are stored did not have holding blanks, even though there were VOA samples stored there for future analysis. The analysis of holding blanks is required by the EPA Contract Laboratory Program (CLP) Statement of Work (SOW) dated February 1988.

8) The blind reference samples (IMECS samples) submitted for analysis are not packaged in laboratory sample bottles and, therefore, the analyst is aware that the samples are reference samples. This may lead to the samples being given special care.

9) There are no formal data review procedures for the Building 881 General Laboratory. Environmental monitoring data and associated quality assurance/quality control (QA/QC) data produced at the Building 881 General Laboratory are reviewed by the Lead Chemist for the particular analysis and a decision is made concerning the acceptability of the data (I-QA-1). The chemists review the data to determine if appropriate QA/QC requirements, such as blanks, duplicates, and blind reference sample analysis, have been met. The Quality Control Coordinator then reviews the data for consistency and completeness (I-QA-2).

10) Environmental monitoring samples awaiting analysis are stored in refrigerators located inside the laboratory and in the adjacent hallway. These refrigerators do not have locks. The temperature in the refrigerators is currently monitored during normal work days but not on weekends. A Work Order has been submitted for the placement of lockable hasps on the refrigerators and for incorporation of automatic temperature loggers on the refrigerators (I-QA-1).

11) Volatile organic standards are kept in a refrigerator in the GC/MS room which is located approximately 5-6 feet from the GC/MS set up to do VOAs. Standard



SUBPOENA 1063RF EGG ITEM 15 5148837

laboratory practice is to keep standards stored in areas away from the analytical instruments in order to avoid potential contamination of samples due to proximity of standards.

12) One refrigerator (#137-1R) being used for the storage of VOA samples was observed to have a temperature (7 degrees C) in excess of that required by EPA procedures (4 degrees C), and one refrigerator (#266-5R) was observed to have no temperature monitors.

13) Standards and VOA samples are being stored in the same refrigerator (#137-1R). This increases the potential for cross-contamination.

14) The analytical laboratory procedures for the Building 881 General Laboratory have recently, within the last two years, been revised. A review of the procedures by the audit team revealed that certain laboratory activities are not covered by written procedures or procedures formally issued through the Quality Laboratories Division. Laboratory activities not covered by formal procedures include, but are not limited to, the following:

- Data review and approval
- Glassware cleaning and preparation
- Preparation and retention of organic analytical standards
- Analysis of volatile organics and semi-volatile organics by CLP methods
- Analysis of Hazardous Substances List (HSL) metals by ICP and AA
- Preparation and retention of inorganic analytical standards.

15) See Audit Finding RAD/AF-5 for a related radiochemistry-specific finding.

**Applicable Citation and Requirements**

Interim Guidelines and Specifications for Preparing Quality Assurance Plans: EPA-QAMS-005/80.

Guidelines for Specifications for Preparing Quality Assurance Program Plans: EPA-QAMS-004/80.

Strategy for the Implementation of the EPA's Mandatory Quality Assurance Program: EPA-QAMS-001/80.

DOE Order 5700.6B, Quality Assurance.

40 CFR 136.2, Guidelines establishing test procedures for the analysis of pollutants.

"Clarification of Applicable Radiation Protection Standards for the public and the Environment," Memorandum to Distribution for John Tseng, Acting Director, Office of Environmental Guidance and Compliance, U.S. Department of Energy, November 4, 1987.

"Radiation Standards for Protection of the Public in the Vicinity of DOE Facilities," Memorandum to Distribution from W. A. Vaughan, Assistant Secretary, Environment, Safety, and Health, U.S. Department of Energy, August 5, 1985.



SUBPOENA 1063RF EGG ITEM 15 5140838

DOE Order 5484.1, Chapter 3 (Draft)

A formal comprehensive laboratory quality assurance program is necessary to ensure and document that analytical data are accurate, precise and defensible. The need for such programs is explained and guidance for their development provided in numerous documents, including:

Establishing a Quality Assurance Program for Analytical Chemistry Laboratories within the Nuclear Industry, ASTM C1009-83.

Manual for the Certification of Laboratories Analyzing Drinking Water, EPA-570/9-82-002, October, 1982.

Handbook for Analytical Quality Control in Radioanalytical Laboratories, L.Kanipe, U.S. Environmental Protection Agency, 1977,EPA-600/7-77-088.

Evaluation of Internal Control Measurements in Radioassay, Health Physics, A. S. Goldin, September 1984, Pages 361-374.

Principles of Quality Assurance of Chemical Measurements, J.K. Taylor National Bureau of Standards, NBSIR-85/3105, February 1985.

Handbook for Analytical Quality Control in Water and Wastewater Laboratories: EPA/600/06.

Sampling and Chemical Analysis Quality Assurance Program of U.S. Army Toxic and Hazardous Materials Agency, April 1982. Department of the Army, U.S. Army Toxic and Hazardous Materials Agency, Aberdeen Proving Ground, MD 21010.

Recommendations

1) Develop a comprehensive quality assurance program, manual and implementation procedures following the guidance of ASTM C1009, and Interim Guidelines and Specifications for Preparing Quality Assurance Project Plans (QAMS-005/08), U.S. EPA.

2) Assign responsibility for monitoring and directing the quality assurance program in the laboratory to the QA/QCC and not the Lead Chemists. This would minimize the potential for bypassing quality assurance requirements in order to meet production schedules.

3) Establish an organizational structure such that QA/QC personnel report directly to a Division Quality Assurance Officer. The position of Quality Assurance Officer should be established to ensure that quality concerns from the laboratories are investigated at upper management levels. The Quality Assurance Officer should report directly to the Manager of Quality Laboratories. This organization would provide organizational independence from production concerns.

4) The Building 881 General Laboratory and the Building 123 HS&E Laboratory should coordinate in an effort to develop consistent laboratory procedures and quality assurance programs. The report of an audit of the Building 881 General Laboratory and Building 123 HS&E Laboratory performed by the Rocky Flats Area Office (RFAO) Safety and Environmental Evaluations Branch in October 1988 recommended that "Rockwell should develop a QA/QC Manual designed to



SUBPOENA 1065RF EGG ITEM 15 5140839

accommodate and satisfy uniform environmental program protocols to be followed by both the 881 QL and 123 HS&E Labs. or any other onsite labs involved in the environmental program."

5) Ensure that all Laboratory personnel who perform audits for the Quality Laboratories Division are trained in auditing techniques and the Division audit procedure (L-1005).

6) Perform internal audits of procedure (L-1005) and associated documentation to ensure that the Self Evaluations are performed according to the procedure and that the reports accurately reflect Self Evaluation activities. Revise procedure L-1005 to require documentation in the audit report of all procedural requirements that have been performed.

7) Revise audit procedure L-1005 to include a formal system by which findings can be accurately tracked through corrective action and closure.

8) Prepare holding blanks for VOA analysis and store them in the sample storage refrigerator with environmental monitoring samples.

9) Revise procedures for the submission of reference standards (IMECS samples) so that the analyst cannot readily identify them as performance checks.

10) Develop a formal procedure that details the responsibilities and methods to be employed for the review of environmental monitoring data. The procedure should include provisions for documentation of data reviews by appropriate QA/QC personnel.

11) Continuously monitor all refrigerators used for the storage of samples and standards. A written procedure should be issued that details the temperature monitoring method and procedures to follow when a refrigerator fails or the temperature rises above a set point.

12) Do not store standards and samples in the same refrigerator to avoid the potential for cross-contamination.

13) Do not locate standards refrigerator/freezers in the same room as the analytical instrument employing those standards to minimize the potential for cross-contamination and elevated backgrounds.

14) Conduct a thorough review of laboratory activities to identify additional procedures that must be developed.

15) See Audit Finding RAD/AF-5 for a related radiochemistry-specific finding and recommendations.



SUBPOENA 1063RF EGG ITEM 15 5140340

**Audit Discipline** Quality Assurance

**Audit Finding Number** QA/AF-2

**Audit Finding Title** Laboratory Quality Assurance Program/Practices - Building 123 HS&E Laboratory

**Audit Finding and Applicable Reference**

The programs and practices associated with the quality assurance and quality control for the environmental analyses conducted at the Building 123 HS&E Laboratory are not adequate to document the validity of the analytical data. Valid data are necessary to provide a defensible basis for remedial actions and assessments of environmental impacts. Deficiencies noted during the audit include:

1) The laboratory does not have a clearly defined comprehensive quality assurance program. There is no up-to-date quality assurance manual.

2) The Quality Control Coordinator (QCC) for the Building 123 HS&E Laboratory reports directly to the Laboratory Manager for the Building 123 Lab and has minimal contact with other QA/QC personnel for HS&E (I-QA-7). The QCC does not have the organizational freedom to report quality problems to upper management and independently pursue corrective actions. The QA organization, as it is currently set up, presents the potential for conflict between quality assurance needs and production needs in the HS&E Laboratory. This potential conflict also exists for the Lead Chemists who are responsible for the monitoring of quality control work performed in their respective areas and are also responsible for the timely production of analytical data.

3) The HS&E Quality Assurance Coordinator (QAC) does not have responsibility for program oversight of quality activities with respect to environmental monitoring analyses from the Building 123 HS&E Lab.

4) Environmental monitoring analyses are performed at Rocky Flats Plant (RFP) by two laboratory groups, Building 881 General Laboratory and Building 123 Health, Safety, and Environment (HS&E) Laboratory. The HS&E Laboratory is responsible for radiochemical analyses of surface water, effluent air, ambient air, soils, and vegetation; and the analysis of air samples for beryllium. The two laboratories do not coordinate with one another to maintain consistency between their respective procedures and quality assurance programs.

5) The report of an audit of the Building 881 General Laboratory and the Building 123 HS&E Laboratory performed by the Rocky Flats Area Office (RFAO) Safety and Environmental Evaluations Branch in October 1988 stated that "the current auditing system does not provide adequate evaluation of overall laboratory performance" and recommended that "NEIC audit protocols should be used as a basis for developing an audit system that frequently evaluates the laboratories entire QC program".

6) Duplicate analyses are not conducted for all analytical procedures (I-QA-6).

7) Blank filters (method blanks) for beryllium (Be) analysis are not regularly included in analytical batches (I-QA-7).

8) Reagent blanks for Be analysis are analyzed after approximately every forty-five samples (I-QA-7).

9) Daily instrument calibration data for the analysis of Be is not reviewed by the Lead Chemist or QCC (I-QA-21).

10) The instrument service log for the atomic absorption spectrophotometer employed for beryllium (Be) analysis was not complete. Information concerning the preparation of standards in February 1989 and installation of a new Be lamp in May 1989 was not included in the log.

11) There are no formal data review procedures for the Building 123 HS&E Laboratory. Environmental monitoring data and associated quality assurance/ quality control (QA/QC) data produced at the Building 123 HS&E Laboratory are reviewed by the Lead Chemist for the particular analysis and a decision is made concerning the acceptability of the data (I-QA-6). The chemists review the data to determine if appropriate QA/QC requirements, such as blanks, duplicates, and blind reference sample analyses, have been met. The data is not reviewed at any level above the Lead Chemist.

12) The analytical laboratory procedures for the Building 123 HS&E laboratory are currently undergoing revision and incorporation into a procedure control system. The revisions were begun approximately eight months ago and completion is not planned for another six months (I-QA-11).

    A review of revised procedures by the audit team revealed that the format for the procedures does not include a separate section for quality assurance/quality control (QA/QC). The QA/QC information is included in various sections of the procedure but is not identified as QA/QC related.

13) Refer to the Audit Finding RAD/AF-3 for a related radiochemistry-specific finding.

**Applicable Citation and Requirements**

Interim Guidelines and Specifications for Preparing Quality Assurance Plans: EPA-QAMS-005/80.

Guidelines for Specifications for Preparing Quality Assurance Program Plans: EPA-QAMS-004/80.

Strategy for the Implementation of the EPA's Mandatory Quality Assurance Program: EPA-QAMS-001/80.

DOE Order 5700.6B, Quality Assurance.

40 CFR 136.2, Guidelines establishing test procedures for the analysis of pollutants.

"Clarification of Applicable Radiation Protection Standards for the public and the Environment," Memorandum to Distribution for John Tseng, Acting Director, Office of Environmental Guidance and Compliance, U.S. Department of Energy, November 4, 1987.



SUBPOENA 1063RF EGG ITEM 15 5140843

"Radiation Standards for Protection of the Public in the Vicinity of DOE Facilities," Memorandum to Distribution from W. A. Vaughan, Assistant Secretary, Environment, Safety, and Health, U.S. Department of Energy, August 5, 1985.

DOE Order 5484.1, Chapter 3 (Draft)

A formal comprehensive laboratory quality assurance program is necessary to ensure and document that analytical data are accurate, precise and defensible. The need for such programs is explained and guidance for their development provided in numerous documents, including:

Establishing a Quality Assurance Program for Analytical Chemistry Laboratories within the Nuclear Industry, ASTM C1009-83.

Manual for the Certification of Laboratories Analyzing Drinking Water, EPA-570/9-82-002, October, 1982.

Handbook for Analytical Quality Control in Radioanalytical Laboratories, L.Kanipe, U.S. Environmental Protection Agency, 1977,EPA-600/7-77-088.

Evaluation of Internal Control Measurements in Radioassay, Health Physics, A. S. Goldin, September 1984, Pages 361-374.

*Principles of Quality Assurance of Chemical Measurements*, J.K. Taylor National Bureau of Standards, NBSIR-85/3105, February 1985.

Handbook for Analytical Quality Control in Water and Wastewater Laboratories: EPA/600/06.

Sampling and Chemical Analysis Quality Assurance Program of U.S. Army Toxic and Hazardous Materials Agency, April 1982. Department of the Army, U.S. Army Toxic and Hazardous Materials Agency, Aberdeen Proving Ground, MD 21010.

## Recommendations

1) Develop a comprehensive quality assurance program and manual following the guidance of ASTM C1009.

2) The Quality Control Coordinator (QCC) for the Building 123 HS&E Laboratory should have organizational independence from production concerns in order to properly implement and maintain an effective quality assurance/quality control program. The QCC should report directly to the Division Quality Assurance Coordinator for HS&E.

3) The Division Quality Assurance Coordinator should oversee the implementation and maintenance of the quality assurance/quality control program for the Building 123 HS&E Laboratory.

4) The Building 881 General Laboratory and the Building 123 HS&E Laboratory should coordinate in an effort to develop consistent laboratory procedures and quality assurance programs. The report of an audit of the Building 881 General Laboratory and Building 123 HS&E Laboratory performed by the Rocky Flats Area Office (RFAO) Safety and Environmental Evaluations Branch in October 1988



SUBPOENA 106SRF EGG ITEM 15 51403843

recommended that "Rockwell should develop a QA/QC Manual designed to accommodate and satisfy uniform environmental program protocols to be followed by both the 881 QL and 123 HS&E Labs, or any other on-site labs involved in the environmental program."

5) Revise audit procedures to include a formal system by which findings can be accurately tracked through corrective action and closure.

6) Incorporate Environmental Management personnel into the laboratory audit process since these are the ultimate users of the data.

7) Initiate the analysis of duplicate samples for all analytical procedures.

8) Increase the frequency of analyses of beryllium method and reagent blanks to 10 percent of sample analyses.

9) Initiate review of daily calibration data for the beryllium analysis by the Lead Chemist or QCC.

10) Prepare and implement formal procedures for the use of instrument service logs.

11) Develop a formal procedure that details the responsibilities and methods to be employed for the review of environmental monitoring data. The procedure should include provisions for documentation of data reviews by appropriate QA/QC personnel.

12) Expedite the revision of analytical laboratory procedures. Include a separate section for QA/QC in the procedure format.

13) See Audit Finding RAD/AF-3 for a related radiochemistry-specific finding and recommendations.



SUBPOENA 1063RF EG&G ITEM 15 5140845

**Audit Discipline** Quality Assurance

**BMP Finding Number** QA/BMP-1

**BMP Finding Title** Data Management System for Environmental Monitoring QA/QC Data

**BMP Finding and Applicable Reference**

The data management system for environmental monitoring quality assurance/quality control (QA/QC) data requires manual entry and review and is therefore subject to human error. The use of inaccurate QA/QC data may lead to erroneous interpretation of data quality and suitability.

The management of environmental monitoring QA/QC data in the Building 881 General Laboratory (QA-1, 2) is performed manually. The installation of "Lab-SAM" data management system is in progress. However, additional funding is needed to upgrade the system to manage the QA/QC data required by the RCRA Program Office. QA/QC data is checked by the Lead Chemists and for some parameters, such as volatile organics and radionuclides, it is entered into software programs which produce control charts. The production of the control charts for volatile organics is done at the end of the quarter (I-QA-22), which nullifies the effectiveness of control charts as tools for immediate evaluation of analytical performance. Control charts are intended to provide information on trends associated with QA/QC data. By plotting at the end of the quarter, problems that develop early in the quarter are not recognized and corrected in a timely manner.

The data management system used in the Building 123 HS&E Laboratory is the "Flow Gemini" system. This data management system is not specifically for laboratory data and consequently cannot readily process QA/QC data such as duplicates (I-QA-7). Requests have been submitted for funding to change the data management system but no action has been taken to date (I-QA-6).

**Applicable BMP and Recommendations**

1) The data management system, "Lab-SAM," for the Building 881 General Laboratory needs to be brought on-line as soon as possible and upgraded to handle the data required by the RCRA Program Office. Incorporation of this system into the data flow will decrease data turnaround time and increase the ability of the laboratory to properly manage and interpret QA/QC data.

2) Control charts should be updated and reviewed daily in order to determine if any out-of-control conditions are developing and permit immediate corrective actions to be taken.

3) The data management system, "Flow Gemini," in operation in the Building 123 HS&E Laboratory needs to be upgraded in order to handle simple QA/QC data such as duplicates. Duplicate analyses provide information on data precision and sample preparation techniques.



SUBPOENA 1063RF EGG ITEM 15 5140546

| | |
|---|---|
| **Audit Discipline** | Quality Assurance |
| **BMP Finding Number** | QA/BMP-2 |
| **BMP Finding Title** | Provision for Transmission of Updated Laboratory Procedures |

**BMP Finding and Applicable Reference**

There is no formal procedure for the timely transmission of revised or updated laboratory procedures from the Building 881 General Laboratory to the RCRA Program Office (I-QA-13). Referring to outdated procedures by personnel involved in the interpretation of data may result in incorrect conclusions related to accuracy and precision and the significance of the result. If modified procedures are not provided by the laboratory, the only method available to the RCRA Program Office for identifying a procedural revision is through the annual laboratory audit.

**Applicable BMP and Recommendations**

Develop a formal protocol for the timely transmission of revised or updated laboratory procedures from Building 881 General Laboratory to the RCRA Program Office. One effective way to accomplish this is to include the RCRA Office as a part of the formal sign-off sequence for procedural revisions.



SUBPOENA 1063RF EGG ITEM 15 5148848

**Audit Discipline** Quality Assurance

**Audit Finding Number** QA/NP-1

**Audit Finding Title** Progression Training for Laboratory Technicians

**Noteworthy Practice**

The Progression Training Program for laboratory technicians in the HS&E Laboratory provides extensive training in various aspects of laboratory activities. This program goes beyond the procedure-directed training that is typically found in laboratories. This program strengthens the overall background of the technicians and should aid in improving performance.

The Progression Training Program was implemented and is currently maintained by the Progression Program subcommittee. The program is defined by a document entitled "Progression Programs, Rockwell International - Rocky Flats Plant, October 1, 1989."

The Progression Program is comprised of training modules designed to first provide the technician with general science training and progressing up to detailed "hands on" experience in specific laboratory activities. The technicians are tested during and after the modules and all grades are permanently documented. Technicians who are falling behind in the training or not satisfactorily completing the modules are counseled and tutored. The training program lasts three to four years, depending on the technician's assigned Division.

Successful completion of the Progression Training Program enables the employee to receive top pay within the employment category and provides the technician with intensive training in various aspects of chemical sciences and laboratory activities.

This program should be modified and expanded to include other personnel with responsibilities for collecting environmental samples or conducting laboratory analyses.

The program might be improved by adopting objective-based training methodology such as that supported by the Institute for Nuclear Power Operations. The Rocky Flats Plant (RFP) should also investigate the possibility of obtaining college credit for program participants.



SUBPOENA 1063RF EGG ITEM 15 5140850

# Section 9.0

# Inactive Waste Sites and Releases

# 9.0 - INACTIVE WASTE SITES AND RELEASES

## SCOPE OF AUDIT

1. Adherence to schedule and technical content of 1986 Compliance Agreement regarding inactive waste site issues

   a. SWMUs to be closed under interim status (inactive sites closure/post-closure

   b. SWMUs to be remediated under CERCLA/RCRA (high, medium, and low priority sites)

2. Excess properties per SARA 120(h)

   a. Existence of these properties

   b. Conformance with reporting procedures

3. Spill reporting and notification procedures

   a. Review all relevant procedures

   b. Determine conformance with CERCLA Section 103(a)

4. Conformance with National Contingency Plan (based on 1986 Compliance Agreement)

   a. Preliminary Assessments/Site Investigations (PA/SIs) and CEARP Phase I Report

   b. Development of Remedial Investigation/Feasibility Study (RI/FS) work plans

   c. Development of RI/FS reports

   d. Adherence of response action activities to guidance

5. Compliance with SARA Title III

   a. Section 302 notification

   b. Section 304, 311, 312, and 313 reporting

   c. Methods used to develop 311 through 313 reporting

6. Closure/Post-Closure Plan conformance with RCRA (40 CFR 265 Subpart G)

7. Present landfill inspection

   a. Conformance with RCRA (40 CFR 257)

   b. Management of asbestos disposal



SUBPOENA 106SRF EG&G ITEM 15 5140854

# INACTIVE WASTE SITES AND RELEASES FINDINGS

## AUDIT FINDINGS:

| | |
|---|---|
| IWS/AF-1 | Lack of a Finalized and Implemented Community Relations Plan for the Rocky Flats Remedial Corrective Action Program |
| IWS/AF-2 | Incorrect Entries in SARA, Title III, Section 313 Reports (EPA Form R) |
| IWS/AF-3 | Lack of an Administrative Record for the Environmental Restoration Program |
| IWS/AF-4 | Inadequate Remedial Investigation/Feasibility Study Work Plan - Low Priority Sites |
| IWS/AF-5 | Omission of SWMUs from the Environmental Restoration Program |
| IWS/AF-6 | Inadequate Remedial Investigation/Feasibility Study - 881 Hillside |

## BEST MANAGEMENT PRACTICES:

| | |
|---|---|
| IWS/BMP-1 | Lack of a Unified Spill Reporting and Notification Procedure |
| IWS/BMP-2 | Inadequate Time for Preparation and Review Cycle for Environmental Restoration Documents |
| IWS/BMP-3 | Determination of Threshold Amounts for SARA Title III, Section 313 Reporting |
| IWS/BMP-4 | Reprioritization of the Original Landfill |



SUBPOENA 1063RF EG&G ITEM 15 5140856

**Audit Discipline** Inactive Waste Sites and Releases

**Audit Finding Number** IWS/AF-1

**Audit Finding Title** Lack of a Finalized and Implemented Community Relations Plan for the Rocky Flats Remedial/Corrective Action Program

**Audit Finding and Applicable Reference**

The Rocky Flats Plant (RFP) has not finalized or implemented a Community Relations Plan for its Remedial/Corrective Action Program. A draft plan was prepared by RFP (IWS-42) and submitted to the U.S. EPA, Region VIII, in August, 1986. Comments were provided by EPA, although it is not documented on what date or in what form (written or verbal) (I-IWS-10, I-IWS-17, I-IWS-18, I-IWS-22, and I-IWS-28). A meeting was held in early 1988 with EPA in which comments on the Community Relations Plan and the need to finalize the plan were discussed. A final plan has not yet been produced or implemented by RFP.

**Applicable Citation and Requirements**

Section 10.f(1) of the Compliance Agreement and Order of Consent between DOE, EPA, and Colorado Department of Health (CDH) (effective July 31, 1986) requires that within 30 days of the effective date of the agreement, DOE shall submit to EPA and CDH a draft communications strategy/community relations plan. In addition, a final strategy/plan shall be prepared within 14 days of receipt of EPA/CDH comments.

**Recommendations**

The RFP Community Relations Plan for the remedial/corrective action program should be finalized and implemented. Guidance provided in the Office of Solid Waste and Emergency Response (OSWER) Directive 9230.0-3B, Community Relations in Superfund: A Handbook published by EPA in June 1988, should be followed. Before initiating work on this document, RFP should meet with EPA and CDH community relations specialists to solicit their advice and input. Comments from meetings and reviews should be documented in writing and agreed to by all principals. There should be complete coordination between all groups involved in environmental restoration and community relations.

Important features of a community relations plan that should be incorporated are interviews with the public to allow their participation in development of the plan, establishment of an information repository, and a strategy for public informational meetings, releases, and newsletters. Once developed, the Community Relations Plan should be implemented.



SUBPOENA 1063RF EGG ITEM 15 5140858

**Audit Discipline** Inactive Waste Sites and Releases

**Audit Finding Number** IWS/AF-2

**Audit Finding Title** Incorrect Entries in SARA Title III, Section 313, Reports (EPA Form R)

**Audit Finding and Applicable Reference**

Information has been incorrectly calculated and entered on EPA Form R, Toxic Chemical Release Inventory Form. For example, for carbon tetrachloride, 1,1,1-trichloroethane, and Freon 113 for reporting years 1987 and 1988 (IWS-30, and IWS-31) the entry on Form R indicates the estimate is based on monitoring data or emissions measurements. In actuality, the estimates for quantities discharged in liquid effluent streams are based on process knowledge and engineering judgement. Form R indicates the methods used for estimating the amounts of carbon tetrachloride, for reporting years 1987 and 1988 and for 1,1,1-trichloroethane, in 1988, released to stacks or air point sources are based on mass balance calculations. The estimates are actually based on best engineering judgement. (IWS-32, I-IWS-20, and I-IWS-33). In addition, the basis of the estimate for stack or point air emissions for Freon 113 in the 1988 reporting year is missing.

Calculations of 1987 carbon tetrachloride air and liquid influent concentrations to waste treatment systems, contained within the documentation file, are in error, resulting in higher values being reported in Form R (I-IWS-39).

**Applicable Citation and Requirements**

Section 313 of SARA/CERCLA Title III (Emergency Planning and Community Right-to-Know) requires that the owner or operator of a facility subject to the requirements of that Section complete Form R. The owners and operators of the Rocky Flats Plant are subject to these requirements.

**Recommendations**

1) Initiate a program for the formal review of calculations and the transfer of information from calculation sheets, memos, or other documentation used in preparing release estimates. The completed forms should also be reviewed for accuracy and completeness, as part of a formalized quality assurance/quality control program, by senior staff or technical personnel within the groups that generate the technical work, such as the Waste Operations and Environmental Management Groups.



SUBPOENA 1063RF EGG ITEM 15 5140860

**Audit Discipline** Inactive Waste Sites and Releases

**Audit Finding Number** IWS/AF-3

**Audit Finding Title** Lack of an Administrative Record for the Environmental Restoration Program

**Audit Finding and Applicable References**

The Rocky Flats Plant (RFP) does not have administrative records documenting the information used to make decisions on the selection of response actions under CERCLA. The site is presently performing or planning response actions at several sites, including the 881 Hillside; the 903 Pad, Mound, and East Trenches; and the Low Priority Sites. The studies being performed at these sites have, and will, result in information needed to formulate remedial actions. Information generated to date has not been placed in administrative records.

**Applicable Citation and Requirements**

Section 113(k) of CERCLA requires the establishment of administrative records for selection of CERCLA response actions. Administrative records consist of documents that are to be considered in selecting a response action and those which demonstrate the public's opportunity to participate in the selection of the action. Executive Order 12580 authorizes Federal agencies to establish administrative records for selection of response actions for facilities under their control; these agencies must compile and maintain records as required by regulations.

**Recommendations**

RFP should establish administrative records for information developed during response/remedial action activities. As part of this effort, a program for community involvement should be developed. See related Finding IWS/AF-1. The records should be available to the public at, or near, the plant. RFP had contacted the City of Westminster regarding the establishment of a public document room in a municipal building (I-IWS-22). RFP has, however, more recently decided to establish a room in Building 60, a public access facility near the west gate (I-IWS-47).

Guidance on the development and maintenance of administrative records is available from the U.S. EPA Office of Solid Waste and Emergency Response.



SUBPOENA 1063RF EGG ITEM 15 5140362

**Audit Discipline** — Inactive Waste Sites and Releases

**Audit Finding Number** — IWS/AF-4

**Audit Finding Title** — Inadequate Remedial Investigation/ Feasibility Study Work Plan - Low Priority Sites

**Audit Finding and Applicable References**

The draft Remedial Investigation and Feasibility Study (RI/FS) Plans for Low Priority Sites (IWS-68), dated June 1, 1988, does not address several aspects required under CERCLA/SARA and other relevant guidance available at the time the plan was being produced. Deficiencies include:

1) Lack of Adequate Scoping - A scoping meeting was not held between the Rocky Flats Plant (RFP) and regulatory agency personnel to discuss strategies and to plan for the RI/FS (I-IWS-45).

2) Lack of ARARs - There is no discussion of the potential applicable or relevant and appropriate requirements (ARARs) that will be addressed during the RI/FS.

3) Lack of a Conceptual Model - There is no development of a conceptual model for each of the Solid Waste Management Unit (SWMU) groupings to assess waste sources, the nature and extent of contamination, pathways, receptors, and assist in identifying data needs.

4) Lack of Data Quality Objectives (DQOs) - There is no assessment of the use of data for the determination of the types of chemical analyses and quality assurance/quality control requirements that will be applicable.

5) Incomplete Evaluation of Existing Data - There are discussions on the existence of available data, but this information is not incorporated into the sampling plan. For example, for SWMU Group D, there is a discussion on the availability of data upstream and downstream of the original landfill and ash pits; however, these data are not evaluated to determine data gaps or to aid in the development of a sampling plan. Instead, the plan indicates that these data will be evaluated as part of the RI, but then goes on to describe a sampling program without the benefit of data review.

6) Lack of a Remedial Alternatives Discussion - There is no discussion of general response actions and alternatives to assist in identifying data needs.

7) Incomplete Work Plan Elements - Not all standard tasks for Federal-lead sites are discussed; e.g., community relations (see related Finding IWS/AF-1), sample analysis/ validation, and data evaluation.

8) Omitted SWMUs - Twelve SWMUs identified in the 3004(u) Appendix of the Part B Application (IWS-78) may not have been included in this work plan (see related Finding IWS/AF-5). There is not sufficient justification for eliminating SWMU 171, which is included in the work plan, from further consideration.



SUBPOENA 1063RF EGG ITEM 15 5140364

Case 1:91-cv-01862-CFL Document 195-13 Filed 07/27/2006 Page 24 of 36

9) Lack of Specificity in Feasibility Study Plan - The Feasibility Study Plan is too generic and does not deal specifically with how the SWMU groupings will be assessed.

## Applicable Citation and Requirements

Section 104 of CERCLA mandates that those hazardous substances released to the environment that present a danger to public health and welfare be responded to in accordance with the National Contingency Plan (NCP) (40 CFR 300). 40 CFR 300.68 of the NCP (or 40 CFR 300.430 of the December 21, 1988, proposed NCP) provides procedures for conducting RI/FSs. The RI/FS procedures are amplified in the Interim Final Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA, dated October 1988 (EPA/540/G-89/004). Two draft versions of this document were available before the Low Priority Sites RI/FS Work Plan was submitted, one in October 1987 and the other in March 1988.

## Recommendations

1) The Low Priority Sites RI/FS Work Plan should be finalized in accordance with the October 1988 Interim Final Guidance (or the Final Guidance, when issued), and include any omitted SWMUs. Before proceeding, RFP should incorporate EPA and CDH comments, which have not yet been received (I-IWS-10, I-IWS-17, and I-IWS-18).

2) Scoping meetings should be held with the regulatory agencies present to plan the RI/FS. Minutes should be taken at these sessions, and all parties should agree to their contents before further work takes place in order to ensure that there is a mutual understanding of the scope and nature of activities being performed.

3) Sufficient time should be scheduled to complete a work plan of high quality. This includes sufficient time for required internal and external review (see related Finding IWS/BMP-2).



SUBPOENA 1065RF EGG ITEM 15 5140565

**Audit Discipline** Inactive Waste Sites and Releases

**Audit Finding Number** IWS/AF-5

**Audit Finding Title** Omission of SWMUs from the Environmental Restoration Program

**Audit Finding and Applicable References**

The Rocky Flats Plant (RFP) Environmental Restoration program may not address all of the inactive SWMUs indicated in the appendix of the December 15, 1987, RCRA Part B Application, dealing with 3004(u) waste management units (IWS-78), as required by the DOE/EPA/CDH Compliance Agreement (IWS-3). Of the 166 inactive SWMUs identified in the 3004(u) document, 12 may not have been addressed in closure plans (IWS-79) and in the high priority, medium priority, and low priority remedial activity documents (IWS-7 and IWS-9, IWS-49, and IWS-68). The omitted sites are included on the attached table. Sites 147.1, 147.2, 150.2, 150.4, 150.6, 150.7, and 150.8 may be included in the Original Process Waste Lines Closure Plan (IWS-79, Volume XIV). However, the 3004(u) Appendix SWMU reference numbers are not used in this closure plan and correlation between the 3004(u) appendix and the closure plan is difficult. Nonetheless, based on descriptions of these sites provided in the 3004(u) appendix, they do not appear to be addressed.

**Applicable Citation and Requirements**

Section 8 of the Compliance Agreement between DOE, EPA, and CDH dated July 31, 1986, requires RFP to identify all SWMUs and to take actions related to site characterization, corrective action, and closure for any inactive SWMUs in accordance with the schedules attached to the agreement. By June 1, 1988, all SWMUs should have been addressed.

**Recommendations**

Review closure plans and remedial activities to verify that the 12 units listed in the attached table have not been included. Address any omitted units in a revised Low Priority Sites RI/FS Work Plan . See related Finding IWS/AF-4. These sites should be incorporated into SWMU groupings, their characteristics assessed, available data analyzed, and data gaps identified. If it is determined that additional field studies are required, data quality objectives, preliminary ARARs, and a conceptual model should be developed to assist in the design of a field program.



SUBPOENA 1063RF EGG ITEM 15 5140366

SWMUs OMITTED FROM THE
ENVIRONMENTAL RESTORATION PROGRAM*

| SWMU Number | Unit |
|---|---|
| 135 | Cooling tower blowdown |
| 137 | Cooling tower blowdown - Bldg 774 |
| 138 | Cooling tower blowdown - Bldg 779 |
| 144 | Sewer line break |
| 147.1 | Process waste leak - Maas area |
| 147.2 | Process waste leak - Owen area |
| 150.2 | Radioactive liquid leak - W of Bldg 771 |
| 150.4 | Radioactive liquid leak - E of Bldg 750 |
| 150.6 | Radioactive liquid leak - S of Bldg 779 |
| 150.7 | Radioactive liquid leak - S of Bldg 776 |
| 150.8 | Radioactive liquid leak - NE of Bldg 779 |
| 198 | VOCs in groundwater |

*Reference: IWS-78



SUBPOENA 1063RF EGG ITEM 15 5140867

**Audit Discipline** Inactive Waste Sites and Releases

**Audit Finding Number** IWS/AF-6

**Audit Finding Title** Inadequate Remedial Investigation/ Feasibility Studies - 881 Hillside

**Audit Finding and Applicable References**

The Rocky Flats Plant (RFP) prepared remedial investigation (RI) and feasibility study (FS) reports for the 881 Hillside, dated March 1, 1988, (IWS-7), that do not address several aspects required under CERCLA and relevant guidances available at the time these reports were being prepared. Examples of these deficiencies include:

1) Lack of a Conceptual Model - There is no conceptual model developed based on data collected for the 881 Hillside.

2) Inadequate Background Characterization - The 881 Hillside RI does not adequately characterize the background hydrogeologic setting for metals and radionuclides. See related Finding GW/AF-2. Background characterization is necessary to determine potential downgradient effects of the 881 Hillside. Only one background well and a one-time soil sampling event, consisting of nine samples to a depth of one foot, were used to characterize the groundwater and soil background levels. A background hydrogeochemical characterization is being initiated by the RFP.

3) Poorly Defined Extent of Contamination - The source of the metals contamination and the lateral and vertical extent of contamination is not well defined. See related Finding GW/AF-1. Results of groundwater quality are discussed for the individual solid waste management units (SWMUs) located at the 881 Hillside (e.g., SWMUs 103, 106, and 107). However, there is no comprehensive discussion or delineation, either vertically or horizontally, of contaminant plumes emanating from the 881 Hillside in its entirety.

4) Insufficient Quality Assurance/Quality Control (QA/QC) - The programs and practices associated with the quality assurance and quality control for the environmental analyses conducted at the Building 881 General Laboratory are not adequate to document the validity of the analytical data. See related Findings QA/AF-1 and RAD/AF-5.

5) Premature Preparation of Feasibility Study - The 881 Hillside Feasibility Study was prepared prematurely. The RI used in preparing the FS did not adequately describe the background level, or extent of contamination, and data were of poor quality (see discussions above). Consequently, decisions made in the FS were based on insufficient or inadequate data.

RFP has identified the need for additional remedial investigation work to be performed and a revised RI and FS will need to be produced. This will lead to a delay in remediation. However, in the meantime an interim remedial action plan is being evaluated for implementation.



SUBPOENA 1063RF EG&G ITEM 15 5140868

Applicable Citation and Requirements

Section 104 of CERCLA mandates that those hazardous substances released to the environment that present a danger to public health and welfare be responded to in accordance with the National Contingency Plan (NCP) (40 CFR 300). 40 CFR 300.68 of the NCP (or 40 CFR 300.430 of the December 21, 1988, proposed NCP) provides procedures for conducting RI/FSs. The RI/FS procedures are amplified in the Interim Final Guidance for Conducting Remedial Investigation and Feasibility Studies Under CERCLA, dated October 1988 (EPA/540/G-89/004). A draft version of this document was available in October 1987. Section 12.f. of the Compliance Agreement between DOE, EPA, and CDH, dated July 31, 1986, requires that the RFP shall use CDH or EPA-approved QA/QC and chain-of-custody procedures.

Recommendations

1) Prepare the final RI and FS reports in accordance with the latest RI/FS guidance.

2) Incorporate the results of the ongoing background hydrogeochemical characterization (IWS-45) into the final RI. Since the remedial investigation process can be performed in phases, additional data collected from existing wells, future wells, and any other sampling should also be incorporated.

3) FS tasks dependent on RI data should be performed only after the RI data have been fully evaluated and are of good quality.

4) Detailed minutes should be taken at all meetings with regulatory agencies. All parties should agree to their contents before further work takes place to ensure that there is a mutual understanding of the scope and nature of the activities being performed.

5) Sufficient time and resources should be allotted to complete a RI and FS of high quality. This includes sufficient time for required internal and external review. See related Finding IWS/BMP-2.



SUBPOENA 1065RF EGG ITEM 15 5140569

**Audit Discipline** Inactive Waste Sites and Releases

**BMP Finding Number** IWS/BMP-1

**BMP Finding Title** Lack of a Unified Spill Reporting and Notification Procedure

**BMP Finding**

The Rocky Flats Plant (RFP) does not have a unified spill reporting and notification procedure. Instead, it has several procedures which were developed for different purposes and have different approaches. These procedures include the following:

1) The Hazardous and Mixed Waste RCRA Standard Operating Procedures 11 - Hazardous Substance/Waste Spill Response and RCRA Spill Use Kit (SOP HW-11) (IWS-24) was developed as part of the RCRA Part B Contingency Plan. In this procedure, the discoverer of the spill is to notify the Shift Superintendent. Eight scenarios have been developed for notification, but in all cases, "one pint or one pound" of material spilled is used as a guideline for spill reporting. Depending on the type, location, and size of the spill, the Shift Superintendent is responsible for calling the RCRA/CERCLA office. The latter group, in turn, determines whether the spill is of a reportable quantity, and if necessary, notifies the DOE Rocky Flats Office Environmental Branch, which notifies the National Response Center.

2) The DOE RFAO Environmental Branch has its own incident notification procedure (IWS-17) in which members of that branch, upon notification of a reportable quantity release, are to contact EPA, CDH, and the National Response Center.

3) RFAO Order RF 5000.3, Unplanned Events Notification and Reporting System (IWS-57) establishes responsibilities within RFAO for investigating, evaluating, reporting, and correcting unusual occurrences and unplanned events such as environmental spills. A hierarchy of reporting is provided, including notifications to the Shift Superintendent, the Staff Duty Officer, RFAO, and the ALO and DOE-HQ Emergency Operations Center. However, no mention is made of notification to the National Response Center.

4) DOE Order 5500.2A, Emergency Notification, Reporting, and Response Levels (IWS-67), requires DOE field elements to notify the Headquarters Emergency Operations Center and the National Response Center after discovery of environmental releases of hazardous materials in excess of reportable quantities.

5) Chapter 4 of the Rocky Flats Emergency Plan (IWS-34) contains information on notifications in the event of emergencies. It provides a hierarchy of reporting environmental releases on-site, including the Shift Superintendent, the site Emergency Operations Center, ALO, and county and state agencies, although specific contacts and triggering quantities for notification are not provided. In addition, specific procedures for notifying the National Response Center and DOE-HQ are not covered.

6) The Spill Prevention, Control, and Countermeasures/Best Management Practices (SPCC/BMP) Plan (IWS-18) was developed for NPDES-permitting purposes. Appendix II of the second draft revision (May 1989) indicates that the Shift Superintendent is authorized to call the National Response Center and the local



SUBPOENA 1063RF EGG ITEM 15 5140370

emergency planning commission and that Environmental Management is responsible for determining whether the volume of the spill is a reportable quantity.

7) Finally, each major building has its own Emergency Plan, for example the Building 771 Emergency Plan (IWS-33). This particular document has procedures for local notification of spills. Major (larger than 10 gallons) hazardous material spills are to be reported by calling the site emergency number while minor spills (less than 10 gallons) can be cleaned up at the direction of the supervisor and Industrial Hygiene, according to RCRA criteria.

## Applicable BMP and Recommendation

Section 103(a) of CERCLA (implemented by 40 CFR 302), Section 304 of SARA Title III (implemented by 40 CFR 355), and DOE Order 5500.2A require that the National Response Center, local and state emergency planning commissions, and DOE-HQ Emergency Operations Center, respectively, be contacted in the event of certain types of environmental spills. To ensure that proper notifications are made in a consistent manner and that all site personnel understand their responsibilities, the site should develop one unified procedure for spill reporting and notification. Of the seven procedures discussed, SOP HW-11 is the most comprehensive and should be developed to include all requirements, including SARA Title III, Section 304 notification and follow-up. In addition, consistency with this procedure should be maintained in all other required plans and orders. The unified procedure should include applicable steps to be taken from the time the release is first detected to the time DOE notifies the appropriate authorities. Specific responsibilities and emergency contacts should be defined. The unified procedure will assist in ensuring that the appropriate parties are notified and that there is site-wide coordination in responding to releases.

RFP is doing several things to improve spill reporting procedures. An Emergency Preparedness Task Group is in the process of being established to develop a unified spill response procedure (I-IWS-26 and I-IWS-29). The SPCC/BMP plan is under review and changes that will make it consistent with SOP HW-11 (I-IWS-21) are anticipated. An internal letter was sent by RFP management on May 12, 1989, to all employees reminding them of procedures for reporting hazardous material spills (IWS-36).

| | |
|---|---|
| Audit Discipline | Inactive Waste Sites and Releases |
| BMP Finding Number | IWS/BMP-2 |
| BMP Finding Title | Inadequate Time for Preparation and Review Cycle for Environmental Restoration Documents |

## BMP Finding

Internal (DOE and Rocky Flats Plant [RFP]) and external (CDH and EPA) written reviews of RFP environmental restoration documents have not been performed in a timely manner, if at all. In addition, field work, data analysis, and document preparation have proceeded on an aggressive schedule without the benefit of reviewer's comments, in order to meet schedules in the DOE, EPA, and CDH Compliance Agreement (IWS-3). Consequently, conclusions made and decisions reached have not necessarily received the approval of regulatory agencies.

RFP has produced numerous documents dealing with the remediation and closure of inactive SWMUs, including remedial investigation/feasibility study (RI/FS) work plans, RI and FS reports, and closure plans. Some of these studies have been performed under ambitious schedules. For example, work plans for the 881 Hillside RI and the 903 Pad, Mound and East Trenches RI were submitted in February 1987 and the RI reports were submitted on July 1, 1987 and December 31, 1987; these dates were set forth in the July 31, 1986, Compliance Agreement.

In several cases, these documents were reviewed and written comments were provided, as indicated in the attached table; this list is not all-inclusive. In all but one of the documented cases of internal DOE reviews, their written comments were not submitted to RFP until after the reports had been sent to the regulatory agencies. For certain reports, verbal comments were provided by DOE before reports were submitted, but there was not adequate time for DOE to perform a comprehensive review (I-IWS-11, I-IWS-27). A similar situation existed with reviews between RFP and subcontractors performing remedial work (I-IWS-45).

External written reviews from regulatory agencies were also not provided in a timely manner, if at all, as indicated in the attached table. In order to keep to the schedules set forth in the July 31, 1986, Compliance Agreement (IWS-3), the site chose to continue with the next phase of remedial work rather than wait for comments; for example the High Priority Sites RI and revised RI and FS reports (I-IWS-17, I-IWS-18, I-IWS-23, I-IWS-27 ).

## Applicable BMP and Recommendations

Current industry practices for the production of remedial response documents for Federal facilities include internal quality assurance/quality control review by the contractor (see related Finding GW/AF-4) and review by the agency for which the work is being performed before the document is released. After all comments are incorporated and the document is released, regulatory agencies generally request a 30-day review cycle. DOE-Headquarters has requested that they be allowed a 21-day review period for RI/FS Work Plans, draft and final RI/FS reports, proposed plans, and the draft and final records of decision (IWS-86). RFO has requested a 30-day simultaneous review period. (I-IWS-11). CERCLA Section 121(f)(1)(E) requires that states be given a reasonable opportunity to comment on remedial response studies. Section 12.c. of the Compliance Agreement states that certain DOE submittals shall be provided to EPA and CDH for



SUBPOENA 1063RF EG&G ITEM 15 5140872

comment two weeks prior to the scheduled date and that a final submittal by DOE, which incorporates EPA and CDH comments, be provided by the later of the schedule deadline or seven days after DOE's receipt of the comments, whichever is later.

1) Develop realistic schedules for the performance of RIs and FSs, incorporating all requested and required review cycles, at the inception of a project. Presently, EPA anticipates that RI/FS studies should take approximately 12 to 18 months to complete. In actuality, many RI/FSs are taking 2 years to complete. Such scheduling is presently being included in the Long-Range Environmental Restoration Schedules for Rocky Flats (IWS-87).

2) Establish an internal QA/QC program to ensure that the documents are complete and of the highest quality. See related Finding GW/BMP-4. Allowances should be made for this in project schedules. Comments should be submitted in writing; any verbal comments should be documented in writing and all parties should agree to their contents. If the review or the QA/QC process is delayed, the report should not be released, and the next phase of work should not be initiated until comments have been received and incorporated.

## WRITTEN REVIEWS OF ENVIRONMENTAL RESTORATION DOCUMENTS

| DOCUMENT | DOCUMENT SUBMITTAL DATE (To Regulators) | DATE WRITTEN COMMENTS SUBMITTED (To RFP) | COMMENTING AGENCY |
|---|---|---|---|
| Draft Community Relations Plan (IWS-42) | 8/86 | none<br>none | EPA(I-IWS-10, I-IWS-22)<br>CDH(I-IWS-22) |
| CEARP Phase II: Site Specific Monitoring Plan (IWS-5, IWS-6) | 2/87 | none<br>4/87 | CDH(I-IWS-9, I-IWS-10)<br>EPA(IWS-83) |
| RI Report for High Priority Sites (IWS-4) | 7/1/87 | 8/87<br>10/14/87 | EPA-Preliminary (IWS-37)<br>EPA/CDH-Final (IWS-38) |
| 903 Pad, Mound, East Trenches Report(IWS-49) | 12/31/87 | 3/25/88<br>8/33/88 | EPA(IWS-56)<br>RFAO(IWS-52) |
| 881 Hillside Revised RI(IWS-7) and FS(IWS-9) | 3/1/88 | 6/01/88<br>8/31/88<br>9/23/88 | RFAO(IWS-40)<br>EPA/CHD(IWS-41)<br>DOE-HQ(IWS-47) |
| Bldg. 443,No. 4 Fuel Oil Tank Closure Plan (IWS-85) | 4/5/88 | 9/09/88 | CDH(IWS-74) |
| Low Priority Sites RI-FS Work Plan | 6/1/88 | none<br>none | EPA(I-IWS-34)<br>CDH(I-IWS-17, I-IWS-18) |
| Phase II 903 Pad, Mound East Trenches Sampling Plan (IWS-54) | 6/30/88 | 6/30/88<br>11/30/88 | RFAO (IWS-56)<br>EPA/CDH(IWSS-66) |
| Solar Evaporation Pond Closure Plan | 6/1/88 | 6/30/88<br>11/29/88 | RFAO(IWS-73)<br>CDH(IWS-71) |



SUBPOENA 1063RF EGG ITEM 15 5140874

**Audit Discipline** Inactive Waste Sites and Releases

**BMP Finding Number** IWS/BMP-3

**BMP Finding Title** Determination of Threshold Amounts for SARA Title III Section 313 Reporting

**BMP Finding**

The Rocky Flats Plant (RFP) currently uses a cumbersome and time-consuming method for determining the amount of toxic chemicals that are manufactured, processed, or used. In 1988, three teams of two people contacted all chemical users and with the use of bar-coding devices, inventoried the chemicals on hand. The resulting lists of chemicals were sent back to the users, and they were asked for annual usages and maximum amounts on hand during the year. Once the lists were returned, MSDSs were searched by hand to identify the individual components on the toxic chemical list that were in tradename mixtures. Total amounts of toxic chemicals manufactured, processed, or used were then calculated and compiled, and compared to the threshold quantities in SARA Title III, Section 313, (IWS-32 and I-IWS-20).

**Applicable BMP and Recommendations**

SARA Title III, Section 313 (implemented by 40 CFR 372) requires that certain facilities, such as RFP, report emissions of toxic chemicals that are manufactured, processed, or used in excess of certain threshold quantities. The first step in this process is determining which toxic chemicals, if any, are manufactured, processed, or used in excess of the threshold amounts.

1) RFP should implement a system in which the inventory of annual usage is tied into the procurement system. Thus, toxic chemical usage estimates could be developed throughout the year based on a record of purchases, rather than on a manual system of inventorying all facilities at one point during the year or obtain estimates from users. This system would be automated, less labor intensive, and more accurate than the system used in 1988. A system such as this is being implemented by the Industrial Hygiene Information Systems Group (I=IWS-44). Another system that could be used is the one addressed in Finding WM/BMP-8, which deals with procurement control for regulated materials.

2) In addition, the RFP should continue, and possibly accelerate its present program of entering the MSDSs of the nearly 12,000 chemicals on site into a data base; presently 2,000 have been entered. This would simplify the task of developing inventories of toxic chemicals which are contained in tradename mixtures.



SUBPOENA 1063RF EGG ITEM 15 5140876

**Audit Discipline** Inactive Waste Sites and Releases

**BMP Finding Number** IWS/BMP-4

**BMP Finding Title** Reprioritization of the Original Landfill

**BMP Finding**

The C-series ponds, which are downstream of the original landfill, are scheduled for remedial activities before the landfill. This could result in recontamination of the ponds if there is contaminant runoff to the ponds during remediation of the old landfill.

The original landfill is situated on a slope that drains to Woman Creek and is 300 feet from the creek. The South Diversion Ditch collects runoff and leachate from the landfill and carries the drainage to pond C-2 on Woman Creek, where it is held to prevent off-site releases. The landfill contains 20 kilograms of depleted uranium and is suspected of containing solvents, paints, paint thinners, oil, pesticides, cleaners and other such materials. Ash pits, which are in proximity to the landfill are on the same slope that drains to Woman Creek, received ash from an incinerator, which is estimated to have burned 100 grams of depleted uranium.

The C-series ponds consist of ponds C-1 and C-2. Pond C-1 receives the flow of Woman Creek and is diverted around pond C-2 to the Woman Creek channel downstream. Pond C-2 receives surface runoff from the South Diversion Ditch. Water from pond C-2 is discharged to Woman Creek in accordance with the plant NPDES permit. Pond C-2 formerly received cooling tower blowdown, as well as runoff from the landfill, and therefore may contain chromates.

For the purposes of the Remedial Investigation and Feasibility Study Plans for the Low Priority Sites (IWS-68), the original landfill and the ash pits were combined to form Solid Waste Management Unit (SWMU) Group D, and the C-series ponds were combined to form SWMU Group C. SWMU Group D received a hazard ranking system (HRS) score of 17 chemical and 5 radioactive, whereas the SWMU Group C received a HRS score of 37 chemical and 6 radioactive. Thus, Group C was scheduled for response actions before Group D. However, the SWMU Group D score did not consider the surface water migration route, since that pathway was considered in the SWMU Group C score. The Group D SWMUs may contribute surface water contaminants to the Group C SWMUs, but this is not reflected in the Group D score. Presently, remedial activities at SWMU Group C are scheduled to begin 14 months sooner than those at SWMU Group D.

**Applicable BMP and Recommendations**

1) Because of the potential for contamination of downstream SWMUs such as the C-series ponds during remediation of upstream units such as the landfill, remediation activities should begin at upstream locations and proceed downstream. In this manner, the downstream units would not have to be remediated twice in the event that contaminants are released to them during remediation of the upstream units.

2) Strict controls on runoff should be implemented during potential landfill remediation so that any potential release of contaminants to downstream locations is controlled. Since the A- and B-series ponds are also scheduled for early remedial activities, it is recommended that the sequencing of the



SUBPOENA 1063RF EG&G ITEM 15 5140878

response/remediation activities for all low priority sites be reviewed to determine the potential for downstream contamination.



SUBPOENA 1063RF EGG ITEM 15 5140379