EXHIBIT 36

IN THE UNITED STATES
CLAIMS COURT

ROCKWELL INTERNATIONAL )
CORPORATION, )
Plaintiff, ) Case No.
vs. ) 91-1362C
THE UNITED STATES, ) Pages 1 - 114
Defendant. )

---

DEPOSITION OF:
ROBERT M. NELSON, JR.
MONDAY, NOVEMBER 9, 1992
10:25 A.M.

Reported by:
ROBERTA L. THIBODEAU
CA C.S.R. No. 8263
NV C.S.R. No. 358

on how you define the word "involvement with," when I was the assistant manager for operations, starting in 1982, I started sitting on those boards. But I was in more of a leadership role as being the -- the contracting officer from 1985 on.

Q. In your operations position, did you submit input to the boards?

A. Yes.

Q. In the contracts in Nevada in which you have played some part in an award fee, what official was the fee determining official?

A. The manager of the office is almost always the fee determining official.

Q. The manager of the Nevada office?

A. Uh-huh.

Q. I believe you stated, Mr. Nelson, that you first became involved with the Rocky Flats plant at the end of January 1990; is that right?

A. That's correct.

Q. When were you first informed that you would be assigned to the Rocky Flats plant?

A. The precise date -- let me give you an about date. I would say it was about the 25th or so of January of 1990 I received a telephone call from the deputy assistant secretary for military

application in Washington which asked me to come to Washington and -- and meet with people, at that point undefined, for a reason he could not tell me on the phone. One of those very scary phone calls.

Q. Who was the deputy secretary?

A. That was Admiral Mike Barr. I -- of course, when you get a call like that, unless for, you know, overriding reason, I said, "Of course." I went on a plane the next day. And again, I can't be exactly precise, but it was that week. I -- I went the next day. I met with the -- I met with Admiral Barr. I met with the under secretary of energy, John Tuck, and then ultimately with the secretary of energy, Admiral Watkins. And at that point Admiral Watkins asked me to come to Rocky Flats for about six months. So it was and how fast could I get there, and I told them the next month. So whatever the month is, around the 28th or 29th of January of 1990 was the first day I had ever set foot on the place. So I had about a day's -- couple days' opportunity to pack bags and that kind of stuff.

Q. How long did you meet with the various people in Washington?

A. Well, it was -- it was a one-day affair. I would say I probably spent a couple hours with

secretary.

Q. You had never met Mr. Tuck before; is that right?

A. No.

Q. Had you ever met Mr. Watkins before?

A. No. Never even seen him before, I mean, except in pictures.

Q. And what did Mr. Watkins discuss with you?

A. He -- really the only thing that I remember out of that is his -- a couple interesting things to me. He was interested in the fact -- he knew, probably from Admiral Barr, that I was a priest and had a parish here in Las Vegas. He asked me if I could work to continue that, and I told him I probably could. And he said he thought it would only be six months, that it would probably at that point take us three months to fix the corrections at Rocky Flats with maybe three months of get things back into normal operations. And that was about it.

Again, I think he was really trying to take my measure to see if I was who he wanted to put up there.

Q. What were the problems that you were supposed to fix?

EXHIBIT 37

Department of Energy

ROCKY FLATS OFFICE
P.O. BOX 928
GOLDEN, COLORADO 80402-0928

February 26, 1990 90-DOE-5212

Mr. Dominick J. Sanchini
Vice President, Major Programs
Rockwell International Corporation
Department 001, Mail Code D-37
2230 East Imperial Highway
El Segundo, CA 90245

Dear Mr. Sanchini:

In accordance with Appendix D of Contract DE-AC04-76DP03533, the Department of Energy (DOE) hereby determines that Rockwell International Corporation (Rockwell) has earned an award fee of $1,241,604 for Plant and $338,035 for PRMP/PROVE, for a total of $1,579,639. The enclosed Performance Evaluation Report for the period April 1, 1989 through September 30, 1989, provides the basis for the DOE award fee determination.

The award fee approved by the DOE for payment to Rockwell is pursuant to an award fee plan previously developed to cover the period April 1, 1989 to September 30, 1989. This was prior to the institution by the DOE of stronger and tougher award fee plans to reward improvements in environment, safety, and health (ES&H) and substantially increase the proportion of the fee attributable to ES&H performance. Under the old contract provisions, however, the DOE was constrained as to the weight that might be given to ES&H performance in setting the fee for the six month period covered.

In the old award fee plan, which includes this period, up to 20% of the total amount of fee paid could be attributable to performance in the ES&H area. By reducing the award fee rating for ES&H to "Unsatisfactory," the DOE is indicating to Rockwell that its ES&H performance was unacceptable. In addition, by reducing the award fee rating for general management to "Marginal," the DOE is indicating to Rockwell that its general management performance was deficient.

As specified in the Contract, you may, within five working days after receipt of this letter, request an opportunity to present to the DOE an analysis of your performance under the Contract. Otherwise, after this period we will provide you the award fee amount, plus a base fee of $432,850, for a total fee of $2,012,489.

DEFENDANT'S EXHIBIT 1103 4/24/98

DEFENDANT'S EXHIBIT A547 89-M-1154

E 000198

If you wish to meet with us, please contact this office in order to coordinate those arrangements for you.

Sincerely,

Robert M. Nelson, Jr.
Manager

Enclosures

# PERFORMANCE EVALUATION REPORT
# ROCKWELL INTERNATIONAL CORPORATION
# CONTRACT NO. DE-AC04-76DP03533
# FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

The overall performance of Rockwell International Corporation (Rockwell) was maintained at least at the level of "Satisfactory" during the period April 1 through September 30, 1989.

The following are separate evaluations of the performance of Rockwell relative to the management and operation of the Rocky Flats Plant and the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the selected Functional Performance Areas (FPA's). The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's have been evaluated in accordance with the contract Award Fee Plan, and the following summary of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

## PLANT

GENERAL MANAGEMENT: There was considerable evidence of Rockwell management's inability to effectively manage this facility, and this was seen by DOE to be a serious, major deficiency. This deficiency was manifested in lack of progress in integrating safety responsibility and accountability at all working levels and also by deficient lines of responsibility, procedures, discipline/work ethic, training, on-floor supervision, and problem investigation/resolution. Numerous incidents provide evidence of the above deficiencies. A continuing lack of priority attention to safety and health, as evidenced by the open status of many of the safety concerns documented during the period, was a clear indication of poor management. Additionally, despite an increase in nitrate concentrations on the 750 Pad, little action was taken to contain saltcrete after precipitation events. The preparation for the annual DOE inventory of Special Nuclear Material at Rocky Flats was unsatisfactory.

ENVIRONMENT, SAFETY & HEALTH: Long term understaffing in the Health, Safety and Environment organization resulted in less than adequate attention applied to several essential projects and safety functions. Rockwell was unsuccessful in reaching their Plant Performance Goal for recordable injuries and in reducing the total number of workplace contamination incidents. Rockwell continued to have problems in the construction safety area. Rockwell failed to exercise an acceptable level of program management in the development of official recommendations for restart of the Building 374 evaporator. A criticality safety assessment performed in August 1989, noted many aspects of the criticality safety program which needed improvement. Rockwell failed to exercise an acceptable level of program management in dealing with pondcrete and saltcrete. Rockwell's oversight of the environmental subcontractors performing routine environmental monitoring was deficient. As identified in the DOE-HQ assessment team report, deficiencies in the RFP effluent air monitoring program may adversely affect determination of radioactive materials released to the atmosphere. Waste shipments to Idaho and Nevada were marked by errors in manifests and contamination on waste packages, which jeopardized the future of offsite disposal plans.



E 000200

QUALITY: The plant-wide implementation of DOE non-weapons quality assurance requirements did not progress at the accelerated rate expected.

The Rockwell Final Product Acceptance group performed effectively after only one year of having the responsibility for most product acceptance. Lot rejects and Final Product Acceptance observations decreased during the second half of FY89.

COST MANAGEMENT: Rockwell provided excellent support to both the Environmental Restoration and Waste Management Five-Year Plan and to the Modernization Study. Rockwell did an extraordinary job of collecting information, categorizing and documenting the large number of new funding requirements created by the FBI/EPA investigation, the DOE Tiger teams, and the DOE/CDH Agreement. All validated construction line item projects were included in the Department's 1991 budget request.

PRODUCTION OPERATIONS: The processing of procured finished machined products was consolidated within Building 460 to reduce overall process times and decrease costs. Rockwell was effective in reducing halogenated solvent usage, and continued to make progress with its new scheduling philosophy which was designed to minimize work-in-process inventories by managing bottlenecks.

The self-appraisal program instituted in all Production Operations buildings, an adaptation of the Building 771 Restart Criteria, did not receive sufficient management attention or "ownership" and was ineffective.

CHEMICAL OPERATIONS: Plutonium Recovery Operations and Production Operations worked in conjunction to develop the Nuclear Facility Operation Manual, which was to establish the standard of excellence for operations of Rocky Flats facilities. As a result of the deliverables that Rockwell had to complete before Building 771 restart approval was granted, a number of procedures were changed or developed and implemented. This implementation was successful, and the building management team continued to develop and implement improvements to those procedures.

Rockwell's management controls and directives in areas such as recovery operations planning, work breakdown structure and scheduling systems, and cost control systems result in implementation/installation/operation delays and other problems. There continued to be a failure to establish performance goals for process operations and to measure process performance; therefore, operations were not baselined to provide for improved performance.

PRMP/PROVE

PROJECT MANAGEMENT: Rockwell took an active role in establishing Los Alamos National Laboratory technical personnel as a part of the PRMP structure. Provisional agreement was reached by the Senior Management Review Board on the baseline PRMP process technologies.

Rockwell did not provide an adequate system to produce timely and accurate project control information. Integration of an essential, computerized, three-dimensional Plant Configuration Model into the overall PRMP design strategy has been slow.

COST MANAGEMENT: Rockwell took positive action to reduce the cost of A-E services, including reducing overhead, requiring the A-E to meet commitments, and upgrading control measures over the scope of A-E work.

The Cost and Schedule Reduction Precursor activity incurred over $100,000 cost without any visible or deliverable product, which indicates an unacceptable lack of cost controls.

SCHEDULE PERFORMANCE: The PROVE test schedule was prepared as an integrated effort between Plutonium Operations and PROVE engineering. Detailed schedules were developed for activities preliminary to PRMP construction to provide a base for performance measurement.

Schedule reports were not provided in a form which ensured timely reporting and accuracy to the overall project schedules.

SUBCONTRACT MANAGEMENT: Rockwell took positive action to develop an A-E Statement of Work which provided for their required services at an appropriate level of detail.

Inadequate Quality Assurance/Quality Control oversight of the glovebox subcontractor resulted in extra costs and delivery delays to the Government.

DESIGN QUALITY: PRMP Technical Baseline documentation was of unacceptable quality and behind schedule.

TECHNICAL PRODUCT QUALITY: Rockwell did not require periodic, independent audit of NQA-1 compliance and Non-Conformance Report actions to ensure that quality actions were completed without prejudice. A QA plan for PRMP, required prior to start of the full design effort and Title I activities, was not completed.

EXHIBIT 38

**Donald R. Beall**
Chairman of the Board and
Chief Executive Officer

**Rockwell International Corporation**
2230 East Imperial Highway
El Segundo, California 90245

(213) 647-5127

June 13, 1989

The Honorable James D. Watkins
Secretary of Energy
Department of Energy
1000 Independence Avenue, S. W.
Washington, D. C. 20585

Dear Secretary Watkins:

The government's initiation last week of a broad-scale investigation of possible environmental violations at the Rocky Flats Plant, which we manage under contract for the United States Department of Energy, is of serious personal concern to me, as well as to our Board of Directors and management.

We are cooperating in that investigation. We believe we have managed the Rocky Flats Plant responsibly and effectively in the past and continue to do so today. In our judgment the Plant has been run safely and in compliance with applicable laws and regulations.

As with all Rockwell operations, we take great pride in our commitment to excellence and ethical conduct. I am convinced that the dedicated performance of Rockwell management and our more than 5,000 people at Rocky Flats will be confirmed as the current investigation is concluded. I assure you that immediate and vigorous action will be taken to deal with any conduct incompatible with our stringent management principles and the laws and regulations applying to the Rocky Flats facility.

Our commitment to excellence throughout Rockwell International extends in every way to the welfare and safety of our Rocky Flats employees and the surrounding communities. You have my personal assurance that the interest of the people of Colorado are of utmost concern to all of us at Rockwell.

We will welcome an opportunity to discuss personally any questions you may have regarding our management of the Rocky Flats Plant.

Sincerely,

D R Beall

EXHIBIT 39

UNITED STATES COURT OF
FEDERAL CLAIMS

ROCKWELL INTERNATIONAL )
CORPORATION, )
)
Plaintiff, )
)
vs. ) CASE NO. 91-1362
)
UNITED STATES OF AMERICA, )
)
Defendant. )
______________________________)

DEPOSITION OF DONALD R. BEALL

MONDAY, JULY 18, 1994

SIMS, SCHNEIDER & ASSOCIATES
REPORTED BY: CERTIFIED SHORTHAND REPORTERS
JEANNETTE K. JESSUP 149 PALOS VERDES BOULEVARD
C.S.R. #8573 SUITE C
REDONDO BEACH, CALIFORNIA 90277
(310) 791-4466

specifics were known at that time or what.

Q. Did you give any directions to the person who called you in that phone call that you remember now?

A. Not that I recall. But if I had, it would only have been to be as cooperative as we can and let's get to the bottom of this, understand the facts and take appropriate action.

MR. KOLAR: I'd like to have this document marked as I'm going to call it Defendant's Exhibit 100, which I think is beyond the range of exhibits that we had previously marked.

MR. NEY: Yes.

(Exhibit Number 100 was marked for identification by the reporter and is attached hereto.)

THE WITNESS: Okay.

BY MR. KOLAR:

Q. Have you had a chance to look at Defendant's Exhibit 100, Mr. Beall?

A. Yes.

Q. Do you recognize that document?

A. Yes.

Q. What is it?

A. It's a letter from myself dated June 13th, 1989 to Secretary Watkins, Secretary of Energy, commenting

on this so-called raid. That's not what it says in the letter, but -- and indicating that Rockwell had taken a great deal of pride in our commitment and to excellence and ethical conduct; that we would investigate these -- any allegations here; that we would take vigorous action if there were any issues discovered, and et cetera.

Q. Between the time of the search warrant on June 6th, 1989 and this letter June 14th, 1989, did you have any discussions with anyone from the Department of Energy about the search warrant --

A. No.

Q. -- to your recollection now?

A. I don't recall any. I don't think I had any.

Q. So, to your recollection, at this time this is the first contact that was had between yourself and the Department of Energy about that matter. Would that be a fair statement?

A. Yes.

Q. In the letter you stated that the government's initiation of the investigation of possible environmental violations at Rocky Flats is of serious personal concern to me, as well as to our board of directors and management. This may seem like an obvious question to you, but I need to ask it anyway. Why was that the case?

A. Any allegation of wrongdoing of any significance related to any part of Rockwell would be of serious personal concern to me, our board and our management.

Q. Did you, as a result of the FBI raid, change the level of oversight that you personally exercised with regard to the Rocky Flats plant?

MR. NEY: "You" is Mr. Beall as an individual?

MR. KOLAR: Yes.

THE WITNESS: You know, I'm ultimately accountable for everything in Rockwell. So because of the raid, I was putting increasing personal focus on understanding what occurred. And subsequently, we further enhanced our management process to involve -- to assure that we had available to our Rocky Flats management every resource in this company, which they could always call on in any event. But we took extraordinary steps to be sure that we had adequate corporate oversight to the activities and to help work our way through these allegations and understand them.

BY MR. KOLAR:

Q. I'm stating in the last paragraph of this letter, which is Defendant's Exhibit 100, "We will welcome an opportunity to discuss personally any questions you," and that's the Secretary of Energy, Admiral Watkins, "may

have regarding the management of the Rocky Flats plant."

A. Right.

Q. Did you subsequently have conversations with Admiral Watkins about this matter?

A. Yes. Yes.

Q. And how did that come about, to your recollection?

A. I don't remember exactly. I know that we went back, several of us, and met with the admiral and his deputy, Henson Moore, shortly after this letter to discuss the whole question of Rockwell's commitment to support the DOE as we saw appropriate in getting to the bottom of this and to support the secretary's announced priorities to have -- to be sure that health, safety, environmental concerns were at the top of the list of management focus in running that plant.

Q. Now, was that meeting in Washington, D.C., at the Department of Energy?

A. Yes.

Q. And you mentioned that you and several others, I think is the way you characterized it. Who were the others from Rockwell who attended that meeting with you?

A. Sam Iacobellis was with me. Charlie Harff was with me. And Dom Sanchini, who ran Rocky Flats, was

significant changes in emphasis, including changes in organization and staffing and people. I recall that coming up.

And he -- one of the things that was discussed at that time was his attitude that we share with him in that -- in that belief and take similar steps, with which I disagreed. Rockwell, we felt, had very adequate -- and, you know, we would certainly bolster and had resources, but I felt the top management of our activity was excellent.

Q. Just so I'm clear on what you're saying, Admiral Watkins felt that Rockwell's management --

A. He was not specific in that meeting, but he was -- he was strongly urging us to make -- without being specific, he was making strong suggestions that there be a significant change in management.

Q. On the part of Rockwell?

A. Right. Right.

Q. Rocky Flats?

A. Right. Right.

Q. And he also indicated, you're telling me, that there were to be or had been changes in organization and staffing by DOE at Rocky Flats?

A. They hadn't been made. He saw the need for them.

Q. And did he indicate that he intended to make those changes?
A. He implied that, as I recall.
Q. Do you know whether they did that? "They" being DOE.
A. They made some changes, yes.
Q. Did anyone from Rockwell in that meeting or at any other time for that matter express disagreement or objection to the Department of Energy making changes in its management?
A. I'm sure we did not.
Q. Or in its organization at Rocky Flats?
A. I don't recall.
Q. Was anything else discussed in the meeting that you can now recall?
A. No.
Q. Was there any discussion in that meeting of Rockwell's award fees for operating Rocky Flats?
A. Not that I recall. If there was, it would have been an assertion on my part that the -- that we believed we were receiving the highest award fees and were very proud of it. And I would have brought that up only in the context of Rockwell's view that our performance under our contract had been exemplary.
Q. Do you recall that that actually occurred, or

Beall, that it's my understanding the meeting took place on June 23rd. I think that was a Friday. Exhibit 304, Plaintiff's 304, is, as I said, dated June 17th, 1989. And direct your attention to the first paragraph and third paragraph on the first page. Have you had a chance to look at those paragraphs?

A. Yeah, I have.

Q. They report that the Department of Energy, specifically Henson Moore, the Deputy Energy Secretary, said that the Department of Energy was suspending bonus payments for good performance by Rockwell International Corporation at Rocky Flats. Do you recall the occurrence of that press conference?

A. I do now that I see this. But I didn't recall that.

Q. So Exhibit 304 refreshes your recollection about that conference? You were aware of that --

A. I don't really recall the conference, honestly. I recall having been aware of this now that you bring this up.

Q. Do you recall in this time frame the Department of Energy stating that it was suspending bonus payments to Rockwell?

A. I hadn't recalled that until you raised it and I see in this.

Q. I guess what I'm trying to get at, Mr. Beall, do you have your own recollection of that now that you've seen Exhibit 304? Or are you simply looking at 304 and telling me that you believe this occurred?

A. No. I recall it. I believe that occurred.

Q. Did you have any discussions with anyone at Rockwell about that? And by "that" I mean the suspension of bonus payments by the Department of Energy in this time frame.

A. I don't recall specific discussions. So I'd be speculating.

Q. That's fine.

A. I'm sure I did, but I don't recall.

Q. That's fine. Thank you.

A. And I should point out, I realize award fees are part of a major issue in this undertaking. My focus at that time, this would not have been a major issue in my mind. It would be, "Let's get to the bottom of these allegations. Let's find out what the facts are and take appropriate action in serving our customer."

Q. You've testified to one meeting you had with Admiral Watkins and Henson Moore regarding the Rocky Flat situation in this relative time frame. Did you have any other meetings besides that one?

MR. NEY: With whom?

time, September 18th, 1989?
MR. NEY: In contrast to what he might have said at this meeting?
BY MR. KOLAR:
Q. Mr. Beall, I'm asking you now your position as opposed to the specific words said.
A. Well, we were certainly -- I certainly wasn't expressing the idea that Rockwell wanted to get out of this contract. What we were talking about is the impediments that Rockwell saw to performance because of the issues that ultimately were stated in the lawsuit. And I also recall the discussion related to the quality of Rockwell's people performing the work at Rocky Flats, particularly the top management.
Q. That's the issue you referred to earlier --
A. Right. It is.
Q. -- in which you disagreed with the Admiral; is that correct?
A. That's correct. And this, in all fairness, we had a difference of opinion.
Q. So that's correct as far as you can recall?
A. Right.
Q. I'd like you to look at the third paragraph on page 2. "Beall responded that he agreed with the Admiral's views and was committed to bringing that new

culture to Rocky Flats. His policy was to stay on the job and" quote, "do it right," unquote. Do you have an understanding of what's meant there by "new culture?" I realize you didn't write that.

A. No. But I recall the environment. The Admiral felt that there had been -- well, first, running these flats is a complicated national endeavor, as any major undertaking of this sort would be. And he felt that there was undue priority on production versus the environment and safety and wanted to have added emphasis -- he wanted to have greater emphasis, he wanted the culture of the institution of everybody involved to be focused more on environmental and safety concerns and then production.

And he felt that there wasn't that balance. And I was happy to see us accommodate our customer, if that's the direction he wanted to go. I had no feeling -- I should say clearly -- that anything Rockwell had done had less than complete focus on safety.

You know, we built a space shuttle. We built the B-1 Bomber. We built Apollo. Rockwell felt it was bringing a very competent program, management disciplines and skills and people to this undertaking at Rocky Flats. And I had no problem if he wants to relatively change priorities.

I also knew that if they did they'd have to put a lot more money into it, because there were areas where not this -- they were safety issues, where I had been told that the DOE would have to spend a lot more money in areas where we had recommended they do to deal with some of these issues.

So anyway, those are -- I mean, I had that general sense at that time.

Q. So I take it from your testimony that this memorandum attributing the view -- or attributing the statement to you that you were committed to bringing the new culture to Rocky Flats is basically accurate?

A. I'd say that's basically accurate. I think the rest of this paragraph is basically accurate, too. I was expressing a strong feeling of support for the professionalism and quality and experience of the top management people that Rockwell had there. And if the Admiral didn't feel that those people would get the job done, maybe he ought to get somebody else.

Q. Did there come a time when Rockwell told DOE that it would suspend operations at Rocky Flats?

A. Yes. Prior to this.

Q. Prior to this. And what do you recall about that more specifically?

A. Well, for the same reasons that ultimately

from myself to Secretary Watkins dealing with a management plan for Rocky Flats plant operation improvements that was submitted to our customer.

Q. Was this essentially in response to Admiral Watkins' concerns that the management at Rocky Flats on Rockwell's part was not strong enough?

A. I think it was submitted in concern that the combined DOE and Rockwell management could use some areas of improvement. And this was our part of it.

MR. KOLAR: I'd like to mark this as Exhibit 106.

(Exhibit Number 106 was marked for identification by the reporter and is attached hereto.)

BY MR. KOLAR:

Q. This is a letter to you from Admiral Watkins dated August 25th, 1989. Do you recall receiving this letter?

A. I do now.

Q. In the paragraph that begins on page 1 and extends over to page 2, Admiral Watkins is informing you that he's reorganized the line management at Rocky Flats to provide that the staff of the Rocky Flats area office will report to the assistant secretary for defense programs to ensure to more effectively oversee and support Rocky Flats operations. Do you see that?

A. Uh-huh.
Q. After receiving this letter and being so advised, did you object to this management change on DOE's part?
A. Not really. They're our customer. They can organize the staff as they see fit.
MR. KOLAR: This will be Defendant's 107.
(Exhibit Number 107 was marked for identification by the reporter and is attached hereto.)
MR. NEY: Okay.
BY MR. KOLAR:
Q. Mr. Beall, what is Defendant's 107?
A. It is a letter to Admiral Watkins, transmittal letter I guess you'd say, commenting on the public disclosure of an affidavit that the government used to obtain a search warrant for the Rocky Flats plant so-called raid. And it's commenting that Rockwell had completed its investigation of the more sensational allegations and had found them to be unfounded. And it was asking the Justice Department to make public the information which it claims supported those allegations in the first place. And if the government has information, you know, that there is some health and safety risk that it hadn't disclosed, that we felt that they should