ELECTRONICALLY FILED ON AUGUST 28, 2006

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 91-1362 C<br>(Judge Lettow) |

**PLAINTIFF'S MEMORANDUM IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION <u>TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ........ ii

I. PRELIMINARY STATEMENT ........ 1

II. ARGUMENT ........ 4

A. Defendant's Non-Breach Theory Is Both Unreasonable and Inconsistent with the Stipulation and Contemporaneous Documents ........ 4

1. The Government's Interpretation Is Unreasonable and Contrary to the Parties' Intent ........ 6

2. The Government's Interpretation Elevates General and Tangential Contract Provisions over Specific Ones ........ 8

3. The Government's Interpretation Contradicts the Government's Own Stipulation ........ 10

4. The Government's Current Interpretation Is Inconsistent with Contemporaneous Documents ........ 11

5. Defendant's Allegations About Mr. Twining Are Nothing More than Defendant's Barred Impossibility/Justification Defense ........ 12

B. This Court Has Power to Review Rockwell's Breach of Contract Claims ........ 14

C. The Government's Breach of Contract Damaged Rockwell ........ 16

D. The Government's Defense of Waiver Is Barred and, in Any Event, Insufficient as a Matter of Law ........ 22

1. This Court Barred the Government's Waiver Defense ........ 22

2. In Any Event, There Was No Waiver ........ 25

III. CONCLUSION ........ 30

## TABLE OF AUTHORITIES

### CASES

Page

*200 E. 87th St. Assocs. v. MTS, Inc.*,
793 F. Supp. 1237 (S.D.N.Y.), *aff'd*, 978 F.2d 706 (2d Cir. 1992) ....26

*A Olympic Forwarder, Inc. v. United States*, 33 Fed. Cl. 514 (1995) ....28

*Abraham v. Rockwell Int'l Corp.*, 326 F.3d 1242 (Fed Cir. 2003)....19, 20

*Am. Shipbuilding Co.*, 61-1 BCA ¶ 3046 (ASBCA May 12, 1961) ....15

*Arizona v. United States*, 575 F.2d 855 (Ct. Cl. 1978) ....7, 11

*Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173 (2005)....16

*Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*,
767 F. Supp. 363 (D. Mass. 1991) ....27

*Brazos Elec. Power Coop., Inc. v. United States*, 52 Fed. Cl. 121 (2002) ....17, 18

*In re Briggs Transp. Co.,* 780 F.2d 1339 (8th Cir. 1985)....18

*Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854 (Fed. Cir. 1997)....16

*Cent. Kan. Credit Union v. Mut. Guar. Corp.*, 102 F.3d 1097 (10th Cir. 1996)....14

*City of Gettysburg, S.D. v. United States*, 64 Fed. Cl. 429 (2005) ....23

*CW Gov't Travel, Inc. v. United States*,
61 Fed. Cl. 559 (2004), *recons. denied*, 63 Fed. Cl. 459 (2005) ....11

*G. L. Christian & Assocs. v. United States*, 312 F.2d 418 (Ct. Cl. 1963)....18

*George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229 (2005)....15, 16

*Gould, Inc. v. United States*, 935 F.2d 1271 (Fed. Cir. 1991) ....6, 7

*Hanson v. Fid. Mut. Ben. Corp.*, 13 A.2d 456 (Del. Super. Ct. 1940) ....24

*Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51 (1984)....23

*Hercules Inc. v. United States*, 49 Fed. Cl. 80 (2001),
*aff'd*, 292 F.3d 1378 (Fed. Cir. 2002) ....23

*Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409 (2003), *rev'd on other grounds, Tesoro Haw. Corp. v. United States*, 405 F.3d 1339 (Fed. Cir. 2005) ....26

TABLE OF AUTHORITIES

CASES

Page

*Hills Materials Co. v. Rice*, 982 F.2d 514 (Fed. Cir. 1992)....................8

*Hirsch v. United States*, 499 F.2d 1248 (Ct. Cl. 1974)....................16

*Hosp. Prods., Inc. v. Sterile Design, Inc.*,
734 F. Supp. 896 (E.D. Mo.), *aff'd*, 923 F.2d 859 (8th Cir. 1990)....................24, 27

*Landmark Land Co. v. FDIC*, 256 F.3d 1365 (Fed. Cir. 2001)....................8

*Lone Mountain Prod. Co. v. Natural Gas Pipeline Co. of Am.*,
710 F. Supp. 305 (D. Utah 1989), *aff'd,* 984 F.2d 1551 (10th Cir. 1992)....................27, 29

*Loyola Univ. v. Humana Ins. Co.*, 996 F.2d 895 (7th Cir. 1993)....................25

*Lyon Dev. Co. v. Bus. Men's Assurance Co. of Am.*, 76 F.3d 1118 (10th Cir. 1996)....................27, 28

*Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226 (Fed. Cir. 1997)....................18

*Melrose Assocs., L.P. v. United States*, 43 Fed. Cl. 124 (1999)....................23

*Midwest Petroleum Co. v. Am. Petrofina, Inc.*, 603 F. Supp. 1099 (E.D. Mo. 1985)....................24

*Mooney v. City of New York*, 219 F.3d 123 (2d Cir. 2000)....................26

*NI Indus., Inc. v. United States*, 841 F.2d 1104 (Fed. Cir. 1988)....................15

*N.Y. Shipbuilding Corp. v. United States*, 385 F.2d 427 (Ct. Cl. 1967)....................6, 16, 22

*Orange Cove Irrigation Dist. v. United States*, 28 Fed. Cl. 790 (1993)....................18

*RCS Enters. v. United States*, 53 Fed. Cl. 303 (2002)....................15

*Rockwell Int'l Corp.*, 02-2 BCA ¶ 32,018 (DOEBCA Oct. 31, 2001),
*aff'd on other grounds*, *Abraham v. Rockwell Int'l Corp.*,
326 F.3d 1242 (Fed. Cir. 2003)....................19, 20

*S. Cal. Edison Co. v. United States*, 43 Fed. Cl. 107 (1999),
*rev'd on other grounds,* 226 F.3d 1349 (Fed. Cir. 2000)....................23

*Seaboard Lumber Co. v. United States*, 308 F.3d 1283 (Fed. Cir. 2002)....................14

*Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664 (7th Cir. 2004)....................26, 28

*United States v. Adams*, 74 U.S. 463 (1868)....................12, 13

TABLE OF AUTHORITIES

CASES

Page

*United States v. Amwest Sur. Ins. Co.*, 54 F.3d 601 (9th Cir. 1995)........26

*Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795 (Fed. Cir. 2002)........3

*Vassar v. United States*, 63 Fed. Cl. 166 (2004)........3

*Wright v. Wagner*, 34 A.2d 441 (Md. 1943)........24

STATUTES

28 U.S.C. § 2514........1

41 U.S.C. § 605(a)........15

41 U.S.C. § 609(a)........15

42 U.S.C. § 7132(a)........5

42 U.S.C. § 7342........5

OTHER

Black's Law Dictionary (8th ed. 2004)........4-5

Restatement (Second) of Contracts § 347 (1981)........17

Restatement (Second) of Contracts § 347 cmt. a (1981)........17

30 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 77:1 (4th ed. 2004)........14

The government submitted a memorandum dated July 27, 2006, both in opposition to Rockwell's motion for summary judgment and in support of the government's cross-motion for summary judgment ("Gov. Br."). Rockwell submits this memorandum in reply to the government's opposition to Rockwell's motion and in opposition to the government's cross-motion.

## I. PRELIMINARY STATEMENT

This 15-year old case is now ready to be decided.

For most of those 15 years, the government described its "main defense" as follows:

> The Government's main defense to Rockwell's claim here is that Rockwell's violations of the environmental laws, and certain misrepresentations that Rockwell made to DOE to cover up its environmental noncompliance, constituted breaches of the Contract, which estop it from recovering against DOE on its theory that the wrong official made the award fee decisions. (See Answer, ¶ 40, asserting affirmative defense of estoppel.)

Pl. Ex. 28 at 3; *see also* Pl. Ex. 29 at 6.[1]

The government has now dropped its "main defense." Gov. Br. at 4 n.3.

The government caused this case to be stayed for almost 8 years in favor of the *Stone* FCA case because it was going to obtain a common law fraud judgment in *Stone* which would establish its special plea in fraud defense, 28 U.S.C. § 2514, here. The government,

---

[1] References to "Pl. Ex. __" refer to the exhibits attached to the Declaration of Richard J. Ney in Support of Plaintiff's Motion for Summary Judgment, filed May 31, 2006. References to "Pl. Supp. Ex. __" refer to the exhibits attached to the Declaration of Richard J. Ney in Further Support of Plaintiff's Motion for Summary Judgment, filed concurrently herewith.

however, having successfully achieved a stay here, withdrew its common law fraud claim in *Stone* before the jury could even rule on it.

The government has now also dropped its special plea in fraud defense here. Gov. Br. at 4 n.3.

In lieu of the dropped defenses, the government makes four arguments, some, if not all, of which are newly minted. First, the government argues that there was no contract breach. It contends that the contract provision that Rockwell's award fees "be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations)" permitted award fees to be determined by any DOE contracting officer, in this case, Admiral Watkins, even though there was in existence a Manager of Albuquerque Operations. The government's theory is both contrary to the provision's ordinary meaning and inconsistent with the provision's admitted purpose, the government's September 22, 1993, Stipulation and contemporaneous (1989) documents. The argument is entirely pretext.

Second, the government argues that because award fees are determined subjectively by the AFDO, this Court is precluded from reviewing them. The argument is specious. Rockwell is not challenging the AFDO's award fee determinations. Rather, it is seeking damages measured by the AFDO's determinations. In addition, the contract contained numerous provisions detailing the procedure by which award fees were to be determined. Rockwell's claim is based on DOE's breach of those contract procedures -- DOE headquarters breached the contract when it, and not the contractually designated AFDO, made the award fee determinations. Surely, this Court can remedy a contract breach.

Third, the government contends that even if it did breach the contract, the breach caused no damages because Rockwell received just what it bargained for. Rockwell

bargained for award fees determined by the AFDO, the Manager, Albuquerque Operations. The AFDO determined Rockwell's award fees, but Rockwell was paid a lesser amount by DOE headquarters. The difference between what Rockwell was entitled to and the lesser amount that it received is classic damage. The claim that headquarters' evaluation was superior to the AFDO's is not only beside the point, but fails to grasp that the headquarters evaluation was infected by the publicity and politics resulting from an FBI/EPA raid grounded, as found by other tribunals, on discredited and baseless allegations.

Fourth, the government argues that its contract breach was waived by Rockwell's alleged acquiescence. This Court previously barred this defense unless the government showed that its waiver defense is "embrace[d]" by its estoppel defense. This, the government cannot do. Estoppel requires detrimental reliance; waiver does not. The government has no evidence that Rockwell's purported acquiescence induced DOE headquarters into determining Rockwell's award fees and breaching the contract. The defense, therefore, is barred by the Court's prior Order. In any event, the defense is insufficient on the merits. The government does not even come close to showing that Rockwell clearly and unequivocally intended to waive its contract right to have award fees decided by the AFDO.

After all these years, the principal remaining issue is one of contract interpretation -- construing the provision that award fees are to "be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations)." "Issues of contract interpretation are questions of law, which are properly resolved on motions for summary judgment." *Vassar v. United States*, 63 Fed. Cl. 166, 169 (2004); *see also Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002) ("Contract interpretation is a question of law generally amenable to summary judgment.").

The other issues -- does the Court have power to review Rockwell's claim; assuming breach, was Rockwell damaged; and is defendant's waiver defense "embrace[d]" by its estoppel defense -- are quintessential questions of law also readily susceptible to summary judgment disposition.

## II. ARGUMENT

### A. Defendant's Non-Breach Theory Is Both Unreasonable and Inconsistent with the Stipulation and Contemporaneous Documents

The contract provides that "[t]he amount of the award fee actually to be paid to the Contractor shall be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations) in accordance with the provisions of subparagraph (b)(2) of this clause." *See* Pl. Ex. 3 at 2 (clause 62(b)(1)); *see also id.* at Attach. A, page 1 of 9 ("The Award Fee Determination Official (Manager or anyone acting as Manager, Albuquerque Operations) (AFDO) shall evaluate the Contractor's performance during each evaluation period and will determine the amount of award fee to be paid the Contractor for that evaluation period.").

The meaning of these provisions is plain: (1) if there is a Manager of Albuquerque Operations, he or she shall serve as the AFDO and (2) if the position of Manager of Albuquerque Operations is vacant (*e.g.,* due to retirement or disability), the individual performing the Manager's duties (*i.e.,* "acting as Manager, Albuquerque Operations") shall serve as the AFDO.[2] Bruce Twining was the Manager of Albuquerque Operations at all

---

[2] Interpreting "acting as Manager" as arising only when there is no existing Manager is consistent with the plain meaning of "acting" and the ordinary usage of the word "acting" in procedures governing the appointment of DOE's own officers. *See, e.g.,* Black's Law

(cont'd on following page)

relevant times. Thus, by operation of the contract, he was also the AFDO. When DOE headquarters "mandated" award fees lower than those determined by the AFDO and "caused the AFDO to issue" final award fees "determined by DOE headquarters" (*see* Pl. Ex. 5, Stipulation, ¶¶ 6-8, 10-12), it breached the contract. *See* Pl.'s Mot. for Summ. J. and Mem. in Supp. Thereof ("Moving Br.") at 21-25.[3]

After stipulating 13 years ago that the AFDO was the Manager of Albuquerque Operations (89/1 Period) and the Manager of the Rocky Flats Office (89/2 Period) and that DOE headquarters, and not the AFDO, determined Rockwell's award fees (*see* Pl. Ex. 5, Stipulation, ¶¶ 1, 6-12), the government now scrambles to argue that there was no breach because Secretary Watkins and "DOE Headquarters' officials of his choosing" had replaced these officials as the AFDO (*see* Gov. Br. at 1-2; *see also id*. at 17, 19, 22-24). Under the

---

(cont'd from previous page)

Dictionary 27 (8th ed. 2004) ("**acting**, *adj*. Holding an interim position; serving temporarily <an acting director>."); 42 U.S.C. § 7342 (providing for interim appointments for individuals "to act in such office until the office is filled as provided in this chapter. While so acting such persons shall receive compensation at the rates provided by this chapter for the respective offices in which they act."); *cf*. 42 U.S.C. § 7132(a) ("The Deputy Secretary shall act for and exercise the functions of the Secretary during the absence or disability of the Secretary or in the event the office of Secretary becomes vacant.").

[3] For the 89/2 Period, Mr. Twining delegated his authority as AFDO to David Simonson (and, later, to Robert Nelson), Manager of the Rocky Flats Office. *See* Pl. Supp. Ex. 37 (memorandum from B. Twining to D. Simonson, Oct. 13, 1989). Although Rockwell initially alleged and continues to believe that that delegation was in breach of contract, *see* Compl. ¶ 27, Rockwell is not pursuing that breach because no damages resulted. Rockwell accepts the award fee determined by Mr. Simonson. The award fee Rockwell received for the 89/2 Period, however, was determined by DOE headquarters and mandated by DOE headquarters to be issued by Mr. Nelson. *See* Pl. Ex. 5, Stipulation, ¶¶ 11, 12.

government's proposed reading, the AFDO could be (1) the Manager of Albuquerque Operations or -- regardless of whether there was a Manager of Albuquerque Operations -- (2) "any official of DOE carrying out the same functions as Mr. Twining with respect to the subject matter in question." *See id.* at 17-19. This strained reading is inconsistent with the provision's intent, the government's own Stipulation and contemporaneous documents.

1. The Government's Interpretation Is Unreasonable and Contrary to the Parties' Intent

The parties bargained for award fees to "be determined subjectively" and "agreed upon a special officer--not any individual designated by the Government--for this important duty." *See* Pl. Ex. 3 at 3 (clause 62(b)(2)); *N.Y. Shipbuilding Corp. v. United States*, 385 F.2d 427, 433-34 (Ct. Cl. 1967). Yet, the government contends that when DOE headquarters disagreed with the AFDO's award fee determinations (*see* Pl. Ex. 5, Stipulation, ¶¶ 6, 10), the contract allowed the Secretary to designate someone other than the Manager of Albuquerque Operations as a new AFDO by "investing that authority in himself . . . or in others of his choice" (*see* Gov. Br. at 17). This remarkable reading makes meaningless the contract's vesting a special official (the Manager of Albuquerque Operations) with authority and discretion to determine award fees. *See, e.g.,* Pl. Ex. 3 at Attach. A, page 2 of 9 ("Final award fee determination shall be made by the AFDO."); *see generally id.* at 2-3 (clauses 62(b)(1) and 62(b)(2)) and Attach. A, pages 1 and 2 of 9 (outlining duties of "*[t]he* Award Fee Determination Official") (emphasis added). Contract interpretation which renders a provision "useless" or "meaningless" should be avoided. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

The government's interpretation also eviscerates the government's own view of Rockwell's purpose in "bargaining for a contract provision limiting decision-making to a

specified, local government official." *See* Gov. Br. at 27. According to the government, "[t]he rationale of the process for which Rockwell bargained was to have award fees determined by persons with close, on-the-ground knowledge of Rockwell's performance." *Id*. But Defendant asserts, nonetheless, that the contract permitted the Secretary to designate himself, or others of his choice, as AFDO whenever he felt it was warranted. *See, e.g., id*. at 2, 20-23. Under that construction, DOE could appoint an AFDO lacking "close, on-the-ground knowledge of Rockwell's performance," thereby nullifying Rockwell's "bargain" and achieving an unreasonable result.

"'[P]rovisions of a contract must be so construed as to effectuate its spirit and purpose . . . an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.'" *Gould*, 935 F.2d at 1274 (quoting *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)). The contract reflects the parties' agreement that one official, the Manager, Albuquerque Operations, make a final subjective determination as to award fees. The government's interpretation is incompatible with that agreement because it permits any number of persons in addition to the Albuquerque Operations Manager, regardless of their "on-the-ground knowledge of Rockwell's performance," to qualify and serve as AFDO at the Secretary's discretion. Basic rules of contract construction require that the contract be construed so that Rockwell bargained for something, not nothing.

In contrast, Rockwell's interpretation is the far more reasoned one because it is consistent with customary usage and the provision's admitted purpose, while giving DOE the

flexibility to designate a new AFDO by changing the occupant of the position of Manager of Albuquerque Operations.

2. The Government's Interpretation Elevates General and Tangential Contract Provisions over Specific Ones

Defendant's proposed reading of the contract disregards the "well established" rule "that when interpreting a contract, a specific provision will dominate a general provision." *See Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1376 (Fed. Cir. 2001) (citing *Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed. Cir. 1992) ("Where specific and general terms in a contract are in conflict, those which relate to a particular matter control over the more general language.")). In arguing "that the award fee could be determined by any duly designated contracting officer(s) acting in the function of Manager, Albuquerque--not one official only, Mr. Twining," the government hones in on references to "[t]he Contracting Officer" in clauses 62(a) and 84(b)(5) of the contract. *See* Gov. Br. at 19. Defendant misplaces its reliance on both of these clauses.

Clause 62(a), entitled "Compensation for Contractor's Services," does not purport to deal with the determination of award fees directly. That subject is covered specifically by the aptly-entitled clauses "Base Fee and Award Fee" and "Determination of Award Fee," which follow immediately after clause 62(a), and by Appendix D, entitled "Award Fee Plan." *See* Pl. Ex. 1 at 130-32 and App. D; Pl. Ex. 3 at 2-4 and Attach. A. In contrast to these specific provisions, clause 62(a) contains no instruction as to the determination of award fees. *Compare* Pl. Ex. 1 at 130 (clause 62(a)) *with id.* at 130-32; *id.* at App. D; Pl. Ex. 3 at 2-4; *and* Pl. Ex. 3 at Attach A. Indeed, clause 62(a) explicitly refers the parties to the provisions that *follow* for the procedures for determining award fees. *See* Pl. Ex. 1 at 130 (clause 62(a), referencing "the award fee as may be determined by the Contracting Officer,

*as hereinafter provided*") (emphasis added).[4] The provisions which follow (clauses 62(b)(1) and (b)(2)) explicitly refer to the AFDO. In any event, clause 62(a) does not help Defendant's contention that the AFDO was not limited to Mr. Twining because, in addition to being the contractually designated AFDO, Mr. Twining was also the Contracting Officer for the 1989 Contract. *See, e.g., id.* at 184; Pl. Ex. 3 at 4.

Clause 84(b)(5) is another red herring. This provision relates to proration of award fees in the event of contract termination during an award fee evaluation period. *See* Def. Ex. 6 at 175, 178 ("The Contracting Officer shall then determine the portion, if any, of the prorated maximum available award fee which shall be awarded to the Contractor for the evaluation period, or part thereof, which ends on the effective date of termination."). This has nothing to do with the two award fees at issue, which cover the period October 1, 1988, to September 30, 1989. Although the parties agreed to transfer Rockwell's responsibilities to a successor contractor effective January 1, 1990, this did not affect the determination of award fees for periods prior to October 1, 1989. *See* Pl. Supp. Ex. 38, Mod. No. A140, Oct. 23, 1989, at 1-3.

---

[4] "[A]s hereinafter provided" relates to the determination of award fees and not to "Contracting Officer," as "Contracting Officer" is defined in a clause that *precedes* clause 62(a). *See id.* at 2 (clause 1(b)).

3. The Government's Interpretation Contradicts the Government's Own Stipulation

The government should not be permitted to run away from its 13-year old Stipulation.[5] According to the government's Opposition, Secretary Watkins and "DOE Headquarters' officials of his choosing" were the AFDOs. *See* Gov. Br. at 2, 4, 17, 19, 23. But the Stipulation says nothing to that effect. To the contrary, it explicitly identifies DOE's Manager of Albuquerque Operations as the one and only AFDO for the 89/1 Period and DOE's Manager of the Rocky Flats Office as the one and only AFDO for the 89/2 Period. *See* Pl. Ex. 5, Stipulation, ¶¶ 1, 9.[6]

The Stipulation belies the government's current interpretation in another important respect. In its Opposition, the government argues that the AFDO and DOE headquarters were one and the same. Yet, in paragraph after paragraph of the Stipulation, the government makes clear that the AFDO was *distinct from* "DOE headquarters." *See* Pl. Ex. 5, Stipulation, ¶¶ 1, 9 (the AFDO "forwarded his conclusion to DOE headquarters"); *id.* ¶ 2

---

5 The government repeatedly refers to the AFDO's award fee determinations as merely "recommendation[s]." *See, e.g.,* Gov. Br. at 9-11, 15; Def.'s Proposed Findings of Uncontroverted Fact ¶¶ 51-58, 61. Defendant originally proposed that the Stipulation characterize the AFDO's determinations as "recommendation[s]" (Pl. Supp. Ex. 39, letter from J. Kolar to R. Ney, Apr. 21, 1993, encl. ¶¶ 1, 9), but Rockwell rejected that proposal (Pl. Supp. Ex. 40, letter from R. Ney to J. Kolar, May 20, 1993). The Stipulation, as executed by government counsel, says that the AFDO "concluded" Rockwell's award fees for the 89/1 and 89/2 Periods. Pl. Ex. 5, Stipulation, ¶¶ 1, 9. The government is bound by the Stipulation and cannot now backtrack in resisting summary judgment.

6 Tellingly, while the government takes great pains to argue that Mr. Twining was displaced due to a conflict of interest or lack of impartiality (*see* Section II.A.5, *infra*), the government has not shown -- or even asserted -- similar grounds for DOE's displacement of Mr. Simonson as the AFDO for the 89/2 Period. Mr. Simonson was even an appointee of Secretary Watkins. *See* Gov. Br. at 14.

("DOE headquarters advised the AFDO that it did not concur in his conclusion that the award fee should be $5,176,482"); *id.* ¶ 6 ("DOE headquarters determined that the award fee . . . for the 89/1 period initially arrived at by the AFDO in May 1989 . . . [was] too high."); *id.* ¶ 7 ("DOE headquarters mandated that the award fee for Plant Operations for the 89/1 period be $2,716,624, and caused the AFDO to issue a final award fee determination in that amount."); *id.* ¶ 10 ("DOE headquarters determined that both the [award fees] for the 89/2 period that were forwarded by the AFDO were too high."); *id.* ¶ 11 ("DOE headquarters mandated that the award fee for Plant Operations for the 89/2 period be $1,241,604, and the award fee for PRMP/PROVE be $338,035, and caused the AFDO to issue a final award fee determination in those amounts."). The Stipulation is entirely at odds with the government's non-breach argument and vividly shows that the argument is pretext.

4. The Government's Current Interpretation Is Inconsistent with Contemporaneous Documents

"The parties' contemporaneous construction of an agreement, before it has become the subject of dispute, is of course entitled to great weight in its interpretation." *Arizona*, 575 F.2d at 863; *see also CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 571 (2004) ("The contemporaneous interpretation of the parties, during contract performance and before interpretation of the contract became a subject of controversy, is of great, if not controlling, weight."), *recons. denied*, 63 Fed. Cl. 459 (2005).

Here, the record is devoid of any proof that the Secretary removed Mr. Twining from the position of AFDO and transferred that role to himself and others.[7] For example, Defendant submits no documents identifying Secretary Watkins or any other DOE headquarters official as the AFDO. Instead, the evidence shows that DOE headquarters (and Mr. Twining himself) treated Mr. Twining as the AFDO. *See, e.g.,* Pl. Ex. 9, memorandum from J. Meinhardt to B. Twining, Sept. 20, 1989 (attaching, for Twining's signature, draft letter stating, "I hereby determine" Rockwell's award fees for the 89/1 Period); Pl. Supp. Ex. 37, memorandum from B. Twining to D. Simonson, Oct. 13, 1989 (delegating AFDO authority from Twining to Simonson for the 89/2 Period). These documents, the parties' intent, the Stipulation and Defendant's conspicuous absence of proof demonstrate that the government's interpretation of the contract today is not consistent with its actions in 1989.

5. Defendant's Allegations About Mr. Twining Are Nothing More than Defendant's Barred Impossibility/Justification Defense

The government refers to the Secretary's "inherent" and "plenary authority" (Gov. Br. at 16, 20) and quotes at length from *United States v. Adams*, 74 U.S. 463, 477 (1868), for the unremarkable proposition that an agency secretary has power to suspend payments on contracts as "an indispensable step to prevent the consummation of the frauds" (*see* Gov. Br. at 23; 74 U.S. at 477). But this case is not about the power of a secretary, whether it is the Secretary of War in *Adams* suspending payments under civil war contracts or the Secretary of Energy taking award fee responsibilities away from the contractually-designated AFDO.

[7] Of course, even if Defendant could show that the Secretary named himself the AFDO in 1989 and therefore acted consistently with Defendant's current interpretation, there would still be a breach of contract for the reasons set forth in Sections II.A.1, 2 and 3, *supra*.

Rather, the issue here is whether the exercise of that power constitutes a contract breach and, if so, how to compensate the contractor. Indeed, the Supreme Court in *Adams* found it "commendable in the secretary" for establishing a board of commissioners, thereby "affording an immediate opportunity to the claimants to exhibit their claims, and establish their justice and integrity." *Adams*, 74 U.S. at 478. Here, the Secretary's exercise of power breached Rockwell's contract, and Rockwell is entitled to be compensated for its loss.

Defendant seeks to justify that breach on the ground that "Mr. Twining might have been acting dishonestly." *See* Gov. Br. at 24; *see also id*. at 23 ("[T]he head of the agency concluded that any decision by Mr. Twining . . . might be tainted by a real or apparent conflict of interest or lack of impartiality."). But if "well-grounded suspicions" existed about Mr. Twining's character (*see id*. at 24), why did DOE allow him to continue as Manager of Albuquerque Operations or determine other contractors' award fees (*see* Pl. Ex. 8, Def.'s Second Am. Answer, ¶ 64; Pl. Supp. Ex. 41, memorandum from T. Wade II to Manager, Albuquerque Operations Office, June 21, 1989)? The government's actions in 1989 are inconsistent with the government's advocacy in 2006.

In any event, the assertions about Mr. Twining (*see* Gov. Br. at 1, 17, 19-20, 22-24) are nothing more than an attempt to resurrect the proposed impossibility/justification affirmative defense this Court denied the government leave to assert in its second amended answer. *See* Pl. Ex. 32, Opinion and Order, Mar. 10, 2006, at 13. Although the Court permitted Defendant to pursue the theory that estoppel embraces impossibility and justification, it also cautioned Defendant that "[d]ifferences in the scope and effect of these defenses are readily apparent." *See id*. at 14, 14 n.10. Rockwell addressed these differences

in its motion papers (*see* Moving Br. at 37-38), but the government has not responded to the argument in its Opposition and, therefore, has appropriately dropped the defense.

Indeed, by raising, albeit in disguised form, its impossibility/justification defense, the government is conceding the very existence of a contract breach. *See Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294 (Fed. Cir. 2002) ("the doctrine of impossibility of performance 'excuses delay or nonperformance of a contract'") (quoting *Hercules Inc. v. United States*, 24 F.3d 188, 204 (Fed. Cir. 1994)); *Cent. Kan. Credit Union v. Mut. Guar. Corp.*, 102 F.3d 1097, 1103 (10th Cir. 1996) ("impracticability of performance is properly raised *only* as an excuse for a party's *nonperformance* of a contractual obligation") (first emphasis added); 30 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 77:1, at 278 (4th ed. 2004) ("[i]mpossibility is a common law contract doctrine that excuses what would otherwise be a breach of contract").

B. This Court Has Power to Review Rockwell's Breach of Contract Claims

Defendant argues that this Court is powerless to review the parties' dispute over award fees. *See, e.g.,* Gov. Br. at 25 ("Because the fees are at the Government's option, the merits of award fee decisions are not reviewable."); *see generally id.* at 24-26. This proposition is frivolous and fails in two respects. First, Rockwell is not challenging the AFDO's award fee determination in either of the award fee periods at issue. Rather, Rockwell seeks damages measured by the AFDO's award fee determinations. *See* Moving Br. at 7-10.

Second, the government errs in suggesting that the award fee determination was "entirely within the Government's discretion." *See* Gov. Br. at 24. The contract required that several procedures be followed in determining award fees. *See* Pl. Ex. 3 at 2-3 and Attach.

A. Rockwell's claims arise from DOE's breach of one of those contractual requirements, to wit, that award fees be determined by the AFDO, the Manager, Albuquerque Operations. That failure was a straightforward breach of contract, which this Court has the power to review. *See* 41 U.S.C. § 605(a) (establishing Contract Disputes Act coverage over "[a]ll claims by a contractor against the government relating to a contract"); 41 U.S.C. § 609(a) ("in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary"); *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 248 (2005) ("this court and boards of contract appeals have power to consider whether the agency acted illegally or followed improper procedures" in making discretionary fee determinations) (internal quotation marks omitted); *RCS Enters. v. United States*, 53 Fed. Cl. 303, 309 (2002) (plaintiff alleging failure to follow contractual requirement "remains free to challenge whether the contracting officer's decision was generally in accordance with the law and with other duties that the Government owed to the plaintiff"); *cf. NI Indus., Inc. v. United States*, 841 F.2d 1104, 1107 n.1 (Fed. Cir. 1988) (while "the Board had no authority to review the agency's determination, for example, that the proposed [value engineering change proposal] was not worthwhile," it "did have power to consider whether the agency . . . followed improper procedures"); *Am. Shipbuilding Co.,* 61-1 BCA ¶ 3046, at 15,762 n.3 (ASBCA May 12, 1961) ("failure to observe the ground rules laid down by the contract" rendered government's determination "subject to attack"); *id.* at 15,761-63 (rejecting government's contention that decision was not appealable because it was within sole discretion of official who rendered it).

The AFDO had some discretion in making award fees,[8] but the government had no discretion to choose an AFDO who was not the Manager of Albuquerque Operations. "That choice was locked into the agreement and became a contractual term." *N.Y. Shipbuilding*, 385 F.2d at 435.[9]

C. The Government's Breach of Contract Damaged Rockwell

Defendant next contends that "Rockwell did not suffer any legally cognizable damages." *See* Gov. Br. at 30; *see generally id.* at 26-30. Here, the government tries yet again to avoid the consequences of its Stipulation, which clearly sets forth Rockwell's damages. Under the contract, Rockwell was entitled to the AFDO's determination of award fees. *See* Pl. Ex. 3 at 2-3 (clauses 62(b)(1) and 62(b)(2)); *id.* at Attach. A, page 1 of 9. What it received instead were lower award fees "mandated" and "determined by DOE headquarters." *See* Pl. Ex. 5, Stipulation, ¶¶ 6-8, 10-12. None of this is disputed.

---

[8] Even that discretion was limited by the terms of the contract. *See* Pl. Ex. 3 at 3 ("The award fee shall be determined subjectively by the Award Fee Determination Official based on the Contractor's performance *in accordance with the Award Fee Plan set forth in Appendix D*.") (emphasis added).

[9] DOE's breach of an explicit contractual requirement sets Rockwell's claims apart from those in *Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854 (Fed. Cir. 1997) (cited in Gov. Br. at 25, 26). There the contractor challenged the conversion method used by the fee determining official, but the contract specified no particular conversion method. *See* 107 F.3d at 856-57. Defendant's other authorities (*see* Gov. Br. at 25, 26) are also distinguishable. *See George Sollitt*, 64 Fed. Cl. at 305-06 (concluding government's failure to consider contractor's self-evaluation prior to removing $70,000 from award fee pool was not improper because self-evaluation was late and fee determining official already had enough data to mandate zero award fee under the contract); *Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 183-87, 190 (2005) (bid protest case); *Hirsch v. United States*, 499 F.2d 1248, 1250 (Ct. Cl. 1974) (denial of promotion case).

The relief Rockwell seeks is a classical measure of damages. *Compare* Moving Br. at 7-10 (outlining Rockwell's entitlement to $5,333,606 in damages measured by difference between the award fees determined by the AFDO and the amount Rockwell actually received) *with* Restatement (Second) of Contracts § 347 (1981) ("the injured party has a right to damages based on his expectation interest as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency") *and* Restatement (Second) of Contracts § 347 cmt. a (1981) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed.").

On the issue of damages, Rockwell concurs with the analysis set forth in defendant's own authorities. This Court's opinion in *Brazos Electric Power Cooperative, Inc. v. United States*, 52 Fed. Cl. 121 (2002) (cited in Gov. Br. at 27) is particularly instructive, given the similarity in facts:

> The court agreed with plaintiff that the Government violated its contractual and statutory duties toward Brazos, because both federal law governing FFB loans and the contract between the parties provided that the prepayment decision resides with the "borrower." Brazos, not TU Electric, was the borrower of the Brazos FFB Note, and therefore only Brazos could decide to prepay. The Government allowed TU Electric to make that decision, however, and penalized Brazos for it in contravention of its contractual and statutory obligations.

52 Fed. Cl. at 123. Thus, in *Brazos*, as here, the contractor alleged breach of a contractual requirement that a particular determination be made by a particular authority. *See id.* In *Brazos*, this Court concluded that the proper measure of damages for the government's breach was the difference between the amount "plaintiff would have received" "[i]f the

Government had not breached its contract" and "the dollar value it actually received." *Id*. at 131. That is exactly what Rockwell seeks here.[10]

DOE's contract breach and the resulting damages are clear. Nonetheless, the government argues that "[e]ven if DOE Headquarters's actions in determining the award fees constituted a breach," Rockwell incurred no damages because it "received the benefit of its bargain through the process DOE Headquarters applied in assessing the award fees." Gov. Br. at 26-27. Nothing could be further from the truth.

On May 31, 1989, the AFDO, Mr. Twining, forwarded to DOE headquarters the award fee determinations for Rockwell and five other contractors. Def. Ex. 32. DOE headquarters held up the award fee to Rockwell because of the imminent June 6 surprise raid

---

[10] Other authorities cited by defendant also lend support to Rockwell's claim for damages. *See Orange Cove Irrigation Dist. v. United States*, 28 Fed. Cl. 790, 792, 796 (1993) (cited in Gov. Br. at 27) (concluding plaintiff was entitled to recover amount paid to government under protest following government's contractual breach); *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1234 (Fed. Cir. 1997) (cited in Gov. Br. at 27) (concluding government breached its obligations under the contract and was liable for damages); *Mass. Bay. Transp. Auth.*, 129 F.3d at 1232 ("No authority supports the theory that the government is not liable for breach of its contractual undertakings.").

The remaining decisions cited by the government are too distinguishable to be of relevance. *See G. L. Christian & Assocs. v. United States,* 312 F.2d 418, 423, 426, 427 (Ct. Cl. 1963) (cited in Gov. Br. at 27) (concluding plaintiff had no right to recover anticipated profits because, by operation of law, contract included convenience termination clause prohibiting recovery of anticipated but unearned profits); *In re Briggs Transp. Co.,* 780 F.2d 1339, 1349 (8th Cir. 1985) (cited in Gov. Br. at 28) ("What constitutes the bargain whose benefit should be protected *on the creditor's behalf* turns on factors which reveal the parties' reasonable expectations.") (emphasis added); *Briggs Transp.*, 780 F.2d at 1340 ("The issue before us is whether the concept of 'adequate protection' found in 11 U.S.C. §§ 361 and 362 (West Supp.1985) entitles undersecured creditors as a matter of law to interest payments from a debtor to compensate the creditors for lost opportunity costs due to the delay in reinvesting the collateral's liquidated value caused by an automatic stay.").

on the Plant and ensuing investigation. *See* Gov. Br. at 10. Mr. Twining, at the time, did not know about the raid. *See id.* at 5. After Secretary Watkins "was briefed on the contents of the search warrant affidavit," he "removed Mr. Twining from substantive oversight responsibility" of Rocky Flats, including Mr. Twining's contract obligation to determine Rockwell's award fees. *See id.* at 6; *see generally id.* at 9-14.[11]

The search warrant affidavit, however, was fatally flawed. Sadly, this flawed affidavit engendered enormous publicity and political fallout, causing and tainting "the process DOE Headquarters applied in assessing the award fees" (Gov. Br. at 27).

In *Rockwell International Corp.*, 02-2 BCA ¶ 32,018 (DOEBCA Oct. 31, 2001) ("*Rockwell/DOEBCA*"), *aff'd on other grounds*, *Abraham v. Rockwell Int'l Corp.*, 326 F.3d 1242 (Fed. Cir. 2003), the DOEBCA made several highly pertinent findings of fact concerning these events. For example, on June 6, 1989, "between 70 and 100 officers of the FBI, EPA and possibly other enforcement agencies arrived at the Plant, accompanied by a caravan of TV trucks." *Rockwell/DOEBCA* at 158,210 (¶ 17). While originally filed under seal, the search warrant affidavit was shortly thereafter "made public in conjunction with a news conference by the U.S. Attorney in Colorado." *Id.* at 158,211 (¶ 18).

"The affidavit contained a series of sensational and alarming allegations of environmental crimes" and "[e]arly press reports suggested that radioactive dust was possibly

---

[11] Because Mr. Twining was "removed . . . from substantive oversight responsibility," confined to "ministerial tasks[s]," and "tak[en] . . . out of the loop" concerning Rocky Flats (*id.* at 6, 7, 23), his later purported "comfort[]" with Mr. Goldberg's 89/1 Period award fee proposal (*see* Def.'s Proposed Findings of Uncontroverted Fact ¶¶ 58-61) cannot be tantamount to an independent decision of the AFDO.

being carried over the metropolitan Denver area." *Id*. (¶ 19). The affidavit's suggestion "that medical wastes were being flushed into streams that fed drinking water supplies of neighboring communities created great concern in the Denver area." *Id*. (¶ 20).

"The raid on the Plant and the sensational search-warrant allegations were highly publicized across the country. Many Colorado politicians, including the Governor, two members of the United States House of Representatives and a United States Senator, held press conferences. The publicity surrounding the raid generated an atmosphere of fear and anxiety." *Id.* (¶ 23) (citation omitted).[12]

The search warrant allegations, however, were ultimately "discredit[ed]" and found "baseless." *Rockwell/DOEBCA* at 158,211 (¶ 24), 158,222 (col. 1). "[E]ach and every allegation contained in the search-warrant affidavit was not supportable, either legally or factually." *Id*. at 158,213-14 (¶ 50). The allegations "never ripened into formal criminal charges against either Rockwell or its employees." *Abraham*, 326 F.3d at 1245.

Significantly, the DOEBCA also found that "[g]iven the state of environmental conditions at all of DOE's facilities, it was practically a foregone conclusion that violations of environmental laws would be found at Rocky Flats. DOE's own 'Tiger Teams' sent from headquarters to all the facilities around this time period found environmental violations at nearly every location." *Rockwell/DOEBCA* at 158,211 (¶ 28). DOE headquarters, nonetheless, concurred in the award fees determined by Mr. Twining for contractors at the

---

[12] In *Stone*, Admiral Watkins testified that within two days of the raid, he received a letter from a Congresswoman complaining about Rockwell's past award fees. *See* Pl. Supp. Ex. 42, *Stone* Trial Tr., Mar. 16, 1999, at 3427-28. Congress also asked Admiral Watkins for a report on the award fee process at Rocky Flats. *See id*. at 3430-34.

other locations supervised by the Albuquerque Operations office, singling out Rockwell for special treatment. *See* Pl. Ex. 8, Def.'s Second Am. Answer, ¶ 64; Pl. Supp. Ex. 41, memorandum from T. Wade II to Manager, Albuquerque Operations Office, June 21, 1989.

According to the government, Rockwell bargained for a "process" where "award fees [were] determined by persons with close, on-the-ground knowledge of Rockwell's performance." Gov. Br. at 27. Those persons, with their "on-the-ground knowledge," would measure Rockwell's environmental performance against the funding and priority DOE gave to that performance. That award fee "process" is reflected in Mr. Twining's May 31, 1989, determination. *See* Def. Ex. 7, *Stone* Trial Tr., Mar. 15, 1999, at 3137-38. But the award fees actually paid to Rockwell were based on a far different process -- a process Rockwell had not bargained for.[13] In the process actually employed, Rockwell's award fees were "mandated" and "determined" by DOE headquarters in Washington, D.C., by persons following their own agenda and reacting to a highly publicized and politically-charged investigation founded on "baseless" and "discredit[ed]" allegations.

In any event, a comparison of the quality of the AFDO's evaluations to headquarters' evaluations is entirely beside the point. Rockwell's right to an award fee

---

[13] In contrast to "on-the-ground knowledge of Rockwell's performance," Rockwell received just the opposite. Admiral Watkins testified in *Stone*:

> I didn't know an award fee from the man in the moon when I got [to DOE]. I didn't know how we ran contracts. And when I began to look into it, I was--I was shocked at the fact that I would get a recommendation from the field activity that owns Rocky Flats headquartered in Albuquerque, that they should have something around an 80 percent award fee. I said, "Absolutely not, this is preposterous."

Pl. Supp. Ex. 42, *Stone* Trial Tr., Mar. 16, 1999, at 3377.

determination by the AFDO "was locked into the agreement and became a contractual term." *N.Y. Shipbuilding*, 385 F.2d at 435.[14]

D. The Government's Defense of Waiver Is Barred and, in Any Event, Insufficient as a Matter of Law

1. This Court Barred the Government's Waiver Defense

In its March 10, 2006, Opinion and Order, the Court denied leave to the government to raise its belated defense of waiver. *See* Pl. Ex. 32 at 13. The Court, however, allowed the government to "pursue its theory that estoppel embraces . . . waiver," although noting that the "[d]ifferences in . . . these defenses are readily apparent." *Id.* at 14, 14 n.10.

The government's Opposition simply confirms the "differences" between estoppel and waiver. Estoppel requires detrimental reliance; waiver does not. The government cites no authority for the proposition that estoppel can exist without detrimental reliance. And the government's waiver theory -- that "Rockwell, through its highest corporate officials,

---

[14] Defendant's argument that Rockwell should accept headquarters' award fee decisions because they were "more fully informed" than Mr. Twining's (*see* Gov. Br. at 30) was soundly rejected in *N.Y. Shipbuilding*. There, the government tried to defend a determination made by one Mr. MacCutcheon, who was not the Nuclear Projects Officer specified in the contract to decide disputes:

> Defendant tells us, by way of argument, that in fact Mr. MacCutcheon knew as much about the subject as anyone . . . . [W]e must consider the question, not on the basis of Mr. MacCutcheon's actual expertise as it may have been [when he rendered his decision], but from the parties' standpoint when the contract was made . . . . Looking forward from that time, the parties selected a particular officer on the reasonable assumption (as we judge) that he was most likely to have the knowledge necessary to an informed decision of contractual disputes under this unusual contract. That choice was locked into the agreement and became a contractual term. As with other contract provisions, the agreement would not be automatically altered if the forecast proved incorrect in that by chance some other official turned out to know as much or more.

385 F.2d at 435.

acquiesced in DOE Headquarters' assumption of the award fee process" (Gov. Br. at 3-4) -- lacks any showing that DOE was induced to change its position for the worse in reliance on Rockwell's purported acquiescence. Accordingly, the government's purported waiver is not "embrace[d]" by estoppel and is barred by the March 10, 2006, Opinion and Order.

"The essence of estoppel is the inducement of another to act to his prejudice." *S. Cal. Edison Co. v. United States,* 43 Fed. Cl. 107, 122 (1999), *rev'd on other grounds,* 226 F.3d 1349 (Fed. Cir. 2000); *see also Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 59 (1984) ("the party claiming the estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse") (internal quotation marks omitted); *Hercules Inc. v. United States*, 49 Fed. Cl. 80, 88 (2001) (party asserting estoppel must show that it "rel[ied] . . . to [its] injury" on conduct of party to be estopped), *aff'd*, 292 F.3d 1378 (Fed. Cir. 2002). Detrimental reliance is essential for estoppel regardless of whether the conduct of the party to be estopped is active or passive. *See City of Gettysburg, S.D. v. United States*, 64 Fed. Cl. 429, 449 (2005) ("[t]he elements of equitable estoppel are: (1) misleading conduct, which may include not only statements and action but silence and inaction . . . ; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice"). In short, when estoppel is based on "silence and inaction," the party seeking estoppel must still show "reliance upon" the silence and inaction which thereby caused "material prejudice." *See id.*

In sharp contrast, waiver does not require detrimental reliance, but rather: "(1) the existence at the time of the waiver [of] a right, privilege, advantage or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit." *Melrose Assocs., L.P. v. United States*, 43 Fed.

Cl. 124, 149 (1999) (quoting *Youngdale & Sons Constr. Co. v. United States*, 22 Cl. Ct. 345, 346 (1991)).

Although the government argues that "[t]he term 'estoppel' as a matter of law does encompass waiver" (Gov. Br. at 30) it cites no authority that estoppel might embrace waiver where, as here, the government was not induced to change its position to its detriment because of the right or privilege allegedly waived. Indeed, the government's own authorities underscore the "essential differences" between waiver and estoppel. *See Hanson v. Fid. Mut. Ben. Corp.*, 13 A.2d 456, 460 (Del. Super. Ct. 1940) (quoted in Gov. Br. at 32). In *Wright v. Wagner*, 34 A.2d 441 (Md. 1943) (cited in Gov. Br. at 32), the court said that it is "well settled that where a party . . . *induces another to act* on the reasonable belief that he has waived, or will waive, certain rights or remedies which he is entitled to assert, he will be estopped to insist on such rights or remedies to the prejudice of the one misle[d]." 34 A.2d at 446 (emphasis added). Thus, a waiver amounts to estoppel only where the waived right or remedy "induces another to act."

In short, "[e]stoppel is a doctrine separate from waiver." *Hosp. Prods., Inc. v. Sterile Design, Inc.*, 734 F. Supp. 896, 904 (E.D. Mo.), *aff'd*, 923 F.2d 859 (8th Cir. 1990). Where there is no detrimental reliance on waived conduct, there cannot be estoppel. *See, e.g., Midwest Petroleum Co. v. Am. Petrofina, Inc.*, 603 F. Supp. 1099, 1115 (E.D. Mo. 1985) (rejecting estoppel as a matter of law where "defendants did not lack knowledge of the truth of the facts in question" and thus could not have relied in good faith on plaintiff's conduct, but allowing waiver defense where, *by that same conduct*, plaintiff "could be construed as intentionally relinquishing its [contract] right[s]").

The government has not shown, nor could it credibly do so, that Rockwell's purported acquiescence induced DOE headquarters into determining Rockwell's award fees and breaching the contract. Rather, the sequence was just the opposite. DOE headquarters acted, told Rockwell of the action and Rockwell allegedly acquiesced. *Cf. Loyola Univ. v. Humana Ins. Co.*, 996 F.2d 895, 902 (7th Cir. 1993) ("[t]he party asserting estoppel must show that it would not have so acted but for the conduct or representations of the other party") (internal quotation marks omitted). The government has offered no evidence that "DOE's Secretariat" (Gov. Br. at 5) "would not have so acted [in determining Rockwell's award fee] but for" Rockwell's purported acquiescence. But absent a change of position by DOE headquarters caused by Rockwell's alleged acquiescence, there can be no estoppel.[15]

2. <u>In Any Event, There Was No Waiver</u>

In light of the Court's March 10, 2006, Opinion and Order and the foregoing discussion, it is not necessary for the Court to reach the government's belated waiver defense. Nonetheless, Rockwell would be remiss not to note that the government's waiver defense is insufficient as a matter of law.

---

[15] Even if the government could show that its estoppel defense embraced waiver as a matter of law, which it cannot, the Court should nonetheless disallow waiver because the estoppel defense does not embrace waiver as a matter of fact. From November 1991 through October 2005, the government's estoppel defense was based on Rockwell's violations of and disclosures concerning environmental laws. *See* Pl. Ex. 27, Def.'s Answer, ¶ 40; Pl. Ex. 28 at 3; Pl. Ex. 29 at 6; Moving Br. at 17. The Court properly disallowed the defense of waiver by acquiescence because the government waited too long (until October 2005) to plead it. *See* Pl. Ex. 32 at 8, 13. That delay in pleading waiver does not vanish just because the government had on file since 1991 an estoppel defense based on facts wholly unrelated to waiver by acquiescence.

"[W]aiver may be established either through an express statement or by implication through a party's conduct inconsistent with an intent to assert a right." *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409, 415 (2003), *rev'd on other grounds, Tesoro Haw. Corp. v. United States*, 405 F.3d 1339 (Fed. Cir. 2005). The government has not even alleged that Rockwell expressly waived its contract right to have the award fee determined by the AFDO, the Manager, Albuquerque Operations. Instead, the government strains to imply from Rockwell's conduct following the June 6, 1989, raid an intent to waive that contract right. *See* Gov. Br. at 33-36. As a matter of law, the government's showing on this point falls far short of the stringent standard required to prevail on an implied waiver defense.

"Waiver of a contractual right is shown only when a party conducts itself in a manner which is wholly inconsistent with the clause or condition, thereby indicating its intent to abandon the contractual right." *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 679 (7th Cir. 2004) (quoting *Solow v. Northwest Airlines*, 180 B.R. 851, 919-20 (Bankr. N.D. Ill. 1995)). "[T]he conduct said to constitute a waiver must be clear and unequivocal, as waivers are never to be lightly inferred." *Mooney v. City of New York*, 219 F.3d 123, 131 (2d Cir. 2000) (quoting *Tray-Wrap, Inc. v. Six L's Packing Co.*, 984 F.2d 65, 68 (2d Cir. 1993)); *see also United States v. Amwest Sur. Ins. Co.*, 54 F.3d 601, 602-603 (9th Cir. 1995) (implied waiver will be found only "where there is 'clear, decisive and unequivocal' conduct which indicates a purpose to waive the legal rights involved"); *200 E. 87th St. Assocs. v. MTS, Inc.*, 793 F. Supp. 1237, 1251 (S.D.N.Y.) (intent to waive "cannot be inferred from doubtful or equivocal acts or language") (quoting *E. 56th Plaza, Inc. v. Abrams*, 458 N.Y.S.2d 953, 955 (N.Y. App. Div. 1983)), *aff'd*, 978 F.2d 706 (2d Cir. 1992).

Indeed, the conduct of a party impliedly waiving a contract right must be "so consistent with intent to waive that no other reasonable explanation is possible." *Lyon Dev. Co. v. Bus. Men's Assurance Co. of Am.*, 76 F.3d 1118, 1125 (10th Cir. 1996) (quoting *Errante v. Kadean Real Estate Serv., Inc.*, 664 S.W.2d 27, 29 (Mo. Ct. App. 1984)); *see also Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 372 (D. Mass. 1991) ("[a] waiver implied by a person's conduct . . . must allow room for no other explanation of the conduct"); *Hosp. Prods., Inc.*, 734 F. Supp. at 904 (waiver can only be implied by conduct "that is 'so consistent with intention to waive that no other reasonable explanation is possible'"); *Lone Mountain Prod. Co. v. Natural Gas Pipeline Co. of Am.*, 710 F. Supp. 305, 311 (D. Utah 1989) ("To constitute waiver, the party's actions or conduct must be distinctly made, must evince in some unequivocal manner an intent to waive, and must be inconsistent with any other intent."), *aff'd*, 984 F.2d 1551 (10th Cir. 1992).

The government asserts in conclusory fashion "that Rockwell waived its purported right to have Manager Twining decide its award fees and that Rockwell did so through its highest corporate officials." Gov. Br. at 36. Yet the government supports this purported contract waiver only with allegations that (1) Rockwell was communicating directly with DOE headquarters, including with Admiral Watkins (*id.* at 33-34) and (2) Rockwell was told that DOE headquarters was (a) "taking over oversight and management of Rocky Flats" (*id.*), (b) making "significant changes in DOE's management of Rocky Flats" (*id.* at 34), (c) "implementing a new 'culture' which placed ES&H compliance on a par with weapons production" (*id.* at 35), and (d) "delaying the pending award fee determination" (*id.*).

None of this alleged acquiescence was in any way inconsistent with Rockwell's contract right to have the award fee determined independently by the Manager of Albuquerque Operations, let alone "so consistent with intent to waive that no other reasonable explanation is possible." *Lyon Dev.*, 76 F.3d at 1125.[16] DOE headquarters could assume direct oversight over, and require management changes at, Rocky Flats, demand greater emphasis on ES&H and delay *the timing* of the award fee without impinging on the contractually required obligation of the AFDO independently to determine *the amount* of the award fee.

The government never alleges that Rockwell expressly acquiesced in Admiral Watkins or others at headquarters substituting themselves as the AFDO in place of the Manager, Albuquerque Operations, the contractually designated AFDO. And there can be no implied waiver unless Rockwell acted in a manner "wholly inconsistent" with the contract right in question, thereby clearly "indicating its intent to abandon the contractual right." *Sphere Drake Ins.*, 376 F.3d at 679; *see also A Olympic Forwarder, Inc. v. United States*, 33 Fed. Cl. 514, 521-22 (1995) (defendant could not prevail on theory of waiver absent evidence that plaintiff "knowingly and intentionally 'waived' its right"). Far from "indicating its intent to abandon the contractual right," *Sphere Drake Ins.*, 376 F.3d at 679, Rockwell in October 1989 complained to DOE that the award fee "evaluation is being conducted by different personnel, further removed from the contract performance and using a new set of evolving

---

[16] For example, it is not surprising that Rockwell communicated directly with Deputy Secretary Moore about the timing of award fees (*see* Gov. Br. at 35) since Mr. Moore announced at a press conference at the Colorado Capitol (in the company of the Colorado Governor) on June 16, 1989, that DOE was delaying the payment of award fees. *See* Def. Ex. 41.

criteria based upon external pressure, jurisdictional disputes, sensational allegations from a government investigation, and the current political climate." Pl. Supp. Ex. 43, letter from Rockwell to DOE, Oct. 25, 1989, at 2. That's anything but a waiver.

In summary, the government has not shown any conduct on Rockwell's part "evinc[ing] in some unequivocal manner an intent to waive" the contract right to have the award fee determined by the Manager of Albuquerque Operations. *Lone Mountain Prod.*, 710 F. Supp. at 311. Accordingly, the government's purported waiver defense, which the Court properly barred, in any event fails on the merits as a matter of law.

/ / /

## III. CONCLUSION

For the reasons set forth herein and in Plaintiff's Motion for Summary Judgment and Memorandum in Support Thereof, Rockwell respectfully requests that the Court grant its motion for summary judgment for $5,333,606 of additional award fees, plus interest as allowed by law.

August 28, 2006

CHADBOURNE & PARKE LLP
RICHARD J. NEY
Attorney of Record

S. JEAN KIM
Of Counsel

By: s/ Richard J. Ney
Richard J. Ney
350 South Grand Avenue, Suite 3300
Los Angeles, CA 90071
Telephone: (213) 892-1000
Facsimile: (213) 622-9865

Attorneys for Plaintiff
THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION