ELECTRONICALLY FILED ON AUGUST 28, 2006

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 91-1362 C<br>(Judge Lettow)<br><br>**DECLARATION OF RICHARD J. NEY IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

I, RICHARD J. NEY, declare and state as follows:

1. I am a member of the law firm of Chadbourne & Parke LLP, which represents Plaintiff The Boeing Company, Successor-in-Interest to Rockwell International Corporation, ("Rockwell") in these proceedings. I make this declaration on my personal knowledge and could competently testify to the matters set forth herein, if necessary.

2. Attached hereto as Exhibit 37 is a copy of a memorandum from Bruce G. Twining to David P. Simonson, dated October 13, 1989.

3. Attached hereto as Exhibit 38 is a copy of Modification No. A140, Supplemental Agreement to Contract DE-AC04-76DP03533, effective October 23, 1989.

4. Attached hereto as Exhibit 39 is a copy of a letter from John A. Kolar to Richard J. Ney, dated April 21, 1993.

5. Attached hereto as Exhibit 40 is a copy of a letter from Richard J. Ney to John A. Kolar, dated May 20, 1993.

6. Attached hereto as Exhibit 41 is a copy of a memorandum from Troy E. Wade II to Manager, Albuquerque Operations Office, dated June 21, 1989.

7. Attached hereto as Exhibit 42 is a copy of selected pages from the transcript of the trial in *United States ex rel. Stone v. Rockwell International Corp.*, No. 89 M 1154 (D. Colo.), on March 16, 1999.

8. Attached hereto as Exhibit 43 is a copy of a letter from Dominick J. Sanchini to David P. Simonson, dated October 25, 1989.

9. Attached hereto as Exhibit 44 is a copy of Handbook for Award Fee Performance Evaluation and Review Process, dated June 24, 1977.

10. Attached hereto as Exhibit 45 is a copy of selected pages from the transcript of the deposition of Bruce G. Twining on February 23, 1993.

11. Attached hereto as Exhibit 46 is a copy of selected pages from the transcript of the deposition of Edward S. Goldberg on November 10, 1992.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Los Angeles, California, on August 28, 2006.

Richard J. Ney

PL. SUPP. EX. 37

United States Government | Department of Energy

# memorandum

Albuquerque Operations Office

DATE: OCT 1 3 1989

REPLY TO ATTN OF: CPD

SUBJECT: Award Fee Determination Official (AFDO)

TO: David P. Simonson, Manager, Rocky Flats Office

As Manager, Rocky Flats Office, you are hereby designated as the AFDO, effective immediately, for the Rockwell management and operating contract DE-AC04-76DP03533. This will allow you to make the award fee decision for the recently completed period of April 1, 1989, to September 30, 1989.

As a result of this delegation, it will be necessary for the Rocky Flats Office to quickly develop procedures for processing the award fee determination. If my contracts staff can be of any assistance to you in this endeavor, please contact Mr. Ted Cone at 844-5777.

If you have any other questions regarding this matter, please contact me at 844-7231.

Bruce G. Twining
Manager

cc:
John L. Meinhardt, Acting Assistant Secretary for Defense Programs, DP-1, HQ
J. M. Barr, RADM, USN, Associate Deputy Assistant Secretary, DP-20, HQ

RECEIVED
U.S.D.O.E.
R.F.A.O.
1989 OCT 23 A 8:43

PL. SUPP. EX. 38

UNITED STATES

DEPARTMENT OF ENERGY

1000 Independence Avenue, S.W.

WASHINGTON, DC 20585

Modification No. A 140
Supplemental Agreement
to Contract
DE-AC04-76DP03533

SUPPLEMENTAL AGREEMENT

This SUPPLEMENTAL AGREEMENT, effective October 23, 1989, by and between the UNITED STATES OF AMERICA (hereinafter called the "Government"), represented by the undersigned Contracting Officer of the UNITED STATES DEPARTMENT OF ENERGY (hereinafter called "DOE"), and ROCKWELL INTERNATIONAL CORPORATION (hereinafter called the "Contractor"), a corporation organized and existing under the laws of the State of Delaware.

WITNESSETH THAT:

WHEREAS, the Government and the Contractor entered into Contract AT(29-2)-3533 on January 8, 1975, effective June 30, 1975, for the performance by the Contractor of certain work and services; and

WHEREAS, this Contract has previously been amended by Modification Number 1 through 139; and

WHEREAS, the parties have agreed that it is in their mutual interests that the Contractor's responsibilities as the management and operating contractor for the Rocky Flats Plant should cease on the transfer date established herein: and

WHEREAS, DOE has entered into a binding contract with a successor contractor whereby the successor contractor shall assume responsibilities as the management and operating contractor on the transfer date established herein; and

WHEREAS, the parties have agreed to provide for the orderly transfer of management and operating contractor responsibilities to the successor contractor and for certain arrangements of facilitate performance by the Contractor of its continuing obligations and protection of its rights and interests relating to its performance of work under this contract: and

WHEREAS, the Contracting Officer certifies that this Supplemental Agreement is authorized by and executed under Public Law 95-91 and other applicable law

NOW THEREFORE, the parties agree that the contract, as previously amended, is hereby further amended in the following particulars only:

1. Clause 2 "Statement of Work" of the Contract is revised by the Addition of the Following subparagraph (e):

(e) <u>Transfer of management and operating contractor responsibilities- transition and post-operational activities.</u>

(1) Effective at the beginning of the day shift on January 1, 1990, or such earlier date as the Parties may mutually agree, (hereinafter "the transfer date") the contractor's responsibilities to manage, operate and maintain the Rocky flats Plant as set forth in the Statement of Work and Appendix B to the Contract shall cease and such responsibilities shall be assumed by a successor contractor under a contract with DOE.

The Contractor agrees that should the successor contractor, despite its best good faith efforts, be unable to assume operational control of the Rocky Flats facility at the time herein specified the Contractor shall continue to perform as management and operating contractor of the facility until the sucessor contractor shall be determined by DOE to be capable of assuming control of the facility. In no event shall the Contractor be required to continue as the Management and Operating Contractor beyond March 31, 1990, subject to the provision of subparagraph (a) of clause 28, "Continuity of Services".

(2) Effective upon execution of this Supplemental Agreement the Contractor shall:

(i) Assist in the preparation of a phase-in plan for the operations in such detail and to the extent requested by DOE.

(ii) Cooperate fully with the DOE in order to assure an orderly and efficient transfer of functions to the new contractor and continuity of operations.

(iii) At the request of the DOE, permit the new contractor to send a project team to the Rocky Flat Plant to observe the operation and management of the Rocky Flats Plant prior to the transfer date and assist such project team to the maximum extent possible during this orientation period; including, but not limited to providing, at the direction of the Contracting Officer full and complete access, on a non-interference basis, to Contractor personnel as well as the Rocky Flats Plant, its records, equipment and processes.

(iv) Perform all those administrative and other actions requested by the DOE which are necessary and related to the proper settlement of its contract and transfer of rights and functions to the new contractor.

(3) To facilitate the performance by Rockwell of contract close-out activities and its continuing obligations under other provisions of this contract arising from its operation of the Rocky Flats Plant, it is agreed that after the transfer date, Rockwell shall maintain such office space, equipment and furniture to be provided by DOE at the Rocky Flats Plant, needed to fulfill obligations of Rockwell relating to their operation of the Rocky Flats Facility. The definitive terms of the obligations of the parties for the continuing participation by Rockwell at the Rocky Flats Plant shall be provided in Supplemental Agreement to follow. The Parties agree to negotiate the terms of said agreement as expeditiously as practicable.

2. Effective October 1, 1989, Clause 62 "Allowable Costs, Base Fee and Award Fee" is revised by deletion of award fee and goal achievement objectives fee as the methods for determining compensation for the Contractor's services. In lieu of the award fee and goal achievements objectives fee for the period October 1, 1989 through December 31, 1989, the Contractor shall receive a monthly fixed fee of $750,000 payable at the end of each month. In the event of completion of performance as the Management and Operating Contractor prior to Dec. 31, 1989 such fee shall be reduced appropriately. Any continuation beyond Dec. 31, 1989 shall be subject to the payment of such additional fixed fee as the parties shall agree upon in good faith negotiations.

After the transfer date, the Secretary of Energy may determine, in his sole and absolute discretion, to pay an additional amount to Rockwell in the event he determines that Rockwell has performed its obligations under this Supplemental Agreement to such exceptional degree that an orderly and efficient transfer of functions and continuity of operations has occurred more expeditiously and effectively than contemplated by the establishment of the fixed fee hereunder.

3. Transfer Agreement. DOE, its successor contractor, and the Contractor will begin immediately good faith negotiations for a three-party Transfer Agreement. The Transfer Agreement will address, but not be limited to, the following subjects relating to the transfer of management and operating contractor responsibilities from the Contractor to the successor contractor:

(a) The successor contractor's coordination and support for the activities of the Contractor listed in paragraphs (e) (2) and (3) of Clause 2, "Statement of Work".

(b) Appropriate assignment and transfer of all rights and obligations under outstanding subcontracts, purchase orders and leases.

(c) Transfer to the successor contractor of all employer responsibilities, including, but not limited to, pension plans, benefit plans, worker compensation, insurance, labor contracts, payroll and personnel records and files pertaining to those employees of the Contractor who will, on the transfer date become employees of the successor contractor.

(d) Transfer to the successor contractor of the Contractor's responsibilities under the provisions of this contract pertaining to Government property, classified materials, special nuclear materials, and patents.

(e) Banking and disposition of payments and revenues.

(f) Liability insurance, third party claims and pending and future litigation.

(g) Transfer of responsibilities for compliance with requirements of all permits and permit applications, including RCRA interim status.

(h) Any other matters required or appropriate to assure the prompt and orderly transfer of management and operating contractor responsibilities.

Except as otherwise provided, all the terms and conditions of this contract remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Supplemental Agreement in several counterparts.

UNITED STATES OF AMERICA
BY: U.S. DEPARTMENT OF ENERGY

DATE: Oct 23, 1989 BY: Ronald E. Cone

ROCKWELL INTERNATIONAL CORP.
AEROSPACE OPERATIONS

DATE: Oct 23, 1989 BY: [signature] DJ Santini

TITLE: President

PL. SUPP. EX. 39

U.S. Department of Justice

JAKolar
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

Staff Attorney:
John A. Kolar
(202) 307-0405

Washington, D.C. 20530

April 21, 1993

BY TELECOPIER (213) 622-9865

Richard J. Ney
Chadbourne & Parke
601 South Figueroa Street
16th Floor
Los Angeles, California

Re: Rockwell International Corp. v. United States, No. 91-1362C (U.S. Court of Federal Claims)

Dear Mr. Ney:

Enclosed with this letter is a redraft of the stipulation that we are prepared to enter with Rockwell in lieu of Rockwell's deposing those seven individuals whose depositions were noticed in late December (Watkins, Moore, Tuck, Wade, Meinhardt, Barr, and Fess). Please let me know Rockwell's response as soon as possible.

Very truly yours,

John A. Kolar

JOHN A. KOLAR
Attorney
Commercial Litigation Branch
Civil Division

Enclosure

U.S. Draft - 4/21/93

PROPOSED STIPULATION

With respect to the first award fee period in issue, October 1, 1988 through March 31, 1989 (the "89/1 period"), the United States hereby stipulates and agrees as follows:

1. In May 1989, the Department of Energy's ("DOE's") Manager of Albuquerque Operations (the Award Fee Determination Official or "AFDO") made a recommendation that Rockwell International Corporation's ("Rockwell's") award fee for Plant Operations at the Rocky Flats Plant for the 89/1 period be $5,176,482.

2. In June 1989, DOE headquarters advised the AFDO that it did not concur in his recommendation of $5,176,482, and "that it would be premature at this time to make a final determination until the Department of Energy investigation of environmental, safety, and health charges are resolved."

3. In June 1989, DOE headquarters appointed Edward S. Goldberg Acting Manager of the Rocky Flats Office and directed that Mr. Goldberg and the Rocky Flats Office report directly to DOE headquarters. Prior to June 1989, the Rocky Flats Office and its Manager reported directly to the Albuquerque Operations Office.

4. DOE headquarters, in June 1989, directed Mr. Goldberg to review the award fee recommended by the AFDO in May 1989.

5. In July 1989, Mr. Goldberg proposed an award fee for Plant Operations at Rocky Flats for the 89/1 period in the amount

of $3,628,622 to the AFDO. The AFDO considered and agreed with Mr. Goldberg's proposal, and recommended it to DOE headquarters.

6. DOE headquarters determined that the award fees for Plant Operations at Rocky Flats for the 89/1 period initially recommended by the AFDO, and that subsequently recommended by Mr. Goldberg and adopted by the AFDO, were both too high.

7. DOE headquarters mandated that the award fee for Plant Operations for the 89/1 period be $2,716,624, and the AFDO issued a final award fee determination in that amount.

8. The $2,716,624 award fee for Plant Operations for the 89/1 period was determined by DOE headquarters.

With respect to the second award fee period in issue, April 1, 1989 through September 30, 1989, (the "89/2 period"), the United States hereby stipulates and agrees as follows:

9. In December 1989, DOE's Manager of the Rocky Flats Office (the Award Fee Determination Official or "AFDO") made a recommendation that Rockwell's award fees for the 89/2 period be $3,114,245 for Plant Operations and $628,982 for PRMP/PROVE.

10. DOE headquarters determined that both the $3,114,245 award fee for Plant Operations and the $628,982 award fee for PRMP/PROVE recommended by the AFDO for the 89/2 period were too high.

11. DOE headquarters mandated that the award fee for Plant Operations for the 89/2 period be $1,241,604, and the award fee for PRMP/PROVE be $338,035, and the AFDO issued a final award fee determination in that amount.

12. The award fee for Plant Operations of $1,241,604, and the award fee for PRMP/PROVE of $338,035 for the 89/2 period were both determined by DOE headquarters.

PL. SUPP. EX. 40

CHADBOURNE & PARKE
601 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-5704

30 ROCKEFELLER PLAZA
NEW YORK, NEW YORK 10112-0127
(212) 408-5100
TELECOPIER (212) 541-5369

1101 VERMONT AVENUE, N.W.
WASHINGTON, D.C. 20005-3521
(202) 289-3000
TELECOPIER (202) 289-3002

(213) 892-1000
TELECOPIER (213) 622-9865

DUBAI WORLD TRADE CENTRE
P.O. BOX 9329
DUBAI, U.A.E.
TELEPHONE (9714) 314-222
TELECOPIER (9714) 314-777

CHADBOURNE, PARKE, HEDMAN &
UNION OF ADVOCATES
A JOINT VENTURE
38 MAXIM GORKY NABEREZHNAYA
MOSCOW, RUSSIAN FEDERATION 113035
TELEPHONE (7095) 231-1064
TELEPHONE/TELECOPIER (7095) 233-5298
DIRECT LINE FROM U.S.A.:
TELEPHONE (212) 408-1190

WRITER'S DIRECT NUMBER

(213) 892-2005

May 20, 1993

John A. Kolar, Esq.
Commercial Litigation Branch
Civil Division
Department of Justice
Room 3722
Tenth and Constitution Avenue, N.W.
Washington, D.C. 20530

Re: Rockwell International Corporation v. United States, U.S. Court of Federal Claims, No. 91-1362 C

Dear Jack:

We have carefully considered your April 21 redraft of our March 22 proposed stipulation in lieu of deposing the seven individuals we noticed for deposition last December. Your redraft is not acceptable to us. It simply falls short of what we believe could be obtained through the testimony of those key people. In contrast with our proposed stipulation, yours does not agree on the purpose and effect of Mr. Goldberg's award-fee recommendation, or that the AFDO's May and December 1989 award-fee determinations were the AFDO's independent determinations, or that the award fees actually issued to Rockwell were not the independent determinations of the AFDO. In sum, you are asking us to forgo deposing very important people to our case in return for a stipulation that, in these critical areas, fails to provide facts we believe the depositions would yield.

Our March 22 proposed stipulation includes those facts, and we remain ready to enter into that stipulation in lieu of deposing the seven noticed individuals. Should you change your position on the contents of a stipulation you would agree to, please let me know immediately. As we are all aware, the depositions were noticed almost five months ago now. We have provided you with the facts we would need in order to forgo the depositions. If those are not acceptable to you, I see no reason why you should not now produce these witnesses for deposition.

Sincerely yours,

Richard J. Ney

VIA TELECOPIER

PL. SUPP. EX. 41

DOE F 1325.8 (10-86)

United States Government — Department of Energy

# memorandum

DATE: JUN 2 1 1989

REPLY TO ATTN OF: DP-3 (B.Barker, 6-2181)

SUBJECT: Albuquerque Operations Office (AL) Award Fee Determination for the Period October 1, 1988, through March 31, 1989

TO: Manager, Albuquerque Operations Office

Please be advised that I have thoroughly reviewed your findings for each contractor as noted in your May 31, 1989, memorandum to me, subject same as above. Based upon your input and my own personal observations, I concur in your findings for Allied Signal, Inc., EG&G, Mound Applied Technologies, Inc., General Electric Company, Mason Hanger - Silas Mason, Inc., and Westinghouse Electric Corporation.

In the case of Rockwell International Corporation, it would be premature at this time to make a final determination until the Department of Energy investigation of environmental, safety, and health charges are resolved.

I have noted my concurrence and concerns in the attached file copy response.

Troy E. Wade II
Acting Assistant Secretary
for Defense Programs

Attachment:
Memo to DP-1 fm
AL dtd 5/31/89

PL. SUPP. EX. 42

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA and
UNITED STATES OF AMERICA, ex rel.
JAMES S. STONE, )
)
Plaintiffs, )
)
vs. ) 89 M 1154
)
ROCKWELL INTERNATIONAL CORPORATION, et al., )
)
Defendants. )

---

TRIAL TO JURY - DAY 15
TRANSCRIPT OF PROCEEDINGS

---

Proceedings held before the HONORABLE RICHARD P. MATSCH, U.S. District Judge for the District of Colorado, beginning at 8:30 a.m. on the 16th day of March, 1999, in Courtroom C-204, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs: Maria T. Vullo, Esq.
Jeannie S. Kang, Esq.
Matthew Chevez, Esq.
Robert E. Montgomery, Jr., Esq.
Paul, Weiss, Rifkind, Wharton
& Garrison
1285 Avenue of the Americas
Suite 2607
New York, New York 10019

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES: (Continued)

| | |
|---|---|
| | Hartley D. Alley, Esq.<br>4251 Kipling Street, #130<br>Wheat Ridge, Colorado 80033 |
| For Defendant Rockwell: | Christopher J. Koenigs, Esq.<br>Michael A. Williams, Esq.<br>Brian Eberle, Esq.<br>Amy Benson, Esq.<br>Michael Brian Carroll, Esq.<br>Karen DuWaldt, Esq.<br>Michael T. Gilbert, Esq.<br>Williams, Youle & Koenigs<br>950 17th Street<br>Suite 2450<br>Denver, Colorado 80202 |
| For USA, ex rel: | John A. Kolar, Esq.<br>Joel D. Hesch, Esq.<br>Donald Williamson, Esq.<br>U.S. Department of Justice<br>Civil Division<br>P.O. Box 261<br>Ben Franklin Station<br>Washington, D.C. 20044 |

Q And let me ask you, when the raid occurred, did you have some concern about the award fee recommendation that was then pending at headquarters from Mr. Twining in Albuquerque?
A Well, that came out of it. It wasn't my initial concern to worry about award fee in a thing like this, but it came up. I didn't know an award fee from the man in the moon when I got there. I didn't know how we ran contracts. And when I began to look into it, I was--I was shocked at the fact that I would get a recommendation from the field activity that owns Rocky Flats headquartered in Albuquerque, that they should have something around an 80 percent award fee. I said, "Absolutely not, this is preposterous."
Q That's 80 percent of the allowable award fee pool?
A 80 percent of the allowable. 80 percent sounds like a good grade to me.
Q All right. Let me invite your attention to Plaintiff's Exhibit 77 in the notebook there.
MR. KOLAR: This is stipulated, Your Honor.
THE WITNESS: Yes.
Q (by Mr. Kolar) Is that a letter from Mr. Moore to Mr. Iacobellis at Rockwell headquarters in California that discusses the award fee?
A Yes, it is.
Q And who was Mr. Iacobellis?
A Well, Mr. Iacobellis was the result of an action taken

MR. KOENIGS: All right. I'll offer these.

MR. KOLAR: Your Honor, we object on hearsay grounds.

THE COURT: What's the purpose of the offer?

MR. KOENIGS: Well, to tell you the truth, Your Honor, I'm actually interested only in the first, and it is to--it relates to notice and motivation of congressional concern about award fees.

THE COURT: So you're only offering the letter of June 8?

MR. KOENIGS: Yes. The first page of this exhibit.

THE COURT: All right. The objection's overruled. It's received for the purpose identified.

(Defendant Exhibit D138 was received in evidence.)

Q (By Mr. Koenigs) Is this a letter that you received, Admiral Watkins, two days after the raid from Congresswoman Schroeder?

A Yes, that's correct.

Q And do you see in this letter she tells you that she was deeply disturbed by an article in the Washington Post that revealed Rockwell International was awarded bonuses for meeting production quotas as the Rocky Flats plant?

A Yes.

Q And then she goes on to say, does she not, in the third paragraph, she was astounded that the DOE awarded these bonuses while environmental and safety problems were allowed

to continue at the plant. And so were you, I take it?
A Yes, so was I.
Q Okay. And it was your view, like hers, that for too long the Department of Energy had made production its overriding priority?
A Yes. I had told Congresswoman Schroeder this before so she was telling me what I had already told her, yes. That's typical of politicians. Mr. Skaggs did from the local area. He was constantly telling me what I already told him.
Q Okay. So you were aware that the media was interested. The Washington Post had articles about it.
A Oh, yes, very.
Q And you referred to, in your view, you might have zeroed out Rockwell for this period but, in fact, you were aware that the contract, this provision, the killer clause, didn't exist for the time frame.
A It didn't exist then, no.
Q So it wouldn't have been consistent with a contractual--
A It wouldn't have been, but I would have done it anyway and taken my lumps in the court on a contract violation because of it. I would have been willing to go that far.
Q You would have been willing, sir, to violate the contractual obligations of DOE?
A If they had an unsatisfactory environment, safety, and health that was very obvious to everybody, I would have said,

Q Sir, I'm sorry, I didn't finish my question.
A --on this thing.
Q You had reached the conclusion that you were going to substantially reduce Rockwell's award fees within two days of the raid: namely, before Congresswoman Schroeder--
A No.
Q --even sent you the letter?
A No, I was not. I didn't know the degree I was--I knew that I didn't like the award fee arrangement.
Q And you knew that, actually, your man on the site was recommending an award fee significantly higher than the one you decided?
A I reckon that that was always the case.
Q And I'm referring to Mr. Goldberg, the man you put in place.
A Yes, sure.
Q And we could look at it, but you remember in the executive briefing he recommended an award fee of about 3.7 million, significantly higher than what you ended up giving?
A Yes.
Q Okay. Now, sir, do you recall that Congress asked you to submit a report to it concerning whether or not there had been any fraud in the award fee process at Rocky Flats?
A That's correct.
Q I wonder if you could look, please, with me at Tab 43,

which is Defendant's Exhibit A562. It's stipulated. Is this a memorandum from you--excuse me--from John Tuck to you dated May 31, 1990?

A That's correct.

Q And this is, roughly, a year after the FBI raid at Rocky Flats?

A That's correct.

Q And who was John Tuck?

A John Tuck was the Undersecretary of Energy, and he, in his hat, was responsible for the nuclear side of the Department of Energy, primarily having the Assistant Secretary for Defense Programs, Environmental Restoration of Waste Management, Reactor Safety, Nuclear Energy report through him to me, as opposed to the Deputy who had all of the other non-nuclear responsibilities. That was just an internal reporting arrangement.

Q Okay. And in this memorandum that's Exhibit A562, Mr. Tuck is sending you a report in response to the law enacted by Congress. Do you see that?

A Yes.

Q And if you could turn to Tab 44, which is also stipulated, is this a letter--actually, it's the first four pages of four letters that you sent to various members of Congress and the Senate on June 1, 1990?

A That's correct.

Q And it's Defendant's Exhibit A64, stipulated. And you see the report itself. Did you read the report before you sent it on to Congress?

A Yes.

Q Okay. And it begins on the fifth page of that same exhibit. And do you see what Congress is asking you to do, to prepare a report on Rocky Flats bonuses?

A Yes, I do.

Q And it says, "The Secretary of Energy shall investigate the payment from 1981 to 1988 of production bonuses to Rockwell International, the contractor operating the Rocky Flats in Golden, Colorado, for purposes of determining whether the payment of such bonuses was made under fraudulent circumstances." Do you see that?

A That's correct.

Q And you understood that was a directive or a law passed by Congress asking you to conduct this investigation?

A Yes, I did.

Q All right. And then this report sets forth the results of your investigation?

A Yes.

Q And in the letter we were just looking at, Mr. Tuck--and this is, again, at Tab 43, Exhibit A562--Mr. Tuck points out to you at the bottom of the first page, second paragraph from the bottom, that "The report notes that individuals involved

in the evaluation process for award fee determinations for Rocky Flats in the 1981-88 time period were recently surveyed and they believe there is no evidence to suggest that Rockwell provided misleading information in order to obtain a higher rating." Do you see that?

A That's correct.

Q And is that the information you provided to Congress in response to the law enacted?

A That's correct.

Q And before you did it, as you can see on the second page of the same exhibit, the report and the letter had the concurrence of people who are just designated by initials. I'm looking at the second page of Tab 43. Can you tell us who CP1, PR2, and GC1 are, if you recall? GC1, is that general counsel?

A That's the general counsel. That's the only one I can tell you. I really don't know the others.

Q All right. GC1 means the lead lawyer for DOE; is that right?

A GC1 is the general counsel.

Q Right. And your understanding is that these people all would concur, review and concur, in this report before it got to your level, and then you would read it and concur in it and send it off to Congress?

A Yes. In other words, there was no evidence that we had

in any file that people provided us misleading information. I mean, I would have been surprised if there had been and we didn't do anything about it, you know. So we didn't have any information, but that gets back to ground truth issue. What's misleading?

Q Right. And you know of nothing misleading done by Rockwell. Now, you indicated that--

A It did not mean, however, there wasn't any misleading action going on. I don't want to imply that. If that's in my statement, I want to clarify to you.

Q No, sir, you were simply answering a question I asked and that's okay to do. Do you recall, sir, that you learned that there was a plea that ended the investigation, the criminal investigation, at Rocky Flats, that Rockwell pled guilty to certain environmental violations at Rocky Flats?

A Yes, I am.

Q And you were briefed on that?

A Yes, I was.

Q And that was about the time it occurred: namely, in March of 1992?

A That's correct.

Q Okay. Were you aware, sir, that at the time that Rockwell entered its guilty plea the government filed publicly with the court here in Denver a lengthy sentencing memorandum?

PL. SUPP. EX. 43

Rocky Flats Plant
Aerospace Operations
Rockwell International Corporation
P.O. Box 464
Golden, Colorado 80402-0464
(303) 966-7000
Contractor to U.S. Department of Energy

Rockwell International

OCT 25 1989

89-RF-3591

David P. Simonson
Manager
DOE, RFO

AWARD FEE - 10/1/88 THROUGH 3/31/89 CONTRACTOR PRESENTATION

Per Contract DE-AC04-76DP03533, Appendix D, Award Fee Plan and the AL Handbook for Award Fee Performance Evaluation, the following constitutes Rockwell International's written comments to be submitted two days prior to the Contractor's Oral Presentation on its performance evaluation.

Our comments include a clarification of the issues contained in the performance evaluation report (Attachment 1). Quotations from DOE documents and officials during the same time period which do not support the "Unsatisfactory" rating for Health, Safety & Environment (Attachment 2), and our comments on the chronology of events and the performance evaluation process itself.

The attached Chronology of Events (Attachment 3) lists the times of communication between DOE and Rockwell during the performance evaluation process. Preliminary discussions of the various FPA's were held at Rocky Flats April 4 and 5. The draft performance appraisal was reviewed between DOE/RFO and Rockwell April 11. A summary of the items included in the draft performance appraisal (Attachment 4) clearly shows the achievements, deficiencies, and positive and negative observations included in the draft report. Using the Performance Evaluation Plan and Rating Plan included in the Contract Award Fee Plan for proper FPA weights and performance adjectives respectively, we developed the Summary - Draft Performance Appraisal (Attachment 5) and the expected grade of 92.375. While this summary uses average grade data for each FPA adjective rating, it has been historically accurate. The Comparison of CPAF Appraisals (Attachment 6) compares previous summary data for all award fee periods since its inception at Rocky Flats in 1979 to the actual grade determined. This comparison shows that the expected grade based on average data has consistently been within some fraction of a point of the actual grade and in

RECEIVED
U.S.D.O.E.
R.F.A.O.

NEY SUPP. DECL. P. 26

E 000920

no case off more than a few points. Based upon this data, Rockwell strongly feels that the proper grade should be in the 91.5 to 93.0 range.

On April 28, 1989, CIRD/AL was contacted by telephone to check on the fee determination process. We were informed that the Performance Evaluation Review Board had met, and that the Performance Evaluation was in the office of the Manager, AL, for approval. We checked again on May 15, 1989, the contract deadline for fee determination, and were informed that the AL Manager, the fee Determination Official, had completed the determination, that it had been forwarded to the assistant Secretary, Defense Programs for concurrence and that final approval was expected at any moment.

The evaluation process seemed to be proceeding according to the Award Fee Plan and the AL Handbook. A grade in the range of 91.5 to 93.0 was expected based upon the normal evaluation process.

At this point, a major departure occurred in the evaluation process. See Change in Evaluation Criteria (Attachment 7). The evaluation is being conducted by different personnel, further removed from the contract performance and using a new set of evolving criteria based upon external pressure, jurisdictional disputes, sensational allegations from a government investigation, and the current political climate.

Despite the contractual provisions to the contrary, no further word on the fee determination was received by Rockwell until September 28, 1989 when we received your fee determination letter dated September 27, 1989. Based upon this information, it is apparent that the performance evaluation was returned to AL for further review during the summer of 1989. It was returned to Headquarters with a proposed reduced grade of 87 on August 8, 1989. This constitutes a drastic reduction in that the primary award fee was not only reduced, but the grade was placed below that required (Grade of 88) to participate in the award on approved Goal Achievement Objectives. This reduction caused Rockwell to lose eligibility for a $969,000 award, which had been earned on the Waste Minimization GAO. On September 20, 1989, the evaluation was returned to AL with the conclusion that the overall rating for the period should be reduced to 84.25. This constitutes a second drastic reduction in the performance evaluation grade and the associated fee

OCT 25 1989

determination. The History of Award Fee Payments (Attachment 8) shows that this award is approximately 50% of the previous Award Fee History over a 10 year period. We cannot agree that a change of such drastic magnitude has taken place at Rocky Flats, nor can we agree that this grade is based upon a proper performance evaluation.

We strongly object to this newly inserted second phase of the fee determination process. The evaluation was finally made over five months after the close of the performance period, based on extraneous data not previously included in the RFO (PEC) or ALO (PERB) evaluation reports. Information covering events which occurred outside the review period was considered. The resulting untimely fee determination is clearly based upon public and media reactions to sensational allegations and to pressures of the current political climate and not upon any performance evaluation criteria.

Our Oral Presentation of our view of the performance evaluation will be presented at ALO October 30, 1989, at 1:00 p.m.

Dominick J. Sanchini
President
Rocky Flats Plant

Orig. and 1 cc - D. P. Simonson
Enc.

ATTACHMENT 1

# CPAF
# CLARIFICATION OF ISSUES
# CONTRACT NO. DE-AC04-76DP03533
For the Period October 1, 1988 - March 31, 1989

1. INADEQUATE PROGRESS IN PREPARING FOR TRUPACT II CONTAINERS - Six different options were evaluated and incorporated into the overall GPP priority list for FY 1989. Rockwell recognized the high priority of the TRUPACT II facility and utilized design information acquired from INEL experience. Completion of the facility has always been coordinated with availability of TRUPACT II containers and with anticipated shipping schedules. Rockwell's original plans were based on TRUPACT I and had to be quickly revised when it failed required DOT testing.

2. VIOLATIONS OF DOT REGULATIONS ON TWO SHIPMENTS TO NTS - It is inaccurate that these two situations resulted in violations by the Department of Transportation. Both were low-level waste errors caused by shipping papers being issued which were inaccurate, both were reported to DOE and Rocky Flats by the disposal site on arrival of the shipments, and neither error caused danger to facility, carrier personnel, or to the environment.

   Appropriate corrective actions, approved by Traffic and Non-Weapons Quality Assurance have been taken and there have been no further instances of drum or trailer errors.

3. INSUFFICIENT EMPHASIS ON THE ROCKY FLATS INSTITUTE - A significant amount of planning was accomplished during the period ending March 31, 1989. Considerable planning progress was made in needs assessment, curriculum design, and the evaluation of the availability of resources, including assessing the expertise of potential instructors. These important aspects of planning were essential in supporting the beginning of classes on August 28, 1989, and were necessary steps to put a quality program into place. Currently the following five classes are being offered: Intro to Hazardous Materials Management, Environmental Health and Safety (OSHA), Intro to Environmental Laws & Policies, Intro to Recycling and Reclaimation, and Intro to Treatment, Storage & Disposal.

4. MAJOR ENVIRONMENTAL INCIDENT INVOLVING CHROMIC ACID SPILL - We are certainly concerned with the potential impact to the environment that this incident might have had. However, it is sensationalistic to imply that the incident had any detrimental effect on the environment. No environmental laws were violated and and the follow up DOE investigation has proposed to include that finding in their final report. The waters released off site after the incident were released in full compliance with EPA requirements governing discharge.

5. FAILURE TO ESTABLISH OR MAKE NECESSARY PROGRESS TOWARDS NEW STANDARDS OF EXCELLENCE ... IN NUCLEAR FACILITIES OPERATIONS.

Non Weapons Quality Assurance (NWQA) - NWQA is one of the programs that will facilitate the change in attitude and the development of procedures in Nuclear Facilities. During this period, the following significant accomplishments were made:

- An organization was created to provide commercial nuclear expertise to the plant. Staffing of the organization (Non-Weapons Quality Systems & Plans) was initiated, and a manager with 10 years of commercial nuclear Quality Assurance experience was selected.

- The Plant QA Audit program was defined, and documented in a plant policy. The procedure for certification of lead auditors was completed, and training for auditors was conducted.

- The plant document control process was defined and published in the Plant Publications Administration Manual.

- A review of plant calibration activities was completed and recommendations for organizational assignments were made.

Nuclear Facilities Operating Manual - A task team was assigned to develop a Nuclear Facilities Operating Manual, and significant portions of the manual were completed during this time period. This manual was to contain many of the QA procedures for the major plant buildings. Both the task concept and progress toward its completion were highly commended by RFO during both the following mid term and final appraisal periods. Presently the NFOM is being implemented only as a pilot project due to resource limitations. The manual has applications complex-wide for defining the building manager role and the process by which nuclear facilities are managed.

Plant-wide Document Control Project - A project was defined and revision schedules were developed to achieve an integrated plant-wide publications system. Designed to standardize and improve the administration of implementation publications relating to external requirements, the project will involve revising over 80 publications, including the plant policy manual, requirements manuals, standard operating procedures and working level publications.

6. SHUTDOWN OF 771 FACILITY - Safety procedures were violated , but no adverse health impacts were caused by the incident. Bioassays on the involved individuals, both invitro and invivo were performed and showed statistically zero internal deposition. Repercussions of this incident caused substantial changes in the radiation protection program, housekeeping, management safety surveillance practices, maintenance procedures, training programs, building access control, and quality assurance of change implementation. The sign posting policy and types of signs have also been changed. Some irregularities of enforcement have been observed as can be expected from a changing program, but none of the irregularities has put any individuals at risk. The present posting and sign policy is functioning at high level of compliance as has been noted in recent DOE audits.

7. NINETY ONE OUT OF 230 TSA FINDINGS REMAIN OPEN - All ninety-one findings were on schedule as of 3/31/89 because the respective corrective action schedules extended into subsequent periods. HS&E observation #13 from the following midterm RFO report stated "Rockwell has made good progress on TSA recommendations."

   A 10/20/89 progress report on the subject 91 findings indicates the following:

   - 21 findings were completed during the 3/31/89 to 9/30/89 period as scheduled
   - 56 findings are still open and are on schedule
   - 14 findings either have resource problems or otherwise are being rescheduled

   Clearly, this progress and status does not warrant the statement that "this indicates that a lack of priority attention was being paid to safety and health by Rockwell" as stated in the DOE award fee determination letter of September 27, 1989. In any other political climate, DOE's CPAF evaluation comments associated with Rockwell's response to the TSA findings would have been very positive.

8. THIRTY-TWO NEW SAFETY FINDINGS DURING THE PERIOD, INCLUDING SIX CATEGORY II FINDINGS - This TSA, the fourth in a two-year period, was highly complementary of Rockwell's progress from the previous TSA's, especially in the areas of Training, Radiation Protection, and Emergency Planning.

   The TSA report and Rockwell recognized that significant follow up effort would be required to achieve the defined goals of the plant. In the CPAF performance evaluation for this period Rockwell is surprised that DOE has chosen to ignore the strong trend of reduced findings between this TSA and the earlier ones and the complimentary words of several DOE representatives describing the Rocky Flats plant as having made significant progress toward becoming a model facility.

ATTACHMENT 2

DOE QUOTATIONS
ROCKY FLATS PLANT OPERATIONS

Performance Evaluation - Highlights
December 8, 1988

"Responded to DOE Safety concerns with an aggressive improvement program.

- Established corporate and plant safety oversight groups.
- Enhanced management staff in Environment, Safety, and Health.
- Met deadlines for extensive environmental documents to state and federal agencies.

Initiated many new activities...to achieve a fully adequate program."

R. W. Starostecki, Deputy Assistant Secretary, Safety, Health, and Quality Assurance, DOE-Hq.

Letter to Senator Timothy E. Wirth, dated February 2, 1989

"The recent management initiatives by Rockwell International to make a major cultural change, establish line ownership of safety and assure full accountability for safety requirements and practices represent a noteworthy first step in what must be a continuing effort to nurture a work philosophy at Rocky Flats that assures safety as a high priority.

DOE Nuclear Waste Meeting - University of Arizona - February 24, 1989

"Vast improvements have been made at Rocky Flats in the past year only because 'the contractor responded well' to concerns raised by inspectors from DOE's Washington, D.C., headquarters....The encouraging news is there's a contractor who can turn things around.

"Improvements at Rocky Flats have been so extensive that the plant should be a model to other problem-plagued weapons facilities."

ATTACHMENT 3

# AWARD FEE

OCTOBER 1, 1988 - MARCH 31, 1989

## CHRONOLOGY OF EVENTS

| | | | GRADE |
|---|---|---|---|
| • | April 4-5 | Preliminary Discussions - FPA's | |
| • | April 11 | Draft Performance Appraisal - RFAO | 92.375 |
| • | April 28 | PERB Has Met - Manager for Approval - CIRD | |
| • | May 15 | Contract Due Date<br>Asst Sec DP - For Approval - Expected Shortly | |
| • | ? | Performance Evaluation Returned to AL | |
| • | August 8 | Performance Evaluation to Asst Sec DP | 87 |
| • | Sept 20 | Performance Evaluation Returned to AL | 84.25 |
| • | Sept 27 | Performance Evaluation and Fee Determination sent to Rockwell International | 84.25 |

ATTACHMENT 4

DRAFT
PERFORMANCE APPRAISAL
OCTOBER 1 - MARCH 31, 1989
RFO APRIL 11, 1989

| Plant | Especially Noteworthy | Noteworthy Achievements | Notable Significant Deficiencies | Notable Deficiencies | Observations Positive | Observations Negative | Total Items |
|---|---|---|---|---|---|---|---|
| General Management | | 7 | - | - | 10 | 8 | 25 |
| Cost Management | | 4 | - | - | 1 | 2 | 17 |
| Quality | 1 | 3 | - | 3 | 2 | 2 | 11 |
| Chemical Ops | | 2 | - | - | 6 | - | 8 |
| Production Ops | | 2 | - | - | 3 | - | 5 |
| HS&E | | 5 | - | 3 | 9 | - | 17 |
| Subtotals | 1 | 23 | - | 6 | 31 | 12 | 73 |
| PRMP | | | | | | | |
| Project Management | | 2 | 1 | 1 | 2 | - | 6 |
| Cost Management | | 2 | 1 | 1 | 3 | - | 7 |
| Schedule Performance | | 2 | - | 1 | 3 | - | 6 |
| SubContract Mgmt | | 3 | - | 2 | 2 | - | 7 |
| Design Quality | | 2 | 1 | - | 5 | - | 8 |
| Tech Prod. Quality | | 1 | 1 | - | 2 | - | 4 |
| Subtotals | | 12 | 4 | 5 | 17 | - | 38 |

ATTACHMENT 5

SUMMARY

DRAFT PERFORMANCE APPRAISAL

CPAF
10/1/88 - 3/31/89

PLANT OPERATIONS

| FPA | Weight | Estimated Grade | Average Grade | Points |
|---|---|---|---|---|
| General Mgmt | 25% | Very Good-Excellent | 87.5-92.5 | 21.875-23.125 |
| Cost Mgmt | 15% | Outstanding | 97.5 | 14.625 |
| Quality | 15% | Excellent | 92.5 | 13.875 |
| Chem Op | 10% | Excellent | 92.5 | 9.250 |
| Prod Op | 15% | Outstanding | 97.5 | 14.625 |
| ES&H | 20% | Very Good | 87.5 | 17.500 |
| | 100% | | | 91.75-93.00 |
| | | Grade Expected | | 92.375 |

PRMP/PROVE

| FPA | Weight | Estimated Grade | Average Grade | Points |
|---|---|---|---|---|
| Proj Mgmt | 25% | Very Good | 87.5 | 21.875 |
| Cost Mgmt | 15% | Very Good | 87.5 | 13.125 |
| Sched Perf | 15% | Very Good | 87.5 | 13.125 |
| SubCont Mgmt | 20% | Very Good | 87.5 | 17.500 |
| Design Quality | 15% | Very Good | 87.5 | 13.125 |
| Tech Prod Qual | 10% | Very Good | 87.5 | 8.750 |
| | 100% | | | 87.500 |
| | | Grade Expected | | 85.0 |

ATTACHMENT 6

12-22-88

COMPARISON OF CPAF APPRAISALS
5-31-79 THROUGH 9-30-88

| | 4 MONTHS ENDING 5-31-79 | 4 MONTHS ENDING 9-30-79 | 6 MONTHS ENDING 3-31-80 | 6 MONTHS ENDING 9-30-80 | 6 MONTHS ENDING 3-31-81 | 6 MONTHS ENDING 9-30-81 | 6 MONTHS ENDING 3-31-82 |
|---|---|---|---|---|---|---|---|
| AVG. GRADE* | 90.50 | 91.75 | 91.25 | 92.25 | 88.25 | 88.75 | 89.00 |
| AVG. DOLLARS | $700,754 | $771,184 | $1,302,605 | $1,393.870 | $1,186,528 | $1,226,502 | $1,388,03[illegible] |
| ACTUAL GRADE | 89.15 | 91.28 | 90.65 | 91.80 | 89.25 | 87.80 | 89.20 |
| ACTUAL DOLLARS | $661,859 | $751,421 | $1,258,798 | $1,342,762 | $1,266,478 | $1,150,550 | $1,405,832 |

| | 6 MONTHS ENDING 9-30-82 | 6 MONTHS ENDING 3-31-83 | 6 MONTHS ENDING 9-30-83 | 6 MONTHS ENDING 3-31-84 | 6 MONTHS ENDING 9-30-84 | 6 MONTHS ENDING 3-31-85 | 6 MONTHS ENDING 9-30-85 |
|---|---|---|---|---|---|---|---|
| AVG. GRADE* | 88.00 | 90.00 | 91.50 | 90.00 | 90.75 | 90.00 | 90.50 |
| AVG. DOLLARS | $1,299,050 | $1,559,155 | $1,700,121 | $1,941,800 | $2,029,580 | $2,931,315 | $3,019,656 |
| ACTUAL GRADE | 87.70 | 89.40 | 91.80 | 87.25 | 90.20 | 89.55 | 90.05 |
| ACTUAL DOLLARS | $1,272,335 | $1,502,769 | $1,728,314 | $1,619,940 | $1,965,208 | $2,851,808 | $2,940,14[illegible] |

| | 6 MONTHS ENDING 3-31-86 | 6 MONTHS ENDING 9-30-86 | 6 MONTHS ENDING 3-31-87 | 6 MONTHS ENDING 9-30-87 | 6 MONTHS ENDING 3-31-88 | 6 MONTHS ENDING 9-30-88 |
|---|---|---|---|---|---|---|
| AVG. GRADE* | 91.50 | 89.75 | 90.75 | 93.00 | 90.50 | 90.25 |
| AVG. DOLLARS | $3,471,673 | $3,135,485 | $4,055,418 | $4,581,612 | $4,265,644 | $4,520,706 |
| ACTUAL GRADE | 89.95 | 90.80 | 91.30 | 92.05 | 90.80 | 90.87** |
| ACTUAL DOLLARS | $3,174,225 | $3,337,342 | $4,184,053 | $4,359,441 | $4,758,244 | $4,790,073** |

* RI-RFAO feedback on adjective grades and assuming midpoint numerical score
** Grade was 91.25 and dollars $4,940,073 prior to $150,000 downward adjustment for "Model Shop"

ATTACHMENT 7

CHANGE IN EVALUATION CRITERIA

SITUATION

- DOE/RFAO, AL Evaluation
  - Knowledgeable, Informative
  - Day-by-Day Interfacing with Contractor
  - Understand Requirements, Performance Thereto
  - Source of Requirements, Interpretations
  - Provided CPAF Evaluation Areas of Emphasis
  - Criteria for Evaluation Published, Practiced - Recognizing Safety, Environmental Concerns
  - DOE/EPA/State of Colorado Jurisdictional Issues
- Change
  - External Pressure
  - External Reviews, Oversight
  - Revised Criteria
    - Audits Against DOE Orders, Drafts, Not Received by Contractor
    - The Criteria Developed In Real Time by Review Groups
  - DOE Jurisdictional Issues Become Major
    - State of Colorado Becomes a Key Player
    - EPA Successful in Obtaining the Prime Role for Environmental Jurisdiction
    - Governmental Investigation
      - Sensational Allegations
      - Public and Media Reaction
      - Assumed Guilt
  - GOCO Operations Now Open
  - Secretary of Energy - 10 Points, His Customers
    - Public
    - State of Colorado
    - EPA
- SUMMARY
  - CRITERIA REQUIREMENTS FOR OPERATION OF A DOE GOCO FACILITY CHANGED
  - CONTRACTOR WAS EVALUATED AGAINST THIS NEW, CURRENTLY EVOLVING CRITERIA

ATTACHMENT 8




E 000932

PL. SUPP. EX. 44

# HANDBOOK FOR AWARD FEE PERFORMANCE EVALUATION AND REVIEW PROCESS

ALBUQUERQUE OPERATIONS OFFICE

UNITED STATES ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION

ALBUQUERQUE OPERATIONS OFFICE (AL)

HANDBOOK FOR

AWARD FEE PERFORMANCE EVALUATION
AND REVIEW PROCESS

APPROVED: [signature]
Herman E. Roser
Manager, AL

Date: June 24, 1977

# PREFACE

This Handbook contains the policy and procedural guidelines to be used in the evaluation and review process associated with Cost-Plus-Award-Fee (CPAF) contracts applied to Albuquerque Operations Office (AL) GOCO production contractors within the weapons production complex.

The Handbook is to be used by all AL Headquarters and Area Office personnel who have a responsibility for and participate in the evaluation and review of AL GOCO production contractors' performance under the provisions of applicable CPAF contracts.

TABLE OF CONTENTS

PREFACE. . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. GENERAL. . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Introduction . . . . . . . . . . . . . . . . . . . . 1
B. Objective . . . . . . . . . . . . . . . . . . . . . . 2

II. PLANNING FOR CPAF IMPLEMENTATION . . . . . . . . . . . . 4

A. Interface With Contractors . . . . . . . . . . . . . 4
B. Performance Evaluation Plan . . . . . . . . . . . . . 4
C. Award Fee Plan . . . . . . . . . . . . . . . . . . . 7
D. Evaluation Administration Plan . . . . . . . . . . . 7

III. EVALUATION AND REVIEW - ORGANIZATION AND ADMINISTRATION 9

A. Organization And Administration . . . . . . . . . . 9
B. Performance Evaluators And Monitors . . . . . . . . 9
C. Area Office Managers . . . . . . . . . . . . . . . 9
D. AL Division Directors . . . . . . . . . . . . . . . 10
E. Performance Evaluation Committees (PECs) . . . . . 10
F. Performance Evaluation Review Boards (PERBs) . . . 12
G. Contracting Officer (Fee Determination Official) . 13

IV. IMPLEMENTATION OF EVALUATION PROCESS . . . . . . . . . 14

A. Monitoring Process . . . . . . . . . . . . . . . . 14
B. Making An Evaluation . . . . . . . . . . . . . . . 18
C. Role Of Performance Evaluation Committee (PEC) . . 22
D. Role Of Performance Evaluation Review Board (PERB) 23
E. Role Of Contracting Officer (CO) . . . . . . . . . 24

V. CONTINUING EVALUATION PROCESS . . . . . . . . . . . . . 26

A. General . . . . . . . . . . . . . . . . . . . . . . 26
B. Changes To Performance Evaluation Plan . . . . . . 26
C. Changes to Evaluation Administration Plan . . . . 27

VI. NOTIFICATIONS . . . . . . . . . . . . . . . . . . . . . 28

A. Area Office Manager Responsibilities . . . . . . . 28
B. Other Notification Responsibilities . . . . . . . . 29

VII. ANNUAL APPRAISAL . . . . . . . . . . . . . . . . . . . 30

A. General . . . . . . . . . . . . . . . . . . . . . 30
B. Evaluation . . . . . . . . . . . . . . . . . . . . 30
C. Annual Appraisal Report . . . . . . . . . . . . . 32

Appendix A. MASTER LIST OF FUNCTIONAL PERFORMANCE AREAS (FPAs) . . . . . . . . . . . . . . . . . . 36

Appendix B. SAMPLE AWARD FEE PLAN . . . . . . . . . . . . . 42

Appendix C. RATING PLAN . . . . . . . . . . . . . . . . . . 51

GLOSSARY OF TERMS . . . . . . . . . . . . . . . . . . . . . 52

I. GENERAL

A. Introduction

This Handbook is intended as a guide to be utilized in the preparation and implementation of the performance evaluation and review process applicable to Cost-Plus-Award-Fee (CPAF) contracts with AL GOCO production contractors within the weapons production complex. The provisions contained herein may be applied in connection with other CPAF contracts administered within the AL system at the discretion of responsible officials. The purpose of the Handbook is to provide a uniform structure within which all those involved in the CPAF evaluation and review process may operate. Such standardization is necessary in order that the methodology, terminology, procedures, and practices can accommodate the several contracts within the weapons production complex and facilitate participation by the various parties who will be involved. On the other hand, it is necessary to allow maximum flexibility in the details of implementation of each CPAF Award Fee Plan due to the variations between each contractor's management, organization, and operations and between AL objectives for each facility. Therefore, application of CPAF Award Fee Plans must be tailored to meet individual considerations associated with each contractor. Substantive exceptions to the requirements of this Handbook may be authorized by the Contracting

Officer or the Performance Evaluation Review Board (PERB) Chairman when such variations are determined to be appropriate for a particular CPAF contract.

B. Objective

The AL objective in entering into CPAF contracts with the weapons production complex GOCO production contractors is to achieve optimum performance levels, affording the contractors an opportunity to earn increased fee in the pursuit of this objective. Optimum performance does not necessarily connote the very best operating level which could possibly be achieved in each functional area; rather, it represents the most favorable degree of performance considering the objectives to be realized balanced by the most effective utilization of available resources.

In applying CPAF contracts to the contractors within the weapons production complex, the level of performance attained by the individual contractors and the long association of these contractors with AL under the Cost-Plus-Fixed-Fee (CPFF) arrangement must be considered. In doing so, it is AL's intention to apply the CPAF concept in a manner compatible with the unique weapons production complex arrangement, with the expectation of mutual benefits to AL and the contractors. In

implementing the evaluation process under the CPAF arrangement, the AL expectation is to provide a fair assessment of contractors' performance without imposing an excessive, burdensome monitoring and documentation system which would encroach upon the limited manpower resources available to both AL and the contractors. The evaluation process outlined in this Handbook relies heavily on existing organizations, established survey and appraisal techniques, and personnel who are assigned management, administrative, and operating responsibilities in connection with the ongoing AL missions and operations. Within these constraints, every attempt will be made to elicit enough information to introduce as much specificity and objectivity into the evaluation process as possible.

II. PLANNING FOR CPAF IMPLEMENTATION

A. <u>Interface With Contractors</u>

The first step in the application and implementation of a CPAF contract arrangement with a particular contractor should be a discussion with that contractor to explain the approach which AL intends to use in the formulation, application, and implementation of an Award Fee Plan and the procedures and processes associated therewith. These discussions should occur early in the planning stage between management representatives of AL and the contractor so that agreement in principle may be achieved. Subsequently, the definitive provisions of the Award Fee Plan and the Performance Evaluation Plan should be developed in consultation with the contractor in order to facilitate a common understanding of intent prior to the contract negotiations and the implementation of the CPAF concept. The Award Fee Plan itself will become an appendix to the contract.

B. <u>Performance Evaluation Plan</u>

The Area Office Manager, during the planning stages, will be responsible for preparing a proposed Performance Evaluation Plan applicable for the initial evaluation period under the CPAF contract. The Plan should normally be composed of from 5 to 10 Functional Performance Areas (FPAs) selected from the "Master List Of Functional Performance Areas (FPAs)"

included in this Handbook (see Appendix A). In all cases, the FPA entitled "General Management" will be included as a part of the Plan. The selection of the other FPAs shall be based upon specific considerations associated with the contractor's mission, performance level, and the degree to which AL wishes to stimulate or emphasize performance in any specific areas without lowering the level of performance in other areas. Normally, an FPA would be selected to either encourage an improvement in performance which has not been at the desired level or to emphasize the importance of performance in a particular area in the context of existing conditions. It is not necessary--at times perhaps not even desirable--to include certain so-called "main mission" FPAs in a Performance Evaluation Plan for any particular evaluation period. The advantages inherent in covering a wide spectrum of contractor activities in a Performance Evaluation Plan should be considered. There are provisions, which are discussed in other sections of this Handbook, for changing FPAs from evaluation period to evaluation period; so there is no need to get "locked in" on any specific group of FPAs. Certain FPAs, by virtue of their prominence and the administrative and operational requirements surrounding them, inherently demand a high level of performance and receive a great deal of visibility on a continuing basis. Therefore,

contractor performance in connection with such FPAs may not have to be stimulated or monitored under the award fee concept.

In addition to designating the FPAs, the proposed Performance Evaluation Plan shall include the Area Manager's recommended weighting for each FPA (including "General Management") with the sum of the individual allocations totaling 100%. After the Plan has been drafted, it shall be forwarded to the Chairman of the Performance Evaluation Review Board (PERB) for review. The rationale indicating why specific FPAs and weightings were selected should be submitted with the Plan for the edification of the PERB. The Chairman of the PERB will coordinate review of the Area Office Manager's proposal with the other PERB members; will discuss all proposed changes with the Area Office Manager; and, with PERB concurrence, will approve the Plan to be implemented.

After the Performance Evaluation Plan has been approved by the PERB, the Area Office Manager shall notify the contractor of the Plan at least 30 days prior to commencement of the evaluation period or as specified by the contract. In addition, the Area Office Manager shall notify the concerned AL Divisions of the FPAs to be evaluated to facilitate the Divisions' planning for and participation in the evaluation process.

C. Award Fee Plan

The Award Fee Plan, which will become an appendix to the contract, will be developed by the AL Contracts and Procurement Division in consultation with the Area Office Manager. It will include such elements as the Performance Evaluation Plan, the Rating Plan and associated grades and definitions, an award fee performance table, and a description of the administrative procedures which are to be applied. A format for, and sample provisions of, an Award Fee Plan are included in this Handbook as Appendix B. The specifics of an Award Fee Plan, including the fee provisions applicable to each contract, will be negotiated with the contractor during the contract negotiation phase and, normally, will be renegotiated each year.

D. Evaluation Administration Plan (EAP)

After a Performance Evaluation Plan has been approved by the PERB, the Area Office Manager will construct an Evaluation Administration Plan (EAP) to facilitate implementation of the evaluation and review process associated with the Performance Evaluation Plan. The Evaluation Administration Plan will be designed to meet the requirements of each contract situation. The Plan shall contain the FPAs to be evaluated, the Functional Performance Elements (FPEs) associated with these FPAs, and any additional information or instructions related thereto

which the Area Office Manager chooses to include. The Functional Performance Elements (FPEs) are listed in Appendix A. In addition, the Plan shall normally include the designation of Performance Monitors and Performance Evaluation Coordinators and the areas for which they are responsible. Methods, procedures, and instructions to be utilized by the Performance Monitors and Performance Evaluation Coordinators should also be a part of the Evaluation Administration Plan. The Plan shall denote the intended frequency of meetings with the contractor during each evaluation period (no less frequent than bi-monthly) to discuss the contractor's performance. These meetings are intended to facilitate a mutual exchange of information and views concerning contractor performance. The procedures, level of attendance, and documentation of such meetings shall be established by mutual agreement between the Area Office and the contractor.

## III. EVALUATION AND REVIEW - ORGANIZATION AND ADMINISTRATION

### A. Organization and Administration

Organizational and administrative responsibilities for the award fee evaluation, review, and fee determination process will involve: (1) Performance Evaluators and Performance Monitors, (2) Area Office Managers, (3) AL Division Directors, (4) Performance Evaluation Committees, (5) Performance Evaluation Review Boards, and (6) the Contracting Officer.

### B. Performance Evaluators And Monitors

Performance Evaluators and Performance Monitors are those personnel responsible for gathering and assessing evaluation information relative to contractor performance of specific FPAs. A Monitor is an on-site AL representative (normally Area Office staff) who performs assigned evaluation functions on a continuing basis. An Evaluator is an off-site AL representative (normally AL Division staff) who performs evaluation functions on a periodic basis. The roles of Evaluators and Monitors are further delineated in other sections of this Handbook.

### C. Area Office Managers

Each Area Office Manager is responsible for implementation of the award fee evaluation process at the site of the contractor's operations. The Area Office Manager shall assure

that evaluation material is accumulated and consolidated so as to facilitate on-going and subsequent review in the evaluation process. The Area Office Manager shall also serve as Chairman of the Performance Evaluation Committee (PEC) and shall be responsible for notifications to the contractor and concerned AL Divisions of pertinent information associated with the award fee evaluation process. The roles of the Area Office Managers are further delineated in other sections of this Handbook.

D. <u>AL Division Directors</u>

AL Division Directors are responsible for AL Headquarters' evaluations of contractor performance relative to the specific FPAs for which an individual Division has a responsibility. Each AL Division Director involved in the evaluation of one or more FPAs shall assure that evaluation material is collected and assessed by Performance Evaluators to facilitate on-going and subsequent review in the evaluation process. The roles of the AL Division Directors are further delineated in other sections of this Handbook.

E. <u>Performance Evaluation Committees (PECs)</u>

A Performance Evaluation Committee (PEC) will be appointed by the Contracting Officer for each CPAF contract. A PEC shall normally be composed of three to six members, with

representatives from both the Area Office and AL Headquarters. The PEC Chairman shall be the Area Office Manager and the AL Headquarters' representatives shall normally be at the Division Director level. The PEC responsibility is to accumulate, review, and consolidate evaluation material submitted by the Area Office Manager and the AL Division Directors. Specifically, for each evaluation period, the PEC shall assess reports provided by the Area Office Manager and involved AL Division Directors, develop a composite evaluation, rate the contractor's performance, and apply appropriate adjectival and numerical grades to each of the FPAs consistent with the definitions in the Award Fee Plan. The PEC shall seek clarifications or additional information from organizations that submitted evaluation material as necessary to assure a fair and complete evaluation of the contractor in connection with each of the FPAs. Following this evaluation and the rating process, the PEC shall prepare a written Performance Evaluation Report summarizing the results of the evaluation based on the input received. As a part of the Report, the PEC shall be responsible for evaluation commentary for the "General Management" portion of the Report based upon its overall perspective of the contractor's management and the perspective gleaned from the total evaluation material available to the PEC. The Report shall include a write-up for each FPA,

with an adjectival summary grade for each FPA. The PEC shall also compute a proposed award fee utilizing the numerical grades and the weightings assigned to the FPAs. The PEC Performance Evaluation Report and the award fee recommendation shall be transmitted to the PERB as early as possible within the time frame specified in the Award Fee Plan. In addition, the PEC shall forward to the PERB the numerical grade for each FPA and the computation sheet indicating how the award fee recommendation was determined.

F. <u>Performance Evaluation Review Boards (PERBs)</u>

A Performance Evaluation Review Board (PERB) will be appointed by the Contracting Officer for each CPAF contract. A PERB shall normally be composed of two to five members of the AL Manager's senior staff. The PERB shall review the Performance Evaluation Report prepared by the PEC and the PEC's award fee computation and recommendation. This review should assure that the write-ups for each FPA are clear and substantiate the adjectival and numerical grades associated therewith. With respect to the "General Management" section, the PERB should introduce the perspective of the PERB members to complement the views expressed by the PEC. In the event that the PERB requires clarifications or additional information, the PERB Chairman will obtain the necessary information from the PEC Chairman. After completing its review and arriving

at its conclusions, the PERB shall provide a Performance Evaluation Report to the Contracting Officer along with a recommendation regarding the amount of award fee to which the contractor is entitled for the evaluation period. If the award fee recommendation submitted to the Contracting Officer by the PERB is different from that recommended by the PEC, the PERB will provide a written statement to the Contracting Officer explaining the rationale for the difference.

G. Contracting Officer (Fee Determination Official)

The Manager, AL, who is the Contracting Officer (CO), will review the material submitted by the PERB. When the Contracting Officer is satisfied that the Performance Evaluation Report adequately describes the contractor's performance and supports the conclusions contained therein, the Report will be forwarded to the contractor for review and comment as provided by provisions of the contract. After provisions of the contract related to notification of the contractor and its response option have been satisfied, the Contracting Officer will make a final award fee determination and will confirm such determination to the contractor in writing.

## IV. IMPLEMENTATION OF EVALUATION PROCESS

### A. Monitoring Process

After the Performance Evaluation Plan has been developed and approved and the contractor and concerned AL Divisions have been appropriately notified by the Area Office Manager, the monitoring of contractor performance for the selected FPAs begins at the start of the evaluation period. At the Area Office level, the Evaluation Administration Plan (EAP), previously prepared, should indicate the responsibilities of Area Office personnel in connection with award fee evaluation activities. The structure of the Area Office evaluation system is left to each Area Office Manager so as to permit optimum utilization of available resources. The Area Office Manager may designate Performance Evaluation Monitors for groups of FPAs, individual FPAs, or portions of FPAs (i.e., selected Functional Performance Elements). A Monitor is an on-site AL representative (normally Area Office staff) responsible for gathering and assessing evaluation information relative to contractor performance of FPAs, or portions thereof, on a continuing basis. Performance Evaluation Coordinators may also be appointed at the discretion of the Area Office Manager to coordinate the Monitors' activities. The Evaluation Administration Plan should also include instructions to the Monitors as to how evaluations are to be conducted and the extent to which documentation is required.

The Area Office Performance Monitors are the heart of the evaluation process. They represent the specific, continuing interface with the contractor in those functional areas for which an award fee determination will be made. Therefore, their efforts must be as objective and comprehensive as possible. Each Monitor must ultimately provide his or her evaluation judgment to the Area Office Manager in terms of a narrative, adjectival grade, and a numerical grade. The adjectival grades, numerical grades, and associated definitions which will be used are noted in Appendix C.

Besides the evaluation information developed at the Area Office level, the contractor's performance for specified FPAs will be evaluated by the AL Divisions that have a responsibility for the designated areas. Personnel within these Divisions who participate in the evaluations related to specific FPAs are Performance Evaluators. A Performance Evaluator is an off-site AL representative responsible for gathering and assessing evaluation information on a periodic basis. These Evaluators may provide information in several forms to the Division Director who, in turn, will be responsible to see that appropriate evaluation material is made available to the Area Office Manager or other Area Office personnel designated to receive it. One means of providing evaluation

information will be through normal audits, surveys, and appraisals of the contractor. In addition, the Evaluators may provide other written or oral assessments to their respective Division Directors based on their observations or information available to them. It is incumbent upon the AL Division Director to provide appropriate current evaluation material to the Area Office during the evaluation period. Such material should include the "noteworthy achievements" and "notable deficiencies" associated with the individual FPAs. Evaluation information may be transmitted orally or in writing from a Division Director (or specified representative) to an Area Office Manager (or specified representative). Oral transmissions shall clearly indicate that the information being furnished is applicable for award fee evaluation purposes and represents the views of the responsible Division Director. It is also incumbent upon the Area Office Manager to consolidate such information with the Area Office evaluation material--consulting with the Division Director as necessary--and to reflect a composite AL viewpoint when discussing with the contractor its performance. The Area Office Manager may provide evaluation information to participating AL Divisions periodically and request "feedback" from such Divisions to facilitate an accurate, in-process assessment of contractor performance.

During an evaluation period, the Area Office Manager must assure that periodic meetings are held with the contractor to mutually discuss contractor performance. These meetings must be held no less often than bi-monthly. The procedures, level of attendance, and documentation of such meetings shall be established by mutual agreement between the Area Office and the contractor.

At or near the end of each evaluation period, on a schedule specified by the PEC Chairman, the Area Office Manager and each AL Division Director responsible for evaluating performance in an FPA must provide to the PEC a summarization of the applicable evaluation. This summarization must include a narrative statement, an adjectival grade, and a numerical grade for each FPA under consideration. It is important that any adjectives used in the narratives denoting levels of performance are consistent with the terms used in the Award Fee Plan (see Appendix C). Evaluation summaries provided to the PEC by the concerned AL Division Directors at the conclusion of an evaluation period must reflect, and be consistent with, material provided to the Area Office <u>during</u> the evaluation period. No material which was not previously provided to the Area Office will be considered or utilized by the PEC unless such information was not available to the AL Division until near or at the end

of the evaluation period. This procedure is necessary in order to preclude "surprises" to the contractor who is entitled to be kept advised periodically of the AL view of its performance. Ideally, it would be desirable for the AL Divisions that participate in the award fee evaluation process to prepare a monthly or bi-monthly summary evaluation for each applicable FPA to facilitate timely input to the Area Office. However, these or other options are left to the discretion of the individual AL Division Directors.

The Area Office Manager and AL Division Directors may provide evaluation material to the PEC in connection with the "General Management" FPA. Such material shall be considered by the PEC in formulating the "General Management" section of the Performance Evaluation Report.

B. Making An Evaluation

The key to the success of the award fee process is the quality of the evaluation determination for each and all the FPAs included in the Performance Evaluation Plan. Thousands of dollars of available award fee may be at stake in connection with judgments applied against a single FPA. Therefore, it is extremely important that Monitors and Evaluators assigned an evaluation role be qualified and knowledgeable in the areas

for which they have a responsibility. The specific performance data upon which the ultimate award fee determination will be based must emanate from those personnel closest to and most intimately familiar with the contractors' activities.

In evaluating each FPA, the following Function Performance Factors (FPFs) should be considered to the extent possible and where they are applicable:

1. Planning
2. Organizing
3. Control
4. Staffing
5. Coordination and integration
6. Cost-effectiveness
7. Execution

"Execution" includes all procedural, programmatic, and operational aspects of the activities which fall within each FPA.

The Monitors and Evaluators must think in terms of "findings" or facts (including "achievements" and "deficiencies") while assessing contractor performance. Only after the "findings" or facts have been determined should the Monitor or Evaluator consider "grades" - either adjectival or numerical. The

"findings" or facts, after they have been quantified, should be reasonably easy to convert to "grades" using the definitions in or referenced in the Award Fee Plan. Appendix C contains the "grades" and definitions which will be used. Obviously, the professional judgments of the Monitors and Evaluators will be necessary in order to arrive at conclusions regarding the significance of specific "achievements" or "deficiencies" - that's why qualified personnel must be employed in the evaluation process.

Facts or "findings" upon which the Monitor or Evaluator will make his or her judgments may come from a variety of sources. Direct observations of contractor performance by the Monitor or Evaluator or other personnel are, of course, one principal source. Reports, other documents, and applicable data may also be used. Any information which is germane and accurate is appropriate for consideration - hearsay is <u>not</u>. It is not necessary or expected that a Monitor or Evaluator assigned to evaluate an FPA must personally observe all performance or directly derive all information related thereto.

One very important point to recognize in connection with award fee evaluation determinations is that the contractor's performance is <u>not</u> to be judged against a <u>theoretically</u> perfect

performance in an area. It is to be judged against a performance which could realistically be achieved considering limitations imposed on a contractor over which it has little or no control. Lack of funds or late deliveries of material from another AL contractor are examples which may be considered as limitations. Therefore, in collecting data from which to make an informed judgment, the Monitor or Evaluator must know "why" the contractor's performance is at a certain level.

Ultimately the Monitor or Evaluator must develop a narrative conclusion and grade relative to the contractor's performance in an FPA. In connection with the narrative conclusion as to performance, the Monitor or Evaluator must not only indicate the level of actual performance, but must also identify circumstances which influenced that performance; that is, the factors which enhanced or limited the contractor's ability to perform.

It is important that the Monitors and Evaluators assign grades consistent with the rating plan definitions in or referenced in the contract. It is intended that a grade of 100 is realistically achievable and there should be no hesitancy to assign a grade at any level if performance falls within the range of a specific definition.

C. Role Of Performance Evaluation Committee (PEC)

The Chairman of the PEC will be responsible to assure that all AL Divisions that will participate in the award fee evaluation process are advised of the due date for evaluation summaries which are required at the conclusion of each evaluation period. After the evaluation summaries are received from the Area Office Manager and the AL Division Directors, the PEC shall assess the reports, question the inputs as appropriate, and ultimately prepare a summary evaluation in the form of a Performance Evaluation Report. In the event that there is a substantive difference between input material from an AL Division Director and the Area Office Manager conclusion for a specific FPA, it will be the responsibility of the PEC to reconcile the difference with the responsible parties. If reconciliation is not possible, the matter should be referred to the AL Assistant Manager(s) having jurisdictional responsibility for the FPA for resolution. The PEC shall be responsible for evaluation commentary for the "General Management" portion of the Report based upon its overall perspective of the contractor's management and the perspective gleaned from the total evaluation material available to the PEC.

The Performance Evaluation Report shall include a narrative for each FPA with an adjectival summary grade for each FPA. The

PEC shall also compute a proposed award fee utilizing the information in the Area Office Manager and AL Division Directors reports and the weightings assigned to the FPAs in the Performance Evaluation Plan. The PEC Report and the award fee recommendation shall be forwarded to the PERB as early as possible within the time frame specified in the contract. In addition, the PEC shall transmit to the PERB the numerical grades for each FPA and the computation sheet indicating how the award fee recommendation was determined.

D. Role Of Performance Evaluation Review Board (PERB)

The PERB will be responsible to provide a management overview of the work of the PEC. The Board will review the Performance Evaluation Report prepared by the PEC as well as the PEC's award fee computation and recommendation. This review should assure that the commentary associated with each FPA is clear and substantiates the adjectival and numerical grades provided by the PEC. The PERB should place particular emphasis on the "General Management" section, assuring that this section is supported by the overall report as well as reflecting other pertinent information available to the Board. Any dissatisfactions or questions that arise in connection with the material submitted by the PEC shall be communicated to the

PEC with the intent to derive clarifications or resolve questions raised. Subsequent to its review and satisfactory resolution of any questions, the PERB shall provide a Performance Evaluation Report to the Contracting Officer along with a recommended award fee. If the award fee recommendation submitted to the Contracting Officer by the Board is different from that recommended by the PEC, the PERB will provide a written statement to the Contracting Officer explaining the rationale for the different recommendation.

E. Role Of Contracting Officer (CO)

The Manager, AL, who is the Contracting Officer (CO), will review the material submitted by the PERB and, if satisfied, will see that the Performance Evaluation Report is forwarded to the contractor. If the Report is not deemed satisfactory, the Contracting Officer shall consult with the Chairman of the PERB to resolve any questions. Ultimately, a Report satisfactory to the Contracting Officer shall be forwarded to the contractor.

After provisions of the contract related to notification of the contractor and its response option have been satisfied, the Contracting Officer will make a final award fee determination and will confirm such determination to the contractor in writing.

A simplified "Schematic of Award Fee Evaluation and Review Process" is included in Figure 1.

## SCHEMATIC OF AWARD FEE EVALUATION AND REVIEW PROCESS




Figure 1

V. CONTINUING EVALUATION PROCESS

A. General

Once a CPAF contract has been negotiated and the Award Fee Plan initially implemented, the evaluation and review process will be essentially repeated for each specified evaluation period. Changes in the Award Fee Plan and the Performance Evaluation Plan may be made, as provided by the contract, prior to commencement of the next evaluation period. These changes must be communicated to the contractor in the time frame and in the manner specified by the contract.

B. Changes To Performance Evaluation Plan

Normally, the currently effective Performance Evaluation Plan will be reviewed before the next evaluation period begins in the context of determining the desirability and appropriateness of making changes in the FPAs specified in connection with award fee applicability. FPAs can be changed periodically from evaluation period to evaluation period, as permitted by the Award Fee Plan, when: (1) AL wishes to place particular emphasis on one or more other FPAs, (2) the contractor's past performance in any area(s) warrants a change in FPAs, or (3) other conditions suggest that a rearrangement of FPAs is in order. The weightings of the FPAs shall also be reviewed and may be revised unilaterally

5. notify all AL Divisions of the due dates for evaluation summaries to be utilized in the preparation of an Annual Appraisal Report of the contractor's overall performance. (See Part VII of this Handbook for annual appraisal requirements.)

The actions required following the notifications listed above are described in other parts of this Handbook.

B. Other Notification Responsibilities

Other notification responsibilities and associated actions are delineated throughout this Handbook in the context of the total evaluation, review, and approval process. These responsibilities pertain to: (1) the preparation, review, and approval of the Performance Evaluation Plan and changes thereto, (2) the development of an Evaluation Administration Plan and changes thereto, (3) the preparation, review, approval, and transmittal to the contractor of a Performance Evaluation Report, and (4) the computation, proposal, determination, and notification to the contractor of an award fee.

## VII. ANNUAL APPRAISAL

### A. General

The evaluation and review process described in Parts I through VI of this Handbook applies only to selected FPAs included in the Performance Evaluation Plan. However, contractor performance in all areas (all FPAs included in Appendix A as applicable to a particular contractor) must be maintained at least at an overall "satisfactory" level in order for the contractor to be eligible for any award fee in addition to the base fee provided for in the contract. The level "satisfactory" is defined in the Award Fee Plan. In order to determine whether the contractor has achieved and is maintaining at least the overall "satisfactory" level of performance, it is necessary for AL to maintain continual surveillance over the contractor's performance in all areas. Further, it is necessary to specify certain procedures to assure that surveillance observations and conclusions of a significant nature are promptly brought to AL Management's attention. In addition, a formalized summarization of the contractor's overall performance must be documented annually.

### B. Evaluation

The process of maintaining continual surveillance of essentially all of a contractor's activities is inherent in the responsibilities

assigned to AL Headquarters and Area Office personnel in their normal administrative and operational functions. The contractors' performances have been evaluated in this context in the past under the CPFF contract arrangements. No significant change in the current evaluation process is contemplated. Each AL organization will continue to function, in an appraisal sense, consistent with Manual Chapter and other directives and requirements--conducting audits, surveys, data collection and analyses, studies, and observations. However, in order to accommodate the CPAF contract concept and associated requirements, each AL Division Director and Area Office Manager shall formally report any significant degradation in contractor performance or any performance of an FPA which appears to be less than "satisfactory." Such reports shall be made promptly to the AL Assistant Manager(s) having jurisdictional responsibility for the FPA involved. The Assistant Manager so advised will make an evaluation of the situation, collecting whatever additional information is necessary to reach an informed conclusion. The Assistant Manager will consult with the cognizant Area Office Manager as appropriate and take those actions deemed necessary--including notifying the Contracting Officer. Should information be assembled which indicates that

a contractor's <u>overall</u> performance might be at, or be approaching, a less than "satisfactory" level; the Contracting Officer shall make an evaluation of the situation and render a judgment. If such judgment is that a less than overall "satisfactory" level of performance exists, the Contracting Officer shall notify the contractor of same. The specific contract terms will be used to determine what effect such a judgment will have on the award fee. The award fee for performance during the previous evaluation period(s) will not be affected.

C. <u>Annual Appraisal Report</u>

At the end of each 12 months, normally encompassing 2 award fee evaluation periods, an Annual Appraisal Report of the contractor's overall performance will be prepared. The 12-month interval may vary in some cases. This Report is to summarize the contractor's overall level of performance which has been evaluated on a continuing basis during the year. The PEC will be responsible for preparing the Annual Appraisal Report. Evaluation input for the annual appraisal will be provided to the PEC on time scales normally compatible with alternate award fee evaluation periods and as specified by the responsible PEC Chairman. Each AL Division Director shall provide to the

PEC a summary statement in connection with the FPAs for which that Division has a responsibility. These statements must include a short narrative highlighting "noteworthy achievements" and/or "significant deficiencies" and must conclude with an adjectival grade for each FPA (see Appendix C for the grades and definitions).

The Area Office Manager will consider all FPAs applicable to the contractor's activities and shall provide a summary report to the PEC indicating the "noteworthy achievements" and/or "significant deficiencies" associated with specific FPAs.

The PEC will consolidate the annual appraisal information received from the AL Division Directors and Area Office Manager and will summarize this material in an Annual Appraisal Report. This report shall be prepared in four sections:

1. General Management
2. Technical/Program Operations
3. Operational Support, and
4. Administrative Support.

Within these sections the PEC will summarize overall performance relating to the applicable FPAs identified for each section in the "Master List of FPAs" included in this Handbook as Appendix A. Within each section, the PEC shall summarize

"noteworthy achievements" and/or "significant deficiencies" related to the applicable FPAs. It is not intended that all the FPAs be individually addressed in the Annual Appraisal Report. A general statement regarding performance of the FPAs as a group within a section is all that is required, as well as a conclusion regarding each section in terms indicating whether overall performance of the FPAs represented by that section has been at least "satisfactory." The Report shall conclude with a statement as to whether overall contractor performance for all applicable FPAs (covered in the four sections) has been at least "satisfactory."

The Annual Appraisal Report prepared by the PEC shall be forwarded to the PERB. The PERB will evaluate the Report and contact the PEC if there are any questions or problems which need to be resolved before a report is submitted to the Contracting Officer. The PERB will submit an Annual Appraisal Report to the Contracting Officer for approval.

The Contracting Officer shall review the Annual Appraisal Report submitted by the PERB and shall consult with the PERB to resolve any questions or concerns. When a Report has been prepared which is acceptable to the Contracting Officer, it will be forwarded to the contractor. It is anticipated that the

Contracting Officer and his senior staff will meet with the contractor management annually to discuss the Annual Appraisal Report, matters related to the award fee process, and other items of mutual management interest.

# APPENDIX A

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
| --- | --- |
| B. TECHNICAL/PROGRAM OPERATIONS | |
| Delivery Performance (Weapons Related) | 1. New build<br>2. Disassembly and rebuild<br>3. Retirement disposal |
| Production Support (Weapons Related) | 1. Manufacturing<br>2. Production control<br>3. Program control<br>4. Tooling fabrication<br>5. Material handling<br>6. Test equipment fabrication |
| Chemical Operations | 1. Material output<br>2. Minimum inventory levels<br>3. Process capability |
| Technical Support | 1. Product engineering<br>2. Industrial engineering<br>3. Tool and gage design |
| Quality Control | 1. Quality control engineering<br>2. Quality control operations<br>3. Standards and calibration<br>4. Product inspection |
| Development Work | 1. Internal process development<br>2. Development activities for Design Laboratories<br>3. Cost/design trade-offs |
| Nuclear Materials Management | 1. Nuclear material transactions<br>2. Forecasts of special nuclear materials requirements<br>3. Nuclear material allotment control<br>4. Inventory justification and utilization of nuclear material<br>5. Disposition of scrap and excess nuclear material |
| Nuclear Waste Management | 1. Control of nuclear waste<br>2. Maintenance of burial ground/ storage for nuclear waste |
| Non-Weapon Programs | 1. To be defined for each contractor |

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| C. OPERATIONAL SUPPORT | |
| Transportation Safeguards | 1. Maintenance Support<br>2. Shipment planning<br>3. Shipment operational support |
| Security | 1. Personnel security<br>2. Physical security<br>3. Technical security |
| Safeguards | 1. Physical control of nuclear material<br>2. Accountability of nuclear material |
| Facilities Engineering and Construction Management | 1. Pre-project authorization activities<br>2. Pre-project directive activities<br>3. Project directive activities<br>4. Project management overview |
| Facilities Maintenance, Utilities, and Energy Conservation Management | 1. Maintenance management plan<br>2. Energy conservation program<br>3. Operating plan for utilities<br>4. Equipment maintenance program<br>5. Job planning and scheduling<br>6. Physical condition of plant and equipment |
| Industrial Safety | 1. Employee safety<br>2. Property protection<br>3. Construction safety |
| Fire Protection | 1. Fire prevention program<br>2. Fire protection engineering<br>3. Facility protection<br>4. Fire suppression capability |
| Health Protection | 1. Health physics<br>2. Occupational medicine<br>3. Industrial hygiene<br>4. Sanitation |
| Environmental Protection | 1. Radioactive/toxic material pollution control<br>2. Environmental monitoring<br>3. Environmental assessments/ impact statements |

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| Emergency Preparedness | 1. Emergency plans and procedures<br>2. Resources<br>3. Liaison and coordination with other agencies |
| Nuclear Criticality | 1. Nuclear material handling and storage<br>2. Facility design<br>3. Packaging and transportation |
| Nuclear Explosives Safety | 1. Personnel assurance plan<br>2. Nuclear safety operations<br>3. Tester control program |
| Facilities Safety | 1. Facilities design<br>2. Safety analysis |

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| **D. ADMINISTRATIVE SUPPORT** | |
| Operating & Capital Resources Management | 1. Resources forecasting<br>2. Budgeting<br>3. Resources analysis<br>4. Financial Plan control<br>5. Resources utilization<br>6. Cost management |
| Financial Management | 1. Financial/custodial accounting<br>2. Performance/decision accounting |
| Internal Auditing | 1. Audit program<br>2. Adherence to generally accepted auditing standards<br>3. Reporting<br>4. Follow-up action |
| Automated Data Processing | 1. ADP resources projections<br>2. Acquisition of ADP resources<br>3. Operation and maintenance of ADP resources<br>4. Software support |
| Telecommunications | 1. Data communications services<br>2. Telephone services<br>3. Radio services<br>4. Miscellaneous telecommunications systems and services |
| Records Management | 1. Current record control<br>2. Low cost record control<br>3. Destruction of records<br>4. Word processing management |
| Property Management | 1. Stores management<br>2. Storage management<br>3. Vehicle management<br>4. Traffic management<br>5. Personal property management |

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| Procurement Management | 1. Purchasing procedures and purchasing operations<br>2. Findings and observations of Contract Review Board<br>3. Small and minority business support<br>4. Reporting against ERDA report requirements<br>5. Response to ERDA requests for information, comments, or directives |
| Industrial Relations | 1. Labor relations<br>2. Wage and salary administration<br>3. Fringe benefits administration<br>4. Employment and placement<br>5. Training<br>6. Employee relations |
| Equal Employment Opportunity | 1. Establishment and implementation of Affirmative Action Plan<br>2. Resolution of discrimination complaints |
| Administrative/Services | 1. To be defined for each contractor |
| Public Affairs | 1. Communications with public, public officials, news media, and employees<br>2. Participation in community relations |
| Classification | 1. Classification guides<br>2. Policy and procedures<br>3. Employee classification indoctrination<br>4. Classification application<br>5. Use of classification board and authorized classifiers |
| Technical Information | 1. Dissemination of technical and scientific information to others<br>2. Receipt and availability of technical and scientific information from others<br>3. Preparation of required reports covering technical activities |

# APPENDIX B

SAMPLE AWARD FEE PLAN

APPENDIX
TO
CONTRACT ________
MODIFICATION__

AWARD FEE PLAN

1. PURPOSE

This Cost-Plus-Award-Fee (CPAF) contract has been employed to provide an incentive, in the form of an available award fee, which is sufficient to encourage the attainment of and to reward the Contractor for increased proficiency in the performance of the contract. The Award Fee Plan, as set forth in this Appendix, constitutes the substantive and procedural provisions which will be utilized in arriving at the amount of the award fee to which the Contractor is entitled for each evaluation period.

2. INTRODUCTION

The Contracting Officer will evaluate the Contractor's performance during each evaluation period and will determine the amount of award fee to be paid the Contractor for that evaluation period. Evaluation of the Contractor's performance will be based upon the Performance Evaluation Plan established for the evaluation period by the Contracting Officer, after consultation with the Contractor. The

Performance Evaluation Plan will consist of (i) a limited number (approximately 5-10) of identifiable areas of contract work which are designated as "Functional Performance Areas" (FPAs) and (ii) the specified weighting assigned to each FPA. The Contractor's performance of each FPA will be evaluated in terms of a numerical grade taken from the Rating Plan set forth in Section 4. Using the numerical grades and weights assigned each FPA, the award fee to which the Contractor is entitled will then be determined in accordance with the provisions of Section 5. The Contractor will receive an evaluation report which will include the adjectival grade for each FPA and will be given an opportunity to comment on said report. Section 6. outlines the basic administrative procedures which will be followed in the process of arriving at the determination of the amount of award fee to which the Contractor is entitled for each evaluation period.

3. PERFORMANCE EVALUATION PLAN

The following FPAs with specified weightings will be used in evaluating the Contractor's performance:

(THE FOLLOWING IS AN EXAMPLE ONLY)

| Functional Performance Areas | Weighting |
|---|---|
| General Management | 15% |
| Development Work | 10% |
| Production Support (Weapons Related) | 20% |
| Quality Control | 10% |
| Safeguards | 15% |
| Facilities Maintenance, Utilities and Energy Conservation Management | 5% |
| Operating and Capital Resources Management | 15% |
| Fire Protection | 5% |
| Procurement Management | 5% |
| | 100% |

The Albuquerque Operations Office (AL) award fee evaluation process will require that a grade be given for each FPA consistent with the Rating Plan definitions which are set forth in Section 4.

In arriving at a grade for each FPA, consideration will be given to (i) planning, (ii) organizing, (iii) control, (iv) staffing, (v) coordination and integration, (vi) cost-effectiveness, and (vii) execution. "Execution" includes all procedural, programmatic, and operational aspects of the activities which fall within each FPA.

The FPAs and weightings may be changed for subsequent evaluation periods in accordance with Paragraph 2.c. of the contract article entitled "Allowable Costs, Base Fee and Award Fee." A breakdown of the work elements which comprise each FPA for a given evaluation period will be furnished to the Contractor prior to the commencement of that evaluation period.

4. RATING PLAN

Evaluation of the Contractor's performance, for award fee purposes, shall be made in accordance with the following Rating Plan:

# RATING PLAN

| ADJECTIVAL GRADES | NUMERICAL GRADES | DEFINITIONS* |
|---|---|---|
| Outstanding | 96-100 | Substantially exceeds expected performance level. Several noteworthy achievements or some especially noteworthy achievements. No notable deficiencies. |
| Excellent | 91-95 | Exceeds expected performance level. Some noteworthy achievements. No notable deficiencies. |
| Very Good | 86-90 | Expected performance level. Some noteworthy achievements. Some notable minor deficiencies. **or** No noteworthy achievements. No notable deficiencies. |
| Good | 81-85 | Minimum expected performance level. No noteworthy achievements. Some notable minor deficiencies. **or** Some noteworthy achievements. Several notable minor deficiencies. |
| Moderately Good | 76-80 | Exceeds acceptable performance level. No noteworthy achievements. Several notable minor deficiencies. **or** Some noteworthy achievements. Some notable significant deficiencies. |
| Satisfactory | 71-75 | Acceptable performance level. No noteworthy achievements. Some notable significant deficiencies. |
| Marginal | 66-70 | Minimum acceptable performance level. Several notable significant deficiencies. |
| Unsatisfactory | 65 and below | Unacceptable performance level. Notable serious major deficiencies. |

***NOTES:** 1. *A "noteworthy achievement" is some accomplishment beyond the routine performance associated with a function or activity.*

2. *A "notable deficiency" is something more than an incidental deficiency. While its significance may vary, it is considered worthy of mention. The absence of "notable deficiencies" does not imply that there are no deficiencies at all.*

5. APPLICATION OF RATING PLAN TO PERFORMANCE EVALUATION PLAN

The performance of each FPA will be evaluated in terms of the Rating Plan set forth in Section 4. The performance evaluation determination will be equated to a numerical grade which will then be multiplied by the weighting assigned to that FPA. The sum of the resulting products computed for each FPA will consitute the numerical grade evaluation of the Contractor's performance for the evaluation period. If the sum of the numerical grades for all the FPAs is seventy (70) or less, the Contractor will not be entitled to any award fee for that evaluation period. If such sum is over seventy (70) and the overall performance under the contract is not less than "satisfactory," the Contractor will be entitled to a proportionate share of the maximum available award fee.

The proportionate share of the maximum available award fee to which the Contractor will be entitled for each of the first two (2) evaluation periods shall be computed in accordance with the following table.

AWARD FEE PERFORMANCE TABLE

| Performance Points Earned | Amount of Maximum Available Award Fee Per Point | Total Maximum Available Award Fee | Percent of Maximum Available Award Fee |
|---|---|---|---|
| 0 thru 70 | $ -0- | $ -0- | 0 |
| 71 thru 75 | | | |
| 76 thru 80 | | | |
| 81 thru 85 | | | |
| 86 thru 90 | | | |
| 91 thru 95 | | | |
| 96 thru 100 | | | |

6. ADMINISTRATIVE PROCEDURES

The award fee evaluation process will be administered for the Contracting Officer by a Performance Evaluation Committee (PEC) and a Performance Evaluation Review Board (PERB), each appointed by the Contracting Officer.

For each evaluation period, the PEC shall assess reports which summarize evaluation information accumulated by performance evaluators and monitors, shall rate the Contractor's performance, and shall apply appropriate adjectival and numerical grades to each of the FPAs. Following this evaluation and rating process, the PEC shall prepare a written report summarizing the results of the evaluation and shall compute a proposed award fee. The PEC report and an award fee recommendation shall be transmitted to the PERB by the twenty-fifth (25th) working day following the end of each evaluation period. During each evaluation period, the PEC Chairman, or his designee(s), will meet with the Contractor periodically, but not less often than bi-monthly, to discuss the Contractor's performance to date and to give the Contractor an opportunity to present performance evidence in its behalf.

The PERB shall review the performance evaluation report prepared by the PEC and the PEC's award fee computation and recommendation. Based on its findings and conclusions, the PERB shall provide a performance evaluation report to the Contracting Officer and a recommendation

regarding the amount of award fee to which the Contractor is entitled for the evaluation period.

The Contracting Officer will evaluate the Contractor's performance and, within thirty-five (35) working days after the end of the evaluation period, will transmit to the Contractor a final written evaluation report which includes adjectival grades for each FPA. In the event it has been determined that the Contractor's overall performance of the contract is less than "Satisfactory" as that term is defined in Section 4., the final written evaluation report will also include the bases for that determination.

Within five (5) working days after receipt of said report, the Contractor may request an opportunity to present to the Contracting Officer a brief oral analysis of its performance. Upon receipt of such request, the Contracting Officer shall specify a time and place for the Contractor to make its presentation. The time specified must be not later than ten (10) working days after receipt of the Contractor's request, unless the parties otherwise agree. At least two (2) working days prior to such presentation, the Contractor shall have provided the Contracting Officer with a brief written summary of the points to be covered in the presentation. Within ten (10) working days after the Contractor's presentation, or if no request for presentation is made, immediately upon the expiration of the time

within which the Contractor could have made such a request, the Contracting Officer shall determine the amount of the award fee to which the Contractor is entitled for the evaluation period and shall notify the Contractor. Such determination shall be confirmed in writing to the Contractor.

APPENDIX C

# RATING PLAN

| ADJECTIVAL GRADES | NUMERICAL GRADES | DEFINITIONS* |
|---|---|---|
| Outstanding | 96-100 | Substantially exceeds expected performance level. Several noteworthy achievements or some especially noteworthy achievements. No notable deficiencies. |
| Excellent | 91-95 | Exceeds expected performance level Some noteworthy achievements. No notable deficiencies. |
| Very Good | 86-90 | Expected performance level. Some noteworthy achievements. Some notable minor deficiencies. **or** No noteworthy achievements. No notable deficiencies. |
| Good | 81-85 | Minimum expected performance level. No noteworthy achievements. Some notable minor deficiencies. **or** Some noteworthy achievements. Several notable minor deficiencies. |
| Moderately Good | 76-80 | Exceeds acceptable performance level. No noteworthy achievements. Several notable minor deficiencies. **or** Some noteworthy achievements. Some notable significant deficiencies. |
| Satisfactory | 71-75 | Acceptable performance level. No noteworthy achievements. Some notable significant deficiencies. |
| Marginal | 66-70 | Minimum acceptable performance level. Several notable significant deficiencies. |
| Unsatisfactory | 65 and below | Unacceptable performance level. Notable serious major deficiencies. |

***NOTES:** 1. *A "noteworthy achievement" is some accomplishment beyond the routine performance associated with a function or activity.*

2. *A "notable deficiency" is something more than an incidental deficiency. While its significance may vary, it is considered worthy of mention. The absence of "notable deficiencies" does not imply that there are no deficiencies at all.*

# GLOSSARY OF TERMS

# GLOSSARY OF TERMS

Annual Appraisal Report. A report, prepared annually and normally encompassing 2 award fee evaluation periods, which summarizes a contractor's overall performance of all Functional Performance Areas (FPAs)--not just those associated with the award fee provisions of a specific contract. An Annual Appraisal Report satisfactory to the Contracting Officer is forwarded to the contractor.

Award Fee Plan. A formal plan which contains the policies and procedures applicable for the award fee provisions of a specific contract. In addition, this Plan includes such elements as the Performance Evaluation Plan, the Rating Plan and associated grades and definitions, and an award fee performance table. The Award Fee Plan is negotiated as a part of a contract.

Contracting Officer (CO). The Manager, Albuquerque Operations Office. In some incentive fee contracts the CO is referred to as the Fee Determination Official (FDO).

Cost-Plus-Award-Fee (CPAF) Contract. A cost type contract with special fee provisions to motivate a contractor to achieve a high or higher level of performance.

Cost-Plus-Fixed-Fee (CPFF) Contract. A cost type contract which provides for the payment of a negotiated fixed fee to a contractor.

Evaluation Administration Plan (EAP). A plan developed at the Area Office level to facilitate implementation of the evaluation and review process associated with an approved Performance Evaluation Plan. The EAP contains the Functional Performance Areas (FPAs) to be evaluated, the Functional Performance Elements (FPEs) associated with these FPAs, assignments of Performance Monitors, and additional information and instructions relative to the evaluation process.

Functional Performance Area (FPA). A specific category representing a group of activities or functions (managerial, administrative, or operational) in which a contractor is required to perform.

Functional Performance Element (FPE). A specific activity or function (managerial, administrative, or operational) which a contractor is required to perform. Several related FPEs generally define the scope of a Functional Performance Area (FPA).

Functional Performance Factor (FPF). One of several identified factors (such as cost-effectiveness) that normally contributes to desired end results and which is considered, to the extent possible and applicable, in evaluating contractor performance within a Functional Performance Area (FPA).

Notable Deficiency. A deficiency which is something more than an incidental deficiency. While its significance may vary, it is considered worthy of mention. The absence of "notable deficiencies" does not imply that there are no deficiencies at all.

Noteworthy Achievement. Some accomplishment beyond the routine performance associated with a function or activity. It is worthy of mention as a "credit" to contractor performance in the evaluation process.

Performance Evaluation Committee (PEC). A Committee appointed by the Contracting Officer for each CPAF contract to accumulate, review, and consolidate evaluation material submitted by an Area Office and AL Divisions. A PEC is normally composed of Area Office and AL Division personnel. This Committee prepares a proposed Performance Evaluation Report and computes a proposed award fee for subsequent consideration by the Performance Evaluation Review Board (PERB).

Performance Evaluation Coordinator. An individual appointed at the discretion of an Area Office Manager to assist in the coordination of Performance Monitors' activities and to consolidate evaluation material provided by such Monitors.

Performance Evaluation Plan. A plan which identifies the specific Functional Performance Areas (FPAs) in which a contractor's performance is evaluated during a particular evaluation period in connection with an award fee determination. This plan also specifies the "weighting" assigned to each FPA for award fee computation purposes. A Performance Evaluation Plan is a part of an Award Fee Plan.

Performance Evaluation Report. A report, prepared at the conclusion of each evaluation period in connection with the award fee evaluation and review process, which summarizes contractor performance in the applicable Functional Performance Areas (FPAs). The report includes a narrative and an adjectival summary grade for each FPA. A Performance Evaluation Report satisfactory to the Contracting Officer is forwarded to the contractor after the evaluation period has been completed.

Performance Evaluation Review Board (PERB). A Committee appointed by the Contracting Officer for each CPAF contract to provide a management overview of the work of the Performance Evaluation Committee (PEC). A PERB is normally composed of members of the AL Manager's senior staff. This Board reviews the Performance Evaluation Report and the proposed award fee submitted by the PEC and provides a Performance Evaluation Report and an award fee recommendation to the Contracting Officer.

Performance Evaluator. An off-site (remote from contractor) AL representative (normally AL Division staff) responsible for gathering and assessing evaluation information on a periodic basis relative to a contractor's performance in specified Functional Performance Areas (FPAs).

Performance Monitor. An on-site (contractor location) AL representative (normally Area Office staff) responsible for gathering and assessing evaluation information on a continuing basis relative to a contractor's performance in specified Functional Performance Areas (FPAs).

Rating Plan. That section of an Award Fee Plan which delineates the adjectival grades, numerical grades, and the definitions thereof which are used in the evaluation process. The Rating Plan facilitates the award fee computation based upon the translation of evaluation information into definitive grades.

PL. SUPP. EX. 45

UNITED STATES COURT OF FEDERAL CLAIMS

ROCKWELL INTERNATIONAL CORPORATION, )
)
Plaintiff, )
)
vs. ) No. 91-1362 C
) (Judge Yock)
UNITED STATES OF AMERICA, )
)
Defendant. )

ORIGINAL

DEPOSITION OF:

BRUCE G. TWINING

Tuesday, February 23, 1993

10:00 A.M.

Reported by:

BARBARA K. HARRIS

CSR # 93

TEARNEY & TEARNEY

Certified Court Reporters

1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025
310/477-8867 FAX 310/478-8412

MR. KOLAR: Objection; again calls for speculation, lack of foundation.

MR. NYE: Well, the foundation is Mr. Troell's memorandum that refers to a grade of 87 and I'm asking how he learned -- if he knows. He either does or doesn't --

MR. KOLAR: I will limit my objection to calls for speculation because it's asking how Mr. Troell knew.

Q. If you have knowledge. Don't speculate. If you know.

A. I cannot explain the date on this memo being July 27 and the date on Mr. Troell's memo being July 10th. My recollection of this process is we got a recommendation from Goldberg, the PERB considered that recommendation, and we went into headquarters with a modified proposal.

Q. Did you have conversations with Mr. Goldberg on the subject of his recommendation of '87?

A. I don't think so before we got the letter.

Q. Okay.

A. The conversations that I had with Mr. Goldberg, after he took over at Rocky Flats, were trying to have us continue to provide support in areas that he wasn't equipped to deal with in this new management arrangement that had been implemented by the Tuck memo.

Q. At any time have you had discussions with Mr. Goldberg with respect to Mr. Goldberg's recommendation of 87 as the award fee grade for Rockwell for the first period in 1989?

A. I don't recall. I don't recall those conversations.

Q. One way or the other.

A. One way or the other.

Q. On the first page of Exhibit 49, in the last sentence, it states that "Subsequently," and I think in context that means subsequent to the PERB making its recommendation to you, "much more stringent expectations of contractor performance have been mandated by the secretary and other DOE policy makers' statements and issuances." Do you know what is being referred to there?

A. Well, when Secretary Watkins came in he made it very clear that he was going to put a major priority on ES & H, and the level of DOE's performance in those areas. And I think that is what he is referring to.

Q. As of July 10, how long would Mr. Goldberg have been at Rocky Flats?

A. Well, a little over a month.

Q. Do you know what sources of input Mr. Goldberg was receiving at Rocky Flats with respect to Rockwell's performance over the first award fee period for '89?

A. Just this letter is all I recall.

Q. Was there anything in that letter that you didn't know about before in the process of making your own recommended grade?

MR. KOLAR: Take your time and read the letter through.

A. I would say there are details here that I wasn't aware of.

Q. And these would be details that were not included in the material that you received from the PERB?

A. I'm not sure.

Q. You don't know one way or the other without --

A. Without going back and doing it.

Q. -- and studying it. And Mr. Troell, looking at Exhibit 49, makes a suggestion to you, is that a fair characterization, that "Since Mr. Goldberg" -- I'm looking at the last paragraph -- "has been on-site for several weeks, that he would have greater insight into the current conditions at the plant, and, accordingly, we," I take it that's the PERB, "do not believe you are in a position to offer an informed alternative to his proposal"?

A. Yes.

Q. Did you concur with that recommendation?

A. Yes.

Q. Let me show you what has been marked as

the board's action or not.

Q. You might note on Exhibit 49, Mr. Troell's memorandum, there is the handwritten note that somebody wrote in handwriting at the bottom of it. It says, "Charlie, this is the draft memo which was sent to Mr. Tuck on July 10, 1989. You may want to sign this memo for our records. Ted Hill." I assume that's Mr. Hill's handwriting?

A. That's his name down there.

Q. You don't know? Okay. Was it unusual for an area manager to recommend an award fee after the PERB had already made a recommendation to you?

A. It was unusual to have a plant invaded by the FBI and the EPA. There were a lot of unusual things around this whole...

Q. Had you ever had an area manager recommend a different award fee grade after the process had already gone through the PERB?

A. No.

Q. Do you know if anyone asked Mr. Goldberg to take a look at the proposed award fee?

A. No, I don't.

Q. It wasn't the responsibility of an area manager to do that, was it, after the PERB had already reached a decision?

A. No.

Q. Let me show you a document that has been marked Exhibit 50 for identification, a memorandum from Mr. Tuck again to you and Mr. Goldberg.

A. Okay.

Q. Is there any significance in Mr. Goldberg reporting to the Assistant Secretary for Defense Programs versus his prior reporting responsibility which was to the Undersecretary of Energy?

A. Defense Programs was the primary customer organization for the product at Rocky Flats.

Q. Is that who you reported to?

A. I'm not sure when things happened. I reported to Tuck and the secretary until the secretary decided how he wanted to reorganize, and at that point me and a number of other field office managers were changed over to reporting to DP, because the Assistant Secretary for Defense Programs was the primary programatic contact in Washington, and so all of the field structure was eventually tied into a programatic secretarial officer.

Q. As of the June/July 1989 time frame, was the Rocky Flats office and the Albuquerque office basically on the same horizontal line as far as the organizational structure, Department of Energy?

A. I'm not sure when my line was changed from

Q. Have you seen this document before?
A. Yes.
Q. Is that your signature on it?
A. Yes.
Q. You note that in the third paragraph it states that, "As stated in my draft memorandum to John C. Tuck dated July 10, '89"?
A. Yes.
Q. Does that refresh your recollection that that memorandum, indeed, went to Mr. Tuck?
A. I would say that's one way to interpret that. I'm a little surprised that we reference a draft memorandum as an official memorandum, but that...
Q. You state that, "I am not" -- you being Mr. Twining -- "am not in a position to offer an informed alternative to his proposal, especially in view of our changing philosophy in the application of Department of Energy performance standards and level of DOE expectations."
What do you mean by that, that you were "not in a position to offer an informed alternative"?
A. What I meant is at this point there were many more people looking at that plant in intimate detail than there had been before the raid, and that since Albuquerque was no longer in the loop and we didn't have access to the site, I didn't have any way to validate what they are finding. So I

was accepting what other federal employees, who were on site, were discovering during this period after the raid.

Q. What is the purpose of this memorandum to Mr. Meinhardt?

A. Well, the purpose of this memorandum was to respond to the nonconcurrence around my prior recommendation, and to provide a new recommendation for headquarters' consideration, and this new recommendation reflected the input from Ed Goldberg who was the acting area manager of Rocky Flats.

Q. At the time you sent this memorandum, did you have any information that headquarters was considering an even lower award fee?

A. No.

Q. Let me show you a document that has been marked Plaintiff's Deposition Exhibit 150.

A. Okay.

Q. Who would have prepared this letter?

A. Well, I can't tell because there is not an organizational code on it, but probably our contracts people.

Q. Did they have forms in their word processor for these award fee letters to contractors?

A. I don't know.

Q. Do you know when this letter was prepared?

MR. KOLAR: Let me have a moment. Okay.

Q. If you will look at the top page that has the Bates number E 000936, and going over to 937, that is a memorandum to you from Mr. Meinhardt; correct?

A. Yes.

Q. And in that Mr. Meinhardt proposes a Rockwell award fee.

A. Yes, he does.

Q. Now, would this be the communication that you testified to earlier that you believe you received some memo from Mr. Meinhardt on a lower award fee?

A. Yes.

Q. This would be it?

A. Yes.

Q. Now the memorandum to you from Mr. Meinhardt is dated September 20, 1989.

A. Yes.

Q. Do you recall whether you had any discussions with Mr. Meinhardt prior to September 20 in connection with this proposed award fee?

A. I don't recall specifically.

Q. Which means you don't recall one way or the other?

A. No.

Q. No, you don't recall one way or the other?

A. No, I do not recall one way or the other.

Q. All right. The memorandum is dated, as I said, September 20. Do you know when you would have received this memorandum?

A. We could have very well gotten it that day on a fax machine.

Q. Do you recall?

A. No.

Q. How were memoranda or other documents generally communicated between headquarters and Albuquerque? Fax? Letter? Federal Express?

A. All of the above. Important things quite typically go on the fax.

Q. When a document was faxed to you, would it also have been mailed to you?

A. Yes, I think so, but I can't speak to this one.

Q. And you just don't recall one way or the other?

A. No.

Q. If you would turn to the pages that bear Bates numbers E 000938 and 939. Is this a draft letter from you to Mr. Sanchini that was prepared by Mr. Meinhardt?

A. Yes, it appears so.

Q. Have you ever had any other occasions where your draft award fee letter to a contractor was drafted by a headquarters official?

A. We have had occasions where headquarters has

provided comments that were of concern to them and that we have incorporated.

Q. Have they ever drafted a letter that says "Dear Mr."?

A. Not that I recall.

Q. In Mr. Meinhardt's memorandum to you, on the page that is E 000936 --

A. Yes.

Q. -- the last sentence on that page states, "Admiral Watkins concurs in this recommendation."

A. Yes.

Q. Was there some significance from your point of view for a reference to Admiral Watkins?

A. Not really, other than to give me an indication that this response had been staffed within the department.

Q. Had been what?

A. Had been staffed within the department.

Q. What does that mean, "staffed"? I assume Admiral Watkins isn't on somebody's staff.

A. That means that DP had taken it to the people who were interested and gotten their agreement in it.

Q. Had you ever had any conversations with Admiral Watkins concerning Rockwell's award fee?

A. No.

Q. Now, on this exhibit, the first two pages of it,

A. No.

Q. Did you have any conversations with Mr. Meinhardt about his memorandum and the proposed fee, after you received this communication?

A. I told you I don't recall any specific telephone discussions or face-to-face discussions with Meinhardt on the award fee. It doesn't mean they didn't happen.

Q. On the first page of your official file copy, it says in the bottom, in quotes, "Previous concurrence remains valid." Do you see that?

A. Yes.

Q. What does that refer to?

A. That could refer to the fact that this memo made it partway through the chain and then somebody suggested a change, and the author decided that that change didn't merit going back through the whole concurrence chain again.

Q. You're the author, aren't you?

A. No, Ted Cone is the author.

Q. Even though it's your --

A. It was written for me to send to Dominick Sanchini.

Q. When you sent letters on the award fee, was it customary for you to say "The Department of Energy determines"?

MR. KOLAR: If you had a custom.

PL. SUPP. EX. 46

CERTIFIED COPY



No. 91-1362 C

UNITED STATES CLAIMS COURT

-o0o-

| | |
|---|---|
| ROCKWELL INTERNATIONAL CORPORATION, | : |
| Plaintiff, | : |
| vs. | : |
| UNITED STATES OF AMERICA, | : |
| Defendant. | : |

---

DEPOSITION OF

EDWARD S. GOLDBERG

Tuesday, November 10, 1992

Reno, Nevada

Reported by:

NANCY J. REIGLE, CSR #266, RPR, CP
CALIFORNIA CSR #7643



TEARNEY & TEARNEY
Certified Shorthand Reporters

from Mr. Charles Troell to Bruce Twining dated July 10th, 1989.

Please review the document and tell me if you have ever seen this before.

(Exhibit 49 was marked.)

THE WITNESS: I do not recall that I have seen this thing. I don't know that I have not, but just sitting here looking at it I don't recall.

BY MR. KELLEY:

Q Let me direct your attention to the second page of the memorandum where it indicates that you have proposed an overall numerical rating of 87 for Rockwell's award fee.

A It says that, yes.

Q By July 10th of 1989, then had you proposed an overall rating for Rockwell's award fee?

A To the best of my knowledge I just don't remember. All I can do is read what it says there. I don't even recall the 87, although there was a numerical number.

I just-- it's too long-- too far away to recall those kinds of details.

Q When did you first learn that you would become involved in Rockwell's award fee?

A It was sometime during the early period

that I was there that I was asked by headquarters, I believe it was Mr. Tuck, it could have been Mr. Duffy, but I just don't recall, was asked to review the award fee for the period October 1st through March 31st.

Q You were requested then by either Mr. Tuck or Mr. Duffy to review Rockwell's award fee; is that right?

A Yes.

Q Were you requested by Mr. Twining to review Rockwell's award fee?

A I don't recall what Mr. Twining's part in it was, but he certainly was cognizant of what I was doing.

Q Were you requested by Mr. Tuck or Mr. Duffy, either both of them or just one of them, to review Rockwell's award fee?

A Best of my knowledge it was one, but I don't remember which one, I mean, each one was cognizant of what was going on.

Q What were you told to do with respect to Rockwell's award fee?

A I was asked to review it.

Q What were you asked to review?

A I was asked to review it in light of the new information that was being developed by the

overview team with regard to that award fee period.

Q When you were asked to review Rockwell's award fee, was there already some award fee that had been determined?

A Yes. To the best of my knowledge I was given the award fee package to review.

Q What was in that package?

A It was Mr. Twining's staff and Mr. Twining's recommendation to headquarters.

Q Mr. Goldberg, I'm handing you a document that has been previously marked as Exhibit 12 which is a memorandum from Mr. Twining to Troy Wade dated May 31st, 1989.

Would you please review the document and tell me if you've ever seen it before?

A I do not recall seeing this document or not seeing it. It just doesn't ring a bell with me. I'm sorry.

Q Was this part of the package you were given?

A I don't remember.

Q Who gave you the package to review in connection with Rockwell's award fee?

A It was sent up to the best of my knowledge from Albuquerque, and I just don't remember. It might

a package at that time?

A Not that I recall.

Q Were you provided with that package shortly thereafter?

A I don't know when it came. It was just sometime in early June, early part of my tenure there.

Q Did Mr. Tuck or Mr. Duffy describe to you how you should go about reviewing Rockwell's award fee?

A No.

Q What was the period of the award fee for which you were to review?

A The best of my knowledge it was the period October to March, somewhere in there.

Q October 1988 through--

A Yeah.

Q --March of 1989?

A Yes.

Q Is that the-- was that the first half of the fiscal year of 1989?

A Yes, I believe that's correct.

Q What did you do after Mr. Tuck or Mr. Duffy requested that you review Rockwell's award fee?

A I talked with Mr. Barkmeier, the best of my recollection, and-- and asked him to review the award fee in light of the new information that had been

uncovered by the team that I had brought from various parts of the department to conduct this evaluation of the Rocky Flats operation.

Q Who was Mr. Barkmeier?

A He was a member of the Rocky Flats area office who was charged with the administrative side of the business at Rocky Flats.

Q Did you talk to Mr. Barkmeier about Rockwell's award fee prior to receiving the package from Albuquerque?

A I don't recall. It was simultaneous as far as I can remember within that period. I just don't recall.

Q Did you provide to Mr. Barkmeier the package you received from Albuquerque?

A He might have received the package through the administrative channel. I do not remember whether I received it direct, but it was a kind of a simultaneous action if you can consider it within a few days of each other a simultaneous action.

Q Are you saying that the package may have been sent directly to Mr. Barkmeier?

A It could have been; I just don't recall how the package came into my possession. It would have seemed natural that it would have come to him as the

A About the award fee? No.

Q Did you ever tell Mr. Sanchini approximately what award fee you were recommending?

A No.

Q Did you ever tell Mr. Sanchini anything about what award fee Rockwell might be getting?

A No.

Q Did you ever speak to anyone else at Rockwell about Rockwell's award fee?

A I do not believe I did. I do not recall any conversations that I had with anyone of the Rockwell Rocky Flats operation other than Mr. Sanchini. I do not recall that any conversations were had with the corporate people. I just don't remember, but I think he was the only person that I talked with.

Q What happened with your recommendation after you sent it to Albuquerque?

A It was my understanding in-- I don't specifically recall the details that my recommendation was agreed to by Mr. Twining. I don't have any direct knowledge except the conversation. I don't recall seeing the piece of paper.

Q Are you saying that you think he did agree with your recommendation, or not?

A Yes, sir, I think he did agree.

Q But you never saw any documentation on that?

A I don't recall seeing it at this point in time. It's just something that I just don't recall. You will have to look at the files and see if there was a piece of paper that came back to the Rocky Flats office. I just do not recall it.

Q Did you ever find out what Rockwell eventually received as an award fee?

A I don't know, you know, just sitting here at this point in time I just don't know. Only thing I do know is that it was reduced, and I do not remember or recall that I saw what the final number was, and I don't know why I don't recall, but I just don't.

Q After you sent your recommendation to Mr. Twining, did you speak with anyone at Albuquerque about Rockwell's award fee?

A Mr. Twining and I might have had some discussions, but specifically I don't recall anyone else. He might have called, and I just don't specifically recollect what took place after I sent the recommendation to Mr. Twining.

Q Did Mr. Twining call you or did you call Mr. Twining?

A It could have been either way.

Q What did you two discuss?

A I don't recall any of the discussions. What I'm saying is that he could have called for clarifications and so on; I just don't recall.

Q Did he ever express to you whether he agreed or disagreed with your recommendation?

A I don't recall.

Q After sending your recommendation on Rockwell's award fee to Mr. Twining, did you ever speak with anyone at DOE headquarters about Rockwell's award fee?

A I don't remember. It would only have been if I did to the extent that I've done the job, and that's it. I would not have discussed any details, but I specifically do not recall talking to anyone at headquarters.

Q Prior to sending your recommendation on Rockwell's award fee to Mr. Twining, did you speak with Mr. Twining about Rockwell's award fee?

A Mr. Twining and I had many conversations. I don't recall specifically the ones where the award fee might have come up. I just do not. But we talked because he was responsible for supplying considerable assistance to me, and as the budget was part of that assistance he was interested in what we were doing,

'cause the money was coming out of his budget. So we had many conversations, and the award fee could have come up in those conversations and discussed what we were doing, where we were going, but I do not specifically recall any of those conversations.

Q Was it your understanding that Mr. Twining was to provide you assistance in connection with Rockwell's award fee?

A Not specifically. Mr. Barkmeier was handling that, and I don't recall that he asked for any assistance from Mr. Twining. I certainly did not.

Q Did Mr. Twining ever tell you what he thought should be Rockwell's award fee?

A I certainly saw what he had initially recommended, but beyond what was written in that document he did not, to my-- best of my knowledge recommend anything to me after we initiated the relook.

Q Did he ever recommend anything different from what he had had in his written recommendation?

A As far as I know he made a recommendation to headquarters after I made my recommendation to him, and I don't recall what that was.

Q Prior to sending your recommendation on Rockwell's award fee to Mr. Twining, did you speak to anyone from headquarters about Rockwell's award fee?