ELECTRONICALLY FILED ON AUGUST 28, 2006

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 91-1362 C<br>(Judge Lettow)<br><br>**PLAINTIFF'S RESPONSES TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT** |

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims Rockwell submits the following Responses to Defendant's Proposed Findings of Uncontroverted Fact.

PRELIMINARY STATEMENT

The overwhelming majority of Defendant's Proposed Findings relates to (1) the authority purportedly granted to and delegated by the Secretary of Energy, (2) the "process" DOE headquarters allegedly used to determine Rockwell's award fees and (3) the affirmative defenses of impossibility, justification and waiver, which this Court denied Defendant leave

to assert in its second amended answer (*see* Pl. Ex. 32 at 13).[*] None of these proposed findings raises a genuine issue of material fact (indeed, none is even relevant) if the Court rules as a matter of law that the contract entitled Rockwell to award fees determined by the Manager of Albuquerque Operations; that DOE breached the contract when headquarters "determined" and "mandated" Rockwell's award fees; that Rockwell was damaged as a result of this breach; that the Court has power to review Rockwell's claim; and that the government's waiver by acquiescence defense is not embraced by estoppel.

Rockwell's specific responses to Defendant's Proposed Findings are set forth below:

THE SECRETARY OF ENERGY’S AUTHORITY

1. In establishing the Department of Energy, Congress provided that “[t]he Department shall be administered . . . under the supervision and direction of the Secretary.” Exhibit (“Ex.”) 1, Pub. L. 95-91, Title II, § 201 (August 4, 1977), 91 Stat. 565, 569, codified as 42 U.S.C. § 7131.

**RESPONSE: Agree.**

2. Congress authorized the Secretary to “appoint and fix the compensation of

[*] References to "Pl. Ex. __" refer to the exhibits attached to the Declaration of Richard J. Ney in Support of Plaintiff's Motion for Summary Judgment, filed May 31, 2006. References to "Pl. Supp. Ex. __" refer to the exhibits attached to the Declaration of Richard J. Ney in Further Support of Plaintiff's Motion for Summary Judgment, filed concurrently herewith. References to "Def. Ex. __" refer to the exhibits attached to the Declaration of John A. Kolar in Opposition to Rockwell's Summary Judgment Motion and in Support of the Government's Cross-Motion, filed July 27, 2006.

such officers and employees, including attorneys, as may be necessary to carry out such functions." Ex. 1, 42 U.S.C. § 7231(a).

**RESPONSE: Agree, with the proviso that all references herein to "the Secretary" refer to the Secretary of the Department of Energy.**

3. The Secretary was empowered to "establish, alter, consolidate or discontinue such organizational units or components with the Department as he may deem to be necessary or appropriate." Ex. 1, 42 U.S.C. § 7253(a).

**RESPONSE: Agree.**

4. The Secretary was given authority to

> enter into and perform such contracts . . . with private organizations and persons, and to make such payments (in lump sum or installments, and by way of advance or reimbursement) as he may deem to be necessary or appropriate to carry out functions now or hereafter vested in the Secretary.

Ex. 1, 42 U.S.C. 7256(a).

**RESPONSE: Agree, with the proviso that the proposed finding includes a minor deviation from the text of the quoted reference ("with private organizations" should be "with public agencies and private organizations").**

5. Congress provided that the Secretary

> may delegate any of his functions to officers and employees of the Department as he may designate, and may authorize such successive delegations of such functions within the Department as he may deem to be necessary or appropriate."

Ex. 1, 42 U.S.C. 7252.

**RESPONSE: Agree, with the proviso that the proposed finding includes minor deviations from the text of the quoted reference ("to officers" should be "to such officers" and "successive delegations" should be "successive redelegations").**

THE SECRETARY'S DELEGATION TO THE MANAGER OF ALBUQUERQUE

6. The Secretary in Delegation Order No. 0204-98 delegated authority over personnel decisions and contracting decision, including the designation of contracting officers, to the Assistant Secretary, Management and Administration. Ex. 2, Delegation Order No. 0204-98 (June 14, 1982).

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: The Secretary, in Delegation Order No. 0204-98, delegated to the Assistant Secretary, Management and Administration, authority to designate contracting officers and to make certain other personnel decisions and contracting decisions. Def. Ex. 2, Delegation Order No. 0204-98, June 14, 1982.**

7. Delegation Order 0204-98 provided that

> In exercising the authority delegated by this Order the delegate shall be governed by the rules and regulations of DOE and the policies and procedures prescribed by the Secretary or

his delegate.

Ex. 2, Delegation Order No. 0204-98 at 5.

**<u>RESPONSE</u>: Agree.**

8. Delegation Order 0204-98 also provided that

> Nothing in this Order shall preclude the Secretary from exercising any of the authority so delegated whenever in his judgment the exercise of such authority is necessary or appropriate to administer the functions vested in him.

Ex. 2, Delegation Order 0204-98 at 6.

**<u>RESPONSE</u>: Agree.**

9. In Redelegation Order No. 0204-98.1, the Assistant Secretary, Management and Administration, redelegated authority over contracts to the Director, Procurement and Assistance Management, with a reservation of authority "whenever in his judgment the exercise of such authority is necessary or appropriate to administer the functions vested in him." Ex. 3, Redelegation Order 0204-98.1.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: In Redelegation Order No. 0204-98.1, the Assistant Secretary, Management and Administration, redelegated to the Director, Procurement and Assistance Management, authority over certain contracting decisions, with the**

**proviso that "[n]othing in this Order shall preclude the Assistant Secretary, Management and Administration from exercising any of the authority so delegated whenever in his judgment the exercise of such authority is necessary or appropriate to administer the functions vested in him." Def. Ex. 3, Redelegation Order 0204-98.1.**

10. By memorandum dated July 8, 1986, the Director, Procurement and Assistance Management delegated authority over contracts to the Manager of the Albuquerque Operations Office, with a similar reservation of authority. Ex. 4, July 8, 1986 Memorandum from Burton J. Roth to the Manager of the Albuquerque Operations Office.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: By memorandum dated July 8, 1986, the Director, Procurement and Assistance Management Directorate, delegated to the Manager, Albuquerque Operations Office, authority over certain contracting decisions, with the proviso that "[n]othing in this redelegation shall preclude the Director, Procurement and Assistance Management Directorate, from exercising any of the Director's authority whenever in the Director's judgment the exercise of such authority is necessary or appropriate to administer the functions vested in that position." Def. Ex. 4, memorandum from Berton J. Roth to the Manager of the Albuquerque Operations Office, July 8, 1986.**

11. 48 C.F.R. § 3.101-1 provides that

> Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation,

> with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships. While many Federal laws and regulations place restrictions on the actions of Government personnel, their official conduct must, in addition, be such that they would have no reluctance to make a full public disclosure of their actions.

Ex. 5, 48 C.F.R. § 3.101-1.

**<u>RESPONSE</u>: Agree.**

12. 48 C.F.R. § 1.602-2 (b) provides, among other things, that "[c]ontracting officers shall– . . . [e]nsure that contractors receive impartial, fair, and equitable treatment." Ex. 5, 48 C.F.R. § 1.602-2 (b).

**<u>RESPONSE</u>: Agree.**

<u>CONTRACT PROVISION ON TERMINATION</u>

13. The Termination Clause of the contract, clause 84(b)(5) of Mod M124, states:

> If performance of the work under this contract is terminated in whole by the Government, the base fee and award fee of the Contractor shall be prorated to and including the effective date of such termination. The Contracting Officer shall then determine the portion, **if any**, of the prorated maximum available award fee which shall be awarded to the Contractor for the evaluation period, or part thereof, which ends on the effective date of the termination.

Ex. 6, Mod M124, clause 84, p. 178.

**<u>RESPONSE</u>: Agree, with the proviso that the proposed finding includes minor deviations from the text of the quoted clause ("performance of the work" should be "performance of work" and, in the last sentence quoted, "date of the termination" should be "date of termination").**

<u>THE AWARD FEE PROCESS FOR ROCKY FLATS PRE-JUNE 6, 1989</u>

14. During the period prior to June 6, 1989, the purpose of the award fee process was to make sure that the people most knowledgeable about the performance of the contractor during the relevant time period were given substantial weight in assessing the award fee. Ex. 7, Trial Testimony of Bruce Twining in *Stone v. Rockwell*, 3/15/99, p. 3253.

**<u>RESPONSE</u>: Disagree. The main purpose of the award fee plan is set forth in the 1989 Contract. *See* Pl. Ex. 3 at Attach. A, page 1 of 9 (¶ 1, "PURPOSE").**

**<u>PROPOSED REVISION</u>: According to the contract, the purpose for the award fee plan was "to provide an incentive, in the form of an available award fee, which is sufficient to encourage the attainment of, and to reward the Contractor for, increased proficiency in the performance of the contract." *See* Pl. Ex. 3 at Attach. A, page 1 of 9 (¶ 1, "PURPOSE"). Rockwell agrees that in requiring award fees to be the subjective determination of the Manager, Albuquerque Operations, it "bargained . . . to have award fees determined by persons with close, on-the-ground knowledge of Rockwell's performance." Gov. Br. at 27.**

15. DOE's Area Manager at Rocky Flats would prepare a draft "award fee report" and provide it to Albuquerque Operations officials sitting on a board called the Performance Evaluation Review Board (PERB). Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/89, pp. 16-18. It was appropriate that DOE people at Rocky Flats prepare the initial draft of the award fee report because they were on site and could see first-hand Rockwell's operations. Ex. 7, Trial Testimony of Bruce Twining in *Stone v. Rockwell*, pp. 3137-3138.

**RESPONSE: Disagree. The proposed finding is overly broad. Moreover, the cited deposition of Bruce Twining took place on February 23, 1993, not February 23, 1989. Rockwell refers to the parties' contract and the Albuquerque Operations Office (AL) Handbook for Award Fee Performance Evaluation and Review Process, dated June 24, 1977 (Pl. Supp. Ex. 44), for a full explication of the award fee process.**

**PROPOSED REVISION: Mr. Twining testified that the Rocky Flats area office provided input which was set forth in a draft report submitted to Albuquerque personnel sitting on a board called the PERB [Performance Review Evaluation Board]. Mr. Twining also testified that it was appropriate that people on site prepare a draft report for submission to the PERB because the people on site could see the conditions under which Rockwell was operating, including funding and other constraints. *See* Def. Ex. 8, Dep. of Bruce G. Twining, Feb. 23, 1993, at 16-18; Def. Ex. 7, *Stone* Trial, Mar. 15, 1999, at 3137-38.**

16. The PERB would then provide a report to the Manager of Albuquerque Operations, Bruce Twining, and he would make an award fee determination. Ex. 8,

Deposition of Bruce Twining in this proceeding, 2/23/89, p. 18.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad. Moreover, the cited deposition of Bruce Twining took place on February 23, 1993, not February 23, 1989. Rockwell refers to the parties' contract and the Albuquerque Operations Office (AL) Handbook for Award Fee Performance Evaluation and Review Process, dated June 24, 1977 (Pl. Supp. Ex. 44), for a full explication of the award fee process.**

**<u>PROPOSED REVISION</u>: Mr. Twining testified, "[T]he PERB reviews what the area manager has to say, changes it if appropriate, and then I was given and am still given a report with a proposed award fee determination and a briefing. I look through that, ask my questions. If my concerns haven't been reflected, the PERB may or may not meet again to reflect the input I have or the questions I ask. But when we are all finished, I make an award fee determination." Def. Ex. 8, Dep. of Bruce G. Twining, Feb. 23, 1993, at 18.**

17. At some point after Admiral James D. Watkins became Secretary of Energy, that is sometime in early 1989, Mr. Twining received a directive from DOE Headquarters requiring him to obtain formal Headquarters concurrence before issuing an award fee. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/89, pp. 21-24.

**<u>RESPONSE</u>: Agree, with the proviso that (1) the directive was issued after the effective date of Rockwell's contract and (2) the cited deposition of Bruce Twining took place on February 23, 1993, not February 23, 1989.**

18. However, prior to that directive, Mr. Twining typically called DOE Headquarters to get their input as part of the process of determining the award fee. The members of the PERB also typically obtained input from DOE Headquarters in arriving at a recommended award fee, inasmuch as Albuquerque was meeting a Headquarters program. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/89, pp. 23-25.

**RESPONSE: Disagree. The proposed finding is overly broad. Moreover, the cited deposition of Bruce Twining took place on February 23, 1993, not February 23, 1989.**

**PROPOSED REVISION: Mr. Twining testified that "it was not unusual for me to call and get input or the PERB to call and get input from headquarters before [a task force recommended obtaining formalized headquarters' input]."** ***See*** **Def. Ex. 8, Dep. of Bruce G. Twining, Feb. 23, 1993, at 22-23. Mr. Twining also testified that, for the 1988 award fee periods, "[t]hose kind of inputs [from headquarters] could also have typically been developed by individuals on the PERB, in areas that were of interest to headquarters, because, of course, what we were doing in the plants was to meet a headquarters program. That process was not formalized."** ***See id.*** **at 24-25.**

THE FBI/EPA RAID AND DOE HEADQUARTER's RESPONSE THERETO

19. On June 6, 1989, approximately 70 agents of the FBI and EPA served a search warrant on the Rocky Flats Plant looking for evidence of alleged environmental crimes being committed by Rockwell and possibly by DOE officials. Ex. 9, Deposition of Ed Goldberg in

*Stone v. Rockwell*, 4/23/98, pp. 12-14; Ex. 10, Deposition of W. Henson Moore ("Henson Moore") in *Stone v. Rockwell*, 4/15/98, p. 16; Ex. 11, Search Warrant Affidavit, pp. 1, 14-15, 65, 96 and 100.

**<u>RESPONSE</u>: Agree.**

20. Shortly prior to the raid, the Department of Justice informed Secretary of Energy Watkins, Deputy Secretary W. Henson Moore, and Under Secretary John Tuck-collectively known as "DOE's Secretariat"–about the upcoming raid. Ex. 12, Deposition of James D. Watkins in *Stone v. Rockwell*, 4/29/94, pp. 104-105; Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 11, 13; Ex. 13, Deposition of John C. Tuck in *Stone v. Rockwell*, 4/27/98, pp. 14, 23-24.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad. Moreover, the cited deposition of James D. Watkins took place on April 28, 1998, not April 29, 1994.**

**<u>PROPOSED REVISION</u>: Admiral Watkins testified that he recalled learning about the Department of Justice's intent to raid Rocky Flats "within the week before" the raid. *See* Def. Ex. 12, Dep. of James D. Watkins in *Stone*, Apr. 28, 1998, at 104. Henson Moore testified that "we understood" the term "secretariat" to consist of the Secretary, Deputy Secretary, and Under Secretary. *See* Def. Ex. 10, Dep. of W. Henson Moore in *Stone*, Apr. 15, 1998, at 11. Mr. Moore also testified that he recalled learning that the FBI raid would occur "only a matter of weeks, maybe a month" before the raid took place. *See id.* at 13. John Tuck testified that he recalled first learning about the**

**impending Rocky Flats raid in April or May of 1989. *See* Def. Ex. 13, Dep. of John C. Tuck in *Stone*, Apr. 27, 1998, at 23.**

21. DOE's Secretariat was informed about the raid ahead of time on the condition that they not inform anyone else lest the investigation be stymied. Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, p. 14. Mr. Twining was not to be told in advance. Ex. 14, Deposition of Troy Wade in this proceeding, 9/21/94, p. 28.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: Mr. Moore and Mr. Wade testified that DOE's Secretariat was informed about the raid ahead of time on the condition that they not inform anyone else lest the investigation be stymied. *See* Def. Ex. 10, Dep. of W. Henson Moore in *Stone*, Apr. 15, 1998, at 14; Def. Ex. 14, Dep. of Troy E. Wade, Sept. 21, 1994, at 28.**

22. Secretary Watkins was briefed on the contents of the search warrant affidavit by the Justice Department. Ex. 12, Deposition of James D. Watkins in *Stone v. Rockwell*, 4/29/94, p. 119.

**RESPONSE: Disagree. The proposed finding is overly broad. Moreover, the cited deposition of James D. Watkins took place on April 28, 1998, not April 29, 1994.**

**PROPOSED REVISION: Admiral Watkins testified that he was briefed on the contents of the search warrant affidavit by the Justice Department. *See* Def. Ex. 12,**

**Dep. of James D. Watkins in *Stone*, Apr. 28, 1998, at 119.**

23. The search warrant affidavit alleged, among other things, that there was probable cause to believe that DOE officials and/or Rockwell had committed environmental crimes, and had concealed and made false statements about those violations. Ex. 11, Search Warrant Affidavit, pp. 14-15, 65, 96, and 100.

**RESPONSE: Agree, with the proviso that the search warrant allegations were ultimately "discredit[ed] and found "baseless." *See Rockwell Int'l Corp*., 02-2 BCA ¶ 32,018, at 158,211 (¶ 24), 158,222 (col. 1) (DOEBCA Oct. 31, 2001).**

24. Approximately concurrently with the raid at Rocky Flats, pursuant to the criminal investigation, federal agents came to the Albuquerque Operations Office to search for documents. Ex. 15, Deposition of Bruce Twining in *Stone v. Rockwell*, Vol. I, 4/7/98, p. 20.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: Mr. Twining testified that approximately concurrently with the raid at Rocky Flats, pursuant to the criminal investigation, federal agents came to the Albuquerque Operations Office to search for documents. *See* Def. Ex. 15, Dep. of Bruce G. Twining in *Stone*, Apr. 7, 1998, at 20.**

25. Deputy Secretary Moore was aware that DOE field employees faced the risk

of indictment as a result of the raid. Those employees were very concerned about potential exposure, and some threatened to retire from DOE due to their concern. Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 33-35.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: In his April 1998 deposition in *Stone*, Mr. Moore was asked if he recalled whether any DOE employees faced the risk of indictment as a result of the raid. *See* Def. Ex. 10, Dep. of W. Henson Moore in *Stone*, Apr. 15, 1998, at 33-35. He responded, "Yes, and that risk went on for some years afterwards, not just Rocky Flats. . . . [W]e were faced with a substantial walkout of our own DOE personnel at these sites . . . . People were saying, 'I'm going to retire. I'm leaving. I am not going to run this plant on behalf of the government and do what I'm asked to do and go to jail. I'm not going to do that.' These people were very concerned, very worried. I remember meeting with them." *Id.***

26. Albuquerque Manager Twining himself was personally concerned that he might be indicted. Ex. 16, Deposition of Bruce Twining in *Stone v. Rockwell*, Vol. II, 4/8/98, p. 272.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: Mr. Twining testified that he was personally concerned that he might be indicted. *See* Def. Ex. 16, Dep. of Bruce G. Twining in *Stone*, Apr. 8, 1998, at 272.**

27. Secretary Watkins believed that Mr. Twining was a potential "party" to the investigation underway at Rocky Flats. Ex. 17, Deposition of James D. Watkins in this proceeding, 4/29/94, at 27.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: Admiral Watkins testified that he believed that Mr. Twining was a potential "party" to the investigation underway at Rocky Flats. *See* Def. Ex. 17, Dep. of James D. Watkins, Apr. 29, 1994, at 27.**

28. Secretary Watkins believed that when a superior in the chain of command (Mr. Twining) is potentially involved, you have to "bypass that system" and "take more positive control of the situation." And that is what he decided to do in regard to Mr. Twining and the Albuquerque office. Ex. 17, Deposition of James D. Watkins in this proceeding, 4/29/94, pp 27-29.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: Admiral Watkins testified, "My own experience has been when you have a situation where the superiors in the chain of command are potentially involved, you have to bypass that system without jeopardy at the time and take more positive control of the situation. And that is what I did." Def. Ex. 17, Dep. of James D. Watkins, Apr. 29, 1994, at 27-28.**

29. Secretary Watkins appointed Ed Goldberg as Acting Manager of the Rocky Flats Office in order to have someone in charge there who was not a "party" to the criminal investigation, and who would not be perceived by the FBI as interfering with the investigation. Watkins wanted Goldberg to report directly to DOE Headquarters outside "the Twining circuit." Ex. 17, Deposition of James D. Watkins in this proceeding, 4/29/94, pp 27-29.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: Admiral Watkins testified that he appointed Ed Goldberg as Acting Manager of the Rocky Flats Office in order to have someone in charge there who was not a "party" to the criminal investigation, and who would not be perceived by the FBI as interfering with the investigation. Admiral Watkins also testified that he wanted Goldberg to report directly to DOE headquarters outside "the Twining circuit."** ***See*** **Def. Ex. 17, Dep. of James D. Watkins, Apr. 29, 1994, at 27-29.**

30. Accordingly, on June 6, 1989, the day of the raid, Under Secretary John C. Tuck issued a memorandum to Bruce Twining and Ed Goldberg, who theretofore had been Deputy Manager of DOE's Richland, Washington Office. Mr. Tuck's memorandum designated Mr. Goldberg as Acting Manager of the Rocky Flats Office. Mr. Tuck's memorandum further stated that Mr. Goldberg would report directly to DOE Headquarters regarding plant operations, rather than to Mr. Twining. Ex. 18, June 6, 1989 Memorandum from John C. Tuck to Bruce Twining and E.S. Goldberg.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: On June 6, 1989, the day of the raid, Under Secretary John C. Tuck issued a memorandum to Bruce Twining and Ed Goldberg, who theretofore had been Deputy Manager of DOE's Richland, Washington Office. Mr. Tuck's memorandum designated Mr. Goldberg as Acting Manager of the Rocky Flats Area Office. Mr. Tuck's memorandum further stated that Mr. Goldberg would report to Mr. Tuck regarding operations of the Rocky Flats facility. *See* Def. Ex. 18, memorandum from John C. Tuck to Bruce Twining and E.S. Goldberg, June 6, 1989.**

31. One of Mr. Goldberg's tasks when he arrived at Rocky Flats was to try to calm concerns about DOE Rocky Flats employees that they might be arrested. Goldberg communicated to DOE Headquarters that field employees had this concern. Ex. 19, Trial Testimony of Ed Goldberg in *Stone v. Rockwell*, 3/22/99, pp. 4409-4411.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: Mr. Goldberg testified that one of his tasks when he arrived at Rocky Flats was to try to calm concerns of DOE Rocky Flats employees that they might be arrested. Mr. Goldberg also testified that he communicated to DOE headquarters that field employees had this concern. *See* Def. Ex. 19, *Stone* Trial, Mar. 22, 1999, at 4409-4411.**

32. On June 9, 1989, Under Secretary Tuck designated an interim organization, known as the Rocky Flats Area Office, which would report directly to DOE Headquarters,

and not to Albuquerque Operations. Ex. 20, June 9, 1989 Memorandum from John Tuck to Edward Goldberg. There was a substantial infusion of people into the Rocky Flats Area Office in an effort to bring up the level of technical expertise overseeing Rockwell. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 42-43.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: A June 9, 1989, memorandum from Under Secretary Tuck approving an interim organization for the Rocky Flats Area Office had an attached diagram indicating that that Office would be organized under the Area Manager, who was under the Under Secretary. *See* Def. Ex. 20, memorandum from John Tuck to Edward Goldberg, June 9, 1989. Jon Barr testified that "[t]here was a substantial infusion of people trying to bring up that level of technical expertise that we mentioned and a substantial investment in training people to oversee." Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 43.**

33. After Mr. Goldberg's appointment, Mr. Twining's substantive oversight responsibilities for Rocky Flats ended. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/93, p. 68; Ex. 15, Deposition of Bruce Twining in *Stone v. Rockwell*, Vol. I, 4/7/98, p. 115; Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 42-43. Thereafter, Mr. Twining's only role was the ministerial task of continuing to provide administrative assistance to Mr. Goldberg. Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 36-37.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: Mr. Twining testified that after Mr. Goldberg's appointment, Mr. Twining's substantive oversight responsibilities for Rocky Flats ended. *See* Def. Ex. 8, Dep. of Bruce G. Twining, Feb. 23, 1993, at 68; Def. Ex. 15, Dep. of Bruce G. Twining in *Stone*, Apr. 7, 1998, at 115. Mr. Barr testified that "by the time I had gotten there the Albuquerque Operations Office no longer had responsibility for oversight of the Rocky Flats Plant . . . from the time I was there, I think it is fair to say that all of the substantive oversight of the Rocky Flats Plant was accomplished by the Rocky Flats Office." Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 42-43. Mr. Goldberg testified that after his appointment, he and the Rocky Flats Plant were to receive administrative and technical assistance from Albuquerque. *See* Def. Ex. 22, Dep. of Edward S. Goldberg, Nov. 10, 1992, at 36-37.**

34. Secretary Watkins took measures after the June 6, 1989 raid to ensure that DOE Headquarters had in-depth knowledge regarding environmental conditions at the plant, and the quality (or lack thereof) of Rockwell's performance. Ex. 23, Trial Testimony of James D. Watkins in *Stone v. Rockwell*, 3/16/99, pp. 3369-3370.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: Admiral Watkins testified that he sent an assessment team in to Rocky Flats to report the "ground truth" to him (*i.e.*, "to understand the technologies that were involved. Were safe practices being followed? Was there a strict conduct of operations? Was there radiologic controls in being and in place? Was there**

**oversight?"). *See* Def. Ex. 23, *Stone* Trial, Mar. 16, 1999, at 3369-70.**

35. For example, when Mr. Goldberg arrived at Rocky Flats on June 6, 1989, Mr. Goldberg brought with him a team of 50 or so experts to establish an environmental, safety and health baseline and give him an idea of what was going on at the Rocky Flats Plant. This team presented Mr. Goldberg and DOE management officials with information on a daily and weekly basis. Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 55-56; Ex. 19, Trial Testimony of Ed Goldberg, 3/22/99, p. 4410.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: Mr. Goldberg testified that when he arrived at Rocky Flats on June 6, 1989, he brought with him a team of 50 or so experts to establish an environmental, safety and health baseline and give him an idea of what was going on at the Rocky Flats Plant. Mr. Goldberg also testified that this team presented Mr. Goldberg and DOE management officials with information on a daily and weekly basis. *See* Def. Ex. 22, Dep. of Edward S. Goldberg, Nov. 10, 1992, at 55-56; Def. Ex. 19, *Stone* Trial, Mar. 22, 1999, at 4410.**

36. After his arrival at the plant, Mr. Goldberg reported to Secretary Watkins on a daily basis, mostly through the Under Secretary John Tuck and a special assistant to the Secretary named Leo Duffy. Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 103-104; Ex. 19, Trial Testimony of Ed Goldberg in *Stone v. Rockwell*, 3/22/99, p. 4411.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: Mr. Goldberg testified that after his arrival at the plant, he reported to Secretary Watkins on a daily basis, mostly through the Under Secretary John Tuck and a special assistant to the Secretary named Leo Duffy. *See* Def. Ex. 22, Dep. of Edward S. Goldberg, Nov. 10, 1992, at 103-104; Def. Ex. 19, *Stone* Trial, Mar. 22, 1999, at 4411.**

37. Beginning as early as June 16, 1989, the Rocky Flats Office began sending daily report memorandum, as well as bi-weekly reports and weekly highlights of the operations at the Rocky Flats Office, to DOE Headquarters. Ex. 24, Samples of Reports.

**<u>RESPONSE</u>: Disagree. Rockwell agrees that the Rocky Flats Office issued "Daily Report" memoranda dated June 16, 1989; July 10, 1989; July 11, 1989; July 12, 1989; July 13, 1989; July 24, 1989; August 2, 1989; August 4, 1989; August 9, 1989; August 18, 1989; August 21, 1989; and a "Weekly Highlights" memorandum dated July 10, 1989, but disagrees that this establishes that reports were sent daily, bi-weekly, and weekly.**

38. On June 22, 1989, Rocky Flats Area Office Manager Goldberg wrote a memorandum to Under Secretary Tuck stating that DOE lacked confidence in Rockwell management's ability to manage the facility because there was considerable evidence of a lack of clear lines of responsibility for safe operations, a lack of adequate procedures to

assure safe operations, and a lack of conformance to procedures at the plant. Ex. 25, June 22, 1989 draft Memorandum from Edward S. Goldberg to John Tuck.

**RESPONSE: Disagree. Defendant's Exhibit 25 is a draft memorandum.**

**PROPOSED REVISION: Acting Area Manager Goldberg signed a draft memorandum to John Tuck dated June 22, 1989, stating, "We have lost confidence in Rockwell management's ability to manage this facility because there is considerable evidence of lack of clear lines of responsibility for safe operations, lack of adequate procedures to assure safe operations, [and] lack of conformance to procedures."** ***See*** **Def. Ex. 25, draft memorandum from Edward S. Goldberg to John Tuck, June 22, 1989, at 1.**

39. Also on the day of the raid, June 6, 1989, DOE Headquarters formed a "special assignment team," later referred to as a "Tiger Team," to provide DOE Headquarters with an independent evaluation of operations and practices at the Rocky Flats Plant. The Tiger Team included approximately 50 skilled personnel, including DOE officials and contractor personnel from all over the county. The teams began gathering data regarding the Rocky Flats Plant operations in early June and were onsite from June 19 through July 14, 1989. Ex. 26, Assessment of Environmental Conditions at the Rocky Flats Plant, August 1989 (hereinafter "Tiger Team Report"), Introduction, pp. 1-1 - 1-5.

**RESPONSE: Disagree. The proposed finding includes statements ("later referred to as a 'Tiger Team,'" "The Tiger Team included approximately 50 skilled**

**personnel, including DOE officials and contractor personnel from all over the county.") that are not supported by the cited reference.**

**<u>PROPOSED REVISION</u>: Also on the day of the raid, June 6, 1989, DOE Headquarters formed a "special assignment team" to provide DOE Headquarters "with an independent evaluation of operations and practices at the Rocky Flats Plant." The team began gathering data regarding the Rocky Flats Plant operations in early June and was onsite from June 19 through July 14, 1989. *See* Def. Ex. 26 at 1-1 to 1-5.**

40. Deputy Secretary Moore accompanied the FBI and EPA agents onto the Rocky Flats site on the day of the raid, June 6, 1989, and remained there for two weeks personally observing conditions at the plant. Moore visited Rocky Flats again for another week a month or two later. Within a couple of days after the raid, Deputy Secretary Moore became aware of many important infractions that were not being resolved. Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 11, 20, 24.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: Mr. Moore testified that he accompanied the FBI and EPA agents onto the Rocky Flats site on the day of the raid, June 6, 1989, and remained there for two weeks personally observing conditions at the plant. Mr. Moore also testified that he visited Rocky Flats again for another week a month or two later. Mr. Moore also testified that within a couple of days after the raid, they began to find what they considered important infractions that were not being resolved. *See* Def. Ex. 10, Dep. of W. Henson Moore, Apr. 15, 1998, at 11, 20.**

41. Beginning about July 5, 1989, DOE Headquarters also conducted an audit of the Rocky Flats Plant compliance with the National Environmental Policy. Ex. 27, July 7, 1989 Bi-Weekly Report from D.J. Sanchini to S.F. Iacobellis, p. 3.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: A July 7, 1989, Bi-Weekly Status Report states that beginning on July 5, 1989, personnel from DOE headquarters arrived to conduct an audit of the Rocky Flats Plant compliance with the National Environmental Policy. Def. Ex. 27 at 3.**

42. On July 21, 1989, Under Secretary Tuck issued a memorandum directing that the Area Manager of the Rocky Flats Area Office would report to the Assistant Secretary for Defense Programs in DOE Headquarters, as opposed to being a direct report to the Under Secretary. Ex. 29, July 21, 1989 Memorandum from John C. Tuck to Bruce Twining and E.S. Goldberg.

**RESPONSE: Agree.**

43. On August 19, 1989, the Tiger Team appointed by DOE Headquarters issued its final written report titled, "Assessment of Environmental Conditions at the Rocky Flats

Plant." Exs. 26 through 26-E.[1]

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: The Special Assignment Environmental Team appointed by DOE headquarters issued a written report titled, "Assessment of Environmental Conditions at the Rocky Flats Plant," which is dated August 1989.**

44. The Tiger Team report assessed Rockwell's environmental, safety and health deficiencies in far greater detail than had Albuquerque's May 1989 award fee evaluation. Compare Exs. 26 through 26-E, The Tiger Team Report to Ex. 30, (the PERB's May 17, 1989 Award Fee Performance Review.

**RESPONSE: Disagree insofar as there is any inference (1) that the Tiger Team and Award Fee Performance Evaluation Review Board ("PERB") assessed Rockwell's environmental, safety and health performance ("ES&H") for the same purpose, (2) that the Tiger Team complied with the award fee plan in assessing Rockwell's ES&H or**

---

[1] We have divided the Tiger Team Report into parts under different exhibit numbers due to its volume. Exhibit 26 consists of the title page, the Executive Summary, the Introduction (Section 1.0), and the audit findings on air (Section 2.0). Exhibit 26-A consists of the audit findings on surface water (Section 3.0), and groundwater (Section 4.0). Exhibit 26-B consists of the findings on waste management (Section 5.0). Exhibit 26-C consists of the findings regarding toxic and chemical materials (Section 6.0) and radiation (Section 7.0). Exhibit 26-D contains the findings on quality assurance (Section 8.0) and inactive waste sites and releases (Section 9.0). Finally, Exhibit 26-D contains the audit findings on the National Environmental Policy Act. Pages of the report which the writers intentionally left blank have been omitted from the copy submitted herewith.

**(3) that in evaluating Rockwell's ES&H, the Tiger Team considered the directives, funding, priorities and other constraints imposed by DOE, which the PERB had considered.**

45. Also in August 1989, a DOE Headquarters Criticality Assessment Team completed a review of the Rocky Flats Plant Criticality Safety Program. Ex. 28, August 17, 1989 Bi-Weekly Report from Edward S. Goldberg to John L. Meinhardt.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: An August 17, 1989, Bi-Weekly Report states, "The Criticality Safety Assessment Team held their closeout meeting August 11 with the RFO and Rockwell." Def. Ex. 28 at 2.**

46. Mr. Twining himself believed that Mr. Goldberg and the teams of experts from DOE Headquarters learned of conditions at Rocky Flats that Twining did not know about, and that they had gone down to a deeper level of detail than Twining and the PERB had in assessing ES&H performance there. Ex. 7, Trial Testimony of Bruce Twining in *Stone v. Rockwell*, 3/15/99, pp. 3283-3284.

**RESPONSE: Disagree insofar as there is any inference that "Mr. Goldberg and the teams of experts from DOE Headquarters," on the one hand, and Mr. Twining and the PERB, on the other, assessed Rockwell's ES&H for the same purpose or (2) that in evaluating Rockwell's ES&H, "Mr. Goldberg and the teams of experts from DOE**

**Headquarters" considered the directives, funding, priorities and other constraints imposed by DOE, which Mr. Twining and the PERB had considered.**

**Further disagree on the ground that the proposed finding lacks context. Mr. Twining testified that he did not recall any discussions with Mr. Goldberg regarding Mr. Goldberg's recommendation of 87 as the award fee grade for the 89/1 Period. *See* Pl. Supp. Ex. 45, Dep. of Bruce G. Twining, Feb. 23, 1993, at 70-71. Mr. Twining also testified that he did not believe he was in a position to offer an informed alternative to Mr. Goldberg's proposal in that "at this point there were many more people looking at that plant in intimate detail than there had been before the raid, and that since Albuquerque was no longer in the loop and we didn't have access to the site, I didn't have any way to validate what they are finding. So I was accepting what other federal employees, who were on site, were discovering during this period after the raid." *See id*. at 73, 90-91.**

47. Prior to the issuance of the Tiger Team's formal report, Deputy Secretary Moore was receiving verbal briefings from the Team. Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 67-68.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: Mr. Moore testified, "Whether we had the [Tiger Team's] written report in or not, we would very often get briefings." Def. Ex. 10, Dep. of W. Henson Moore in *Stone*, Apr. 15, 1988, at 67-68.**

48. Moore believed that the Tiger Team was looking more deeply into Rockwell's ES&H deficiencies than Goldberg had been able to do, and that DOE Headquarters acted on Rockwell's award fee with better information than Goldberg had available. Ex. 31, Deposition of Henson Moore in this proceeding, 4/29/94, pp. 41-43; Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 67-68.

**RESPONSE: Disagree insofar as there is any inference (1) that the Tiger Team or Mr. Goldberg complied with the award fee plan in assessing Rockwell's ES&H, (2) that in evaluating Rockwell's ES&H, the Tiger Team or Mr. Goldberg considered directives, funding, priorities and other constraints imposed by DOE, which Mr. Twining and the PERB had considered, (3) that DOE headquarters had a contract right to determine Rockwell's award fee, or (4) that the award fee determined by DOE headquarters was "better" than the award fee determined by the AFDO. Further disagree that the citation to Def. Ex. 10 supports the proposed finding.**

49. In deciding what award fee DOE Headquarters felt should be awarded to Rockwell, Deputy Secretary Moore took into account the Tiger Team report. Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, pp. 133-134.

**RESPONSE: Disagree insofar as there is any inference (1) that the Tiger Team complied with the award fee plan in preparing its report, (2) that the Tiger Team considered directives, funding, priorities and other constraints imposed by DOE or (3) that DOE headquarters had a contract right to determine Rockwell's award fee.**

50. Moore believed that the decision Headquarters made on the award fee fairly reflected Rockwell's performance given all of the deficiencies he had observed and the Tiger Team had reported. Ex. 10, Deposition of Henson Moore in *Stone v. Rockwell*, 4/15/98, p. 138.

**RESPONSE: Disagree insofar as there is any inference (1) that Mr. Moore or the Tiger Team complied with the award fee plan in their observations or (2) that DOE headquarters had a contract right to determine Rockwell's award fee.**

THE 89/1 AWARD FEE DECISION

51. On May 31, 1989, prior to the FBI/EPA raid, Bruce G. Twining, DOE's Manager of the Albuquerque Operations Office, had submitted his recommendation that Rockwell be awarded an award fee of $5,176,482 for plant operations for the 89/1 period. Ex. 32, May 31, 1989 Memorandum from Bruce Twining to Troy E. Wade, II.

**RESPONSE: Disagree. The proposed finding's use of the word "recommendation" is inconsistent with the government's Stipulation. *See* Pl. Ex. 5, Stipulation, ¶ 1.**

**PROPOSED REVISION: On May 31, 1989, prior to the FBI/EPA raid, the AFDO, Bruce G. Twining, DOE's Manager of the Albuquerque Operations Office, concluded that Rockwell's award fee should be $5,176,482 for plant operations for the 89/1 Period. *See* Def. Ex. 32; Pl. Ex. 5, Stipulation, ¶ 1. This was consistent with the**

**contract's requirement that the award fee be determined by the AFDO, Manager of Albuquerque Operations. *See* Pl. Ex. 3 at 2 ("[t]he amount of the award fee actually to be paid to the Contractor shall be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations)" (clause 62(b)(1))); *id*. at Attach. A, page 1 of 9 ("The Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations) (AFDO) . . . will determine the amount of award fee to be paid the Contractor for that evaluation period."); *id.* at Attach. A, page 2 of 9 ("Final award fee determination shall be made by the AFDO.").**

52. Mr. Twining submitted his recommendation to Mr. Troy Wade, DOE Headquarters' Acting Assistant Secretary for Defense Programs, and asked for Mr. Wade's concurrence. Plaintiff's Ex. 5, Stipulation ¶ 1; Ex. 32, May 31, 1989 Memorandum from Bruce Twining to Troy E. Wade, II.

**<u>RESPONSE</u>: Disagree. The proposed finding's use of the word "recommendation" is inconsistent with the government's Stipulation. *See* Pl. Ex. 5, Stipulation, ¶ 1. The contract required that the award fee be determined by the AFDO, Manager of Albuquerque Operations. *See* Pl. Ex. 3 at 2 ("[t]he amount of the award fee actually to be paid to the Contractor shall be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations)" (clause 62(b)(1))); *id*. at Attach. A, page 1 of 9 ("The Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations) (AFDO) . . . will determine the amount of award fee to be paid the**

**Contractor for that evaluation period."); *id.* at Attach. A, page 2 of 9 ("Final award fee determination shall be made by the AFDO.").**

**<u>PROPOSED REVISION</u>: The AFDO, Mr. Twining, forwarded his conclusion as to Rockwell's award fee for the 89/1 Period to DOE headquarters for concurrence. *See* Def. Ex. 32; Pl. Ex. 5, Stipulation, ¶ 1.**

53. Mr. Twining was comfortable with that recommendation based on the information he had up to that point. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/93, p. 53.

**<u>RESPONSE</u>: Disagree. The proposed finding's use of the word "recommendation" is inconsistent with the government's Stipulation. *See* Pl. Ex. 5, Stipulation, ¶ 1.**

**<u>PROPOSED REVISION</u>: The AFDO, Mr. Twining, testified that he was comfortable with his award fee determination "[b]ased on the information I had up to that point." *See* Def. Ex. 8, Dep. of Bruce G. Twining, Feb. 23, 1993, at 53.**

54. At the time he received Mr. Twining's May 31, 1989 award fee recommendation for Rockwell, Mr. Wade was aware of the criminal investigation underway at Rocky Flats that was to lead in the June 6, 1989 raid. Mr. Wade had been asked not to inform Mr. Twining of the criminal investigation. Ex. 14, Deposition of Troy Wade in this proceeding, dated 9/21/94, pp. 28.-29

**<u>RESPONSE</u>: Disagree. The proposed finding's use of the word "recommendation" is inconsistent with the government's Stipulation. *See* Pl. Ex. 5, Stipulation, ¶ 1. The contract required that the award fee be determined by the AFDO, Manager of Albuquerque Operations. *See* Pl. Ex. 3 at 2 ("[t]he amount of the award fee actually to be paid to the Contractor shall be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations)" (clause 62(b)(1))); *id*. at Attach. A, page 1 of 9 ("The Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations) (AFDO) . . . will determine the amount of award fee to be paid the Contractor for that evaluation period."); *id.* at Attach. A, page 2 of 9 ("Final award fee determination shall be made by the AFDO.").**

**Further disagree on the ground that the proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: Mr. Wade testified that at the time he received Mr. Twining's conclusion as to Rockwell's award fee, Mr. Wade was aware of the criminal investigation underway at Rocky Flats that was to lead to the June 6, 1989, raid. Mr. Wade also testified that he had been asked not to inform Mr. Twining of the criminal investigation. *See* Def. Ex. 14, Dep. of Troy E. Wade, Sept. 21, 1994, at 28-29.**

55. Mr. Wade concluded that it would be prudent to make a final award fee determination for Rockwell based on Mr. Twining's recommendation in view of the ongoing investigation. Mr. Twining's May 31, 1989 recommendation never became a final award fee determination. Ex. 14, Deposition of Troy Wade in this proceeding, 9/21/94, pp. 28-29.

**<u>RESPONSE</u>: Disagree. The proposed finding's use of the word "recommendation" is inconsistent with the government's Stipulation. *See* Pl. Ex. 5, Stipulation, ¶ 1. The contract required that the award fee be determined by the AFDO, Manager of Albuquerque Operations. *See* Pl. Ex. 3 at 2 ("[t]he amount of the award fee actually to be paid to the Contractor shall be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations)" (clause 62(b)(1))); *id*. at Attach. A, page 1 of 9 ("The Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations) (AFDO) . . . will determine the amount of award fee to be paid the Contractor for that evaluation period."); *id.* at Attach. A, page 2 of 9 ("Final award fee determination shall be made by the AFDO.").**

**Further disagree on the ground that Mr. Twining's May 31, 1989, determination was the final award fee for the 89/1 Period.**

**Further disagree on the ground that the proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: Mr. Wade testified that he felt it was not prudent to allow Mr. Twining's award fee determination to proceed until the issue of the Rocky Flats investigation had been resolved. *See* Def. Ex. 14, Dep. of Troy E. Wade, Sept. 21, 1994, at 28-29.**

56. Sometime during the early period after the raid, DOE Headquarters asked Mr. Goldberg to review Mr. Twining's recommendation for the award fee for the 89/1 period in light of new information that was being uncovered by the team he had brought to Rocky Flats. Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 40-42, 45-46, 66.

**<u>RESPONSE</u>: Disagree. The proposed finding's use of the word "recommendation" is inconsistent with the government's Stipulation. *See* Pl. Ex. 5, Stipulation, ¶ 1. The contract required that the award fee be determined by the AFDO, Manager of Albuquerque Operations. *See* Pl. Ex. 3 at 2 ("[t]he amount of the award fee actually to be paid to the Contractor shall be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations)" (clause 62(b)(1))); *id*. at Attach. A, page 1 of 9 ("The Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations) (AFDO) . . . will determine the amount of award fee to be paid the Contractor for that evaluation period."); *id.* at Attach. A, page 2 of 9 ("Final award fee determination shall be made by the AFDO.").**

**Further disagree on the ground that the proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: Mr. Goldberg testified that sometime during the early period after the raid, DOE headquarters asked him to review the award fee for the 89/1 Period in light of new information that was being uncovered by the team he had brought to Rocky Flats. *See* Pl. Supp. Ex. 46, Dep. of Edward S. Goldberg, Nov. 10, 1992, at 40-42, 45-46.**

57. In July 1989, Mr. Goldberg made a recommendation to Mr. Twining of an award fee of $3,628,622 for plant operations for the 89/1 period. Plaintiff's Ex. 5, Stipulation, ¶ 5; Ex. 8, Deposition of Bruce G. Twining in this proceeding, 2/23/93, pp. 69-70, 76, 93.

**<u>RESPONSE</u>: Disagree on the ground that the proposed finding lacks context. Mr. Twining testified that (1) prior to Mr. Goldberg, Mr. Twining had never had an area manager recommend a different award fee grade after the process had already gone through the PERB and (2) it was not the responsibility of an area manager to review the proposed award fee after the PERB had already reached a decision. *See* Pl. Supp. Ex. 45, Dep. of Bruce G. Twining, Feb. 23, 1993, at 80-81.**

**<u>PROPOSED REVISION</u>: In July 1989, Mr. Goldberg proposed an award fee for Plant Operations at Rocky Flats for the 89/1 Period in the amount of $3,628,622 to the AFDO. *See* Pl. Ex. 5, Stipulation, ¶ 5. Mr. Twining testified that it was not the responsibility of an area manager to review a proposed award fee after the PERB had reached a decision. *See* Pl. Supp. Ex. 45, Dep. of Bruce G. Twining, Feb. 23, 1993, at 80-81.**

58. Mr. Twining believed Mr. Goldberg was more fully informed about Rockwell's performance than Mr. Twining had been when Twining made his initial May 1989 recommendation of an award fee of $5,176,482 for plant operations. Ex.8, Deposition of Bruce Twining in this proceeding, 2/23/93, pp. 69-70, 76, 93.

**<u>RESPONSE</u>: Disagree. The proposed finding's use of the word "recommendation" is inconsistent with the government's Stipulation. *See* Pl. Ex. 5, Stipulation, ¶ 1. The contract required that the award fee be determined by the AFDO, Manager of Albuquerque Operations. *See* Pl. Ex. 3 at 2 ("[t]he amount of the award**

**fee actually to be paid to the Contractor shall be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations)" (clause 62(b)(1))); *id*. at Attach. A, page 1 of 9 ("The Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations) (AFDO) . . . will determine the amount of award fee to be paid the Contractor for that evaluation period."); *id.* at Attach. A, page 2 of 9 ("Final award fee determination shall be made by the AFDO.").**

**Further disagree insofar as there is any inference that (1) Mr. Goldberg and Mr. Twining assessed Rockwell's performance for the same purpose or (2) that in evaluating Rockwell's performance, Mr. Goldberg considered the directives, funding, priorities and other constraints imposed by DOE, which Mr. Twining and the PERB had considered.**

**Further disagree on the ground that the proposed finding lacks context. Mr. Twining testified that he did not recall any discussions with Mr. Goldberg regarding Mr. Goldberg's recommendation of 87 as the award fee grade for the 89/1 Period. *See* Pl. Supp. Ex. 45, Dep. of Bruce G. Twining, Feb. 23, 1993, at 70-71. Mr. Twining also testified that he did not believe he was in a position to offer an informed alternative to Mr. Goldberg's proposal in that "at this point there were many more people looking at that plant in intimate detail than there had been before the raid, and that since Albuquerque was no longer in the loop and we didn't have access to the site, I didn't have any way to validate what they are finding. So I was accepting what other federal employees, who were on site, were discovering during this period after the raid." *See* *id*. at 73, 90-91.**

59. Mr. Twining felt there were many more DOE people looking at the plant in intimate detail than there had been before the raid. Ex.8, Deposition of Bruce Twining in this proceeding, 2/23/93, p. 90.

**<u>RESPONSE</u>: Disagree insofar as there is any inference (1) that Mr. Twining and the additional DOE people "look[ed] at the plant" for the same purpose or (2) that in "looking at the plant," the additional DOE people considered the directives, funding, priorities and other constraints imposed by DOE, which Mr. Twining and the PERB had considered.**

**Further disagree on the ground that the proposed finding lacks context.**

**<u>PROPOSED REVISION</u>: Mr. Twining testified that "at this point there were may more people looking at that plant in intimate detail than there had been before the raid, and that since Albuquerque was no longer in the loop and we didn't have access to the site, I didn't have any way to validate what they are finding." Def. Ex. 8, Dep. of Bruce G. Twining, Feb. 23, 1993, at 90.**

60. Mr. Twining concluded that he and the PERB had graded Rockwell too high on Environmental, Safety and Health (ES&H) performance in May 1989. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/93, pp. 73, 111-112; Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, p. 61.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad.**

**Further disagree on the ground that the proposed finding lacks context. Mr. Twining testified that he did not recall any discussions with Mr. Goldberg regarding Mr. Goldberg's recommendation of 87 as the award fee grade for the 89/1 Period. *See* Pl. Supp. Ex. 45, Dep. of Bruce G. Twining, Feb. 23, 1993, at 70-71. Mr. Twining also testified that he did not believe he was in a position to offer an informed alternative to Mr. Goldberg's proposal in that "at this point there were many more people looking at that plant in intimate detail than there had been before the raid, and that since Albuquerque was no longer in the loop and we didn't have access to the site, I didn't have any way to validate what they are finding. So I was accepting what other federal employees, who were on site, were discovering during this period after the raid." *See id*. at 73, 90-91.**

**Further disagree insofar as there is any inference (1) that the PERB, Mr. Goldberg, and DOE headquarters reviewed Rockwell's ES&H for the same purpose or (2) that in reviewing Rockwell's ES&H, Mr. Goldberg and DOE headquarters considered the directives, funding, priorities and other constraints imposed by DOE, which Mr. Twining and the PERB had considered.**

**Further disagree that the cited testimony of Edward Goldberg supports the proposed finding. Mr. Goldberg testified that he didn't "specifically recall the details that my recommendation was agreed to by Mr. Twining" and that he didn't recall specifically any conversations with Mr. Twining where the award fee might have come up. *See* Pl. Supp. Ex. 46, Dep. of Edward S. Goldberg, Nov. 10, 1992, at 61-64.**

61. In August 1989, Mr. Twining modified his original May 1989

recommendation to reflect the input by Mr. Goldberg, and recommended to DOE headquarters that Rockwell receive an award fee of $3,628,622--the same amount recommended by Mr. Goldberg--for plant operations for 89/1. Mr. Twining was comfortable with the lower grade of 79 for ES & H that Goldberg gave Rockwell. Ex. 8, Deposition of Bruce G. Twining in this proceeding, 2/23/93, pp. 69-70, 76, 91, 93, 111.

**<u>RESPONSE</u>: Disagree. The proposed finding's use of the word "recommend[ation]" with respect to Mr. Twining is inconsistent with the government's Stipulation. *See* Pl. Ex. 5, Stipulation, ¶ 1. The contract required that Rockwell's performance be evaluated, and Rockwell's award fee be determined, by the AFDO, Manager of Albuquerque Operations. *See* Pl. Ex. 3 at 2 ("[t]he amount of the award fee actually to be paid to the Contractor shall be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations)" (clause 62(b)(1))); *id*. at Attach. A, page 1 of 9 ("The Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations) (AFDO) shall evaluate the Contractor's performance during each evaluation period and will determine the amount of award fee to be paid the Contractor for that evaluation period."); *id.* at Attach. A, page 2 of 9 ("Final award fee determination shall be made by the AFDO.").**

**Further disagree on the ground that the proposed finding lacks context. Mr. Twining testified that he did not recall any discussions with Mr. Goldberg regarding Mr. Goldberg's recommendation of 87 as the award fee grade for the 89/1 Period. *See* Pl. Supp. Ex. 45, Dep. of Bruce G. Twining, Feb. 23, 1993, at 70-71. Mr. Twining also**

**testified that he did not believe he was in a position to offer an informed alternative to Mr. Goldberg's proposal in that "at this point there were many more people looking at that plant in intimate detail than there had been before the raid, and that since Albuquerque was no longer in the loop and we didn't have access to the site, I didn't have any way to validate what they are finding. So I was accepting what other federal employees, who were on site, were discovering during this period after the raid."** ***See id.*** **at 73, 90-91.**

**Further disagree insofar as there is any inference (1) that Mr. Twining and Mr. Goldberg reviewed Rockwell's performance for the same purpose or (2) that Mr. Goldberg considered the directives, funding, priorities and other constraints imposed by DOE, which Mr. Twining and the PERB had considered.**

62. Admiral Jon Barr assumed the position of Deputy Assistant Secretary for Military Applications beginning in June 1989, contemporaneous with the FBI/EPA raid. Prior to taking the position at DOE, Admiral Barr had served in the Navy Nuclear Power Program for 27 years. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 7-9.

**RESPONSE: Disagree. The proposed finding includes statements that are not supported by the cited testimony.**

**PROPOSED REVISION: Jon Barr testified that he assumed the position of Deputy Assistant Secretary for Military Application on July 5, 1989. Admiral Barr also testified that during his career in the United States Navy, he went through the Nuclear Power Training Pipeline, was an instructor at the Navy Nuclear Power School, and was**

**a Commanding Officer of the Navy Nuclear Power School. *See* Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 7-9.**

63. During the latter half of 1989, Admiral Barr traveled to Rocky Flats approximately once per month. Beginning in early 1990, he traveled there once every two or three months. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, p. 40. Admiral Barr also received information from people in his office who made trips to Rocky Flats, and from on-site people like Mr. Goldberg. Those reports reflected things that had occurred at the plant during the 89/1 award fee grading period from October 1, 1988 through March 31, 1989.[2]

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: Admiral Barr testified that he traveled to Rocky Flats approximately once per month during the latter half of 1989 and once every two or three months thereafter. *See* Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 40. He testified that he also received information from people in his office who made trips to Rocky Flats, and from on-site people like Mr. Goldberg. *See id.* at 18-19. Admiral Barr testified that the trips, reports, and observations he mentioned were not made during the period October 1, 1988, to March 31, 1989, but added that they reflected things that had gone on during that period. *See id.* at 19.**

---

[2] Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 18-19, 98.

64. In Admiral Barr's judgment, prior to Mr. Goldberg's arrival along with his team of experts, the people in DOE's Rocky Flats Office had very little technical acumen, and were effectively an administrative office. They lacked the ability to be pro-active in looking for problems. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, p. 33

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: Admiral Barr testified that prior to Mr. Goldberg's arrival with more technical support, people at the area office had very little technical acumen and were effectively an administrative office. Admiral Barr testified that the philosophy and ability to be proactive was not present at the Rocky Flats area and others. *See* Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 33.**

65. Although technical expertise existed in the Albuquerque Operations Office, that office was hundreds of miles away from Rocky Flats, and although there were periodic visits by Albuquerque personnel, Albuquerque did not exercise sufficiently close scrutiny over Rocky Flats due to distance. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 33-34.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: Admiral Barr testified that although technical expertise existed in the Albuquerque Operations Office, that office was hundreds of miles away from Rocky Flats, and although there were periodic visits by Albuquerque**

**personnel, it was not adequate to conduct the kind of oversight he was talking about. *See* Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 33-34.**

66. During the period August through November 1989, Admiral Barr received information from people in his office who made trips to Rocky Flats, and from on-site people like Mr. Goldberg. Those reports reflected things that had occurred at the plant during the 89/1 award fee grading period from October 1, 1988 through March 31, 1989. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 18-19, 98.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**PROPOSED REVISION: Admiral Barr testified that he received information from people in his office who made trips to Rocky Flats, and from on-site people like Mr. Goldberg. *See* Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 18-19. Admiral Barr testified that the trips, reports, and observations he mentioned were not made during the period October 1, 1988, to March 31, 1989, but added that they reflected things that had gone on during that period. *See id*. at 19.**

67. Shortly after Admiral Barr arrived at DOE, DOE sent a group of experts to Rocky Flats to determine whether there had been any uncontrolled nuclear criticalities at the plant. If a criticality occurred under certain conditions, it could send fission fragments into a local area and thereby harm people in the location. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 20-23.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad and lacks context.**

**<u>PROPOSED REVISION</u>: Admiral Barr testified, "Very shortly after I got there, and this had been apparently in the works before I arrived, a group of non-DOE experts were brought in to conduct a review of what had gone on at Rocky Flats with a view to determining whether or not there had been any uncontrolled criticalities of the plant. Their findings were there had not been, and they were able to back that up with some reasonable technical documentation." Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 20. He testified that if there were a criticality, it "could send fission fragments into the local area and could conceivably get out into the atmosphere. It would have to be a pretty bad criticality accident for that to happen, but it is conceivable." *See id*. at 23-24.**

68. The experts found that no criticalities had occurred, but they also found that there were "multi-tens" of kilograms of plutonium in the duct-work in several buildings at Rocky Flats, and that this plutonium had gotten into the duct-work through long-term improper operations of glove boxes at the site. They further found that there was a disturbing lack of knowledge on the part of Rockwell people regarding the form or amount of plutonium in the duct-work, and a lack of adequate concern for the problem by Rockwell. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 20-21.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad.**

**<u>PROPOSED REVISION</u>: Admiral Barr testified that the experts found that no criticalities had occurred, but also found that there were "initial estimates in the**

**multi-tens kilograms of plutonium in the ductwork in several of the buildings in Rocky Flats, and that this plutonium had gotten into the ductwork through improper, long-term improper operation of glove boxes . . . Additionally their finding was that there was a disturbing lack of knowledge on the part of the appropriate Rockwell people for the form or amount of plutonium in the ductwork and a lack of what the criticality experts would agree, felt was inadequate concern over the possibility of plutonium in the ductwork." Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 20-21.**

69. Admiral Barr believed the seriousness of the "chromic acid spill," although known to Albuquerque officials when they were evaluating Rockwell's award fee, was not adequately appreciated by those officials. In Admiral Barr's opinion, the spill was not an isolated deficiency, but rather it was indicative of systematic weakness on Rockwell's part toward safety alarm systems. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 34-37.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad and includes a statement ("on Rockwell's part") that is not supported by the cited testimony.**

**<u>PROPOSED REVISION</u>: Admiral Barr testified, "Although [the chromic acid spill] was reported as a serious incident [and known to Albuquerque officials when they were evaluating Rockwell's award fee], it was clearly not analyzed from the standpoint of the number of fundamental operating practices, safely [sic] practices, which had to break down in order for that to occur." Def. Ex. 21, Dep. of Admiral Jon Michael Barr,**

**Sept. 23, 1994, at 34. He testified that "the problem that DOE had and may well still have is that the culture of the organization was such that the ability to identify, explain, follow up on and insure correction of deficiencies was in many cases just not that good."** ***Id*. at 35. When asked about his testimony that there was insufficient oversight by either the Rocky Flats Area Office or the Albuquerque Operations Office, he responded, "For example, in the chromic acid spill, if you look at what were the fundamental problems that went into that, there is an inoperative alarm which had been allowed to remain inoperative. There were no special precautions taken because of that inoperative alarm for more frequent monitoring to insure that the function of the alarm was carried out in some other manner. So that shows an approach to alarms, to safety features, which I would call inadequate."** ***See id*. at 36-37.**

70. Admiral Barr on a visit to Rocky Flats personally noted a situation where switching off an alarm on one tank would disable a series of alarms on other tanks. Rockwell had not put in place any meaningful additional procedures to ensure that the function of the alarms was carried out. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 37-38, 40.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad and includes a statement ("Rockwell had not put in place . . .") that is not supported by the cited testimony.**

**<u>PROPOSED REVISION</u>: Admiral Barr testified, "I noted in one, personally, one case where alarms which dealt with levels of tanks were defeated because the alarm**

**system, when one tank alarmed, you couldn't stop the alarm without defeating all of the alarms. So it was a very poor design. But, again, no meaningful additional procedures were put in place to insure that the function of the alarm was carried out." Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 37.**

71. Admiral Barr believed there was a fundamental philosophy of operating a nuclear facility which would minimize the likelihood of serious problems. He had lived that philosophy during his 28 years in the Navy Nuclear Power Program. Admiral Barr concluded that this philosophy had never been present at Rocky Flats, and that Rockwell's overall running of the plant fell below a standard that was appropriate given the potential for serious accidents. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 37-38, 40, 86-88.

**RESPONSE: Disagree. The proposed finding is overly broad and lacks context.**

**Further disagree insofar as there is any inference that Admiral Barr was involved in developing the award fee plan for the 89/1 or 89/2 Period.**

**PROPOSED REVISION: Admiral Barr testified that he thought there were things that "indicate[d] that the plant was just not operated at a standard which in my judgment is appropriate for something with that degree of potential severity."** ***See*** **Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 37-40. He testified that "there is a philosophy of how you run a complex hazardous plant which minimizes the likelihood of serious problems. I know that philosophy because I have lived it for thirty-some years. That philosophy was not present at Rocky Flats, nor do I expect had**

**it ever been. So, therefore, my opinion was that the likelihood of a problem was greater than it would be had the, basically it's the Navy Nuclear Power Program approach to things been adopted, had the culture been changed."  *Id*. at 86-87. He testified, "As a matter of fact, the plant had operated for a lot of years with only one, that I can recall, problem, the fire, whatever, in the late 1960's, which was a major concern.[***] But we are dealing here with the likelihood. We are dealing with, is the probability one in a hundred years or one in a million years? And the effort is to make the probability one in a million, not one in a hundred. . . . In my opinion, all that could have been done to reduce the likelihood or that reasonably could have been done over the years to reduce the likelihood of the problem had not been done."  Def. Ex. 21 at 87-88.**

72. The more Admiral Barr learned about conditions at Rocky Flats, the lower the award fee he believed Rockwell should receive. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, p. 98.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**Further disagree insofar as there is any inference that Admiral Barr had a contract right to determine Rockwell's award fee.**

**PROPOSED REVISION: Admiral Barr testified that he probably would have suggested further reductions to Rockwell's award fee if he had had additional time for review. *See* Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 98.**

[***] Rockwell first contracted to operate the Rocky Flats Plant in 1975. *See* Pl. Ex. 3 at 1.

73. On September 20, 1989, John L. Meinhardt, the Acting Assistant Secretary for Defense Programs in DOE Headquarters advised Albuquerque Operations that the award fee should be downwardly adjusted in the area of ES&H. Meinhardt indicated that Rockwell's performance warranted an ES & H grade of 65.25, resulting in an award fee of $2,716,307 for plant operations, plus $186,591 for PRMP/PROVE, totaling $2,902,898. Ex. 33, September 20, 1989 Memorandum from John L. Meinhardt to Bruce Twining.

**<u>RESPONSE</u>: Disagree. The proposed finding's use of the words "advised" and "indicated" is inconsistent with the government's Stipulation. *See* Pl. Ex. 5, Stipulation, ¶¶ 7, 8.**

**<u>PROPOSED REVISION</u>: DOE headquarters mandated that the award fee for Plant Operations for the 89/1 Period be $2,716,624, and caused the AFDO to issue a final award fee determination in that amount. *See* Pl. Ex. 5, Stipulation, ¶ 7. The $2,716,624 award fee for Plant Operations for the 89/1 Period was determined by DOE headquarters. *See* Pl. Ex. 5, Stipulation, ¶ 8.**

74. Mr. Twining was comfortable with the 65.25 grade Meinhardt gave Rockwell for ES & H. Deposition of Bruce Twining in this proceeding, 2/23/94, p. 111.

**<u>RESPONSE</u>: Disagree. The proposed finding's use of the word "gave" is inconsistent with the government's Stipulation. *See* Pl. Ex. 5, Stipulation, ¶ 7 ("DOE headquarters mandated that the award fee for Plant Operations for the 89/1 [P]eriod be**

**$2,716,624, and caused the AFDO to issue a final award fee determination in that amount."). The contract required that Rockwell's performance be evaluated, and Rockwell's award fee be determined, by the AFDO, Manager of Albuquerque Operations. *See* Pl. Ex. 3 at 2 ("[t]he amount of the award fee actually to be paid to the Contractor shall be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations)" (clause 62(b)(1))); *id*. at Attach. A, page 1 of 9 ("The Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations) (AFDO) shall evaluate the Contractor's performance during each evaluation period and will determine the amount of award fee to be paid the Contractor for that evaluation period."); *id.* at Attach. A, page 2 of 9 ("Final award fee determination shall be made by the AFDO."). The $2,716,624 award fee for Plant Operations for the 89/1 Period "was determined by DOE headquarters." Pl. Ex. 5, Stipulation, ¶ 8.**

**Further disagree on the ground that the proposed finding lacks context. Mr. Twining testified that he did not recall any discussions with Mr. Meinhardt regarding Mr. Meinhardt's mandated lower award fee. *See* Pl. Supp. Ex. 45, Dep. of Bruce G. Twining, Feb. 23, 1993, at 95-96, 100. He testified that he could not recall any prior occasions where DOE headquarters had drafted an award fee letter to the contractor for his signature. *See id*. at 96-97; Pl. Ex. 9. He also testified that "at this point there were many more people looking at that plant in intimate detail than there had been before the raid, and that since Albuquerque was no longer in the loop and we didn't have access to the site, I didn't have any way to validate what they are finding. So I was accepting what other federal employees, who were on site, were discovering during this**

**period after the raid."** ***See*** **Pl. Supp. Ex. 45 at 90-91.**

**Further disagree insofar as there is any inference (1) that Mr. Twining and Mr. Meinhardt reviewed Rockwell's performance for the same purpose or (2) that Mr. Meinhardt considered the directives, funding, priorities and other constraints imposed by DOE, which Mr. Twining and the PERB had considered.**

75. Mr. Meinhardt's September 20, 1989 to Mr. Twining also attached a draft letter for Mr. Twining to send to Rockwell informing them of the award fee and a draft Performance Evaluation Report for the 89/1 period. Ex. 33, September 20, 1989 Memorandum from John L. Meinhardt to Bruce Twining.

**RESPONSE: Agree.**

THE 89/2 AWARD FEE DECISION

76. On September 12, 1989, Secretary Watkins announced the appointment of David P. Simonson as Manager of the Rocky Flats Office of DOE. Ex. 34, September 12, 1989 DOE News Release.

**RESPONSE: Agree.**

77. Shortly before Thanksgiving of 1989, DOE Headquarters sent a team of around 50 people to take another comprehensive look at Rocky Flats. Admiral Barr led one branch of the team, and Mr. Starostecki, another Headquarters official, led the other. The

team spent four days at the plant. This review discovered numerous deficiencies in virtually all areas. The review indicated poor performance by Rockwell across the board, and led to a halt of weapons production. DOE subsequently discovered that it was very difficult to effect corrections to the identified problems, because Rocky Flats operational capabilities had become so flawed during Rockwell's management. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 151-152.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad and lacks context.**

**<u>PROPOSED REVISION</u>: Admiral Barr testified that shortly before Thanksgiving of 1989, DOE headquarters sent a team of around 50 people to Rocky Flats. He testified that he and Mr. Starostecki each led one branch of the team. He testified, "It was a comprehensive look at Rocky Flats. The decision had been made at that point to replace Rockwell. EG&G was going to come in, and the feeling was that we needed to have another look, and I agree with this, another look at how Rocky Flats was doing. And that look turned up numerous deficiencies in virtually all areas . . . the numbers scope, the implications for the method of operation of the plant were serious and indicated poor performance by Rockwell across the board, and additionally, as I have also said, I think the lack of ability of DOE to, on a continuing basis, oversee the contract radically. . . . The upshot of that review was to stop weapons production at Rocky Flats. . . . To my knowledge, production has never been[] reestablished for a combination of reasons, not the least of which was that as we got further and further into trying to correct the deficiencies, the underlying, the underpinning, Rocky Flats' operational capability, which had been under Rockwell direction for some years, was so**

**flawed that it was not, we were not able to make corrections . . . ."** ***See*** **Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 151-52.**

78. On December 6, 1989, Mr. Simonson, the Manager of the Rocky Flats Area Office, forwarded a memorandum to DOE Headquarters containing his preliminary view of Rockwell's performance, and recommending an award fee for the April 1, 1989 through September 30, 1989 of $3,114,245, plus $628,982 for PRMP/PROVE, for a total payment of $4,176,077. Ex. 35, December 6, 1989 Memorandum from David P. Simonson to John C. Tuck.

**<u>RESPONSE</u>: Disagree. The proposed finding's use of the words "preliminary view" and "recommending" is inconsistent with the government's Stipulation.** ***See*** **Pl. Ex. 5, Stipulation, ¶ 9.**

**<u>PROPOSED REVISION</u>: On December 6, 1989, Mr. Simonson, the Manager of the Rocky Flats Office and, as stipulated by Defendant, the AFDO for the 89/2 Period, concluded that Rockwell's award fee should be $3,114,245 for Plant Operations and $628,982 for PRMP/PROVE and forwarded his conclusion to DOE headquarters for concurrence.** ***See*** **Def. Ex. 35; Pl. Ex 5, Stipulation, ¶ 9.**

79. Secretary Watkins, Under Secretary Tuck, and Admiral Barr made the decision to appoint Nelson as Rocky Flats Area Manager in place of Mr. Simonson. Mr. Nelson, like Admiral Watkins and Admiral Barr, was a veteran of the Navy's Nuclear Power Program. Ex. 36, Deposition of Robert Nelson in this proceeding, 11/9/92, pp. 22-23, 27.

**RESPONSE: Disagree. The proposed finding is overly broad and includes statements that are not supported by the cited testimony.**

**PROPOSED REVISION: Robert Nelson testified that he met with Admiral Barr, Under Secretary Tuck, and Secretary Watkins, and that Secretary Watkins asked him to go to Rocky Flats for about six months. *See* Def. Ex. 36, Dep. of Robert M. Nelson, Jr., Nov. 9, 1992, at 22-23, 27.**

80. On February 26, 1990, Mr. Nelson wrote to Rockwell and informed it that DOE had determined that Rockwell earned an award fee of $1,579,639, plus a base fee of $432,850, for a total payment of $2,012,489. Ex. 37, February 26, 1990 Letter from Robert M. Nelson, Jr. To Dominick J. Sanchini.

**RESPONSE: Disagree. The proposed finding is inconsistent with the government's Stipulation. *See* Pl. Ex. 5, Stipulation, ¶ 11.**

**Further disagree insofar as there is any inference that "DOE" as DOE headquarters had a contract right to determine Rockwell's award fee.**

**PROPOSED REVISION: DOE headquarters mandated that the award fee for Plant Operations for the 89/2 Period be $1,241,604, and the award fee for PRMP/PROVE be $338,035, and caused the AFDO to issue a final award fee determination in those amounts. *See* Def. Ex. 37; Pl. Ex. 5, Stipulation, ¶ 11.**

ROCKWELL'S ACQUIESCENCE IN DOE HEADQUARTER'S ACTIONS

81. On June 13, 1989, Rockwell's Board Chairman and Chief Executive Officer (CEO) Donald Beall initiated contact with DOE at the highest level by writing directly to Secretary Watkins, bypassing the Manager of Albuquerque Operations, Bruce Twining. Mr. Beall wrote that the criminal investigation was of serious personal concern to him, and that he would welcome an opportunity to discuss Rockwell's management of Rocky Flats personally with Secretary Watkins. Ex. 38, Letter from D.R. Beall to The Honorable James D. Watkins; Ex. 39, Deposition of Donald Beall in this proceeding, 7/18/94, pp. 8-11.

**RESPONSE: Disagree. The proposed finding is overly broad and lacks context.**

**Further disagree insofar as there is any inference that Mr. Beall's letter concerned the contract requirement that Rockwell's award fees be determined by the Manager, Albuquerque Operations.**

**PROPOSED REVISION: On June 13, 1989, one week after the raid, Rockwell's Chairman and Chief Executive Officer ("CEO") Donald R. Beall wrote a letter to Secretary Watkins. Mr. Beall wrote that the government's initiation of a broad-scale investigation of possible environmental violations at the Rocky Flats Plant was of serious personal concern to him. The letter concluded, "We will welcome an opportunity to discuss personally any questions you may have regarding our management of the Rocky Flats Plant."** ***See*** **Def. Ex. 38, letter from Donald R. Beall to James D. Watkins, June 13, 1989. Mr. Beall testified that his June 13, 1989, letter was the first contact that he had with DOE regarding the search warrant.** ***See*** **Def. Ex. 39, Dep. of Donald R. Beall, July 18, 1994, at 8-9.**

82. On June 15, 1989, Secretary Watkins wrote back to CEO Beall, advising that a special departmental team, headed by Deputy Secretary Moore, had visited Rocky Flats in conjunction with the criminal investigation. He advised Mr. Beall that he had effected significant management changes there and that others would follow once his team completed its review. He expressed concern that Rockwell's management did not sufficiently understand the importance of complying with ES&H requirements, and stated that needed to be a new "culture" which placed ES&H compliance on a par with weapons production. He requested that Rockwell submit within 60 days a comprehensive plan indicating how Rockwell would provide satisfactory assurance that management shortcomings would not occur. Ex. 40, June 15, 1989 Letter from James D. Watkins, Admiral, U.S. Navy (Retired) to Mr. Donald R. Beall, Chairman and Chief Executive Officer, Rockwell International Corporation.

**<u>RESPONSE</u>: Disagree. The proposed finding lacks context and includes a statement ("concern that Rockwell's management did not sufficiently understand") that is not supported by the cited document.**

**Further disagree insofar as there is any inference that Admiral Watkins's letter concerned the contract requirement that Rockwell's award fees be determined by the Manager, Albuquerque Operations.**

**<u>PROPOSED REVISION</u>: On June 15, 1989, shortly after the raid, Secretary Watkins wrote back to CEO Beall, advising that a special departmental team, headed by Deputy Secretary Moore, had visited Rocky Flats in conjunction with the criminal investigation. *See* Def. Ex. 40, letter from James D. Watkins to Donald R. Beall, June**

**15, 1989, at 1. Secretary Watkins expressed dissatisfaction with DOE's oversight of Rocky Flats and advised Mr. Beall that he had effected significant management changes there and expected that others would follow once his team completed its review. *Id.* at 2. He stated, "I cannot over-emphasize the necessity for individuals at every level to understand completely the need to adopt and adhere to a new culture of professionalism in operating the Rocky Flats Plant," which placed ES&H compliance on a par with weapons production. *Id.* at 1. He requested that Rockwell submit within 60 days a comprehensive plan indicating how Rockwell would provide satisfactory assurance that management shortcomings of the types described in the letter would not occur. *Id.* at 2.**

83. On or about June 16, 1989, Deputy Secretary Moore publicly announced that DOE was suspending bonus payments for good performance by Rockwell at Rocky Flats. Ex. 39, Deposition of Donald Beall in this proceeding, 7/18/94, pp. 17-18; Ex. 41, June 17, 1989 New York Times article.

**<u>RESPONSE</u>: Agree.**

84. In mid-June 1989, DOE Deputy Secretary Henson Moore told Sam Iacobellis, Rockwell's Executive Vice-President, that DOE was suspending the award fee determination for two to three weeks pending the investigation by the DOE Tiger Team. By letter dated June 20, 1989, Deputy Secretary Moore confirmed that conversation. Ex. 42, June 20, 1989 Letter from W. Henson Moore to Mr. Sam Iacobellis. This letter placed Rockwell on notice

about DOE Headquarters' role in the award fee process. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 52, 56.

**RESPONSE: Disagree. The proposed finding is overly broad.**

**Further disagree insofar as there is any inference that the cited letter placed Rockwell on notice that its award fees would be determined and mandated by DOE headquarters instead of being determined by the AFDO, as the contract required.**

**PROPOSED REVISION: On June 20, 1989, Deputy Secretary Henson Moore wrote a letter to Rockwell Executive Vice President Sam Iacobellis, confirming their conversation of the previous week regarding the status of Rockwell's award fee. *See* Dep. Ex. 42, letter from W. Henson Moore to Sam Iacobellis, June 20, 1989. When asked if Rockwell was ever informed of DOE headquarters' insertion into the award fee process, Admiral Barr testified, "Well, I mean, I can only, I can point to this letter to Mr. Iacobellis, which certainly, unless he's a lot denser than I think he is, clearly indicated that Headquarters was getting involved." *See* Def. Ex. 21, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 52, 56. When asked if Rockwell was ever notified prior to the June 20, 1989, letter, Admiral Barr testified that he had no knowledge of that. *See id.***

85. On June 28, 1989, CEO Beall again wrote to Secretary Watkins expressing appreciation for the opportunity to discuss Rocky Flats personally with DOE Headquarters officials. Mr. Beall stated that he would personally ensure that Rockwell's employees at Rocky Flats fully implemented the new culture instituted by Secretary Watkins. He advised

that Rockwell's Headquarters was establishing a "Corporate Rocky Flats Overview Board" to increase senior Rockwell management oversight of all aspects of the Rocky Flats Plant including ES&H compliance. He was also instituting a requirement for bi-weekly management reports from Rocky Flats that would go to the Rockwell Overview Board and to Secretary Watkins via Rocky Flats Area Manager Goldberg. CEO Beall expressed his desire for a further meeting with Secretary Watkins on Rocky Flats oversight. Ex. 43, June 28, 1989 Letter from D.R. Beall to Admiral James D. Watkins.

**RESPONSE: Disagree. The proposed finding is overly broad and lacks context.**

**Further disagree insofar as there is any inference that the cited letter concerned the contract requirement that Rockwell's award fees be determined by the Manager, Albuquerque Operations.**

**PROPOSED REVISION: On June 28, 1989, 22 days after the raid, CEO Beall wrote a letter to Admiral Watkins. *See* Def. Ex. 43, letter from Donald R. Beall to Admiral James D. Watkins, June 28, 1989. The letter stated, "I sincerely appreciate the candid and constructive discussions we had with you, Deputy Secretary Moore and your associates last Friday." *Id.* at 1. The letter stated that Mr. Beall would "personally see to it that our people fully understand and implement th[e] new culture." *Id.* The letter advised that Mr. Beall and Mr. Iacobellis were establishing a Corporate Rocky Flats Overview Board "to enhance senior Rockwell management visibility into all aspects of the Rocky Flats Plant," including ES&H. *Id.* at 2, App. A. The letter also advised that Mr. Beall and Mr. Iacobellis were initiating bi-weekly management reports at the Rocky Flats Plant, copies of which would be furnished to**

**the overview board and to Admiral Watkins via the local DOE office. *Id.* at 2. The letter concluded, "Sam Iacobellis and I look forward to a further meeting with you . . . . Thank you again for the opportunity to meet with you and your associates." *Id.* at 3.**

86. On July 13, 1989, Deputy Secretary Moore informed Rockwell's Mr. Iacobellis that DOE Headquarters was further delaying the pending award fee determination until August 1989, inasmuch as additional time was needed to permit the Tiger Team to prepare a written report. Ex. 44, Memorandum for The File from W. Henson Moore. Mr. Iacobellis acquiesced in DOE Headquarters' decision to delay the award fee determination until sometime in August 1989. Ex. 45, Deposition of Sam Iacobellis in this proceeding, 7/19/94, pp. 28-29, 60-61.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad and lacks context.**

**Further disagree insofar as there is any inference that the cited testimony suggests that Mr. Iacobellis acquiesced in award fees being determined and mandated by DOE headquarters instead of being determined by the AFDO, as the contract required.**

**<u>PROPOSED REVISION</u>: A memorandum from W. Henson Moore to file on July 14, 1989, the month after the raid, references a call to Mr. Iacobellis on July 13 and states, "I also informed Iacobellis that we were going to delay the pending award fee determination until sometime in August. Iacobellis agreed to the delay." *See* Def. Ex. 44, memorandum from W. Henson Moore to The File, July 14, 1989. Mr. Iacobellis testified that he acquiesced or agreed to the delay, but that he didn't recall how long.**

***See* Def. Ex. 45, Dep. of Sam Iacobellis, July 19, 1994, at 28-29, 60-61.**

87. On August 14, 1989, CEO Beall submitted to Secretary Watkins the Management Plan Watkins had requested in his June 15, 1989 letter. The Plan was intended to assure that compliance with ES & H requirements would not be subordinated to the Plant's production mission. Ex. 46, August 14, 1989 Letter from Donald R. Beall to Admiral James D. Watkins.

**RESPONSE: Agree.**

88. On August 25, 1989, Secretary Watkins wrote back to CEO Beall stating that DOE Headquarters did not believe Rockwell's Management Plan adequately addressed the issue of the management problems at Rocky Flats. Secretary Watkins also advised Mr. Beall that he had reorganized the line management to provide that the staff of the Rocky Flats Area Office would report directly to the Assistant Secretary for Defense Programs so that DOE Headquarters could more effectively oversee Rocky Flats operations. Ex. 47, August 25, 1989 Letter from Admiral Watkins to Mr. Donald R. Beall. Mr. Beall did not object. Beall felt that DOE could "organize their staff as they see fit." Ex. 39, Deposition of Donald Beall in this proceeding, 7/18/94, pp. 35-36.

**RESPONSE: Disagree. The proposed finding is overly broad and lacks context.**

**Further disagree insofar as there is any inference that the cited testimony suggests that Mr. Beall acquiesced in award fees being determined and mandated by**

**DOE headquarters instead of being determined by the AFDO, as the contract required.**

**<u>PROPOSED REVISION</u>: On August 25, 1989, Secretary Watkins wrote to Mr. Beall, stating that Secretary Watkins and Henson Moore did not believe Rockwell's Management Plan adequately addressed the issue of management problems at Rocky Flats. *See* Def. Ex. 47, letter from James D. Watkins to Donald R. Beall, Aug. 25, 1989, at 1. Secretary Watkins also advised Mr. Beall that Secretary Watkins had reorganized line management to provide that the staff of the Rocky Flats Area Office would report directly to the Assistant Secretary for Defense Programs to ensure that DOE could more effectively oversee and support Rocky Flats operations. *Id.* at 1-2. When asked if he objected to this management change on DOE's part after receiving this letter, Mr. Beall responded, "Not really. They're our customer. They can organize the staff as they see fit." *See* Def. Ex. 39, Dep. of Donald R. Beall, July 18, 1994, at 35-36.**

89. On September 18, 1989, CEO Beall spoke with Secretary Watkins regarding Rockwell's continued operations of the Rocky Flats Plant. Secretary Watkins stated he was concerned that Rockwell was not acknowledging his directives regarding new culture which would place ES & H on a level equivalent to production. Mr. Beall agreed with the Secretary's views and stated he was committed to bringing that new culture to Rocky Flats. Ex. 48, September 18, 1989 Memorandum to File from Stephen A. Wakefield. Mr. Beall had no problem with Secretary Watkins' changes to the priorities at Rocky Flats to have greater emphasis on ES & H. Deposition of Donald Beall in this proceeding, 7/18/94, pp. 28-30.

**<u>RESPONSE</u>: Disagree. The proposed finding is overly broad and lacks context.**

**Further disagree insofar as there is any inference that the cited testimony suggests that Mr. Beall acquiesced in award fees being determined and mandated by DOE headquarters instead of being determined by the AFDO, as the contract required.**

**PROPOSED REVISION: A memorandum to file from Stephen A. Wakefield recounts his understanding of a conversation he overheard between Admiral Watkins and Mr. Beall on September 18, 1989. *See* Def. Ex. 48, memorandum from Stephen A. Wakefield to File, Sept. 18, 1989, at 1. The memorandum references Rockwell's continued operations of Rocky Flats. *See id.* at 1-3. The memorandum states that Admiral Watkins "was concerned that Rockwell had not acknowledged properly his directives to accept a new culture which would place environment, safety and health on a level equivalent to production." *Id.* at 2. The memorandum states, "Beall responded that he agreed with the Admiral's views and was committed to bringing that new culture to Rocky Flats." *Id.* When asked about this memorandum, Mr. Beall testified, "I was happy to see us accommodate our customer, if that's the direction he wanted to go. . . . I had no problem if he wants to relatively change priorities. I also knew that if they did they'd have to put a lot more money into it, because there were areas where not this -- they were safety issues, where I had been told that the DOE would have to spend a lot more money in areas where we had recommended they do to deal with some of these issues." *See* Def. Ex. 39, Dep. of Donald R. Beall, July 18, 1994, at 28-30.**

90. On September 20, 1989, Secretary Watkins wrote a letter to CEO Beall, informing him that the award fee determination for the 89/1 period was undertaken at his direction and to expect the award fee to reflect 40% of the total possible award fee. Secretary

Watkins stated:

> As you know, the Department has had under advisement the question of the proper award fee determination to be made for the management and operation of the Department's Rocky Flats plant for the period October 1, 1988, through March 31, 1989. Because of the importance of this facility's operations to DOE's ability to carry out its missions and the environmental sensitivity presented by its activities, at my direction the Department has considered with special care the proper fee for this period, particularly as it reflects Rockwell's performance in environment, safety and health.
>
> * * * *
>
> . . . this determination was made under an award fee plan as it existed before the recent revisions to award fee plans enable more stringent downward adjustments in the event of deficiencies in contractor performance for environment, safety and health.

Ex. 49, September 20, 1989 Letter from Admiral Watkins to Mr. Donald R. Beall.

**RESPONSE: Disagree. The proposed finding is overly broad and lacks context.**

**Further disagree insofar as there is any inference that Rockwell acquiesced in award fees being determined and mandated by DOE headquarters instead of being determined by the AFDO, as the contract required.**

**PROPOSED REVISION: On September 20, 1989, Secretary Watkins wrote a letter to Mr. Beall, which stated,**

> **As you know, the Department has had under advisement the question of the proper award fee determination to be made for the management and operation of the Department's Rocky Flats plant for the period October 1, 1988, through March 31, 1989. Because of the importance of this facility's operations to DOE's ability to carry out its missions and the environmental sensitivity presented by its activities, at my direction the Department has considered with special care the proper fee for this period, particularly as it reflects Rockwell's performance in environment, safety and health.**

> **After this thorough review, the Department has concluded that an award fee for this period that reflects approximately 40% of the total possible award fee is the proper determination in this instance. Accordingly, Rockwell will, in the near future, be advised of the particulars of the award fee determination of the Department by the appropriate contracting officer, as is the normal procedure.**
>
> **I feel obliged to observe, however, that this determination was made under an award fee plan as it existed before the recent revisions to award fee plans enabled more stringent downward adjustments in the event of deficiencies in contractor performance for environment, safety and health.**

***See* Def. Ex. 49, letter from James D. Watkins to Donald R. Beall, Sept. 20, 1989.**

August 28, 2006

CHADBOURNE & PARKE LLP
RICHARD J. NEY
Attorney of Record

S. JEAN KIM
Of Counsel

By: s/Richard J. Ney
Richard J. Ney
350 South Grand Avenue, Suite 3300
Los Angeles, CA 90071
Telephone: (213) 892-1000
Facsimile: (213) 622-9865

Attorneys for Plaintiff
THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION