**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 91-1362 C (Judge Lettow) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO ROCKWELL'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

JOHN A. KOLAR
DONALD WILLIAMSON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 305-9301
Attorneys for Defendant

Dated: October 30, 2006

TABLE OF CONTENTS

Page

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. The Government Is Entitled To Summary Judgement That It Did Not Breach The Award Fee Provisions Of Rockwell's Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. The Secretary's Action Of Transferring *De Facto* Mr. Twining's Authority Over Rockwell's Award Fees To DOE Officials In The Office Of Defense Programs Did Not Constitute A Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. Supplemental Facts Regarding Headquarters' Involvement In The Award Fee Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1. The 89/1 Award Fee Determination Process . . . . . . . . . . . . . . . . . . . . . . 10

2. The 89/2 Award Fee Determination Process . . . . . . . . . . . . . . . . . . . . . . 22

3. DOE Did Not Breach The Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C. Rockwell Has Not Alleged That DOE Breached The Award Fee Provisions Of The Contract Other Than By Having The "Wrong Official" Determine The Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

D. The Albuquerque Operations Office Award Fee Handbook Was Not Part Of The Rockwell-DOE Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

E. DOE Did Not "Conceal" Headquarters' Involvement In Rockwell's Award Fee Determination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

II. If DOE Breached, Rockwell Was Not Damaged, Or The Damages Are Less Than Rockwell Seeks In Its Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# TABLE OF AUTHORITIES

**Page**

None cited.

**UNITED STATES COURT OF FEDERAL CLAIMS**

THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

No. 91-1362 C
(Judge Lettow)

**DEFENDANT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO ROCKWELL'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to the Court's direction at the September 21, 2006 hearing, see Transcript ("Tr.") of hearing at 89, defendant the United States of America ("defendant" or "government") respectfully submits this supplemental brief in opposition to the summary judgment motion filed by plaintiff The Boeing Company, Successor-in-Interest to Rockwell International Corporation ("Rockwell"), and in support of the Cross-Motion for Summary Judgment filed by the government.

## ARGUMENT

### I. The Government Is Entitled To Summary Judgement That It Did Not Breach The Award Fee Provisions Of Rockwell's Contract

#### A. The Secretary's Action Of Transferring *De Facto* Mr. Twining's Authority Over Rockwell's Award Fees To DOE Officials In The Office Of Defense Programs Did Not Constitute A Breach

During the September 21, 2006 hearing (Tr. at 88), the Court asked counsel for the parties to address in their supplemental submissions whether this case is appropriate for summary disposition. The government respectfully submits that this case is appropriate for

summary judgment in its favor because the undisputed facts demonstrate, and the language of the contract is clear, that the DOE Secretary was permitted to take the actions of which Rockwell complains. The Secretary of Energy acted properly within his statutory and regulatory authority[1] to remove the substantive authority of the Manager of DOE's Albuquerque Operations Office, Mr. Bruce Twining, over Rocky Flats and Rockwell's award fee determination, and transfer that authority to other DOE officials he designated, *i.e.,* to officials in the DOE Headquarters Office of Defense Programs (see below). This was not a breach because the contract's language expressly permitted anyone "acting as manager" of Albuquerque to decide Rockwell's award fee.

The Secretary acted through the "Secretariat," consisting of himself, his Deputy Secretary W. Henson Moore, and his Under Secretary, John C. Tuck.[2] The Secretary removed Mr. Twining's substantive authority over Rockwell effective June 6, 1989 in view of the fact that Mr. Twining and others in the Albuquerque Operations Office were potential subjects of the criminal investigation.[3] The Secretary replaced Mr. Twining as the substantive decisionmaker over Rocky Flats and Rockwell *de facto*, without formally conferring the title of "Manager of Albuquerque" or "Award Fee Determination Official" ("AFDO") on others whom the Secretary decided should exercise that authority in place of Mr. Twining. There were two steps involved in that process.

---

[1] The relevant statute, regulations, and delegation orders are cited in Defendant's Proposed Findings Of Uncontroverted Fact ("DPFUF"), filed July 27, 2006, nos. 1-12.

[2] See DPFUF no. 20, and the supporting proof cited therein.

[3] See DPFUF nos. 19-29, and the supporting proof.

First, the Secretary terminated the reporting relationship of the Rocky Flats Office of DOE to the Albuquerque Operations Office with respect to decisionmaking over Rocky Flats, and directed that that office would report directly to the Office of the Under Secretary of Energy, John C. Tuck. The Secretary determined that Mr. Twining, the Manager of Albuquerque, should no longer exercise managerial responsibility for Rocky Flats, but that management of Rocky Flats should be exercised by an on-site manager reporting to the Under Secretary. Later it was decided that the on-site Rocky Flats manager would report to DOE's Assistant Secretary for Defense Programs rather than directly to the Under Secretary–see below.

In the words of Mr. Twining (see deposition testimony quoted below), the Secretary "rewired" the organization chart so that the line of authority ran directly from the Rocky Flats manager to the Under Secretary, instead of to him in his capacity as Manager of Albuquerque. The Under Secretary, later succeeded by the Office of Defense Programs, thereafter functioned *de facto* as Manager of Albuquerque for purposes of Rocky Flats and Rockwell. Such a decision was properly within the Secretary of Energy's authority to "establish, alter, consolidate or discontinue such organizational units or components with the Department as he may deem to be necessary or appropriate." Def. Ex. 1, 42 U.S.C. § 7253(a).[4]

Second, the Secretary replaced the then current DOE on-site manager of Rocky Flats, Rush O. Inlow, with a new manager, Edward S. Goldberg, whom he handpicked. This was properly within the Secretary's authority to "appoint . . . such officers and employees, including attorneys, as may be necessary to carry out such functions." Def. Ex. 1, 42 U.S.C. § 7231(a).

---

[4] And, under the contract, the officials duly designated by the Secretary to function in place of the Albuquerque Manager for the purpose of overseeing Rockwell were also permitted to decide Rockwell's award fees.

The Secretary took these actions in view of Mr. Twining's status as a "party" to the criminal investigation in order to bypass Mr. Twining as far as substantive decisionmaking about Rockwell was concerned.

These actions are memorialized in several documents in the record. The memorandum issued by Under Secretary John Tuck on June 6, 1989, the day of the FBI/EPA raid, stated:

> Effective 9:00 a.m. MDT June 6, 1989, E.S. Goldberg is designated Acting Manager of the Rocky Flats Area Office. Mr. Goldberg will report to the Under Secretary of Energy, John C. Tuck, with regard to the operations of the Rocky Flats facility. This assignment is to continue through the current investigation period and until specifically reassigned by the Under Secretary. Mr. Goldberg will relieve the current Acting Area Manager without prejudice so that Mr. Rush Inlow can assist the Department of Justice in the evaluation of allegations concerning the Rocky Flats facility.
>
> Mr. Goldberg will assess plant status and conduct reviews and inspections to insure that the facility can be maintained operational during the current facility investigation. Mr. Goldberg shall determine what additional actions must be taken, working with the Department of Energy team under the direction of the Special Assistant to the Secretary, Mr. Leo P. Duffy. Mr. Goldberg will advise the Deputy Secretary, Henson Moore, or his designated on-site representative of his recommendations to insure continuity of facility safety.

Def. Ex. 18. The memorandum provided that the Manager of Albuquerque Operations, even though divested of substantive authority over Rocky Flats, was to provide "continued support" to Mr. Goldberg. On June 9, 1989, Mr. Tuck sent Mr. Goldberg another memorandum approving the interim organizational structure of the Rocky Flats Area Office. Mr. Twining was copied on this memorandum. Def. Ex. 20.

On July 21, 1989, Under Secretary Tuck issued another memorandum to Mr. Goldberg and Mr. Twining. It stated:

> Effective immediately, the Area Manager, Rocky Flats Office, will report to the Assistant Secretary for Defense Programs. This action is a follow-up of the decision made June 6, 1989 when the Area Manager was temporarily reassigned to report directly to the Under Secretary of Energy.
>
> In assuming line management oversight of the Rocky Flats Area Office and related facilities, the Assistant Secretary will be accountable for on-going operations. It is expected that implementation actions affecting the Rocky Flats Facilities which already have been approved will continue without interruption.

Def. Ex. 29.[5]

Although these directives were issued over the signature of Under Secretary Tuck, there is no genuine issue of fact whether Mr. Tuck was acting pursuant to the Secretary's direction. It is clear from Secretary Watkins' deposition testimony that he was the prime mover with regard to these changes. Secretary Watkins testified that he believed that Mr. Twining was a potential "party" to the investigation underway at Rocky Flats. He testified that he believed that when a superior in the chain of command (Mr. Twining) is potentially involved, you have to "bypass that system" and "take more positive control of the situation." He chose Ed Goldberg as Acting Manager of the Rocky Flats Office in order to have someone in charge there who was not a "party" to the criminal investigation, and who would not be perceived by the FBI as interfering with the investigation. Watkins wanted Goldberg to report directly to DOE Headquarters outside "the Twining circuit." Def. Ex. 17, Deposition of James D. Watkins in this proceeding, 4/29/94, pp 27-29.

[5] This memorandum explains why Mr. John Meinhardt, then Acting Assistant Secretary for Defense Programs, and his subordinate, Admiral Jon Barr, the Deputy Assistant Secretary for Military Application, Defense Programs, became involved in Rockwell's award fee determinations (see further discussion below).

Following the issuance of these directives by DOE's Secretariat, Mr. Twining had no further substantive involvement in decisions regarding Rockwell, although he continued to provide "support" to the Rocky Flats Area Office, and eventually communicated the award fee decision for the 89/1 period by letter to Rockwell in view of his retention of the nominal title of AFDO. Albuquerque Manager Bruce Twining testified as follows:

> Q. After Mr. Goldberg became acting area manager at Rocky Flats, did you have a lot of dealings with him?
>
> A. Not very many, but as this memo points out, we were expected to continue to support the office, and we did that in a number of areas, but in operational areas or major ES & H areas, there was a period of very little interaction between our staffs.
>
> Q. This memo states that Mr. Goldberg will report to the Undersecretary of Energy, John C. Tuck, with regard to operations of Rocky Flats.
>
> A. Yes.
>
> Q. Was that a change of prior procedures, or prior reporting responsibilities?
>
> A. Well, prior to this memo that area office reported to me.
>
> Q. Who do you report to, or in 1989 who did you report to as manager at Albuquerque?
>
> A. I believe at that time all the field plugged into the box that had the secretary, the deputy secretary, and the undersecretary, and I did have some daily interactions with John Tuck.
>
> Q. When did you first hear about the raid at Rocky Flats?
>
> A. The day before it happened. It might even have been the morning it happened.
>
> Q. Were you told at that time that Mr. Goldberg would come in as area manager?
>
> A. Yes, I was.

> Q. Were you also told at that time that he would reporting directly to headquarters?
>
> A. Yes.
>
> Q. After Mr. Goldberg's appointment, did you consider Rocky Flats still to be under the supervision of Albuquerque?
>
> A. I considered this memo to be the effective document. That office reported to headquarters, and we were to do everything we could to help make things work.
>
> Q. So the answer is no, you did not consider --
>
> A. No, I did not --
>
> Q. -- Rocky Flats to be under your jurisdiction.
>
> A. No.

Def. Supp. Ex. 53, February 23, 1993 Deposition of Bruce Twining, pp. 66-68.

In his subsequent deposition in the *Stone qui tam* case, Mr. Twining testified as follows:

> Q. (By Mr. Koenigs) After the raid I think you indicated that your oversight responsibilities with respect to Rocky Flats were either diminished or eliminated. I don't mean to characterize it, but is that correct?
>
> A. I think "eliminated" is closer than "diminished."
>
> Q. Do you recall how you learned that was going to be the case?
>
> A. John Tuck, who was the under secretary at the time, telephoned me the day before the raid, or the morning of the raid, and told me the raid was going to happen, and told me how they were going to rewire the organizational chart.
>
> Q: By rewiring it, you're referring to placing Mr. Goldberg as area manager of the plant and having him report directly to headquarters?
>
> A. Yes.

Def. Supp. Ex. 54, April 7, 1998 Deposition of Bruce Twining, pp. 115-116.

Mr. Goldberg testified regarding a meeting he had with Deputy Secretary Moore shortly before the June 6, 1989 FBI/EPA raid. Mr. Moore explained to Mr. Goldberg that "I would be the manager of Rocky Flats, that I would be responsible for interface with the FBI and EPA to assure a smooth process, and responsible for the operation of the plant, and I would be reporting directly to Mr. Tuck." Mr. Goldberg was told he would not be reporting to Mr. Twining, that he would be responsible for the Rocky Flats Plant from June 6 forward, but that he would receive administrative and technical assistance from Albuquerque. It was Mr. Goldberg's understanding that, before June 6, 1989, Mr. Twining had complete responsibility for the Rocky Flats Plant. Beginning June 6, Mr. Twining no longer had complete responsibility, but that he did retain some official duties. Def. Ex. 22, November 11, 1992 Deposition of Ed Goldberg, pp. 36-37.

In his testimony, Admiral Barr also shed light on the allocation of responsibility for the Rocky Flats Plant which DOE effectuated on June 6, 1989. Admiral Barr testified that Albuquerque had been "cut out of the loop" as far as Rocky Flats was concerned "with exceptions." According to Admiral Barr, all substantive oversight over Rocky Flats was exercised by the Rocky Flats Office after June 6, but

> A. . . . There still was use of . . . some Albuquerque expertise in specific areas. The decision was made not to make Rocky Flats a full operations office, which would have taken all areas, and some areas, such as safety and security–I think I remember correctly–remained with the Albuquerque Operations office.
>
> Q. Any other areas?
>
> A. Some of the administration, I think. As I say again, I believe safety and security. I can't recall any others. But the effort, the thrust was to provide on-site capability [in the Rocky Flats Office] to adequately oversee the contractor [Rockwell].

Def. Ex. 21, September 23, 1994 Deposition of Jon Barr, pp. 42-43.

These decisions by the Secretary did not constitute a breach of Rockwell's contract because nothing in the award fee provision of the contract precluded these actions. In saying that anyone "acting as manager" of Albuquerque may decide Rockwell's award fee, the contract uses "acting" as a participle, rather than as adjective or formal title. Therefore, the fact that the Secretary did not formally transfer Mr. Twining's nominal titles of "Manager of Albuquerque" or "AFDO" to some other designated official of DOE is not material. The test is functional, not formal. Rockwell's counsel appeared to concede this at the September 21, 2006 hearing:

> Rockwell's construction of the words "award fee determination official (manager or anyone acting as manager, Albuquerque operations)" is that the AFDO is the Albuquerque manager, or if there happens at a particular time not to be a manager, it is whoever is fulfilling the manager's duties.

9/21/06 Hearing Tr. At 3. At another point, Rockwell's counsel explained:

> Rockwell is not arguing that the AFDO must be someone formally named to the position of manager or acting manager of the Albuquerque operations; rather, the AFDO is the manager, and if there is no manager, then the AFDO is whoever is fulfilling the duties of manager, whether given the title "acting manager" or not.

Id. at 4. Because the contract permitted "anyone acting as Manager" of Albuquerque in a substantive, functional sense to determine Rockwell's award fees, this case is appropriate for summary disposition in favor of the government on the basis that DOE did not breach the contract when Secretary Watkins transferred Mr. Twining's substantive role as AFDO to DOE Headquarters officials of his choosing.

### B. Supplemental Facts Regarding Headquarters' Involvement In The Award Fee Process

During the September 21, 2006 hearing, the Court asked the government's counsel to further elucidate the process by which DOE Headquarters officials determined Rockwell's award

fees, identifying the specific officials involved and their roles. See 9/21/06 Tr. at 51 and 53-54. In response to that direction by the Court, the government respectfully sets forth in the next two subsections detailed facts regarding the two award fee periods in question.

To summarize, these facts show that it was the Headquarters Office of Defense Programs, with the concurrence of the Secretariat, which exercised the AFDO function subsequent to the June 6, 1989 raid. Mr. Twining retained the nominal title of AFDO for the 89/1 award fee period, and delegated that nominal title to the Manager of Rocky Flats, Mr. Robert Nelson, for the second period, but neither Mr. Twining nor Mr. Nelson had substantive involvement in determining the award fees. The award fees were determined by officials in Defense Programs with the concurrence of the Secretariat. The field officials were then tasked to communicate those decisions to Rockwell.

Although the substantive AFDO decisionmaking was exercised by Defense Programs, Mr. Twining for the first period, and Mr. Nelson for the second, subjectively agreed with Headquarters' determinations. Moreover, when Rockwell appealed the determinations made by Headquarters, Mr. Twining and Mr. Nelson subjectively determined that the award fee decisions should not be raised in response to Rockwell's appeals.

**1. <u>The 89/1 Award Fee Determination Process</u>**

Even prior to the June 6, 1989 raid, DOE had instituted a requirement that field managers' award fee decisions receive the concurrence of the Assistant Secretary for Defense Programs. In his deposition, Mr. Twining was asked to describe how the award fee process worked. In the course of describing that process, Mr. Twining testified:

> And at the time of this award fee, we had just gotten into a process of formally sending those proposed determinations to headquarters for concurrence.

Mr. Twining could not recall the date when Headquarters' concurrence in the award fee decision became a requirement. He did not believe it was in place during 1988. He believed the requirement resulted from a task force that was formed under Secretary Watkins' administration which began on January 1, 1989. Def. Supp. Ex. 53, February 23, 1993 Deposition of Bruce G. Twining, pp. 16-18, 23-24.[6]

It was pursuant to this requirement that Mr. Twining submitted his May 31, 1989 memorandum proposing an award fee of $5,176,482 to Mr. Troy Wade, the Acting Assistant Secretary of Defense Programs. See Def. Ex. 32. The memorandum contained boxes in which Mr. Wade (who was succeeded by Mr. Meinhardt) could check off whether he concurred or did not concur in Mr. Twining's recommendation. In this memorandum, Mr. Twining termed his recommendation for Rockwell his "tentative finding," thereby clearly indicating that Mr. Twining understood that his conclusion did not constitute an actual award fee "determination" unless and until it received Mr. Wade's concurrence. Similarly, an August 4, 1989 DOE memorandum by Mr. Ted Hill, the secretary of the Albuquerque Performance Evaluation Review Board ("PERB"), refers to Mr. Twining's original May 31, 1989 recommendation as Mr. Twining's "tentative finding," and notes that Mr. Twining submitted it to Mr. Wade for "review and concurrence/nonconcurrence." Def. Supp. Ex. 55, August 4, 1989 Memorandum by Ted Hill; and Def. Supp. Ex. 56, Deposition testimony of Charles Troell, p. 39.

---

[6] We have reviewed the record, but have been unable to locate any indication of the exact date when the requirement of Headquarters concurrence became effective. It was reflected in a February 19, 1990 revision of the Albuquerque Operations Award Fee Handbook (see discussion below), but there is no genuine dispute that Mr. Twining considered the requirement to be in force when he sent his May 31, 1989 recommendation for Rockwell to Mr. Wade. Excerpts of the 1990 revision of the handbook are submitted herewith as Def. Supp. Ex. 57.

This recommendation by Mr. Twining never did become a final award fee determination. At the time he received Mr. Twining's May 31, 1989 award fee recommendation for Rockwell, Mr. Wade was aware of the criminal investigation underway at Rocky. Mr. Wade concluded that it would not be prudent to make a final award fee determination for Rockwell based on Mr. Twining's recommendation in view of the ongoing investigation. Def. Ex. 14, Deposition of Troy Wade in this proceeding, 9/21/94, pp. 28-29.

This is reflected in a June 21, 1989 memorandum to Mr. Twining in which Mr. Wade stated:

> Please be advised that I have thoroughly reviewed your findings for each contractor as noted in your May 31, 1989, memorandum to me, subject same as above. Based upon your input and my own personal observations, I concur in your findings for Allied Signal, Inc., EG&G, Mound Applied Technologies, Inc., General Electric Company, Mason Hanger-Silas Mason, Inc., and Westinghouse Electric Corporation.
>
> In the case of Rockwell International Corporation, it would be premature at this time to make a final determination until the Department of Energy investigation of environmental, safety, and health charges are [sic] resolved.

Def. Supp. Ex. 52.

Following the raid, Headquarters directed Mr. Goldberg to review the then still pending Rockwell award fee recommendation in light of new information that was being uncovered by the team he had brought to Rocky Flats. The team consisted of 50 or so experts to establish an environmental, safety and health baseline and give him an idea of what was going on at the Rocky Flats Plant. This team presented Mr. Goldberg and DOE management officials with information on a daily and weekly basis. Def. Ex. 22, Deposition of Ed Goldberg in this proceeding, 11/10/92, pp. 40-42, 45-46, 55-56, 66; Def. Ex. 19, Trial Testimony of Ed

Goldberg, 3/22/99, p. 4410. Mr. Goldberg made an on-site review of Rockwell's performance for the period October 1, 1988, through March 31, 1989, and submitted his observations to Mr. Twining in a memorandum dated July 27, 1989. Def. Supp. Ex. 55, August 4, 1989 Memorandum by Ted Hill.

Mr. Goldberg's July 27, 1989 memorandum to Mr. Twining cited specific deficiencies which Mr. Goldberg had observed with regard to the FPA's for General Management, Quality Assurance, and Environment, Safety and Health. Mr. Goldberg wrote:

> The problems that I see in my review of Rockwell's ongoing operations tend to impact the three FPA's noted above for which I recommend [downwardly] revised scores, but the basic problem which underlies all FPA's is a lack of discipline in operation. This is apparent in Rockwell's failure to adequately define the entire safety envelope for the operation of each facility. This should, but does not, manifest itself in a cohesive flow from Safety Analysis Reports to Operational Safety Requirements to limiting conditions for operations to detailed operator procedures. A lack of clear lines of responsibility for operations, safety, maintenance, etc. is apparent.

Mr. Goldberg also cited a lack of discipline in the Waste Management and Quality Assurance programs. Def. Supp. Ex. 58, July 27, 1989 Memorandum Edward S. Goldberg to Bruce Twining.

Mr. Twining's May 31, 1989 recommendation had recommended the following grades for Rockwell in the Functional Performance Areas (FPAs) set forth in the Performance Evaluation Plan:

| FPA's | Numerical Grade | Weight | Score |
|---|---|---|---|
| General Management | 92 | 25% | 23.00 |
| Production Operations | 96 | 15% | 14.40 |
| Cost Managment | 95 | 15% | 14.25 |

| | | | |
|---|---|---|---|
| Quality | 95 | 15% | 14.25 |
| Environment, Safety & Health | 81 | 20% | 16.20 |
| Chemical Operations | 91 | 10% | 9.10 |
| | | 100% | 91.20 |

Those grades, when weighted according to the weights for each FPA set forth in the Performance Evaluation Plan, led to an overall score of 91.20, resulting in a recommended award fee of $5,326,482 for plant operations. See Pl. Ex. 6.

Mr. Goldberg recommended a reduction in the numerical ratings for three FPAs. Mr. Goldberg's recommended ratings were as follows, as compared to Mr. Twining's:

| FPA's | Numerical Grade | Weight | Twining's 5/31 Recomm. |
|---|---|---|---|
| General Management | 81 | 25% | 92 |
| Quality | 88 | 15% | 95 |
| Environment, Safety & Health | 79 | 20% | 81 |

Mr. Goldberg did not change the ratings Mr. Twining had recommended for the other FPAs–i.e., Production Operations, Cost Management, and Chemical Operations–or the weights attached to any of the FPAs. The reduced ratings led to an overall rating for Plant Performance of 87 and to a corresponding reduction in recommended award fee to $3,628,622. Def. Supp. Ex. 58, July 27, 1989 Memorandum Edward S. Goldberg to Bruce Twining.

At the time he received Mr. Goldberg's July 27, 1989 memorandum, Mr. Twining believed Mr. Goldberg was more fully informed about Rockwell's performance than Mr. Twining had been when Twining made his initial May 1989 recommendation. He felt there were many more DOE people looking at the plant in intimate detail than there had been before the raid. Def. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/93, pp. 69-70, 76, 90, 93.

Mr. Charles E. Troell, the Chairman of DOE's PERB in the Albuquerque Operations Office testified at his deposition:

> I can remember, for example, Twining called me in one day and he says, "Hey, you have seen some of the new input that we have gotten from other folks, including Goldberg, and he said, in light of that, if you were to reassess the performance now, would you come up with a different answer than you did with the information that was available to you at the time the PERB worked before?"
>
> And I said, "Yeah, there is additional information, in fact, we didn't have in our possession at the time that we did it, and it probably would lower the overall rating and performance grade." Because Goldberg and company looked a lot more carefully and a lot more specifically at some areas than we had available to us in the normal process that preceded that.

Def. Supp. Ex. 64, March 2, 1993 Deposition of Charles Edward Troell, p. 58.

In July 1989, Mr. Troell memoralized this view in a memorandum to Mr. Twining stating that, if the PERB were to reassess Rockwell's performance for the 89/1 award fee period, the PERB would in all likelihood recommend a lower overall rating. Mr. Troell wrote: "Therefore, the PERB would not object to Ed Goldberg's proposed overall numerical rating of '87.'" Def. Supp. Ex. 59.

Mr. Twining modified his original May 1989 recommendation to reflect the input by Mr. Goldberg, and adopted Mr. Goldberg's recommendation of $3,628,622 as his (Mr. Twining's) own recommendation to DOE Headquarters. Mr. Twining's concurrence in Mr. Goldberg's recommendation is reflected in an August 8, 1989 memorandum from Mr. Twining to Mr. John L. Meinhardt, the Acting Assistant Secretary for Defense Programs, HQ (who by that time had succeeded Mr. Wade). Def. Supp. Ex. 60.

Mr. Meinhardt concluded that Mr. Goldberg's ratings in the cited FPA's still were too high based on DOE Headquarters' knowledge of Rockwell's performance. Mr. Meinhardt wrote

a handwritten notation next to Mr. Goldberg's weighted ratings for General Management, Quality, and Environment, Safety and Health which stated:

> Too high! Based on what we know and Goldberg's comments, how can Ed arrive at these %?

Def. Supp. Ex. 58, July 27, 1989 Memorandum from Edward S. Goldberg to Bruce G. Twining. At the time, Headquarters was gathering extensive, detailed information regarding Rockwell's performance through frequent reporting by Mr. Goldberg to Headquarters, and the Tiger Team and other groups of expert reviewers Headquarters had dispatched to Rocky Flats.[7]

Mr. Meinhardt tasked one of his subordinates, Admiral Jon Barr, the Deputy Assistant Secretary for Military Application in Defense Programs, with revising Mr. Goldberg's recommendation. An undated memorandum written by Ted Hill of the Albuquerque Operations Office states that Admiral Barr was drafting another award fee recommendation. Mr. Hill's memorandum noted that "Admiral Barr is delaying his decision until he determines whether or not those 'on high' will support his position." Def. Supp. Ex. 61. Admiral Barr was intimately familiar with Rockwell's performance based upon trips he took to Rocky Flats and input from experts sent to the plant.[8]

Admiral Barr completed his recommendation, and submitted it to Mr. Meinhardt on September 6, 1989. Admiral Barr recommended that Mr. Goldberg's rating of 79 in the ES&H FPA (which had been adopted by Mr. Twining) be downgraded to a rating of 65.25. Admiral Barr cited specific examples of ES&H deficiencies which led him to recommend the reduction.

---

[7] See DPFUF, nos. 34-41 and 43-45, and 47-50.

[8] See DPFUF nos. 62-72.

He advised Mr. Meinhardt that an ES&H rating of 65.25 would result in an overall Rockwell rating of 84.75 (versus Mr. Goldberg's overall rating of 87, which Mr. Twining had adopted), and a reduction in the recommended award fee for Plant Performance for the 89/1 period of $2,716,307 (versus Mr. Goldberg's recommended award fee of $3,628,622, which Mr. Twining had adopted). See Def. Supp. Ex. 62.

On September 20, 1989, Mr. Meinhardt faxed Admiral Barr's September 6, 1989 memorandum to Jim Culpepper, Mr. Twining's Deputy Manager of the Albuquerque Operations Office. Def. Supp. Ex. 63. Concurrently, Mr. Meinhardt sent a letter to Mr. Twining incorporating the concerns cited by Admiral Barr, and Barr's award fee recommendation. Mr. Meinhardt explained:

> This Office has carefully reviewed all of the documentation provided by your Office regarding the Award Fee Determination for the period in question. The Office is essentially in concurrence with your recommendations, with an additional downward adjustment in the area of Environment, Safety and Health (ES&H).
>
> The additional downward adjustment to ES&H reflects several concerns. Operations in Building 771 had to be stopped during October 1988 due to inadequate safety procedures and radiological safety margins in the building. Although RI [Rockwell International] pursued a very aggressive corrections effort after the fact, the mere existence of this situation demonstrated less than satisfactory attitudes, procedures, and awareness of safety issues on its part. Out of 230 safety concerns documented by external reviews and an internal RI review done prior to the award fee period, 91 were not addressed during the period. This further evidences a lack of priority attention paid to ES&H. During the period, 32 new safety concerns, including six classified as Type 2 (serious), were identified. Finally, the release of chromic acid from Building 444 into the plant's holding pond could have resulted in a major environmental incident. An inoperable alarm system and deficient operator vigilance contributed significantly to the seriousness of this incident. Overall, there is strong evidence that throughout the award fee period there was a continuing pattern

> of lax attitudes, inadequate procedures, and lack of consideration of ES&H issues.
>
> My Office has concluded that the "moderately good" numerical grade of 79 given to RI for its performance under the ES&H category be downgraded to a numerical grade of 65.25. Since ES&H carries an evaluation weight of 20 percent, the overall rating for the period drops from 87 to 84.25. This equates to an award fee of $2,716,307 for the Plant. We have not changed the award fee of $186,591 for PRMP/PROVE. Therefore, the total fee is $2,902,898. Admiral Watkins concurs in this recommendation.
>
> In order to facilitate the dissemination of this information to RI and coordinate it with the letter from Admiral Watkins to Chairman Beall of today's date, we have attached a copy of your draft letter to RI which reflects our concerns in the ES&H area.

Def. Supp. Ex. 65. Mr. Twining prepared a memorandum to the file in which he stated:

> I hereby determine an award fee of $2,903,215. This determination is based on the attached memorandum from John L. Meinhardt, Acting Assistant Secretary for Defense Programs, and the attached Performance Evaluation Report.

Def. Supp. Ex. 66.[9]

The DOE Headquarters Office of Defense Programs had the concurrence of the Secretariat for the actions it took with respect to this award fee. Mr. Meinhardt's September 20, 1989 letter to Mr. Twining stated that "Admiral Watkins concurs in this recommendation." Def. Supp. Ex. 65.

This is confirmed by the September 20, 1989 letter from Secretary Watkins to Rockwell's CEO Donald Beall stating in pertinent part:

> As you know, the Department has had under advisement the question of the proper award fee determination to be made for the management and operation of the Department's Rocky Flats plant

[9] It is not clear from the record why the fee Mr. Twining said he had determined, i.e., $2,903,215, was slightly higher than the fee in Mr. Meinhardt's letter, i.e., $2,902,898.

> for the period October 1, 1988 through March 31, 1989. Because of the importance of this facility's operations to DOE's ability to carry out its missions and the environmental sensitivity presented by its activities, at my direction the Department has considered with special care the proper fee for this period, particularly as it reflects Rockwell's performance in environment, safety and health.
>
> After this thorough review, the Department has concluded that an award fee for this period that reflects approximately 40% of the total possible award fee is the proper determination in this instance. Accordingly, Rockwell will, in the near future, be advised of the particulars of the award fee determination of the Department by the appropriate contracting procedure, as is the normal procedure.

Def. Ex. 49, September 20, 1989 Letter from James D. Watkins to Donald R. Beall.

Deputy Secretary Moore testified at his deposition in *Stone:*

> Because of Rocky Flats they [award fee decisions] came to me . . . whether those facilities were something I worked with or not, came to me for review to be sure the system was working like we had decided, the new system.
>
> Nancy Wolicki as I remember was the person who would receive it, review it, go into great details, come in and brief me, and they [sic] would make a decision whether we agreed or disagreed with the Operations Office's determination. In the early years I think there were a number of them we sent back and said "We don't agree" or we set a new number for it. That happened on the Rockwell award fee.

Def. Supp. Ex. 70, April 15, 1998 Deposition of W. Henson Moore, at 132.

Mr. Moore, who had made his own personal observations at Rocky Flats over a significant time period following the raid, believed that the Tiger Team was looking more deeply into Rockwell's ES&H deficiencies than Goldberg had been able to do, and that DOE Headquarters acted on Rockwell's award fee with better information than Goldberg had available. In deciding what award fee DOE Headquarters felt should be awarded to Rockwell, Deputy Secretary Moore took into account the Tiger Team report. Moore believed that the

decision Headquarters made on the award fee fairly reflected Rockwell's performance given all of the deficiencies he had observed and the Tiger Team had reported.[10]

On September 27, 1989, Mr. Twining sent Rockwell a letter informing it that "the Department of Energy (DOE) hereby determines that Rockwell International Corporation (Rockwell) has earned an award fee of $2,716,624 for Plant and $186,591 for PRMP/PROVE, for a total of $2,903,215." Mr. Twining raised the dollar figures slightly from those contained in the draft letter Mr. Meinhardt had sent Mr. Twining, as noted above, and changed the phrasing identifying who had determined the fee from "I hereby determine" (in Mr. Meinhardt's letter) to "the Department of Energy (DOE) hereby determines." Compare Def. Supp. Ex. 65 (containing Mr. Meinhardt's draft letter) with Def. Supp. Ex. 67 (the letter signed by Mr. Twining).

Rockwell, upon receiving the award fee determination appealed the assessment of their performance to Mr. Twining. Rockwell provided a written analysis in a letter dated October 25, 1989 to Mr. Simonson, who had succeeded Mr. Goldberg as Manager of the Rocky Flats Area Office. Rockwell made a verbal presentation on October 30, 1989 to Charles Troell, Mr. Twining's Assistant Manager for Management and Administration and James A. Scout, Chief Counsel of Albuquerque Operations. Def. Supp. Ex. 68, November 8, 1989 Memorandum from Bruce Twining to John L. Meinhardt.

On November 14, 1989, in a letter signed by Mr. Culpepper for Mr. Twining, Mr. Twining informed Rockwell that, "[a]fter due consideration of the [written and verbal presentations by Rockwell], I have determined that my original determination of an award fee in

---

[10] See DPFUF nos. 47-50, and the proof cited in support thereof.

the total amount of $2,903,215.00 for the performance period noted above, shall remain unchanged. Def. Supp. Ex. 69.[11]

Although the government's stipulation describes the award fee decision for 89/1 as have been "mandated" by DOE Headquarters officials and states that those officials "caused" Mr. Twining to issue the award fee decision, the evidence shows that Mr. Twining subjectively agreed with the fee determined by Headquarters.[12] Mr. Twining testified that he was comfortable with the 65.25 grade Meinhardt gave Rockwell for ES&H, based on the additional information that was coming out about Rocky Flats. Def. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/94, p. 111-112. At the trial in the *Stone* case, Mr. Twining testified that he adopted the approximately $2.9 million award fee figure reflected in his September 27, 1989 letter to Rockwell after his staff, some of whom were members of the PERB, signalled their agreement with that figure by initialing off on the concurrence copy of the letter informing Rockwell of the fee. Def. Supp. Ex. 71, Trial Testimony of Bruce Twining in *Stone*, pp. 3281-

[11] A file copy of this letter, which is also included in Def. Ex. 69, reflects that Deputy Secretary Moore concurred in Mr. Twining's decision not to change the award fee after Rockwell's appeal.

[12] During the September 21, 2006 hearing the Court asked: "What do we do with the stipulation because there are parts of the stipulation that do not accord, shall we say, with the parties' current arguments." 9/21/06 Tr. at 75. The government entered into the stipulation in consideration for Rockwell's promise not to depose seven high-ranking DOE Headquarters officials. See Pl. Supp. Ex. 40. Those officials were Watkins, Moore, Tuck, Wade, Meinhardt, Barr, and Gregory Fess. See Def. Supp. Ex. 84. The government did not get the benefit of this bargain. Rockwell went on to depose six out of seven of these officials: Secretary Watkins twice (on April 29, 1994 and April 28, 1998), Deputy Secretary Moore twice (April 29, 1994 and April 15, 1998), Under Secretary Tuck (on April 28, 1994), Mr. Wade (on September 21, 1994 and October 11, 1994), Admiral Barr (on September 23, 1994), and Meinhardt (on April 26, 1994). The government respectfully submits that the stipulation appears ambiguous when viewed in the context of the evidentiary record developed over the course of several years of discovery subsequent to its execution. The government further submits that, in the face of such ambiguity, it is the evidence that should govern.

3282. Mr. Twining's subjective agreement with the award fee determined by Headquarters is memorialized in Def. Supp. Ex. 66, which is a memorandum by Mr. Twining to the file stating:

> I hereby determine an award fee of $2,903,215. This determination is based on the attached memorandum from John L. Meinhardt, Acting Assistant Secretary for Defense Programs, and the attached Performance Evaluation Report.

**2. <u>The 89/2 Award Fee Determination Process</u>**

Mr. David Simonson was appointed Manager of the Rocky Flats Office of DOE on September 12, 1989, replacing Mr. Goldberg. Def. Ex. 34. In a December 6, 1989, memorandum to Under Secretary Tuck, Mr. Simonson recommended that Rockwell receive an award fee for April 1, 1989 through September 30, 1989 of $3,114,245, plus $628,982 for PRMP/PROVE, for a total payment of $4,176,077. Mr. Simonson advised Mr. Tuck that his recommendation was based upon staff level assessment against the Award Fee Plan, review and modification by the Rocky Flats PERB, and presentation to him for final determination. Mr. Simonson's memorandum contained a concurrence line for Mr. Tuck, which apparently was never signed, because DOE Headquarters disagreed with his recommended award fee. See Def. Ex. 35.

Mr. Simonson stated in the memorandum that he was recommending an increase in Rockwell's rating for ES&H performance over the prior period's rating due to Rockwell's assistance in negotiations with EPA and the State of Colorado on environmental agreements and compliance with those agreements. Mr. Simonson wrote that this performance offset Rockwell's performance on safety which, according to Mr. Simonson, "continues to be unacceptable." See Def. Ex. 35, December 6, 1989 Memorandum from David P. Simonson to John C. Tuck, p. 1.

DOE Headquarters Environment, Safety and Health officials disagreed with an increase in Rockwell's ES&H rating. On December 18, 1989, Robert W. Barber, DOE Headquarters' Acting Director, Office of Safety Compliance wrote a memorandum providing his office's analysis of the award fee proposed by Mr. Simonson. Mr. Barber wrote:

> We essentially agree with the narrative information concerning safety in the memorandum and its five attachments. However, sufficient data is not provided for us to understand why the rating for Environment, Safety and Health for the Plant for the current 6 month period should increase to 78 pervent from a 65.25 percent rating for the previous 6 month period. The written explanation in the [Simonson] memorandum stated: "As the evaluation indicates, the contractor's performance in the safety area continue [sic] to be unacceptable. However, this has been offset in our evaluation by the performance of Rockwell in assisting with negotiations with EPA and the State on environmental agreements and complying with these very aggressive agreements." The weight given this performance in the environmental area must have been significant to offset the unacceptable safety rating and increase the overall Environment, Safety and Health rating. In addition, the recent safety and health review (1/27-12/1) identified long standing concerns that are more extensive than those included in the award fee determination: an example is the lack of a traceable safety control system from SAR's to Operational Safety Requirements to procedures.

Mr. Barber also questioned the General Management rating recommended by Mr. Simonson, noting that it was the same as the last period's (81), and explaining: "Since no progress has been made during the current rating period on safety and health issues, we question no reduction in the rating." Def. Supp. Ex. 72, December 18, 1989 Memorandum from Robert W. Barber to G.J. Judge.[13]

---

[13] The reference in Mr. Barber's memorandum to the "recent safety and health review" appears to be a reference to a comprehensive look at Rocky Flats by DOE Headquarters that Admiral Barr testified occurred "shortly before Thanksgiving, 1989." Admiral Barr may have been slightly incorrect about the date of the review. It appears from the Barber memorandum that the review actually took place shortly after Thanksgiving of that year.

On December 28, 1989, Peter Brush, the Assistant Secretary for Environment, Safety and Health wrote a handwritten memorandum to Dave LeClaire in Defense Programs stating that

> For RFP [the Rocky Flats Plant] we cannot agree that some good actions in the environmental area offset an unacceptable safety rating. The Action Memo needs to reflect this.

Def. Supp. Ex. 73, handwritten note from "Peter" on letterhead of the Assistant Secretary, Environment, Safety and Health.[14]

Admiral Barr prepared a memorandum to the Acting Assistant Secretary for Defense Programs recommending that Rockwell's ratings in the FPA's for ES&H and General Management be reduced from the levels recommended by Mr. Simonson, resulting in an award fee for plant operations of $2,160,393. Def. Supp. Ex. 75, p. 3, carryover paragraph. Admiral Barr cited specific reasons for his lowered assessment. Id., pp. 1-2. Admiral Barr further recommended a downgrade of the award fee of PMRP/PROVE to $338,035. Id. p. 3, 1st full paragraph. Admiral Barr's memorandum, which was unsigned and undated, was "cc'd" to Dave Simonson, Manager, RFO.

---

In any event, Admiral Barr testified that he led one branch of the team that made that review, and Mr. Starostecki, another Headquarters official, led the other. The team spent four days at the plant. This review discovered numerous deficiencies in virtually all areas. The review indicated poor performance by Rockwell across the board, and led to a halt of weapons production. DOE subsequently discovered that it was very difficult to effect corrections to the identified problems, because Rocky Flats operational capabilities had become so flawed during Rockwell's management. Def. Ex. 21, Deposition of Jon Barr in this proceeding, 9/23/94, pp. 151-152.

[14] "Peter" is identified as Peter Brush in Def. Supp. Ex. 74, which also reflects also bears a handwritten note indicating that office's nonconcurrence in the Simonson recommendation. Def. Supp. Ex. 74, 12/14/89 Routing and Transmittal Slip from Robert D. Quinn to a number of DOE Headquarters officials, including Peter Brush.

According to a handwritten notation on another copy of Barr's memorandum, see Def. Supp. Ex. 76, it was handcarried to Rocky Flats on January 11, 1990. The notation states: " . . . Simonson does not agree with this and wants comparison with our proposal so RFO [Rocky Flats Office] position can be developed." Around January 25, 1990, Secretary Watkins, Under Secretary Tuck, and Admiral Barr made the decision to replace Mr. Simonson with Robert M. Nelson, Jr. as Rocky Flats Area Manager. Def. Ex. 36, Deposition of Robert Nelson in this proceeding, 11/9/92, pp. 22-23, 27.

On February 22, 1990, Under Secretary Tuck sent a memorandum to Deputy Secretary Moore adopting Admiral Barr's description of the deficiencies in Rockwell's performance, and recommending a further lowering of its ratings in the ES&H and General Management FPA's. Mr. Tuck recommended $1,241,604 for plant operations and $338,035 for PRMP/PROVE. Def. Supp. Ex. 77. On February 23, 1990, Deputy Secretary Moore concurred in this recommendation. Def. Supp. Ex. 78.

On February 26, 1990, Mr. Nelson, the then Manager of DOE's Rocky Flats Office sent Rockwell a letter stating that the "Department of Energy (DOE)" had determined an award fee of $1,241,604 for plant operations and $338,035 for PRMP/PROVE**,** the figures that Mr. Tuck had recommended and Mr. Moore had approved. Def. Supp. Ex. 79.

Although the government's stipulation describes the award fee decision for 89/2 as having been "mandated" by DOE Headquarters officials and states that those officials "caused" Mr. Nelson to issue the award fee decision, Mr. Nelson testified at the trial in *Stone* that, despite receiving input from other DOE officials, he ultimately decided for himself what amount Rockwell should earn for the 89/2 period. Def. Supp. Ex. 85, Trial Testimony of Robert M. Nelson, Jr. at 3482-3485.

As it had done with respect to the prior award fee decision, Rockwell appealed the decision for 89/2. Rockwell provided written material to the Rocky Flats Office on May 3, 1990, and an oral presentation on July 10, 1990. In response, Mr. Nelson assembled a team of Rocky Flats employees knowledgable about Rockwell's performance to review Rockwell's information. This team recommended to Mr. Nelson that Rockwell's award fee not be changed. Def. Supp. Ex. 80. Accordingly, on July 26, 1990, Mr. Nelson sent Rockwell a letter confirming that the award fee would remain the same. Def. Supp. Ex. 86.

#### 3. DOE Did Not Breach The Contract

The foregoing facts demonstrate that DOE did not breach the contract. In determining the 89/1 and 89/2 award fees, DOE officials duly designated by DOE's Secretariat pursuant to statutory and regulatory authority–*i.e.*, the DOE Headquarters Office of Defense Programs–acted functionally for the Manager of Albuquerque in deciding the award fees. That did not constitute a breach in light of the language of the contract permitting "anyone acting as Manager, Albuquerque" to serve as the AFDO.

Alternatively, even if the contract required that the AFDO be the responsible field official, and even if DOE Headquarters "mandated" and "caused" the decisions to be made as indicated in the stipulation, the evidence shows that Mr. Twining for the first period, and Mr. Nelson for the second, subjectively adopted Headquarters' decisions. Both testified that they agreed with the figures sent them by Headquarters.

Moreover, in both cases, after appeals by Rockwell, these field officials again exercised their subjective judgment by reconfirming the original determinations.[15] The contract requires

[15] The proposition that Mr. Twining and Mr. Nelson subjectively adopted the determinations which Headquarters had made in the first instance by re-confirming them

only that "the award fee shall be determined subjectively by the Award Fee Determination Official." See clause 62(b)(2), Pl. Ex. 1. The evidence shows that this is what occurred in this case in regard to both award fee periods. Accordingly, defendant is entitled to entry of summary judgment that it did not breach the contract.

In sections C through E below, we clarify a couple of other issues that arose during the September 21, 2006 hearing relating to the government's non-breach argument. Section E also bears on the government's waiver/estoppel defense. In Part II below, we discuss damages.

### C. Rockwell Has Not Alleged That DOE Breached The Award Fee Provisions Of The Contract Other Than By Having The "Wrong Official" Determine The Fees

The only contract provision which Rockwell alleges DOE breached was the provision governing who was to determine the award. As far as the procedure for evaluating Rockwell's performance is concerned, the contract sets only very broad requirements, and Rockwell has not shown that DOE breached those. For example, Appendix D of the contract[16] provides that

> Evaluation of the Contractor's performance will be based upon the Performance Evaluation Plan established for the evaluation period by the AFDO, after consultation with the Contractor.
>
> The Performance Evaluation Plan will consist of: (i) a limited number (approximately 5-10) of identifiable areas of contract work which are designated as "Functional Performance Areas" (FPA's); and (ii) the specific weighting assigned to each FPA. The FPA's and FPE's [Functional Performance Elements] are defined in Appendix A to the Albuquerque Operations' "Handbook for Award Fee Performance Evaluation and Review Process," which has been furnished to the Contractor.

---

following appeals by Rockwell is not inconsistent with the government's stipulation. The stipulation addresses only the process by which the determinations were first reached, not what occurred after Rockwell appealed.

[16] Appendix D is reproduced as part of Pl. Ex. 1.

See Pl. Ex. 1.

Rockwell has not shown that DOE Headquarters, in determining Rockwell's award fees for 89/1 and 89/2, deviated from the "Performance Evaluation Plan," or failed to take into account the correct FPAs and FPEs, or deviated from the weights assigned to each FPA in the Performance Evaluation Plan.[17] In fact, the evidence set forth above shows that Headquarters utilized the FPAs and weights upon which the parties had agreed, although Headquarters differed from the field officials in its judgment about the quality of Rockwell's performance under certain of the designated FPAs.

The only issue Rockwell has pleaded is whether DOE breached the contract by having the "wrong official" decide the award fee.[18] For the reasons shown above in Section A, that allegation is meritless.

### D. The Albuquerque Operations Office Award Fee Handbook Was Not Part Of The Rockwell-DOE Contract

A question arose at the September 21, 2006 hearing as to whether the Albuquerque Operations Office's Award Fee Handbook was part of the Rockwell-DOE contract, such that a failure to adhere to the handbook would constitute grounds for finding a breach of contract. The answer to that question is "no."

---

[17] These FPAs and weights were specified in the contract as follows: General Management, weighted at 25%; Cost Managment, with a weight of 15%; Quality at 15%; Chemical Operations at 10%; Production Operations, weighted at 15%; and Environment, Safety & Health at 20%. See Pl. Ex. 3, Appendix D to Modification No. M128, pp. 3-4 of 9.

[18] DOE apparently did not render its award fee decision in accordance with the time frame set forth in the contract, but there is no basis for concluding that Rockwell was damaged as a result.

The only reference to the handbook contained in the contract is a single sentence in Appendix D, which is highlighted in the quotation below. Appendix D states in pertinent part:

> Evaluation of the Contractor's performance will be based upon the Performance Evaluation Plan established for the evaluation period by the AFDO, after consultation with the Contractor.
>
> The Performance Evaluation Plan will consist of: (i) a limited number (approximately 5-10) of identifiable areas of contract work which are designated as "Functional Performance Areas" (FPA's); and (ii) the specific weighting assigned to each FPA. **The FPA's and FPE's [Functional Performance Elements] are defined in Appendix A to the Albuquerque Operations' "Handbook for Award Fee Performance Evaluation and Review Process," which has been furnished to the Contractor.**

See excerpts from Appendix D, Pl. Ex. 1, pp. 1-2 of 7 (emphasis added). The highlighted sentence does no more than describe where the FPA's and FPE's actually set forth in the contract were defined; it does not purport to incorporate the handbook into the contract.

Other evidence in the record shows that the handbook was merely internal guidance intended for DOE's discretionary use in the award fee process, rather than a binding set of enforceable requirements. Mr. Twining testified that the 1977 handbook was a guidance document and that those involved in the award fee process were free to deviate from the procedures set forth therein if circumstances warranted. Def. Supp. Ex. 53, February 23, 1993 Deposition of Bruce G. Twining, pp. 15-16. The handbook itself confirms this:

> Substantive exceptions to the requirements of this Handbook may be authorized by the Contracting Officer or the Performance Evaluation Review Board (PERB) when such variations are determined to be appropriate for a particular CPAF [Cost Plus Award Fee] contract."

Pl. Supp. Ex. 44, 1977 Handbook, pp. 1-2.

The testimony of other DOE witnesses indicates that the handbook was not viewed by DOE as giving rise to binding requirements for the award fee process.[19] Mr. Terrel Agy, an employee of DOE's Rocky Flats office who was involved in the award fee process, testified that he was given a copy of the 1977 version of the handbook in 1989. His had a lot of revisions and changed pages. Mr. Agy saw correspondence in the file indicating that Albuquerque was in the process of revising the handbook and had been doing so for some time. "[The handbook] was in a state of flux, in other words . . . ." During the time Rocky Flats was under Albuquerque, the handbook was never in a final form. For this reason, Mr. Agy did not consider the handbook something that had to be followed closely in determining Rockwell's award fee. Def. Supp. Ex. 81, October 21, 1992 Deposition of Terrel John Agy, Vol. I, pp. 85-89.

Mr. Rush Inlow, who had served as Manager of the Rocky Flats office prior to Mr. Goldberg's taking over that office, testified that there were parts of the handbook that were not followed. For example, the handbook indicated that a "Performance Evaluation Committee," which was separate from the PERB, was to review the Rocky Flats office's award fee evaluation before passing it along to the PERB. Mr. Inlow did not recall this happening. Mr. Inlow also was aware of efforts to revise the handbook and "bring into it what was accepted practice at the time." Def. Supp. Ex. 82, December 1, 1992 Deposition of Rush Osborne Inlow, pp. 70-71.

Charles Troell, an Albuquerque contracts official, testified that the handbook was "a guidance document, especially in a period of transition where the department is changing its award fee process. Mr. Troell further stated:

---

[19] Again, the only binding requirements were those expressly set forth in clause 62 of the contract and in Appendix D.

> The PERB, I believe, was free to use the document as guidance and then do what they thought was right in a specific circumstance.

Def. Supp. Ex. 64, March 2, 1993 Deposition of Charles Edward Troell, p. 15.

Eventually, DOE did revise the 1977 version. On February 16, 1990, prior to the second award fee decision at issue in this case, the 1977 handbook was formally revised with the issuance of the "Albuquerque Operations Office Handbook for Award Fee Administration." This revised handbook formalized the requirement that field officials obtain formal Headquarters concurrence before issuing an award fee determination. It stated: "The FDO [Fee Determining Official] will obtain appropriate DOE HQ concurrence prior to providing the award fee determination to the Contractor." Def. Supp. Ex. 57, Albuquerque Operations Office Handbook for Award Fee Administration, p. III-10.

Rockwell may suggest that the absence of language in the 1977 handbook providing for Headquarters concurrence means that Mr. Twining's submission of his May 31, 1989 award fee recommendation to DOE Headquarters was itself a breach of the contract. However, as shown above, the handbook merely provided discretionary guidance for DOE in reaching award fee determinations; it did not create contractually enforceable limitations. Nothing in the language of the contract itself precluded Mr. Twining, while he was acting as AFDO, from submitting his award fee conclusions to Headquarters for concurrence, as long as he subjectively agreed with the resulting numbers, which he testified he did in this case.

### E. DOE Did Not "Conceal" Headquarters' Involvement In Rockwell's Award Fee Determination

DOE did not conceal Headquarters' involvement in the determination of the award fee process, as Rockwell has lately alleged. See 9/21/06 Tr. at 33-34.

On June 16, 1989, Deputy Secretary Moore publicly announced that DOE was suspending bonus payments for good performance by Rockwell at Rocky Flats. A news article reporting the announcement was headlined: "U.S. Suspends Bonus to Operator of Rocky Flats Plutonium Plant." It stated:

> W. Henson Moore, the Deputy Energy Secretary, said this afternoon that his department was suspending bonus payments for good performance by the company, the Rockwell International Corporation, for the period from September 1, 1988 [sic] to March 31, 1989.

Def. Ex. 41, June 17, 1989 New York Times article.

A few days later, on June 20, 1989, Mr. Moore wrote to Mr. Sam Iacobellis, President of Rockwell's Aerospace Operations, as follows:

> This letter will confirm our conversation of last week regarding the status of **the Department's determination** of Rockwell's award fee for the most recent completed evaluation period . . .
>
> As I mentioned during our conversation, the final determination has been suspended pending receipt **by the Secretary** of the report of the special departmental team that he dispatched to Rocky Flats. I anticipate that this report will have been rendered in sufficient time so that **the Department may make its determination of Rockwell's award fee** in approximately two to three weeks.
>
> I am sure you appreciate **our need to review this matter with care**, and **the Department will make its determination** as promptly as possible.

Pl. Ex. 42 (emphasis added). "[O]ur need to review this matter with care" clearly meant that Secretary Watkins and Deputy Secretary Moore were reviewing "this matter," *i.e.*, the award fee determination, with care.

Mr. Moore's letter referenced a previous conversation he had had with Mr. Iacobellis. Mr. Moore testified:

> The best I can recall, he called very concerned about that delay and the awarding of the award fee and was asking for some kind of guidance as to when this was going to be made.

Pl. Supp. Ex. 83, April 29, 1994 Deposition of W. Henson Moore, p. 32. Mr. Moore testified further as follows:

> Q. Do you have any recollection as to how Mr. Iacobellis would have known that you had any involvement in the award fee process at this time?
>
> A. I don't think it would have been hard for him to find that out. All he had to do was to go to Ed Goldberg, and at that point he would be told, well, you understand these things are being reviewed in the headquarters first. I don't know when this press statement was made, but that indicated that I was taking some role to play in the award fee, so that was made before the letter, June 19th according to this Lexis.
>
> MR. KOLAR: June 17th.
>
> BY MR. NEY:
>
> Q. June 17th.
>
> A. So it would not have been hard for him to find that out that, in fact, there was not going to be an award fee made until it cleared my desk.

Id., pp. 34-35.

In view of the public announcement by Mr. Moore regarding the suspension of the award fee determination, and Mr. Moore's June 20, 1989 letter to Mr. Iacobellis, it would strain

credulity to suggest that Rockwell was unaware that Headquarters had taken over the award fee process.

Further, on July 14, 1989, Mr. Moore wrote a memorandum to the file summarizing another phone conversation he had had with Mr. Iacobellis. Mr. Moore stated:

> I also informed Iacobellis that we were going to delay the pending award fee determination until sometime in August. Iacobellis agreed to the delay.

Pl. Ex. 44. Again, it is simply not reasonable to believe that Rockwell was unaware that the Secretary and Deputy Secretary were personally overseeing the question of the proper award fee to pay Rockwell.

Moreover, DPFUF nos. 81-90, and the proof submitted in support thereof, shows that Rockwell elected to deal, not with Mr. Twining, but with the highest levels of DOE regarding all other aspects of its performance at Rocky Flats. In view of this evidence there is no basis for Rockwell's contention that DOE concealed their involvement from Rockwell, notwithstanding that, once Headquarters made the decision, it tasked Mr. Twining with communicating the determination to Rockwell in view of his retention of the nominal title of AFDO.

At the September 21,2006 hearing, the government's counsel stated his belief that Mr. Twining, when he communicated the award fee decision to Rockwell, wrote that "the Department" had decided the award fee. The Court asked counsel to cover this point in this supplemental submission. 9/21/06 Tr. At 74.

The accompanying Def. Supp. Ex. 67 is a copy of the letter Mr. Twining sent Rockwell on September 27, 1989 containing the award fee determination for 89/1. The first sentence of that letter states:

> In accordance with Appendix D of [the] Contract . . ., **the Department of Energy (DOE)** hereby determines that Rockwell International Corporation has earned an award fee of $2,716,624 for Plant and $186,591 for PRMO/PROVE, for a total of $2,903,215.

Def. Supp. Ex. 67, p.1 (emphasis added).

This same evidence supports the government's contention that Rockwell acquiesced in DOE Headquarters' determination of its award fees, and that the government therefore is entitled to judgment as a matter of law on its waiver/estoppel defense.

## II. If DOE Breached, Rockwell Was Not Damaged, Or The Damages Are Less Than Rockwell Seeks In Its Motion

If DOE breached the contract, Rockwell was not damaged for the reasons stated in the government's opening and reply briefs. Alternatively, if Rockwell was damaged at all, the damages are considerably less than the $5,333,606 to which it argues it is entitled in its summary judgment motion. See Plaintiff's Motion For Summary Judgment And Motion In Support Thereof, dated May 25, 2006, at 9-10.

Rockwell's damages computation is predicated on the notion that Mr. Twining reached a final determination of an award fee in the amount of $5,176482 for the Plant for 89/1 plus $710,160 for the Waste Management Goal Achievement Objective (GAO), but that Headquarters improperly lowered the fee to $2,716,624 for the Plant and eliminated the GAO altogether. However, as demonstrated above and in the government's other filings, Mr. Twining's initial May 31, 1989 recommendation never became an award fee "determination." Mr. Twining regarded his conclusion as tentative, and subsequently adopted Mr. Goldberg's reduced recommendation of $3,628,622. See Def. Supp. Ex. 60.

Of course, the latter figure also was merely Mr. Twining's "recommendation," it was not a final determination. However, if a Twining recommendation is to be used as the starting point from which to measure damages, it is more reasonable to use the later-in-time recommendation, which Mr. Twining testified was predicated on Mr. Goldberg's superior knowledge regarding Rockwell's performance. The difference between Mr. Twining's second recommendation and the Headquarters determination is $3,628,622 - $2,716,624, or $911,998. This is the maximum damages suffered by Rockwell for the 89/1 period.

Rockwell argues that the damages for the second award fee period at issue should be measured by the difference between Mr. David Simonson's recommended figures of $3,114,245 for Plant and $628,982 for PRMP/PROVE, and the Headquarters determination of $1,241, 064 for Plant and $338,035 for PRMP/PROVE. However, for purposes of trying to establish a breach, Rockwell contends that Mr. Twining was the one and only official entitled to make an award fee determination. Since Mr. Twining never made any recommendation for the 89/2 period, accepting Rockwell's position that only Mr. Twining could properly make the decision, there is no benchmark from which to measure damages for the 89/2 period, and Rockwell has failed to establish any damages for that period.

As Rockwell explains in its reply brief, Rockwell initially alleged in its complaint, and continues to believe, that Mr. Simonson's involvement in the award fee determination for 89/2 was in breach of the contract. Rockwell asserts, however, that it is not pursuing that breach "because no damages resulted." See Plaintiff's Memorandum In Reply To Defendant's Opposition To Plaintiff's Motion For Summary Judgment And In Opposition To Defendant's Cross-Motion for Summary Judgment, filed August 28, 2006 at 5 n. 3. Rockwell's counsel reiterated the same point at the hearing. 9/21/2006 Tr. at 79.

However, that being conceded, there is no legal or logical reason that Mr. Simonson's recommendation, which was wholly nugatory under Rockwell's theory as to why DOE's conduct breached the contract in the first place, should be used as the benchmark for measuing damages for the 89/2 period. There is no way for the Court to determine what Mr. Twining would have recommended for 89/2, and according to the logic of Rockwell's position, the only way to measure damages is by taking the difference between a Twining determination or "recommendation" and the corresponding Headquarters determination. Thus, Rockwell has not met its burden of showing that it suffered any damages for 89/2.

In summary, if Rockwell suffered any damages at all during the 89/1 period, they were $911,998 at most; Rockwell has failed to establish any damages whatsoever for 89/2.

**CONCLUSION**

For the foregoing reasons, and those set forth in the government's opening and reply pleadings, the Court should enter summary judgment for the government. Alternatively, the Court should deny Rockwell's motion for summary judgment inasmuch as Rockwell has not demonstrated an absence of genuine issues of material fact and that it is entitled to judgment as a matter of law.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

s/ John A. Kolar

JOHN A. KOLAR
DONALD WILLIAMSON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 305-9301
Attorneys for Defendant

Dated: October 30, 2006

# Defendant's Supplemental Exhibit 52

United States Government Department of Energy

# memorandum

DATE: JUN 21 1989

REPLY TO ATTN OF: DP-3 (B.Barker, 6-2181)

SUBJECT: Albuquerque Operations Office (AL) Award Fee Determination for the Period October 1, 1988, through March 31, 1989

TO: Manager, Albuquerque Operations Office

Please be advised that I have thoroughly reviewed your findings for each contractor as noted in your May 31, 1989, memorandum to me, subject same as above. Based upon your input and my own personal observations, I concur in your findings for Allied Signal, Inc., EG&G, Mound Applied Technologies, Inc., General Electric Company, Mason Hanger - Silas Mason, Inc., and Westinghouse Electric Corporation.

In the case of Rockwell International Corporation, it would be premature at this time to make a final determination until the Department of Energy investigation of environmental, safety, and health charges are resolved.

I have noted my concurrence and concerns in the attached file copy response.

Troy E. Wade II
Acting Assistant Secretary
for Defense Programs

Attachment:
Memo to DP-1 fm
AL dtd 5/31/89

Defendant's Supplemental Exhibit 53

UNITED STATES COURT OF FEDERAL CLAIMS

ROCKWELL INTERNATIONAL )
CORPORATION, )
)
)
Plaintiff, )
)
vs. ) No. 91-1362 C
) (Judge Yock)
UNITED STATES OF AMERICA, )
)
)
Defendant. )

DEPOSITION OF:

BRUCE G. TWINING

Tuesday, February 23, 1993

10:00 A.M.

Reported by:

BARBARA K. HARRIS

CSR # 93

handbook, was actually part of a headquarters task force that did a fairly thorough look at the award fee possess for DOE and made several recommendations to enhance it.

Q. Were the individuals at Albuquerque who were involved in the award fee process at liberty to deviate from the handbook as they wished?

A. I would view the handbook as a guidance document, especially in a period of transition where the department is changing its award fee process.

Q. So anybody in the Albuquerque Division who thought it was a good idea to deviate from the handbook was free to do so?

A. The PERB, I believe, was free to use the document as guidance and then do what they thought was right in a specific circumstance.

Q. So if the --

A. This doesn't say order. It doesn't say -- I haven't read it. But the handbook is a guidance document.

Q. So if the handbook said one thing, the PERB was free to do something else if they thought it was sensible under the circumstances?

MR. KOLAR: Could you be more specific about instances, examples?

MR. NYE: I will get to that, but right now I am just asking generally.

Q. Generally the PERB was perfectly free to deviate from the letter of this handbook.

MR. KOLAR: Objection on grounds of vagueness.

Q. That's fine. You may answer.

A. I would view that handbook as a guidance document, that laid out the process. My opinion on where we were in this process is that this handbook, which was dated 1977, was likely becoming obsolete, and led to this 1990 revision.

Q. Would you, Mr. Twining, describe for me how the award fee process worked at Albuquerque. Take your time and go from step one to the issuance of the actual fee to the M & O contractor.

A. Well, again, I said the award fee process has been evolving.

Q. Let's start with 1988 when you first arrived here.

A. In general, my view of how that award fee process worked at that time is that the area manager was responsible for pulling together the award fee report.

Q. Now, the area manager in connection with Rockwell would be the manager at the Rocky Flats facility in Colorado?

A. Yes. The area manager actually pulled together the report. In pulling together a report, he would have, ClCt

considered input from the people in his area office. He would have also been expected to consider input from people in functional divisions in Albuquerque.

For example, he would get input from the Weapons Quality Division that would deal with the quality of the product that Rockwell was producing in the plant. He would have been expected to get input from our ES & H people to reflect the kind of reviews and appraisals that had been done by both our people and headquarters people. And then he would incorporate that into a draft report.

He would then come to the PERB meeting, and be prepared to talk to that report. The other members of the PERB, which were -- and I'm not sure whether at this time the PERB was chaired by Jim Culpepper or Charlie Troell, but there was a chairman and other functional assistant managers on the PERB, and the PERB as a whole would listen to what the area manager had to say, make an assessment on whether it fairly characterized the input from their own functional people, as well as whether it, you know, fairly characterized Rockwell's performance from their point of view.

Q. Who were the members of the PERB?

A. Well, typically it would be the chairman, and I'm not sure whether at that time it was Charlie Troell or Jim Culpepper; the assistant manager for Operations and Weapons

would be on the PERB, the assistant manager for ES & H, all of our assistant managers that have a functional interest in what went on at the site.

There is, I believe, a PERB secretariat which is from the Contracts Division, but the board itself is the decision-making body. I think we probably have an attorney advisor to the PERB. Again, that was changed over time, I think.

But the PERB reviews what the area manager has to say, changes it if appropriate, and then I was given and am still given a report with a proposed award fee determination and a briefing. I look through that, ask my questions. If my concerns haven't been reflected, the PERB may or may not meet again to reflect the input I have or the questions I ask. But when we are all finished, I make an award fee determination.

And at the time of this award fee, we had just gotten into a process of formally sending those proposed determinations to headquarters for concurrence.

Now, over time, we have gotten much more formalized about determining what the performance objectives are that we are going to be interested in in the award fee process, and I am not sure what the practice was back in this period, but today we review those performance objectives, or performance criteria, the PERB agrees to them, they run them

Q. If you would look at the handbook that superseded the 1977 handbook, which is Exhibit 30, if you would look at page Roman III-10, it bears Bates number E 001096, and is entitled, there is a paragraph entitled, "Role of Fee Determination Official," and I would ask that you read that, Mr. Twining.
A. Yes.
Q. And on the following page there is a summary of the steps involved in the award fee process, and I would ask if you would look at that.
A. Yes.
Q. Now, does that paragraph comport to your understanding of how the process worked as well as the summary?
A. I think that paragraphs is fairly consistent with what I said.
Q. All right. So that the handbook, as it existed prior to the February 16, 1990 edition, makes no reference to headquarters' concurrence.
A. That's right.
Q. And the February 16, 1990 edition, which is Exhibit 30, does make explicit reference to headquarters' concurrence.
A. Yes.
Q. And I believe you have testified that the process ClCt

of headquarters' concurrence was an evolving one; is that fair?

A. Yes. Basically there was a task force that looked at the whole award fee process. One of their recommendations was that there ought to be a formalized headquarters' input, and it was not unusual for me to call and get input or the PERB to call and get input from headquarters before. But a formalized headquarters' input, I don't know exactly when we got guidance from headquarters that said, "From here forward you will send these forward for concurrence." But once we got that guidance, we did it. The handbook revision would have come later.

Q. So at some point before the February 1990 handbook, you would have received some directive from headquarters saying that award fee recommendations would have to go to headquarters for concurrence; is that correct?

A. I believe that's the case.

Q. Now, let's go back to 1988 when you arrived on the scene in Albuquerque, and I believe you testified you were involved in both award fee determinations for the six months of fiscal year '88. At that point in time, was there a formal requirement for headquarters' concurrence?

A. I don't recall, but I don't think so. I can't be absolutely sure. I do not believe that first award fee determination went to headquarters.

Q. In '88.

A. The determination that would have been made right after I got there, which would have been for the period that ended in March of '88.

Q. And what about the second half of 1988, that would be the award fee going from April 1 through September 30, 1988, did that go to headquarters for concurrence?

A. I don't recall. I don't know. I don't know for sure. I would say no because the task force was really started under the new administration, which came in in January of '89.

Q. As of the time that Admiral Watkins became the Secretary.

A. Yes.

MR. KOLAR: Give me a second, please.

(WHEREUPON, there were proceedings held off the record.)

Q. Now, it's your testimony, or your recollection, that for the two award fee periods in 1988, concurrence from headquarters is not required. Was headquarters informed at some point of the determinations that were being made for Rockwell, as well as the other M & O contractors under the supervision of Albuquerque?

A. It was not -- before I came to Albuquerque, there had been a technical safety appraisal at Rockwell, at Rocky-t

experience with Rocky Flats prior to June 6, 1989?
A. Mr. Goldberg was in the plutonium business at Richland. There was a lot of interaction among all the plutonium facilities in the department. From that standpoint, Mr. Goldberg would have been familiar with Rocky. I don't think he had personal day-to-day knowledge of what went on there, at the time he entered.
Q. Subject to dealing with Rocky Flats in his position at Hanford, do you have any information as to any other personal knowledge Mr. Goldberg would have concerning the Rocky Flats operations prior to June 6?
A. No.
Q. And how long did Mr. Goldberg serve as area manager?
A. I don't recall.
Q. A year?
A. I would say most of a year, but I don't know.
Q. Do you know who replaced him?
A. I would say either Dave Nelson or --
Q. Simonson?
A. Dave Simonson or Bob Nelson.
Q. After Mr. Goldberg became acting area manager at Rocky Flats, did you have a lot of dealings with him?
A. Not very many, but as this memo points out, we were expected to continue to support the office, and we didn't

that in a number of areas, but in operational areas or major ES & H areas, there was a period of very little interaction between our staffs.

Q. This memo states that Mr. Goldberg will report to the Undersecretary of Energy, John C. Tuck, with regard to operations of Rocky Flats.

A. Yes.

Q. Was that a change of prior procedures, or prior reporting responsibilities?

A. Well, prior to this memo that area office reported to me.

Q. Who do you report to, or in 1989 who did you report to as manager at Albuquerque?

A. I believe at that time all the field managers plugged into the box that had the secretary, the deputy secretary, and the undersecretary, and I did have some daily interactions with John Tuck.

Q. When did you first hear about the raid at Rocky Flats?

A. The day before it happened. It might even have been the morning it happened.

Q. Were you told at that time that Mr. Goldberg would come in as area manager?

A. Yes, I was.

Q. Were you also told at that time that he would be ClCt

reporting directly to headquarters?
A. Yes.
Q. After Mr. Goldberg's appointment, did you consider Rocky Flats still to be under the supervision of Albuquerque?
A. I considered this memo to be the effective document. That office reported to headquarters, and we were to do everything we could to help make things work.
Q. So the answer is no, you did not consider --
A. No, I did not --
Q. -- Rocky Flats to be under your jurisdiction.
A. No.
Q. Let me show you a document that has been marked as Plaintiff's Exhibit 49. It's a memorandum from Mr. Troell directed to you, dated July 10, 1989.
A. Okay.
Q. Have you seen this memorandum before?
A. Yes, I think I have.
Q. Why did Mr. Troell draft this memorandum?
MR. KOLAR: Objection, lack of foundation. It calls for testimony about what was in Mr. Troell's mind.
Q. Go ahead. You can answer.
A. As I recall this process, we got a recommendation from Mr. Goldberg based on the period of time that he had been at Rocky Flats, and we also had the nonconcurrence from

Defendant's Supplemental Exhibit 54

00001

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA ex rel. James S. Stone,

Plaintiff,

v. No. 89-M-1154

ROCKWELL INTERNATIONAL CORPORATION, THE BOEING CORP., BOEING NORTH AMERICAN, INC.,

Defendants.

VIDEO DEPOSITION OF BRUCE TWINING
VOLUME I
April 7, 1998
9:00 a.m.
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. CHRISTOPHER J. KOENIGS
ATTORNEY FOR THE DEFENDANTS

REPORTED BY: MARY ABERNATHY SEAL, RDR, CRR, NM CCR #69
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

5434-2 MAS

00115
received widespread press coverage, to your recollection?
A. Yes, they did.
Q. And to your recollection, did they harm DOE's reputation?
MR. HESCH: Objection. Foundation, form.
A. I think they hurt DOE's reputation.
Q. (By Mr. Koenigs) Do you think they also hurt Rockwell's reputation?
MR. HESCH: Objection. Form, foundation.
A. Yes.
Q. (By Mr. Koenigs) After the raid I think you indicated that your oversight responsibilities with respect to Rocky Flats were either diminished or eliminated. I don't mean to characterize it, but is that correct?
A. I think "eliminated" is closer than "diminished."
Q. Do you recall how you learned that that was going to be the case?
A. John Tuck, who was the under secretary at the time, telephoned me either the day before the raid, or the morning of the raid, and told me that the raid was going to happen, and told me about how they were going to rewire the organizational chart.
Q. By rewiring it, you're referring to placing Mr. Goldberg as area manager of the plant and having him report directly to headquarters?

00116

A. Yes.

Q. Did he tell you why that was being done?

A. It's just something the secretary wanted to do.

Q. Did he indicate to you in that conversation any dissatisfaction with Albuquerque's oversight of the plant?

A. No.

Q. Did you subsequently come to understand that headquarters was dissatisfied with Albuquerque's oversight of the plant?

A. I think they were dissatisfied with what happened to Rocky Flats and that we had a share in that.

Q. At that point in time -- strike that.

(Exhibit 852 marked for identification.)

Q. Before we look at this document, Mr. Whiteman was already area manager at Rocky Flats when you became the manager of Albuquerque?

A. Yes, he was.

Q. Okay. Was part of your responsibility to assess his performance as area manager?

A. Yes, it was.

Q. And did you conduct any kind of regular, such as annual, evaluations of Mr. Whiteman's performance?

A. Yes, I did.

Q. Were they, in fact, annual, or were they more frequent than that?

Defendant's Supplemental Exhibit 55

P84

EXECUTIVE SUMMARY

AUG 0 4 1989

| | |
|---|---|
| SUBJECT: | Award Fee Determination for the Period October 1, 1988, through March 31, 1989, Rockwell International Corporation |
| Technical Monitor/Division: | Acting Area Manager, RFAO |
| Contractor/Contract No: | Rockwell International Corporation/DE-AC04-76DP03533 |
| Action Initiator/Phone: | TH Ted Hill/4-9189 |
| Action Requested: | Sign Memorandum to John L. Meinhardt, Acting Assistant Secretary for Defense Programs |

Description/Nature of Action/Background

On May 31, 1989, the Manager, Albuquerque Operations Office (AL), submitted tentative findings for each Management and Operating award fee contractor for the period October 1, 1988, through March 31, 1989, to the Acting Assistant Secretary for Defense Programs for his review and concurrence/nonconcurrence. On June 21, 1989, Troy E. Wade, Acting Assistant Secretary for Defense Programs, responded with concurrence for the proposed Award Fee Determinations for all award fee contractors except Rockwell International Corporation, stating that "it would be premature at this time to make a final determination until the Department of Energy investigation of environmental, safety, and health charges are resolved."

Subsequently, Edward S. Goldberg, Acting Area Manager, Rocky Flats Area Office, made an on-site review of Rockwell's performance for the period October 1, 1988, through March 31, 1989, and submitted his observations to the Manager, AL, in a memorandum dated July 27, 1989. Mr. Goldberg further proposed an award fee amount of $3,628,622, which equates to an overall grade of "87" and 53.19% of the total available award fee versus the Performance Evaluation Review Board's (PERB's) recommendation of $5,326,482, equating to a grade of "91.20."

Mr. Goldberg's observations, along with the AL Manager's tentative determination, are being sent to the Acting Assistant Secretary for Defense Programs for concurrence/nonconcurrence.

Although the Performance Evaluation Report has been revised to reflect Mr. Goldberg's observations, the PERB's initial recommendation to the Manager, AL, has not been changed. The PERB did send a memorandum to the Manager dated July 10, 1989, stating that "in light of these new expectations, if the PERB was to reassess Rockwell's performance for the period October 1, 1988, through March 31, 1989, it would, in all likelihood, recommend a lower overall rating. Therefore, the PERB would not object to Ed Goldberg's proposed overall numerical rating of '87'."

MOCB:3-89-696

E 000972

Defendant's Supplemental Exhibit 56

UNITED STATES COURT OF FEDERAL CLAIMS

ROCKWELL INTERNATIONAL )
CORPORATION, )
)
)
Plaintiff, )
)
vs. ) No. 91-1362 C
) (Judge Yock)
UNITED STATES OF AMERICA, )
)
)
Defendant. )

DEPOSITION OF:

CHARLES EDWARD TROELL

Tuesday, March 2, 1993

9:30 A.M.

Reported by:
BARBARA K. HARRIS
CSR # 93

Q. Do you have any reason to believe that Mr. Hill's minutes of the meeting are not an accurate reflection of what took place at the meeting?

A. Ted Hill was probably the best secretary I ever had in the performance evaluation review board, and generally it was impeccable. I never had occasion to find him make a mistake on one. He really was very thorough and very competent, but certainly a human being, he could have made a mistake. And when Ted Hill says there was considerable discussion, believe me, there was considerable discussion.

Q. Mr. Troell, I'm handing you a document which has previously been marked as Exhibit 9, which is a memorandum from Claude Broxmeier to James Beiriger dated May 23rd, 1989.

A. Yes.

Q. Have you ever seen this document before?

A. I don't recall seeing it. I never heard of Beiriger. I wouldn't say -- it's possible I saw it, but I sure don't recall it. This was between two fairly low staff members, and probably never got to my level.

Q. The last sentence of the memorandum talks about directing questions about the Albuquerque HQ role with Theetis Hill.

A. Yes.

Defendant's Supplemental Exhibit 58

United States Government | Department of Energy

# memorandum

Albuquerque Operations Office
Rocky Flats Area Office

DATE: JUL 27 1989

REPLY TO ATTN OF: ADM:CHB

SUBJECT: Award Fee Determination for the Period, October 1, 1988, through March 31, 1989, Rockwell International Inc.

TO: Bruce G. Twining Manager, AL

Based on my review of Rockwell's performance as it relates to the first half of FY89, I offer my observations for your your consideration in a fee determination for the Plant portion of the award fee for the subject period. These observations differ from the PERB's original recommendation in the FPA's on General Management, Quality Assurance and Environment, Safety and Health. I agree with the PRMP/PROVE portion of the fee determination recommended by the PERB.

The problems that I see in my review of Rockwell's ongoing operations tend to impact the three FPA's noted above for which I recommend revised scores, but the basic problem which underlies all FPA's is a lack of discipline in operation. This is apparent in Rockwell's failure to adequately define the entire safety envelope for the operation of each facility. This should, but does not, manifest itself in a cohesive flow from Safety Analysis Reports to Operational Safety Requirements to limiting conditions for operations to detailed operator procedures. A lack of clear lines of responsibility for operations, safety, maintenance,etc. is apparent. This is evidenced by an incident in which a building manager was unaware of a decision about filter changes which had significant safety implications for his operation. We see many instances in which decisions are made by people without the proper knowledge or training. Because these matters indicate systematic ongoing conditions that require significant improvement, I believe there is no doubt that they existed during the first half of FY 1989.

The overall lack of discipline is also apparent in the Waste Management program. The system that exists to identify and track drums lacks formality. No uniform system exists from building to building to classify waste. The decisions regarding the distinctions between waste and residue appear to be arbitrary. An integrated waste management program is not really evident.

With the exception of the weapons program, the implementation of a Quality Assurance program is inadequate. Operators on the floor do not consistently follow formal procedures. We have observed instances where operators signed off on procedures in "rote" fashion, evidently without reading them or receiving proper training on their implementation. We find no system in place to check adherence to operating procedures.

JUL 27 1989

In the area of Environment Safety and Health, my teams constantly observed failures to adhere to established safety procedures. During the first half of FY 1989, there were 30 lost time injuries, an average of one every 8.6 days. The Headquarters EH on-site representatives routinely observe and report problems which in-plant supervision should identify and correct without outside intervention. Again, these are systematic problems indicating a lack of discipline in operations and proper attentiveness to safety.

In addition to my observations, during the period Rocky Flats and AL staff identified the following problems which I regard as deficiencies:

General Management

The identification and resolution of problems by Rockwell is too slow. Examples are pondcrete storage monitoring, analysis of National Pollution Discharge Elimination System (NPDES) violations, internal dissemination of incident information within Rockwell, and Rockwell's inability to provide timely information on the availability of waste for shipment when the Governor of Idaho curtailed shipments of TRU mixed waste. During the period, Rockwell violated Department of Transportation Regulations on two shipments of waste to Nevada. Although nitrate concentrations on the 750 pad increased and reached an all time high, Rockwell took little action to contain the major contributor, saltcrete. Rockwell has not made adequate progress to prepare for utilization of TRUPACT because the definition of alterations required to modify Building 664 to utilize TRUPACT containers was not made in a timely manner.

Quality Assurance

Rockwell has failed to make the necessary progress towards the establishment of a new standard of excellence and attendant requirements, procedures and practices in nuclear facility operations.

In three incidents during the period, Rockwell failed to provide the necessary measures to adequately control nonconforming WR material. Analysis of each incident revealed that the cause was either a breakdown of an existing system or lack of an adequate system.

Environment Safety and Health

The PERB report contains seven "Notable Deficiencies". I believe the first two are properly categorized as "Notable Significant Deficiencies". The Shutdown of Building 771 was the result of a management failure to prevent degradation of safety conditions to the point that a shutdown was necessary. Also, the release of dilute chromic acid demonstrated a series of inadequate controls that eventually resulted in an offsite discharge.

A copy of the January 12, 1989, memorandum from A. E. Whiteman to Dominick J. Sanchini establishing CPAF Goals and Objectives for the period is attached. I believe the foregoing information provides evidence of Rockwell's failure to

JUL 27 1989

meet those Goals and Objectives as they relate to the three FPA's noted above. For your consideration, attached is a revised calculation of the award fee for the period that factors in the conditions which I have described.

Please contact me or have your staff contact Claude Barkmeier of my staff on FTS 320-4263 if you have further questions.

Edward B. Goldberg
Acting Area Manager

Attachment

# AWARD FEE RECOMMENDATION

**CONTRACT NO.: DE-AC04-76DP03533**

**CONTRACTOR: ROCKWELL INTERNATIONAL CORPORATION - PLANT**

**PERIOD: October 1, 1988 - March 31, 1989**

## ROCKY FLATS OFFICE RECOMMENDATION

| EPA's | ADJECTIVAL GRADE | NUMERICAL GRADE X | WEIGHT = | SCORE | |
|---|---|---|---|---|---|
| General Management | GOOD | 81 | 25% | 20.25 | — ? |
| Production Operations | OUTSTANDING | 96 | 15% | 14.40 | |
| Cost Management | EXCELLENT | 95 | 15% | 14.25 | |
| Quality | VERY GOOD | 88 | 15% | 13.20 | — ? |
| Environment, Safety and Health | MODERATELY GOOD | 79 | 20% | 15.80 | — ? |
| Chemical Operations | EXCELLENT | 91 | 10% | 9.10 | |
| | | | 100% | 87.00 | |

**MAXIMUM AVAILABLE AWARD FEE**
**$6,822,000**

**RECOMMENDED FEE**
**$3,628,622**

[signature]
Edward S. Goldberg
Acting Area Manager
Rocky Flats Office

Too High!

Based on what we know + Goldberg's comments, how can Ed arrive at these % ?

JM

E 001598

PERFORMANCE EVALUATION
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD OCTOBER 1, 1988 - MARCH 31, 1989

The overall performance of Rockwell International Corporation (Rockwell) has been maintained at least at a level of "Satisfactory" during the period October 1, 1988, through March 31, 1989.

The following is an evaluation of the performance of Rockwell, relative to the management and operation of the Rocky Flats Plant, including the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the Functional Performance Areas (FPA's) selected for award fee evaluation. The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's for Plant operations have been evaluated in accordance with the contract Award Fee Plan, and the following discussion of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

PLANT

GENERAL MANAGEMENT: There was a rapid resolution to the problem of obtaining United States Department of Transportation approval for using a modified ATMX railcar for making the first shipment of Transuranic mixed waste in 1989. Interplant schedule compliance continued at 100% for the third consecutive rating period. The Emergency Preparedness organization has a well-planned and effective program, is involved in Albuquerque Operations Office (AL)-wide coordination activities, and continues to make improvements. In less than four years, Rockwell has exceeded a ten-year Energy Conservation Goal.

Rockwell has not made adequate progress to prepare for utilization of the TRUPACT II container when it becomes available. The identification and timely resolution of problems by Rockwell is often slow. Rockwell has recently violated DOT regulations on two shipments to the Nevada Test Site. Despite the knowledge that nitrate concentrations on the 750 pad have increased, little action has been taken to contain saltcrete after precipitation events. Rockwell is still not placing sufficient emphasis on the timely establishment of the Rocky Flats Institute. Inadequate project staffing for the PRMP continues to influence Rockwell's performance.

COST MANAGEMENT: Good data and narratives provided by Rockwell to define Department of Energy (DOE) unfunded Environment, Safety, and Health requirements in an FY89 supplemental budget request were also used to support DOE requests to Congress for additional FY90 funding. Rockwell has done an extraordinary job of tracking information and preparing responses to a large variety of budget information requests and of maintaining the current status of its requirements. In addition, construction project data sheets and conceptual design reports supporting Capital Budget requests were both of high quality and ahead of schedule. Budget narratives were improved and expanded and were helpful in DOE's analysis of Rockwell's resource requirements.

QUALITY: Non-Weapons Quality Assurance activities conducted during the Building 771 restart have resulted in an improved quality program to be used in the operation of the building. For War Reserve Quality Assurance, Rockwell is implementing Phase 2 of the Quality Improvement Plan which will continue a new culture in quality practices and should lead to further improvement in the Quality Assurance program.

Rockwell failed to establish or make the necessary progress towards the establishment of a new standard of excellence and attendant requirements, procedures, and practices in nuclear facility operations. In addition, three incidents came to DOE's attention where Rockwell failed to provide the necessary measures to adequately control nonconforming product material.

CHEMICAL OPERATIONS: Noteworthy progress has been made towards the implementation of the Operational Readiness Review (ORR) program as demonstrated through ORR's in Building 771 and elsewhere. Rockwell has also successfully completed the development of a new extractant compound for use in the Molten Salt Extraction process. Both of these accomplishments will yield safer and more controlled production processes while maintaining or improving production performance.

PRODUCTION OPERATIONS: Significant progress has been made in the development of a Nuclear Facility Operations Manual. Rockwell has been supportive of the AL effort to develop an Operational Surety Program. Rockwell has taken several steps to reduce work in process inventories and process times by, among other things, reduced planned process times in Building 460, reduced pit assembly process time in Building 707, and reduced lot sizes on the ST bodies.

ENVIRONMENT, SAFETY, AND HEALTH: Progress towards achieving a high quality training program and the establishment of a new pilot radiation safety course are among the notable achievements in the radiation protection area. Rockwell has demonstrated good responsiveness in the preparation and coordination on National Emissions Standards for Hazardous Air Pollutants issues specific to the Rocky Flats Plant and has contributed to the DOE-wide review of this regulation. Significant progress has been made towards reducing the rate of radiological incidents. Several positive steps have been taken towards achievement of a permanent reduction in plant personnel ratiation exposure. In the safety program, substantial corrective actions are underway, including the development of an integrated safety program. A Safety Review Group has been established and its efforts during the period were commendable.

The shutdown of Building 771, resulting despite earlier identification of safety problems, created major disruptions to the commitments for processing of plutonium. An unintentional release of dilute chromic acid revealed inadequate procedures for the reporting and coordination of discovered releases to the sewage treatment plant with downstream control of contamination. Rockwell's housekeeping of production buildings has not improved adequately. Although a downward trend has been achieved during the first five months of FY89, no significant progress in reducing the wound rate has yet occurred. Rockwell has been unable to resolve the 1988 National Pollutant Discharge Elimination System permit violations for five-day biochemical oxygen demand. Regarding the East Firing Range, Rockwell has taken no action to date in response to concerns about its safe operation. The ES&H management oversight of Building 771 operations after the January 19, 1989, phased restart was inadequate.

# PRMP/PROVE

PROJECT MANAGEMENT: Rockwell has given PROVE renewed emphasis by separating responsibility for PROVE from that of the PRMP and placing it under a full-time project manager. The recently implemented "Precursor Plan" represents an improvement in direction for the entire project and was implemented with professionalism and enthusiasm.

Overall PRMP management attention to project technical, cost, schedule, and manpower need was inadequate. In addition, inadequate project staffing continues to influence Rockwell's performance.

COST MANAGEMENT: Cost development and baselining of costs for the "Precursor Plan" have been handled with the highest degree of quality. Rockwell's redirection of J. A. Jones' manpower planning on PROVE resulted in reduced costs and apparent increased construction productivity.

PROVE continues to demonstrate cost growth. PRMP cost planning far exceeded available project funding allocations.

SCHEDULE PERFORMANCE: Rockwell has successfully resolved several problems which were impacting schedule in the PROVE area. The diligent effort by Rockwell, Bechtel, and J. A. Jones in the joint development of the Precursor planning has resulted in a comprehensive schedule that should provide a smooth transition from PROVE to the receipt of capital funding for PRMP.

The PROVE schedule has deteriorated during the reporting period, extending the PROVE end date from 1/90 to 8/90.

SUBCONTRACT MANAGEMENT: Rockwell, consistent with project technical needs and evolved cost and schedules, has provided rapid and effective subcontract redirection of Bechtel. Rockwell subcontract management of J. A. Jones has ensured J. A. Jones' participation in construction planning. Rockwell has been successful in obtaining active participation and commitment from the National Laboratories and other Rockwell organizations on the PRMP Precursor Program.

The subcontract work with the PROVE glovebox manufacturer has resulted in the need for significant rework to the glovebox piping and piping penetration welds. Line Item and cost/schedule activities over the balance of the FY89 demand that Rockwell provide continuous site representation at Bechtel.

DESIGN QUALITY: The Precursor Program, geared toward improving PRMP design quality, has been initiated with broad based involvement. Use of the Configuration Control System for PROVE has been greatly improved.

The quality of the existing PROVE engineering has been poor, and change orders to correct poor initial design quality are reflected in cost growth.

TECHNICAL PRODUCT QUALITY: PROVE activities in addressing and rectifying glovebox welding problems are directed towards, and should significantly improve, technical product quality.

Welding problems recently surfacing on the PROVE glovebox indicate a significant lack of technical product quality success.

# Defendant's Supplemental Exhibit 59

 P49

United States Government **Department of Energy**

# memorandum

**Albuquerque Operations Office**

PREDECISIONAL

DATE: JUL 1 ? 1989

REPLY TO ATTN OF: CPD

SUBJECT: Award Fee Determination for Period October 1, 1988, through March 31, 1989, Rockwell International, Inc.

TO: Bruce G. Twining, Manager, COM

In February 1988, Department of Energy (DOE) Headquarters (HQ) performed a Technical Safety Appraisal (TSA) at Rocky Flats which disclosed a number of significant safety concerns. This was the third TSA performed at Rocky Flats. Many of the concerns were repeated from the previous two TSA's. As a result of these disclosures, DOE HQ, Albuquerque Operations Office (AL), and Rockwell all agreed to the actions required to correct the areas of concern. All of the parties recognized that due to the magnitude and complexity of the problems, considerable resources, as well as a substantial period of time, would be required to make the necessary upgrades and cultural changes. All of the parties agreed that this could be done while the plant operated without jeopardizing the plant employees or the public.

Although Rockwell initiated a number of corrective actions and did, in fact, make reasonable progress in correcting the concerns, AL and DOE HQ decided, in early October 1988, that sufficient progress had not been made in radiation protection in Building 771 and that building was shut down. Rockwell prepared a comprehensive corrective action plan coupled with an aggressive restart plan and began a phased restart in January 1989, under close scrutiny of DOE HQ and AL.

A follow-up TSA was conducted in November-December 1988, which focused on the safety performance at all facilities at Rocky Flats, in contrast to prior TSA's which addressed individual buildings. The TSA recognized that the Rocky Flats safety program was in transition and was open to change, which was a marked improvement to the earlier environment. The TSA also recognized that the management initiatives by Rockwell represent a noteworthy first step in what must be a continuing effort that assures safety as a high priority and noted that the major changes initiated can take several years to be effectively embraced. The TSA further noted that substantial corrective actions were underway and that continued progress and heightened safety awareness by Rockwell provide a measure of confidence that the safety upgrades can be effectively implemented.

The Performance Evaluation Review Board (PERB) evaluated Rockwell's performance for the period October 1, 1988, through March 31, 1989, in light of AL's own oversite activities and all the above information using DOE guidelines and standards known at the time the evaluation was performed. Subsequently, much more stringent expectations of contractor performance have been mandated by the Secretary and other DOE policymakers' statements and issuances.

PREDECISIONAL

PREDECISIONAL

Bruce G. Twining 2 JUL 10 1989

In light of these new expectations, if the PERB was to reassess Rockwell's performance for the period October 1, 1988, through March 31, 1989, it would, in all likelihood, recommend a lower overall rating. Therefore, the PERB would not object to Ed Goldberg's proposed overall numerical rating of "87."

Finally, since Mr. Goldberg has been on site for the past several weeks and would, therefore, have a greater insight into current conditions within the plant, we do not believe you are in a position to offer an informed alternative to his proposal.

Charlie:
This is the draft memo which was sent to Mr. Tuck on July 10, 1989.
You may want to sign this memo for our records.
Ted Hill

...rles E. Troell
...rman, Performance Evaluation
...view Board

PREDECISIONAL

Defendant's Supplemental Exhibit 60

UNCLASSIFIED

DOE F 1325 7

Exception to SF 14 Approved by NARS, June 1978

1. INSERT ABOVE, CLASSIFICATION LEVEL, UNCLASSIFIED, OR OFFICIAL USE ONLY

2. MESSAGE CONTAINS WEAPON DATA? ("X" appropriate box. Message Center will not transmit message unless one box is marked.)
☐ YES ☒ NO

U.S. DEPARTMENT OF ENERGY
**TELECOMMUNICATION MESSAGE**
*(See reverse side for Instructions.)*

3. USE WHEN REQUIRED
THIS DOCUMENT CONSISTS OF 10 PAGES
NO ___ OF ___ COPIES, SERIES ___

4. PRECEDENCE DESIGNATION ("X" appropriate box):

| | FOR NORMAL USE | | EMERGENCY USE ONLY | |
|---|---|---|---|---|
| ACTION: | ☐ Routine | ☒ Priority | ☐ Immediate | ☐ FLASH |
| INFO: | ☐ (6 Hrs.) | ☐ (3 Hrs.) | ☐ (30 Mins.) | ☐ (ASAP) |

5. TYPE OF MESSAGE ("X" appropriate box)
☒ Single Address
☐ Multiple Address
☐ Title Address
☐ Book Message

FOR COMMUNICATION CENTER USE
MESSAGE IDENTIFICATION
NR DTG: Z

6. FROM Theetis V. Hill
U. S. Department of Energy
Albuquerque Operations Office
Contracts and Procurement Division

7. OFFICIAL BUSINESS (TIME) A.M. P.M.
(Signature of authorizing official)

8. DATE 8/9/89

9. TO

DOE, HQ
John G. Meinhardt
DP-1/Room 4A-014/FORS
586-2177

COMMUNICATION CENTER ROUTING
69 E 69 P

BE BRIEF - ELIMINATE UNNECESSARY WORDS

10. ORIGINATOR *(On separate lines, enter Name, Routing Symbol, & Tel. No.)*

Hill
CPD
4-9189

11. DERIVATIVELY CLASSIFIED NSI

NATIONAL SECURITY INFORMATION
Unauthorized Disclosure subject to Administrative and Criminal Sanctions.

Derivative Classifier: (Name)
(Title)
Declassify on: (Date or Event. OADR)
Derivatively Classified by (Guide or Source Document)

12. ORIGINALLY CLASSIFIED NSI

NATIONAL SECURITY INFORMATION
Unauthorized Disclosure subject to Administrative and Criminal Sanctions.

Originally Classified by: (Name)
(Title)
Declassify on: (Date or Event OADR)

13. ☐ RESTRICTED DATA
This document contains Restricted Data as defined in the Atomic Energy Act of 1954. Unauthorized disclosure subject to Administrative and Criminal Sanctions.

DERIVATIVE CLASSIFIER

14. ☐ FORMERLY RESTRICTED DATA
Unauthorized disclosure subject to Administrative and Criminal Sanctions. Handle as Restricted Data in Foreign Dissemination Section 144.b Atomic Energy Act, 1954

DERIVATIVE CLASSIFIER

E 002252

LOGGER
J1

CONCURRENCE
3-89-694
RTG. SYMBOL CPD:MDCB:1
INITIALS/SIG. Hill/Cobb
DATE 8/3/89
RTG. SYMBOL CPD
INITIALS/SIG. Bell/Hoya
DATE 8/4/89
RTG. SYMBOL OESH
INITIALS/SIG. Krenz
DATE 8/ /89
RTG. SYMBOL OCW
INITIALS/SIG. Hymer
DATE 8/ /89
RTG. SYMBOL OCC
INITIALS/SIG. Stout
DATE 8/ /89
RTG. SYMBOL OMA
INITIALS/SIG. Hanson
DATE 8/ /89
RTG. SYMBOL OMA
INITIALS/SIG. Trout
DATE 8/8/89
RTG. SYMBOL OOM
INITIALS/SIG. Culpepper
DATE 8/ /89
RTG. SYMBOL OOM
INITIALS/SIG. Twining
DATE 8/ /89

AUG 8 1989

CPD

Award Fee Determination for the Period October 1, 1988, through March 31, 1989, Rockwell International Corporation (RI)

John L. Meinhardt, Acting Assistant Secretary for Defense Programs, DP-1, HQ

Reference is made to my memorandum to Troy E. Wade dated May 31, 1989, regarding Award Fee Determinations for the subject period. Mr. Wade responded on June 21, 1989, concurring in the Albuquerque Operations Office (AL) findings for all AL Management and Operating (M&O) award fee contractors with the exception of RI. He further stated that "it would be premature at this time to make a final determination until the Department of Energy investigation of environmental, safety, and health charges are resolved."

Edward S. Goldberg, Acting Area Manager, Rocky Flats Area Office, has made a review of RI's performance for the first half of FY 1989, and has offered his observations for my consideration in making an Award Fee Determination. Mr. Goldberg's observations relate to three Functional Performance Areas, General Management, Quality, and Environment, Safety, and Health, and are set forth in the attached memorandum dated July 27, 1989. Based upon Mr. Goldberg's on-site review, he has proposed an overall numerical rating of "87" for RI Plant Operations, which equates to an award fee of $3,628,622 or 53.19 percent of the available award fee. Mr. Goldberg concurs with my recommended award fee of $186,591 for the Plutonium Recovery Modification Project/Plutonium Recovery Option Verification Exercise.

As stated in my draft memorandum to John C. Tuck dated July 10, 1989, although I am the Award Fee Determination Official for the RI Contract, Mr. Goldberg's presence on site during the past several weeks has undoubtedly given him considerable insight into current conditions at the Rocky Flats Plant. Given this, I am not in a position to offer an informed alternative to his proposal, especially in view of our changing philosophy in the application of Department of Energy (DOE) performance standards and the level of DOE expectations. Although the proposed change to an overall numerical rating of "87" may seem modest when compared to the previously proposed AL rating of "91.2," the result is a downward adjustment in the dollar award of $1,697,859 (-31.9 percent) due to the steepness of the AL award fee distribution curve which we negotiated with RI in order to optimize RI's performance.

Based upon the above considerations, I propose to approve an award fee of $3,628,622 for RI, subject to your concurrence. The Performance Evaluation Report, as revised to reflect Mr. Goldberg's observations, is attached for your review. The report will be sent to RI when the final Award Fee Determination is made.

E 002253

Please indicate your concurrence/nonconcurrence below. If you have questions or if additional information is required, please let me know.

Original Signed By
BRUCE G TWINING

Bruce G. Twining
Manager

2 Attachments

/__/ Concur /__/ Nonconcur

______________________________
John L. Meinhardt
Acting Assistant Secretary for
Defense Programs

Defendant's Supplemental Exhibit 61

P88

EXECUTIVE SUMMARY

| | |
|---|---|
| SUBJECT: | Award Fee Determination, Rockwell International Corporation |
| Technical Monitor/Division: | Rocky Flats Office |
| Contractor/Contract No: | Rockwell International Corporation/DE-AC04-76DP03533 |
| Action Initiator/Phone: TH | Ted Hill/4-9189 |
| Action Requested: | For Information |

Description/Nature of Action/Background

On August 8, 1989, the Manager, AL, transmitted the Rockwell award fee recommendation for the period October 1, 1988, through March 31, 1989, to John L. Meinhardt, Acting Assistant Secretary for Defense Programs, for his concurrence.

Follow-up with James P. Beiriger, DP-542.1, on August 29, 1989, resulted in the following status report:

1. Ralph Erickson, Acting Director of Weapons Production, DP-23, does not agree with the AL recommendation and has recommended about a 20% reduction.

2. A meeting was held between Admiral Barr, DP-20, David B. Leclaire, DP-50, and James P. Beiriger, DP-542.1, on August 25, 1989, to discuss the recommended 20% reduction. No decision resulted from this meeting.

3. A recommendation is being drafted from Admiral Barr to John L. Meinhardt. However, Admiral Barr is delaying his decision until he determines whether or not those "on high" will support his position.

4. In the meantime, the Office of General Counsel has been drawn into the deliberations because there is some indication that Rockwell is planning some legal action against the Department of Energy.

MOCB:3-89-757

Defendant's Supplemental Exhibit 62

2 Turn To [illegible] Willett

DOE F 1325.8 (12-84)

United States Government — Department of Energy

# memorandum

DATE: SEP 6 1989

REPLY TO ATTN OF: DP-23

SUBJECT: Award Fee Determination for the Period October 1, 1988, through March 31, 1989, Rockwell International Corporation (RI)

TO: Acting Assistant Secretary for Defense Programs, DP-1

The Award Fee Determination Official (Manager, Albuquerque Operations Office), based on Performance Evaluation Review Board reports and a special onsite review, evaluation, and recommendation by Edward Goldberg, Acting Area Manager, has determined that a numerical rating of "87" be given to RI in its performance as operating contractor for the Rocky Flats Plant. The numerical rating of "87" equates to an award fee of $3,815,213 (this includes a recommended award fee of $186,591 for the Plutonium Recovery Modification Project/Plutonium Recovery Option Verification Exercise (PROVE)). The available award fee for the period was $6,822,000.

Although the recommended amount represents only 53.19 percent of the available award fee, I recommend that an additional downward adjustment be made that reflects the environmental, safety, and health (ES&H) situation that existed at the Rocky Flats Plant during the appraisal period.

I base my position on the following points:

1. Cessation of operations in Building 771 in October 1988 due to inadequate safety procedures and radiological safety margins in the building. Although Rockwell pursued a very aggressive corrections effort after the fact, the mere existence of this situation demonstrated less than satisfactory attitudes, procedures, and awareness for safety on the part of Rockwell.

2. Ninety one out of 230 safety concerns documented by external reviews (as well as by an internal Rockwell review) remained open during the period. Again, this indicates that a lack of priority attention was being paid to safety and health by Rockwell.

3. During the period, 32 new safety concerns, including 6 classified as Type 2 (serious), were identified.

4. An inoperable alarm system was not repaired and eventually was a factor in a major environmental incident on April 13, 1989, when chromic acid was released from Building 444 and contaminated the plant's holding ponds.

Overall, I believe there is strong evidence that throughout the appraisal period there was a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities.

I recommend, therefore, the "moderately good" numerical grade of 79 given to RI for its performance under the ES&H category be downgraded to a numerical grade of 66. Since ES&H carries an evaluation weight of 20 percent, the adjusted weighted score would now be 13.2 (66 X 20). The weighted score awarded by Mr. Goldberg was 15.80. The adjusted overall rating will now be 84.4. This equates to an award fee of $2,757,126. I totally support the award fee of $186,591 for PROVE. I, therefore, recommend awarding RI a fee of $2,943,717.

J. M. Barr
Rear Admiral, U.S. Navy
Deputy Assistant Secretary
for Military Application
Defense Programs

# Defendant's Supplemental Exhibit 63

PAGES: 2 (not counting cover page)

DATE: 9/20/89

TO: Jim Culpepper
DOE Albuquerque Opns.

FROM: John Meinhardt, DP-1
DOE Washington

NOTE: Sender, please contact receiver to pick up message !

| LOCATION | FAX NO. | NOTES |
|---|---|---|
| FSTL DP-20 | 586-7260 | Bonnie — Please pass this to Mr. Culpepper as Mr. Meinhardt has requested. Thanks Tim Pflaum |
| GTN DP-20 | 353-5850 | |
| GTN DP-22 | 353-6417 | |
| GTN DP-32 | 353-6133 | |
| GTN DP-34 | 353-4164 | |
| GTN DP-50 | 353-2965 | |
| AL | 8-844-4197 | |
| CH | 8-972-2527 | |
| ID | 8-583-1184 | |
| OR | 8-626-1063 | |
| NV | 8-575-1371 | |
| RL | 8-444-8153 | |
| SAN | 8-536-6647 | |
| SR | 8-239-1259 | |

DRAFT

DP-23

Award Fee Determination for the Period October 1, 1988, through March 31, 1989, Rockwell International Corporation (RI)

Acting Assistant Secretary for Defense Programs, DP-1

The Award Fee Determination Official (Manager, Albuquerque Operations Office), based on Performance Evaluation Review Board reports and a special onsite review, evaluation, and recommendation by Edward Goldberg, Acting Area Manager, has determined that a numerical rating of "87" be given to RI in its performance as operating contractor for the Rocky Flats Plant. The numerical rating of "87" equates to an award fee of $3,815,213 (this includes a recommended award fee of $186,591 for the Plutonium Recovery Modification Project/Plutonium Recovery Option Verification Exercise (PROVE)). The available award fee for the period was $6,822,000.

Although the recommended amount represents only 53.19 percent of the available award fee, I recommend that an additional downward adjustment be made that reflects the environmental, safety, and health (ES&H) situation that existed at the Rocky Flats Plant during the appraisal period.

I base my position on the following points:

1. Cessation of operations in Building 771 in October 1988 due to inadequate safety procedures and radiological safety margins in the building. Although Rockwell pursued a very aggressive corrections effort after the fact, the existence of this situation indicated a less than satisfactory attitude, procedures, and awareness for safety on the part of Rockwell.

2. Ninety one out of 230 safety concerns documented by external reviews (as well as by an internal Rockwell review) remained open during the period. Again, this indicates that a lack of priority attention was being paid to safety and health by Rockwell.

3. During the period, 32 new safety concerns, including 6 classified as Type 2 (serious), were identified.

4. A major environmental incident occurred during the period when chromic acid was released from Building 444 and contaminated the plant's holding ponds. An inoperable alarm system and deficient operator vigilance contributed significantly to the seriousness of this incident.

Should be substituted for 1st ES&H paragraph of your attachment

E 001469

Overall, I believe there is strong evidence that throughout the appraisal period there was a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities.

I recommend, therefore, the "moderately good" numerical grade of 79 given to RI for its performance under the ES&H category be downgraded to a numerical grade of 65.25. Since ES&H carries an evaluation weight of 20 percent, the adjusted weighted score would now be 13.05 (65.25 X 20). The weighted score awarded by Mr. Goldberg was 15.80. The adjusted overall rating will now be 84.75. This equates to an award fee of $2,716,307. I totally support the award fee of $186,591 for PROVE. I, therefore, recommend awarding RI a fee of $2,902,898.

This review was based on limited staff and limited review time; future award fee reviews will be conducted in a more rigorous fashion by my staff.

J. M. Barr
Rear Admiral, U.S. Navy
Deputy Assistant Secretary
for Military Application
Defense Programs

DP-231:JMarchetti:bc:3-3487:8/28/89(Bonnie HDD--erick15)

Distribution:
so: Addressee
6bcc: Std DASMA

Correspondence Reviewer ________

*PREVIOUS COORDINATION VALID.

Defendant's Supplemental Exhibit 64

UNITED STATES COURT OF FEDERAL CLAIMS

ROCKWELL INTERNATIONAL )
CORPORATION, )
)
)
Plaintiff, )
)
vs. ) No. 91-1362 C
) (Judge Yock)
UNITED STATES OF AMERICA, )
)
)
Defendant. )

DEPOSITION OF:

CHARLES EDWARD TROELL

Tuesday, March 2, 1993

9:30 A.M.

Reported by:

BARBARA K. HARRIS

CSR # 93

handbook, was actually part of a headquarters task force that did a fairly thorough look at the award fee possess for DOE and made several recommendations to enhance it.

Q. Were the individuals at Albuquerque who were involved in the award fee process at liberty to deviate from the handbook as they wished?

A. I would view the handbook as a guidance document, especially in a period of transition where the department is changing its award fee process.

Q. So anybody in the Albuquerque Division who thought it was a good idea to deviate from the handbook was free to do so?

A. The PERB, I believe, was free to use the document as guidance and then do what they thought was right in a specific circumstance.

Q. So if the --

A. This doesn't say order. It doesn't say -- I haven't read it. But the handbook is a guidance document.

Q. So if the handbook said one thing, the PERB was free to do something else if they thought it was sensible under the circumstances?

MR. KOLAR: Could you be more specific about instances, examples?

MR. NYE: I will get to that, but right now I am just asking generally.

I don't believe it was ever signed. It may have been.

Q. Let me draw your attention to the handwriting on the second page of the memorandum.

A. Yes.

Q. Which I believe says, "Charlie, this is the draft memo which was sent to Mr. Tuck on July 10, 1989. You may want to sign the memo for our records. Ted Hill." Does that refresh your recollection as to whether you ever did sign this memorandum?

A. No, it doesn't. I really can't remember whether I did sign it. I remember the process of going through it, Bill, but I just -- I can remember, for example, Twining called me in one day and he says, "Hey, you have seen some of the new input that we have gotten from other folks, including Goldberg, and he said, in light of that, if you were to reassess the performance now, would you come up with a different answer than you did with the information that was available to you at the time the PERB worked before?"

And I said, "Yeah, there is additional information, in fact, we didn't have in our possession at the time that we did it, and it probably would lower the overall rating and performance grade." Because Goldberg and company looked a lot more carefully and a lot more specifically at some areas than we had available to us in the normal process that preceded that.

Defendant's Supplemental Exhibit 65

**Department of Energy**
Washington, DC 20585

P103

September 20, 1989

MEMORANDUM FOR Bruce G. Twining
Manager
Albuquerque Operations Office

SUBJECT: Award Fee Determination for the Period October 1, 1988 through March 31, 1989, Rockwell International Corporation (RI).

Reference is made to your memorandum to me dated August 8, 1989, on this same subject. This Office has carefully reviewed all of the documentation provided by your Office regarding the Award Fee Determination for the period in question. The Office is essentially in concurrence with your recommendations, with an additional downward adjustment in the area of Environment, Safety and Health (ES&H).

The additional downward adjustment to ES&H reflects several concerns. Operations in Building 771 had to be stopped during October 1988 due to inadequate safety procedures and radiological safety margins in the building. Although RI pursued a very aggressive corrections effort after the fact, the mere existence of this situation demonstrated less than satisfactory attitudes, procedures, and awareness of safety issues on its part. Out of 230 safety concerns documented by external reviews and an internal RI review done prior to the award fee period, 91 were not addressed during the period. This further evidences a lack of priority attention paid to ES&H. During the period, 32 new safety concerns, including six classified as Type 2 (serious), were identified. Finally, the release of chromic acid from Building 444 into the plant's holding ponds could have resulted in a major environmental incident. An inoperable alarm system and deficient operator vigilance contributed significantly to the seriousness of this incident. Overall, there is strong evidence that throughout the award fee period there was a continuing pattern of lax attitudes, inadequate procedures, and lack of consideration of ES&H issues.

My Office has concluded that the "moderately good" numerical grade of 79 given to RI for its performance under the ES&H category be downgraded to a numerical grade of 65.25. Since ES&H carries an evaluation weight of 20 percent, the overall rating for the period drops from 87 to 84.25. This equates to an award fee of $2,716,307 for the Plant. We have not changed the award fee of $186,591 for PRMP/PROVE. Therefore, the total fee is $2,902,898. Admiral Watkins concurs in this recommendation.

99 120

In order to facilitate the dissemination of this information to RI and coordinate it with the letter from Admiral Watkins to Chairman Beall of today's date, we have attached a copy of your draft letter to RI which reflects our concerns in the ES&H area.

John L. Meinhardt
Acting Assistant Secretary
for Defense Programs

Attachment

Mr. Dominick J. Sanchini
President
Rocky Flats Plant
North American Space Operations
Rockwell International Corporation
P.O. Box 464
Golden, CO 80402

Dear Mr. Sanchini:

In accordance with Appendix D of Contract DE-AC04-76DP03533, I hereby determine that Rockwell International Corporation (Rockwell) has earned an award fee of $2,716,307 for Plant and $186,591 for PRMP/PROVE, for a total of $2,902,898. The enclosed Performance Evaluation Report for the period October October 1, 1988 through March 31, 1989 and a Memorandum from the Acting Assistant Secretary for Defense Programs, provide the basis for my award fee determination.

The award fee approved by the Department for payment to Rockwell was pursuant to an award fee plan previously developed to cover the period October 1, 1988 to March 31, 1989. This was prior to the institution by the Department of stronger and tougher award fee plans to reward improvements in environment, safety and health (ES&H) and substantially increase the proportion of the fee attributable to ES&H performance. Under the old contract provisions, however, the Department was constrained as to the weight that might be given to ES&H performance in setting the fee for the six month period covered.

In the old award fee plan, which includes this period, up to 20% of the total amount of fee paid could be attributable to performance in the ES&H area. By reducing the award fee for ES&H to "Unsatisfactory", the Department is indicating to Rockwell that your ES&H performance is unacceptable. Under the new plan, failure in any important area may result in the payment of no award fee.

As specified in the Contract, you may, within five working days after receipt of this letter, request an opportunity to present to me, or my designee, an analysis of your performance under the Contract. Otherwise, you may withdraw funds as a net award fee in the above amount from your Special Bank Account.

If you wish to meet with me, or my designee, please contact the Rocky Flats Area Office which will coordinate those arrangements for you.

Sincerely,

Bruce G. Twining
Manager

Enclosures

Defendant's Supplemental Exhibit 66

EXP174

UNITED STATES

DEPARTMENT OF ENERGY

AWARD FEE DETERMINATION

PLANT

CONTRACT NO.: DE-AC04-76DP03533

CONTRACTOR: Rockwell International Corporation

PERIOD: October 1, 1988 - March 31, 1989

I hereby determine an award fee of $2,~~903~~,215. This determination is based on the attached memorandum from John L. Meinhardt, Acting Assistant Secretary for Defense Programs, and the attached Performance Evaluation Report.

Bruce G. Twining
Manager
Albuquerque Operations Office
Award Fee Determination Official

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL
FOR PERIOD OCTOBER 1, 1988 THROUGH MARCH 31, 1989

PRMP/PROVE

| FUNCTIONAL PERFORMANCE AREA | PREVIOUS 6 MONTHS | | CURRENT 6 MONTHS RECOMMENDED WEIGHTING | | |
|---|---|---|---|---|---|
| | WEIGHT | RATING | WEIGHT | RATING | GRADE |
| PROJECT MANAGEMENT | 0 | 0 | .25 | 75 | 18.75 |
| COST MANAGEMENT | 0 | 0 | .15 | 76 | 11.40 |
| SCHEDULE PERFORMANCE | 0 | 0 | .15 | 86 | 12.90 |
| SUBCONTRACT MANAGEMENT | 0 | 0 | .20 | 82 | 16.40 |
| DESIGN QUALITY | 0 | 0 | .15 | 78 | 11.70 |
| TECHNICAL PRODUCT QUALITY | 0 | 0 | .10 | 76 | 7.60 |
| TOTAL | 0 | 0 | 1.00 | | 78.75 |

| PERFORMANCE POINTS EARNED | AWARD FEE PER POINT | AWARD FEE |
|---|---|---|
| 0 - 70 | $ -0- | $ -0- |
| 71 - 75 | 15,509 x 5.0 | 77,545 |
| 76 - 80 | 29,079 x 3.75 | 109.046 |
| | | $186,591 |

| BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|
| $53,850 | $186,591 | $240,441 |

| BASE FEE | MAXIMUM AF | TOTAL |
|---|---|---|
| $53,850 | $969,300 | $1,023,150 |

% ACTUAL AWARD FEE VX. MAXIMUM AWARD FEE 19.25%

% OF TOTAL ACTUAL FEES VS. TOTAL MAXIMUM FEES 23.50%

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL
FOR PERIOD OCTOBER 1, 1988 THROUGH MARCH 31, 1989

PLANT

| FUNCTIONAL PERFORMANCE AREA | PREVIOUS 6 MONTHS | | CURRENT 6 MONTHS RECOMMENDED WEIGHTING | | |
|---|---|---|---|---|---|
| | WEIGHT | RATING | WEIGHT | RATING | GRADE |
| GENERAL MANAGEMENT | .25 | 92 | .25 | 81 | 20.25 |
| COST MANAGEMENT | .15 | 97 | .15 | 95 | 14.25 |
| QUALITY | .15 | 97 | .15 | 88 | 13.20 |
| CHEMICAL OPERATIONS | .10 | 84 | .10 | 91 | 9.10 |
| PRODUCTION OPERATIONS | .15 | 97 | .15 | 96 | 14.40 |
| ENVIRONMENT, SAFETY AND HEALTH | .20 | 81 | .20 | 65.25 | 13.05 |
| TOTAL | 1.00 | 91.25 | 1.00 | | 84.25 |

| PERFORMANCE POINTS EARNED | AWARD FEE PER POINT | AWARD FEE |
|---|---|---|
| 0 - 70 | $ -0- | $ -0- |
| 71 - 75 | 109,152 x 5.0 | 545,760 |
| 76 - 80 | 204,660 x 5.0 | 1,023,300 |
| 81 - 85 | 270,015 x 4.25 | 1,147,564 |
| | | $2,716,624 |

| BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|
| $379,000 | $2,716,624 | $3,095,624 |

| BASE FEE | MAXIMUM AF | TOTAL |
|---|---|---|
| $379,000 | $6,822,000 | $7,201,000 |

% ACTUAL AWARD FEE VS. MAXIMUM AWARD FEE 39.8%

% OF TOTAL ACTUAL FEES VS. TOTAL MAXIMUM FEES 43.0%

UNITED STATES

DEPARTMENT OF ENERGY

AWARD FEE DETERMINATION

PRMP/PROVE

CONTRACT NO.: DE-AC04-76DP03533

CONTRACTOR: Rockwell International Corporation

PERIOD: October 1, 1988 - March 31, 1989

I hereby determine an award fee of $ 186,591 . This determination is based on the attached Performance Evaluation Report.

Bruce G. Twining
Manager
Albuquerque Operations Office
Award Fee Determination Official

PERFORMANCE EVALUATION
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD OCTOBER 1, 1988 - MARCH 31, 1989

The overall performance of Rockwell International Corporation (Rockwell) has been maintained at least at a level of "Satisfactory" during the period October 1, 1988, through March 31, 1989.

The following is an evaluation of the performance of Rockwell, relative to the management and operation of the Rocky Flats Plant, including the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the Functional Performance Areas (FPA's) selected for award fee evaluation. The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's for Plant operations have been evaluated in accordance with the contract Award Fee Plan, and the following discussion of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

PLANT

GENERAL MANAGEMENT: Significant improvement has been made in many important Plant functions during the appraisal period. While continued improvement is needed in many areas, Rockwell has done a remarkable job of pushing for and achieving recent improvements under extreme pressure. Interplant schedule compliance continued at 100% for the third consecutive rating period. There was a rapid resolution to the problem of obtaining United States Department of Transportation approval for using a modified ATMX railcar for making the first shipment of Transuranic mixed waste in 1989. The Emergency Preparedness organization has a well-planned and effective program, is involved in Albuquerque Operations Office (AL)-wide coordination activities, and continues to make improvements. A Rockwell "We Do Care" program was developed to address the maintenance work order backlog. In less than four years, Rockwell has exceeded a ten-year Energy Conservation Goal. In addition, Rockwell completed an automated logging system in all major production and support buildings. Inadequate project staffing for the PRMP continues to influence Rockwell's performance.

COST MANAGEMENT: Good data and narratives provided by Rockwell to define Department of Energy (DOE) unfunded Environment, Safety, and Health requirements in an FY89 supplemental budget request were also used to support DOE requests to Congress for additional FY90 funding. Rockwell has done an extraordinary job of tracking information and preparing responses to a large variety of budget information requests and of maintaining the current status of its requirements. In addition, construction project data sheets and conceptual design reports supporting Capital Budget requests were both of high quality and ahead of schedule. Budget narratives were improved and expanded and were helpful in DOE's analysis of Rockwell's resource requirements.

QUALITY: Significant progress has been made towards implementing the Non-weapons Quality Assurance (NWQA) NQA-1 Standard at Rocky Flats. More specifically, NWQA activities conducted during the Building 771 restart have resulted in a significantly improved quality program to be used in the operation of the building. For War Reserve Quality Assurance, Rockwell is implementing Phase 2 of the Quality Improvement Plan which will continue a new culture in quality practices and should lead to further improvement in the Quality Assurance program. In Nondestructive Testing, an alert technician identified an anomaly in the X-ray film which lead to the detection of a defective process in another AL plant. This kind of effort reflects a work ethic that ensures a quality product for the DOE.

There were three incidents which came to DOE's attention where Rockwell failed to provide the necessary measures to adequately control nonconforming product material.

CHEMICAL OPERATIONS: Noteworthy progress has been made towards the implementation of the Operational Readiness Review (ORR) program as demonstrated through ORR's in Building 771 and elsewhere. Rockwell has also successfully completed the development of a new extractant compound for use in the Molton Salt Extraction process. Both of these accomplishments will yield safer and more controlled production processes while maintaining or improving production performance.

PRODUCTION OPERATIONS: Significant progress has been made on the number one priority for this year, excellence in facility operations, by the development of a Nuclear Facility Operations Manual and the active support of the AL effort to develop an Operational Surety Program. Rockwell has taken several steps to reduce work in process inventories and process times by, among other things, reduced planned process times in Building 460, reduced pit assembly process time in Building 707, and reduced lot sizes on the 3T bodies.

ENVIRONMENT, SAFETY, AND HEALTH: Progress towards achieving a high quality training program and the establishment of a new pilot radiation safety course are among the notable achievements in the radiation protection area. Rockwell has demonstrated good responsiveness in the preparation and coordination on National Emissions Standards for Hazardous Air Pollutants issues specific to the Rocky Flats Plant and has contributed to the DOE-wide review of this regulation. Significant progress has been made towards reducing the rate of radiological incidents. Several positive steps have been taken towards achievement of a permanent reduction in plant personnel radiation exposure. In the safety program, substantial corrective actions are underway, including the development of an integrated safety program. A Safety Review Group has been established and its efforts during the period were commendable.

The shutdown of Building 771, resulting despite earlier identification of safety problems, created major disruptions to the commitments for processing of plutonium. An unintentional release of dilute chromic acid revealed inadequate procedures for the reporting and coordination of discovered releases to the sewage treatment plant with downstream control of contamination. Rockwell's housekeeping of production buildings has not improved adequately. Although a downward trend has been achieved during the first five months of FY89, no significant progress in reducing the wound rate has yet occurred. Rockwell has been unable to resolve the 1988 National Pollutant Discharge Elimination System permit violations for five-day biochemical oxygen demand. Regarding the East Firing Range, Rockwell has taken no action to date in response to concerns about its safe operation. The ES&H management oversight of Building 771 operations after the January 19, 1989, phased restart was inadequate.

PRMP/PROVE

PROJECT MANAGEMENT: Rockwell has given PROVE renewed emphasis by separating responsibility for PROVE from that of the PRMP and placing it under a full-time project manager. The recently implemented "Precursor Plan" represents an improvement in direction for the entire project and was implemented with professionalism and enthusiasm.

Overall PRMP management attention to project technical, cost, schedule, and manpower need was inadequate. In addition, inadequate project staffing continues to influence Rockwell's performance.

COST MANAGEMENT: Cost development and baselining of costs for the "Precursor Plan" have been handled with the highest degree of quality. Rockwell's redirection of J. A. Jones' manpower planning on PROVE resulted in reduced costs and apparent increased construction productivity.

PROVE continues to demonstrate cost growth. PRMP cost planning far exceeded available project funding allocations.

SCHEDULE PERFORMANCE: Rockwell has successfully resolved several problems which were impacting schedule in the PROVE area. The diligent effort by Rockwell, Bechtel, and J. A. Jones in the joint development of the Precursor planning has resulted in a comprehensive schedule that should provide a smooth transition from PROVE to the receipt of capital funding for PRMP.

The PROVE schedule has deteriorated during the reporting period, extending the PROVE end date from 1/90 to 8/90.

SUBCONTRACT MANAGEMENT: Rockwell, consistent with project technical needs and evolved cost and schedules, has provided rapid and effective subcontract redirection of Bechtel. Rockwell subcontract management of J. A. Jones has ensured J. A. Jones' participation in construction planning. Rockwell has been successful in obtaining active participation and commitment from the National Laboratories and other Rockwell organizations on the PRMP Precursor Program.

The subcontract work with the PROVE glovebox manufacturer has resulted in the need for significant rework to the glovebox piping and piping penetration welds. Line Item and cost/schedule activities over the balance of the FY89 demand that Rockwell provide continuous site representation at Bechtel.

DESIGN QUALITY: The Precursor Program, geared toward improving PRMP design quality, has been initiated with broad based involvement. Use of the Configuration Control System for PROVE has been greatly improved.

The quality of the existing PROVE engineering has been poor, and change orders to correct poor initial design quality are reflected in cost growth.

TECHNICAL PRODUCT QUALITY: PROVE activities in addressing and rectifying glovebox welding problems are directed towards, and should significantly improve, technical product quality.

Welding problems recently surfacing on the PROVE glovebox indicate a significant lack of technical product quality success.

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL
FOR PERIOD OCTOBER 1, 1988 THROUGH MARCH 31, 1989

PLANT

| FUNCTIONAL PERFORMANCE AREA | PREVIOUS 6 MONTHS WEIGHT | PREVIOUS 6 MONTHS RATING | CURRENT 6 MONTHS RECOMMENDED WEIGHTING WEIGHT | RATING | GRADE |
|---|---|---|---|---|---|
| GENERAL MANAGEMENT | .25 | 92 | .25 | 92 | 23.00 |
| COST MANAGEMENT | .15 | 97 | .15 | 95 | 14.25 |
| QUALITY | .15 | 97 | .15 | 95 | 14.25 |
| CHEMICAL OPERATIONS | .10 | 84 | .10 | 91 | 9.10 |
| PRODUCTION OPERATIONS | .15 | 97 | .15 | 96 | 14.40 |
| ENVIRONMENT, SAFETY AND HEALTH | .20 | 81 | .20 | 81 | 16.20 |
| TOTAL | 1.00 | 91.25 | 1.00 | | 91.20 |

| PERFORMANCE POINTS EARNED | AWARD FEE PER POINT | AWARD FEE |
|---|---|---|
| 0 - 70 | $ -0- | $ -0- |
| 71 - 75 | 109,152 x 5.0 | 545,760 |
| 76 - 80 | 204,660 x 5.0 | 1,023,300 |
| 81 - 85 | 270,015 x 5.0 | 1,350,075 |
| 86 - 90 | 354,744 x 5.0 | 1,773,720 |
| 91 | 532,457 x 1.0 | 532,457 |
| 92 | 505,851 x 0.2 | 101,170 |
| | | $5,326,482 |

| BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|
| $379,000 | $5,326,482 | $5,705,482 |

| BASE FEE | MAXIMUM AF | TOTAL |
|---|---|---|
| $379,000 | $6,822,000 | $7,201,000 |

% ACTUAL AWARD FEE VX. MAXIMUM AWARD FEE 78.08%

% OF TOTAL ACTUAL FEES VS. TOTAL MAXIMUM FEES 79.23%

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL
FOR PERIOD OCTOBER 1, 1988 THROUGH MARCH 31, 1989

PRMP/PROVE

| FUNCTIONAL PERFORMANCE AREA | PREVIOUS 6 MONTHS | | CURRENT 6 MONTHS RECOMMENDED WEIGHTING | | |
|---|---|---|---|---|---|
| | WEIGHT | RATING | WEIGHT | RATING | GRADE |
| PROJECT MANAGEMENT | 0 | 0 | .25 | 75 | 18.75 |
| COST MANAGEMENT | 0 | 0 | .15 | 76 | 11.40 |
| SCHEDULE PERFORMANCE | 0 | 0 | .15 | 86 | 12.90 |
| SUBCONTRACT MANAGEMENT | 0 | 0 | .20 | 82 | 16.40 |
| DESIGN QUALITY | 0 | 0 | .15 | 78 | 11.70 |
| TECHNICAL PRODUCT QUALITY | 0 | 0 | .10 | 76 | 7.60 |
| TOTAL | 0 | 0 | 1.00 | | 78.75 |

| PERFORMANCE POINTS EARNED | AWARD FEE PER POINT | AWARD FEE |
|---|---|---|
| 0 - 70 | $ -0- | $ -0- |
| 71 - 75 | 15,509 x 5.0 | 77,545 |
| 76 - 80 | 29,079 x 3.75 | 109.046 |
| | | $186,591 |

| BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|
| $53,850 | $186,591 | $240,441 |

| BASE FEE | MAXIMUM AF | TOTAL |
|---|---|---|
| $53,850 | $969,300 | $1,023,150 |

% ACTUAL AWARD FEE VX. MAXIMUM AWARD FEE 19.25%

% OF TOTAL ACTUAL FEES VS. TOTAL MAXIMUM FEES 23.50%

Defendant's Supplemental Exhibit 67

Y60

**Department of Energy**
Albuquerque Operations Office
P. O. Box 5400
Albuquerque, New Mexico 87115

SEP 27 1989

Mr. Dominick J. Sanchini
President
Rocky Flats Plant
North American Space Operations
Rockwell International Corporation
P. O. Box 464
Golden, CO 80402

Dear Mr. Sanchini:

In accordance with Appendix D of Contract DE-AC04-76DP03533, the Department of Energy (DOE) hereby determines that Rockwell International Corporation (Rockwell) has earned an award fee of $2,716,624 for Plant and $186,591 for PRMP/PROVE, for a total of $2,903,215. The enclosed Performance Evaluation Report for the period October 1, 1988 through March 31, 1989, and a Memorandum from the Acting Assistant Secretary for Defense Programs, provide the basis for the DOE award fee determination.

The award fee approved by the DOE for payment to Rockwell was pursuant to an award fee plan previously developed to cover the period October 1, 1988 to March 31, 1989. This was prior to the institution by the DOE of stronger and tougher award fee plans to reward improvements in environment, safety, and health (ES&H) and substantially increase the proportion of the fee attributable to ES&H performance. Under the old contract provisions, however, the DOE was constrained as to the weight that might be given to ES&H performance in setting the fee for the six month period covered.

In the old award fee plan, which includes this period, up to 20% of the total amount of fee paid could be attributable to performance in the ES&H area. By reducing the award fee for ES&H to "Unsatisfactory," the DOE is indicating to Rockwell that your ES&H performance is unacceptable. Under the new plan, effective for performance after October 1, 1989, failure in any important area critical to contract performance may result in the payment of no award fee.

As specified in the Contract, you may, within five working days after receipt of this letter, request an opportunity to present to the DOE an analysis of your performance under the Contract. Otherwise, you may withdraw funds as a net award fee in the above amount from your Special Bank Account.

If you wish to meet with the DOE, please contact the Rocky Flats Office which will coordinate those arrangements for you.

Sincerely,

Bruce G. Twining
Manager

Enclosures

cc w/enclosures:
David P. Simonson, Area Manager, RFO

PERFORMANCE EVALUATION
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD OCTOBER 1, 1988 - MARCH 31, 1989

The overall performance of Rockwell International Corporation (Rockwell) has been maintained at least at a level of "Satisfactory" during the period October 1, 1988, through March 31, 1989.

The following is an evaluation of the performance of Rockwell, relative to the management and operation of the Rocky Flats Plant, including the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the Functional Performance Areas (FPA's) selected for award fee evaluation. The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's for Plant operations have been evaluated in accordance with the contract Award Fee Plan, and the following discussion of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

PLANT

<u>GENERAL MANAGEMENT</u>: There was a rapid resolution to the problem of obtaining United States Department of Transportation (DOT) approval for using a modified ATMX railcar for making the first shipment of Transuranic mixed waste in 1989. Interplant schedule compliance continued at 100% for the third consecutive rating period. The Emergency Preparedness organization has a well-planned and effective program, is involved in Albuquerque Operations Office (AL)-wide coordination activities, and continues to make improvements. In less than four years, Rockwell has exceeded a ten-year Energy Conservation Goal.

Rockwell has not made adequate progress to prepare for utilization of the TRUPACT II container when it becomes available. The identification and timely resolution of problems by Rockwell is often slow. Rockwell has recently violated DOT regulations on two shipments to the Nevada Test Site. Despite the knowledge that nitrate concentrations on the 750 pad have increased, little action has been taken to contain saltcrete after precipitation events. Rockwell is still not placing sufficient emphasis on the timely establishment of the Rocky Flats Institute. Inadequate project staffing for the PRMP continues to influence Rockwell's performance.

<u>COST MANAGEMENT</u>: Good data and narratives provided by Rockwell to define Department of Energy (DOE) unfunded Environment, Safety, and Health requirements in an FY89 supplemental budget request were also used to support DOE requests to Congress for additional FY90 funding. Rockwell has done an extraordinary job of tracking information and preparing responses to a large variety of budget information requests and of maintaining the current status of its requirements. In addition, construction project data sheets and conceptual design reports supporting Capital Budget requests were both of high quality and ahead of schedule. Budget narratives were improved and expanded and were helpful in DOE's analysis of Rockwell's resource requirements.

QUALITY: Non-Weapons Quality Assurance activities conducted during the Building 771 restart have resulted in an improved quality program to be used in the operation of the building. For War Reserve Quality Assurance, Rockwell is implementing Phase 2 of the Quality Improvement Plan which will continue a new culture in quality practices and should lead to further improvement in the Quality Assurance program.

Rockwell failed to establish or make the necessary progress towards the establishment of a new standard of excellence and attendant requirements, procedures, and practices in nuclear facility operations. In addition, three incidents came to DOE's attention where Rockwell failed to provide the necessary measures to adequately control nonconforming product material.

CHEMICAL OPERATIONS: Noteworthy progress has been made towards the implementation of the Operational Readiness Review (ORR) program as demonstrated through ORR's in Building 771 and elsewhere. Rockwell has also successfully completed the development of a new extractant compound for use in the Molton Salt Extraction process. Both of these accomplishments will yield safer and more controlled production processes while maintaining or improving production performance.

PRODUCTION OPERATIONS: Significant progress has been made in the development of a Nuclear Facility Operations Manual. Rockwell has been supportive of the AL effort to develop an Operational Surety Program. Rockwell has taken several steps to reduce work in process inventories and process times by, among other things, reduced planned process times in Building 460, reduced pit assembly process time in Building 707, and reduced lot sizes on the 3T bodies.

ENVIRONMENT, SAFETY, AND HEALTH: Throughout the appraisal period, there was strong evidence of a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities. The operations in Building 771 were ceased in October 1988 due to inadequate safety procedures and radiological safety margins in the Building. Although Rockwell pursued a very aggressive corrections effort after the fact, the existence of this situation indicated a less than satisfactory attitude, procedures, and awareness for safety on the part of Rockwell. Ninety-one out of 230 safety concerns documented by external reviews (as well as by an internal Rockwell review) remained open during the period. Again, this indicates that a lack of priority attention was being paid to safety and health by Rockwell. During the period, 32 new safety concerns, including six classified as Type 2 (serious), were identified. A major environmental incident occurred during the period when chromic acid was released from Building 444 and contaminated the Plant's holding ponds. An inoperable alarm system and deficient operator vigilance contributed significantly to the seriousness of this incident.

PRMP/PROVE

PROJECT MANAGEMENT: Rockwell has given PROVE renewed emphasis by separating responsibility for PROVE from that of the PRMP and placing it under a full-time project manager. The recently implemented "Precursor Plan" represents an improvement in direction for the entire project and was implemented with professionalism and enthusiasm.

Overall PRMP management attention to project technical, cost, schedule, and manpower need was inadequate. In addition, inadequate project staffing continues to influence Rockwell's performance.

COST MANAGEMENT: Cost development and baselining of costs for the "Precursor Plan" have been handled with the highest degree of quality. Rockwell's redirection of J. A. Jones' manpower planning on PROVE resulted in reduced costs and apparent increased construction productivity.

PROVE continues to demonstrate cost growth. PRMP cost planning far exceeded available project funding allocations.

SCHEDULE PERFORMANCE: Rockwell has successfully resolved several problems which were impacting schedule in the PROVE area. The diligent effort by Rockwell, Bechtel, and J. A. Jones in the joint development of the Precursor planning has resulted in a comprehensive schedule that should provide a smooth transition from PROVE to the receipt of capital funding for PRMP.

The PROVE schedule has deteriorated during the reporting period, extending the PROVE end date from 1/90 to 8/90.

SUBCONTRACT MANAGEMENT: Rockwell, consistent with project technical needs and evolved cost and schedules, has provided rapid and effective subcontract redirection of Bechtel. Rockwell subcontract management of J. A. Jones has ensured J. A. Jones' participation in construction planning. Rockwell has been successful in obtaining active participation and commitment from the National Laboratories and other Rockwell organizations on the PRMP Precursor Program.

The subcontract work with the PROVE glovebox manufacturer has resulted in the need for significant rework to the glovebox piping and piping penetration welds. Line Item and cost/schedule activities over the balance of the FY89 demand that Rockwell provide continuous site representation at Bechtel.

DESIGN QUALITY: The Precursor Program, geared toward improving PRMP design quality, has been initiated with broad based involvement. Use of the Configuration Control System for PROVE has been greatly improved.

The quality of the existing PROVE engineering has been poor, and change orders to correct poor initial design quality are reflected in cost growth.

TECHNICAL PRODUCT QUALITY: PROVE activities in addressing and rectifying glovebox welding problems are directed towards, and should significantly improve, technical product quality.

Welding problems recently surfacing on the PROVE glovebox indicate a significant lack of technical product quality success.

Defendant's Supplemental Exhibit 68

United States Government Department of Energy

# memorandum

Albuquerque Operations Office

DATE: November 8, 1989

REPLY TO ATTN OF: OCC (James A. Stout/FTS 844-7265)

SUBJECT: Approval of Draft Response to Rockwell International's October 25, 1989 Letter

TO: J. L. Meinhardt, Acting Principal Deputy Assistant Secretary for Defense Programs, DP-2, HQ

ISSUE/ACTION STATEMENT

- Rockwell International Corporation, the Management and Operating contractor for the Department of Energy (DOE) Rocky Flats Plant (RFO), has requested in their letter dated October 25, 1989, that DOE reconsider the award fee determination for the period October 1, 1988 to March 31, 1989.
- AL has evaluated both Rockwell's written and verbal justification for increasing the amount of award fee and requests Headquarter's approval to send the attached draft letter which sets forth DOE's final award fee determination.

TIMING

- In accordance with the terms of the DOE/Rockwell contract, a final award fee determination must be provided to Rockwell by November 14, 1989.

DISCUSSION

- The Manager, AL, provided Rockwell with DOE's award fee determination in a letter dated September 27, 1989.
- Rockwell, upon receiving the award fee determination requested, in accordance with the terms of the contract, that they be provided an opportunity to provide an analysis of their performance. Rockwell provided their written analysis in a letter dated October 25, 1989, from Dominick J. Sanchini, President, to David P. Simonson, Manager, RFO. A verbal presentation was made by Rockwell on October 30, 1989, to AL officials James A. Stout, Chief Counsel and Charles C. Troell, Assistant Manager for Management and Administration.
- The amount of award fee determined by DOE for the period October 1, 1988 to March 31, 1989, is a significantly lesser amount than Rockwell has earned for previous performance periods. They feel that the

amount of award fee does not properly reflect their level of performance during the period for the following reasons:

1. DOE personnel that were not fully knowledgeable of Rockwell's performance influenced DOE's performance evaluations.

2. New evaluation criteria based upon "external pressure, jurisdictional disputes, sensational allegations from a government investigation, and the current political climate" were utilized.

CONCERNS/SENSITIVITIES

- Rockwell has informed AL that there is a high probability Rockwell will take legal action against DOE if the issue of award fee is not resolved to their satisfaction.

- The DOE/Rockwell contract specifies that DOE shall provide a final award fee determination within ten working days of Rockwell's verbal performance analysis presentation to DOE. Rockwell made their presentation on October 30, 1989, therefore, DOE's response should be provided by November 14, 1989.

RECOMMENDATION/APPROVAL

- AL recommends that Headquarters approve the attached DOE final determination on the Rockwell award fee.

Bruce G. Twining
Manager

Attachment

APPROVED: ______________________
W. Henson Moore, Deputy Secretary

DATE: ______________________

J. L. Meinhardt 3 1989

cc w/attachment:
S. Wakefield, GC-1, HQ
B. J. Roth, MA-4, HQ
RAdm. J. M. Barr, USN, DP-20, HQ

bcc w/attachment:
B. G. Twining, OOM, AL
J. A. Stout, OCC, AL
R. L. de Timmerman, OCC, AL
R. A. Marquez, OIEA, AL
J. G. Hoyal, CPD, AL

Defendant's Supplemental Exhibit 69

Rockwell Award File

Department of Energy
Albuquerque Operations Office
P.O. Box 5400
Albuquerque, New Mexico 87115

NOV 14 1989

Mr. D. J. Sanchini
President
Rockwell International, AERO
Rocky Flats Plant
P. O. Box 464
Golden, CO 80401

Dear Mr. Sanchini:

This is in response to your written comments dated October 25, 1989, concerning the Department's Award Fee Performance Evaluation of Rockwell International for the period October 1, 1988, through March 31, 1989, as well as the oral presentation of your views concerning this performance evaluation which was presented by your representatives at the Albuquerque Operations Office on October 30, 1989.

After due consideration of the above-referenced information, I have determined that my original determination of an award fee in the total amount of $2,903,215.00 for the performance period noted above, shall remain unchanged.

Accordingly, should you choose to do so, you may withdraw funds for an award fee in the above amount from your special bank account.

Sincerely,

Samuel Culpepper for
Bruce G. Twining
Manager

cc:
D. P. Simonson, Manager, RFO
J. A. Stout, Chief Counsel,
OCC, AL
C. E. Troell, Assistant Manager,
OMA, AL
J. G. Hoyal, Director, CPD, AL

P152

NOV 14 1989

Mr. D. J. Sanchini
President
Rockwell International, AERO
Rocky Flats Plant
P. O. Box 464
Golden, CO 80401

Dear Mr. Sanchini:

This is in response to your written comments dated October 25, 1989, concerning the Department's Award Fee Performance Evaluation of Rockwell International for the period October 1, 1988, through March 31, 1989, as well as the oral presentation of your views concerning this performance evaluation which was presented by your representatives at the Albuquerque Operations Office on October 30, 1989.

After due consideration of the above-referenced information, I have determined that my original determination of an award fee in the total amount of $2,903,215.00 for the performance period noted above, shall remain unchanged.

Accordingly, should you choose to do so, you may withdraw funds for an award fee in the above amount from your special bank account.

Sincerely,

Bruce G. Twining
Manager

cc:
D. P. Simonson, Manager, RFO
J. A. Stout, Chief Counsel, OCC, AL
C. E. Troell, Assistant Manager, OMA, AL
J. G. Royal, Director, CPD, AL

Approved By Eric Fygi & John Meinhardt by Telecon with Jim Stout on 11/7/89. Henson Moore consulted & approved. Issue paper to be signed by Moore & returned to AL by Meinhardt 11/14/9

Dist:
Original - Addressee
Yellow - Chronological File
Pink - JAS'RF:JASII:SANCHINI
Green - MGR's RF

E 001999

AL F 1325.7
(11/87)

OFFICIAL FILE COPY

CONCURRENCE: OCC:LAR. STOUT 11/7/89; OMA TROELL 11/ /89; OCM CULPEPPER 11/14/89; OM TWINING 11/14/89

Defendant's Supplemental Exhibit 70

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

-----------------------------------X
UNITED STATES OF AMERICA, EX REL; :
:
Plaintiff, : Civil Action
: No. 89-M-1154
-vs- :
:
ROCKWELL INTERNATIONAL CORP., : PAGES 1 - 155
ET AL, :
:
Defendants. :
-----------------------------------X

Deposition of W. HENSON MOORE

Washington, D.C.

Wednesday, April 15, 1998

Reported by: Nancy Bond Rowland

JOB NO. 106926

them by himself or he wasn't the last review of an award fee determination.

Because of Rocky Flats they came to me, and for a while there as I remember all of them, whether those facilities were something I worked with or not, came to me for review to be sure the system was working like we had decided, the new system.

Nancy Wolicki as I remember was the person who would receive it, review it, go into great details, come in and brief me, and they would make a decision whether we agreed or disagreed with the Operations Office's determination. In the early years I think there were a number of them we sent back and said "We don't agree" or we set a new number for it. That happened on the Rockwell award fee.

Q You would get what, performance evaluation reports, kind of a short evaluation prepared by the Operations Office, and that would be reviewed by Nancy?

A The way the system worked after we designed it was the fact when the Operations Office finished its work, and everything up to that point was done as it always had been done with the exception of this 51

Defendant's Supplemental Exhibit 71

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA and
UNITED STATES OF AMERICA, ex rel.
JAMES S. STONE, )
)
Plaintiffs, )
)
vs. ) 89 M 1154
)
ROCKWELL INTERNATIONAL CORPORATION, et al., )
)
Defendants. )

---

TRIAL TO JURY - DAY 14
TRANSCRIPT OF PROCEEDINGS

---

Proceedings held before the HONORABLE RICHARD P. MATSCH, U.S. District Judge for the District of Colorado, beginning at 8:55 a.m. on the 15th day of March, 1999, in Courtroom C-204, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs: Maria T. Vullo, Esq.
Jeannie S. Kang, Esq.
Matthew Chevez, Esq.
Robert E. Montgomery, Jr., Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
Suite 2607
New York, New York 10019

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

matters is a reference to the period before or after the compliance agreement of 1986?

A I don't know what the author was referring to.

Q I'd like to show you or have you look again at Tab 56 in the defendant's binder. It's Exhibit D173--I'm sorry, it's Tab 47; excuse me. And for the record --

THE COURT: D173 is at 56.

MR. KOLAR: I made a mistake. What I wanted him to look at is Tab 57 and it's Exhibit A513 for the record.

THE COURT: Thank you. Okay.

Q (by Mr. Kolar) Do you have that in front of you, Mr. Twining?

A Yes, I do.

Q Now, that's a--is that a draft of the letter that you ultimately sent to Mr. Sanchini, informing him of your decision that the award fee would be 2.9 million, approximately?

A It looks like the concurrence copy of the letter, which I wouldn't call a draft.

Q All right. So, and do you see the concurrence ladder on the right-hand side of the document?

A Yes, I do.

Q Are there--is the purpose of that to show concurrence by other people on your staff with your decision?

A Yes.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q And, are some of the people listed there people who were members of the PERB; I see Mr. Troell's name?
A Yes, they are.
Q And, so. would it be fair to say when they initialed off on this document they were telling you in essence that they concurred or they were recommending or agreeing with this figure and then you in turn adopted that?
A Yes, that would be fair.
Q You said that Secretary Watkins when he came in, brought high expectations of contractors; is that right?
A Yes, he did.
Q Did he also bring high expectations, Mr. Twining, of Department of Energy people who worked for him?
A Yes, he did.
Q And, Mr. Koenigs showed you some documents that talked about new expectations or revised expectations. Do you recall that?
A Yes.
Q Was honesty from a contractor one of these new expectations or had that always been an expectation?
A I think that's always an expectation and I don't remember Admiral Watkins talking about that. He had expectations of stricter conduct of operations, more discipline of the operations.
Q But honesty was always an expectation; that was nothing

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Defendant's Supplemental Exhibit 72

United States Government Department of Energy

# memorandum

DATE: DEC 1 8 1989

REPLY TO ATTN OF: EH-342

SUBJECT: Rocky Flats Award Fee Determination for the Period April 1 through September 30, 1989

TO: G. J. Judge, EH-10

We have reviewed the safety and health aspects of the subject award fee determination for Rockwell International Corporation, Contract No. DE-AC04-76DP03533, for the period of April 1, 1989 through September 30, 1989. Our comments are based upon current knowledge of site operations including results of TSA's and corrective action plans, incident reporting and corrective actions, special reviews such as the Criticality Safety Assessment, EH site resident observations and special studies, and the recent intensive safety, heath and management review of site operations.

We essentially agree with the narrative information concerning safety in the memorandum and its five attachments. However, sufficient data is not provided for us to understand why the rating for Environmental, Safety and Health for the Plant for the current 6 month period should increase to 78 percent from a 65.25 percent rating for the previous 6 month period. The written explanation in the memorandum states: "As the evaluation indicates, the contractor's performance in the safety area continue to be unacceptable. However, this has been offset in our evaluation by the performance of Rockwell in assisting with negotiations with EPA and the State on environmental agreements and complying with these very aggressive agreements." The weight given this performance in the environmental area must have been significant to offset the unacceptable safety rating and increase the overall Environmental, Safety and Health rating by 12.75 percent. We question this increase in the Environmental, Safety and Health rating. In addition, the recent safety and health review (11/27-12/1) identified long standing concerns that are more extensive than those included in the award fee determination: an example is the lack of a traceable safety control system from SAR's to Operational Safety Requirements to procedures. Yet, the RF Office award fee determination gave credit to Rockwell for making every effort to meet safety analysis requirements within available resources. That degree of effort is not apparent.

We also question the General Management rating of 81 percent. Again, we do not know the relative weights given to the General Management noteworthy achievements and positive observations versus the relative weights of the serious major deficiencies, notable deficiencies, and negative observations. The previous rating period also had a rating of 81 percent. Since no progress has been made during the current rating period on safety and health issues, we question no reduction in the rating. The deficiencies were serious enough to warrant a General Management rating less than 81 percent.

Robert W. Barber
Acting Director
Office of Safety Compliance

cc:
J. Fitzgerald, EH-30

Defendant's Supplemental Exhibit 73

12/28/89 13:47

**DEPARTMENT OF ENERGY**
**WASHINGTON, D.C. 20585**

12/28/89

Assistant Secretary
Environment, Safety
and Health

Dave LeClair - DP-50

Award fee packages are returned as follows:

① EH has no problem with the recommended award fee for Rockwell - INEL - ATI and MK - Ferguson.

② For W - WIPP we believe there have been problems which should be reflected in a reduced award fee. See attached action Memo. mark-up.

③ For RFP we can not agree that some good actions in the environment are offset an unacceptable safety rating. The Action Memo needs to reflect this!

Peter.

Defendant's Supplemental Exhibit 74

ROUTING AND TRANSMITTAL SLIP 12/14/89

| To: (Name, office symbol, room number, building, Agency/Post) | Initials | Date |
|---|---|---|
| 1. G. Leah Dever, EH-232/3G-092 | | 12-14 |
| 2. Kathleen I. Taimi, EH-232/3G-092 | | 12-14 |
| 3. John C. Tseng, EH-23/7A-075 | | 12/19 |
| 4. Raymond P. Berube, EH-20/7A-075 | | 12/26 |
| 5. Geoffrey J. Judge, EH-10/GB-096A (Peter Brush, EH-1) | | |

| | | |
|---|---|---|
| Action | File | Note and Return |
| Approval | For Clearance | Per Conversation |
| As Requested | For Correction | Prepare Reply |
| Circulate | For Your Information | See Me |
| Comment | Investigate | Signature |
| Coordination | Justify | |

Re: Proposed Award Fee Determinations for Kansas City, Mound, Pantex, Pinellas and Rocky Flats

EH-232 has reviewed the referenced packages and recommends EH-1 concurrence on all determinations except Pinellas.

The SEN-7 Reports prepared by the Pinellas Area Office have raised concerns that..."the ES&H Program within the Pinellas Plant is not being given the level of management commitment commensurate with the emphasis being placed in this area by DOE... It is evident that this new culture will take time." No mention of these substantive concerns is raised within the award fee package, and a 90% rating in the ES&H area seems to indicate that little to no consideration was given to the concerns when rating contractor performance.

I am also concerned about the RF's rating for Rockwell in the ES&H area. I don't believe Rockwell's environ. performance was so good to offset safety deficiencies and some. We should consider holding Rockwell to previous levels.

John

I agree. RPB 12/26

#510

FROM: (Name, org. symbol, Agency/Post) Room No.—Bldg.

Robert D. Quinn, EH-232/3G-092 Phone No.

# Defendant's Supplemental Exhibit 75

DP-231: W. M. ARENDALE (3-2984)

Award Fee Determination for the Period April 1, 1989, through September 30, 1989, Rockwell International Corporation (RI).

Acting Assistant Secretary for Defense Programs, DP-1

o ISSUE

I am recommending a decrease in the award fee for RI as proposed by the Award Fee Determining Official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 30% lower than that proposed by the AFDO, and in our estimation more acurately reflects the level of performance of RI during the rating period. Specifically, we have recommended a total fee (award fee plus base fee) of $2,931,278 as compared to the AFDO recommendation of $4,176,077 (see attachment 1). Comparison of the Headquarters and AFDO award fee determinations are provided in tabular format in the attachments for your convenience.

o BACKGROUND

The AFDO has determined and recommended that RI be given a numerical rating of "85.55" for plant operations in its performance as operating contractor for the Rocky Flats Plant. This numerical rating equates to an award fee of $3,114,245 for plant operations. He has also recommended a numerical rating of "89.25" and an award fee of $628,982 for the Plutonium Recovery Modification Project/Plutonium Recovery Option Verification Exercise (PRMP/PROVE). The available base fee ($432,850) plus award fee ($7,791,300) for the period for both plant operations and PRMP/PROVE is $8,224,150 and the AFDO has recommended a total fee of $4,176,077.

o DISCUSSION

Although the AFDO recommended amount represents only 45.65% of the available award fee for plant operations and 64.89% of the available award fee for PRMP/PROVE, I recommend that a further reduction be made for plant operations that reflects the lack of concern and management for the environmental, safety, and health (ES&H) situation that existed at the Rocky Flats Plant during the appraisal period. A further reduction in fee is also recommended for the performance in PRMP/PROVE which more accurately reflects the overall moderate improvement over the previous rating period.

o PLANT OPERATIONS

Concerning plant operations I base my position on the following:

1. Many of the 230 safety concerns documented by external reviews (as well as by internal RI review) remained open during this period. This lack of priority

attention to safety and health by RI is a clear indictment of poor management.

2. During this period, Environment, Safety, and Health (EH) representatives continued to report of ES&H problems in the following areas:

   o Inadequacies of a fire protection program and a continuing presence of fire hazards in Buildings 881 and 460.

   o Lack of radiological protection continued to exist in Buildings 707, 777, and 881. Deficiencies noted ranged from alpha radiation detectors not functioning to eleven glovebox shielding doors found open.

   o Worker training deficiencies were noted throughout the plant as well as current and complete operating procedures. It was reported there appeared to be no direct relationship or cross reference between the Operational Safety Requirements, Operational Safety Analysis, and the Nuclear Material Safety Limits.

3. There was no formalized conduct of operations as evidenced by:

   o Lack of standards and criteria for operations;

   o Lack of well documented procedures for operations;

   o Lack of clear lines of responsibility for safe operations;

   o Lack of adequate work ethic and mental discipline within the work force;

   o Lack of adequate on-floor supervision;

   o Lack of ability to apply root cause analysis to investigations of unplanned events and to implement lessons-learned on a plant-wide basis.

4. The Department of Energy (DOE), through an independent assessment by Scientech, Inc., has identified several inadequate criticality safety conditions and practices at the Rocky Flats Plant. In addition, DOE is not satisfied with worker understanding of nuclear safety standards at the plant.

I therefore recommend the numerical rating of "77.75" be given to RI for its performance under the General Management category and "65.25" for its performance under the ES&H category, thus

downgrading their overall performance rating from "85.55" to "82.19" for plant operations (see attachment 2). This equates to a total fee of $2,539,393 ($2,160,393 award fee + $379,000 base fee) for plant operations. This is a downgrade of $953,852 from the amount recommended by the AFDO. Our recommendation reflects a 31.67% award fee versus maximum award fee as compared to the 45.65% recommended by the AFDO.

o PRMP/PROVE

With respect to the performance for PRMP/PROVE and the specific areas of project management, schedule performance, design and technical quality, the contractor fell substantially below the 90 or 91 rating given. Performance was satisfactory, but still required further improvement, and the rating should be in the range of 80-85 in these areas. Many products delivered in this time frame required rework, and management was not totally responsive to the DOE requirements that were provided. The overall rating should be reduced from 89.25 to 83.00 (some improvement over last period) with a resultant reduction in fee of $290,947 (see attachment 3).

The overall rating for the PRMP/PROVE performance is downgraded from the AFDO amount of "89.25" to "83.00". This equates to a total fee of $391,885 ($338,035 award fee + $53,850 base fee). This is a downgrade of $290,947 in award fee from the amount recommended by the AFDO. Our recommendation reflects a 34.87% award fee versus maximum fee as compared to the 64.89% recommended by the AFDO.

o SUMMARY/RECOMMENDATION

Overall, I recommend awarding RI a total fee of $2,931,278 of which $432,850 is base fee. This is a reduction of $1,244,799 from the $4,176,077 total fee proposed by the AFDO of which $432,850 was also base fee. Our total recommended fee is approximately 30% lower than proposed by the AFDO (see attachment 1). My intent to reduce the recommended fee has been communicated to the Rocky Flats Office.

J. M. Barr
Rear Admiral, U.S. Navy
Deputy Assistant Secretary
for Military Application
Defense Programs

cc: Dave Simonson, Manager, RFO

ATTACHMENT 1

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 TO SEPTEMBER 30, 1989

SUMMARY COMPARISON AFDO VERSUS HQ

***** SUMMARY *****

| | | AFDO | | HQ | |
|---|---|---|---|---|---|
| | BASE FEE | AWARD FEE | TOTAL | AWARD FEE | TOTAL |
| PLANT | $379,000 | $3,114,245 | $3,493,245 | $2,160,393 | $2,539,393 |
| PRMP/PROVE | $53,850 | $620,982 | $682,832 | $338,035 | $391,885 |
| TOTAL | $432,850 | $3,743,227 | $4,176,077 | $2,498,428 | $2,931,278 |

| | |
|---|---|
| MAXIMUM AWARD FEE FOR PLANNT OPERATIONS | $6,822,000 |
| MAXIMUM AWARD FEE FOR PRMP/PROVE | $969,300 |
| TOTAL MAXIMUM AWARD FEE | $7,791,300 |

| | AFDO | | | HQ | | |
|---|---|---|---|---|---|---|
| | PLANT | PRMP/PROVE | BOTH | PLANT | PRMP/PROVE | BOTH |
| % RECOMMENDED AWARD FEE VERSUS MAXIMUM AWARD FEE | 45.65% | 64.89% | 48.04% | 31.67% | 34.87% | 32.07% |
| % RECOMMENDED TOTAL FEE VERSUS MAXIMUM TOTAL FEE | 48.51% | 66.74% | 50.78% | 35.26% | 38.30% | 35.64% |

E 000260

ATTACHMENT 2

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 TO SEPTEMBER 30, 1989

SUMMARY COMPARISON AFDO VERSUS HQ

***** PLANT OPERATIONS *****

| FUNCTIONAL PERFORMANCE AREA | FY1989 WEIGHT | PREVIOUS 6 MONTH RATE | AFDO CURRENT 6 MONTHS RECOMMENDED RATING | AFDO GRADE | HQ CURRENT 6 MONTHS RECOMMENDED RATING | HQ GRADE |
|---|---|---|---|---|---|---|
| GENERAL MANAGEMENT | 0.25 | 81 | 81 | 20.25 | 77.75 | 19.44 |
| ENVIRONMENT, SAFETY, HEALTH | 0.20 | 65.25 | 78 | 15.60 | 65.25 | 13.05 |
| QUALITY | 0.15 | 88 | 90 | 13.50 | 90 | 13.50 |
| COST MANAGEMENT | 0.15 | 95 | 93 | 13.95 | 93 | 13.95 |
| PRODUCTION OPERATIONS | 0.15 | 96 | 91 | 13.65 | 91 | 13.65 |
| CHEMCIAL OPERATIONS | 0.10 | 91 | 86 | 8.60 | 86 | 8.60 |
| TOTALS | 1.00 | 84.25 | | 85.55 | | 82.19 |

| PERFORMANCE POINTS EARNED | AFDO AWARD FEE PER POINT | AFDO AWARD FEE | HQ AWARD FEE PER POINT | HQ AWARD FEE |
|---|---|---|---|---|
| 0-70 | 0 | 0 | 0 | 0 |
| 71-75 | 109152 × 5.0 | $545,760 | 109152 × 5.0 | $545,760 |
| 76-80 | 204660 × 5.0 | $1,023,300 | 204660 × 5.0 | $1,023,300 |
| 81-85 | 270015 × 5.0 | $1,350,075 | 270015 × 2.19 | $591,333 |
| 86-90 | 354744 × .55 | $195,110 | 354744 × 0 | 0 |
| | | $3,114,245 | | $2,160,393 |

| BASE FEE | AFDO AWARD FEE | AFDO TOTAL | HQ AWARD FEE | HQ TOTAL |
|---|---|---|---|---|
| $379,000 | $3,114,245 | $3,493,245 | $2,160,393 | $2,539,393 |
| % RECOMMENDED AWARD FEE VERSUS MAXIMUM AWARD FEE | 45.65% | | 31.67% | |
| %TOTAL RECOMMENDED AWARD FEE VERSUS TOTAL MAXIMUM FEE | | 48.51% | | 35.26% |

E 000261

ATTACHMENT 3

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 TO SEPTEMBER 30, 1989

SUMMARY COMPARISON AFDO VERSUS HQ

***** PRMP/PROVE *****

| FUNCTIONAL PERFORMANCE AREA | FY1989 WEIGHT | PREVIOUS 6 MONTH RATE | AFDO CURRENT 6 MONTHS RECOMMENDED RATING | AFDO CURRENT 6 MONTHS RECOMMENDED GRADE | HQ CURRENT 6 MONTHS RECOMMENDED RATING | HQ CURRENT 6 MONTHS RECOMMENDED GRADE |
|---|---|---|---|---|---|---|
| PROJECT MANAGEMENT | 0.25 | 75 | 91 | 22.75 | 80 | 20.00 |
| COST MANAGEMENT | 0.15 | 76 | 87 | 13.05 | 87 | 13.05 |
| SCHEDULE PERFORMANCE | 0.15 | 86 | 90 | 13.50 | 85 | 12.75 |
| SUBCONTRACT MANAGEMENT | 0.20 | 82 | 86 | 17.20 | 86 | 17.20 |
| DESIGN QUALITY | 0.15 | 78 | 91 | 13.65 | 80 | 12.00 |
| TECHNICAL PRODUCT QUALITY | 0.10 | 76 | 91 | 9.10 | 80 | 8.00 |
| TOTALS | 1.00 | 78.75 | | 89.25 | | 83.00 |

| PERFORMANCE POINTS EARNED | AFDO AWARD FEE PER POINT | AFDO AWARD FEE | HQ AWARD FEE PER POINT | HQ AWARD FEE |
|---|---|---|---|---|
| 0-70 | 0 | 0 | 0 | 0 |
| 71-75 | 15509 x 5.0 | $77,545 | 15509 x 5.0 | $77,545 |
| 76-80 | 29079 x 5.0 | $145,395 | 29079 x 5.0 | $145,395 |
| 81-85 | 38365 x 5.0 | $191,825 | 38365 x 5.0 | $115,095 |
| 86-90 | 50404 x 4.25 | $214,217 | 50404 x 0.0 | 0 |
| | | $628,982 | | $338,035 |

| BASE FEE | AFDO AWARD FEE | AFDO TOTAL | HQ AWARD FEE | HQ TOTAL |
|---|---|---|---|---|
| $53,850 | $628,982 | $682,832 | $338,035 | $391,885 |
| % RECOMMENDED AWARD FEE VERSUS MAXIMUM AWARD FEE | 64.09% | | 34.87% | |
| %TOTAL RECOMMENDED AWARD FEE VERSUS TOTAL MAXIMUM FEE | | 66.74% | | 38.30% |

E 000262

Defendant's Supplemental Exhibit 76

P136

SUMMARY MEMORANDUM

SECRETARIAL ACTION REQUESTED BY:

Date:

Orig. Office: DP-231 (M. Arendale, 3-2984)

Transmittal: ACTION: Award Fee Determination for Rockwell International Corporation (RI) at the Rocky Flats Plant under Contract No. DE-AC04-76DP03533, for the Period April 1 through September 30, 1989.

To: Deputy Secretary, S-2

Issue: Should RI's Award Fee be reduced from $4,176,077 to $2,931,278?

Timing: URGENT, prompt notification of award fee determination is required.

Discussion: A decrease is recommended in the award fee for RI as proposed by the Award Fee Determining Official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 30% lower than that proposed by the AFDO, and in our estimation more accurately reflects the level of performance of RI during the rating period.

Specifically, we have recommended a total fee (award fee plus base fee) of $2,931,278 as compared to the AFDO recommendation of $4,176,077.

Conclusion: Concur in the Headquarters decrease in total fee for RI.

John C. Tuck
Under Secretary

Agree ______________________

Disagree ______________________

Concurrence: EH__________
Jan./ /90

Received from Admiral Barr to Simonson on 1/11/90 (Handcarried)

Agy received 1/12/90 from H. Miller.

Per Miller, Simonson does not agree with this and wants comparison with our proposal so RFO position can be developed.

(Later revised by HQ)

DP-231: W. M. ARENDALE (3-2984)

Award Fee Determination for the Period April 1, 1989, through September 30, 1989, Rockwell International Corporation (RI).

Acting Assistant Secretary for Defense Programs, DP-1

o ISSUE

I am recommending a decrease in the award fee for RI as proposed by the Award Fee Determining Official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 30% lower than that proposed by the AFDO, and in our estimation more acurately reflects the level of performance of RI during the rating period. Specifically, we have recommended a total fee (award fee plus base fee) of $2,931,278 as compared to the AFDO recommendation of $4,176,077 (see attachment 1). Comparison of the Headquarters and AFDO award fee determinations are provided in tabular format in the attachments for your convenience.

o BACKGROUND

The AFDO has determined and recommended that RI be given a numerical rating of "85.55" for plant operations in its performance as operating contractor for the Rocky Flats Plant. This numerical rating equates to an award fee of $3,114,245 for plant operations. He has also recommended a numerical rating of "89.25" and an award fee of $628,982 for the Plutonium Recovery Modification Project/Plutonium Recovery Option Verification Exercise (PRMP/PROVE). The available base fee ($432,850) plus award fee ($7,791,300) for the period for both plant operations and PRMP/PROVE is $8,224,150 and the AFDO has recommended a total fee of $4,176,077.

o DISCUSSION

Although the AFDO recommended amount represents only 45.65% of the available award fee for plant operations and 64.89% of the available award fee for PRMP/PROVE, I recommend that a further reduction be made for plant operations that reflects the lack of concern and management for the environmental, safety, and health (ES&H) situation that existed at the Rocky Flats Plant during the appraisal period. A further reduction in fee is also recommended for the performance in PRMP/PROVE which more accurately reflects the overall moderate improvement over the previous rating period.

o PLANT OPERATIONS

Concerning plant operations I base my position on the following:

1. Many of the 230 safety concerns documented by external reviews (as well as by internal RI review) remained open during this period. This lack of priority

attention to safety and health by RI is a clear indictment of poor management.

2. During this period, Environment, Safety, and Health (EH) representatives continued to report of ES&H problems in the following areas:

   o Inadequacies of a fire protection program and a continuing presence of fire hazards in Buildings 881 and 460.

   o Lack of radiological protection continued to exist in Buildings 707, 777, and 881. Deficiencies noted ranged from alpha radiation detectors not functioning to eleven glovebox shielding doors found open.

   o Worker training deficiencies were noted throughout the plant as well as current and complete operating procedures. It was reported there appeared to be no direct relationship or cross reference between the Operational Safety Requirements, Operational Safety Analysis, and the Nuclear Material Safety Limits.

3. There was no formalized conduct of operations as evidenced by:

   o Lack of standards and criteria for operations;

   o Lack of well documented procedures for operations;

   o Lack of clear lines of responsibility for safe operations;

   o Lack of adequate work ethic and mental discipline within the work force;

   o Lack of adequate on-floor supervision;

   o Lack of ability to apply root cause analysis to investigations of unplanned events and to implement lessons-learned on a plant-wide basis.

4. The Department of Energy (DOE), through an independent assessment by Scientech, Inc., has identified several inadequate criticality safety conditions and practices at the Rocky Flats Plant. In addition, DOE is not satisfied with worker understanding of nuclear safety standards at the plant.

I therefore recommend the numerical rating of "77.75" be given to RI for its performance under the General Management category and "65.25" for its performance under the ES&H category, thus

downgrading their overall performance rating from "85.55" to "82.19" for plant operations (see attachment 2). This equates to a total fee of $2,539,393 ($2,160,393 award fee + $379,000 base fee) for plant operations. This is a downgrade of $953,852 from the amount recommended by the AFDO. Our recommendation reflects a 31.67% award fee versus maximum award fee as compared to the 45.65% recommended by the AFDO.

o PRMP/PROVE

With respect to the performance for PRMP/PROVE and the specific areas of project management, schedule performance, design and technical quality, the contractor fell substantially below the 90 or 91 rating given. Performance was satisfactory, but still required further improvement, and the rating should be in the range of 80-85 in these areas. Many products delivered in this time frame required rework, and management was not totally responsive to the DOE requirements that were provided. The overall rating should be reduced from 89.25 to 83.00 (some improvement over last period) with a resultant reduction in fee of $290,947 (see attachment 3).

The overall rating for the PRMP/PROVE performance is downgraded from the AFDO amount of "89.25" to "83.00". This equates to a total fee of $391,885 ($338,035 award fee + $53,850 base fee). This is a downgrade of $290,947 in award fee from the amount recommended by the AFDO. Our recommendation reflects a 34.87% award fee versus maximum fee as compared to the 64.89% recommended by the AFDO.

o SUMMARY/RECOMMENDATION

Overall, I recommend awarding RI a total fee of $2,931,278 of which $432,850 is base fee. This is a reduction of $1,244,799 from the $4,176,077 total fee proposed by the AFDO of which $432,850 was also base fee. Our total recommended fee is approximately 30% lower than proposed by the AFDO (see attachment 1). My intent to reduce the recommended fee has been communicated to the Rocky Flats Office.

J. M. Barr
Rear Admiral, U.S. Navy
Deputy Assistant Secretary
for Military Application
Defense Programs

cc: Dave Simonson, Manager, RFO

ATTACHMENT 1

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 TO SEPTEMBER 30, 1989

SUMMARY COMPARISON AFDO VERSUS HQ

***** SUMMARY *****

| | | AFDO | | HQ | |
|---|---|---|---|---|---|
| | BASE FEE | AWARD FEE | TOTAL | AWARD FEE | TOTAL |
| PLANT | $379,000 | $3,114,245 | $3,493,245 | $2,160,393 | $2,539,393 |
| PRMP/PROVE | $53,850 | $628,982 | $682,832 | $338,035 | $391,885 |
| TOTAL | $432,850 | $3,743,227 | $4,176,077 | $2,498,428 | $2,931,278 |

| | |
|---|---|
| MAXIMUM AWARD FEE FOR PLANNT OPERATIONS | $6,822,000 |
| MAXIMUM AWARD FEE FOR PRMP/PROVE | $969,300 |
| TOTAL MAXIMUM AWARD FEE | $7,791,300 |

| | AFDO | | | HQ | | |
|---|---|---|---|---|---|---|
| | PLANT | PRMP/PROVE | BOTH | PLANT | PRMP/PROVE | BOTH |
| % RECOMMENDED AWARD FEE VERSUS MAXIMUM AWARD FEE | 45.65% | 64.89% | 48.04% | 31.67% | 34.87% | 32.07% |
| % RECOMMENDED TOTAL FEE VERSUS MAXIMUM TOTAL FEE | 48.51% | 66.74% | 50.78% | 35.26% | 38.30% | 35.64% |

E 000269

ATTACHMENT 2

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 TO SEPTEMBER 30, 1989

SUMMARY COMPARISON AFDO VERSUS HQ

***** PLANT OPERATIONS *****

| FUNCTIONAL PERFORMANCE AREA | FY1989 WEIGHT | PREVIOUS 6 MONTH RATE | AFDO CURRENT 6 MONTHS RECOMMENDED RATING | AFDO CURRENT 6 MONTHS RECOMMENDED GRADE | HQ CURRENT 6 MONTHS RECOMMENDED RATING | HQ CURRENT 6 MONTHS RECOMMENDED GRADE |
|---|---|---|---|---|---|---|
| GENERAL MANAGEMENT | 0.25 | 81 | 81 | 20.25 | 77.75 | 19.44 |
| ENVIRONMENT, SAFETY, HEALTH | 0.20 | 65.25 | 78 | 15.60 | 65.25 | 13.05 |
| QUALITY | 0.15 | 88 | 90 | 13.50 | 90 | 13.50 |
| COST MANAGEMENT | 0.15 | 95 | 93 | 13.95 | 93 | 13.95 |
| PRODUCTION OPERATIONS | 0.15 | 96 | 91 | 13.65 | 91 | 13.65 |
| CHEMCIAL OPERATIONS | 0.10 | 91 | 86 | 8.60 | 86 | 8.60 |
| TOTALS | 1.00 | 84.25 | | 85.55 | | 82.19 |

| PERFORMANCE POINTS EARNED | AFDO AWARD FEE PER POINT | AFDO AWARD FEE | HQ AWARD FEE PER POINT | HQ AWARD FEE |
|---|---|---|---|---|
| 0-70 | 0 | 0 | 0 | 0 |
| 71-75 | 109152 x 5.0 | $545,760 | 109152 x 5.0 | $545,760 |
| 76-80 | 204660 x 5.0 | $1,023,300 | 204660 x 5.0 | $1,023,300 |
| 81-85 | 270015 x 5.0 | $1,350,075 | 270015 x 2.19 | $591,333 |
| 86-90 | 354744 x .55 | $195,110 | 354744 x 0 | 0 |
| | | $3,114,245 | | $2,160,393 |

| BASE FEE | AFDO AWARD FEE | AFDO TOTAL | HQ AWARD FEE | HQ TOTAL |
|---|---|---|---|---|
| $379,000 | $3,114,245 | $3,493,245 | $2,160,393 | $2,539,393 |
| % RECOMMENDED AWARD FEE VERSUS MAXIMUM AWARD FEE | 45.65% | | 31.67% | |
| %TOTAL RECOMMENDED AWARD FEE VERSUS TOTAL MAXIMUM FEE | | 48.51% | | 35.26% |

E 000270

ATTACHMENT 3

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 TO SEPTEMBER 30, 1989

SUMMARY COMPARISON AFDO VERSUS HQ

***** PRMP/PROVE *****

| FUNCTIONAL PERFORMANCE AREA | FY1989 WEIGHT | PREVIOUS 6 MONTH RATE | AFDO CURRENT 6 MONTHS RECOMMENDED RATING | AFDO GRADE | HQ CURRENT 6 MONTHS RECOMMENDED RATING | HQ GRADE |
|---|---|---|---|---|---|---|
| PROJECT MANAGEMENT | 0.25 | 75 | 91 | 22.75 | 80 | 20.00 |
| COST MANAGEMENT | 0.15 | 76 | 87 | 13.05 | 87 | 13.05 |
| SCHEDULE PERFORMANCE | 0.15 | 86 | 90 | 13.50 | 85 | 12.75 |
| SUBCONTRACT MANAGEMENT | 0.20 | 82 | 86 | 17.20 | 86 | 17.20 |
| DESIGN QUALITY | 0.15 | 78 | 91 | 13.65 | 80 | 12.00 |
| TECHNICAL PRODUCT QUALITY | 0.10 | 76 | 91 | 9.10 | 80 | 8.00 |
| TOTALS | 1.00 | 78.75 | | 89.25 | | 83.00 |

| PERFORMANCE POINTS EARNED | AFDO AWARD FEE PER POINT | AFDO AWARD FEE | HQ AWARD FEE PER POINT | HQ AWARD FEE |
|---|---|---|---|---|
| 0-70 | 0 | 0 | 0 | 0 |
| 71-75 | 15509 × 5.0 | $77,545 | 15509 × 5.0 | $77,545 |
| 76-80 | 29079 × 5.0 | $145,395 | 29079 × 5.0 | $145,395 |
| 81-85 | 38365 × 5.0 | $191,825 | 38365 × 5.0 | $115,095 |
| 86-90 | 50404 × 4.25 | $214,217 | 50404 × 0.0 | 0 |
| | | $628,982 | | $338,035 |

| BASE FEE | AFDO AWARD FEE | AFDO TOTAL | HQ AWARD FEE | HQ TOTAL |
|---|---|---|---|---|
| $53,850 | $628,982 | $682,832 | $338,035 | $391,885 |
| % RECOMMENDED AWARD FEE VERSUS MAXIMUM AWARD FEE | 64.89% | | 34.87% | |
| %TOTAL RECOMMENDED AWARD FEE VERSUS TOTAL MAXIMUM FEE | | 66.74% | | 38.30% |

E 000271

Defendant's Supplemental Exhibit 77

DOE F 1325.8 (8-89)

United States Government Department of Energy

# memorandum

Jewel agy

DATE: February 22, 1990

REPLY TO ATTN OF: DP-231: W. M. ARENDALE (3-2984)

SUBJECT: Award Fee Determination for the Period April 1, 1989, through September 30, 1989, Rockwell International Corporation (RI)

TO: Deputy Secretary, S-2

**ISSUE**

I am recommending a decrease in the award fee for RI as proposed by the Award Fee Determining Official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 52 percent lower than that proposed by the AFDO and, in our estimation, more acurately reflects the level of performance of RI during the rating period. Specifically, we have recommended a total fee (award fee plus base fee) of $2,012,489 as compared to the AFDO recommendation of $4,176,077. For the previous 6-month period, RI was awarded a total fee of $3,336,065 (see attachment 1). Comparisons of the Headquarters and AFDO award fee determinations are provided in tabular format in the attachments for your convenience.

**BACKGROUND**

The AFDO has determined and recommended that RI be given a numerical rating of "85.55" (good and almost very good) for plant operations in its performance as operating contractor for the Rocky Flats Plant. This numerical rating equates to an award fee of $3,114,245 for plant operations. He has also recommended a numerical rating of "89.25" (very good) and an award fee of $628,982 for the Plutonium Recovery Modification Project/Plutonium Recovery Option Verification Exercise (PRMP/PROVE). The available base fee ($432,850) plus award fee ($7,791,300) for the period for both plant operations and PRMP/PROVE is $8,224,150, and the AFDO has recommended a total fee of $4,176,077. The previous 6-month numerical rating was "84.25" (good) for plant operations which yielded an award fee of $2,716,624, and the numerical rating for PRMP/PROVE was "78.75" (moderately good) which yielded an award fee of $186,591.

**DISCUSSION**

The AFDO recommended amount represents only 45.65 percent of the available award fee for plant operations and 64.89 percent of the available award fee for PRMP/PROVE. I recommend that a further reduction be made for plant operations that reflects the deficiency in overall general management and, more specifically, the deficiency in management for the environmental, safety, and health (ES&H) situation that existed at the Rocky Flats Plant during the appraisal period.

A further reduction in fee is also recommended for the performance in PRMP/PROVE which more accurately reflects the very slight improvement over the previous rating period.

I will outline my position in reducing the award fee for plant operations and PRMP/PROVE in greater detail on the following pages.

**PLANT OPERATIONS**

Concerning plant operations, I base my position on the following:

1. Many of the 230 safety concerns documented by external reviews (as well as by internal RI review) remained open during this period. This continuing lack of priority attention to safety and health by RI is a clear indication of poor management.

2. During this period, representatives from the Office of the Assistant Secretary for Environment, Safety, and Health (EH) continued to report of ES&H problems in the following areas:

   o Inadequacies of a fire protection program, and a continuing presence of fire hazards in Buildings 460 and 881.

   o Lack of radiological protection continued to exist in Buildings 707, 777, and 881. Deficiencies noted ranged from alpha radiation detectors not functioning to 11 glovebox shielding doors found open.

   o Worker training deficiencies were noted throughout the plant as well as current and complete operating procedures. It was reported there appeared to be no direct relationship or cross reference between the Operational Safety Requirements, Operational Safety Analysis, and the Nuclear Material Safety Limits.

   o The Building 771 filter incident on June 21, 1989, revealed that it had been 11 months since filters were last changed in an area where filters are supposed to be changed every 6 months.

3. There was no formalized conduct of operations as evidenced by:

   o Lack of standards and criteria for operations;

   o Lack of well documented procedures for operations;

   o Lack of clear lines of responsibility for safe operations;

   o Lack of adequate work ethic and mental discipline within the workforce;

   o Lack of adequate on-floor supervision;

   o Lack of ability to apply root cause analysis to investigations of unplanned events and to implement lessons-learned on a plantwide basis.

- o Lack of interest in improvement. There is a strong cultural sense that the plant has operated for 37 years and that there is no reason to change. New goals and reasons for change have not been effectively conveyed by management.

4. The Department of Energy (DOE), through an independent assessment by Scientech, Inc., has identified several inadequate criticality safety conditions and practices at the Rocky Flats Plant. In addition, DOE is not satisfied with worker understanding of nuclear safety standards at the plant.

5. The RI Management Plan submitted to the Secretary failed to address bringing new management expertise or approaches. Instead, it only addressed tasks and accompanying resource requirements.

I, therefore, recommend the numerical rating of "69" (marginal) be given to RI for its performance under the General Management category and "64" (unsatisfactory) for its performance under the ES&H category, thus, downgrading their overall performance rating from "85.55" (good and almost very good) to "78.4" (moderately good) for plant operations (see attachment 3). This equates to a total fee of $1,620,604 ($1,241,604 award fee plus $379,000 base fee) for plant operations. This is a downgrade of $1,872,641 from the amount recommended by the AFDO. Our recommendation reflects a 18.20 percent award fee versus maximum award fee as compared to the 45.65 percent recommended by the AFDO.

PRMP/PROVE

With respect to the performance for PRMP/PROVE and the specific areas of project management, schedule performance, design and technical quality, the contractor fell substantially below the "89.25" (very good) rating given. Performance, at best, was good, with required further improvement obviously necessary. The rating should be in the range of "80" to "85" (moderately good to good). Many products delivered in this timeframe required rework, and management was not totally responsive to the DOE requirements that were provided. The overall rating should be reduced from "89.25" (very good) to "83.00" (good), which is some improvement over last period, with a resultant reduction in fee of $290,947 (see attachment 4).

The overall rating for the PRMP/PROVE performance is downgraded from the AFDO amount of "89.25" (very good) to "83.00" (good). This equates to a total fee of $391,885 ($338,035 award fee plus $53,850 base fee). This is a downgrade of $290,947 in award fee from the amount recommended by the AFDO. Our recommendation reflects a 34.87 percent award fee versus maximum fee as compared to the 64.89% recommended by the AFDO.

**SUMMARY/RECOMMENDATION**

Overall, I recommend awarding RI a total fee of $2,012,489 of which $432,850 is base fee. This is a reduction of $2,163,588 from the $4,176,077 total fee proposed by the AFDO of which $432,850 was also base fee. Our total recommended fee is approximately 52 percent lower than proposed by the AFDO (see attachment 2). My intent to reduce the recommended fee has been communicated to the Rocky Flats Office.

John C. Tuck
Under Secretary

4 Attachments

cc w/atts:
Manager, Rocky Flats Office

ATTACHMENT 1

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 TO SEPTEMBER 30, 1989

SUMMARY COMPARISON AFDO VERSUS HQ
AGAINST LAST PERIOD
***** SUMMARY *****

| | | LAST PERIOD | | AFDO | | HQ | |
|---|---|---|---|---|---|---|---|
| | BASE FEE | AWARD FEE | TOTAL | AWARD FEE | TOTAL | AWARD FEE | TOTAL |
| PLANT | $379,000 | $2,716,624 | $3,095,624 | $3,114,245 | $3,493,245 | $1,241,604 | $1,620,604 |
| PRMP/PROVE | $ 53,850 | $ 186,591 | $ 240,441 | $ 628,982 | $ 682,832 | $ 338,035 | $ 391,885 |
| TOTAL | $432,850 | $2,903,215 | $3,336,065 | $3,743,227 | $4,176,077 | $1,579,639 | $2,012,489 |

| | |
|---|---|
| MAXIMUM AWARD FEE FOR PLANT OPERATIONS | $6,822,000 |
| MAXIMUM AWARD FEE FOR PRMP/PROVE | $ 969,300 |
| TOTAL MAXIMUM AWARD FEE | $7,791,300 |

| | LAST PERIOD (10/1/88 TO 3/31/89) | | THIS PERIOD -- (4/1/89 TO 9/30/89) AFDO | | HQ | |
|---|---|---|---|---|---|---|
| | PLANT | PRMP/PROVE | PLANT | PRMP/PROVE | PLANT | PRMP/PROVE |
| % RECOMMENDED AWARD FEE VERSUS MAXIMUM AWARD FEE | 39.82% | 19.25% | 45.65% | 64.89% | 18.20% | 34.87% |
| % TOTAL RECOMMENDED FEE VERSUS TOTAL MAXIMUM FEE | 42.99% | 23.50% | 48.51% | 66.74% | 22.50% | 38.30% |

E 000021

ATTACHMENT 2

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 TO SEPTEMBER 30, 1989

SUMMARY COMPARISON AFDO VERSUS HQ

***** SUMMARY *****

| | | AFDO | | HQ | |
|---|---|---|---|---|---|
| | BASE FEE | AWARD FEE | TOTAL | AWARD FEE | TOTAL |
| PLANT | $379,000 | $3,114,245 | $3,493,245 | $1,241,604 | $1,620,604 |
| PRMP/PROVE | $ 53,850 | $ 628,982 | $ 682,832 | $ 338,035 | $ 391,885 |
| TOTAL | $432,850 | $3,743,227 | $4,176,077 | $1,579,639 | $2,012,489 |

| | |
|---|---|
| MAXIMUM AWARD FEE FOR PLANT OPERATIONS | $6,822,000 |
| MAXIMUM AWARD FEE FOR PRMP/PROVE | $ 969,300 |
| TOTAL MAXIMUM AWARD FEE | $7,791,300 |

| | AFDO | | | HQ | | |
|---|---|---|---|---|---|---|
| | PLANT | PRMP/PROVE | BOTH | PLANT | PRMP/PROVE | BOTH |
| % RECOMMENDED AWARD FEE VERSUS MAXIMUM AWARD FEE | 45.65% | 64.89% | 48.04% | 18.20% | 34.87% | 20.27% |
| % TOTAL RECOMMENDED FEE VERSUS TOTAL MAXIMUM FEE | 48.51% | 66.74% | 50.78% | 22.50% | 38.30% | 24.47% |

E 000022

ATTACHMENT 3

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 TO SEPTEMBER 30, 1989

SUMMARY COMPARISON AFDO VERSUS HQ

***** PLANT OPERATIONS *****

| FUNCTIONAL PERFORMANCE AREA | FY1989 WEIGHT | PREVIOUS 6 MONTH RATE | AFDO CURRENT 6 MONTHS RECOMMENDED RATING | AFDO CURRENT 6 MONTHS RECOMMENDED GRADE | HQ CURRENT 6 MONTHS RECOMMENDED RATING | HQ CURRENT 6 MONTHS RECOMMENDED GRADE |
|---|---|---|---|---|---|---|
| GENERAL MANAGEMENT | 0.25 | 81 | 81 | 20.25 | 69 | 17.25 |
| ENVIRONMENT, SAFETY, HEALTH | 0.20 | 65.25 | 78 | 15.60 | 64 | 12.80 |
| QUALITY | 0.15 | 88 | 90 | 13.50 | 86 | 12.90 |
| COST MANAGEMENT | 0.15 | 95 | 93 | 13.95 | 91 | 13.65 |
| PRODUCTION OPERATIONS | 0.15 | 96 | 91 | 13.65 | 90 | 13.50 |
| CHEMICAL OPERATIONS | 0.10 | 91 | 86 | 8.60 | 83 | 8.30 |
| TOTALS | 1.00 | 84.25 | | 85.55 | | 78.40 |

| PERFORMANCE POINTS EARNED | AFDO AWARD FEE PER POINT | AFDO AWARD FEE | HQ AWARD FEE PER POINT | HQ AWARD FEE |
|---|---|---|---|---|
| 0-70 | 0 | 0 | 0 | 0 |
| 71-75 | 109152 x 5.0 | $ 545,760 | 109152 x 5.0 | $545,760 |
| 76-80 | 204660 x 5.0 | $1,023,300 | 204660 x 3.4 | $695,844 |
| 81-85 | 270015 x 5.0 | $1,350,075 | 270015 x 0 | 0 |
| 86-90 | 354744 x .55 | $ 195,110 | 354744 x 0 | 0 |
| TOTALS | | $3,114,245 | | $1,241,604 |

| BASE FEE | AFDO AWARD FEE | AFDO TOTAL | HQ AWARD FEE | HQ TOTAL |
|---|---|---|---|---|
| $379,000 | $3,114,245 | $3,493,245 | $1,241,604 | $1,620,604 |

| | AFDO | HQ |
|---|---|---|
| % RECOMMENDED AWARD FEE VERSUS MAXIMUM AWARD FEE | 45.65% | 18.20% |
| % TOTAL RECOMMENDED AWARD FEE VERSUS TOTAL MAXIMUM FEE | 48.51% | 22.50% |

E 000023

ATTACHMENT 4

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 TO SEPTEMBER 30, 1989

SUMMARY COMPARISON AFDO VERSUS HQ

***** PRMP/PROVE *****

| FUNCTIONAL PERFORMANCE AREA | FY1989 WEIGHT | PREVIOUS 6 MONTH RATE | AFDO CURRENT 6 MONTHS RECOMMENDED RATING | AFDO GRADE | HQ CURRENT 6 MONTHS RECOMMENDED RATING | HQ GRADE |
|---|---|---|---|---|---|---|
| PROJECT MANAGEMENT | 0.25 | 75 | 91 | 22.75 | 80 | 20.00 |
| COST MANAGEMENT | 0.15 | 76 | 87 | 13.05 | 87 | 13.05 |
| SCHEDULE PERFORMANCE | 0.15 | 86 | 90 | 13.50 | 85 | 12.75 |
| SUBCONTRACT MANAGEMENT | 0.20 | 82 | 86 | 17.20 | 86 | 17.20 |
| DESIGN QUALITY | 0.15 | 78 | 91 | 13.65 | 80 | 12.00 |
| TECHNICAL PRODUCT QUALITY | 0.10 | 76 | 91 | 9.10 | 80 | 8.00 |
| TOTALS | 1.00 | 78.75 | | 89.25 | | 83.00 |

| PERFORMANCE POINTS EARNED | AFDO AWARD FEE PER POINT | AFDO AWARD FEE | HQ AWARD FEE PER POINT | HQ AWARD FEE |
|---|---|---|---|---|
| 0-70 | 0 | 0 | 0 | 0 |
| 71-75 | 15509 x 5.0 | $ 77,545 | 15509 x 5 | $ 77,545 |
| 76-80 | 29079 x 5.0 | $145,395 | 29079 x 5 | $145,395 |
| 81-85 | 38365 x 5.0 | $191,825 | 38365 x 3 | $115,095 |
| 86-90 | 50404 x 4.25 | $214,217 | 50404 x 0 | 0 |
| TOTALS | | $628,982 | | $338,035 |

| BASE FEE | AFDO AWARD FEE | AFDO TOTAL | HQ AWARD FEE | HQ TOTAL |
|---|---|---|---|---|
| $53,850 | $628,982 | $682,832 | $338,035 | $391,885 |
| % RECOMMENDED AWARD FEE VERSUS MAXIMUM AWARD FEE | 64.89% | | 34.87% | |
| % TOTAL RECOMMENDED AWARD FEE VERSUS TOTAL MAXIMUM FEE | | 66.74% | | 38.30% |

E 000024

Defendant's Supplemental Exhibit 78

United States Government **Department of Energy**

# memorandum

p170 ES - 90-003243

SUMMARY MEMORANDUM

: February 22, 1990 **SECRETARIAL ACTION REQUESTED BY:** 02/27/90

Orig. Office: DP-231 (M. Arendale, 3-2984)

Transmittal: **ACTION:** Award Fee Determination for Rockwell International Corporation (RI) at the Rocky Flats Plant under Contract No. DE-AC04-76DP03533 for the Period April 1 through September 30, 1989.

To: Deputy Secretary, S-2

Issue: Should RI's award fee be reduced from $4,176,077 to $2,012,489?

Timing: URGENT, prompt notification of award fee determination is required.

Discussion: A decrease is recommended in the award fee for RI as proposed by the Award Fee Determining Official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 52 percent lower than that proposed by the AFDO and, in our estimation, more accurately reflects the level of performance of RI during the rating period. Specifically, we have recommended a total fee (award fee plus base fee) of $2,012,489 as compared to the AFDO recommendation of $4,176,077. For the previous 6-month period, RI was awarded a total fee of $3,336,065 (see attachment 1 for comparison).

Recommendation: Concur in the Headquarters decrease in total fee for RI.

John C. Tuck
Under Secretary

Agree ________

Disagree ________ Date 2/23/90

Concurrence: EH/Brush (no objections)
Feb./22/90

U.S. DEPARTMENT OF ENERGY
OFFICE OF THE EXECUTIVE SECRETARY

# DOCUMENT TRANSMITTAL FORM

| CONTROL NO. | ACTS NO. | DATE SENT | DATE DUE |
|---|---|---|---|
| ES-90-003243 | | 02/22/90 | 02/27/90 |

TYPE OF DOCUMENT/ADDRESSEE: ˊction Memorandum for approval by the ˊeputy Secretary

FROM: DP/US/Tuck

SUBJECT: Award Fee Determination for Rockwell International Corp. at the Rocky Flats Plant for the period 04/01/89 through 09/30/89, Contract No. DE-AC04-76DP03533

| TO | ACTION COPY TO | INFO COPY TO | TO | ACTION COPY TO | INFO COPY TO |
|---|---|---|---|---|---|
| THE SECRETARY (S) | | | POLICY AND EVALUATION (PE) | | |
| DEPUTY SECRETARY (DS) | | | INTERNATIONAL AFFAIRS (IA) | | |
| UNDER SECRETARY (US) | | | CONSERVATION & SOLAR ENERGY (CS) | | |
| CHIEF FINANCIAL OFFICER (CF) | | | NUCLEAR ENERGY (NE) | | |
| THE SPECIAL ASSISTANT (SA) | | | FOSSIL ENERGY (FE) | | |
| THE EXECUTIVE ASSISTANT (EA) | | | DEFENSE PROGRAMS (DP) | | |
| DIR., OFFICE OF THE SECRETARY (DOSE) | | | ENVIRONMENT (EV) | | |
| PUBLIC AFFAIRS (PA) | | | RESOURCE APPLICATIONS (RA) | | |
| LEGISLATIVE AFFAIRS (LA) | | | ENERGY RESEARCH (ER) | | |
| INTERGOVERNMENTAL AFFAIRS (IR) | | | INSPECTOR GENERAL (IG) | | |
| CONSUMER AFFAIRS (CA) | | | ADMINISTRATION (AD) | | |
| GENERAL COUNSEL (GC) | | | CONTROLLER (CR) | | |
| ENERGY INFORMATION ADMINISTRATION (EI) | | | PROCUREMENT & CONTRACTS MGMT. (PR) | | |
| ˊCONOMIC REGULATORY ADMIN. (RG) | | | EQUAL EMPLOYMENT OPPORTUNITY (EO) | | |
| ˊECIAL COUNSEL (SC) | | | MINORITY ECONOMIC IMPACT (MI) | | |
| HEARINGS AND APPEALS (HG) | | | BOARD OF CONTRACT APPEALS (CB) | | |
| OS/May | X | | | | |

**ACTION REQUIRED (ES USE ONLY)**

| | |
|---|---|
| | SIGNATURE |
| | APPROVAL |
| | INFORMATION |
| X | CONCURRENCE |
| | COMMENTS AND/OR RECOMMENDATIONS |
| | OTHER (SEE REMARKS) |

REMARKS:

AFTER COMPLETION PLEASE RETURN ATTACHED FOLDER AND ... TO THE OFFICE OF THE EXECUTIVE SECRETARIAT

ES CONTACT: Desk I 6-9586 lc

**STAFF ACTION SUMMARY**

| | OFFICE | NAME/INITIALS | DATE |
|---|---|---|---|
| 1 | EH | Brush | 02/22/90 |
| 2 | GC* | Wakefield | |
| 3 | EM* | Duffy | |
| 4 | MA* | Fitzpatrick | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |

REMARKS:
* DP simultaneously handcarried concurrence packages to these offices on 02/22/90, concurrences still outstanding

E 001848

# Defendant's Supplemental Exhibit 79

83161

Department of Energy

ROCKY FLATS OFFICE
P.O. BOX 928
GOLDEN, COLORADO 80402-0928

February 26, 1990 90-DOE-5212

Mr. Dominick J. Sanchini
Vice President, Major Programs
Rockwell International Corporation
Department 001, Mail Code D-37
2230 East Imperial Highway
El Segundo, CA 90245

Dear Mr. Sanchini:

In accordance with Appendix D of Contract DE-AC04-76DP03533, the Department of Energy (DOE) hereby determines that Rockwell International Corporation (Rockwell) has earned an award fee of $1,241,604 for Plant and $338,035 for PRMP/PROVE, for a total of $1,579,639. The enclosed Performance Evaluation Report for the period April 1, 1989 through September 30, 1989, provides the basis for the DOE award fee determination.

The award fee approved by the DOE for payment to Rockwell is pursuant to an award fee plan previously developed to cover the period April 1, 1989 to September 30, 1989. This was prior to the institution by the DOE of stronger and tougher award fee plans to reward improvements in environment, safety, and health (ES&H) and substantially increase the proportion of the fee attributable to ES&H performance. Under the old contract provisions, however, the DOE was constrained as to the weight that might be given to ES&H performance in setting the fee for the six month period covered.

In the old award fee plan, which includes this period, up to 20% of the total amount of fee paid could be attributable to performance in the ES&H area. By reducing the award fee rating for ES&H to "Unsatisfactory," the DOE is indicating to Rockwell that its ES&H performance was unacceptable. In addition, by reducing the award fee rating for general management to "Marginal," the DOE is indicating to Rockwell that its general management performance was deficient.

As specified in the Contract, you may, within five working days after receipt of this letter, request an opportunity to present to the DOE an analysis of your performance under the Contract. Otherwise, after this period we will provide you the award fee amount, plus a base fee of $432,850, for a total fee of $2,012,489.

If you wish to meet with us, please contact this office in order to coordinate those arrangements for you.

Sincerely,

Robert M. Nelson, Jr.

Robert M. Nelson, Jr.
Manager

Enclosures

PERFORMANCE EVALUATION REPORT
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

The overall performance of Rockwell International Corporation (Rockwell) was maintained at least at the level of "Satisfactory" during the period April 1 through September 30, 1989.

The following are separate evaluations of the performance of Rockwell relative to the management and operation of the Rocky Flats Plant and the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the selected Functional Performance Areas (FPA's). The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's have been evaluated in accordance with the contract Award Fee Plan, and the following summary of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

PLANT

GENERAL MANAGEMENT: There was considerable evidence of Rockwell management's inability to effectively manage this facility, and this was seen by DOE to be a serious, major deficiency. This deficiency was manifested in lack of progress in integrating safety responsibility and accountability at all working levels and also by deficient lines of responsibility, procedures, discipline/work ethic, training, on-floor supervision, and problem investigation/resolution. Numerous incidents provide evidence of the above deficiencies. A continuing lack of priority attention to safety and health, as evidenced by the open status of many of the safety concerns documented during the period, was a clear indication of poor management. Additionally, despite an increase in nitrate concentrations on the 750 Pad, little action was taken to contain saltcrete after precipitation events. The preparation for the annual DOE inventory of Special Nuclear Material at Rocky Flats was unsatisfactory.

ENVIRONMENT, SAFETY & HEALTH: Long term understaffing in the Health, Safety and Environment organization resulted in less than adequate attention applied to several essential projects and safety functions. Rockwell was unsuccessful in reaching their Plant Performance Goal for recordable injuries and in reducing the total number of workplace contamination incidents. Rockwell continued to have problems in the construction safety area. Rockwell failed to exercise an acceptable level of program management in the development of official recommendations for restart of the Building 374 evaporator. A criticality safety assessment performed in August 1989, noted many aspects of the criticality safety program which needed improvement. Rockwell failed to exercise an acceptable level of program management in dealing with pondcrete and saltcrete. Rockwell's oversight of the environmental subcontractors performing routine environmental monitoring was deficient. As identified in the DOE-HQ assessment team report, deficiencies in the RFP effluent air monitoring program may adversely affect determination cf radioactive materials released to the atmosphere. Waste shipments to Idaho and Nevada were marked by errors in manifests and contamination on waste packages, which jeopardized the future of offsite disposal plans.



SUBPOENA 1014RF DOE ITEM 11 3015571

QUALITY: The plant-wide implementation of DOE non-weapons quality assurance requirements did not progress at the accelerated rate expected.

The Rockwell Final Product Acceptance group performed effectively after only one year of having the responsibility for most product acceptance. Lot rejects and Final Product Acceptance observations decreased during the second half of FY89.

COST MANAGEMENT: Rockwell provided excellent support to both the Environmental Restoration and Waste Management Five-Year Plan and to the Modernization Study. Rockwell did an extraordinary job of collecting information, categorizing and documenting the large number of new funding requirements created by the FBI/EPA investigation, the DOE Tiger teams, and the DOE/CDH Agreement. All validated construction line item projects were included in the Department's 1991 budget request.

PRODUCTION OPERATIONS: The processing of procured finished machined products was consolidated within Building 460 to reduce overall process times and decrease costs. Rockwell was effective in reducing halogenated solvent usage, and continued to make progress with its new scheduling philosophy which was designed to minimize work-in-process inventories by managing bottlenecks.

The self-appraisal program instituted in all Production Operations buildings, an adaptation of the Building 771 Restart Criteria, did not receive sufficient management attention or "ownership" and was ineffective.

CHEMICAL OPERATIONS: Plutonium Recovery Operations and Production Operations worked in conjunction to develop the Nuclear Facility Operation Manual, which was to establish the standard of excellence for operations of Rocky Flats facilities. As a result of the deliverables that Rockwell had to complete before Building 771 restart approval was granted, a number of procedures were changed or developed and implemented. This implementation was successful, and the building management team continued to develop and implement improvements to those procedures.

Rockwell's management controls and directives in areas such as recovery operations planning, work breakdown structure and scheduling systems, and cost control systems result in implementation/installation/operation delays and other problems. There continued to be a failure to establish performance goals for process operations and to measure process performance; therefore, operations were not baselined to provide for improved performance.

## PRMP/PROVE

PROJECT MANAGEMENT: Rockwell took an active role in establishing Los Alamos National Laboratory technical personnel as a part of the PRMP structure. Provisional agreement was reached by the Senior Management Review Board on the baseline PRMP process technologies.

Rockwell did not provide an adequate system to produce timely and accurate project control information. Integration of an essential, computerized, three-dimensional Plant Configuration Model into the overall PRMP design strategy has been slow.



SUBPOENA 1014RF DOE ITEM 11 3015572

COST MANAGEMENT: Rockwell took positive action to reduce the cost of A-E services, including reducing overhead, requiring the A-E to meet commitments, and upgrading control measures over the scope of A-E work.

The Cost and Schedule Reduction Precursor activity incurred over $100,000 cost without any visible or deliverable product, which indicates an unacceptable lack of cost controls.

SCHEDULE PERFORMANCE: The PROVE test schedule was prepared as an integrated effort between Plutonium Operations and PROVE engineering. Detailed schedules were developed for activities preliminary to PRMP construction to provide a base for performance measurement.

Schedule reports were not provided in a form which ensured timely reporting and accuracy to the overall project schedules.

SUBCONTRACT MANAGEMENT: Rockwell took positive action to develop an A-E Statement of Work which provided for their required services at an appropriate level of detail.

Inadequate Quality Assurance/Quality Control oversight of the glovebox subcontractor resulted in extra costs and delivery delays to the Government.

DESIGN QUALITY: PRMP Technical Baseline documentation was of unacceptable quality and behind schedule.

TECHNICAL PRODUCT QUALITY: Rockwell did not require periodic, independent audit of NQA-1 compliance and Non-Conformance Report actions to ensure that quality actions were completed without prejudice. A QA plan for PRMP, required prior to start of the full design effort and Title I activities, was not completed.



SUBPOENA 1014RF DOE ITEM 11 3015573

# Defendant's Supplemental Exhibit 80

P45

United States Government Department of Energy

# memorandum

Rocky Flats Office

DATE: JUL 1 7 1990

REPLY TO ATTN OF: ADM:TA:7679

SUBJECT: Review of Rockwell Written and Oral Presentations in Response to the AFDO Determination of 2/26/90, Contract DE-AC04-76DP03533, Evaluation Period 4/1/89 - 9/30/89

TO: Robert M. Nelson, Jr., Manager

At your request, I assembled a team of RFO employees knowledgeable about Rockwell's performance during the evaluation period of April 1 - September 30, 1989. This team has reviewed the material presented by Rockwell in their written comments of May 3 and June 7, 1990, as well as their oral presentation comments of July 10, 1990.

An Executive Summary and an analysis of Rockwell's position are attached for your review.

I recommend, based on the conclusions reached by the team, that the award fee decision of February 26, 1990 remain the same. A change is not warranted by the substantive arguments put forth by Rockwell or by any other matters arising from Rockwell's operation of the facility during this period.

Marshall L. Bishop
Director, Administration Division

Attachments

# EXECUTIVE SUMMARY

## FINAL FEE RECOMMEDATION

July 17, 1990

To: Robert M. Nelson, Jr., Manager, Rocky Flats Office

**Background:**

Under Contract DE-AC04-76DP03533 with Rockwell International (Rockwell) for the award fee period 4/1/89 - 9/30/89, your award fee determination was issued February 22, 1990. In response to that decision, Rockwell was allowed, under the Contract, to present written and oral arguments which you are required to consider before rendering a final decision. Marshall Bishop was tasked to review the Rockwell comments. The final award fee decision must be transmitted to Rockwell no later than July 24, 1990.

**Review of Rockwell Comments:**

A team was assembled to review the Rockwell written and oral comments and met on July 13 and 16, 1990. The team participants and their organizations were:

| | |
|---|---|
| Robert Ostmeyer | Occupational Safety Branch |
| Gary Huffman | Waste Management Branch |
| Thomas Lukow | Waste Management Division |
| Shirley Olinger | Safety Division |
| Frazer Lockhart | Plutonium Recovery Modification Project |
| Tod Anderson | Quality Assurance Division |
| William Rask | Production Division |

The analysis of the Rockwell comments is attached.

**Conclusion:**

No data has been presented, nor have subsequent events changed the overall award fee determination. Individual elements may have been influenced by knowledge gained subsequent to the determination of 2/26/90; however, the overall determination adequately accommodated the pluses and minuses. Paramount issues were the filter testing intervals and employment and funding shortfalls. The filter issue was partially addressed in John Tuck's S-3 to S-2 memo of 2/22/90 and the Stephen Wakefield, OGC, memo reviewing the Rockwell management of the filter tests and releases to the environment. Further, the employment ceilings and lack of funding which Rockwell alleged to be the cause of its management problems are only symptoms of the root cause and were assessed appropriately in the AFDO determination of 2/26/90.

Marshall Bishop, Director
Administration Division

# RFO ANALYSIS

The following is an analysis of the written and oral comments from Rockwell in connection with their appeal to the AFDO to reconsider his fee determination made February 26, 1990 covering the evaluation period April 1 - September 30, 1989. It was compiled using wording from the three-page evaluation summary comments attached to the AFDO decision of 2/26/90; Rockwell comments from their letters of May 3 and June 7, 1990 and/or oral arguments of July 10, 1990; and the RFO suggested position was compiled from both written and oral comments from RFO staff during their 7/16/90 analysis of the Rockwell comments.

First the Functional Performance Area (FPA) is identified, then the issue is quoted from the three-page evaluation summary, then the Rockwell position is followed by an RFO assessment. Where more than one argument was made within an FPA, the issues are numbered and relate to the same numbered Rockwell position and RFO assessment.

## PLANT FPA: GENERAL MANAGEMENT

Issue from 3-page DOE Evaluation Summary:

> 1) There was considerable evidence of Rockwell management's inability to effectively manage this facility, and this was seen by DOE to be a serious, major deficiency. This deficiency was manifested in lack of progress in integrating safety responsibility and accountability at all working levels and also by deficient lines of responsibility, procedures, discipline/work ethic, training, on-floor supervision, and problem investigation/resolution. Numerous incidents provide evidence of the above deficiencies.
>
> 2) A continuing lack or priority attention to safety and health as evidenced by the open status of many of the safety concerns documented during the period.
>
> 3) The preparation for the annual DOE inventory of SNM at Rocky Flats was unsatisfactory.

Rockwell's Position:

> 1) "There is overwhelming evidence to the contrary, which is ignored by the award fee evaluation. See general comments above."
>
> > (The general comments referred to argue that Rockwell faced a great challenge just in keeping the plant operating with no significant injuries or releases and at the same time meet the overwhelming demands of various outside investigators; that Rockwell was a very responsive contractor; that DOE management underwent a great change during the period and that Rockwell was the only thread of continuity; that there were multiple demands from senior DOE HQ management in temporary residence; that Rockwell had to support the DOE Criticality Safety Review Team; that Rockwell developed a Management Plan for Rocky Flats Plant Operation Improvements; that Rockwell achieved a reduction of TRU waste generation; and that after each review team departed, DOE would publicly state that no unsafe conditions at Rocky Flats affecting the employees, the plant or the surrounding community had been found.)
>
> In their oral presentation, Rockwell alleges that due to the circumstances surrounding the period under evaluation and the task of managing a plant in such an atmosphere, Rockwell had their finest hour in the General Management area.

2) Rockwell efforts to close safety concerns were impacted during this period by the audits and investigations that required staff attention. However, Rockwell still managed to close an additional 18 of the approximately 230 TSA Findings, bringing the total closed to 163. Many of these action items related to specific recommendations in Rockwell's "Management Plan for Rocky Flats Plant Operation Improvements."

3) (Rockwell position is lengthy and takes the position that only 2 of 65 SNM MBA's were not prepared for the inventory, and that Rockwell cooperated in getting the two problem MBA's inventoried, and that the inventory results were favorable.)

RFO Assessment:

1) The Management Plan for Rocky Flats Plant Operation Improvements was not the masterpiece Rockwell would have us believe. The plan should have been given much more thought and attention by Rockwell in its preparation and was a poor product typical of Rockwell plans.

There was a reduction in TRU waste generation which could have been recognized by DOE in a positive manner. However, the operational status of the Plant for the period reduces the magnitude of the Rockwell claim.

Concerning any DOE public statement about the conditions at Rocky Flats after a review team departed, the public statement does not diminish the fact that there are lots of indicators of safety problems and DOE never said that the margin of safety was acceptable.

The other situations cited by Rockwell were a direct result of previous Rockwell management inattention to various issues that had become compounded and then come to a head and had to be addressed all at once due to that previous inattention.

2) The fixes that Rockwell touts were often superficial and that real fixes should have been identified and completed much earlier if Rockwell management had been attentive and committed.

3) The root cause was poor coordination by Rockwell management in preparing for the SNM inventory.

## PLANT FPA: ENVIRONMENT, SAFETY AND HEALTH

Issue from 3-page DOE Evaluation Summary:

1) Long term understaffing in the Health, Safety and Environment organization resulted in less than adequate attention applied to several essential projects and safety functions.

2) Rockwell failed to exercise an acceptable level of program management in dealing with pondcrete and saltcrete.

3) As identified in the DOE-HQ Assessment Team Report, deficiencies in the RFP effluent air monitoring program may adversely effect determination of radioactive materials released to the atmosphere.

4) Waste shipments to Idaho and Nevada were marked by errors in manifests and contamination on waste packages which jeopardized the future of offsite disposal plans.

Rockwell's Position:

1) (Rockwell position is lengthy and takes the position that the HS&E organization was increased 28% during FY89, in spite of fact that in the late 80's DOE had imposed staffing ceilings and was directing the contractors to operate with fewer people and on a constant or reduced budget; that Rockwell also increased waste management and RCRA Program staffs from 161 to 208 personnel; that only after the June 1989 raid did DOE show interest in increasing staffing at the Plant to acceptable levels, but personnel in the ES&H field cannot be found easily who are willing to work here after all the public statements and Government actions in connection with the Rocky Flats Plant.)

2) Attached letters, Sanchini/Goldburg of July 12, 1989, Sanchini/Whiteman of October 3, 1988 and Jierree/Whiteman of December 19, 1988 speak for themselves on this issue. In spite of Rockwell's earlier requests, it was not until the first quarter of FY90 that DOE made funds available to provide for the purchase of temporary shelters for pondcrete and saltcrete.

3) Radionuclide emissions from DOE facilities have been controlled under EPA regulation contained in 40 CFR 61 since Feb. 5, 1985. Compliance reports for Rocky Flats have been provided to EPA, through DOE, since 1985. Data contained in these reports demonstrate that emissions attributable to RF operations represent a small fraction of those allowed under the regulation.

Furthermore, radioactive emissions to the atmosphere from RF operations have never exceeded DOE's Derived Concentration Guides (DCG).

Of the eleven specific recommendations for improvements made as part of the audit, Rockwell responded by implementing some changes immediately or developing a plan to respond when funds are provided by DOE. The recommendations covered a broad spectrum from writing procedures to addition of new sampling ports to purchasing new, expensive sampling equipment. These improvements, for items such as purchasing isokinetic sampling devices are extremely expensive and beyond the funds that DOE had previously elected to provide for this area.

None of the audit findings of the assessment Team were based upon identified violations of applicable air quality regulations. (See "Audit Findings-Legal Considerations" submitted with Rockwell's Environmental Assessment Action Plan on November 8, 1989.)

4) During the subject time period Rocky Flats shipped 276 trailer loads and 12 railcars of waste. One bill of lading and three labeling errors were recorded on these shipments, for a total percentage of error that is miniscule (.001%).

The one case of a contaminated waste package was, on investigation, found to have been caused by an employee at the Idaho National Energy Lab (INEL), who punctured a box with a forklift truck and did not properly report it to management.

RFO Assessment:

1) DOE had to resort to staffing-level management due to Rockwell's failure to manage costs, and this was the way DOE attempted to force Rockwell to manage better.

2) Upon receipt of the July 12, 1989 memo from Sanchini to Goldberg, Waste Management was directed to write a memo to Rockwell indicating that they were to fund the temporary shelters (tents) with $3.6M from FY89 funds. That memo was issued in early August and in late August Waste Management was informed the tents would be on-site in October 1989. In October it was learned that the tents had not even been ordered and another memo was written asking that a "Crisis Management Team" be assembled to deal with the pondcrete issue. Very little progress was made until January 1990 due to a lack of Rockwell management support and deliberate indecisiveness on the part of Rockwell management.

There may be some blame on DOE's part for requiring the material to be held at Rocky Flats so long, but the packaging problems were the fault of Rockwell.

3) This issue was appropriately addressed in the AFDO's determination of 2/26/90. Additionally, Stephen Wakefield's, HQ GC-1, memo of 6/25/90 (attached) addresses a further aspect of this deficiency. Our review of this issue did not support a further reduction to the award fee, nor an increase as suggested by Rockwell.

4) Our records are incomplete, so the number of incidents will be accepted as stated. However, neither NTS or the transportation laws provide for an acceptable level of error. An audit was performed which was not formally transmitted, but the findings were clear and the need was clearly communicated. There was almost a complete lack of quality assurance system with respect to loading and shipping, compounded by inadequate procedures and training. [It should be noted that some of the errors that occurred (e.g., the bill of lading) were reviewed by other groups and the errors were still missed.] These issues were reviewed with Rockwell management on several occasions and met with resistance for implementing a change.

PLANT FPA: QUALITY

Issue from 3-page DOE Evaluation Summary:

The plant wide implementation of DOE non-weapons quality assurance requirements did not progress at the accelerated rate expected.

Rockwell's Position:

The RFO Quality Assurance Requirements Specification (QARS) was never released by RFO and submitted to Rockwell. The QARS was to provide detailed guidance on how the requirements of the Quality Assurance document, RFO Order 5700.6, were to be implemented at the Rocky Flats Plant. In addition, RFO Order 5700.6 was never released and given to Rockwell until the end of September 1989. Therefore, it is incorrect for the DOE to criticize Rockwell for not implementing the Non-Weapons Quality Assurance Program at the accelerated rate expected when the RFO did not release the necessary Requirements document for guidance. It should be noted that during the Award Fee Period, Rockwell did make considerable

progress in the implementation of the Non-Weapons Quality Assurance program as reported to the DOE in Rockwell's Self-Analysis.

RFO Assessment:

The existence of an RFO Order is not the issue. Compliance was still required by the HQ order. An RFO Order would not change the basic requirements. However, it should be noted here that RFAO/RFO did not put a high priority on NQA-1 either.

## PLANT FPA: PRODUCTION OPERATIONS

Issue from 3-page DOE Evaluation Summary:

The self-appraisal program instituted in all Production Operations buildings, an adaptation of the Building 771 Restart Criteria, did not receive sufficient management attention or "ownership" and was ineffective.

Rockwell's Position:

The self-appraisal program instituted in all Production Operations was implemented to the maximum extent possible within the limits of available funding and manpower. The management time required in support of the aforementioned audits and investigations resulted in some implementation delays. However, the major buildings in Pu Operations were essentially completed with the exception of areas such as clothing control, and clean-up/decontamination which were constrained by the facility physical configuration and funding availability. In the Production Operations, the main building, 707, and buildings 444 and 447 were essentially completed with constraints similar to those in Pu Operations. A complete listing of each building and the status of implementation is attached.

RFO Assessment:

Rockwell refuses to acknowledge the fundamental issue here: that Rockwell did not and still does not understand the importance of management self appraisals. They may have went through some of the motions of a self-appraisal, but there was no evidence that Rockwell management really supported the program and they certainly did not implement the program to the maximum extent possible.

## PRMP/PROVE FPA: PROJECT MANAGEMENT

Issue from 3-page DOE Evaluation Summary:

Rockwell did not provide an adequate system to produce timely and accurate project control information. Integration of an essential computerized, three dimensional plant configuration model into the overall PRMP design strategy has been slow.

Rockwell's Position:

1) All monthly cost and schedule performance reports were accurate, delivered on schedule, and correctly reflected project performance in the areas of schedule and cost. This is demonstrated in September 1989 issues of the PRMP and PROVE project reports.

2) The integration of the three-dimensional plant configuration model was successfully completed in this time period when DOE approved incorporating the requirements into the A&E statement of work. Implementation of the model was to begin after resolution of program studies and decision to either modify Building 371 and/or build an annex. These studies are still in process.

RFO Assessment:

1) Overall project management was not responsive to the requirements of the DOE Project Management Order, 4700.1, even after emphasis in direct correspondence. The scheduling information was particularly weak. Although schedules were prepared they were not based on any critical path logic (CPM), they lacked evidence of any logic ties, and they did not provide evidence of sufficient detail to allow effective management of the project. In addition, manpower staffing plans based on the schedules were repeatedly requested both formally and informally by the DOE and not provided. These fundamental problems in the project management of the PRMP were identified in meetings and formal correspondence, yet were never resolved.

2) Use of a Plant Configuration Model (PCM) was identified as a requirement for the project in May 1989. DOE took action to acquire special funds earmarked for use in acquiring the PCM, and to identify one acceptable contractor to install the model, to facilitate the PCM work. The PSM was a continuing area of DOE interest, with almost weekly emphasis in meetings, informal conversations, and correspondence. The end result of the DOE emphasis, preliminary technical groundwork, and funding set-aside was the written statement in the architect-engineer statement of work that a PCM would be used for PRMP. No deliverables were achieved, or even stated, during the 5 month period. DOE approval of the PCM in the A/E statement of work was at the end of the period, after no action had been taken in 5 months, and did not relieve Rockwell of their failure to perform up to that point.

## PRMP/PROVE FPA: COST MANAGEMENT

Issue from 3-page DOE Evaluation Summary:

The Cost and Schedule Reduction Precursor activity incurred over $100,000 cost without any visible or deliverable product, which indicates an unacceptable lack of cost controls.

Rockwell's Position:

The cost and schedule reduction precursor studies which accumulated over $100,000 of cost were suspended when major redirection was received from the DOE/PMP. The data developed during these studies (conducted by Bechtel, J. A. Jones, and Rockwell) were ultimately utilized in preparing the cost and schedule estimates submitted for headquarters validations in November 1989.

RFO Assessment:

The Cost and Schedule Reduction Precursor activity was a distinct activity with a completion date in late summer 1989. The purpose of the activity was to identify target issues or items which could provide substantial cost reductions or schedule improvements. These reductions were to be applicable to the project in any form,

so project redirection is no reason to suspend activity on the task. Even if activity was suspended, there was no interim or closed action report prepared. It appears to the DOE that $100,000 was spent with no tangible product. The fact that over seventy cost saving measures were identified in February 1990 to save almost $200 million dollars compared to the November 1989 estimate, gives further evidence that very little of the claimed cost savings effort went into the November estimate.

## PRMP/PROVE FPA: SCHEDULE PERFORMANCE

Issue from 3-page DOE Evaluation Summary:

Schedule reports were not provided in a form which ensured timely reporting and accuracy to the overall project schedules.

Rockwell's Position:

Schedule reports were provided in an acceptable format and quality for the level of project maturity. It was planned to incorporate all project schedules into a computer data base once the program direction had been validated, approved, and stabilized.

RFO Assessment:

Project schedules were repeatedly requested to be created on the Primavera® scheduling system specifically procured for PRMP use. This automated system provided for fast, flexible changes, future growth as the project matured, and clear logic ties for an integrated schedule. Instead, the Rockwell project management continued to provide reports on a graphic barchart format with no detailed backup figures and no evidence of logical relationships between tasks. These barchart schedules did not meet the DOE schedule reporting requirements, a fact which was repeatedly communicated in monthly reviews, informal meetings and correspondence. Also, these graphic schedules were difficult and time-consuming to modify. They did not provide an adequate scheduling or reporting tool for the PRMP.

## PRMP/PROVE FPA: TECHNICAL PRODUCT QUALITY

Issue from 3-page DOE Evaluation Summary:

Rockwell did not require periodic, independent audit of NQA-1 compliance and Non-Conformance Report actions to ensure that quality actions were completed without prejudice. A QA plan for PRMP, required prior to start of the full design effort and Title I activities, was not completed.

Rockwell's Position:

1) Rockwell implemented NQA-1 in the PRMP project as a pilot project in 1986. Until recently DOE was uncertain whether to implement NQA-1 at Rocky Flats and therefore the program was not funded and independent audits not undertaken. Although problems were encountered, Rockwell did successfully apply the NQA-1 program on the PRMP project and used the lessons learned to enhance the implementation across the plantsite.

2) All required Q.A. plans were completed and approved by Rockwell in 1988.

RFO Assessment:

NQA-1 quality requirements were stipulated for use on the PROVE project and on PRMP. The fact that it was the first major area at Rocky Flats to come under NQA-1 should have indicated an increased effort to comply with quality requirements, rather than a diminished effort. Verification and follow-up actions are key to any quality program, whether NQA-1 or not. Lack of independent audits and verification would have been cause for negative comments even if PRMP had not been under NQA-1.

## OTHER ARGUMENTS PUT FORWARD BY ROCKWELL

Rockwell's Position:

The DOE changed the rules for the evaluation period unilaterally by setting ES&H goals at 51%, by changing the AFDO from Twining to Nelson, by letting the award fee decision be influenced by politicians and newspapers, by allowing the embarrassment of Rocky Flats to DOE to be factored into the evaluation criteria, and by allowing the series of events between Rockwell and Watkins regarding the suspension of operations issue and the court suit by Rockwell to affect DOE's evaluation objectivity.

RFO Assessment:

These Rockwell comments generally concern legal or contractual issues that would be better addressed, if necessary, before a court of law. They were not addressed during the RFO review meeting held on July 16, 1990.

Defendant's Supplemental Exhibit 81

UNITED STATES CLAIMS COURT

Case No. 91-1362 C,

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF TERREL JOHN AGY
VOLUME I

October 21, 1992

Pursuant to Notice taken on behalf of Plaintiff at 150 East Tenth Avenue, Denver, Colorado 80203, at 9:50 a.m., before Judy L. Busbee, Registered Professional Reporter and Notary Public within Colorado.

evaluation of Rockwell that we recommended to Albuquerque.

Q. The supplemental agreement to the contract refers to the Albuquerque operations' handbook for award fee performance evaluation and review process. I am handing you a document marked as Plaintiff's Exhibit 2, which is entitled "Handbook for Award Fee Performance Evaluation and Review Process, Albuquerque Operations Office." And if you will look on the second page, it is signed and approved by Herman E. Roser, Manager, Albuquerque, dated June 24, 1977. Would you review this document, and indicate to me when you have finished reviewing it.

MR. RIGSBY: The whole thing?

MR. KELLEY: Well, in as much detail as Mr. Agy feels comfortable with discussing the document.

A. I've reviewed it.

Q. Have you ever seen this document before?

A. I've seen something like it.

Q. What was the document--

A. It was--

Q. --that you saw?

A. The document I saw that we had a copy of probably had this same cover sheet on it, but as I was given it in 1989, when I started as a program analyst, it

had a lot of revisions to it, changed pages, and nobody knew whether it was up to date or not. So I'm not sure that the document that I have in front of me, which has the initials of Mike Frietze on it, who is an Albuquerque employee--they put it out, so they probably had an up-to-date version, but I don't think we did. Basically, no one seemed to know if we did or not. And they were in the process of changing it again in 1989, and it was my understanding that it was more or less in draft again at that time.

Q. Was the document that you saw signed by Mr. Herman Roser?

A. I don't recall.

Q. Was it dated June 24, 1977?

A. I don't recall that either.

Q. How did you know there were changes to the document?

A. As I recall, like I said, there was pages that had been added to it, and correspondence in the file that indicated that Albuquerque was in the process of revising it, and had been in the process of revising it for some time. It was in a state of flux, in other words, and we--if there were questions about what we were supposed to do, if it wasn't clear, I wasn't clear, whether this addressed it or not, I would talk to Ted

Hill and ask him what his expectations were, and he would let me know what he wanted.

Q. How could you tell the changes had been added to the document?

A. Well, I believe I said that there were pages that were--had been added. I guess I don't recall exactly how I knew that.

Q. Were they numbered differently?

A. I think there was some of the material that was marked draft, and I believe it was a document similar to this, but that someone had taken it and made a lot of changes in it, and had marked draft on it, you know. And so it was--and then also I had seen correspondence in the file that indicated that it was under revision, you know. So it wasn't a complete document like this, that appeared to be, you know, something that was in force as originally written in 1977. That wasn't the case.

Q. Was some of the text stricken out?

A. I don't recall, but that's a possibility. Seems like it was something like that. It's been a while.

Q. Do you remember how it was that you first came to see this document, or this document as revised?

A. I believe it was Ed Green's copy that was left over after he left. He left it behind.

Q. And who was Ed Green?
A. Ed Green was the person who did the job that I did prior to me becoming a program analyst.
Q. Why did you review the document at that time?
A. Most likely it was because I was trying to find out what the process was, understand the process better.
Q. Did somebody refer you to the Albuquerque handbook to get a better idea of the process?
A. As I recall, I saw reference to it in the--that 128 we were just talking about, it addresses it, but--which is probably when it first came to my attention. It was in the file I found, so--in Ed Green's file. In Ed Green's desk, I should say.
Q. In what ways did you use the Albuquerque handbook which you had a copy?
A. Well, I was new at that time, and just trying to learn the process. And since it was my understanding that this thing was a draft in the process of being changed, I usually went by the previous--how we did it in the past. If I had questions about that, if that was proper, I would probably ask Barkmeier or Ted Hill. I know I referred to this, and read this on occasion, but I didn't--like I said, it was in revision,

so I wasn't sure whether it included the latest, latest guidance.

Q. Is it true, then, that, to the extent the handbook, or the version of the handbook you had, was not clear as to how you should be performing your role, that you discussed that with Mr. Barkmeier and Mr. Hill?

A. Yes. And it's also possible I may have talked to them without looking to that handbook on various questions too.

Q. Did you consider that the handbook was a document which was to be followed closely in determining Rockwell's award fee?

A. No, sir, I did not.

Q. Why was that?

A. Because it was my understanding it was in the process of being changed, and had been in the process of being changed for several years, and during the time that we were still under Albuquerque's direction, I don't believe it was ever put in final form, so--

Q. Was it your understanding that, because the handbook was being revised, that it did not carry force in terms of providing a procedure for determining Rockwell's award fee?

A. Well, not necessarily. It had some meaning, but only to the people in Albuquerque--the people in

Defendant's Supplemental Exhibit 82

No. 91-1362 C

UNITED STATES CLAIMS COURT

- oOo -

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

============================================================

DEPOSITION OF

RUSH OSBORNE INLOW

Tuesday, December 1st, 1992

Albuquerque, New Mexico

Reported by:

ARLETTE McCLAIN, CSR #85

A. To the best of my knowledge, he was, yes.
Q. For both periods?
A. Yes.
Q. Let me direct your attention to the next page of the handbook, which is page 25, and it is entitled, "Schematic of Award Fee Evaluation and Review Process." Does this schematic present an accurate picture of the award fee process?
A. Not entirely. For instance, the block labeled Performance Evaluation Committee, I don't recall during the April and May 1989 period, that there was an Albuquerque Performance Evaluation Committee that played a significant role in getting the summary report ready for the PERB.
I believe, as we have discussed in some detail, that the area office reports which had been reconciled with the Albuquerque divisions went directly to the PERB without any intervention by the PEC.
Q. Was there a Rocky Flats area office Performance Evaluation Committee?
A. I think there still was at that time, but its role was limited to gathering the input from the area office staff and preparing the report for the area manager.
Q. Did you ever discuss with Mr. Whiteman the role of the Rocky Flats Performance Evaluation Committee?
A. I don't recall any such conversation, no.

Q. Other than the role of the Performance Evaluation Committee, do you see anything else on this schematic that you would have any comments on?
A. The schematic leaves out a lot of the details that we have discussed, but I think in general process flow terms that it appears to be accurate.
Q. Does this schematic have any provision for input or review by DOE headquarters?
A. Not explicitly in the schematic, no.
Q. Were you aware at any point that this handbook, which is dated June of 1977 was being revised?
A. Yes, I was. I can't recall the specific date when the revision process started, but there was considerable effort by the Albuquerque Field Office staff to try to update the handbook and bring it into what was accepted practice at that time.
Q. Were these revisions taking place during your tenure at Rocky Flats?
A. To the best of my memory the process had started, but I don't think that any final revision had been issued by that time.
Q. What revisions were being made?
A. Well, in general terms, trying to update the handbook to reflect things such as not having the Performance Evaluation Committee that we had discussed, and

Defendant's Supplemental Exhibit 83

0001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------- x
ROCKWELL INTERNATIONAL :
CORPORATION, :
:
Plaintiffs, :
: No. 91-1362C
v. : Judge York
:
THE UNITED STATES, :
:
Defendants. :
--------------------------------x

Friday, April 29, 1994
Washington, D.C.

DEPOSITION OF:

HENSON MOORE,

a witness, called for examination by counsel for the Plaintiff, pursuant to notice of counsel, held at Chadbourne & Parke, 1101 Vermont Street, N.W., Washington, D.C. at 8:30 a.m. on Friday, April 29, 1994, before Thomas R. McPhail, CSR, Notary Public when were present on behalf of the parties:

0032

Q. In the first line of the letter, there is a reference to conversation of last week, I assume with Mr. Iacobellis. Do you remember what was said in that conversation?

A. The best I can recall, he called very concerned about that delay and the awarding of the award fee and was asking for some kind of guidance as to when this was going to be made.

Q. It is your recollection that Mr. Iacobellis initiated this telephone call?

A. The best I can remember, yes. And I assume he was looking for some kind of guidance, which I gave him by letter.

Q. Do you recall if that conversation was the first communication you ever had with Mr. Iacobellis on the subject of award fees?

A. I don't know whether it was the first or not. I don't recall.

Q. Is it possible that you initiated the call to Mr. Iacobellis?

MR. KOLAR: Objection to the form of the question. It calls for speculation and the

0034

Q. Do you have any recollection as to how Mr. Iacobellis would have known that you had any involvement in the award fee process at this time?

A. I don't think it would have been hard for him to find that out. All he had to do was to go to Ed Goldberg, and at that point he would be told, well, you understand these things are being reviewed in the headquarters first. I don't know when this press statement was made, but that indicated that I was taking some role to play in the award fee, so that was made before the letter, June 19th according to this Lexis.

MR. KOLAR: June 17th.

BY MR. NEY:

Q. June 17th.

A. So it would not have been hard for him to find that out that, in fact, there was not going to be an award fee made until it cleared my desk.

Q. Does that in any way refresh your recollection that perhaps, you tell me if it refreshes your recollection, that Mr. Iacobellis

0035

was calling you in reaction to the press release?

A. I was there on the site during that same time period and saw him on two or three occasions. We had two or three conferences about what was going on, the difference in the culture, I met with him on that occasion, on several occasions to explain that very clearly what was expected. So I had no idea what would have triggered a call, other than the fact that he's concerned about the award fee.

Q. Do you recall saying anything to Mr. Iacobellis on the subject of the award fee other than what is set forth in Exhibit 64?

A. No. However, I just might add, I think it is pretty obvious what was going on here, in terms of it would have been somewhat ridiculous for us to award award fees if, in fact, we had our own knowledge that laws had been broken by Rockwell and that was the reason for suspending the fees at that point.

Q. And the statement you just made is you are referring to the fact that there was a special

# Defendant's Supplemental Exhibit 84

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROCKWELL INTERNATIONAL CORPORATION, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | ) | No. 91-1362 C (Judge Yock) <br> <br> NOTICE OF DEPOSITIONS |

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Rules of the United States Court of Federal Claims, plaintiff Rockwell International Corporation will take the deposition upon oral examination of defendant United States of America, by the former employee Gregory Fess, on January 14, 1993, at the offices of Vorys, Sater, Seymour & Pease, 52 East Gay Street, Columbus, Ohio 43216, before an officer authorized to administer oaths.

PLEASE TAKE FURTHER NOTICE that, pursuant to Rule 30 of the Rules of the United States Court of Federal Claims, plaintiff Rockwell International Corporation will take the deposition upon

oral examination of defendant United States of America, by the employees or former employees named below, on the dates indicated, at the offices of Chadbourne & Parke, 1101 Vermont Avenue, Washington, D.C. 20005, before an officer authorized to administer oaths.

| Deponent | Date |
|---|---|
| James M. Barr | January 19, 1993 |
| John L. Meinhardt | January 20, 1993 |
| Troy E. Wade, II | January 21, 1993 |
| John C. Tuck | January 22, 1993 |
| W. Henson Moore | January 26, 1993 |
| James D. Watkins | January 27, 1993 |

Each deposition will begin at 9:30 a.m. and continue from day to day and on such adjourned dates as may be necessary until completed.

Dated: December 29, 1992

CHADBOURNE & PARKE
RICHARD J. NEY
WILLIAM J. KELLEY, III

William J. Kelley, III
Attorneys for Plaintiff Rockwell International Corporation
601 South Figueroa Street
16th Floor
Los Angeles, California 90017
(213) 892-1000

CERTIFICATE OF SERVICE

I certify under penalty of perjury that I am in the employ of Chadbourne & Parke, attorneys for plaintiff Rockwell International Corporation ("Rockwell"); my business address is 601 South Figueroa Street, 16th Floor, Los Angeles, California 90017; I am over the age of eighteen years; and on December 29, 1992, I served on defendant United States of America Rockwell's NOTICE OF DEPOSITIONS by mailing a true copy of the same to the office of Allen D. Bruns, Esq., Attorney of Record, Commercial Litigation Branch, Civil Division, United States Department of Justice, Attn: Classification Unit, 2nd Floor, 550 11th Street, N.W., Washington, D.C. 20530.

Executed this 29th day of December, 1992, at Los Angeles, California.

Patricia Meade

Patricia Meade

Defendant's Supplemental Exhibit 85

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA and
UNITED STATES OF AMERICA, ex rel.
JAMES S. STONE,

Plaintiffs,

vs. ) 89 M 1154

ROCKWELL INTERNATIONAL CORPORATION, et al.,

Defendants.

---

TRIAL TO JURY - DAY 15
TRANSCRIPT OF PROCEEDINGS

---

Proceedings held before the HONORABLE RICHARD P. MATSCH, U.S. District Judge for the District of Colorado, beginning at 8:30 a.m. on the 16th day of March, 1999, in Courtroom C-204, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs:

Maria T. Vullo, Esq.
Jeannie S. Kang, Esq.
Matthew Chevez, Esq.
Robert E. Montgomery, Jr., Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
Suite 2607
New York, New York 10019

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

you used to be an area manager. Can you just briefly describe the distinction or difference?

A Sure. Sometime after the FBI raid in June of 1989 and prior to my coming to Rocky Flats, there was a decision to separate the Rocky Flats federal office, the DOE office, out from under the Albuquerque operations office, and to make it separately reporting directly to headquarters. And when Admiral Watkins asked me to go there, he designated me as manager of that what would now be a new office in the Department of Energy, new in the sense of title, and new in the sense of reporting responsibility.

Q Basically a restructuring of the organization?

A Yes.

Q Did you have an understanding that you had the right and responsibility to make the award fee determination for Rockwell's last award fee?

A Yes, I did.

Q I'd draw your attention to Exhibit 2707, which I believe is a stipulated exhibit.

MS. BENSON: It is.

THE COURT: It is.

MS. BENSON: It's stipulated, Your Honor.

THE COURT: Thank you. All right, 2707.

Q (by Mr. Hesch) Can you explain what this letter is?

A This is the letter I sent to Rockwell as a--identifying

to them the award fee that I had decided to allow under the contract for them.

Q What is the period of time that this award fee covers?

A It covers the period from April 1, 1989 through September 30, 1989.

Q You weren't at the plant in September of '89, were you?

A No.

Q Were you able to make an award fee determination?

A Yes.

Q And how were you able to do that if you weren't there at the time?

A Well, in any of the award fee efforts, evaluations, there is a group of people, a performance board of one of a number of names, but it's a board of the plant people who are there in the DOE office reporting generally to the manager, in this case, to the award fee official, whoever that might be, and it is the manager, who are really familiar with work going on at the site, and they go through a fairly lengthy process of looking at reports and making evaluations, ultimately making a recommendation to the fee determining official, and it's up to that official, in this case me, to feel comfortable, probe at maybe the evaluations, and come to a judgment which makes sense for the facts and the contract and the amount of award fee.

Q Were you comfortable with relying on information from

others to make the determination?
A Yes.
Q And why is that?
A Well, they were people who reported to me on the staff. They were people who had been at Rocky Flats, some for a long time, some for shorter times, and they were people who I trusted in the day to day work.
Q Is it unusual to receive input from other people to make award fee determinations?
A No, it's the way it has to be done. The manager, the award fee official has to rely on others for information. I mean, I as the senior person there would perhaps deal with the senior contractor person there, but I don't deal with all the levels of work that these--that the contractor does. There are, perhaps at that time, in the order of 6,000 employees, contractor employees on the site, and a small number of federal employees. So it would be impossible to do it without that kind of review and evaluation by the staff people.
Q And input from headquarters, would that be something that would be important or--
A Certainly. It's another set of facts to use to try in this case to come up with an evaluation and an award fee.
Q Did you ultimately decide for yourself what amount Rockwell should earn for that period?

A Yes, I did.

Q And can you point out from this letter what the amount was that Rockwell received?

A Sure. It's the third line down, an award fee of $1,241,604.

Q And this was based upon your assessment of their performance of work?

A Yes, that's correct.

Q At the time that you made this award fee, were you aware of any fraud or knowing concealment by Rockwell relating to its work under the contract?

A No.

Q Would that have been a concern to you if there were allegations of knowing concealment?

A Yes, it would.

Q Why is that?

A Whenever Watkins asked me to go there, my job presented to him--or presented from him was to get the plant back in operation. It had been stopped with the FBI raid. I knew that the only way we would ever resume operation was to re-establish credibility with the public and our regulators, and so for me, it was extremely important that we be honest about what's going on. And I had established, particularly with our public affairs folks, kind of a rule chiseled almost on the walls that said tell on yourself, even if it hurts. That

Defendant's Supplemental Exhibit 86

JUL 2 6 1990

90-DOE-7564

Mr. John F. McNett
Associate General Counsel
Rockwell International Corporation
P. O. Box 464
Golden, CO 80402-0464

Dear Mr. McNett:

This is in response to comments provided to the Rocky Flats Office concerning the Department of Energy's Award Fee Evaluation of Rockwell International's performance for the period of April 1, 1989 through September 30, 1989. Due consideration was given to your written comments provided by letters dated May 3 and June 7, 1990, and your and Mr. Hood's oral comments presented at our meeting on July 10, 1990.

I have determined, based upon review of the data presented, that my original determination of an award fee in the total amount of $1,579,639.00 for the performance period noted above shall remain the same. I should also note that, since the original determination was made, it has been brought to my attention that in 1988 and 1989 Rockwell did not comply with the leak testing interval for final-stage HEPA filters in Pu plenums specified in either the applicable OSR (annual testing) or in the alternative that had been proposed by Rockwell (testing at a 2 to 3 year interval).

Rockwell International may submit a voucher for payment of this amount to the Albuquerque Operations Office.

Sincerely,

Original Signed By
Robert M. Nelson, Jr.

Robert M. Nelson, Jr.
Manager

bcc:
B. G. Twining, Manager, AL
FMD, AL
J. A. Stout, OCC/AL
Ted Hill, CPD/AL
T. Agy, Admin. Div., RFO

RECORD NOTE: This action is the AFDO's final decision on the amount of fee awarded to Rockwell as a result of its last award fee evaluation under Contract DE-AC04-76DP03533. As allowed by the specific contract language the contractor was allowed to provide a written response and an oral presentation to the FDO for reconsideration of his original determination.

| C&S BR | C/C&S BR | D/AMD | OCC | OOM | OOM | MANAGER |
|---|---|---|---|---|---|---|
| Agy:jk | Miller | Bishop | [illegible] | Simonson | Paröle | Nelson |

E 000077