Defendant's Supplemental Exhibit 52

United States Government Department of Energy

# memorandum

DATE: JUN 2 1 1989

REPLY TO ATTN OF: DP-3 (B.Barker, 6-2181)

SUBJECT: Albuquerque Operations Office (AL) Award Fee Determination for the Period October 1, 1988, through March 31, 1989

TO: Manager, Albuquerque Operations Office

Please be advised that I have thoroughly reviewed your findings for each contractor as noted in your May 31, 1989, memorandum to me, subject same as above. Based upon your input and my own personal observations, I concur in your findings for Allied Signal, Inc., EG&G, Mound Applied Technologies, Inc., General Electric Company, Mason Hanger - Silas Mason, Inc., and Westinghouse Electric Corporation.

In the case of Rockwell International Corporation, it would be premature at this time to make a final determination until the Department of Energy investigation of environmental, safety, and health charges are resolved.

I have noted my concurrence and concerns in the attached file copy response.

Troy E Wade II
Acting Assistant Secretary
for Defense Programs

Attachment:
Memo to DP-1 fm
AL dtd 5/31/89

Defendant's Supplemental Exhibit 53

UNITED STATES COURT OF FEDERAL CLAIMS

ROCKWELL INTERNATIONAL )
CORPORATION, )
)
)
Plaintiff, )
)
vs. ) No. 91-1362 C
) (Judge Yock)
UNITED STATES OF AMERICA, )
)
)
Defendant. )

DEPOSITION OF:

BRUCE G. TWINING

Tuesday, February 23, 1993

10:00 A.M.

Reported by:

BARBARA K. HARRIS

CSR # 93

handbook, was actually part of a headquarters task force that did a fairly thorough look at the award fee possess for DOE and made several recommendations to enhance it.

Q. Were the individuals at Albuquerque who were involved in the award fee process at liberty to deviate from the handbook as they wished?

A. I would view the handbook as a guidance document, especially in a period of transition where the department is changing its award fee process.

Q. So anybody in the Albuquerque Division who thought it was a good idea to deviate from the handbook was free to do so?

A. The PERB, I believe, was free to use the document as guidance and then do what they thought was right in a specific circumstance.

Q. So if the --

A. This doesn't say order. It doesn't say -- I haven't read it. But the handbook is a guidance document.

Q. So if the handbook said one thing, the PERB was free to do something else if they thought it was sensible under the circumstances?

MR. KOLAR: Could you be more specific about instances, examples?

MR. NYE: I will get to that, but right now I am just asking generally.

Q. Generally the PERB was perfectly free to deviate from the letter of this handbook.

MR. KOLAR: Objection on grounds of vagueness.

Q. That's fine. You may answer.

A. I would view that handbook as a guidance document, that laid out the process. My opinion on where we were in this process is that this handbook, which was dated 1977, was likely becoming obsolete, and led to this 1990 revision.

Q. Would you, Mr. Twining, describe for me how the award fee process worked at Albuquerque. Take your time and go from step one to the issuance of the actual fee to the M & O contractor.

A. Well, again, I said the award fee process has been evolving.

Q. Let's start with 1988 when you first arrived here.

A. In general, my view of how that award fee process worked at that time is that the area manager was responsible for pulling together the award fee report.

Q. Now, the area manager in connection with Rockwell would be the manager at the Rocky Flats facility in Colorado?

A. Yes. The area manager actually pulled together the report. In pulling together a report, he would have, ClCt

considered input from the people in his area office. He would have also been expected to consider input from people in functional divisions in Albuquerque.

For example, he would get input from the Weapons Quality Division that would deal with the quality of the product that Rockwell was producing in the plant. He would have been expected to get input from our ES & H people to reflect the kind of reviews and appraisals that had been done by both our people and headquarters people. And then he would incorporate that into a draft report.

He would then come to the PERB meeting, and be prepared to talk to that report. The other members of the PERB, which were -- and I'm not sure whether at this time the PERB was chaired by Jim Culpepper or Charlie Troell, but there was a chairman and other functional assistant managers on the PERB, and the PERB as a whole would listen to what the area manager had to say, make an assessment on whether it fairly characterized the input from their own functional people, as well as whether it, you know, fairly characterized Rockwell's performance from their point of view.

Q. Who were the members of the PERB?

A. Well, typically it would be the chairman, and I'm not sure whether at that time it was Charlie Troell or Jim Culpepper; the assistant manager for Operations and Weapons

would be on the PERB, the assistant manager for ES & H, all of our assistant managers that have a functional interest in what went on at the site.

There is, I believe, a PERB secretariat which is from the Contracts Division, but the board itself is the decision-making body. I think we probably have an attorney advisor to the PERB. Again, that was changed over time, I think.

But the PERB reviews what the area manager has to say, changes it if appropriate, and then I was given and am still given a report with a proposed award fee determination and a briefing. I look through that, ask my questions. If my concerns haven't been reflected, the PERB may or may not meet again to reflect the input I have or the questions I ask. But when we are all finished, I make an award fee determination.

And at the time of this award fee, we had just gotten into a process of formally sending those proposed determinations to headquarters for concurrence.

Now, over time, we have gotten much more formalized about determining what the performance objectives are that we are going to be interested in in the award fee process, and I am not sure what the practice was back in this period, but today we review those performance objectives, or performance criteria, the PERB agrees to them, they run them

Q. If you would look at the handbook that superseded the 1977 handbook, which is Exhibit 30, if you would look at page Roman III-10, it bears Bates number E 001096, and is entitled, there is a paragraph entitled, "Role of Fee Determination Official," and I would ask that you read that, Mr. Twining.

A. Yes.

Q. And on the following page there is a summary of the steps involved in the award fee process, and I would ask if you would look at that.

A. Yes.

Q. Now, does that paragraph comport to your understanding of how the process worked as well as the summary?

A. I think that paragraphs is fairly consistent with what I said.

Q. All right. So that the handbook, as it existed prior to the February 16, 1990 edition, makes no reference to headquarters' concurrence.

A. That's right.

Q. And the February 16, 1990 edition, which is Exhibit 30, does make explicit reference to headquarters' concurrence.

A. Yes.

Q. And I believe you have testified that the process ClCt

of headquarters' concurrence was an evolving one; is that fair?

A. Yes. Basically there was a task force that looked at the whole award fee process. One of their recommendations was that there ought to be a formalized headquarters' input, and it was not unusual for me to call and get input or the PERB to call and get input from headquarters before. But a formalized headquarters' input, I don't know exactly when we got guidance from headquarters that said, "From here forward you will send these forward for concurrence." But once we got that guidance, we did it. The handbook revision would have come later.

Q. So at some point before the February 1990 handbook, you would have received some directive from headquarters saying that award fee recommendations would have to go to headquarters for concurrence; is that correct?

A. I believe that's the case.

Q. Now, let's go back to 1988 when you arrived on the scene in Albuquerque, and I believe you testified you were involved in both award fee determinations for the six months of fiscal year '88. At that point in time, was there a formal requirement for headquarters' concurrence?

A. I don't recall, but I don't think so. I can't be absolutely sure. I do not believe that first award fee determination went to headquarters.

Q. In '88.
A. The determination that would have been made right after I got there, which would have been for the period that ended in March of '88.
Q. And what about the second half of 1988, that would be the award fee going from April 1 through September 30, 1988, did that go to headquarters for concurrence?
A. I don't recall. I don't know. I don't know for sure. I would say no because the task force was really started under the new administration, which came in in January of '89.
Q. As of the time that Admiral Watkins became the Secretary.
A. Yes.
MR. KOLAR: Give me a second, please.
(WHEREUPON, there were proceedings held off the record.)
Q. Now, it's your testimony, or your recollection, that for the two award fee periods in 1988, concurrence from headquarters is not required. Was headquarters informed at some point of the determinations that were being made for Rockwell, as well as the other M & O contractors under the supervision of Albuquerque?
A. It was not -- before I came to Albuquerque, there had been a technical safety appraisal at Rockwell, at Rocky t

experience with Rocky Flats prior to June 6, 1989?

A. Mr. Goldberg was in the plutonium business at Richland. There was a lot of interaction among all the plutonium facilities in the department. From that standpoint, Mr. Goldberg would have been familiar with Rocky. I don't think he had personal day-to-day knowledge of what went on there, at the time he entered.

Q. Subject to dealing with Rocky Flats in his position at Hanford, do you have any information as to any other personal knowledge Mr. Goldberg would have concerning the Rocky Flats operations prior to June 6?

A. No.

Q. And how long did Mr. Goldberg serve as area manager?

A. I don't recall.

Q. A year?

A. I would say most of a year, but I don't know.

Q. Do you know who replaced him?

A. I would say either Dave Nelson or --

Q. Simonson?

A. Dave Simonson or Bob Nelson.

Q. After Mr. Goldberg became acting area manager at Rocky Flats, did you have a lot of dealings with him?

A. Not very many, but as this memo points out, we were expected to continue to support the office, and we did

that in a number of areas, but in operational areas or major ES & H areas, there was a period of very little interaction between our staffs.

Q. This memo states that Mr. Goldberg will report to the Undersecretary of Energy, John C. Tuck, with regard to operations of Rocky Flats.

A. Yes.

Q. Was that a change of prior procedures, or prior reporting responsibilities?

A. Well, prior to this memo that area office reported to me.

Q. Who do you report to, or in 1989 who did you report to as manager at Albuquerque?

A. I believe at that time all the field managers plugged into the box that had the secretary, the deputy secretary, and the undersecretary, and I did have some daily interactions with John Tuck.

Q. When did you first hear about the raid at Rocky Flats?

A. The day before it happened. It might even have been the morning it happened.

Q. Were you told at that time that Mr. Goldberg would come in as area manager?

A. Yes, I was.

Q. Were you also told at that time that he would be ClCt

reporting directly to headquarters?
A. Yes.
Q. After Mr. Goldberg's appointment, did you consider Rocky Flats still to be under the supervision of Albuquerque?
A. I considered this memo to be the effective document. That office reported to headquarters, and we were to do everything we could to help make things work.
Q. So the answer is no, you did not consider --
A. No, I did not --
Q. -- Rocky Flats to be under your jurisdiction.
A. No.
Q. Let me show you a document that has been marked as Plaintiff's Exhibit 49. It's a memorandum from Mr. Troell directed to you, dated July 10, 1989.
A. Okay.
Q. Have you seen this memorandum before?
A. Yes, I think I have.
Q. Why did Mr. Troell draft this memorandum?
MR. KOLAR: Objection, lack of foundation. It calls for testimony about what was in Mr. Troell's mind.
Q. Go ahead. You can answer.
A. As I recall this process, we got a recommendation from Mr. Goldberg based on the period of time that he had been at Rocky Flats, and we also had the nonconcurrence from

Defendant's Supplemental Exhibit 54

00001

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA ex rel. James S. Stone,

Plaintiff,

v. No. 89-M-1154

ROCKWELL INTERNATIONAL CORPORATION, THE BOEING CORP., BOEING NORTH AMERICAN, INC.,

Defendants.

VIDEO DEPOSITION OF BRUCE TWINING
VOLUME I
April 7, 1998
9:00 a.m.
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. CHRISTOPHER J. KOENIGS
ATTORNEY FOR THE DEFENDANTS

REPORTED BY: MARY ABERNATHY SEAL, RDR, CRR, NM CCR #69
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

5434-2 MAS

00115
received widespread press coverage, to your recollection?
A. Yes, they did.
Q. And to your recollection, did they harm DOE's reputation?
MR. HESCH: Objection. Foundation, form.
A. I think they hurt DOE's reputation.
Q. (By Mr. Koenigs) Do you think they also hurt Rockwell's reputation?
MR. HESCH: Objection. Form, foundation.
A. Yes.
Q. (By Mr. Koenigs) After the raid I think you indicated that your oversight responsibilities with respect to Rocky Flats were either diminished or eliminated. I don't mean to characterize it, but is that correct?
A. I think "eliminated" is closer than "diminished."
Q. Do you recall how you learned that that was going to be the case?
A. John Tuck, who was the under secretary at the time, telephoned me either the day before the raid, or the morning of the raid, and told me that the raid was going to happen, and told me about how they were going to rewire the organizational chart.
Q. By rewiring it, you're referring to placing Mr. Goldberg as area manager of the plant and having him report directly to headquarters?

00116
A. Yes.
Q. Did he tell you why that was being done?
A. It's just something the secretary wanted to do.
Q. Did he indicate to you in that conversation any dissatisfaction with Albuquerque's oversight of the plant?
A. No.
Q. Did you subsequently come to understand that headquarters was dissatisfied with Albuquerque's oversight of the plant?
A. I think they were dissatisfied with what happened to Rocky Flats and that we had a share in that.
Q. At that point in time -- strike that.
(Exhibit 852 marked for identification.)
Q. Before we look at this document, Mr. Whiteman was already area manager at Rocky Flats when you became the manager of Albuquerque?
A. Yes, he was.
Q. Okay. Was part of your responsibility to assess his performance as area manager?
A. Yes, it was.
Q. And did you conduct any kind of regular, such as annual, evaluations of Mr. Whiteman's performance?
A. Yes, I did.
Q. Were they, in fact, annual, or were they more frequent than that?

Defendant's Supplemental Exhibit 55

P84

# EXECUTIVE SUMMARY

AUG 0 4 1989

| | |
|---|---|
| SUBJECT: | Award Fee Determination for the Period October 1, 1988, through March 31, 1989, Rockwell International Corporation |
| Technical Monitor/Division: | Acting Area Manager, RFAO |
| Contractor/Contract No: | Rockwell International Corporation/DE-AC04-76DP03533 |
| Action Initiator/Phone: | TH Ted Hill/4-9189 |
| Action Requested: | Sign Memorandum to John L. Meinhardt, Acting Assistant Secretary for Defense Programs |

Description/Nature of Action/Background

On May 31, 1989, the Manager, Albuquerque Operations Office (AL), submitted tentative findings for each Management and Operating award fee contractor for the period October 1, 1988, through March 31, 1989, to the Acting Assistant Secretary for Defense Programs for his review and concurrence/nonconcurrence. On June 21, 1989, Troy E. Wade, Acting Assistant Secretary for Defense Programs, responded with concurrence for the proposed Award Fee Determinations for all award fee contractors except Rockwell International Corporation, stating that "it would be premature at this time to make a final determination until the Department of Energy investigation of environmental, safety, and health charges are resolved."

Subsequently, Edward S. Goldberg, Acting Area Manager, Rocky Flats Area Office, made an on-site review of Rockwell's performance for the period October 1, 1988, through March 31, 1989, and submitted his observations to the Manager, AL, in a memorandum dated July 27, 1989. Mr. Goldberg further proposed an award fee amount of $3,628,622, which equates to an overall grade of "87" and 53.19% of the total available award fee versus the Performance Evaluation Review Board's (PERB's) recommendation of $5,326,482, equating to a grade of "91.20."

Mr. Goldberg's observations, along with the AL Manager's tentative determination, are being sent to the Acting Assistant Secretary for Defense Programs for concurrence/nonconcurrence.

Although the Performance Evaluation Report has been revised to reflect Mr. Goldberg's observations, the PERB's initial recommendation to the Manager, AL, has not been changed. The PERB did send a memorandum to the Manager dated July 10, 1989, stating that "in light of these new expectations, if the PERB was to reassess Rockwell's performance for the period October 1, 1988, through March 31, 1989, it would, in all likelihood, recommend a lower overall rating. Therefore, the PERB would not object to Ed Goldberg's proposed overall numerical rating of '87'."

MOCB:3-89-696

E 000972

Defendant's Supplemental Exhibit 56

UNITED STATES COURT OF FEDERAL CLAIMS

ROCKWELL INTERNATIONAL )
CORPORATION, )
)
)
Plaintiff, )
)
vs. ) No. 91-1362 C
) (Judge Yock)
UNITED STATES OF AMERICA, )
)
)
Defendant. )

DEPOSITION OF:

CHARLES EDWARD TROELL

Tuesday, March 2, 1993

9:30 A.M.

Reported by:

BARBARA K. HARRIS

CSR # 93

Q. Do you have any reason to believe that Mr. Hill's minutes of the meeting are not an accurate reflection of what took place at the meeting?

A. Ted Hill was probably the best secretary I ever had in the performance evaluation review board, and generally it was impeccable. I never had occasion to find him make a mistake on one. He really was very thorough and very competent, but certainly a human being, he could have made a mistake. And when Ted Hill says there was considerable discussion, believe me, there was considerable discussion.

Q. Mr. Troell, I'm handing you a document which has previously been marked as Exhibit 9, which is a memorandum from Claude Broxmeier to James Beiriger dated May 23rd, 1989.

A. Yes.

Q. Have you ever seen this document before?

A. I don't recall seeing it. I never heard of Beiriger. I wouldn't say -- it's possible I saw it, but I sure don't recall it. This was between two fairly low staff members, and probably never got to my level.

Q. The last sentence of the memorandum talks about directing questions about the Albuquerque HQ role with Theetis Hill.

A. Yes.