ELECTRONICALLY FILED ON OCTOBER 30, 2006

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 91-1362 C<br>(Judge Lettow) |

**ROCKWELL'S SUPPLEMENTAL SUBMISSION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .......... 1

ARGUMENT .......... 3

I. THE GOVERNMENT CANNOT SIDE-STEP ITS STIPULATED BREACH OF CONTRACT .......... 3

A. The Government's "Functional" Interpretation Supports Rockwell's Claims .......... 4

B. The Government's Interpretation Has No Judicial Support .......... 6

C. The Government's Interpretation Is Inconsistent with the Plain Language of the Contract .......... 8

1. The Federal Circuit Employs the Plain Meaning Rule in Interpreting Contracts .......... 8

2. Under the Federal Circuit's Rules of Contract Construction, Defendant's Interpretation Is Unreasonable .......... 9

3. In Contrast, Rockwell's Interpretation Is Consistent with the Contract's Plain Meaning and Is Manifestly Reasonable .......... 12

D. If the Court Were to Consider Extrinsic Evidence, That Evidence Supports Rockwell's Interpretation .......... 13

II. TWINING'S AND SIMONSON'S AWARD FEE DETERMINATIONS WERE FINAL .......... 17

A. The Award Fee Procedure .......... 17

B. 89/1 Period: Mr. Twining's May 31, 1989, Determination .......... 18

C. 89/2 Period: Mr. Simonson's December 6, 1989, Determination .......... 21

D. Headquarters' Concurrence Policy Also Breached Rockwell's Contract .......... 22

III. THERE ARE NO GENUINE ISSUES OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT FOR ROCKWELL .......... 26

A. There Are No Genuine Issues of Material Fact Preventing the Court from Deciding That It Has Power to Decide Rockwell's Breach of Contract Claims .......... 26

# TABLE OF CONTENTS

Page

B. There Are No Genuine Issues of Material Fact Regarding Defendant's Breach of the Contract ....... 28

1. Under the Contract's Plain Meaning, DOE Breached the Contract ....... 28

2. Even Under Defendant's Contract Interpretation, DOE Breached the Contract ....... 29

a. DOE Breached the Contract When Headquarters Overrode Mr. Twining's and Mr. Simonson's Decisions ....... 29

b. DOE Breached the Award Fee Contract Provisions in Other Respects as Well ....... 29

i. DOE Breached the Contract Requirement That the AFDO Be a Single, Final Decision-Maker ....... 30

ii. DOE Breached the Contract's Weighting Requirements for ES&H ....... 31

iii. DOE Breached the Contract by Making Results-Oriented Award Fee Decisions ....... 33

C. There Are No Genuine Issues of Material Fact Regarding Rockwell's Damages ....... 35

D. There Are No Genuine Issues of Material Fact Regarding Defendant's Affirmative Defenses ....... 37

CONCLUSION ....... 39

Pursuant to the Court's Scheduling Order dated September 21, 2006, Rockwell submits this supplemental submission in further support of its motion for summary judgment and in opposition to the government's cross-motion for summary judgment.

## PRELIMINARY STATEMENT

The parties agree that the contract requires that award fees be the final, subjective determination of the AFDO. The parties differ on who is the AFDO. The contract specifies that the AFDO is the "Manager, or anyone acting as Manager, Albuquerque Operations." Rockwell gives those words their plain meaning: the AFDO is the Manager of Albuquerque Operations or, if the position of Manager is vacant, whoever is acting as Manager of Albuquerque Operations. It is not disputed that during the 89/1 and 89/2 award fee periods, Bruce Twining was Manager of Albuquerque Operations. Accordingly, Mr. Twining was the AFDO.

The contract sets forth the specific Functional Performance Areas from which the contractor's performance is to be measured. The contract also provides the respective weight of each Functional Performance Area in the evaluation process and an award fee Rating Plan. DOE's Handbook for Award Fee Performance Evaluation and Review Process details the process leading up to the AFDO's final determination. Briefly, the Rocky Flats Area Office collects and reviews information on the contractor's performance, prepares a draft evaluation report, calculates a proposed award fee based on the contract's criteria, and forwards its findings and recommendations to the Performance Evaluation Review Board. That Board reviews the Area Office's work product, gathers further information, and provides the AFDO with its own evaluation report and award fee recommendation. In the final step of the process, the AFDO considers the Board's evaluation and recommendation and makes his or her own final, subjective determination of the contractor's award fee.

The foregoing process was followed in the 89/1 and 89/2 award fee periods and culminated in Mr. Twining's May 31, 1989, award fee determination for the 89/1 Period and Mr. Twining's delegate, Mr. Simonson's, December 6, 1989, determination for the 89/2 Period. Under the contract and DOE's Handbook, those determinations were the final step.

After Admiral Watkins became DOE Secretary in March 1989, DOE headquarters instituted a new policy requiring AFDO award fee determinations to be sent to headquarters for review and concurrence before issuance to the contractor. Accordingly, pursuant to this new policy, Mr. Twining and Mr. Simonson each forwarded his contractually final award fee determination to headquarters for concurrence. As stipulated by Defendant, headquarters found each award fee determination too high, made its own award fee determination and mandated the AFDO to issue the award fee determined by headquarters.

This new requirement for headquarters' concurrence in an AFDO's award fee determination was instituted after execution of Rockwell's contract. The new requirement never became part of Rockwell's contract. Nor was this new requirement even included in DOE's own Handbook for Award Fee Performance Evaluation and Review Process until months after the end of the 89/2 Period. The law is clear that an agency's internal review procedure cannot undo the final determination of a contractually designated decision-maker. In short, the headquarters' concurrence policy cannot act to divest the AFDO of the legal authority to make a final award fee determination which is binding on DOE.

Because (1) DOE's concurrence policy was not part of, and did not change, the parties' contract and (2) DOE stipulated that Rockwell's award fees were determined by headquarters and not by the AFDO, Defendant is forced to argue that, under the contract, Rockwell's AFDO was headquarters. Defendant claims that the words "Manager, or anyone acting as Manager,

Albuquerque Operations" mean the Manager of Albuquerque Operations or, even if there is an existing Manager, as here, any DOE contracting officer assigned the function of determining Rockwell's award fees.

Defendant's interpretation strains the plain meaning of those words, eviscerates the explicit provision limiting the AFDO to the Manager of Albuquerque Operations, ignores the words "Albuquerque Operations," is flatly inconsistent with Defendant's Stipulation, and is contrary to extrinsic evidence. Finally, assuming *arguendo* that the contract permitted headquarters to transfer award fee responsibilities from the AFDO to itself, those transfers, in this case, occurred too late. Defendant has stipulated that after Messrs. Twining and Simonson made their respective award fee determinations, headquarters overrode them in favor of lower award fees. The law is clear that the decision of a contract decision-maker cannot be reversed by a successor decision-maker.

Rockwell is entitled to summary judgment.

## ARGUMENT

### I. THE GOVERNMENT CANNOT SIDE-STEP ITS STIPULATED BREACH OF CONTRACT

The government's non-breach argument centers on the contract's definition of "the Award Fee Determination Official" as "Manager, or anyone acting as Manager, Albuquerque Operations." *See generally* Gov. Br. at 16-24; Gov. Reply at 3-11. Rockwell construes this language in accordance with its plain meaning: (1) if there is a Manager of Albuquerque Operations, he or she shall serve as the AFDO and (2), if there is no Manager of Albuquerque Operations, the individual "acting as Manager" at Albuquerque Operations shall serve as the AFDO. *See* Pl. Reply at 4. Thus, because Mr. Twining was the Manager of Albuquerque Operations at all relevant times, he was also the contractually designated AFDO.

The government proposes a far different interpretation, arguing that this language "was

open-ended, and literally indicated that any duly designated contracting officer(s) acting in the function of Manager of Albuquerque could determine the award fee." Gov. Reply at 6. In its initial brief, the government urged an even broader construction: "'Anyone acting as Manager, Albuquerque' means *any official of DOE* carrying out the same functions as Mr. Twining with respect to the subject matter in question." Gov. Br. at 17 (emphasis added). This reading of the contract not only nullifies the provision limiting the award fee decision-maker to a single, identified official, it also does not support Defendant's theory that, in this case, headquarters was the AFDO. Moreover, Defendant's interpretation finds no support in caselaw, the contract, or extrinsic evidence.

A. The Government's "Functional" Interpretation Supports Rockwell's Claims

While the government's theory is ever-changing, its inherent fallacy remains the same. The government implicitly concedes that award fee determination was a "function" that belonged to the Manager of Albuquerque. *See, e.g.,* Gov. Reply at 6. And because "the subject matter in question" (Gov. Br. at 17) was award fees, the government's interpretation would define Award Fee Determination Official as the Manager of Albuquerque Operations or "anyone [determining award fees]." Defendant's proposed reading is at best supportive of Rockwell's interpretation and at worst merely circular.

Under the "functional" test the government advocates (*see* Gov. Reply at 4), the AFDO was not Secretary Watkins, Mr. Goldberg, or other DOE officials, as Defendant contends (*see, e.g.,* Gov. Br. at 1-2; *id.* at 17; Gov. Reply at 4). To the contrary, this test compels the conclusion that, consistent with Defendant's Stipulation, at the relevant times, the AFDO was Mr. Twining for the 89/1 Period and Mr. Simonson for the 89/2 Period. *See* Pl. Ex. 5, Stipulation, ¶¶ 1, 9. Defendant does not, and cannot, dispute that Mr. Twining was "acting as Manager" over Rocky Flats when the 89/1 Period ended on March 31, 1989, or when he rendered his award fee determination on May 31, 1989, *before* DOE's change in reporting structure. *See* Def.'s Proposed Findings of Uncontroverted Fact, filed July 27, 2006,

("DPFOUF") ¶¶ 30, 51; (announcing change in reporting structure effective June 6, 1989); Def. Ex. 32 (Twining's May 31, 1989, determination); Pl. Supp. Ex. 48, Dep. of Bruce G. Twining, Feb. 23, 1993, ("Twining Dep.") at 60, 67-68 (discussing shift in management arrangement at time of the raid); Pl. Supp. Ex. 49, Dep. of Edward S. Goldberg, Nov. 10, 1992, ("Goldberg Dep.") at 13-14, 38-39 (Goldberg did not begin working at Rocky Flats until June 6, 1989).[1]

Similarly, Defendant does not, and cannot, dispute that Mr. Simonson was "acting as Manager" over Rocky Flats when the 89/2 Period ended on September 30, 1989, or when he rendered his award fee determination on December 6, 1989. *See* DPFOUF ¶¶ 76, 78; Def. Ex. 34 (DOE press release announcing Simonson would replace Goldberg in mid-September 1989); Def. Ex. 35 (Simonson's Dec. 6, 1989, determination); Pl. Supp. Ex. 50, memorandum from D. Simonson, Manager, RFO, dated Sept. 21, 1989; Pl. Supp. Ex. 51, memorandum to D. Simonson, Manager, RFO, dated Sept. 22, 1989; Pl. Supp. Ex. 49, Goldberg Dep. at 13-14, 93 (Goldberg left Rocky Flats in Sept. 1989); Pl. Supp. Ex. 52, Dep. of Robert M. Nelson, Jr., Nov. 9, 1992, ("Nelson Dep.") at 22-25 (Nelson didn't succeed Simonson until Jan. 28 or 29, 1990). In short, the "functional" award fee decision-maker was Mr. Twining for the 89/1 Period and Mr. Simonson for the 89/2 Period.

The government argues that after award fee decisions were made by Messrs. Twining and Simonson, the "function" of award fee decision-maker, in each case, was transferred to headquarters. Assuming *arguendo* that Defendant's contract construction is correct, which it

---

1 The exhibits referenced as "Def. Ex. __" are attached to the Declaration of John A. Kolar in Opposition to Rockwell's Summary Judgment Motion and in Support of the Government's Cross-Motion, filed July 27, 2006. The exhibits referenced as "Pl. Ex. __" are attached to the Declaration of Richard J. Ney in Support of Plaintiff's Motion for Summary Judgment, filed May 31, 2006. The exhibits referenced as "Pl. Supp. Ex. [37 to 46]" are attached to the Declaration of Richard J. Ney in Further Support of Plaintiff's Motion for Summary Judgment, filed August 28, 2006. The exhibits referenced as "Pl. Supp. Ex. [47 *et seq.*]" are attached to the Declaration of S. Jean Kim in Support of Rockwell's Supplemental Submission on Cross-Motions for Summary Judgment, filed concurrently herewith.

plainly is not, those transfers were too late to be effective. The law is clear that once a contractually designated decision-maker renders a decision, that decision cannot be undone by a successor decision-maker. *See Gen. Elec. Co. v. United States*, 412 F.2d 1215, 1221-22 (Ct. Cl. 1969) (decision-maker's finding could not be reversed by successor contracting officer; latter's decision was therefore a nullity); *Southern, Waldrip & Harvick Co. v. United States*, 334 F.2d 245, 249-50 (Ct. Cl. 1964) (superior's reversal of contracting officer's determination was unlawful); *Tele-Sentry Sec. Inc.*, 84-2 BCA ¶ 17,360 at 86,510 (GSBCA May 7, 1984) (where contracting officer agreed to substitution of equipment without reduction in contract price, successor contracting officer's reduction in contract price was improper); *Bell Helicopter Co.*, 74-1 BCA ¶ 10,411, at 49,192 (ASBCA Dec. 17, 1973) (contracting officer's decision was final and binding on government and not subject to revocation by successor contracting officer). In short, even under the government's interpretation of the contract, the headquarters' determinations were improper and ineffective.[2]

B. The Government's Interpretation Has No Judicial Support

The government does not dispute the well-established principle that where the contract vests decision-making authority in a specified official (here, "the Award Fee Determination Official"), that official's decision must be personal and independent. *See* Mov. Br. at 21-25 (discussing cases). While the decision-maker may consider input from superiors in rendering an independent decision, in the end that decision cannot be "determined" and "mandated" from above. *See* Pl. Ex. 5, Stipulation, ¶¶ 7, 8, 11, 12; Mov. Br. at 22-24 (discussing cases); *see also*

---

[2] The government argues that the award fee decisions of Messrs. Twining and Simonson were not final because they required headquarters' concurrence. In Section II, *infra*, it is shown that those decisions complied with all the contract requirements concerning award fees -- indeed, they constituted the last step in the award fee process -- and that headquarters' concurrence policy was not part of Rockwell's contract. Indeed, DOE's insistence on that policy was itself a contract breach.

*Fischbach & Moore Int'l Corp. v. United States*, 617 F.2d 223, 226 n.7 (Ct. Cl. 1980) (where contract designates a specific official to render a contractual decision, "other persons (including higher officials) cannot displace the designated decision-maker"). Headquarters cannot encroach on the decision-making process. *See, e.g., Edmund Leising Bldg. Contractor, Inc.*, 81-1 BCA ¶ 14,925 at 73,852-53 (VACAB Feb. 3, 1981) (concluding decision was improperly made and "mandated" by Central Office staff); *N.Y. Shipbuilding Corp. v. United States*, 385 F.2d 427, 434 (Ct. Cl. 1967) (reasoning that contractor who agreed upon determination by District Engineer should not have to find "determination made by . . . the Secretary, personally"); *Southern, Waldrip*, 334 F.2d at 250 (holding agency official in Washington, D.C., had no authority to overrule local district engineer designated as decision-maker); *Standard Dredging Co. v. United States*, 1930 WL 2458 (Ct. Cl. 1930) (holding agency official in Washington, D.C., had no authority to direct designated local decision-maker to cancel contract); *Williams Eng'g & Contracting Co. v. United States*, 1920 WL 628 (Ct. Cl. 1920) (holding Secretary of Navy could not displace designated decision-makers).

Defendant's interpretation of the contract turns this jurisprudence on its head. If a superior cannot force a determination on a designated decision-maker, surely the superior cannot simply "remove[]" the decision-maker's authority and transfer it to "officials of his choosing" (Gov. Br. at 2). Indeed, courts have rejected Defendant's assertion that a contract's designation of "*the* Contracting Officer" means the government may select *any* contracting officer it deems appropriate. *See, e.g., Gen. Elec.*, 412 F.2d at 1218, 1219, 1221 (upholding contract's designation of "the Contracting Officer, Boston Procurement District" as decision-maker and nullifying decision of Army Weapons Command contracting officer).[3]

---

[3] In support of its non-breach theory, Defendant relies on three cases, one of which dates back to 1868. *See* Gov. Br. at 23 (citing *United States v. Adams*, 74 U.S. 463 (1868)); Gov. Reply at 7 (citing *Manson Constr. Co. v. United States*, 64 Fed. Cl. 746 (2005), and *Helix Elec., Inc. v. United States*, 68 Fed. Cl. 571 (2005)). None of these decisions supports Defendant's notion that, consistent with the contract, headquarters could usurp the contractually designated

(cont'd on following page)

C. <u>The Government's Interpretation Is Inconsistent with the Plain Language of the Contract</u>

1. <u>The Federal Circuit Employs the Plain Meaning Rule in Interpreting Contracts</u>

The government's interpretation contradicts several principles of contract interpretation recognized by the Federal Circuit. The proper analysis "begins with the plain language of the written agreement." *Hercules Inc. v. United States*, 292 F.3d 1378, 1380 (Fed. Cir. 2002); *accord Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). Where, as here, there is only one reasonable interpretation discernible within the "four corners" of an integrated agreement, the plain meaning controls. *See Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375-76, 1380 (Fed. Cir. 2004); Pl. Ex. 1 at 1, 2 (referencing "the entire agreement of the parties").

Extrinsic evidence is not used to determine whether an interpretation is reasonable in the first instance. *See Barron Bancshares*, 366 F.3d at 1375-76; *McAbee Constr., Inc. v United States*, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996). Thus, the reasonableness of Defendant's interpretation depends on the language of the contract itself and not on extrinsic matters, such as the Secretary's purportedly inherent authority, internal delegation orders, or circumstances

---

(cont'd from previous page)

decision-maker's authority. At issue in *Adams* was the Secretary of War's decision to suspend payment on certain contracts and to establish a special board to review claims brought under the suspended contracts. No breach of contract or contract interpretation question was presented, although the court did note that an agency head is duty-bound to ensure that contracts "are properly and faithfully executed." *See Adams*, 74 U.S. at 477. *Manson* was a bid protest brought by the low bidder. There, the Court rejected plaintiff's claim that it should have received a government contract, where the applicable statute and regulations did not limit the government's discretion to award the contract to any bid within a specified range. *See Manson*, 64 Fed. Cl. at 753. In *Helix Electric*, the Court rejected a proposed contract interpretation because the contract provision did not reference certain statutory and regulatory requirements and because the interpretation would permit the contractor to award a contract to itself, thereby engaging in prohibited self-dealing. *See Helix Elec.*, 68 Fed. Cl. at 585. *Adams*, *Manson*, and *Helix Electric* are inapposite and underscore the absence of judicial support for the government's proposed contract interpretation.

relating to the June 6, 1989, raid.[4]

The contract must be read as a whole. *See Coast Fed. Bank v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) ("The Agreement must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts."); *see also Hercules*, 292 F.3d at 1381; *McAbee*, 97 F.3d at 1434. Contract provisions must be interpreted "so as to make them consistent." *Abraham v. Rockwell*, 326 F.3d 1242, 1251 (Fed. Cir. 2003). "[T]erms of a contract should not be interpreted so as to render them ineffective or superfluous." *Id.* at 1254. Finally, general contract provisions must yield to specific ones. *See id.*; *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1376 (Fed. Cir. 2001).

2. Under the Federal Circuit's Rules of Contract Construction, Defendant's Interpretation Is Unreasonable

The government's reading of the contract violates each of these principles. In arguing that its interpretation was "in keeping with the plain meaning of the contract language," Defendant relies improperly on extrinsic matters. *See, e.g.*, Gov. Reply at 4 (alleging "Secretary Watkins deemed Manager Twining to be 'disabled'"). This is not surprising, as it is hardly self-evident or even plausible that the plain and ordinary meaning of "or anyone acting as" could be (i) "any official of DOE carrying out the same functions . . . with respect to the subject matter in question," (ii) "any duly designated contracting officer(s) acting in the function of," or (iii) "a DOE contracting officer other than the Manager . . . (as long as he or she was the functional equivalent of the Manager with respect to knowledge of Rockwell's performance)." *See* Gov. Br.

---

4 The government's assertion that headquarters' actions were proper because Mr. Twining was "tainted" and "disabled" by conflict of interest or lack of impartiality (*see, e.g.*, Gov. Br. at 23; Gov. Reply at 11) should be disregarded in any event. This Court has ruled that it is too late for Defendant to pursue an impossibility or justification defense based on allegations "that DOE had grounds for removing from the AFDO the authority to determine Rockwell's award fees because of DOE's 'good faith belief' that the AFDO had become a focus of the FBI's criminal investigation into Rockwell's activities." *See* Pl. Ex. 32, Opinion and Order, March 10, 2006, at 11, 13.

at 17, 19; Gov. Reply at 11.[5]

The government contends that under its interpretation, headquarters could "overr[i]de" the AFDO's conclusions. *See* Gov. Reply at 10. But depriving the AFDO of final say would render meaningless the explicit contract provisions vesting the AFDO with authority to make a "[f]inal," "subjective[]" determination of award fees. *See, e.g.,* Pl. Ex. 3 at 2, 3; *id.* at Attach. A, pp. 1 and 2 of 9. These provisions cannot be overlooked in interpreting the meaning of "or anyone acting as Manager." *See Air-Sea Forwarders, Inc. v. United States*, 166 F.3d 1170, 1172 (Fed. Cir. 1999) ("[T]he provisions must be read together in order to implement the substance and purpose of the entire agreement."); *see also Abraham*, 326 F.3d at 1254 (rejecting government's interpretation, which "would largely eviscerate" another portion of the contract); *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 572 (2004) (rejecting government's interpretation, which "ignore[d]" a section of the contract, in favor of interpretation that "read in context").

The government's interpretation presumes that "*the* AFDO" was, in fact, multiple persons. *See* Gov. Br. at 1-2, 16, 17, 19, 22-23; Gov. Reply at 4-5, 7, 8. This reading is plainly inconsistent with the contract's numerous provisions identifying the AFDO as a single official.[6]

---

[5] In arguing for its interpretation, Defendant repeatedly points to what's *not* in the contract. *See, e.g.,* Gov. Br. at 16 ("Nothing in the contract restricts . . . nor limits . . ."); *id.* at 17 ("There is nothing in this language prohibiting . . ."); Gov. Reply at 6 ("The contract did not purport to impose . . ."). This implicitly acknowledges the lack of support for Defendant's reading within the four corners of the contract. But this absence of support does not create an ambiguity. *See McAbee*, 97 F.3d at 1433, 1435 (reversing judgment of lower court, which had concluded "missing" provision created ambiguity).

[6] *See* Pl. Ex. 3 at 2 (clause 62(b)(1)); *id.* at 3 ("Determinations of award fee will be made every six months or at the end of such other evaluation periods as *the* Award Fee Determination Official may determine are appropriate after consultation with the Contractor . . . . *The* Award Fee Determination Official shall notify the Contractor in writing of any changes in the duration of such periods . . . . The award fee shall be determined subjectively by *the* Award Fee Determination Official based on the Contractor's performance in accordance with the Award Fee Plan set forth in Appendix D."); *id.* at Attach. A, p. 1 of 9 ("*The* Award Fee Determination Official (Manager or anyone acting as Manager, Albuquerque Operations) (AFDO) shall evaluate the Contractor's performance during each evaluation period and will

(cont'd on following page)

*Cf. Gould*, 935 F.2d at 1274-75 (rejecting government's interpretation, which restricted contract's "plural reference to 'grounds['] . . . to the singular remedy of reformation").

Under the government's interpretation, the AFDO was Secretary Watkins and other officials at DOE headquarters in Washington, D.C. This plainly disregards the contract's reference to "Albuquerque Operations." Under the contract's plain language, whether the AFDO was the "Manager" or "anyone acting as Manager," in all cases the AFDO had to be an "Albuquerque Operations" official. Defendant's argument that DOE took Mr. Twining and Albuquerque Operations "out of the loop" (*see* Gov. Br. at 23; *cf.* Gov. Reply at 4) is a red herring that simply ignores the contract's plain language. Language specifying the decision-maker's post will not be read out of a contract even where the government eliminates the post or the post's relationship to the contractor. *See Gen. Elec.*, 412 F.2d at 1218, 1219, 1222 (enforcing contract's designation of "the Contracting Officer, Boston Procurement District" as decision-maker and nullifying decision of Army Weapons Command contracting officer even though "the previously delegated administrative authority with respect to this contract and others was removed from the Boston Procurement District and reverted to the Army Weapons Command"); *N.Y. Shipbuilding*, 385 F.2d at 433-34 (concluding government could not substitute another

---

(cont'd from previous page)

determine the amount of award fee to be paid the Contractor for that evaluation period."); *id.* at Attach. A, p. 2 of 9 ("Final award fee determination shall be made by *the* AFDO. . . . Within five (5) working days after receipt of said reports and award fee determinations, the Contractor may request an opportunity to present to *the* AFDO, or *his* designee, a brief oral analysis of its performance. Upon receipt of such request, *the* AFDO shall specify a time and place for the Contractor to make its presentation. . . . At least two (2) working days prior to such presentation, the Contractor shall have provided *the* AFDO with a brief written summary of the points to be covered in the presentation. Within ten (10) working days after the Contractor's presentation *the* AFDO shall determine the amount of the award fee to which the Contractor is entitled for the evaluation period and shall notify the Contractor. Such final determination shall be confirmed in writing to the Contractor and shall constitute the notification by *the* AFDO as required by paragraph (b) of the clause entitled 'Payments and Advances.'") (emphasis added throughout).

decision-maker for "Nuclear Projects Officer" specified in contract even though government had abolished Nuclear Projects Office and Nuclear Projects Officer).[7]

The government's interpretation also relies on tangential or general provisions in the contract. *See* Gov. Br. at 19 (citing references to "the Contracting Officer" in clauses 62(a) and 84(b)(5)); Pl. Reply at 8-9 (discussing same). These provisions do not support Defendant's theory that the AFDO could be individuals other than Mr. Twining, as it is undisputed that Mr. Twining was the Contracting Officer for the 1989 Contract. *See, e.g.*, Pl. Ex. 3 at 4.

3. <u>In Contrast, Rockwell's Interpretation Is Consistent with the Contract's Plain Meaning and Is Manifestly Reasonable</u>

Rockwell's interpretation avoids the multiple problems created by Defendant's reading of the contract. Interpreting the words "acting as Manager, Albuquerque Operations" to refer to the individual performing the Manager's duties when there is no actual Manager of Albuquerque Operations comports with the plain and ordinary meaning of "acting": to hold an interim position or serve temporarily. *See* Reply Br. at 4-5 n.2 (citing Black's Law Dictionary and statutes governing appointment of DOE officers); *Gould*, 935 F.2d at 1274 (turning to Black's Law Dictionary for "common definition" of disputed contract term). This reading ensures that there is only one AFDO at a time, which allows one official to exercise final, subjective decision-making authority, as the contract provides. It accords with the contract's reference to "Albuquerque Operations." And it does not depend on tangential or general language in the contract. Finally, Rockwell's interpretation is consistent with the contract as a whole. The contract's designation of the award fee decision-maker is a provision of limitation. Rockwell limits the decision-maker to Albuquerque Operations Manager or, if the position is vacant, to whomever is acting as Manager

[7] The government's notion that the AFDO and headquarters were one and the same also flies in the face of the government's own Stipulation. *See* Pl. Ex. 5, Stipulation, ¶¶ 1, 2, 6, 7, 9, 10, 11.

at Albuquerque Operations.

By contrast, the government's interpretation takes the words "or anyone acting as Manager" out of context, creates unnecessary tension with other provisions in the contract, and gives an expansive reading to what are clearly words of limitation. "[A]n agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony." *Air-Sea Forwarders*, 166 F.3d at 1172. Because Rockwell's interpretation is the only reasonable one within the plain language of the contract, the Court should reject Defendant's proposed reading and Defendant's proffer of extrinsic evidence. *See Barron Bancshares*, 366 F.3d at 1375-76; *McAbee*, 97 F.3d at 1434-35.

D. If the Court Were to Consider Extrinsic Evidence, That Evidence Supports Rockwell's Interpretation

Even if the Court were to disregard the inconsistencies between Defendant's interpretation and the plain language of the contract, extrinsic evidence would confirm that Rockwell's interpretation is the only one that is reasonable. Because the contract's Award Fee Plan was entered into in February 1989 (*see* Pl. Ex. 3 at 4), evidence from that time or earlier is key. *See N.Y. Shipbuilding*, 385 F.2d at 435 (contract's designation of decision-maker must be evaluated "from the parties' standpoint when the contract was made"). Thus, for contract interpretation purposes, the Court should reject Defendant's allegations that the raid, which occurred several months after contract formation, justified headquarters' usurpation of the AFDO's authority. Moreover, if, as Defendant argues, the Secretary had "well-grounded suspicions" regarding Mr. Twining's impartiality, it defies reason that headquarters would allow Mr. Twining to remain Manager at Albuquerque and to issue millions of dollars in award fees to five other contractors. *See* Gov. Br. at 24; Gov. Reply at 4-5; Def. Ex. 32; Pl. Supp. Ex. 41.

As this Court's predecessor made clear, it does not matter whether, at some later date, other officials are deemed "more informed" (*see* Gov. Reply at 7) than the decision-maker chosen by the parties:

> [T]he parties selected a particular officer on the reasonable assumption (as



LA1 - 106849.06

> we judge) that he was most likely to have the knowledge necessary to an informed decision . . . . *That choice was locked into the agreement and became a contractual term.* As with other contract provisions, the agreement would not be automatically altered if the forecast proved incorrect in that by chance some other official turned out to know *as much or more.*

*N.Y. Shipbuilding*, 385 F.2d at 435 (emphasis added). The argument that headquarters had access to more or better information is pretext. Headquarters could have incorporated such information into the award fee process without breaching the contract. For example, it could have made such information available to Mr. Twining, in a timely fashion, for his consideration in rendering the 89/2 award fee. Instead, headquarters cut Mr. Twining "out of the loop" (*see* Section II.B, *infra*) and now tries to argue that the decision to deprive Mr. Twining of information and usurp his authority was contractually permissible. Alternatively, if Mr. Twining had really been "disabled" as the government now claims, headquarters could have put him on leave, appointed an acting Manager of Albuquerque Operations, and had that individual serve as the contractually designated AFDO.

DOE's own "Handbook for Award Fee Performance Evaluation and Review Process," dated June 24, 1977, ("1977 Handbook") provides that award fees are to be determined by the Manager of Albuquerque Operations, not by officials at DOE headquarters. *See* Pl. Supp. Ex. 53 at 13 ("The Manager, AL [Albuquerque Operations], who is the Contracting Officer (CO), . . . will make a final award fee determination"); *id.* at 24 (same); *id.* at 25 (schematic showing "Approved Performance Evaluation Report and Award Fee Determination" flowing directly from CO to Contractor); *id.* at 42 (the CO "will determine the amount of award fee"); *id.* at 50 (the CO "shall determine the amount of the award fee"); *id.* at 52 (CO is "[t]he Manager, Albuquerque Operations Office," sometimes referred to as the Fee Determination Official).

The 1977 Handbook was in place when Rockwell entered into the 1989 Contract. It remained in effect until one year after the parties amended the 1989 Contract's award fee provisions by executing Modification No. M128. *See* Pl. Supp. Ex. 54, Handbook for Award Fee Administration, Feb. 16, 1990, ("1990 Handbook") at ii; *see also* Pl. Supp. Ex. 55, Dep. of

Claude Hudgel Barkmeier, Oct. 23 and Dec. 7, 1992, ("Barkmeier Dep.") at 7, 32 (confirming 1977 Handbook had not been revised or reissued when he retired, which was in December 1989). Significantly, while the 1990 Handbook included a new provision that award fees were ultimately subject to headquarters' approval, no corresponding change was made to Rockwell's 1989 Contract. *See* Pl. Supp. Ex. 54 at II-1, II-2, III-2, III-10, IV-1, IV-3; Pl. Supp. Ex. 48, Twining Dep. at 109; *cf.* Pl. Supp. Ex. 56, Dep. of Marshall L. Bishop, Dec. 8, 1992, ("Bishop Dep.") at 68-70, 118-19, 158-60.

DOE did, however, intend to *revise* the 1989 Contract so that headquarters would have final say in award fee determinations. *See* Pl. Supp. Ex. 57, Dep. of Terrel Agy, Oct. 21 and Dec. 9, 1992, ("Agy Dep.") at 64-73 (testifying that headquarters instructed Rocky Flats Area Office to prepare contract modification modeled on Savannah River plan, which would (1) require the AFDO to seek concurrence from headquarters prior to issuing an award fee determination and (2) be effective Oct. 1, 1989, for the 90/1 award fee period); Pl. Supp. Ex. 58, Dep. of David P. Simonson, Dec. 10, 1992, ("Simonson Dep.") at 25-30 (testifying that after Watkins became Secretary, headquarters changed award fee process at Savannah River, but that Simonson didn't know of any instance where a contract was modified accordingly); Pl. Supp. Ex. 59, memorandum from C. Barkmeier, Oct. 6, 1989, at -706, 708, 714, 718, 723.[8] The absence of such a provision in the 1989 Contract further demonstrates that the phrase "or anyone acting as Manager" did not mean DOE headquarters. *See Lockheed Martin IR Imaging Sys. v. West*, 108 F.3d 319, 322, 323 (Fed. Cir. 1997) (rejecting government's interpretation as unreasonable where government tried to correct problem in its solicitation through an addendum, but did not present the addendum for the contractor's signature); *CW Gov't Travel*, 61 Fed. Cl. at 573. If the 1989

---

[8] Although Pl. Supp. Ex. 59 references "an agreement with AL" and a "local process" concerning the 89/2 award fee (*see* E 000705), the parties never modified the 1989 Contract to add a headquarters' concurrence requirement after the AFDO made his or her final, subjective decision.

Contract meant what the government argues here, there would be no need to amend it.

Defendant's interpretation is also belied by the fact that, prior to the award fee for the 89/1 Period, Rockwell's award fee determinations had been made by the Manager of Albuquerque Operations, without headquarters' concurrence.[9]

Defendant's claim that "the record is replete with evidence that the Secretary removed Mr. Twining's substantive role of deciding Rockwell's award fees . . . and vested that authority in himself and others of his choosing" (Gov. Reply at 8) misses the point. There is no dispute that headquarters "determined" and "mandated" Rockwell's award fees; the government stipulated to those facts over a decade ago. While there is ample evidence of Defendant's breach, what the record lacks is confirmation, consistent with Defendant's proposed contract interpretation, that any headquarters official in Washington, D.C., was appointed as "the AFDO" in place of Albuquerque's Mr. Twining. To the contrary, the evidence shows that, from headquarters on down, DOE recognized that the Manager of Albuquerque Operations, Mr. Twining, was the AFDO.[10] The single exception is DOE's trial counsel in this proceeding.

---

[9] *See* Pl. Supp. Ex. 60, Dep. of Theetis V. Hill, Dec. 2, 1992, ("Hill Dep.") at 42, 47-48; Pl. Supp. Ex. 55, Barkmeier Dep. at 17-21, 150-51; Pl. Supp. Ex. 61, Dep. of Albert Earl Whiteman, Dec. 4, 1992, ("Whiteman Dep.") at 11-17, 73-74, 87-88; Pl. Supp. Ex. 62, Dep. of W. Henson Moore in *Stone*, Apr. 15, 1998, ("Moore Dep. in *Stone*") at 129-33; Pl. Supp. Ex. 63, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, ("Barr Dep.") at 57-58; Pl. Supp. Ex. 64, Dep. of Henson Moore, Apr. 29, 1994, ("Moore Dep.") at 13-14, 19-21; Pl. Supp. Ex. 65, Dep. of James D. Watkins, Apr. 29, 1994, ("Watkins Dep.") at 22; Pl. Supp. Ex. 66, Dep. of Troy E. Wade, Sept. 21, 1994, ("Wade Dep.") at 22-25.

[10] *See, e.g.*, Pl. Supp. Ex. 67 (Sept. 1, 1989, draft memorandum from J.L. Meinhardt, Acting Ass't Sec'y for Defense Programs, referencing "The Award Fee Determination Official (AFDO) (Manager, Albuquerque Operations Office)" and "Mr. Twining, the AFDO"); Pl. Supp. Ex. 68 (memorandum from J.M. Barr, Deputy Ass't Sec'y for Military Application Defense Programs, referencing "The Award Fee Determination Official (Man[a]ger, Albuquerque Operations Office)"); Pl. Supp. Ex. 69 (Sept. 6, 1989, memorandum from J.M. Barr to Acting Ass't Sec'y for Defense Programs, referencing "The Award Fee Determination Official (Manager, Albuquerque Operations Office)"); Pl. Supp. Ex. 70 (Sept. 20, 1989, fax from J. Meinhardt, "DOE Washington," referencing "The Award Fee Determination Official (Manager, Albuquerque Operations Office)"); Pl. Supp. Ex. 47; Pl. Supp. Ex. 66, Wade Dep. at 23-24; Pl. Supp. Ex. 49, Goldberg Dep. at 94; Pl. Supp. Ex. 71, Dep. of James A. Stout in *Stone*, Apr. 30, 1998, ("Stout Dep. in *Stone*") at 123; Pl. Supp. Ex. 52, Nelson Dep. at 41, 108;

(cont'd on following page)

While Defendant argues that extrinsic evidence supports its interpretation, a closer examination of Defendant's proffered exhibits reveals nothing of the kind. *See* Gov. Reply at 7-8; Def. Exs. 38-49. At most, these documents indicate that, months after the 1989 Contract was amended, in the wake of the raid and ensuing "front-page" publicity, (1) Rockwell was communicating directly with headquarters, (2) Rockwell was told that headquarters was "taking oversight and management of Rocky Flats," making "significant changes in DOE's management of Rocky Flats," "implementing a new 'culture' which placed ES&H compliance on a par with weapons production," and "delaying the pending award fee determination." While the evidence suggests that Rockwell was aware that headquarters was taking a role in the award fee process, it in no way establishes that Rockwell was aware of, much less acquiesced to, headquarters' usurpation of the decision-making role contractually reserved for the Manager of Albuquerque Operations.[11]

## II. TWINING'S AND SIMONSON'S AWARD FEE DETERMINATIONS WERE FINAL

### A. The Award Fee Procedure

The contract provides that award fees are to be the subjective determination of the AFDO. The contract also sets forth the Functional Performance Areas and Rating Plan applicable to the award fee period at issue. *See* Pl. Ex. 3 at 2, 3; *id.* at Attach. A, pp. 1 to 6 of 9. The 1977 Handbook sets forth the specific procedures for rendering award fee determinations.

---

(cont'd from previous page)

Pl. Supp. Ex. 55, Barkmeier Dep. at 22-23, 73, 83-84; Pl. Supp. Ex. 60, Hill Dep. at 57-58; Pl. Supp. Ex. 61,Whiteman Dep. at 13.

[11] Indeed, Mr. Beall testified that he did not recall award fees coming up in communications he had with Secretary Watkins following the raid. *See* Pl. Supp. Ex. 72, Dep. of Donald R. Beall, July 18, 1994, ("Beall Dep.") at 37. Mr. Iacobellis recalled only one discussion with DOE regarding award fees: his agreeing to a *delay* of the 89/1 award fee determination. *See* Pl. Supp. Ex. 73, Dep. of Sam Iacobellis, July 19, 1994, ("Iacobellis Dep.") at 28-29, 60-61.

*See* Pl. Supp. Ex. 53 at ii. First, the Area Office Manager spearheads the collection and review of information related to the contractor's performance; prepares a draft evaluation report; and recommends grades for each Functional Performance Area ("FPA") included in the contract, as well as a proposed award fee. *See id.* at 10-12, 22-23, 25; *see generally* Mov. Br. at 6. Next, the Performance Evaluation Review Board ("PERB") reviews these materials, adds input, and provides the AFDO with a revised evaluation report and the PERB's award fee recommendation. *See* Pl. Supp. Ex. 53, 1977 Handbook at 12-13, 23-24, 25. Finally, the AFDO reviews the material submitted by the PERB, making any changes he or she deems appropriate, until the evaluation and award fee is satisfactory in the AFDO's personal judgment. *See id.* at 13, 24, 25. Significantly, under the contract and 1977 Handbook, the AFDO's award fee determination is the final step in the process.

B. <u>89/1 Period: Mr. Twining's May 31, 1989, Determination</u>

Mr. Twining's May 31, 1989, determination (*see* Def. Ex. 32) complied with every step of the award fee procedure outlined above. After meeting in early April 1989, the Rocky Flats Area Office Manager-led team forwarded its draft evaluation report and recommendations to the PERB on April 19, 1989. *See* Pl. Supp. Ex. 74; Pl. Supp. Ex. 57, Agy Dep. at 23-37. The PERB met on May 10, 1989; made changes to the draft evaluation report; and then forwarded its revised evaluation and recommended award fee to Mr. Twining on May 17, 1989. *See* Pl. Supp. Exs. 75-78; Pl. Supp. Ex. 48, Twining Dep. at 51. Mr. Twining testified that the PERB "did a thorough job based on the information they had available at the time they did the[ir] review." Pl. Supp. Ex. 48, Twining Dep. at 88. He decided, however, to reduce the PERB's recommended award fee for Plant by approximately $150,000. *See id.* at 57. He testified that he was comfortable with his May 31, 1989, determination "[b]ased on the information I had up to that point." *See id.* at 53-54; *see also id.* at 56-57 (Twining put same thought and attention and more firsthand experience into his 89/1 award fee decision relative to his 88/2 award fee decision).

Defendant alleges that Mr. Twining also "was comfortable with" the reductions first made by Mr. Goldberg and later by headquarters. *See* DPFOUF ¶¶ 61, 74. The undisputed facts, however, confirm that Mr. Twining could not have "put his own mind to the problems and render[ed] his own decisions" about those reductions. *See N.Y. Shipbuilding*, 385 F.2d at 435. First, Defendant stipulated that the 89/1 award fee was not Mr. Twining's decision, but was instead "determined" and "mandated" by headquarters. Pl. Ex. 5, Stipulation, ¶¶ 6-8. Second, Defendant has admitted that Mr. Twining was "removed . . . from substantive oversight responsibility," confined to "ministerial task[s]," and "tak[en] . . . out of the loop" following the June 6, 1989, raid. *See* Gov. Br. at 6, 7, 23. Because Mr. Twining "didn't have access to" Rocky Flats following the raid, he was put in a position where he could not "offer an informed alternative" to Mr. Goldberg's reduction. *See* Pl. Supp. Ex. 48, Twining Dep. at 90-91 ("I didn't have any way to validate what they [were] finding."); *id.* at 125-26 ("[A]s far as Albuquerque having direct access to the site, firsthand knowledge, that ended with the Tuck memo."). While Mr. Twining recalled being informed of Mr. Goldberg's and headquarters' reductions, he could not recall discussing those reductions with Mr. Goldberg or with headquarters. *See id.* at 70-73, 83-88, 95, 97, 101; *see also* Pl. Supp. Ex. 49, Goldberg Dep. at 62-64 (Goldberg could not recall discussing 89/1 award fee with Twining). Mr. Twining testified that the 89/1 award fee was "not the way an award fee ought to be done." *See* Pl. Supp. Ex. 48, Twining Dep. at 126-27. This evidence shows that Mr. Twining simply did not have "knowledge of the relevant facts" concerning the reductions made by Mr. Goldberg or headquarters. *Cf. Gen. Elec.*, 412 F.2d at 1221.[12]

---

[12] The evidence also shows that the information Mr. Goldberg and headquarters purportedly relied on in reducing Mr. Twining's determination came to light after the end of the 89/1 Period on March 31, 1989. *See, e.g.*, Pl. Supp. Ex. 48, Twining Dep. at 76, 88-91. Thus, under the contract, it should not have been considered in determining Rockwell's 89/1 award fee. *See* Pl. Ex. 3 at Attach. A, pp. 1 and 2 of 9; *see also* Pl. Supp. Ex. 55, Barkmeier Dep. at 63-66 (Barkmeier was not comfortable with calculations in report he gave to Goldberg "[b]ecause they were forced to satisfy DOE headquarters based on events that occurred after

(cont'd on following page)

Indeed, Mr. Twining's situation was much like that of the decision-maker in *Edmund Leising*, who denied that his Central Office "mandated" him to render an adverse decision. *See* 81-1 BCA at 73,852-53. In *Edmund Leising*, as here, the decision the decision-maker sent to the contractor was substantively identical to what was dictated to him by his superiors. *See id.* at 73,852. *Compare* Pl. Supp. Ex. 79, letter from B. Twining to D. Sanchini, Sept. 27, 1989, *with* Pl. Ex. 9, draft letter attached to memorandum from J. Meinhardt to B. Twining, Sept. 20, 1989.[13] And in *Edmund Leising*, as here, the proposed final decision had been drafted by superiors without the designated decision-maker's participation. *See* 81-1 BCA at 73,852-53; Pl. Supp. Ex. 48, Twining Dep. at 83-86, 91, 95. In *Edmund Leising*, the board found the decision issued by the decision-maker had in fact been "mandated" by his superiors, despite the decision-maker's protestations to the contrary. *See* 81-1 BCA at 73,852-53 (recognizing "it important . . . that even the appearance of coercion be avoided"). Because Defendant stipulated that

---

(cont'd from previous page)

the period being evaluated"); *id.* at 72 ("I felt that they violated the process because they were based on things that became known after the period had ended. That was contrary to the process. So I was uncomfortable with that. I am a person that likes an orderly process that works the way it's set out to work."); *id.* at 80 (Barkmeier had concerns "[t]hat the scores were being changed at a later point in the period than the contract provided for the scores to be finalized").

13 The letter issued by Mr. Twining on September 27, 1989, differs only minimally from the draft letter headquarters' prepared for his signature. In the first paragraph, "I hereby determine" is changed to "the Department of Energy (DOE) hereby determines." The amount of the award fee for Plant is $317 higher, and the total adjusted accordingly. In the second and third paragraphs, references to "the Department" are changed to "the DOE." The third paragraph adds the phrases "effective for performance after October 1, 1989," and "critical to contract performance." In the fourth paragraph and in the closing paragraph, "me or my designee" is changed to "the DOE." The September 27, 1989, letter also adds a "cc" to Mr. Simonson. When Mr. Twining was deposed in February 1993, he could not recall why changes had been made to the draft letter prepared for his signature. *See* Pl. Supp. Ex. 48, Twining Dep. at 97-99. When Mr. Meinhardt was asked if he knew that Mr. Twining had adopted Mr. Meinhardt's draft letter, Mr. Meinhardt responded, "I would assume that he would do that, he would adopt the words that were sent. . . . Because he was a subordinate." *See* Pl. Supp. Ex. 80, Dep. of John L. Meinhardt, Apr. 26, 1994, ("Meinhardt Dep.") at 57-58.

headquarters caused Mr. Twining to issue a decision "determined" and "mandated" by headquarters (*see* Pl. Ex. 5, Stipulation, ¶¶ 1, 6, 7), the same result should obtain here.

C. <u>89/2 Period: Mr. Simonson's December 6, 1989, Determination</u>

Mr. Twining testified that he delegated the 89/2 award fee decision to Mr. Simonson because Mr. Twining's lack of access to Rocky Flats left him "in an untenable position to be determining the award fee." *See* Pl. Supp. Ex. 48, Twining Dep. at 129; *see also id.* at 125-26; Pl. Supp. Ex. 37. The delegation was ordered by headquarters and headquarters worked with Mr. Simonson as the AFDO until the end of January 1990, when headquarters opted to replace him with someone "a little more aggressive." *See* Pl. Supp. Ex. 80, Meinhardt Dep. at 60; Pl. Supp. Ex. 58, Simonson Dep. at 87-88, 178-81, 185, 214-16; Pl. Supp. Ex. 63, Barr Dep. at 158; *cf.* Pl. Supp. Ex. Nelson Dep. at 22-25. Mr. Twining testified that after the delegation, he was not consulted regarding the 89/2 award fee. *See* Pl. Supp. Ex. 48, Twining Dep. at 133.[14]

As with Mr. Twining's May 31, 1989, decision, Mr. Simonson's December 6, 1989, determination (*see* Def. Ex. 35) complied with every step of the award fee procedure. *See* Sections II.A and II.C, *supra*. The Rocky Flats Area Office Manager-led team (known as the Performance Evaluation Committee or "PEC") compiled information; held meetings on October 3 and 10, 1989, to discuss Rockwell's performance; and forwarded its recommendations to the PERB. *See* Pl. Supp. Ex. 57, Agy Dep. at 157-86, 198-99. The PERB met on or about October 27, October 31, and November 1, 1989. *See id.* at 186-89, 194-96, 198-202, 206. The PERB then submitted its recommendations to Mr. Simonson on November 7, 1989. *See* Pl. Supp. Ex. 81, memorandum from C. Barkmeier to D. Simonson, with enclosures, Nov. 7, 1989. Mr.

---

[14] As noted previously (*see* Pl. Reply at 5 n.3), Rockwell views the delegation to Mr. Simonson by the AFDO, Mr. Twining, to be a contract breach. Because Rockwell is satisfied with the amount of award fees set forth in Mr. Simonson's December 6, 1989, determination, the breach caused no damages.

Simonson approved the PERB's recommendations, which he considered "well reasoned." *See* Pl. Supp. Ex. 58, Simonson Dep. at 177-78, 196. Before making his December 6, 1989, determination, Mr. Simonson considered input from the PEC, the PERB, and Rockwell. *See id.* at 129-33, 147-49; Pl. Supp. Ex. 57, Agy Dep. at 182-86 . He also received and considered input from headquarters. *See* Pl. Supp. Ex. 58, Simonson Dep. at 161-62, 178-81, 184-85, 213-16. He disagreed with Admiral Barr's evaluation of Rockwell's ES&H performance and explained his position in his determination. *See id.* at 192-94. Mr. Simonson believed his determination was appropriate. *See id.* at 178-79; Pl. Supp. Ex. 63, Barr Dep. at 155 (Barr was "sure" he had conversations with Simonson in which Simonson indicated the award fee Simonson had recommended was appropriate; "Otherwise he wouldn't have recommended it.").

Although Mr. Simonson's December 6, 1989, determination was the final step in the contract's award fee process, in January 1990, headquarters reduced Mr. Simonson's determination by approximately 30%. *See* Pl. Supp. Ex. 82. The following month, headquarters reduced Mr. Simonson's determination again, resulting in a 52% reduction in Mr. Simonson's award fee decision. *See* Pl. Supp. Ex. 83; Def. Ex. 37; Pl. Ex. 5, Stipulation, ¶¶ 9-12. Mr. Simonson did not agree with either of these reductions. *See* Pl. Supp. Ex. 58, Simonson Dep. at 241-49, 278-79; Pl. Supp. Ex. 57, Agy Dep. at 269-74; *see also* Pl. Supp. Ex. 63, Barr Dep. at 157 (recalling Simonson had expressed concern that Simonson's award fee determination had not been accepted by headquarters). As Defendant stipulated, and Mr. Simonson confirmed, the 89/2 award fee was not a product of Mr. Simonson's personal and independent judgment; rather, it was "determined" and "mandated" by headquarters. *See* Pl. Ex. 5, Stipulation, ¶¶ 9-12; Pl. Supp. Ex. 58, Simonson Dep. at 279, 291.

### D. Headquarters' Concurrence Policy Also Breached Rockwell's Contract

After Admiral Watkins became DOE Secretary in March 1989, headquarters implemented a new policy stating that each award fee determination "will come to Headquarters for review and concurrence prior to issuance to the contractor." *See* Pl. Supp. Ex. 84,

memorandum from W.H. Moore, Aug. 21, 1989; *see also* Pl. Supp. Ex. 58, Simonson Dep. at 25-30 (the need for headquarters concurrence in award fee determinations was a change initiated by Admiral Watkins in 1989). Defendant argues that this policy meant that Mr. Twining's and Mr. Simonson's determinations "were merely interim conclusions that never became final determinations." *See* Gov. Reply at 10-11. That contention is wrong.

For starters, "concurrence" should not even be an issue in this case. The Stipulation confirms that headquarters (1) deemed Mr. Twining's and Mr. Simonson's award fees "too high" and (2) "mandated" lower award fees "determined by DOE headquarters." *See* Pl. Ex. 5, Stipulation, ¶¶ 1, 2, 6-12; *see also* Gov. Reply at 10 (headquarters "overrode" Mr. Twining's and Mr. Simonson's conclusions).

Moreover, headquarters' concurrence policy was outside of, and in conflict with, the contract. *See supra* at 15. The policy did not come into existence until sometime after Admiral Watkins became Secretary, which was *after* the parties executed Mod. M128 in February 1989. Accordingly, headquarters' concurrence policy was not part of Rockwell's contract. Although DOE *wanted* to amend the contract to incorporate a concurrence provision, the contract was never actually amended to include such a term. *See supra* at 15.

The Federal Circuit has made clear that an agency's internal review procedures do not prevent a contractually designated decision-maker from rendering a final, binding decision:

> [T]he law presumes that when [a decision-maker] acquainted with the underlying facts signs an internal document, . . . she has decided to express a definite opinion on the merits . . . in the absence of contrary testimony or evidence.
>
> * * *
>
> The fact that the . . . Department has issued a non-public, internal directive that purports to add a limitation upon [the decision-maker's] authority . . . , which limitation is not present in either statute or validly-issued regulation, cannot act to divest the [decision-maker] of the legal authority to make a decision that is final and conclusive.

*Tex. Instruments Inc. v. United States*, 922 F.2d 810, 813-14, 815 (Fed. Cir. 1990) (citing *Gen.*

*Elec.*, 412 F.2d 1215).

*General Electric* involved circumstances similar to those at issue here. There, the court granted summary judgment to the contractor and denied the government's cross-motion, finding that a contracting officer from the Army Weapons Command improperly overruled a decision made by one Colonel McDermott, a contracting officer from the Boston Procurement District. *See* 412 F.2d at 1218-22. The contract specified that all non-technical matters were "the responsibility of the Contracting Officer, Boston Procurement District." *See id.* at 1218. The parties' contract documents, however, had been signed by more than one of the "several contracting officers" of the Boston Procurement District, and had also been counter-signed by a Mr. Lindblad, a contracting officer and funding supervisor for the Army Weapons Command. *See id.* The decision in question was communicated to the Army Weapons Command in a June 30 letter setting forth the opinion of the Boston Procurement District's chief legal officer, which recommended that the Contracting Officer take action to fund an overrun of $12,880. *See id.* at 1219. Colonel McDermott signed the letter under the heading "CONCUR WITH RECOMMENDATION." *See id.* Shortly thereafter, the government removed the administrative authority for the contract from the Boston Procurement District, and transferred it to the Army Weapons Command, at which time Mr. Lindblad assumed the duties of procuring contracting officer. *See id.* Thereafter, Mr. Lindblad issued a final decision denying the overrun. *See id.* The court held that Colonel McDermott's concurrence in the June 30 letter "was an effective decision," entitling the contractor to $12,880 in additional overrun costs. *See id.* at 1220, 1222. In so ruling, the court stated, "the internal administrative scheme whereby the Boston Procurement District was to defer to the Army Weapons Command concerning funding cannot diminish Colonel McDermott's authority." *See id.* at 1220. The court held that Mr. Lindblad's attempt to overrule Colonel McDermott was "a nullity." *See id.* at 1222.[15]

---

[15] The court also held that "Colonel McDermott's finding [could not] be reversed by a successor

(cont'd on following page)

In *General Electric*, the court presumed that the Colonel was "acquainted with the facts underlying" his decision. *See id.* at 1221 ("it seems clear that, as a responsible Government official, he would have duly investigated the matter before indicating his concurrence, as contracting officer, in a recommended course of action"). Here, however, the evidence shows that Messrs. Twining and Simonson considered the grounds underlying their award fee determinations. *See* Sections II.B and II.C, *supra*. They had "knowledge of the relevant facts," to wit, information compiled by the PERB and others according to the contract and 1977 Handbook. *See* Sections II.A to C, *supra; cf.* 412 F.2d at 1221. When they made their decisions in May and December 1989, each was acting as AFDO determining Rockwell's award fees. *See* Pl. Ex. 5, Stipulation, ¶¶ 1, 9; Pl. Supp. Ex. 65, Watkins Dep. at 33-34 (Twining's oversight was taken away "at the time that Goldberg hit the site"); Pl. Supp. Ex. 80, Meinhardt Dep. at 60; Pl. Supp. Ex. 58, Simonson Dep. at 87-88, 178-81, 185, 214-16; Pl. Supp. Ex. 37; Pl. Supp. Ex. 85; *cf.* 412 F.2d at 1221. Defendant has neither shown, nor even alleged, that Mr. Twining's and Mr. Simonson's determinations did not reflect their own opinions. *Cf.* 412 F.2d at 1221 ("There is no evidence that Colonel McDermott was not expressing his own opinion when he concurred in Mr. Marcus' recommendation."). Thus, under the law of this Circuit, Mr. Twining's May 31, 1989, determination and Mr. Simonson's December 6, 1989, determination are final, enforceable decisions. *See Tex. Instruments*, 922 F.2d at 813 (adopting Court of Claims' opinion in *Gen. Elec.*); *cf. Johnson Controls World Servs., Inc. v. United States*, 48 Fed. Cl. 479, 491 (2001) (letter "[r]equest[ing]" that action be taken to fund overrun constituted "decision"); *Bell Helicopter*, 74-1 BCA at 49,192 (finding contracting officer's letter was "final and binding" and that subsequent decisions by successor contracting officer were legal nullity); *Southern, Waldrip,*

---

(cont'd from previous page)

contracting officer." *See id.* at 1221. For application of the "successor" rule to the government's argument in this case, see *supra* at 6 and Section III.B.2.a, *infra*.

334 F.2d at 247, 250 (contracting officer's "Findings of Fact and Recommendation of Award" was determination that Washington, D.C., official had no authority to reverse).

In a nutshell, under the contract's award fee provisions, the final step was the AFDO's award fee determination. Headquarters' attempt to issue "a non-public, internal directive that purports to add a limitation upon [the AFDO]'s authority . . . , which limitation is not present in either statute or validly-issued regulation, cannot act to divest the [AFDO] of the legal authority to make a decision that is final and conclusive." *Tex. Instruments*, 922 F.2d at 815.

## III. THERE ARE NO GENUINE ISSUES OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT FOR ROCKWELL

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). "A 'material fact' is a fact that will make some difference in the outcome of a case." *Circle K Corp. v. United States*, 23 Cl. Ct. 161, 164, *vacated on other grounds*, 23 Cl. Ct. 659 (1991). In contrast to genuine issues of material fact, "[m]atters of law may be decided on motion for summary judgment." *Orlosky Inc. v. United States*, 64 Fed. Cl. 63, 68 (2005) (quoting *Santa Fe Pac. R.R. Co. v. United States*, 294 F.3d 1336, 1340 (Fed. Cir. 2002)).

### A. There Are No Genuine Issues of Material Fact Preventing the Court from Deciding That It Has Power to Decide Rockwell's Breach of Contract Claims

This Court's determination of its own subject matter jurisdiction to hear Rockwell's claim is a question of law. *See Caldwell v. United States*, 57 Fed. Cl. 193, 197 (2003). Accordingly, this question is appropriate for summary determination. *See Orlosky*, 64 Fed. Cl. at 68.

The government does not dispute that the Court has "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Instead, the government strains unsuccessfully to recast

Rockwell's breach of contract claim as a challenge to "the merits of [the] award fee decisions" at issue in this case. *See* Gov. Br. at 25. A brief glance at Rockwell's Complaint puts the government's argument to rest. *See* Compl. ¶ 12 (contract "explicitly provides" that award fee is to be determined subjectively by AFDO in accordance with Award Fee Plan; AFDO "is defined in the Contract as the Manager of DOE's Albuquerque Operations"); *id.* ¶ 31 ("DOE officials other than the AFDO either made, or improperly influenced or coerced, the decision regarding Rockwell's award fee [for the 89/1 Period], thereby breaching the Contract"); *id.* ¶ 35 (same allegation as to 89/2 Period). In short, Rockwell's summary judgment motion is not a challenge to any exercise of discretion by headquarters. Rather, Rockwell claims that the very act of headquarters' admitted determination of Rockwell's award fees is a contract breach.

The government's reliance on *Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854 (Fed. Cir. 1997), and *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229 (2005), is misplaced. These cases stand for the proposition that if a court determines that the government's award fee determination does not conflict with "any part of the contract," the court is "limited to reviewing whether the government's award decision was arbitrary or capricious." *George Sollitt*, 64 Fed. Cl. at 247-48 (citing *Burnside-Ott*, 107 F.3d at 860). Thus, this Court has already recognized its power to determine whether the government's method of determining an award fee conflicts with "any part of the contract." *See also* Pl. Reply at 15 (citing cases). That is precisely Rockwell's claim here.

This is not a case in which the Court is asked to substitute its judgment for that of a government representative acting within his or her contractual discretion. Rockwell simply requests that the Court (1) hold the government to its agreement that award fees be determined by the official specifically designated in the contract and (2) award damages for the government's breach measured by the award fees *actually determined* by the AFDO. The Court's authority to review this breach of contract claim is clear as a matter of law and raises no issues of material fact.

B. There Are No Genuine Issues of Material Fact Regarding Defendant's Breach of the Contract

"The parties' cross-motions involve issues of contract interpretation, which are particularly well-suited for resolution by summary judgment." *See Johnson Controls*, 48 Fed. Cl. at 486.

1. Under the Contract's Plain Meaning, DOE Breached the Contract

Because the government's reading of the contract language "(Manager, or anyone acting as Manager, Albuquerque Operations)" is unreasonable and has no jurisprudential or evidentiary support (*see* Section I, *supra*), Rockwell's plain meaning interpretation should prevail. Under Rockwell's reading, the contractually designated AFDO was Mr. Twining, the Manager of Albuquerque Operations. Defendant has stipulated that for the 89/1 and 89/2 Periods, the AFDO concluded that Rockwell should receive award fees in amounts that were higher than the award fees later "determined" and "mandated" by headquarters. *See* Pl. Ex. 5, Stipulation, ¶¶ 6-8, 10-12. This confirms that Rockwell did not receive its contracted-for right to a personal and independent determination by the designated decision-maker and was damaged thereby. *See* Mov. Br. at 21-25; Section I.B, *supra*. In addition, it is not disputed (1) that the AFDO determinations here were the final steps in the award fee process as set forth in the contract and the 1977 Handbook and (2) that the headquarters' concurrence policy was instituted after execution of the 1989 Contract and never became part of the contract. There are no disputed facts, and summary judgment for Rockwell is warranted as a matter of law. *See Gen. Elec.*, 412 F.2d at 1222 (granting contractor's motion for summary judgment and denying government's cross-motion).[16]

---

[16] If the Court agrees with Rockwell's interpretation of the contract, it does not have to consider the issues raised in Section III.B.2 below.

2. Even Under Defendant's Contract Interpretation, DOE Breached the Contract

a. DOE Breached the Contract When Headquarters Overrode Mr. Twining's and Mr. Simonson's Decisions

Mr. Twining's May 31, 1989, determination and Mr. Simonson's December 6, 1989, determination were final, enforceable decisions. *See* Section II, *supra*. DOE has stipulated that *after* these determinations were made, headquarters overruled them in favor of lower award fees "determined" and "mandated" by headquarters. *See* Pl. Ex. 5, Stipulation, ¶¶ 6-8, 10-12; *see also* Gov. Reply at 10 (headquarters "overrode" conclusions made by Messrs. Twining and Simonson). These actions by headquarters breached the contract because once a final decision is made, the government cannot undo it. *See Gen. Elec.*, 412 F.2d at 1221-22 (decision-maker's finding could not be reversed by successor contracting officer; latter's decision was therefore a nullity); cases cited at 6, *supra*. Thus, even if the Court were to accept Defendant's contract construction that headquarters' officials could replace Messrs. Twining and Simonson as the AFDO, Defendant still breached the contract as a matter of law because, in this case, the replacement and ensuing award fee determinations by headquarters occurred after final decisions had already been issued by Messrs. Twining and Simonson. No genuine issue of fact is in dispute as to this issue.

b. DOE Breached the Award Fee Contract Provisions in Other Respects as Well

In addition, headquarters' determination of Rockwell's award fees breached the contract in several other respects.[17] Even if the contract language "or anyone acting as Manager" permits

---

[17] If the Court finds that headquarters' award fee decisions were improper and a nullity because they came after final decisions of the contractually designated decision-makers (*see* Section III.B.2.a, *supra*), the Court does not have to reach these other breaches by headquarters.

the AFDO to be Secretary Watkins or another headquarters official, as Defendant contends, that headquarters AFDO would still be obligated to comply with the contract's numerous other provisions regarding award fee determinations. *See* Pl. Ex. 3 at 2-3; *id.* at Attach. A, p. 1 of 9 ("[t]he Award Fee Plan, as set forth in this Appendix D., constitutes the substantive and procedural provisions which will be utilized in arriving at the amount of the award fee"); *id.* at Attach. A, pp. 1 to 9 of 9. Headquarters' non-compliance with these other provisions is not subject to an abuse of discretion standard of review because that only applies where the matter in question is "left by contract to the [A]FDO" and is not otherwise circumscribed by contract terms. *See Burnside-Ott*, 107 F.3d at 860 (applying arbitrary and capricious standard because contractor "cannot point to any part of the contract that requires the award fee to correspond directly with the performance rating"). Given the contract's elaborate Award Fee Plan, this is not a case where "the contract language supports a finding that unilateral discretion has been granted to the government to determine the amount of a performance award." *Compare George Sollitt*, 64 Fed. Cl. at 247. In light of the several contract breaches set forth below, the Court should adopt the award fee determinations of Messrs. Twining and Simonson as the best measure of Rockwell's award fees, and deny Defendant's cross-motion for summary judgment.

i. DOE Breached the Contract Requirement That the AFDO Be a Single, Final Decision-Maker

The contract required that award fees be determined by one final decision-maker, *the* Award Fee Determination Official. *See supra* at 10-11 n.6. But Defendant's own briefing confirms that Secretary Watkins never appointed any one individual to serve as the AFDO. *See* Gov. Br. at 1-2, 16, 17, 19, 22-23; Gov. Reply at 4-5, 7, 8. To the contrary, the evidence confirms that there were multiple would-be AFDOs at headquarters. *See, e.g.,* Pl. Supp. Ex. 63, Barr Dep. at 149-50 ("[t]here were a lot of people with fingers in the pie"); Pl. Supp. Ex. 58, Simonson Dep. at 233-35, 241-49. This group decision-making breached the contract.

ii. DOE Breached the Contract's Weighting Requirements for ES&H

Headquarters also breached the contract provisions specifying that ES&H was to account for only 20% of the award fee for Plant. The contract required that Rockwell's performance be evaluated "based upon the Performance Evaluation Plans established for the evaluation period." Pl. Ex. 3 at Attach. A, p. 1 of 9. The Performance Evaluation Plans for 89/1 and 89/2 were set forth in Appendix D. The Performance Evaluation Plan for Plant specified six different FPAs on which the Contractor would be evaluated, with ES&H weighted at 20%. *See id.* at Attach. A, pp. 3 to 4 of 9. The contract permitted this weighting to be changed only if (1) Rockwell was consulted in advance and (2) Rockwell was "duly notified, in writing, of such revisions thirty days in advance of the period in which" its performance was to be evaluated under the revised weightings. *See id.* at 3; *see also id.* at Attach. A, pp. 4 to 5 of 9. Approximately four months after the 89/2 Period began, however, DOE sent Rockwell a letter advising that ES&H would be weighted more heavily. That was a contract breach.

> At that point in time, there was a directive by DOE headquarters regarding the weighting that was to be given to Environment, Safety and Health in evaluating performance. And I am not sure what weighting was required. It may have been more than 50 percent or it may have been something more specific than that. Anyway, this memo was originated for the purpose of advising Rockwell and documenting the file to the effect that General Management; Quality Assurance; and Environment, Safety and Health were all considered Environment, Safety and Health in their evaluations, in order to comply with this headquarters directive.

Pl. Supp. Ex. 55, Barkmeier Dep. at 110-11; *see generally id.* at 109-12; Pl. Supp. Ex. 86, letter from E. Goldberg to D. Sanchini, July 27, 1989. The 20% weighting for ES&H was never changed in the contract. *See* Pl. Supp. Ex. 55, Barkmeier Dep. at 110-11. *Compare* Pl. Ex. 3 at Attach. A, pp. 3 and 4 of 9 *with* Pl. Supp. Ex. 87, memorandum from A. Whiteman to D. Sanchini, Apr. 5, 1989. There are no genuine issues of material fact about the July 27, 1989, letter because when Mr. Goldberg was asked about it in April 1998, he testified only that he

could not recall sending the letter, but did recall having one conversation with Mr. Sanchini along the same lines. *See* Pl. Supp. Ex. 88, Dep. of Edward S. Goldberg in *Stone*, Apr. 23, 1998, at 78-79.

The evidence shows that headquarters initiated a policy of weighing ES&H at 50-51 percent, rather than the 20 percent specified in the contract, and that that change in policy resulted in a reduction of Rockwell's award fees. For example, when Deputy Secretary Henson Moore was asked what he recalled about Rockwell's award fee process, he testified:

> What I can remember about it is simply that we had begun a change in the award fee system before the Rocky Flats raid. The Rocky Flats raid simply exacerbated the fact that we had to change the system and to do it now.
>
> I was of the belief that this did not require waiting and changing a contract when a contract came up for renewal. The award fee system was a separate mechanism for determining how much of an award fee the contract did call for was measured or was determined. And so we could change that system without waiting for a contract to come up.
>
> And so I moved to change that system very quickly, and so that the first award fees that were due on our watch would by under the new system. And the first decision the admiral made himself which was I went to him and said "What degree do we want to have environment, safety, and health measured?" We both agreed it wasn't being measured enough, and I'm pretty confident he came up with 51 percent. May have been me but certainly together we did that. That was a major change to say that 51 percent of your grade is now going to be based on something totally different than it had been based on before.

Pl. Supp. Ex. 62, Moore Dep. in *Stone* at 130-31; *see also id.* at 129-33; *id.* at 56-59; Pl. Suppl. Ex. 63, Barr Dep. at 111-12; Pl. Supp. Ex. 80, Meinhardt Dep. at 29-30, 48-58; Pl. Supp. Ex. 71, Stout Dep. in *Stone* at 126-27; Pl. Supp. Ex. 58, Simonson Dep. at 192-94; Pl. Supp. Ex. 89, Dep. of James D. Watkins in *Cook v. Rockwell Int'l Corp.*, No. 90-K-181 (D. Colo.) (a different Rocky Flats-related case), Apr. 22, 1996, ("Watkins Dep. in *Cook*") at 92-114; Pl. Supp. Ex. 90, Dep. of John Tuck in *Stone*, Apr. 27, 1998, ("Tuck Dep. in *Stone*") at 143-44. Even Secretary Watkins admitted that this "major change" meant headquarters had breached the contract. *See*

Pl. Supp. Ex. 65, Watkins Dep. at 37 ("I felt the contract in itself had been somewhat violated perhaps on both sides. . . . Me, maybe in award fee differences and changes and maybe the other side, in just violation of the law."); *see generally id.* at 16-37; Pl. Supp. Ex. 89, Watkins Dep. in *Cook* at 95, 100-01 (when questioned about a June 27, 1989, press release, Admiral Watkins testified, "I said that from now on, [ES&H] would have a weighting factor on award fees of 51 percent; that I wasn't going to tolerate a 20 percent or 10 percent weighting factor . . . I said I'm not going to tolerate it. And if we -- and if we're sued, we're sued. Let's get on with it.").

iii. DOE Breached the Contract by Making Results-Oriented Award Fee Decisions

Headquarters also breached the contract by reverse-engineering its award fee decisions. The contract provides for performance to be evaluated first and award fees calculated thereafter, on the basis of the grades given and the weighting specified for each FPA. *See* Pl. Ex. 3 at Attach. A, p. 2 of 9 ("[Rockwell]'s performance of each FPA will be evaluated in terms of a numerical grade taken from the Rating Plan set forth in Section 4. below. Using the numerical grades and weights assigned each FPA, the award fee to which [Rockwell] is entitled shall then be determined in accordance with the provisions of Section 5."); *id.* at Attach. A, p. 6 of 9 ("The performance evaluation determination shall be equated to a numerical grade which shall then be multiplied by the weighting assigned to the FPA. The sum of the resulting products computed for each FPA shall constitute the numerical grade evaluation of [Rockwell]'s performance for the evaluation period. . . . If such sum is over seventy (70) and the overall performance under a Performance Evaluation Plan is not less than 'satisfactory,' [Rockwell] shall be entitled to a proportionate share of the maximum available award fee for the Performance Evaluation Plan involved."); *see also id.* at 3 (award fees are to be "based on [Rockwell]'s performance in accordance with the Award Fee Plan set forth in Appendix D"); *id.* at Attach. A, p. 1 of 9 ("Evaluation of [Rockwell]'s performance will be based upon the Performance Evaluation Plans established for the evaluation period by the AFDO, after consultation with the Contractor."); *cf.* Pl. Supp. Ex. 48, Twining Dep. at 32-33 (score results from assessment of achievements and

deficiencies, not the other way around); Pl. Supp. Ex. 57, Agy Dep. at 259-60 ("the achievements and deficiencies were identified first and then a score was discussed later").

The evidence shows that headquarters disregarded these contract provisions by taking a results-oriented approach to deciding Rockwell's award fees. For example, on January 11, 1990, after Terrel Agy of the Rocky Flats Office called Rush Inlow at headquarters to check the status of headquarters' review of Mr. Simonson's December 6, 1989, decision, Mr. Inlow informed Mr. Agy that headquarters' Admiral Barr had "INSTRUCTED HIS STAFF TO RECALCULATE THE AWARD FEE TO A LEVEL NOT HIGHER THAN FOR THE PERIOD ENDING MARCH 31, 1989, FOR PLANT." *See* Pl. Supp. Ex. 91 (Pl. Dep. Ex. 34), Record of Telephone Conversation, Jan. 11, 1990 (capitalized in original); *see also* Pl. Supp. Ex. 92 (Pl. Dep. Ex. 81), memorandum from H. Miller to D. Simonson. There are no genuine issues of material fact about these documents or their content. *See* Pl. Supp. Ex. 57, Agy Dep. at 239-44; Pl. Supp. Ex. 63, Barr Dep. at 132-37; *id.* at 133 (re Pl. Dep. Ex. 81, "I don't dispute the gist of what he says here[,] . . . [t]hat the available award fee shouldn't exceed the percent of the available fee awarded the last period. Although I don't remember specifically saying it that way, it would not be an unreasonable evaluation of how I viewed Rocky Flats' performance."); Pl. Supp. Ex. 93, Dep. of Rush Osborne Inlow, Dec. 1, 1992, ("Inlow Dep.") at 99-109 (regarding Pl. Dep. Ex. 81, "I won't dispute what is in here"; regarding Pl. Dep. Ex. 34, "I'm not disputing the contents of this"); *see also id.* at 108-09 (describing Agy as "conscientious," "meticulous," and generally accurate in taking notes).

And there is ample evidence of other headquarters' reverse-engineering. *See, e.g.*, Pl. Supp. Ex. 89, Watkins Dep. in *Cook* at 100-01, 112-14; Pl. Supp. Ex. 65, Watkins Dep. at 22-23; Pl. Supp. Ex. 63, Barr Dep. at 12-13, 118-19 (Barr was "[v]irtually certain" he had never seen 1989 amendment to contract's award fee provisions and did not review contract's Rating Plan in coming up with an ES&H grade "because the rating plan would have been prepared before I ever got there"); Pl. Supp. Ex. 80, Meinhardt Dep. at 50-56 (Meinhardt spoke to Twining or Twining's deputy about "beefing up" the performance evaluation report with respect to ES&H before it was

sent to Rockwell); Pl. Supp. Ex. 58, Simonson Dep. at 233-35 (discussing Pl. Supp. Ex. 94 (Pl. Dep. Ex. 169) fax regarding headquarters' review of Rocky Flats and other award fees and handwritten notations thereon which state, "We should consider holding Rockwell to previous levels. . . . 'I agree.' . . . [underneath which i]s another note that says, 'I agree[,]' with some initials, dated 12-26."); Pl. Supp. Ex. 57, Agy Dep. at 277-79, 295-99, 302-28 (testifying about headquarters' second reduction to Simonson's 89/2 determination and resulting efforts to make performance evaluation conform to headquarters' grades on February 26, 1990, because, as Agy was informed at 6:55 a.m. that morning, headquarters planned to issue press release about Rockwell's award fee that day and wanted Rockwell's award fee decision to go out that day also); *cf.* Pl. Supp. Ex. 85 (memorandum from B. Twining to R. Nelson delegating AFDO authority on Feb. 26, 1990); Pl. Supp. Ex. 95 (Feb. 26, 1990, letter from R. Nelson to D. Sanchini, issuing headquarters' award fee decision). The contract required that the award fee amounts be based on graded evaluations of Rockwell's performance. Headquarters breached these requirements when it reversed the procedure, "determin[ing]" award fee amounts first and then tailoring the performance evaluation to fit those amounts.

C. There Are No Genuine Issues of Material Fact Regarding Rockwell's Damages

It is undisputed that Messrs. Twining and Simonson concluded that Rockwell should receive $5,333,606 more in award fees than headquarters actually awarded. *See* Mov. Br. at 7-10. That difference (plus interest as allowed by law) is the proper measure of damages because "it is the unfettered opinion of the person delegated as decision-maker by the parties to the contract that is determinative." *See Gen. Elec.*, 412 F.2d at 1221; *see also Tex. Instruments*, 922 F.2d at 816; *John A. Johnson Contracting Corp. v. United States*, 132 F. Supp. 698, 705-06 (Ct. Cl. 1955); *Southern, Waldrip*, 334 F.2d at 249-50.

The government contends that even if it breached the contract, Rockwell suffered no legally cognizable damages because headquarters officials "were as fully informed, or even more informed, about Rockwell's performance" than the AFDOs, Messrs. Twining and Simonson. *See*

Gov. Reply at 13; *see generally id.* at 13-15; Gov. Br. at 26-30. But the few cases the government cites for this proposition are either irrelevant or supportive of Rockwell's claim for damages. *See* Pl. Reply at 17-18, 18 n.10. Indeed, the theory that a contractually designated decision-maker could be supplanted by a different official who "turned out to know as much or more" was explicitly rejected by this Court's predecessor in *N.Y. Shipbuilding*. *See* 385 F.2d at 435 (parties' choice of decision-maker was "locked into the agreement and became a contractual term").

In essence, Defendant argues that Rockwell should not prevail because what the contract *meant* was the award fee should be decided by the Manager of Albuquerque Operations, unless "more fully informed" headquarters officials took over that determination. *See, e.g.*, Gov. Br. at 30. But that is not what the contract says. As the Federal Circuit noted, "If we accepted this argument, we would have to rewrite the contract, and insert words the parties never agreed to, which we do not have the authority to do." *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 581 (Fed. Cir. 1987). If the contract specifies a method, that method is enforced. *See Barron Bancshares*, 366 F.3d at 1372-80 (reversing summary judgment for government where lower court erred in considering extrinsic evidence to determine intent of the parties as to contract's capital credit and supervisory goodwill provisions); *Coast Fed.*, 323 F.3d at 1038-41 (where contract authorized only one "limited deviation" from GAAP, court would not sanction accounting method constituting additional departure from GAAP; party could not rely on extrinsic evidence to interpret phrases to contradict plain language of agreement); *Hercules*, 292 F.3d at 1379-81 (where contract incorporated Federal Acquisition Regulations (FAR) provisions requiring particular treatment of tax refunds, court rejected argument that different procedure under Cost Accounting Standards (CAS) applied). The government has not averred or offered evidence that the May 31, 1989, or December 6, 1989, decision was the product of fraud, gross mistake, or bad faith, such that either decision should be regarded as anything but conclusive. *See Kihlberg v. United States*, 97 U.S. 398, 402 (1878) ("it is sufficient that the parties expressly agreed that distances should be ascertained and fixed by the chief quartermaster, and in the

absence of fraud or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment, his action in the premises is conclusive").

The parties' contracted-for method is enforced even where, as here, one party alleges that that method is inferior. *See Thos. Somerville Co. v. United States*, 99 Ct. Cl. 329, 334 (1943) (where contract specified that units of heat were to be measured in accordance with U.S. Bureau of Standards measurements, supplier's "insistence that this was not the proper basis of measurement [was] immaterial. It was the basis agreed on, proper or not."); *Mid-Wood, Inc. v. Hunter Agri-Sales, Inc.*, 184 F. Supp. 2d 689, 692 (N.D. Ohio 2002) ("Mid-Wood got what it paid for: a 6 mil poly under liner with tile monitoring system. That that liner, as installed, did not do what Mid-Wood now claims it should have done is immaterial: what matters is whether the item described in the contract was delivered and installed."); *Allmand Assocs. v. Hercules Inc.*, 960 F. Supp. 1216, 1233-34 (E.D. Mich. 1997) (when defendant contracted to share the information it possessed regarding manufacture of a molded plastic product, it "did not promise that the information shared . . . would yield 'quality' or 'desired' or 'usable' parts"). If Rockwell was content to have its award fee determined by any person with "close, on-the-ground knowledge" of its performance, it could have settled for a contract provision to that effect. Instead, Rockwell bargained for language specifying that a particular official following particular procedures make the award fee determination. Rockwell is entitled to the benefit of its bargain. This issue is a question of law and ripe for summary adjudication.

D. There Are No Genuine Issues of Material Fact <u>Regarding Defendant's Affirmative Defenses</u>

Defendant proffered no facts to support the affirmative defenses of prior material breach or special plea in fraud and advised the Court it was abandoning these arguments. *See* DPFOUF; Gov. Br. at 4 n.3. As such, the only remaining affirmative defense is estoppel because of waiver. *See* Pl. Ex. 32, Opinion and Order, Mar. 10, 2006, at 13-14; Pl. Ex. 8, Def.'s Second Am. Answer, Mar. 28, 2006.

Defendant's dogged insistence that waiver encompasses estoppel does not make it so.

Defendant cannot prevail on its estoppel defense as a matter of law because it has not proven – or even alleged – the essential element of detrimental reliance. *See* Pl. Reply at 22-25; Mov. Br. at 34-37. Defendant cites no authority allowing estoppel where one party does not induce another to act to its detriment. And Defendant, here, simply has not even averred that Rockwell's alleged acquiescence caused or induced headquarters to usurp the AFDO's authority. Absent such inducement, Rockwell is entitled to summary judgment as a matter of law.

Defendant's estoppel by waiver defense also fails because the evidence proffered by the government does not prove that Rockwell acted "wholly inconsistent[ly]" with its contractual right to have award fees decided by the Manager of Albuquerque Operations. *See* Pl. Reply at 25-29; DPFOUF ¶¶ 81-90. Having contact with headquarters and being notified of management changes (which did not include removing Mr. Twining from his position as Manager of Albuquerque Operations), a new "culture," and a delay in the award fee determination, do not add up to conduct "so consistent with intent to waive" the right to have award fees determined by Mr. Twining "that no other reasonable explanation is possible." *See Lyon Dev. Co. v. Bus. Men's Assur. Co. of Am.*, 76 F.3d 1118, 1125 (10th Cir. 1996). To the contrary, this state of affairs was entirely reasonable in the wake of the raid, which was based on "sensational and alarming" allegations that would not be "discredit[ed]" and found "baseless" until long after headquarters had "determined" and "mandated" Rockwell's award fees. *See* Pl. Reply at 19-21.

**CONCLUSION**

For the reasons set forth herein, in Plaintiff's Motion for Summary Judgment and Memorandum in Support Thereof, and in Plaintiff's Memorandum in Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Cross-Motion for Summary Judgment, Rockwell respectfully requests that the Court grant its motion for summary judgment for $5,333,606 of additional award fees, plus interest as allowed by law.

October 30, 2006

CHADBOURNE & PARKE LLP
RICHARD J. NEY
Attorney of Record

By: s/ Richard J. Ney
Richard J. Ney
S. Jean Kim
350 South Grand Avenue, Suite 3300
Los Angeles, CA 90071
Telephone: (213) 892-1000
Facsimile: (213) 622-9865

Attorneys for Plaintiff
THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION