ELECTRONICALLY FILED ON OCTOBER 30, 2006

## UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 91-1362 C<br>(Judge Lettow)<br><br>**DECLARATION OF S. JEAN KIM IN SUPPORT OF ROCKWELL'S SUPPLEMENTAL SUBMISSION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

I, S. JEAN KIM, declare and state as follows:

1. I am an attorney with the law firm of Chadbourne & Parke LLP, which represents Plaintiff The Boeing Company, Successor-in-Interest to Rockwell International Corporation, ("Rockwell") in these proceedings. I make this declaration on my personal knowledge and could competently testify to the matters set forth herein, if necessary.

2. Attached hereto as Exhibit 47 is a table listing (1) the witnesses whose testimony is cited in Rockwell's Supplemental Submission on Cross-Motions for Summary Judgment and (2) each witness's title(s) or position(s) during the relevant time period.

3. Attached hereto as Exhibit 48 is a copy of selected pages from the transcript of the deposition of Bruce G. Twining on February 23, 1993, ("Twining Dep.").

4. Attached hereto as Exhibit 49 is a copy of selected pages from the transcript of the deposition of Edward S. Goldberg on November 10, 1992, ("Goldberg Dep.").

5. Attached hereto as Exhibit 50 is a copy of a memorandum from David P. Simonson, Manager, Rocky Flats Area Office, dated September 21, 1989.

6. Attached hereto as Exhibit 51 is a copy of a memorandum from John J. Schinkle to D.P. Simonson, Manager, RFO, dated September 22, 1989.

7. Attached hereto as Exhibit 52 is a copy of selected pages from the transcript of the deposition of Robert M. Nelson, Jr., on November 9, 1992, ("Nelson Dep.").

8. Attached hereto as Exhibit 53 is a copy of the Handbook for Award Fee Performance Evaluation and Review Process, dated June 24, 1977.

9. Attached hereto as Exhibit 54 is a copy of the Handbook for Award Fee Administration, dated February 16, 1990.

10. Attached hereto as Exhibit 55 is a copy of selected pages from the transcript of the deposition of Claude Hudgel Barkmeier on October 23 and December 7, 1992, ("Barkmeier Dep.").

11. Attached hereto as Exhibit 56 is a copy of selected pages from the transcript of the deposition of Marshall L. Bishop on December 8, 1992, ("Bishop Dep.").

12. Attached hereto as Exhibit 57 is a copy of selected pages from the transcript of the deposition of Terrel Agy on October 21 and December 9, 1992, ("Agy Dep.").

13. Attached hereto as Exhibit 58 is a copy of selected pages from the transcript of the deposition of David P. Simonson on December 10, 1992, ("Simonson Dep.").

14. Attached hereto as Exhibit 59 is a copy of a memorandum from Claude H. Barkmeier, dated October 6, 1989.

15. Attached hereto as Exhibit 60 is a copy of selected pages from the transcript of the deposition of Theetis V. Hill on December 2, 1992, ("Hill Dep.").

16. Attached hereto as Exhibit 61 is a copy of selected pages from the transcript of the deposition of Albert Earl Whiteman on December 4, 1992, ("Whiteman Dep.").

17. Attached hereto as Exhibit 62 is a copy of selected pages from the transcript of the deposition of W. Henson Moore in *Stone* on April 15, 1998.

18. Attached hereto as Exhibit 63 is a copy of selected pages from the transcript of the deposition of Admiral Jon Michael Barr on September 23, 1994, ("Barr Dep.").

19. Attached hereto as Exhibit 64 is a copy of selected pages from the transcript of the deposition of Henson Moore on April 29, 1994, ("Moore Dep.").

20. Attached hereto as Exhibit 65 is a copy of selected pages from the transcript of the deposition of James D. Watkins on April 29, 1994, ("Watkins Dep.").

21. Attached hereto as Exhibit 66 is a copy of selected pages from the transcript of the deposition of Troy E. Wade on September 21, 1994, ("Wade Dep.").

22. Attached hereto as Exhibit 67 is a copy of a draft memorandum from John L. Meinhardt, dated September 1, 1989.

23. Attached hereto as Exhibit 68 is a copy of a draft memorandum from J.M. Barr.

24. Attached hereto as Exhibit 69 is a copy of a memorandum from J.M. Barr to Acting Assistant Secretary for Defense Programs, dated September 6, 1989.

25. Attached hereto as Exhibit 70 is a copy of a fax from J. Meinhardt, dated September 20, 1989.

26. Attached hereto as Exhibit 71 is a copy of selected pages from the transcript of the deposition of James A. Stout in *Stone* on April 30, 1998, ("Stout Dep. in *Stone*").

27. Attached hereto as Exhibit 72 is a copy of selected pages from the transcript of the deposition of Donald R. Beall on July 18, 1994, ("Beall Dep.").

28. Attached hereto as Exhibit 73 is a copy of selected pages from the transcript of the deposition of Sam Iacobellis on July 19, 1994, ("Iacobellis Dep.").

29. Attached hereto as Exhibit 74 is a copy of a memorandum from Albert E. Whiteman to Theetis V. Hill, with attachment, dated April 19, 1989.

30. Attached hereto as Exhibit 75 is a copy of Minutes of PERB Meeting May 10, 1989.

31. Attached hereto as Exhibit 76 is a copy of a memorandum regarding "Changes to Plant Recommendations and Summary."

32. Attached hereto as Exhibit 77 is a copy of the Award Fee Performance Evaluation Review Board Recommendation for the Period: October 1, 1988 Through March 31, 1989, dated May 17, 1989.

33. Attached hereto as Exhibit 78 is a copy of the Award Fee Recommendation for Plant and PRMP/PROVE.

34. Attached hereto as Exhibit 79 is a copy of a letter from Bruce Twining to Dominick J. Sanchini, dated September 27, 1989.

35. Attached hereto as Exhibit 80 is a copy of selected pages from the transcript of John L. Meinhardt on April 26, 1994, ("Meinhardt Dep.").

36. Attached hereto as Exhibit 81 is a copy of a memorandum from Claude H. Barkmeier to David P. Simonson, with enclosures, dated November 7, 1989.

37. Attached hereto as Exhibit 82 is a copy of a Summary Memorandum from John C. Tuck.

38. Attached hereto as Exhibit 83 is a copy of a Summary Memorandum from John C. Tuck, dated February 23, 1990.

39. Attached hereto as Exhibit 84 is a copy of a memorandum from W. Henson Moore, dated August 21, 1989.

40. Attached hereto as Exhibit 85 is a copy of a memorandum from Bruce G. Twining to Robert M. Nelson, Jr., dated February 26, 1990.

41. Attached hereto as Exhibit 86 is a copy of a letter from Edward S. Goldberg to Dominick J. Sanchini, dated July 27, 1989.

42. Attached hereto as Exhibit 87 is a copy of a memorandum from Albert E. Whiteman to Dominick J. Sanchini, dated April 5, 1989.

43. Attached hereto as Exhibit 88 is a copy of selected pages from the transcript of the deposition of Edward S. Goldberg in *Stone* on April 23, 1998.

44. Attached hereto as Exhibit 89 is a copy of selected pages from the transcript of the deposition of James D. Watkins in *Cook v. Rockwell Int'l Corp.*, No. 90-K-181 (D. Colo.), on April 22, 1996, ("Watkins Dep. in *Cook*").

45. Attached hereto as Exhibit 90 is a copy of selected pages from the transcript of the deposition of John Tuck in *Stone* on April 27, 1998, ("Tuck Dep. in *Stone*").

46. Attached hereto as Exhibit 91 is a copy of a Record of Telephone Conversation, dated January 11, 1990.

47. Attached hereto as Exhibit 92 is a copy of a memorandum from Hugh Miller to Dave Simonson.

48. Attached hereto as Exhibit 93 is a copy of selected pages from the transcript of the deposition of Rush Osborne Inlow on December 1, 1992, ("Inlow Dep.").

49. Attached hereto as Exhibit 94 is a copy of a routing and transmittal slip, dated December 14, 1989, with handwritten notations dated December 26.

50. Attached hereto as Exhibit 95 is a copy of a letter from Robert M. Nelson, Jr., to Dominick J. Sanchini, dated February 26, 1990.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Los Angeles, California, on October 30, 2006.

S. Jean Kim

PL. SUPP. EX. 47

## WITNESSES

| **Name** | **Title(s) or Position(s)** |
|---|---|
| Agy, Terrel | Mr. Agy was a DOE Program Analyst at the Rocky Flats Area Office[1] from about February 1989 to November 1990. *See* Agy Dep. at 6-9, 12-13, 15. In that position, he coordinated the award fee activities for the Rockwell contract. *See id.* at 8-9, 20. Mr. Agy was supervised by Mr. Barkmeier and Mr. Barkmeier's successor, Mr. Bishop. *See id.* at 17-18, 76, 229. |
| Barkmeier, Claude Hudgel | Mr. Barkmeier was Chief of the Administrative Branch at the Rocky Flats Area Office from February 1974 to fall of 1989. *See* Barkmeier Dep. at 7, 11; Agy Dep. at 18-20. He then became Director of Administration at the Rocky Flats Area Office, a position he held until he retired in December 1989. *See* Barkmeier Dep. at 7; Agy Dep. at 18-19. |
| Barr, Jon Michael | Admiral Barr became Deputy Assistant Secretary for Military Applications on July 5, 1989. *See* Barr Dep. at 7, 12. He held that position for "almost exactly two years." *See id.* at 12. |

1 At some point, the Rocky Flats Area Office was renamed the Rocky Flats Office. *See* Agy Dep. at 32-33, 69. Both are referred to collectively as the "Rocky Flats Area Office" herein and in Rockwell's Supplemental Submission on Cross-Motions for Summary Judgment.

| **Name** | **Title(s) or Position(s)** |
|---|---|
| Beall, Donald R. | Mr. Beall was Rockwell's Chairman and Chief Executive Officer during the 89/1 and 89/2 Periods. *See* Beall Dep. at 4-5. |
| Bishop, Marshall L. | Mr. Bishop succeeded Mr. Barkmeier as Director of the administrative division at the Rocky Flats Area Office. *See* Bishop Dep. at 16, 19. |
| Goldberg, Edward S. | Mr. Goldberg was acting Manager of the Rocky Flats Area Office from June 6, 1989, to September 1989. *See* Goldberg Dep. at 13-14; DPFOUF ¶¶ 30, 76. |
| Hill, Theetis V. | Mr. Hill was Executive Secretary to the PERB from May 1987 to October 1990. *See* Hill Dep. at 9-11. |
| Iacobellis, Sam | Mr. Iacobellis reported to Mr. Beall and had responsibility for Rocky Flats. *See* Iacobellis Dep. at 7-9; Beall Dep. at 6-7. In 1989, Mr. Iacobellis's titles were (prior to July 13) president, Aerospace Operations and (after July 13) Executive Vice President and Chief Operating Officer. *See* Iacobellis Dep. at 7. |
| Inlow, Rush Osborne | Mr. Inlow was acting Manager of the Rocky Flats Area Office from on or about May 1, 1989, to June 6, 1989. *See* Inlow Dep. at 8-10. From October 1989 to January 1990, he was temporarily assigned to headquarters to work in Defense Programs. *See id.* at 11. |

| **Name** | **Title(s) or Position(s)** |
| --- | --- |
| Meinhardt, John L. | In 1989, Mr. Meinhardt was the Principal Deputy Assistant Secretary for Defense Programs, until July 1, 1989, when he became the Acting Assistant Secretary for Defense Programs. *See* Meinhardt Dep. at 7-9. |
| Moore, W. Henson | Mr. Moore was Deputy Secretary of Energy between 1989 and 1992. *See* Moore Dep. in *Stone* at 5. |
| Nelson, Jr., Robert M. | Mr. Nelson replaced Mr. Simonson as the Manager of the Rocky Flats Area Office, and served in that position from on or about January 28, 1990, to April 1992. *See* Nelson Dep. at 9, 16-17, 22-25. |
| Simonson, David P. | Mr. Simonson was the Manager of the Rocky Flats Area Office who replaced Mr. Goldberg. *See* Simonson Dep. at 12. After Mr. Nelson replaced Mr. Simonson as Manager of the Rocky Flats Area Office, Mr. Simonson was demoted to Deputy Manager. *See* Bishop Dep. at 140-42. |
| Stout, James A. | Mr. Stout was chief counsel at DOE's Albuquerque Operations Office from 1985 to 1994. *See* Stout Dep. in *Stone* at 8-9. He provided legal advice to DOE relating to the award fees paid to Rockwell between 1987 and 1990. *See id.* at 135-37. |
| Tuck, John | Mr. Tuck was Admiral Watkins's Under Secretary from 1989 to January 1992. *See* Tuck Dep. in *Stone* at 17-18. |

| Name | Title(s) or Position(s) |
|---|---|
| Twining, Bruce G. | Mr. Twining became Manager of the Albuquerque Operations Office in April 1988 and was still in that position as of his deposition on February 23, 1993. *See* Twining Dep. at 5. |
| Wade, Troy E. | Mr. Wade was DOE's Acting Assistant Secretary from July 1987 to June 1989. *See* Wade Dep. at 10-11; Pl. Supp. Ex. 41, memorandum from T. Wade to Manager, Albuquerque Operations Office, June 21, 1989. |
| Watkins, James D. | Admiral Watkins was sworn in as DOE Secretary on March 1, 1989. *See* Watkins Dep. at 8. |
| Whiteman, Albert Earl | Mr. Whiteman was the Manager of the Rocky Flats Area Office from November 1985 to April 1989, when he was succeeded by Mr. Inlow. *See* Whiteman Dep. at 9-11. |

PL. SUPP. EX. 48

UNITED STATES COURT OF FEDERAL CLAIMS

ROCKWELL INTERNATIONAL CORPORATION, )
)
Plaintiff, )
)
vs. )
) No. 91-1362 C
UNITED STATES OF AMERICA, ) (Judge Yock)
)
Defendant. ) ORIGINAL

DEPOSITION OF:

BRUCE G. TWINING

Tuesday, February 23, 1993

10:00 A.M.

Reported by:

BARBARA K. HARRIS

CSR # 93

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025
310/477-8867 FAX 310/478-8412

are unclear as to what I'm driving at, then please ask me to clarify. Do you understand that?
A. Yes.
Q. If you want to take a break at any time, just speak up.
A. Okay.
Q. What is your current position, Mr. Twining?
A. I'm the Manager of the DOE's Albuquerque Field Office.
Q. And how long have you been manager at Albuquerque?
A. Since April of 1988.
Q. And what was your position immediately prior to becoming manager at Albuquerque?
A. I was on a temporary detail to Washington, D.C. as the Deputy Assistant Secretary for Nuclear Materials, and that lasted about eight or nine months.
Q. When you became manager in April, 1988, did you play a role in the award fee determination for the first six-month period of fiscal year 1988 for Rockwell?
A. Yes, I did.
Q. And you would also have played a role, then, in the second six-month period for 1988.
A. Yes.
Q. Would you describe for me your education since high school.

final score.

Q. And if you would turn to page 5 of 9 of the attachment, and on that page is a rating plan?

A. Yes.

Q. And describe to me what the rating plan is.

A. That is an attempt to define, again, guidance for the board to use in determining and talking about a certain area, what kind of performance is expected in order to get a certain grade. And this is actually one of the areas that has evolved quite a bit over time in the last several years, but this is what it was at that point.

Q. And in this rating plan, under the heading "Definitions," depending on what grade you are looking at, there are references to achievements and deficiencies.

A. Yes.

Q. And could you explain to me how achievements and deficiencies work vis-a-vis a grade, under the rating plan, at least in a general sense?

A. In a general sense -- and I will talk about what we have got today. I am not sure how it relates to what was done here. But in a performance area, the performance evaluation board deals with something they call observations, which can be slightly positive or slightly negative, but don't really count in the score; achievements, which are positive; significant achievements, which are what

the word implies, significant; deficiencies, which are negative; and significant deficiencies.

Over time, we may have changed, there may be notables as an adjective there. It's changed over time. But what the PERB tries to do in a given functional area, general management, for example, is look at the performance over the rating period, and what the contractor did that was really good, what did they do that was good, you know, what did we just observe going on, and then identify the weaknesses and the major weaknesses. And once that was done, they attempted to correlate from the number of things in those categories to this score. It's not a precise science. It is a subjective evaluation.

Q. So the score is the result of the assessment of achievements and deficiencies in the particular areas.

A. Yes, it is.

Q. It's not the other way around, you come up with a score and then you develop --

A. No.

Q. The rating plan that we are looking at in Appendix A, that is the rating plan that was in effect for the Rockwell contract for fiscal year 1989; is that correct?

A. Yes.

Q. Do you know what functional performance elements are?

A. It's not in the format that would come to me.
Q. It says in the top right "Prepared by Lawrence R. Oliver." Do you know who he is?
A. No, I don't.
Q. Also it says under his name "DP-50." What does that stand for?
A. DP-50 is an organization in Defense Programs in headquarters.
Q. DP-50 stands for Defense Programs, or is it part of Defense Programs? I didn't understand your response.
A. DP is Defense Programs. 50 is an organizational number; they are resource management or -- I don't know the title.
Q. Now, when you received the PERB recommendation, what did you do with it?
A. I think this was a period in which we packaged them all up and sent them to headquarters for concurrence. What I would have done first is determined that I was satisfied with what the PERB did.
Q. So you reviewed it.
A. I reviewed it.
Q. Were you given a briefing about it?
A. I believe in every case I have had a report given to me and a briefing by PERB.
Q. And who would have made the briefing to you?

Q. You don't remember one way or the other?
A. I don't remember.
Q. Do you remember if you asked the PERB to go back and redo its report?
A. No.
Q. Have you ever asked the PERB at Albuquerque to go back and redo its report?
A. I have asked questions that have caused the PERB to redo their report.
Q. Do you recall whether that happened in this case?
A. No, I don't.
Q. And you believe in this instance you would have sent a recommendation to headquarters, is that correct, for this award fee period?
A. I believe this is the first cycle that we did that.
Q. And that recommendation would have reflected your review of the PERB's recommendation to you?
A. Yes.
Q. And possibly changes that you made on your own.
A. Yes.
Q. And you would have been comfortable with that recommendation prior to sending it to headquarters?
A. Based on the information I had up to that point.
Q. Which would have come from the PERB?

A. The area office manager, the functional people that input to that, the PERB.

Q. Do you recall having any criticisms of the PERB with respect to the report it gave you and its recommendation?

A. Not in this specific case, I don't recall.

Q. Let me show you a document that has been marked as Plaintiff's Exhibit 9, and please review it and then I'll ask you whether you have ever seen it before.

A. No, I haven't seen it.

Q. Who is Mr. Beiriger, is that the way you pronounce it, or do you know who Mr. Beiriger is?

A. I don't know him.

Q. So you don't know why he was asking this information.

A. No, I don't.

Q. I show you what has been marked as Exhibit 12, which is a memorandum addressed to Troy E. Wade, Acting Assistant Secretary for Defense Programs. It appears to be from you.

A. Okay.

Q. Have you seen this document before?

A. Yes.

Q. And is that your signature on page 5?

A. Yes.

A. I don't recall where the guidance came from.
Q. Who drafted this memorandum?
A. Our Contracts Division.
Q. Do you know who within that division would have drafted it?
A. No, I don't.
Q. And you have various award fees proposed for Rockwell as well as other contractors in this memorandum; is that right?
A. Yes.
Q. Up to this point in the award fee process, Mr. Twining, where, take Rockwell, you have a proposed number, was the process in reaching that number similar to the process that would have taken place during 1988 when you were in Albuquerque?
A. I have said it could have been somewhat different because of the evolving nature of the process.
Q. As you sit here today, do you recall any differences between coming up with the proposed number for Rockwell for fiscal year 1989 and the methodology in which you came up with numbers during 1988?
A. No.
Q. So that the same thought and attention on your part that went into this number went into the numbers in 1988 as well.

A. Yes. I would have had a little more firsthand experience in the job with Rocky Flats than I did during that first determination.

Q. When you said "more firsthand experience," you are referring to the first half of 1989, versus 1988.

A. Yes.

Q. And you proposed on the plant for Rockwell one million -- excuse me, $5,176,482?

A. Yes.

Q. And if you go back to look at Exhibit 91, which was the PERB's recommended fee, which was 5,326,482, it would appear that you made a reduction to the PERB's recommendation for the plant.

A. It appears so.

Q. It would appear that the reduction was $150,000.

A. Yes.

Q. Do you recall the basis for that reduction?

A. I'm going to speculate again. It might have been the model shop, but I don't recall specifically.

Q. Okay. And on the PRMP/PROVE, you proposed an award fee for headquarters' concurrence of $186,591; is that correct?

A. Yes.

Q. And that is the same amount that was recommended by the PERB.

A. No.

Q. When you proposed an award fee for concurrence and Mr. Wade withheld concurrence, what happens next?

A. Well, I think that -- this is the period that the raid happened. The management arrangement shifted during that period. The area office, rather than reporting into Albuquerque, became directly connected with headquarters. Another management team was brought in. And I don't recall exactly what the steps were that happened after that, that nonconcurrence.

The management situation around Rocky Flats was pretty confused at that point, at the point of the raid.

Q. On the first page of Exhibit 12, I guess in the second paragraph, the second sentence states, "The performance evaluation reports, which will be sent to each contractor, are attached." Do you see that sentence? In document production, we didn't have any performance evaluation reports attached.

Is it your understanding that would have been the performance evaluation report of the PERB that would have been attached, or don't you know?

A. Again, I can't remember where we were in the process, but you highlighted a summary in an earlier exhibit. I would guess that is what was attached.

Q. Would headquarters have first learned of your

that in a number of areas, but in operational areas or major ES & H areas, there was a period of very little interaction between our staffs.

Q. This memo states that Mr. Goldberg will report to the Undersecretary of Energy, John C. Tuck, with regard to operations of Rocky Flats.

A. Yes.

Q. Was that a change of prior procedures, or prior reporting responsibilities?

A. Well, prior to this memo that area office reported to me.

Q. Who do you report to, or in 1989 who did you report to as manager at Albuquerque?

A. I believe at that time all the field managers plugged into the box that had the secretary, the deputy secretary, and the undersecretary, and I did have some daily interactions with John Tuck.

Q. When did you first hear about the raid at Rocky Flats?

A. The day before it happened. It might even have been the morning it happened.

Q. Were you told at that time that Mr. Goldberg would come in as area manager?

A. Yes, I was.

Q. Were you also told at that time that he would be

reporting directly to headquarters?
A. Yes.
Q. After Mr. Goldberg's appointment, did you consider Rocky Flats still to be under the supervision of Albuquerque?
A. I considered this memo to be the effective document. That office reported to headquarters, and we were to do everything we could to help make things work.
Q. So the answer is no, you did not consider --
A. No, I did not --
Q. -- Rocky Flats to be under your jurisdiction.
A. No.
Q. Let me show you a document that has been marked as Plaintiff's Exhibit 49. It's a memorandum from Mr. Troell directed to you, dated July 10, 1989.
A. Okay.
Q. Have you seen this memorandum before?
A. Yes, I think I have.
Q. Why did Mr. Troell draft this memorandum?
MR. KOLAR: Objection, lack of foundation. It calls for testimony about what was in Mr. Troell's mind.
Q. Go ahead. You can answer.
A. As I recall this process, we got a recommendation from Mr. Goldberg based on the period of time that he had been at Rocky Flats, and we also had the nonconcurrence from

MR. KOLAR: Objection; again calls for speculation, lack of foundation.

MR. NYE: Well, the foundation is Mr. Troell's memorandum that refers to a grade of 87 and I'm asking how he learned -- if he knows. He either does or doesn't --

MR. KOLAR: I will limit my objection to calls for speculation because it's asking how Mr. Troell knew.

Q. If you have knowledge. Don't speculate. If you know.

A. I cannot explain the date on this memo being July 27 and the date on Mr. Troell's memo being July 10th. My recollection of this process is we got a recommendation from Goldberg, the PERB considered that recommendation, and we went into headquarters with a modified proposal.

Q. Did you have conversations with Mr. Goldberg on the subject of his recommendation of '87?

A. I don't think so before we got the letter.

Q. Okay.

A. The conversations that I had with Mr. Goldberg, after he took over at Rocky Flats, were trying to have us continue to provide support in areas that he wasn't equipped to deal with in this new management arrangement that had been implemented by the Tuck memo.

Q. At any time have you had discussions with Mr. Goldberg with respect to Mr. Goldberg's recommendation of 87 as the award fee grade for Rockwell for the first period in 1989?

A. I don't recall. I don't recall those conversations.

Q. One way or the other.

A. One way or the other.

Q. On the first page of Exhibit 49, in the last sentence, it states that "Subsequently," and I think in context that means subsequent to the PERB making its recommendation to you, "much more stringent expectations of contractor performance have been mandated by the secretary and other DOE policy makers' statements and issuances." Do you know what is being referred to there?

A. Well, when Secretary Watkins came in he made it very clear that he was going to put a major priority on ES & H, and the level of DOE's performance in those areas. And I think that is what he is referring to.

Q. As of July 10, how long would Mr. Goldberg have been at Rocky Flats?

A. Well, a little over a month.

Q. Do you know what sources of input Mr. Goldberg was receiving at Rocky Flats with respect to Rockwell's performance over the first award fee period for '89?

MR. KOLAR: Objection, calls for speculation.

MR. NYE: No, it doesn't call for speculation. He either knows or he doesn't. If he knows, then it wouldn't be speculation.

MR. KOLAR: He is not Mr. Goldberg. How could he know what Mr. Goldberg is getting in terms of input?

MR. NYE: He could very easily know. He could be giving input to Mr. Goldberg.

MR. KOLAR: Is the question what did Mr. Goldberg communicate to you what sources of input he was receiving?

MR. NYE: I asked if he knew what sources of input Mr. Goldberg had.

A. Not in detail.

Q. How about generally?

A. There was a, quote unquote, tiger team of people that was put together to come in and help Mr. Goldberg dig into the ongoing operations at Rocky Flats.

Q. Do you know how many people were on that team?

A. No.

Q. Did Mr. Goldberg ever communicate to you any bases for reducing the Rockwell grade from the 92.1 or .2, that you had recommended, to 87?

A. Just this letter is all I recall.
Q. Was there anything in that letter that you didn't know about before in the process of making your own recommended grade?
MR. KOLAR: Take your time and read the letter through.
A. I would say there are details here that I wasn't aware of.
Q. And these would be details that were not included in the material that you received from the PERB?
A. I'm not sure.
Q. You don't know one way or the other without --
A. Without going back and doing it.
Q. -- and studying it. And Mr. Troell, looking at Exhibit 49, makes a suggestion to you, is that a fair characterization, that "Since Mr. Goldberg" -- I'm looking at the last paragraph -- "has been on-site for several weeks, that he would have greater insight into the current conditions at the plant, and, accordingly, we," I take it that's the PERB, "do not believe you are in a position to offer an informed alternative to his proposal"?
A. Yes.
Q. Did you concur with that recommendation?
A. Yes.
Q. Let me show you what has been marked as

think I can demonstrate for you later that this memorandum probably went to headquarters. Having laid that as a predicate, what did you mean, or what was meant by "changing circumstances"?

A. The memo was drafted by CPD. I would be speculating about what they were thinking about on "changing circumstances." They could have been referring to the nonconcurrence from headquarters. I don't know.

Q. In the second paragraph in this memorandum that bears your name, if not signature, there is a reference to changing philosophy in the application of Department of Energy performance standards and the level of DOE expectations. It's in the middle of that second paragraph. Do you know what is referred to there?

A. The secretary's expectations on excellence in ES & H and compliance with ES & H laws.

Q. And they were different, or they were changing from something. What were they changing from?

A. They were changing from a period of time in the prior administration when we were discovering problems, and trying to get them fixed, and, you know, with considerable priority placed on those kind of things in the prior administration, to this is one of the major initiatives of this Secretary as he came in, to get the DOE complex up to the point where we could defend our level of operations to

anybody.

Q. Did you do any form of an analysis as to how Mr. Goldberg came up with the grade of 87?

A. No, I didn't. My recollection, and I cannot explain the dates, my recollection is we got a recommendation from Goldberg, the PERB looked at it, the PERB advised me that there was much more in what was going on at Rocky Flats than we had been able to provide, and that we had no basis, really, to argue with the kind of findings that were coming out of Rocky Flats after those first several days and weeks and months of the raid.

Q. What findings were those?

A. The levels of detail, changing filters with significant safety implications without having building managers know about it; just the -- we had been focusing on really radiological protection, and around this time, mostly around 771, and I don't believe my staff was aware of the magnitude of some of the other issues that came out right after the raid.

Q. So, it's your testimony that, while you don't understand the dates, you believe that the PERB, prior to its memorandum to you of July 10, had received some form of rationale from Goldberg on the 87?

A. I'm quite sure they must have.

Q. Did the PERB ever change its report to you on the

I' not sure exactly what his title was.
Q. Do you recall whether you ever had any discussions with him about Mr. Goldberg's recommended fee of 87?
A. No, I don't think I did.
Q. I show you a document that has been marked as Plaintiff's Exhibit 57.
A. There is the day we were talking about before. Okay.
Q. Have you ever seen these documents before?
A. No.
Q. Now, in these documents, Mr. Meinhardt, the Acting Assistant Secretary for the Defense Programs, is recommending that the Rockwell award fee be reduced from 3.8 million down to 2.9 million, approximately $871,496. Did Mr. Meinhardt ever discuss that proposed reduction with you?
A. I believe he might have sent a letter to that effect. We might have talked about it on the phone.
Q. What do you recall?
A. I am pretty sure we got a letter to that effect.
MR. KOLAR: What Exhibit Number is this? Oh, 57.
MR. NYE: Fifty-seven.
MR. KOLAR: Thank you.
Q. On the page that has the Bates number E 001552, under "Discussion" -- do you see the heading "Discussion"?

A. Yes.

Q. The first sentence says, after implementing the ASDP nonconcurrence in the Rockwell proposed award fee and its transmittal of May 31, 1989, requested Mr. Edward S. Goldberg, acting area manager Rocky Flats office, to reevaluate Rockwell's performance for the period covered by the award fee plan. Did you ask Mr. Goldberg to reevaluate Rockwell's performance vis-a-vis an award fee?

A. I don't recall doing that. I may have. I don't recall, though.

Q. If you did it, would it have been in writing?

MR. KOLAR: Objection; lack of foundation. He testified he doesn't recall doing it.

A. I don't recall asking Mr. Goldberg. You know, looking back on it, it's not a bad thing to do, given the circumstances, but I don't recall doing it.

Q. I have seen no writing. I'm not trying to hide anything from you. In this memorandum, Mr. Meinhardt is requesting the agreement of the Deputy Secretary S-2. Who would that be?

A. The Deputy Secretary at that time would have been Henson Moore.

Q. You testified that you do recall receiving a letter from Meinhardt on the subject of a further reduction in a Rockwell award fee from Mr. Goldberg's 87. I believe

you testified to that.

A. I believe so, yes.

Q. Would that have been before Mr. Meinhardt received the agreement or disagreement from Mr. Moore? In other words -- I'll try to help you out. You frowned. This memorandum was prepared by Mr. Meinhardt at a time when he was -- prepared for the purpose of seeking a concurrence from Henson Moore; is that right?

A. This looks like a paper that was going to the Deputy Secretary. I don't see a date on it.

Q. I don't see a date on it either, but I'm not sure why that has anything to do with my question. My question is this memorandum --

A. Okay.

Q. -- was Mr. Meinhardt's effort to obtain a concurrence from the Deputy Secretary S-2, who you identified as Henson Moore; right? My question to you is, when you received a letter from Mr. Meinhardt on the subject of a further reduction in the award fee, was that at a time before Henson Moore had approved that further reduction?

A. I don't know what the whole headquarters process was that led to Meinhardt's letter. I don't know what happened here. I didn't get into that.

Q. In this letter that you received from Meinhardt, was Meinhardt at that time still seeking approvals that he

needed at headquarters?

A. Not as I recall.

Q. He had already received the approvals, is that what you mean?

A. I don't know what his process was. He was giving me his view on what the award fee ought to be.

Q. Was he telling you it was a done deal, as far as headquarters goes?

A. There wasn't much room for interpreting that letter. It was pretty clear.

Q. That it was --

A. They were approving a certain award fee.

Q. Let me show you a document that has been marked as Plaintiff's Exhibit 51, which is another copy of Mr. Goldberg's July 27, 1989 memorandum to you.

A. Okay.

Q. And I ask you to turn to, I guess, the fourth page, that is Bates number E 001598, and you can see there is some handwritten annotations there.

A. Yes.

Q. Do you know whose handwriting that is?

A. No.

Q. They appear to be the initials J.M. Can you think of anyone other than Meinhardt?

MR. KOLAR: Objection to the form of the

question.

Q. Let me rephrase that question. That was a good objection. Do you have any ideas who J.M. is?

A. I --

MR. KOLAR: Only if you know. Don't speculate.

A. No, I don't know.

Q. Okay. Have you ever seen this document before with the handwritten annotation?

A. No.

Q. And I believe you testified that you don't recall ever having a telephone conversation with Mr. Meinhardt where Mr. Meinhardt was expressing a view that Mr. Goldberg's 87 recommendation was too high a grade?

A. No, I don't recall that.

Q. Who is Admiral Barr?

A. He was the Assistant Secretary for Weapons Programs, DP-20. I'm not sure of his exact title. That position is a military officer that serves in DOE for a period of, I think, two years at a time.

Q. And who would he report to?

A. The Assistant Secretary for Defense Programs.

Q. So Admiral Barr reported to Mr. Meinhardt at the time?

A. Mr. Meinhardt was Acting Assistant Secretary for

Defense Programs for a period of time, yes.

Q. Let me show you a document that has been marked as Plaintiff's Exhibit 52.

A. Okay.

Q. Have you seen that document before?

A. No.

Q. Did you have any conversations with Mr. Barr with respect to his view on the proposed award fee for Rockwell?

A. Not that I recall.

Q. On the page that has the Bates number E 001446, Mr. Barr states that he bases his position, and he lists four points. Were those four points information, new information to you?

A. Points one and four were not. I don't recall those other two. We had ongoing tracking of TSE action items, and I don't know whether that was the same information that we were dealing with or not.

Q. Your PERB had a lot of information before it, didn't it?

A. Yes.

Q. Do you believe your PERB did a thorough job in reaching its original recommendation for you?

A. They did a thorough job based on the information they had available at the time they did the review. We knew about 771. We knew about the chromic acid spill. We should

have known about the tiger team findings. But I am quite sure we did not know the details of some of the operational issues that were being uncovered at Rocky Flats by the people that were brought in with Goldberg.

Q. Would that have been information not known as well to the DOE personnel in the area office at Rocky Flats?

MR. KOLAR: Objection, calls for speculation.

Q. To the extent you know.

A. I'm not sure whether you are talking before the Whiteman input to the PERB or the Goldberg input.

Q. Before the Whiteman input.

A. I'm quite sure that the insight that Whiteman's people had into Rocky Flats in a lot of the detailed operational areas was not as extensive as that uncovered by the tiger team.

Q. Who made up the tiger team?

A. A number of people from within DOE that had technical credentials in a whole myriad of areas.

Q. Do you know how much time they spent at Rocky Flats facility between June 6 and July 10?

A. Not offhand. Well, yes.

Q. Let me show you a document that has been marked Plaintiff's Exhibit 53. It's a memorandum from you to Mr. Meinhardt dated August 8, 1989.

A. Okay.

Q. Have you seen this document before?
A. Yes.
Q. Is that your signature on it?
A. Yes.
Q. You note that in the third paragraph it states that, "As stated in my draft memorandum to John C. Tuck dated July 10, '89"?
A. Yes.
Q. Does that refresh your recollection that that memorandum, indeed, went to Mr. Tuck?
A. I would say that's one way to interpret that. I'm a little surprised that we reference a draft memorandum as an official memorandum, but that...
Q. You state that, "I am not" -- you being Mr. Twining -- "am not in a position to offer an informed alternative to his proposal, especially in view of our changing philosophy in the application of Department of Energy performance standards and level of DOE expectations."
What do you mean by that, that you were "not in a position to offer an informed alternative"?
A. What I meant is at this point there were many more people looking at that plant in intimate detail than there had been before the raid, and that since Albuquerque was no longer in the loop and we didn't have access to the site, I didn't have any way to validate what they are finding. So I

was accepting what other federal employees, who were on site, were discovering during this period after the raid.

Q. What is the purpose of this memorandum to Mr. Meinhardt?

A. Well, the purpose of this memorandum was to respond to the nonconcurrence around my prior recommendation, and to provide a new recommendation for headquarters' consideration, and this new recommendation reflected the input from Ed Goldberg who was the acting area manager of Rocky Flats.

Q. At the time you sent this memorandum, did you have any information that headquarters was considering an even lower award fee?

A. No.

Q. Let me show you a document that has been marked Plaintiff's Deposition Exhibit 150.

A. Okay.

Q. Who would have prepared this letter?

A. Well, I can't tell because there is not an organizational code on it, but probably our contracts people.

Q. Did they have forms in their word processor for these award fee letters to contractors?

A. I don't know.

Q. Do you know when this letter was prepared?

MR. KOLAR: Let me have a moment. Okay.
Q. If you will look at the top page that has the Bates number E 000936, and going over to 937, that is a memorandum to you from Mr. Meinhardt; correct?
A. Yes.
Q. And in that Mr. Meinhardt proposes a Rockwell award fee.
A. Yes, he does.
Q. Now, would this be the communication that you testified to earlier that you believe you received some memo from Mr. Meinhardt on a lower award fee?
A. Yes.
Q. This would be it?
A. Yes.
Q. Now the memorandum to you from Mr. Meinhardt is dated September 20, 1989.
A. Yes.
Q. Do you recall whether you had any discussions with Mr. Meinhardt prior to September 20 in connection with this proposed award fee?
A. I don't recall specifically.
Q. Which means you don't recall one way or the other?
A. No.
Q. No, you don't recall one way or the other?
A. No, I do not recall one way or the other.

provided comments that were of concern to them and that we have incorporated.

Q. Have they ever drafted a letter that says "Dear Mr."?

A. Not that I recall.

Q. In Mr. Meinhardt's memorandum to you, on the page that is E 000936 --

A. Yes.

Q. -- the last sentence on that page states, "Admiral Watkins concurs in this recommendation."

A. Yes.

Q. Was there some significance from your point of view for a reference to Admiral Watkins?

A. Not really, other than to give me an indication that this response had been staffed within the department.

Q. Had been what?

A. Had been staffed within the department.

Q. What does that mean, "staffed"? I assume Admiral Watkins isn't on somebody's staff.

A. That means that DP had taken it to the people who were interested and gotten their agreement in it.

Q. Had you ever had any conversations with Admiral Watkins concerning Rockwell's award fee?

A. No.

Q. Now, on this exhibit, the first two pages of it,

the one E 000934 and 935, it says on the bottom, "Official file copy."

A. Yes.

Q. This would be a copy of the letter that you signed that went to Mr. Sanchini?

A. Yes.

Q. Did you prepare this letter?

A. No.

Q. Who would have prepared it?

A. Ted Cone.

Q. How did you figure that out?

A. Well, the author of the letter is the first person on the concurrence block.

Q. I see. Now this letter is substantially the same, is it not, as the draft that was prepared by Mr. Twining? And take a look and review it yourself, if you don't recall.

A. I would say it would be fair to say it is substantially the same. The numbers are a little bit different.

Q. Do you recall the explanation for the difference in the numbers?

A. No.

Q. In the draft that was prepared by Mr. Meinhardt, E 000938 --

A. Yes.
Q. -- in the first line of that, he states, "In accordance with Appendix D of Contract DE-AC04-76-DP03533, I hereby determine that Rockwell International has earned an award fee," and then it goes on. If you turn now to your official file copy, in the first line, again, in accordance with the contract, it now states "The Department of Energy hereby determines."
A. Yes.
Q. Do you recall that change being made?
A. No.
Q. Do you recall any discussions about that change?
A. No.
Q. When you received this package from, or the memorandum from Mr. Meinhardt, did you call your PERB back into session to decide whether you would go along with it or not?
A. I don't recall whether the PERB was called back into session or not. I'm sure I consulted with the chairman of the PERB.
Q. Do you recall any discussions with Mr. Troell concerning --
A. Not specifically, no.
Q. You don't recall as you sit here today any discussions of what was said?

Q. Do you recall?

A. I don't know.

Q. I show you Exhibit 150, which was your draft letter proposing another award fee, and in there you refer to "I hereby determine." Does that help you in any way?

A. It would be very, very straightforward to go through a sample of award fee letters and see what we usually do. I don't know.

Q. Okay. Thank you.

A. I focus more on the content of what we do rather than the specific wording of the letters.

Q. Did you talk to Mr. Goldberg about the fee that Mr. Meinhardt came up with?

A. I don't recall having discussions with either Mr. Meinhardt or Mr. Goldberg as this process was proceeding.

Q. Let me mark as Plaintiff's Exhibit 174 a document that bears Bates numbers E 000978 through 987.

A. Okay.

(THEREUPON, Deposition Exhibit Number 174 was marked for identification.)

MR. KOLAR: Just give us a second to look at it.

Q. Okay?

A. All right.

whether it was written or verbal or who it came from, but I'm quite sure we got it because that's why we sent the packages to headquarters.

Q. Are you aware of any contracts with your M & O contractors that were amended to reflect the fact that headquarters' concurrence was required for award fees?

MR. KOLAR: In what time frame are we talking about?

MR. NYE: I'll take any time frame.

MR. KOLAR: All right.

MR. NYE: But I assume we are talking about since 1989.

Q. I think it's better to specify.

A. The major contract changes that came out of this overall contractual management improvement effort was the accountability rule, the new award fee curves, the 51 percent on ES & H. I think that occurred after this time frame. I'm not aware of any contractual changes that were made just to reflect the fact that we needed to get headquarters' concurrence.

Q. In your current M & O contracts, or under your auspices, did they refer to the fact in the award fee plan or elsewhere in the contract that headquarters' concurrence is part of the award fee possess?

A. I don't know whether they are in the contracts or

that right?
A. That's what it appears to be.
Q. And I believe your testimony this morning is that a document such as this would not be forwarded to your attention?
A. No.
Q. Would Albuquerque's functions provide input to the area office in connection with the mid term evaluations?
A. Normally they would. Rocky Flats was not a normal situation, and, frankly, I'm a little surprised that they were sending this report to Albuquerque in the first place.
Q. Why is that?
A. Because I think that I delegated the FDO authority for this period to the area manager up at Rocky Flats. It was very difficult for us to do an award fee if we don't have virtually any interactions with a site.
Q. And that lack of interaction began on June 6th.
A. June 6th.
Q. So that going back now to the first award fee period in '89, did you feel that it was difficult to do the award fee once June 6 came along?
A. It was difficult, yes. It was a very difficult situation.
Q. And you were really out of the loop in Albuquerque vis-a-vis Rocky Flats after June 6.

A. On the operational issues going on at the plant, we were out of the loop. We were still doing financial support and budgeting support and helping them on contracts, but as far as Albuquerque having direct access to the site, firsthand knowledge, that ended with the Tuck memo.

Q. Let me show you what has been marked as Exhibit 80, which is an August 30, 1989 memorandum from Mr. Troell to a long list of addressees.

A. Okay.

Q. Do you recall ever seeing this memorandum?

A. No.

Q. As of the date this was signed, August 30th, was there doubt as to who would be the award fee determination official for Rockwell for the second half of fiscal year 1989?

A. There didn't appear to be in Mr. Troell's mind.

Q. How about in your mind, if you recall?

A. I will repeat what I said. I don't know how I could do an award fee evaluation without having direct access to the site.

Q. You just did it for the first award fee period.

A. No, we had direct access to the site during the first evaluation. We had input from Mr. Goldberg and a lot of people that were brought in to help him. That doesn't mean it was easy, and it's not the way an award fee ought to

be done in the long term.

Q. In the second sentence of the second paragraph, it says, "It has not been determined what our future involvement with regard to CPAF support to Rocky Flats will be for fiscal year 1989 and beyond." Was that a subject of discussion at the time as to what the future role of Albuquerque would be in the Rocky Flats award fee process.

A. Well, there were a lot of things being discussed, at this time and over the next several months, and, in fact, there is an MOU that was formulated between ourselves and headquarters and the Rocky Flats office that gives a schedule on how various areas of support that we were providing would transition to the Rocky Flats office as they grew. And so beginning with the June 6 Tuck memo, there was, you know, an evolution of Albuquerque getting out of the Rocky Flats business.

Now, I don't know what the date on the MOU was, but these kind of discussions were going on in all of the areas that Albuquerque was involved in, personnel security, project management, financial management. We still have a financial role.

Q. Was that MOU in the package that was put together for your review by your contracts and pricing people for this deposition?

A. No.

Q. Were "Award Fee Reporting Procedures and Key Milestones," which is the title of Exhibit 71, were they prepared for other award fee periods prior to the second half of '89?
A. I don't recall specifically, but I think so.
Q. And I take it if they were, they would not, however, have included items on the milestones numbers eight and nine which refer to seeking and obtaining concurrence from the Assistant Secretary?
A. That was a new requirement. It wouldn't have included that.
Q. I believe you alluded in prior testimony that the award fee decision-making authority was delegated by you to the manager at Rocky Flats for the second half of '89?
A. Right.
Q. How did that decision come about?
A. I don't recall the specifics.
Q. Was it your decision?
A. I think so, but I don't recall. I mean, it puts me in an untenable position to be determining the award fee on a site where we haven't had access. I felt fairly strongly that I shouldn't be the award fee determining official, the contracting officer, or the financial management allottee, because I don't have the ability to control what a person ought to control with those roles.

the initiative with respect to the delegation.
A. I don't remember the specifics.
Q. Do you know who learned first of the delegation, you or Mr. Simonson?
A. No.
Q. Did you inform Rockwell at the time that there was a delegation?
A. I don't know whether they would have gotten a copy of that letter or not. It doesn't look like it, and I don't know whether there was another letter that went to them.
Q. After this delegation on October 13, were you consulted further with respect to the award fees for the second half of 1989 for Rocky Flats?
A. I wasn't.
Q. What about Albuquerque, if you know?
A. Well, I think there would still have been some areas where it was legitimate to get functional input from some of my people. I don't know whether the Rocky Flats office did that or not.
Q. Let me show you a document that has been marked as Exhibit 142, a memorandum from Mr. Agy to Mr. Miller, dated February 7, 1990.
THE WITNESS: If that's his question, that's an easy answer.
MR. KOLAR: Hold on a second.

PL. SUPP. EX. 49

CERTIFIED COPY



No. 91-1362 C

UNITED STATES CLAIMS COURT

-oOo-

ROCKWELL INTERNATIONAL CORPORATION, :
Plaintiff, :
vs. :
UNITED STATES OF AMERICA, :
Defendant. :

DEPOSITION OF

EDWARD S. GOLDBERG

Tuesday, November 10, 1992

Reno, Nevada

Reported by:

NANCY J. REIGLE, CSR #266, RPR, CP
CALIFORNIA CSR #7643

TEARNEY & TEARNEY
Certified Shorthand Reporters

deputy to three deputies at that time.

Q When did you first become a deputy manager at Handford?

A 1984.

Q What were your responsibilities as the deputy manager of site resources?

A I was responsible for all administrative activities for the site, I also had responsibility for environment, safety and health oversight of the entire site.

Q Was that a promotion from your previous position?

A No.

Q What was your next position?

A I retired.

Q When did you retire?

A Retired effective March 1st, 1992.

Q Sometime during 1989 you were given responsibilities in connection with the Rocky Flats Plant; is that right?

A That is correct. I was detailed to acting manager of the Rocky Flats Plant.

Q When was that?

A That was beginning June 6th and ending sometime in September of 1992. I do not recall the

exact date.

Q So by--

MR. BRUNS: I'm sorry. What year did you mean, Mr. Goldberg?

THE WITNESS: Oh, excuse me, 1989. I said '92. I think he wrote '89 down. I think it was '89.

MR. BORNHOFT: I heard '92, so--

THE WITNESS: I did say '92.

BY MR. KELLEY:

Q By detailed to the Rocky Flats Plant, do you mean that you were assigned summarily?

A Yes. I maintained my position as deputy manager at Handford.

Q Other than what you described to me as your positions, were you detailed to any other positions?

A Yes.

Q What were they?

A I don't recall all of them because they go back through my whole career, but I'll give you some of the more recent ones.

I was detailed in the 1986-87 period to head a major task force for the Department of Energy called the Strategics Issue Analysis Facilities. And I was also detailed--

Q Did you have any experience similar to what took place at the Rocky Flats Plant on June 6th?

A No.

Q At the meeting in Denver, did Mr. Moore say anything about Rockwell's award fee?

A I don't recall that anything came up with regard to the award fee at that meeting.

Q No one mentioned it; is that correct?

A I don't recall that anyone mentioned award fee at that meeting; if they did, it just never stuck, but I just don't recall that that came up in that meeting really. The FBI and EPA was just too big a thing to bring in any ancillary items, and I wouldn't have paid much attention to them at any rate. It was just a very, very big thing.

Q Did you go on site at Rocky Flats on June 6th?

A Yes.

MR. KELLEY: Can we go off the record? Let's take a little break here.

(Exhibit 48 was marked.)

BY MR. KELLEY:

Q Mr. Goldberg, I'm handing you a document that has been marked as Exhibit 48 which is a memorandum from John Tuck to Bruce Twining and yourself

dated June 6th, 1989.

Would you please review the document and tell me if you've ever seen it before.

A Yes.

Q Is this the document that formally assigned you to the Rocky Flats Plant?

A To the best of my recollection this is the document, although there was other formal paperwork that goes to the administrative-- through the administrative channel which defines the detail.

Q What other paperwork is there that defines the detail?

A It's just what I explained to you. There's normal informational paperwork. It has to go through the administrative channel so you get your paycheck and the administrative side knows where you are all the time.

Q Does this explain the details of your duties or responsibilities?

A No. It just says you're detailed to such and such a job from such and such a job effective such and such a date to such and such a date, and so just a formal administrative document.

Q Mr. Goldberg, I'm handing you a document that's been marked as Exhibit 49 which is a memorandum

Q But you never saw any documentation on that?

A I don't recall seeing it at this point in time. It's just something that I just don't recall. You will have to look at the files and see if there was a piece of paper that came back to the Rocky Flats office. I just do not recall it.

Q Did you ever find out what Rockwell eventually received as an award fee?

A I don't know, you know, just sitting here at this point in time I just don't know. Only thing I do know is that it was reduced, and I do not remember or recall that I saw what the final number was, and I don't know why I don't recall, but I just don't.

Q After you sent your recommendation to Mr. Twining, did you speak with anyone at Albuquerque about Rockwell's award fee?

A Mr. Twining and I might have had some discussions, but specifically I don't recall anyone else. He might have called, and I just don't specifically recollect what took place after I sent the recommendation to Mr. Twining.

Q Did Mr. Twining call you or did you call Mr. Twining?

A It could have been either way.

Q What did you two discuss?

A I don't recall any of the discussions. What I'm saying is that he could have called for clarifications and so on; I just don't recall.

Q Did he ever express to you whether he agreed or disagreed with your recommendation?

A I don't recall.

Q After sending your recommendation on Rockwell's award fee to Mr. Twining, did you ever speak with anyone at DOE headquarters about Rockwell's award fee?

A I don't remember. It would only have been if I did to the extent that I've done the job, and that's it. I would not have discussed any details, but I specifically do not recall talking to anyone at headquarters.

Q Prior to sending your recommendation on Rockwell's award fee to Mr. Twining, did you speak with Mr. Twining about Rockwell's award fee?

A Mr. Twining and I had many conversations. I don't recall specifically the ones where the award fee might have come up. I just do not. But we talked because he was responsible for supplying considerable assistance to me, and as the budget was part of that assistance he was interested in what we were doing,

'cause the money was coming out of his budget. So we had many conversations, and the award fee could have come up in those conversations and discussed what we were doing, where we were going, but I do not specifically recall any of those conversations.

Q Was it your understanding that Mr. Twining was to provide you assistance in connection with Rockwell's award fee?

A Not specifically. Mr. Barkmeier was handling that, and I don't recall that he asked for any assistance from Mr. Twining. I certainly did not.

Q Did Mr. Twining ever tell you what he thought should be Rockwell's award fee?

A I certainly saw what he had initially recommended, but beyond what was written in that document he did not, to my-- best of my knowledge recommend anything to me after we initiated the relook.

Q Did he ever recommend anything different from what he had had in his written recommendation?

A As far as I know he made a recommendation to headquarters after I made my recommendation to him, and I don't recall what that was.

Q Prior to sending your recommendation on Rockwell's award fee to Mr. Twining, did you speak to anyone from headquarters about Rockwell's award fee?

Q You sent your recommendation for Rockwell's award fee to Mr. Twining; is that right?
A Yes.
Q Why did you send it to Mr. Twining?
A He was the fee determining official.
Q How did you learn that?
A How did I learn he was the fee determining official?
Q Yes.
A The manager of Albuquerque is the fee determining official.
Q Did somebody tell you?
A I guess I just knew it. The manager is the fee determining official, and the fact that Albuquerque was responsible for operations at Rocky Flats, it was just a fact. The manager is the fee determining official. I don't think anybody specifically told me that, but it's just something I knew intuitively.
Q Was it the case at any of the other places you worked at other than Rocky Flats that the award fee determination official was someone at another office?
A No.
Q Mr. Goldberg, I'm handing you a document that is being marked as Exhibit 55.

PL. SUPP. EX. 50

DOE F 1325.8

United States Government | Department of Energy

# memorandum

Albuquerque Operations Office

Rocky Flats Area Office

DATE: SEP 2 1989

REPLY TO ATTN OF: ADM:TA

SUBJECT: Schedule of Award Fee Evaluation, Second Half of FY89

TO: RFO Assistant Managers (2)
RFO PRMP Project Manager (1)
RFO Division Directors (7)
RFO Branch Chiefs (13)

RFO will be performing an evaluation of Rockwell's performance under the Cost Plus Award Fee contract at the conclusion of the six-month award fee evaluation period of April 1, 1989 through September 30, 1989. The evaluation process used will be the approach developed by AL and used in our previous evaluations of Rockwell. This evaluation will result in an award of fee and the evaluation report, in the form of a recommendation, will be provided by RFO to the Chairman of the AL Performance Evaluation Review Board (PERB). The PERB, in turn, with make an award fee recommendation to the Manager, AL. The final award fee determination for this period will be made by the Manager, AL.

Meetings have been scheduled as follows:

| | |
|---|---|
| 1st RFO Meeting: | Tuesday, October 3<br>8:00-10:00 am<br>DOE Conference Room |
| Rockwell Meetings: | October 3(pm), 4, 5, or 6<br>Times to be Determined |
| 2nd RFO Meeting: | Tuesday, October 10<br>12:30-2:30 pm<br>DOE Conference Room |

Plaintiff/Defendant Deposition Exhibit 109
Case # 91-1362C
Date 12-7-92
Hyatt Court Reporting

Preparing for the 1st RFO Meeting

This meeting and the 2nd RFO meeting will be attended by the Manager, Assistant Managers, the Project Manager, Directors, and the Chief of the Contracts & Services Branch. The Contract Administrator (Terrel Agy) within the Contracts & Services Branch will be the coordinator for the RFO meetings and for the award fee package sent to AL.

The purpose of the 1st RFO meeting will be to decide on the language to be used in the evaluation version to be discussed with your Rockwell counterpart. In preparation for the 1st RFO meeting, Division Directors [those with Functional Performance Areas (FPA's)] and the Project Manager will be expected to prepare an evaluation of their FPA's in the correct format. These should be prepared based on imput from AL Directors and Branch Chiefs and/or other imput or knowledge. The evaluation should be based on achievements or lack thereof against the Goals and Objectives (G&O's) letter sent to Dom Sanchini on April 18, 1989. Comments can also be made on areas not covered by the G&O's where, for example, important achievements or failures need to be noted.

A Director without an FPA is expected to submit evaluations in their area of responsibility for inclusion in the General Management (GM) FPA. Assistant Managers, Directors and the Project Manager should submit comments for the GM FPA when the comments would be more appropriate there or when the comment does not fit within their own FPA.

As the input from the AL Directors (due by September 29) is received, the Division of Administration will assure that the appropriate Assistant Manager, Project Manager, Director, and Branch Chief receive a copy. Please provide the Division of Administration with a copy of any AL Director input that is received by you directly. The Coordinator will be compiling a complete record of the AL input. Useable input from the AL Directors should be included in the evaluation and efforts should be made to resolve significant differences of opinion with the AL Directors.

Five pieces of correspondence on FPA's and Goals & Objectives for the period under review are attached. These items should help in bringing the newer RFO supervisors up to date.

The Coordinator will be responsible for gathering together a complete evaluation package to hand out to each attendee at the RFO meetings. He will also be compiling the comments for the GM FPA. To facilitate this effort, please provide Terrel with 15 copies of each FPA evaluation by COB October 2. Your GM FPA comments also need to be provided by that time on a disk in the Microsoft Word format for the Macintosh. Copies of all evaluations initiated at RFO this period should be marked both "Predecisional" and "Official Use Only."

<u>Meeting with Rockwell</u>

Dave Fergason of Rockwell Contract Administration has been informed of the RFAO meeting dates and will be arranging meeting times between the Rockwell Directors and the RFO Directors/ Assistant Managers/Project Manager, as appropriate, to discuss RFO preliminary evaluation positions and findings. You may be receiving a telephone call from Dave in connection with the meeting times. The meetings will start on October 4 and all meetings will be completed no later than the morning of October 10. Changes to the meeting

dates can be coordinated through Terrel. You will be provided with a copy of the meeting schedule with Rockwell.

The preliminary evaluations discussed with Rockwell cannot contain the adjectival or numerical grade and a copy of the evaluation should not be provided to Rockwell, informally or otherwise, for retention at the meeting.

The 2nd RFO Meeting

The Directors/Project Manager should be prepared with a revision of their evaluation if their discussions with Rockwell deserve such a revision. Otherwise, attendees should come to this meeting prepared to discuss the Rockwell reaction and what influence, if any, it should have on the evaluation. At this meeting the final version of the RFO evaluation recommendation is determined.

In preparation for this meeting, 15 copies of the revised evaluation needs to be furnished to Terrel at least two hours prior to the meeting.

Following the 2nd RFO meeting, the final RFO recommended version of the FPA evaluations (as revised by decisions made at the 2nd RFO meeting) should be furnished to Terrel on a disk by the Project Manager and appropriate Directors. Subsequently, I will be having a meeting with Dom Sanchini to cover the GM and other FPA's, as appropriate.

Questions about these meetings or about the award fee process can be directed to Claude Barkmeier, Hugh Miller or Terrel Agy.

David P. Simonson

David P. Simonson
Manager

Attachments (5)

cc:
Terrel Agy

PL. SUPP. EX. 51

United States Government

Department of Energy

# memorandum

DATE: SEP 22 1989

REPLY TO ATTN OF: SPD

SUBJECT: CPAF Input - April 1 through September 30, 1989

TO: D. P. Simonson, Manager, RFO

The attached input is provided for your use in the CPAF process in which 20% has been established as an FPA in ES&H.

If there are any questions, please call Ray Miller at FTS 844-7877.

John J. Schinkle
Director
Safety Programs Division

Attachment

RFO DISTRIBUTION

FOSTER
SCHASSBURGER
ALDRICH
OSTMEYER
Agy

Plaintiff/Defendant Deposition Exhibit 112
Case # 91-1362C
Date 12-7-93
Hyatt Court Reporting

E 000650

CPAF INPUT
ROCKWELL INTERNATIONAL
ROCKY FLATS PLANT
APRIL 1 - SEPTEMBER 30, 1989

ELECTRICAL SAFETY

1. Summary

The Contractor has placed greater emphasis on the electrical safety program for the Rocky Flats Plant as a result of issues, identified through HQ Technical Safety Appraisals (TSAs), AL appraisals, and focus by the EH site representative.

There were no noteworthy achievements and no notable deficiencies.

Suggested Adjectival Grade: Very Good

2. Achievements

None

3. Deficiencies

None

4. Observations

The Contractor continues corrective action on electrical system deficiencies. There was one Unusual Occurrence Report (UOR) in this period that involved a contract electrician who cut into a live 480-volt cable. Seven other UORs included two contamination incidents; three releases of acid or acid fumes; and two involving fire protection (See element - Fire Protection).

FIREARMS SAFETY

1. Summary

Rockwell International has not submitted a quarterly status report on the February Firearms Safety Appraisal. The East firing range has been reopened without an approved Safety Analysis Report (SAR) or risk analysis, even though a preliminary analysis indicated a hazard to the public. Corrective action plans for the February 1989 Firearms Safety Appraisal were acceptable.

There were no noteworthy achievements and some notable deficiencies.

Suggested Adjectival Grade: Good

2. Achievements

None

3. Deficiencies

a. The East firing range has been reopened without an approved SAR or risk analysis, even though a preliminary analysis indicated a hazard to the public.

b. Rockwell International was late in preparing an action plan in response to a February 1989, Firearms Safety Appraisal.

c. Rockwell International has not submitted a quarterly status report on the 1989 Firearms Safety Appraisal.

4. Observations

None

FIRE PROTECTION

1. Summary

AL fire protection appraisals have identified the need for additional fire protection engineering staff. In terms of fire loss, the program has been extremely successful with a cumulative fire loss ratio over the last ten years of 0.02 cents per $100 plant valuation compared to an expected Improved Risk loss ratio of 3.0 cents. There is one notable deficiency dating back to 1985 regarding the need for additional fire protection engineering staff as mentioned above.

There was one noteworthy achievement and one notable deficiency.

Suggested Adjectival Grade: Very Good

2. Achievements

The low fire loss record over the last ten years continued for this reporting period.

3. Deficiencies

One major deficiency has been identified by AL related to the need for increased staffing in the fire protection engineering function. A recommendation was made in a 1985 AL Fire Protection Engineering Appraisal Report and has not been satisfied by Rockwell International. The recommendation remains outstanding.

4. Observations

a. There have been two UORs related to fire protection during this period. There was one small metal duct fire with minimum damage. Of significance was the fact that an employee had previously notified both the Contractor and Area Office of specifics regarding the potential for an event. The other UOR related to the failure of a glovebox overheat detection system.

b. Rockwell International is presently in the process of developing internal programs to control combustible fuel loads and poor housekeeping in building areas, the identification of fire wall penetrations, and the improvement of supervision over these concerns. These developments are in response to deficiencies noted in past TSAs.

NUCLEAR FACILITIES SAFETY (FPE)

1. Summary

The Contractor's program for nuclear facilities safety is effective. Recommendations from previous Technical Safety Appraisals have been vigorously implemented in the nuclear facilities and most of them were closed in a satisfactory manner. All AL recommendations have been expeditiously implemented. Safety and housekeeping in the nuclear facilities at the plant have been significantly improved.

There have been some noteworthy achievements and some notable minor deficiencies.

Suggested Adjectival Grade: Very Good

2. Achievements

Significant efforts at the nuclear facilities have been made in response to the concerns of the Technical Safety Appraisals. Most of the concerns have been implemented and closed. Those concerns remaining open are being worked in an expeditious manner.

Detailed audits continue to be made by both operating and overview group at the Plant and these audits are effective in identifying problems and concerns. Problems and concerns so identified are reviewed by a qualified technical staff and corrective actions are identified for resolution. The audits involve physical building walk-through as well as paper review activities.

3. Deficiencies

Some AL appraisal closeouts have not been attended by the appropriate level of Rockwell Management. Although it is understood that time is limited in a busy schedule, extra effort should be taken by management to attend closeouts.

Building 771 was shut down for three months from October 1988 to January 1989, in order to upgrade safety procedures and practices. Phase I and Phase II of the restart have been completed, and Phase III is being worked.

4. Observations

There are no incomplete actions from previous AL appraisals. The Nuclear Safety Programs at the Plant are performed in a professional manner and personnel attitude toward safety is very good.

SAFETY ANALYSIS REVIEW PROGRAM

1. Summary

In keeping with prior review and analysis, Rockwell International has maintained an excellent Safety Analysis Program. Their program has been implemented effectively and the interface with AL on safety analysis issues is considered very good.

There were some noteworthy achievements and one notable deficiency.

Suggested Adjectival Grade: Very Good

2. Achievements

Rockwell International is continuing to maintain and implement their Safety Analysis Program and is continuing dialogue with DOE/AL on past items of mutual concern.

3. Deficiencies

More resources have been judged needed to complete safety analysis projects in a timely manner and to correct noted program minor discrepancies.

4. Observations

Rockwell has made every effort to try and meet DOE's new and existing safety analysis requirements within available resources. However, Rockwell's resources may be unable to meet the new safety analysis requirements now being promulgated by DOE and other agencies. Organization and responsibility changes in DOE make it difficult to identify resources needed for the future of the Rockwell safety program.

PL. SUPP. EX. 52

IN THE UNITED STATES
CLAIMS COURT

| | | |
|---|---|---|
| ROCKWELL INTERNATIONAL CORPORATION, | ) | |
| Plaintiff, | ) | Case No. |
| vs. | ) | 91-1362C |
| THE UNITED STATES, | ) | Pages 1 - 114 |
| Defendant. | ) | |

DEPOSITION OF:

ROBERT M. NELSON, JR.
MONDAY, NOVEMBER 9, 1992
10:25 A.M.

Reported by:
ROBERTA L. THIBODEAU
CA C.S.R. No. 8263
NV C.S.R. No. 358

Q. Is there any other limitation that would affect your ability to testify here today?

A. No.

Q. Do you understand everything I've said?

A. Yes.

Q. What is your current work address?

A. I have two current work addresses. I am the deputy manager of the Nevada field office of the Department of Energy, and the address is on Mr. Bornhoft's card here. It's a post office box. It's physically located at 2753 South Highland Avenue. I'm also the manager of the Rocky Flats DOE office on detail. So it's a collateral assignment.

Q. About how much time do you spend in the two different offices?

A. Physically I spend four days a week at the Rocky Flats plant and one day a week here. Much of my time on the one day here is spent on Rocky Flats business.

Q. What is your current home address?

A. My current home address is 3609 Casa Grande Avenue, Las Vegas, Nevada 89102.

Q. Mr. Nelson, please describe your formal education since graduating from high school.

A. I went one year to UCLA, enlisted in the

Q. And how long did you hold that position?

A. About -- I'm going to have to guess now. About -- must have been about three years. About three years to be -- and then I was -- I was moved laterally from assistant manager of operations to the assistant manager for administration, and -- and must have been around -- we could get precise dates. I just can't remember exactly, but I spent about three years in the operations job, and then about a like period of time in the -- in the administration job.

Q. And what position did you hold after the administrative job?

A. The deputy manager. What I have now.

Q. So when did you first hold that position? Would that have been around 1985?

A. When did I hold that position of -- must have been about -- about '85 to become the assistant manager for administration, and then about '88 I think I became the deputy manager.

Q. And have you held that position constantly since 1988?

A. Yes, recognizing that I've been put off on this detail. Now, a little nuance of the detail. The first year on the detail, I really was full time in Denver from -- from like January -- the end of

January 1990 for about a year. Probably January time frame in 1991 I came home about once a month. And so it was basically full time in the Denver area.

After that I -- I told them -- I had been sent up there for a six-month assignment, which clearly after a year was going to last longer than six months. And I told them that obviously because of family and other things I really needed to come home more often. And so at that point they changed my detail to be a collateral assignment, which really required me to be at both places during parts of the week.

So starting in January of '91, I was on this kind of a -- well, what I have now except that that lasted until April of '92. In April of '92 I was replaced at Rocky Flats and then was asked to go back again about a month ago. And so I'm -- I'm back on doing that collateral assignment now.

Q. And what was your position for the whole time you were at Rocky Flats?

A. Manager of the DOE office.

Q. Did you ever hold any other position at Rocky Flats?

A. Never.

Q. In any of your positions other than your

on how you define the word "involvement with," when I was the assistant manager for operations, starting in 1982, I started sitting on those boards. But I was in more of a leadership role as being the -- the contracting officer from 1985 on.

Q. In your operations position, did you submit input to the boards?

A. Yes.

Q. In the contracts in Nevada in which you have played some part in an award fee, what official was the fee determining official?

A. The manager of the office is almost always the fee determining official.

Q. The manager of the Nevada office?

A. Uh-huh.

Q. I believe you stated, Mr. Nelson, that you first became involved with the Rocky Flats plant at the end of January 1990; is that right?

A. That's correct.

Q. When were you first informed that you would be assigned to the Rocky Flats plant?

A. The precise date -- let me give you an about date. I would say it was about the 25th or so of January of 1990 I received a telephone call from the deputy assistant secretary for military

application in Washington which asked me to come to Washington and -- and meet with people, at that point undefined, for a reason he could not tell me on the phone. One of those very scary phone calls.

Q. Who was the deputy secretary?

A. That was Admiral Mike Barr. I -- of course, when you get a call like that, unless for, you know, overriding reason, I said, "Of course." I went on a plane the next day. And again, I can't be exactly precise, but it was that week. I -- I went the next day. I met with the -- I met with Admiral Barr. I met with the under secretary of energy, John Tuck, and then ultimately with the secretary of energy, Admiral Watkins. And at that point Admiral Watkins asked me to come to Rocky Flats for about six months. So it was and how fast could I get there, and I told them the next month. So whatever the month is, around the 28th or 29th of January of 1990 was the first day I had ever set foot on the place. So I had about a day's -- couple days' opportunity to pack bags and that kind of stuff.

Q. How long did you meet with the various people in Washington?

A. Well, it was -- it was a one-day affair. I would say I probably spent a couple hours with

Admiral Barr. I spent probably 15 minutes with the under secretary and probably a few minutes with the secretary.

Q. What did you discuss with Mr. Barr?

A. Well, first, he gave me the -- the idea that they would like me to go -- potentially go to Rocky Flats. Was there any reason I couldn't do that? There was a new contractor there, EG&G. I had had -- one of the five contracts here in Nevada is EG&G, a different company of EG&G, but certainly a company that I'm familiar with, a corporation I'm familiar with. A sense of -- of a lot of problems being at Rocky Flats, but nothing specific is my -- I don't recall any details. Mostly dealing with could I do that job, and would I be willing to do that job, and what would I want personnelwise kind of issues.

For example, David Simonson was my predecessor. There was another person named Ed Blackburn, I think, who was -- who had been Dave's deputy. What would I want them to do with those people kind of discussions if I were to go. And I asked them certainly to keep Dave Simonson there if he was willing. If I was going to replace him, I knew that would be an awkward situation, but I knew also -- I had known Dave before casually, but I knew who he

was anyway. And I knew he had been there about six months as the manager or some number of months as the manager, and I felt I could really use his knowledge of the plant.

It was a rather rapid turnover. So part of that -- as a matter of fact, Dave Simonson was at Washington that day for some reason which I don't know today, and I had an opportunity to sit down with him and ask him to stay and help me.

Q. Did Mr. Simonson end up staying?

A. Uh-huh. Still there.

Q. What was his position after you arrived at Rocky Flats?

A. I made him my deputy. He stayed my deputy for about six months.

Q. Did Mr. Barr discuss with you what your duties or responsibilities would be at Rocky Flats?

A. Yes. In very general terms a manager is responsible for everything that goes on in the plant. And certainly we talked about the focus was to take this new contractor and get them to fix the -- the various problems that had caused the transition of Rockwell to EG&G. We had the Tiger Team of the previous year with a lot of findings, and there were a lot of -- there had been over that period of time

Q. Let me draw your attention to Appendix D in this document.
A. Uh-huh.
Q. The page that is labeled E 001278.
A. Yes, okay.
Q. And let me further draw your attention to section No. 2, Introduction, on that page, and in particular the first sentence --
A. Uh-huh.
Q. -- which reads: "The award fee determination official (manager or anyone acting as manager, Albuquerque operations)."
A. Uh-huh.
Q. Were you aware that the manager of the Albuquerque operations was the award fee determination official for the Rockwell contract?
A. Yes.
Q. And you were aware of that in February of 1990?
A. Yes.
Q. Mr. Nelson, I'm handing you a document --
A. Do you want these back?
Q. Yes, please.
I'm handing you a document that has been

A. Must have been around December of '90. Hold on just a second. Okay.
Q. Did you prepare the letter?
A. No.
Q. Did you assist in drafting the letter?
A. No.
Q. Did anyone consult with you in preparation of the letter?
A. No.
Q. Were you the manager of the Rocky Flats office in December of 1990?
A. Yes.
Q. What was Mr. Twining's position at that time?
A. Manager of the Albuquerque office, and, of course, still the contracting officer, I believe, for the Rockwell contract.
Q. Were you the award fee determination official in December of 1990 with respect to Rockwell?
A. I don't think so. As I mentioned to you, I was to be the award fee official for that one six-month period and the close out of that remaining part of that year, and before that were Mr. Twining's responsibility.
Q. Does this letter relate to the

PL. SUPP. EX. 53

Plaintiff/Defendant
Deposition Exhibit
2
Case # 91-1362 C
Date 10-21-92

# HANDBOOK FOR AWARD FEE PERFORMANCE EVALUATION AND REVIEW PROCESS

ALBUQUERQUE OPERATIONS OFFICE

UNITED STATES ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION

ALBUQUERQUE OPERATIONS OFFICE (AL)

HANDBOOK FOR

AWARD FEE PERFORMANCE EVALUATION
AND REVIEW PROCESS

APPROVED: [signature]
Herman E. Roser
Manager, AL

Date: June 24, 1977

# PREFACE

This Handbook contains the policy and procedural guidelines to be used in the evaluation and review process associated with Cost-Plus-Award-Fee (CPAF) contracts applied to Albuquerque Operations Office (AL) GOCO production contractors within the weapons production complex.

The Handbook is to be used by all AL Headquarters and Area Office personnel who have a responsibility for and participate in the evaluation and review of AL GOCO production contractors' performance under the provisions of applicable CPAF contracts.

TABLE OF CONTENTS

PREFACE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. GENERAL. . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Introduction . . . . . . . . . . . . . . . . . . . . . 1
B. Objective . . . . . . . . . . . . . . . . . . . . . . . 2

II. PLANNING FOR CPAF IMPLEMENTATION . . . . . . . . . . . . 4

A. Interface With Contractors . . . . . . . . . . . . . 4
B. Performance Evaluation Plan . . . . . . . . . . . . . 4
C. Award Fee Plan . . . . . . . . . . . . . . . . . . . 7
D. Evaluation Administration Plan . . . . . . . . . . . 7

III. EVALUATION AND REVIEW - ORGANIZATION AND ADMINISTRATION 9

A. Organization And Administration . . . . . . . . . . 9
B. Performance Evaluators And Monitors . . . . . . . . 9
C. Area Office Managers . . . . . . . . . . . . . . . . 9
D. AL Division Directors . . . . . . . . . . . . . . . 10
E. Performance Evaluation Committees (PECs) . . . . . 10
F. Performance Evaluation Review Boards (PERBs) . . . 12
G. Contracting Officer (Fee Determination Official) . 13

IV. IMPLEMENTATION OF EVALUATION PROCESS . . . . . . . . . 14

A. Monitoring Process . . . . . . . . . . . . . . . . . 14
B. Making An Evaluation . . . . . . . . . . . . . . . . 18
C. Role Of Performance Evaluation Committee (PEC) . . 22
D. Role Of Performance Evaluation Review Board (PERB) 23
E. Role Of Contracting Officer (CO) . . . . . . . . . 24

V. CONTINUING EVALUATION PROCESS . . . . . . . . . . . . . 26

A. General . . . . . . . . . . . . . . . . . . . . . . . 26
B. Changes To Performance Evaluation Plan . . . . . . 26
C. Changes to Evaluation Administration Plan . . . . 27

VI. NOTIFICATIONS . . . . . . . . . . . . . . . . . . . . 28

A. Area Office Manager Responsibilities . . . . . . . . 28
B. Other Notification Responsibilities . . . . . . . . . 29

VII. ANNUAL APPRAISAL . . . . . . . . . . . . . . . . . . . 30

A. General . . . . . . . . . . . . . . . . . . . . . . 30
B. Evaluation . . . . . . . . . . . . . . . . . . . . . 30
C. Annual Appraisal Report . . . . . . . . . . . . . . 32

Appendix A. MASTER LIST OF FUNCTIONAL PERFORMANCE AREAS (FPAs) . . . . . . . . . . . . . . . . . . 36

Appendix B. SAMPLE AWARD FEE PLAN . . . . . . . . . . . . . 42

Appendix C. RATING PLAN . . . . . . . . . . . . . . . . . 51

GLOSSARY OF TERMS . . . . . . . . . . . . . . . . . . . . . 52

# I. GENERAL

## A. Introduction

This Handbook is intended as a guide to be utilized in the preparation and implementation of the performance evaluation and review process applicable to Cost-Plus-Award-Fee (CPAF) contracts with AL GOCO production contractors within the weapon production complex. The provisions contained herein may be applied in connection with other CPAF contracts administered within the AL system at the discretion of responsible officials. The purpose of the Handbook is to provide a uniform structure within which all those involved in the CPAF evaluation and review process may operate. Such standardization is necessary in order that the methodology, terminology, procedures, and practices can accommodate the several contracts within the weapons production complex and facilitate participation by the various parties who will be involved. On the other hand, it is necessary to allow maximum flexibility in the details of implementation of each CPAF Award Fee Plan due to the variations between each contractor's management, organization, and operations and between AL objectives for each facility. Therefore, application of CPAF Award Fee Plans must be tailored to meet individual considerations associated with each contractor. Substantive exceptions to the requirements of this Handbook may be authorized by the Contracting

Officer or the Performance Evaluation Review Board (PERB) Chairman when such variations are determined to be appropriate for a particular CPAF contract.

B. Objective

The AL objective in entering into CPAF contracts with the weapons production complex GOCO production contractors is to achieve optimum performance levels, affording the contractors an opportunity to earn increased fee in the pursuit of this objective. Optimum performance does not necessarily connote the very best operating level which could possibly be achieved in each functional area; rather, it represents the most favorable degree of performance considering the objectives to be realized balanced by the most effective utilization of available resources.

In applying CPAF contracts to the contractors within the weapons production complex, the level of performance attained by the individual contractors and the long association of these contractors with AL under the Cost-Plus-Fixed-Fee (CPFF) arrangement must be considered. In doing so, it is AL's intention to apply the CPAF concept in a manner compatible with the unique weapons production complex arrangement, with the expectation of mutual benefits to AL and the contractors. In

implementing the evaluation process under the CPAF arrangement, the AL expectation is to provide a fair assessment of contractors' performance without imposing an excessive, burdensome monitoring and documentation system which would encroach upon the limited manpower resources available to both AL and the contractors. The evaluation process outlined in this Handbook relies heavily on existing organizations, established survey and appraisal techniques, and personnel who are assigned management, administrative, and operating responsibilities in connection with the ongoing AL missions and operations. Within these constraints, every attempt will be made to elicit enough information to introduce as much specificity and objectivity into the evaluation process as possible.

## II. PLANNING FOR CPAF IMPLEMENTATION

### A. Interface With Contractors

The first step in the application and implementation of a CPAF contract arrangement with a particular contractor should be a discussion with that contractor to explain the approach which AL intends to use in the formulation, application, and implementation of an Award Fee Plan and the procedures and processes associated therewith. These discussions should occur early in the planning stage between management representatives of AL and the contractor so that agreement in principle may be achieved. Subsequently, the definitive provisions of the Award Fee Plan and the Performance Evaluation Plan should be developed in consultation with the contractor in order to facilitate a common understanding of intent prior to the contract negotiations and the implementation of the CPAF concept. The Award Fee Plan itself will become an appendix to the contract.

### B. Performance Evaluation Plan

The Area Office Manager, during the planning stages, will be responsible for preparing a proposed Performance Evaluation Plan applicable for the initial evaluation period under the CPAF contract. The Plan should normally be composed of from 5 to 10 Functional Performance Areas (FPAs) selected from the "Master List Of Functional Performance Areas (FPAs)"

included in this Handbook (see Appendix A). In all cases, the FPA entitled "General Management" will be included as a part of the Plan. The selection of the other FPAs shall be based upon specific considerations associated with the contractor's mission, performance level, and the degree to which AL wishes to stimulate or emphasize performance in any specific areas without lowering the level of performance in other areas. Normally, an FPA would be selected to either encourage an improvement in performance which has not been at the desired level or to emphasize the importance of performance in a particular area in the context of existing conditions. It is not necessary--at times perhaps not even desirable--to include certain so-called "main mission" FPAs in a Performance Evaluation Plan for any particular evaluation period. The advantages inherent in covering a wide spectrum of contractor activities in a Performance Evaluation Plan should be considered. There are provisions, which are discussed in other sections of this Handbook, for changing FPAs from evaluation period to evaluation period; so there is no need to get "locked in" on any specific group of FPAs. Certain FPAs, by virtue of their prominence and the administrative and operational requirements surrounding them, inherently demand a high level of performance and receive a great deal of visibility on a continuing basis. Therefore,

contractor performance in connection with such FPAs may not have to be stimulated or monitored under the award fee concept.

In addition to designating the FPAs, the proposed Performance Evaluation Plan shall include the Area Manager's recommended weighting for each FPA (including "General Management") with the sum of the individual allocations totaling 100%. After the Plan has been drafted, it shall be forwarded to the Chairman of the Performance Evaluation Review Board (PERB) for review. The rationale indicating why specific FPAs and weightings were selected should be submitted with the Plan for the edification of the PERB. The Chairman of the PERB will coordinate review of the Area Office Manager's proposal with the other PERB members; will discuss all proposed changes with the Area Office Manager; and, with PERB concurrence, will approve the Plan to be implemented.

After the Performance Evaluation Plan has been approved by the PERB, the Area Office Manager shall notify the contractor of the Plan at least 30 days prior to commencement of the evaluation period or as specified by the contract. In addition, the Area Office Manager shall notify the concerned AL Divisions of the FPAs to be evaluated to facilitate the Divisions' planning for and participation in the evaluation process.

C. Award Fee Plan

The Award Fee Plan, which will become an appendix to the contract, will be developed by the AL Contracts and Procurement Division in consultation with the Area Office Manager. It will include such elements as the Performance Evaluation Plan, the Rating Plan and associated grades and definitions, an award fee performance table, and a description of the administrative procedures which are to be applied. A format for, and sample provisions of, an Award Fee Plan are included in this Handbook as Appendix B. The specifics of an Award Fee Plan, including the fee provisions applicable to each contract, will be negotiated with the contractor during the contract negotiation phase and, normally, will be renegotiated each year.

D. Evaluation Administration Plan (EAP)

After a Performance Evaluation Plan has been approved by the PERB, the Area Office Manager will construct an Evaluation Administration Plan (EAP) to facilitate implementation of the evaluation and review process associated with the Performance Evaluation Plan. The Evaluation Administration Plan will be designed to meet the requirements of each contract situation. The Plan shall contain the FPAs to be evaluated, the Functional Performance Elements (FPEs) associated with these FPAs, and any additional information or instructions related thereto

which the Area Office Manager chooses to include. The Functional Performance Elements (FPEs) are listed in Appendix A. In addition, the Plan shall normally include the designation of Performance Monitors and Performance Evaluation Coordinators and the areas for which they are responsible. Methods, procedures, and instructions to be utilized by the Performance Monitors and Performance Evaluation Coordinators should also be a part of the Evaluation Administration Plan. The Plan shall denote the intended frequency of meetings with the contractor during each evaluation period (no less frequent than bi-monthly) to discuss the contractor's performance. These meetings are intended to facilitate a mutual exchange of information and views concerning contractor performance. The procedures, level of attendance, and documentation of such meetings shall be established by mutual agreement between the Area Office and the contractor.

## III. EVALUATION AND REVIEW - ORGANIZATION AND ADMINISTRATION

### A. Organization and Administration

Organizational and administrative responsibilities for the award fee evaluation, review, and fee determination process will involve: (1) Performance Evaluators and Performance Monitors, (2) Area Office Managers, (3) AL Division Directors, (4) Performance Evaluation Committees, (5) Performance Evaluation Review Boards, and (6) the Contracting Officer.

### B. Performance Evaluators And Monitors

Performance Evaluators and Performance Monitors are those personnel responsible for gathering and assessing evaluation information relative to contractor performance of specific FPAs. A Monitor is an on-site AL representative (normally Area Office staff) who performs assigned evaluation functions on a continuing basis. An Evaluator is an off-site AL representative (normally AL Division staff) who performs evaluation functions on a periodic basis. The roles of Evaluators and Monitors are further delineated in other sections of this Handbook.

### C. Area Office Managers

Each Area Office Manager is responsible for implementation of the award fee evaluation process at the site of the contractor's operations. The Area Office Manager shall assure

that evaluation material is accumulated and consolidated so as to facilitate on-going and subsequent review in the evaluation process. The Area Office Manager shall also serve as Chairman of the Performance Evaluation Committee (PEC) and shall be responsible for notifications to the contractor and concerned AL Divisions of pertinent information associated with the award fee evaluation process. The roles of the Area Office Managers are further delineated in other sections of this Handbook.

D. AL Division Directors

AL Division Directors are responsible for AL Headquarters' evaluations of contractor performance relative to the specific FPAs for which an individual Division has a responsibility. Each AL Division Director involved in the evaluation of one or more FPAs shall assure that evaluation material is collected and assessed by Performance Evaluators to facilitate on-going and subsequent review in the evaluation process. The roles of the AL Division Directors are further delineated in other sections of this Handbook.

E. Performance Evaluation Committees (PECs)

A Performance Evaluation Committee (PEC) will be appointed by the Contracting Officer for each CPAF contract. A PEC shall normally be composed of three to six members, with

representatives from both the Area Office and AL Headquarters. The PEC Chairman shall be the Area Office Manager and the AL Headquarters' representatives shall normally be at the Division Director level. The PEC responsibility is to accumulate, review, and consolidate evaluation material submitted by the Area Office Manager and the AL Division Directors. Specifically, for each evaluation period, the PEC shall assess reports provided by the Area Office Manager and involved AL Division Directors, develop a composite evaluation, rate the contractor's performance, and apply appropriate adjectival and numerical grades to each of the FPAs consistent with the definitions in the Award Fee Plan. The PEC shall seek clarifications or additional information from organizations that submitted evaluation material as necessary to assure a fair and complete evaluation of the contractor in connection with each of the FPAs. Following this evaluation and the rating process, the PEC shall prepare a written Performance Evaluation Report summarizing the results of the evaluation based on the input received. As a part of the Report, the PEC shall be responsible for evaluation commentary for the "General Management" portion of the Report based upon its overall perspective of the contractor's management and the perspective gleaned from the total evaluation material available to the PEC. The Report shall include a write-up for each FPA,

with an adjectival summary grade for each FPA. The PEC shall also compute a proposed award fee utilizing the numerical grades and the weightings assigned to the FPAs. The PEC Performance Evaluation Report and the award fee recommendation shall be transmitted to the PERB as early as possible within the time frame specified in the Award Fee Plan. In addition, the PEC shall forward to the PERB the numerical grade for each FPA and the computation sheet indicating how the award fee recommendation was determined.

F. <u>Performance Evaluation Review Boards (PERBs)</u>

A Performance Evaluation Review Board (PERB) will be appointed by the Contracting Officer for each CPAF contract. A PERB shall normally be composed of two to five members of the AL Manager's senior staff. The PERB shall review the Performance Evaluation Report prepared by the PEC and the PEC's award fee computation and recommendation. This review should assure that the write-ups for each FPA are clear and substantiate the adjectival and numerical grades associated therewith. With respect to the "General Management" section, the PERB should introduce the perspective of the PERB members to complement the views expressed by the PEC. In the event that the PERB requires clarifications or additional information, the PERB Chairman will obtain the necessary information from the PEC Chairman. After completing its review and arriving

at its conclusions, the PERB shall provide a Performance Evaluation Report to the Contracting Officer along with a recommendation regarding the amount of award fee to which the contractor is entitled for the evaluation period. If the award fee recommendation submitted to the Contracting Officer by the PERB is different from that recommended by the PEC, the PERB will provide a written statement to the Contracting Officer explaining the rationale for the difference.

G. <u>Contracting Officer (Fee Determination Official)</u>

The Manager, AL, who is the Contracting Officer (CO), will review the material submitted by the PERB. When the Contracting Officer is satisfied that the Performance Evaluation Report adequately describes the contractor's performance and supports the conclusions contained therein, the Report will be forwarded to the contractor for review and comment as provided by provisions of the contract. After provisions of the contract related to notification of the contractor and its response option have been satisfied, the Contracting Officer will make a final award fee determination and will confirm such determination to the contractor in writing.

IV. IMPLEMENTATION OF EVALUATION PROCESS

A. Monitoring Process

After the Performance Evaluation Plan has been developed and approved and the contractor and concerned AL Divisions have been appropriately notified by the Area Office Manager, the monitoring of contractor performance for the selected FPAs begins at the start of the evaluation period. At the Area Office level, the Evaluation Administration Plan (EAP), previously prepared, should indicate the responsibilities of Area Office personnel in connection with award fee evaluation activities. The structure of the Area Office evaluation system is left to each Area Office Manager so as to permit optimum utilization of available resources. The Area Office Manager may designate Performance Evaluation Monitors for groups of FPAs, individual FPAs, or portions of FPAs (i.e., selected Functional Performance Elements). A Monitor is an on-site AL representative (normally Area Office staff) responsible for gathering and assessing evaluation information relative to contractor performance of FPAs, or portions thereof, on a continuing basis. Performance Evaluation Coordinators may also be appointed at the discretion of the Area Office Manager to coordinate the Monitors' activities. The Evaluation Administration Plan should also include instructions to the Monitors as to how evaluations are to be conducted and the extent to which documentation is required.

The Area Office Performance Monitors are the heart of the evalu ation process. They represent the specific, continuing interface with the contractor in those functional areas for which an award fee determination will be made. Therefore, their efforts must be as objective and comprehensive as possibl Each Monitor must ultimately provide his or her evaluation judgment to the Area Office Manager in terms of a narrative, adjectival grade, and a numerical grade. The adjectival grades, numerical grades, and associated definitions which will be used are noted in Appendix C.

Besides the evaluation information developed at the Area Office level, the contractor's performsnce for specified FPAs will be evaluated by the AL Divisions that have a responsibility for the designated areas. Personnel within these Divisions who participate in the evaluations related to specific FPAs are Performance Evaluators. A Performance Evaluator is an off-site AL representative responsible for gathering and assessing evaluation information on a periodic basis. These Evaluators may provide information in several forms to the Division Director who, in turn, will be responsible to see that appropriate evaluation material is made available to the Area Office Manager or other Area Office personnel designated to receive it. One means of providing evaluation

information will be through normal audits, surveys, and appraisals of the contractor. In addition, the Evaluators may provide other written or oral assessments to their respective Division Directors based on their observations or information available to them. It is incumbent upon the AL Division Director to provide appropriate current evaluation material to the Area Office during the evaluation period. Such material should include the "noteworthy achievements" and "notable deficiencies" associated with the individual FPAs. Evaluation information may be transmitted orally or in writing from a Division Director (or specified representative) to an Area Office Manager (or specified representative). Oral transmissions shall clearly indicate that the information being furnished is applicable for award fee evaluation purposes and represents the views of the responsible Division Director. It is also incumbent upon the Area Office Manager to consolidate such information with the Area Office evaluation material--consulting with the Division Director as necessary--and to reflect a composite AL viewpoint when discussing with the contractor its performance. The Area Office Manager may provide evaluation information to participating AL Divisions periodically and request "feedback" from such Divisions to facilitate an accurate, in-process assessment of contractor performance.

During an evaluation period, the Area Office Manager must assure that periodic meetings are held with the contractor to mutually discuss contractor performance. These meetings must be held no less often than bi-monthly. The procedures, level of attendance, and documentation of such meetings shall be established by mutual agreement between the Area Office and the contractor.

At or near the end of each evaluation period, on a schedule specified by the PEC Chairman, the Area Office Manager and each AL Division Director responsible for evaluating performance in an FPA must provide to the PEC a summarization of the applicable evaluation. This summarization must include a narrative statement, an adjectival grade, and a numerical grade for each FPA under consideration. It is important that any adjectives used in the narratives denoting levels of performance are consistent with the terms used in the Award Fee Pl (see Appendix C). Evaluation summaries provided to the PEC by the concerned AL Division Directors at the conclusion of an evaluation period must reflect, and be consistent with, materia provided to the Area Office <u>during</u> the evaluation period. No material which was not previously provided to the Area Office will be considered or utilized by the PEC unless such informati was not available to the AL Division until near or at the end

of the evaluation period. This procedure is necessary in order to preclude "surprises" to the contractor who is entitled to be kept advised periodically of the AL view of its performance. Ideally, it would be desirable for the AL Divisions that participate in the award fee evaluation process to prepare a monthly or bi-monthly summary evaluation for each applicable FPA to facilitate timely input to the Area Office. However, these or other options are left to the discretion of the individu AL Division Directors.

The Area Office Manager and AL Division Directors may provide evaluation material to the PEC in connection with the "General Management" FPA. Such material shall be considered by the PEC in formulating the "General Management" section of the Performance Evaluation Report.

B. Making An Evaluation

The key to the success of the award fee process is the quality of the evaluation determination for each and all the FPAs included in the Performance Evaluation Plan. Thousands of dollars of available award fee may be at stake in connection with judgments applied against a single FPA. Therefore, it is extremely important that Monitors and Evaluators assigned an evaluation role be qualified and knowledgeable in the areas

for which they have a responsibility. The specific performance data upon which the ultimate award fee determination will be based must emanate from those personnel closest to and most intimately familiar with the contractors' activities.

In evaluating each FPA, the following Function Performance Factors (FPFs) should be considered to the extent possible and where they are applicable:

1. Planning
2. Organizing
3. Control
4. Staffing
5. Coordination and integration
6. Cost-effectiveness
7. Execution

"Execution" includes all procedural, programmatic, and operational aspects of the activities which fall within each FPA.

The Monitors and Evaluators must think in terms of "findings" or facts (including "achievements" and "deficiencies") while assessing contractor performance. Only after the "findings" or facts have been determined should the Monitor or Evaluator consider "grades" - either adjectival or numerical. The

"findings" or facts, after they have been quantified, should be reasonably easy to convert to "grades" using the definitions in or referenced in the Award Fee Plan. Appendix C contains the "grades" and definitions which will be used. Obviously, the professional judgments of the Monitors and Evaluators will be necessary in order to arrive at conclusions regarding the significance of specific "achievements" or "deficiencies" - that's why qualified personnel must be employed in the evaluation process.

Facts or "findings" upon which the Monitor or Evaluator will make his or her judgments may come from a variety of sources. Direct observations of contractor performance by the Monitor or Evaluator or other personnel are, of course, one principal source. Reports, other documents, and applicable data may also be used. Any information which is germane and accurate is appropriate for consideration - hearsay is not. It is not necessary or expected that a Monitor or Evaluator assigned to evaluate an FPA must personally observe all performance or directly derive all information related thereto.

One very important point to recognize in connection with award fee evaluation determinations is that the contractor's performance is not to be judged against a theoretically perfect

performance in an area. It is to be judged against a performance which could realistically be achieved considering limitations imposed on a contractor over which it has little or no control. Lack of funds or late deliveries of material from another AL contractor are examples which may be considered as limitations. Therefore, in collecting data from which to make an informed judgment, the Monitor or Evaluator must know "why" the contractor's performance is at a certain level.

Ultimately the Monitor or Evaluator must develop a narrative conclusion and grade relative to the contractor's performance in an FPA. In connection with the narrative conclusion as to performance, the Monitor or Evaluator must not only indicate the level of actual performance, but must also identify circumstances which influenced that performance; that is, the factors which enhanced or limited the contractor's ability to perform.

It is important that the Monitors and Evaluators assign grades consistent with the rating plan definitions in or referenced in the contract. It is intended that a grade of 100 is realistically achievable and there should be no hesitancy to assign a grade at any level if performance falls within the range of a specific definition.

C. Role Of Performance Evaluation Committee (PEC)

The Chairman of the PEC will be responsible to assure that all AL Divisions that will participate in the award fee evaluation process are advised of the due date for evaluation summaries which are required at the conclusion of each evaluation period. After the evaluation summaries are received from the Area Office Manager and the AL Division Directors, the PEC shall assess the reports, question the inputs as appropriate, and ultimately prepare a summary evaluation in the form of a Performance Evaluation Report. In the event that there is a substantive difference between input material from an AL Division Director and the Area Office Manager conclusion for a specific FPA, it will be the responsibility of the PEC to reconcile the difference with the responsible parties. If reconciliation is not possible, the matter should be referred to the AL Assistant Manager(s) having jurisdictional responsibility for the FPA for resolution. The PEC shall be responsible for evaluation commentary for the "General Management" portion of the Report based upon its overall perspective of the contractor's management and the perspective gleaned from the total evaluation material available to the PEC.

The Performance Evaluation Report shall include a narrative for each FPA with an adjectival summary grade for each FPA. The

PEC shall also compute a proposed award fee utilizing the information in the Area Office Manager and AL Division Directors reports and the weightings assigned to the FPAs in the Performance Evaluation Plan. The PEC Report and the award fee recommendation shall be forwarded to the PERB as early as possible within the time frame specified in the contract. In addition, the PEC shall transmit to the PERB the numerical grades for each FPA and the computation sheet indicating how the award fee recommendation was determined.

D. Role Of Performance Evaluation Review Board (PERB)

The PERB will be responsible to provide a management overview of the work of the PEC. The Board will review the Performance Evaluation Report prepared by the PEC as well as the PEC's award fee computation and recommendation. This review should assure that the commentary associated with each FPA is clear and substantiates the adjectival and numerical grades provided by the PEC. The PERB should place particular emphasis on the "General Management" section, assuring that this section is supported by the overall report as well as reflecting other pertinent information available to the Board. Any dissatisfactions or questions that arise in connection with the material submitted by the PEC shall be communicated to the

PEC with the intent to derive clarifications or resolve questions raised. Subsequent to its review and satisfactory resolution of any questions, the PERB shall provide a Performance Evaluation Report to the Contracting Officer along with a recommended award fee. If the award fee recommendation submitted to the Contracting Officer by the Board is different from that recommended by the PEC, the PERB will provide a written statement to the Contracting Officer explaining the rationale for the different recommendation.

E. Role Of Contracting Officer (CO)

The Manager, AL, who is the Contracting Officer (CO), will review the material submitted by the PERB and, if satisfied, will see that the Performance Evaluation Report is forwarded to the contractor. If the Report is not deemed satisfactory, the Contracting Officer shall consult with the Chairman of the PERB to resolve any questions. Ultimately, a Report satisfactory to the Contracting Officer shall be forwarded to the contractor.

After provisions of the contract related to notification of the contractor and its response option have been satisfied, the Contracting Officer will make a final award fee determination and will confirm such determination to the contractor in writing.

A simplified "Schematic of Award Fee Evaluation and Review Process" is included in Figure 1.

## SCHEMATIC OF AWARD FEE EVALUATION AND REVIEW PROCESS




Figure 1



E 001040

V. CONTINUING EVALUATION PROCESS

A. General

Once a CPAF contract has been negotiated and the Award Fee Plan initially implemented, the evaluation and review process will be essentially repeated for each specified evaluation period. Changes in the Award Fee Plan and the Performance Evaluation Plan may be made, as provided by the contract, prior to commencement of the next evaluation period. These changes must be communicated to the contractor in the time frame and in the manner specified by the contract.

B. Changes To Performance Evaluation Plan

Normally, the currently effective Performance Evaluation Plan will be reviewed before the next evaluation period begins in the context of determining the desirability and appropriateness of making changes in the FPAs specified in connection with award fee applicability. FPAs can be changed periodically from evaluation period to evaluation period, as permitted by the Award Fee Plan, when: (1) AL wishes to place particular emphasis on one or more other FPAs, (2) the contractor's past performance in any area(s) warrants a change in FPAs, or (3) other conditions suggest that a rearrangement of FPAs is in order. The weightings of the FPAs shall also be reviewed and may be revised unilaterally

to reflect the degree of emphasis AL chooses to place on each FPA. It will be the responsibility of the Chairman of the PEC to conduct the reviews heretofore indicated and propose revisions in the Performance Evaluation Plan to the PERB for approval. This must be done in a time frame compatible with the contract requirement to provide advance notification to the contractor of changes in the Plan before the next evaluation period. The AL Divisions that will be involved in the evaluation process for the forthcoming evaluation period shall be so advised by the Area Office Manager.

C. Changes To Evaluation Administration Plan

When the Performance Evaluation Plan is changed for a forthcoming evaluation period, the Area Office Manager must revise the Evaluation Administration Plan to facilitate the evaluation of the FPAs selected. Normally, this will involve a redesignation of Performance Monitors and Performance Evaluation Coordinators to accommodate changes made in the Performance Evaluation Plan. Other revisions to the Plan which the Area Office Manager considers appropriate should be made prior to the beginning of the impending evaluation period. Changes which involve direct contractor participation, such as the frequency and conduct of meetings between the Area Office and the contractor, should be coordinated with the contractor in advance.

VI. NOTIFICATIONS

A. Area Office Manager Responsibilities

In order for the award fee evaluation and review process to operate effectively, all participating organizations must receive timely notifications regarding those FPAs selected for evaluations and the due dates for evaluation input. The Area Office Manager, as Chairman of the Performance Evaluation Committee (PEC), is responsible for providing such notifications. In this regard, the Area Office Manager shall:

1. provide the contractor with the PERB-approved Performance Evaluation Plan prior to the commencement of each evaluation period and as required by the contract;

2. notify concerned AL Divisions of the FPAs selected for evaluation in connection with the award fee process prior to the commencement of each evaluation period;

3. notify concerned AL Divisions of the frequency and timing of meetings to be held with the contractor during each evaluation period to discuss contractor performance;

4. notify concerned AL Divisions of the due dates for evaluation summaries to be utilized in the preparation of a Performance Evaluation Report at the conclusion of each evaluation period;

5. notify all AL Divisions of the due dates for evaluation summaries to be utilized in the preparation of an Annual Appraisal Report of the contractor's overall performance. (See Part VII of this Handbook for annual appraisal requirements.)

The actions required following the notifications listed above are described in other parts of this Handbook.

B. Other Notification Responsibilities

Other notification responsibilities and associated actions are delineated throughout this Handbook in the context of the total evaluation, review, and approval process. These responsibilities pertain to: (1) the preparation, review, and approval of the Performance Evaluation Plan and changes thereto, (2) the development of an Evaluation Administration Plan and changes thereto, (3) the preparation, review, approval, and transmittal to the contractor of a Performance Evaluation Report, and (4) the computation, proposal, determination, and notification to the contractor of an award fee.

VII. ANNUAL APPRAISAL

A. General

The evaluation and review process described in Parts I through VI of this Handbook applies only to selected FPAs included in the Performance Evaluation Plan. However, contractor performance in all areas (all FPAs included in Appendix A as applicable to a particular contractor) must be maintained at least at an overall "satisfactory" level in order for the contractor to be eligible for any award fee in addition to the base fee provided for in the contract. The level "satisfactory" is defined in the Award Fee Plan. In order to determine whether the contractor has achieved and is maintaining at least the overall "satisfactory" level of performance, it is necessary for AL to maintain continual surveillance over the contractor's performance in all areas. Further, it is necessary to specify certain procedures to assure that surveillance observations and conclusions of a significant nature are promptly brought to AL Management's attention. In addition, a formalized summarization of the contractor's overall performance must be documented annually.

B. Evaluation

The process of maintaining continual surveillance of essentially all of a contractor's activities is inherent in the responsibiliti

assigned to AL Headquarters and Area Office personnel in their normal administrative and operational functions. The contractors' performances have been evaluated in this context in the past under the CPFF contract arrangements. No significant change in the current evaluation process is contemplated. Each AL organization will continue to function, in an appraisal sense, consistent with Manual Chapter and other directives and requirements--conducting audits, surveys, data collection and analyses, studies, and observations. However, in order to accommodate the CPAF contract concept and associated requirements, each AL Division Director and Area Office Manager shall formally report any significant degradation in contractor performance or any performance of an FPA which appears to be less than "satisfactory." Such reports shall be made promptly to the AL Assistant Manager(s) having jurisdictional responsibility for the FPA involved. The Assistant Manager so advised will make an evaluation of the situation, collecting whatever additional information is necessary to reach an informed conclusion. The Assistant Manager will consult with the cognizant Area Office Manager as appropriate and take those actions deemed necessary--including notifying the Contracting Officer. Should information be assembled which indicates that

a contractor's overall performance might be at, or be approaching, a less than "satisfactory" level; the Contracting Officer shall make an evaluation of the situation and render a judgment. If such judgment is that a less than overall "satisfactory" level of performance exists, the Contracting Officer shall notify the contractor of same. The specific contract terms will be used to determine what effect such a judgment will have on the award fee. The award fee for performance during the previous evaluation period(s) will not be affected.

C. Annual Appraisal Report

At the end of each 12 months, normally encompassing 2 award fee evaluation periods, an Annual Appraisal Report of the contractor's overall performance will be prepared. The 12-month interval may vary in some cases. This Report is to summarize the contractor's overall level of performance which has been evaluated on a continuing basis during the year. The PEC will be responsible for preparing the Annual Appraisal Report. Evaluation input for the annual appraisal will be provided to the PEC on time scales normally compatible with alternate award fee evaluation periods and as specified by the responsible PEC Chairman. Each AL Division Director shall provide to the

PEC a summary statement in connection with the FPAs for which that Division has a responsibility. These statements must include a short narrative highlighting "noteworthy achievements" and/or "significant deficiencies" and must conclude with an adjectival grade for each FPA (see Appendix C for the grades and definitions).

The Area Office Manager will consider all FPAs applicable to the contractor's activities and shall provide a summary report to the PEC indicating the "noteworthy achievements" and/or "significant deficiencies" associated with specific FPAs.

The PEC will consolidate the annual appraisal information received from the AL Division Directors and Area Office Manager and will summarize this material in an Annual Appraisal Report. This report shall be prepared in four sections:

1. General Management
2. Technical/Program Operations
3. Operational Support, and
4. Administrative Support.

Within these sections the PEC will summarize overall performance relating to the applicable FPAs identified for each section in the "Master List of FPAs" included in this Handbook as Appendix A. Within each section, the PEC shall summarize

"noteworthy achievements" and/or "significant deficiencies" related to the applicable FPAs. It is not intended that all the FPAs be individually addressed in the Annual Appraisal Report. A general statement regarding performance of the FPAs as a group within a section is all that is required, as well as a conclusion regarding each section in terms indicating whether overall performance of the FPAs represented by that section has been at least "satisfactory." The Report shall conclude with a statement as to whether overall contractor performance for all applicable FPAs (covered in the four sections) has been at least "satisfactory."

The Annual Appraisal Report prepared by the PEC shall be forwarded to the PERB. The PERB will evaluate the Report and contact the PEC if there are any questions or problems which need to be resolved before a report is submitted to the Contracting Officer. The PERB will submit an Annual Appraisal Report to the Contracting Officer for approval.

The Contracting Officer shall review the Annual Appraisal Report submitted by the PERB and shall consult with the PERB to resolve any questions or concerns. When a Report has been prepared which is acceptable to the Contracting Officer, it will be forwarded to the contractor. It is anticipated that the

Contracting Officer and his senior staff will meet with the contractor management annually to discuss the Annual Appraisal Report, matters related to the award fee process, and other items of mutual management interest.

# APPENDIX A

## MASTER LIST OF FUNCTIONAL PERFORMANCE AREAS (FPAs)

The following Functional Performance Areas (FPAs) are to be used, as they are applicable, to develop the Performance Evaluation Plans for each award fee contract. The Elements associated with each FPA are included to generally define the scope of each area to be evaluated. In the actual evaluation process, each FPA is to be assessed, to the extent possible and applicable, in terms of the following Functional Performance Factors (FPFs):

1. Planning
2. Organizing
3. Control
4. Staffing
5. Coordination and integration
6. Cost-effectiveness
7. Execution

"Execution" includes all procedural, programmatic, and operational aspects of the activities which fall within the definition of each FPA.

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| A. GENERAL MANAGEMENT | Consideration of the performance factors listed above in the context of overall management of plant operations and activities |



E 001052

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| B. TECHNICAL/PROGRAM OPERATIONS | |
| Delivery Performance (Weapons Related) | 1. New build<br>2. Disassembly and rebuild<br>3. Retirement disposal |
| Production Support (Weapons Related) | 1. Manufacturing<br>2. Production control<br>3. Program control<br>4. Tooling fabrication<br>5. Material handling<br>6. Test equipment fabrication |
| Chemical Operations | 1. Material output<br>2. Minimum inventory levels<br>3. Process capability |
| Technical Support | 1. Product engineering<br>2. Industrial engineering<br>3. Tool and gage design |
| Quality Control | 1. Quality control engineering<br>2. Quality control operations<br>3. Standards and calibration<br>4. Product inspection |
| Development Work | 1. Internal process development<br>2. Development activities for Design Laboratories<br>3. Cost/design trade-offs |
| Nuclear Materials Management | 1. Nuclear material transactions<br>2. Forecasts of special nuclear materials requirements<br>3. Nuclear material allotment control<br>4. Inventory justification and utilization of nuclear material<br>5. Disposition of scrap and excess nuclear material |
| Nuclear Waste Management | 1. Control of nuclear waste<br>2. Maintenance of burial ground/ storage for nuclear waste |
| Non-Weapon Programs | 1. To be defined for each contractor |

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| C. OPERATIONAL SUPPORT | |
| Transportation Safeguards | 1. Maintenance Support<br>2. Shipment planning<br>3. Shipment operational support |
| Security | 1. Personnel security<br>2. Physical security<br>3. Technical security |
| Safeguards | 1. Physical control of nuclear material<br>2. Accountability of nuclear material |
| Facilities Engineering and Construction Management | 1. Pre-project authorization activities<br>2. Pre-project directive activities<br>3. Project directive activities<br>4. Project management overview |
| Facilities Maintenance, Utilities, and Energy Conservation Management | 1. Maintenance management plan<br>2. Energy conservation program<br>3. Operating plan for utilities<br>4. Equipment maintenance program<br>5. Job planning and scheduling<br>6. Physical condition of plant and equipment |
| Industrial Safety | 1. Employee safety<br>2. Property protection<br>3. Construction safety |
| Fire Protection | 1. Fire prevention program<br>2. Fire protection engineering<br>3. Facility protection<br>4. Fire suppression capability |
| Health Protection | 1. Health physics<br>2. Occupational medicine<br>3. Industrial hygiene<br>4. Sanitation |
| Environmental Protection | 1. Radioactive/toxic material pollution control<br>2. Environmental monitoring<br>3. Environmental assessments/impact statements |

E 001054

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| Emergency Preparedness | 1. Emergency plans and procedures<br>2. Resources<br>3. Liaison and coordination with other agencies |
| Nuclear Criticality | 1. Nuclear material handling and storage<br>2. Facility design<br>3. Packaging and transportation |
| Nuclear Explosives Safety | 1. Personnel assurance plan<br>2. Nuclear safety operations<br>3. Tester control program |
| Facilities Safety | 1. Facilities design<br>2. Safety analysis |

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| D. ADMINISTRATIVE SUPPORT | |
| Operating & Capital Resources Management | 1. Resources forecasting<br>2. Budgeting<br>3. Resources analysis<br>4. Financial Plan control<br>5. Resources utilization<br>6. Cost management |
| Financial Management | 1. Financial/custodial accounting<br>2. Performance/decision accounting |
| Internal Auditing | 1. Audit program<br>2. Adherence to generally accepted auditing standards<br>3. Reporting<br>4. Follow-up action |
| Automated Data Processing | 1. ADP resources projections<br>2. Acquisition of ADP resources<br>3. Operation and maintenance of ADP resources<br>4. Software support |
| Telecommunications | 1. Data communications services<br>2. Telephone services<br>3. Radio services<br>4. Miscellaneous telecommunications systems and services |
| Records Management | 1. Current record control<br>2. Low cost record control<br>3. Destruction of records<br>4. Word processing management |
| Property Management | 1. Stores management<br>2. Storage management<br>3. Vehicle management<br>4. Traffic management<br>5. Personal property management |

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
| --- | --- |
| Procurement Management | 1. Purchasing procedures and purchasing operations<br>2. Findings and observations of Contract Review Board<br>3. Small and minority business support<br>4. Reporting against ERDA report requirements<br>5. Response to ERDA requests for information, comments, or directives |
| Industrial Relations | 1. Labor relations<br>2. Wage and salary administration<br>3. Fringe benefits administration<br>4. Employment and placement<br>5. Training<br>6. Employee relations |
| Equal Employment Opportunity | 1. Establishment and implementation of Affirmative Action Plan<br>2. Resolution of discrimination complaints |
| Administrative/Services | 1. To be defined for each contractor |
| Public Affairs | 1. Communications with public, public officials, news media, and employees<br>2. Participation in community relation: |
| Classification | 1. Classification guides<br>2. Policy and procedures<br>3. Employee classification indoctrinati<br>4. Classification application<br>5. Use of classification board and authorized classifiers |
| Technical Information | 1. Dissemination of technical and scientific information to others<br>2. Receipt and availability of technical and scientific information from others<br>3. Preparation of required reports covering technical activities |

APPENDIX B

SAMPLE AWARD FEE PLAN

APPENDIX
TO
CONTRACT ___________
MODIFICATION__

AWARD FEE PLAN

1. PURPOSE

This Cost-Plus-Award-Fee (CPAF) contract has been employed to provide an incentive, in the form of an available award fee, which is sufficient to encourage the attainment of and to reward the Contractor for increased proficiency in the performance of the contract. The Award Fee Plan, as set forth in this Appendix, constitutes the substantive and procedural provisions which will be utilized in arriving at the amount of the award fee to which the Contractor is entitled for each evaluation period.

2. INTRODUCTION

The Contracting Officer will evaluate the Contractor's performance during each evaluation period and will determine the amount of award fee to be paid the Contractor for that evaluation period. Evaluation of the Contractor's performance will be based upon the Performance Evaluation Plan established for the evaluation period by the Contracting Officer, after consultation with the Contractor. The

Performance Evaluation Plan will consist of (i) a limited number (approximately 5-10) of identifiable areas of contract work which are designated as "Functional Performance Areas" (FPAs) and (ii) the specified weighting assigned to each FPA. The Contractor's performance of each FPA will be evaluated in terms of a numerical grade taken from the Rating Plan set forth in Section 4. Using the numerical grades and weights assigned each FPA, the award fee to which the Contractor is entitled will then be determined in accordance with the provisions of Section 5. The Contractor will receive an evaluation report which will include the adjectival grade for each FPA and will be given an opportunity to comment on said report. Section 6. outlines the basic administrative procedures which will be followed in the process of arriving at the determination of the amount of award fee to which the Contractor is entitled for each evaluation period.

3. PERFORMANCE EVALUATION PLAN

The following FPAs with specified weightings will be used in evaluating the Contractor's performance:

(THE FOLLOWING IS AN EXAMPLE ONLY)

| Functional Performance Areas | Weighting |
| --- | --- |
| General Management | 15% |
| Development Work | 10% |
| Production Support (Weapons Related) | 20% |
| Quality Control | 10% |
| Safeguards | 15% |
| Facilities Maintenance, Utilities and Energy Conservation Management | 5% |
| Operating and Capital Resources Management | 15% |
| Fire Protection | 5% |
| Procurement Management | 5% |
| | 100% |

The Albuquerque Operations Office (AL) award fee evaluation process will require that a grade be given for each FPA consistent with the Rating Plan definitions which are set forth in Section 4.

In arriving at a grade for each FPA, consideration will be given to (i) planning, (ii) organizing, (iii) control, (iv) staffing, (v) coordination and integration, (vi) cost-effectiveness, and (vii) execution. "Execution" includes all procedural, programmatic, and operational aspects of the activities which fall within each FPA.

The FPAs and weightings may be changed for subsequent evaluation periods in accordance with Paragraph 2.c. of the contract article entitled "Allowable Costs, Base Fee and Award Fee." A breakdown of the work elements which comprise each FPA for a given evaluation period will be furnished to the Contractor prior to the commencement of that evaluation period.

4. RATING PLAN

Evaluation of the Contractor's performance, for award fee purposes, shall be made in accordance with the following Rating Plan:

# RATING PLAN

| ADJECTIVAL GRADES | NUMERICAL GRADES | DEFINITIONS* |
|---|---|---|
| Outstanding | 96-100 | Substantially exceeds expected performance level. Several noteworthy achievements or some especially noteworthy achievements. No notable deficiencies. |
| Excellent | 91-95 | Exceeds expected performance level. Some noteworthy achievements. No notable deficiencies. |
| Very Good | 86-90 | Expected performance level. Some noteworthy achievements. Some notable minor deficiencies. **or** No noteworthy achievements. No notable deficiencies. |
| Good | 81-85 | Minimum expected performance level. No noteworthy achievements. Some notable minor deficiencies. **or** Some noteworthy achievements. Several notable minor deficiencies. |
| Moderately Good | 76-80 | Exceeds acceptable performance level. No noteworthy achievements. Several notable minor deficiencies. **or** Some noteworthy achievements. Some notable significant deficiencies. |
| Satisfactory | 71-75 | Acceptable performance level. No noteworthy achievements. Some notable significant deficiencies. |
| Marginal | 66-70 | Minimum acceptable performance level. Several notable significant deficiencies. |
| Unsatisfactory | 65 and below | Unacceptable performance level. Notable serious major deficiencies. |

***NOTES:** 1. *A "noteworthy achievement" is some accomplishment beyond the routine performance associated with a function or activity.*

2. *A "notable deficiency" is something more than an incidental deficiency. While its significance may vary, it is considered worthy of mention. The absence of "notable deficiencies" does not imply that there are no deficiencies at all.*

5. APPLICATION OF RATING PLAN TO PERFORMANCE EVALUATION PLAN

The performance of each FPA will be evaluated in terms of the Rating Plan set forth in Section 4. The performance evaluation determination will be equated to a numerical grade which will then be multiplied by the weighting assigned to that FPA. The sum of the resulting products computed for each FPA will consitute the numerical grade evaluation of the Contractor's performance for the evaluation period. If the sum of the numerical grades for all the FPAs is seventy (70) or less, the Contractor will not be entitled to any award fee for that evaluation period. If such sum is over seventy (70) and the overall performance under the contract is not less than "satisfactory," the Contractor will be entitled to a proportionate share of the maximum available award fee.

The proportionate share of the maximum available award fee to which the Contractor will be entitled for each of the first two (2) evaluati periods shall be computed in accordance with the following table.

AWARD FEE PERFORMANCE TABLE

| Performance Points Earned | Amount of Maximum Available Award Fee Per Point | Total Maximum Available Award Fee | Percent of Ma: mum Availabl Award Fee |
|---|---|---|---|
| 0 thru 70 | $ -0- | $ -0- | 0 |
| 71 thru 75 | | | |
| 76 thru 80 | | | |
| 81 thru 85 | | | |
| 86 thru 90 | | | |
| 91 thru 95 | | | |
| 96 thru 100 | | | |



E 001064

6. ADMINISTRATIVE PROCEDURES

The award fee evaluation process will be administered for the Contracting Officer by a Performance Evaluation Committee (PEC) and a Performance Evaluation Review Board (PERB), each appointed by the Contracting Officer.

For each evaluation period, the PEC shall assess reports which summarize evaluation information accumulated by performance evaluators and monitors, shall rate the Contractor's performance, and shall apply appropriate adjectival and numerical grades to each of the FPAs. Following this evaluation and rating process, the PEC shall prepare a written report summarizing the results of the evaluation and shall compute a proposed award fee. The PEC report and an award fee recommendation shall be transmitted to the PERB by the twenty-fifth (25th) working day following the end of each evaluation period. During each evaluation period, the PEC Chairman, or his designee(s), will meet with the Contractor periodically, but not less often than bi-monthly, to discuss the Contractor's performance to date and to give the Contractor an opportunity to present performance evidence in its behalf.

The PERB shall review the performance evaluation report prepared by the PEC and the PEC's award fee computation and recommendation. Based on its findings and conclusions, the PERB shall provide a performance evaluation report to the Contracting Officer and a recommendation

regarding the amount of award fee to which the Contractor is entitled for the evaluation period.

The Contracting Officer will evaluate the Contractor's performance and, within thirty-five (35) working days after the end of the evaluation period, will transmit to the Contractor a final written evaluation report which includes adjectival grades for each FPA. In the event it has been determined that the Contractor's overall performance of the contract is less than "Satisfactory" as that term is defined in Section 4., the final written evaluation report will also include the bases for that determination.

Within five (5) working days after receipt of said report, the Contractor may request an opportunity to present to the Contracting Officer a brief oral analysis of its performance. Upon receipt of such request, the Contracting Officer shall specify a time and place for the Contractor to make its presentation. The time specified must be not later than ten (10) working days after receipt of the Contractor's request, unless the parties otherwise agree. At least two (2) working days prior to such presentation, the Contractor shall have provided the Contracting Officer with a brief written summary of the points to be covered in the presentation. Within ten (10) working days after the Contractor's presentation, or if no request for presentation is made, immediately upon the expiration of the time

within which the Contractor could have made such a request, the Contracting Officer shall determine the amount of the award fee to which the Contractor is entitled for the evaluation period and shall notify the Contractor. Such determination shall be confirmed in writing to the Contractor.

# APPENDIX C

# GLOSSARY OF TERMS

# RATING PLAN

| ADJECTIVAL GRADES | NUMERICAL GRADES | DEFINITIONS* |
|---|---|---|
| Outstanding | 96-100 | Substantially exceeds expected performance level.<br>Several noteworthy achievements or some especially noteworthy achievements.<br>No notable deficiencies. |
| Excellent | 91-95 | Exceeds expected performance level<br>Some noteworthy achievements.<br>No notable deficiencies. |
| Very Good | 86-90 | Expected performance level.<br>Some noteworthy achievements.<br>Some notable [redacted] deficiencies.<br>or<br>No noteworthy achievements.<br>No notable deficiencies. |
| Good | 81-85 | Minimum expected performance level.<br>No noteworthy achievements.<br>Some notable [redacted] deficiencies.<br>or<br>Some noteworthy achievements.<br>Several notable [redacted] deficiencies. |
| Moderately Good | 76-80 | Exceeds acceptable performance level.<br>No noteworthy achievements.<br>Several notable [redacted] deficiencies.<br>or<br>Some noteworthy achievements.<br>Some notable significant deficiencies. |
| Satisfactory | 71-75 | Acceptable performance level.<br>No noteworthy achievements.<br>Some notable significant deficiencies. |
| Marginal | 66-70 | Minimum acceptable performance level.<br>Several notable significant deficiencies. |
| Unsatisfactory | 65 and below | Unacceptable performance level.<br>Notable serious major deficiencies. |

***NOTES:** 1. *A "noteworthy achievement" is some accomplishment beyond the routine performance associated with a function or activity.*

2. *A "notable deficiency" is something more than an incidental deficiency. While its significance may vary, it is considered worthy of mention. The absence of "notable deficiencies" does not imply that there are no deficiencies at all.*

# GLOSSARY OF TERMS

Annual Appraisal Report. A report, prepared annually and normally encompassing 2 award fee evaluation periods, which summarizes a contractor's overall performance of all Functional Performance Areas (FPAs)--not just those associated with the award fee provisions of a specific contract. An Annual Appraisal Report satisfactory to the Contracting Officer is forwarded to the contractor.

Award Fee Plan. A formal plan which contains the policies and procedures applicable for the award fee provisions of a specific contract. In addition, this Plan includes such elements as the Performance Evaluation Plan, the Rating Plan and associated grades and definitions, and an award fee performance table. The Award Fee Plan is negotiated as a part of a contract.

Contracting Officer (CO). The Manager, Albuquerque Operations Office. In some incentive fee contracts the CO is referred to as the Fee Determination Official (FDO).

Cost-Plus-Award-Fee (CPAF) Contract. A cost type contract with special fee provisions to motivate a contractor to achieve a high or higher level of performance.

Cost-Plus-Fixed-Fee (CPFF) Contract. A cost type contract which provides for the payment of a negotiated fixed fee to a contractor.

Evaluation Administration Plan (EAP). A plan developed at the Area Office level to facilitate implementation of the evaluation and review process associated with an approved Performance Evaluation Plan. The EAP contains the Functional Performance Areas (FPAs) to be evaluated, the Functional Performance Elements (FPEs) associated with these FPAs, assignments of Performance Monitors, and additional information and instructions relative to the evaluation process.

Functional Performance Area (FPA). A specific category representing a group of activities or functions (managerial, administrative, or operational) in which a contractor is required to perform.

Functional Performance Element (FPE). A specific activity or function (managerial, administrative, or operational) which a contractor is required to perform. Several related FPEs generally define the scope of a Functional Performance Area (FPA).

Functional Performance Factor (FPF). One of several identified factors (such as cost-effectiveness) that normally contributes to desired end results and which is considered, to the extent possible and applicable, in evaluating contractor performance within a Functional Performance Area (FPA).

Notable Deficiency. A deficiency which is something more than an incidental deficiency. While its significance may vary, it is considered worthy of mention. The absence of "notable deficiencies" does not imply that there are no deficiencies at all.

Noteworthy Achievement. Some accomplishment beyond the routine performance associated with a function or activity. It is worthy of mention as a "credit" to contractor performance in the evaluation process.

Performance Evaluation Committee (PEC). A Committee appointed by the Contracting Officer for each CPAF contract to accumulate, review, and consolidate evaluation material submitted by an Area Office and AL Divisions. A PEC is normally composed of Area Office and AL Division personnel. This Committee prepares a proposed Performance Evaluation Report and computes a proposed award fee for subsequent consideration by the Performance Evaluation Review Board (PERB).

Performance Evaluation Coordinator. An individual appointed at the discretion of an Area Office Manager to assist in the coordination of Performance Monitors' activities and to consolidate evaluation material provided by such Monitors.

Performance Evaluation Plan. A plan which identifies the specific Functional Performance Areas (FPAs) in which a contractor's performance is evaluated during a particular evaluation period in connection with an award fee determination. This plan also specifies the "weighting" assigned to each FPA for award fee computation purposes. A Performance Evaluation Plan is a part of an Award Fee Plan.

Performance Evaluation Report. A report, prepared at the conclusion of each evaluation period in connection with the award fee evaluation and review process, which summarizes contractor performance in the applicable Functional Performance Areas (FPAs). The report includes a narrative and an adjectival summary grade for each FPA. A Performance Evaluation Report satisfactory to the Contracting Officer is forwarded to the contractor after the evaluation period has been completed.

<u>Performance Evaluation Review Board (PERB)</u>. A Committee appointed by the Contracting Officer for each CPAF contract to provide a management overview of the work of the Performance Evaluation Committee (PEC). A PERB is normally composed of members of the AL Manager's senior staff. This Board reviews the Performance Evaluation Report and the proposed award fee submitted by the PEC and provides a Performance Evaluation Report and an award fee recommendation to the Contracting Officer.

<u>Performance Evaluator</u>. An off-site (remote from contractor) AL representative (normally AL Division staff) responsible for gathering and assessing evaluation information on a periodic basis relative to a contractor's performance in specified Functional Performance Areas (FPAs).

<u>Performance Monitor</u>. An on-site (contractor location) AL representative (normally Area Office staff) responsible for gathering and assessing evaluation information on a continuing basis relative to a contractor's performance in specified Functional Performance Area's (FPAs).

<u>Rating Plan</u>. That section of an Award Fee Plan which delineates the adjectival grades, numerical grades, and the definitions thereof which are used in the evaluation process. The Rating Plan facilitates the award fee computation based upon the translation of evaluation information into definitive grades.

PL. SUPP. EX. 54

# ALBUQUERQUE OPERATIONS OFFICE
# HANDBOOK FOR
# AWARD FEE ADMINISTRATION

APPROVED: ____________________
James W. Culpepper
Chairman, Performance Evaluation
Review Board

Date: 2/16/90

PLAINTIFF'S EXHIBIT 30 11/9/92 ...

E 001074

# PREFACE

This Handbook contains the policy and procedural guidelines to be used in the evaluation and review process associated with Cost-Plus-Award-Fee (CPAF) contracts applied to Albuquerque Operations Office (AL) Management and Operating (M&O) Contractors within the weapons production complex and as a general guide for other AL CPAF contracts.

The Handbook is to be used by AL (Headquarters and Area Office) personnel who have a responsibility for and participate in the evaluation and review of AL M&O Contractors' performance under the provisions of applicable CPAF contracts. (Note: Where roles of the AL Headquarters and Area Office differ, those terms will be used in lieu of AL.)

This Handbook supersedes the "AL Handbook for Award Fee Performance Evaluation Review Process," dated June 24, 1977.

## TABLE OF CONTENTS

PAGE

PREFACE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-1

A. Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-1
B. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-1
C. Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-2
1. Achieve Optimum Performance . . . . . . . . . . . . . . . . I-2
2. Communications Vehicle . . . . . . . . . . . . . . . . . . . . I-2
D. Evaluation Process Overview . . . . . . . . . . . . . . . . . . I-2
E. Fair Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . I-3
F. Handbook Changes . . . . . . . . . . . . . . . . . . . . . . . . I-3

II. PERFORMANCE EVALUATION PLAN . . . . . . . . . . . . . . . . II-1

A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-1
B. Performance Evaluation Plan . . . . . . . . . . . . . . . . . II-1
C. Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2
1. General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2
2. Criteria Development . . . . . . . . . . . . . . . . . . . . . II-3
D. Contractor Notification . . . . . . . . . . . . . . . . . . . . . II-4
E. Goal Achievement Objectives . . . . . . . . . . . . . . . . . II-4
1. General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-4
2. When Used . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-5
3. Constraints . . . . . . . . . . . . . . . . . . . . . . . . . . . II-5
4. Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . II-6

III. ORGANIZATION AND IMPLEMENTATION OF EVALUATION PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . III-1

A. Organization and Administration . . . . . . . . . . . . . . . III-1
B. Evaluation Process . . . . . . . . . . . . . . . . . . . . . . . . III-1
1. Basic Process . . . . . . . . . . . . . . . . . . . . . . . . . . III-1
2. General Instructions . . . . . . . . . . . . . . . . . . . . . III-1
3. On-site Evaluators . . . . . . . . . . . . . . . . . . . . . . III-3
4. Off-site Evaluators . . . . . . . . . . . . . . . . . . . . . . III-3
5. Ongoing Communications. . . . . . . . . . . . . . . . . . . .
6. Initiatives and Milestones . . . . . . . . . . . . . . . . . . III-4
7. AL Division Evaluation . . . . . . . . . . . . . . . . . . . . III-4
8. Resolving Differences . . . . . . . . . . . . . . . . . . . . III-5
9. Establishing the Recommended FPG Grade . . . . . . . . III-5
10. Contractor Self-Assessment . . . . . . . . . . . . . . . . . III-6
C. Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-6
1. Evaluation Importance . . . . . . . . . . . . . . . . . . . . III-6
2. Evaluator Findings . . . . . . . . . . . . . . . . . . . . . . . III-6

3. Evaluation Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-7
4. Observations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-7
5. Sources of Information . . . . . . . . . . . . . . . . . . . . . . . . . III-8
6. Narrative Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . III-8
D. Role of Area Office Manager (AOM). . . . . . . . . . . . . . . . . . III-8
E. Role of Performance Evaluation Review Board (PERB) . . . . III-9
1. Appointment of PERB . . . . . . . . . . . . . . . . . . . . . . . . . III-9
2. FPG Manager Responsibility . . . . . . . . . . . . . . . . . . . . III-9
3. PERB Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . III-10
F. Role of PERB Executive Secretary . . . . . . . . . . . . . . . . . . III-10
G. Role of Fee Determination Official (FDO) . . . . . . . . . . . . . III-10

IV. SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IV-1

APPENDIX A - Master List of Functional Performance Groups (FPG's)
APPENDIX B - Sample Performance Evaluation Plan and Related Contract Provisions
APPENDIX C - Fee Negotiation Process
APPENDIX D - Evaluator Rating Guide
APPENDIX E - Glossary of Terms
APPENDIX F - Performance Evaluation Report Format and Format for AL Division Evaluation
APPENDIX G - FPG Grading Guideline

# SECTION I. GENERAL

## A. Purpose

This Handbook is intended as a guide to be utilized in the preparation and implementation of the performance evaluation and review process applicable to Cost-Plus-Award-Fee (CPAF) contracts with Albuquerque Operations Office (AL) Management and Operating (M&O) Contractors within the weapons production complex. The provisions contained herein may be applied in connection with other CPAF contracts administered within the AL system at the discretion of responsible officials. The purpose of the Handbook is to provide a uniform structure within which all those involved in the CPAF evaluation and review process may operate. Such standardization is necessary in order that the methodology, terminology, procedures, and practices can accommodate the several contracts within the weapons production complex and facilitate participation by the various parties who will be involved. On the other hand, it is necessary to allow maximum flexibility in the details of implementation of each CPAF plan due to the variations among each Contractor's mission, organization, and operation and among the objectives for each facility. Therefore, application of the CPAF Performance Evaluation Plan (PEP) must be tailored to meet individual considerations associated with each Contractor. Any exception to the requirements of this Handbook will be coordinated with AL/Contracts and Procurement Division (CPD). Major exceptions to the requirements of this Handbook must be authorized by the Fee Determination Official (FDO) or the Performance Evaluation Review Board (PERB) Chairman when such variations are determined to be appropriate for a particular CPAF contract.

## B. Background

A CPAF contract is a cost-reimbursement contract that provides for a fee consisting of (i) a base amount fixed at inception of a contract period and (ii) an award amount that the Contractor may earn in whole or in part at the end of the performance evaluation period and is sufficient to provide motivation for excellence in performance. The amount of award fee, if any, to be paid is determined by the FDO's evaluation of the Contractor's performance in terms of

the PEP stated in the contract. The FDO is the Manager, AL. The base fee and maximum available award fee for any M&O contract will be established in accordance with Department of Energy (DOE) fee policy set forth in Department of Energy Acquisition Regulation (DEAR) 970.1509.

C. Objectives

1. Achieve Optimum Performance

In an M&O contract the Government contracts for the operation, maintenance, or support, on its behalf, of Government-owned, or controlled research, development, production, or testing establishment wholly or principally devoted to one or more major programs. The AL objective in entering into CPAF contracts with the M&O Contractor is to achieve optimum performance while affording the Contractor an opportunity to earn increased fee in the pursuit of this objective. Optimum performance does not necessarily connote the maximum achievable operating level for any single functional area; rather, it represents the most favorable degree of overall performance considering established objectives to be realized within the limits of available resources. Properly applied, a CPAF contract provides a unique combination of flexibility and potential for Contractor motivation not generally present in other types of contractual arrangements.

2. Communications Vehicle

A CPAF contract also serves as a vehicle for communication between the Contractor and AL. Properly used, it enables AL to place management emphasis in particular areas and to convey this emphasis to the Contractor. Over the life of the contract, as areas of emphasis change, the CPAF contract is flexible enough to accommodate such revisions.

D. Evaluation Process Overview

AL will adhere to the basic principles of CPAF contracting in the administration of its M&O contracts. First among the principles of CPAF contracting is that the

Contractor's performance will be subjectively evaluated within clearly defined parameters. The contract PEP and the AL "Handbook for Award Fee Administration" define the contractual requirements and administrative procedures for the administration of AL award fee contracts. Specific performance areas to be evaluated and their relative importance are communicated to the Contractor as Functional Performance Groups (FPG's) that are numerically weighted.

E. Fair Assessment

It is AL's intention to apply the CPAF concept in a manner compatible with the unique weapons production complex arrangement, with the expectation of mutual benefits to AL and the Contractor. In implementing the evaluation process under the CPAF arrangement, the AL expectation is to provide a fair assessment of the Contractor's performance without imposing an excessive, burdensome monitoring and documentation system which would encroach upon the limited manpower resources available to both AL and the Contractors. The evaluation process outlined in this Handbook relies heavily on existing organizations, established survey and appraisal techniques, and personnel who are assigned management, administrative, and operating responsibilities in connection with the ongoing AL missions and operations. Within these constraints, every attempt will be made to elicit enough information to introduce as much specificity and objectivity into the evaluation process as possible.

F. Handbook Changes

Any suggested changes to the Handbook shall be directed to the Chief, Management and Operating Contracts Branch, CPD, AL.

# SECTION II. PERFORMANCE EVALUATION PLAN

## A. Background

The Performance Evaluation Plan (PEP) sets forth the manner in which the award fee determination will be made. The PEP is incorporated as an appendix to the contract. It will include such elements as the rating plan and definitions, and a description of the administrative procedures to be followed. A format for, and sample provisions of, a PEP is included in this Handbook in Appendix B.

## B. Performance Evaluation Plan

Area Office Managers (AOM) and the Waste Isolation Pilot Plant (WIPP) Program Manager shall submit for approval, recommended Functional Performance Group (FPG) weightings, Special Criteria, and the appropriate supporting rationale to the Performance Evaluation Review Board (PERB) in accordance with Section VI of this Handbook. The weight associated with Environment, Safety and Health related activities shall be at least 51 percent of the total available weight and will be calculated by summing the weights included for the FPG of Environment, Safety, and Health; Waste Management, Operational Surety, and Environmental Restoration; and at least one-half of the General Management weight. In order to have sufficient weight to incentivize a Contractor, a weight of less than 10 percent per FPG should normally not be used. The Chairman of the PERB will: coordinate review of the AOM's proposal with the other PERB members; discuss all proposed changes with the AOM; and, with the Fee Determination Official's (FDO) concurrence, approve the PEP criteria and weights to be implemented. The AL approved PEP criteria and weights are then submitted to Department of Energy (DOE) Headquarters for concurrence (see Figure II-1).

Note: Individuals involved in the Cost-Plus-Award-Fee (CPAF) process should refer to the PEP of the particular Management and Operating (M&O) contract and the terms and conditions of the said contract particularly the clauses entitled "Award Fee," and "Allowable Cost, Base Fee, and Award Fee" (examples of these documents are provided in Appendix B).

# DEVELOPMENT OF CRITERIA and FPG WEIGHTS




FIGURE II-1

## C. Criteria

### 1. General

A CPAF contract type is useful when the Government is unable to specify precisely the work to be performed and the resources necessary for accomplishment; yet the Government desires to motivate the Contractor to improve contract performance. Contractor performance is based upon a subjective, comprehensive evaluation by the Government. It is, therefore, important that Contractors have a clear understanding of what is expected of them and that DOE perform a fair and accurate assessment of performance. By emphasizing well-defined criteria, the expected level of performance can be conveyed to the Contractor and performance more readily assessed. The greater the ability to identify and quantify the facts

considered in arriving at performance evaluation, the more credible these judgments are likely to be.

2. Criteria Development

Contractor performance areas shall be evaluated against FPG's, Functional Performance Areas (FPA's), Functional Performance Elements (FPE's) and Special Criteria.

FPG's are defined by FPA's, which in turn are more specifically defined by FPE's. FPG's are intended to define the total performance requirements of the AL M&O contracts that will be evaluated by Albuquerque Operations Office (AL) during each contractual award fee period. The FPG's and their subelements, which are defined in Appendix A, will normally remain static throughout the term of the M&O contract, although AL can revise them at any time with 30 days prior notice to the Contractor.

The Contractor will also be evaluated against "Special Criteria," which will be developed every period to further define the FPG. These Special Criteria address significant issues and priorities of the Department. These Special Criteria should be developed at the FPG level, be relatively broad in nature, and should discuss special issues or priorities within each FPG where special emphasis should be placed during the upcoming period. These criteria should be reflective of those significant issues and priorities at the Departmental level. These Special Criteria are to supplement the General Criteria as described by the FPA's and FPE's. Two-to-five Special Criteria for each FPG should be appropriate.

AOM's will be the focal point for developing FPA's, FPE's, and Special Criteria. These may be developed from input from Headquarters, AL Divisions, Area Office personnel, or the Contractor. The Contractor's input will be coordinated with the responsible AL Division. AL Divisions desiring to establish criteria for specific FPG's to be evaluated during the next evaluation period should submit input to the AOM.

Moreover, in the evaluation process, AL will use as an evaluation tool applicable plans, orders, laws, regulations, etc. A good example of how AL communicates contract requirements is contained in the "AL Development and Production Manual." This manual defines the AL "policies for the development, production, modification, repair, stockpile support, and retirement disposal of nuclear weapons." The policies contained in this manual apply to all DOE Contractors responsible for executing any phase of the AL nuclear weapon programs. It is through the system established by this manual that many of AL's goals, objectives, schedules, etc., are communicated to the Contractor. The accomplishment of the performance requirements defined in this manual are evaluated under the appropriate award fee FPG's.

D. Contractor Notification

After approval, the criteria and associated weights shall be provided by letter from the AOM to the Contractor at least 30 days prior to commencement of the evaluation period or as specified by the contract. The PERB Executive Secretary shall provide to the AL Divisions a copy of the approved PEP criteria and weights (for each facility) in order to facilitate the Divisions' planning for and participation in the evaluation process.

E. Goal Achievement Objectives

1. General

The PEP provides for a concept called Goal Achievement Objectives (GAO's). The use of GAO's is an optional method which may be used to provide additional incentives for specific areas of performance. The significant parts of the GAO contract provisions read as follows:

"Goal Achievement Objectives (hereinafter called "Objectives") are one or more specific performance objectives assigned to the Contractor, which are used to motivate the Contractor to attain a higher level of performance and to achieve specific Government programmatic objectives that may periodically arise. The use of

these Objectives is an optional method, which may be utilized by the Government as a supplement to the Performance Evaluation Plan.

While it is recognized that the Objectives may likely fall under FPG's referred to in the Performance Evaluation Plan, these Objectives generally reflect increasingly stringent or changing Government requirements and can be evaluated by definable, measurable, quantifiable indices . . . ."

2. <u>When Used</u>

Based on the contract provisions, GAO's should be used for <u>unusual</u> situations which periodically arise during the performance of a contract. They will be used by the <u>Government</u> to motivate the Contractor to achieve a higher level of performance in a specific area. GAO's are very specific in their requirements and "can be evaluated by definable, measurable, quantifiable indices." GAO's are not to be used for ongoing performance requirements that are adequately covered by contract award fee provisions. They are not a mechanism for providing additional fee to a Contractor. They are a tool to be used by the Government to motivate Contractors to perform new and critical tasks under unusual and stringent conditions.

3. <u>Constraints</u>

The contract provision contains several constraints in the use of GAO's. First, in order to be eligible to earn fee from a GAO, the Contractor must receive a minimum performance rating of 88 and no single FPG rated unsatisfactory for the GAO performance period. Secondly, the Government may withdraw a GAO at its sole discretion and the Contractor would then receive an amount based upon achieved milestones, assuming overall performance is at the minimum standard set forth above. Finally, since GAO's are funded with unearned award fee dollars, payment on a GAO is subject to the availability of unearned award fee funds during the period in which the GAO is to be paid.

4. Procedures

a. The Government identifies a new or more stringent requirement which might be a candidate for a GAO. This procedure does not contemplate proposals from the Contractor. The AOM is consulted to determine if the proposed objective truly meets the criterion of a GAO, or if the objective should be an Initiative and Milestone. If, in the AOM's assessment, it is in fact a candidate for a GAO, the GAO is prepared and is coordinated by the AOM with the cognizant AL Division(s) and with the Contractor. The GAO is then sent to AL/Contracts and Procurement Division (CPD) for processing through the cognizant AL Division(s) and obtaining the Contracting Officer's approval.

b. After the performance period is completed, the AOM will determine if the GAO was completed successfully and will send a memo to the Director, AL/CPD, indicating whether performance criteria were met. AL/CPD will ensure award fee dollars are available, award fee performance minimums were met, coordinate with the cognizant AL Divisions, and recommend approval or disapproval to the Contracting Officer.

# SECTION III. ORGANIZATION AND IMPLEMENTATION OF EVALUATION PROCESS

## A. Organization and Administration

Organizational and administrative responsibilities for the award fee evaluation, review, and fee determination process will involve: On-site Evaluators, Off-site Evaluators, Area Office Managers (AOM), Albuquerque Operations Office (AL) Division Directors, Performance Evaluation Review Board (PERB), the Fee Determination Official (FDO), and Headquarters (HQ).

## B. Evaluation Process

### 1. Basic Process

A simplified "Schematic of Award Fee Evaluation and Review Process," Figure III-1, illustrates the basic steps to be followed.

### 2. General Instructions

AL will determine the amount of award fee to be paid to the Contractor through periodic evaluations. In general, all those involved in the evaluation process are responsible for monitoring, reviewing, and evaluating the Contractor's performance against the criteria (including adherence to generally accepted standards of performance), and translating these evaluations into the Performance Evaluation Report (PER). Evaluators will utilize all available performance information (e.g., audits, appraisals, task force reports, etc.) as sources of input to their reports. The evaluation will consider the Contractor's compliance with appropriate laws, regulations, and other requirements. The evaluation will also appraise a combination of the Contractor's diligence in developing written procedures for all aspects of the Contractor's operation and the degree of adherence to these procedures by the Contractor's employees.

JR/CPD
2/6/90

# CPAF EVALUATION PROCESS






E 001088

3. On-site Evaluators

The AOM will designate On-site Evaluators to monitor and evaluate the Contractor's performance. An On-site AL Evaluator (Area Office Staff) is responsible for gathering and assessing evaluation information relative to Contractor performance on a continuing basis. They represent the specific, continuing interface with the Contractor in those areas for which an award fee determination will be made. Therefore, their efforts must be objective and comprehensive. Each On-site Evaluator must ultimately provide his or her evaluation to the AOM in terms of a narrative providing achievements, deficiencies and observation, and adjectival and numerical grades (see Appendix D, Evaluator Rating Guide).

4. Off-site Evaluators

Besides the evaluation information developed at the Area Office level, the Contractor's performance will also be evaluated by the AL Divisions and by appropriate Department of Energy (DOE) HQ Offices. Off-site Evaluators are personnel within these Divisions/Offices who participate in gathering and assessing information on a periodic basis. They are expected to have a more detailed level of expertise in specialized areas and provide a broader complex-wide perspective on issues related to Contractor performance. In general, a blend of off-site and on-site viewpoints results in the best possible Contractor evaluations.

5. Ongoing Communications

The AOM must ensure that ongoing communications are held with the Contractor throughout the period to discuss findings related to the Contractor's performance. Meetings shall be held as often as required. The procedures, level of attendance, and documentation of such meetings shall be established by mutual agreement with the Contractor.

As a part of this communications process, it is incumbent upon the AL Division Directors and DOE HQ Office Managers to ensure that appropriate evaluation material is provided to the Area Offices during the

evaluation period. Evaluation information may be transmitted orally or in writing from a Division Director (or specified representative). Oral transmissions shall clearly indicate that the information being furnished represents the views of the responsible Division Director/ Office Manager.

It is also incumbent upon the AOM to consider and consolidate such information with the Area Office evaluation material--consulting with the Division Director/Office Manager as necessary--and to reflect a composite DOE viewpoint when discussing performance with the Contractor. The AOM may provide evaluation information to participating AL Divisions and HQ Offices periodically and request "feedback" to facilitate an accurate, in-process assessment of Contractor performance.

6. <u>Initiatives and Milestones</u>

At the beginning of each six-month evaluation period, the AOM, after coordination with the Contractor, may provide to the Contractor the Initiatives and Milestones for that period. Initiatives and Milestones are performance goals and requirements that the AOM wishes to emphasize. The accomplishment of most Initiatives and Milestones can be objectively measured. Because of their nature, Initiatives and Milestones can be revised, eliminated, increased in number, etc., by the AOM throughout the six-month period in order to focus on current situations. At the end of the performance period, the Contractor's performance in accomplishing the defined Initiatives and Milestones will be considered as a part of the evaluation of the Contractor's overall performance under the Functional Performance Groups (FPG's) with which they are related.

7. <u>AL Division Evaluation</u>

At or near the end of each evaluation period, but not later than the last day of the evaluation period, each AL Division Director responsible for evaluating performance must provide to the AOM an evaluation. Appendix A sets forth FPG's, Functional Performance Areas (FPA's), and Functional Performance Elements (FPE's) for both the Production Plants and Waste Isolation Pilot Plant. The Primary AL Responsible

Division listed shall be the AL focal point for gathering together information for that FPA and submitting input to the AOM. Any AL Division desiring to provide input for an FPA shall submit the input through the Primary Responsible Division. This evaluation shall include the particular criteria being evaluated, the achievements, deficiencies, observations, and adjectival and numerical grades. It is very important that any adjectives used in the evaluation denoting levels of performance and the categorization of achievements and deficiencies are consistent with the terms used in Appendix D. These evaluations must reflect, and be consistent with, material provided to the Area Office during the evaluation period or differences explained. This is necessary in order to preclude "surprises" to the Contractor who is entitled to be kept advised periodically of the AL view of its performance. The AL Division Directors may provide evaluation material to the AOM in connection with the "General Management" FPG with a copy to the cognizant FPG Manager. Such material shall be considered by the AOM in formulating the "General Management" FPG of the PER. The format for preparation of the AL Division Evaluation is shown in Appendix F.

8. Resolving Differences

It is important that the AOM and AL Division Director(s) attempt to resolve any performance evaluation differences prior to preparation and distribution of the final draft of the PER. Substantive changes to AL Division input must be coordinated with the AL Division. AOM's are responsible for resolution of any differences with AL Division prior to the PERB meeting. In the event that satisfactory resolution is not attained, the matter should be referred to the appropriate FPG Manager for resolution or referral to the PERB. A minority opinion or report may be submitted to the FDO.

9. Establishing the Recommended FPG Grade

After the AOM's have completed their efforts to resolve differences, they must then determine a grade for each FPG and an overall grade for the period. The guideline to be used for this process is provided in Appendix G.

10. Contractor Self-Assessment

Pursuant to the Award Fee clause set forth in each Management and Operating contract, the Contractor must submit a self-assessment to the PERB Chairman (AL Deputy Manager) in accordance with the Performance Evaluation Plan.

The PERB Chairman will provide a copy of the self-assessment to the AOM. The AOM shall evaluate the Contractor's self-assessment and consider its realism as a part of his evaluation of the Contractor's performance. This evaluation shall be documented in an attachment to the PER. If it is found that the Contractor's self-assessment is unrealistic, such finding shall be documented and shall result in a lower grade for the specific FPG.

C. Evaluation

1. Evaluation Importance

The key to the success of the award fee process is the quality of the evaluation determination for each criteria being evaluated. Thousands of dollars of available award fee may be at stake in connection with judgments applied against the criteria. Therefore, it is extremely important that On-site and Off-site Evaluators (referred to as "Evaluators" in this section) assigned an evaluation role be qualified and knowledgeable in the areas for which they have a responsibility. The specific performance data upon which the ultimate award fee determination will be based must emanate from those personnel closest to and most intimately familiar with the Contractors' activities.

2. Evaluator Findings

The Evaluator must think in terms of "findings" or facts (including "achievements" and "deficiencies") while assessing Contractor performance. Only after the "findings" or facts have been determined and

summarized should the Evaluators consider "grades" - adjectival and numerical. The "findings" or facts, after they have been quantified, should be reasonably easy to convert to "grades" using the definitions in the Evaluator Rating Guide, Appendix D, which contains the "grades" and definitions which will be used. Obviously, the professional judgments of the Evaluators will be necessary in order to arrive at conclusions regarding the significance of specific "achievements" or "deficiencies" - that is why qualified personnel must be employed in the evaluation process.

3. Evaluation Standard

One very important point to recognize in connection with award fee evaluation determinations is that the Contractor's performance is not to be judged against a theoretically perfect performance in an area. It is to be judged against a performance which could realistically be achieved considering limitations imposed on a Contractor over which it has little or no control. Lack of funds or late deliveries of material from another AL Contractor are examples which may be considered as limitations. Therefore, in collecting data from which to make an informed judgment, the Evaluator must know "why" the Contractor's performance is at a certain level.

It is important that the Evaluators assign adjectival and numerical grades consistent with the Appendix D definitions. It is intended that grades be realistically achievable and there should be no hesitancy to assign a grade at any level if performance falls within the range of a specific definition.

4. Observations

During the data collection process, certain facts or findings may be noted (observations) by an Evaluator which do not appear appropriate to classify as "achievements" or "deficiencies." These "observations," however, can be used as an effective tool to communicate such information as: a message; positive or negative trends; and impressions of Contractor

performance. Some "observations" may be appropriate to pass on to a Contractor for its information. Today's "observation" could turn into tomorrow's "deficiency" or "achievement." Quite simply, a provision for "observations" permits an Evaluator to note or provide information which may not deserve any other classification at a particular point in time.

5. Sources of Information

Facts or findings upon which the Evaluators will make judgments may come from a variety of sources. Direct observations of Contractor performance by the Evaluator or other personnel are, of course, one principal source. Reports, other documents, and applicable data may also be used. Any information which is germane and can be authenticated is appropriate for consideration. It is not necessary or expected that an Evaluator must personally observe all performance or directly derive all information related thereto.

6. Narrative Summary

Ultimately the Evaluator must develop a narrative conclusion relative to the Contractor's performance. In connection with the narrative conclusion as to performance, the Evaluator must not only indicate the level of actual performance, but must also identify circumstances which influenced that performance; that is, the factors which enhanced or limited the Contractor's ability to perform.

D. Role of Area Office Manager (AOM)

Each AOM, who is a member of the PERB, is responsible for implementation of the award fee evaluation process at the site of the Contractor's operations. After the Performance Evaluation Plan (PEP) has been established, the AOM should develop an internal plan to facilitate implementation of the evaluation and review process. The AOM shall assure that evaluation material is accumulated from both On-site and Off-site Evaluators, including any DOE HQ input, and consolidated so as to facilitate ongoing and subsequent review in the evaluation process. The AOM will assist in the evaluation of the Contractor's self-

assessment and will consider its realism in making the recommendation to the PERB, and will include a specific discussion concerning the realism of the self-evaluation in the PERB recommendations. The AOM shall develop a method of tracking audits, reviews, etc., and shall consider this information as a part of the evaluation. The Performance Evaluation Report (PER) shall include a positive statement that all such information was considered. The AOM shall then prepare a draft PER, in the format prescribed in Appendix F with recommended scores for each FPG, using the guidance provided in Appendix G. Please note that the FPG grade is not simply a numerical average of the scores for FPA's since in the judgment of the AOM, FPA's may vary in importance. The AOM will then brief the PERB as to the contents of the report. The AOM shall be responsible for notifications to the Contractor of pertinent information associated with the award fee evaluation process. The roles of the AOM's are further delineated in other sections of this Handbook.

E. Role of Performance Evaluation Review Board (PERB)

1. Appointment of PERB

A PERB will be appointed by the FDO for each Cost-Plus-Award-Fee contract. The PERB is generally composed of a chairman appointed by the FDO, the Assistant Managers, the AOM, and other selected senior staff members that the FDO chooses to participate.

2. FPG Manager Responsibility

The FPG Manager, a member of the PERB, is responsible for overseeing the FPA's that fall under the purview of that FPG. Prior to the start of the period, the FPG Manager will be involved in developing FPG weights and criteria by providing an overview. With regards to evaluation of Contractor performance, the FPG Manager will assure the FPG grade is appropriate and the FPA's are adequately addressed, resolve any problems that the divisions and the Area Office cannot, be knowledgeable of issues from both an AL and HQ perspective, and assist the PERB Chairman in the evaluation of the Contractor self-assessment.

3. PERB Responsibility

The PERB will be responsible for providing a management overview of the award fee process. The PERB will review the draft PER prepared by the AOM. At the same time, the draft PER is furnished to the PERB for review, the AOM will furnish a copy to all the AL Division Directors. Prior to the PERB meeting, it will be the responsibility of the AL Division Directors to brief the appropriate FPG Managers on any issues that should be discussed at the meeting. This review should assure that the commentary is clear and substantiates the adjectival and numerical grades. Any conflicts or questions that arise in connection with the material submitted by the AOM may be discussed with the appropriate AL Division Director with the intent to derive clarifications or resolve questions raised. Subsequent to the PERB's review and satisfactory resolution of any questions, the PERB Chairman shall present a draft PER and recommended award fee to the FDO.

F. Role of PERB Executive Secretary

The PERB Executive Secretary provides staff support to the PERB and FDO. This includes establishing schedules, coordinating meetings, interfacing between the PERB and Area Offices, and ensuring the final PER reflects all changes made by the PERB and FDO. Also, he shall assist in coordination with DOE HQ.

G. Role of Fee Determination Official (FDO)

The FDO is responsible for the award fee process. The FDO will review the material submitted by the PERB and, when satisfied, will approve the PER and make the award fee determination. The FDO will obtain appropriate DOE HQ concurrence prior to providing the award fee determination to the Contractor.

## SECTION IV. SUMMARY

The following is a summary of the general steps to be followed in the Cost-Plus-Award-Fee (CPAF) Evaluation Process. Figure IV-1 below illustrates the general process.

FIGURE IV-1
AWARD FEE SCHEDULE

| | JUL | AUG | SEP | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. FINAL INPUT | | | | X | | | | | | X | | |
| 2. AOM ASSESS INPUT | | | | X | | | | | | X | | |
| 3. PRELIM. BRIEFING TO CONTRACTOR | | | | X | | | | | | X | | |
| 4. SUBMIT REPORT TO PERB/DIV. DIR. | | | | X | | | | | | X | | |
| 5. FPG. MGR.'s/DIV. DIR. PRELIM. MEETING | | | | X | | | | | | X | | |
| 6. PERB MEETING | | | | X | | | | | | X | | |
| 7. PERB CHAIRMAN BRIEFS FDO | | | | | X | | | | | | X | |
| 8. FDO FEE DECISION | | | | | X | | | | | | X | |
| 9. FEE DECISION TO HQ. FOR AGREEMENT | | | | | X | | | | | | X | |
| 10. HQ. AGREEMENT ON FEE | | | | | X | | | | | | | |
| 11. NOTIFY CONTRACTOR | | | | | X | | | | | | | |
| 12. CPD REQ. WEIGHTS/ CRITERIA FROM AOM | X | | | | | | X | | | | | |
| 13. AOM's SUBMIT WEIGHTS/CRITERIA | X | | | | | | X | | | | | |
| 14. PERB REV./APPROVE WEIGHTS/CRITERIA | X | | | | | | X | | | | | |
| 15. WEIGHTS/CRITERIA TO HQ. for CONCURRENCE | | X | | | | | | X | | | | |
| 16. RECEIVE HQ. CONCURRENCE | | X | | | | | | X | | | | |
| 17. NOTIFY CONTRACTOR | | X | | | | | | X | | | | |



E 001097

Following is a discussion of the individual steps identified above.

1. At the end of the award fee period, the On-site and Off-site Evaluators are responsible for gathering, assessing, and providing evaluation information relative to the Contractor's performance. It is important that all external reviews be considered in providing input. In addition, Functional Performance Group (FPG) Managers are to ensure that any input received as a result of continuous dialogue with DOE Headquarters (HQ) is conveyed to the Area Office Manager (AOM). This input is to be submitted to the AOM by the last day of the reporting period, necessitating a prior cutoff date. If after this cutoff date and prior to the last day of the reporting period something significant occurs which changes the evaluation, contact the AOM immediately.

2. The AOM is responsible for evaluating the input from the various Evaluators and preparing the initial draft Performance Evaluation Report (PER), and proposing a recommended grade (both adjectival and numerical) for the performance period. Due to the time constraints, it is imperative that the PER be prepared in a standard format that can be readily reviewed and modified. Appendix F contains report preparation instructions.

3. The AOM provides a preliminary briefing to the Contractor on the draft PER (without an adjectival rating or grades).

4. The AOM submits the draft PER, recommended grades, and supporting documentation to the Performance Evaluation Review Board (PERB) Executive Secretary for distribution to PERB members. The PERB Executive Secretary will distribute to all Albuquerque Operations Office (AL) Division Directors only a copy of the draft PER.

5. The AL Division Directors will brief their respective FPG Manager on any issues that should be discussed at the PERB meeting.

6. The PERB will meet to discuss the draft PER submitted by the AOM. The AOM makes necessary changes to finalize the PER. The PERB Executive Secretary

will assist the AOM in the finalization of the PER for the PERB Chairman's approval.

7. The PERB Chairman or his designee makes a presentation to the Fee Determination Official (FDO) and recommends a grade for the Contractor.

8. The PER is submitted to the FDO for approval. An "Award Fee Determination" sheet signed by the PERB Chairman is presented to the FDO. This document shows a listing of the FPG's, adjectival grade, numerical grade, weight for each FPG, score of each FPG, total score and the PERB's recommended award fee.

9. The FDO will forward the PER and fee determination to the DOE HQ for agreement.

10. After review of the data and DOE HQ concurrence, the FDO will make his award fee determination.

11. The PERB Executive Secretary will make necessary copies and transmit the PER and the FDO's award fee determination to the Contractor and to others on distribution.

The following steps to be followed pertain to the next award fee period.

12. The PERB Executive Secretary will request from the AOM the criteria and weights. This call will be issued approximately 75 days before the start of the new award fee period.

13. The AOM is to submit the criteria and weights not later than 45 days before the start of the new award fee period.

14. The AOM may request the Contractor provide proposed Initiatives and Milestones for those FPG's listed in the Performance Evaluation Plan (PEP).

15. The PERB Chairman and members will review and approve the criteria and weights.

Also, the PERB Executive Secretary will provide the approved PEP to all AL Divisions.

17. Initiatives and Milestones for each FPG may be developed jointly with the Contractor to provide a tool for use in evaluation during the performance period and are furnished to the cognizant AL Division Directors.

# APPENDIX A

## MASTER LIST OF FUNCTIONAL PERFORMANCE GROUPS (FPG'S)

# APPENDIX A

## MASTER LIST OF FUNCTIONAL PERFORMANCE GROUPS

### INTRODUCTION

This Appendix A provides a Master List of Functional Performance Groups (FPG's) applicable to Albuquerque Operations Office (AL) Management and Operating (M&O) award fee contracts for both the Production Plants and the Waste Isolation Pilot Plant (WIPP). Also shown are the FPG Managers and Primary AL Responsible Divisions for the various Functional Performance Areas (FPA's). The FPG's and their constituent FPA's are to be used, as applicable, to evaluate AL's award fee contracts. The Functional Performance Elements (FPE's) associated with each FPA are included to generally define the scope of each area to be evaluated. In the actual evaluation process, each FPA is to be assessed, to the extent possible and applicable, in terms of the following factors:

(1) Planning

(2) Organizing

(3) Control

(4) Staffing

(5) Coordination and integration

(6) Cost-effectiveness

(7) Execution

"Execution" includes all procedural, programmatic, and operational aspects of the activities which fall within the definition of each FPA.

REPORTING RESPONSIBILITIES
PRODUCTION PLANTS

| FUNCTIONAL PERFORMANCE GROUPS (FPG'S) | PRIMARY AL RESPONSIBLE DIVISION |
|---|---|
| GENERAL MANAGEMENT | |
| A. OVERALL OPERATIONS AND ACTIVITIES (FPG MGR: OFC DIR, OMPA) | |
| STRATEGIC PLANNING | APD |
| LEGAL | OCC |
| INTERNAL AUDITING | MRD |
| PUBLIC AFFAIRS | OIEA |
| TECHNICAL INFORMATION | OIEA |
| EMERGENCY MANAGEMENT | GAOD |
| TECHNOLOGY TRANSFER | TT&C |
| COMPUTER INTEGRATED MANUFACTURING | POD |
| B. OVERALL MANAGEMENT OF ES&H (FPG MGR: ASST MGR, OESH) | -- |
| OPERATIONS AND WEAPONS (FPG MGR: ASST MGR, OOW) | |
| WEAPON PROGRAM PERFORMANCE | POD |
| PRODUCTION OPERATIONS | POD |
| WEAPON QUALITY | WQD |
| NUCLEAR MATERIALS MANAGEMENT | POD |
| WASTE MANAGEMENT, OPERATIONAL SURETY, AND ENVIRONMENTAL RESTORATION (FPG MGR: ASST MGR, OOW) | |
| WASTE PLANNING | WMOSD |
| WASTE OPERATIONS | WMOSD |
| WASTE TECHNOLOGY | WMOSD |
| OPERATIONAL SURETY | WMOSD |
| ENVIRONMENTAL RESTORATION | ERPO |
| ENVIRONMENT, SAFETY, AND HEALTH (FPG MGR: ASST MGR, OESH) | |
| ENVIRONMENTAL PROTECTION | EHD |
| SAFETY | SPD |
| HEALTH PROTECTION | EHD |
| NUCLEAR EXPLOSIVE SAFETY | NESD |
| OPERATIONS QUALITY | OQD |
| SAFEGUARDS AND SECURITY (FPG MGR: ASST MGR, OSS) | |
| SECURITY | SNSD |
| NUCLEAR SAFEGUARDS | SNSD |
| TRANSPORTATION SAFEGUARDS | TSD |
| CLASSIFICATION | OIEA |
| RESOURCES AND BUSINESS MANAGEMENT (FPG MGR: ASST MGR, OMA) | |
| BUDGET AND COST MANAGEMENT | BRMD |
| FINANCIAL MANAGEMENT | FMD |
| CONTRACTS AND PROCUREMENT MANAGEMENT | CPD |
| INDUSTRIAL RELATIONS | PIRD |
| FACILITIES, MODERNIZATION, AND PROJECT MANAGEMENT | PMD |
| INFORMATION MANAGEMENT | IMD |
| NON-DOE FUNDED WORK | FMD |
| MAINTENANCE MANAGEMENT | FPMD |

REPORTING RESPONSIBILITIES
WIPP

| FUNCTIONAL PERFORMANCE GROUPS (FPG'S) | PRIMARY AL RESPONSIBLE DIVISION |
|---|---|
| GENERAL MANAGEMENT | |
| A. OVERALL OPERATIONS AND ACTIVITIES (FPG MGR: OFC DIR, OMPA) | |
| STRATEGIC PLANNING | APD |
| LEGAL | OCC |
| INTERNAL AUDITING | MRD |
| PUBLIC AFFAIRS AND INTERGOVERNMENTAL AFFAIRS | OIEA |
| TECHNICAL INFORMATION | OIEA |
| EMERGENCY MANAGEMENT | GAOD |
| TECHNOLOGY TRANSFER | TT&C |
| B. OVERALL MANAGEMENT OF ES&H (FPG MGR: ASST MGR, OESH) | -- |
| OPERATIONS (FPG MGR: ASST MGR, OESP) | |
| GENERAL FACILITY OPERATIONS | -- |
| TRU WASTE OPERATIONS | -- |
| FACILITY MINING | -- |
| MAINTENANCE MANAGEMENT | FPMD |
| OPERATIONS | -- |
| WASTE MANAGEMENT, OPERATIONAL SURETY, AND ENVIRONMENTAL RESTORATION (FPG MGR: ASST MGR, OESP) | |
| WASTE PLANNING | OESP |
| WASTE OPERATIONS - SITE GENERATED | ENV. MGT. STAFF |
| WASTE TECHNOLOGY | ENV. MGT. STAFF |
| OPERATIONAL SURETY | OESP |
| ENVIRONMENTAL RESTORATION | ERPO |
| TRU PROGRAM MANAGEMENT | ESP |
| TRANSPORTATION PACKAGE DEVELOPMENT AND FABRICATION | ENV. MGT. STAFF |
| ENVIRONMENT, SAFETY, AND HEALTH (FPG MGR: ASST MGR, OESH) | |
| ENVIRONMENTAL PROTECTION | EHD |
| SAFETY | SPD |
| HEALTH PROTECTION | EHD |
| OPERATIONS QUALITY | OQD |
| SAFEGUARDS AND SECURITY (FPG MGR: ASST MGR, OSS) | |
| SECURITY | SNSD |
| RESOURCES AND BUSINESS MANAGEMENT (FPG MGR: ASST MGR, OMA) | |
| BUDGET AND COST MANAGEMENT | BRMD |
| FINANCIAL MANAGEMENT | FMD |
| CONTRACTS AND PROCUREMENT MANAGEMENT | CPD |
| INDUSTRIAL RELATIONS | PIRD |
| FACILITIES, MODERNIZATION, AND PROJECT MANAGEMENT | PMD |
| INFORMATION MANAGEMENT | IMD |

## FUNCTIONAL PERFORMANCE GROUPS*

### A. FPG: General Management

This FPG is intended to address the overall management of plant operations and activities. General management performance is best evaluated in terms of essential generic principles of operation. The following seven criteria and the principles on which they are based address management's basic attitudes toward safe operation, explore their underlying motivation, and examine the force of the example given to the rest of the organization. In addition to testing present fitness to operate, these criteria can also tell us something about how management is likely to respond to future events.

The criteria are briefly described in the following paragraphs:

(1) Rising Standard of Adequacy. Excellence in operating nuclear weapons production plants cannot be achieved merely by meeting a set of minimum standards. Excellence is achieved by raising standards and goals when lower thresholds of competence have been reached. The competence of management must be measured not only by success in reaching prescribed minimum standards, but by its determination and success in exceeding them.

(2) Technical Self-Sufficiency. Nuclear weapons production involves technology whose complexity far exceeds that used in most other common manufacturing plants. This technology is relatively new and is still evolving and changing. It is essential that decision-making managers not only have extensive technical training themselves, but that they also have expert analytical and engineering resources readily available within their own organization. It is insufficient to rely solely, or even primarily, on outside contractors or consultants for technical support. A nuclear weapons production plant must have its own broad-based technical staff capable of all but the most specialized services.

(3) Facing Facts. A problem cannot be solved until it is transmitted to and acknowledged at the organizational level where it can be properly addressed. Unfortunately, there is a disposition common to all operating organizations to minimize the potential consequences of problems, especially when blame may attach to the reporter or when the solution may require higher level assistance. Facing up to difficulties, regularly informing higher levels of management of them, and determining and correcting their root causes involve attitudes and practices which are essential to operating competence.

(4) Respect for Radiation. It is incumbent on nuclear weapons production operators to minimize personnel radiation exposure by all reasonable means. A constant concern for the undesirable biological consequences of even small amounts of radiation and an insistence on reducing them are characteristics of competent nuclear management. Since exposure levels allowed by regulations are seldom approached in practice, management's intent and ability to accomplish the purposes of the "As Low as Reasonably Attainable" (ALARA) program can be tested by examining its Radiological Control Program and the measures which it has adopted to minimize exposures.

*Those FPG's, FPA's, and FPE's unique to WIPP will be covered by a revision to the Handbook.

(5) The Importance of Training. The selection and training of personnel is at least as important as any other element of safe plant operations. It is vital that the mental abilities, qualities of judgment, and level of training be commensurate with the responsibility involved in operating a nuclear weapons production plant. Management's attitude toward excellence in operation and its understanding of how to achieve excellence are both revealed in the quality of training provided.

(6) Concept of Total Responsibility. Operating nuclear weapons plants safely requires adherence to a total concept wherein all elements are recognized as important and each is constantly reinforced. Training, equipment maintenance, technical support, radiological control, and quality control are essential elements, but safety is achieved through integrating them effectively in operating decisions. Management's understanding of this principle at the corporate and plant levels is a valid measure of competence. The organizational structure gives some indication of management's awareness, but is less important than understanding and applying the principle.

(7) Capacity to Learn from Experience. Since we are dealing with persons and machines which cannot be made perfect, it is important to recognize that mistakes will be made. We must do our best to design machines having tolerance for mistakes and to continue to improve them through experience. This process of evolutionary improvement, the basis for much of our most useful technology, depends on a capacity to acknowledge mistakes and to determine and correct their underlying causes, whatever the cost. An inability or unwillingness to learn from experience is intolerable in nuclear weapons Production Plants and WIPP.

This FPG should be addressed in terms of two FPA's as follows:

| Functional Performance Areas (FPA's) | Functional Performance Elements (FPE's) |
|---|---|
| A. Overall Operations and Activities | Consideration of the performance factors listed above in the context of overall management of all plant operations and activities excepting those defined in Part B. This includes the activities of strategic planning, legal, internal auditing, public affairs, technical information, emergency management, and technology transfer. |
| B. Overall Management of Environment, Safety, and Health | Consideration of the performance factors and criteria listed above in the context of the overall management of operations and activities related to environment, safety, health, waste management, operational surety, and environmental restoration. |

B. FPG: Operations and Weapons

| Functional Performance Areas (FPA's) | Functional Performance Elements (FPE's) |
|---|---|
| Weapon Program Performance | 1. Regular production<br>2. Special production<br>3. Program control<br>4. Development support |
| Production Operations | 1. Production control<br>2. Manufacturing<br>3. Tool, gauge, and tester management<br>4. Product engineering<br>5. Industrial engineering<br>6. Process development<br>7. Vendor support<br>8. Make or buy decisions |
| Weapon Quality | 1. Quality control engineering<br>2. Quality control operations<br>3. Standards and calibration<br>4. Product inspection<br>5. Loss due to nonconforming material |
| Nuclear Materials Management | 1. Nuclear material transactions<br>2. Forecasts of special nuclear material requirements<br>3. Nuclear material allotment control<br>4. Inventory justification and utilization of nuclear material<br>5. Disposition of scrap and excess nuclear material |

C. FPG: Waste Management, Operational Surety, and Environmental Restoration

| Functional Performance Areas (FPA's) | Functional Performance Elements (FPE's) |
|---|---|
| Waste Planning | 1. Implementation plans (DOE 5820.2A)<br>2. Annual waste management site plans<br>3. Waste minimization<br>4. Programmatic waste quality assurance<br>5. Environmental restoration/waste management five-year plan<br>6. Waste stream identification and characterization<br>7. Training<br>8. Regulatory reporting<br>9. Permitting |
| Waste Operations | 1. Waste storage<br>2. Waste treatment<br>3. Waste disposal<br>4. Waste minimization<br>5. Continuity of waste operations |
| Waste Technology | 1. Planning<br>2. Implementation<br>3. Storage<br>4. Treatment<br>5. Disposal<br>6. Minimization<br>7. Transportation |
| Operational Surety | 1. Formality of operations<br>2. Competency of work force<br>3. Management of corrective actions |
| Environmental Restoration | FPE's to be determined |

D. FPG: Environment, Safety, and Health

| Functional Performance Areas (FPA's) | Functional Performance Elements (FPE's) |
|---|---|
| Environmental Protection | 1. Groundwater monitoring and evaluation<br>2. Potable water assurance, cross-connection prevention<br>3. Sanitary and industrial wastewater treatment and NPDES permitting<br>4. Air quality monitoring, evaluation, and regulatory compliance<br>5. Radioactive effluent and environmental monitoring<br>6. Sanitary and industrial waste operations regulatory compliance and environmental performance<br>7. NEPA compliance and document preparation<br>8. Pesticide and herbicide management<br>9. Specialized areas of environmental compliance and evaluation |
| Safety | 1. Industrial Safety<br>2. Fire Protection<br>3. Nuclear Facilities Safety<br>4. Hazardous Materials Packaging<br>5. ES&H Facility Planning<br>6. Safety Analysis Review System<br>7. Incident/Occurrence Reporting<br>8. Nuclear Reactor Safety<br>9. Firearms Safety |
| Health Protection | 1. Radiological protection<br>2. Industrial hygiene<br>3. Occupational medicine |
| Nuclear Explosives Safety | 1. Personnel assurance program<br>2. Nuclear explosives safety operations<br>3. Tester control program<br>4. Packaging/transportation of nuclear explosives and special assemblies |
| Operations Quality | 1. Documented QA program plans<br>2. Personnel training<br>3. Self-appraisal system to include management evaluation<br>4. Corrective action tracking system |

E. FPG: Safeguards and Security

| Functional Performance Areas (FPA's) | Functional Performance Elements (FPE's) |
|---|---|
| Nuclear Safeguards | 1. Physical control of nuclear material<br>2. Accountability of nuclear material |
| Security | 1. Personnel security<br>2. Physical security<br>3. Technical security |
| Transportation Safeguards | 1. Maintenance support<br>2. Shipment planning<br>3. Shipment Operational Support |
| Classification | 1. Classification guides<br>2. Policy and procedures<br>3. Employee classification indoctrination<br>4. Classification application<br>5. Use of classification board and authorized classifiers<br>6. Sensitive unclassified information |

F. FPG: Resources and Business Management

| Functional Performance Areas (FPA's) | Functional Performance Elements (FPE's) |
|---|---|
| Cost Management | 1. Integrated cost/schedule control systems<br>2. Direct and indirect cost management<br>3. Baseline cost management<br>4. Resources utilization (operation/capital)<br>5. Budgeting<br>6. Approved funding program<br>7. Resource forecasting/estimating/analysis |
| Financial Management | 1. Financial/custodial accounting<br>2. Performance/decision accounting |
| Contracts and Procurement Management | 1. Purchasing procedures and purchasing operations<br>2. Findings and observations of Contract Review Board<br>3. Small and disadvantaged business support<br>4. Reporting against DOE report requirements<br>5. Response to DOE requests for information, comments, or directives |
| Industrial Relations | 1. Labor relations<br>2. Wage and salary administration<br>3. Fringe benefits administration<br>4. Employment and placement<br>5. Training<br>6. Employee relations<br>7. Equal Employment Opportunity |
| Facilities, Modernization, and Project Management | 1. Construction management<br>2. Site development<br>3. Construction quality assurance<br>4. Utilities management<br>5. Engineering management<br>6. Real Estate and Property management<br>7. Design review<br>8. Cost estimating/validation and control |

| | |
|---|---|
| Information Management | 1. Automated Data Processing<br>2. Telecommunications<br>3. Records Management |
| Non-DOE Funded Work | 1. Federally Funded Work<br>2. Non-Federally Funded Work |
| Maintenance Management | 1. BMAR breakout and reporting<br>2. Productivity improvement initiatives<br>3. Preventive maintenance<br>4. Formal job planning<br>5. Performance measurement and improvement<br>6. Plant condition (facility, inspections, etc.)<br>7. All other DOE Maintenance Handbook Elements<br>8. Action by contractor addressing appraisal findings/recommendations |

# APPENDIX B

## SAMPLE PERFORMANCE EVALUATION PLAN

## AND

## RELATED CONTRACT PROVISIONS

- PART I SAMPLE PERFORMANCE EVALUATION PLAN
- PART II AWARD FEE CLAUSE
- PART III SAMPLE ALLOWABLE COST, BASE FEE, AND AWARD FEE CLAUSE

**Sample**

**Performance Evaluation Plan**

(Included as Appendix D
to AL's M&O Contract)

1. **Purpose**

a. The Cost-Plus-Award-Fee (CPAF) type of contract has been employed to provide an incentive, in the form of an available award fee, which is sufficient to encourage the attainment of, and to reward the Contractor for, increased proficiency in the performance of the contract. The Performance Evaluation Plan, as set forth in this Appendix D, constitutes the substantive and procedural provisions which shall be utilized in arriving at the amount of award fee to which the Contractor is entitled for each evaluation period.

b. The objective of the award fee provisions of this Contract is to afford the Contractor an opportunity to earn increased fee commensurate with the achievement of optimum contract performance. Optimum performance is not necessarily equated with the highest level of performance achievable in all incentivized areas. Rather, it represents the most favorable degree of performance obtainable in light of the Contractor's most effective utilization of available resources (see Note (1) in Section 3, below). The DOE expects the Contractor to exceed minimum performance standards and equates this level of performance with a "good" performance rating. The Contractor is responsible for striving to attain the highest standards of excellence in executing its responsibilities under the contract as measured against performance standards consistent with best available practices.

2. **Administration**

a. The procedure for (a) evaluating Contractor performance and (b) the determination of award fee is described in the "Albuquerque Operations Office (AL) Handbook for Award Fee Administration," as it may be amended from time to time by DOE at its discretion. A current copy of said Handbook will be furnished to the Contractor. The Handbook is a compilation of existing policies and procedures that govern the manner in which AL will determine the Award Fee under Cost-Plus-Award-Fee contracts.

b. The Functional Performance Groups (FPG's) as set forth in the above described Handbook shall be considered a part of this Performance Evaluation Plan. These FPG's shall encompass all areas of effort which are the Contractor's responsibility. The Contractor's performance on each FPG shall be evaluated in terms of a numerical grade taken from the Rating Plan set forth in Section 3, below. Pursuant to paragraph (d) of the clause of this contract entitled "Award Fee," the criteria to be considered in evaluating the FPG's shall be the Functional Performance Areas (FPA's) and the Functional Performance Elements (FPE's) set forth in the Handbook, and Special Criteria furnished to the Contractor, if any, established for the FPG's. Using the numerical grades and weights

assigned each FPG, the award fee shall then be determined in accordance with the provisions of Section 4.

c. The Contractor shall have a strong self-assessment program to measure progress against the standard of excellence. In accordance with the clause entitled "Award Fee," the contractor must submit a self-assessment to the Deputy Manager, AL, by the 10th working day after the end of the period. The self-assessment shall be limited to approximately two pages per FPG and a one page Executive Summary, and must be written to the FPG level. The contractor shall assess its performance, including any achievements, deficiencies, strengths and weaknesses during the evaluation period. Where deficiencies are noted, the contractor shall describe the actions planned or taken to correct the deficiencies and avoid their recurrence. The Contractor will receive a favorable rating for identifying problems to DOE and developing and implementing corrective action.

d. Pursuant to paragraph (f) of the clause of this contract entitled "Award Fee," the final award fee determination will be made by the Fee Determination Official (FDO) within 60 calendar days after receipt of the Contractor's self-assessment.

e. The FPG's and weights shall be provided to the Contractor by letter from the FDO 30 calendar days in advance of the period in which the Contractor's performance is to be evaluated utilizing such FPG's and weights.

f. The DOE award fee evaluation process shall require that a grade be given for each FPG consistent with the Rating Plan definitions which are set forth in Section 3, below. In arriving at a grade for each FPG, consideration shall be given to (i) planning, (ii) organizing, (iii) control, (iv) staffing, (v) coordination and integration, (vi) compliance with all applicable Laws, Regulations, and Orders, (vii) cost-effectiveness, and (viii) execution. "Execution" includes all procedural, programmatic, and operational aspects of the activities which fall within each FPG.

3. <u>Rating Plan</u>

<u>General guidelines</u> to be used for Contractor performance evaluation are shown below. <u>Management judgment is essential in applying these guidelines when determining the quality of performance</u>.

| Adjective Grade | Numerical Grade | Performance Description |
|---|---|---|
| Outstanding | 96-100 | Performance substantially exceeds expected levels of performance. |
| Excellent | 91-95 | Performance exceeds expected levels. |
| Good | 86-90 | Performance meets expected levels. Minimum standards are exceeded and "good practices" are evident in contract operations. |

| Adjective Grade | Numerical Grade | Performance Description |
|---|---|---|
| Marginal | 70-85 | Performance is less than expected. |
| Unsatisfactory | Below 70 | Performance is below minimum acceptable levels and is sufficiently below expected levels that improvements in performance are required to avoid possible termination action. |

Notes:

(1) The standard expected level of rating of a qualified, competent, and successful Contractor is Good. This corresponds to a numerical rating of 86 points on the rating scale and to earning approximately 50 percent of the available award fee pool dollars. Performance points will reflect deviations from this expected level in the direction of either better or worse performance. Performance ratings above the expected level will reflect the extent to which the Contractor, on its own initiative, is actively involved in performance improvement activities and the extent to which these actions contribute to more efficient, effective, and economical operations. However, a rating above the expected level (86 points) may be justified by a high level of sustained performance where further improvements in performance would not be cost effective.

(2) The DOE expects the Contractor to exercise due diligence in the conduct of all contract activities. It is expected that management systems will be in place and enforced to assure that effective procedures are developed and implemented. The Contractor's failure to oversee, through acts of commission or omission, the conduct of its operations and all of its employees, which potentially or actually causes property damage, losses, endangers the environment, safety or health or compromises the ability of DOE to carry out its mission, will be weighted heavily in the performance ratings. By the same standard, the performance ratings will not be adversely affected if the Contractor raises environmental, safety, or health issues to the appropriate DOE official for resolution. Furthermore, the performance ratings will not be adversely affected if the Contractor stops an activity which is deemed inadequate even though the Contractor's action may appear to be contrary to DOE direction.

(3) A performance rating below 70 points for total performance in any FPG is a matter of grave concern to DOE. This is particularly true in the performance of Environment, Safety and Health related FPG(s), where inadequate levels of performance could cause immediate and detrimental impact upon the environment, safety or health and could result in unsatisfactory programmatic impacts. Similarly, inadequate levels of performance in FPG's related to production, operations or construction could have unacceptable programmatic effects potentially impacting national security. For these reasons, in the event that the FDO determines the Contractor's performance to be unacceptable in any area contract performance which is specified in the Performance Evaluation Plan, even if no weight or fee is specifically assigned, the FDO may at his/her discretion determine the Contractor's overall performance to be unacceptable and, accordingly, may withhold the entire award fee for the evaluation period.

4. Application of Rating Plan to Performance Evaluation Plan

The performance of each FPG shall be evaluated in terms of the Rating Plan set forth in Section 3, above. The performance evaluation determination shall be equated to a numerical grade which shall then be multiplied by the weighting assigned to the FPG. The sum of the resulting products computed for each FPG shall constitute the numerical grade evaluation of the Contractor's performance for the evaluation period. If the sum of the numerical grades for all the FPG's is below 70, the Contractor shall not be entitled to any award fee for that evaluation period. Except as set forth in Note (3) in Section 3 above, if such sum is over seventy, the Contractor shall be awarded a proportionate share of the maximum available award fee, based on the Award Fee Distribution Table contained in the contract clause entitled "Allowable Cost, Base Fee and Award Fee," subject to the fee determination of the FDO. The amount determined may not result solely from mathematical summing, averaging, or the application of a formula.

5. Goal Achievement Objectives (GAO's)

a. GAO's are one or more specific performance objectives assigned to the Contractor which are used to motivate the Contractor to attain a higher level of performance and to achieve specific Government programmatic objectives that may periodically arise. The use of GAO's is an optional method which may be utilized by the Government as a supplement to the Award Fee process.

b. While it is recognized that GAO's fall under FPG's included in the Performance Evaluation Plan, these GAO's generally reflect increasingly stringent or changing Government requirements and can be evaluated by definable, measurable and quantifiable indices. The grading for the GAO's shall be rated separately from any of the FPG's. In order to motivate the Contractor to a high level of performance and to avoid encouraging the Contractor to achieve the GAO's at the expense of overall performance, a minimum Performance Evaluation Plan rating of 88 is required to be eligible to earn fee from achievement of the GAO's, and no single FPG may be rated unsatisfactory or a determination of "unacceptable" is given to any area of contract performance, as discussed in Note 3, above.

c. GAO's can be instituted at any time by the Government at its sole discretion. The GAO's shall be communicated to the Contractor via letter. The letter shall contain the GAO, milestone requirements, goal achievement standards, and the amount of fee (including partial awards, if any) to be earned.

d. If the period of performance to achieve a GAO overlaps more than one six-month award fee evaluation period, the GAO shall be carried over into each succeeding evaluation period until the GAO period of performance expires. Fee earned shall be paid to the Contractor within 30 days after a Government determination that the GAO has been attained successfully, provided, the Contractor meets the conditions specified in paragraph 5.b. above for the GAO performance period(s).

e. The Government, at its sole discretion, may withdraw a GAO at any time. In such an event, the Contractor shall receive an award amount based on performance achieved in accordance with the standards and milestones set forth in the letter from the Government to the Contractor communicating the GAO, assuming that the Contractor meets the conditions specified in paragraph 5.b., above, for the award fee evaluation period during which the Government withdrew the GAO.

f. The Contractor shall be afforded the opportunity to provide to the Government an oral analysis of its progress prior to the Government's determination on the Contractor's performance, whether the GAO was completed or withdrawn. This determination shall not be subject to the "Disputes" clause of this contract.

970.5204-51 [Reserved]

970.5204-52 Foreign Travel.
See 952.247-70.

970.5204-53 Contractor employee travel discounts

Insert the contract clause at 952.251-70 when the circumstances described in 951.7002 apply.

970.5204-54 Award fee.

(a) *Base Fee and Award Fee.* It is herewith agreed that a base fee and an award fee, to be determined in accordance with the provisions of this clause, are available for payment in accordance with the clause of this contract entitled Payment, and Advances.

(b) *Fee Negotiations.* Prior to the beginning of each fiscal year under this contract, or other appropriate period as mutually agreed upon, the contracting officer and contractor shall enter into negotiation of a base and award fee in accordance with appropriate provisions for management and operating contract fees set forth in the Department of Energy Acquisition Regulation. This contract shall be modified at the conclusion of each negotiation to reflect the negotiated amonts for base and award fees. It is herein agreed the award fee amount shall be assigned to evaluation periods six months in duration. If the parties are unable to agree on a reasonable fee, the contracting officer shall determine the base and award fee unilaterally, in accordance with the clause of this contract entitled Disputes.

(c) *Determination of Award Fee Earned.* (1) The Government shall at the conclusion of each specified evaluation period evaluate the contractor's performance for a determination of award fee earned.

(2) For this contract, the Government Fee Determination Official (FDO) will be (insert title of FDO). The contractor agrees that the determination as to the amount of award fee earned will be made by the Government FDO and such determination is binding on both parties and shall not be subject to appeal under the "Disputes" clause or any other appeal clause.

(3) The evaluation of contractor performance shall be in accordance with the Performance Evaluation Plan described in subparagraph (d), below. The contractor shall be promptly advised in writing of the determination, and the reasons why the award fee was or was not earned. While it is recognized that the basis for determination of the fee shall be the evaluation by the government, in accordance with the Performance Evaluation Plan, the FDO may also consider any information available to him or her which relates to the contractor's performance of contract requirements. In the event that the contractor's performance is considered unacceptable in any area of contract performance which is specified in the Performance Evaluation Plan; even if no weight or fee is specifically assigned to the particular performance area, the FDO may at his/her discretion determine the contractor's overall performance to be unacceptable, and accordingly may withhold the entire award fee for the evaluation period.

(4) Unearned award may be carried over within a single fiscal year, or other two-period fee negotiation cycle as may have been agreed upon. The FDO may, at their sole discretion, specify in a fee determination that award fee not earned during the first evaluation period of a two-period fee cycle may be allocated to the second fee period in that fee cycle. The contractor shall not, however, be entitled to earn any of this "carry-over" fee if its overall performance in the latter evaluation period does not reflect an improvement over the prior evaluation period. Overall performance evaluations in the second period which are equal to or the same as those in the first period shall not be considered as improvements providing entitlement to the carry-over portion of the award fee pool. If the single negotiation of a base and award fee amount (fee cycle) will be for more than two evaluation periods, unearned award fees in any one of the evaluation periods established by that negotiation may be carried over only to the next period covered by that negotiation. Fees unearned under one fee cycle may not be carried forward to another fee cycle.

(d) *Performance Evaluation Plan.* (1) The Government shall establish unilaterally a Performance Evaluation Plan upon which the determination of award fee shall be based. Such Plan shall include the criteria to be considered under each area evaluated and, the percentage of award fee, if any, available for each area. A copy of the plan shall be provided to the contractor thirty (30) calendar days prior to the start of an evaluation period.

(2) The Performance Evaluation Plan will set forth the criteria upon which the contractor will be evaluated for performance relating to any technical, schedule, management, and/or cost functions selected for evaluation.

(3) The Performance Evaluation Plan may, consistent with the contract statement of work, be revised unilaterally by the Government at any time during the period of performance. Notification of such changes shall be provided to the contractor at least thirty (30) calendar days prior to the start of the evaluation period to which the change will apply.

(e) *Contractor Self-Assessment.* Following each evaluation period, the contractor shall submit a self-assessment within (Insert Number) calendar days after the end of the period. This self- assessment shall address both the strengths and weaknesses of the contractor's performance during the evaluation period. Where deficiencies in performance are noted, the contractor shall describe the actions planned or taken to

correct such deficiencies and avoid their recurrence. The FDO will review the contractor's self-assessment as part of their evaluation of the contractor's management during the period. An unrealistic self-assessment will result in lower award fee determinations. The contractor will not be penalized for a realistic self-assessment, although deficiencies noted by the contractor may be reflected in the Government's evaluation. The self-assessment itself will not be the basis for the award fee determination.

(f) *Schedule for Award Determinations.* The FDO shall issue the final award fee determination in accordance with a schedule set forth in the Performance Evaluation Plan. However, a determination must be made within sixty (60) calendar days after the receipt by the contracting officer of the contractor's self-assessment discussed in paragraph (e), above. If the determination is delayed beyond that date, the contractor shall be entitled to interest on the determined award fee amount at the rate established by the Secretary of the Treasury under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. 611) that is in effect on the payment date. This rate is referred to as the "Renegotiation Board Interest Rate," and is published in the Federal Register semiannually on or about January 1 and July 1. The interest on any late award fee determination amount will accrue daily and be compounded in 30- day increments inclusive from the first day after the schedule determination date through the actual date the determination is issued. That is, interest accrued at the end of any 30-day period will be added to the determined amount of award fee and be subject to interest if not paid in the succeeding 30-day period.

## Subpart 970.70-Use of DOE Facilities for Work for Others

### 970.7000 Mission-oriented solicitation.

Contractors shall be required to promptly advise the DOE contracting officer of any advance notices of, or solicitations for, requirements which would logically involve DOE facilities or resources operated or managed by the contractor, received from other agencies pursuant to FAR 34.005. Management and operating contracts shall provide that the contractor shall not respond or otherwise propose to participate in response to the requirements of such solicitations unless the contractor shall have first obtained the written approval of the DOE manager of the field activity having cognizance over the contract. Such approval shall not be given except in compliance with DOE directives and with the concurrence of the appropriate Senior Program Official.

## Subpart 970.71-Management and Operating Contractor Purchasing

### 970.7101 General.

(a) The Department of Energy contracts for the management and operation of DOE facilities, the design and production of nuclear weapons, energy research and development, and the performance of other services. These management and operating (M&O) contractors have been selected for their technical and managerial expertise and are expected to bring to bear these technical and managerial skills to accomplish the significant Federal mission(s) described in their contracts with, and work plans approved by, DOE.

(b) Purchasing done by management and operating contractors is one area in which the particular skills of the contractors will be brought to bear in order to more readily accomplish the contractors' assigned missions. The contracting procedures of the contractor's organization, therefore, form the basis for the development of a purchasing system and methods that will comply with its contract with DOE and this subpart.

(c) Completion is fundamental to M&O contractor purchasing.

(d) The Federal Acquisition Regulation generally is not directly applicable to the purchasing activities of management and operating contractors. There are, however, certain Federal laws, Executive Orders and Federal and DOE regulations which do pertain to and apply to purchases by management and operating contractors and thus should be reflected in the contractor's purchasing system and methods. These requirements are identified in this subpart.

### 970.7102 DOE responsibility.

(a) In the Department of Energy, overall responsibility for the oversight of the performance of management and operating contractors, including their purchasing activities, rests with the cognizant DOE contracting activity and, in particular, the Head of Contracting Activity (HCA). Contracting officers are responsible for management and operating contractors' conformance with this subpart and their contracts, and for determining whether those purchasing activities provide timely and effective support to DOE programs. (For the purposes of this subpart, the term "Head of Contracting Activity" includes his or her duly authorized representative except for the HCA actions identified in 970.7104-8(a), 970.7104-9(b), 970.7104-22(c), 970.7104-28(f)(1), and 970.7108(a), which actions are nondelegable. Further, when the term "contracting officer" is used in this subpart, it refers to that individual who has been delegated authority by the HCA for the day-to-day oversight of a

SAMPLE

Clause ... - 970.5204-13 Allowable Costs, Base Fee and Award Fee, subparagraphs (b)(1), (b)(2), (b)(4), and (d)(15) are provided as an example.

(b)(1) Base Fee and Award Fee. The base fee payable to the Contractor for the performance of the work during the period October 1, 1989, through September 30, 1990, is ______________ and the maximum award fee available for payment to the Contractor during said period is __________. The amount of the award fee actually to be paid to the Contractor shall be determined by the Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations) in accordance with the provisions of subparagraph (b)(2) of this clause. Prior to October 1 of each year during the term of this contract, the DOE and the Contractor shall commence negotiations for the base fee and the maximum available award fee for the ensuing contract year (October 1 through September 30). Upon agreement of the parties, the contract shall be modified in writing accordingly.

(2) Determination of Award Fee. The award fee available to be earned by the Contractor ranges from zero to ____________, which is hereby established as the maximum amount of such fee that the Contractor may earn during the period from October 1, 1989, through September 30, 1990. Determinations of award fee shall be made every six months, or at the end of such other evaluation periods as the Fee Determination Official may determine are appropriate after consultation with the Contractor. The Fee Determination Official shall notify the Contractor in writing of any changes in the duration of such periods thirty days in advance of the Contractor's commencement of performance in such period. The award fee shall be determined subjectively by the Fee Determination Official based on Contractor performance in accordance with the Performance Evaluation Plan set forth in Appendix D, which is hereby incorporated by reference and made a part of this contract.

The proportionate share of the maximum available award fee to which the Contractor shall be entitled for each of the two (2) evaluation periods during Fiscal Year 1990 shall be computed in accordance with the following Award Fee Performance Table.

| Performance Points Earned | Amount of Maximum Available Award Fee Per Point | Total Maximum Available Award Fee | Percent of Maximum Available Award Fee |
|---|---|---|---|
| 0 thru 70 | $-0- | $-0- | 0 |
| 71 thru 85 | | | 46% |
| 86 thru 90 | | | 20% |
| 91 thru 95 | | | 30% |
| 96 thru 100 | | | 4% |
| Total Maximum Available Award Fee for each Six-month Period | | | 100% |

E 001121

C012460

The amount of award fee, if any, earned by the Contractor, as determined by the Fee Determination Official, is not subject to appeal under the clause entitled, "Disputes" or to claim of suit in the United States Claims Court.

(4) Estimated Cost. In agreeing upon the base fee and the maximum available award fee to be paid, the amount and character of the work which the parties contemplated would be performed by the Contractor during the period October 1, 1989, through September 30, 1990, is that reflected in the work assumptions set forth in the document entitled, "FY-1990 Fee Base Calculation Summary," which was an attachment to the ______________, memorandum from __________ to __________________. The presently estimated cost of such work is _____________. There shall be no adjustment in the amount of the Contractor's base fee or in the maximum available award fee by reason of differences between any estimate of cost for performance of the work under this contract and the actual cost for performance of that work.

(d)(15) Establishment and maintenance of bank accounts in connection with the work hereunder, including, but not limited to. service charges, the cost of disbursing cash, necessary guards, cashiers, and paymasters. If payments are made by check, facilities and arrangements for cashing checks may be provided without expense to the employees, subject to the approval of the Contracting Officer.

# APPENDIX C

## Fee Negotiation Process

# APPENDIX C

## Fee Negotiation Process

The following discussion provides an overview of the annual fee negotiation process which precedes evaluation of an award fee contract. An example is provided to illustrate the process. Also included is a summary of the steps followed in determining the amount of award fee earned.

1. Fee Base Established

The fee base represents that estimate of necessary allowable costs, for work, which are to be incurred for the upcoming period, exclusive of certain costs set forth in DEAR 970.1509-6. The Contractor and DOE (Area Office, Budget Resource Management Division and CPD) must agree to an estimated cost for the upcoming Fiscal Year and the costs to be excluded from the fee base. These costs, comprising the total fee base, are broken down into such categories as those shown in the following example:

Figure C-1
Estimated Annual Fee Base (EXAMPLE)

| Fee Base Elements | Estimated Annual Amount |
|---|---|
| a. Production | $400,000,000 |
| b. Research and Development | 100,000,000 |
| c. Special Equipment | 25,000,000 |
| d. Construction Management | 1,000,000 |
| e. Construction by Subcontract | 15,000,000 |
| Total Fee Base | $541,000,000 |

## 2. Calculation of Cost-Plus-Fixed-Fee (CPFF) Maximum Allowable Fee

Using the fee schedules set forth in the DEAR for the various categories of cost, the CPFF Maximum Allowable Fee is calculated. Shown below are the various fee schedules from the DEAR.

### Table 1 - DEAR 970.1509-5

**CONSTRUCTION MANAGEMENT CONTRACTS SCHEDULE**

| Fee base | Fee | Fee, percent | Increment, percent |
|---|---|---|---|
| $100,000 | $5,400 | 5.40 | 5.25 |
| $300,000 | 15,900 | 5.30 | 5.00 |
| $500,000 | 25,900 | 5.18 | 4.72 |
| $1,000,000 | 49,500 | 4.95 | 3.33 |
| $3,000,000 | 116,100 | 3.87 | 2.82 |
| $5,000,000 | 172,500 | 3.45 | 2.53 |
| $10,000,000 | 299,000 | 2.99 | 2.18 |
| $15,000,000 | 408,000 | 2.72 | 1.90 |
| $25,000,000 | 598,000 | 2.39 | 1.68 |
| $40,000,000 | 850,000 | 2.13 | 1.46 |
| $40,000,000 | 1,142,000 | 1.90 | 1.28 |
| $80,000,000 | 1,398,000 | 1.75 | 1.24 |
| $100,000,000 | 1,646,000 | 1.65 | 1.03 |
| Over $100,000,000 | 1,646,000 | | [1] 1.03 |

**CONSTRUCTION CONTRACTS SCHEDULE**

| Fee base | Fee | Fee, percent | Increment, percent |
|---|---|---|---|
| $100,000 | $5,400 | 5.40 | 5.25 |
| $300,000 | 15,900 | 5.30 | 5.00 |
| $500,000 | 25,900 | 5.18 | 4.72 |
| $1,000,000 | 49,500 | 4.95 | 3.33 |
| $3,000,000 | 116,100 | 3.87 | 2.82 |
| $5,000,000 | 172,500 | 3.45 | 2.53 |
| $10,000,000 | 299,000 | 2.99 | 2.18 |
| $15,000,000 | 408,000 | 2.72 | 1.90 |
| $25,000,000 | 598,000 | 2.39 | 1.68 |
| $40,000,000 | 850,000 | 2.13 | 1.46 |
| $40,000,000 | 1,142,000 | 1.90 | 1.28 |
| $80,000,000 | 1,398,000 | 1.75 | 1.24 |
| $100,000,000 | 1,646,000 | 1.65 | 1.03 |
| $180,000,000 | 2,161,000 | 1.44 | .80 |
| $200,000,000 | 2,561,000 | 1.28 | .65 |
| $300,000,000 | 3,211,000 | 1.07 | .50 |
| $400,000,000 | 3,711,000 | .93 | .35 |
| $500,000,000 | 4,061,000 | .81 | |
| $Over $500 m | 4,061,000 | | [1] .35 |

**SPECIAL EQUIPMENT PURCHASES/ SUBCONTACT WORK SCHEDULE**

| Fee base | Fee | Fee, percent | Increment, percent |
|---|---|---|---|
| $100,000 | $1,300 | 1.50 | 1.50 |
| $200,000 | 3,000 | 1.50 | 1.47 |
| $400,000 | 5,940 | 1.48 | 1.39 |
| $400,000 | 8,720 | 1.45 | 1.29 |
| $800,000 | 11,300 | 1.41 | 1.15 |
| $1,000,000 | 13,600 | 1.36 | 1.00 |
| $2,000,000 | 23,600 | 1.18 | .80 |
| $4,000,000 | 39,600 | .99 | .62 |
| $6,000,000 | 52,000 | .87 | .62 |
| $6,000,000 | 64,400 | .81 | .57 |
| $10,000,000 | 75,800 | .76 | .53 |
| $15,000,000 | 102,300 | .68 | .45 |
| $25,000,000 | 147,300 | .59 | .42 |
| $40,000,000 | 210,300 | .53 | .36 |
| $60,000,000 | 282,300 | .47 | .33 |
| $60,000,000 | 348,300 | .44 | .28 |
| $100,000,000 | 404,800 | .41 | .22 |
| $150,000,000 | 514,300 | .34 | .15 |
| $200,000,000 | 589,300 | .29 | .09 |
| $300,000,000 | 679,300 | .23 | |
| Over $300 million | 679,300 | | [1] .09 |

### Table 2 - DEAR 915.971-5

**PRODUCTION EFFORTS**

| Fee base | Fee | Fee (percent) | Increment (percent) |
|---|---|---|---|
| Up to $1 million | | 7.00 | 7.00 |
| 1,000,000 | $70,000 | 7.00 | 6.05 |
| 3,000,000 | 191,000 | 6.37 | 5.25 |
| 5,000,000 | 296,000 | 5.92 | 4.18 |
| 10,000,000 | 505,000 | 5.05 | 3.50 |
| 15,000,000 | 680,000 | 4.53 | 3.30 |
| 25,000,000 | 1,010,000 | 4.04 | 2.86 |
| 40,000,000 | 1,439,000 | 3.60 | 2.41 |
| 60,000,000 | 1,921,000 | 3.20 | 2.07 |
| 60,000,000 | 2,335,000 | 2.92 | 1.30 |
| 100,000,000 | 2,635,000 | 2.64 | 1.10 |
| 150,000,000 | 3,185,000 | 2.12 | .60 |
| 200,000,000 | 3,485,000 | 1.74 | .50 |
| 300,000,000 | 3,985,000 | 1.33 | .40 |
| 400,000,000 | 4,385,000 | 1.10 | .30 |
| 500,000,000 | 4,685,000 | .94 | |
| Over 500M | 4,685,000 | [1]+.30 | |

[1] Excess.

**RESEARCH AND DEVELOPMENT EFFORTS**

| Fee base | Fee | Fee (percent) | Increment (percent) |
|---|---|---|---|
| $25,000 | $2,500 | 10.00 | 9.74 |
| 50,000 | 4,938 | 9.87 | 8.97 |
| 100,000 | 9,420 | 9.42 | 8.22 |
| 200,000 | 17,640 | 8.82 | 7.64 |
| 400,000 | 32,920 | 8.23 | 7.28 |
| 400,000 | 47,480 | 7.91 | 6.92 |
| 800,000 | 61,320 | 7.67 | 6.69 |
| 1,000,000 | 74,700 | 7.47 | 6.38 |
| 3,000,000 | 202,300 | 6.74 | 6.11 |
| 5,000,000 | 324,500 | 6.49 | 5.53 |
| 10,000,000 | 601,000 | 6.01 | 4.82 |
| 15,000,000 | 842,000 | 5.61 | 4.15 |
| 25,000,000 | 1,257,000 | 5.03 | 3.60 |
| 40,000,000 | 1,797,000 | 4.49 | 3.10 |
| 60,000,000 | 2,417,000 | 4.03 | 2.40 |
| 80,000,000 | 2,897,000 | 3.62 | 1.88 |
| 100,000,000 | 3,273,000 | 3.27 | 1.12 |
| 150,000,000 | 3,833,000 | 2.56 | .65 |
| 200,000,000 | 4,158,000 | 2.08 | .55 |
| 300,000,000 | 4,708,000 | 1.57 | .45 |
| 400,000,000 | 5,158,000 | 1.29 | .35 |
| 500,000,000 | 5,508,000 | 1.10 | |
| Over 500M | 5,580,000 | [1]+.35 | |

The CPFF Maximum Allowable Fee represents the maximum fee if the contract were CPFF and is a standard fee allowance which cannot be exceeded without approval by the DOE Procurement Executive. Continuing the example, the CPFF Maximum Allowable Fee is obtained as follows:

Figure C-2
Calculation of CPFF Maximum Allowable Fee (EXAMPLE)

| | Fee Base Element and Estimated Amount | Fee Amount |
|---|---|---|
| a. | Production<br>$400,000,000 | $4,385,000 (1) |
| b. | R&D<br>$100,000,000 | $3,273,000 (1) |
| c. | Special Equipment<br>$25,000,000 | $ 147,300 (2) |
| d. | Construction Management<br>$1,000,000 | $ 49,500 (2) |
| e. | Construction by Subcontract<br>$15,000,000 | $ 102,300 (2) |
| | CPFF Maximum Allowable Fee | $7,957,100 |

(1) From Table 1
(2) From Table 2

3. Application of Reference Fee Potential

It is the policy of DOE that fee is remuneration to Contractors for organizing and managing resources, the use of Contractor resources, and the risk that all costs incurred may not be reimbursed. Since DOE M&O Contractors typically have a limited level of Contractor cost, capital goods, and operating capital outlays for

performance of such contracts, a purely cost-based approach to a determination of fee is inappropriate. Instead of being solely cost-based, the more desirable approach calls for a structure that allows judgmental evaluation of significant factors and values. Therefore, a structured approach to the determination of a fee negotiation objective was established for each M&O Contractor. The structured approach involves the evaluation of each production Contractor against the following factors and weights:

Figure C-3
Establishing Reference Fee Potential

| | Factor | Maximum Weights | Example Contract |
|---|---|---|---|
| a. | ES&H | 12% | 10% |
| b. | S&S | 5 | 3 |
| c. | Difficulty | 5 | 5 |
| d. | Diversity | 4 | 4 |
| e. | Corporate Effective | 2 | 2 |
| f. | Size of Operation | 2 | 2 |
| | Total Factors | 30% | 26% |
| | Reference Fee Base (1) | 70% | 70% |
| | Reference Fee Potential | 100% | 96% |

(1)The reference fee minimum of 70 percent represents equal rewards to all award fee Management and Operating Contractors for those eleven factors set forth in DEAR 970.1509-4.

AL will periodically evaluate each CPAF contract against these factors and arrive at a specific reference fee potential for that contract. Thus, in developing a fee objective for negotiations, judgmental consideration of the above weighted factors are recognized. CPD will request input from the AOM and other AL organizations in developing the negotiation position for the referenced fee potential. Continuing the example, using the CPFF maximum allowable fee calculated in Figure C-2, and assuming that 90 percent Reference Fee Factor has been established for this contract, the Reference Fee is calculated as follows:

Reference Fee Potential x CPFF Maximum Allowable Fee = Reference Fee

96% x $7,957,100 = $7,638,816

4. <u>Establishing Total Available Fee</u>

A CPAF contract has two elements of fee, a base fee and an award fee. The base fee is designed to compensate the Contractor for minimum performance and is subject to limits set forth in the DEAR. Normally, the base fee may range from 0 to 50 percent of the fixed fee amount. The award fee pool, which is a function of the base fee amount, represents the additional amount to reward the Contractor for performance above the minimum acceptable performance level in those areas described in the evaluation plan. The following Figure C-4 shows the maximum potential award fee corresponding to a given base fee.

FIGURE C-4
MAXIMUM TOTAL FEE
(AS % OF REFERENCE FEE)

| BASE FEE | AWARD FEE | TOTAL |
|---|---|---|
| 50% | 100% | 150% |
| 40% | 120% | 160% |
| 30% | 140% | 170% |
| 20% | 160% | 180% |
| 10% | 180% | 190% |
| 0% | 200% | 200% |






E 001128

The base fee plus the amount included in the award fee should normally not exceed the fixed fee amount by more than 50 percent (a 50 percent/100 percent base fee ratio). A smaller base fee/award fee ratio (resulting in a larger maximum total) may be negotiated if AL desires to motivate the Contractor to higher performance levels and the Contractor is willing to accept a higher level of risk. Negotiation of a smaller base fee/award fee ratio must be approved by the FDO, the Manager, AL.

The total available fee represents the total fee the Contractor might receive for the upcoming year. Continuing the example, the total available fee is calculated as follows assuming a 40 percent/120 percent Base Fee/ Award Fee ratio is negotiated and using the Reference Fee Potential computed earlier.

| Reference Fee | x | Base Fee % | = | Base Fee (1) |
|---|---|---|---|---|
| $7,638,816 | x | 40% | = | $ 3,055,526 |
| Reference Fee | x | Award Fee % | = | Maximum Available Award Fee(2) |
| $7,638,816 | x | 120% | = | $ 9,166,579 |
| Total Available Fee | | | | $12,222,105 |

(1)Paid on a monthly basis

(2)Total Maximum Available Award Fee = $9,166,579/ 2 = $4,583,289 (for Each six-Month Period)

5. Award Fee Performance Table

After the maximum available award fee is determined, an Award Fee Performance Table is established. This table converts performance points earned to a percentage of maximum available award fee. As can be seen in Figure C-5 below, the Total Maximum Available Award Fee is not distributed evenly among the 30 performance points. Instead, the award fee curve, Figure C-6, graphically shows an award fee curve which corresponds to the table shown in Figure C-5. The fee curve can be varied when more incentive is

required at some levels of the performance range and less in others (to illustrate, the curves of 50/100, 40/120 and 0/200 are shown in Figure C-6).

Figure C-5
Award Fee Performance Table for Each Six-Month Period
Fiscal Year 19XX (EXAMPLE)

| Performance Point Earned | Amount of Maximum Available Award Fee Per Point | Total Maximum Available Award Fee | Percent of Maximum Available Award Fee |
|---|---|---|---|
| 0 thru 70 | $ 0 | $ 0 | 0% |
| 71 thru 85 | $152,776 | 2,291,645 | 50 |
| 86 thru 90 | $201,665 | 1,008,324 | 22 |
| 91 thru 95 | $210,831 | 1,054,156 | 23 |
| 96 thru 100 | $ 45,833 | 229,164 | 5 |
| Total Maximum Available Award Fee for Each Six-Month Period | | $4,583,289 | 100% |

**Figure C-6**
**Performance Curves**

RESERVED

6. FDO Approval of Fee Negotiation Objective

Once a Base Fee and an Award Fee negotiation objective is developed, CPD will request approval by the FDO. Upon approval, CPD, in consultation with the Area Manager, will negotiate a Base Fee and Award Fee with the Contractor for the upcoming year.

7. Award Fee Determination

The amount of award fee to be paid to a Contractor is based upon a judgmental assessment by the FDO of Contractor performance. The assessment of Contractor performance is based upon the Performance Evaluation Plan (PEP) established for the evaluation period. After the evaluation period is complete, the FDO makes a determination as to the amount of award fee the Contractor is to receive. Each FPG is evaluated in terms of the rating plan set forth in the PEP (an Appendix of the contract). The performance evaluation determination is equated to a numerical score and then multiplied by the weighting assigned to that FPG. The sum of scores for each FPG, represents a weighted average and constitutes the numerical grade for the evaluation period. The proportionate share of the maximum available award fee for the evaluation period is computed in accordance with the Award Fee Performance Table (see Figure C-5). If the numerical score is below seventy (70), the Contractor shall not be entitled to any award fee for that evaluation period. The example in Figure C-7 below illustrates how a weighted grade is calculated and used to develop an award fee recommendation to the FDO.

**Figure C-7**
**Recommended Award Fee Calculation for Six-Month Period (EXAMPLE)**

| Functional Performance Groups | Weight | x | Grade | = | Weighted Grade |
|---|---|---|---|---|---|
| General Management | .15 | | 95 | | 14.25 |
| Operations and Weapons | .22 | | 92 | | 20.24 |
| Environment, Safety & Health | .23 | | 90 | | 20.70 |
| Safeguards and Security | .10 | | 89 | | 8.9 |
| Resource and Business Management | .10 | | 90 | | 9.0 |
| Waste Mgmt. and Operations Surety | .20 | | 91 | | 18.2 |
| Total | 1.00 | | | | 91.29 |

Given an overall weighted grade of 91.29 for this example and using the Award Performance Table shown in Figure C-5, the award fee earned for the six-month period is calculated as follows:

**Figure C-8**
**Calculating Award Fee Earned (EXAMPLE)**

| Performance Points Earned | Award Fee Per Point | Award Fee Earned |
|---|---|---|
| Below 70 | $ 0 x | $ 0 |
| 81-85 | $152,776 x 15 | 2,291,645 |
| 86-90 | $201,665 x 5 | 1,008,324 |
| 91-91.29 | $210,831 x 1.29 | 271,972 |
| Total | | $3,571,941 |

# APPENDIX D

## EVALUATOR RATING GUIDE

# Appendix D

## Evaluator Rating Guide

The information provided in this appendix is only intended as general guidelines to assist evaluators in establishing adjectival and numerical scores for Contractor performance. Management judgment is essential in applying these guidelines when determining the quality of achievements/deficiencies and whether achievements might offset deficiencies or vice versa.

1. Rating Guide

| Adjective Grade | Numerical Grade | Performance Description |
|---|---|---|
| Outstanding | 96-100 | Performance substantially exceeds expected level. Some significant achievements and/or several achievements. No deficiencies of any kind. |
| Excellent | 91-95 | Performance exceeds expected level. Some achievements and no deficiencies . . . or . . . some deficiencies, but these are more than offset by several achievements or some significant achievements. No significant deficiencies. |
| Good | 86-90 | Performance meets expected levels. Minimum standards are exceeded and "good practices" are evident in contract operations. Some achievements and some deficiencies . . . or . . . no achievements or deficiencies. |
| Marginal | 70-85 | Performance is less than expected. No achievements and some deficiencies . . . or . . . some achievements, but these are more than offset by several deficiencies or some significant deficiencies. |
| Unsatisfactory | Below 70 | Performance is below minimum acceptable levels and is sufficiently below expected levels that improvements in performance are required to avoid possible termination action. Significant deficiencies causing severe impacts on mission capabilities. |

Notes:

(1) In general, "some" means one to four items and "several" means five or more.

(2) The standard expected level of rating of a qualified, competent, and successful Contractor is Good. This corresponds to a numerical rating

of 86 points on the rating scale and to earning approximately 50 percent of the available award fee pool dollars. Performance points will reflect deviations from this expected level in the direction of either better or worse performance. Performance ratings above the expected level will reflect the extent to which the Contractor, on its own initiative, is actively involved in performance improvement activities and the extent to which these actions contribute to more efficient, effective, and economical operations. However, a rating above the expected level (86 points) may be justified by a high level of sustained performance where further improvements in performance would not be cost effective.

(3) The Department of Energy (DOE) expects the Contractor to exercise due diligence in the conduct of all contract activities. It is expected that management systems will be in place and enforced to assure that effective procedures are developed and implemented. The Contractor's failure to oversee, through acts of commission or omission, the conduct of its operations and all of its employees, which potentially or actually causes property damage, losses, endangers the environment, safety or health, or compromises the ability of DOE to carry out its mission, will be weighted heavily in the performance ratings. By the same standard, the performance ratings will not be adversely affected if the Contractor raises environmental, safety, or health issues to the appropriate DOE official for resolution. Furthermore, the performance ratings will not be adversely affected if the Contractor stops an activity which is deemed inadequate even though the Contractor's action may appear to be contrary to DOE direction.

(4) A performance rating below 70 points for total performance in any Functional Performance Group (FPG) is a matter of grave concern to DOE. This is particularly true in the performance of Environment, Safety and Health related FPG(s), where inadequate levels of performance could cause immediate and detrimental impact upon the environment, safety, or health and could result in unsatisfactory programmatic impacts. Similarly, inadequate levels of performance in FPG's related to production, operations, or construction could have unacceptable programmatic effects potentially impacting national security. For these reasons, in the event that the FDO determines the Contractor's performance to be unacceptable in any area of contract performance which is specified in the Performance Evaluation Plan, even if no weight or fee is specifically asigned, the FDO may at his/her discretion determine the Contractor's overall performance to be unacceptable and, accordingly, may withhold the entire award fee for the evaluation period.

2. <u>Criteria Guidelines</u> - The purpose of the below guidelines is to provide assistance in categorizing achievements and deficiencies, thereby making the criteria more objective. Therefore, evaluators should consider the description provided herein in ascertaining whether an achievement/deficiency should be considered as significant.

| FPG | Achievements | Significant Achievements |
| --- | --- | --- |
| GM | A timely response in meeting a new (or changing) requirement, resolving a problem, or fostering general improvement through training, leadership and management direction to the work force . . . or . . . execution of a specific management initiative, e.g., quality improvement process. | Execution of important system changes which result in significantly improved functional indicators in general plant operations, e.g., unusual occurrence reports, recordable injuries, lost workdays, cycle time reduction, work in-process maintenance backlog. |
| ES&H | Sustained operations over the award fee period which complied with requirements . . . or . . . timely execution of an action plan which resulted in compliance with a requirement. | Execution of operations resulting in performance beyond compliance and aimed at achieving lowest practical levels of risk. |
| WM/OSP/ ER | Sustained operations over the award fee period which complied with requirements . . . or . . . timely execution of an action plan which resulted in compliance with a requirement. | Execution of operations resulting in performance beyond compliance and aimed at achieving lowest practical levels of risk or liability . . . or successful, cost-effective, and timely execution of an ER action plan or project. |
| OPNS/ WPNS | Compliance with all directive schedules with only temporary deviations from full lead time . . . or . . . improvements within a functional area, e.g., a general decrease in cost of nonconformance. | Compliance with all directive schedules with no deviation from full lead time . . . or . . . innovative important changes in the system which result in significant continuous improvement within a functional area, e.g., production operations. |
| S&S | Sustained operations over the award fee period which complied with requirements . . . or . . . timely execution of an action plan which resulted in compliance with a requirement. | Execution of operations resulting in performance beyond compliance and aimed at achieving lowest practical level of risk. |
| RES/BDGT/ MGMT | Execution of a well-balanced application of resources which takes into account the interaction and importance of DOE requirements and priorities . . . or . . . execution of an initiative that results in improvement, e.g., a clear process of prioritization of requirements that drive a budget. | Innovative important change to the system of managing which results in major improvements in functional indicators, e.g., headcount, gross budget, productivity through use of capital equipment. |

| FPG | Deficiencies | Significant Deficiencies |
| --- | --- | --- |
| GM | General lack of timely management actions designed to identify, correct, or avoid problems . . . or . . . a negative trend in performance of management processes. | An important failure of the system of managing which resul in major impacts or high risk t personnel, facilities, or opera tions . . . or . . . a significant negative trend in management performance which remains unresolved or unrecognized due to a lack of management attention. |
| ES&H | Deviations from ES&H requirements which result in low risk to the public, work force, and environment and for which timely plans for resolution were not developed or adequately executed . . . or . . . a negative trend in ES&H performance. | Deviations from ES&H requirements, which could result in high risk to the public, work force, and environment . . . or . . . a significant negative trend in ES&H performance which remains unresolved or unrecognized. |
| WM/OSP/ ER | Deviations from requirements for which timely plans for resolution were not developed . . . or . . . a negative trend in performance. | Deviations from requirements, which could result in high risk to continued operations . . . o . . . a significant negative trend in deviations from requirements. |
| OPNS/ WPNS | Failure to comply with requirements which results in workarounds or other impacts . . . or . . . a negative trend in performance. | Failure to comply with lead time requirement resulting in major impact . . . or . . . a significant negative trend of the system which remains unresolved or unrecognized . . . or . . . a pattern of operations which results in chronic failure to comply with requirements, e.g., rarely or never achieving full lead on a weapon production program. |
| RES/BDGT/ MGMT | Failure to apply resources in a well-balanced process which impacts the achievement of DOE requirements and priorities . . . or . . . failure to execute a specific plan of action or requirement, e.g., cost overruns, improper application of procurement regulations, minority business plans. | An important failure of the system which results in a major impact on plant functions or DOE requirements . . . or . . . a significant negative trend that remains unresolved or unrecognized. |

| FPG | Deficiencies | Significant Deficiencies |
| --- | --- | --- |
| S&S | Deviations from requirements which result in low risk to the security of facilities, classified material, classified documents or SNM and for which timely plans for resolution were not developed . . . or . . . a negative trend in the level of performance. | Deviations from requirements result in high risk to the security of facilities, classified material, classified documents or SNM . . . or . . . a significant negative trend that remains unresolved or unrecognized. |

Notes:

(1) "Significant" signifies a major event or sustained level of performance which, due to its importance, is exceptionally good or poor and deserves to be brought to the Manager's attention for fee determination purposes.

(2) The word "requirement" appears frequently in the criteria. Requirement is used in the general sense for brevity. A requirement can be a law, regulation, DOE Order, directive schedule, a policy such as QC-1, a notice as in SEN-7, etc.

The left-hand column (achievements and deficiencies) usually applies to: (a) an action, event, or singular achievement or deficiency. Example: ES&H, Noteworthy Achievement - ". . . timely execution of an action plan which resulted in compliance with a requirement." or (b) is compliance-oriented (see same example above).

(3) The right-hand column of the Criteria Guidelines (Significant Achievements and Significant Deficiencies) usually applies to: (a) more general, broad-based achievements or deficiencies such as a beneficial system change or a detrimental system failure.

Example: Resource/Budget Management, Significant Achievement - ". . . innovative important <u>change to the system</u> of managing which results in <u>major improvements</u> in functional indicators (e.g., headcount, gross budget, productivity through use of capital equipment. . . ."

Example: General Management, Significant Deficiency ". . . an important failure of the system which results in major impacts or high risk to personnel, facilities, or operations . . ." or (b) an achievement that is <u>not</u> compliance-oriented but is aimed at excellence.

Example: Waste Management, Operational Surety, Environmental Restoration - ". . .execution of operations resulting in performance beyond compliance and aimed at achieving lowest practical levels of risk or liability. . . ."

(4) The Criteria Guidelines are also meant to illustrate the spectrum of items which can be involved. For instance, a notable achievement can recognize a sustained high level of performance. See Waste Management, Operational Surety and Environmental Restoration. "Sustained operations over the award fee period which complied with requirements . . ." or a notable achievement can be narrow in scope and relate to improvements which have or will yield a higher level of performance. See the continuation of the Waste

Management, Operational Surety and Environmental Restoration statement above: or ". . . timely execution of an action plan which resulted in compliance with a requirement."

# APPENDIX E

## GLOSSARY OF TERMS

## Appendix E

## Glossary of Terms

Area Office Managers (AOM). The Performance Evaluation Review Board (PERB) member responsible to accumulate, review, and consolidate evaluation material submitted by Performance Evaluators and Monitors and prepare the initial Performance Evaluation Report (PER) and recommended award fee.

Cost-Plus-Award-Fee (CPAF) Contract. A cost type contract with special fee provisions to motivate a Contractor to achieve a high or higher level of performance.

Cost-Plus-Fixed-Fee (CPFF) Contract. A cost type contract which provides for the payment of a negotiated fixed fee to a Contractor.

Fee Determination Official (FDO). The Manager, or anyone acting as Manager, Albuquerque Operations.

Functional Performance Groups (FPG). A grouping with an assigned weight, consisting of FPA's. Normally, each AL award fee Management and Operating Contract will consist of five or six very broad FPG's.

Functional Performance Area (FPA). The specific category representing a group of activities or functions (managerial, administrative, or operational) within a FPG in which a Contractor is required to perform.

Functional Performance Element (FPE). A specific activity or function (managerial, administrative, or operational) which a Contractor is required to perform. Several related FPE's generally define the scope of a FPA.

Management & Operating (M&O) Contracts. An agreement under which the Government contracts for the operation, maintenance, or support, on its behalf of a Government-owned or -controlled facility.

Observation. Facts or findings noted by a monitor/evaluator which do not appear appropriate to classify as an achievement or deficiency, but may be useful in communicating a message to the Contractor.

Off-site Evaluator. An off-site (remote from Contractor) AL representative (normally AL Division staff) responsible for gathering and assessing evaluation information on a periodic basis relative to a Contractor's performance in specified FPA's.

On-site Evaluator. An on-site (Contractor location) AL representative (normally Area Office staff) responsible for gathering and assessing evaluation information on a continuing basis relative to a Contractor's performance in specified FPA's.

Performance Evaluation Plan (PEP). A formal plan which contains the policies and procedures applicable for the award fee provisions of a specific contract.

Performance Evaluation Report (PER). A report, prepared at the conclusion of each evaluation period in connection with the award fee evaluation and review process, which summarizes Contractor performance in the applicable FPG. The report includes a narrative and an adjectival summary grade for each FPG. A PER satisfactory to the Fee Determination Official will be forwarded to the Contractor after the evaluation period has been completed.

Performance Evaluation Review Board (PERB). A Board appointed by the Fee Determination Official for each CPAF contract to provide a management overview of the Performance Evaluation Report prepared by the AOM. A PERB is normally composed of members of the AL Manager's senior staff, including the appropriate AOM. This Board reviews the PER and the proposed award fee submitted by the AOM and provides a PER and an award fee recommendation to the Fee Determination Official.

PERB Executive Secretary. An Albuquerque Operations Office (AL) representative from the Contracts and Procurement Division (CPD), Management and Operating Contracts Branch, responsible for the administration of the award fee performance program.

Rating Plan. That section of an Award Fee Plan which delineates the adjectival grades, numerical grades, and the definitions thereof which are used in the evaluation process. The Rating Plan facilitates the award fee computation based upon the translation of evaluation information into definitive grades.

Special Criteria - Criteria developed each period to define the FPG which address significant issues and priorities of the Department.

# APPENDIX F

## PERFORMANCE EVALUATION REPORT FORMAT

## AND

## FORMAT FOR AL DIVISION EVALUATION

# Appendix F

## Performance Evaluation Report Format

### Instructions

Submit data on IBM-PC disks (Multimate Format). If unable to use or transfer onto IBM-PC disks, please indicate type of system to be used. When submitting data, please verify all data before mailing disk. Also, ensure disks are well wrapped (cardboard on both sides). If disks are to be handcarried, do not let them go through metal detectors at the airport since data may be erased.

Use prestige elite type.

Flush left margin at 12 spaces.

Leave at least six lines at top of each page and six lines at bottom of page.

Page Numbering - First page and remaining pages should be numbered at the BOTTOM. Recommended Award Fee Calculation Sheet is the last page of report. Page should NOT be numbered or stamped with classification markings. Numerical grade is required.

Stamped documentation goes on first page of report. Leave extra space at top and bottom of signature and first page. These documents have to be reproduced so STAMP WITH BLACK INK.

Introductory paragraph should not give a numerical grade - just an adjectival grade for overall performance.

Header on first page of report should read as follows:

PERFORMANCE EVALUATION
(NAME OF Contractor)
FOR THE PERIOD __________, 199_ THROUGH ____________, 199_

The overall performance of (Contractor's Name) has been maintained at least at a level of "Satisfactory" during the period __________, 198_ through __________, 199_.

The following is an evaluation of the performance of (Contractor's Name) in the FPA's selected for award fee evaluation.

FPG: (IN CAPS)

Adjectival/Numerical Grade: (IN CAPS)

Second and Subsequent FPG's

FPG: (IN CAPS)

Adjectival/Numerical Grade: (IN CAPS)

List in order of importance: Significant Achievements
Achievements
Significant Deficiencies
Deficiencies
Observations

If none exist, show "None" under the subheader.

Subheaders should be initial capped, with a line between subheader and body. If only one activity under subheader, DO NOT NUMBER - start flush with left hand margin.

EACH FPA SHOULD BE ON A SEPARATE PAGE.

## Format for AL Division Evaluation

## Contractor's Name, (X) Half FY (XX)

### FPA

Summary statement with adjective and numerical grade; e.g., performance exceeded the expected level with two achievements, no deficiencies and four observations. The rating is Excellent - 92 percent.

### Significant Achievements

### Achievements

### Significant Deficiencies

### Deficiencies

### Observations

Note: Inputs submitted for the FPA of General Management should not include an adjective or numerical grade since they must be integrated with others by the Area Manager.

# APPENDIX G

## FPG GRADING GUIDELINE

## Appendix G

## FPG Grading Guideline

The following discussion provides a guideline of the methodology to be used in developing an overall Cost-Plus-Award-Fee grade for the Fee Determination Official to consider.

### 1. FPG Grades

The performance evaluation process is basically subjective and its effectiveness depends upon the mature judgment of the evaluators. No simple "chug and plug" formulas will suffice. In a similar manner, the system for determining an FPG grade from its constituent FPA's must allow room for judgment and not be overly prescriptive. Nevertheless, some standardized methodology is required in order to ensure consistency among the sites and over time.

This balance between flexibility and standardization will be accomplished in two steps. The first step is standardized and simply requires finding the average numerical grade of the FPA's within an FPG. The second step is more difficult in that it requires judgment. Specifically, it requires evaluating the relative importance of the FPA's with an FPG. The importance of an FPA in a given period is a function of many factors such as the number of initiatives and milestones and their significance, the volume of activity, and the gravity of issues. With these factors in mind, the FPG grade may be shifted as appropriate from the numerical average in the direction of the more important FPA's. An example of this methodology is shown in Figure 1.

**Figure 1**

**FPG Grading System: Example**

*FPG - Environment, Safety, and Health

| | | |
|---|---|---|
| FPA's - (1) | Environmental Protection | 86 - Good |
| (2) | Safety | 92 - Excellent |
| (3) | Health Protection | 90 - Good |
| (4) | Nuclear Explosive Safety | 91 - Excellent |
| (5) | Operations Quality | 96 - Outstanding |
| *Determine FPA Average | | 91 - Excellent |
| *Apply Judgment: e.g., If (1) is more important than (5), could reduce FPG grade. | | 90 - Good |

Relative Importance Adjustment: The rationale for any shifts from the numerical average should be submitted as part of the draft Performance Evaluation Review Board recommendations.

E 001149

2. Overall Grade

The overall grade shall be determined by multiplying the FPG grades by their assigned weights as defined in the Performance Evaluation Plan and taking the sum of these products. An example of this calculation is shown in Figure 2.

Figure 2

Overall Grade Calculation: Example

| FPG | Weight | Grade | |
|---|---|---|---|
| General Management | | | |
| A. Overall Operations and Activities | 9% | 93 | 8.37 |
| B. Overall Management of ES&H | 11% | 89 | 9.29 |
| Operations and Weapons | 20% | 92 | 18.40 |
| Waste Management, Operational Surety, and Environmental Restoration | 20% | 88 | 17.60 |
| Environment, Safety, and Health | 20% | 93 | 18.60 |
| Safeguards and Security | 10% | 96 | 9.60 |
| Resources and Business Management | 10% | 94 | 9.40 |
| Totals | 100% | | 91.26 |

3. Award Fee Calculation

The proportionate share of the Maximum Available Award Fee for the evaluation period is computed in accordance with the Award Fee Performance Table set forth in the contract and negotiated annually.

E 001150

PL. SUPP. EX. 55

UNITED STATES CLAIMS COURT

Case No. 91-1362 C,

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF CLAUDE HUDGEL BARKMEIER
VOLUME I

October 23, 1992

Pursuant to Notice taken on behalf of Plaintiff at 150 East Tenth Avenue, Denver, Colorado 80203, at 9:35 a.m., before Judy L. Busbee, Registered Professional Reporter and Notary Public within Colorado.

Q. Is there any other reason that would affect your ability to testify here today?
A. No.
Q. Mr. Agy, are you currently employed?
MR. BRUNS: Mr. Barkmeier.
A. My name is not Agy.
Q. (BY MR. KELLEY) Mr. Barkmeier. I'm sorry. Are you currently employed?
A. No, I'm not.
Q. Are you retired?
A. Yes. I'm a retired federal employee.
Q. What agency did you retire from?
A. Department of Energy.
Q. When did you retire?
A. December 1989.
Q. What position did you hold at the time you retired?
A. I was Director of Administration of the Rocky Flats office.
Q. What were your duties in connection with that position?
A. I was responsible for most administrative functions; that included budgeting, contracting, property management, office services, cost management, federal personnel, contractor industrial relations. That's about

those were primarily fixed-price construction contracts, although there was a cost-plus-fixed-fee construction contract. And I was responsible for surveillance of the--it was the Atomic Energy Commission at the time--operating contractor's procurement activities and property management activities.

Q. What was your next position?

A. After I left the one in Kansas City--

Q. Yes.

A. --is that the question? Chief of the Administrative Branch at the Rocky Flats office. It was the Atomic Energy Commission at the time.

Q. And when did you begin that job?

A. That was in February 1974.

Q. Did you retain that position until you retired?

A. More or less. There were a couple of changes at various points in time. When I initially went into it, I was not responsible for federal personnel or contractor industrial relations. And that was given to me, oh, I don't know, maybe a couple of years later. And then at a later point in time, I would say about 1980, '81, I was given responsibility for security. And I had that, oh, probably for about two years, and then that was assigned to someone else. Other than that, the duties

Performance Evaluation Committee?

A. Yes.

Q. How many branch chiefs were there during the period of the first award fee in 1979?

A. I can't say for sure, because I don't recall exactly how the office was organized at that point in time.

Q. Do you recall approximately how many?

A. Yeah. Half a dozen. Six. Might have been one or two more or one or two less. Well, it wouldn't have been one or two less. It might have been one less.

Q. What was the function of the Rocky--no, strike that. What was the function of the Performance Evaluation Committee in 1979 in the process of determining Rockwell's award fee?

A. The preparation of a draft report of findings, deficiencies, observation, and formulation of a recommended grade, which in turn computed into an award fee amount.

Q. Who was it who made--

(A break was taken, during which Mr. Bruns left the deposition room.)

Q. Mr. Barkmeier, could you explain to me what were the steps taken in the Rocky Flats office in 1979 in connection with determining Rockwell's award fee?

A. Well, first, the branch chiefs were advised that they were to prepare draft reports for their areas of responsibility. Then the branch chiefs were assembled into a meeting with the manager, the assistant manager, and the secretary of the Performance Evaluation Committee. Each of the drafts was discussed, and we also--the branch chiefs also provided at that time any recommendations they had regarding items that should be included in the report for the general management area. And the manager sometimes provided a draft of that area at that meeting, and sometimes did not. Sometimes that came later.

Anyway, the group met, discussed each of the recommendations that had been made, made any revisions of--that the group felt necessary, with the manager having the majority vote on each of those recommendations. At that point, a draft report was prepared--

Q. Did all those inputs and recommendations take place at one meeting?

A. There were two meetings. But a complete set did take place at the first meeting, with the possible exception of the general management area.

Q. Please continue.

A. Okay. Then after a draft report had been

produced, each of the branch chiefs met with their contractor division director counterpart to discuss the achievements, deficiencies, and observations regarding that person's area.

When that process had been completed, the Performance Evaluation Committee met again and considered any comments that the Rockwell directors had provided or any changes that the branch chiefs had decided to make as a result of their discussions with the contractor's directors.

The general management section would be more or less finalized--be completed, anyway, in a draft form. Another draft report was produced. The manager then met with the contractor's plant manager, and discussed the entire report. As a result of that meeting, sometimes some changes were made, and sometimes no changes were made.

At that point, the Rocky Flats' input to the report was finalized. It was forwarded to Albuquerque to a Performance Evaluation Review Board with recommended scores and the fee computations resulting from those scores. The Albuquerque Performance Evaluation Review Board met, either did or didn't make recommended changes. The manager of Rocky Flats was a member of that body. If they had recommended changes, those were discussed with

whoever at Rocky Flats was responsible for the area, and sometimes the changes were made without further discussion, sometimes they were discussed and modified, and sometimes they were rejected.

That Performance Evaluation Board then forwarded a report with a recommendation on the amount of award fee to the manager, Albuquerque, who was the fee determination official. He then made the fee determination, and his option at that point was to either accept the recommendation of the Performance Evaluation Review Board, or change the award fee, since the entire process was aimed at producing an award fee. And they sometimes did increase or decrease the award fee amount recommended by Rocky Flats and the Performance Evaluation Review Board.

Q. Is what you have described the procedure that was in place in 1979?

A. I don't think I heard the entire question.

Q. Is the procedure that you just described the procedure that was in place in 1979?

A. Yes, it is.

Q. Was the procedure different at the time you retired in 1989?

A. Yes, it was.

Q. When did it change?

A. In the second performance period for 1989. That's for fiscal year 1989.

Q. Up until the second half of fiscal year 1989, was the procedure for determining Rockwell's award fee the same as you have described for 1979?

A. With one exception; in the first period in 1989, the Secretary of Energy claimed the right to review the award fee recommendation before the manager of Albuquerque finalized it.

Q. Had the Secretary of Energy ever claimed that right before 1989?

A. No.

Q. Mr. Barkmeier, I'm handing you a document that has been marked as Plaintiff's Exhibit No. 1, which is modification No. M128 to the Rocky Flats contract. Would you please take a moment to review this document.

(A pause occurred in the proceedings.)

A. Okay.

Q. Have you ever seen this document before?

A. Yes, I have.

Q. In your own words, what is this document?

A. This document is the modification to the contract which establishes the award fee conditions for fiscal year 1989.

Q. Was this a document that you used in the

process of determining Rockwell's award fee for the fiscal year 1989?

A. Yes, it is.

Q. Let me draw your attention to page 2 of Exhibit 1, subparagraph (b) (1), entitled Base Fee and Award Fee, and specifically to the sentence in the middle of that subparagraph that begins "The amount of the award fee" . . .

A. Okay.

Q. Would you please read that sentence aloud.

A. "The amount of the award fee actually to be paid to the contractor shall be determined by the Award Fee Determination Official, (Manager, or anyone acting as Manager, Albuquerque Operations) in accordance with the provisions of Subparagraph (b) (2) of this clause."

Q. Did you ever have occasion to discuss that sentence with anyone?

A. No.

Q. Who was the manager or the person acting as manager of Albuquerque operations for the first half of fiscal year 1989?

A. Bruce Twining.

Q. Who was the person who was manager or the person acting as manager of Albuquerque operations for the second half of fiscal year 1989?

A. Bruce Twining.

Q. Let me draw your attention to Appendix D, which is part of Exhibit 1. On the first page of Appendix D, under the section entitled "Introduction," the document describes the terms "functional performance areas" and "functional performance elements," and makes reference to the Albuquerque Operations Handbook for award fee performance evaluation and review process. Are you familiar with functional performance areas?

A. Yes, I am.

Q. Let me draw your attention to the page of Exhibit 1 that is page 3 of 9, Appendix D.

A. Okay.

Q. At the bottom of that page, and continuing on to the next page, there is a list of functional performance areas, and a corresponding column with weightings in terms of percentages.

A. Yes.

Q. What was the role of those functional performance areas in determining Rockwell's award fee for the period ending March 31, 1989?

A. These were the areas of Rockwell's performance that were evaluated and graded for purposes of establishing the award fee.

Q. In fact, when you made your recommendation

A. Yes, it is.

Q. Was that changed procedure also applied to the award fee period for the second half of fiscal year 1989?

A. I was no longer working for the Department of Energy when the process was completed for that second period, so I'm not certain.

Q. At the time you retired, were you aware of headquarters interjecting itself into the award fee process for the second half of fiscal year 1989?

A. Yes.

Q. At the time you retired, had any changes to the handbook formally been issued?

A. No.

Q. At the time that you retired, had a new handbook been issued?

A. No.

Q. With respect to the first half of fiscal year 1989, how did Secretary Watkins interject himself into the award fee process?

A. My understanding is that he required that the recommended award fee be approved by him prior to being issued--prior to a determination being issued by the manager, Albuquerque.

Q. Based on your understanding of the Rocky

this independent report?

A. I don't recall that he did instruct me to, but I'm--I know no other reason why I would have prepared it.

Q. Did you report directly to Mr. Goldberg?

A. Yes, I did.

Q. When Mr. Whiteman was the Rocky Flats area office manager, did you report directly to Mr. Whiteman?

A. Yes, I did.

Q. When Mr. White--strike that. When Mr. Inlow was acting area manager at Rocky Flats, did you report to Mr. Inlow?

A. Yes.

Q. Did Mr. Inlow cease being the acting area manager on the same day that Mr. Goldberg was appointed to that position?

A. I don't know. I believe that happened on the same day, but there may have been a lapse of less than a week between the two events.

Q. For any of the award fee periods prior to the first half of fiscal year 1989, were you ever asked to prepare an independent report of the type that you were asked to prepare by Mr. Goldberg?

A. With the exception that I don't recall Mr. Goldberg asking me to prepare it, no, I never

prepared a report independently.

Q. For any of the periods prior to the first half of fiscal year 1989, were you aware of anyone preparing any report independent of the PEC report?

A. No.

Q. Did you discuss with anyone at the time you were preparing the independent report on Rockwell's award fee the fact that you were preparing an independent report?

A. I recall discussing it with Ed Goldberg. I believe I would have discussed it with Terrel Agy.

Q. Anyone else?

A. I'm not sure. I don't recall.

Q. What were your discussions with Mr. Agy about the independent report?

A. I don't actually recall discussions, but consistent with my method of operations, since it was his area of responsibility, I believe I would have told him what I was doing and why.

Q. What would you have told him?

A. That I was trying to prepare a report that we could support and that headquarters would accept.

Q. Did you inform Mr. Agy that headquarters would not accept the number that had been recommended by the PEC?

A. Once again, I don't recall that, but I believe that I would have.

Q. Did you consider that the fact you were preparing an independent report to be unusual?

A. Certainly.

Q. What did you discuss with Mr. Goldberg about your preparation of this independent report?

A. I don't recall. Well, let me correct myself. I recall going through the revised scores and fee calculations with Mr. Goldberg after I had completed my work on it.

Q. What did Mr. Goldberg tell you about the revised calculations?

A. I don't recall.

Q. What did you tell him about the calculations?

A. How I had arrived at them, and what the results were.

Q. Were you comfortable with those results?

A. No.

Q. Did you express that to Mr. Goldberg?

A. I'm sure I did, but I don't recall that I did.

Q. Do you know what his reaction was when you expressed that?

A. No.

Q. Did you express your discomfort to Mr. Agy?

A. Probably. Although, again, I don't recall.

Q. Why were you uncomfortable with the results contained in your independent report?

A. Because they were forced to satisfy DOE headquarters based on events that occurred after the period being evaluated.

Q. What were those events?

A. The FBI/EPA raid, and subsequent review of operations at the plant by teams of DOE and DOE contractor personnel.

Q. What were these DOE teams or DOE contractor personnel teams?

A. Well, they were called Tiger Teams, and they were teams established by the Secretary of Energy to do a thorough review of plant operations, particularly in the environment, safety and health areas.

Q. For any of the award fee periods prior to the first half of fiscal year 1989, were there investigations by any Tiger Teams or any similar DOE teams?

A. Can you ask the question again? I'm not sure that I can answer it in the form that you asked it.

Q. You stated that there were Tiger Teams

Q. Were you uncomfortable with the summary that you prepared?

A. I'm sure I was.

Q. Did you consider that the award fee dollars contained in your independent report were lower than deserved?

A. I don't know.

Q. You don't recall?

A. Well, okay, let me explain myself. I felt that they violated the process because they were based on things that became known after the period had ended. That was contrary to the process. So I was uncomfortable with that. I am a person that likes an orderly process that works the way it's set out to work. As far as what was or wasn't deserved, I don't have a firm opinion.

Q. Was preparing your independent report clearly outside the proper process of determining Rockwell's award fee?

A. I believe it was.

Q. What happened with the numbers contained in your independent report to Mr. Goldberg?

A. I don't know. I don't know whether that was resolved before or after I left the Department of Energy.

Q. Were the award fee grades contained in your independent report passed on to the Department of Energy

headquarters?

A. I believe that they were, but I'm not certain.

Q. After you completed your report and provided it to Mr. Goldberg, did you have any involvement with the award fee process for the first half of fiscal year 1989?

A. No. I guess I should modify that to say that I don't recall whether I did.

I would like to take another short break.

MR. KELLEY: I was going to go off the record.

(Discussion off the record.)

(A break was taken from 1:00 p.m. to 2:05 p.m.)

Q. (BY MR. KELLEY) Mr. Barkmeier, you were telling me this morning that, subsequent to the PEC's recommendation of an award fee for the first half of fiscal year 1989, you prepared an independent report that contained grades different from what had been recommended by the PERB; is that right?

A. That's correct.

Q. Mr. Barkmeier, I'm handing you a document that has been marked as Exhibit 14, which is a DOE memorandum from Edward S. Goldberg to Bruce G. Twining, dated July 27, 1989. Would you please review this document, and when you are finished reviewing it, state

that?

A. I told him what the revised grades were, and what had been done to the summary report in order to support those revised grades.

Q. Did Mr. Goldberg express to you any concern that the PEC and the PERB recommendations were different from what you were presenting in this calculation contained on page E 001546?

A. I don't believe that he did. I don't recall for sure, though.

Q. Did you express to him any concerns about that?

A. I don't recall.

Q. Did you have any concerns about that?

A. Yes.

Q. What were those concerns?

A. That the scores were being changed at a later point in the period than the contract provided for the scores to be finalized.

Q. Did Mr. Goldberg express to you that he was in agreement with the overall score of 87 and the overall recommended fee that's reflected in Exhibit 14?

A. I don't remember.

Q. Did Mr. Goldberg express to you whether DOE headquarters would approve the scores reflected in

A. I don't know.

Q. Do you remember whether you drafted these three pages from scratch to provide to Mr. Goldberg?

A. I do not believe that I did. I think I probably worked from an existing version of this summary report.

Q. And made changes to the existing summary; is that right?

A. Yes.

Q. And on what basis did you make those changes?

A. In order to support the revisions in the scores that are reflected in this same document.

Q. Exhibit 14 was sent to Mr. Twining; is that correct?

A. I'm sorry, I didn't--

Q. Exhibit 14 was sent to Mr. Twining; is that correct?

A. Is this Exhibit 14? It doesn't have an exhibit number on my copy.

Q. Yes.

A. Yes.

Q. Who was Mr. Twining at that time?

A. He was the same person he is now. He was the Manager of Albuquerque operations office.

Q. Was he the award fee determination official?
A. Yes, he was.
Q. Why were you sending this memorandum to Mr. Twining?
A. Because he was the award fee determination official.
Q. Had Mr. Twining asked for this memorandum or asked that it be prepared?
A. I have no knowledge of that.
Q. Did you ever speak directly with Mr. Twining concerning Rockwell's award fee for the first half of fiscal year 1989?
A. No, I did not.
Q. Did Mr. Goldberg ever tell you that he had spoken directly with Mr. Twining concerning Rockwell's award fee for that period?
A. I don't recall.
Q. Do you know whether the scores contained in Exhibit 14 were ever provided to anyone at DOE headquarters?
A. As a result of my review of documents a couple of weeks ago, I know that they were.
Q. Did you know that at any time in 1989?
A. I don't recall. I probably did, but I don't recall.

A. Probably because I believed it.

Q. Did somebody tell you that?

A. The input that we received for these things was generally worthless, or close to it, so it tended to clutter up the files more than it helped us with the process.

Q. Now Mr. Agy's note in which he describes what you told him is dated 7-5-89, or at least it looks from his note as though that's when you told Mr. Agy what you had told Mr. Hill.

A. Yeah, I believe so.

Q. Was that after Mr. Goldberg took over as acting manager?

A. Yes, it was.

Q. Was that after the Rocky Flats office began reporting directly to DOE headquarters?

A. Yes, it was.

Q. Were you advising Mr. Hill that it didn't matter if Albuquerque sent input on the midterm evaluations because their role had been usurped by DOE headquarters?

A. I'm not sure. I don't know.

Q. Is that a possibility?

A. It's a possibility.

Q. Mr. Barkmeier, I'm handing you a document

that has been marked Exhibit 25, which is a memorandum or letter from Edward S. Goldberg to Dominick J. Sanchini dated July 27, 1989. Have you ever seen this document before?

A. Yes.

Q. When did you see it?

A. Sometime between July 25, 1989, and July 27, 1989, although I authored it, and I probably did that on July 25, 1989.

Q. You authored this document?

A. Yes.

Q. Did Mr. Goldberg tell you to prepare this document?

A. I don't recall.

Q. Did Mr. Goldberg sign the document?

A. I can't tell. Someone signed it for him if he didn't sign it, but I can't tell whether he's the one that signed it or not.

Q. Did you prepare this document for Mr. Goldberg's signature?

A. Yes, I did.

Q. What was the purpose of this document?

A. At that point in time, there was a directive by DOE headquarters regarding the weighting that was to be given to Environment, Safety and Health in evaluating

performance. And I am not sure what weighting was required. It may have been more than 50 percent or it may have been something more specific than that. Anyway, this memo was originated for the purpose of advising Rockwell and documenting the file to the effect that General Management; Quality Assurance; and Environment, Safety and Health were all considered Environment, Safety and Health in their evaluations, in order to comply with this headquarters directive. And I don't recall the percentage that was contained in that, or whether it was in writing or not.

Q. Were the FPA weightings being changed?

A. No.

Q. Had Rockwell already been informed as to what the FPA--

A. Yes, they had.

Q. --weightings would be?

A. They had.

Q. Could you please read the first sentence of this memorandum.

A. "As you are aware, Secretary of Energy, James D. Watkins, has placed a heavy emphasis on Environment, Safety and Health in DOE's evaluation of its Contractors."

Q. Was Environment, Safety and Health a

functional performance area on which Rockwell was to be evaluated for the first half of fiscal year 1989?

A. Yes, it was.

Q. Was it also an area on which Rockwell was to be evaluated for the second half of fiscal year 1989?

A. Yes, it was.

Q. Why then is Mr. Goldberg informing Mr. Sanchini that Secretary Watkins has placed a heavy emphasis on Environment, Safety and Health in evaluating contractors?

A. The purpose of the memo was to advise Rockwell that in the three functional performance areas: General Management; Quality Assurance; and Environment, Safety and Health, Environment, Safety and Health would be considered.

Q. Had that not been explained to Rockwell prior to this July 27 memorandum?

A. I don't know. I don't know what the sequence of events was.

Q. The next two sentences in this memorandum refer to goals and objectives that were reaffirmed in Mr. Whiteman's April 18, 1989, memorandum. Is the memorandum being referred to as the April 18, 1989, memorandum the document that I showed you which is marked as Exhibit 21?

UNITED STATES CLAIMS COURT

Case No. 91-1362 C

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF CLAUDE HUDGEL BARKMEIER
VOLUME II

December 7, 1992

Pursuant to Notice taken on behalf of the Plaintiff at 1719 Emerson Street, Denver, Colorado 80218, at 9:33 a.m., before Donna E. French, Registered Professional Reporter and Notary Public within Colorado.

(Plaintiff's Deposition Exhibit 108 was marked.)

A. Yeah. I wouldn't have seen this. This is after the time I retired.

Q. For the record, Exhibit 108 is a letter from Mr. Sanchini to Mr. Simonson, dated December 22, 1989, with attachments. Let me direct your attention to the page that is stamped E 000220.

A. Okay.

Q. Please review that page and tell me if that refreshes your recollection as to whether Rockwell achieved the goal achievement objectives for the first half of fiscal year 1989.

A. No.

Q. Do you have any reason to doubt the figures that are contained on that page?

A. Well, because they were generated by Rockwell, I would have needed somebody from the Department of Energy to verify them before I would have accepted them. Generally, the information that Rockwell provided was accurate.

Q. When did you retire, Mr. Barkmeier?

A. December 1, '89.

Q. Mr. Barkmeier, I'm handing you a document that's previously been marked as Exhibit 54, which is a

memorandum from Mr. Moore to various assistant secretaries and others, dated August 21, 1989. Please review the document and tell me if you have ever seen it before.

A. I'm just not sure.

Q. During the summer of 1989, did headquarters institute a process where an award fee would go to headquarters for concurrence before it went to the contractor?

A. Yes, they did.

Q. Did they ever have that process in place before the summer of 1989?

A. No.

Q. Why did they make that change?

A. I can't say. I don't really know.

Q. Do you have any idea why they did?

A. Well, my assumption would be that Secretary of Energy Watkins wanted more control over things that took place in the field than his predecessors had exercised. But I really don't know.

Q. Mr. Barkmeier, I'm handing you a document that has previously been marked as Exhibit 49, which is a memorandum from Mr. Troell to Mr. Twining, dated July 10, 1989. Please review the document and tell me if you've ever seen it before.

PL. SUPP. EX. 56

UNITED STATES CLAIMS COURT

Case No. 91-1362 C

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF MARSHALL L. BISHOP

December 8, 1992

Pursuant to Notice taken on behalf of the Plaintiff at 1719 Emerson Street, Denver, Colorado 80218, at 9:30 a.m., before Donna E. French, Registered Professional Reporter and Notary Public within Colorado.

A. Approximately two years.

Q. What was your next position?

A. I was promoted to the director, administrative division, Rocky Flats office.

Q. When did that take place?

A. I reported for duty to Rocky Flats on--during January of 1990.

Q. And how long were you in that position?

A. I am actually still in that position with the proviso that it has been expanded and I am now the assistant manager for administration.

Q. What were your duties and responsibilities as the director of the administrative division at Rocky Flats?

A. Basically managed in concert with the Albuquerque field office all of the administrative functions at Rocky Flats, budget, finance, procurement, records, property management, and others.

Q. And what are your duties and responsibilities as the assistant manager of administration?

A. We have transitioned the majority of those functions so that there is no longer an involvement of the Albuquerque operations office, and we primarily have the total responsibility for those.

open?

A. It was announced in the normal DOE government announcements.

Q. Did you replace Mr. Barkmeier at the Rocky Flats office?

A. That's true. He had retired or was in the process of retiring.

Q. Prior--strike that. Other than when you went to the Rocky Flats office beginning in January of 1990 and the one-week detail December of 1989, were you ever on site at the Rocky Flats plant?

A. No.

Q. Other than the positions that you've held, including the detail at the Rocky Flats plant, did you ever have any involvement with an award fee?

A. When I was at the Hanford operations office, I was a performance monitor for the procurement systems within the procurement division.

Q. How was that involved in an award fee?

A. Based upon my oversight of the M&O contractor, I would prepare reports and send those to the operations office. I who would then incorporate those into the overall fee evaluation.

Q. For how many contracts did you perform that function?

submitted to headquarters, the recommendation did come back and was changed.

Q. Rockwell's award fee for the second half of fiscal year 1989?

A. Yes.

Q. At the time you prepared this executive summary or at the time that this executive summary was prepared, were you aware of those changes?

A. To the best of my recollection, I was not.

Q. Was it your view in 1990 that changes to an award fee that were mandated by headquarters would be difficult to justify or defend?

A. During the early parts of 1990, that is correct. In the latter parts of 1990, no.

Q. During January and February of 1990, was that your view?

A. Yes, it was.

Q. Why was that your view?

A. I'll have to speculate on the interpretation of the contract.

THE DEPONENT: Is that okay?

Q. What was your view on the contract?

A. My view on the contract in the way it was structured was that the performance evaluation plan had

been incorporated into the contract and that except by subsequent letters from Albuquerque, the process had not been changed. Notwithstanding the fact that those letters were signed by Bruce Twining, who is a contracting officer, I felt that it would be difficult to support the headquarters' involvement.

Q. And what was this view based on?

A. As I recall, during the reevaluation of the award fee, the modification to the contract which had incorporated the performance evaluation plan had been reviewed and--I reviewed it, and based upon the review of that modification, that was the basis for my opinion.

Q. Your opinion that--

A. That it would be difficult to justify headquarters' approval in the award fee process.

Q. That was based on your review of the Rockwell contract; is that right?

A. Specifically the modification incorporating the award fee plan.

Q. Is that the modification that you reviewed earlier, which is Exhibit 1?

A. Yes, it is.

Q. Does this modification provide for headquarters' involvement?

A. To the best of my knowledge, it does not.

Q. Was the Rockwell contract modified subsequent to the modification that is Exhibit 1?

A. With respect to the fee determination official, the letter that Bruce Twining signed designating fee determinations officials does constitute a modification to the contract.

Q. In your view, did Mr. Twining's letter modify the contract with respect to headquarters' involvement in the award fee process?

A. No, it did not.

Q. Mr. Bishop, in addition to award fee based on plant performance and PRMP/PROVE, Rockwell was also eligible for an award based on goal achievement objectives; is that right?

A. I have been told that that is true, yes.

Q. In 1990, were you familiar with the goal achievement objectives for Rockwell?

A. No, I was not.

Q. I'm handing you a document that's previously been marked as Exhibit 108, which is a memorandum from Mr. Sanchini to Mr. Simonson dated December 22, 1989. Please review the document and tell me if you've ever seen it before. I note that the last page of the exhibit contains a distribution list.

Exhibit 140?

A. That's correct.

Q. In 1990, did you discuss Mr. Tuck's February 22 memorandum with anyone?

A. It would appear certain that I did. I have no specific recollection of that, though.

Q. Who did you discuss it with?

A. I'm sorry, I don't remember.

Q. Did you discuss it with Mr. Agy?

A. It's possible. I have no specific recollection of that.

Q. With Mr. Nelson?

A. Yes, Mr. Nelson was there and that's certainly a possibility.

Q. Mr. Simonson?

A. Oh, he was the deputy manager at that time and that's certainly a possibility.

Q. Anyone else you can think of?

A. There could have been any number of people, including the committee we chaired for the reevaluation, performance monitors.

Q. Did you ever express any views to anyone regarding Mr. Tuck's February 22 memorandum?

A. Yes. I have a vague recollection of discussing the propriety of this approach with Terrel.

Q. What did you tell Terrel?

A. In my opinion, that this was inconsistent with the contract with Rockwell.

Q. What was it that was inconsistent?

A. The headquarters' approval and determination of the award fee.

Q. Did Mr. Terrel express to you any view on that subject?

A. I don't recall what it was if he did.

Q. Did anyone else express any views to you on that subject?

A. Not that I remember.

Q. Mr. Bishop, I'm handing you a document that is being marked as Exhibit 143.

(Plaintiff's Deposition Exhibit 143 was marked.)

Q. Which is a memorandum from Mr. Tuck to the deputy secretary. It's dated February 22, 1990. Have you ever seen this document before?

A. Yes, I have.

Q. When did you first see it?

A. It had to be the February, March time frame.

Q. Of 1990?

A. Yes.

A. Yes, I was.

Q. Why was Mr. Simonson replaced as manager of Rocky Flats?

A. I do not know.

Q. Did you ever hear any reason why he was replaced?

A. Not anything other than gossip.

Q. What did you hear?

A. In the vernacular, that he had pissed off the wrong people at headquarters.

Q. That Mr. Simonson had?

A. Yes.

Q. In what way?

A. I'm sorry, I don't know.

Q. Did you hear anything about that?

A. No.

Q. Did it have anything to do with Rockwell's award fee?

A. I don't have any idea.

Q. Did you know Mr. Nelson before he came to Rocky Flats?

A. No.

Q. Why was Mr. Nelson chosen to replace Mr. Simonson?

A. I have no idea.

Q. Did you ever hear any reason?

A. Speculation amongst the office because of his background in the nuclear Navy in association with Admiral Rickover and his work at the Arvada test site with nuclear weapons.

Q. Did Mr. Simonson stay on at the Rocky Flats office after he was replaced as manager?

A. Yes, he did.

Q. Did he become the deputy manager?

A. That's true.

Q. Did you ever talk to Mr. Simonson about his being replaced as manager?

A. No, not specifically with respect to him being replaced.

Q. What did you talk to him about in that regard?

A. Events that affected him because he had been replaced.

Q. What were those events?

A. Changes in his personnel records that I had to make because of the change to deputy manager and then the subsequent change to special technical advisor.

Q. When did he become a special technical advisor?

A. I can't even remember the date, but approximately eight months to a year ago.

Q. From today?

A. Um-hum.

Q. Was Mr. Simonson's change from being manager to deputy manager a demotion?

A. Not in pay or personnel matters. In perception, yes, and in the organizational order of the office, yes.

Q. Was Mr. Simonson's change from being deputy manager to a special technical advisor a demotion?

A. No. It's a basic change in career ladder, I guess you would call it. He went from the senior executive service into a special pay and grade classification.

Q. Did you ever receive an evaluation of your performance at the Rocky Flats plant for the first half of calendar year 1990?

A. I received my first evaluation, I believe, in July of 1990, which would have covered that period.

Q. From the date you first reported, January 4?

A. Yes.

Q. Who gave you that evaluation?

here, though.

Q. Did you provide any assistance in preparing this letter?

A. No.

Q. Were you ever consulted for the preparation of this letter?

A. Not that I recall.

Q. Were you aware that this letter was being prepared?

A. No, not that I recall.

Q. What issues in this letter were you familiar with?

A. The disputes portion relative to the fee determination and the breach issue relative to the contract.

Q. Did you discuss those issues with anyone?

A. These are similar to the issues that I had discussed with Terrel Agy previously.

Q. Did you express your view concerning those issues to anyone?

A. To Terrel.

Q. What did you tell Terrel?

A. That I did not believe that it was proper for headquarters to be involved in the award fee to the extent that they were and that was over providing just

recommendations and evaluations for the period because the performance evaluation plan had been incorporated into the Rockwell contract.

Q. Did you tell Mr. Agy anything else?

A. I'm sure that we discussed it, but I don't recall what we discussed at this time.

Q. Did Mr. Agy tell you his views on the matter?

A. I don't recall Terrel responding.

Q. Did you ever express to anyone any views on the matter other than what you've just stated?

A. Not that I can recall.

Q. Did you ever express your views on the matter to anyone other than Mr. Agy?

A. I cannot recall having done that with anyone; that there would have been opportunities for me to have done that, but I do not recall it.

Q. When did you express your views on the matter to Mr. Agy?

A. As I recall, when we received the Tuck letter.

Q. At any time subsequent to that?

A. There have been subsequent discussions that I vaguely recall that it's come up in conversation, yes.

Q. And have you ever expressed your views during those conversations?

A. Yes.

Q. Are the views that you expressed during those conversations the same that you expressed to Mr. Agy after seeing the Tuck memorandum?

A. To the best of my memory. My opinion has not changed.

Q. You retain the same views of the matter today; is that right?

A. Yes.

Q. The same as you had in February of 1990?

A. To the extent that the contractual issues were, in my opinion, not appropriately handled, yes.

MR. KELLEY: I have no further questions. Mr. Bruns?

MR. BRUNS: Can I have a chance to talk with Mr. Bishop just for a second?

MR. KELLEY: Off the record?

MR. BRUNS: Yes, please.

(Discussion off the record.)

MR. BRUNS: I don't have any questions.

PL. SUPP. EX. 57

UNITED STATES CLAIMS COURT

Case No. 91-1362 C,

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF TERREL JOHN AGY
VOLUME I

October 21, 1992

Pursuant to Notice taken on behalf of Plaintiff at 150 East Tenth Avenue, Denver, Colorado 80203, at 9:50 a.m., before Judy L. Busbee, Registered Professional Reporter and Notary Public within Colorado.

which can't be taken down; do you understand?
A. Yes, I do.
Q. If at any time you would like a recess, it's appropriate for you to ask for one; do you understand?
A. Yes, I do.
Q. Are you taking any medications that would affect your ability to testify here today?
A. No.
Q. Are there any other limitations which would affect your ability to testify truthfully here today?
A. No.
Q. Do you have any questions about what I have just gone over?
A. No.
Q. Okay. What is your current position with the United States Department of Energy?
A. As a--I'm employed as a contract specialist.
Q. And what do you do in that capacity?
A. Currently, I'm involved in aspects of M and O contractors, which are management and operations contractors, at the Rocky Flats plant. In general terms, contract administration.
Q. How long have you had this position?
A. Since December '90, I believe it is, as a contract specialist.

Q. And what position did you hold before that?
A. As a program analyst position, doing essentially the same work.
Q. Was the contracts specialist a promotion from the program analyst?
A. No.
Q. How long were you a program analyst?
A. Approximately one year.
Q. And what was your position before being a program analyst?
A. A security specialist.
Q. And what did that job entail?
A. Monitoring the M and O contracts--contractors, excuse me, in their carrying out of security responsibilities and safeguards responsibilities at the Rocky Flats plant.
Q. Was that position, then, a more confined position, or more restricted, than program analyst or a contract specialist, in terms of your responsibilities?
A. I guess I don't understand your question.
Q. As a contract specialist, do you have a general or broad responsibility with respect to contract administration?
A. No.
Q. Is it confined to certain limited aspects of

administration?

A. Yes.

Q. Could you describe the particular aspects that it is confined to.

A. Do you mean currently?

A. Yes, currently.

A. Currently, I'm involved in two areas within the M and O contracting activity, and that's something the Department of Energy calls task order contracting, which could be generally described as the putting together of a statement of work for the M and O contractors. The second duty I have now is in connection with what is known in the department as the accountability rule, which in essence is an area where the contractors are subject to a decision by the contracting officer as to whether they incur costs that could be avoidable. And I get involved in assisting the contracting officer in reviewing those areas.

Q. Do you have any other particular tasks in your current position?

A. Those are the main two.

Q. Were there other or different particular tasks in your position as a program analyst?

A. Yes. The two main tasks I had in that position as a program analyst, I coordinated the award

fee activities for Rockwell--the Rockwell contract, that is, and I interfaced with Rockwell's procurement group, because we have some responsibility in monitoring their subcontractor or subcontracting activities.

Q. Do you remember when you became a program analyst?

A. I believe it was August 1989.

Q. What were your particular tasks in your position as a security specialist?

A. Mainly reviewing Rockwell's activities in the security area and safeguards area, their compliance with DOE order requirements.

Q. Was your change in position from the security specialist to a program analyst a promotion?

A. No, it was not.

Q. Could you describe for me your formal education since graduating from high school.

A. I have a bachelor of science degree in business administration with emphasis in accounting.

Q. And where was that from?

A. I graduated from Colorado State University.

Q. In what year?

A. 1968.

Q. Do you have any formal postgraduate education?

were you evaluating Rockwell's performance yourself?
A. Generally those were my comments.
Q. Were you the person primarily responsible for evaluating Rockwell's performance in the security and safeguards area?
A. No.
Q. Who would that have been?
A. Everybody above me.
Q. Who was your supervisor in 1981?
A. George Carnahan.
Q. Until what year did you evaluate Rockwell's performance in the security and safeguards area?
A. Through 1988. I believe probably through the end of 1988.
Q. Through December of 1988?
A. Roughly, yes.
Q. Would that have been after you became a program analyst?
A. No. Can I correct something?
Q. Certainly.
A. I started functioning as a program analyst in about February of '89. Around February, yes. I think I--I believe I said August before, but sometimes the paperwork--I got confused with the paperwork. But I've functioned in that position since February of '89.

Q. Is it the case that you were not formally appointed to that position until August?

A. I don't recall when I was formally appointed.

Q. But you did start functioning as a program analyst in February of 1989?

A. Yes, sir. Approximately February. It was either February or March.

Q. During the time you were employed at the Rocky Flats plant, did the award fee process always take place on the basis of the government's fiscal years running from October 1 of the year through the following September 30?

A. I believe that's true.

Q. And were the award fees always determined at six-month intervals during that fiscal year?

A. I believe that's true.

Q. Now, for the fiscal year beginning October 1, 1988, did you make evaluations of Rockwell's performance in the security and safety areas?

A. Not as you phrased it.

Q. How would you explain your function in these safety areas for the fiscal year ending September 30, 1989?

A. I had nothing to do with safety. You're

using the word "safety."

Q. Oh. Please explain what areas you did have.

A. Security.

Q. Security?

A. Security and safeguards. Those two areas.

Q. Did you evaluate Rockwell's performance in security and safeguards for the first half of fiscal year 1989?

A. I was involved to some extent.

Q. Were you involved during the first half of fiscal year 1989 in evaluating any other areas of Rockwell's performance?

A. No, I didn't personally evaluate them in other areas, and in the safeguards and security area, that's not done until after the end of March 31. I wasn't in safeguards and security at that time, so--but there was, I believe, an interim evaluation during that period, too, that I may have been involved in.

Q. During the first half of fiscal 1989?

A. Yes.

Q. Did you evaluate Rockwell's performance in any area during the second half of fiscal year 1989?

A. Not personally evaluate their performance, no.

Q. Is it correct to say that you personally

evaluated Rockwell's performance in the security and safeguards area from 1981 until December of 1988?

A. Yes, to the extent that I made my comments available to my supervisor.

Q. Did you ever personally evaluate Rockwell's performance in any area other than security and safeguard?

A. No, I don't recall ever doing that.

Q. Are you currently familiar with the general procedures that were used to evaluate Rockwell's performance under its contract at the Rocky Flats plant?

A. Generally, yes.

Q. When did you become familiar with the procedures for evaluating Rockwell's performance?

A. To a limited extent, in 1981. To a greater extent, in--when I became a program analyst.

Q. Which would have been in February of 1989?

A. Approximately, yes.

Q. What was the reason that you became more familiar with the evaluation process when you became a program analyst?

A. That's the first time I had access to guidance that was given to the area offices that were under the Albuquerque operations office, and to the contract with Rockwell, and to the contract modifications

discussions with the Albuquerque counterparts, Albuquerque operations counterparts.

Q. Did the branch chiefs have personal knowledge of Rockwell's performance at the Rocky Flats plant?

A. I don't know if I can answer that question. I'm not sure I know the answer.

Q. Do you know the answer as it pertains to the area of security and safeguards?

A. Yeah, I believe that's true in safeguards and security.

Q. Who was the branch chief for the first half of fiscal year 1989 in the area of security and safeguards?

A. I think his name was Nick Roberts.

Q. When you became a program analyst in February of 1989, who was your supervisor?

A. Claude Barkmeier.

Q. Who was your supervisor immediately prior to Claude Barkmeier?

A. That's a difficult question. We were without a supervisor, so in effect, I guess I reported to the area manager, Earl Whiteman, or someone acting in the capacity of the supervisor for that branch. At times that was various people.

Q. That branch being security and safeguards?
A. Yes.
Q. Prior to your appointment in February of 1989 as a program analyst, did you report your evaluations in the security and safeguards area to Mr. Whiteman?
A. To my supervisor. No, I guess, is the answer, not generally to my supervisor.
Q. Well, who did you report your evaluations to during the period when you did not have a branch chief?
A. They would have been given by the acting supervisor to Whiteman.
Q. Until when was Mr. Barkmeier your supervisor?
A. I believe until the end of November 1989.
Q. And who became your supervisor after that time?
A. I have to correct that a little bit. Barkmeier was still supervisor. However, there was a--my immediate supervisor sometime in the fall of '89 became Hugh Miller, who himself reported to Barkmeier. Hugh Miller was actually my supervisor--my immediate supervisor in the fall of '89.
Q. Do you remember what month?
A. I would say approximately September.

A. In early '89, when I first became a program analyst, he was the chief of the administrative branch.

Q. Did he continue in that position until the time Mr. Miller became your supervisor?

A. Yes, to my knowledge.

Q. In February of 1989, what were your responsibilities with respect to Rockwell's award fee?

A. When I started as a program analyst, I was to coordinate the award fee activities as directed by Mr. Barkmeier in interface with the Albuquerque operations office in order to supply them with the necessary paperwork.

Q. What type of coordination did you perform in this role?

A. Well, for example, to the extent that Mr. Barkmeier didn't coordinate it, I would see that the branch chiefs submitted their evaluation and put in the time frames required by the--by Barkmeier to enable the meeting to take place to discuss the material.

Q. How many branch chiefs were there?

A. I believe there were five. Around that.

Q. Do you recall by what date the branch chiefs were supposed to give their input to Mr. Barkmeier?

A. No.

Q. Was it difficult to get the branch chiefs to

Q. What was discussed at the meeting?

A. Rockwell's accomplishments and deficiencies, and any other observations about performance, whether positive or negative, that the branch chiefs wanted to include in the evaluation.

Q. Was the discussion confined to Rockwell's performance for the period October 1, 1988, through March 31, 1989?

A. I believe so.

Q. When did this meeting take place?

A. I don't know precisely, but it would have taken place in early April 1989.

Q. Did each branch chief provide a presentation with respect to an evaluation on his or her particular area?

A. The branch chiefs did not present--make a formal presentation. They brought--they made available to the other attendees a copy of what--of their evaluation, which generally was typed and sometimes was handwritten, and they discussed, you know, each of their evaluations as they went around the table.

Q. Did each branch chief have responsibility over certain areas of Rockwell's performance?

A. Generally that was true, although sometimes there was some overlap.

Q. What were the areas?
A. I don't understand the question.
Q. Well, you have explained that there were five branch chiefs. Were there five corresponding areas of Rockwell's performance that was being evaluated?
A. Not necessarily: It didn't always correlate that way.
Q. What were the titles of the branch chiefs?
A. Well, I'll try to remember. There was a branch chief in Safeguards and Security; Operations; one called Engineering and Construction, I believe; one called Quality Assurance; one called Health and Safety branch, I believe it was titled; and the Administrative branch.
Q. I'm sorry, I didn't hear.
A. Administrative branch. I believe that's it.
Q. That's six different branches; is that right?
A. Yes, I believe that must have been it. Must have been six.
Q. And did a branch chief from each of these areas attend the meeting that you were referring to?
A. As I recall, a branch chief or a representative of the branch chief attended.
Q. How long did the meeting last?

A. I don't recall.

Q. Was it more than one day?

A. I would guess an hour, hour and a half maybe.

Q. Was there much discussion of the evaluations that had been provided by each of the branch chiefs?

A. The procedure was to read each other's input, then discuss it to the extent necessary to be sure that it was correct or a correct assessment.

Q. At this meeting in April of '89, was there much disagreement with any of the evaluations that were provided by any of the branch chiefs?

A. I don't recall. And like I earlier said, there may have been more than one meeting, but I don't recall that either.

Q. Do you remember any particular issues that were discussed at this meeting or this series of meetings?

A. No, I don't.

Q. Was it a relatively smooth process?

A. As I recall, it was. And I just thought of another name. There was an individual involved in the--what was called the PRMP project. He would have been at the meeting too. He was equivalent of a branch chief.

Q. Did he submit a written evaluation?
A. Yes. It's also possible the deputy manager may have been there, but I don't know. I don't recall.
Q. The deputy manager?
A. Deputy area manager, I'm sorry. Deputy area manager.
Q. For the Rocky Flats area?
A. For the Rocky Flats area office. Mr. Whiteman's deputy.
Q. Who was that?
A. I'm not sure I remember, but I believe it was John Whitsit at that time, but I'm not sure. Whitsit was detailed to the Savannah River office sometime around then, so he may not have been around.
Q. At the end of this meeting or series of meetings, was some written report produced describing the outcome of the meetings?
A. Only in the form of--well, the outgrowth of the meeting was some paperwork submitted to Albuquerque that the area manager would have to agree with making his recommendation for Rockwell for that period as the area manager.
Q. Did the branch chiefs first make a recommendation to Mr. Whiteman, who then in turn made a recommendation on an award fee to Albuquerque?

A. In essence, yes. But the recommendation to Whiteman was not a formal recommendation, it was a compilation of what the branch chiefs felt was a proper evaluation.

Q. How was--

A. And he got--he would change it as he saw fit.

Q. How was the branch chief's recommendation presented to Mr. Whiteman?

A. As I recall, at some point the area manager, assuming it was Mr. Whiteman, I believe it was, got involved probably either at the end of the meeting or--I just don't remember precisely. But Mr. Whiteman would have gotten involved either at the meeting or shortly thereafter, and looked at the paperwork and decided. He would have told Mr. Barkmeier to go ahead.

Q. Go ahead and--

A. Put the paperwork necessary to send to Albuquerque together, and he would sign it. Most likely it would happen something like that. Mr. Barkmeier and his branch was responsible for sending the paperwork for Albuquerque--preparing the paperwork for Mr. Whiteman's signature.

Q. Now, what was the paperwork that came out of the meeting of the branch chiefs?

A. After they decided what the narrative should be and what the recommended scores should be in each of the areas, and changed it to the extent that Mr. Whiteman wanted it changed, and I'm not sure what changes there were for Mr. Whiteman, we prepared a report--you might refer to it as a report, anyway--similar to what the board--the Performance Evaluation Review Board in Albuquerque would eventually issue in that same format, which was submitted to the Albuquerque operations office, which included the suggested achievements, deficiencies, and observations in the areas being evaluated. And, if I didn't say it already, the suggested score for each area.

Q. So, Whiteman then suggested scores, as well as a narrative, to Albuquerque?

A. As I recall, yes.

Q. Were these numerical scores or adjectival ratings or both?

A. Well, really both.

Q. Did the branch chiefs, in presenting their report to Mr. Whiteman, present both a narrative and scores?

A. As I recall, they came to the meeting or meetings with a general idea of what they felt the score should be. It was one of the items that they discussed, and decided on what number they wanted to recommend for

each of the areas, after they analyzed the achievements and deficiencies among the group. I don't recall the numbers being on the paperwork they brought to the meeting.

Q. So did they arrive at numbers during the course of the meeting?

A. Yes, that--generally, that's what they would have done. A suggested number for the manager--for the manager's review.

Q. Was there a number arrived at for each area which was under evaluation or was it just an overall number that was--

A. Each area.

Q. Were the numbers arrived at as a consensus of the entire group?

A. Not that I recall.

Q. Did the branch managers vote on the numbers?

A. No. I recall that they discussed the numbers, and how they each felt about it, you know, generally. That's how the discussions went. I don't recall any votes.

Q. Did each of the branch managers agree with all the numbers that were recommended to Mr. Whiteman?

A. I don't know if they all agreed. I don't know of any requirement that they all agree.

Q. Did any of them voice strong disagreement with any of the numbers that were recommended to Mr. Whiteman?

A. Not that I recall.

Q. Did any of them voice any disagreement with the numbers that were recommended to Mr. Whiteman?

A. I don't recall.

Q. Had you ever attended a meeting of the branch chiefs before this meeting or meetings in April of 1989 where the branch chiefs determined numbers to recommend to the area manager for Rockwell's award fee?

A. I don't believe I ever had, although--I don't recall. I may have. I may have in the security.

Q. When you were a security specialist?

A. Yes. I may have.

Q. Would you have been representing the security and safeguard branch?

A. Yes, if I would have attended. Like I said, we were without a branch chief for quite a while, so it's possible that I could have in '88--early '88. I don't recall.

Q. Do you know if prior to April of 1989 the procedures for determining Rockwell's award fee as recommended by the branch chiefs was the same as what occurred in April of '89?

A. It was my understanding that that's the way the process had worked.

Q. And what was that understanding based on?

A. I believe it was discussions with Mr. Barkmeier, and with the individual who coordinated those activities prior to me. Right before he left, I talked to him.

Q. Who was that individual?

A. His name was Ed Green.

Q. Are you familiar with the term "Performance Evaluation Committee"?

A. I've heard the term. I'm somewhat familiar.

Q. What is the Performance Evaluation Committee or what was the Performance Evaluation Committee with respect to the first half of fiscal year 1989?

A. I never personally interfaced with them. They were, as I understood it, a group of directors representing the Albuquerque operations office, I think, that made the recommendation or reviewed these evaluations that came in from the area offices. They made recommendations to the Albuquerque board, the Performance Evaluation Review Board. I think that's the way it worked.

Q. Did Mr. Whiteman send his recommendation on Rockwell's award fee for the first half of fiscal year

1989 to the Performance Evaluation Committee?

A. As I recall, that's how it worked.

Q. But you don't recall having any dealings with the Performance Evaluation Committee; is that correct?

A. I'm having trouble recalling, but it seems like that you're correct that we did send that down--that Whiteman did send that down to that committee, and if so, I would have got the paperwork ready to send it down. And that's probably who we addressed it to. Seems like it went to a lot of people down in Albuquerque. I don't remember all of who we sent it to.

Q. Was anyone in the Rocky Flats office a member of this Performance Evaluation Committee?

A. Not to my knowledge.

Q. It was made exclusively--excuse me, it was made up exclusively of Albuquerque people?

A. That's how I recall it.

Q. And those Albuquerque people consisted of certain Albuquerque directors?

A. As I recall, that's correct.

Q. What were Albuquerque directors?

A. Individuals who were responsible for various areas of interest; such as safeguards and security, safeguards and security director that in the safeguards

and security branch at Rocky Flats area office had--it just dawned on me when I said that that it used to be called the Rocky Flats area office, and now it's called Rocky Flats office. The word "area" has been dropped. But, anyway, we would interface with that division director. It's a director of a division.

Q. For each branch chief at the Rocky Flats area office, was there a counterpart director in the Albuquerque office?

A. Generally that was true, yes. And then some.

Q. Was that the case in the security and safeguard area?

A. Yes. There was a director of safeguards and security in Albuquerque.

Q. Did you ever have any contact with that person?

A. Do you mean direct contact?

A. Yes, direct contact.

Q. Yes, I've spoken to that person. Not on a routine basis.

Q. Did the subject of your discussion with the Albuquerque director involve Rockwell's award fee?

A. No, I don't recall it ever involving that.

Q. When Mr. Whiteman sent his recommendation to

Albuquerque on Rockwell's award fee for the first half of fiscal year 1989, did he delegate to you directly the responsibility to put the paperwork together and send it to Albuquerque?

A. No.

Q. Did Mr. Barkmeier delegate that responsibility to you?

A. I worked under Mr. Barkmeier's direction.

Q. Did Mr. Barkmeier direct you to send Mr. Whiteman's recommendation to Albuquerque?

A. No. Mr. Barkmeier would have told me to prepare the paperwork in coordination with the Albuquerque--excuse me, in coordination with my counterpart in Albuquerque, working with him preparing the paperwork necessary for Whiteman's signature.

Q. Who was your counterpart in Albuquerque?

A. Ted Hill. Theetis Hill.

Q. Did you have direct contact with Mr. Hill regarding Rockwell's award fee?

A. Yes.

Q. Did you speak with him on the phone?

A. Exclusively.

Q. During what time period did your contact with Mr. Hill continue?

A. I believe that I started talking to Mr. Hill

shortly after I took over as a program analyst. He would have been sending me paperwork instructions on how to proceed with the evaluation or what their expectations were as far as paperwork, and when they wanted the paperwork. And I continued talking to him--well, he retired. I don't remember exactly when. I don't remember when he retired. Seems like it was in 1990 sometime.

Q. But you would have had contact with him up until the time he retired?

A. Yes.

Q. Did your initial contact with Mr. Hill take place before the April 1989 meeting of the branch chiefs?

A. I'm sure it did.

Q. What was your first contact with Mr. Hill?

A. I don't recall precisely.

Q. Prior to the April 1989 meeting of the branch chiefs, did Mr. Hill request any information from you?

A. Yes.

Q. What kind of information?

A. Well, his request took the form of a schedule of due dates for the award fee process to be completed.

Q. Was that a written schedule?

A. In accordance with Albuquerque's schedules.
Q. Did Mr. Hill provide you with a written schedule?
A. Yes.
Q. When did he provide you with this schedule?
A. I don't recall precisely, but it would have been before March 31 of 1989. It's not--wouldn't have been addressed to me. It would have been addressed to Barkmeier or Whiteman or whatever.
Q. But you received a copy?
A. Yes.
Q. Did this schedule call for the Rocky Flats area office to provide Albuquerque with information on certain dates?
A. Yes. As I recall, we had a specified date when our material was due.
Q. What was that date?
A. I don't recall precisely.
Q. Would it have been after March 31 of 1989?
A. Yes, it would have.
Q. Was it sometime in April of 1989?
A. Yes.
Q. Do you know why Albuquerque wanted this information from the Rocky Flats area office during--or not later than April of 1989?

A. Not precisely. I believe it was dealing with the contract provisions.

Q. What information is it that Albuquerque wanted from the Rocky Flats area manager not later than the end of April, 1989?

A. That was the date within sometime in April, and they wanted his recommendation.

Q. Mr. Whiteman's recommendation?

A. His evaluation and recommendations in connection with the Rockwell's performance for the six months ending March 31, 1989.

Q. This would be Mr. Whiteman's recommendation?

A. Yes.

Q. What other tasks were on the schedule provided by Mr. Hill to be completed or performed by the Rocky Flats area office?

A. I don't recall any other. That was the culmination of our effort at that office for that evaluation, was to submit it to Albuquerque, at which time they took it from there.

Q. What other events were listed on this schedule other than the due date for the Rocky Flats area office to submit its recommendation to Albuquerque?

A. As I recall, it even indicated--the schedule even indicated when the Performance Evaluation Review

fee. But I stopped myself from saying that, because I have a feeling it involved the preparation of an award fee planned for the period beginning October 1, 1989, and some format that had been developed by Savannah River operations office for a plan--an evaluation plan or award fee plan, it's known by several terms. And the more I think about it, I think it had to do with that, rather than--although that's related to the Rockwell award fee also at that time, because they were still going to be the contractor after October 1. And I was involved in trying to put together or coordinate the preparation of that plan, and as I recall, I presented him with what I proposed to do in that area, or something, in that plan. He wanted to know some background about the planning process, something like that anyway. That's not to say that the Rockwell fee for the first period of 1989 didn't come up. I just don't recall.

Q. Did you prepare a plan for Rockwell's award fee for the period starting October 1, 1989?

A. As I recall, we were in the process of preparing a plan. The plan was never--I don't believe the plan was ever completed.

Q. What was the purpose of creating this plan?

A. The plan is the--what we refer to as a performance evaluation plan currently. I don't remember

what exactly it was called in 1989. But it's used as the basis for determining the fee evaluation process, the basis for doing our evaluation of the contractor, and it lays out the administrative procedures we go through, and how the contract will be evaluated.

Q. Was there a performance evaluation plan that applied to the award fee for fiscal year 1989?

A. There was some paperwork that constituted about the same thing. It was part of a modification to the contract, which was supplemented by direction from the area manager to the contractor as to what his expectations were as far as performance for 1989.

Q. In this meeting with Mr. Goldberg, were you discussing changing the existing plan?

A. As I recall the discussion, assuming I'm thinking about the right meeting, it was--we were being asked to prepare a plan that was in the format of a boilerplate, to have a boilerplate that had been established by Savannah River for award fee periods beginning October 1, 1989, and thereafter.

Q. Was the plan you were creating going to change the existing procedures for determining Rockwell's award fee?

A. Yes, there were changes from the previous approach.

Q. What were those changes?
A. I can't say that I even remember them all, but one of them was that there was going to be a performance evaluation plan that was referred to in the contract, but separate from the contract, and it laid out objectives and criteria that the contract would be evaluated on, and as I recall, included headquarters' involvement in the decision. Let me rephrase that. It required, as I recall, the fee determination official to seek concurrence from headquarters on decisions that--prior to his decision.
Q. Do you recall any other changes that were being made in preparing this plan which was to come into effect beginning for the fiscal year 1990?
A. No, not anything significant as I recall.
Q. What do you consider was insignificant that was being changed?
A. Nothing that I recall. I just can't remember anything, any more details about the differences between those two approaches.
Q. You said that one of the changes was that the performance evaluation plan was to lay out objectives and criteria for evaluating Rockwell's performance under the contract. Was it your understanding that for the fiscal year 1989 there were no objectives or criteria

laid out for that evaluation?

A. No, they were--as I stated earlier, they were in the form of letters from the area manager to Rockwell that supplemented the contract modification award fee.

Q. So in the new plan that you were preparing, was that changing the objectives and criteria?

A. No. It didn't change anything for fiscal year 1989, if that's what your question is.

Q. No, my question is did the plan that you were preparing set out different objectives and criteria for fiscal year 1990 than had existed for fiscal year 1989?

A. Yes.

Q. What were the changes in those objectives and criteria?

A. Well, I believe it could be characterized as a more formal approach to establishing objectives and criteria. But as far as me being able to tell you what the changes--what the differences were, I can't tell you, because we never finalized that plan. There were several versions of it, but we never finalized it. So I can't tell you what the differences were.

Q. Was there a consideration to make the environmental safety and health area a more significant

area for evaluation?

A. Yes, I believe there was.

Q. Did the new plan call for other areas to be weighed to a different extent than they had been weighed for fiscal year 1989?

A. Do you mean by giving a percentage of the total award fee available; is that what you mean by "weighed"?

Q. Yes, um-hum.

A. There may have been. I don't really recall. I know there was at some point a direction from headquarters to weigh SAE at a certain level, but I don't remember when that came to us. I don't remember the time period. So I don't know whether we had that at the time we were preparing this plan that was to be effective October 1, 1989.

Q. Was preparation of the plan being directed by headquarters?

A. Do you mean the format?

Q. Let me reask the question. Was headquarters instructing the Rocky Flats area office to prepare a new plan?

A. That was my understanding. That was because that at that time--it was my understanding that we reported directly to headquarters starting in the fall of

'89 sometime.
Q. Prior to that period?
A. So it would have been--it was my understanding that we were preparing it in the Savannah River format, at headquarters' request.
Q. Prior to that period, the Rocky Flats area office had reported to Albuquerque; is that correct?
A. That's correct.
Q. And after the changes took place in the fall of 1989, the Rocky Flats area office reported directly to headquarters; is that correct?
A. That's correct. And I believe they changed our name to the Rocky Flats office at that time, in the fall of' 89.
Q. Was headquarters requesting that specific objectives or criteria be implemented in this plan that you were preparing?
A. I'm sorry, but I don't recall.
Q. Now, is it true that your role in preparing this plan was one of a coordinator?
A. Yes.
Q. Did you have any other role in preparing the plan?
A. No, I don't--
Q. Who told you to begin preparing the plan?

A. Probably Mr. Barkmeier.

Q. When was that?

A. As I recall, I started doing that in--I can only guess, but I think it was September of 1989. It could have been August, but I just don't recall.

Q. How did you go about preparing the plan?

A. Well, I started going about coordinating its preparation by obtaining a copy of the Savannah River plan that had been sent to our office or obtained by the area manager. Anyway, I was given a copy of it. And we distributed that to the branch chiefs, and as I recall, we asked them to prepare objectives and criteria in their areas, similar to the approach used by Savannah River. And at the same time, Mr. Barkmeier and I and this Mr. John Wilcynski were preparing the administrative procedures part of that. There's actually two sections of that plan; the first plan covers how the process works, the second part covered objectives and criteria that laid out the goals for the contractor. So we, the three of us, worked on that first part, and revised it several times. And the branch chiefs were responsible--or the directors, whatever they were called at that time--were responsible for preparing some proposed objectives and criterias in the various areas of performance, which I don't recall what they were even.

Q. Of the three changes you talked about that were going to be implemented through this plan, the first you mentioned was that the performance evaluation plan was to be referred to in the contract by a separate document from the contract. Would that have been in part one of the plan?

A. As I recall, it was--I guess I don't understand the question. Would you try it one more time.

Q. You mentioned that there were three changes that you recall that were being made in the plan that you were coordinating in its preparation, and one of those changes was to make the plan a more formal document, and referred to in the contract by a separate document from the contract. How was that change to be implemented?

A. As I recall, when we were under Albuquerque, those kind of things were addressed in a contract modification--an annual contract modification that laid out the fee for that fiscal year, and the rules for earning that fee for that year.

Q. So do you think that would have been implemented through a contract modification?

A. Yeah. And I think the difference is that we would have had a contract modification that would have--where we would have agreed to the fee, and it would have referred to a plan, and all those words about how

the process worked and all that, and how they would be in this plan that was just referenced in the contract. That's the way it is now, so I think that's what was being contemplated at the time.

Q. Did you ever assist in preparing a modification to the contract to implement those changes?

A. No. I don't recall ever working on one.

Q. The second change that you mentioned was a change in the objectives and criteria for evaluating Rockwell's performance under the contract. Is it correct that those changes would have been made by the branch chiefs, or whatever they were called at that time?

A. Yes. Like I said, they were expected to submit suggested performance objectives and performance criteria under each objective. Whereas for 1989--that would have been different than the way we did it in 1989, yes.

Q. The third change you mentioned was requiring the award fee determination official to seek headquarters' concurrence in making an award fee determination. Would that have been implemented through part one of the plan you were preparing?

A. Yes, it would have addressed it in part one.

Q. Did you ever discuss the change relating to headquarters' involvement with Mr. Goldberg?

A. No.

Q. Did you ever discuss that change with Mr. Barkmeier?

A. Well, as a direct report to Mr. Barkmeier during most of this period, I assume I did. I don't remember the discussions.

Q. Do you remember the substance of them?

A. Again, the discussions about the headquarters--would you help me out? What do you want me to respond to?

Q. Did you ever discuss with Mr. Barkmeier the change that was being made to the plan that related to headquarters' involvement in the award fee process?

A. I really don't recall any discussions with him on that subject, although I know we wrote that part one, and it is, as I recall, included in there. But I don't remember discussing it with him.

Q. Now why was that included in part one?

A. As I recall, it was in the Savannah River boilerplate.

Q. And you were given the Savannah River boilerplate to include in the Rocky Flats plan; is that right?

A. Yes.

MR. KELLEY: Off the record.

Q. Anyone else?
A. My supervisors.
Q. And who would they be?
A. Hugh Miller, Jerri Adams, that's J-e-r-r-i, Adams, and Marshall Bishop.
Q. Anyone else?
A. I don't understand whether it's anybody I ever discussed the subject with or--
Q. Yes, anyone who you have discussed--
A. --or mentioned the word or--
Q. --the subject of the litigation with. Not--now I'm not asking you for all the people with whom you have discussed Rockwell's award fee, but I'm asking you with whom you have discussed the litigation connected with Rockwell's award fee.
A. I mentioned it to several people that I was getting deposed today, but that's--I don't know if you consider that discussing.
Q. So you didn't have any substantive discussions with those people about the litigation?
A. No.
Q. But you did have substantive discussions with the six people that you named concerning the subject of litigation?
A. No, I don't believe that you would define it

UNITED STATES CLAIMS COURT

Case No. 91-1362 C

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF TERREL AGY
VOLUME II

December 9, 1992

Pursuant to Notice taken on behalf of the Plaintiff at 1719 Emerson, Denver, Colorado 80218, at 9:40 a.m., before Donna E. French, Registered Professional Reporter and Notary Public within Colorado.

information"--I mean, "award fee evaluation and recommendations to Albuquerque. Upon the delegation to RFO of the AFDO designation, parenthesis, see Twining, slash, Simonson memo of 10/13/89, this 9/21/89 memo became obsolete and was superseded by the October 6, '89, memo from C. Barkmeier to staff. The meeting was brought--was held on October 13, 1989, by Simonson."

Q. Mr. Agy, I'm handing you a document that's previously been marked as Exhibit 27. Is this the October 6 memorandum that is referred to in the note you just read?

A. I believe it is.

Q. Mr. Agy, as of October 3, 1989, was it still your understanding that the Albuquerque office would be playing the lead role in the award fee process to Rocky Flats?

A. I don't know. I don't remember. That's only three days before this memo. I don't remember the time frames that closely.

Q. I'm handing you a document that has previously been marked as Exhibit 116. Would you please look at the first page and tell me whether the handwriting on that page is yours.

A. Yes, it's mine.

Q. What does the note at the upper right-hand

corner say?

A. "For first RFO CPAF meeting, 10/3/89."

Q. Was there a meeting held at the Rocky Flats office with respect to Rockwell's award fee on October 3, 1989?

A. That appears to be the case according to my note anyway. Would you please rephrase--I mean, restate the question so I make sure I'm answering precisely what you asked.

Q. Was there a meeting at the Rocky Flats office with respect to Rockwell's award fee on October 3, 1989?

A. Yes, it appears to be, like I said earlier, yes.

Q. Was the document that is marked 116 prepared by you?

A. I believe it was. Has my name and date.

Q. Was that document prepared for the October 3 meeting?

A. Yeah. This document does appear to be something I put together for a meeting at Rocky Flats on October the 3rd. It's a compilation of input. That appears to be all dated that same day and prepared for that meeting apparently.

Q. How did you receive the input?

A. I assume you are referring to the attachments in a different--

Q. Well, you just mentioned that the document is a compilation of input.

A. Yes.

Q. Where did the input come from?

A. From the--from the branch chiefs of the Rocky Flats area office. I believe they were called branch chiefs at that time.

Q. Who were the branch chiefs at that time?

A. In looking at the names on the submissions here--it doesn't say. I guess I don't recall all the names of the branch chiefs, but I just read attendees that I have listed here on the front page of this document, and I see that there--they weren't all branch chiefs that attended the meeting. And the names on some of these documents are higher than branch chief level.

Q. Who were the people who attended the meeting?

A. The list says here Werkema, Foster, O'Brien, Witherill, Barkmeier, Miller, and Agy.

Q. And you are reading from your handwritten list on the first page of the document?

A. Yes, I am.

Q. Were there any other attendees you can think of who are not included on the handwritten list?

A. Not that I recall.

Q. Did all of the attendees provide input to this document?

A. Generally they were all--they would have all supplied something, some input from the meeting, but I can't tell from what we have in--what I have in front of me as to whether they all provided something. Several of them did. I'm not sure that all of them did.

Q. Who can you tell with any certainty did provide input?

A. O'Brien, Miller, Barkmeier, Werkema, Foster, and I guess the only one I'm not sure about is Witherill. I don't see anything that's--with his name on it or any reference to his name.

Q. Did anyone not included on the list provide input to the document?

A. Normally this input would have been put together by the branch chiefs or members of the branch chiefs' staffs. And it possibly could have been edited by them and by the person who brought it to the meeting after the branch chief got done with it if it wasn't the branch chief that attended the meeting.

So I guess the answer to this, obviously, based on previous practice, it has to be yes, that there were other people who input here, but their names wouldn't be known to me.

Q. These people would be on the staff of the various branch chiefs; is that right?

A. Yes, they would be DOE employees on the staff of one of the branches.

Q. Which of the people listed of the attendees were branch chiefs?

A. I believe Mr. Miller was a branch chief at that time.

Q. What was he branch chief of?

A. Contracts and something to do with contracts. I don't remember the exact title at that time.

Q. Who else?

A. I'm having trouble answering your question because I--as I recall, around this time there was a reorganization, and some of these individuals were called directors and maybe even assistant managers. And so I don't know what to call them at this moment because I don't remember what their titles were at that time.

Q. Were all of the people listed here either

branch chiefs or directors or assistant managers?

A. I believe they were and it may have been some of them in acting capacities, other than myself, that is. I'm not a branch chief.

Q. Let me direct your attention to the page in Exhibit 116 that is stamped at the bottom right-hand corner E 000631. That page contains handwriting. Do you know whose handwriting that is?

A. That appears to be my writing.

Q. Did you place that handwriting on the document during the October 3 meeting?

A. I don't exactly recall, but I assume that's the case, that I wouldn't have any basis for doing it prior to the meeting.

Q. Why would you have put the handwriting on the document?

A. I don't precisely recall, but it--most likely it's based on discussions at that meeting and reclassifications of these things by the members at that meeting. It reflects their wishes or would have reflected their wishes.

Q. Did it reflect a consensus of the members of the meeting?

A. That was generally the case, yes, they would discuss it. I don't recall precisely on this,

but that was generally the case.

Q. Did the attendees of this meeting constitute the performance evaluation committee?

A. It doesn't say. I don't recall.

Q. Directing your attention to the pages that are stamped E 000632, 633, and 634, those pages also contain handwriting. Is the handwriting on those pages yours?

A. It appears to be mine, yes.

Q. Was the handwriting on those pages also placed there by you during the October 3 meeting?

A. Most likely.

Q. Why was the award fee process transferred from Albuquerque to Rocky Flats?

A. Was your first word "how"?

Q. Why.

A. Why. I don't believe I have firsthand knowledge of why.

Q. Did you ever hear a reason why?

A. I have a general recollection of, I suppose, things I heard that--

Q. What is that recollection?

A. I believe I heard that Mr. Twining thought it would be more appropriate for the Rocky Flats office to make those decisions. Exactly why he felt that way,

I don't know.
Q. Do you have a general understanding why?
A. Well, I assume it's because he--he didn't have a lot of control over that office anymore.
Q. Over the Rocky Flats office?
A. Yes. That's my understanding.
Q. After June 6, 1989?
A. Yes, that's my understanding.
Q. Mr. Agy, I'm handing you a document that's previously been marked as Exhibit 117, which, like Exhibit 116, is also entitled Performance Appraisal, Rockwell International. This document contains handwriting on the first page. Is that handwriting yours?
A. It appears to be. I can't read all of it, but it appears to be my handwriteing.
Q. Can you read the note at the upper right-hand corner? It's not very clear on this copy. Unfortunately this is the only copy I received from the--
A. I'm not sure if you want me to guess. I think it says, "PEC meeting." PEC meeting.
Q. Is there a date in front of that?
A. Yes. It appears to be a date 10/10/89, would be a guess, but it's not clear.

Q. Below that there's a list of names. Were those the people who attended that meeting?

A. Most likely, yes, sir.

Q. Was there a meeting on that date?

A. Apparently. It appears to be 10/10/89, but I'm not sure. And it generally was reflective of a meeting, yes. When I list the attendees, that would be a meeting.

Q. Did you prepare this document?

A. It appears that I did. My name is on the bottom of it.

Q. And did you prepare it on October 6, 1989?

A. Yes, I believe I probably did. That's how I generally did it. I dated them the day I prepared them or the day I assembled that information.

Q. Was this document put together by you in preparation for the 10/10/89 PEC meeting?

A. It would appear that I put it together for that meeting. I believe it says, "PEC." I'm not positive about that.

Q. Directing your attention to Exhibit 116 once more, I note in this document there are no adjectival grades listed; is that right?

A. I just leafed through the document, and you seem to be right. I don't see any adjectival

grades.

Q. In Exhibit 117 there do appear adjectival as well as numerical grades, sometimes written in hand, sometimes typed. Where did you obtain the adjectival and numerical grades to put in Exhibit 117?

A. The normal procedure would be to have received those from whoever was inputting this information. It would--either they'd put them there or they told me what they wanted to be put there.

Q. Who were the people providing input to the document that is Exhibit 117?

A. Well, normally that would be various people. Could be anybody that worked for DOE at Rocky Flats that would have initially written some of these things. Like I said earlier, they would have run--been reviewed by their supervisors and then in turn that person's supervisors. And I'm not specifically--I don't--let me rephrase that. I'm not sure exactly who wrote all this, but the people listed as the attendees would be the ones who are representing those--whoever has written it.

Q. Could you read off the people who attended the meeting who you believe provided input to the document.

A. It's a hard question to answer. Obviously

Rosseau and Werkema--well, wait a minute. That's not--you are asking who on the list provided--

Q. Well, why don't you just name for me all the people you can who provided input to this document.

A. Bill Rosseau and George Werkema, Claude Barkmeier, Jack O'Brien, Hugh Miller, Don Riley, Vern Witherill, Bill Rask. I'm just reading the names that are noted here. Ron Foster, Hugh Miller--I may have mentioned his name already, but--that's the only ones that are noted here. I'm not sure if there's others.

Q. I note that included in your list of attendees is a Mr. Ostmeyer. Did he provide input to the document?

A. I don't recall.

Q. Did Mr. Simonson?

A. I don't recall. His name isn't noted here as--like some others are.

Q. By being noted in the document, do you mean included in parentheses?

A. Yes.

Q. Within individual paragraphs?

A. Yes. And that would have been the person who submitted that or wrote it or--generally wrote it in or submitted it.

Q. Were the attendees that you have listed members of the performance evaluation committee?

A. I don't recall the--whether there was a membership list. I don't--I don't remember.

Q. On the first page of the document under the FPA General Management and next to the heading Adjectival Grade, there's some handwriting. Is that your handwriting?

A. It appears to be.

Q. Can you read it?

A. It says, "Good"--there's another word there, but I--it's not readable. And then there's a numerical grade 80 something, but I can't read it either since the second number is not clear.

Q. Down farther on that page in the left-hand margin there's also some handwriting. Is that yours?

A. It appears to be.

Q. What does that say?

A. It says "To o-b-s," but it's--that would have meant that we were transferring that from an achievement to an observation.

Q. Would that kind of a comment have been made during the October 10 meeting?

A. Most likely, yes.

Q. Would that have been the consensus of the

attendees of the meeting?

A. Yes, that was generally the case. I don't remember precisely, but that was generally the case.

Q. Is that also the case with the handwritten adjectival grade and numerical score that's placed under General Management? In other words, were those arrived at during the meeting?

A. I don't recall precisely, but I assume that that was the case, yes, that there was a consensus that that's what the score should be and--yes, or at least that's what the recommended rating was.

Q. Please direct your attention to the page that is stamped E 000595. This page was to the FPA cost management, and after adjectival grade is typed "excellent" and, parentheses, "93," and written in hand after that appears to be the letters "O-K." Is that your handwriting?

A. It appears to be.

Q. Does that say, "OK"?

A. Yes, it does.

Q. Why would you have placed that there?

A. Well, I don't recall precisely writing it there, but generally it would reflect that the board looked at that or the--this committee or whatever it was looked at that and agreed with that number, that

adjectival rating. So I made a notation probably that they had at least at this point thought that was a fair score.

Q. Was it one of the purposes of this meeting to arrive at a recommended adjectival and numerical grade for the various FPAs?

A. Yeah. Part of the recommendation process would have been to recommend to the manager what the adjectival and numerical scores--to recommend an adjectival and numerical score for his consideration.

Q. Please direct your attention to the following page, which is stamped E 000596. This page relates to the FPA quality and adjectival grade. It's typed in "excellent" and in parentheses, "91"; is that right?

A. Yes, that's what it means.

Q. There's a handwritten note to the right of that. Is that your handwriting?

A. Yes, it appears to be mine.

Q. What does that say?

A. It says, "Grade may not hold when ES&H is considered."

Q. Why did you write that?

A. I don't recall precisely, but I assume it's a comment made at the meeting that I more or less

recorded for the record.

Q. Do you recall what that comment related to?

A. No, I don't recall.

Q. Please direct your attention to the page in the exhibit that is stamped E 000598, which relates to the FPA chemical operations. What is the adjectival and numerical grades that are typed on that page?

A. Would you repeat that, please.

Q. What are the adjectival and numerical grades that are typed on the page for the FPA chemical operations?

A. It says, "very good" with a grade of "90."

Q. There's some handwriting next to that. Is that your handwriting?

A. It appears to be mine.

Q. The 90 has a circle drawn around it and a line drawn through it. Did you make those notations?

A. Most likely.

Q. There's also some writing immediately adjacent to those notations. What does that say?

A. It says, "86 per Rask."

Q. Now, I'm referring to the handwriting immediately adjacent to the circle.

A. It says, "Werkema," as in George Werkema.

Q. Why did you draw a circle and a line through the 90?

A. Well, I don't remember precisely, but I think it was probably because I was--that was Werkema's initial recommendation.

Q. And what does the "86 per Rask" mean?

A. Most likely that was what Mr. Rask recommended after discussion with the committee or board.

Q. Please direct your attention to the page in the document that is stamped E 000602, which relates to the FPA production operations. What are the adjectival and numerical scores that are typed on that page?

A. Very good, and the numerical score says, "86, dash, 90."

Q. Now, there's some handwriting immediately around those scores. Is that your handwriting?

A. Well, I assume it is, but I'm not sure about that. Doesn't quite look like mine in this case, but there's a good chance it is anyway.

Q. What does the handwriting say?

A. It apparently says--changed the very good to an excellent.

Q. What did you do with the numerical score?

A. Apparently the numerical score was settled on at a 91.

Q. Settled on at the meeting?

A. Yes. At apparently the meeting the recommendation was that it be a 92, at least that's what the notes indicate, and these are generally the notes that I took during the meeting.

Q. Is the typed parenthetical to the right of the numerical score stricken out by the parenthetical which reads, At first meeting was 95 but def was since added? "Def," I assume, meaning deficiency?

A. Yes, you assume correct. And yes, it does appear to be scratched out, which means it wouldn't be included on the next version.

Q. Please direct your attention to the page in the document stamped E 000605, which relates to the FPA environment, safety, and health. Next to the typed words "adjectival grade" is handwriting. Is that your handwriting?

A. Yes, it appears to be mine.

Q. What does that handwriting say?

A. I don't precisely recall the writing on this or precisely what it meant, but it appears to mean that--appears to indicate that Mr. Ron Foster

recommended an 81. And that's contrasted with Mr. Goldberg's recommendation for the previous period, which was apparently a 79. And yet there's another score that says 78, and I believe it says "Simonson" above that.

Q. That--that score and name is circled.

A. Um-hum.

Q. What does the circle mean?

A. I'm not sure. I would have to look at the next version to see whether--which one I picked up and used.

Q. What does the rest of the handwriting say?

A. It appears to say, "Simonson, colon, add critical report information as deficiency." Then there's a parentheses, but I'm not sure what that says. It appears to say, "Ron," who was the same Ron as Ron Foster, but I'm not sure that's what that says. It appears to be cut off.

Q. Do you know what that note means?

A. Well, appears to be telling us to add a deficiency concerning the crit report. It says, "Add crit report," but I don't know what the objective of that was.

Q. Does the note indicate that that comment

came from Mr. Simonson?

A. It does tend to indicate that, yes.

Q. Please direct your attention to the page in the document stamped E 000607. There's some handwriting on the left margin on that page. Is that your handwriting?

A. I believe it is.

Q. What does that note mean?

A. Well, I just looked at--it refers to general management Deficiency No. 3, and I turned up to page E 000592 and looked at that one, but offhand I don't see any correlation, so I--I'm not sure what it means.

Q. Now, were all the handwritten markings on this document placed there by you at the October 10 meeting?

A. I believe that's generally true. I--I don't know how I could tell you exactly yes or no at this point, but I see one notation on the front that says something about Claude Barkmeier on the 11th, so I guess I may have made that notation on the 11th. But I think for the most part that's probably true, that these notes were made at the meeting which apparently was on the 10th.

Q. Mr. Agy, I'm handing you a document that

has previously been marked as Exhibit 118, which is a memorandum from Mr. Barkmeier to Michael Frietze, dated October 12, 1989, with attachment. Please review the document and tell me if you've ever seen it before.

A. Yes, I've seen it.

Q. There's handwriting on the front page of the exhibit. Is that yours?

A. Yes, it is.

Q. What is the handwriting referring to on the first page?

A. It's referring to Albuquerque's--let me start all over. It's referring to our--the opportunity we gave Albuquerque to comment on the PEC report and the fact that they're not going to comment.

Q. They did not comment on the report; is that right?

A. That's what my note indicates.

Q. Do you know why they didn't comment?

A. No, I don't have personal knowledge as to why they didn't.

Q. Did you remember a reason why they didn't?

A. I don't recall.

Q. Do you have any idea why they did not comment?

A. No, I really don't know why they didn't

comment.

Q. What was the purpose of this document?

A. Well, like it says in the letter, some of the--it--this document includes some of the initial evaluation comments made by Albuquerque directors because that was the process, we always sought their input. And it was just a courtesy, I assume, to run this past them and see if they had any comments on the complete report.

Q. Is the attached performance appraisal the recommendation of the performance evaluation committee at Rocky Flats for the award fee for the second half of fiscal year 1989?

A. Well, it's not--it doesn't appear to be the formal one because it would have a cover sheet on the front signed by the chairman. It was probably a--as it shows here, it was one of the many versions. This is Version 6. But it was apparently at such a point that Mr. Barkmeier wanted to get Albuquerque's reaction to it.

Q. Now, I'll show you later a document that is signed by Mr. Barkmeier that contains the performance evaluation review board recommended award fee. Did the performance evaluation committee ever prepare a recommended award fee that was signed by the

chairman of the performance evaluation committee?

A. Not that I recall. I don't believe that there was ever such a report that was signed.

Q. So this is the performance evaluation committee's recommendation; is that right? And I direct your attention to--

A. That's what it indicates, yes.

Q. That's what the memorandum indicates, doesn't it?

A. Yes.

Q. Please direct your attention to the page in the document that is stamped E 000559. There is handwriting on that page. Is that your handwriting?

A. It appears to be mine.

Q. Can you read the note at the upper right?

A. Yeah. That was just some notes that I had made trying to determine whether the unclassified control nuclear information was in the report.

Q. In the box at the top of the page of the right-hand side is typed "V.6." What does that mean?

A. It stands for Version 6. It was an attempt by me to keep track of the various versions so I didn't lose track of which ones had been superseded.

Q. And also in that box is typed "RFO PEC Draft." Does this mean Rocky Flats office performance

evaluation committee draft?

A. Yes, that's what it stands for.

Q. Does this draft contain any numerical scores for the various FPAs?

A. I'd have to leaf through it to find that out, but it doesn't appear to have any. It just has adjectival grade recommendations.

Q. Toward the end of the document are two pages. Let me direct your attention to those. They are pages stamped E 000585 and 586. Those pages contain numerical scores, don't they?

A. Yes. So that the report does include numerical recommendations, yes.

Q. But not within the text; is that right?

A. Yeah, I believe you are right. I didn't see any in the text; just as an attachment.

Q. Are the numerical scores that are contained on the pages E 000585 and 586 the performance evaluation committee's recommendation of award fee scores for Rocky Flats?

A. Yes, that's what it appears to be.

Q. For the second half of fiscal year 1989; is that right?

A. Yes.

Q. What is the overall grade recommended by

the performance evaluation committee for plant?
A. For plant it's--appears to be 85.7.
Q. What dollar award fee does that correspond to?
A. It indicates here that it's calculated to be $3,167,000 approximately.
Q. What is it precisely?
A. $3,167,456.
Q. What is the overall grade recommended by the performance evaluation committee for PRMP, slash, PROVE?
A. Indicates on this document that it's 89.4.
Q. And what dollar award fee does that correspond with?
A. $636,543.
Q. Let me direct your attention to the last two pages of the exhibit, which are stamped E 000587 and 588. Did you prepare those two pages?
A. Yes, I must have. I didn't even remember this, but yes.
Q. Are they your minutes of the PEC meeting that took place on October 10, 1989?
A. Yes, that's what the document indicates.
Q. Were the people listed at the top of the

page stamped E 000587 members of the performance evaluation committee?

A. Some of them are members apparently and some of them are not.

Q. Who were members?

A. It indicates that Mr. Foster, Mr. Rask, Mr. Ostmeyer, and Mr. O'Brien were members, as well as Mr. Barkmeier, who was the chairman.

Q. Were you a member?

A. No.

Q. What was your position?

A. It indicates there that I was executive secretary.

Q. Of the PEC?

A. Yes, that's what it says. That's what it says, all right.

Q. Do these minutes accurately reflect what took place at the PEC meeting on October 10, 1989?

A. As I recall, they do. It was certainly my intention to reflect that.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 119. Please review the document and tell me if you prepared that document.

A. Yes, I prepared this document.

Q. What is the document?

A. It's another version of the recommendation being made to the manager by the--but I'm not sure whether it's the board or the PERB or the PEC. It doesn't say.

Q. Now, I note that in the box at the top of the first page on the right-hand side of the box is typed "V.6 w/o." The previous exhibit we looked at you said was Version 6.

A. Yes.

Q. What does the "V.6 w/o" mean?

A. As I recall, the only difference would have been that this is Version 6 without the scores.

Q. Without the adjectival grades?

A. Without any of the scores being identified. Now, it may not read precisely like 6 did, but there may have been some changes. But without reading it and comparing it, I wouldn't be able to tell you that.

Q. Why was this document prepared?

A. Why?

Q. Yes. Why was it prepared, that it didn't have adjectival or numerical scores?

A. As I recall, this was the version that was shown to and discussed with Rockwell by--I'm not sure

who. Apparently Mr. Simonson.

Q. Is the handwriting on the first page of the document yours?

A. Yes, it appears--well, some of it is. The top one is.

Q. The one that starts "From CB"?

A. Yes.

Q. What about the note just underneath that that starts, "Response"?

A. That doesn't appear to be mine.

Q. What about the handwriting on the left-hand margin--

A. No.

Q. --that says, "Insert"?

A. No, that's not my handwriting.

Q. What does your note say on the front page?

A. It says, "From CB 10/26/89. Changes requested by D. Simonson as result of 10/13/89 meeting with Rockwell. Per CB, no written comments were"--and I believe that's supposed to say sent or received. It probably said received, "recd." I bet that is--that's a guess, but I believe it says, "no written comments were received from Rockwell."

Q. Who is CB?

A. That's Claude Barkmeier.
Q. Were written comments received from Rockwell on this draft?
A. Not to my recollection.
Q. Did you prepare this draft on October 13, 1989?
A. The date on the bottom of it would indicate that I did, so I generally did reflective of the date I prepared it, so I assume it was done so on that day.
Q. Are any of the handwritten comments following the first page made by you?
A. Looks like there's a note on E 000506 where I--looks like I signed it and dated it, but I can't read the note.
Q. That's the note on the left-hand margin?
A. Yes, in the center.
Q. Is anything else on that page yours?
A. It doesn't appear to be mine. I don't recognize that. The writing isn't mine. The rest of it isn't anyway. I should probably point out that these check marks are probably mine.
Q. The check marks on--that are on a number of the pages?
A. Most likely those are mine. I generally

checked them off as I incorporated them into the next version so I would keep track of where I'm at.

Q. Other than the check marks and the note on the front page, which is E 000497, and the one note on the page that's stamped E 000506, are any of the handwritten marks yours?

A. No, I don't believe they are.

Q. So do the check marks on Exhibit 119 indicate that you incorporated the changes that were indicated in that draft in the next draft?

A. That's generally what they would mean, yes. I can't say that I--that they are reflected in the next one, but that would--that--

Q. That was your practice?

A. That's a notation that I made to me to keep track of where I was at to make sure I incorporated all the changes in the next version.

Q. That was your practice?

A. That was my practice, yes, sir.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 120. Did you prepare that document?

A. Yes, I believe I did.

Q. Is that your signature at the bottom?

A. Yes, it is.

Q. What was the purpose of the document?
A. I believe the purpose of the document was just to record for the--my information the--the information I knew about the meeting with Rockwell that had taken place.
Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 121, which is entitled RF PERB meeting October 27, 1989, Agenda Suggestions. Have you ever seen that document before?
A. Yes.
Q. Did you prepare the document?
A. Yes, apparently.
Q. What is this document?
A. In general, it's a suggestion to the board as to things that need to be considered during their meeting.
Q. Is all of the handwriting contained on Exhibit 121 yours?
A. It appears to be mine, yes.
Q. Next to the first paragraph in the left-hand margin is some handwriting. What does that say?
A. Next to Item No. 1?
Q. Yes, next to Item No. 1.
A. It says, "None received."

Q. What does that refer to?

A. It refers to the fact that Albuquerque didn't respond to the October 12, 1989, memo from Mr. Barkmeier.

Q. And that memo solicited comments?

A. Yes.

Q. When did you place that handwritten note on the document?

A. I don't recall precisely, but I assume that this reflects the notes that I took at the meeting or meetings that apparently took place on this subject.

Q. Is that true of all of the handwritten notes that you placed on the document? Were they all placed there during the meeting or meetings of the PERB?

A. I believe that's true.

Q. Paragraph No. 2 is entitled Entertain Verbal Comments from AL Representatives. What is the handwritten note that you have next to that?

A. It says, "No show." That indicates that no Albuquerque representative attended the meeting.

Q. Why didn't they?

A. I don't know if I have an answer to that question. I didn't--I don't have any firsthand

information as to why they didn't.

Q. Did you ever hear why they didn't?

A. I don't believe I did.

Q. Paragraph No. 3 is entitled Reconsideration of GM Notable Deficiency No. 2, and you have some handwriting next to that. What does that handwriting say?

A. It says, "Adopt per 10/27/89 meeting."

Q. What does that mean?

A. I'll have to think about it for a second here. Now, this was a suggestion made by Vern Witherill that a deficiency that was identified at the midterm--in a midterm evaluation for this period be recognized as an observation for the final evaluation rather than a deficiency because of apparent improvements that Rockwell made since the midterm evaluation was made.

Q. What does your handwritten note mean, then?

A. Means that the board agreed with Vern and adopted his suggestion.

Q. You attended this PERB meeting; is that right?

A. Yes.

Q. How would that suggestion be adopted? Was

it put to a vote?

A. Generally not as a formal show of hands or--as I recall, it would be discussed, and if no one objected, then someone would say, "Well, let's go ahead with that."

Q. What happened if someone objected?

A. They would generally discuss it more, and they would generally reach a consensus as to what everybody wanted to do.

Q. Paragraph that is typed No. 4 reads, "Consider other changes and suggestions to the PEC draft evaluation report." There's some handwriting next to that. What does that say?

A. It's not all there. Some of it's crossed out--cut off, but I believe it says, "None offered other than from PERB members verbally," with a note on that that says, "See No. 5 below."

Q. What does that note mean?

A. I'm not sure at this time. I--I believe it probably means that item--agenda Item 5 there says that they were to review and approve the final approved version of the board report, which would most likely have included all the verbal changes that the PERB members had made and since the last time they had met. And by approving that, they approved all the changes

A. Well, assuming I read that properly, I think that says RAT. I'm not sure. I'm not--this note doesn't make any sense to me at this time. There was a RAT team based out of Idaho. DOE office in Idaho, there was some sort of response team to environmental problems. That's my recollection, anyway. And if it was used in some other sense, I'm not sure what it meant. But like I say, it doesn't make sense to me at this point. I don't know why that note is on there.

Q. Did you prepare this document on October 27, 1989?

A. I would--the document would indicate that I did, yes. It says I did. That's generally the way I put my name on it and put the date on it I prepared it, so I assume I did, yes.

Q. What does the handwritten note on the upper right-hand corner say?

A. Well, it indicates that this was my copy of the agenda. And then it says also "10/31/89," also "11/1/89." So I assume my recollection is that we must have met three different times, on the 27th, the 31st of October, and then on the 1st of November also and it just took three meetings before we got through the agenda. That's my guess.

Q. Mr. Agy, I'm handing you a document that

has previously been marked as Exhibit 122. Have you ever seen this document before?

A. Yes. I prepared this document.

Q. Now, this document indicates that--well, strike that. According to this document, how many meetings of the PERB were there?

A. It says we met three times.

Q. What were the dates?

A. October 27, 28--

Q. Is that 28 or 29?

A. Oh, I'm reading--I'm sorry. I'm reading the wrong paragraph. Yeah. May be a discrepancy in the memo. Yeah. The first paragraph says that we met on the 27, 29, and on November 1.

Q. Does the body of the memo say something different?

A. Yeah. After the names of the attendees are listed, there's some indication there that we may have met on the 28th rather than the 29th. It's not--I'm assuming it doesn't make any difference.

Q. Directing your attention back to Exhibit 121 and the dates in the upper right-hand corner--

A. Seems to be a difference all right. There's the 31st mentioned here, so I couldn't

explain--let's see. Yeah. I agree that there's a discrepancy. I don't know how to resolve it at this point.

Q. Do you recall that there were three meetings of the PERB?

A. I think that's really clear that there were three meetings.

Q. Directing your attention to Exhibit 122, there are five names identified at the top of the first page. Were those people members of the PERB?

A. I don't recall whether there was any--ever a formal list of the members, but it indicates that the first two individuals were members, Mr. Barkmeier and Mr. Werkema, with Mr. Barkmeier being the chairman. Apparently the other two individuals, Aldrich and Reed, substituted for someone else, but I don't remember who they substituted for.

Q. And you were executive secretary to the PERB; is that right?

A. Yes.

Q. Does this document accurately reflect what took place at the PERB meetings?

A. I believe it was my intention to have it accurately reflect that. I--to the best of my knowledge, it does.

that's who Mr. Aldrich--if Mr. Foster was there. He left at some point, I don't remember when that was, left employment at Rocky Flats. Maybe Mr. Aldrich sat in for him. But seems like there was two acting assistant managers and then the PRMP project manager, as well as the division director of administration. I believe they were the members, as I recall. I think there was only four, but I don't recall precisely.

Q. Did you attend all of the meetings of the PERB for the second half of fiscal year 1989?

A. It's my recollection that I attended all the formal meetings at the PERB, yeah.

Q. Were there any informal meetings of the PERB that you were aware of?

A. No. There weren't any that I'm aware of.

Q. Let's take a break.

(A break was taken.)

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 123. Please review the document and tell me whether you prepared the document.

A. Yes, I--yes, I did.

Q. Did you prepare it on October 27, 1989?

A. It appears I did, yes.

Q. Directing your attention back to

Exhibit 122, was the first meeting of the PERB on October 27, 1989?
A. That's what it indicates, yes.
Q. Was Exhibit 123 prepared in preparation for the PERB meeting?
A. I believe so.
Q. The box at the top of the first page contains the typing "V.7." Does that mean this is Version 7?
A. Yes.
Q. And was this version the Rocky Flats office PEC draft prepared subsequent to discussions with Rockwell?
A. Yes, that's what it indicates. I believe that's the case.
Q. Is the handwriting on the first page of Exhibit 123 yours?
A. I believe it is.
Q. When did you place the handwriting on this document?
A. Well, like others, it's not dated, so it's not evident, but I believe it was done during the meeting of the board.
Q. Of the PERB?
A. At the PERB, yes. And it's one of those

three meetings.

Q. Were these comments put on during only one of the three meetings, or were there some comments that were placed on here as a result of all the three meetings?

A. I don't recall.

Q. How is it you would have marked up this draft at the meeting? Did somebody tell you to?

A. Most likely. Generally the board would review these documents, sometimes paragraph by paragraph. And if they saw something that they wanted to rephrase or delete or whatever, they would discuss it and decide on how they wanted it to read. I see some of the notations are abbreviations and things like that that I may have added myself, not necessarily at the meeting, where I was trying to identify all acronyms and so that it would read a little clearer.

Q. Would any of the substantive comments have been decided on by the PERB?

A. I believe all the substantive comments were made by the PERB.

Q. Did the PERB review Exhibit 123 paragraph by paragraph?

A. I don't recall. It does appear that way, but--with all the comments, but it's--I don't recall

whether they looked at every paragraph. They looked at the paragraphs that they wanted to look at.

Q. Do the check marks contained in Exhibit 123 indicate that you incorporated the changes by those check marks into the next draft?

A. That was my practice for doing that. I believe that's what they indicate. I'm not positive that each and every one of them indicates that, though.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 124. Did you prepare that document?

A. Yes, I believe I did.

Q. Did you prepare it on November 2, 1989?

A. I believe I did, yes. That's what it indicates.

Q. Is this document Version 9 of the performance appraisal of Rockwell?

A. Yes, that's what it indicates.

Q. And what is this document?

A. This apparently is the final draft of the PERB report after the--those series of three meetings were completed and my attempt to incorporate all their changes into the document they made at those meetings and anything subsequent to those meetings that they

told me to incorporate, which I'm not sure it's clear from here.

Q. This draft contains adjectival grades for the FPAs; is that right?

A. Yes.

Q. Were those adjectival grades decided on by the PERB?

A. Yes.

Q. Was each of the FPAs discussed by the PERB?

A. As I recall, they were, although there were so many in the PRMP area, they may not have discussed each and every one of them. I remember there was lots of them. As I recall, they did discuss them, though. But it's not clear from here.

Q. But your recollection is that they did discuss each one?

A. Yes, they generally did discuss each and every one.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 31, which is a memorandum from Mr. Barkmeier to Mr. Simonson, dated November 7, 1989, with attachment.

A. Yes.

Q. Have you ever seen this document before?

this type of a change, does that indicate that the person reviewed the document and concurred with it?

A. To me, it would indicate that they didn't object to its issuance, so I'm not sure that that indicated that they reviewed it.

Q. Were you aware of any PERB member who disagreed with the issuance of the recommendation to the manager that is Exhibit 31?

A. I don't recall any of the members objecting to it.

Q. Did any member ever express to you dissatisfaction with the PERB recommendation to the manager?

A. Not that I recall.

Q. Please direct your attention to the page in the exhibit that is stamped E 000332. That page contains a handwritten note. Is that note by you?

A. Yes, it is.

Q. The second sentence of the note talks about a "disk with all calculations, reports, forms, and letters for this evaluation," period; is that correct?

A. Yeah. I would have had it on a disk, yeah.

Q. What does that mean?

A. Yes.
Q. What does the note below that say?
A. It says that Hugh mailed a copy to Bishop on or about December 7, 1989, which indicates that my immediate supervisor, Hugh Miller, mailed a copy of it to Marshall Bishop, who was his immediate supervisor, or supervisor to be as the case may be. I think he must have been coming in about that time. And wherever Bishop was, he mailed him a copy so he could see what was going on.
Q. Mr. Bishop was to replace Mr. Barkmeier; is that correct?
A. Yes, that's correct, as a director.
Q. Do you remember when Mr. Bishop arrived at the Rocky Flats plant?
A. No, sir, I don't.
Q. Was it in December of 1989 or January of 1990?
A. As I recall, it was sometime in December.
Q. Did you ever speak with Mr. Bishop about the document that is Exhibit 32?
A. I assume I have. I don't recall the instances when I did, but I--because it did come up, as I recall, later.
Q. What was the nature of those discussions?

Q. What were the changes being mandated by headquarters?
A. At the time we wrote this memo, which appears to be January 10, 1990, I'm not sure we knew.
Q. Had Mr. Inlow already had his telephone conversation with Mr. Miller at this point?
A. Yes.
Q. Was that one of the changes being mandated by headquarters?
A. That was apparently a potential change. I don't know if we knew any more specifics than that, though, at the time.
Q. Mr. Agy, I'm handing you a document that's previously been marked as Exhibit 34, which is a record of telephone conversation, dated January 11, 1990, with a time of 8 a.m. Did you prepare that document?
A. Yes, I did.
Q. On January 11, 1990, at 8 a.m., did you have a telephone conversation with Mr. Inlow?
A. Would you repeat that, please.
Q. On January 11, 1990, at 8 a.m., did you have a telephone conversation with Mr. Inlow?
A. Yes. My record of telephone conversation indicates that.
Q. Why did you place that call to Mr. Inlow?

Or did you place the call to Mr. Inlow?

A. Yes, I placed a call to Mr. Inlow.

Q. And he returned your call; is that right?

A. Yes, I believe that's what the memo indicates.

Q. Why did you call Mr. Inlow?

A. Well, the memo indicates that Mr. Bishop asked me to do so and that we wanted to get the status of headquarters' actions regarding our manager's--that is the December 6, '89, request for concurrence, what the status of headquarters' actions was on that package, I guess.

Q. Were you also calling Mr. Inlow to discuss his telephone conversation with Mr. Miller of December 20?

A. Yes. That's what my memo indicates.

Q. What did you talk to Mr. Inlow about concerning Mr. Inlow's December 20, 1989, telephone conference with Mr. Miller?

A. I don't remember a whole lot about it, but I--obviously my memo says that Inlow advised us that Mr. Barr had instructed his staff to recalculate the award fee to a level not higher than the period ending March 31, 1989, for plant, and that on the PRMP/PROVE award fee pool, that the information had been given to

Bruce Birnbaum and he had beat on it.

Q. Who was Mr.--is it Birnbaum?

A. I believe it is. B-i-r-n-b-a-u-m.

Q. Who is he?

A. I don't believe I ever met the gentleman, but he was, as I understand it, a headquarters' employee in the defense program's organization involved with oversight of the PRMP/PROVE project at Rocky Flats.

Q. He was at headquarters, then, right?

A. Yes.

Q. What did you mean when you state here that Mr. Birnbaum was to beat on PRMP/PROVE?

A. Well, I assume since I have "beat on it" in quotes, that that's something that Mr. Inlow had said. And I assume that it means that he was preparing to reduce the score in that area for whatever reason.

Q. Did Mr. Inlow tell you the reason?

A. If he did, I don't recall.

Q. So it was your understanding at the time Mr. Birnbaum was going to reduce the PRMP/PROVE award fee; is that right?

A. Yes, that was my understanding.

Q. Was the plant award fee also going to be reduced?

A. Apparently they were going to recommend to their own--some higher level in DP than they were to be reduced or at least reduced from the level that had been recommended by the manager.

Q. To a level not higher than for the first half of fiscal year 1989; is that right?

A. That's what it indicates, yes, sir.

Q. And that's for the plant portion, isn't it?

A. Yes.

Q. Please read aloud the last paragraph of the memorandum.

A. It says, "Inlow had the impression that it would be discussed with Simonson by Arendale and Willett, parenthesis, both of DP-20, end parenthesis, on 1/11/90, but that it pretty much was decided on already, colon, the headquarters' changes were going to be forced on us." End.

Q. Was that what Mr. Inlow told you in the telephone conversation?

A. Well, since I don't have it in quotes, I couldn't testify that that's what he told me. I must have had that impression from what he told me, though, that that was pretty much the--as he saw it. But it's not clear there that--exactly what he said, but that's

the impression I was left with after the telephone conversation anyway.

Q. So these may not be the words verbatim that Mr. Inlow used; is that right?

A. I believe that would be true, yes, they are not.

Q. But they do reflect what Mr. Inlow told you accurately; is that right?

A. Would you restate that, please.

Q. Do the words in your note accurately reflect the substance of what Mr. Inlow told you?

A. I believe so.

Q. What did you understand were the "headquarters' changes that were going to be forced on us"? And by "us," I take it you meant the Rocky Flats office?

A. Yes. Or on the manager, actually.

Q. What were those changes that were going to be forced on the Rocky Flats office or the manager?

A. At that time, I'm not sure I knew specifically except that his staff was going to review that information. So I think later we learned what some of their positions were, but I don't believe I knew at that time.

Q. Did you know at that time that the changes

were going to be reducing the award fee?
A. Yes, that was my understanding.
Q. Was it your understanding that the changes that were going to be directed from headquarters were going to be mandated on the Rocky Flats office?
A. I guess I had that impression, but I don't really--I never really knew how much legal room the manager had.
Q. After your conversation with Mr. Inlow, was it your understanding that the Rocky Flats office would have much legal room?
A. It didn't appear that we would have.
Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 133. Would you please review the document and tell me if you've ever seen it before.
A. Yes, I have seen all this information.
Q. Did you provide this information to Mr. Bishop on January 17, 1990?
A. Yes, it appears that I did. I don't remember doing it, but my note indicates that I did provide Mr. Bishop with a copy on January 17, 1990.
Q. Did you later make a presentation to the manager with respect to Rockwell's award fee?
A. My handwritten note indicates that there

headquarters' numbers; is that right?

A. Yes.

Q. So if you adopted the headquarters' numbers, you would have to rewrite the performance evaluation report; is that right?

A. That was my opinion.

Q. Is that normally the way the process worked, that the numbers were arrived at first and then the text for the performance evaluation report was written?

A. Well, since this is the first time that I have been--the first time we had our own board at Rocky Flats, I'm not sure I could state what the normal practice was.

Q. Was that how the PEC came up with its recommendation?

A. No.

Q. Is that how the PERB came up with its recommendation?

A. Generally the narrative--the achievements and deficiencies were identified first and then a score was discussed later.

Q. Can you think of any instance where the PERB came up with its recommendation other than that way?

A. Not during this period anyway. At Rocky Flats it wasn't done that way.
Q. With respect to any of the FPA categories listed on this page, had anyone from the PERB requested that you change any of the observations, achievements, or deficiencies?
A. I don't recall any of them having suggested that I do that. I mean, I--I wasn't doing this at their direction. I don't even think any of them were around anymore at this time.
Q. Had anyone requested you to change any of the observations, deficiencies, or achievements?
A. Did you say directed me or--
Q. Requested that you make those changes.
A. I don't recall that they did that. I wouldn't have the authority to change anything anyway.
Q. So you were making suggestions on how to conform to the rating plan if the headquarters' numbers were being adopted; is that right?
A. Yes, I agree that's a fair characterization.
Q. Turning to the next two pages in the exhibit, those stamped E 000253 and 254, did you prepare those two documents?
A. I believe I did.

the process. So in that respect, it added some time to it.

Q. It took away some control?

A. And it took--if not, it gave it a different flavor, anyway.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 136, which is a copy of the two top memos that are Exhibit 134 and 135, but Exhibit 136 has some handwriting on the front page. Is that your handwriting?

A. Yes, it is.

Q. What does your handwriting state?

A. It indicates that this document was originally received by Simonson from Admiral Barr on January 11, 1990, and that Mr. Miller had given it to me on January the 12th of 1990.

Q. Was Mr.--was Admiral Barr at the Rocky Flats plant on January 11?

A. I don't recall, but this note says, quote--it says that it's hand carried, so I assume that probably indicates that Mr. Simonson was in headquarters on that day, then carrying it back with him, but I'm not sure.

Q. And you received it the following day from your supervisor; is that right?

A. Yes, that's what my note indicates.
Q. January 12, 1990?
A. Yes.
Q. What does the rest of your note say?
A. It says, "Per Miller, Simonson does not agree with this and wants comparison with our proposal so RFO position can be developed."
Q. What does that note mean?
A. Well, apparently that was my marching orders for preparing that analysis I did on Exhibit 133. That's an assumption on my part. I don't remember, but I assume that was the information I had to go do this analysis.
Q. What did Mr. Simonson not agree with?
A. Well, I don't have any personal knowledge of what he didn't agree with. I didn't talk to him.
Q. You talked to Mr. Miller; is that right?
A. I talked to Mr. Miller. So I'm just kind of assuming that I had my facts straight when I wrote this note, but that's--I don't know exactly what he didn't agree with. It doesn't say.
Q. Would "this" refer to Mr. Tuck's memorandum?
A. You mean him not agreeing with--
Q. Yes.

A. The item that he didn't agree with?

Q. Yes.

A. I--well, yeah. He says he "does not agree with this," so it's on this document, so I assume it's--he supposedly didn't agree with Exhibit 136. But--but that's an assumption on my part or based on a discussion I had with Mr. Miller.

Q. What did Mr. Miller tell you that Mr. Simonson's view was?

A. I don't remember the discussion at all, but all my note here says that he indicated that he didn't agree with it, so--to what extent, I don't know.

Q. When you wrote notes on documents concerning conversations that took place, did your notes generally reflect accurately those conversations?

A. Well, they were intended to. They were intended to refresh my own memory. They were more or less personal notes that I wrote to trigger my own memory so I could--if questioned about how something went down, you know, how something came about, why it happened the way it did, I could go back and hopefully explain it. And to some extent it was covering my own tail, you know. I was leaving a track so I could--a trail so I could remember what happened and why it

happened the way it did.

But I--in answer to your question, they were notes for me and not for, you know, anybody else really. So there's no reason not to put it down like I saw it and like I understood it, which is not necessarily to say that I understood it correctly.

Q. But you have no reason to believe that any of the notes you took recording conversations or telephone calls or meetings did not accurately reflect the substance of those things, do you?

A. Yeah. They--I think you are right, that they--at least they reflected my interpretation of what those folks had said on the assumption that, you know, I interpreted it--their feelings correctly.

Q. What was the Rocky Flats office position that was to be developed that's mentioned in your note on Exhibit 136?

A. Well, I assume--and I don't know exactly what I meant by that, but I assume that we were--we worked for Mr. Simonson. And Simonson was--had to respond to this thing, so we were--it was an effort on our part to help him with some information so he could develop his position.

Q. Would that be developing the Rocky Flats office position on Rockwell's award fee that would take

into account the information from headquarters that's contained in Exhibit 136?

A. I'm not sure I completely understood the question, but it was--it was to help Mr. Simonson develop a supportable position in case he, I assume, wanted to disagree with something, he needed to understand just what it was, how it impacted his recommendation, and put him in a position so he could intelligently discuss it with headquarters.

I am not--I don't want to imply that he--it was his intention to adopt their position because I don't know what his intention was.

Q. What was your view as to whether Mr. Simonson was going to adopt headquarters' position?

A. Well, like I indicate, I didn't talk to Mr. Simonson myself, so I didn't know what his position was, but I was operating under the assumption that--on the one hand that he apparently didn't agree, but the other hand, I wanted to provide him with the options that--at least some of the options he had available to him in case he had to--or wanted to change his original fee recommendation.

Q. And you had already been told by Mr. Inlow, hadn't you, that the headquarters' changes

were going to be forced on the Rocky Flats office?

A. That was my understanding, yes.

Q. Mr. Agy, I'm handing you a document that previously has been marked as Exhibit 137. Did you prepare that document?

A. I believe I did. It says I did anyway.

Q. Did you prepare it on January 12, 1990?

A. Looks like it.

Q. Was that part of the package that you provided to Mr. Bishop?

A. I didn't see it in that exhibit you showed me, so I'm not sure it was part of that package or not. I don't believe this contains any information that wasn't--isn't on the Exhibit 133.

Q. And would you, please, compare the scores contained in Exhibit 137 with the scores provided by headquarters in Exhibit 135.

A. Yeah, this seems to--that is, Exhibit 137 scores at the top of the page for PRMP and plant seem to be the same scores that were being suggested by DP-20 around the 11th of January.

Q. Is that true for all of the individual FPAs?

A. It--I compared them and I didn't see any differences, so I--yeah, I believe that's true.

A. Um-hum.
Q. Would you please read that aloud.
A. Third paragraph, "Although we would welcome any comments you may have on the Rockwell memo, our main concern at this point are issues of fact. Therefore, please identify any new factual information disclosed in the Rockwell memo which might impact our previous evaluation."
Q. Why was your main concern at this point issues of fact?
A. I don't remember exactly why or why we used those words, but I assume that we are talking about issues and facts that were relevant to the period under review, not before or after that period.
Q. The period under review being April 1--
A. April 1 through September 30 of 1989.
Q. Because it was only facts that took place during that time period that would be relevant; is that right?
A. I believe that's what we intended, yes.
Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 138. Did you prepare this document?
A. Yes, I believe I did put this document together.

Q. What is--is that your handwriting on the first page?

A. Yes, it appears to be.

Q. What does the handwriting in the upper right-hand corner say?

A. It says, "Presented to Simonson and Bishop."

Q. Did you present this document to Mr. Simonson and Mr. Bishop?

A. I believe that that's what that infers. I don't remember doing it, but I--I believe that's probably the case.

Q. Did you prepare this document on January 19, 1990?

A. Most likely. That's the date I have entered in on the bottom of that first page anyway.

Q. Earlier we saw a reference on Exhibit 133 to a January 19, 1990, manager presentation.

A. Um-hum.

Q. Would Exhibit 138 be the presentation that is referred to in Exhibit 133?

A. I'm not positive about it, but I would assume that that would be the case. And I assume the presentation took place, but I--like I said, I don't really remember. Hopefully that reflects the actual

situation.

Q. Would you please read your other note on Exhibit 138 on the front page.

A. It's a note dated July 10 of 1990, and it says, "Prepared prior to final headquarters' recommendation of 2/22/90, parenthesis, where headquarters lowered award fee dollars they were considering earlier, end parenthesis."

Q. When did you write that note?

A. It says--it indicates I wrote it on July 10 and, again, probably just a note to myself so I could keep track of what version this was.

Q. So headquarters later reduced further the award fee from the DP-20 input that you received that was contained in Exhibit 135; is that correct?

A. That's what my note says. And as I recall, that's what the situation was, but I--I'm sure we'll get to the specifics.

Q. Please turn to the last page of Exhibit 138, which is a page stamped E 000246. Did you prepare that page?

A. Mr. Bishop and I prepared that page.

Q. What does this page represent?

A. It's intended to represent the kind of things that the award fee determination official or the

A. As I recall, I made an index of what it was in the binder for easy reference. I don't see it attached here.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 37, which is a memorandum from John Tuck to deputy secretary, dated February 22, 1990, with attachment. Have you ever seen that document before?

A. Yes, I've seen this document.

Q. When did you first see that document?

A. Well, it's not clear to me. It doesn't say. In the latter part of February of 1990 probably.

Q. Does this document contain the later headquarters' award fee numbers that were lower than the initial input from headquarters?

A. Yes.

Q. Did you ever discuss this document with anyone?

A. Yeah, I believe this is the document that I must have had when I put together the attachment to the determination letter that went to Rockwell in, I believe, this same month. I forget the exact date that the determination letter went out or when it was signed by Mr. Nelson.

Q. The letter signed by Mr. Nelson was dated

February 26, 1990.

A. So I probably had this when I put that attachment together when--or the attachment to that letter of February 26.

Q. According to this February 22 memorandum, what is the headquarters' overall award fee grade for plant operations?

A. Well, according to page E 000023, it's--it was 78.4.

Q. And what is it for PRMP/PROVE?

A. 83.

Q. And what dollar amounts do those grades correspond with?

A. For plant operations, was $1,241,406.

Q. And or PRMP/PROVE?

A. It was apparently $338--I'm sorry, 338,035.

Q. Did you discuss this memorandum with anyone?

A. I'm sure I did. Probably during the period when I was--prior to--or and including the 26th of February. Probably Mr. Miller. As I recall, I discussed it with their--was mentioned, anyway, by Jerry Duffy. Gerald Duffy.

Q. Who was he?

A. He was a branch chief working for Mr. Bishop; same level as Mr. Miller. And as I recall, I discussed it with Mr. Fess and Mr. Simonson.

Q. Who was Mr. Fess?

A. The chief counsel at Rocky Flats office.

(A break was taken.)

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 143. Have you ever seen that document before?

A. Yes.

Q. Did you see that document in late February of 1990?

A. I believe I did.

Q. What is the recommendation made in this document?

A. It says, "Concur in the headquarters' decrease in total fee for RI."

Q. And what is the issue listed in this document?

A. On the issue line it says, "Should RI's award fee be reduced from $4,176,077 to $2,012,489?"

Q. Is the $2,012,489 the same award fee that is being recommended by Mr. Tuck in Exhibit 37?

A. Yes, on page E 000021.

Q. Did Exhibit 143 accompany Exhibit 37 when

you first saw them?

A. Well, they are definitely related, but I don't recall whether I got them at the same time or not.

Q. Was Rockwell's award fee reduced to $2,012,489?

A. As I recall, that was the number on the February 26 memo to Rockwell. I don't have that in front of me, so I'm not positive. But I sort of recall that was the number that was used for the award fee.

Q. Let me show you what has previously been marked as Exhibit 28. Is that the letter that was sent informing Rockwell of the award fee for second half of fiscal year 1989?

A. That looks like the letter all right. Yes, I believe it is.

Q. What award fee is being issued to Rockwell for plant and PRMP/PROVE?

A. This is for the period April 1, '89, to September 30, '89. And for plant, the fee determination official awarded $1,241,604 for plant award fee and $338,035 for the award fee related to PRMP/PROVE.

Q. Are those numbers the same as the headquarters' numbers in Mr. Tuck's February 22

memorandum that is Exhibit 37?
A. Yes, they are.
Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 144, which is a DOE news release dated February 26, 1990. Have you ever seen that document before?
A. I believe I did see that, yes.
Q. Did you see it in February of 1990?
A. As I recall, I saw it shortly after we issued the letter of February 26 to Mr. Sanchini.
Q. That was Exhibit 28?
A. Yes.
Q. Did you--
A. Or the attachment to the 28 anyway.
Q. Did you ever see any drafts of the news release that is Exhibit 144?
A. I don't believe so. This was drawn up by headquarters. I don't remember ever seeing a draft of it. At least it's not something that I'd normally see.
Q. Mr. Agy, I'm handing you a document that is being marked as Exhibit 148.
(Plaintiff's Deposition Exhibit 148 was marked.)
Q. Which consists of several drafts of a news

A. I don't believe I ever heard.
Q. Do you have any idea why he was replaced?
A. Well, it's not that I hadn't asked, but I guess I never asked anybody that knew or was willing to share that with me.
Q. Did anybody ever tell you a reason why they thought Mr. Simonson was replaced?
A. I don't recall specifically, but as I recall, somebody mentioned that it was--that he most likely got on somebody's bad side, but I don't know any more than that. That's just--that's a rumor. I don't know what the facts are.
Q. Did you ever hear that Mr. Simonson's being replaced had anything to do with the Rockwell award fee?
A. No, I'd never heard that.
Q. Was the letter sent to Rockwell announcing the award fee for the second half of fiscal year 1989 sent out on February 26 of 1990?
A. Yes, that's what it was dated, so that's the day it went out.
Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 36, which is a record of a meeting. The date given is February 26, 1990, and the time given is 6:55 a.m. Did you prepare

this document?

A. Yes, I prepared the document. 6:55 a.m., though, instead of p.m.

Q. Did you have a meeting with Jerry Duffy at 6:55 a.m. on February 22nd--excuse me, February 26, 1990?

A. Yes. It indicates that Mr. Duffy contacted me that morning.

Q. Was Mr. Bishop also at that meeting?

A. Well, this is the kind of matter that would have been handled by Mr. Bishop had he been there, so I assume that Mr.--well, in fact, it says that Mr. Duffy was acting director that day, so that's why I was talking to Duffy rather than Bishop.

Q. I note under Attendees it lists both you and Marshall Bishop.

A. Yes. I failed to notice that myself. Hum.

Q. Did the three of you meet that morning?

A. Well, something's wrong with the way I wrote this if Mr. Bishop was present. And I have Mr. Duffy identified as acting because Mr. Bishop is the director. So anyway, I had better take a minute and read the memo.

Q. Please do.

A. Okay. I've read the memo. What was your question, please?

Q. Did you speak with Mr. Duffy at 6:55 a.m. on February 26, 1990?

A. Yes. The memo indicates I did.

Q. Was Mr. Bishop included in that discussion?

A. The memo indicates he was, but I don't remember him being present, especially that time of the morning. He usually doesn't get there that early.

Q. The first sentence of your notes refers to a Tuck February 22, 1990, memo. Is that the memo that is Exhibit 37?

A. I believe it is this Exhibit 37 that we're referring to there.

Q. Does your first sentence indicate that that memo was received by the Rocky Flats office on February 23, 1990?

A. Yes, that's what it indicates. And that's probably confirmed by the fax data that's on the top of the Exhibit 37. It shows that it was faxed February 23.

Q. Would you please read aloud the second sentence of your notes in Exhibit 36.

A. "Headquarters called Greg Fess RFO chief

counsel"--actually, it says, "RFO GC," but I think he was the chief counsel. And that's an aside. Anyway, he says, "Headquarters called Greg Fess, RFO GC, told him AFDO determination letter must go out on Monday, 2/26/90 since Secretary Watkins will be issuing a press release 2/26/90 about the determination."

Q. Greg Fess was an attorney at the Rocky Flats office; is that right?

A. That's right.

Q. Why would headquarters call Greg Fess to tell him when the AFDO determination letter had to go out?

A. Well, I don't know. That's just what Mr. Duffy told me.

Q. Please read the first sentence in the second paragraph of your notes.

A. "Duffy informed me that Fess was coordinating this effort to get the determination out and that Fess and Eric Figi, headquarters GC, were writing the determination letter."

Q. Do you know Eric Figi?

A. No, I do not.

Q. Do you know what his position was at this time?

A. I don't know anything other than I

understood he was in the general counsel's office. I don't know what position he held.

Q. At headquarters?

A. At DOE headquarters.

Q. Prior to your discussion with Mr. Duffy on the morning of February 26, 1990, were you aware that Mr. Fess and Mr. Figi were writing the determination letter?

A. I think this is the first I learned of it.

Q. Why was it that two counsel were writing the determination letter?

A. I don't have any idea. As opposed to someone else, I don't know why. It wasn't something I was involved in.

Q. Were you surprised to learn that Mr. Fess and Mr. Figi were writing the letter?

A. No.

Q. Prior to learning that they were writing the letter, who would you have thought would write the letter?

A. I assumed, I guess, that they would probably ask me to do it, but that may be presumptious since it was beyond my level at that time and--but I don't know the reason why they--why those two gentlemen

wrote it. You know, it must--I have no problem with that.

Q. Prior to this, you had been preparing award-fee-related documents that were being prepared at Rocky Flats office; is that right?

A. Yes, but I'm at a much lower level than these gentlemen.

Q. Did you prepare Mr. Simonson's December 6 memo to Mr. Tuck?

A. Yes, I put that together for him.

Q. So were you surprised to learn that you would not be preparing the letter to be signed by Mr. Nelson?

MR. BRUNS: Asked and answered.

MR. KELLEY: I don't believe Mr. Agy answered whether he was surprised that he would not be writing that letter.

Q. (BY MR. KELLEY) Were you surprised?

A. No, I can't say I was.

Q. But you would have expected that you would write it; is that right?

A. Well, I was normally involved in those things, but, you know, only to assist them. If they chose to write it at our level, I was there.

Q. Mr. Simonson chose to have you prepare his

letter to Mr. Tuck on December 6; is that right?

A. Yes. Actually, Mr. Barkmeier directed me to do it.

Q. The last sentence of the first paragraph of your notes states that, and I quote, Secretary Watkins will be issuing a press release 2/26/90 about the determination, end quote.

Prior to speaking with Mr. Duffy on the morning of the 26th, were you aware that Secretary Watkins was going to issue a press release about the Rockwell award fee?

A. It's my recollection that this was the first time I heard about that and that, you know, which was the driver for--to get our letter out. I don't--I assume if I had known before this, that I would have been in on the weekend working on this thing.

Q. So you did not know before the 26th that the letter had to go out on the 26th?

A. As I recall, that was the situation all right.

Q. Please read aloud the second sentence in the second paragraph of your notes.

A. Second sentence in the second paragraph, "Duffy told me I needed to take a look at the 2/22/90 input from headquarters and revise the three-page

performance evaluation report, as appropriate, so that it can be attached to the determination letter today."

Q. Did you do that?

A. Yes, I did.

Q. And is the February 22, 1990, input from headquarters the memorandum from Mr. Tuck that is Exhibit 37?

A. I believe that's what we were referring to there, yes.

Q. So you revised the three-page performance evaluation report to incorporate information from Exhibit 37; is that right?

A. Yes, I believe that's a correct interpretation of what that means.

Q. Please read aloud the third paragraph of your notes.

A. "Duffy says Simonson and Fess decided we were going to issue the determination letter to reflect headquarters' position on award fee and we were not going to include a copy of Tuck's 2/22/90 memo as an attachment."

Q. Did what you state in that sentence take place?

A. Yes, I believe it did.

Q. Other than what is contained in your notes

of meeting, which are contained in Exhibit 36, do you recall anything else that you discussed with Mr. Duffy or Mr. Bishop at this meeting that is reflected in Exhibit 36?

A. That's not reflected in Exhibit 36?

Q. Yes, that is not reflected in your notes of the meeting on Exhibit 36. Do you recall anything else that was discussed?

A. With Mr. Bishop and Mr. Duffy, is that--I'm sorry.

Q. Yes, that's right.

A. Those two gentlemen?

Q. Or either of them.

A. I don't think so. I don't--can't remember anything. It seems like after this discussion took place, that I was working with Mr. Simonson and Mr. Fess and not Mr. Duffy and Mr. Bishop, working with them to accomplish this--to getting the determination letter out.

Q. Subsequent to this meeting, that is?

A. Yes. They probably got me this as I walked in the door, and then I went to work on it.

Q. What time did you normally arrive at work in February of 1990?

A. I usually started at 7 a.m.

Q. So it would be normal for you to be in the office five minutes early at 6:55; is that right?

A. It was either 7 or 7:15 was my starting time. I can't remember exactly, but yeah. And I usually got there early.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 38, which is a record of meeting. And the date given is February 26, 1990. The time listed is approximately 9 a.m. Did you prepare this document?

A. Yes.

Q. Did you have a meeting with Robert Ostmeyer at about 9 a.m. on February 26, 1990?

A. Yes, I did.

Q. Was that meeting related to Rockwell's award fee?

A. Yes, it was.

Q. Did you initiate the meeting?

A. Yes, I did.

Q. Please read aloud the first sentence of your notes.

A. "I called upon Ostmeyer with the 2/22/90 Tuck memo in hand to ask about the legitimacy of the headquarters' comments regarding safety and their useability in the performance evaluation report to be

issued today by the manager, RFO."

Q. Does that accurately reflect the reason you called upon Mr. Ostmeyer?

A. Yeah. I don't remember the specifics, but apparently there was headquarters' comments about safety. I mean, I see it's on page E 000018.

Q. And that's in Exhibit--

A. 37. I assume that's the ones I was referring to and, of course, if--

Q. Which are those comments? Are they the ones under which paragraph?

A. Under Plant Operations, apparently Items 1 and then the first bullet under 2 on that page about fire protection and I guess the others in general, says--according to my note.

Q. The other comments contained in Exhibit 37?

A. Yes, are related to safety that Mr. Ostmeyer would have been knowledgeable about.

Q. Prior to February 26, 1990, had you ever spoken to Mr. Ostmeyer about Mr. Tuck's February 22 memo?

A. Oh, I'm sure I didn't. We only got it--you mean--we only got the memo the 22nd. No, this is the first time since the 22nd of February I have

talked to him.

Q. Why was it on February 26 that you decided to call upon Mr. Ostmeyer?

A. Because I was tasked to put together the attachment to the determination letter, the narrative that spelled out the--an explanation of why the grades were the way they were. And I was attempting to review with Mr. Ostmeyer some headquarters' comments that we may want to incorporate into that--that attachment. And before I included them, I wanted to make sure he--I wanted to get his feelings about how I should proceed in doing that.

Q. And did you decide to call upon Mr. Ostmeyer that morning because it was that morning you found out that the determination letter had to be sent out that day?

A. Yes.

Q. Was Mr. Ostmeyer a branch chief at the Rocky Flats office?

A. I believe that was his position at that time. Oh, yes, it says that he was chief of--on the memo, Exhibit 30, it says he is the chief of the--I think that stands for industrial safety branch.

Q. Please read the second bullet in the second paragraph aloud.

A. "He was not comfortable with the headquarters' criticism of fire protection."

Q. Which item in the February 22 Tuck memo dealt with fire protection?

A. Well, appears to be the second--first bullet under Item No. 2 on page E 000018.

Q. Would you please read that item aloud.

A. Yeah, from Exhibit 37 it says "Inadequacies of a fire protection program and a continuing presence of fire hazards in Buildings 460 and 881."

Q. Do you recall anything else that Mr. Ostmeyer told you on February 26, 1990, about his discomfort with headquarters' criticism of fire protection, other than what is stated in your record of meeting which is Exhibit 38?

A. No, I don't recall anything else that he said about fire protection.

Q. Did you discuss with anyone on February 26, 1990, Mr. Ostmeyer's comments on the February 22 Tuck memo?

A. No, at least I don't remember talking to anybody about it.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 39, which is a

record of telephone conversation. The date given is February 26, 1990, and the time listed is 10:30 a.m. Did you prepare that document?

A. Yes. It's a document I prepared, a memo, a record of telephone conversation.

Q. Did you call Mr. Lockhart at 10:30 a.m. on February 26, 1990?

A. Yes, I believe I did. The memo indicates I did.

Q. Would you please read the first sentence of your notes.

A. "In process of revising the performance evaluation report to conform with the rating plan, I had to eliminate many achievements and add many deficiencies."

Q. And proceed with the next sentence.

A. "The deficiencies I added were obtained by reviewing negative observations found in the PERB report for the period."

Q. Is the word "reviewing" or "rewriting"?

A. I'm sorry. You are right. It does say "rewriting."

Q. Were you rewriting the performance evaluation report so that report would fit with the adjectival and numerical grades that were being given

Rockwell?

A. In so many words, yes.

Q. Please read the next sentence in your notes aloud.

A. "Lockhart was called when I couldn't find any deficiencies in the design quality FPA under PRMP/PROVE."

Q. Was the design quality FPA under PRMP/PROVE one of the FPAs where headquarters was recommending a change in the number that the Rocky Flats office had recommended?

A. Yes, it was.

Q. Who was Mr. Lockhart?

A. It says he was the acting project manager for PRMP RFO. He was a DOE employee, and we had a project there called PRMP/PROVE. And he was the project manager of that--or acting project manager.

Q. Please read the next sentence aloud.

A. The second sentence in the second paragraph says, "Lockhart faxed me the attached to assist me in my effort and stated the attachment was done by SMS, contained many deficiencies, but had been changed extensively later by D. R. Riley, former PM, comma, PRMP," which stands for project manager of PRMP, "for his input to the PERB report."

Q. What does SMS stand for?

A. That's a support services contractor employed by the Department of Energy to assist in that project, PRMP/PROVE. They assisted the project manager.

Q. I take it from your sentence here that SMS had provided some kind of an evaluation with respect to PRMP/PROVE and that that had been provided to Mr. Riley; is that right?

A. Yes. That's my understanding.

Q. I also take it from this sentence that Mr. Riley had changed extensively the evaluation given by SMS; is that right?

A. That was my understanding also.

Q. And I also take it that Mr. Riley used his own analysis which he had changed from the SMS evaluation for his input to the PERB report; is that right?

A. I don't know if I could speak to that. I don't know what he used. I guess it reflected his own feelings rather than what he had--the information he received from the SMS. I assume that to be true, but I don't know what--his total basis for his analysis.

Q. Whatever it was that Mr. Riley used for his input to the PERB, it had been changed extensively

from the SMS evaluation; is that right?
A. That was the--what Mr. Lockhart had told me.
Q. Did you ever talk to Mr. Riley on February 26, 1990?
A. No, I did not.
Q. Did Mr. Riley ever tell you that he had changed his view on PRMP/PROVE from his input to the PERB report?
A. No, I don't recall him ever talking to me about it.
Q. Was the SMS evaluation the only information that Mr. Riley had when he gave his input to the PERB report with respect to PRMP/PROVE?
A. I don't know what Mr. Riley had available to him.
Q. Would you please read the next sentence aloud.
A. The third paragraph?
Q. Yes.
A. "My effort was made necessary due to the fact that headquarters had insisted we lower the grade from 91 to 80 on three FPAs with PRMP/PROVE and headquarters failed to provide any real justification."
Q. How did you learn that headquarters had

insisted that "we lower the grade from 91 to 80"? I take it that "we" means the Rocky Flats office; is that right?

A. Yes, I believe that's what we meant by "we."

Q. How did you learn that?

A. Well, I may have overstated that. I guess I--that was my interpretation of what they were--what their position was.

Q. Of what Mr. Bishop had told you?

A. February 22--a reading--my reading of the February 22, 1990, memo gave me that impression.

Q. Did you also gain that impression from your discussion with Mr. Bishop?

A. No, I don't believe so. I probably--that probably reflects my own personal feeling of what was happening and may not necessarily reflect the position of those above me.

Q. But that was the impression that you gained from all the information that you had learned throughout January and February of 1990; is that correct?

A. Yes, I think that's probably correct. That was my overall impression of what was happening.

Q. Was it your view when you wrote this

memorandum that headquarters had failed to provide any real justification for lowering the PRMP/PROVE grade from 91 to 80?

A. Well, I think that was poorly worded. What I think I was trying to say there was that they didn't supply a real usable narrative to go along with their numbers that they were recommending so we could have a better understanding of why they felt the numbers should be the way they are--the way they recommended it. So without--so we didn't know their reasoning. That doesn't mean it didn't exist.

Q. Did you ever attempt to find out the reasoning at headquarters for lowering the score from 91 to 80?

A. No, I never personally attempted to find it out.

Q. Did you ever ask anyone to find out headquarters' reasoning for lowering the score from 91 to 80?

A. I wasn't in a position to question the headquarters.

Q. Did anyone ever tell you why headquarters was lowering the score from 91 to 80?

A. I only had the February 22 memo. That's the only reason I had. But other than that, no, no one

told me.

Q. Please read aloud the last sentence in your memorandum.

A. "Using the attached information, I revised the FPAs for design quality and technical product quality."

Q. The attached information was the SMS report or evaluation; is that right?

A. Yes, that's what I was referring to.

Q. Did you use any other information in revising the FPAs for design quality and technical product quality?

A. I don't believe I did. And if I did, it's not noted here, but I don't remember.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 40, which is a record of meeting. The date given is February 26, 1990. The time listed is 11:15 a.m. Did you prepare this document?

A. Yes.

Q. Did you meet with Greg Fess and Dave Simonson at 11:15 on February 26, 1990?

A. Yes.

Q. Please read aloud the first sentence in your note.

A. "I showed Fess a draft of the revised performance report."

Q. And the second sentence?

A. "He made some minor changes and I put it in final form for him after making the changes he wanted."

Q. Did you speak--strike that. Did you show anyone other than Mr. Fess a draft of the revised performance report that you prepared on February 26, 1990?

A. Not before I put it in final form. I don't--at least I don't remember showing it to anybody else. There wasn't time.

Q. Please read aloud the second paragraph of your memorandum.

A. "We then met with Simonson who read the final form of the revised performance evaluation report."

Q. And the next sentence.

A. "After reading it, Simonson stated, 'This is fine.'"

Q. How long did Mr. Simonson take to review the revised performance evaluation report?

A. I don't recall.

Q. Was it more than an hour?

A. No, it was less than an hour. It was--I don't remember--several minutes. I don't know. It doesn't say, so--but it's only three pages long.

Q. Please read aloud the third paragraph of your memorandum.

A. "Fess, who had already obtained R. M. Nelson's signature on the determination letter he had drafted for Nelson, then gave a copy of the performance evaluation report to Jean Finch for inclusion in mailing with the determination letter."

Q. Did Mr. Nelson sign the determination letter prior to your finalizing the performance evaluation report?

A. Well, my note tends to indicate that, but I'm not sure what Mr. Nelson reviewed.

Q. Who is Jean Finch?

A. Mr. Nelson's secretary. And obviously Jean Finch wasn't at the meeting, so some of this took place after the meeting. It just appears to take place all in that half hour, but it obviously didn't.

Q. Why do you say half hour?

A. Because I say the meeting ended at about 11:45. So the way I wrote that--

Q. The meeting began at 11:15; is that right?

A. Yeah, that's about right. So I assume

that--probably that last sentence about the meeting ending probably should have been the third paragraph and last two, the third and fourth paragraphs, ought to have followed it. And that's probably the way it really happened, but it's not written that way.

Q. It's not written that way?

A. It implies that all that took place during that half hour, like I followed Fess around, but I didn't.

Q. Mr. Fess was the one preparing the letter for Mr. Nelson to sign; is that right?

A. That's the impression I had.

Q. Did Mr. Fess ever discuss with you preparation of the letter that Mr. Nelson was to sign?

MR. BRUNS: Objection. Calls for attorney-client privilege.

MR. KELLEY: Even if there was some kind of privilege in the communications between Mr. Fess and Mr. Agy, I am certainly entitled to discover the subject of those discussions.

Q. (BY MR. KELLEY) Mr. Agy, did Mr. Fess ever discuss with you the preparation of the letter that Mr. Nelson was to sign on February 26, 1990?

A. As I recall, we may have discussed it. I don't know whether it was that day or maybe earlier as

to how it ought to be done. But I don't--I really don't remember. It seems like it may have happened.

Q. Did you assist in any way on February 26, 1990, in the preparation of the letter that Mr. Nelson eventually signed?

A. I don't recall getting involved in that--

Q. At all?

A. --on that day.

Q. Not at all?

A. I don't believe I did. I was busy doing the other.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 29, which is a memorandum from Bruce Twining to Robert Nelson, dated February 26, 1990. Have you ever seen that document before?

A. Yes, I have.

Q. Did you see it in February of 1990?

A. Probably. I have a copy of it in my file, so I know I had it, but I don't remember exactly when I got it. It was probably in February, although there weren't too many days left from the 26th on, but I think so.

Q. Prior to seeing this memorandum, what was your understanding as to who was the award fee

determination official for Rockwell for the second half of fiscal year 1989?

A. I'm sorry. Prior to when?

Q. Prior to seeing this memorandum.

A. Well, there was an earlier memo issued to Mr. Simonson for the same purpose.

Q. Now, I believe you testified earlier that Mr. Simonson was replaced by Mr. Nelson in January 1990 as the manager at Rocky Flats; is that right?

A. Yes. As I recall, it was January of 1990.

Q. This memorandum designating Mr. Nelson is dated February 26, 1990. Is that approximately a month after Mr. Nelson became the manager?

A. Approximately.

Q. What was your understanding as to who was the award fee determination official after Mr. Nelson became manager and prior to seeing this memorandum that is Exhibit 29?

A. I assumed it was Mr. Nelson.

Q. After he was apointed--

A. After he became manager, he should have assumed the--he would automatically become the fee determination official, in my mind, but--

Q. Mr. Agy, I'm showing you again the

document that has previously been marked as Exhibit 28, which is the letter from Mr. Nelson to Mr. Sanchini, dated February 26, 1990. Did you prepare the three pages with the title Performance Evaluation Report that are attached to Mr. Nelson's letter? Those pages are stamped E 000200 through E 000202.

A. Prepared is probably an overstatement. Those pages existed even when Simonson sent his recommendation to headquarters in December. What I did was revise them to some extent.

Q. You had revised them earlier that day; is that right?

A. Yes. On the 26th.

Q. Is that the final form of the performance report--

A. Yes.

Q. --that you mentioned in your record of meeting that is Exhibit 40?

A. Yes, it would be.

Q. Is that the version that you showed Mr. Simonson?

A. Yes.

Q. During your meeting on that morning that began at 11:15 a.m.?

A. Yes, that's correct.

Q. Were there any changes made to the document after that time?

A. Not that I'm aware of.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 145. Have you ever seen that document before?

A. I believe I have seen this in responding to--

Q. Do you know why headquarters was asking for the information that's listed on the attachment, which is page E 000044?

A. Well, I--the only thing I can tell you is what it says here, establishing a data base. So they wanted this for historical purposes for some reason.

Q. Do you know why they were establishing a data base?

A. No, I don't.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 146. Have you ever seen this document before?

A. Yes. I prepared it.

Q. Did you send this document to headquarters on March 27, 1990?

A. Yes, I did.

Q. Did you ever speak with Paul Grimes or Jim

PL. SUPP. EX. 58

UNITED STATES CLAIMS COURT

Case No. 91-1362 C

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION DAVID P. SIMONSON
VOLUME I

December 10, 1992

Pursuant to Notice taken on behalf of the Plaintiff at 1719 Emerson Street, Denver, Colorado 80218, at 9:30 a.m., before Lori D. Porter, Registered Professional Reporter and Notary Public within Colorado.

that as a recommendation to the fee determining official. And I was both providing--depending on where I was at what time, I was both providing data to that committee and also being part of it.

Q. So if I understand it right, at times you were a source--one of the sources for input to a committee that would make a recommendation to an award fee--

A. That's correct.

Q. --official, and then at other times you were actually a member of the committee that was making a recommendation to the award fee official?

A. Yes, that's correct.

Q. Okay. And in 1989, you were transferred from the headquarters position to Rocky Flats; is that correct?

A. That's correct. That's correct.

Q. What was your position at Rocky Flats at that time?

A. I was--I was transferred out there as a manager at Rocky Flats.

Q. Who was your predecessor at Rocky Flats?

A. Ed Goldberg was out there as a temporary manager at that time and had been there, well, since about June.

particular date that was in effect at the time, what particular version was in effect at the time.

Q. But you are testifying that you would have reviewed the existing provision of the Rockwell contract that dealt with the award fee at the time you took on responsibility as manager; is that correct?

A. Yes. Well, at least during the process of determining the award fee, yes.

Q. When you were describing earlier the award fee process, at the end you stated that the determination of the fee determination official would be sent on to headquarters for concurrence?

A. That was our process, yes.

Q. Do you recall any discussions about that was a new process in 1989? Had it not taken place prior to that?

A. It was a new process. It may have been in place before 1989, but it was a new--the process was changed during the time I was in Washington, D.C., and so I was aware of some changes being made to the process from my responsibilities in Washington, D.C.

Q. And what time period would that have been?

A. That would have been a year and a half, approximately, before I went to Rocky Flats. May or

June of 1987. I may be off a year, but I was in Washington, D.C., about a year and a half before I went to Rocky Flats.

Q. Would you tell me about this change in process. What was the change?

A. As I recall, the change that was going on at that time was with the new administration, Secretary Watkins taking over responsibility for the department. He was driving for increased responsibility for what are called the programmatic secretarial offices in the department, which in this case would have been the assistant secretary for defense programs, and as part of that effort to increase their responsibility for their programs, they changed the award fee process to where a concurrence of that official was required before an award fee was actually finally determined.

Q. Do you recall when Admiral Watkins came in as secretary of the Department of Energy?

A. It would have been fairly soon after the--after President Bush took over as president.

Q. Does that help you in coming up with the time frame as to when this change took place?

A. Well, the--sure. You know, there was a period of time there, as any--as always, when new administrations come in, where there's changes made to

the way things are done. This is one of them. Whether that occurred immediately after he took over or whether that occurred six months or a year, you know, it was sometime in that time period.

Q. But it wouldn't have been 1987, would it?

A. Well, again, I may be off a year. I'll have to go back and think back through that and write it down. I went to Rocky in--in the fall of '89. I was in Washington a year and a half ahead of that, so I guess that would have been the spring of 1988.

Q. When was President Bush elected president?

A. Well, it would have been '88. He would have taken over in January of the next year.

Q. Of '89.

A. Yes.

Q. And when did Watkins come in as secretary?

A. Soon--soon thereafter. I don't remember exactly.

Q. So it would have been in '89, then, that Watkins became secretary of--

A. Again, the reason--the way I'm pinning down when that happened was it was during that year and a half I was in Washington. I just don't have any way

to tell you exactly.

Q. No, I understand, but you did testify that the change that would require award fee concurrence by headquarters emanated from Admiral Watkins.

A. That's correct.

Q. And I take it we can agree Admiral Watkins would have taken his position in 1989?

A. Yes. Okay.

Q. So would you then agree this change would have occurred sometime in 1989?

A. Yes, I would.

Q. How was the change--strike that, please. So that prior to this change we've been talking about, is it your testimony that concurrence from headquarters was not required for award fee determination?

A. My previous experience until the time I went to Washington was--in the award fee process was at the level of generating the recommendations made to the fee determining official. What the fee determining official did with those recommendations before he passed them on--you know, made the official determination, I am not familiar with or sure of. When I was in Washington, the requirement to get Washington concurrence was formalized.

Q. And that's--what you've been testifying

to, that occurred in 1989, after Secretary Watkins took over?

A. After Watkins took over, right.

Q. Do you know Mr. Whiteman?

A. I have acquaintance with him, yes.

Q. Have you ever talked to Mr. Whiteman about the award fee process at Rocky Flats?

A. No, sir.

Q. Getting back to this change that occurred in 1989 by headquarters, how was it implemented?

A. The first implementation that I'm familiar with was regarding the Savannah River award fee process, and I was involved in that a little bit from my headquarters responsibilities. And there was a document similar to this--similar to this document called the Handbook for Award Fee Administration, that is gen--that was generated by--again, I'm not sure of the title, but it was generated by Savannah River and included in it the requirement for headquarters' concurrence, the formal requirement for headquarters' concurrence in the award fee determination.

Q. Are you familiar with any department of contract--excuse me--Department of Energy contracts being modified to reflect this change in procedure that called for headquarters' concurrence in award fee

determinations?

A. I don't know whether they were modified or not. I don't know whether they would be required to be modified.

Q. But you know of--your testimony is you're unaware of any instance when a contract was modified to reflect concurrence by headquarters in the award fee determination?

A. I don't know of any.

Q. In the Rockwell contract at the time that you became manager at Rocky Flats, do you know who the fee determination official was designated to be in that contract?

A. As I recall, as it was the manager of Albuquerque operations office, who at the time was Bruce Twining.

Q. If you look at page 3 of Plaintiff's Deposition Exhibit 1, in the paragraph at the top, there's a sentence that reads, "The award fee shall be determined subjectively by the Award Fee Determination Official based on the Contractor's performance in accordance with the Award Fee Plan set forth in Appendix D." Have you ever read that sentence before?

A. I don't specifically recall. I would imagine that I've read that sentence.

first period.

Q. You also said you had conversations with Mr. Culpepper about who would be the award fee determination official for the second half of 1989.

A. Yes.

Q. What do you recall about your conversations with Mr. Culpepper?

A. Basically the same as Mr. Twining, whether it made sense to do it, whether we had the resources to do it.

Q. Was it your decision to make as to who would be the award fee determination official for the second half of 1989?

A. Was it my decision? I was the--I was involved in that decision. I couldn't have made it unilaterally, of course.

Q. Who had the final say on that particular issue?

A. I believe Mr. Twining, as contracting officer, and I think that would--final decision would lie there, I mean, the ultimate decision.

Q. There was no involvement of headquarters on this issue?

A. There was involvement with headquarters on--yes, on several issues regarding who was going to

do what at Rocky Flats, yes.

Q. Were you party in any communications with headquarters personnel on who would be the award fee determination official for the second half of 1989?

A. I don't recall any specific conversations. We were working on memorandum of understandings and things like that during that time period, which involved Admiral Barr, and the discussion--I just don't recall the specifics of those.

Q. What memorandum of understandings are you talking about?

A. Well, during this period of time when we were--when we were trying to establish the new office at Rocky Flats, we were using the document called memorandum of understanding to define what their role was and what our role was and what--and what--and what service they would provide to us and what we would do. I don't recall whether those were ever signed or not, but they were certainly the basis for the discussions.

MR. NEY: Mr. Bruns, we have never received any memorandum of understanding vis-a-vis the roles of Rocky Flats and Albuquerque in the document production. I believe they would certainly be called for by our document request. I'd ask that you would make a further inquiry on those documents.

to--for version, if that refreshes your recollection.

A. Doesn't refresh my recollection, but I would suspect he's right.

Q. Do you recall seeing this document?

A. Well, again, this is the document that's at least one version of the evaluation that was prepared of Rockwell's performance. As I previously stated, I would have seen some versions of this. I can't recall or tell you whether I saw V.5 or not or whichever other version there might be or which date.

Q. On the front page of V.5, there's in handwriting a list of people.

A. Yes.

Q. Your name is listed there.

A. Yes.

Q. Does that help you in recalling whether you participated in reviewing this draft?

A. Again, I would--as I said, I'm sure I saw versions of this performance evaluation criteria. I really can't tell you which ones I saw and which ones I didn't see.

Q. What exactly is this document, besides being a draft? It's a draft of what?

A. It's a draft of the appraisal of the performance that was done by the performance monitoring

people and reflects their view of Rockwell's performance, identifying deficiencies, identifying the seriousness of those deficiencies, identifying accomplishments, the significance of those accomplishments, having other observations, and also includes a suggested grade for the areas.

Q. Mr. Agy testified that he believed that this exhibit was the subject of discussion at a meeting on October 10, 1989, of the performance evaluation committee. Does that refresh your recollection in any way?

A. No. Again, I--I state again that I had conversations with the people doing the evaluation several times in several different meetings. I have looked at a lot of evaluation information such as this, but I cannot tell you which dates and which meetings on which dates I attended.

Q. What is the performance evaluation committee?

A. It's a committee made up of the monitors who start the evaluation process on--on the contractor's performance.

Q. And that is an entity that was created in this performance evaluation plan that we just talked about that was put in play once you, as manager--

A. Yes. But also there was similar committees--and, again, I'm not sure the terminology, but there was similar committees in place during previous plans, and so we adopted that to a new--to the new evaluation process.

Q. Keeping with the plan that we previously talked about, which is the attachment to Exhibit 27, the PEC would be the--if I understand you right, the entity that originally would come up with an evaluation and grading for Rockwell's award fee?

A. I'm not sure whether they did the grading. We can review the plan and see whether that's what it said or not.

Q. Okay.

A. I'm not sure where the grade was assigned.

A. This says that their responsibility includes commission of a draft PERB report, and the PERB was to have the proposed grading, so that would suggest that the PEC should have come up with the draft of the rating.

Q. And the PERB is the performance evaluation review board?

A. That's correct.

Q. And so the PERB would receive a

recommendation with a grading from the PEC; is that correct?

A. That's correct.

Q. And then what would the PERB do?

A. The PERB would evaluate that, decide whether it was correct or not, look at the ratings, provide a recommendation to the fee determining official.

Q. Who is you?

A. Yes, at this time.

Q. And then you would then approve, disapprove, change, or whatever the recommendation you received from the PERB; is that correct?

A. Yes. However, as I recall, in this instance, I had spent time with the members of the boards discussing their evaluation before they finished their report.

Q. So you had given--if I understand what you're saying correctly, you had given some input during the process leading up to the PERB providing you with the recommendation?

A. Yes. I had discussed what their view was and how they were coming up with their evaluation and how they were considering the different factors involved, since we were both--since I was new to the

organization.

Q. So when you received the PERB report ultimately, it came as no surprise to you?

A. That's correct.

Q. Now, going back to Exhibit 117, I would take it that this Version 5 is a draft of a report by the PEC, P-E-C?

A. Well, I can't tell that, again, which version that is. There may be--if we look through it, we can find some way to tell that, but, again, I can't tell that from this--from this memo.

Q. It's either the PEC or the PERB, right?

A. Yes. It is that--it is that report.

Q. Okay. And what adjective grade did they give under the FPA for general management under plant? Can you read that? It's in handwriting there.

A. It says "good." I don't know what the second word is. Perhaps you have a better copy.

Q. I believe it says 81 after--

A. Yes.

Q. I can't read what's after that either.

A. Yeah. 81, correct.

Q. Let me--just go through this, Mr. Simonson, with me page by page, or a few pages at a time.

was also a member of the PERB, was he not? Or not?

A. Well, depends on how you want to consider that. He was--was executive secretary and attended the meetings, participated in the discussion as he felt necessary, did a lot of the administration of pulling together the various reports, and things like that.

Q. Was his role limited to being a secretary, in contrast to someone such as Mr. Foster, listed as a PERB member?

A. Yes. There would have been a distinction there. Mr. Foster was a--had a much higher management position and would have been much more influential on determining--establishing Rockwell's performance.

Q. So Mr. Agy's role was more ministerial, as compared to a--

A. That's correct.

Q. --source of evaluation?

A. That's correct.

MR. NEY: Let me mark as Exhibit 161 another copy of this performance evaluation. This one says on it Volume 6 w/o, which I guess means "without," but maybe the witness will enlighten me. Bates numbers are E 000526 through E 000552. At the bottom it says Agy, October 13, 1989.

(Plaintiff's Deposition Exhibit 161 was

marked.)

Q. (BY MR. NEY) I'll ask the witness to review that exhibit. Do you know what the--first of all, do you know what it means, Version 6, w/o?

A. Well, I would say your assumption that it means "without" is probably a pretty good one. This version doesn't include the grades on it.

Q. Do you know why this particular version was generated?

A. No. I can tell you why it might have been generated. My view of the award fee performance evaluation was that it should include discussion with as many people as possible to make it as accurate as possible. That would have included the contractor. So there could have been a version generated without the grades for discussion of the facts with the contractor or other people even outside of the contractor, for example, Albuquerque or somebody.

Q. So--

A. In fact, we did discuss many of these facts with the contractor. I would imagine that's what this version is.

Q. So you believe that the PEC's recommendation without the adjective grades was discussed with Rockwell?

A. The--yes. Again, is it this version or a different version, I don't remember, but certainly the facts involved in the evaluation and the evaluation itself was discussed with the contractor in formal meetings.

Q. The version we did identify as the PEC's version is Volume 6?

A. Yes.

Q. Version 6?

A. Yes.

MR. NEY: Should we take a five-minute break now?

THE DEPONENT: If you like.

(A break was taken.)

Q. (BY MR. NEY) Let me show you a document that's been marked as Deposition Exhibit No. 119. It appears to be an annotated version of the performance evaluation, Version 6, without adjective grades. Do you know whose handwriting is on the first and second pages of this exhibit?

A. No, I don't. No, I don't know whose handwriting that is.

Q. Okay. Can you read the handwritten note on the right corner of the first page?

A. At the top? Yes. Yes. It says, "From

Version 7, which was not really the PEC, so I don't know which version, again, was sent to Admiral Barr.

Q. It was the version that was presented to the PERB?

A. To the PERB, so that's the way I would read this note. Yes.

Q. All right.

A. And that certainly would not have been unexpected. That would have been the standard practice.

Q. And what's your basis for saying it was standard practice?

A. If we were going to be asking for headquarters' concurrence on any action we were taking, we would--we would, as a standard practice, send it to them in a draft format for discussion ahead of time.

Q. But this is not your final recommendation, is it?

A. No. That's correct.

Q. It's still--the PERB hasn't even ruled on it yet; is that right?

A. That's correct. Again, like I said, it's standard practice if you're going to be asking for concurrence for an action from headquarters, you generally will provide them copies of the draft for

discussion.

Q. Even before you reach your own determination that you're seeking concurrence on it?

A. That's correct. That helps expedite the process.

Q. When you say "standard practice," what are you basing that on? Is that out of some manual?

A. No. It's just--

Q. Your practice?

A. Practice, that's right. That's my practice. In fact, I think the award fee plan says that happens after you've done the--that that first interaction with headquarters occurs--I don't know whether it says first action, but certainly says the formal submittal comes after the fee determining official has made his preliminary determination.

Q. Might be a little pointless, wouldn't it, to get headquarters involved early on if the final recommendation to headquarters substantially differs from earlier drafts?

A. Again, it's a practice that helps expedite the decisions and discussion.

Q. At this point in time were you reasonably confident that your recommendation would be at least close to the PEC's score?

A. Yes.

Q. Did you review the PERB report after it was submitted to you?

A. Yes.

Q. Did you ask for any of the backup that the PERB or the PEC used in coming up with their recommendations?

A. I don't recall asking for any of the backup. Again, as I discussed, I had been in several conversations and meetings with people doing the evaluation during the whole process, and I had a lot of conversations during that period of time.

Q. Going back to 000368, which is the draft of the memo to Mr. Tuck--

A. Yes.

Q. --in that draft, that has you, at least for draft purposes, approving the recommendations of your PERB; is that right?

A. That's correct.

Q. Did you believe that the PERB recommendation was a well-reasoned one?

A. Yes.

Q. Did you ultimately send it on as--the PERB recommendation as your recommendation to headquarters?

A. The recommendation that I made to

headquarters was in this--was in this range, approximately these numbers. There should be in the record an actual copy of the--of what I did recommend to headquarters.

Q. Prior to sending on your recommendation to headquarters, had you had any discussions with head-quarters about the award fee for the second half of 1989?

A. Yes.

Q. Can you enlighten me as to what those conversations entailed.

A. I had a series of conversations with Admiral Barr regarding the general evaluation.

Q. This is--I'm trying to at this point confine this to before you actually send your recommendation.

A. Yes.

Q. And what did Mr. Barr say to you in those conversations?

A. As I recall, in general terms, Admiral Barr thought this was probably a little too high, that it didn't adequately--wasn't--wasn't sufficiently critical of Rockwell's performance in the safety arena.

Q. What did you say to Admiral Barr?

A. Well, obviously I wouldn't have sent these if I didn't think they were right, and so I reiterated our view of that. And whether the conversation took place before or after we submitted this, the general tone of it was a difference as to the value of the contribution Rockwell was making to us and trying to get ourselves out of our environmental noncompliance problems versus the level of concern of their safety performance.

Q. Do you recall anything else that occurred in those conversations with Admiral Barr on the subject of the award fee prior to formally submitting your recommendation for concurrence?

A. No. That was the tone. I mean, that was the general tone of the discussion. And, of course, going along with the view of their performance, that the ES&H arena was the question as to given our difference of opinion on their performance in the ES&H arena, what did that reflect on the general management of Rockwell. So we talked about those basic areas of concern.

Q. Did Admiral Barr ever suggest in words to the effect that from a political point of view, you couldn't possibly give Rockwell a grade for environment, safety, and health for the second half of

1989 that was higher than for the first half of 1989?
A. I don't recall him suggesting for political reasons. Of course, as I mentioned to you, he wasn't--he thought we were being too generous in the environmental, safety, and health area. Admiral Barr was a--at that time had spent a fair amount of time at Rocky Flats, been out there with an evaluation team, and had a lot of his own data on the safety condition of Rocky Flats.
Q. How much time had he spent out--spent at Rocky Flats?
A. Admiral Barr? He had spent several weeks at Rocky Flats by this time.
Q. Of consecutive time, or did he come in for a day or two--
A. No. He would come in for a week or two and then go and come back for a few days and then go and come back again.
Q. And the members of the PEC and the PERB, how much time did they spend at Rocky Flats?
A. Essentially all their time.
Q. Prior to you submitting your recommendation to headquarters for concurrence, did you have conversations about the award fee with any other headquarters personnel other than Admiral Barr?

A. I don't remember any other conversations. I might have had them with Mr. Tuck or somebody, or maybe Dave Leclaire in the administrative side of the DP, but I don't--I don't recall. And clearly at that time the recommendation that was going to be made to the management back there would have come from Admiral Barr.

Q. That is who you were reporting to at that time, Admiral Barr?

A. Officially I reported to the assistant secretary, but in reality, for most things, my--Admiral Barr was the key manager in headquarters that I talked to and discussed things, and so at least informally, I reported to Admiral Barr.

Q. I'm a little confused. So who were you supposed to report to, at least from a formal point of view?

A. Formal paperwork, it was assistant secretary for defense programs.

Q. Who was that?

A. Well, a series of them during that period of time. I think that when I went to Rocky Flats, it was John Meinhardt, on an acting basis. It then became John Tuck on an acting basis. And I think during this period of time, it was Mr. Tuck.

early December sometime, so--

Q. This was before that?

A. This would have been before that, that's correct.

Q. Now, this review that Mr. Willett was performing, that was prompted by Admiral Barr; is that your recollection?

A. Well, Mr. Willett worked for Admiral Barr, so he would have taken his instructions from Admiral Barr.

Q. Let me show you another memo prepared by Mr. Agy. This one is dated November 29, 1989, and it's been previously marked as Deposition Exhibit 131. Do you recall the subject of this memo?

A. No. Again, this--as I indicated to you before, we gave copies of our reports at various times to headquarters before--before we transmitted them formally. This indicates that, in fact, did happen and is another--identifies what was done at least one time.

Q. So you see no inconsistency between Mr. Willett being tasked to review the determination for Admiral Barr, and as it's describing in Exhibit 131, that you provide Mr. Willett informally with the award fee determination package at least prior to its formal submission to headquarters?

A. No. It's consistent.

Q. Now, according to Exhibit 131, you had the award fee determination package with you while you were visiting headquarters during the week of November 13. Do you have--do you recall having the award fee package with you when you were visiting headquarters?

A. No. But, again, Willett and Admiral Barr were continuously in and out of Rocky Flats. This may be Terrel's conclusion as to when I gave that to Willett. I don't know if it's correct or not.

Q. It's based on what Mr. Barkmeier-- apparently it's twice removed.

A. Yeah.

Q. Okay.

A. But, again, whether it was on November 13 or some other time, I had provided information to the headquarters people on our evaluation process and had had discussions with at least Mr. Willett's boss during that time period as well, who was Admiral Barr.

Q. Do you recall showing the award fee package to anyone at headquarters in addition to Admiral Barr and Mr. Willett?

A. I don't recall doing that. I don't even recall showing it to Mr. Willett, but I would not be surprised if I did because that would have been his

Q. Who is Jim Robbins?
A. I can't tell who Jim Robbins is.
Q. Is he in Albuquerque?
A. I don't know.
Q. And WIPP is what?
A. Waste Isolation Pilot Project.
Q. Would that have anything to do with Rockwell?
A. Minor connection that some point in time, Rock--Rocky Flats is expected to ship wastes to WIPP for ultimate disposal. And so there is some activity associated in--some activity at Rocky Flats associated with getting ready to do that and be sure that whatever waste we generate is, in fact, acceptable to the--to that facility. And there is some involvement, as a waste generator at Rocky Flats, in preparations for the initial test phase of that facility.
Q. Was there a different contractor operating WIPP at this time?
A. I believe WIPP is operated by Westinghouse. Continues to be so.
Q. If you turn to the second page that bears No. E 000273, and this indeed is the--is your transmission to Mr. Tuck.
A. Yes.

Q. The third paragraph that begins "as shown in the attachments." Do you see that?
A. Yes.
Q. Would you read that paragraph.
A. Says, "As shown in the attachments, Rockwell's performance was evaluated as equal to or less than the last period performance on all areas except two. The performance on the PRMP project improved significantly over this last period resulting in a higher award recommendation for the project. The second area of recommended higher performance rating is Environmental, Safety and Health performance area. As the evaluation indicates, the contractor's performance in the safety area continues to be unacceptable. However, this has been offset in our evaluation by the performance of Rockwell in assisting with the negotiations with EPA and the State on environmental agreements and in complying with these very aggressive agreements."
Q. Now, in Deposition Exhibit 31, which was the PERB recommendation to you, there was a draft of a transmission letter to Mr. Tuck.
A. That's correct.
Q. This paragraph that you just read was not included in that draft.

A. Yes.

Q. Do you recall any discussions as to why this paragraph should be included?

A. Yes. As I indicated before, the primary area of difference that existed between myself and Admiral Barr in our evaluation of Rockwell's performance was in the ES&H arena, and consequently, Rockwell's management performance associated with that. I felt it necessary, because of that disagreement, to clearly state why we had that disagreement and to clearly state my views on their performance in that area.

Q. Who was to make the determination as to the award fee for the period?

A. The determination is to be made by the fee determining official.

Q. But you felt it incumbent to beef up your position vis-a-vis--

A. Yes.

Q. --objections--let me finish so she gets it--objections you were receiving from Admiral Barr?

A. Yes.

Q. Now, did this entire package go to Tuck? I just want to make sure. I believe it was produced to us in this fashion. In other words--

A. That's right. This is also, of course, where the narrative ratings are turned into the actual amount of money that goes to the contractor, on these tables.

Q. And then after that, we have the formal PERB report that runs for 26 pages?

A. That's correct.

Q. And your recommended award is the same as the PERB's award; is that correct?

A. Yes. I recall those numbers are about the same. Yes.

Q. You keep saying "about the same." I believe they are the same, are they not?

A. Okay. It's just a matter of comparing them to tell, and that's easily done once we find the PERB report.

Well, the numbers that are in the letter that was attached to the PERB report are the same as in the letter that went forward, so . . .

Q. So you would--

A. They are, in fact, exactly the same.

MR. NEY: This would be a convenient time for me to break. Go off the record.

UNITED STATES CLAIMS COURT

Case No. 91-1362 C

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION DAVID P. SIMONSON
VOLUME II

December 11, 1992

Pursuant to Notice taken on behalf of the Plaintiff at 1719 Emerson Street, Denver, Colorado 80218, at 9:31 a.m., before Lori D. Porter, Registered Professional Reporter and Notary Public within Colorado.

Q. Now, would you regularly have communications with Mr. Willett with respect to any findings he was making or questions that he might have as head of the RAT team?

A. Yes. I would have had regular communications with Mr. Willett.

Q. And this would cover the period of time that the RAT team was in existence?

A. Yes.

Q. And do you recall any comments that Mr. Willett may have made to you with respect to Rocky Flats, any specific comments as we sit here today?

A. No, I don't.

Q. I believe you testified yesterday that before you submitted the Rockwell award fee to headquarters for concurrence, that you provided that recommendation to Mr. Willett to review on behalf of Admiral Barr; is that correct?

A. I think the--some of the documentation we looked at yesterday indicated that was the case. Again, I recall discussing it with Admiral Barr. I don't recall discussing it with Lou, but it's quite likely that Lou would have had it because of his position.

Q. Let's talk--go to your discussions with

Admiral Barr before you submitted the award fee for concurrence, I believe on December--it's dated December 6, 1989.

A. Correct.

Q. Did you have more than one conversation with Admiral Barr?

A. I remember a series of conversations.

Q. And I believe you testified yesterday that Admiral Barr expressed some disagreement with the PERB and your award fee evaluation at that time?

A. That's correct.

Q. And he thought you were being too high in the award fee that you were proposing for Rockwell?

A. That's correct.

Q. Can you give me any specifics that you recall that Admiral Barr might have provided to you as to why he thought you were being too high?

A. There was at the time we were going through this process a team of safety experts that were at Rocky Flats from headquarters and other offices and contractor people reviewing the--doing a detailed review of the safety position at Rocky Flats. Admiral Barr would have been giving me feedback from what that--what those teams were finding.

Q. Were those--would you communicate directly

with those teams?

A. I did occasionally, yes.

Q. So were you knowledgeable of the safety team's findings independent of what you were being told by Admiral Barr?

A. Yes.

Q. And do you recall specifically what Admiral Barr might have said with respect to these safety teams?

A. No. There was--not specifically, other than the discussions were in the general areas of the quality of the conduct of operations at the plant and the quality of the maintenance activities at the plant.

Q. Do you recall anything specific about the quality of the conduct and quality of the maintenance?

A. No. It was--there were concerns about the--whether the operators were following procedures, whether they had adequate procedures, whether they had adequate design documentation to support the procedures, whether the surveillances were being done--the surveillances of the safety systems were being done with adequate rigor. As I mentioned, it was concerns about the quality of the maintenance activities at the plant.

Q. Now, in addition to comments that Admiral

Barr may have made in connection with the safety teams--

A. Yes.

Q. --that you just testified to, do you recall specifically any other comments that Admiral Barr would have made in this time period prior to your submission of the award fee to headquarters?

A. No, I don't.

Q. Now, did you--strike that, please. In making the determination, as manager of Rocky Flats, as to the proposed award fee for Rockwell for the second half of fiscal year 1989, did you take into consideration at this time the comments that you received from Admiral Barr?

A. Yes.

Q. And as you testified yesterday, you nonetheless submitted on December--I believe December 6, the award fee that had been determined by your PERB and, I guess, embraced by you at that time; is that correct?

A. That's correct.

Q. Let me show you a document that's previously been marked as Plaintiff's Deposition Exhibit No. 81. It's a memorandum from Hugh Miller directed to you on the subject of award fee, Rockwell,

A. I'm not sure who all would have been on that concurrence.

Q. But you believe it would have been headquarters personnel in addition to Mr. Tuck?

A. Yes.

MR. NEY: Let me mark as Exhibit 169 a one-page document bearing Bates No. E 001840. It would appear to be from Robert D. Quinn, Q-u-i-n-n. Next to his name it says EH-232/3G-092.

(Plaintiff's Deposition Exhibit 169 was marked.)

Q. (BY MR. NEY) Is EH Environment, Health?

A. Yes. Yes.

Q. Note for the record that this document has a received date indicated at the bottom of December 15. At the top there's a fax stamp date of December 28, 1989. Have you ever seen this document before?

A. I don't recall ever seeing this document.

Q. The reference line to the document says Proposed Award Fee Determination for Kansas City, Mound, Pantex, Pinellas--that is P-i-n-e-l-l-a-s--and Rocky Flats. Below that it says, "EH-232 has reviewed the referenced packages and recommends EH-1 concurrence on all determinations except Pinellas." Who or what is

EH-232?

A. EH-232 is one of the organizations within the Environmental, Safety, and Health organization at headquarters. I can't tell you which one that is.

Q. And what about EH-1?

A. EH-1 would have referred to the assistant secretary for Environmental, Safety, and Health.

Q. There's also at the bottom of this single page a handwritten notation. Can you read that for the record, please.

A. "I am also concerned about the RF's rating for Rockwell in the ES&H area. I don't believe Rockwell's environmental performance was so good to offset safety deficiencies and some." That's how I read that. "Safety deficiencies. We should consider"--

Q. "Holding"?

A. "We should consider holding Rockwell to previous levels" is the way I would read that.

Q. Then it is signed?

A. It goes on to say, "I agree."

Q. Looks like there's a signature underneath that.

A. Yes. I don't know--I can't--I have no idea whose signature that is.

Q. Perhaps John?
A. Perhaps. Again, I can't really.
Q. Okay. Then underneath that--
A. Is another note that says, "I agree" with some initials, dated 12-26. I can't tell whose initials those are. Looks like the last letter is a B, but I can't--I can't tell who those are.
Q. Did you ever discuss Rockwell's award fee with Mr. Quinn?
A. I don't recall whether I discussed the award fee with Mr. Quinn or not.
Q. How about--
A. I don't recall any such discussions.
Q. How about John C. Tseng, T-s-e-n-g?
A. I don't remember any specific discussions with John Tseng regarding Rockwell's award fee.
Q. And Raymond P. Berube, B-e-r-u-b-e?
A. I don't remember any specific discussions with Mr. Berube regarding the award fee for Rockwell.
Q. What about Mr. Bush, Peter Bush?
A. No.
Q. And all of these individuals I've just indicated are headquarters individuals?
A. Tseng, Berube, Bush, Quinn are all headquarters individuals.

Willett (both of DP-20) on January 11, 1990, but that it was--but that it pretty much was decided on already. The headquarters changes were going to be forced on us." Who is Mr. Arendale?

A. I don't recall an Arendale at the moment.

Q. Now, according to the memo, at least, they were both of DP-20, so that would mean, if that's correct, that Mr. Arendale was on Admiral Barr's staff?

A. Yes.

Q. Now, do you recall on or around January 11, 1990, having a meeting with or a discussion with Messrs. Arendale and Willett on the subject of reducing the award fee?

A. I don't recall any particular conversation.

Q. Do you ever recall having a discussion with Mr. Arendale?

A. I can't recall right now who Mr. Arendale is, so I cannot recall any particular conversations with him. It may come back later as we talk.

Q. Let me show you a document that's been marked already as Plaintiff's Deposition Exhibit No. 136. It's entitled on the first page Summary Memorandum and has typed at the bottom John C. Tuck,

Under Secretary. There's an enclosure to the document that at the end of it says--has typed on it Admiral Barr's title and indicates that a copy was given to Mr. Simonson. Have you seen this document before, sir?

A. In my discussions with Admiral Barr, I can recall seeing drafts of similar documents. Whether it's this specific one or not, I cannot remember, but certainly documents similar to this.

Q. There's a handwritten note at the bottom right of the first page, the page that has the stamped No. E 000265, that states that "Received from Admiral Barr to Simonson on 1-11-90 (hand carried)." Does that at all refresh your recollection?

A. That would suggest that Admiral Barr gave this to me.

Q. And it's your testimony that you do recall receiving documents similar to this?

A. Yes.

Q. Although it may not necessarily be this exact document?

A. That's correct. That's correct.

Q. Okay. On the first page it states the issue. Do you see that?

A. Yes.

Q. Read for the record what the issue is.

A. The issue is stated as, "Should RI's award fee be reduced from $4,176,077 to $2,931,278?"

Q. RI is Rockwell International?

A. Yes.

Q. Would you read the paragraph entitled Discussion.

A. The paragraph reads, "A decrease is recommended in the award fee for RI as proposed by the Award Fee Determining Official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 30 percent lower than that proposed by the AFDO, and in our estimation more accurately reflects the level of performance of RI during the rating period. Specifically, we have recommended a total fee (award fee plus base fee) of $2,931,278 as compared to the award fee determining official recommendation of $4,176,077."

Q. Now, this page that you've been reading from at the bottom says John C. Tuck, under secretary.

A. Yes.

Q. And at the top, under--I guess under what says, Originating Office, it says DP-231, (M. Arendale). Do you see that?

A. Yes, I do.

Q. Can you explain to me the relationship in this memorandum between Mr. Arendale and Mr. Tuck?

A. Mr. Arendale is a member--apparently a member of the staff of DP-231, which is part of DP-20, which is Mr.--I believe which is, I believe, Admiral Barr's organization at the time. Mr. Barr, as the head of that organization, would have reported to the assistant secretary for defense programs, who I believe was Mr. Tuck acting in that position.

Q. So is--

A. Mr. Tuck also at the same time was, in fact, the under secretary.

Q. I'm just trying to understand the form of this memorandum. Is Admiral Barr's office in this summary memorandum requesting the concurrence of John C. Tuck, or is John C. Tuck requesting the concurrence of somebody else?

A. This memorandum would have been written where Mr. Tuck was requesting the concurrence of somebody else--I mean, or requesting the agreement or concurrence of somebody else. And that's--

Q. Now, what is the significance, then, of Mr. Arendale's name on it? Did he draft this for Mr. Tuck? Is that what it means?

A. That would be the appearance of it, yeah.

I mean, that's correct. I mean, I think that's correct.

Q. Now, it says at the top, "Secretarial Action Requested By:" Does that mean Mr. Tuck is requesting the concurrence of the secretary?

A. This is addressed to the deputy secretary as to--so that's the action--that's the person whose action Mr. Tuck is requesting.

Q. I see. The deputy secretary.

A. Yes.

Q. So Mr. Tuck is requesting the approval of the deputy secretary?

A. Yes.

Q. Who was that at the time?

A. Henson Moore.

Q. Okay. If you'd turn in this document to the page that's bears Bates No. E 000269. Do you see that?

A. Yes.

Q. And at the table at the top, it sets forth the AFDO's award fee for the plant. Do you see that?

A. Yes.

Q. And how much is that?

A. The total is listed as $4,176,077.

Q. Just the award fee.

A. Just the award fee is 3,743,200--

Q. Just for the plant.

A. I'm sorry. For the plant itself, which is in--is in--the award fee for the plant is listed as $3,114,200--$3,114,245.

Q. And that would have been the plant award fee contained in your December 6 submission; is that right?

A. Yes.

Q. And moving to the right on that column, what is--there's a number for what headquarters is recommending for the award fee for the plant.

A. Yes.

Q. And how much is that?

A. $2,160,393.

Q. And would you give me the same figures for PRMP/PROVE. First, what was the AFDO award fee for PRMP/PROVE?

A. $628,982.

Q. And what was the headquarters award fee for PROVE?

A. $338,035.

Q. And if you go to the very next page that bears Bates No. E 000270, there's a figure which would represent the award fee for the plant recommended by

the AFDO for the six-month period of the second half of 1989. I'm looking now at the numerical grade. Do you see what that is?

A. Yes.

Q. What is that?

A. For the plant, would have been 85.55 percent.

Q. And what was the headquarters grade for the plant?

A. 82.19.

Q. And looking at the functional performance areas, can you see the changes that headquarters was recommending versus what was in your award fee?

A. Yes.

Q. And where were their changes?

A. Changes in the general management.

Q. And what were the score changes?

A. The rating for general management recommended by the AFDO was 81. The headquarters recommended rating was 77.75.

Q. And is there a change--another change?

A. There is a change in the ES&H. The AFDO number for ES&H was 78, and the headquarters recommended rating was 65.25.

Q. Do you know how the 65.25 compares to the

ES&H rating for the first six-month award fee period in 1989?

A. Yes.

Q. And what is that?

A. Yes. That is listed on this chart also in the column called the Previous 6 Month Rate and is shown as 65.25 percent.

Q. And if you go to the last page on this document that bears Bates No. E 000271, can you tell me what the changes in the functional performance areas were for PRMP/PROVE from what you proposed and what headquarters was proposing.

A. Yes. In this case, there are several proposed changes. Project management, the AFDO number was 91. The headquarters recommended rating was 80. In schedule performance, the AFDO proposed rating was 90. The headquarters recommended rating was 85. In design quality, the AFDO recommended rating was 91. The headquarters recommended rating was 80. In technical product quality, the headquarters--the AFDO rating was 91. The headquarters recommended rating was 80.

Q. Thank you. You say you recall receiving some version of this memo similar to this.

A. Yes.

Q. Would those versions have had a proposed 30 percent reduction in the award fee?

A. In that ballpark, yes.

Q. Did you agree with that at the time you saw them?

A. No.

Q. Let me show you a document that bears Bates Nos. E 000240 through 246. These pages were part of, I believe, a somewhat larger document that's previously marked as Deposition Exhibit No. 138. And I'd ask you if you recall seeing this document before, Mr. Simonson.

A. You indicated this was an attachment to another exhibit? Have I seen that other exhibit?

Q. I don't believe so. I'll hand you now the full exhibit that's been marked as Exhibit 138. I'll note for the record that it's exactly what you have before you, except there are two pages that go before what I just handed to you that bear Bates Nos. E 000238 and 239.

A. I can recall discussions with members of my staff regarding this type of information. Whether I saw this exact assessment or not, I can't recall.

Q. Do you recall seeing a written analysis of the headquarters recommendation vis-a-vis your

Exhibit 170 the same as we previously talked about in Exhibit 136?

A. No.

Q. And what was the Rockwell award fee in Exhibit 136 that Mr. Tuck was proposing?

A. The issue in that draft--the issue in that draft memorandum states that the award fee would be reduced to $2,931,278.

Q. And what's he proposing in Exhibit 170?

A. $2,012,489.

Q. Now, would you read the paragraph titled Discussion on Exhibit 170.

A. Yes. "A decrease is recommended in the award fee for RI as proposed by the award fee determining official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 52 percent lower than that proposed by the AFDO and, in our estimation, more accurately reflects the level of performance of RI during the rating period. Specifically, we have recommended a total fee (award fee plus base fee) of $2,012,489 as compared to the AFDO recommendation of $4,176,077. For the previous 6-month period, RI was awarded a total fee of 3 million 336 million dollars and--$3,336,065 (see attachment 1 for comparison)."

Q. In Exhibit 170, Mr. Tuck says he's proposing a reduction of approximately 52 percent; is that correct?

A. That's correct.

Q. And what was the percentage reduction that he was proposing in Exhibit 136?

A. Approximately 30 percent.

Q. And I believe you testified earlier this morning that you disagreed with Mr. Tuck's proposal of approximately 30 percent reduction as shown in Exhibit 136; is that correct?

A. That's correct. Again, I would like to point out that this is an unsigned memo from Tuck. I don't know whether it represented his position or simply the position of Mr. Arendale and Admiral Barr.

Q. Did you agree with the proposed 52 percent reduction set forth in Deposition Exhibit 170?

A. By that time I was no longer the fee determining official, so there was no--I wasn't asked to agree or disagree with it.

Q. Did you have a view?

A. Yes.

Q. Did you agree with it?

A. No.

Q. And Mr. Nelson at this point in time--at

we had the--a determination made that was different than our previous determination and what were the administrative steps we needed to carry out to do that.

Q. And what do you recall about those discussions?

A. Again, we were talking about what our--I recall a conversation about what we should do with things like the PERB report, clearly a piece of that, although there was really no decision to be made. You do have to write a determination letter, but that is not a decision to do that or not to do that. The process requires that that be done.

Q. And in connection with the PERB report, do you recall--I take it you're saying you recall discussions that there was no reason to change the existing PERB report?

A. As I recall, we decided that we did not need to change the existing PERB report.

Q. Do you recall any discussions about not going along with Mr. Tuck's action item, February 22, 1990?

A. No, I don't. And, again, at this period of time, it wouldn't have been my decision. It would not have been my decision, would not have been a subject of conversation for me.

PL. SUPP. EX. 59

United States Government | Department of Energy

# memorandum

Albuquerque Operations Office

Rocky Flats Area Office

Plaintiff/Defendant Deposition Exhibit 27
Case # 91-1362 C
Date 10-23-92
Hyatt & Associates, Inc. 075

DATE: October 6, 1989

REPLY TO ATTN OF: ADM:TA

SUBJECT: Award Fee Evaluation/Determination - Second Half FY89

TO: Assistant Managers
PRMP Project Manage
Chief Counsel
Division Directors

Distribution 10/6/89
Memo - AF Evaluation/Determination

Simonson (Information Copy)
Currier
Barkmeier
Werkema
Foster (3)
Riley
Witherill
O'Brien
Roberts
Miller
Agy

We have reached an ... rd fee
determination proce ... ugh September 30,
1989. Although we ... nded evaluation
of Rockwell to AL f ... ion will take
place at Rocky Flat ... Determination
Official. The loca ... ollow the same
Performance Evaluat ... eriod October 1,
1989 through March ... EP is attached
for your informatio

Changes in the sche ... e as follows:

1. Tuesday, Octobe ... the final meeting
of the RF Performan ... Directors should
plan to attend this ... t of the
evaluation is attac

2. Wednesday, Octo ... ation will be
forwarded to AL Ass ... mment. The
Executive Secretary ... the PEC and
prepare the trasnmit ... e due to RF by
October 20, 1989.

3. Thursday, Octob ... agement will be
held to discuss the

4. Friday, October ... l meet and
finalize their recommendation to the Manager. Both AL Assistant Managers and Directors will be invited to this meeting.

Questions about the meetings or about the award fee evaluation process can be directed to Hugh Miller or Terrel Agy.

Claude H. Barkmeier
Claude H. Barkmeier
Director
Division of Administration

Attachments (2)

cc w/attch
D. P. Simonson

E 000704

United States Government

Department of Energy

# memorandum

Albuquerque Operations Office

Rocky Flats Area Office

DATE: October 6, 1989

REPLY TO ATTN OF: ADM:TA

SUBJECT: Award Fee Evaluation/Determination - Second Half FY89

TO: Assistant Managers
PRMP Project Manager
Chief Counsel
Division Directors

We have reached an agreement with AL concerning the award fee determination process for the period April 1, 1989 through September 30, 1989. Although we will submit a draft of an RF recommended evaluation of Rockwell to AL for comment, the award fee determination will take place at Rocky Flats and the RF Manager will be the Fee Determination Official. The local process for this evaluation will follow the same Performance Evaluation Plan (PEP) as approved for the period October 1, 1989 through March 31, 1990. A copy of Part I of the PEP is attached for your information.

Changes in the schedule issued on September 21, 1989 are as follows:

1. Tuesday, October 10, 12:30 - 2:30 pm This will be the final meeting of the RF Performance Evaluation Committee (PEC). All Directors should plan to attend this meeting. A copy of the latest draft of the evaluation is attached.

2. Wednesday, October 11 The PEC evaluation recommendation will be forwarded to AL Assistant Managers and Directors for comment. The Executive Secretary will make the changes requested by the PEC and prepare the trasnmittal to AL. Comments from AL will be due to RF by October 20, 1989.

3. Thursday, October 12 Discussions with Rockwell Management will be held to discuss the preliminary evaluation.

4. Friday, October 27, 1:30 - 3:00 pm The RF PERB will meet and finalize their recommendation to the Manager. Both AL Assistant Managers and Directors will be invited to this meeting.

Questions about the meetings or about the award fee evaluation process can be directed to Hugh Miller or Terrel Agy.

Claude H. Barkmeier
Claude H. Barkmeier
Director
Division of Administration

Attachments (2)

cc w/attch
D. P. Simonson

E 000705

U.S. DEPARTMENT OF ENERGY
ROCKY FLATS OFFICE
GOLDEN, CO

# PERFORMANCE EVALUATION PLAN

## FOR

## ROCKWELL INTERNATIONAL CORPORATION

## CONTRACT NO. DE-AC04-76DP03533

## PART I OF II

## BASIC PLAN

EVALUATION PERIOD: OCTOBER 1, 1989 THROUGH MARCH 31, 1990

# PART I

## CONTENTS


| Paragraph | | Page |
|---|---|---|
| A. | Introduction | 1 |
| B. | Organizational Structure for Award Fee Administration | 2 |
| C | Method for Determining Award Fee | 5 |
| D. | Changes in Plan Coverage | 8 |
| E | General Instructions For Performance Evaluation Committee (PEC) and Performance Monitors (PMs) | 9 |
| Attachments A - E | | 11 |
| Glossary and Summary of Acronyms | | 19 |

# PERFORMANCE EVALUATION PLAN

## CONTRACT NO. DE-AC04-76DP03533

## A. INTRODUCTION

1. This Performance Evaluation Plan (PEP) covers the administration of the award fee provisions of Contract No. DE-AC04-76DP03533, effective October 1, 1989, with Rockwell International Corporation.

2. The Contractor is required to manage, operate and maintain existing and new facilities of the U.S. Department of Energy (DOE) known as the Rocky Flats Plant, situated in Jefferson County, Colorado and Oxnard, California in accordance with the Scope of Work contained in the Contract and as may be directed by the Contracting Officer. The term of the Contract is from July 1, 1975 through December 31, 1993.

3. The objective of the award fee provisions of the Contract is to afford the Contractor an opportunity to earn increased fee commensurate with the achievement of optimum Contract performance. Optimum performance is not necessarily equated with the highest level of performance achievable in all incentivized areas. Rather, it represents the most favorable degree of performance obtainable in light of the Contractor's most effective utilization of available resources. (See the note on Attachment B, Grading Table.) The Department expects the Contractor to exceed minimum performance standards and equates this level of performance with a good performance rating. In addition to providing special management emphasis to the Performance Objectives and Criteria identified in this Plan, the Contractor is responsible for striving to attain the highest standards of excellence in executing its responsibilities under the Contract as measured against performance standards consistent with best available practices. The Contractor is expected to have a strong self-assessment program to measure progress against the standard of excellence. The Contractor will receive favorable ratings for identifying problems to DOE, and developing and implementing corrective actions.

## B. ORGANIZATIONAL STRUCTURE FOR AWARD FEE ADMINISTRATION

1. Fee Determination Official (FDO)

a. The FDO is the Manager, Rocky Flats Office (RF), his/her successor or assignee.

b. Primary FDO responsibilities are:

(1) Establishing this Performance Evaluation Plan.

(2) Determining the award fee earned and payable for each evaluation period as addressed in Paragraph D.

(3) Changing the matters covered in this Plan as addressed in Paragraph D., as appropriate.

(4) Appointing the Performance Evaluation Review Board (PERB) Chairperson.

2. Performance Evaluation Review Board (PERB)

a. Membership of the PERB shall consist of the Assistant Managers, the Plutonium Recovery Modification Project Manager and the Director, Division of Administration. The PERB Chairperson will be appointed by the Manager. The RF Chief Counsel and the Chief, Contracts and Services Branch, shall serve as non-voting advisors to the PERB. The Contract Administrator within the Division of Administration shall serve as Executive Secretary.

b. Primary responsibilities of the PERB are:

(1) Reviews and recommends the Performance Objectives and Criteria to the FDO.

(2) Reviewing the evaluation reports of the Performance Evaluation Committee (PEC) and functional evaluations regarding Contractor performance.

(3) Conducting independent, ongoing evaluations of Contractor performance.

(4) Submitting a PERB Report to the FDO covering the Board's findings regarding performance and containing a recommendation of fee earned for each evaluation period. The Report to the FDO shall include all minority opinions or reports.

(5) Considering proposed changes to this PEP and recommending those it considers appropriate to the FDO for incorporation into the PEP.

3. <u>Performance Evaluation Committee (PEC)</u>

a. Membership of the PEC will consist of the Division Directors with the Director, Division of Administration serving as Chairperson. The Chief, Contracts and Services Branch, shall serve as a non-voting advisor to the PEC and the Contract Administrator shall serve as Executive Secretary. The Albuquerque Operations Office (AL) may provide a voting representive to serve on the PEC.

b. The PEC will be responsible for complying with the General Instructions for the Performance Evaluation Committee and Performance Monitors set forth in Paragraph E of this PEP. Primary responsibilities of the PEC are:

(1) Prepare for each six month evaluation period a Draft Performance Objectives and Criteria stipulating requirements upon which performance will be assessed.

(2) Monitoring, evaluating and assessing the Contractor's performance in the Performance Objectives and Criteria set forth in Part II of this PEP.

(3) Meeting with the Contractor at least quarterly during each evaluation period to discuss the Contractor's performance relative to the established Performance Objectives and Criteria.

(4) Submission of a draft PERB Report, in the format specified in Attachment D, to the PERB at the end of each evaluation period for the Functional Performance Areas for the period. The draft PERB Report to the PERB shall include all minority opinions or reports. Evaluation input from AL Division Directors is to be

considered by the PEC members in preparation of the draft PERB Report.

(5) Recommending appropriate changes to this Plan to the PERB.

4. <u>Performance Monitors (PMs)</u>

a. Each Performance Evaluation Committee member shall be supported by Performance Monitors (PMs) who shall be Branch Chiefs supported by Staff members who have expertise relative to the Performance Objectives and Criteria set forth for the PEC to evaluate.

b. Primary responsibilities of PMs are:

(1) Recommending Performance Objectives and Criteria for areas important to the success of the RF mission.

(2) Monitoring, evaluating and assessing the Contractor's performance on the Performance Objectives and Criteria assigned to the PM.

(3) Consulting with other RF personnel, as appropriate, regarding the Contractor's performance in aspects of performance within a Performance Objective and Criteria which are not within the PM's expertise or have not been directly observed by the PM.

(4) Providing input, in a format specified by the PEC Chairperson, documenting the Contractor's performance within assigned Performance Objectives and Criteria.

(5) Recommending appropriate changes to this PEP to the PEC Chairperson.

## C. METHOD FOR DETERMINING AWARD FEE

A determination of the award fee earned for each six-month evaluation period is scheduled to be made by the FDO within forty-five working days after the end of each period. The method to be followed in monitoring, evaluating, and assessing Contractor performance during the period, as well as for determining the award fee earned, is described below.

1. Five calendar days after the end of each evaluation period the Contractor shall provide a written, candid self-assessment of performance during the evaluation period. The self-assessment shall address both the strengths and weaknesses of the contractor during the evaluation period. Where deficiencies are noted, the contractor shall describe the actions planned or taken to correct such deficiencies and avoid their recurrence. The self-assessment should clearly assess the Contractor's measured performance against the standard of excellence. An original and 12 copies of the self-assessment will be provided to the PERB Chairperson for distribution to PERB members and to the PEC.

2. The PEC, PERB, and FDO shall evaluate the Contractors self-assessment and consider its realism as part of their evaluation of the Contractor's performance. An unrealistic self-assessment will result in lower award fee determinations. The contractor will not be penalized for a realistic self-assessment, although deficiencies noted by the contractor may be reflected in the government's evaluation. The self-assessment itself will not be the basis for the award fee determination.

3. The PEC, utilizing all available inputs, shall evaluate the Functional Performance Groups identified in Part II of this Plan based upon the Performance Objectives and Criteria set forth therein. The PEC shall submit a draft PERB Report to the PERB at the end of each evaluation period.

4. Not all areas of performance included in the Contract Statement of Work are covered under the Functional Performance Groups identified in Part II. Each RF Division Director who is responsible for a function not covered under a Functional Performance Group shall submit an evaluation of the Contractor's performance within the function to the PERB at the end of each award fee period. These evaluations shall be based upon good business practices, sound

management principles and adherence to generally accepted standards and procedures consistent with best available practices. These functional evaluations shall be considered as supplemental information by the PERB in their fee recommendation to the FDO. Generally, only significant variations in performance, either exceptionally good or poor, within a functional area will impact the PERB's award fee recommendation and the final fee determination by the FDO.

5. Each PEC member shall meet with the Contractor at least quarterly to discuss the Contractor's performance. These meetings shall be held within twenty working days after the end of each evaluation period.

6. After the end of the evaluation period the PERB will meet and consider all appropriate performance information it has obtained. The PERB Chairperson will then finalize the PERB Report for the period and submit it to the FDO. The Report will include a recommended award fee with supporting documentation and all minority opinions or reports.

7. The FDO will consider the PERB Report and discuss it with the PERB and other personnel, as appropriate. If requested by the Contractor, or if the FDO considers it appropriate, the FDO will meet with the Contractor for discussions. If requested by the FDO, the PERB and any other personnel involved in performance evaluation may be required to attend the meeting with the Contractor.

8. The FDO will determine the amount of award fee earned during the period. While it is recognized that the basis for determination of fee shall be the evaluation in accordance with the PEP, the FDO may rely upon the information provided by the PERB and PEC, as well as any other reports, including the Contractor's self-assessment or supplement this information with personal knowledge (or any other factors and information deemed appropriate) in determining the award fee earned. In the event that the FDO determines the contractor's performance to be unacceptable in any important area, critical to contract performance - whether or not that area is specified in the Performance Evaluation Plan, the FDO may at his/her discretion determine the contractor's overall performance to be unacceptable, and accordingly may withhold the entire award fee. The FDO's determination of the amount of award fee earned will be provided in an Award Fee Determination Statement (AFDS) letter to

the Contractor. Prior to the issuance of the AFDS, the FDO will brief the Assistant Secretary for Defense Programs (ASDP) and obtain his/her concurrence.

9. The following is a summary of the principal actions involved in determining the award fee for each evaluation period.

| Action | Schedule |
|---|---|
| 1. FDO provides Performance Evaluation Plan to Contractor. | Minimum of thirty calender days prior to start of the performance evaluation period. |
| 2. PM and PEC Members monitor performance. | Ongoing after start of period. |
| 3. PM's submit input to Division Directors (PEC); Division Directors input functional evaluations. | 5 working days after mid-point and end of period. |
| 4. Contractor submits self-assessment report. | 5 working days after end of evaluation period. |
| 5. DOE HQ ASDP and ASEH submit input to PERB. | 15 working days after end of evaluation period. |
| 6. PEC develops evaluation position; PEC RF members meet with Contractor to discuss findings and positions; PEC prepares draft PERB Report. | 20 working days after end of evaluation period. |
| 7. PERB evaluates draft PERB Report and submits recommendation to the FDO. | 30 working days after end of evaluation period. |
| 8. FDO develops fee position and obtains ASDP concurrence. | 40 working days after end of evaluation period. |
| 9. FDO sends AFDS to Contractor. | 45 Working days after end of evaluation period. |

## D. CHANGES IN PLAN COVERAGE

### 1. Right to Make Unilateral Changes

As authorized in Clause 62, Allowable Costs, Base Fee and Award Fee, paragraph (b)(2) Determination of Award Fee of the Contract, any matters covered in this Plan may be changed unilaterally by the FDO prior to the beginning of an evaluation period by timely notice of at least thirty calendar days to the Contractor in writing. The changes will be made without formal modification of the Contract.

### 2. Method for Changing Plan Coverage

The following is a summary of the principal actions involved in changing Plan coverage.

| | Action | Schedule (Calendar days) |
|---|---|---|
| 1. | PEC submits proposed changes to PERB. | 50 days prior to end of evaluation period. |
| 2. | PERB drafts proposed changes. | Ongoing. |
| 3. | PERB Coordinates proposed changes with Contractor. | Ongoing. |
| 4. | PERB submits recommended changes to FDO. | 40 days prior to end of each evaluation period. |
| 5. | FDO notifies Contractor of changes or that there are no changes. | 30 days before start of applicable evaluation period. |

## E. GENERAL INSTRUCTIONS FOR PERFORMANCE EVALUATION COMMITTEE (PEC) AND PERFORMANCE MONITORS (PM)

### 1. Monitoring and Assessing performance

The basic concept of CPAF Contracting is that Contractors are encouraged to work effectively to meet objectives, to control costs, and to assure the timeliness and quality of performance. In establishing the amount of the award fee to be paid the Contractor through periodic evaluations, RF will in essence determine the degree to which the Contractor has met these goals. The evaluation process consists of (1) formal semi-annual reviews of the Contractor's performance by the PEC; (2) semi-annual reviews of the evaluation reports and recommendations of earned fee by the PERB; and, (3) final award fee determination by the FDO. The evaluation process initiates with the PEC utilizing input from the PM's and from AL. The PEC is responsible for monitoring, reviewing and evaluating the Contractor's performance against established criteria, including adherence to generally accepted standards of practice and standard operating procedures, and translating these evaluations into draft reports for the PERB. The PEC will also utilize all available performance information (e.g., audits, appraisals, task force reports, etc.) as sources of input to their reports and will include an evaluation of the realism of the Contractor's self-evaluation in making their recommendation. The evaluation will also appraise a combination of the Contractor's diligence in developing written procedures for all aspects of the Contractor's operation and the degree of adherence of these procedures by the Contractor's employees.

### 2. Documenting Evaluation/Assessment

a. Performance monitors shall provide their input to the appropriate PEC members. PEC members shall be responsible for drafting the PERB Report after considering all available data including the performance monitor input and the contractor's self-assessment. The PEC will provide this documentation together with a fee recommendation to the PERB. The PERB will finalize the draft report and fee recommendation for submission to the FDO. The FDO will issue an Award Fee Determination Statement.

b. Copies of all official PM/AL/PEC evaluator documentations of evaluations and assessments shall be attached to the PEC Report as back-up information. This will permit the Award Fee Executive Secretary to maintain a complete history of the Contractor's performance during the evaluation period. If an evaluation or assessment identifies a problem or deficiency within a functional area, a copy must immediately be provided by the PEC/PM to the division director responsible for the functional area in order for appropriate performance direction to be issued.

c. All award fee documentation, including AL and PM evaluation reports, draft PERB and PERB Reports, shall be stamped or marked "PREDECISIONAL". The Award Fee Determination Statement provided to the Contractor is considered a public document and is releasable to the general public.

# ATTACHMENT A TO PEP

## CONTRACT NO. DE-AC04-76DP03533

## AWARD FEE EVALUATION PERIODS

| No. | Period Covered |
|---|---|
| 1 | October 1, 1989 - March 31, 1990 |
| 2 | April 1 - September 30, 1990 |
| 3 | October 1, 1990 - March 31, 1991 |
| 4 | April 1 - September 30, 1991 |
| 5 | October 1, 1991 - March 31, 1992 |
| 6 | April 1 - September 30, 1992 |
| 7 | October 1, 1992 - March 31, 1993 |
| 8 | April 1 - September 30, 1993 |

# ATTACHMENT B TO PEP

CONTRACT NO. DE-AC04-76DPO3533

## GRADING TABLE

| ADJECTIVAL GRADES | NUMERICAL GRADES | DESCRIPTIONS |
|---|---|---|
| OUTSTANDING | 96-100 | Performance exceeds standard by a substantial margin; with few elements for improvement, all of which are minor. Of exceptional merit; exemplary performance in a timely, efficient and economical manner. No notable deficiencies. |
| EXCELLENT | 86-95 | Performance exceeds standard. Some notable achievements exist. Although there may be some elements for improvement, these are more than offset by better performance in other elements. Fully responsive to contract requirements. |
| GOOD | 76-85 | Performance is standard in meeting the general requirements placed upon contractor. Areas of deficient performance are offset by areas of above standard performance. |
| MARGINAL | 61-75 | Performance is less than standard; and, although there are elements of standard-or-better performance, these are more than offset by lower graded performance in other elements. |

| | |
|---|---|
| UNSATISFACTORY 0-60 | Performance is significantly below the standard and requires immediate corrective action. There are many areas of poor performance and management. Satisfactory areas are more than offset by significant deficiencies. |

<u>Important Note:</u>

The Department expects the Contractor to perform at the highest levels of excellence; however, the standard anticipated level of rating of a qualified, competent and successful Contractor is Good. This corresponds to a numerical rating of 80 points on the rating scale and to earning fifty percent (50%) of the available award fee pool dollars. Performance points will reflect deviations from this standard in the direction of either better or worse performance. Performance ratings above the standard level will reflect the extent to which the Contractor, on its own initiative, is actively involved in performance improvement activities and the extent to which these actions contribute to more efficient, effective, and economical operations. However, a rating above standard (80 points) may be justified by a high level of sustained performance where further improvements in performance would not be cost effective.

The Department expects the Contractor to exercise due diligence in the conduct of all Contract activities. It is expected that management systems will be in place and enforced to assure that effective procedures are developed and implemented. The Contractor's failure to oversee, through acts of commission or omission, the conduct of its operations and all of its employees, which potentially or actually causes property damage, losses, endangers the safety, health or environment, or compromises the ability of the Department or RF to carry out its mission, will be weighed heavily in the performance ratings. By the same standard, the performance ratings will not be adversely affected if the Contractor raises safety issues to the appropriate DOE Assistant Secretary, or his/her designee, for resolution. Furthermore, the performance ratings will not be adversely affected if the Contractor stops an activity which is deemed unsafe even though the Contractor's action may appear to be contrary to DOE direction.

A performance rating below 60 points for total performance, or within a single functional area, is a matter of grave concern to the Department. This is particularly true in the Environment, Safety and Health performance or functional area(s), where inadequate levels of performance could cause immediate and detrimental impact upon public health and safety, and could result in unacceptable programmatic impacts. Similarly, inadequate levels of performance in other functional areas, such as production, operations or construction, could have unacceptable programmatic effects potentially impacting national security. For these reasons, if a performance area or a functional area is rated "unsatisfactory," the FDO may determine that no award fee payment will be made to the Contractor.

ATTACHMENT C TO PEP
CONTRACT NUMBER DE-AC04-76DP03533

AWARD FEE CONVERSION CHART

| PERFORMANCE POINTS | | PERCENT OF AVAILABLE AWARD FEE |
|---|---|---|
| 100 | OUTSTANDING | 100.0 |
| 99 | | 97.5 |
| 98 | | 95.0 |
| 97 | | 92.5 |
| 96 | | 90.0 |
| 95 | EXCELLENT | 87.5 |
| 94 | | 85.0 |
| 93 | | 82.5 |
| 92 | | 80.0 |
| 91 | | 77.5 |
| 90 | | 75.0 |
| 89 | | 72.5 |
| 88 | | 70.0 |
| 87 | | 67.5 |
| 86 | | 65.0 |
| 85 | GOOD | 62.5 |
| 84 | | 60.0 |
| 83 | | 57.5 |
| 82 | | 55.0 |
| 81 | | 52.5 |
| 80 | | 50.0 |
| 79 | | 47.5 |
| 78 | | 45.0 |
| 77 | | 42.5 |
| 76 | | 40.0 |
| 75 | MARGINAL | 37.5 |
| 74 | | 35.0 |
| 73 | | 32.5 |
| 72 | | 30.0 |
| 71 | | 27.5 |
| 70 | | 25.0 |
| 69 | | 22.5 |
| 68 | | 20.0 |
| 67 | | 17.5 |
| 66 | | 15.0 |
| 65 | | 12.5 |
| 64 | | 10.0 |
| 63 | | 07.5 |
| 62 | | 05.0 |
| 61 | | 02.5 |
| 60 | UNSATISFACTORY | 00.0 |

# ATTACHMENT D TO PEP

CONTRACT NO. DE-AC04-76DP03533

AWARD FEE ORGANIZATION
AND DOCUMENT FLOW




TIME PERIOD = WORKING DAYS AFTER END OF EVALUATION PERIOD

# ATTACHMENT E TO PEP

## CONTRACT NO. DE-AC04-76DP03533

## FORMAT FOR
## PERFORMANCE EVALUATION REVIEW BOARD REPORT

I. EXECUTIVE SUMMARY - The Executive Summary shall provide an overall summary of the Contractor's performance during the rating period and shall provide both an adjective and performance point rating. Any minority opinions or reports shall be identified.

II. ACHIEVEMENTS/DEFICIENCIES/OBSERVATIONS - This section of the report contains a listing of the Contractor's important achievements, performance deficiencies, and general performance observations during the period. It shall be presented in the following format for each Functional Performance Group.

- SIGNIFICANT ACHIEVEMENTS (if any) - List by Functional Performance Area.
- NOTABLE ACHIEVEMENTS (if any) - List by Functional Performance Area.
- SIGNIFICANT DEFICIENCIES (if any) - List by Functional Performance Area.
- NOTABLE DEFICIENCIES (if any) - List by Functional Performance Area.
- OBSERVATIONS (if any) - List by Functional Performance Area.

DEFINITIONS:

<u>Significant</u> - This term signifies a major event or sustained level of performance which due to its importance is exceptionally good or poor and deserves to be brought to the Manager's attention for fee determination purposes.

<u>Notable</u> - This term signifies an event or sustained level of performance which is of lesser importance than a "significant" event, but nonetheless deserves some recognition.

Identification of events/performance as "significant" or "notable" should be reserved for those events/levels of performance which are extraordinary and warrant the attention of both DOE and Contractor management.

III. DISCUSSION

a. Part I of this section shall identify in chart format each Functional Performance Area which were evaluated and shall provide an adjective and numerical rating for each.

b. A summary of the Contractor's performance within each Functional Performance Area shall be provided in Part II of this section.

c. A full discussion of the Contractor's performance in each Functional Performance Objective and Criteria is to be provided in Part III of this section. This discussion must address the Contractor's performance during the entire evaluation period. The overall rating should be based upon total performance, not simply on isolated examples of good or poor performance. Factors outside the Contractor's reasonable control contributing to performance weaknesses should be identified and taken into consideration in the rating. The discussion should provide sufficient information to fully and clearly support the performance ratings assigned. The PEC shall also include in its draft PERB Report an evaluation of the realism of the Contractor's self-assessment report.

d. Identify and fully discuss in Part IV of this section any other aspects of the Contractor's performance within the general coverage of the Functional Performance Group not specifically identified in the Criteria. The impact of this information on the overall rating must be specified.

e. Part V of this section shall discuss any minority opinions and/or include any minority reports.

# GLOSSARY AND SUMMARY OF ACRONYMS

## DEFINITIONS

FUNCTIONAL PERFORMANCE GROUP (FPG) - A major grouping of functions within the Contract Scope of Work identified as an area which is extremely important to the Department of Energy and the Rocky Flats Office (RF). The Contractor's performance under a Functional Performance Group will be the primary basis for payment of the award fee under the Contract. These aspects are defined in Part II of this PEP.

FUNCTIONAL PERFORMANCE AREA (FPA) - An aspect of the Contractor's performance responsibilities covered by the Contract Statement of Work.

PERFORMANCE OBJECTIVE - A very broad category of performance which will be evaluated under a Functional Performance Group. Normally it encompasses the performance of a total function or program.

PERFORMANCE CRITERIA - The basic aspects of performance within a Performance Objective which breaks down the Performance Objective into the important integral parts which will be evaluated for award fee determination purposes.



E 000726

## ACRONYMS

| | |
|---|---|
| AFDS | Award Fee Determination Statement |
| AL | Albuquerque Operations Office, DOE |
| CPAF | Cost Plus Award Fee |
| DOE | U. S. Department of Energy |
| DP | Assistant Secretary for Defense Programs |
| EH | Assistant Secretary for Environment, Safety, and Health |
| FDO | Fee Determination Official |
| FPA | Functional Performance Area |
| FPG | Functional Performance Group |
| HQ | U. S. Department of Energy, Washington, D. C, |
| PEC | Performance Evaluation Committee |
| PERB | Performance Evaluation Review Board |
| PM | Performance Monitor |
| RF | Rocky Flats Office, DOE |

PL. SUPP. EX. 60

CERTIFIED COPY

No. 91-1362 C

UNITED STATES CLAIMS COURT

- oOo -

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

==========================================================

DEPOSITION OF

THEETIS V. HILL

Wednesday, December 2nd, 1992

Albuquerque, New Mexico

Reported by:

ARLETTE McCLAIN, CSR #85

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025

Q. What division or branch were you branch chief of?

A. I don't remember the name of it right now. It involved awarding contracts for architect/engineer, construction, small value purchases, other contracts and some R&D work. It was primarily awarding contracts and administering contracts for that branch.

Q. And what did you do then after May of 1987?

A. I was in the management operating contractor branch, which was the branch that I stayed in until I retired in October of '90.

Q. And what were your duties and responsibilities in the management and operating contracting branch?

A. Negotiating fee and scope, on a lot of occasions the management operating contracts. I was executive secretary to the Performance Evaluation Review Board. Those were the primary things.

Q. When did you first become executive secretary to the Performance Evaluation Review Board?

A. In May of 1987.

Q. When did you first become involved in any way with an award fee under a government contract?

A. At the time I became secretary to the Performance Evaluation Review Board.

Q. Prior to that time you had had no involvement with an award fee; is that right?

A. That's right. I did have some involvement -- very minor involvement prior to that time. We had had an award fee contract at the time I negotiated fee and scope. We deleted the award fee from that contract. It was a regular fixed price -- not fixed price, but cost plus fixed fee contract. My involvement with award fee was very minor.

Q. Other than that experience, your involvement really began in May of 1987?

A. Yes.

Q. What was your involvement beginning in May of 1987 with the award fees?

A. As the secretary to the -- I'll call it the PERB, I was not in a position of making -- decision-making position. My position was to coordinate activities in support of the PERB, receive the performance evaluation review report from area managers. I would distribute it to the Performance Evaluation Review Board members, make arrangements for the meeting for the PERB meeting. I would attend the meeting, take notes, take minutes during the meeting and make any changes that might be required to the report -- the draft report, and coordinate those changes with all -- with the hearing officer and with the PERB members, and finalize the report for the chairman of the PERB, and prepare the minutes of the PERB meeting.

Q. Beginning in May of 1987, how many award fees

were you helping to administer in your role as executive secretary to the PERB?

A. Five.

Q. Did that number change over time?

A. The only change that I recall was in 1989, the second half, Rockwell International was handled through the office at Rocky Flats, rather than through AL. So at that time we had four.

Q. Did you keep your position as executive secretary of the PERB until the time you retired?

A. Yes.

Q. After the second half of fiscal year 1989, were you helping to administer four contracts with respect to their award fees through the time you a retired?

A. Yes. I was still the PERB secretary.

Q. And there were four contracts?

A. Yes.

Q. Did the award fee responsibilities for any contract, other than the Rockwell contract, become delegated away from the Albuquerque office during your tenure as executive secretary?

A. No.

Q. Only the Rockwell contract?

A. Yes.

Q. When you first became executive secretary in the

two months.

Q. Would it exceed one month?

A. It might.

Q. Was it less than one-month in some cases?

A. I don't remember.

Q. Prior to the first half of fiscal year 1989, were there any steps in the award fee process which you have described that would take place after the PERB meeting, other than what you have described?

A. No, not that I'm aware of.

Q. Beginning with the award fee period for the first half of fiscal year 1989, were steps added that included headquarter's involvement in the award fee process?

A. Yes.

Q. Was the first half of fiscal year 1989 the first time steps involving headquarters was included in the award fee process?

A. To the best of my memory, yes.

Q. Mr. Hill, I'm showing you a document that has previously been marked as Exhibit 12. Please review this document, and tell me if you have ever seen it before.

A. Yes, I have seen this.

Q. Did you prepare this document?

A. For the most part, yes.

Q. What was the purpose of this document?

office.

Q. Would Mr. Twining have told you directly?

A. I don't recall if he -- I don't recall if he told me directly. I mean, I don't recall if it was even conveyed before this letter -- before I got a copy of the letter.

Q. Did you ever discuss with Mr. Twining, Rockwell's award fee during 1989?

A. Discuss it in what manner?

Q. Did you ever discuss Rockwell's award fee in any manner, directly with Mr. Twining?

A. I don't recall -- no, I don't recall addressing -- discussing the award fee with him, other than -- I mean, I was not in a decision-making capacity. There would be no reason for him to discuss it with me.

Q. Did you always communicate to Mr. Twining through the chairman of the PERB?

A. Most of the time that's true. In this instance he did talk to me directly about preparing a letter.

Q. Preparing this memorandum to Mr. Wade?

A. Yeah.

Q. In any period prior to the first half of fiscal year 1989, did you ever prepare a memorandum similar to Exhibit 12, requesting the concurrence or nonconcurrence of award fees from someone at headquarters?

A. No.

Q. To your knowledge, had any such memorandum ever been sent before to anyone at headquarters?
A. No.
Q. Mr. Hill, I'm handing you a document that has previously been marked as Exhibit 9, which is a memorandum from Mr. Barkmeier to Mr. Berger dated May 23rd, 1989. On the face of the memorandum it indicates that a copy was sent to you. Did you receive this document?
A. I don't recall getting this specific document. I see a copy was sent to me. I don't remember the specific document. It did trigger my memory on one other point that you asked me about the timing. I believe the M&O contracts had a time in the contract which required the contract -- the award fee determination to be made within a 35-day period. I had forgotten that, but it just reminded me of that.
Q. That period is 35 working days after the end of the evaluation period.
A. Yes.
Q. Was that deadline met in the case of Rockwell's award fee for the first half of fiscal year 1989?
A. I don't think so.
Q. Why wasn't it met?
A. I believe the decision was delayed beyond that time period, the manager's decision.

page. Were these functional performance areas and the corresponding weightings used in arriving at the PERBs recommended award fee for Rockwell for the first half of fiscal year 1989?

A. Yes, this was effective October 1st of '88, which was the the beginning of the fiscal year, yes.

Q. Let me direct your attention to the page that is numbered at the bottom E001282. There is a rating plan that begins on that page and continues to the next page. Was that rating plan used in determining the PERBs recommended award fee for Rockwell for the first half of fiscal year 1989?

A. Yes, that is my recollection. I don't think it was changed during that period, so this would have been the plan that was used.

Q. Let me now direct your attention to the page that is marked in the lower right-hand corner 1278.

Would you please read aloud the first sentence under the section number two entitled "Introduction"?

A. "The award fee determination official (manager or anyone acting as manager Albuquerque operations) (AFDO), shall evaluate the contractor's performance during each evaluation period, and will determine the amount of award fee to be paid the contractor for that evaluation period.

Q. In 1989 who would you take it to mean by the

award fee determination official?

A. The manager of Albuquerque operations.

Q. Who was that?

A. Bruce Twining.

Q. Mr. Hill, I'm handing you a document that has been previously marked as Exhibit 2, which is the Albuquerque Operations Handbook for Award Fee Performance Evaluation and Review Process. It is dated on the second page June 24th, 1977. Have you ever seen this handbook before?

A. Yes.

Q. Was this handbook used in arriving at the PERBs recommended award fee for Rockwell for the first half of fiscal year 1989?

A. There was a change made to this handbook, and I don't remember the date that the change was made. In other words, there was a new handbook issued. I don't remember if that new handbook was issued before the first half of 1989 or after.

Q. I'm handing you a document that has previously been marked as Exhibit 30, which is a more recent Albuquerque handbook for award fee administration, dated February 16th, 1990. Is that the more recent handbook you are referring to?

A. Yes.

PL. SUPP. EX. 61

CERTIFIED COPY

No. 91-1362 C

UNITED STATES CLAIMS COURT

-oOo-

ROCKWELL INTERNATIONAL CORPORATION, :

Plaintiff, :

vs. :

UNITED STATES OF AMERICA, :

Defendant. :

=====================================================

DEPOSITION OF

ALBERT EARL WHITEMAN

Friday, December 4, 1992

Albuquerque, New Mexico

Reported by:

SUSAN M. HILTON, CSR, RPR, CP, CM
NEW MEXICO CSR #108

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025
310/477-8867 FAX [illegible]

check in the box with a signature.

Q. So you were the manager at Rocky Flats from sometime in 1985 until sometime in 1989; is that correct?

A. Yes. I don't remember the exact day I left. I know my wife and I drove to Washington, D.C., like the day after I left, and we reached Washington on May 1. I do remember that. So it would have been around the 20th to the 25th of April, something like that, when I left.

Q. How did the transfer from the Rocky Flats office to Washington come about? Did you put in for a position in Washington?

A. Well, about six months before, I indicated to Mr. Twining, who was my supervisor here in Albuquerque, that I desired to do something else, that I was starting to get burnt out. So as it turned out, with the new administration coming in at that time, it looked like a good time to spend a few months in Washington and then to come from there to Albuquerque. So I wasn't looking specifically for that position, but I was looking. I had begun looking for something about six months before that.

Q. And what position did you take in Washington for those four months?

A. It was called the field liaison for the secretary, and it was a new secretary, new administration that had just come in. For the first year or so they wanted

a senior person to be a liaison between the new secretary and his staff and the various field office people.

Q. Who replaced you at Rocky Flats?

A. Rush Inlow.

Q. Where did he come from?

A. Here in Albuquerque.

Q. After you left Rocky Flats to go to Washington in 1989, did you have any involvement with the award fee process?

A. No.

Q. For Rockwell?

A. No.

Q. Do you recall ever being consulted about the award fee process the day after you left?

A. No.

Q. And then after this four months in Washington, you came back to Albuquerque?

A. Right.

Q. What has been your position in Albuquerque since then?

A. Well, initially I took a position as a special assistant to Mr. Twining and did a number of projects for him over the next year. And then in, it would have been late summer of 1990, I took my present position, which is director of the weapons quality division.

Q. After you came back to Albuquerque and were reporting to Mr. Twining, were there occasions when you and Mr. Twining discussed the award fee process in connection with Rockwell?
A. No.
Q. I have a document that somebody put together that indicates that your tenure as manager at Rocky Flats was from November 7, 1985, through April 28, 1989. Do those dates sound correct to you?
A. Yes, that would fit.
Q. Let me show you a document that has been previously marked as Plaintiff's Deposition Exhibit No. 2. It's titled, "Handbook for Award Fee Performance, Evaluation Review Process." And on the second page it has a Bates stamp number E001012. There's a date of June 24, 1977 on it. Are you familiar with this document?
A. Well, I guess. I don't believe this was the current one when I was at Rocky Flats, but I could be wrong. But I have worked in the various positions I have been in, and I have worked in various aspects of the work fee process, so I would have reviewed the handbook for that, yes.
Q. But do you recall whether the June 24, 1977, edition of the handbook was the prevailing handbook during your term at Rocky Flats?
A. No. I thought there had been some changes, but I

don't know whether they were reflected in the new handbook or some other procedure. For example, looking at the table of contents, it references various points of evaluation committee, PEC. And I know that was abolished about the time I went to Rocky Flats and the process was changed. And the PERB remained, but the PEC was abolished. So I know there were changes to the process, I just don't know how they were reflected in a new handbook or modifications to it. I don't remember.

Q. Well, would you describe for me your understanding during the time that you were at Rocky Flats of how the award fee process worked from beginning to end.

A. Well, first, it was on a six-month cycle. At the beginning of the six-month period, DOE would provide to Rockwell a listing of the areas that were to be evaluated and the weighting to be applied to those areas. Typically, I would also try to provide to Rockwell some performance objectives for those various areas or objectives for improvements in those, and sometimes they were very detailed and sometimes very general. Halfway through that six-month process, my staff in the area office would prepare an evaluation report that was nonbinding. It was just a report card midterm.

Q. Excuse me for one second. When you refer to the area office, does that mean Albuquerque?

A. No, my office at Rocky Flats.
Q. Your office at Rocky Flats?
A. Yes. But we would prepare a midterm evaluation, and I would sit down with the Rockwell management and review that. And it didn't have a grade associated with it or a fee associated with it, but just to indicate progress. Then near the end of the six-month process, the various divisions, functional divisions here in Albuquerque that had program responsibilities at Rocky Flats, would provide a written evaluation. My staff would provide a written evaluation in their area generally trying to tie it to these performance improvement areas. If there were disagreements or whatnot, my staff would try to work with the staff people here in Albuquerque to come up with wording in the areas they thought were most important.
Then I would meet with my staff as senior staff to review this draft report. And if I agreed with it, then I would submit it as a draft to the Performance Evaluation Board here in Albuquerque. There would then be subsequent reviews by Albuquerque management of that resulting in a meeting of the Performance Evaluation Board here in Albuquerque that they would then both recommend the written report as well as a numerical evaluation from that to whoever the fee determination official, the manager here in Albuquerque was at the moment for him to approve.

Q. Then what?
A. Then that was the -- well, the fee determination official would determine whether to accept what the board said or to change it and he could. And whatever he decided was transmitted to the contractor.
Q. If you look at Exhibit 2, if you would turn to page 24. There's a paragraph under the heading, "Role of Contracting Officer," I would ask you, Mr. Whiteman, if you would just read that and see whether that comports to your understanding of the role of the contracting officer who is defined in the paragraph as the manager at Albuquerque.
A. Yes, that's my understanding.
Q. If you would turn to the next page, 25, there is a schematic drawing of the award fee process. Again, I would ask if that comports with your understanding of the process.
A. Well, the one difference, what I mentioned earlier about the Performance Evaluation Committee. At some point, that box was eliminated so that the arrow went directly over to the PERB, and it seems like it would have been early in the time I was at Rocky Flats, but I can't remember for sure. It doesn't substantively change the process, but it did eliminate that.
Q. That's the only point that you would take issue with?
A. That's the only one I see, yes.

Q. If I understand your testimony, you're saying that in lieu of the Performance Evaluation Committee, you would simply meet with your staff and come up with the recommendation that would be forwarded to the Performance Evaluation Review Board?

A. Well, no. The formal PEC was replaced with an informal process that the people who would normally have been on that committee, if there were issues in looking at a draft report, we would talk one-to-one on that. And then the other change was -- under this box, I would not have been a member of the PERB. I would have been perhaps chairman, I can't remember, of the PEC. I guess there was one substantive change because when we eliminated that box, I became a member of the PERB as it related to the Rockwell contract. So we essentially replaced that. This was only a coordination function, and we replaced the formal coordination with an informal one.

Q. You don't recall if the handbook changed to reflect what you believe to be the changes?

A. No, I don't. I assume it was written somewhere, but I have no idea in what way.

MR. NEY: Mr. Bruns, what we're talking about is the subject of our document request. And if there are other documents that reflect changes from this 1977 edition, I would request a copy of those documents.

Q. Mr. Whiteman, returning, again, to the paragraph you read concerning the role of the manager at Albuquerque and the schematic process, I note that there's no reference to any involvement by headquarters in the award fee process.
A. That's right.
Q. Prior to the first half of fiscal year 1989, to your knowledge, was headquarters involved in the award fee process?
A. They were never involved in any that I was involved in.
Q. So you have no knowledge of their involvement is your testimony?
A. No, I don't.
Q. What about in the first period of 1989 or first half of the year 1989, was headquarters involved in the award fee process for Rockwell and Rocky Flats?
A. They weren't in the time period I was involved, but would only have been involved in the very early stages, so I have no knowledge what happened after that.
Q. Have you ever heard any mention of headquarters being involved?
A. No.
Q. During the period that you were the area manager of Rocky Flats, are you aware of any deviations from this handbook other than what you have testified to, which I

believe you were characterizing as being changes that took place in the handbook over a period of time?

A. That's the only one I remember.

Q. Could anyone deviate from the handbook --

A. No.

Q. -- or would it have to have some authorization to do so?

A. No, it was a standard process for -- see, this PERB worked on five or six different contracts at the same time using the same process, and so it was a standard process that was used for all of them.

Q. Now, during your tenure at Rocky Flats in 1985 through 1988, were the award fees for Rockwell handled in the same fashion each period?

A. Yes.

Q. Do you recall any changes in the methodology of the award fees during your tenure at Rocky Flats?

A. No, not other than just the process we have talked about.

Q. Dealing with?

A. With the PEC.

Q. Let me show you a document that's been marked Plaintiff's Exhibit 30, which has on the cover page a title, "Albuquerque Operations Office Handbook for Award Fee Administration," and it has a date of February 16, 1990. And

determinations. I ask you if this comports with your understanding of how the process worked during the time you were the manager at Rocky Flats?

A. Yes.

Q. I notice that Mr. Barkmeier in this schedule ends with item 12 that's says, "Albuquerque PERB makes recommendation to the manager at Albuquerque." And then the final one is 13, "Fee determination issued to the contractor," and there is no mention of concurrence from headquarters. Is that your understanding of the way it worked when you were there?

A. Yes.

Q. That concurrence from headquarters was not a requirement?

A. That's right.

Q. Do you know who Mr. Beiriger is?

A. No, I don't.

Q. Do you know why he was asking for a schedule?

A. No, I don't.

Q. Now, am I correct that it's your testimony from this morning that you have no knowledge of any headquarters involvement in the award fee process for the first six-month period of 1989?

A. That's right.

Q. Did you ever have any communications with anyone

from DOE headquarters concerning Rockwell's award fee for the first half of fiscal year 89?

A. I don't remember any.

Q. Did you ever talk to Admiral Watkins?

A. No.

Q. Did you ever talk to him about any subject?

A. No.

Q. Let me show you what has been previously been marked as Plaintiff's Deposition Exhibit No. 12. It's a memorandum dated May 31, 1989, from Mr. Twining to Mr. Wade. Have you ever seen this document before?

A. No, I haven't.

Q. To your knowledge, was a document like this generated in prior award fee periods? By "a document like this," I mean from a manager at Albuquerque going to, in this case, an acting assistant secretary for headquarters seeking concurrence for recommended award fees.

A. I wasn't aware of such a thing.

Q. You have never seen one?

A. No.

Q. Have you ever heard about one?

A. No.

Q. On page three of this document bearing stamp E001504, at the bottom under Rockwell International Corporation, do you see the proposed fee, proposed award fee

official?

A. No, I know that was never the case.

Q. Did you ever talk to Mr. Twining about this letter?

A. No.

Q. Let me show you a document which has been previously marked as Plaintiff's Deposition Exhibit No. 54. It's a memorandum to operations office managers and various assistant secretaries from W. Henson Moore dated August 21, 1989. Have you seen this document before?

A. I believe I have.

Q. Do you know when you saw it?

A. It would have been soon after it was signed.

Q. Now, on the second line, there's reference to general accounting office and Congressional reports. Do you know what's being referred to?

A. The general office. I assume that goes back to the Rocky Flats report. The Congressional reports, I'm not sure what that is. I'm not sure what a Congressional report is in this context.

Q. Now, in the first paragraph, Mr. Moore states that, "We have instituted a review process whereby each award fee plan and fee determination will come to headquarters for review and concurrence prior to issuance of the contractor." In your view, is that a change from the past practice?

A. Yes.
Q. To your knowledge, were any of the DOE contracts changed or modified to reflect this new practice?
A. I don't know.
Q. Do you know what prompted this change in procedure?
A. I know that with the new administration with Secretary Henson and Mr. Moore, they had expressed a desire to be more involved in operational determinations. And so I would have interpreted this as being the continuation of that desire.
Q. Do you know how this change was implemented?
A. No, I do not.
Q. Let me put it this way. Was it implemented in some form beyond just this one memo?
A. If it was, I never saw it.
MR. NEY: Let me mark as Exhibits 104 and 105 two documents. The first one, 104, would be a memorandum from you, Mr. Whiteman, to Mr. Sanchini dated September 19, 1988, on the subject of goals and objectives for fiscal year 1989. Page numbers are E000738 through 740. And Exhibit 105 is a letter with an attachment from Mr. Sanchini to you, Mr. Whiteman, dated December 13, 1988, and the Bates numbers are E000789 through 810.
(Exhibits 104 and 105 marked)

PL. SUPP. EX. 62

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

-----------------------------------
UNITED STATES OF AMERICA, EX REL; :
:
Plaintiff, : Civil Action
: No. 89-M-1154
-vs- :
:
ROCKWELL INTERNATIONAL CORP., : PAGES 1 - 155
ET AL, :
:
Defendants. :
-----------------------------------

Deposition of W. HENSON MOORE

Washington, D.C.

Wednesday, April 15, 1998

Reported by: Nancy Bond Rowland

JOB NO. 106926

Thereupon,

W. HENSON MOORE

the witness, was called for examination by counsel for the Defendants, and, after having been sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. KOENIGS:

Q Would you state your name for the record please?

A William Henson Moore, III.

Q And your current address?

A Home address is 9605 Pinkney Court, Potomac, Maryland.

Q Where are you employed now?

A The American Forest and Paper Association, 1111 19th Street, suite 800, Washington, D.C.

Q I'm sorry, I didn't hear.

A The American Forest and Paper Association.

Q Forest and Paper, all right. You were deputy secretary of Energy between 1989 and 1992, is that correct?

A Yes.

bad, indifferent, they'd get reimbursed for it.

Q That was DOE's practice prior to your watch?

MR. HESCH: Objection. Form. Foundation.

A Yes.

Q And that practice was based upon the contract terms that existed prior to your watch?

MR. HESCH: Objection. Form. Foundation.

A That, and the interpretation by the operations manager and the area guy with what those words in the contract meant.

Q I wonder if you could look please at page 6 of your statement. Maybe just read to yourself that middle paragraph if you would please.

Now, this area of award fee reform I think you testified was an area for which you had principal responsibility?

A Part of the reformation considered both the contract itself and the award fee system.

Q And you had lead responsibility in the secretariat for that area?

A Yes.
Q You see the last sentence in the paragraph refers to a revolutionary new contract clause which provides that a contractor's failure to perform satisfactorily in any important area included in the performance evaluation plan may result in the forfeiture of the entire award fee available for that period?
A Yes.
Q Did you understand in fact that there was a revolutionary new contract clause?
MR. HESCH: Objection. Form. Foundation.
A Sure. Thought so.
Q Why did you implement that change?
A The way the award fee system worked was that, as I remember it, the area fellow for DOE would grade the contractor in certain areas. Based upon that grade you got a percentage. It was almost an automatic mathematical calculation. If you got for example, this is a hypothetical, if you scored 70 out of 100, you'd get 70 percent of the maximum award fee possible. And

then the operations manager would review that grading. Didn't come to headquarters. Stopped right there at the operations office level.

In this case Rocky Flats, as I remember, reported to the Albuquerque operations office. So those DOE officials would largely determine what the award fee was. There was no basis for denying the award fee entirely unless they scored zero. No contractor ever scored zero. Most of the scores were very high.

We were doing two things in this paragraph. To change the culture, both DOE personnel but certainly the personnel of our contractors. The first was to say over half your score now is going to be on environment, safety, and health that was never the case before. It was somewhere around 2 or 3 percent, if that. The way you got graded before is did you get the productions built on time. If you did, chances are you would get a 90 percent score. That kind of a thing.

We said no. We're changing the system. From here on out in the award fee system 51 percent of your score is how did you do on environment, safety, and

health. 49 percent is how did you do on the other stuff which used to be probably 100 percent how you would rate it.

Then we also had to put a provision in the contract that if we think you did really poor in one of these things, you won't get an award fee at all. It won't be done by that mathematical calculation of well, you scored 40 percent, so you still get 40 percent of the award fee. We left it within our purview to say if you really didn't do a good job in an area we consider important, you're going to get zero as an award fee.

As I remember, Eric Fygi would be the guy you'd need to depose further on that. As I remember it, our contract lawyers indicated we had to put that actually into the contracts because that's not the way the contracts had been written up to that point.

MR. HESCH: I'd ask you not disclose what advice lawyers gave you.

THE WITNESS: Okay.

MR. HESCH: Move to strike the testimony.

MR. KOENIGS: I don't think he was

The admiral was trying to find somebody to run Defense Programs. It was a very complicated technical position. And he went through those two and may even have been a third. I don't remember. And basically they didn't get the picture of the cultural change. They were of the mind-set that we were almost a miniature Department of Defense was the way they thought, and whatever the Department of Defense wanted, we did it. If they wanted 15 x-ray bombs by the 4th of May, we were going to make them, and come hell or high water they were going to have those bombs. That was their mentality.

So we started talking about environment, safety, and health, and it was clear we were speaking a different language to them. They were fine men and they had done a fine job in their career, but this required a different sensitivity which they simply didn't have.

Q Do you recall after the raid there was an issue of how much Rockwell's award fee would be?

A Yes.

Q Did you have involvement in the final

decision on the amount of Rockwell's award fees?
A Yes.
Q And there were two periods, one first half of fiscal year 1989 and second half, both of which the decision making process was made during your watch. Do you have recollection of that?
A Yes.
Q What can you tell me about your recollection of the processes?
MR. HESCH: Isn't that the subject of his prior deposition?
MR. KOENIGS: To some extent. I'm not going to go through all that by any means. I want a general recollection.
A What I can remember about it is simply that we had begun a change in the award fee system before the Rocky Flats raid. The Rocky Flats raid simply exacerbated the fact that we had to change the system and to do it now.
I was of the belief that this did not require waiting and changing a contract when a contract came up for renewal. The award fee system was a separate

mechanism for determining how much of an award fee the contract did call for was measured or was determined. And so we could change that system without waiting for a contract to come up.

And so I moved to change that system very quickly, and so that the first award fees that were due on our watch would by under the new system. And the first decision the admiral made himself which was I went to him and said "What degree do we want to have environment, safety, and health measured?" We both agreed it wasn't being measured enough, and I'm pretty confident he came up with 51 percent. May have been me but certainly together we did that. That was a major change to say that 51 percent of your grade is now going to be based on something totally different than it had been based on before.

We then required also because we were convinced that the culture wouldn't change immediately that award fees had to come to headquarters for approval. They hadn't ever before that time. And so when the Rocky Flats ones came up, they had to come to headquarters for approval. Bruce Twining couldn't set

them by himself or he wasn't the last review of an award fee determination.

Because of Rocky Flats they came to me, and for a while there as I remember all of them, whether those facilities were something I worked with or not, came to me for review to be sure the system was working like we had decided, the new system.

Nancy Wolicki as I remember was the person who would receive it, review it, go into great details, come in and brief me, and they would make a decision whether we agreed or disagreed with the Operations Office's determination. In the early years I think there were a number of them we sent back and said "We don't agree" or we set a new number for it. That happened on the Rockwell award fee.

Q You would get what, performance evaluation reports, kind of a short evaluation prepared by the Operations Office, and that would be reviewed by Nancy?

A The way the system worked after we designed it was the fact when the Operations Office finished its work, and everything up to that point was done as it always had been done with the exception of this 51

percent weighting factor being new, then it was sent to headquarters for us to approve or disapprove or change it. That was new.

And when it came to headquarters, I think it officially came to Defense Programs. I'm not sure which. I've forgotten what our procedure called for. But in reality Nancy would get it and would go over it and would come in and sit down with me and go over it, and we made a decision whether we agreed or disagreed with the finding of the Operations Office.

Q So you and Nancy would review these for all the award fee contracts held by DOE or all within the weapons complex?

A I think they were pretty much all of them there for a time period.

Q And how long was the time period roughly?

A I think a year or two. The idea was just to be sure that the changes we were making was being followed.

Q And during this time frame, one of the things you'd take into account is data that was gathered not merely by the Operations Office but by say Tiger Teams?

PL. SUPP. EX. 63

UNITED STATES CLAIMS COURT

ORIGINAL

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

-vs-

UNITED STATES OF AMERICA,

Defendant.

No. 91-1362-C

September 23, 1994
10:00 A.M.

DEPOSITION OF:

ADMIRAL JON MICHAEL BARR

CENTRAL VIRGINIA REPORTERS
PO BOX 12628
ROANOKE, VIRGINIA 24027
(703) 380-5017

Q Since graduating from the Naval Academy, have you been continuously in the service, in the United States Navy?

A I have.

Q At some point, you were assigned to the Department of Energy. Is that true?

A That's correct.

Q When was that?

A My first day on the job was the 5th of July 1989. I had before that in about the previous month visited, as I recall, the office for one reasonably brief period to talk to the officer I was relieving, who was going to retire before I got there and had made a tour of several facilities during one of my four-day off periods in my previous job.

Q Who was the person you were replacing?

A A Brigadier General, Paul Cavanare.

Q What position did you first take with the Department of Energy?

A Deputy Assistant Secretary for Military Application.

Q Prior to being assigned to the Department of Energy, could you briefly describe your career in the United States Navy.

A Oh, where my office was?

Q Yes.

A Yes. I had two offices. I had one office in a Germantown facility for DOE and one office in the Forestall Building in downtown Washington. I shared my time eventually probably 60 to 75 percent, probably closer to 75 percent of the time that I was in Washington and not traveling in the Forestall office.

Q How long were you with DOE?

A Almost exactly two years.

Q What were your different positions while you were at the DOE?

A It was one, only one, Deputy Assistant Secretary for Military Applications.

Q Mr. Barr, I would like you to take a look at this document, which is Plaintiff's Exhibit Number 1, and let me know if you have ever seen that before.

A Okay. Right. I could go through the whole thing, but I don't think I have ever seen this before. Virtually certain I have never seen that before.

Q This document is a supplemental agreement between the DOE and Rockwell International Corporation relating to award fees, and it's signed February of 1989. Would you please read aloud the sentence --

A Sure.
Q -- on Page 2, which is Bates labeled E001274.
A The amount of the award fee actually to be paid to the contractor shall be determined by the award fee determination official, manager or anyone acting as Manager, Albuquerque Operations, in accordance with the provisions of subparagraph (2)(B) of this clause.
Q Who was the Manager, Albuquerque Operations?
A Mr. Bruce Twining.
Q Mr. Barr, I am placing before you a document that has previously been marked as Plaintiff's Exhibit Number 2, which is entitled "Handbook for Award Fee Performance Evaluation and Review Process, Albuquerque Operations Office." Have you ever seen that document before?
A No, not to my recollection, at least.
Q Mr. Barr, I am showing you a document that has been previously marked as Plaintiff's Exhibit 102, which is a memorandum from Duffy to J.G. Hoyal dated November 23rd, 1988. Have you ever seen that document before?
A No.
Q The subject of this document as stated in the document is the GAO Review of Environment, Safety and Health Issues. In the contract award fee, it indicates, I

know there was great concern and the degree and concern at the Secretarial level and the degree to which the very senior levels of the Department of Energy had corresponded with Rockwell. Prior to this point, I don't have any knowledge.

Q Did you ever have any discussions with anyone at DOE regarding the propriety of Headquarters' insertion of itself into the award fee process?

A Not that I recall. I know I did have some discussions with Mr. Twining, and the exact time frame I don't recall, and his concern that things ought to stay basically the way that they were. So there was certainly some, at least in the field at Albuquerque, some concern.

Q What do you mean by "the way they were"?

A That the award fee determining official would essentially be the last word and with no meaningful review from Headquarters.

Q That's when Mr. Twining told you, that's the way things were?

A Not in so many words. That is what I took from our conversations, I mean, our conversations, as I recall them, were, I mean, I would consider him a friend of mine, so they were not adversarial. But his concern was that we were shifting things back to Headquarters which

belonged in the field. So I would summarize as I did, and to some degree putting words in his mouth.

Q Was it your view that Headquarters should insert itself into the award fee process?

A Absolutely.

Q And did you tell Mr. Twining that?

A I'm sure I did. I am sure I said that I agree with the trend that was going on at Headquarters, because I absolutely thought that was necessary. If Headquarters was going to be Headquarters, they had to get involved in things that were important, and there were few things more important as the award fee incentive that the contractor has to do well.

Q And that was Secretary Watkins' view as well?

A I would hate to put words in his mouth, but I think I could say yes without much hesitation.

(A two-page Memorandum dated July 17, 1989, to Peter N. Brush from Edward S. Goldberg was marked as Plaintiff's Exhibit Number 313 and included with the deposition.)

BY MR. KELLEY:

Q Mr. Barr, I am showing you a document that is

enumerated items; is that right?

MR. KOLAR: Objection. Asked and answered, as in the previous document.

You can go ahead and answer.

A Yes. I base my position on the following points, one, two, three, four. Overall I believe. Right. That's what it says.

Q Did you have any reason to believe that the award fee determination official did not take into consideration the four points you enumerated in your September 6 memorandum?

A Oh, I have every reason to believe that they did, as you pointed out, as you ran through these series of documents, that in fact they had been.

However, the question is and my judgment is that these were not adequately taken into account and that an adjectival grade of moderately good for ES&H with this kind of thing going on is more, more than a little questionable, and that the appropriate adjectival grade is unsatisfactory.

Now, that happens to be tied to a certain numerical award, a numerical number, and I believe that the numerical number we gave is very high unsat, about as high

and you can get and still be in the unsat category.

So it's a matter of difference in judgment as to whether the award fee should contain an indication that the environment, safety and health performance of Rockwell was moderately good during this period. It appeared to me at the time that it was not.

And, again, subsequent to that everything that I have learned, including now seeing for the first time that Ralph Erickson on the scene, DP-23, recommended only the base fee. If I should have seen that, I should have suggested even a lower fee. Everything I have seen is consistent with lowering the fee, at least that much, if not more.

Q Let me show you a document that has previously been marked as Exhibit 58 and ask if you have ever seen that before.

A I don't think so. I don't recall seeing it, at least.

Q Did you ever discuss with Mr. Erickson the subject of Rockwell's award fee?

A Probably, but I don't have any specific recollection of that, and I specifically do not have any recollection of him saying what he wrote there, and that is that, based on my five weeks observation that the award fee

letter make it pretty clear why he is, but other knowledge, other than what the letter itself contains, no.

Q Going back to your September 6 memorandum, as part of Exhibit 317, how did you arrive at the numerical grade of 66 for ES&H?

A It was, and I don't remember exactly how, but that is, as I recall, the upper limit on unsatisfactory, and that's probably the way I arrived at that.

As I have been saying here, I think, repeatedly, the concern was that the environment, safety and health area was evaluated as moderately good, when, in my judgment, it was unsatisfactory, and I thought unsatisfactory grade was appropriate. That's what was given. A 64.25, or whatever it is there, I think is within the range of unsatisfactory, and that's what happened. Why it wasn't 30 or 60 or 50, I don't know.

Q Did you ever review a rating plan for Rockwell's is award fee?

A Not that I can remember. I think just flat no, because the rating plan would have been prepared before I ever got there for all of the periods that Rockwell was at Rocky Flats.

Q In coming up with your number of 66, did you review Rockwell's rating plan?

A No, no. Not that I remember.

Q Let me go back to Exhibit 316 for a moment. The change that you made on the first page was in connection with the chromium spill incident; is that right?

A Yes, correct.

Q And I believe you read the writing before. Can you do that again?

A An operable alarm system was not repaired and eventually was a factor in the major environmental incident.

Q Is there more?

A Do you have the -- I can't read my own writing here. If you have the final one.

Eventually was a major factor -- a major factor in a major environmental incident on October 13, 1989, when chromic acid was released from Building 444 and contaminated the plant's holding ponds.

Q Does the final version reflect the changes that you made?

A Yes, it does, as I would expect.

Q Where did you obtain the information to make the changes that you made in the enumerated Item 4?

A From my knowledge of what had gone on. See, the difference here is, the initial way that that was, an

first time. This is EH, isn't it? EH-20. EH. That's what I thought. He worked in the environmental safety and health area, and at this point he was EH-20. Subsequently, as I recall, he became the Deputy EH. The second, number two man to the Assistant Secretary.

Q Did you ever have any discussions with Mr. Berube in the December 1989 time period regarding Rockwell's award fee for the second half of fiscal year 1989?

A Probably, but I don't specifically recall.

Q Do you recall generally?

A I don't recall talking to Mr. Berube on the specific or general category of award fee for Rocky Flats. But I would not be at all surprised if I did.

Q Let me show you a document that has previously been marked as Exhibit 81. I will ask if you have ever seen that before.

A Well, yes. It's in my package.

Q Did you see it in 1989?

A I don't remember. I don't think so, because this looks like a call. It's a write up of a call made by a Mr. Rush Inlow, who was working for me at that time.

Q The document describes a call that you made to Rush Inlow?

A I didn't make a call to Rush Inlow. I probably talked to him person to person. Mr. Inlow relieved temporarily, he was temporarily assigned to the Albuquerque Operations Office, and I needed a person to replace Mr. Erickson, who had left DOE in the DP-23 job. Mr. Inlow served in that capacity temporarily for about six months, and I suspect that I talked to him face to face regarding this issue.

Q Do you recall that conversation?

A No, not the specific conversation.

Q Do you remember generally talking with Mr. Inlow about Rockwell's award fee?

A Oh, sure. Again, and it is very difficult for me to remember specifically, but he would have been my point man on the Rockwell award fee for this period, and I am sure that I discussed this with him. And I don't dispute the gist of what he says here and what this write up is.

Q What is the gist of that?

A That the available award fee shouldn't exceed the percent of the available fee awarded the last period. Although I don't remember specifically saying it that way, it would not be an unreasonable evaluation of how I viewed Rocky Flats' performance.

Q Do you recall that you did not describe it that way?

A No, I don't recall that I did not describe it that way. I just don't think I would have said it in those words. I don't think I would have said don't come in higher than this. I might have. I don't think I would have.

(A recess was taken. Following the recess, the parties returned to the room and the deposition continued as follows.)

BY MR. KELLEY:

Q Let me show you a document that has previously been marked as Exhibit 168. The Handwriting -- somebody named Peter.

A Peter Brush. Okay. No, I don't think I have seen that.

Q Do you remember any discussions with Peter Brush concerning Rockwell's award fee?

A No. No, I don't.

Q Let me show you a document that has previously been marked as Plaintiff's Exhibit 33 and ask if you have seen that document before.

MR. KOLAR: I think that might be one of the ones in the package.

A Yes, it sure looks familiar.

Q Again, the package, referring to the package that Mr. Kolar provided?

A Yes, correct.

MR. KOLAR: It might be in the other binder clip. Yes, there it is.

A January 10.

Q Did you see that document in 1989?

A Let me read it. Just a second.

Q Please take your time.

A Right. You know, I saw it. I remember seeing it when it was given to me and Mr. Kolar. But I do not remember seeing it prior to that. Again, this is an internal Rocky Flats piece of paper, which I normally wouldn't see.

Q Let me direct your attention to this sentence in the document: By providing copies to the M&O, DOE could be placed in the position of having to defend changes initiated by RFO or mandated by H, I believe that's Q.

A Q probably.

Q Do you recall discussing with anyone the subject of having to defend changes mandated by the DOE Headquarters to Rockwell's award fee?

A No, but I certainly have sympathy with the sentiment that says your predecisional internal communications should stay just that.

Q Let me show you a document that has previously been marked as Plaintiff's Exhibit 34, which is a record of a telephone conversation by Terrell Agy. Let me ask you to read the text of the notes of the call which describes award fee conversations that involve you.

A Yes, I have that in the package. I had not seen any of these internal Rocky Flats records of conversations before. This looks like the same kind of thing we said before. Okay. I didn't see it back then. I have seen it recently.

Q Mr. Agy notes that, according to Inlow, you instructed your staff to recalculate the award fee to a level not higher than for the period ending March 31, 1989.

A Correct.

Q Does that help refresh your recollection as to whether you did give that instruction?

A No, because it is basically the same thing I think we had a couple of minutes ago. I am not saying I

did that. I may have. But it would not normally be the way I would instruct my staff to work.

Q This is a later date?

A Well, what was the other date? I don't have a date on this one. 20 December. Okay. Yes, it is 20 December. Right.

Q And Exhibit 34 is dated January 11, 1990?

MR. KOLAR: May I look at the document, please?

A I don't disagree with the sentiments. Whether I actually phrased it that way, I don't think so, because it would not normally be my style of operation.

Q Mr. Agy notes that the Headquarter changes were going to be forced on us.

A I don't know Mr. Agy. I can't answer for his choice of words. I think it's an unfortunate choice of words. Hopefully we would all come to a consensus and agree. That's what he wrote down.

Q Did you ever personally discuss Rockwell's award fee for the second half of fiscal year 1989 with anyone at the Rocky Flats Plant?

A Not that I recall. I probably did with Simonson, but I just don't recall.

of paper on.

Q Is it possible that you and your staff changed your recommendations at some point?

A Sure.

MR. KOLAR: Objection. Objection to the form of the question, "is it possible."

THE WITNESS: Should I answer?

MR. KOLAR: Go ahead and answer.

A Sure, it's possible. Do I remember doing it? No.

There were, what you have to recognize about this process is, there was a great deal of back and forth, and not a clean here is the recommendation going up the chain and being signed out. There were a lot of people with fingers in the pie, a lot of discussions.

Not only was there Rocky Flats, which by itself made it controversial, but it was one of the early attempts to carry out the direction that Headquarters get more involved in the award fee determination process. So I know that other people besides me, other assistant secretaries besides defense programs had substantial input.

Q Were there a lot of fingers in the pie at Headquarters?

A Yes, as was appropriate, because each one of the people who was involved had a different opportunity to look at Rockwell's performance, which I think was thoroughly appropriate.

Q Let me show you a document that has previously been marked as Exhibit 170. Does that appear to be a companion document to the document you just looked at, Exhibit 37?

A Yes, it sure does.

Q Is it recommending the same reduction in Rockwell's award fee?

A Let me make certain. Let me get to the last page. The total award plus base fee is the same. It does look like this was the forwarding memo for this letter, although I can't be certain.

Q Did you help prepare that document?

A Oh, yes. And, again, this was originated by Mr. Arondale, and anything originated by Mr. Arondale, unless I was indisposed and I don't believe I was, would have come through me.

Q And Exhibit 37 was originated by Mr. Arondale as well?

A Exactly. It would have come through me. But who it was that initiated the changes that were reflected

determination to Rockwell in February of 1990?

A I don't recall that.

Q Did you ever hear that Mr. Simonson did not agree with Headquarters' decision to reduce his recommended award fee?

A Yes, I think I knew that.

Q How did you know that?

A I remembered it. Several pieces of paper right here made it pretty clear, but I am sure Dave and I, Mr. Simonson and I had conversations in which he would have indicated that he thought the award fee which he recommended was appropriate. Otherwise he wouldn't have recommended it.

Q Had Mr. Simonson been on site at Rocky Flats for some time before making award fee determination?

A Let's see. If I can remember, he had probably been on site for -- I need to find out when he got there. I don't remember precisely, but I think it would have been late September, October. So he may well have gotten to the site after the award fee period was closed. Mr. Goldberg was there July, August and, I think, into September.

(A Facsimile Transmission Routing Sheet and attached Memorandum dated July 26, 1989, from Edward

perhaps October time frame, but he may have been. It is a matter of record. You can find that out.

Q So when you said he wasn't there until late September, October, you meant in the capacity as manager?

A That's what I meant, correct.

Q Do you know whether Mr. Simonson was on the plant site of Rocky Flats regularly during July of 1989?

A I don't know.

Q Did Mr. Simonson ever express to you directly any objection to DOE's determination of award fees for Rocky Flats?

A Again, I remember not specifically, but generally that Mr. Simonson was concerned that his award fee proposal had not been accepted. Specific conversations or specific contents of those conversations I don't recall.

Q Do you recall generally what you told him?

A I mean, I could surmise, because I know what my thinking was in general at the time. But I don't have any specific recollection.

Q Let me show you a document that has previously been marked as Plaintiff's Exhibit 29, which is a memorandum from Bruce W. Twining to Robert Nelson dated February 26, 1990. Let me ask you whether that document refreshes your recollection as to when Mr. Nelson was

appointed the manager of Rocky Flats Office?

A Yes. Looks like February -- the date of this thing is February 26, 1990. But, again, I don't know how long Mr. Nelson had been there before this piece of paper came out, and I would suggest, again, it is a matter of record as to when Mr. Nelson went out there, and somebody else knows that as a matter of record, a specific date, without my trying to remember.

Q Why did Mr. Nelson replace Mr. Simonson?

A It was felt that somebody with a little more aggressive attitude toward correction of deficiencies was needed.

Q Were you involved in that decision?

A I think the fair thing to say is only peripherally. My, as I recall, my direct opinion -- Barr, do you recommend we replace Simonson with Nelson? -- was never asked for.

Q Who made that determination?

A I don't know. Well, I do know. No, I don't know. I don't really know. That's the right answer.

Q Who do you believe made that determination?

A The Secretary. The Secretary had to approve. Now whether he initiated the determination, the change, he very definitely would have been in the approval loop to

PL. SUPP. EX. 64

COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------ x

ROCKWELL INTERNATIONAL :
CORPORATION, :
: 
Plaintiffs, :
: No. 91-1362C
v. : Judge York
:
THE UNITED STATES, :
:
Defendants. :
------------------------------x

Friday, April 29, 1994
Washington, D.C.

DEPOSITION OF:

HENSON MOORE,

a witness, called for examination by counsel for the Plaintiff, pursuant to notice of counsel, held at Chadbourne & Parke, 1101 Vermont Street, N.W., Washington, D.C. at 8:30 a.m. on Friday, April 29, 1994, before Thomas R. McPhail, CSR, Notary Public when were present on behalf of the parties:

It is a memorandum from you dated August 21, 1989. It is addressed to various assistant secretaries and among others the operations, office managers, the subject is award fee contracting process.

MR. KOLAR: Why don't we hold on to this here.

BY MR. NEY:

Q. Are you generally familiar with DOE's use of award fee contracts and how they work?

A. Yes.

Q. Are you familiar with Exhibit 54, which is before you?

A. Yes.

Q. And this is a memorandum that you issued?

A. Yes.

Q. In the first paragraph of Exhibit 54, you state that you are instituting a review process whereby each award fee determination will come to headquarters for review and concurrence prior to issuance to the contractor; do you see that?

A. Yes.

Q. Was that a new procedure?

A. I don't know if historically it had ever been done. It was certainly new for what was going on at that particular contract cycle.

Q. And I don't understand. What do you mean by it was new at that particular time in the contract cycle?

A. We did not have any contracts in existence when we came to the Department or any procedures when we came to the Department that called for review by the headquarters of award fees.

Q. If I understand you, does that mean that prior to you and Admiral Watkins becoming part of the Secretariat at the Department of Energy, there was not a requirement for award fees to be reviewed and concurred in by headquarters personnel prior to issuance to the contractor?

A. When we got there, that was not the practice or was not part of our award procedures. Whether that had ever been at some point in history, I don't know.

Q. Did this procedure requiring headquarter

there was going to be a raid?

A. I would say a matter of several weeks. I am not sure, but a matter of several weeks before.

Q. Again, just trying to refresh, possibly refresh your recollection, understanding as you did in the latter part of May, at least, 1989, that there was a forthcoming FBI, EPA raid on Rocky Flats facility, would that have caused you to have headquarters have a direct involvement on any possible award fee that might be going to Rockwell at around the same time?

A. No.

Q. Let me show you another memorandum signed by you, this one is dated November 21, 1989, again the subject is award fee determinations; again it went to several assistant secretaries as well as the operations office managers. And this document has been marked as Deposition Exhibit 128. Have you seen this exhibit before, sir?

A. Yes.

Q. And this is a memorandum that was issued

by you?

A. Yes.

Q. In the first paragraph there is a reference that the review process which calls for interaction by headquarters has resulted in some delays in the making of award fee determinations; do you see that?

A. Yes.

Q. What were the delays that you were referring to?

A. The best I can remember, the time fee -- correction, the award fee plan procedures called for certain time periods, decisions had to be made. This was a new process of requiring us to come into the headquarters, it didn't fit in the old award fee time line. What was happening, as best I can remember, is that the operations offices were using all of their time under the award fee process, and winding up sending it into the headquarters for review after the time had lapsed for the naming of the award fee or determination of the award fee. And that then

for the headquarters to look at it in any meaningful way was causing the award fee to then be delayed over the time it should have been awarded.

Q. The requirement for headquarter's concurrence was a new step that was not accounted for in the time allotted for making the determinations; is that right?

A. Yes.

Q. Do you know Ed Goldberg?

A. Yes.

Q. He became acting manager at Rocky Flats; is that correct?

A. Yes.

Q. Did you talk to Mr. Goldberg about what was expected of him at Rocky Flats?

A. Yes.

Q. And as best you can recall, what did you say to Mr. Goldberg?

A. Oh --

Q. Let me try to make it easier for you. What did you say to Mr. Goldberg when he first

PL. SUPP. EX. 65

COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROCKWELL INTERNATIONAL CORPORATION,<br>Plaintiffs,<br>v.<br>THE UNITED STATES,<br>Defendants. | : | No. 91-1362C<br>Judge York |

Friday, April 29, 1994
Washington, D.C.

DEPOSITION OF:

JAMES D. WATKINS,

a witness, called for examination by counsel for the Plaintiff, pursuant to notice of counsel, held at Cadbourne & Parke, 1101 Vermont Street, N.W., Washington, D.C. at 1:30 p.m. on Friday, April 29, 1994, before Thomas R. McPhail, CSR, Notary Public when were present on behalf of the parties:

the president asked me to take over the chairmanship of that commission. That completed in August of 1988.

And at that point, I went back, tried to go back in the private sector, then I got tapped in January of 1989 by President Bush to be Secretary of Energy.

Q. When were you sworn in as Secretary of Energy?

A. I was sworn in officially on the 1st of March, 1989, and ceremonially by the President on 9 March, 1989. But for legal purposes, it was 1 March, 1989.

Q. Were you working full time at the Department prior to being sworn in on March 1, 1989?

A. Did I go in every day?

Q. Yes.

A. Yes, and commence my turnover, yes, I did.

Q. When did that begin?

A. Nominally, 1 February. I can't remember the date, it -- I am not sure about 1 February

It existed in a variety of ways, but certainly by my own personal beliefs, was way out of line with what modern business management would require if I went out to get a contract.

I don't think anybody in the private sector, I have had people in the private sector look at those contracts. Would you ever sign to a subcontractor such a contract with you a major organization like you have, would you sign? Absolutely not, they would say, almost to a person. And then I said, why should the DOE stick to the same contract that was 40 years old.

Q. What about --

A. I can't give you any more detail because I just don't remember, I am not a contract expert, but I know when I hear it and see it what the problems are.

Q. What about the DOE contract with Rockwell for the Rocky Flats facility, did you have occasion early on to review that contract?

A. No, I didn't.

Q. While you were Secretary, did you ever

reach any views about whether there were flaws or defects with that contract?

A. No, except in the generic sense that we set some contract criteria out of our review that came later on. Like I think we started a whole review in June of '89 because of the Rocky Flats catalyst that accelerated our review. When the FBI went in, we had a major team that had to go out there with them; we had a lot of things going on.

So with that impetus, we moved out expeditiously to go after the various ingredients that gave rise or could have given rise to this event, and one of which was required a relook at the contract. But it was looked at really in the context of the larger contract review that was underway by my own contract people. I mean we had already started that in process, but not at Rocky Flats. We were triggered into Rocky Flats only by the FBI event, which I was unalerted to until May, ten days before the event. I didn't know anything about it.

I knew that we had a disconnect between headquarters and field, because I would ask questions and have to go to the field to get the answers; I couldn't get it from my headquarters people; I knew that we had a disconnect. But my focus, my guns were focused on Savannah River until I was alerted that we had this serious situation emerging at Rocky Flats with the FBI and the Justice Department.

Q. Do you recall whether as a result of the review of the Rocky Flats contract any conclusions were reached as to whether changes were required or necessary?

A. I don't remember the specifics, but clearly the contract, as I recall at the time, was not in line with the new principles of application of the waiting factors. For example, we were in court all over the country and losing our court cases on environmental law violations. And environmental law, include health violations of health practices, particularly as they relate to radioactivity.

I reviewed some of those cases unconnected with Rocky Flats, and I felt that we were, again, seriously flawed in our inability to have a credible data base from which we could enter a court case and have any hopes of winning our case. We simply didn't have the data on a lot of things.

So to that extent, I said okay, herein after 51 percent of all award fees are going to be based on compliance with environmental safety and health laws and good business practices. I had some familiarity with good business practices by Rockwell International at one of our own facilities, excellent performance out on the west coast and up in Santa Suzanna Mountains or something, we have a rocket dyne place out there.

And so we had other performance that indicated -- I mean Rockwell International is a big organization, and I had seen it when I was in the military; good performance. And my feeling is that I anticipated that from the

Westinghouses, and the Martin Mariettas, and the Rockwell Internationals, and even Dupont, when I came in, I made an assumption that they were using best business practices. And so that was not what I was focusing on at the outset, not best business practices. I was focusing on contracts; it was a longer term review.

So when the shock came at Rocky Flats, I had to shift my sights over to Rocky Flats, because I was extremely worried about the unprecedented insertion of FBI agents into a production facility with the most hazardous, potentially hazardous materials in the world. We were a plutonium production factory there.

All of a sudden, I had to put all my resources almost totally on that particular event to make sure, one, the investigation got run right; that the entrance of all of the people that were involved was smoothly handled; that we didn't have a confrontation with security people. And this is why Henson Moore was

dispatched out there, along with some experts, Mr. Duffy and others, to get right into the middle of this and ensure that we were not in any way going to hinder the Justice Department actions.

And I told the Attorney General before I went in, when he called me over to the Justice Department's and we met, Henson and I met with him and his people alerting us to this. We said, we must pave the way for you to do this right, otherwise we could have a confrontation there that neither side needs.

So I almost put full time on Rocky Flats really for the next couple of months. Did nothing but worry a lot about the situation there and what the Department of Energy could do. I couldn't just let a bunch of agents run around in that plant. We had operations underway. And we had to be very cautious about an impending investigation at the time we were trying to do things with plutonium.

So that was the sense of urgency when we

shifted gears -- I don't remember the date of the insertion of the FBI agents, but it was right in that late May, early June time frame.

Q. Let me ask you this, at the time you became Secretary, did headquarters play a role in the determination of the dollar amount of an award fee that was to be awarded to contractors?

A. Very little.

Q. Did you change that?

A. I think the contracts that were written, for the most part that was done by the field office determining officer. And that was the practice which I, at the outset, would not have interfered with until we did our complete review; although I sensed that it was not my idea of a top down organization where line responsibilities started with headquarters ownership. You might say the appropriation ownership of the site should have had some say in the performance evaluation; but, nevertheless, that was the way contracts were written.

Q. Did you change that after you became

Secretary?

A. Yes, I did.

Q. How did you change it?

A. I changed it almost at once in terms of award fee weighting factors, and that changed at all sites. I forget when it was, but it was not long thereafter when I went into the ten point program, one of which was to establish 51 percent of ES&H, environment safety and health was going to be the award fee weighting factor. They were in there, but they were down at the 20 percent or some lower level and relatively insignificant. In other words, you could violate the law and get a very good -- okay, you could.

Q. Get a very good award?

A. Sure. Okay. So I said not on my watch.

Q. Because that is in the contract as written?

A. Well, I don't know how it was written in the contract with Rockwell International specifically --

Q. Yes.

A. -- but generally that was the case.

Q. Right. Right. Getting back to involvement by headquarters --

A. That was one of the flaws that I talked about earlier. That we had to set all set of principles that all future contracts were going to disallow that kind of outcome which we felt was a possibility here. We didn't know. We only knew when all of a sudden they felt there were grounds to go into Rocky Flats. I didn't know there were grounds to go into Rocky Flats. And even the allegation, we got nothing out of Albuquerque office. Everything was very good. All evaluations had been very good, very good, excellent. So everything is very good.

Well, the FBI said it was very bad. So I assumed they had some grounds to get their subpoena to go in there. So you know we -- so that was a shock to me. I mean I will have to say it was a shock to me. I knew it was bad because I had seen it from the Defense side looking over the fence, but I had no idea the

depth throughout the organization we had of lack of knowledge of what was going on in the field at headquarters level, like my level.

Q. Getting back to headquarters involvement in the award fee process. You testified they had very little involvement when you first became Secretary.

A. Right.

Q. Did you change that structure during your tenure?

A. Yes, I did. I think I notified Capitol Hill to that effect too. I mean, you know, they even asked me, what are you doing about looking at that. There were all kinds of allegations that would come down from Senator Glenn's office, the Oversight of the Senate, in the house, on our practices.

So we had all these inquiries kept coming in. Of course, Rocky Flats triggered off a lot more.

Q. Right.

A. And we had to answer those and that was

when I answered back, I think on this 51 percent fee.

Q. But in addition to the 51 percent, did you require award fees to come from the field to headquarters --

A. To be reviewed.

Q. -- before going out to the contractor?

A. For their efficacy, yes.

Q. Was that done early on in your term; do you recall?

A. I can't remember when it was done. There is a good paper trail on that when that was put into effect. I don't remember the dates of it. We generally tried not to interfere with existing contracts. That is my belief that we should not do that, so we did not interfere with existing contracts where we didn't have authority within the contract to renegotiate certain sections of it. I didn't believe in that. I thought, you know, so the first major contractor where we did a complete review of everything in the contract was Martin Marietta; that was later on. That was

a two year effort to go through that.

But in the process, there were certain things that I felt we could do within the contract renegotiations and award fees was one of them. Now, the process that we followed there, in my opinion, was in large measure, again, triggered, I don't think it would come as fast if we hadn't had Rocky Flats with the FBI. That accelerated that aspect of it because I felt in our own review of our Tiger Team in parallel to the FBI agents, there was sufficient grounds in my mind, sufficient grounds in my mind to raise serious questions as to the potential outcome of any Grand Jury or any other thing on that case.

And that is why I took a new area officer and put him in, had him report directly into us, and outside the Twining circuit, because Twining in my opinion was a potential party to the investigation underway. And in view of the severe problems that we found, other than that which was allocated by the FBI that brought them in in the first place on the incinerator issue.

My own experience has been when you have a situation where the superiors in the chain of command are potentially involved, you have to bypass that system without jeopardy at the time and take more positive control of the situation. And that is what I did.

Q. Mr. Goldberg, is he the new person you put in at Rocky Flats?

A. Yes. And he later had to be moved because of high blood pressure and potential heart problems and we had to get another alternative who we basically had nothing but acting area officers in there for a period of time even when Rockwell International left.

Q. Mr. Goldberg came in simultaneously on the day of the FBI raid; is that right?

A. Yes, that was my idea, to make sure that we had a new and totally independent DOE official in charge of that site. Because, again, without any jeopardy to incumbents or any other personnel in there, we had to have somebody who could talk to the FBI without any perception that we were

interfering with the investigation in any way, or a person could be party to that investigation.

Q. Did Mr. Goldberg have direct access to you after he became appointed?

A. He did. He was directed to either call me, at the outset, daily or to write me frequently, frequently was daily for a while. And then later on came later, and there should be a paper trail on that.

Q. So he had very active contact with you?

A. Very active contact with me and we almost had daily meetings at the Department of Energy with Henson Moore, Duffy, the other experts that I brought in to oversee, particularly for environment safety and health issues.

Q. Did the --

A. And which started a daily reporting system that triggered off the whole daily operation reporting system from the field. And we brought in teams of people that had knowledge of the field to come into the office and rotate on a three month basis and start reporting to me daily

on operational problems in the field. We never had anything like that. Rocky Flats was the genesis of that thing.

I would have done it anyway because that's the proper procedure in the Navy's nuclear reactor program. When you have operational activities in the field, you had better know what is going on on things radioactive. And I got that going, but again the process was accelerated by this event, but Rocky Flats came in daily.

And phone calls were made to me frequently about is the situation there, is it stable and so forth.

Q. Did the other area managers other than Mr. Goldberg have this kind of access to you?

A. Yes.

Q. They all could?

A. But they did by directive, they just didn't have access, I felt a responsibility and I made them report to me in a bi-weekly letter or at any time they felt they had to contact me on things dealing with environmental safety and

health at their sites, and that included reactor safety. And non reactor nuclear safety.

This is part of the whole program called the 10 point program that I put into effect, and I believe it was in June, it might have been July, but it was sometime in there; and that is a matter of record too. The 10 point program was announced, I did it at a press conference.

Again, in large measure that was triggered much more by Savannah River safety shutdown than it was Rocky Flats, but Rocky Flats added a nice additional incentive to get on with the 10 point program. And 10 points, I can't remember the 10 points, but they are all in the record and they surround the variety of issues that were rapidly emanating from my new reporting procedure, and my new teams that were going out into the field to tell me what the real ground truth was. We didn't know, and neither did Albuquerque know of Rocky Flats; and neither did the Savannah River know for Savannah River; and neither did the Hanford office know for Hanford.

So we had a whole new culture we had to develop in there. The culture was not there. And I don't blame contractors solely, obviously. I mean DOE had responsibility over these years, 40 years had not set -- had not learned the lessons at Three Mile Island. There was an '81 study by the Crawford Board that laid this all out, what we were doing wrong. Department of Energy didn't do anything about it.

There was another study by the National Academy in 1987, laid it all out; the Department didn't do anything about it. That is why Dr. Frank Press came to see me in June of '89, and said Jim, we're not going to do this anymore, your Department isn't doing it. I said, what are you talking about, Dr. Press? And he said here it is, and he was right.

Q. Who is Dr. Press?

A. Dr. Press is the President of the National Academy of Sciences. That triggered, that day, the 10 point program. I said I have had it. We don't know what ground truth is in the field. We

aren't getting honest reporting, not because they are dishonest, because nobody set a demand on them to report. Do you report a spill of 10 gallons of radioactive liquid containing plutonium? You are damn right you do. Tell me right now, did you report it to the state; did you report it to the federal authorities as required by law? The answer was no too many times. Or we made a determination not to.

Q. You are referring to DOE people?

A. DOE as a whole, that kind of thing was going on.

Q. Did you have any communications with Mr. Twining at or around the time that Mr. Goldberg became the acting head at Rocky Flats?

A. Absolutely, I can't remember if I did or Henson Moore did. Henson Moore did most of the work directly with Twining for me, but I was totally aware. Twining had to be told that he was no longer the oversight, and had no oversight responsibility for Rocky Flats, we had it. We

took it away at the time that Goldberg hit the site. And I had Mr. Duffy in there as my right arm who was an expert. I have known him for many many years. He was a former Westinghouse employee at the Idaho National Engineering Laboratory.

Q. Was Mr. Twining told why Mr. Goldberg was going to replace Mr. Twining in the Albuquerque office for direct oversight?

A. I believe so, but I don't remember -- I don't remember any official correspondence in that regard, but I just don't remember.

Q. Do you recall what he was told?

A. I don't know when he was told that. I do know he was told that Goldberg had charge the day it happened.

Q. Yes.

A. That he no longer had that oversight or responsibility, although he had supporting responsibility to Goldberg; I couldn't take that away. I mean he owed Goldberg the paychecks for the people; he owed him a lot of things. So he

had to continue to support Goldberg, but he didn't have the responsibility for site operations any longer, oversight of site operations.

Q. Did you ever talk to Mr. Goldberg about Rockwell's award fees?

A. I don't remember whether I did or not, because I talked to Henson Moore and my people in headquarters. To the best of my knowledge -- well, Goldberg came in sometimes. It could have been generally discussed at that time, I just don't remember. I don't recall any specific event. It doesn't stand out.

Q. Let me just --

A. I mean, I would not deny that I didn't, but I can't tell you that I did.

Q. Okay, I will just make --

A. There is just too much going on at the time, too many people -- Goldberg was in and out of the headquarters. We had him back to give the whole department to debrief on what was going on at Rocky Flats; what he had found; what the Tiger

Teams were doing; what he was doing about the Tiger Teams; there was a lot of work going on.

As I say, we had our own responsibilities to keep that site running safely in oversight along with Rockwell, and we knew that. We had a contract with Rockwell, and I knew that. And I had some discussions with the chairman, the CEO of Rockwell, both in writing and on the phone about it. And you know, he was serious about it too. He was extremely worried about it. So we both were and we both had responsibilities and we were -- I was trying to share those more with him because we knew it was a team effort, supposed to be a team effort out there.

And I don't remember ever being insensitive to the contractual relationship we had. Yet on the other hand, having a situation come up where perhaps violation of environmental law or other health, good health practices, something that would bring discredit to the Department, I felt that was pretty serious on the other side, that the perspective of DOE's

responsibility for perhaps inadequate oversight had, still were responsibilities there. So in many ways, I felt the contract in itself had been somewhat violated perhaps on both sides.

Q. Okay.

A. Me, maybe in award fee differences and changes and maybe the other side, in just violation of law. And you know, what is the chicken and the egg in this thing. That is why I had a discussion with the Chairman of the Board. I think we just -- we both recognized it was a problem and I don't think either was trying to be defensive at the time; we were trying to help resolve it. And I knew that I had heavy responsibilities on the DOE side when my subsequent review revealed we didn't do a very good job.

Q. Just let me make a representation to you and see if it refreshes your recollection at all. Mr. Twining, before the FBI raid, had made a recommendation for an award fee for Rockwell for the pertinent award fee period then in

PL. SUPP. EX. 66

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROCKWELL INTERNATIONAL | : | |
| CORPORATION, | : | ORIGINAL |
| Plaintiff(s), | : | No. 91-1362 C |
| v. | : | Judge Yock |
| UNITED STATES OF AMERICA, | : | |
| Defendant(s). | : | |

Wednesday, September 21, 1994

Washington, D.C.

Deposition of:

TROY E. WADE,

a witness, called for examination by counsel for the plaintiff, pursuant to Notice, at 9:53 o'clock a.m., at the offices of the U.S. Department of Justice, 10th and Constitution, N.W., Washington, D.C., before Diane Shaw, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties.

A In June, I believe it was, of 1977.

Q At that time did you also cease being the director of the laboratory?

A That is correct.

Q What was your position? What did your position become in June of 1987?

A I was transferred back to Washington, D.C. where I became, once again, the principal Deputy Assistant Secretary of Energy for Defense Programs. I held that position for about a month. Then I became the Acting Assistant Secretary when the gentleman, Bob Foley, by name, Admiral Robert Foley, who was the Assistant Secretary, when he retired. I became the Acting Assistant Secretary.

Q That would be in approximately in July of 1987?

A July of '87.

Q How long did you stay in that position?

A Until June of '89.

Q When you retired?

A When I retired, that is correct.

Q Did you retire effective the last day

of June of 1989?

A I believe it was the last day of May of 1989.

Q How long were you actually in the position? Is there a difference between that date and the effective date of your retirement?

A I don't believe so. I was the Acting Assistant Secretary from July the 1st of -- from, I think, the 1st of July of '87 until I retired.

Q I'll show them to you later. I believe there were some documents that were addressed to you during June of 1989.

A Maybe it was June 30 and not May 30. I stand corrected.

Q The documents may help you recollect.

When you were assistant manager of operations in the Nevada office did you have occasion to be involved in the administration of contracts?

A Yes, I did.

Q Did that include cost-plus-award-fee contracts?

Q During your tenure under Mr. Foley, did Mr. Foley give or deny his concurrence in regard to any award fees for any contractors?

A Not to my knowledge.

Q When you became Assistant Secretary for Defense Programs in 1987, what were your duties in connection with award fees?

MR. KOLAR: I believe it was Acting Assistant Secretary.

THE WITNESS: Acting Assistant Secretary.

MR. KOLAR: Just to clarify the record.

THE WITNESS: What were my duties with respect to the award fee? I was certainly as the Assistant Secretary advised of the award-fee determinations that were made by all of the field offices, operations offices that reported to Defense Programs or through Defense Programs to the Undersecretary.

BY MR. KELLEY:

Q When you became Acting Assistant

Secretary of Defense Programs, were you asked to give concurrence to any award fees for any contractors?

MR. KOLAR: Objection, asked and answered. You can go ahead and answer.

THE WITNESS: I'm sorry?

MR. KOLAR: You can go ahead and answer. I just noted an objection for the record. It doesn't affect your answering the question.

THE WITNESS: No, I do not recall ever being required to concur in an award-fee determination.

BY MR. KELLEY:

Q Does that include up until the time you retired?

A With one possible exception, and that was an award-fee determination that I asked be postponed before it was announced, made official.

Q What award fee was that?

A That was at Rocky Flats in early '89.

Q Do you know who the award-fee determination official was for Rocky Flats in

1989?

A Bruce Twining, T-W-I-N-I-N-G. Bruce Twining who was the manager of the Albuquerque Operations Office.

Q Was this in connection with the award fee for the period October 1st, 1988, through March 31st, 1989?

A Yes. Yes, although I -- the reason I'm hesitating was I couldn't remember whether it was a six-month judgment. Some were six months, some were ninety days, some were nine months around the system. It was generally for that time period, yes.

Q Other than that one incident did you ever request concurrence for any award fee during your tenure as Acting Assistant Secretary for Defense Programs?

A Not to my specific recollection. There were discussions in '89 about award-fee determinations with regard to Savannah River, but I do not recall ever instructing anybody to do anything one way or the other with regard to

Savannah River.

Q Prior to the period of October 1st, 1988, through March 31st, 1989, did you ever instruct or require the award-fee determination official to obtain concurrence from Headquarters with regard to Rocky Flats?

A Not to the best of my knowledge.

Q Mr. Wade, I am handing you a document that has been previously marked as Exhibit 12.

A (Witness examining document) There I am. I signed it.

Q I see you have had a chance to review the document. Is that right?

A Yes. I just looked through it. That is correct.

Q What is this document?

A What is this document? Well, it's a compilation of the award-fee determinations for Albuquerque office operations.

Q It is being sent from Mr. Bruce Twining to you. Is that right?

A That is correct.

PL. SUPP. EX. 67

9-1-89
Draft
To: GLM
Fr: DBL

DP-542.1

Award Fee Determination for the Period October 1, 1988 through March 31, 1989, for Rockwell International Corporation

Deputy Secretary, S-2

**ISSUE:**

Payment of Award Fee to Rockwell International (RI) for the evaluation period October 1, 1988 through March 31, 1989, as operating contractor for the Rocky Flats Plant.

**DISCUSSION:**

- The contract with RI as operating contractor specifies that a performance evaluation be completed every six months and an award fee be paid based on said performance evaluation.
- The Award Fee Determination Official (AFDO) (Manager, Albuquerque Operations Office), based on Performance Evaluation Review Board reports, a special on-site review and evaluation by Mr. Goldberg, Acting Area Manager, and other information available to him, has determined that a numerical rating of 87 equating to an award fee of $3,815,213 is appropriate.
- The Headquarters Office of Weapons Production, DP-23, has reviewed the supporting documentation and recommends the Award Fee Determination Official's determination be reduced by $912,315 to a total of $2,902,898 due to Environment, Safety and Health (ES&H) issues existing during the review period.

**CONCERNS/SENSITIVITIES:**

- By contract, the Award Fee Determination Official is to transmit his determination of fee earned to the contractor within a specified period of time.

**RECOMMENDATION:**

Concur in an Award Fee Determination of $2,902,898.

John L. Meinhardt
Acting Assistant Secretary
for Defense Programs

Agree ______________

Disagree ______________

E 001580

DP-542.1

**INFORMATION**: Award Fee Determination for the Period October 1, 1988 through March 31, 1989, for Rockwell International Corporation

Deputy Secretary, S-2

**BACKGROUND**:

Rockwell International Corporation (RI) is the Managing and Operating Contractor (M&O) for Plant Operations at Rocky Flats, Colorado. The Rocky Flats Plant (RFP) operates under the direction and supervision of the Albuquerque Operations Office (ALO). The Manager at ALO is the DOE Contracting Officer for the RI M&O contract at RFP.

On June 21, 1989, the Acting Assistant Secretary for Defense Programs (ASDP), concurred in ALO's Award Fee Determinations for the other M&O's under ALO, i.e., Allied Signal, Inc.; EG&G Mound Applied Technologies, Inc.; General Electric Company; Manson Hanger-Silas Mason, Inc.; and Westinghouse.

At that time, the ASDP stated that it was premature to concur in the proposed Rockwell award fee. The environmental investigations taking place indicated that further scrutiny might reveal environmental, safety and health problems that were systematic and as yet undiscovered. The current contract provides for an award fee based on contractor performance during the 6-month evaluation period, October 1, 1988 thru March 31, 1989. The objective of the award fee is to provide the contractor with the opportunity to earn an increased fee commensurate with the achievement of optimum performance in pursuit of contract goals and objectives.

The contractor's performance during the evaluation period is assessed and reported by a Performance Evaluation Review Board (PERB) established by ALO. The PERB evaluates contractor performance in specific Functional Performance Areas (FPA) identified in the award fee plan. The PERB in turn develops a report with recommendations for award fee which is transmitted to the Award Fee Determination Official (AFDO).

**DISCUSSION**:

The AFDO, implementing the ASDP nonconcurrence in the RI proposed award fee in his transmittal of May 31, 1989, requested Mr. Edward S. Goldberg, Acting Area Manager, Rocky Flats Area Office, to reevaluate RI's performance for the period covered by the Award Fee Plan. In a memorandum dated July 27, 1989, Mr. Goldberg transmitted to Mr. Twining, the AFDO, his assessment of RI's performance and resultant rating(s).
Mr. Goldberg's assessment of RI's performance differs from the

PERB's recommendations in the FPA's on General Management, Quality Assurance and Environment, Safety and Health (ES&H). As a result of this reevaluation, the overall numerical rating was reduced to "87" from the previous rating of "91.2". The numerical rating "87" translate into an award fee of $3,628,622, a downward adjustment of $1,697,859. The maximum available award fee for the period was $6,822,000.

The AFDO, not being in a position to offer an informed alternative, accepted Mr. Goldberg's assessment of RI's performance since he was on site at the RFP for several weeks and had gained considerable insight into the conditions existing at RFP.

FOr the portion of the RFP operations that had been split out for evaluation purposes, i.e., the Plutonium Recovery Modification Project (PRMP) and the Plutonium Recovery Option Verification Exercise (PROVE), Mr. Goldberg agreed with the May 31, 1989, recommendation of an award fee of $186,591. Thus, the total award fee for RI during the period evaluated is $3,815,213 ($3,628,622 plus $186,591).

The Headquarters Office of Weapons Production, DP-23, has reviewed the documentation supporting the proposed award fee and recommend a further reduction of $912,315 to $2,902,898 from the AFDO's determination of $3,815,214 due to ES&H issues existing during the review period.

<u>CONCLUSION</u>:

Concur in an Award Fee Determination of $2,902,898.

John L. Meinhardt
Acting Assistant Secretary
for Defense Programs

PL. SUPP. EX. 68

Uno Lining identifies where legal made changes.

DP-23

Award Fee Determination for the Period October 1, 1988 through March 31, 1989, Rockwell International Corporation (RI)

Acting Assistant Secretary for Defense Programs, DP-1

The Award Fee Determination Official (Manger, Albuquerque Operations Office), based on Performance Evaluation Review Board reports and a special onsite review, evaluation, and recommendation by Edward Goldberg, Acting Area Manager, has determined that a numerical rating of "87" be given to RI in its performance as operating contractor for the Rocky Flats Plant. The numerical rating of "87" equates to an award fee of $3,815,213 (this includes a recommended award fee of $186,591 for the Plutonium Recovery Modification Project/Plutonium Recovery Option Verification Exercise (PROVE)). The available award fee for the period was $6,822,000.

Although the recommended amount represents only 53.19 percent of the available award fee, I recommend that an additional downward adjustment be made that reflects the environmental, safety, and health (ES&H) situation that existed at the Rocky Flats Plant during the appraisal period.

I base my position on the following points:

1. Cessation of operations in Building 771 in October 1988 due to inadequate safety procedures and radiological safety margins in the building. Although Rockwell pursued a very aggressive corrections effort after the fact, the mere existence of this situation demonstrated less than satisfactory attitudes, procedures, and awareness for safety on the part of Rockwell.

2. 91 out of 230 safety concerns documented by external reviews and an internal Rockwell review done prior to the valuation period were not addressed during the period. Again, this indicates that a lack of priority attention was being paid to safety and health by Rockwell.

3. During the period, 32 new safety concerns, including six classified as Type 2 (serious), were identified.

4. A major environmental incident occurred during the period when chromic acid was released from Building 444 and contaminated the plant's holding ponds. An inoperable alarm system and deficient operator vigilance contributed significantly to the seriousness of this incident.

13.2



Overall, I believe there is strong evidence that throughout the appraisal period there was a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities.

I recommend, therefore, the "moderately good" numerical grade of 79 given to RI for its performance ~~under~~ the ES&H category be downgraded to a numerical grade of ~~65.25~~ 66. Since ES&H carries an evaluation weight of 20 percent, the adjusted weighted score would now be ~~13.05~~ (65.25 X 20). The weighted score awarded by Mr. Goldberg was 15.80. The adjusted overall rating will now be ~~84.25~~ 84.4. This equates to an award fee of ~~$2,716,307~~. I totally support the award fee of $186,591 for PROVE. I, therefore, recommend awarding RI a fee of ~~$2,902,898~~.

$2,943,717 $2,757,126

Paragraph deleted.

J. M. Barr
Rear Admiral, U.S. Navy
Deputy Assistant Secretary
for Military Application
Defense Programs

DP-231:JMarchetti:bc:3-3487:8/28/89 (Bonnie HDD--erick15)

Distribution:
so: Addressee
6bcc: Std DASMA

Correspondence Reviewer ___________

*PREVIOUS COORDINATION VALID

ALTERNATIVE (Beiriger's)

65 X .20 = 13

SUM OF ALL GRADE POINTS = 84.2

RESULTANT EARNED FEE = $2,703,123
\+ 186,591
$2,889,714

PL. SUPP. EX. 69

DOE F 1325.8
(12-84)

2 turn to Leo Willett

United States Government

Department of Energy

# memorandum

DATE: SEP 6 1989

REPLY TO ATTN OF: DP-23

SUBJECT: Award Fee Determination for the Period October 1, 1988, through March 31, 1989, Rockwell International Corporation (RI)

TO: Acting Assistant Secretary for Defense Programs, DP-1

The Award Fee Determination Official (Manager, Albuquerque Operations Office), based on Performance Evaluation Review Board reports and a special onsite review, evaluation, and recommendation by Edward Goldberg, Acting Area Manager, has determined that a numerical rating of "87" be given to RI in its performance as operating contractor for the Rocky Flats Plant. The numerical rating of "87" equates to an award fee of $3,815,213 (this includes a recommended award fee of $186,591 for the Plutonium Recovery Modification Project/Plutonium Recovery Option Verification Exercise (PROVE)). The available award fee for the period was $6,822,000.

Although the recommended amount represents only 53.19 percent of the available award fee, I recommend that an additional downward adjustment be made that reflects the environmental, safety, and health (ES&H) situation that existed at the Rocky Flats Plant during the appraisal period.

I base my position on the following points:

1. Cessation of operations in Building 771 in October 1988 due to inadequate safety procedures and radiological safety margins in the building. Although Rockwell pursued a very aggressive corrections effort after the fact, the mere existence of this situation demonstrated less than satisfactory attitudes, procedures, and awareness for safety on the part of Rockwell.

2. Ninety one out of 230 safety concerns documented by external reviews (as well as by an internal Rockwell review) remained open during the period. Again, this indicates that a lack of priority attention was being paid to safety and health by Rockwell.

3. During the period, 32 new safety concerns, including 6 classified as Type 2 (serious), were identified.

4. An inoperable alarm system was not repaired and eventually was a factor in a major environmental incident on April 13, 1989, when chromic acid was released from Building 444 and contaminated the plant's holding ponds.

Overall, I believe there is strong evidence that throughout the appraisal period there was a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities.

I recommend, therefore, the "moderately good" numerical grade of 79 given to RI for its performance under the ES&H category be downgraded to a numerical grade of 66. Since ES&H carries an evaluation weight of 20 percent, the adjusted weighted score would now be 13.2 (66 X 20). The weighted score awarded by Mr. Goldberg was 15.80. The adjusted overall rating will now be 84.4. This equates to an award fee of $2,757,126. I totally support the award fee of $186,591 for PROVE. I, therefore, recommend awarding RI a fee of $2,943,717.

J. M. Barr
Rear Admiral, U.S. Navy
Deputy Assistant Secretary
for Military Application
Defense Programs

PL. SUPP. EX. 70

001

PAGES: 2
(not counting cover page)

DATE: 9/20/89

TO: Jim Culpepper
DOE Albuquerque Opns.

FROM: John Meinhardt, DP-1
DOE Washington

NOTE: Sender, please contact receiver to pick up message !

| LOCATION | FAX NO. | NOTES |
|---|---|---|
| FSTL DP-20 | 586-7260 | Bonnie — Please pass this to Mr. Culpepper as Mr. Meinhardt has requested. Thanks Tim Pflaum |
| GTN DP-20 | 353-5850 | |
| GTN DP-22 | 353-6417 | |
| GTN DP-32 | 353-6133 | |
| GTN DP-34 | 353-4164 | |
| GTN DP-50 | 353-2965 | |
| AL | 8-844-4197 | |
| CH | 8-972-2527 | |
| ID | 8-583-1184 | |
| OR | 8-626-1063 | |
| NV | 8-575-1371 | |
| RL | 8-444-8153 | |
| SAN | 8-536-6647 | |
| SR | 8-239-1259 | |

DRAFT

DP-23

Award Fee Determination for the Period October 1, 1988, through March 31, 1989, Rockwell International Corporation (RI)

Acting Assistant Secretary for Defense Programs, DP-1

The Award Fee Determination Official (Manager, Albuquerque Operations Office), based on Performance Evaluation Review Board reports and a special onsite review, evaluation, and recommendation by Edward Goldberg, Acting Area Manager, has determined that a numerical rating of "87" be given to RI in its performance as operating contractor for the Rocky Flats Plant. The numerical rating of "87" equates to an award fee of $3,815,213 (this includes a recommended award fee of $186,591 for the Plutonium Recovery Modification Project/Plutonium Recovery Option Verification Exercise (PROVE)). The available award fee for the period was $6,822,000.

Although the recommended amount represents only 53.19 percent of the available award fee, I recommend that an additional downward adjustment be made that reflects the environmental, safety, and health (ES&H) situation that existed at the Rocky Flats Plant during the appraisal period.

I base my position on the following points:

1. Cessation of operations in Building 771 in October 1988 due to inadequate safety procedures and radiological safety margins in the building. Although Rockwell pursued a very aggressive corrections effort after the fact, the existence of this situation indicated a less than satisfactory attitude, procedures, and awareness for safety on the part of Rockwell.

2. Ninety one out of 230 safety concerns documented by external reviews (as well as by an internal Rockwell review) remained open during the period. Again, this indicates that a lack of priority attention was being paid to safety and health by Rockwell.

3. During the period, 32 new safety concerns, including 6 classified as Type 2 (serious), were identified.

4. A major environmental incident occurred during the period when chromic acid was released from Building 444 and contaminated the plant's holding ponds. An inoperable alarm system and deficient operator vigilance contributed significantly to the seriousness of this incident.

Should be substituted for 1st ES&H paragraph of your attachment

E 001469

Overall, I believe there is strong evidence that throughout the appraisal period there was a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities.

I recommend, therefore, the "moderately good" numerical grade of 79 given to RI for its performance under the ES&H category be downgraded to a numerical grade of 65.25. Since ES&H carries an evaluation weight of 20 percent, the adjusted weighted score would now be 13.05 (65.25 X 20). The weighted score awarded by Mr. Goldberg was 15.80. The adjusted overall rating will now be 84.75. This equates to an award fee of $2,716,307. I totally support the award fee of $186,591 for PROVE. I, therefore, recommend awarding RI a fee of $2,902,898.

This review was based on limited staff and limited review time; future award fee reviews will be conducted in a more rigorous fashion by my staff.

J. M. Barr
Rear Admiral, U.S. Navy
Deputy Assistant Secretary
for Military Application
Defense Programs

DP-231:JMarchetti:bc:3-3487:8/28/89(Bonnie HDD--erick15)

Distribution:
so: Addressee
6bcc: Std DASMA

Correspondence Reviewer ________

*PREVIOUS COORDINATION VALID.

PL. SUPP. EX. 71

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA ex rel. James S. Stone,

Plaintiff,

v. No. 89-M-1154

ROCKWELL INTERNATIONAL CORPORATION, THE BOEING CORP., BOEING NORTH AMERICAN, INC.,

Defendants.

DEPOSITION OF JAMES A. STOUT
April 30, 1998
9:10 a.m.
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. MICHAEL A. WILLIAMS
ATTORNEY FOR THE DEFENDANTS

REPORTED BY: MARY ABERNATHY SEAL, RDR, CRR, NM CCR #69
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

5439-10 MAS

Albuquerque, and then over a little over a year ago, formed my own company.

Q. You told me the name. Tell me again.

A. Stout Group.

Q. Would you tell me what positions you held with the AEC?

A. I was an attorney in the office --

Q. I mean AEC, ERDA, and DOE.

A. Yes. These agencies just literally succeeded themselves by act of Congress.

Q. Preceded by what? Manhattan Engineer District, or --

A. Manhattan Engineer District, and I was never a part of that, okay?

Q. All right.

A. I was an attorney in the office of chief counsel here in Albuquerque for AEC, beginning late in 1966. And I became the counsel for the Rocky Flats Area Office of AEC in approximately 1972, and I left there in about 1978.

Q. You were onsite at Denver?

A. I was. I was at the Rocky Flats plant.

Q. At Rocky Flats? Okay.

A. I had a year as a congressional fellow in Washington, and I returned to Albuquerque as an assistant chief counsel. Then the deputy chief counsel, then the chief counsel, and that's the position I held until I retired in 1994. My

recollection is that I was appointed as the chief counsel in 1985.

Q. What were your duties when you were at Rocky Flats from 1972 to 1978?

A. I was the legal advisor to the manager of the Rocky Flats -- DOE's Rocky Flats Area Office, and working for the chief counsel in Albuquerque.

Q. Who was the chief counsel at that time?

A. A gentleman by the name of Leonard Jacobvitz.

Q. Who succeeded you at Rocky Flats in that position?

A. A gentleman by the name of Patrick Currier.

Q. In connection with the work you did there at Rocky Flats, did you have the occasion to interact with Rockwell personnel?

A. Yes, part of the time.

Q. Any particular people that you interacted with more than others or that come to mind?

A. When I went to Rocky Flats, the Dow Chemical Company was operating the facility, and in about 1975 there was a selection, competition, which was won by Rockwell International. There was a -- I have a recollection of only a few names. There was a gentleman by the name of R.O. Williams, who was an onsite manager. There was a gentleman by the name of Sam Iakobellis, who was a corporate official. And eventually, before I left the site, Rockwell International had

Q. Had to do with whether it was an accurate representation to have your views?

A. Yes. Might be someone else's views, but to the extent they characterized mine, it was inaccurate.

Q. Okay. Did you participate in any way in the awards fee process for Rocky Flats?

A. Yes.

Q. What was your role? How did you participate?

A. The award fee process was administered -- first of all, the award fee determining official was the manager of Albuquerque. His small staff included a gentleman by the name of Charles Troell, who was an assistant manager responsible for finance and contracts. He led a group called the Performance Evaluation Review Board that included the other key officials and members of the small staff, and I was one of those officials.

My role, if you will -- I mean, we each carried to the table our own specialties, so that when one evaluated a contractor's -- by the way, this was broader than Rocky Flats. It was every contract under DOE's --

Q. There were eight or ten, weren't there?

A. Six or eight, and it was done twice a year, and they were all done at one time, in a long two- or two-and-a-half-day session. Each contract -- as we took up Rocky Flats, for example, the staff, or at least the manager from Rocky Flats,

Q. And the what?
A. And the contract.
Q. And let's say prior to 1989, the weight assigned to ES&H matters was very small, was it not?
MR. HESCH: Objection. Form, foundation.
Q. (By Mr. Williams) I know we can dig it out, but it seems to me it's like 3 percent.
A. There was a time in the Watkins administration when all factors related to ES&H --
Q. I'm talking pre-Watkins?
A. Had to be 50 percent.
Q. I understand, but pre-Watkins, let's say pre-Watkins. Whatever that date was, pre-Watkins, by "relatively small," I would have been surprised to see much variation from 15 or 20 percent of the total fee for ES&H.
Q. Which of these is the originals?
A. So I think that's -- and the obvious -- there were categories in production, procurement. I can't remember all of them, but by comparison to the Watkins administration, they were much less than 50 percent, and perhaps that meets your definition of "very small."
Q. Well, I'm looking at Exhibit 701, which indicates that 1981 to 1985 ES&H average rate was 3 percent, and from 1985 to 1988, the average rate was 12 percent. I think that's where I got my sense. I think that's a record on your award

fees.

A. Well, I agree that this document says that. My time on the PERB would have been during the 1986-to-1988 time frame. I was chief counsel in 1985. And I would have remembered a higher number than 12 percent. That's my recollection. But this says 12, I grant you. Smaller by far than 50 percent.

Q. Yes. Well, I mean, Admiral Watkins, I think, has said publicly that he intended a major change and shift in emphasis.

A. Yes.

Q. And in fact, it's your observation that happened after he became Secretary; right?

A. No question.

MR. HESCH: Object. Form, foundation.

Q. (By Mr. Williams) Do you remember in the consideration of the award fees for 1988 any discussion about pondcrete?

A. No, not in that context. And again, attention to a year, in any case.

Q. Do you remember discussion about pondcrete in connection with award fees at all during the time that you were there?

A. Yes.

Q. Tell me about that.

morning that described a Savannah River -- a challenged amount in the range of some number like $64 million. I believe that was a question of willful misconduct or lack of good faith. But I don't recall any other specific allegations of fraud involving a DOE M&O contractor.

(Exhibit 1866 marked for identification.)

Q. I'm handing you what's been marked 1866. It's actually a declaration that I have prepared and submitted to the Court. I'm going to use it as an aid to ask you questions about communications and conversations you have had with Rockwell's counsel relating to this lawsuit or issues in this lawsuit.

MR. WILLIAMS: I'm going to object to that. The reason for my objection is that he's already testified that he didn't see it at any time before it was filed, and saw only portions of it last night, so I don't think it's an aid to him other than some kind of an outline for you to follow.

With that objection, obviously, you can proceed.

Q. (By Mr. Hesch) Well, let me start with just a little background. Was your title chief counsel at Albuquerque? Did I have that correct, or did I make --

A. The title is correct.

Q. You were chief counsel from what year to what year?

A. 1985 to April of 1994.

Q. Can you just briefly describe what the role and

duties of chief counsel are, what your duties and role as chief counsel were? And you don't have to refer to this document. I'm just going to ask you in general to state that.

A. Well, I served as a legal officer for the United States Department of Energy both with respect to the internal affairs of the agency, hiring, firing, compliance with the various federal requirements; and with respect to the business affairs of the agency, namely its contracts with other outside organizations.

Q. Were you the chief legal advisor for your office?

A. For the contracting officer and the manager of the ops office, yes.

Q. What percentage of your job was actually, then, involved with providing legal advice to your client, DOE? Was that substantially all of your job?

A. Yeah. Yes.

MR. JAKE CHAVEZ: Don't forget to look at the reporter when you answer the question.

A. Thank you, Jake. Being cruel again.

Q. (By Mr. Hesch) Would it be fair to state that part of your advice that you provided to the Department of Energy related to DOE's contract with Rockwell?

A. Yes.

Q. And you would have provided advice relating to the award fees paid by DOE to Rockwell between 1987 and 1990?

A. Yes.
Q. And you were involved in the determination by DOE whether to renew Rockwell's M&O contract in or about the 1987-1988 time period?
A. I'm sorry, I can't relate to the time frame involved, but as a general proposition, any time an M&O contract would be extended by Albuquerque, I would see or sign off on the documents related to that extension. So your specific reference to the dates -- I can't focus on that.
Q. But you provided legal guidance and opinions to DOE relating to contract renewal of Rockwell?
A. Yes.
Q. Did you provide guidance to Mr. Currier as counsel to the Rocky Flats area?
A. Mr. Currier, Mr. Patrick Currier, worked for me in the legal chain. I was his legal supervisor for matters of law and legal policy, and I think it would be fair to say that I provided guidance to him. He was a senior attorney, and oftentimes I provided guidance and response to his questions. He was alone and didn't require day-to-day supervision.
Q. Would it be fair to say that often, at least -- maybe you could tell me a different term if you don't agree with the term "often" -- but often your communications with him would have been confidential communications?
A. That would be a fair statement. Certainly not

PL. SUPP. EX. 72

UNITED STATES COURT OF

FEDERAL CLAIMS

| | | |
|---|---|---|
| ROCKWELL INTERNATIONAL CORPORATION, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | ) | ORIGINAL<br>CASE NO. 91-1362 |

DEPOSITION OF DONALD R. BEALL

MONDAY, JULY 18, 1994

REPORTED BY:
JEANNETTE K. JESSUP
C.S.R. #8573

SIMS, SCHNEIDER & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
149 PALOS VERDES BOULEVARD
SUITE C
REDONDO BEACH, CALIFORNIA 90277
(310) 791-4466

SEAL BEACH, CALIFORNIA; MONDAY, JULY 18, 1994
2:15 P.M.

DONALD R. BEALL,
the witness herein, having been
first duly sworn, was examined
and testified as follows:

EXAMINATION

BY MR. KOLAR:

Q. Would you go ahead, sir, and state your full name and spell it for the record.
A. Donald Ray, R-a-y, Beall, B-e-a, double "l."
Q. Mr. Beall, my name is Jack Kolar. I'm an attorney with the Department of Justice, civil division, representing the government in this matter, the lawsuit by Rockwell International against the United States. I would assume that your attorneys have met or Rockwell's attorneys, that is, have met with you and explained the deposition procedure. I'd be happy to give you a brief explanation if you'd like to do that, or we could simply move on.
A. I think we could move on.
Q. You're currently the Chairman of the Board

and Chief Executive Officer of Rockwell International Corporation; is that correct?

A. Yes.

Q. How long have you served in that job?

A. Since February 1988.

Q. Are you familiar with the Rocky Flats plant?

A. Yes.

Q. For the record, what is that?

A. It's a nuclear weapons -- it's part of the nuclear weapons complex.

Q. And at one point Rockwell International operated that plant for the Department of Energy; is that right?

A. That's right.

Q. On Tuesday, June 6th, 1989, agencies of the Federal Bureau of Investigation and the Environmental Protection Agency executed a search warrant at Rocky Flats. Do you recall that?

A. Yes.

Q. I'm going to refer to this, for shorthand, as the FBI raid. Were you aware of the raid before it occurred?

A. No.

Q. Was anyone in Rockwell International, to your knowledge, aware of the raid before it occurred?

A. No.
Q. How did you learn about it?
A. I got a phone call in -- I believe I was in London.
Q. And who called you?
A. I suppose it was our general counsel, but I don't -- or Sam Iacobellis. I don't recall.
Q. Who was the general counsel at the time? That's in June 1989.
A. Charles Harff.
Q. Is he still the general counsel?
A. Yes.
Q. Who is Mr. Sam Iacobellis?
A. Mr. Sam Iacobellis is today Executive V.P. and Special Deputy Chairman. At that time he was, among other things, accountable for Rocky Flats, in addition to other parts of the company, all our aircraft and space businesses.
Q. Was he one of a number of peers, or was he the second in command, as it were, to you?
A. He was one of a number of direct reporting subordinates who, among them, had accountability for all of Rockwell's businesses.
Q. And Mr. Iacobellis was the particular individual accountable for Rocky Flats, you said?

A. Yes.

Q. Did Mr. Iacobellis call you on the day of the raid?

A. I don't remember.

MR. NEY: Objection. He said Mr. Iacobellis or Mr. Harff, or he really didn't recall.

MR. KOLAR: All right. Excuse me.

Q. Was it on the day of the raid that you received the call, or was it sometime thereafter, to your recollection?

A. I don't recall. I don't recall specifically.

Q. And what were you told in this telephone call?

A. I really don't recall the specifics. I mean, I recall the allegations that were made at the time of the raid -- so-called raid, but I don't remember the specifics of the conversation.

Q. What do you recall about the allegations?

A. That we were, you know, releasing toxic and/or radioactive materials into waste streams and into the atmosphere through consideration and such things like that.

Q. And was this reported to you in that phone call, that these were the allegations that were made?

A. I don't recall specifically whether the

disclose it.

Q. Mr. Beall, we've looked at a number of items of correspondence between yourself and Admiral Watkins following the June 6th, 1989 FBI raid. And you've testified to a number of conversations that you've had with the Admiral. In summary, during any of those conversations or communications did the subject of award fees come up, to your recollection?

A. In those conversations I don't recall that specifically came up. I don't recall.

Q. Do you have a recollection of any conversations you had with Admiral Watkins in which award fees were talked about?

A. I only had two conversations with him, both of which we've discussed, and I don't recall that specifically coming up.

Q. You did talk to Admiral Watkins, however, about a number of issues involving management at Rocky Flats, whether Rockwell would continue as contractor there. You've testified to that. At any point did you object to Admiral Watkins' involvement in the issues relating to Rocky Flats?

MR. NEY: In the issues you just identified?

MR. KOLAR: In any of the issues related to Rocky Flats. I was simply characterizing what I felt he

PL. SUPP. EX. 73

UNITED STATES COURT OF FEDERAL CLAIMS

ORIGINAL

Rockwell International Corporation
Plaintiff,
vs.
United States of America,
Defendant.

No. 91-1362

Deposition of Sam Iacobellis

July 19, 1994

SIMS, SCHNEIDER & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
149 PALOS VERDES BOULEVARD
SUITE C
REDONDO BEACH, CALIFORNIA 90277
(310) 791-4466

Reported by: Arthur M. Schneider CSR No. 4771

A Yes.

Q What was your title and duties in 1989?

A President -- I am going to give you two. It was either president, Aerospace Operations, or it was executive vice president and chief operating officer. I don't recall which it was.

Q We marked a document yesterday as Exhibit 104. I will show you a copy of it today and ask you whether that helps you clarify your recollection.

A What was the date you asked?

Q In 1989, the year 1989.

A Effective July 13 I -- my title was the latter, Executive Vice President and Chief Operating Officer. Prior to July 13 I was the other title. I had the other title, which was -- it doesn't say it here but president of the Aerospace Operations.

Q What were your duties generally as president of the Aerospace Operations?

A I was in charge of all of the aerospace activities of Rockwell.

Q Were you also in charge of the Rocky Flats plant?

A Yes.

Q For the record what was the Rocky Flats plant and what was Rockwell's relationship to it in 1989?

A In 1989, Rockwell was the operator of the government Rocky Flats facility in Golden, Colorado.

Q That's a nuclear weapons facility?

A Yes.

Q Did your duties change, and if so, in what way, after you became executive vice president and chief operating officer July 13, 1989?

MR. NEY: In general or with respect to Rocky Flats?

MR. KOLAR: First, in general.

THE WITNESS: Thank you. In general, it included all of the previous responsibilities, including some responsibilities that were corporate functions, and specifically relative to Rocky Flats, it continued the responsibility for that activity.

BY MR. KOLAR:

Q Did the nature of your responsibilities for Rocky Flats change at that point or did they continue to be the same as they had been before?

A Relative to Rocky Flats, I believe they continued as they were before. As an individual, I had a broad responsibility.

Q Do you recall that on Tuesday, June 6, 1989, the Federal Bureau of Investigation and Environmental Protection Agency executed a search warrant at Rocky Flats?

A Am I aware of that?

Q Yes.

A Yes.

Q I am going to refer to that for shorthand as the FBI raid.

A Okay.

Q How did you learn about the FBI raid, you yourself?

A I received a phone call from Dominick Sanchini.

Q Who was Dominick Sanchini at the time?

A He was the president and general manager, I believe his title was at the time, of Rocky Flats.

Q Did Mr. Sanchini in June of 1989 report directly to you or through intermediaries?

A Directly.

the phone calls.

Q Who do you know John Tuck to be?

A Someone in the Washington office of the DOE.

MR. KOLAR: I would like to mark this as Exhibit 111.

(The above-mentioned document was marked for identification by the Certified Shorthand Reporter, and is attached hereto.)

BY MR. KOLAR:

Q Exhibit 111 is Mr. Moore's report of a telephone conversation that he initiated to you on July 13. Do you recall that conversation?

A I don't recall a conversation.

Q Do you recall Mr. Moore at any time informing you that Department of Energy was delaying the pending award fee determination until August?

A I recall upon reflection and refreshing yesterday, that such a call did take place.

Q What was said during that call?

A That the award fee was going to be delayed. I don't recall how long or --

Q Do you recall how you responded to

that information?

A I acknowledged.

Q Did you acquiesce or agree?

A Yes.

Q Let's go ahead and mark this as Exhibit 112.

(The above-mentioned document was marked for identification by the Certified Shorthand Reporter, and is attached hereto.)

BY MR. KOLAR:

Q Before you look at that document, Mr. Iacobellis, going back to the conversation you just testified to, was that a conversation between you and Mr. Moore, Henson Moore, and who were the participants in that conversation?

A Under the nature of the previous question, I assume it was Mr. Moore. I have no reason to believe it was not Mr. Moore. I have no recollection of anybody else being on the phone call.

Q Why don't you go ahead then and peruse Exhibit 112.

A (Witness complies.)

Q I think if you look at the first

conditions?

A I don't recall. Was the next one -- I am asking you. Was the next one the phone call between Watkins and Beall?

Q To tell you the truth, I am not sure whether there weren't others, but let me simply ask you, do you have any recollection of Admiral Watkins telling Rockwell that he would terminate Rockwell if Rockwell suspended operations?

A No.

MR. KOLAR: Let me have a couple minutes to review what we have done so far, and I will be able to tell you. I may not have any additional questions.

MR. NEY: Why don't we take a five-minute break.

(Short recess).

BY MR. KOLAR:

Q I just have a couple summary questions, and I will be through. Do you have any recollection, Mr. Iacobellis, of discussing at any time in this period from June 1989 to September 1989, award fees with the Department of Energy?

A Yes. Only to the extent in line with what I already testified, that -- and refresh my

memory with these letters, that Henson Moore asked or told me or suggested that we would -- he was asking for a delay in the determinations. That's the extent of what I remember.

Q That's all you remember?

A Yes.

Q I think you indicated earlier you agreed to that; is that correct?

A Yes.

MR. KOLAR: I don't have anything else at this time.

MR. NEY: We have no questions.

PL. SUPP. EX. 74

United States Government

Department of Energy

# memorandum

Albuquerque Operations Office

Rocky Flats Area Office

DATE: APR 19 1989

REPLY TO ATTN OF: ADM:TA

SUBJECT: Draft Performance Evaluation Review Board Recommendations and Performance Evaluation Reports Summary on Rockwell International

TO: Theetis V. Hill, Executive Secretary for PERB, CPD/AL

In response to the February 24, 1989 memo from C. E. Troell, enclosed are items in the quantities agreed to in the April 10, 1989 telephone conservation between you and Terrel Agy of my staff. The reports cover the award fee evaluations on Rockwell International at the Rocky Flats Plant for both Plant and PRMP/PROVE performance during the rating period October 1, 1988 through March 31, 1989.

- Eleven (11) copies of the book to be used by the PERB members, including the RFAO Area Manager.
- Twenty-one (21) sets of the PERB Recommendations and Summary for distribution to the AL Division Directors.

Also included in the enclosure is one copy of a computer disk, using the IBM MultiMate format, containing the following information for this rating period:

- PERB Recommendations
- Performance Evaluation Reports Summary
- Fee Calculation for PLANT
- Fee Calculation for PRMP/PROVE

The original due date was April 18, 1989. An extension until April 20 was verbally requested by Claude Barkmeier and approved by you on April 13.

for Ron L Foster

Albert E. Whiteman
Area Manager

Attachment

SENT VIA FEDERAL EXPRESS ON 4/19/89

E 002558

OFFICIAL USE ONLY

# AWARD FEE EVALUATION

# ROCKWELL INTERNATIONAL

# OCTOBER 1, 1988 - MARCH 31, 1989

CONTENTS

PERB Evaluation Report Summary

PERB Recommendations

Fee Calculations

AL Input

Rockwell Self Evaluation

Goals & Objectives

Contract Modification

OFFICIAL USE ONLY

OFFICIAL USE ONLY

PERFORMANCE EVALUATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD OCTOBER 1, 1988 - MARCH 31, 1989
CONTRACT NO. DE-AC04-76DP03533

The overall performance of Rockwell International Corporation (Rockwell) has been maintained at least at a level of "Satisfactory" during the period October 1, 1988 through March 31, 1989.

The following is an evaluation of the performance of Rockwell, relative to the management and operation of the Rocky Flats Plant, including the performance for PRMP/PROVE, in the Functional Performance Areas (FPA's) selected for award fee evaluation. The first section covers plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's for plant operations have been evaluated in accordance with the contract Award Fee Plan, and the following discussion of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

PLANT

GENERAL MANAGEMENT: Significant improvement has been made in many important plant functions during the appraisal period. While continued improvement is needed in all areas, Rockwell has done a remarkable job of pushing for and achieving recent improvements under extreme pressure. IP schedule compliance continued at 100% for the third consecutive rating period. There was a rapid resolution to the problem of obtaining DOT approval for using a modified ATMX railcar for making the first shipment of TRU mixed waste in 1989. The Emergency Preparedness organization has a well planned and effective program and continues in an active AL role and to make improvements. A Rockwell "We Do Care" program was developed to address the maintenance work order backlog. In less than four years, Rockwell has exceeded a ten year Energy Conservation Goal. In addition, Rockwell completed an automated logging system in all major production and support buildings.

COST MANAGEMENT: Good data and narratives provided by Rockwell to define DOE's unfunded ES&H reqirements in a FY 1989 supplemental budget request were also used to support DOE requests to Congress for additional FY 1990 funding. Rockwell has done an extraordinary job of tracking information and preparing responses to a large variety of budget information requests and of maintaining the current status of its requirements. In addition, construction project data sheets and conceptual design reports supporting Capital Budget requests were both of high quality and ahead of schedule. Budget narratives were improved and expanded and were helpful in DOE's analysis of Rockwell's resource requirements.



OFFICIAL USE ONLY

QUALITY: Significant progress has been made towards implementing the NWQA NQA-1 Standard at Rocky Flats. More specifically, NWQA activities conducted during the Building 771 restart have resulted in a significantly improved quality program to be used in the operation of the building. For WR QA, Rockwell is implementing Phase 2 of the Quality Improvement Plan which will continue a new culture in quality practices and should lead to further improvement in the QA program. In NDT, an alert technician identified an anomoly in the X-ray film which lead to the detection of a defective process in another AL plant. This kind of effort reflects a work ethic that ensures a quality product for the DOE.

There were three incidents which came to DOE's attention where Rockwell failed to provide the necessary measures to adequately control nonconforming product material.

CHEMICAL OPERATIONS: Noteworthy progress has been made towards the implementation of the Operational Readiness Review (ORR) program as demonstrated through ORR's in Building 771 and elsewhere. Rockwell has also successfully completed the development of a new extractant compound for use in the Molton Salt Extraction process.

PRODUCTION OPERATIONS: Significant progress has been made on the number one priority for this year, excellence in facility operations, by the development of a Nuclear Facility Operations Manual and the active support of the AL effort to develop an Operational Surety Program. Rockwell has taken several steps to reduce work in process inventories and process times by, among other things, reduced planned process times in Building 460, reduced pit assembly process time in Building 707 and reduced lot sizes on the 3T bodies.

ENVIRONMENT, SAFETY AND HEALTH: Progress towards achieving a high quality training program and the establishment of a new pilot radiation safety course are among the notable achievements in the radiation protection area. Rockwell has demonstrated good responsiveness in the preparation and coordination on National Emissions Standards for Hazardous Air Pollutants issues specific to the Rocky Flats Plant and has contributed to the DOE-wide review of this regulation. Significant progress has been made towards reducing both the rate of radiological incidents and personnel radiation exposure. In the safety program, substantial corrective actions are underway, including the development of an integrated safety program. A Safety Review Group has been established and its efforts during the period were commendable.

An unintentional release of dilute chromic acid revealed inadequate procedures for the reporting and coordination of discovered releases to the sewage treatment plant with downstream control of contamination. Rockwell's housekeeping of production buildings has not improved adequately. Although a downward trend has been achieved during the first five months of FY89, no significant progress in reducing the wound rate has yet occurred.

PRMP/PROVE

PROJECT MANAGEMENT: Rockwell has given PROVE renewed emphasis by separating responsibility for PROVE from that of the PRMP and placing it under a full

OFFICIAL USE ONLY

time project manager. The recently implemented "Precursor Plan" represents an improvement in direction for the entire project and was implemented with professionalism and enthusiasm.

Inadequate PRMP management required significant PRMP management redirection to be consistent with allocated funding. In addition, inadequate project staffing continues to influence Rockwell performance.

COST MANAGEMENT: Cost development and baselining of costs for the "Precursor Plan" has been handled with the highest degree of quality. Rockwell's redirection of J. A. Jones' manpower planning on PROVE resulted in reduced costs and apparent increased construction productivity.

PROVE continues to demonstrate cost growth. PRMP cost planning far exceeded available project funding allocations.

SCHEDULE PERFORMANCE: Rockwell has successfully resolved several problems which were impacting schedule in the PROVE area. The diligent effort by Rockwell, Bechtel, and J. A. Jones in the joint development of the Precursor planning has resulted in a comprehensive schedule that should lead PRMP into the Line Item in a most suitable manner.

The PROVE schedule has deteriorated during the reporting period, extending the PROVE end date from 1/90 to 8/90.

SUBCONTRACT MANAGEMENT: Rockwell, consistent with project technical needs and evolved cost and schedules, has provided rapid and effective subcontract redirection of Bechtel. Subcontract management of J. A. Jones has ensured their participation in construction planning. Rockwell has been successful in obtaining active participation and commitment from the National laboratories and other Rockwell organizations on the PRMP Precursor Program.

The PECO subcontract work has resulted in the need for significant rework to the glovebox piping and piping penetration welds. Line Item and cost/schedule activities over the balance of the FY demand that Rockwell provide continuous site representation at Bechtel.

DESIGN QUALITY: The Precursor Program, geared toward improving PRMP design quality, has been initiated with broad based involvement. PROVE use of the Configuration Control System has been greatly improved.

The quality of the existing PROVE engineering has been poor, and change orders to correct poor initial design quality are reflected in cost growth.

TECHNICAL PRODUCT QUALITY: PROVE activities in addressing and rectifying glovebox welding problems are directed towards and should significantly improve technical product quality.

Welding problems recently surfacing on the PROVE glovebox indicates a signficant lack of technical product quality success.




OFFICIAL USE ONLY

OFFICIAL USE ONLY

PERFORMANCE APPRAISAL
ROCKWELL INTERNATIONAL
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD OCTOBER 1, 1988 - MARCH 31, 1989

The overall performance of the contractor has been maintained at least at a level of "Satisfactory" during the appraisal period. The following is the Performance Evaluation Review Board recommendations for the Functional Performance Areas (FPA's) selected for evaluation. The first section covers plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

**PLANT**

FPA: GENERAL MANAGEMENT

ADJECTIVAL GRADE: EXCELLENT

Noteworthy Achievements

1. Significant improvement has been made in important plant functions during the appraisal period. These improvements are covered in more detail in the FPA's for Environment, Safety and Health, Production Operations, Non-Weapons Quality, and Chemical Operations. While continued improvement is needed in all of these areas, Rockwell has done a remarkable job of pushing for and achieving recent improvements under extreme pressure.

2. IP schedule compliance continued at 100% for the third consecutive rating period. This performance was achieved despite material supply limitations generated by the shutdown of Building 771.

3. Rockwell achieved a rapid resolution to the problem of obtaining DOT approval for using a modified ATMX railcar for shipping the first shipment of TRU mixed waste in 1989 from the Rocky Flats Plant to the INEL. Several obstacles existed, both within DOE and DOT, to the granting of appropriate approvals. Due to Rockwell's persistence, the approval was granted for use of the modified railcars at the time proposed by DOE.

4. The Emergency Preparedness Organization was credited in the December 1988 Safety Performance Review with having a "...well planned, and effective program in meeting emergency readiness needs." In addition, Rockwell's emergency preparedness personnel have sustained a high level of participation in AL-wide emergency preparedness coordination activities, have supported the development of the AL emergency preparedness appraisal program in a significant manner, and have continued to identify and implement improvements in Emergency Operations Center capabilities and operations.

5. More than 60% (47,000 hours) of the maintenance work order backlog older than 90 days has been worked off. A team of 50 people, under the Rockwell "We Do Care" program, was established for this purpose.

E 002561

"REVIEWED FOR CLASSIFICATION
By Douglas S. Cox RFAO
Date April 18, 1989 (U)



OFFICIAL USE ONLY

OFFICIAL USE ONLY

6. Rockwell has already exceeded the 10 year (1986-1995) Energy Conservation Goal of a 10% reduction in energy usage.

7. Rockwell has completed the development and installation of the Personnel Evacuation Logging System (PELS) in all major production and support buildings. This enhances the security and safety of the buildings serviced and provides a data base for emergency actions in specific areas.

Notable Deficiencies

None

Observations

1. The Management Oversight Group (MOG) reported needed changes in the management of the Plutonium Recovery Modification Project (PRMP) by Rockwell. A Precursor Program has been established with the DOE Project Manager to address the MOG concerns, and significant progress is being made. Further improvements are necessary by Rockwell for this high priority DOE project.

2. The redefinition of the Building Manager responsibilities has been a visible action which has enhanced the integration of functions. The Building Manager position is functioning to exercise responsibilities for all activities in the building. Development of an "in-house" safety program in Production Operations is evidence of the success that can be achieved by Building Managers. The Building Manager position should be further strengthened and supported to insure complete integration of all activities necessary for safety, quality, maintenance, training, security and production.

3. The shutdown of production and maintenance activities in Building 771 from October 1988 to January 1989 resulted in a significant impact to plutonium recovery schedules, as well as a slip in ongoing maintenance and facility upgrade schedules. With the exception of electrorefining, Rockwell is significantly behind recovery schedules established at the beginning of the fiscal year. The shutdown was made to allow Rockwell time to correct safety related problems in the building, most of which had been identified before the period began. Much work remains by Rockwell to make Building 771 operate to DOE standards. Accomplishing the restart requirements on schedule and maintaining the present restart schedule should avoid any impact to pit delivery schedules.

4. Training of waste generators and improved generation practices have reduced the quantity of reject waste drums, a major contributor to reducing the supplied air operations in the Size Reduction vault.

5. Rockwell has not made adequate progress to prepare for utilization of the TRUPACT II container when it becomes available. The final definition of modifications to Building 664 for handling TRUPACT II containers and submittal of the budget request was not completed in a timely manner.

6. Rockwell is developing a comprehensive plan for plantwide application of Building 771 Restart Criteria. The plan reviews each of the 771 Restart Criteria for potential applicability to other areas on plantsite, recommends items that should be implemented, determines the status of each


OFFICIAL USE ONLY

item, determines a rough order of magnitude of resources and manpower requirements, and finally recommends an action plan and management scheme.

7. The identification and timely resolution of problems by Rockwell is often slow. Examples include pondcrete storage monitoring, analysis of NPDES violations, complete dissemination of incident information within Rockwell, and TRU waste storage data. For example, in October, the Governor of Idaho curtailed shipments to Idaho of transuranic waste from Rocky Flats. The curtailment resulted in an immediate need for information on the TRU mixed waste at Rocky Flats available for shipment. The time required to obtain accurate information on the types and quantities of stored waste was too long for an issue of this importance.

8. The development of a training program leading to accreditation has been accelerated due to the anticipated release in mid-April 1989 of DOE Order 5480.XX. To date, Rockwell has appointed a Training Accreditation Coordinator, established a plant-wide Training Accreditation Task Team, made an initial assessment of plant positions to determine those which will need accreditation, and drafted a Gross Resource Plan. They have also supported an accreditation site assistance visit from EG&G personnel. While Rockwell's efforts have been satisfactory to date, continued emphasis will be required to assure implementation of DOE Order 5480.XX once it is published in its final form.

9. Rockwell has recently violated DOT regulations on two shipments to the Nevada Test Site (RF890154 and RF880951). One involved mis-counting the number of waste containers on a shipment to the NTS on 9/3/88, and the other involved incorrect drum numbers (due to exchange of a drum which was listed on the bill of lading with a drum which was not listed on the bill of lading) on 1/17/89.

10. Despite the knowledge that nitrate concentrations on the 750 pad have increased, little action has been taken to contain saltcrete (which has been identified as a major contributor to storage pad nitrate concentrations) after precipitation events. Data provided in March of 1989 indicated the highest nitrate concentrations ever observed on the pads.

11. Rockwell is still not placing sufficient emphasis on the timely establishment of the Rocky Flats Institute. The DOE considers this program, along with the Rocky Flats School, to be essential to enhancing the capabilities of building management personnel at Rocky Flats.

12. Rockwell has done a commendable job of establishing the Rocky Flats School. Continued top management emphasis is needed. The School has not been integrated into the Rockwell professional career development program as a recognized approach to enhancing the capabilities of building management personnel at Rocky Flats.

13. Successful preparations are being made for purchase and installation of the supercompactor. The decision to not perform operational testing in the form of a pilot study, but to go directly to full use may pose some problems at a future time. Some form of operational testing should be planned in a documented form which can be reviewed prior to startup.

OFFICIAL USE ONLY

14. The Waste Isolation Pilot Plant (WIPP) Waste Acceptance Criteria Committee performed an audit on Rocky Flat's transuranic waste activities. The positive results of this audit reflect diligence in waste analysis and quality assurance in packaging.

15. Rockwell has developed a Trauma Response Team (TRT) to respond to the emotional/psychological needs of employees exposed to traumatic incidents. This was done in advance of a March 6, 1989 AL letter suggesting the development of TRT team.

16. Several waste minimization efforts have led to reductions in wastes produced. The most dramatic effort has been the waste paper recycle program which has exceeded all expectations for the quantities of waste paper recycled. This has the added benefit of extending the useful life of the sanitary landfill.

17. Rockwell implemented an extensive on-site Information Technologies training program with considerable savings in cost over the previous off-site program. Classrooms have been equipped, courses developed and over 200 people have already received training. Significant cost savings are accruing by replacing off-site training. The course are also specifically directed to Rockwell objectives while contract courses were general in nature.

18. A significant disagreement has existed between DOE and Rockwell regarding the priority of PFMS work. This resulted in an AL decision to transfer portions of the work to Los Alamos.



OFFICIAL USE ONLY

OFFICIAL USE ONLY

FPA: COST MANAGEMENT

ADJECTIVAL GRADE: EXCELLENT

Noteworthy Achievements

1. Rockwell performed well in providing data and narratives to define DOE's unfunded ES&H requirements in support of a FY 1989 supplemental budget request. A significant portion of this data was used to support DOE requests to Congress for additional FY 1990 funding.

2. Rockwell has done an extraordinary job of tracking information and preparing responses to a large variety of budget information requests and of maintaining the current status of its requirements. The quality and consistency of information provided to the DOE has been exceptional considering the number of different funding options that have been addressed. Support provided for the on-site DOE review of requests for additional funding was excellent.

3. Rockwell construction project data sheets and conceptual design reports supporting its requests for the FY 1991/1992 Capital Budget were of high quality and were completed ahead of schedule. Rockwell is well-prepared for DOE Headquarters reviews of FY 1991 projects.

4. The FY 1991 budget narratives were improved and expanded by Rockwell. Detailed identification of program cost growth and impacts of Production and Surveillance target guidance was particularly helpful in DOE's analysis of Rockwell's resource requirements.

Notable Deficiencies

None

Observations

1. Rockwell's SACNET submission of budget schedules was late and its FY 1988 Schedule 1 and 2 actual costs were late and were also inaccurate in regard to New Material Flight Tests/Stockpile Flight Tests and New Material Laboratory Tests/Stockpile Lab Tests.

2. In deciding on final GPP allocations for the year, AL has reviewed the status of committed funds. The large dollar amount of uncommitted funds has adversely affected the support for the plant's FY 1989 GPP requirements.

3. Rockwell continues to be responsive to OCAD requirements and initiatives including indirect Cost Management, the Work Load Model initiative and Baseline Cost Management (particularly the W 89 Cost Call). Although Indirect Cost Management packages were submitted late, the quality of the packages was very good.



OFFICIAL USE ONLY

FPA: QUALITY CONTROL

ADJECTIVAL GRADE: EXCELLENT

Especially Noteworthy Achievement

The NWQA surveillance activities conducted during the Building 771 restart have been especially noteworthy in that they have resulted in the identification of and provide for corrective actions necessary for a more viable quality program. This early detection and correction of deficiencies in operations will provide for a greater assurance of the quality of our product.

Noteworthy Achievements

1. After two years of accomplishments, the continual improvement in the Rockwell Quality program has leveled off. As anticipated, a new phase of the Quality Improvement Plan is currently being implemented. This new phase is now being referred to as Phase 2 and will incorporate a new culture in quality practices. Rockwell has aggressively entered into Phase 2 with a Program Manager and a Continual Improvement Steering Committee to guide the effort. The steering committee is further supported with technical personnel, one being closely associated with Dr. W. Edward Deming.

2. Significant progress has been made towards implementing the NQA-1 Standard at Rocky Flats. The NWQA program office now has three reporting managers with established responsibilities. The Management Plan has been updated and eleven new positions added to the NWQA office. The Plant Level Control Systems portion of the implementation plan is divided into four parts and is mostly in place. Also, a manager has been assigned to facilitate the implementation of the Non-WR Calibration Program. Quality personnel associated with procurement of needed services and commodities for the plant, within the Quality Directorate and outside the Quality Directorate, have recently been reorganized into one group within the NWQA program office. This reorganization should increase the consistency of Non-WR and WR procurement activities.

3. Because of his exceptional attention to detail, a technician in the NDT Department was able to have defective material that was received from Pinellas removed from the production line before it could be further processed into the system. During a routine NDT examination of a Rocky Flats production process, the technician detected a suspected anomaly in a reservoir while evaluating X-ray film of a weld joint performed at Rocky Flats. After sectioning the suspected unit, it was learned that a weld, unrelated to the Rocky Flats weld, had been completed unsatisfactorily at the Pinellas Plant. The unsatisfactory weld was not detected during NDT at Pinellas and was accepted and forwarded to Rocky Flats for continued processing. The discovery of this defect is very praiseworthy because the Rocky Flats NDT set up was not optimized to evaluate the Pinellas weld joint. The alertness, attention to detail, attitude and discipline shown here depicts a work ethic that ensures a quality product.

OFFICIAL USE ONLY

Notable Deficiency

In three incidents, Rockwell failed to provide the necessary measures to adequately control nonconforming product material.

1) During the period, it was discovered that Rockwell had cancelled a deviation for a nonconforming component that had been properly deviated when accepted and released from Rocky Flats in FY 1988. Rockwell also failed to notify all affected DOE organizations that this action had taken place.

2) Five reject components were mistakenly accepted and released from Rocky Flats into the complex and subsequently had to be retrieved.

3) An acceptable reservoir was mistakenly reworked for defectiveness. A defective reservoir was then mistakenly accepted without being reworked and shipped to the next user.

The analysis of these incidents revealed that all these errors happened either from a breakdown of an existing system or that an inadequate system was in place.

Observations

1. The DOE is concerned with the low level of quality performance being displayed by the beryllium supplier. Deficiencies such as lack of subcontracting controls, poor manufacturing instructions, and failure to identify root causes of nonconformances were identified in a recent Rockwell survey of the beryllium supplier. Beyond these findings, a recent DOE, AL survey of the beryllium supplier found that the supplier's configuration management and product traceability systems were also operating poorly.

2. Approximately 272 QAS 2, 3 and 4 surveys were conducted during the period resulting in 55 complimentary observations and 66 findings. However, all eleven QC-1 elements were evaluated to be satisfactory or better. Four findings were considered to be significant. Three findings involved paperwork problems and the fourth was assigned for a part which failed the DOE verification inspection of the component. No findings were identified in two of the QC-1 elements and no negative trends were identified.

3. Rockwell continues to make excellent progress towards implementing the complete Quality Information System (QIS). Shortly the fifth module will be complete. Three additional modules are planned and scheduled to be complete during FY90.

4. Duplicate serial numbers have become an issue during the performance period. Three DOE plants have identified product from Rocky Flats with serial numbers which have been used twice. After significant investigation by the DOE and Rockwell, it has been found that only a small quantity of the identified serial numbers have actually been duplicated. The underlying problem is how each plant interprets the Engineering Procedure which governs the requirement. The resolution of this issue will be completed in a future meeting between contractor, design agency and DOE personnel.


OFFICIAL USE ONLY

FPA: CHEMICAL OPERATIONS

ADJECTIVAL GRADE: EXCELLENT

Noteworthy Achievements

1. The Plutonium Operations effort to implement an Operational Readiness Review (ORR) program is excellent. Progress toward implementation has been demonstrated through ORR's for the Building 771 Incinerator, Part V, and the Dicesium Hexachloroplutonate Molten Salt Extraction processes. These efforts support the top priority goal for excellence in facility operations and should be further developed and continued on a plant-wide bases.

2. Rockwell has successfully completed the development of a new extractant compound for use in the Molten Salt Extraction (MSE) process. Dicesium Hexachloroplutonate (DCHP) has the advantage of substantially reducing the gamma and neutron exposures to MSE operations personnel, eliminating magnesium contamination of the product plutonium buttons, and increasing the efficiency of the process to a single pass process. These last two changes also reduce the recycle residues produced. This development work was performed concurrently with the building 771 shutdown, safety improvements and the Building 771 restart activities.

Notable Deficiencies

None

Observations

1. DOE intends to evaluate the productivity of Chemical Operations in terms of Base Recovery Units (BRUs). Using this approach, Rockwell appears to be regaining productivity while concurrently executing new safety requirements. Because of the Building 771 shutdown, the most current metal production period was only three months in length. A comparison of that production period was made against the two previous periods as shown below:

| Period | Months | %Change | %Change |
|---|---|---|---|
| July 86 - July 87 | 13 | Base | --- |
| Aug 87 - June 88 | 11 | -12% | Base |
| Current | 3 | +8% | +22.6% |

When using the 13 month period as the base for comparison, the efficiency of recovery for the three month period increased by 8.0%. Using the 11 month period as the base for comparison shows in increase in efficiency of 22.6% for the 3 month period. In the first comparison, the 12% drop for the 11 month period resulted from the initiation of ES&H facility upgrades. The dramatic improvement seen when comparing the 3 month period against the 11 month period as base reflects an adjustment to the new ES&H requirements and increased efficiencies resulting from facility upgrades.

2. The establishment of a Self-Assessment Audit Program in Building 771 has enabled Rockwell to take a proactive role in identifying and correcting housekeeping and safety concerns. The emphasis on immediate corrective action

and recurrence control is a positive step toward implementing the surety of operations concept in Building 771. Rockwell's vigorous proactive self-assessment efforts in Building 771 are to be highly commended and encouraged throughout the plant-site.

3. The Building 771 Contamination Control Committee has continued to work at determining the root cause of mechanical and administrative failures which led to contamination incidents. New decontamination methods, new anti-contamination clothing, safer work methods, trend analyses and engineering enhancements are all measures being utilized by the Committee. During the last six months there has been only one possible inhalation case which was confirmed as negative. In addition, the number of contamination incidences appears to be staying low as production increases under the Restart Plan. However, further reductions in the number of contamination incidences are necessary.

4. Identification of process information has promoted identification of process shortcomings. Further analysis requires instrumentation, which has been delayed in some cases by the Building 771 shutdown. Continued process improvements through the Recovery Improvement Program (RIP) and Process Technology Development (PTD) support have also been impacted by the shutdown and some shifts in goals. However, there is still a need for continued efficiency and process improvements and these programs should be revitalized in some form.

5. Rockwell has successfully completed initial experiments with an electrolytic decontamination technique for use on fixed contamination on stainless steel and some other metals. The technique, coined electrodecontamination (EDC), has been highly successful on flat stainless steel surfaces in the first few trials. Further development of this technique for the decontamination of large surface areas, uneven surfaces and welds, without detrimental effects to the equipment decontaminated, would constitute a significant achievement.

6. The development of a budget planning process for chemical operations is considered to be essential to the improvement of the efficiency of the plutonium recovery processes, increased metal purity, decreased residue recycle and waste minimization. To date, Rockwell management has provided excellent support for establishing a budget development process. However, it is essential that Plutonium Operations line management provide a leadership role and be involved in the entire budget development process, not just provide support to the budget development process.

OFFICIAL USE ONLY

FPA: PRODUCTION OPERATIONS

ADJECTIVAL GRADE: OUTSTANDING

Noteworthy Achievements

1. Rockwell has made significant progress on the number one priority for this year, excellence in facility operations. They have made noteworthy contributions toward this goal in the two areas below:

a. The effort toward development of a Nuclear Facility Operations Manual (NFOM) directly supports the facility excellence goal. The NFOM Task Team has drafted and approved all procedures for the NFOM based on the original outline. The Task Team is committed and has an appropriate mix of members to insure a balanced perspective. With continued emphasis, this effort is expected to create a model document for the AL complex.

b. Rockwell has been very supportive of the AL effort to develop an Operational Surety Program. They have actively participated in meetings, presented briefings on request, and provided documents for application by other sites. RFP is currently recognized as a leader in Operational Surety within AL.

2. Rockwell has taken several steps to reduce work in process inventories and process times. Among these are:

a. Reduced planned process times by approximately 25% "across the board" in the production control system in Building 460. The result has been roughly a 50% reduction in work in process inventories in the building, measured by the number of components.

b. Reduced pit assembly process time in Building 707 by six weeks, from eight weeks total to two weeks.

c. Reduced lot sizes on the 3T bodies from approximately 50 to approximately 24 to reduce backlogs at the 4 and 5 axis mills.

Notable Deficiencies

None

Observations

1. Utilization of direct labor, as measured by productive time, efficiency and realization, has declined during this period. This decline is a result of changes required to implement new plant safety procedures. Rockwell's Industrial Engineering Group has conducted a study of possible approaches to improve labor utilization. In the long term, utilization should improve as experience is gained in the new operating procedures, and as the emphasis on training results in yield improvements. In addition, greater safety consciousness should result in fewer process interruptions.

2. Rockwell has responded effectively to DOE's initiatives on make or buy policy. Rockwell will soon be submitting their revised Capability Maintenance


OFFICIAL USE ONLY

OFFICIAL USE ONLY

Plan, now called the Make Or Buy Plan, and the supporting Baseline Capability Plan. They have also complied with the requirement to submit a "Buy Rate" calculation. The calculation for the first quarter in FY 1989 showed that the buy rate declined in comparison with FY 1988, but this is attributed to the "buy ahead" of a significant quantity of beryllium parts in FY 1988.

3. During March, Rockwell hosted a seminar to share information on their experience in eliminating halogenated solvents. Thirty-two representatives from twelve corporations attended. Feedback was positive and enthusiasm was expressed for continued information exchanges. This seminar was a constructive first step in the program for technology transfer from Rocky Flats to private industry and has significant potential for building a positive image for Rocky Flats within local communities.


OFFICIAL USE ONLY

OFFICIAL USE ONLY

FPA: ENVIRONMENT, SAFETY AND HEALTH

ADJECTIVAL GRADE: GOOD

Noteworthy Achievements

1. Rockwell has made good progress towards achieving a high quality radiation protection training program for Radiation Monitors which meets the requirements of DOE 5480.11. Other significant initiatives in radiation protection training have also occurred during this period, most notable being a new pilot radiation safety course for Radiation Worker Supervisors and plant Building Management. Rockwell has successfully completed many improvements and started several new initiatives above and beyond the DOE requirements in their radiation protection training programs.

2. Rockwell has demonstrated good responsiveness in the preparation and coordination on National Emissions Standards for Hazardous Air Pollutants (NESHAP) issues specific to the Rocky Flats Plant. Rockwell has also demonstrated a thorough understanding of the regulatory requirements through its contributions to the DOE-wide review of the NESHAP (Subpart H) regulation.

3. Rockwell has made significant progress towards reducing the rate of radiological incidents. The average monthly rate for Possible Inhalations (PI's) during FY88 was approximately seven per month. During the first five months of FY89, the rate of PI's was less than three per month. The FY88 monthly average rate for exceeding contamination limit criteria in both controlled and uncontrolled areas was about 37 occurrences each month. However, for the first five months of FY89, the monthly rate for this type of contamination incident has dropped to approximately twenty occurrences per month, well below the RFP performance goals. Though still much higher than DOE expectations, this performance is especially noteworthy when it is recognized that more stringent reporting of "area contamination" problems has occurred during this time frame due to implementation of DOE Order 5480.11.

4. Significant progress has been made towards reducing personnel radiation exposure. During the first four months of the rating period, personnel in the semi-monthly and monthly badge exchange groups used about 102 REM. This figure represents a reduction of approximately 29% below the projected goal of 143 REM. Although Building 771 process operations were curtailed most of this period, many other plantwide maintenance improvements and decontamination initiatives served to counterbalance exposure reduction occasioned by the Building 771 shutdown.

5. The comprehensive review of the TSA showed that Rockwell's safety program is in transition and open to change. Rockwell was commended for improvements in union/management relations and for developments in an integrated safety program. A definite change in culture was observed. Substantial corrective actions are underway, which when properly implemented should result in an exemplary safety program in the future. Rockwell also submitted it's TSA response document to DOE two weeks ahead of the schedule set by DOE.

6. In establishing the Safety Review Group, Rockwell has developed a dedicated investigative group that provides a coordinated systems approach to


OFFICIAL USE ONLY

unplanned event investigations that ensures that such events are investigated in a timely manner and enhance the safety awareness throughout the plant. Rockwell should be commended for the establishment of this group as well as for the SRG's efforts to date.

Notable Deficiencies

1. There was an unintentional release of dilute chromic acid on February 22, 1989, which upset the RFP's sanitary wastewater treatment plant, was partially applied to the RFP's spray irrigation site, and through surface runoff, wound up in Pond B-5. There are inadequate incident reporting procedures or operating procedures governing the coordination of the discovery of releases to the sewage treatment plant with downstream control of contamination. Furthermore, the incident shows the need for the development and implementation of adequate Spill Prevention Control and Countermeasures procedures and practices.

2. Rockwell's housekeeping of production buildings has not improved adequately. Most buildings do not compare to the standard set in Building 771. Rockwell is beginning to work the problem, however does not yet have a program to solve the problem.

3. The rate of wounds which occur in radiation controlled areas averaged about 60 per month during FY88, and though a downward trend has been achieved during the first five months of FY89, no significant progress in reducing the wound rate has yet occurred during FY89.

Observations

1. Rockwell, for the first time, has a 100% glove change compliance across the plantsite. The Y-12 Plant has requested a Rockwell employee visit their plant so that a review of their operations and recommendations on development of a glove change program similar to that at RFP can be made.

2. Rockwell has been proactive in establishing a NEPA compliance committee. Rockwell has reviewed the appropriate NEPA guidance documents and has established a logical method for reviewing plant projects in order to determine the level of NEPA action required for the project. Although the committee has just been established, its cross section of divisions will enable it to consider a wide range of plant projects with minimal chance of leaving out a project. The system for documenting the review of projects, the judgments made and the recommendation for NEPA action are thorough and track in a logical fashion.

3. The Colorado Department of Health and the Environmental Protection Agency conducted six waste storage audits under Resource Convservation and Recovery Act (RCRA) during the last three and a half months, and only minor findings resulted. Because of consistently good audit results, TRU mixed shipments to the INEL were reinstated and the frequency of future inspections will be reduced.

4. Rockwell has established a strategy for upgrading the air monitoring system at RFP. The strategy was the result of excellent analysis, successful peer review, and resulted in a significant reduction in projected costs.

OFFICIAL USE ONLY

5. Rockwell continues to successfully complete the requirements of RCRA and the Comprehensive Environmental Response Compensation and Liability Act.

6. Rockwell has made significant improvement in responsiveness to the AL safety appraisals. Although none to date have been turned in on time, the amount of tardiness has steadily decreased to the point that Rockwell has no outstanding responses at this time. Rockwell has initiated "Completion Certificates" for completed actions.

7. Rockwell established proposed plutonium and uranium maximum permissible contamination levels in oils and solvents which are defensible and practical for analytical evaluation. Although this is only a proposed method for establishing limits for a limited type of contaminated vs. non-contaminated waste materials, the need for these limits to be established has been indicated by the Environment & Health Program.

8. Rockwell has developed a Radiation Monitoring work schedule pilot program. This program is expected to cut Radiation Monitors overtime by 30-50%. The program was completed three weeks ahead of schedule in Building 776. Survey schedules have been maintained up to date. Plans are being developed for implementation of the work scheduling program across the plant site.

9. Rockwell has responded well in initial implementation of the more stringent requirements of DOE Order 5480.11, "Radiation Protection For Occupational Workers". Rockwell is developing an implementation plan to accurately assess the impact of full implementation


OFFICIAL USE ONLY

OFFICIAL USE ONLY

PRMP/PROVE

PRMP/PROVE FPA: PROJECT MANAGEMENT

ADJECTIVAL GRADE: MODERATELY GOOD

Noteworthy Achievements

1. Rockwell has given PROVE renewed emphasis. Rockwell has separated the responsibility for PROVE from that of the PRMP and placed it under a full time project manager. In addition, the Rockwell Plutonium Operations directorship has committed a top staff member to be the Chief PROVE Project Engineer.

2. Rockwell has recently developed and implemented a "Precursor Plan." This plan represents a marked improvement in direction for the entire project. The planning has been both detailed and complete. This "Precursor Plan" has been implemented by Rockwell with professionalism and enthusiasm.

Notable Significant Deficiency

Overall PRMP management attention to project technical, cost, schedule and manpower needs was inadequate.

Notable Deficiency

Inadequate project staffing continues to influence Rockwell PRMP performance. The above referenced "Precursor Plan" has made the staffing shortage obvious to all parties concerned.

Observations

1. The task of evaluating and incorporating PROVE's "Lessons Learned" is now a Precursor Plan activity with the anticipation that full benefit will be realized.

2. The degree to which Rockwell appropriately manages the Precursor Plan will directly impact PRMP's future success technically and administratively.



OFFICIAL USE ONLY

OFFICIAL USE ONLY

PRMP/PROVE FPA: COST MANAGEMENT

ADJECTIVAL GRADE: MODERATELY GOOD

Noteworthy Achievements

1. The cost development and baselining of those costs for the "Precursor Plan" has been handled with the highest degree of quality. Subcontractors have been integrally involved in this development and baselining.

2. Rockwell has redirected J. A. Jones' manpower planning on PROVE which has resulted in reduced costs and apparent increased construction productivity.

Notable Significant Deficiency

PROVE continues to demonstrate cost growth. Rockwell has increased their forecast for the Total Estimate at Completion on PROVE from less than $43 million at the beginning of FY89 to the current $45.6 million.

Notable Deficiency

PRMP cost planning did not take into account allocated funding availability, resulting in a disconnect in project activities.

Observations

1. Rockwell has restructured PROVE cost estimates to be able to use a realistic $45.6 million baseline.

2. The PROVE Cost Performance Reports (CPRs) have been timely and of a consistently high quality. Changes to the Performance Measurement Baseline have been incorporated accurately and in a timely fashion.

3. Rockwell's management of the Construction Plan, Cost and Schedule Reduction, System Design Descriptions, and Cost and Schedule Baseline Precursor Plan activities can have a favorable cost impact on PRMP.



OFFICIAL USE ONLY

OFFICIAL USE ONLY

PRMP/PROVE FPA: SCHEDULE PERFORMANCE

ADJECTIVAL GRADE: VERY GOOD

Noteworthy Achievements

1. Rockwell has addressed several problems impacting schedule in the PROVE area and brought them to successful resolution. Among these problems were the additional requirements imposed on the health physics monitors and engineering support to provide on-the-spot resolutions and aid to the construction personnel.

2. The diligent effort by Rockwell, Bechtel, and J. A. Jones in the joint development of the Precursor planning has resulted in a comprehensive schedule that should lead PRMP into the Line Item in a most suitable manner.

Notable Deficiency

The PROVE schedule has deteriorated during the reporting period. The PROVE end date was extended from 1/90 to 8/90. The Service Module redesign will reduce the material and work required and improve operability. Present activities should result in schedules that will be met.

Observations:

1. The intermediate Level PRMP Schedule was completed during this reporting period.

2. The direction Rockwell has given J. A. Jones in the PROVE area of manpower planning already has J. A. Jones working toward a potential schedule reduction of two months.

3. Rockwell's management of the Construction Plan, Cost and Schedule Reduction, System Design Description, and Cost and Schedule Baseline Precursor Plan activities can have a favorable schedule performance impact on PRMP.


OFFICIAL USE ONLY

OFFICIAL USE ONLY

PRMP/PROVE FPA: SUBCONTRACT MANAGEMENT

ADJECTIVAL GRADE: GOOD

Noteworthy Achievements

1. Rockwell, consistent with project technical needs and evolved cost and schedules, has provided rapid and effective subcontract redirection of Bechtel. The redirection included contractual changes, a rescheduling of resources, and the cost rebaselining.

2. Rockwell subcontract management of J. A. Jones has ensured their participation in construction planning. J. A. Jones' PRMP productivity has shown noticeable improvement since their inclusion in the teaming concept.

3. Rockwell has been successful in obtaining active participation and commitment from National laboratories and other Rockwell organizations on the PRMP Precursor Program.

Notable Deficiencies

1. The PECO subcontract work has resulted in the need for significant rework to the glovebox piping and piping penetration welds.

2. Rockwell has still not provided continuous site representation at Bechtel's location. The participation of Bechtel in the Precursor Program does not eliminate the necessity for such coverage to coordinate line item and cost/schedule activities.

Observation

1. The construction subcontractor on PROVE has been asked by Rockwell to develop a Performance Measurement System (PMS). The DOE PMO anticipates demonstration of the PMS early in the next six month evaluation period.

2. Rockwell management of PECO, the PROVE glovebox manufacturer, has resulted in favorable and timely response to redirection and changes to both schedule and configuration.


OFFICIAL USE ONLY

OFFICIAL USE ONLY

PRMP/PROVE FPA: DESIGN QUALITY

ADJECTIVAL GRADE: MODERATELY GOOD

Noteworthy Achievements

1. A significant effort, the PRMP Precursor Program, has been initiated by Rockwell with broad based involvement of subcontractors, other Rockwell operations and the National laboratories. The Precursor Program is geared toward improving PRMP design quality and should result in improved design quality and the ability to maintain that quality over the life of PRMP.

2. PROVE use of the Configuration Control System was greatly improved. The Engineering Review Board has met regularly and a timely disposition of the engineering changes has been accomplished, consistent with Rockwell procedures and the needs of the project.

Notable Significant Deficiency

The quality of the existing PROVE engineering has been poor. This quality condition continues to be felt at this late hour in the project. Change orders to correct poor initial design quality are reflected in cost growth of Design Engineering and PROVE construction.

Observations

1. The Technical Management Discipline (TMD) approach being undertaken by Rockwell through the Precursor Program and on PRMP/Line Items, should lead to improved design quality through time phased baselining, technical reviews, and appropriate change control.

2. PRMP project and PROVE, design quality, will be enhanced by the generation of a complete System Design Description for PROVE during the next period.

3. The recently added Configuration Management manager should add to TMD capability and Design Quality through the change control process.

4. Rockwell has completed and distributed the PROVE SO Test, Cold Test, and Hot Test procedures, and Test Plans have been completed and forwarded to this PMO.

5. PROVE Operations Procedures and Job Task Analysis are proceeding according to schedule.


OFFICIAL USE ONLY

OFFICIAL USE ONLY

PRMP/PROVE FPA: TECHNICAL PRODUCT QUALITY

ADJECTIVAL GRADE: MODERATELY GOOD

Noteworthy Achievement

PROVE activities in addressing and rectifying glovebox welding problems are directed towards and should significantly improve technical product quality. Specifically, the drive to fully understand the problem, root administrative and technical causes, and to implement needed changes in a timely manner, should result in improved technical product quality.

Notable Significant Deficiency

Welding problems recently surfacing on the PROVE glovebox indicates a significant lack of technical product quality success.

Observations

1. It is anticipated PROVE will take advantage of the most recent "Lessons Learned" in order to insure that similar significant deficiencies are not repeated on PRMP.

2. It is anticipated PROVE will take advantage of recent problems, will assess other vendor supplied areas for potential problems, and will shake down modules (dry) with operations and maintenance personnel as they are completed, in order to surface potential problems early.


OFFICIAL USE ONLY

OFFICIAL USE ONLY

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL
FOR PERIOD OCTOBER 1, 1988 THROUGH MARCH 31, 1989

PLANT

| FUNCTIONAL PERFORMANCE AREA | PREVIOUS 6 MONTHS WEIGHT | PREVIOUS 6 MONTHS RATING | CURRENT 6 MONTHS RECOMMENDED WEIGHTING WEIGHT | CURRENT 6 MONTHS RECOMMENDED WEIGHTING RATING | CURRENT 6 MONTHS RECOMMENDED WEIGHTING GRADE |
|---|---|---|---|---|---|
| GENERAL MANAGEMENT | .25 | 92 | .25 | 92 | 23.00 |
| COST MANAGEMENT | .15 | 97 | .15 | 95 | 14.25 |
| QUALITY | .15 | 97 | .15 | 95 | 14.25 |
| CHEMICAL OPERATIONS | .10 | 84 | .10 | 91 | 9.10 |
| PRODUCTION OPERATIONS | .15 | 97 | .15 | 96 | 14.40 |
| ENVIRONMENT, SAFETY AND HEALTH | .20 | 81 | .20 | 84 | 16.80 |
| TOTAL | 1.00 | 91.25 | 1.00 | | 91.80 |

| PERFORMANCE POINTS EARNED | AWARD FEE PER POINT | AWARD FEE |
|---|---|---|
| 0 - 70 | $ -0- | $ -0- |
| 71 - 75 | 109,152 x 5.0 | 545,760 |
| 76 - 80 | 204,660 x 5.0 | 1,023,300 |
| 81 - 85 | 270,015 x 5.0 | 1,350,075 |
| 86 - 90 | 354,744 x 5.0 | 1,773,720 |
| 91 | 532,457 x 1.0 | 532,457 |
| 92 | 505,851 x 0.8 | 404,681 |
| | | $5,629,993 |

| BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|
| $379,000 | $5,629,993 | $6,008,993 |

| BASE FEE | MAXIMUM AF | TOTAL |
|---|---|---|
| $379,000 | $6,822,000 | $7,201,000 |

% ACTUAL AWARD FEE VS. MAXIMUM AWARD FEE 82.53%

% OF TOTAL ACTUAL FEES VS. TOTAL MAXIMUM FEES 83.45%

OFFICIAL USE ONLY

OFFICIAL USE ONLY

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL
FOR PERIOD OCTOBER 1, 1988 THROUGH MARCH 31, 1989

PRMP/PROVE

| FUNCTIONAL PERFORMANCE AREA | PREVIOUS 6 MONTHS | | CURRENT 6 MONTHS RECOMMENDED WEIGHTING | | |
|---|---|---|---|---|---|
| | WEIGHT | RATING | WEIGHT | RATING | GRADE |
| PROJECT MANAGEMENT | 0 | 0 | .25 | 76 | 19.00 |
| COST MANAGEMENT | 0 | 0 | .15 | 76 | 11.40 |
| SCHEDULE PERFORMANCE | 0 | 0 | .15 | 86 | 12.90 |
| SUBCONTRACT MANAGEMENT | 0 | 0 | .20 | 82 | 16.40 |
| DESIGN QUALITY | 0 | 0 | .15 | 78 | 11.70 |
| TECHNICAL PRODUCT QUALITY | 0 | 0 | .10 | 76 | 7.60 |
| TOTAL | 0 | 0 | 1.00 | | 79.00 |

| PERFORMANCE POINTS EARNED | AWARD FEE PER POINT | AWARD FEE |
|---|---|---|
| 0 - 70 | $ -0- | & -0- |
| 71 - 75 | 15,509 x 5.0 | 77,545 |
| 76 - 80 | 29,079 x 4.0 | 116,316 |
| | | $193,861 |

| BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|
| $53,850 | $193,861 | $247,711 |

| BASE FEE | MAXIMUM AF | TOTAL |
|---|---|---|
| $53,850 | $969,300 | $1,023,150 |

% ACTUAL AWARD FEE VS. MAXIMUM AWARD FEE 20.00%

% OF TOTAL ACTUAL FEES VS. TOTAL MAXIMUM FEES 24.21%

OFFICIAL USE ONLY

E 002582

**HISTORY OF AWARD FEE PAYMENTS**
**ROCKWELL INTERNATIONAL**

**PLANT**

| PERIOD | BASE FEE | AWARD FEE PAID | AF NOT AWARDED | POTENTIAL AWARD FEE | TOTAL FEE PAID | POTENTIAL TOTAL FEE | % AF AWD | % TTL AWD |
|---|---|---|---|---|---|---|---|---|
| 06/01/79 - 09/30/79 | $583,990 | $751,421 | $204,199 | $955,620 | $1,335,411 | $1,539,610 | 79% | 87% |
| 10/01/79 - 03/31/80 | $829,685 | $1,258,797 | $400,573 | $1,659,370 | $2,088,482 | $2,489,055 | 76% | 84% |
| 01/01/80 - 09/30/80 | $829,685 | $1,342,761 | $316,609 | $1,659,370 | $2,172,446 | $2,489,055 | 81% | 87% |
| 10/01/80 - 03/31/81 | $908,525 | $1,266,478 | $550,572 | $1,817,050 | $2,175,003 | $2,725,575 | 70% | 80% |
| 04/01/81 - 09/30/81 | $908,525 | $1,150,550 | $666,500 | $1,817,050 | $2,059,075 | $2,725,575 | 63% | 76% |
| 10/01/81 - 03/31/82 | $1,058,220 | $1,405,832 | $710,608 | $2,116,440 | $2,464,052 | $3,174,660 | 66% | 78% |
| 04/01/82 - 09/30/82 | $1,058,220 | $1,272,335 | $844,105 | $2,116,440 | $2,330,555 | $3,174,660 | 60% | 73% |
| 10/01/82 - 03/31/83 | $1,067,915 | $1,502,769 | $633,061 | $2,135,830 | $2,570,684 | $3,203,745 | 70% | 80% |
| 04/01/83 - 09/30/83 | $1,067,915 | $1,728,314 | $407,516 | $2,135,830 | $2,796,229 | $3,203,745 | 81% | 87% |
| 10/01/83 - 03/31/84 | $1,330,000 | $1,619,940 | $1,040,060 | $2,660,000 | $2,949,940 | $3,990,000 | 61% | 74% |
| 04/01/84 - 09/30/84 | $1,330,000 | $1,965,208 | $694,792 | $2,660,000 | $3,295,208 | $3,990,000 | 74% | 83% |
| 10/01/84 - 03/31/85 | $1,338,500 | $2,851,808 | $1,163,692 | $4,015,500 | $4,190,308 | $5,354,000 | 71% | 78% |
| 04/01/85 - 09/30/85 | $1,338,500 | $2,940,149 | $1,075,351 | $4,015,500 | $4,278,649 | $5,354,000 | 73% | 80% |
| 10/01/85 - 03/31/86 | $1,453,800 | $3,174,225 | $1,187,175 | $4,361,400 | $4,628,025 | $5,815,200 | 73% | 80% |
| 04/01/86 - 09/30/86 | $1,453,800 | $3,337,342 | $1,024,058 | $4,361,400 | $4,791,142 | $5,815,200 | 77% | 82% |
| 10/01/86 - 03/31/87 | $1,138,950 | $4,184,053 | $1,131,047 | $5,315,100 | $5,323,003 | $6,454,050 | 79% | 82% |
| 04/01/87 - 09/30/87 | $1,138,950 | $4,359,441 | $955,659 | $5,315,100 | $5,498,391 | $6,454,050 | 82% | 85% |
| 10/01/87 - 03/31/88 | $782,400 | $4,758,244 | $1,500,956 | $6,259,200 | $5,540,644 | $7,041,600 | 76% | 79% |
| 04/01/88 - 09/30/88 | $782,400 | $4,790,073 | $1,469,127 | $6,259,200 | $5,572,473 | $7,041,600 | 77% | 79% |
| TOTALS | $20,399,980 | $45,659,740 | $15,975,660 | $61,635,400 | $66,059,720 | $82,035,380 | 74% | 81% |

E 002583

# HISTORY OF AWARD FEE PAYMENTS
# ROCKWELL INTERNATIONAL

## PRMP/PROVE

| PERIOD | BASE FEE | AWARD FEE PAID | AF NOT AWARDED | POTENTIAL AWARD FEE | TOTAL FEE PAID | POTENTIAL TOTAL FEE | % AF AWD | % TTL AWD |
|---|---|---|---|---|---|---|---|---|
| 10/01/88 - 03/31/89 | | | | | | | | |

NOTE: THIS IS THE FIRST PERIOD THAT PRMP/PROVE HAS BEEN EVALUATED SEPERATELY

PL. SUPP. EX. 75

Rockwell International Corporation
Contract DE-AC04-76DP03533
Determination of Award Fee
Minutes of PERB Meeting May 10, 1989

The Performance Evaluation Review Board (PERB) met on May 10, 1989. Those in attendance were:

| | |
|---|---|
| C. E. Troell, AM/Management & Administration | Chairman |
| J. W. Culpepper, Deputy Manager | Observer |
| R. L. Hymer, AM/Operations & Weapons | Member |
| D. L. Krenz, AM/Environment, Safety & Health | Member |
| J. R. Roeder, AM/Safeguards & Security | Member |
| R. O. Inlow, Acting Area Manager, RFAO | Member |
| J. J. Szenasi, Acting AM/Projects & Energy Programs | Member |
| V. V. Berniklau, Director, OMPA | Member |
| W. Baer, Acting Director, OEPO | Member |
| J. A. Stout, Chief Counsel | Legal Advisor |
| J. G. Hoyal, Jr., Director, CPD | Procurement Advisor |
| T. V. Hill, CPD | Executive Secretary |
| M. J. Frietze, CPD | Dep. Exec. Secretary |
| L. L. Sanchez, CPD | Recording Secretary |

The purpose of the meeting was to discuss the Area Manager's Performance Evaluation Report and recommend award fee for the period October 1, 1988, through March 31, 1989. Copies of the report were given to the PERB members and Division Directors prior to the PERB meeting for their review and evaluation.

The Area Manager gave the highlights of the Performance Evaluation Report.

The PERB's deliberations were as follows:

I. Plant

1. Cost Management - The PERB noted that the recommended grade was two points below the previous six months (97-95). The primary reason was that the Contractor had accomplished some outstanding actions during the last period which were reflected in an Especially Noteworthy Achievement. Although there were four Noteworthy Achievements this period, there were no Outstanding actions reflected in the report.

2. Quality - Quality was rated as Outstanding for the previous period and Excellent for this period (97-95). There were no Notable Deficiencies for the last period but one deficiency was given for the current period. The deficiency was written as a Notable Deficiency, however, since the PERB considered this to be more in the incidental category, the PERB recommended deleting the word Notable and record it only as a Deficiency.



E 000975

3. Chemical Operations - The recommended grade for Chemical Operations was raised seven points from the last period (84-91), from Good to Excellent. There were three Notable Deficiencies last period relating to PROVE, recovery mission, and overall metal production in the various recovery processes. For the current period, there are no Notable Deficiencies and two Noteworthy Achievements. Also, the PRMP/PROVE was broken out as a separate project with its own Functional Performance Areas (FPA's) and award fee evaluation.

PRMP/PROVE was assigned to Rockwell as a turnkey project so that one organization will be responsible for design, construction, and operation of the facility.

If the PRMP/PROVE work were added to the plant work for fee purposes, the fixed fee for PRMP/PROVE would be at the lower end of the fee schedule for each fee base element. This would result in an unreasonably low fee for a Major System Acquisition whose success is highly critical to the continued successful operation of the Rocky Flats Plant. The project also has high visibility both within and outside of the Department. Considering this, the Assistant Manager for Management and Administration, AL, concurred in calculation of a separate fee for this effort in order to provide Rockwell with sufficient motivation and appropriate awards to ensure a high level of management effort toward the successful completion of the project. The Performance Evaluation Review Board met to consider this matter and the Board recommended calculation of a separate fee.

4. Production Operations - There is a one point drop in the recommended grade from last period (97-96). The recommendation is still within the excellent range. There were no deficiencies noted for either period and there were three Noteworthy Achievements for each period.

5. Environment, Safety and Health - There was considerable discussion on this area. The PERB asked that Noteworthy Achievement No. 3, relating to radiological incidents, be changed to reflect a positive trend rather than showing numbers and referring to goals. A Notable Deficiency was added with regard to shutdown of Building 771. Notable Deficiency No. 4 was changed to clarify that the downward trend was for the first five months of FY89; however, more progress is required.

The Area Manager recommended a grade of 84 which is three points higher than last period. There were two Noteworthy Achievements and five Notable Deficiencies last period and six Noteworthy Achievements and seven Notable Deficiencies this period. After consideration of all the data, and in view of the nature of the deficiencies, the Board was of the opinion that the grade should not be hgher than the last period and recommended a grade of 81.

## II. PRMP/PROVE

The Board reviewed the recommended grades for all of the PRMP/PROVE FPA's and concurred with those recommended with the exception of Project Management. The recommended grade was 76 which is the lowest grade for Moderately Good. The Board was of the opinion that in view of the performance under the other FPA's, Project Management should be rated as satisfactory rather than Moderately Good. The grade was lowered to 75.



E 000976

## III. General Management

The recommended grade was 92 which is the same as last period. The Board concurred in this recommendation. Noteworthy Achievement No. 1 was rewritten to reflect that Building 771 is now an exemplary facility, after the shutdown, however, this improvement has not been translated accross the board to other areas of the Rocky Flats Plant.

Observations 3 and 6 were combined since they are related. Observations 8, 12, 13, 15, 17, and 18 were deleted since that large number tends to dilute the overall effect.

The PERB recommends a grade of 91.20 with an award fee of $5,326,482 for Plant and a grade of 78.75 with an award fee of $186,591 for PRMP/PROVE.

Theetis V. Hill
Theetis V. Hill
Executive Secretary

PL. SUPP. EX. 76

FAXED TO TED HILL 5/11/89

**Award Fee Evaluation of Rockwell International**

**Rating Period: October 1, 1988 - March 31, 1989**

**This is a 5/11/89 Notice from RFAO to Ted Hill, PERB ES, CPD/AL**

**Subject: Changes to Plant Recommendations and Summary.**

**Message A: The Noteworthy Achievements and Observations are revised as follows in the Plant FPA on General Management:**

To Noteworthy Achievement #1 completely replace the existing #1 with the following revised version:

1. Significant improvement has been made simultaneously in many important plant functions during the appraisal period. These improvements are covered in more detail in the FPA's for Environment, Safety and Health (ES&H), Production Operations, Non-Weapons Quality, and Chemical Operations. Most notable is the achievement of exemplary standards for operations in Building 771. These standards were achieved on compressed schedules while maintaining the other plant activities. While continued improvement is sought, Rockwell has done a remarkable job of pushing for and achieving the recent improvements while under extreme pressure.

To Observations No's 3 and 6, completely eliminate No. 6 and completely replace No. 3 with the following revised version (a combination of 3 & 6):

3. The shutdown of production and maintenance activities in Building 771 from October 1988 to January 1989 resulted in a significant impact to plutonium recovery schedules, as well as a slip in ongoing maintenance and facility upgrade schedules. With the exception of electrorefining, Rockwell is significantly behind recovery schedules established at the beginning of the fiscal year. This was the penalty for the shutdown made to correct safety problems. Rockwell's development of a comprehensive plan for plant-wide application of Building 771 Restart Criteria should continue vigorously. The plan reviews each of the 771 Restart Criteria for potential applicability to other areas on plant site, recommends items that should be implemented, determines the

status of each item, determines rough order of magnitude of resourses and manpower requirements, and finally recommends an action plan and management scheme. This effort will help preclude future shutdowns and resultant lost production.

<u>To Observations, completely eliminate the following GM Observations:</u>

Numbers 8,12,13,15,17,and 18 (Note: This will leave eleven observations and they will need to be renumbered)

**Message B: The Notable Deficiencies are revised as follows in the Plant FPA on ES&H:**

<u>To the Notable Deficiencies, add a new #1, to read as follows:</u>

1. The shutdown of Building 771 created major disruptions to the commitments for processing of plutonium, with resultant downstream and upstream impacts on nuclear material throughout the weapons complex. The shutdown was made to allow Rockwell time to correct safety related problems in the building, most of which had been identified before the period began. Although Rockwell's corrective action during shutdown was noteworthy, management should not have permitted the situation to degrade to the point of shutdown. Much work remains to make Building 771 and the other nuclear facilities at Rocky Flats operate in full compliance with DOE standards.

<u>To the Notable Deficiencies, completely replace existing #3 with the following revised version:</u>

3. The rate of wound occurence in radiation controlled areas averaged about 60 per month during FY88. Although a slight downward trend was achieved during the first five months of FY89, the rate of wound occurrence must still be significantly reduced during the remainder of the fiscal year.

<u>To the existing Notable Deficiencies, renumber:</u>

All existing deficiencies remain and should be numbered #2-#7.

**Message C: The Summary document should be revised as follows in the section on ES&H:**

Add this new sentence to the beginning of the second paragraph:

The shutdown of Building 771, resulting despite earlier identification of saftey problems, created major disruptions to the commitments for processing of plutonium.

Add this new sentence to the end of the second paragraph:

The ES&H management oversight of Building 771 operations after the January 19, 1989 phased restart was inadequate.

**The above changes to Plant GM and ES&H reflect the RFAO input of changes requested by the PERB at their 5/10/89 meeting on Rockwell International. These are the only changes RFAO was requested to input. We understand that other changes requested by the PERB will be made by the PERB ES.**

**We also understand that we will later receive from you a copy of the long form recommendations, the Summary, and a revised Fee Calculation reflecting the final scores for the period.**

**Call Terrel Agy, RFAO, at 320-2492 with any questions.**

PL. SUPP. EX. 77

OFFICIAL USE ONLY

U. S. Department of Energy
Albuquerque Operations Office

# AWARD FEE
# PERFORMANCE EVALUATION REVIEW
# BOARD RECOMMENDATION
# FOR THE PERIOD:

## October 1, 1988 Through March 31, 1989

## CONTRACT DE - ACO4 - 76DP03533

## ROCKWELL INTERNATIONAL CORPORATION
## ROCKY FLATS PLANT

DATE: 5/17/89

Charles E. Troell
Assistant Manager For Management & Administration
Chairman, Performance Evaluation Review Board
Albuquerque Operations Office

CIRD JP MAY 89 111 030

OFFICIAL USE ONLY

PERFORMANCE APPRAISAL
ROCKWELL INTERNATIONAL
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD OCTOBER 1, 1988 - MARCH 31, 1989

The overall performance of the contractor has been maintained at least at a level of "Satisfactory" during the appraisal period. The following is the Performance Evaluation Review Board recommendations for the Functional Performance Areas (FPA's) selected for evaluation. The first section covers plant operations while the second section covers Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE). The General Management FPA was evaluated considering performance for both areas.

PLANT

FPA: GENERAL MANAGEMENT

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. Significant improvement has been made simultaneously in many important plant functions during the appraisal period. These improvements are covered in more detail in the FPA's for Environment, Safety and Health (ES&H), Production Operations, Non-Weapons Quality, and Chemical Operations. Most notable is the achievement of exemplary standards for operations in Building 771. These standards were achieved on compressed schedules while maintaining the other plant activities. While continued improvement is sought. Rockwell has done a remarkable job of pushing for and achieving recent improvements under extreme pressure.

2. Interplant schedule compliance continued at 100% for the third consecutive rating period. This performance was achieved despite material supply limitations generated by the shutdown of Building 771.

3. Rockwell achieved a rapid resolution to the problem of obtaining U. S. Department of Transportation (DOT) approval for using a modified ATMX railcar for shipping the first shipment of Transuranic (TRU) mixed waste in 1989 from the Rocky Flats Plant (RFP) to the Idaho National Engineering Laboratory. Several obstacles existed, both within the Department of Energy (DOE) and DOT, to the granting of appropriate approvals. Due to Rockwell's persistence, the approval was granted for use of the modified railcars at the time proposed by DOE.

4. The Emergency Preparedness Organization was credited in the December 1988 Safety Performance Review with having a "...well planned, and effective program in meeting emergency readiness needs." In addition, Rockwell's emergency preparedness personnel have sustained a high level of participation in Albuquerque Operations Office (AL)-wide emergency preparedness coordination

activities, have supported the development of the AL emergency preparedness appraisal program in a significant manner, and have continued to identify and implement improvements in Emergency Operations Center capabilities and operations.

5. More than 60% (47,000 hours) of the maintenance work order backlog older than 90 days has been worked off. A team of 50 people, under the Rockwell "We Do Care" program, was established for this purpose.

6. Rockwell has already exceeded the 10 year (1986-1995) Energy Conservation Goal of a 10% reduction in energy usage.

7. Rockwell has completed the development and installation of the Personnel Evacuation Logging System in all major production and support buildings. This enhances the security and safety of the buildings serviced and provides a data base for emergency actions in specific areas.

Notable Deficiencies

None

Observations

1. The Management Oversight Group (MOG) reported needed changes in the management of the PRMP by Rockwell. A Precursor Program has been established with the DOE Project Manager to address the MOG concerns, and significant progress is being made. Further improvements are necessary by Rockwell for this high priority DOE project.

2. The redefinition of the Building Manager responsiblities has been a visible action which has enhanced the integration of functions. The Building Manager position is functioning to exercise responsibilities for all activities in the building. Development of an "in-house" safety program in Production Operations is evidence of the success that can be achieved by Building Managers. The Building Manager position should be further strengthened and supported to insure complete integration of all activities necessary for safety, quality, maintenance, training, security, and production.

3. The shutdown of production and maintenance activities in Building 771 from October 1988 to January 1989 resulted in a significant impact to plutonium recovery schedules, as well as a slip in ongoing maintenance and facility upgrade schedules. With the exception of electrorefining, Rockwell is significantly behind recovery schedules established at the beginning of the fiscal year. This was the penalty for the shutdown made to correct safety problems. Rockwell's development of a comprehensive plan for plant-wide application of Building 771 Restart Criteria should continue vigorously. The plan reviews each of the 771 Restart Criteria for potential applicability to other areas on plant site, recommends items that should be implemented, determines the status of each item, determines rough order of magnitude of resources and manpower requirements, and finally recommends an action plan and management scheme. This effort will help preclude future shutdowns and resultant lost production.

4. Training of waste generators and improved generation practices have reduced the quantity of reject waste drums, a major contributor to reducing the supplied air operations in the Size Reduction vault.

5. Rockwell has not made adequate progress to prepare for utilization of the TRUPACT II container when it becomes available. The final definition of modifications to Building 664 for handling TRUPACT II containers and submittal of the budget request was not completed in a timely manner.

6. The identification and timely resolution of problems by Rockwell is often slow. Examples include pondcrete storage monitoring, analysis of National Pollutant Discharge Elimination System (NPDES) violations, complete dissemination of incident information within Rockwell, and TRU waste storage data. For example, in October the Governor of Idaho curtailed shipments to Idaho of TRU waste from Rocky Flats. The curtailment resulted in an immediate need for information on the TRU mixed waste at Rocky Flats available for shipment. The time required to obtain accurate information on the types and quantities of stored waste was too long for an issue of this importance.

7. Rockwell has recently violated DOT regulations on two shipments to the Nevada Test Site (NTS) (RF890154 and RF880951). One involved miscounting the number of waste containers on a shipment to the NTS on 9/3/88, and the other involved incorrect drum numbers (due to exchange of a drum which was listed on the bill of lading with a drum which was not listed on the bill of lading) on 1/17/89.

8. Despite the knowledge that nitrate concentrations on the 750 pad have increased, little action has been taken to contain saltcrete (which has been identified as a major contributor to storage pad nitrate concentrations) after precipitation events. Data provided in March of 1989 indicated the highest nitrate concentrations ever observed on the pads.

9. Rockwell is still not placing sufficient emphasis on the timely establishment of the Rocky Flats Institute. The DOE considers this program, along with the Rocky Flats School, to be essential to enhancing the capabilities of building management personnel at Rocky Flats.

10. The Waste Isolation Pilot Plant Waste Acceptance Criteria Committee performed an audit on Rocky Flat's TRU waste activities. The positive results of this audit reflect diligence in waste analysis and quality assurance in packaging.

11. Several waste minimization efforts have led to reductions in waste produced. The most dramatic effort has been the waste paper recycle program which has exceeded all expectations for the quantities of waste paper recycled. This has the added benefit of extending the useful life of the sanitary landfill.

FPA: COST MANAGEMENT

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. Rockwell performed well in providing data and narratives to define DOE's unfunded ES&H requirements in support of a FY89 supplemental budget request. A significant portion of this data was used to support DOE requests to Congress for additional FY90 funding.

2. Rockwell has done an extraordinary job of tracking information and preparing responses to a large variety of budget information requests and of maintaining the current status of its requirements. The quality and consistency of information provided to the DOE has been exceptional considering the number of different funding options that have been addressed. Support provided for the on-site DOE review of requests for additional funding was excellent.

3. Rockwell construction project data sheets and conceptual design reports supporting its requests for the FY91/92 Capital Budget were of high quality and were completed ahead of schedule. Rockwell is well prepared for DOE Headquarters reviews of FY91 projects.

4. The FY91 budget narratives were improved and expanded by Rockwell. Detailed identification of program cost growth and impacts of Production and Surveillance target guidance was particularly helpful in DOE's analysis of Rockwell's resource requirements.

Notable Deficiencies

None

Observations

1. Rockwell's SACNET submission of budget schedules was late and its FY88 Schedule 1 and 2 actual costs were late and were also inaccurate in regard to New Material Flight Tests/Stockpile Flight Tests and New Material Laboratory Tests/Stockpile Laboratory Tests costs.

2. In deciding on final General Plant Project (GPP) allocations for the year, AL has reviewed the status of committed funds. The large dollar amount of uncommitted funds has adversely affected the support for the plant's FY89 GPP requirements.

3. Rockwell continues to be responsive to OCAD requirements and initiatives including indirect Cost Management, the Work Load Model initiative and Baseline Cost Management (particularly the W 89 Cost Call). Although Indirect Cost Management packages were submitted late, the quality of the packages was very good.

FPA: QUALITY

Adjectival Grade: EXCELLENT

Especially Noteworthy Achievement

The Non-Weapons Quality Assurance (NWQA) surveillance activities conducted during the Building 771 restart have been especially noteworthy in that they have resulted in the identification of and provide for corrective actions necessary for a more viable quality program. This early detection and correction of deficiencies in operations will provide for a greater assurance of the quality of our product.

Noteworthy Achievements

1. After two years of accomplishments, the continual improvement in the Rockwell Quality program has leveled off. As anticipated, a new phase of the Quality Improvement Plan is currently being implemented. This new phase is now being referred to as Phase 2 and will incorporate a new culture in quality practices. Rockwell has aggressively entered into Phase 2 with a Program Manager and a Continual Improvement Steering Committee to guide the effort. The steering committee is further supported with technical personnel, one being closely associated with Dr. W. Edward Deming.

2. Significant progress has been made towards implementing the NQA-1 Standard at Rocky Flats. The NWQA program office now has three reporting managers with established responsibilities. The Management Plan has been updated and 11 new positions added to the NWQA office. The Plant Level Control Systems portion of the implementation plan is divided into four parts and is mostly in place. Also, a manager has been assigned to facilitate the implementation of the Non-War Reserve (WR) Calibration Program. Quality personnel associated with procurement of needed services and commodities for the plant, within the Quality Directorate and outside the Quality Directorate, have recently been reorganized into one group within the NWQA program office. This reorganization should increase the consistency of Non-WR and WR procurement activities.

3. Because of his exceptional attention to detail, a technician in the Nondestructive Testing (NDT) Department was able to have defective material that was received from Pinellas removed from the production line before it could be further processed into the system. During a routine NDT examination of a Rocky Flats production process, the technician detected a suspected anomaly in a reservoir while evaluating X-ray film of a weld joint performed at Rocky Flats. After sectioning the suspected unit, it was learned that a weld, unrelated to the Rocky Flats weld, had been completed unsatisfactorily at the Pinellas Plant. The unsatisfactory weld was not detected during NDT at Pinellas and was accepted and forwarded to Rocky Flats for continued processing. The discovery of this defect is very praiseworthy because the Rocky Flats NDT set up was not optimized to evaluate the Pinellas weld joint. The alertness, attention to detail, attitude, and discipline shown here depicts a work ethic that ensures a quality product.

Deficiencies

In three incidents, Rockwell failed to provide the necessary measures to adequately control nonconforming product material.

1) During the period, it was discovered that Rockwell had cancelled a deviation for a nonconforming component that had been properly deviated when accepted and released from Rocky Flats in FY88. Rockwell also failed to notify all affected DOE organizations that this action had taken place.

2) Five reject components were mistakenly accepted and released from Rocky Flats into the complex and subsequently had to be retrieved.

3) An acceptable reservoir was mistakenly reworked for defectiveness. A defective reservoir was then mistakenly accepted without being reworked and shipped to the next user.

The analysis of these incidents revealed that all these errors happened either from a breakdown of an existing system or that an inadequate system was in place.

Observations

1. The DOE is concerned with the low level of quality performance being displayed by the beryllium supplier. Deficiencies such as lack of subcontracting controls, poor manufacturing instructions, and failure to identify root causes of nonconformances were identified in a recent Rockwell survey of the beryllium supplier. Beyond these findings, a recent DOE, AL survey of the beryllium supplier found that the supplier's configuration management and product traceability systems were also operating poorly.

2. Approximately 272 Quality Assurance Survey (QAS) 2, 3 and 4 surveys were conducted during the period resulting in 55 complimentary observations and 66 findings. However, all 11 QC-1 elements were evaluated to be satisfactory or better. Four findings were considered to be significant. Three findings involved paperwork problems and the fourth was assigned for a part which failed the DOE verification inspection of the component. No findings were identified in two of the QC-1 elements and no negative trends were identified.

3. Rockwell continues to make excellent progress towards implementing the complete Quality Information System. Shortly, the fifth module will be complete. Three additional modules are planned and scheduled to be complete during FY90.

4. Duplicate serial numbers have become an issue during the performance period. Three DOE plants have identified product from Rocky Flats with serial numbers which have been used twice. After significant investigation by the DOE and Rockwell, it has been found that only a small quantity of the identified serial numbers have actually been duplicated. The resolution of this issue will be completed in a future meeting between contractor, design agency, and DOE personnel.

FPA: CHEMICAL OPERATIONS

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. The Plutonium Operations effort to implement an Operational Readiness Review (ORR) program is excellent. Progress toward implementation has been demonstrated through ORR's for the Building 771 Incinerator, Part V, and the Dicesium Hexachloroplutonate (DCHP) Molten Salt Extraction (MSE) processes. These efforts support the top priority goal for excellence in facility operations and should be further developed and continued on a plant-wide bases.

2. Rockwell has successfully completed the development of a new extractant compound for use in the MSE process. Dicesium Hexachloroplutonate has the advantage of substantially reducing the gamma and neutron exposures to MSE operations personnel, eliminating magnesium contamination of the product plutonium buttons, and increasing the efficiency of the process to a single pass process. These last two changes also reduce the recycle residues produced. This development work was performed concurrently with the Building 771 shutdown, safety improvements, and the Building 771 restart activities.

Notable Deficiencies

None

Observations

1. DOE intends to evaluate the productivity of Chemical Operations in terms of Base Recovery Units (BRU's). Using this approach, Rockwell appears to be regaining productivity while concurrently executing new safety requirements. Because of the Building 771 shutdown, the most current metal production period was only three months in length. A comparison of that production period was made against the two previous periods as shown below:

| Period | Months | %Change | %Change |
|---|---|---|---|
| July 86 - July 87 | 13 | Base | --- |
| Aug 87 - June 88 | 11 | -12% | Base |
| Current | 3 | +8% | +22.6% |

When using the 13 month period as the base for comparison, the efficiency of recovery for the three month period increased by 8.0%. Using the 11 month period as the base for comparison shows an increase in efficiency of 22.6% for the three month period. In the first comparison, the 12% drop for the 11 month period resulted from the initiation of ES&H and facility upgrades. The dramatic improvement seen when comparing the three month period against the 11 month period as base reflects an adjustment to the new ES&H requirements and increased efficiencies resulting from facility upgrades.

2. The establishment of a Self-Assessment Audit Program in Building 771 has enabled Rockwell to take a proactive role in identifying and correcting housekeeping and safety concerns. The emphasis on immediate corrective action and recurrence control is a positive step toward implementing the surety of operations concept in Building 771. Rockwell's vigorous proactive self-assessment efforts in Building 771 are to be highly commended and encouraged throughout the plant-site.

3. The Building 771 Contamination Control Committee has continued to work at determining the root cause of mechanical and administrative failures which led to contamination incidents. New decontamination methods, new anti-contamination clothing, safer work methods, trend analyses, and engineering enhancements are all measures being utilized by the Committee. During the last six months, there has been only one possible inhalation case which was confirmed as negative. In addition, the number of contamination incidences appears to be staying low as production increases under the Restart Plan. However, further reductions in the number of contamination incidences are necessary.

4. Identification of process information has promoted identification of process shortcomings. Further analysis requires instrumentation, which has been delayed in some cases by the Building 771 shutdown. Continued process improvements through the Recovery Improvement Program and Process Technology Development support have also been impacted by the shutdown and some shifts in goals. However, there is still a need for continued efficiency and process improvements and these programs should be revitalized in some form.

5. Rockwell has successfully completed initial experiments with an electrolytic decontamination technique for use on fixed contamination on stainless steel and some other metals. The technique, coined electro-decontamination, has been highly successful on flat stainless steel surfaces in the first few trials. Further development of this technique for the decontamination of large surface areas, uneven surfaces and welds, without detrimental effects to the equipment decontaminated, would constitute a significant achievement.

6. The development of a budget planning process for chemical operations is considered to be essential to the improvement of the efficiency of the plutonium recovery processes, increased metal purity, decreased residue recycle, and waste minimization. To date, Rockwell management has provided excellent support for establishing a budget development process. However, it is essential that Plutonium Operations line management provide a leadership role and be involved in the entire budget development process, not just provide support to the budget development process.

FPA: PRODUCTION OPERATIONS

Adjectival Grade: OUTSTANDING

Noteworthy Achievements

1. The number one priority for this period has been excellence in facility operations. The effort toward development of a Nuclear Facility Operations Manual (NFOM) directly supports the facility excellence goal. The NFOM Task Team has drafted and approved all procedures for the NFOM based on the original outline. The Task Team is commited and has an appropriate mix of members to insure a balanced perspective. With continued emphasis, this effort is expected to create a model document for the AL complex.

2. Rockwell has been very supportive of the AL effort to develop an Operational Surety Program. They have actively participated in meetings, presented briefings on request, and provided documents for application by other sites. Rocky Flats Plant is currently recognized as a leader in Operational Surety within AL.

3. Rockwell has taken several steps to reduce work in process inventories and process times. Among these are:

a. Reduced planned process times by approximately 25% "across the board" in the production control system in Building 460. The result has been roughly a 50% reduction in work in process inventories in the building, measured by the number of components. .

b. Reduced pit assembly process time in Building 707 by six weeks, from eight weeks total to two weeks.

c. Reduced lot sizes on the 3T bodies from approximately 50 to approximately 24 to reduce backlogs at the four and five axis mills.

Notable Deficiencies

None

Observations

1. Utilization of direct labor, as measured by productive time, efficiency, and realization, has declined during this period. This decline is a result of changes required to implement new plant safety procedures. Rockwell's Industrial Engineering Group has conducted a study of possible approaches to improve labor utilization. In the long term, utilization should improve as experience is gained in the new operating procedures, and as the emphasis on training results in yield improvements. In addition, greater safety consciousness should result in fewer process interruptions.

2. Rockwell has responded effectively to DOE's initiatives on make or buy policy. Rockwell will soon be submitting their revised Capability Maintenance Plan, now called the Make Or Buy Plan, and the supporting Baseline Capability Plan. They have also complied with the requirement to submit a "Buy Rate" calculation. The calculation for the first quarter in FY89 showed that the buy rate declined in comparison with FY88, but this is attributed to the "buy ahead" of a significant quantity of beryllium parts in FY88.

3. During March, Rockwell hosted a seminar to share information on their experience in eliminating halogenated solvents. Thirty-two representatives from 12 corporations attended. Feedback was positive and enthusiasm was expressed for continued information exchanges. This seminar was a constructive first step in the program for technology transfer from Rocky Flats to private industry and has significant potential for building a positive image for Rocky Flats within local communities.

OFFICIAL USE ONLY

FPA: ENVIRONMENT, SAFETY AND HEALTH

Adjectival Grade: GOOD

Noteworthy Achievements

1. Rockwell has made significant progress towards achieving a high quality radiation protection training program for Radiation Monitors which meets the requirements of DOE 5480.11. Other significant initiatives in radiation protection training have also occurred during this period, most notable being a new pilot radiation safety course for Radiation Worker Supervisors and plant Building Management. Rockwell has successfully completed many improvements and started several new initiatives above and beyond the DOE requirements in their radiation protection training programs.

2. Rockwell has demonstrated responsiveness in the preparation and coordination on National Emissions Standards for Hazardous Air Pollutants (NESHAP) issues specific to the RFP. Rockwell has also demonstrated a thorough understanding of the regulatory requirements through its contributions to the DOE-wide review of the NESHAP (Subpart H) regulation.

3. Rockwell has made significant progress towards reducing the rate of radiological incidents. The average monthly rate for Possible Inhalations (PI's) during FY88 was approximately seven per month. During the first five months of FY89, the rate of PI's was less than three per month. The FY88 monthly average rate for exceeding contamination limit criteria, in both controlled and uncontrolled areas, was about 37 occurrences each month. However, for the first five months of FY89, the monthly rate for this type of contamination incident has dropped well below the RFP FY88 rate. Progress to date in reducing incidents is noteworthy and is indicative of a positive trend. The DOE encourages continued improvement in this area.

4. Rockwell has taken several positive steps toward achievement of permanent reduction in plant personnel radiation exposure. A full-time As Low As Reasonably Achieveable (ALARA) Program Manager was hired, and completed the development of a basic plant-wide ALARA program. A Rem Reduction Plan describing various plant and building initiatives being taken to effect a permanent decreasing trend in radiation exposure is in its final stages of completion. During the first four months of the rating period, progress was achieved in reducing personnel radiation exposure in the semi-monthly and monthly badge exchange groups. These groups had a projected goal of about 143 Rem during this period, however, they accumulated 102 Rem; this is 41 Rem below the goal. Although some of this exposure decrease occurred due to a curtailment of Building 771 process operations, this was counterbalanced by the fact that during the same timeframe, Building 776 increased their production, and significant decontamination efforts were accomplished in Building 771.





OFFICIAL USE ONLY

5. The comprehensive review of the Technical Safety Appraisal (TSA) showed that Rockwell's safety program is in transition and open to change. Rockwell was commended for improvements in union/management relations and for developments in an integrated safety program. A definite change in culture was observed. Substantial corrective actions are underway which, when properly implemented, should result in an exemplary safety program in the future. Rockwell also submitted it's TSA response document to DOE two weeks ahead of the schedule set by DOE.

6. In establishing the Safety Review Group (SRG), Rockwell has developed a dedicated investigative group that provides a coordinated systems approach to unplanned event investigations that ensures that such events are investigated in a timely manner and enhance the safety awareness throughout the plant. Rockwell should be commended for the establishment of this group as well as for the SRG's efforts to date.

Notable Deficiencies

1. The shutdown of Building 771 created major disruptions to the commitments for processing of plutonium, with resultant downstream and upstream impacts on nuclear material throughout the weapons complex. The shutdown was made to allow Rockwell time to correct safety related problems in the building, most of which had been identified before the period began. Although Rockwell's corrective action during shutdown was noteworthy, management should not have permitted the situation to degrade to the point of shutdown. Much work needs to be done to export lessons learned from Building 771 to other Rocky Flats facilities.

2. There was an unintentional release of dilute chromic acid on February 22, 1989. The chromic acid upset the organic balance of the RFP's sanitary wastewater treatment plant. Subsequent to the release, water containing the chromic acid was spray irrigated on plantsite. Chromic acid contaminated water from the spray irrigation field was carried by runoff into Pond B-5, which was discharged offsite. There are inadequate incident reporting procedures or operating procedures governing the coordination of the discovery of releases to the sewage treatment plant with downstream control of contamination. Furthermore, the incident shows the need for the development and implementation of adequate Spill Prevention Control and Countermeasures procedures and practices.

3. Although Rockwell has shown improvement in housekeeping of production buildings, housekeeping is still inadequate. Housekeeping in the balance of the plant does not approach the standard set in Building 771. Rockwell is attempting to correct this, but has not yet established a successful approach.

4. The rate of wound occurrence in radiation controlled areas averaged about 60 per month during FY88. Although a slight downward trend was achieved during the first five months of FY89, the rate of wound occurrence must still be significantly reduced during the remainder of the fiscal year.

5. Rockwell has not been able to resolve the 1988 NPDES permit violations for five-day biochemical oxygen demand. Although there were several reasons for the violations, the lack of adequate sludge handling capacity and operation and maintenance deficiencies are foremost concerns. Rockwell's inability to comply with the limitations of the NPDES permit is considered serious because the discharges from the RFP go directly into the city of Broomfield's raw drinking water reservoir. Also, the policy of the Environmental Protection Agency (EPA) is to not renew NPDES permits which have outstanding violations, and the NPDES permit for the RFP expires on June 30, 1989. Unless these violations are resolved expeditiously, the renewal of the NPDES permit will be delayed. It is recognized that Rockwell has hired an outside consultant to identify the causes of the violations and the corresponding corrective actions which should correct the situation.

6. The DOE has been concerned about the safe operation of the East Firing Range. Rockwell has taken no actions to date to rectify the situation.

7. Rockwell ES&H management provided inadequate oversight of Building 771 operations after the January 19, 1989, phased restart. The overall assessment of the implementation of this radiological program indicated that the full intent of the comprehensive and multilevel operational assurances were not performed in an integrated and disciplined manner.

Observations

1. Rockwell, for the first time, has a 100% glove change compliance across the plant-site. The Y-12 Plant has requested a Rockwell employee visit their plant so that a review of their operations and recommendations on development of a glove change program similar to that at RFP can be made.

2. Rockwell has been proactive in establishing a National Environmental Policy Act (NEPA) compliance committee. Rockwell has reviewed the appropriate NEPA guidance documents and has established a logical method for reviewing plant projects in order to determine the level of NEPA action required for the project. Although the committee has just been established, its cross section of divisions will enable it to consider a wide range of plant projects with minimal chance of leaving out a project. The system for documenting the review of projects, the judgements made, and the recommendation for NEPA action are thorough and track in a logical fashion.

3. The Colorado Department of Health and the EPA conducted six waste storage audits under Resource Conservation and Recovery Act (RCRA) during the last three and a half months, and only minor findings resulted. Because of consistently good audit results, TRU mixed shipments to the INEL were reinstated and the frequency of future inspections will be reduced.

4. Rockwell has established a strategy for upgrading the air monitoring system at RFP. The strategy was the result of excellent analysis, successful peer review, and resulted in a significant reduction in projected costs.

5. Rockwell continues to successfully complete the requirements of RCRA and Comprehensive Environmental Response Compensation and Liability Act.

6. Rockwell has made significant improvement in responsiveness to the AL safety appraisals. Although none to date have been turned in on time, the amount of tardiness has steadily decreased to the point that Rockwell has no outstanding responses at this time. Rockwell has initiated "Completion Certificates" for completed actions.

7. Rockwell established proposed plutonium and uranium maximum permissible contamination levels in oils and solvents which are defensible and practical for analytical evaluation. Although this is only a proposed method for establishing limits for a limited type of contaminated vs. non-contaminated waste materials, the need for these limits to be established has been indicated by the Environment & Health Program.

8. Rockwell has developed a Radiation Monitoring work schedule pilot program. This program is expected to cut Radiation Monitors overtime by 30-50%. The program was completed three weeks ahead of schedule in Building 776. Survey schedules have been maintained up to date. Plans are being developed for implementation of the work scheduling program across the plant-site.

9. Rockwell has responded well in initial implementation of the more stringent requirements of DOE Order 5480.11, "Radiation Protection For Occupational Workers". Rockwell is developing an implementation plan to accurately assess the impact of full implementation.

10. Routine surveillance and characterization of potential occupational exposures to hazardous chemicals and carcinogens in the work place are not being performed on a regular basis. As more Industrial Hygiene staff are hired and cleared, this must be a high priority.

11. Preparation and submission of the final report on radon in the NDT Vault in Building 771 has taken excessively long. In that it was just received, there has not been enough time for a thorough review of the report by AL.

12. A 1985 Fire Protection Appraisal by AL had a finding regarding the replacement/hiring of a second fire protection engineer. Each AL appraisal since has identified the same need. No response to date has been provided by Rockwell to close out this finding.

PRMP/PROVE FPA: PROJECT MANAGEMENT

Adjectival Grade: SATISFACTORY

Achievements

1. Rockwell has given PROVE renewed emphasis. Rockwell has separated the responsibility for PROVE from that of the PRMP and placed it under a full time project manager. In addition, the Rockwell Plutonium Operations directorship has committed a top staff member to be the Chief PROVE Project Engineer.

2. Rockwell has recently developed and implemented a "Precursor Plan." This plan represents a marked improvement in direction for the entire project. The planning has been both detailed and complete. This "Precursor Plan" has been implemented by Rockwell with professionalism and enthusiasm.

Notable Significant Deficiency

Overall PRMP management attention to project technical, cost, schedule, and manpower needs was inadequate.

Notable Deficiency

Inadequate project staffing continues to influence Rockwell PRMP performance. The above referenced "Precursor Plan" has made the staffing shortage obvious to all parties concerned.

Observations

1. The task of evaluating and incorporating PROVE's "Lessons Learned" is now a Precursor Plan activity with the anticipation that full benefit will be realized.

2. The degree to which Rockwell appropriately manages the Precursor Plan will directly impact PRMP's future success technically and administratively.

PRMP/PROVE FPA: COST MANAGEMENT

Adjectival Grade: MODERATELY GOOD

Noteworthy Achievements

1. The cost development and baselining of those costs for the "Precursor Plan" has been handled with the highest degree of quality. Subcontractors have been integrally involved in this development and baselining.

2. Rockwell has redirected J. A. Jones' manpower planning on PROVE which has resulted in reduced costs and apparent increased construction productivity.

Notable Significant Deficiency

PROVE continues to demonstrate cost growth. Rockwell has increased their forecast for the Total Estimate at Completion on PROVE from less than $43 million at the beginning of FY89 to the current $45.6 million.

Notable Deficiency

PRMP cost planning did not take into account allocated funding availability, resulting in a disconnect in project activities.

Observations

1. Rockwell has restructured PROVE cost estimates to be able to use a realistic $45.6 million baseline.

2. The PROVE Cost Performance Reports have been timely and of a consistently high quality. Changes to the Performance Measurement Baseline have been incorporated accurately and in a timely fashion.

3. Rockwell's management of the Construction Plan, Cost and Schedule Reduction, System Design Descriptions, and Cost and Schedule Baseline Precursor Plan activities can have a favorable cost impact on PRMP.

PRMP/PROVE FPA: SCHEDULE PERFORMANCE

Adjectival Grade: VERY GOOD

Noteworthy Achievements

1. Rockwell has addressed several problems impacting schedule in the PROVE area and brought them to successful resolution. Among these problems were the additional requirements imposed on the health physics monitors and engineering support to provide on-the-spot resolutions and aid to the construction personnel.

2. The diligent effort by Rockwell, Bechtel, and J. A. Jones in the joint development of the Precursor planning has resulted in a comprehensive schedule that should provide a smooth transition from PROVE to the receipt of capital funding for PRMP.

Notable Deficiency

The PROVE schedule has deteriorated during the reporting period. The PROVE end date was extended from 1/90 to 8/90. The Service Module redesign will reduce the material and work required and improve operability. Present activities should result in schedules that will be met.

Observations:

1. The intermediate Level PRMP Schedule was completed during this reporting period.

2. The direction Rockwell has given J. A. Jones in the PROVE area of manpower planning already has J. A. Jones working toward a potential schedule reduction of two months.

3. Rockwell's management of the Construction Plan, Cost and Schedule Reduction, System Design Description, and Cost and Schedule Baseline Precursor Plan activities can have a favorable schedule performance impact on PRMP.

PRMP/PROVE FPA: SUBCONTRACT MANAGEMENT

Adjectival Grade: GOOD

Noteworthy Achievements

1. Rockwell, consistent with project technical needs and evolved cost and schedules, has provided rapid and effective subcontract redirection of Bechtel. The redirection included contractual changes, a rescheduling of resources, and the cost rebaselining.

2. Rockwell subcontract management of J. A. Jones has ensured J. A. Jones' participation in construction planning. J. A. Jones' PROVE productivity has shown noticeable improvement since their inclusion in the teaming concept.

3. Rockwell has been successful in obtaining active participation and commitment from National laboratories and other Rockwell organizations on the PRMP Precursor Program.

Notable Deficiencies

1. The subcontract work with the PROVE glovebox manufacturer has resulted in the need for significant rework to the glovebox piping and piping penetration welds.

2. Rockwell has still not provided continuous site representation at Bechtel's location. The participation of Bechtel in the Precursor Program does not eliminate the necessity for such coverage to coordinate line item and cost/schedule activities.

Observations

1. The construction subcontractor on PROVE has been asked by Rockwell to develop a Performance Measurement System (PMS). The DOE Project Management Office (PMO) anticipates demonstration of the PMS early in the next six month evaluation period.

2. Rockwell management of the PROVE glovebox manufacturer, has resulted in favorable and timely response to redirection and changes to both schedule and configuration.

PRMP/PROVE FPA: DESIGN QUALITY

Adjectival Grade: MODERATELY GOOD

Noteworthy Achievements

1. A significant effort, the PRMP Precursor Program, has been initiated by Rockwell with broad based involvement of subcontractors, other Rockwell operations, and the National laboratories. The Precursor Program is geared toward improving PRMP design quality and should result in improved design quality and the ability to maintain that quality over the life of PRMP.

2. Use of the Configuration Control System for PROVE was greatly improved. The Engineering Review Board has met regularly and a timely disposition of the engineering changes has been accomplished, consistent with Rockwell procedures and the needs of the project.

Notable Significant Deficiency

The quality of the existing PROVE engineering has been poor. This quality condition continues to be felt at this late hour in the project. Change orders to correct poor initial design quality are reflected in cost growth of Design Engineering and PROVE construction.

Observations

1. The Technical Management Discipline (TMD) approach being undertaken by Rockwell through the Precursor Program and on PRMP/Line Items, should lead to improved design quality through time phased baselining, technical reviews, and appropriate change control.

2. PRMP project and PROVE design quality will be enhanced by the generation of a complete System Design Description for PROVE during the next period.

3. The recently added Configuration Management manager should add to TMD capability and Design Quality through the change control process.

4. Rockwell has completed and distributed the PROVE System Operational Test, Cold Test, and Hot Test procedures, and Test Plans have been completed and forwarded to this PMO.

5. PROVE Operations Procedures and Job Task Analysis are proceeding according to schedule.

OFFICIAL USE ONLY

PRMP/PROVE FPA: TECHNICAL PRODUCT QUALITY

Adjectival Grade: MODERATELY GOOD

Noteworthy Achievement

PROVE activities in addressing and rectifying glovebox welding problems are directed towards, and should significantly improve, technical product quality. Specifically, the drive to fully understand the problem, root administrative and technical causes, and to implement needed changes in a timely manner, should result in improved technical product quality.

Notable Significant Deficiency

Welding problems recently surfacing on the PROVE glovebox indicates a significant lack of technical product quality success.

Observations

1. It is anticipated PROVE will take advantage of the most recent "Lessons Learned" in order to insure that similar significant deficiencies are not repeated on PRMP.

2. It is anticipated PROVE will take advantage of recent problems, will assess other vendor supplied areas for potential problems, and will shake down modules (dry) with operations and maintenance personnel as they are completed, in order to surface potential problems early.



OFFICIAL USE ONLY

PL. SUPP. EX. 78

AWARD FEE RECOMMENDATION

CONTRACT NO.: DE-AC04-76DP03533

CONTRACTOR: ROCKWELL INTERNATIONAL CORPORATION - PLANT

PERIOD: October 1, 1988 - March 31, 1989

PERFORMANCE EVALUATION REVIEW BOARD RECOMMENDATION

| FPA's | ADJECTIVAL GRADE | NUMERICAL GRADE | x | WEIGHT | = | SCORE |
|---|---|---|---|---|---|---|
| General Management | EXCELLENT | 92 | | 25% | | 23.00 |
| Production Operations | OUTSTANDING | 96 | | 15% | | 14.40 |
| Cost Management | EXCELLENT | 95 | | 15% | | 14.25 |
| Quality | EXCELLENT | 95 | | 15% | | 14.25 |
| Environment, Safety and Health | GOOD | 81 | | 20% | | 16.20 |
| Chemical Operations | EXCELLENT | 91 | | 10% | | 9.10 |
| | | | | 100% | | 91.20 |

Maximum Available Award Fee
$6,822,000

Recommended Fee
$5,326,482

Suggested Range of Fees

| | | |
|---|---|---|
| Minus One Point | $4,799,346 | (90.20) |
| Recommended Award Fee | $5,326,482 | (91.20) |
| Plus One Point | $5,799,383 | (92.20) |

Award Fee Determination Official Contractual Limitations

$ -0- to $6,822,000 (Maximum Available Award Fee)

Chairman
Performance Evaluation Review Board

E 000973

AWARD FEE RECOMMENDATION

CONTRACT NO.: DE-AC04-76DP03533

CONTRACTOR: ROCKWELL INTERNATIONAL CORPORATION - PRMP/PROVE

PERIOD: October 1, 1988 - March 31, 1989

PERFORMANCE EVALUATION REVIEW BOARD RECOMMENDATION

| FPA's | ADJECTIVAL GRADE | NUMERICAL GRADE | x | WEIGHT | = | SCORE |
|---|---|---|---|---|---|---|
| Project Management | SATISFACTORY | 75 | | 25% | | 18.75 |
| Cost Management | MODERATELY GOOD | 76 | | 15% | | 11.40 |
| Schedule Performance | VERY GOOD | 86 | | 15% | | 12.90 |
| Subcontract Management | GOOD | 82 | | 20% | | 16.40 |
| Design Quality | MODERATELY GOOD | 78 | | 15% | | 11.70 |
| Technical Product Quality | MODERATELY GOOD | 76 | | 10% | | 7.60 |
| | | | | 100% | | 78.75 |

Maximum Available Award Fee
$969,300

Recommended Fee
$186,591

Suggested Range of Fees

| | | |
|---|---|---|
| Minus One Point | $157,511 | (77.75) |
| Recommended Award Fee | $186,591 | (78.75) |
| Plus One Point | $215,670 | (79.75) |

Award Fee Determination Official Contractual Limitations

$ -0- to $969,300 (Maximum Available Award Fee)

[signature]
Chairman
Performance Evaluation Review Board

PL. SUPP. EX. 79

**Department of Energy**
Albuquerque Operations Office
P. O. Box 5400
Albuquerque, New Mexico 87115

SEP 27 1989

Mr. Dominick J. Sanchini
President
Rocky Flats Plant
North American Space Operations
Rockwell International Corporation
P. O. Box 464
Golden, CO 80402

Dear Mr. Sanchini:

In accordance with Appendix D of Contract DE-AC04-76DP03533, the Department of Energy (DOE) hereby determines that Rockwell International Corporation (Rockwell) has earned an award fee of $2,716,624 for Plant and $186,591 for PRMP/PROVE, for a total of $2,903,215. The enclosed Performance Evaluation Report for the period October 1, 1988 through March 31, 1989, and a Memorandum from the Acting Assistant Secretary for Defense Programs, provide the basis for the DOE award fee determination.

The award fee approved by the DOE for payment to Rockwell was pursuant to an award fee plan previously developed to cover the period October 1, 1988 to March 31, 1989. This was prior to the institution by the DOE of stronger and tougher award fee plans to reward improvements in environment, safety, and health (ES&H) and substantially increase the proportion of the fee attributable to ES&H performance. Under the old contract provisions, however, the DOE was constrained as to the weight that might be given to ES&H performance in setting the fee for the six month period covered.

In the old award fee plan, which includes this period, up to 20% of the total amount of fee paid could be attributable to performance in the ES&H area. By reducing the award fee for ES&H to "Unsatisfactory," the DOE is indicating to Rockwell that your ES&H performance is unacceptable. Under the new plan, effective for performance after October 1, 1989, failure in any important area critical to contract performance may result in the payment of no award fee.

As specified in the Contract, you may, within five working days after receipt of this letter, request an opportunity to present to the DOE an analysis of your performance under the Contract. Otherwise, you may withdraw funds as a net award fee in the above amount from your Special Bank Account.

If you wish to meet with the DOE, please contact the Rocky Flats Office which will coordinate those arrangements for you.

Sincerely,

Bruce G. Twining
Manager

Enclosures

cc w/enclosures:
David P. Simonson, Area Manager, RFO

PERFORMANCE EVALUATION
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD OCTOBER 1, 1988 - MARCH 31, 1989

The overall performance of Rockwell International Corporation (Rockwell) has been maintained at least at a level of "Satisfactory" during the period October 1, 1988, through March 31, 1989.

The following is an evaluation of the performance of Rockwell, relative to the management and operation of the Rocky Flats Plant, including the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the Functional Performance Areas (FPA's) selected for award fee evaluation. The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's for Plant operations have been evaluated in accordance with the contract Award Fee Plan, and the following discussion of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

PLANT

GENERAL MANAGEMENT: There was a rapid resolution to the problem of obtaining United States Department of Transportation (DOT) approval for using a modified ATMX railcar for making the first shipment of Transuranic mixed waste in 1989. Interplant schedule compliance continued at 100% for the third consecutive rating period. The Emergency Preparedness organization has a well-planned and effective program, is involved in Albuquerque Operations Office (AL)-wide coordination activities, and continues to make improvements. In less than four years, Rockwell has exceeded a ten-year Energy Conservation Goal.

Rockwell has not made adequate progress to prepare for utilization of the TRUPACT II container when it becomes available. The identification and timely resolution of problems by Rockwell is often slow. Rockwell has recently violated DOT regulations on two shipments to the Nevada Test Site. Despite the knowledge that nitrate concentrations on the 750 pad have increased, little action has been taken to contain saltcrete after precipitation events. Rockwell is still not placing sufficient emphasis on the timely establishment of the Rocky Flats Institute. Inadequate project staffing for the PRMP continues to influence Rockwell's performance.

COST MANAGEMENT: Good data and narratives provided by Rockwell to define Department of Energy (DOE) unfunded Environment, Safety, and Health requirements in an FY89 supplemental budget request were also used to support DOE requests to Congress for additional FY90 funding. Rockwell has done an extraordinary job of tracking information and preparing responses to a large variety of budget information requests and of maintaining the current status of its requirements. In addition, construction project data sheets and conceptual design reports supporting Capital Budget requests were both of high quality and ahead of schedule. Budget narratives were improved and expanded and were helpful in DOE's analysis of Rockwell's resource requirements.

QUALITY: Non-Weapons Quality Assurance activities conducted during the Building 771 restart have resulted in an improved quality program to be used in the operation of the building. For War Reserve Quality Assurance, Rockwell is implementing Phase 2 of the Quality Improvement Plan which will continue a new culture in quality practices and should lead to further improvement in the Quality Assurance program.

Rockwell failed to establish or make the necessary progress towards the establishment of a new standard of excellence and attendant requirements, procedures, and practices in nuclear facility operations. In addition, three incidents came to DOE's attention where Rockwell failed to provide the necessary measures to adequately control nonconforming product material.

CHEMICAL OPERATIONS: Noteworthy progress has been made towards the implementation of the Operational Readiness Review (ORR) program as demonstrated through ORR's in Building 771 and elsewhere. Rockwell has also successfully completed the development of a new extractant compound for use in the Molton Salt Extraction process. Both of these accomplishments will yield safer and more controlled production processes while maintaining or improving production performance.

PRODUCTION OPERATIONS: Significant progress has been made in the development of a Nuclear Facility Operations Manual. Rockwell has been supportive of the AL effort to develop an Operational Surety Program. Rockwell has taken several steps to reduce work in process inventories and process times by, among other things, reduced planned process times in Building 460, reduced pit assembly process time in Building 707, and reduced lot sizes on the 3T bodies.

ENVIRONMENT, SAFETY, AND HEALTH: Throughout the appraisal period, there was strong evidence of a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities. The operations in Building 771 were ceased in October 1988 due to inadequate safety procedures and radiological safety margins in the Building. Although Rockwell pursued a very aggressive corrections effort after the fact, the existence of this situation indicated a less than satisfactory attitude, procedures, and awareness for safety on the part of Rockwell. Ninety-one out of 230 safety concerns documented by external reviews (as well as by an internal Rockwell review) remained open during the period. Again, this indicates that a lack of priority attention was being paid to safety and health by Rockwell. During the period, 32 new safety concerns, including six classified as Type 2 (serious), were identified. A major environmental incident occurred during the period when chromic acid was released from Building 444 and contaminated the Plant's holding ponds. An inoperable alarm system and deficient operator vigilance contributed significantly to the seriousness of this incident.

## PRMP/PROVE

PROJECT MANAGEMENT: Rockwell has given PROVE renewed emphasis by separating responsibility for PROVE from that of the PRMP and placing it under a full-time project manager. The recently implemented "Precursor Plan" represents an improvement in direction for the entire project and was implemented with professionalism and enthusiasm.

Overall PRMP management attention to project technical, cost, schedule, and manpower need was inadequate. In addition, inadequate project staffing continues to influence Rockwell's performance.

COST MANAGEMENT: Cost development and baselining of costs for the "Precursor Plan" have been handled with the highest degree of quality. Rockwell's redirection of J. A. Jones' manpower planning on PROVE resulted in reduced costs and apparent increased construction productivity.

PROVE continues to demonstrate cost growth. PRMP cost planning far exceeded available project funding allocations.

SCHEDULE PERFORMANCE: Rockwell has successfully resolved several problems which were impacting schedule in the PROVE area. The diligent effort by Rockwell, Bechtel, and J. A. Jones in the joint development of the Precursor planning has resulted in a comprehensive schedule that should provide a smooth transition from PROVE to the receipt of capital funding for PRMP.

The PROVE schedule has deteriorated during the reporting period, extending the PROVE end date from 1/90 to 8/90.

SUBCONTRACT MANAGEMENT: Rockwell, consistent with project technical needs and evolved cost and schedules, has provided rapid and effective subcontract redirection of Bechtel. Rockwell subcontract management of J. A. Jones has ensured J. A. Jones' participation in construction planning. Rockwell has been successful in obtaining active participation and commitment from the National Laboratories and other Rockwell organizations on the PRMP Precursor Program.

The subcontract work with the PROVE glovebox manufacturer has resulted in the need for significant rework to the glovebox piping and piping penetration welds. Line Item and cost/schedule activities over the balance of the FY89 demand that Rockwell provide continuous site representation at Bechtel.

DESIGN QUALITY: The Precursor Program, geared toward improving PRMP design quality, has been initiated with broad based involvement. Use of the Configuration Control System for PROVE has been greatly improved.

The quality of the existing PROVE engineering has been poor, and change orders to correct poor initial design quality are reflected in cost growth.

TECHNICAL PRODUCT QUALITY: PROVE activities in addressing and rectifying glovebox welding problems are directed towards, and should significantly improve, technical product quality.

Welding problems recently surfacing on the PROVE glovebox indicate a significant lack of technical product quality success.

PL. SUPP. EX. 80

COPY



UNITED STATES COURT OF FEDERAL CLAIMS

* * * * *

| | |
|---|---|
| ROCKWELL INTERNATIONAL CORPORATION,<br>PLAINTIFF,<br>VS.<br>THE UNITED STATES OF AMERICA,<br>DEFENDANT. | CASE NO. 91-1362 |

DEPOSITION OF JOHN L. MEINHARDT

TAKEN BY PLAINTIFF

DATE: TUESDAY, APRIL 26, 1994

TIME: 9:05 A.M.

LOCATION: OFFICES OF FREE LANCE COURT REPORTERS
915 EAST BONNEVILLE AVENUE
LAS VEGAS, NEVADA 89101

REPORTED BY: KAREN R. BENTLEY, RPR, CCR NO. 180
FREE LANCE COURT REPORTERS
915 EAST BONNEVILLE AVENUE
LAS VEGAS, NEVADA 89101 (702) 382-6082

HANDBOOK, THE OPERATOR'S HANDBOOK FOR THE TITAN MISSILE.

Q AND DURING YOUR YEARS IN THE SERVICE, WHAT EXACTLY WERE YOU DOING?

A SYSTEMS DEVELOPMENT. WELL, PREDOMINANTLY I WAS ASSOCIATED WITH THE RECONNAISSANCE SYSTEMS AND THE DEVELOPMENT OF RECONNAISSANCE SYSTEMS. PLANES SUCH AS THE U2 AND THE SR71.

Q FROM AN ENGINEERING POINT OF VIEW?

A OPERATIONAL TESTS, EVALUATION.

Q STARTING IN 1977, WHAT WERE YOUR POSITIONS AT D.O.E.?

A 1977, FIRST JOB WAS BASICALLY AS AN ANALYST. I MEAN, IF YOU LOOK AT THE EMPLOYMENT RECORD, I WOULD HAVE BEEN HIRED AS AN ANALYST. BECAME DIRECTOR OF INTELLIGENCE AND DIRECTOR OF WEAPONS PRODUCTION.

1984, I BECAME DIRECTOR OF NUCLEAR MATERIALS PRODUCTION. 1986, BECAME DEPUTY ASSISTANT SECRETARY FOR NUCLEAR MATERIALS. 1988 -- I THINK I'M GOING TO CHANGE THAT TO 1987, BECAME ACTING DIRECTOR -- OR ACTING DEPUTY ASSISTANT SECRETARY FOR MILITARY APPLICATIONS. 1988, DEPUTY ASSISTANT SECRETARY FOR PLANNING AND RESOURCE MANAGEMENT.

1989, PRINCIPAL DEPUTY ASSISTANT SECRETARY FOR DEFENSE PROGRAMS. AND THEN ACTING ASSISTANT SECRETARY FOR DEFENSE PROGRAMS.

Q BEFORE YOU BECAME ACTING ASSISTANT SECRETARY OF DEFENSE PROGRAMS, YOU WERE DEPUTY?

A PRINCIPAL DEPUTY.

Q PRINCIPAL DEPUTY. AND WHEN YOU WERE PRINCIPAL DEPUTY, YOU WOULD BE REPORTING TO WHO?

A TROY WADE. THERE'S ALSO -- THERE IS A LITTLE BUREAUCRATIC BACKGROUND YOU SHOULD KNOW. YOU CANNOT ACT AS AN ASSISTANT SECRETARY UNLESS YOU'RE HOLDING THE POSITION OF PRINCIPAL DEPUTY IN RECORD.

THE WAY IT WORKS, RIGHT?

Q LET ME SEE IF I HAVE THAT. YOU CANNOT ACT AS AN ASSISTANT SECRETARY UNLESS YOU HOLD THE POSITION OF PRINCIPAL DEPUTY?

A UNLESS YOU ARE APPOINTED TO A POSITION ABOVE THAT. LIKE AN UNDERSECRETARY COULD CERTAINLY SUBSUME A POSITION UNDERNEATH HIM. BUT IF YOU'RE ON THE UNDERSIDE OF THAT, YOU HAVE TO OCCUPY IN RECORD, YOU KNOW, THE SUBORDINATE POSITION.

Q SO IN 1988 YOU WERE THE PRINCIPAL DEPUTY --

A 1989.

Q 1989 YOU WERE THE PRINCIPAL DEPUTY --

A UM-HUM.

Q -- FOR DEFENSE PROGRAMS?

A RIGHT.

Q AND YOU ALSO WERE ASSISTANT SECRETARY OF DEFENSE

PROGRAMS?

A ACTING EFFECTIVE 1 JULY. TROY LEFT 1ST OF JULY. OR SOMEWHERE ABOUT THERE.

Q ON 1 JULY, YOU BECAME THE ACTING --

A ACTING ASSISTANT SECRETARY, THAT'S RIGHT.

Q AND BEFORE THAT, YOU WERE REPORTING TO MR. WADE?

A RIGHT.

Q YOU HAVE SOME FAMILIARITY, MR. MEINHARDT, WITH THE ROCKY FLATS FACILITY?

A I HAVE -- YES, AS DIRECTOR OF WEAPONS PRODUCTION DURING THE PERIOD '81 TO '84, I WOULD PROBABLY VISIT THERE ONCE A MONTH.

Q AND DID THERE EVER COME A TIME WHERE YOU BECAME INVOLVED IN THE DETERMINATION OF THE AWARD FEE FOR ROCKWELL INTERNATIONAL AS THE MANAGING AND OPERATING CONTRACTOR OF THE ROCKY FLATS FACILITY?

A WOULD YOU DEFINE THE WORD "INVOLVED" FOR ME?

Q DID YOU PARTICIPATE IN THE DETERMINATION OF THE AWARD FEE AT SOME POINT FOR ROCKWELL?

A THE ONLY -- THE FEE DETERMINING OFFICIAL FOR ROCKWELL IS THE MANAGER OF ALBUQUERQUE. THE MANAGER, HE CAN SEEK RECOMMENDATIONS ON THE AWARD FEE, AND TYPICALLY DOES, FROM NOT ONLY THE BOARD THAT HE'S APPOINTED TO DO THAT BUT ALSO WITHIN HIS REPORTING CHAIN.

IN THAT REGARD, FROM -- AND THIS AGAIN GOES

Q OKAY. DID YOU TALK TO MR. TWINING ABOUT HIS RECOMMENDATION CONTAINED IN EXHIBIT 53?

A I DO NOT RECALL TALKING TO BRUCE TWINING PERSONALLY WITH RESPECT TO THAT RECOMMENDATION. AGAIN, FOR THE REASON THAT THOSE WOULD NORMALLY BE STAFFED BY THE INDIVIDUAL WHO WAS RESPONSIBLE. IN THIS CASE, ADMIRAL BARR.

Q BUT THE MEMORANDUM IS ADDRESSED TO YOU, ISN'T IT?

A THE MEMORANDUM IS ADDRESSED TO ME. BUT I'M TRYING TO MAKE THE POINT THAT THERE IS A STAFF ACTIVITY THAT OCCURS AT LEVELS BELOW AND MOST OF THE CONVERSATION WOULD OCCUR AT THAT LEVEL.

Q IN THE THIRD FULL PARAGRAPH OF EXHIBIT 53, MR. TWINING STATES THAT "I," THAT BEING MR. TWINING, "AM NOT IN A POSITION TO OFFER AN INFORMED ALTERNATIVE TO HIS," BEING MR. GOLDBERG'S, "PROPOSAL, ESPECIALLY IN VIEW OF OUR CHANGING PHILOSOPHY IN THE APPLICATION OF DEPARTMENT OF ENERGY PERFORMANCE STANDARDS AND THE LEVEL OF D.O.E. EXPECTATIONS."

DO YOU KNOW WHAT MR. TWINING IS REFERRING TO WITH REGARD TO "CHANGING PHILOSOPHY"?

A MR. TWINING IS REFERRING TO ADMIRAL WATKINS' INITIATIVES TO EMPHASIZE ES&H IN THE AWARD FEE PROCESS RATHER THAN THE HISTORICAL EMPHASIS, WHICH WAS

FUNDAMENTALLY SPLIT BETWEEN PRODUCTION, ES&H, MANAGEMENT.

Q HOW DID ADMIRAL WATKINS SEEK TO IMPLEMENT THIS CHANGE?

A ULTIMATELY, THE CHANGE WAS TO GIVE ES&H MATTERS AT LEAST 51 PERCENT OF THE MECHANISM FOR DETERMINING AWARD FEE. THAT IS, ES&H WOULD BE -- REPRESENT 51 PERCENT OF AN AWARD FEE.

Q SO THAT A CONTRACTOR'S AWARD FEE PLAN WOULD BE CHANGED TO REFLECT THAT?

A THAT'S RIGHT.

Q LET ME MARK AS EXHIBIT 301, PLAINTIFF'S EXHIBIT 301, A ONE-PAGE DOCUMENT THAT HAS THE STAMP NUMBER E001592. IT APPEARS TO BE A ROUTING SLIP -- ROUTING AND TRANSMITTAL SLIP DATED AUGUST 10, 1989.

(PLAINTIFF'S EXHIBIT 301 WAS MARKED FOR IDENTIFICATION BY THE COURT REPORTER.)

Q (BY MR. NEY) HAVE YOU EVER SEEN THIS ROUTING AND TRANSMITTAL SLIP?

MR. KOLAR: WHY DON'T I OFFER THE WITNESS THE MARKED COPY.

THE WITNESS: I DO NOT RECALL HAVING -- HAVING READ THIS.

Q (BY MR. NEY) DOES ANY OF THE HANDWRITING APPEAR TO BE YOUR HANDWRITING, SIR?

A NO.

Q (BY MR. NEY) HAVE YOU SEEN THIS DOCUMENT BEFORE?
A CERTAINLY.
Q NOW, IN THIS EXHIBIT, AM I CORRECT THAT YOU'RE STATING THAT YOUR OFFICE IS MAKING AN ADDITIONAL DOWNWARD ADJUSTMENT TO THE PROPOSED ROCKWELL AWARD FEE IN THE AREA OF ENVIRONMENT, SAFETY AND HEALTH?
A THAT'S CORRECT.
Q IN THE SECOND PARAGRAPH OF THE SEPTEMBER 20, 1989 LETTER, YOU STATE THAT THE ADDITIONAL DOWNWARD ADJUSTMENT TO ES&H REFLECTS SEVERAL CONCERNS. AND THEN IN THE PARAGRAPH, THERE'S SOME DISCUSSION -- OR THERE IS DISCUSSION OF THOSE CONCERNS.
DO YOU SEE THAT, SIR?
A I DO, UM-HUM.
Q WERE THERE ANY OTHER BASES FOR THE ADDITIONAL DOWNWARD ADJUSTMENT IN ADDITION TO THOSE CONCERNS SET FORTH IN THE SECOND PARAGRAPH ON YOUR SEPTEMBER 20, 1989 LETTER?
A NOT THAT I'M AWARE OF.
Q SO YOU DIDN'T HAVE -- YOU DIDN'T -- STRIKE THAT.
IN PUTTING FORTH THE ADDITIONAL DOWNWARD ADJUSTMENT, YOU DIDN'T HAVE ANY BASES OTHER THAN WHAT WAS STATED IN THIS LETTER; IS THAT RIGHT?

A THAT'S CORRECT.
Q OKAY. AT THE VERY BOTTOM OF THE FIRST PAGE OF THE SEPTEMBER 20 LETTER, YOU SAY THAT -- LAST SENTENCE SAYS THAT "ADMIRAL WATKINS CONCURS IN THIS RECOMMENDATION."
WHY DID YOU SAY THAT?
A BECAUSE THE RECOMMENDATION, EITHER VERBALLY OR IN WRITING, AND I CAN'T RECALL WHICH, HAD BEEN, IN FACT, PASSED TO HIM THROUGH A MEETING, AND ON ADVICE OF THOSE HE CONSIDERED TO BE APPROPRIATE, IN FACT DID CONCUR IN THIS RECOMMENDATION.
Q IS THAT THE MEETING THAT YOU TESTIFIED TO A FEW MINUTES AGO?
A THAT'S CORRECT.
Q AND DID YOU THINK IT WAS IMPORTANT FOR MR. TWINING TO KNOW THAT ADMIRAL WATKINS CONCURRED?
A YES.
Q WHY?
A BECAUSE AT THE TIME THERE WAS -- AS THE RECORD STATES, THERE WAS A LOT OF REFLECTION IN THE HEADQUARTERS ABOUT THE AWARD FEE PROCESS IN GENERAL AND, QUOTE, CHANGING PHILOSOPHIES.
SO IT WAS APPROPRIATE THAT THAT WOULD -- THAT BRUCE WOULD BE INFORMED THAT, INDEED, THE HEADQUARTERS ALL THE WAY UP TO THE TOP HAD CONCURRED.

Q DID YOU HAVE ANY COMMUNICATIONS WITH MR. TWINING ABOUT EXHIBIT 103 OR ABOUT THE CONTENT OF EXHIBIT 103?

A CLARIFICATION. WHEN YOU'RE SAYING EXHIBIT 103, YOU'RE TALKING ABOUT IT AND ALL THE ATTACHMENTS?

Q I'M TALKING ABOUT -- YES. YES.

A YOU HAVE TO GIVE ME A MINUTE. OKAY? REFRESH MY MEMORY.

Q TAKE YOUR TIME.

(PAUSE IN THE PROCEEDINGS.)

THE WITNESS: YES.

Q (BY MR. NEY) WHEN DID THAT -- WAS THAT A DISCUSSION?

A I'D LIKE TO CLARIFY THE RECORD OR MAKE -- PERHAPS MAKE A CHANGE. I KNOW THERE WERE DISCUSSIONS BETWEEN ME AND EITHER THE MANAGER OR DEPUTY MANAGER.

NOW YOU ASKED ME WHETHER IT WAS MR. TWINING. IT COULD HAVE BEEN WITH EITHER HE OR HIS DEPUTY. BUT THERE WAS, IN FACT, A DISCUSSION SPECIFICALLY WITH RESPECT TO, CALL IT BEEFING UP THE ES&H SECTION OF THEIR -- OF THEIR ANALYSIS. WHICH IS REFLECTED AS THIS PERFORMANCE EVALUATION OF THE ROCKWELL INTERNATIONAL CORPORATION CONTRACT FOR THE PERIOD OCTOBER 1 THROUGH MARCH 31, '89.

Q SO YOU'RE SAYING THAT THE DISCUSSIONS WERE ADDRESSED TO THE CONTENT OF THE PERFORMANCE EVALUATION

REPORT?

A WITH RESPECT TO ES&H.

Q WITH RESPECT TO ES&H.

IT'S MY UNDERSTANDING THAT THAT REPORT IS SENT TO THE CONTRACTOR ALONG WITH THE AWARD FEE DETERMINATION.

A THAT'S CORRECT.

Q WAS THIS COMMUNICATION WITH THE AFDO, OR HIS DEPUTY, WAS THAT BY TELEPHONE?

A PROBABLY NOT. PROBABLY BOTH. PROBABLY IN WRITING AND -- AND BY TELEPHONE.

Q WHO WAS MR. TWINING'S DEPUTY AT THE TIME?

A JIM CULPEPPER.

Q WOULD YOU TESTIFY, PLEASE, AS TO WHATEVER YOU RECALL WAS STATED IN THIS COMMUNICATION.

A THERE WAS A SUMMARY DOCUMENT -- AND AGAIN, I DON'T KNOW IF IT WAS A DRAFT OR SIGNED OR WHATEVER ELSE -- THAT REFLECTED WHY ADMIRAL BARR AND HIS STAFF WERE RECOMMENDING A FURTHER DOWNGRADE OF THE ES&H SECTION.

IN THAT SECTION, THEY HAD CITED THE SPECIFICS THAT I REFERRED TO BEFORE AND I THINK ARE REFERRED TO UP HERE, BEING THE CHROMATE ACID SPILLS AND SOME OF THOSE THINGS. THAT SECTION NEEDED TO BE REFLECTED IN THIS PARTICULAR DOCUMENT. AND AS I RECALL, THAT'S WHAT I ASKED THEM TO DO.

NOW WHETHER THAT OCCURRED DIRECTLY FROM ME OR AS A RESULT OF MY TELLING SOMEBODY TO HAVE IT REFLECT THAT, I DON'T REMEMBER THE SPECIFICS.

Q DO YOU RECALL ANYTHING THAT WAS SAID BY MR. TWINING OR MR. CULPEPPER IN THIS COMMUNICATION?

A NO, NO.

Q DID EITHER ONE OF THEM EXPRESS ANY DISAGREEMENT WITH THE HEADQUARTERS DETERMINATION?

A THE FINAL DETERMINATION THAT WAS REFLECTED IN THIS LETTER, I'M NOT AWARE THAT THERE WAS ANY FORMAL REBUTTAL TO THIS EITHER VERBALLY OR IN WRITING.

Q DO YOU RECALL ANY REBUTTAL TO ANY RECOMMENDATION, EVEN IF IT WAS SOMETHING SHORT OF THE FINAL?

A NO, I DON'T RECALL ANY SPECIFIC DISCUSSIONS. BUT THOSE DISCUSSIONS COULD HAVE OCCURRED AT A LEVEL OTHER THAN MINE.

Q YEAH, BUT -- I'M JUST SEEKING ANYTHING THAT YOU MIGHT RECALL.

A NO.

Q OKAY. IN THIS EXHIBIT 103, IF YOU TURN TO THE SECOND PAGE OF YOUR LETTER.

A UM-HUM.

Q AT THE TOP, IT STATES THAT -- YOU SAY "WE HAVE ATTACHED A COPY OF YOUR," WHICH WOULD BE TO MR. TWINING,

"DRAFT LETTER TO ROCKWELL WHICH REFLECTS OUR CONCERNS IN THE ES&H AREA." YOU SEE THAT?

A YES.

Q THEN ATTACHED TO THIS DOCUMENT BEARING BATES NUMBER E00938 THROUGH 939 APPEARS TO BE A DRAFT LETTER FROM TWINING TO MR. DOMINICK J. SANCHINI. S-A-N-C-H-I-N-I.

IS THAT THE DRAFT LETTER THAT YOU'RE REFERRING TO IN YOUR LETTER?

A THAT'S CORRECT.

Q WHO DRAFTED THAT LETTER? I MEAN, DID YOU DRAFT IT?

A NO.

Q SOMEBODY REPORTING TO YOU?

A I HAVE NO KNOWLEDGE OF WHO DRAFTED THIS.

Q SOMEBODY HANDED IT TO YOU, I ASSUME, TO PASS ALONG TO --

A AS PART OF THIS PACKAGE.

Q PARDON ME?

A IT CAME AS PART OF THIS PACKAGE. NO DOUBT WHEN THIS PACKAGE WAS PRESENTED FOR SIGNATURE, THESE WERE ATTACHED TO IT.

Q SOMEBODY HANDED THIS DOCUMENT TO YOU FOR YOU TO SIGN AND SHIP OFF TO ALBUQUERQUE; IS THAT RIGHT?

A THROUGH THE NORMAL PROCESSES OF PURE CREDIT

ADMINISTRATION, YES.
Q DO YOU RECALL WHO HANDED IT TO YOU?
A NO.
Q AT THE TIME YOU SIGNED EXHIBIT 103, WERE YOU AWARE OF ANY MISREPRESENTATIONS OF FACT BY ROCKWELL?
A NO.
Q DID YOU HAVE ANY INFORMATION CONCERNING ROCKWELL'S PERFORMANCE DURING THE OCTOBER 1, 1988, MARCH 31, 1989 AWARD FEE PERIOD THAT WAS UNKNOWN TO D.O.E. PERSONNEL AT THE SITE AT ROCKY FLATS OR IN ALBUQUERQUE?
MR. KOLAR: OBJECTION. CALLS FOR SPECULATION.
Q (BY MR. NEY) DID YOU BELIEVE YOU DID?
A NO. I HAD NO KNOWLEDGE OF ANYTHING, NOR WOULD I BE EXPECTED TO.
Q LET ME SHOW YOU A DOCUMENT THAT'S BEEN MARKED AS EXHIBIT 56 IN THIS LITIGATION, WHICH APPEARS TO BE A -- FRONT PAGE IS A -- LOOKS LIKE A TELECOPIER TRANSMISSION COVER SHEET FROM YOU TO MR. CULPEPPER AT THE DEPARTMENT OF ENERGY IN ALBUQUERQUE.
HAVE YOU SEEN THIS DOCUMENT BEFORE, SIR?
A CERTAINLY.
Q AND WHAT IS THIS DOCUMENT ABOUT?
A IT'S A COMMENT ON A DRAFT OF THE AWARD FEE DETERMINATION FOR THE PERIOD REFERENCED PREVIOUSLY.
Q YOU TESTIFIED JUST ABOUT TWO MINUTES AGO ABOUT

COMMUNICATIONS WITH EITHER MR. CULPEPPER OR MR. TWINING ABOUT -- I'M PUTTING THIS IN MY WORDS; I CAN'T RECALL YOUR EXACT WORDS -- BEEFING UP THE PERFORMANCE EVALUATION REPORT TO REFLECT THE CONCERNS EXPRESSED BY HEADQUARTERS ON ES&H?

A UM-HUM.

Q IS THAT WHAT THIS DOCUMENT'S ABOUT?

A THAT'S EXACTLY WHAT I WAS REFERRING TO.

Q NOW, TO SEE IF I UNDERSTAND IT. YOU'VE TAKEN A MEMORANDUM TO YOU FROM ADMIRAL BARR --

A UM-HUM.

Q -- THAT BEARS BATES NUMBERS E001469 TO 70, AND YOU'VE BRACKETED CERTAIN LANGUAGE.

A UM-HUM.

Q AND YOU'RE SUGGESTING THAT CULPEPPER INCLUDE THAT LANGUAGE IN THE PERFORMANCE EVALUATION REPORT THAT'S GOING TO BE SENT TO ROCKWELL; IS THAT RIGHT?

A THAT'S CORRECT.

Q THIS MEMO FROM ADMIRAL BARR THAT'S ADDRESSED TO YOU, DID YOU RECEIVE THAT IN THE NORMAL COURSE OF EVENTS?

A I CERTAINLY RECEIVED IT.

Q UM-HUM. WAS YOUR SEPTEMBER 20 LETTER TO MR. TWINING, WHICH IS EXHIBIT 103, WAS THAT BASED ON THE BARR MEMO?

WHEN I SAY "THE BARR MEMO," I'M REFERRING

TO -- WHICH IS PART OF EXHIBIT 56.

I MIGHT NOTE -- YOU CAN LOOK FOR YOURSELF BUT -- THAT THE LANGUAGE IN YOUR LETTER TO MR. TWINING IN EXHIBIT 103 IS NEARLY IDENTICAL TO THE TEXT IN THE BARR MEMO. BUT I WANT YOUR TESTIMONY, NOT MINE.

A I NEED TO HAVE SOME CLARIFICATION. TELL ME WHAT YOU'RE REFERRING TO WHEN YOU SAY "THE BARR MEMO."

Q I'M REFERRING TO PART OF EXHIBIT 56, THE TWO PAGES.

A OKAY. CAN WE START OVER WITH YOUR QUESTION?

Q OKAY. I'LL JUST RESTATE IT INSTEAD OF READING IT BACK.

WAS YOUR LETTER TO MR. TWINING DATED SEPTEMBER 20, 1989, WHICH IS DEPOSITION EXHIBIT 103, WAS THAT BASED IN LARGE PART ON MR. BARR'S -- OR EXCUSE ME, ADMIRAL BARR'S MEMORANDUM TO YOU WHICH IS PART OF EXHIBIT 56?

A YES.

Q OKAY. AND TO YOUR KNOWLEDGE, WAS THE PERFORMANCE EVALUATION REPORT THAT WAS SENT BY THE AWARD FEE DETERMINATION OFFICIAL TO ROCKWELL CHANGED TO REFLECT THE STATEMENTS MADE BY ADMIRAL BARR IN HIS MEMORANDUM TO YOU WHICH IS PART OF EXHIBIT 56?

A YES.

Q LET ME SHOW YOU WHAT'S BEEN MARKED AS DEPOSITION

EXHIBIT 60 IN THIS ACTION, WHICH IS A LETTER DATED SEPTEMBER 27, 1989, FROM BRUCE TWINING TO ROCKWELL'S DOMINICK SANCHINI. AND THIS IS THE AWARD FEE DETERMINATION FOR THE OCTOBER 1, 1988 THROUGH MARCH 31, 1989 PERIOD.

DID YOU SEE -- HAVE YOU SEEN THIS LETTER BEFORE?

A I'M NOT SURE THAT I HAVE SEEN THIS LETTER IN THIS FORM BEFORE. THE FORM THAT I'M REFERRING TO IS THE -- I THINK WHICH IS -- JUST ON A QUICK SCAN, LOOKS LIKE IT'S -- THE SAME LANGUAGE WAS IN AN ATTACHMENT TO A LETTER I SENT TO BRUCE TWINING.

Q THAT'S EXHIBIT 103; IS THAT RIGHT?

MR. KOLAR: YEAH.

THE WITNESS: YES.

Q (BY MR. NEY) OKAY. YOU DON'T RECALL WHETHER YOU SAW THIS LETTER BEFORE THIS LAWSUIT GOT UNDERWAY? WHEN I SAY --

A NO.

Q -- "THIS LETTER," I'M SAYING THE ONE THAT WAS ACTUALLY SIGNED BY MR. TWINING.

A I DON'T RECALL HAVING SEEN THAT, NO.

Q DID YOU HAVE ANY REASON TO KNOW THAT MR. TWINING ADOPTED THE DRAFT LETTER THAT YOU SENT TO HIM AS PART OF EXHIBIT 103?

A I WOULD ASSUME THAT HE WOULD DO THAT, HE WOULD ADOPT THE WORDS THAT WERE SENT.

Q WHY WOULD YOU ASSUME THAT?

A BECAUSE HE WAS SUBORDINATE.

Q LET ME ASK YOU A QUESTION. WHICH, OF COURSE, I'VE BEEN DOING.

IN YOUR DRAFT LETTER TO MR. SANCHINI WHICH IS PART OF EXHIBIT 103, YOU STATE IN THE FIRST LINE THAT "I," THERE OF COURSE REFERRING TO MR. TWINING SINCE HE WOULD BE SIGNING IT -- "HEREBY DETERMINE WHAT ROCKWELL'S AWARD FEE IS."

IN THE LETTER THAT WENT OUT, WHICH IS TO ROCKWELL, EXHIBIT 60, IN THE FIRST LINE SAYS "THE DEPARTMENT OF ENERGY HEREBY DETERMINES ROCKWELL'S AWARD FEE."

HAD YOU EVER NOTICED THAT DISCREPANCY BETWEEN THE TWO LETTERS BEFORE TODAY?

MR. KOLAR: I'D OBJECT ON THE GROUND THAT THE LETTER -- THE DRAFT LETTER WAS CHARACTERIZED AS "YOUR LETTER," AND I THINK MR. MEINHARDT HAD TESTIFIED EARLIER THAT IT WAS PART OF A PACKAGE OF DOCUMENTS BUT HE DID NOT RECALL WHETHER HE OR SOMEONE ELSE DRAFTED THE LETTER.

MR. NEY: THAT'S RIGHT. BUT IT WAS INCLUDED IN A PACKAGE THAT HE SIGNED OFF ON.

I THINK THERE'S A QUESTION PENDING.

AS EXHIBIT 181, WHICH IS AN OCTOBER 13, 1989 MEMORANDUM FROM MR. TWINING TO MR. SIMONSON AND REFLECTS YOU AND ADMIRAL BARR RECEIVING COPIES OF.

HAVE YOU SEEN THIS DOCUMENT BEFORE, SIR?

A I CAN'T RECALL SPECIFICALLY HAVING SEEN IT. I'M CERTAIN I DID. IN THE POSITION I OCCUPIED, THINGS LIKE THIS WOULD ROUTINELY COME TO ME.

Q NOW IT'S MY UNDERSTANDING THAT MR. TWINING IS ATTEMPTING TO DELEGATE THE AWARD FEE DETERMINATION OFFICIAL RESPONSIBILITY TO MR. SIMONSON FOR THE AWARD FEE PERIOD OF APRIL 1, 1989, TO SEPTEMBER 30, 1989. IS THAT CORRECT?

A THAT'S CORRECT.

Q DO YOU RECALL HOW THIS DELEGATION CAME ABOUT?

A DELEGATION CAME ABOUT BECAUSE ADMIRAL WATKINS' DESIRE WAS TO CAUSE THE ROCKY FLATS AREA OFFICE TO REPORT DIRECTLY TO THE HEADQUARTERS.

Q DID YOU PARTICIPATE IN THIS DECISION MAKING?

A THE DECISION WAS MADE BY THE SECRETARY, AND I DO NOT RECALL ANY SPECIFIC CONVERSATIONS WITH THE SECRETARY.

Q ON THIS SUBJECT?

A ON THIS SUBJECT.

Q OKAY. WERE YOU EVER CONTACTED BY ANYONE IN THE GOVERNMENT OUTSIDE OF THE DEPARTMENT OF ENERGY ON THE SUBJECT OF ROCKWELL'S AWARD FEES?

PL. SUPP. EX. 81

United States Government

# Memorandum

Mr. Simonson: 11-7-89

There are 8 attachments. Not included are the formal determination forms/letters that will follow ASDP concurrence. I have the disk with all calculations, reports, forms, & letters for this evaluation period.

Terrel Agy
PERB Executive Secretary

DATE: November 7, 1989

REPLY TO ATTN OF:

SUBJECT: PERB Recommendations to the Manager

TO: David P. Simonson, Manager, RFO

The Performance Evaluation Review Board has met and our performance evaluation and award fee recommendation are attached for your consideration. This evaluation of Rockwell International Corporation was for the period April 1 through September 30, 1989 under Contract DE-AC04-76DP03533.

The approach used in preparing our evaluation and recommendation was based on the Award Fee Plan set forth in Appendix D of the Contract negotiated for FY89. The DOE/AL reporting format was utilized to provide consistency with the first six months of the FY. The local evaluation process followed the approach described in Part I of the Performance Evaluation Plan for the Rocky Flats Office.

The attached information includes the PERB Report, award fee calculations and recommendations of the Board, as well as drafts of various forms and letters (including a summary evaluation) which will require your approval and signature.

A presentation of the PERB evaluation and recommendations can be arranged at your convenience.

Claude H. Barkmeier
Director, Division of Administration
Chairman,
Performance Evaluation Review Board

Enclosures (10)

PREDECISIONAL - OFFICIAL USE ONLY

U. S. Department of Energy

Rocky Flats Office

# AWARD FEE
# PERFORMANCE EVALUATION REVIEW
# BOARD RECOMMENDATION
# FOR THE PERIOD:

April 1 [illegible]

[illegible] Claude Barkmeier on 11/15/89: A copy of the PERB [illegible] [illegible] of the [illegible] recommendations/evaluation report [illegible] [illegible] [illegible] removed [illegible] [illegible] by [illegible] to Bill Whelan (Assistant Mgr [illegible]) [illegible] 11/13/89. The [illegible] Barkmeier on 11/13/89. [illegible] informed [illegible] Mgr D.P. Simonson [illegible] [illegible] 31.

[illegible]

ROC[illegible]

Date: 11/7/89

Claude H. Barkmeier
Director, Division of Administration
Chairman, Performance Evaluation Review Board
Rocky Flats Office

PREDECISIONAL - OFFICIAL USE ONLY

PREDECISIONAL - OFFICIAL USE ONLY

PERFORMANCE APPRAISAL
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

The overall performance of Rockwell International Corporation (Rockwell) has been at the level of "Satisfactory" during the period April 1 through September 30, 1989.

The following are seperate evaluations of the performance of Rockwell relative to the management and operation of the Rocky Flats Plant and the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the selected Functional Performance Areas (FPA's). The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's have been evaluated in accordance with the contract Award Fee Plan, and the following discussion of each FPA reflects an integrated assessment of all factors.

## PLANT

FPA: GENERAL MANAGEMENT

Adjectival Grade: GOOD

Noteworthy Achievements

1. The C-Centerline Project in Building 707 was an outstanding example of an integrated operating philosophy to assure safety and provide capability to continue operations of the production facilities. Excellent planning, communication, conformance to requirements, and fundamental execution allowed project completion eight days ahead of schedule without any contamination incidences, injuries or shutdowns due to safety concerns.

2. Rockwell successfully completed a complex central telephone system acquisition. A DOE protest was filed by one of the unsuccessful proposers. However, after a meeting with Rockwell, the protest was withdrawn with apologies.

3. Rockwell's logistical and security support of DOE "Tiger Team" activities and Rocky Flats Office (RFO) moves has been extraordinary. When DOE Headquarters Teams, the Federal Bureau of Investigation (FBI) and Environmental Protection Agency (EPA) arrived on plant-site on June 6, 1989, an immediate need arose for many types of support. Rockwell responded to all unusual security requests in an outstanding fashion. In almost all other instances, Rockwell's response was timely and provided the required material or services.

4. Rockwell has provided valuable support to DOE teams negotiating Resource Conservation and Recovery Act (RCRA)/Comprehensive Environmental Response Compensation and Liability Act (CERCLA) agreements with the EPA and the Colorado Department of Health (CDH). Initial efforts to implement those agreements have been prompt and appropriate.

E 000334



11/7/89

PREDECISIONAL - OFFICIAL USE ONLY

5. Information Systems Management (ISM) supported the Plant in a commendable manner.

a. ISM has developed and installed an automated Audit Tracking System for Health, Safety and Environment (HS&E), Operations and Planning. This system provides status information for HS&E management to help ensure timely responses to audit findings issued by oversight agencies.

b. ISM provided finite element analysis (FEA) support to Manufacturing Technology Development in the development of a gravity-fed graphite casting process. The combined effort resulted in a process which will realize significant material savings (estimated at $2.4 million, of which $600,000 is attributed to the FEA effort) over the life of one weapons systems program.

c. The ISM designed and developed Distributed Numerical Control System provides for remote loading and process monitoring of both Numerical Control tape images and associated working drawings.

d. Phase I of the automated Waste & Environmental Management System (WEMS) was completed. WEMS provides a bar-code driven on-line tracking and inventory reporting system for hazardous, radioactive and mixed wastes at Rocky Flats. It also provides for the collection and reporting of field and sample analysis data for the RCRA/CERCLA ground water, surface water, soil and sediment programs.

e. Via the Tool Scheduling and Reporting System, enhanced planning and scheduling of detailed operations in the fabrication of tools has been realized.

6. An automated maintenance work control system has been implemented which enhances planning processes, establishes priorities, supports integrated schedules and provides deficiency tracking. Coupled with material control improvements and pre-kitting operations this system has resulted in significant improvement in resource utilization and overall efficiency.

7. The quantity and quality of support to the PRMP project has increased dramatically over this reporting period. Cooperation between organizations has also increased, resulting in improved coordination and a stronger team approach to the project. The Rockwell commitment to the project is evident.

Serious Major Deficiency:

The DOE has had serious concerns regarding Rockwell management's ability to manage this facility because there is considerable evidence of:

- lack of clear lines of responsibility for safe operations.
- lack of adequate procedures to assure safe operations.
- lack of conformance to procedures.
- lack of adequate work ethic and mental discipline within the work force.
- lack of an adequate corrective system for non-weapons activities.
- lack of real progress in installing a new culture regarding safety.
- lack of an adequate training program.
- lack of adequate on-floor supervision.
- lack of ability to apply root cause analysis to investigation of unplanned events and to implement lessons-learned on a plant-wide basis. Approach has been to fix the immediate problem.



E 000335

11/7/89

PREDECISIONAL - OFFICIAL USE ONLY

The following incidents/situations provide examples of these concerns:

a. The Rockwell Management Plan submitted to Secretary Watkins failed to address bringing new management expertise or approaches. Instead, it only addressed tasks and accompanying resource requirements.
b. The Building 771 filter incident on June 21 which revealed it had been 11 months since filters were last changed in an area where "filters are supposed to be changed every 6 months."
c. Two construction jobs were shut down on June 13 and 21 due to safety violations - excavations not shored, spoils too close to the trench, inadequate escape ladders, and inadequate barricades. These are simple operations which present very real risks to workers and other plant employees. One job was being done by Rockwell maintenance forces and the other by a Rockwell subcontractor. Rockwell was not in control in either case.
d. Recordable injuries occured at the rate of approximately 16 per month.
e. The nitric acid spill in Building 771 during raschig ring inspection on April 13 and numerous other tank overflow incidents (most notably the chromic acid spill on February 28) indicate operators not assuring that their equipment and procedures are ready for safe operations.
f. Five years of failure to develop criteria for new plutonium recovery capability that meet safety, efficiency, and waste minimization objectives. Operating staff are still not involved in oversight of the installation of PROVE equipment or in the optimization of PRMP technologies.
g. A uniform, plant-wide system for managing waste does not exist.
h. Two improperly documented waste shipments were made to the Nevada Test Site (NTS) during the first three months of the period.

Notable Deficiencies

1. Despite an increase in nitrate concentrations on the 750 Pad, little action has been taken to contain saltcrete after precipitation events. Current evidence indicates that saltcrete is destabilizing and many spills have resulted. Better management of saltcrete is needed immediately.

2. The annual DOE inventory of Special Nuclear Material (SNM) at Rocky Flats was conducted during this evaluation period. The preparation for the inventory by Rockwell was less than satisfactory. This problem seems to have been caused by several factors including delayed operational cut-offs to allow interproject (IP) schedules to be met, lack of appropriate cleanup, conflict of scheduling with maintenance operations, etc.

Observations

1. The organizational structure for training has been restructured to assign the responsibility for all technical and safety training to the Director of Human Resources. Program management control for training is maintained over the line training organizations to assure uniform consistency in the development and implementation of performance based training programs. To supplement the organizational reconfiguration, an Executive Training Committee consisting of directors from HS&E, Human Resources, Production Operations, Plutonium Operations, Support Operations, Security and Safeguards and Quality Engineering and Control has been established to provide top level management review and approval of Plant training programs.

2. The Rocky Flats Institute has been implemented. Nine basic subject areas have been identified through needs analysis. Those basic subject areas include chemistry, physical-science, algebra, health-physics, industrial safety, metallurgy and hazardous materials

PREDECISIONAL - OFFICIAL USE ONLY

courses. The primary focus is upon developing technical foreman. However, courses in physical-science, chemistry and algebra are offered after-hours for those hourly employees interested in career growth and development through education. All courses are for college credit. Outcomes include enhanced capability of the work force through education and the career growth and development of employees. Currently there are 204 employees enrolled in ten courses offered onsite through Front Range Community College.

3. A top level Support Operations Directorate plan for a Non-weapons Quality Assurance plan has been developed and initial steps for implementation have been completed. This provides an integrated approach for implementing, managing, and evaluating an NQA program for the entire Rocky Flats Plant.

4. In response to a DOE concern related to timeliness of reporting, Rockwell has exhibited significant improvement. Major reports and documents required by regulation have been submitted in a timely manner, providing DOE sufficient review and transmittal time.

PREDECISIONAL - OFFICIAL USE ONLY

FPA: <u>ENVIRONMENT, SAFETY & HEALTH</u>

Adjectival Grade: <u>MODERATELY GOOD</u>

<u>Noteworthy Achievements</u>

1. Rockwell took positive actions to upgrade the overall quality, capability, and performance of the Rocky Flats radiation instrumentation systems in FY89. In April 1989, a joint DOE/DOE Contractor Conference on Alpha Air Monitoring Instrumentation was hosted by Rockwell at Rocky Flats Plant (RFP). This effort fostered strong coordination between several DOE Offices and DOE Contractors in the research, development and field testing of new generation alpha continuous air monitoring instruments. Rockwell purchased eight prototype alpha monitoring instruments and is on schedule for commencement of field testing and evaluation of these units in a production environment in early November, 1989. The outcome of these instrument proving tests will provide invaluable alpha instrument capability and performance data of benefit to the entire DOE complex. Several other enhancements to the Radiation Instrumentation Program include the recent hiring of an experienced Instrumentation Engineer, three additional Electronic Calibration Technicians, and selection of a Radiation Instrumentation Foreman for PM shift coverage. A new version of the presently used Alpha-Met instrument, having a lower limit of detection, is under field evaluation on plantsite, and purchase of approximately 1000 additional units of this type to replace existing Alpha-Mets is projected in FY90. Finally, Rockwell defined needs and allocated $260,000 in funding to purchase a new instrumentation calibration and recall system.

2. Rockwell developed and implemented a plantwide ALARA (As Low As Reasonably Achievable) Program exceeding the requirements of DOE ORDER 5480.11. Important aspects of the new ALARA program included setting specific exposure goals for 19 Dose Trend Groups, plus setting specific exposure goals for each of the major production buildings. Building specific ALARA committees were established with the charter of ongoing investigation, assessment and implementation of specific methods of reducing worker radiation exposure. The positive impact of the ALARA program was evidenced by the significant reduction in Plant exposure observed in FY89, after normalization for variations in-plant production workloads. During every quarter of FY89, Rockwell was successful in achieving their pre-established plantwide external dose objectives. The FY88 total exposure accrued by the semi-monthly and monthly badge exchange groups was about 506 person-rem. The FY89 person-rem total for these groups is projected to be approximately 300 person-rem. Approximately 50% of this difference is attributed to the ALARA program efforts.

3. Rockwell has responded in a very timely fashion to the new surface water release requirements imposed by the State of Colorado. The Facilities Engineering Group quickly implemented the activated charcoal treatment of the A and B series Ponds as well as the aeration treatment of Pond C-2. Both activities included all National Environmental Policy Act (NEPA) and RCRA required documentation.

4. The extent of the characterization of subsurface contamination has exceeded the requirements of the Agreement in Principle with the State of Colorado. As agreed between DOE and the CDH in the approved closure plans and characterization work plans, Rockwell has currently installed a total of 320 groundwater monitoring wells with 340 on schedule for the end of CY89. The Agreement in Principle with the State of Colorado required 260 wells by the end of the year.

E 000338



11/2/89

PREDECISIONAL - OFFICIAL USE ONLY

5. Rockwell assisted in the negotiations of the important Settlement Agreement and Compliance Order on Consent pertaining to interim status issues. In spite of extremely tight time frames, the Rockwell RCRA/CERCLA group assembled an excellent consolidated Part A which established the basis for interim status operations at RFP.

6. Rockwell has submitted all required environmental documentation pertaining to environmental restoration on schedule. These include twelve closure plans for RCRA regulated units, the Groundwater Assessment Plan, and the Interim Remedial Action Plan for the 903 Pad, Mound, and East Trenches Areas. The 881 Hillside Environmental Assessment was completed on time despite significant last minute changes.

7. Rockwell prepared a detailed Five Year Plan revision (8/31/89) in a very short time period. Rockwell staff provided excellent support to RFO staff in preparation for defense of the revision.

8. A new Rockwell Radiological Engineering group was created in FY89, comprised of the Manager of Radiological Engineering, the ALARA Program Manager, plus three experienced radiological engineers hired from other nuclear facilities. Notable achievements completed by the Radiological Engineering group include: 1) formalizing of the HS&E design review process for all Engineering Job Orders; 2) providing full time radiological engineering support for PRMP; and, 3) completion of numerous ALARA engineering improvements within the production buildings. Specific examples of radiological engineering improvements include: 1) design and installation of moveable curtain radiation shielding in Building 371 high level drum storage room; and, 2) design of shielding for a high level component transfer cart and development of a prototype shielded bag-out operation cart for use in Building 707.

Notable Deficiencies

1. Long term understaffing in the HS&E organization resulted in less than adequate attention applied to several essential projects and safety functions. Due to high turnover rates within the Criticality Engineering Group, the average Criticality Engineer experience level remains unacceptably low for a facility of this size and complexity. Continuous improvements in both the depth and quality of the Rocky Flats Criticality Safety Training Program have been deterred by insufficient staffing, as well as completion of Certification training for Criticality Engineers. There has not been sufficient manning nor time for important criticality safety preventative efforts such as the performance of in-depth root cause analysis of past criticality safety infractions. In the area of Safety Analysis, serious understaffing coupled with a significant expansion of the safety analysis workload has resulted in an enormous backlog of unfinished safety assessment tasks. Rockwell management efforts taken to date appear to have been unsuccessful in reversing this serious understaffing problem. Unless a significant realignment of manpower and resources is made, acceptable progress updating existing Safety Analysis Reports (SAR's), in the preparation of the Rocky Flats Plantsite SAR, and in formally documenting the Level 1 information which supports the existing final SAR's will be impossible. In addition, chronic understaffing deficiencies in the Radiation Protection organization have hampered critical Plant maintenance activities.

2. Rockwell was unsuccessful in reaching their Plant Performance Goal for recordable injuries during FY89. In FY88 the total number of recordable injuries for Rocky Flats Plant was 100, corresponding to an average monthly recordable injury rate of about 8.3 per month. As of September 30, 1989, the FYTD total for recordable injuries (including the Oxnard Facility) was 158.

3. Rockwell failed to meet their internal Plant Performance Goal for reducing the number of contamination incidents for the period, and was unsuccessful in reducing the total number of workplace contamination incidents in FY89. In FY88 the total number of contamination incidents reported was 373. The FY89 total was 479 contamination incidents.

4. Rockwell continues to have problems in the construction safety area on plantsite. Subsequent to the construction shutdown in mid-July, and the resulting emphasis to be placed on construction safety overview, DOE personnel continue to observe construction safety problems and advise Rockwell of needed improvement in construction safety overview. Some of the violations noted to date, all of which have occurred within the Perimeter Security Zone (PSZ) and performed by subcontractors, include: Personnel riding on the fender of a backhoe traveling on the road by Building 750; personnel at the excavation west of T771E working around and above protruding rebar which did not have protective caps; and improper use of access ladders.

5. Rockwell failed to exercise an acceptable level of program management in the development of official recommendations for restart of the Building 374 evaporator, instead relying on the development of written DOE instructions. Although RFO had previously requested analysis of the operation, the first Rockwell analysis based on legal issues suggested continued shutdown of the unit rather than suggest restart criteria.

6. The Scientech Criticality Safety Assessment performed in August, 1989 noted many aspects of the criticality safety program which need improvement. Most prominent of these was the absence of a comprehensive glovebox exhaust fissile material holdup measurement program at Rocky Flats, which although rapidly instituted in response to the report, should have already been in existence. Several other important aspects of the criticality safety program which need strengthening include more in depth training of workers, increasing the experience level, pay, and staffing within the Criticality Engineering organization, and not performing meaningful analysis of past infractions.

7. Rockwell failed to exercise an acceptable level of program management in dealing with pondcrete and saltcrete. On September 29, 1989, Rockwell expressed interest in knowing the "DOE's future plan," rather than developing recommendations for dealing with these wastes.

8. Rockwell's oversight of the environmental subcontractors performing routine environmental monitoring is deficient. Organization of Rockwell subcontractors conducting specialized field sampling is poor and specific Rockwell guidance is less than satisfactory. Rockwell Environmental Management staffing remains inadequate to perform proper field oversight.

9. As identified in the DOE-HQ assessment team report, RFP effluent air monitoring program may adversely affect determination of radioactive materials released to the atmosphere (audit finding AF-2).

10. Rockwell successfully made all allowable (six) TRU waste shipments to Idaho. However, shipments to both Idaho and Nevada were marked by errors in manifests and contamination on waste packages which jeopardized the future of offsite disposal plans.

Observations

1. During FY87 and FY88, the number of Nuclear Material Safety Limit Infractions fluctuated between 2 and 3 per month. During the six month period ending September 30,

the number of infractions was approximately the same as in previous years. These statistics are an indication that no significant progress has been made in positively identifying the root causes which underlie these infractions, nor in evaluating the effectiveness of the recurrence control measures taken.

2. Rockwell reorganized the Radiation Monitoring Organization into a Radiation Protection Technologist (RPT) group and a Radiation Administrative and Technical Support group. The organization was enhanced through selection of a new Manager, addition of seven additional RPT Foreman and upgrading of the training and selection standards for RPT's. At the end of FY88, the Radiation Monitoring Organization had approximately 200 personnel on board. At the end of FY89, the Radiation Protection Organization encompassed approximately 265 salaried plus hourly personnel. Also, in FY89 the development and conduct of accelerated classroom and practical skills training for Radiation Protection Technologists and Radiation Workers was incorporated as part of the DOE 5480.11 Implementation Plan.

3. A thorough assessment of the entire spectrum of HS&E training needs, with appropriate emphasis upon radiation safety and industrial safety, needs to be made. Rockwell internal surveillances, and consultant assessments of Rockwell training, point consistently to the need for added emphasis on training processes and improvements in the depth, frequency and overall quality of worker safety training. The root causes of many unplanned events experienced at Rocky Flats continue to relate closely to inadequacies in worker safety training and qualification programs.

4. Rockwell maintained TRU mixed waste generation at less than 100 cubic yards/month (half of FY88 rate) and established a Limiting Condition of Operations (LCO) for TRU mixed waste storage.

5. At DOE's request, Rockwell has completed a RCRA approved decontamination facility for decontamination of field equipment.

6. Information flow, particularly analytical data, from Rockwell to the DOE-RFO has not been adequate to meet the new reporting requirements to the CDH and the EPA nor has it allowed efficient independent analysis of data. Lack of access to a centralized, controlled data base does not provide the DOE-RFO with a means to quickly respond to information requests or prepare environmental analyses as required by the Agreement in Principle.

7. Coordination between the Rockwell RCRA/CERCLA group and Waste Operations appears to be weak, affecting program management. As an example, some staff members in Waste Operations have recently advised RFO that pondcrete will likely not meet Land Disposal Restriction (LDR) requirements for several constituents, which does not conform with RCRA/CERCLA group's understanding of the situation. Also, RCRA related documentation, information, and requests are frequently submitted to RFO from the Waste Operations group apparently without coordination with the RCRA/CERCLA group.

8. Rockwell submitted completion certificates for 23 completed Technical Safety Appraisal (TSA) actions in the past nine months. Completion certificates for approximately 16 additional TSA action items are currently undergoing Rockwell verification prior to submittal to DOE. This is an indication that progress in addressing and resolving TSA deficiencies was sustained in spite of numerous external impacts.

9. Rockwell has demonstrated a willingness and the ability to deal effectively with State of Colorado oversight groups in the development of monitoring systems.

PREDECISIONAL - OFFICIAL USE ONLY

10. Rockwell's Maintenance department has placed major emphasis on repairing noted deficiencies in fire wall penetrations, fire doors, and in the completion of Engineering Job Orders for the repair of other fire protection deficiencies. Work packages and work permits were restructured to ensure that all fire wall penetrations created during maintenance jobs were closed by the end of the shift.

11. Rockwell needs to perform an assessment of the audible range of the PA system and all alarms on plantsite to determine whether they can be heard in all required areas. There have been several incidents of SAAM alarms that cannot be heard at the opposite end of the room in which they are located.

12. The HS&E organization completed preparation and issue of extensive Fire Loss Prevention Procedures as part of the Rockwell HS&E Manual. Application of the updated criteria, procedures and fire prevention practices addressed in this manual, when fully implemented, will significantly decrease the risk of fire loss and frequency of incidents at Rocky Flats.

13. Rockwell established the Industrial Safety Improvement Program to review and investigate all injuries and industrial illness, both recordable and non-recordable, and determine significant trends, root causes, and appropriate recurrence controls. Monthly trend reports summarizing injuries at the Director, Building, and Program levels were initiated to increase accountability of line management for instituting and taking ownership for effective accident prevention programs within their organizations.

14. Milestones for responding to CDH Compliance Order No. 89-06-07-01, have been met.

15. Rockwell completed the ATMX exemption request.

16. The Safety Review Group (SRG) has shown significant improvement in the quality of information presented in Unusual Occurrence and Critique Reports. The SRG staff was instrumental in obtaining substantial Rockwell participation in a DOE sponsored MORT/Accident Investigation Workshop. The Rockwell personnel that completed the training will be rotated through the SRG and will also serve as a reserve resource for the SRG. The SRG has been a driving force of the Unplanned Event Interagency Steering Committee. They have provided most of the preparatory work on the proposed Unplanned Event Information Center.

17. At RFO's request, the RCRA/CERCLA group has been more conscientious in allowing RFO adequate review time in the preparation of final documents (groundwater assessment plan).

18. The RCRA/CERCLA group is improving review of subcontractor products prior to submission to RFO (Part B for supercompactor), although some documents received still required significant improvement (draft groundwater assessment plan).

19. The RCRA/CERCLA group has responded to a DOE concern regarding field program oversight by contracting for personnel to conduct independent field oversight.

20. Rockwell has identified actions necessary to correct the National Emissions Standards for Hazardous Air Pollutants (NESHAPs) program deficiencies and included these actions in the Five Year Plan.





11/7/89

PREDECISIONAL - OFFICIAL USE ONLY

21. The Rockwell RCRA/CERCLA group is in the process of correcting errors in logging of geologic cores through independent reanalysis of existing core materials.

22. Development of the RCRA incident reporting scheme has been completed and submitted to CDH.

23. Rockwell has moved forward with an extremely aggressive schedule to prepare Air Pollution Emission Notices for the Rocky Flats Plant.

24. Rockwell has not been responsive in submitting and updating quarterly status reports on appraisals.

25. Rockwell has made every effort to meet DOE's new and existing safety analysis requirements within available resources. However, resources may be inadequate to support the new safety analysis requirements now being promulgated by DOE and other agencies. Organization and responsibility changes in DOE make it difficult to identify resources needed for the future of the safety program.

PREDECISIONAL - OFFICIAL USE ONLY

FPA: QUALITY

Adjectival Grade: VERY GOOD

Noteworthy Achievements

1. A review of Rockwell Final Product Acceptance (Final PA) was conducted in August after the first year of Rockwell having the responsibility for most product acceptance. The results of the review, conducted by Albuquerque Operations Office in conjunction with the Rocky Flats Office, indicated that the Rockwell Final PA group was performing effectively. There were no findings and few remarks in the report summarizing the review.

2. Lot rejects and Final PA observations decreased during the second half of FY89 as a result of Rockwell efforts directed toward improvement in these areas. Specific actions include elimination of unnecessary operations, relocation of finish machined vendor product operations, implementation of technical improvements, and an increase in non-weapons quality activities.

Notable Deficiency

While a considerable amount of effort has been applied and a great deal has been accomplished, the DOE assessment conducted in August 1989, confirmed that the plant-wide implementation of DOE Order 5700.6B in the non-weapons area has not progressed at the accelerated rate expected. A strong commitment is needed to implement the updated management plan and schedule.

Observations

1. Indicators for plant yield and deviation reflected improvement in both areas. This improvement occured in spite of the fact that yield and deviation rates were already at highly desirable levels. This was the result of directed engineering efforts and a better understanding of processes.

2. The quality program for tractors and trailers in the Modification Center is marginal. The problem of identifying and documenting discrepancies still exists even though an additional engineer has been assigned by Rockwell. Significant deficiencies have been identified by DOE after these units have been accepted by Rockwell quality engineers. Although the need for a new quality plan has been identified, there seems to be little urgency to accomplish this in a timely manner.

3. A lack of process control and process engineering was evident from the production of numerous defective jamb steel blanks. A complete lack of control occurred when the production of these units was switched from Maintenance to Production Operations. No engineering or process definition was performed and the operation was allowed to proceed resulting in the scrapping of two months' worth of production.

4. Nonconformance to procedural requirements has continued primarily affecting paperwork associated with product. Incorrect changes to product paperwork and omissions of quality evidence occurred many times as discovered during a DOE quality audit in Building 460.

5. A considerable number of responses to Incoming Material Reports have been late.

PREDECISIONAL - OFFICIAL USE ONLY

6. Progress continues in the development of the Quality Information System. This is expected to continue to provide valuable information for quality improvement efforts.

PREDECISIONAL - OFFICIAL USE ONLY

FPA: COST MANAGEMENT

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. Rockwell has provided excellent support to both the Environmental Restoration and Waste Management Five-Year Plan and to the Modernization Study. Each of these budgetary submissions required development of detailed support in a very short time frame. Rockwell prepared the required data in a timely manner and furnished all required information.

2. Rockwell has done an extraordinary job of collecting information, categorizing and documenting the large number of new funding requirements created by the FBI/EPA investigation, the DOE Tiger team, and the DOE/CDH Agreement. The quality and consistency of information provided to the DOE has been high considering the changing situation and the number of areas impacted. Coordination and cooperation with the DOE has been exceptional.

3. The quality of Rockwell's support for its FY91 construction line items resulted in all projects which were validated being accepted for inclusion in the Department's 1991 budget request. Rockwell performed well in presenting data and narratives to Headquarters justification and validation review teams for the FY91 budget. Validation requests for backup cost estimating data were provided promptly and resulted in a satisfactory resolution of questions.

Notable Deficiencies

None

Observations

1. In deciding on final GPP allocations for the year, AL has continued to review the status of committed funds. Although commitment of funds has improved year-by-year, the support for the Plant's FY89 GPP requirements has been adversely affected by the balance of uncommitted funds at key points during the year.

2. Rockwell's financial management systems generally conform to DOE accounting practices and procedures. The accounting systems provide a reliable check on the accuracy of data and adherence to established policies, effective financial internal controls, and meaningful cost accounting data to management. However, a recent cash embezzlement has resulted in Rockwell identifying several weaknesses with respect to the cashier's operation. Implementation of all recommendations to correct these weaknesses is substantially complete.

3. Rockwell has been very responsive to a large number of DOE information requests regarding its August 4, 1989, ten point funding request to DOE. The DOE analysis of requirements and Rockwell's effort to support it have been hampered by the number and magnitude of questions and by legal issues surrounding the Plant's operations.

PREDECISIONAL - OFFICIAL USE ONLY

FPA: PRODUCTION OPERATIONS

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. Rockwell is continuing to make progress with its new scheduling philosophy which is designed to minimize work-in-process (WIP) inventories by managing bottlenecks. In the past year WIP inventories have been cut approximately in half. Production throughput time has been reduced substantially, from 76 to 31 days, for an improvement of 59%. Accompanying this WIP reduction has been continued improvement in schedule performance by Building 460 Fabrication.

2. The processing of procured finished machined products was consolidated within Building 460 to reduce overall process times and decrease costs. The move to Building 460 from Building 991 was completed ahead of schedule on August 3. Particularly noteworthy is that 100% manufacturing schedule compliance was maintained throughout the move and continues to be achieved in Building 460.

3. The halogenated solvent elimination program, in place since October 1987, continues to accomplish reductions. There has been a 49% reduction in solvent use across the plantsite, including an 80% reduction in the non-PSZ areas. The program has recently focused its emphasis on carbon tetrachloride use in the plutonium manufacturing areas.

Notable Deficiencies

None

Observations

1. The self-appraisal program instituted in all Production Operations buildings is an appropriate adaptation of the Building 771 Restart Criteria. In this program each Building Manager is required to conduct monthly appraisals in the areas of safety, hazardous waste management, conformance to standard operating procedures, etc. The common checklist approach devised for use in all buildings should enhance communications and standardization. The program, however, lacks effectiveness. The repetition of non-conforming conduct of operations as evaluated in the Technical Safety Appraisals and the various DOE on-site appraisals indicates a non-disciplined attitude and implementation. Substantial safety management attention is required to affect the safety culture work habits of the managers, supervisors and workers. Ownership throughout entire line management is required to enhance implementation.

2. Rocky Flats has continued its outstanding performance against IP schedules during the current period. Through September, the Plant had 22 consecutive months of 100% IP performance, despite a variety of major obstacles. The plant exceeded all production commitments on the W88 Program despite large production quantities and the redesign of a component. However, numerous events have highlighted continuing problems associated with product control and workload planning. Consistently, at the end of each month a need for considerable overtime has been evident in order to meet IP schedules, resulting in errors and mistakes. Specifically, a) a "D" Test Stem was omitted from a shipment to Allied Signal, b) segregation of SP993 units for "D" test was not accomplished and they were shipped to Savannah River Plant before testing, c) there was a failure to provide adequate packaging for Interconnect Tube Assemblies, d) there was a mishandling and reporting of a Type 123 Pit in Building 707 and e) a war reserve part was delivered to the Pantex Plant

PREDECISIONAL - OFFICIAL USE ONLY

with a red "acceptance required" stamp over one of two different "diamond" acceptance stamps.

3. Building 707 embarked on extensive radiation reduction efforts, including careful analysis and use of shielding, improved production clothing, and other conventional projects. Some experimental projects have also been launched including the prototype shielded bagout cart. This project could have plant-wide application and result in significant radiation exposure reductions.

4. Building 707 is piloting a Safety Action Team on second shift. The Team includes representatives from each organization in the building and seeks both to better communicate the range of building activities to all employees and to obtain input and ideas from all levels on key safety goals. Second shift was selected to pilot the program because management believed second-shift employees felt isolated from the mainstream and wanted to assure that these employees felt personally involved in changing the plant culture. Once the program is established, it will be extended to first shift.

5. Rockwell is structuring a systematic approach for future planning through the following initiatives within Production Operations:

- The Make or Buy Committee was reinstituted with line management leadership to develop a well documented decision process and has defined its task as consisting of more than the traditional make or buy decision: the make or buy task is considered to end only when certified products are provided to the floor. With this in view, the committee is developing simplified and more standard processing and reexamining order quantities on all finished machined items to enable shorter process times and greater efficiency.
- The Manufacturing Resource Planning (MRP) working group which has been operating since December 1988, with representation from all affected line and staff organizations, is seeking to plan system enhancement and support efforts on the basis of total Plant priorities rather than inter-group competition. The working group has developed a plant-wide priority list for current projects and is developing a comparable list for the most promising future projects.
- A continuous improvement team has been established by the MRP working group to develop a workable approach toward configuration management. This team is currently developing a process map for configuration management activities and is seeking to design a simpler system that effectively balances configuration control with responsiveness to customer requirements.

6. Rockwell's complex-wide leadership in manufacturing systems was demonstrated recently in assignment of serial numbers. Rockwell was asked to lead a complex-wide team to develop a common approach toward serial number assignment. The team supported Rockwell's approach as the most capable of providing for optimal future systems development and integration.

7. Incoming Material Reports (IMR's) continue to be generated as a result of duplicate serial numbers on parts sent to other sites. This issue requires coordination with design laboratories and other production plants.

8. Rockwell has identified opportunities to optimize operations for greater efficiency by implementing a new Plant policy and procedure on process material compatibility. These actions were taken in response to RFO quality survey findings. The new approach

provides greater responsiveness and increased efficiency while ensuring that incompatible process materials do not reach the floor. The system minimizes new process materials and eliminates compatibility evaluations except as necessary.

9. Over twenty waste minimization programs are being investigated currently by Rockwell Production Operations for implementation during FY90. A team of production engineers is reviewing manufacturing processes, and a review board has been established which includes Waste Operations, Production Operations, and area management.

PREDECISIONAL - OFFICIAL USE ONLY

FPA: CHEMICAL OPERATIONS

Adjectival Grade: VERY GOOD

Noteworthy Achievements

1. Plutonium Recovery Operations and Production Operations have been working in conjunction to develop the Nuclear Facility Operation Manual (NFOM). This manual is to establish the standard of excellence for operations of Rocky Flats Facilities. Buildings 707, 771, 776, and 777 have been designated as the initial buildings for the implementation of NFOM.

A coordinator was assigned to facilitate the implementation of NFOM in Building 771 for a pilot program for the quarter ending September 30. Several requirements of the manual have been incorporated into the operating activities. Shift relief and turnover meetings are being held and are being modified to reflect the requirements identified in the manual. A Plan-Of-The-Day meeting has been established to communicate daily activities with all organizations within the building. A new tracking and control system for maintenance work was introduced to enhance the needed coordination and accountability. Activities conducted within the building will be documented through operating procedures as necessary to comply with NFOM requirements.

A team was formed to perform the operational readiness review for the PROVE project. The team is using the Process Operational Readiness methodology as developed by EG&G's Idaho System Safety Development Center.

2. The Building 771 Restart Criteria listed 46 specific deliverables that Rockwell had to complete before restart approval would be granted. As a result, a number of procedures were changed or developed and implemented. This implementation was successful, and the building management team continues to develop and implement improvements to those procedures. This is most evident in the area of routine surveys. The Radiation Monitoring organization has realigned its staff and work load in order to properly emphasize and ensure compliance with the new requirements. In addition, the self surveillance program has been greatly expanded to manage the building operations. Another area showing improvement is the communication networking between the operational, maintenance and other support groups.

The building procedures that were put in place as a result of the shutdown have been very successful. The implementation of the housekeeping procedure has identified several hundred deficiencies and has resulted in closing out corrective actions in a timely manner. The building communication and safety knowledge and attention level throughout the building management team have increased as a result of the safety surveillance meeting. The waste container management program has also been successful in moving drums and crates out of the building in a timely fashion. The weekly drum and crate inventory shows the success of the program.

Notable Deficiencies

1. Rockwell has not published a recovery operations plan that clearly identifies the integrated sequencing and disciplined approach necessary to ensure successful material management. The contractor has not developed a work breakdown structure and scheduling system which accurately outlines operational sequencing, integrates all support organizations and metal demands, and effectively responds to operational and requirements changes in a timely fashion. The contractor has not implemented a cost control system.

PREDECISIONAL - OFFICIAL USE ONLY

The lack of these management systems results in excessive time delays for implementation of newly developed technologies, long lead times for new equipment installations and operation, burdensome work procedures, inefficient recovery operations, etc.

2. Rockwell has not established performance goals for process operations or measured process performances. The lack of goals is evident in problems associated with PRMP and poor process efficiencies in chemical recovery. There is a lack of recovery unit process efficiency improvement and integrated process improvement in the overall flow sheet.

Rockwell has not effectively identified needs and developed clear future direction. Baselines for all process systems have not been established, nor has a disciplined configuration management system been established and demonstrated (operating envelope manuals not completed or kept up to date). Rockwell has not provided a sound basis of technology nor technical advocacy for recovery operations. It did not provide sound technical requirements and conceptual design baselines for the PROVE, PRMP, and Building 771/776 upgrade projects. They did not provide a comprehensive, integrated development and demonstration program which supports design need dates with technical decisions for the PROVE, PRMP, and Building 771/776 improvements. Rockwell has not demonstrated a quality assurance management system in compliance with NQA-1 requirements that measures program effectiveness and compliance for designing, purchasing, developing, fabricating, installing, inspecting, testing, training, operating,etc.

Plans are in place to develop and implement a program for all Plutonium Recovery Operations activities (the Plutonium Recovery Operations Program). The preliminary document incorporating program objectives, activities, budget methodology, and resource requirements was released as a supplement to the FY91-92 Budget Submittal, the "Operating Budget for Plutonium Recovery Operations Program: Management Summary and Narrative."

## Observations

1. Building 771 management's development of a strategic plan is a positive step toward providing specific direction through the formulation of short and long-term goals for achieving continuous improvement. Implementation of the plan will support DOE's goal of excellence in facility operations through the development of performance goals, strengthening the building manager concept, Nuclear Facility Operation Manual implementation, and reinforcing an attitude of continuous improvement.

2. Building 771 management continues to take an aggressive, pro-active position on improving housekeeping and giving attention to details when performing daily operations. A number of efforts have been initiated that track, control, and correct deficiencies in facility condition or housekeeping. The basis is a building procedure that defines the housekeeping expectations and surveillance requirements. Communication channels have been put in place to facilitate problem identification and resolution.

3. Plutonium Operations has taken an aggressive role in implementing Building 771 Restart Criteria in the other recovery and waste processing buildings. All building management plans (including Housekeeping, Waste Container Management, Removal of Excess Equipment, Management Safety Surveillance, and Improved Working Environment) have been completed or are scheduled for completion in the near future.

4. Plutonium Recovery Operations successfully planned and executed a thorough radiation exposure analysis of the Building 776 recovery operations. Root causes of the elevated

radiation exposures were determined through the performance of non-operational baseline survey followed by operational phased startup survey. Final analysis is required to complete the identification of corrective actions. The surveys were professionally performed, with an enhanced cooperative effort between the hands-on workers and the technical staff.

5. Plutonium Operations was able to support Building 707 Production Operations metal requirements. However, Molten Salt Extraction (MSE), Electrorefining (ER) and Aqueous processing are all behind schedule. Rockwell's performance against pit disassembly schedules has fallen off during this period and is only about 20% of the committed schedule. This affects internal feed to molten salt extraction, as well as storage of retirement units at both Rocky Flats and Pantex. In addition, communications with DOE on problems and recovery plans have been less than optimum.

6. Plutonium Recovery Operations was successful in developing and producing dicesium hexachloroplutonate (DCHP) to significantly improve MSE process capacity and worker radiation safety. Despite a significant increase in metal throughput over last year, total cumulative penetrating radiation exposure has only increased 15% due to the use of DCHP. Overall contribution from neutron exposure to penetrating total exposure actually decreased. Total cumulative extremity radiation has only increased about 12%. However, the failure to develop written procedures for Material Control and Accountability measurements indicates a lack of discipline required of new process implementation for surety of operation.

7. A Plutonium Operations Quality Assurance Task Team was formed to develop a program to apply to all activities affecting quality in Plutonium Operations. This team developed a narrative form Quality Manual that identifies the requirements of the Non-Weapons Quality Manual to be applied to Plutonium Operations. All process operations and development as well as the associated equipment will be subject to quality assurance requirements plus various programmatic responsibilities within Plutonium Operations. Completion of the Plutonium Operations Quality Manual is scheduled for February 1990. An implementation plan for the Plutonium Operations Quality Assurance Program is currently being developed. A quality assurance plan is currently being written for Nuclear Materials Management.

8. A joint effort between Rockwell, United Nuclear Corporation, and Los Alamos National Laboratory (LANL) has been underway during FY89 to develop a detailed model of the material recovery and fabrication processes at Rocky Flats. The model is intended to provide scheduling support for development of the Master Nuclear Schedule and detailed two-week schedules for process planning. Rockwell has assumed the responsibility for program management of the project and is providing the primary coordination and direction for model development.

9. Plutonium Recovery Operations successfully developed and implemented the ER process, which became fully operational in October, 1988. ER has significantly increased Pyrochemical Operations ability to consistently produce high quality metal and support Building 707 foundry operations. In addition, the backlog of anode heels on plantsite was worked off by the end of April.

10. It should be noted that during this period the personnel in Building 886 have developed and installed a state-of-the-art device for performing inventories for liquid systems. This system has the potential for decreasing the uncertainty in the SNM liquid inventories by at least an order of magnitude. Implementation of this technology appears very appropriate for application in Building 771 and for the PRMP project.

## PRMP/PROVE

PRMP/PROVE FPA: <u>PROJECT MANAGEMENT</u>

Adjectival Grade: <u>EXCELLENT</u>

<u>Noteworthy Achievements</u>

1. Rockwell has taken an active role in establishing LANL technical personnel as a part of the PRMP structure. They have provided the opportunity for direct, immediate input by LANL staff in technical issues involving the project baseline. The initiative to place a LANL technical manager as an integral part of the PRMP staff is a landmark action for Rocky Flats/LANL cooperation.

2. Provisional agreement was reached by the Senior Management Review Board on the baseline PRMP process technologies. This agreement represents a significant milestone in project definition leading to an approved project baseline. The agreement also represents the culmination of many months of effort by the full PRMP technical team to analyze and establish the optimum processes for the PRMP baseline.

3. The management of the PROVE project has improved substantially during this period. Rebaselining was requested to put the project on a credible basis and performance against the new base has exceeded expectation. Problems in worker productivity, glovebox quality, and project control were addressed aggressively to maintain project momentum. The PROVE project has experienced a visible improvement in overall management which has resulted in a more disciplined and success-oriented project.

<u>Notable Deficiencies</u>

None

<u>Observations</u>

1. The Rockwell NQA-1 verification plan is applauded as a positive step to enhance quality. We believe this plan will provide a certifiable, auditable process system after installation is complete. Application of the plan to PRMP quality is anticipated to benefit the project.

2. The first major process Operational Readiness Review at Rocky Flats Plant has been initiated for PROVE. The effort has been initiated as a cooperative effort involving PROVE and Plutonium Operations personnel, as well as other Plant support. This disciplined approach to the review of readiness for operations is a positive action and a good example for future Plant start-up activities.

3. Rockwell has not provided an adequate system to produce timely and accurate project control information. Network Critical Path Method schedules have not been developed and requested manpower staffing plans have not been provided. The control systems being used, as reflected in performance information provided to the Project Management Office (PMO), are not oriented toward accuracy and timely response as the top priorities.

4. Rockwell has been slow to integrate a computerized, three-dimensional Plant Configuration Model (PCM) into the overall PRMP design strategy. Such a system is essential for control of construction interference and project costs. Although some

provision for the PCM exists in the Architect-Engineer (A-E) statement of work, Rockwell has not aggressively pursued this valuable tool.

5. No plan has been developed for implementation of an automated system for control of project documentation. A computer based network is needed to provide paperless storage and revision of System Design Descriptions and other key project information. An automated system would allow accurate action tracking, current project statusing, and simplifies configuration control activities. The development of an automated system to maximize the productivity of project participants must be expedited.

PREDECISIONAL - OFFICIAL USE ONLY

PRMP/PROVE FPA: COST MANAGEMENT

Adjectival Grade: VERY GOOD

Noteworthy Achievement

Rockwell has taken positive action to reduce the cost of A-E services. Overhead has been reduced and non-essential A-E services either eliminated or shifted to lower cost providers. The A-E has been required to meet their commitments, thus avoiding additional charges. Control measures have been upgraded to prevent an expansion of A-E effort beyond project requirements.

Notable Deficiency

The Cost and Schedule Reduction Precursor activity incurred over $100,000 cost without any visible or deliverable product. This indicates a lack of cost control in this area which is unacceptable. Corrective action is needed to assure that goals are developed and expected performance is clearly defined prior to costs being incurred.

Observations

1. Positive steps have been taken to maximize the productive time of construction workers to control PROVE costs.

2. Cost reporting has steadily improved and is coming into compliance with requirements of the Uniform Reporting System (URS) beginning in FY90.

PREDECISIONAL - OFFICIAL USE ONLY

PRMP/PROVE FPA: SCHEDULE PERFORMANCE

Adjectival Grade: VERY GOOD

Noteworthy Achievements

1. The PROVE test schedule has been prepared as an integrated effort between Plutonium Operations and PROVE engineering. The schedules have been used to balance manpower requirements and ensure effective scheduling of the test effort. The test plan appears to provide a complete and well-coordinated plan for meeting the test goals.

2. Detailed schedules have been developed for activities which are preliminary to PRMP construction. These schedules have been modified and analyzed several times in response to adjustments in environmental and safety documentation strategies. The schedules permit clear, quick and accurate adjustment and will provide a solid base for performance measurement.

Notable Deficiency

Schedule reports have not been provided in a form which ensures accuracy to the overall project schedules. Most reports are manually generated to provide a particular graphic presentation. This method of schedule reporting is more labor intensive and provides the continual opportunity for error because of the manual transfer of information between computer systems. A reporting format which takes advantage of current computer tools to ensure accuracy and timely reporting is required.

Observations

1. Despite quality problems resulting in extensive rework of delivered PROVE gloveboxes, Rockwell has remained within schedule thresholds while maintaining costs at acceptable levels.

2. The PROVE project is currently being run in a controlled and disciplined fashion with a clear focus on schedule performance. Problems are addressed quickly to minimize cost and schedule impact. The schedule and cost control of the project has improved over the period.

3. PRMP Master Level Schedules have been prepared to support the cost estimate currently being prepared. Material densities and manpower densities have been included to make a solid basis for the schedule and cost.

E 000356



11/7/89

PREDECISIONAL - OFFICIAL USE ONLY

PRMP/PROVE FPA: SUBCONTRACT MANAGEMENT

Adjectival Grade: VERY GOOD

Noteworthy Achievement

Rockwell has taken positive action to develop an A-E Statement of Work (SOW) which provides for their required services at an appropriate level of detail. Delays in SOW development caused by PRMP redefinition were addressed with the development of a Bridge SOW to maintain the A-E effort during transition.

Notable Deficiency

Inadequate Quality Assurance/Quality Control oversight of the glovebox subcontractor resulted in extra costs and delivery delays to the Government. Serious defects in interior installed piping welds required rework by both the PROVE glovebox subcontractor and Rockwell personnel. The initial corrective action failed to solve the original problem. Delivered equipment continued to require extensive rework.

Observations

1. J. A. Jones has not developed a Project Management System (PMS) that is compliant with Cost and Schedule Control System Criteria despite having spent over $350,000 on this effort. J. A. Jones not been demonstrated full implementation of NQA-1 for PROVE.

2. The A-E has taken action to upgrade their technical capabilities and replace key managers on the project team. Initial observations indicate that a more competent and integrated team of professionals is now assigned to the PRMP design.

3. Rockwell has made progress toward developing an integrated team of Rockwell staff and subcontractors. Agreements by the Senior Management Review Board and integration of subcontractor inputs demonstrate this progress.

PREDECISIONAL - OFFICIAL USE ONLY

PRMP/PROVE FPA: DESIGN QUALITY

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. Rockwell developed and implemented a Nonconformance Status Reporting (NSR) system to support a PROVE Operational Readiness Review. The NSR tracks nonconforming items to completion, providing a verification that actions are being addressed to prepare for eventual project acceptance and operation. With further refinements, the system should be useful to support PRMP activities.

2. Rockwell has nearly developed a complete set of System Design Descriptions (SDD's) for the PRMP. These SDD's will establish the design basis of the overall PRMP at the conceptual design stage. Although behind the original schedule, these SDD's significantly increase the quality and completeness of the conceptual design documentation for the project. These SDD's are fundamental to the design and configuration control efforts throughout the life of the facility.

Notable Deficiencies

None

Observations

1. Over 2000 drawings have been verified to establish a set of valid, as-built drawings for use by Maintenance, Operations and Facility Engineering personnel. This effort has progressed ahead of schedule.

2. An SDD was developed for PROVE to provide full documentation for the design. An independent review was completed and identified problems with the SDD. Correction of the actions from the review is required to create the first comprehensive SDD at the Rocky Flats Plant.

3. Rockwell has taken action to evaluate the applicability of Nuclear Regulatory Commission Regulations to the PRMP and the level to which DOE Order 6430.1A, General Design Criteria, should be incorporated. This effort will place the project in a sound position for completing the design with minimal future impacts. It also provides a sound basis for the decisions needed to establish the technical baseline for design.

E 000358

PREDECISIONAL - OFFICIAL USE ONLY

PRMP/PROVE FPA: TECHNICAL PRODUCT QUALITY

Adjectival Grade: EXCELLENT

Noteworthy Achievement

The PRMP has made significant progress in developing the technical baseline for the project. Technology alternatives were analyzed by broad-based teams against the most current DOE goals and criteria. The proposed technologies were incorporated into an overall PRMP design which was integrated and balanced between individual processes. The product of this nearly complete effort is a comprehensive, disciplined analysis supporting the selection of the PRMP technology baseline. This technical baseline will support the future design and construction of PRMP and facilitate the validation of the project.

Notable Deficiencies

None

Observations

1. Rockwell does not currently require periodic, independent audit of NQA-1 compliance and Non-Conformance Report actions. Responsibility for resolution of Non-Conformance Report actions is within the project chain of management. QA staff independence is important to ensure that quality actions are completed without prejudice.

2. A QA plan for PRMP has not been completed. Completion of the QA plan is required prior to start of the full design effort and Title I activities.

3. Rockwell developed an aggressive schedule and effort to correct welding problems on the internal glovebox piping. Good progress has been made against this plan and the quality of the glovebox construction has been assured.

PERFORMANCE APPRAISAL
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

The overall performance of Rockwell International Corporation (Rockwell) has been at the level of "Satisfactory" during the period April 1 through September 30, 1989.

The following are seperate evaluations of the performance of Rockwell relative to the management and operation of the Rocky Flats Plant and the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the selected Functional Performance Areas (FPA's). The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's have been evaluated in accordance with the contract Award Fee Plan, and the following summary of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

PLANT

<u>GENERAL MANAGEMENT:</u> There is considerable evidence of Rockwell management's inability to effectively manage this facility, and this is seen by DOE to be a serious, major deficiency. This serious, major deficiency is manifested in lack of progress in integrating safety responsibility and accountability at all working levels and also by deficient lines of responsibility, procedures, discipline/work ethic, training, on-floor supervision, and problem investigation/resolution. Numerous incidents provide evidence of the above deficiencies. Additionally, despite an increase in nitrate concentrations on the 750 Pad, little action has been taken to contain saltcrete after precipitation events. The preparation for the annual DOE inventory of Special Nuclear Material at Rocky Flats was less than satisfactory.

The C-Centerline Project in Building 707 was an outstanding example of an integrated operating philosophy that can assure safety while providing for the capability to continue operations of a production facility. Rockwell successfully completed a complex central telephone system acquisition. Rockwell's logistical and security support of DOE "Tiger Team" activities and Rocky Flats Office moves has been extraordinary. Rockwell has provided valuable support to DOE teams negotiating RCRA/CERCLA agreements with the Environmental Protection Agency (EPA) and the Colorado Department of Health (CDH). Notable progress was made in five areas involving system automation. A maintenance work control system has been automated and implemented which enhances planning processes, establishes priorities, supports integrated schedules and provides deficiency tracking. The quantity and quality of support to the PRMP project has increased dramatically over this reporting period.

<u>ENVIRONMENT, SAFETY & HEALTH:</u> Long term understaffing in the Health, Safety and Environment organization resulted in less than adequate attention applied to several essential projects and safety functions. Rockwell was unsuccessful in reaching their Plant Performance Goal for recordable injuries and in reducing the total number of workplace contamination incidents. Rockwell continues to have problems in the construction safety area. Rockwell failed to exercise an acceptable level of program management in the development of official recommendations for restart of the Building 374 evaporator. A

criticality safety assessment performed in August, 1989 noted many aspects of the criticality safety program which need improvement. Rockwell failed to exercise an acceptable level of program management in dealing with pondcrete and saltcrete. Rockwell's oversight of the environmental subcontractors performing routine environmental monitoring is deficient. As identified in the DOE-HQ assessment team report, deficiencies in the RFP effluent air monitoring program may adversely affect determination of radioactive materials released to the atmosphere. Waste shipments to Idaho and Nevada were marked by errors in manifests and contamination on waste packages which jeopardized the future of offsite disposal plans.

Rockwell took positive actions to upgrade the overall quality, capability, and performance of the Rocky Flats radiation instrumentation systems in FY89. Rockwell developed and implemented a plantwide ALARA (As Low As Reasonably Achievable) Program exceeding DOE requirements. Rockwell has responded in a very timely fashion to the new surface water release requirements imposed by the State of Colorado. The extent of the characterization of subsurface contamination has exceeded the requirements of the Agreement in Principle with the State of Colorado. Rockwell assisted in the negotiations of the important Settlement Agreement and Compliance Order on Consent pertaining to interim status issues. Rockwell has submitted all required documentation pertaining to environmental restoration on schedule. Rockwell prepared a detailed Five Year Plan revision (8/31/89) in a very short time period. A new Rockwell Radiological Engineering group was created in FY89 and several notable tasks have already successfully been completed.

<u>QUALITY:</u> The plant-wide implementation of DOE non-weapons quality assurance requirements has not progressed at the accelerated rate expected.

The Rockwell Final Product Acceptance group is performing effectively after the first year of having the responsibility for most product acceptance. Lot rejects and Final Product Acceptance observations decreased during the second half of FY89.

<u>COST MANAGEMENT:</u> Rockwell provided excellent support to both the Environmental Restoration and Waste Management Five-Year Plan and to the Modernization Study. Rockwell did an extraordinary job of collecting information, categorizing and documenting the large number of new funding requirements created by the FBI/EPA investigation, the DOE Tiger teams, and the DOE/CDH Agreement. All validated construction line item projects were included in the Department's 1991 budget request.

<u>PRODUCTION OPERATIONS:</u> The processing of procured finished machined products was consolidated within Building 460 to reduce overall process times and decrease costs. Rockwell has been effective in reducing halogenated solvent usage, and continues to make progress with its new scheduling philosophy which is designed to minimize work-in-process inventories by managing bottlenecks.

<u>CHEMICAL OPERATIONS:</u> Plutonium Recovery Operations and Production Operations have been working in conjunction to develop the Nuclear Facility Operation Manual, which is to establish the standard of excellence for operations of Rocky Flats facilities. As a result of the deliverables that Rockwell had to complete before Building 771 restart approval was granted, a number of procedures were changed or developed and implemented. This implementation was successful, and the building management team continues to develop and implement improvements to those procedures.

Rockwell's management controls and directives in areas such as recovery operations planning, work breakdown structure and scheduling systems, and cost control systems

result in implementation/installation/operation delays and other problems. There continues to be a failure to establish performance goals for process operations and to measure process performance; therefore, operations are not baselined to provide for improved performance.

## PRMP/PROVE

PROJECT MANAGEMENT: Rockwell has taken an active role in establishing Los Alamos National Laboratory technical personnel as a part of the PRMP structure. Provisional agreement was reached by the Senior Management Review Board on the baseline PRMP process technologies. The PROVE project has experienced a visible improvement in overall management which has resulted in a more disciplined and success-oriented project.

COST MANAGEMENT: Rockwell has taken positive action to reduce the cost of A-E services, including reducing overhead, requiring the A-E to meet commitments, and upgrading control measures over the scope of A-E work.

The Cost and Schedule Reduction Precursor activity incurred over $100,000 cost without any visible or deliverable product, which indicates an unacceptable lack of cost controls.

SCHEDULE PERFORMANCE: The PROVE test schedule has been prepared as an integrated effort between Plutonium Operations and PROVE engineering. Detailed schedules have been developed for activities preliminary to PRMP construction and which will provide a solid base for performance measurement.

Schedule reports have not been provided in a form which ensures timely reporting and accuracy to the overall project schedules.

SUBCONTRACT MANAGEMENT: Rockwell has taken positive action to develop an A-E Statement of Work which provides for their required services at an appropriate level of detail.

Inadequate Quality Assurance/Quality Control oversight of the glovebox subcontractor resulted in extra costs and delivery delays to the Government.

DESIGN QUALITY: Rockwell developed and implemented a Nonconformance Status Reporting system to support a PROVE Operational Readiness Review. Rockwell nearly developed a complete set of System Design Descriptions which will significantly increase the quality and completeness of the conceptual design documentation for the project.

TECHNICAL PRODUCT QUALITY: The PRMP has made significant progress in developing the technical baseline which is expected to support the future design and construction of PRMP and facilitate the validation of the project.

PREDECISIONAL/OFFICIAL USE ONLY

# AWARD FEE RECOMMENDATION

CONTRACT NO: DE-AC04-76DP03533

CONTRACTOR: ROCKWELL INTERNATIONAL CORPORATION - PLANT

PERIOD: APRIL 1 - SEPTEMBER 30, 1989

## PERFORMANCE EVALUATION REVIEW BOARD RECOMMENDATION

| EPA's | ADJECTIVAL GRADE | NUMERICAL GRADE | X | WEIGHT | = | SCORE |
|---|---|---|---|---|---|---|
| General Management | GOOD | 81 | | 25% | | 20.25 |
| Environmental, Safety and Health | MODERATELY GOOD | 78 | | 20% | | 15.60 |
| Quality | VERY GOOD | 90 | | 15% | | 13.50 |
| Cost Management | EXCELLENT | 93 | | 15% | | 13.95 |
| Production Operations | EXCELLENT | 91 | | 15% | | 13.65 |
| Chemical Operations | VERY GOOD | 86 | | 10% | | 8.60 |
| | | | | 100% | | 85.55 |

Maximum Available Award Fee
$6,822,000

Recommended Fee
$3,114,245

### Suggested Range of Fees

| | | | |
|---|---|---|---|
| Minus Two Points | $2,527,614 | 83.55 | (37.1%) |
| Minus One Point | $2,797,629 | 84.55 | (41.0%) |
| Recommended Award Fee | $3,114,245 | 85.55 | (45.7%) |
| Plus One Point | $3,468,989 | 86.55 | (50.9%) |
| Plus Two Points | $3,823,733 | 87.55 | (56.1%) |

### Award Fee Determination Official Contractual Limitations

$ -0- to $6,822,000 (Maximum Available Award Fee)

[signature]
Chairman
Performance Evaluation Review Board

PREDECISIONAL - OFFICIAL USE ONLY

AWARD FEE RECOMMENDATION

CONTRACT NO: DE-AC04-76DP03533

CONTRACTOR: ROCKWELL INTERNATIONAL CORPORATION - PRMP/PROVE

PERIOD: APRIL 1 - SEPTEMBER 30, 1989

PERFORMANCE EVALUATION REVIEW BOARD RECOMMENDATION

| EPA's | ADJECTIVAL GRADE | NUMERICAL GRADE | X | WEIGHT | = | SCORE |
|---|---|---|---|---|---|---|
| Project Management | EXCELLENT | 91 | | 25% | | 22.75 |
| Cost Management | VERY GOOD | 87 | | 15% | | 13.05 |
| Schedule Performance | VERY GOOD | 90 | | 15% | | 13.50 |
| Subcontract Management | VERY GOOD | 86 | | 20% | | 17.20 |
| Design Quality | EXCELLENT | 91 | | 15% | | 13.65 |
| Technical Product Quality | EXCELLENT | 91 | | 10% | | 9.10 |
| | | | | 100% | | 89.25 |

Maximum Available Award Fee
$969,300

Recommended Fee
$628,982

Suggested Range of Fees

| | | | |
|---|---|---|---|
| Minus Two Points | $528,174 | 87.25 | (54.5%) |
| Minus One Point | $578,578 | 88.25 | (59.7%) |
| Recommended Award Fee | $628,982 | 89.25 | (64.9%) |
| Plus One Point | $685,698 | 90.25 | (70.8%) |
| Plus Two Points | $761,352 | 91.25 | (78.6%) |

Award Fee Determination Official Contractual Limitations

$ -0- to $969,300 (Maximum Available Award Fee)

[signature]
Chairman
Performance Evaluation Review Board

PREDECISIONAL - OFFICIAL USE ONLY

PREDECISIONAL - OFFICIAL USE ONLY

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

PLANT

| FUNCTIONAL PERFORMANCE AREA | FY89 WEIGHT | PREVIOUS 6 MONTHS RATING | CURRENT 6 MONTHS ~~PERB~~ RECOMMENDED RATING: RATING | GRADE |
|---|---|---|---|---|
| General Management | .25 | 81 | 81 | 20.25 |
| Environmental, Safety and Health | .20 | 65.25 | 78 | 15.60 |
| Quality | .15 | 88 | 90 | 13.50 |
| Cost Management | .15 | 95 | 93 | 13.95 |
| Production Operations | .15 | 96 | 91 | 13.65 |
| Chemical Operations | .10 | 91 | 86 | 8.60 |
| | 1.00 | 84.25 | | 85.55 |

| PERFORMANCE POINTS EARNED | AWARD FEE PER POINT | AWARD FEE |
|---|---|---|
| 0 - 70 | $ -0- | -0- |
| 71 - 75 | 109,152 x 5.0 | $ 545,760 |
| 76 - 80 | 204,660 x 5.0 | 1,023,300 |
| 81 - 85 | 270,015 x 5.0 | 1,350,075 |
| 86 - 90 | 354,744 x .55 | 195,110 |
| | | $ 3,114,245 |

| BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|
| $379,000 | $3,114,245 | $3,493,245 |

| BASE FEE | MAXIMUM AF | TOTAL |
|---|---|---|
| $379,000 | $6,822,000 | $7,201,000 |

% RECOMMENDED AWARD FEE VS. MAXIMUM AWARD FEE 45.65%

% OF TOTAL RECOMMENDED FEES VS. TOTAL MAXIMUM FEES 48.51%

PREDECISIONAL - OFFICIAL USE ONLY

PREDECISIONAL - OFFICIAL USE ONLY

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

PRMP/PROVE

| FUNCTIONAL PERFORMANCE AREA | FY89 WEIGHT | PREVIOUS 6 MONTHS RATING | CURRENT 6 MONTHS *PERB RECOMMENDED RATING | |
|---|---|---|---|---|
| | | | RATING | GRADE |
| Project Management | .25 | 75 | 91 | 22.75 |
| Cost Management | .15 | 76 | 87 | 13.05 |
| Schedule Performance | .15 | 86 | 90 | 13.50 |
| Subcontract Management | .20 | 82 | 86 | 17.20 |
| Design Quality | .15 | 78 | 91 | 13.65 |
| Technical Product Quality | .10 | 76 | 91 | 9.10 |
| | 1.00 | 78.75 | | 89.25 |

| PERFORMANCE POINTS EARNED | AWARD FEE PER POINT | AWARD FEE |
|---|---|---|
| 0 - 70 | $ -0- | -0- |
| 71 - 75 | 15,509 x 5.0 | $ 77,545 |
| 76 - 80 | 29,079 x 5.0 | 145,395 |
| 81 - 85 | 38,365 x 5.0 | 191,825 |
| 86 - 90 | 50,404 x 4.25 | 214,217 |
| | | $ 628,982 |

| BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|
| $53,850 | $628,982 | $682,832 |

| BASE FEE | MAXIMUM AF | TOTAL |
|---|---|---|
| $53,850 | $969,300 | $1,023,150 |

% RECOMMENDED AWARD FEE VS. MAXIMUM AWARD FEE 64.89%

% OF TOTAL RECOMMENDED FEES VS. TOTAL MAXIMUM FEES 66.74%

PREDECISIONAL - OFFICIAL USE ONLY

PREDECISIONAL - OFFICIAL USE ONLY

RECOMMENDED AWARD FEES
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

SUMMARY

| | BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|---|
| PLANT | $379,000 | $3,114,245 | $3,493,245 |
| PRMP/PROVE | 53,850 | 628,982 | 682,832 |
| TOTAL | $432,850 | $3,743,227 | $4,176,077 |

| | |
|---|---|
| MAXIMUM AWARD FEE FOR PLANT | $6,822,000 |
| MAXIMUM AWARD FEE FOR PRMP/PROVE | 969,300 |
| TOTAL MAXIMUM AWARD FEE | $7,791,300 |

% RECOMMENDED AWARD FEE VS. MAXIMUM AWARD FEE 48.04%

PREDECISIONAL - OFFICIAL USE ONLY

United States Government

# memorandum

Department of Energy
Rocky Flats Office

DATE:

REPLY TO
ATTN OF: ADM

SUBJECT: Rocky Flats Office Award Fee Determinations for the Period April 1 through September 30, 1989

TO: John C. Tuck
Acting Assistant Secretary for Defense Programs, DP-1, HQ

Rocky Flats Office has completed its award fee (AF) evaluation of Rockwell International for the subject period. The process included staff level assessment against the Award Fee Plan, consolidation of those assessments by the Performance Evaluation Committee, review and modification as appropriate by the Performance Evaluation Review Board, and presentation to me for a final determination.

My tentative findings are highlighted below for your concurrence. Attached is the Performance Evaluation Report which will be sent to Rockwell as well as other supporting information developed during the award fee process.

Rockwell International Corporation - Rocky Flats Plant

A. Award Fee for Plant

| Last Period | This Period |
|---|---|
| Actual AF - $2,716,624 | Proposed AF - $3,114,245 |
| % of AF Pool - 39.82% | % of AF Pool - 45.65% |
| % of Total Fee Pool - 42.99% | % of Total Fee Pool - 48.51% |

Most Notable Deficiencies

-- Managements inability to effectively manage this facility is seen as a serious, major deficiency
-- Little action taken to contain saltcrete after precipitation events
-- Inadequate attention to essential projects and safety functions as a result of long term understaffing in the HS&E organization
-- Implementation of non-weapons quality assurance requirements are not progressing at the accelerated rate expected

Most Noteworthy Achievements

-- Showed, in the C-Centerline project in Building 707, that an integrated operating philosophy is possible

-- Upgraded radiation instrumentation quality and performance
-- Developed and implemented a plant-wide ALARA program
-- Positive and prompt response to new agreements with and requirements from the State of Colorado
-- Developing a Nuclear Facility Operations Manual

B. Award Fee for PRMP/PROVE

| Last Period | This Period |
| --- | --- |
| Actual AF - $186,591 | Proposed AF - $628,982 |
| % of AF Pool - 19.25% | % of AF Pool - 64.89% |
| % of Total Fee Pool - 23.50% | % of Total Fee Pool - 66.74% |

Most Noteworthy Achievements

-- Dramatic increase in PRMP project support by management
-- Active role in establishing LANL technical personnel as part of the PRMP structure
-- Improved A-E cost control, commitments, and SOW development
-- Significant progress in developing technical baseline for PRMP

Most Notable Deficiencies

-- Unaccepatable cost control in the Cost and Schedule Reduction Precursor activity
-- Schedule reports not provided in form ensuring timely reporting and accuracy to the overall project schedules
-- Inadequate QA/QC oversight of glovebox subcontractor

Please indicate your concurrence/nonconcurrence below. If you have questions or if additional information is required, please let me know.

David P. Simonson
Manager

5 Attachments

[ ] Concur [ ] Nonconcur

John C. Tuck
Acting Assistant Secretary for
Defense Programs

PL. SUPP. EX. 82

**SUMMARY MEMORANDUM**

SECRETARIAL ACTION REQUESTED BY:

Date:

Orig. Office: DP-231 (M. Arendale, 3-2984)

Transmittal: <u>ACTION</u>: Award Fee Determination for Rockwell International Corporation (RI) at the Rocky Flats Plant under Contract No. DE-AC04-76DP03533, for the Period April 1 through September 30, 1989.

To: Deputy Secretary, S-2

Issue: Should RI's Award Fee be reduced from $4,176,077 to $2,931,278?

Timing: URGENT, prompt notification of award fee determination is required.

Discussion: A decrease is recommended in the award fee for RI as proposed by the Award Fee Determining Official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 30% lower than that proposed by the AFDO, and in our estimation more accurately reflects the level of performance of RI during the rating period.

Specifically, we have recommended a total fee (award fee plus base fee) of $2,931,278 as compared to the AFDO recommendation of $4,176,077.

Conclusion: Concur in the Headquarters decrease in total fee for RI.

Plaintiff/Defendant Deposition Exhibit 136
Case # 91-1362C
Date 12-8-92
Hyatt Court Reporting

John C. Tuck
Under Secretary

Agree ______________________

Disagree ______________________

Concurrence: EH______________________
Jan./ /90

RECEIVED FROM Admiral Barr to Simonson on 1/11/90 (HANDCARRIED)
Agy Received 1/12/90 from H. Miller.
Per Miller, Simonson does not agree with this and wants comparison with our proposal so RFO position can be developed.

(LATER REVISED By HQ)

E 000265

PL. SUPP. EX. 83

ted States Government **Department of Energy**

# memorandum

ES. 90-003243

SUMMARY MEMORANDUM

**Date:** February 22, 1990 **SECRETARIAL ACTION REQUESTED BY:** 02/27/90

Orig. Office: DP-231 (M. Arendale, 3-2984)

Transmittal: **ACTION:** Award Fee Determination for Rockwell International Corporation (RI) at the Rocky Flats Plant under Contract No. DE-AC04-76DP03533 for the Period April I through September 30, 1989.

To: Deputy Secretary, S-2

Issue: Should RI's award fee be reduced from $4,176,077 to $2,012,489?

Timing: URGENT, prompt notification of award fee determination is required.

Discussion: A decrease is recommended in the award fee for RI as proposed by the Award Fee Determining Official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 52 percent lower than that proposed by the AFDO and, in our estimation, more accurately reflects the level of performance of RI during the rating period. Specifically, we have recommended a total fee (award fee plus base fee) of $2,012,489 as compared to the AFDO recommendation of $4,176,077. For the previous 6-month period, RI was awarded a total fee of $3,336,065 (see attachment 1 for comparison).

Recommendation: Concur in the Headquarters decrease in total fee for RI.

John C. Tuck
Under Secretary

Agree ____

Disagree ____ Date 2/23/90

Concurrence: EH/Brush (no objections)
Feb./22/90

Plaintiff/Defendant Deposition Exhibit 143
Case # 91-1362C
Date 12-8-92
Hyatt Court Reporting

E 001754

PL. SUPP. EX. 84

United States Government MOVS EDST UI-40T Department of Energy

# memorandum

DATE: August 21, 1989

REPLY TO ATTN OF: S-2

SUBJECT: Award Fee Contracting Process

TO:

Assistant Secretary, Conservation and Renewable Energy
Assistant Secretary for Defense Programs
Assistant Secretary for Fossil Energy
Assistant Secretary for Nuclear Energy
Director of Energy Research
Operations Office Managers
Head of Contracting Activity, Headquarters (MA-45)

As we have discussed, internal Departmental reviews, as well as General Accounting Office and Congressional reports, have recommended that improving our award fee process for our management and operating contracts should include greater interaction between the Headquarters program officials and the Operations Office Managers. To encourage more interaction, we have, among other actions, instituted a review process whereby each award fee plan and fee determination will come to Headquarters for review and concurrence prior to issuance to the contractor.

These reviews, however, are not the final answer to the need for increased interface. To ensure that the award fee system is a truly effective tool in managing our major contractors, the award fee plan for each contract must reflect the Department's restructured objectives and priorities. This is your responsibility. To accomplish this, Operations Office Managers and the cognizant Assistant Secretaries must work together throughout the award fee process to establish meaningful, challenging objectives in the award fee plans; to ensure that the objectives are prioritized appropriately; and to make certain that the fee determination honestly reflects the Department's assessment of the contractor's performance against the objectives.

Your performance of these responsibilities is crucial to the success of our contracting system. Thank you for your cooperation in implementing these improvements in the award fee process.

W. Henson Moore
Deputy Secretary

EXHIBIT 54

E 001639

PL. SUPP. EX. 85

United States Government

Department of Energy

# memorandum

Albuquerque Operations Office

DATE: FEB 26 1990

REPLY TO ATTN OF: CPD

SUBJECT: Fee Determination Official

TO: Robert M. Nelson, Jr., Manager, Rocky Flats Office

As Manager, Rocky Flats Office, you are hereby designated as the Fee Determination Official (FDO) for the Rockwell International Management and Operating Contract DE-AC04-76DP03533. As the FDO, you will be required to make award fee decisions for the appraisal periods specified in the Contract.

If you have any questions regarding this matter, please contact me at FTS 845-6049.

Bruce G. Twining
Manager

PL. SUPP. EX. 86

JUL 27 1989

Plaintiff/Defendant Deposition Exhibit
25
Case # 91-1362 C
Date 10-23-92

ADM:CHB

CPAF Evaluation for 2nd Half of FY 1989

Dominick J. Sanchini.
President
Rockwell International, AERO, RFP

As you are aware, Secretary of Energy, James D. Watkins, has placed a heavy emphasis on Environment, Safety and Health in DOE's evaluation of its Contractors. Goals and Objectives established for Rockwell in A. E. Whiteman's memorandum of January 12, 1989, "CPAF Goals and Objectives for FY89" correlates closely with this emphasis. This approach for the second half of FY 1989 was reaffirmed in our memorandum of April 18, 1989, signed by Ron L. Foster for Whiteman.

I am providing you with this memorandum to assure that there is no misunderstanding regarding the Rocky Flats Office's emphasis on Environment, Safety, and Health in evaluating your performance for the second half of FY 1989. The Functional Performance Areas (FPA's) which we will evaluate will by those established by Modification No. 128 to your contract. In evaluating those FPA's, the criteria established by the January 12 and April 18 memorandums will be heavily emphasized in our evaluations of the FPA's, General Management, Quality Assurance, and Environment, Safety and Health. These FPA's collectively account for sixty per cent of your CPAF score.

Please contact me or have your staff contact Claude Barkmeier of my staff on extension 4263 if you have further questions.

Edward S. Goldberg
Acting Area Manager

bcc: Terrell Cone, Jr., OCB, CPD, AL

| | | |
|---|---|---|
| CH/ADMIN BR | RL | ACT AREA MGR |
| Barkmeier:rd | Wilcynski | Goldberg |
| 07/25/89 | 07/ /89 | 07/ /89 |

RI Contract 6
(a) O&M 17

E 000777

PL. SUPP. EX. 87

APR 05 1989

ADM:TA

Functional Performance Areas - Second Half Fiscal Year 1989

Dominick J. Sanchini
President
Rockwell International, AERO, RFP

The list of approved FPA's for the second half of FY89 is as follows:

| Plant FPA's | Weight |
|---|---|
| General Management | 25% |
| Cost Management | 15% |
| Quality | 15% |
| Production Operations | 15% |
| Environment, Safety & Health | 20% |
| Chemical Operations | 10% |
| | 100% |

| PRMP/PROVE FPA's | Weight |
|---|---|
| Project Management | 25% |
| Cost Management | 15% |
| Schedule Performance | 15% |
| Subcontract Management | 20% |
| Design Quality | 15% |
| Technical Product Quality | 10% |
| | 100% |

Albert E. Whiteman
Area Manager

| ADMIN BR | CH/ADMIN BR | AREA MGR |
|---|---|---|
| Agy:rd | Barkmeier | Whiteman |
| 04/03/89 | 04/ /89 | 04/ /89 |

PL. SUPP. EX. 88

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

-oOo-

UNITED STATES OF AMERICA and
UNITED STATES OF AMERICA, ex
rel. James M. Stone,

Plaintiffs,

-vs- Case No. 89-M-1154

ROCKWELL INTERNATIONAL
CORPORATION, et al.,

Defendants.
_______________________________/

DEPOSITION OF EDWARD S. GOLDBERG

called for examination by counsel for defendants pursuant to Notice, at the offices of Sierra Nevada Reporters, 332 Ryland Street, Reno, Nevada, at 9:00 a.m., Thursday, April 23, 1998, before Kristine A. Bokelmann, a certified court reporter.

APPEARANCES: (See Separate Page.)

Reported by: Kristine A. Bokelmann, CCR #165

Q Okay.

A It's the first half, no, I don't recall, yeah.

Q Okay.

A Right.

Q So the record's clear, you agree that the reference to September 30, 1989 refers to the end of the six-month period, correct?

A Right, right.

Q And that this particular document appears to relate to the first half of the six-month period?

A Right, you're correct.

Q Let me show you what's been marked as Exhibit 25 in the court of claims case.

A Okay.

Q Do you recall sending -- well, first of all, do you recall sending this letter to Rockwell on or about July 27th of 1989?

A I don't have a recollection.

Q Do you recall discussions with Rockwell about a different emphasis being placed upon environmental issues during the second half of fiscal 19 --

A I did have such a conversation, but I don't remember the specifics.

Q Okay. What generally do you recall about that conversation with Rockwell?

A It had to do with the emphasis on environment, safety, health, general quality assurances, based on my team and the fact that I needed to have the president, Mr. Sanchini, understanding exactly where the Department of Energy was coming from.

Q And that conversation would have been with Mr. Sanchini?

A Yes.

Q Do you have any further recollections of that subject matter being discussed?

A No, just generally that I had that conversation, and I remember that.

Q Thank you.

(Discussion off the record.)

BY MR. PLISSEY:

Q Back on the record.

I've asked the witness to review Exhibit 52 from his previous deposition in the claims case. Have you finished reviewing that document, sir?

A Yes, I have.

Q Do you remember receiving a copy of this document at any point in time prior to --

A I don't have any recollection of this document.

Q Okay. There's a reference to Bar's review, and the last two pages appear to be a draft letter from J.M. Bar.

PL. SUPP. EX. 89

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 90-K-181

------------------------------
MERILYN COOK, et al.,

Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION,
and THE DOW CHEMICAL COMPANY,

Defendants.

------------------------------

Washington, D.C.
Monday, April 22, 1996

Transcript of videotaped testimony of JAMES D. WATKINS, as taken by and before KATHLEEN A. PAGLIONE, Federally-Approved Registered Professional Reporter and Notary Public, at the offices of Cohen, Milstein, Hausfeld & Toll, 1100 New York Avenue, N.W. Suite 500, commencing at 10:05 o'clock in the forenoon.

- - -

-JAMES D. WATKINS-

as Secretary of Energy?

A. That's correct.

Q. Okay. And by the way, sir, the first three pages of this is a Department of Energy press release. Was it the practice at the DOE to issue press releases when important initiatives or announcements were made?

A. I had a press conference, so this release was coincident with the conference. I brought in every single writer that I could find, Washington Post, New York Times, you name it, all the people that had been criticizing and I said, we've stopped the process. We've gone back to new ground zero. We're going to go after these issues and we're taking a whole new turn in our approach to the culture that is necessary to change this department.

And this is only linked with the five-year plan in one element, which says, we got to get on with cleaning up

-JAMES D. WATKINS-

the mess. So the five-year plan you talked about that I wrote to Reilly on has only little to do with this. It is an important sub-element, but it's only one element.

Q. It's one of your ten initiatives?

A. It's one of my ten initiatives.

Q. Okay. Now, this -- both the press release that are the first three pages of this exhibit and then there are remarks which follow the remarks --

A. The remarks were made at the press conference.

Q. And you delivered these remark at the press conference?

A. I delivered the remarks at the press conference, I had all kinds of graphs, I had support from my people, major departmental expose' of this, and this was the key initiative triggered off by two events, the Rocky Flats raid, with

-JAMES D. WATKINS-

subsequent findings that were emerging by this time.

But it was also triggered off by a visit to me from the President of the National Academy, who said they'd gotten another request from Congress to do something to review the Waste Management Program of the Department of Energy, and Dr. Frank Press said, this was in June, I'm not going to do any more because DOE pays no attention to the National Academy, witness the '87 reports that I mentioned earlier in discussions this morning.

That was too much for me. I knew Frank Press. I know the National Academy. I've had many dealings with them. They're the best in the nation. And we weren't paying attention. It was the same cultural problems that I had outlined in my earlier speech. I didn't know how deep they were.

But the combination of those two, I'm now going to announce my

-JAMES D. WATKINS-

Ten-Point Plan. I'm tired of fooling around with it. And we got to get -- we got to get professional and serious about what we're doing here in this department, and that was it.

Q. Okay.

MR. KURTENBACH: Move to strike.

A. And from that point on, we moved out.

Q. And your press release took place on June 27th, 1989 as indicated on the press release under Remarks?

A. Yes, I have no reason to doubt that, I assume that's the correct date.

Q. Did you personally prepare the remarks which were delivered at that press conference, sir?

A. Probably not, but I certainly modified them.

I mean, the idea was people prepared -- this came up from seven different branches of my department. I

-JAMES D. WATKINS-

had a Nuclear Safety Office that I'd established. I had a new Environment, Safety and Health Czar in there. I had a new Environmental Restoration Waste Manager. I had a new Assistant Secretary of Defense. They were all in this. So they all, you know, fiddled with theirs and put their paragraphs in, and then it comes to me and I rework it and that's just staffing, and normal staffing.

Q. Sure, and I certainly --

A. The answer is, I don't give anything. I don't approve until everything I say in there, I believe in.

Q. That was going to be my question, sir.

A. Right.

Q. And everything that you -- that was contained in the remarks which are part of this exhibit, you believe in, sir --

A. Yes.

Q. -- is that correct?

-JAMES D. WATKINS-

A. Yes.

Q. All right. Sir, let's look at the press release, and then we'll go to your remarks. I just have a couple of questions.

Third paragraph, it said, "When the President asked me to take this job in January, he indicated that the problems faced by DOE were very serious in nature. The underlying operating philosophy and culture of DOE was that adequate production of defense nuclear materials and a healthy, safe environment were not compatible objectives. I strongly disagree with this thinking, Watkins says."

Do you see that, sir?

A. Yes, I do.

Q. And was that something in fact that you said at the time of this press conference?

A. Yes, it is.

Q. And was it your assessment --

-JAMES D. WATKINS-

A. Yes.

Q. -- that the DOE culture was that adequate production of defense nuclear materials was inconsistent with a healthy and safe environment?

MR. KURTENBACH: Form.

A. It was my belief that priority was given to continued operations irrespective of environmental, safety and health issues on the basis of national security that I thought were excessive and necessary, and that the objectives can be both carried out in a compatible way, that they do not have to be mutually exclusive.

Q. And in fact, sir, was that based on your experience in the nuclear Navy where --

A. Absolutely, that's the reason you haven't had any accidents.

Q. And for your career, sir, you operated in the nuclear Navy, which did not have accidents and you thought that that same culture could be --

-JAMES D. WATKINS-

A. Not only operated, I was a qualified nuclear power plant operator. I had to qualify on three different plants. I had to take engineer's examinations. I had to know what was going on in those plants across the board of all the technical issues.

I had to have the theoretical background to understand why things were happening that were happening, the things they didn't have at Chernobyl.

I had to know the design of the plant. I had to know that the plant was designed safely, that it would not violate environmental concerns if it, in fact, had a failure. I had to know all those things.

Q. Sir, on the initiatives on Page 2 of the press release, it says, on the top, "Resetting of priorities to reflect that environment, safety and health issues as more heavily weighted than production. As a result, DOE is

-JAMES D. WATKINS-

beginning negotiations with those states hosting DOE nuclear facilities to allow direct access and improve state monitoring capabilities."

Do you see that, sir?

A. Yes.

Q. And, sir, was it your understanding that this would be a change in practice whereby the states would have more direct influence and oversight responsibility for nuclear facilities in --

A. If you recall --

MR. KURTENBACH: Objection, foundation.

MR. RAFFMAN: Same objection.

A. -- the reason I set this priority was, in large measure, determined from my observations in the prior six months or nominally six months that I'd been there, heightened by the Rocky Flats experience, and I said that from now on, environment, safety and health would have

-JAMES D. WATKINS-

a weighting factor on award fees of 51 percent; that I wasn't going to tolerate a 20 percent or 10 percent weighting factor, have these unsatisfactory situations exist, and somehow a contractor gets a great grade. And I said I'm not going to tolerate it.

And if we -- and if we're sued, we're sued. Let's get on with it. I can't sit here and do that. That was the whole spathe that we had on the prior testimony that I gave years ago on this -- this thing here, whatever it was.

Q. The suit by Rockwell against the United States over the fees?

A. Rockwell versus USA deposition of James D. Watkins, so it's all in there, I don't want to repeat all that, but that's in my mind right here.

Q. And, sir, for the benefit --

A. It was shortly thereafter that we implemented the 51 percent rule. It might have been even concurrent with this,

-JAMES D. WATKINS-

I can't remember.

Q. Okay. Sir, for the benefit of people looking at this videotape that are not as familiar with what you and I are speaking of, the contractors including those at Rocky Flats were awarded a fee based on certain weighted percentages in the analysis, correct?

MR. KURTENBACH: Objection, vague as to time.

A. I don't -- there was a weighting regime on award fees that were determined by the awards fee determining officer who, in this case, I think in the case there would have been somebody at the Albuquerque office would have made that determination.

Q. Okay. And prior to your Ten-Point initiative, sir, the weighting factor given to environmental, health and safety factors in connection with calculating that fee was 20 percent?

A. I don't know. It was less

than 51 percent, I can guarantee you that. What it was specifically for Rocky Flats, I have no idea. They were at different sites.

Q. Okay. But in any event, it was less than 51 percent?

A. Yes.

Q. And whatever the numbers are --

MR. KURTENBACH: Objection. Objection to form.

BY MR. JACOBSEN:

Q. Whatever the numbers are, they would appear in some document someplace?

A. They appear in some document.

Q. And when you came in and announced your Ten-Point initiatives, you were going to make health, safety and environment a 51 percent weighting factor correct?

A. Yeah, and it was arbitrary, but it was to show that environment, safety and health are more important than

-JAMES D. WATKINS-

production, and in fact, at 51 percent, they're just slightly more important, but they're more important. So the image there was what I was looking for, not so much the detail of 51 percent. That was arbitrary.

Q. But my understanding, sir, and correct me if I'm wrong, is that in connection with the revised calculation or revised weighting of the fee, you also indicated that there could be a downward adjustment on the fee if the health -- withdraw that question. Withdraw it.

Sir, your second initiative, "Modifying the criteria for awarding contractor fees to reflect increased emphasis on environment, safety and health."

Do you see that, sir?

A. Yes.

Q. That's what you were just talking about --

A. Yes.

-JAMES D. WATKINS-

Q. -- in terms of the adjustment?

A. That's what I was just talking about.

Q. Okay. Third initiative, "Establishing independent, quote, Tiger teams, close quote, to conduct environmental compliance assessments."

Do you see that, sir?

A. Yes.

Q. And that relates to what we were talking about before?

A. Right.

Q. And the Rocky Flats was the first Tiger team?

A. The first Tiger team. It would not probably have been the first Tiger team had we not had the FBI insurgence. Rocky Flats didn't -- I didn't know Rocky Flats was any worse than anybody else.

I mean, I would have probably picked Savannah River just because they

-JAMES D. WATKINS-

had a reactor shut down for safety, so that was forced on me. I didn't -- I didn't select Rocky Flats because I knew the Rocky Flats situation. Not at all.

Q. Okay. But when you were informed of the Rocky Flats situation, at least as the Department of Justice perceived it, you sent out a Tiger team into that facility?

A. Right.

Q. And that was the first one?

A. Right. Department of Energy never heard of a Tiger team in their life and they didn't particularly like the idea, so another one of those cultural problems.

Q. Okay. If you could turn now, sir, to your remarks, I just have a couple of questions I'd like to ask you about those, your remarks which are attached to this --

A. Okay.

Q. -- document, and turn to Page

-JAMES D. WATKINS-

2, if you would, sir, of your remarks, the middle of the page, and we're now on Bates number 411047?

A. Yes.

Q. Right in the middle of the page, sir --

A. Yes.

Q. -- the paragraph, "For over four decades, DOE and its contractors have accepted these two objectives as being mutually exclusive," and if you want to refer to above, sir, what the two objectives are, certainly feel free to do it. It refers to the compatibility of health, safety and --

A. Yes, yes.

Q. -- and the environment and production. "Virtually all incentives and awards have been coupled to production...."

A. Right.

Q. " ... such more so than all other considerations combined."

-JAMES D. WATKINS-

A. Sure.

Q. "So, now, the chickens have finally come home to roost...."

A. Right.

Q. "... and years of inattention to changing standards and demands regarding the environment, safety and health are vividly exposed to public examination, almost daily."

A. Right.

Q. "I am certainly not proud or pleased over with what I have seen over my first few months in office. As a result, I must continue to implement measures that can lead the department to a new culture which takes pride in being good stewards of public lands, while demonstrating that our primary production mission can be achieved concurrently"?

A. Yes.

Q. Do you see that, sir?

A. Yes.

Q. And that was a view which you

-JAMES D. WATKINS-

held at the time of this press release?

A. Yes.

Q. Sir, Page 4, at the bottom of the page, "Deputy Secretary Henson Moore introduced the first of these initiatives on June 16th, 1989, when he announced that environment, safety and health objectives now take precedence over production objectives. This served as the basis for a comprehensive agreement between the Department of Energy and the State of Colorado regarding environmental compliance at the Rocky Flats plant...." in Denver "... near Denver," pardon me.

"That agreement is unprecedented in scope and in the degree of cooperation that it portends between DOE and the state. It will be a model for new DOE cooperation with the states."

Do you see that, sir?

A. Yes.

Q. What was that agreement, sir, that you were referring to?

-JAMES D. WATKINS-

A. I don't remember the detail of the agreement, but it was an effort on my part to stay closely associated with the State of Colorado, particularly the Governor and his office, who was extremely concerned about this issue at Rocky Flats.

Obviously, he's a politician, and didn't like the negativism that surrounded the Rocky Flats issue, so he had a -- he had a stake in the game, and I had to try to recover the production plan at that time. The evil empire was still in existence.

We were producing nuclear weaponry, D-5 warheads and so forth at Rocky Flats. Rocky Flats was measured on the number of warheads they could get out per unit time. That's what I talked about earlier. Production was important. We had to get back on line.

And so my -- my whole attempt here was to say I think I can do both, and

-JAMES D. WATKINS-

I wanted to convince the Governor that he was involved with me, that he could put people on site, that I wanted to have an openness with him so he would understand what we're doing, what we're trying to do to repair some of the past practices.

So that's what this is all about. And I didn't realize the dates of June 16th, but we talked about this earlier, the 51 percent issue, which was apparently announced prior to this press conference.

Q. Right. And by the evil empire in your statement, you're referring to the former Soviet Union?

A. The former Soviet Union.

Q. And at the time of this press conference, there had not been a determination as of yet to shut down production at Rocky Flats --

A. No.

Q. -- permanently, correct?

A. No, no, absolutely not.

-JAMES D. WATKINS-

Q. Okay.

A. We had an imperative, a national security imperative at that time just as we did with Savannah River, but I told the President that I was not going to be a part of bringing those plants back on line, trying to claim some sovereign immunity because I didn't feel it was necessary.

I looked at the data. I looked at the inventories. And I felt we could take the time to do it right.

Q. Okay. Sir, the next page, if you would, please, Page 5, and just more on the 51 percent, it says "First" -- right in the middle of the page, are you with me, sir?

A. Yes.

Q. Okay, Admiral. It says, "First, I am modifying the criteria for award fees to our defense production contractors so that not less than 51 percent of the available award will be

-JAMES D. WATKINS-

based on compliance with environmental, safety and health requirements, including requirements that derive from state environmental laws, regulations of the Environmental Protection Agency and the DOE, and actions set forth in tri-party Federal facility compliance agreements."

A. Yes.

Q. "A much smaller percentage is now the norm such as the 20 percent figure in the Rocky Flats contract."

Do you see that, sir?

A. Yes.

Q. Does that refresh your recollection --

A. Yes, it does, yes.

Q. -- to what the percentage --

A. Yes.

Q. -- in the existing Rocky Flats contract with Rockwell was weighted in favor of health, safety and the environment?

A. If you fail everything in

-JAMES D. WATKINS-

environment, safety and health, had the very worst situation you could possibly have in the world, you could still get 80 percent if you did everything else well. I found that offensive and I didn't think it had logic. I'm an engineer and it didn't make any sense to me.

Q. Okay. And, sir, you go on, under "Second," it says, "I am directing that a provision be included in departmental contracts stipulating that all," underscore all "... of the potential awards fee...."

A. Right.

Q. "... that may be earned will be at risk if a contractor fails in any of these three or other important award fee categories."

A. Right.

Q. Can you explain what that was to me, sir?

A. Well, that's a -- that's a -- that's a killer paragraph. None of the

PL. SUPP. EX. 90

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

-----------------------------------X
UNITED STATES OF AMERICA, EX REL., :
:
Plaintiff, : Civil Action
: No. 89-M-1154
-vs- :
:
ROCKWELL INTERNATIONAL CORP., : PAGES 1 - 179
ET AL, :
:
Defendants. :
-----------------------------------X

Deposition of JOHN TUCK

Washington, D.C.

Monday, April 27, 1998

Reported by: Nancy Bond Rowland

JOB NO. 107316

Q Would you describe please your work employment history?

A I graduated from Oakwood High School in 1963. I was in the Georgetown School of Foreign Service from 1963 to 1967.

In 1967 after completion of my undergraduate degree I went to work in the United States Navy. I stayed in the United States Navy until January of '73.

I went to work on the Hill in the patronage position on the House of Representatives side. Worked in several jobs over there for the Republican leadership of the House of Representatives.

The Senate went majority Republican in the 1980 elections. I was invited to be a part of the staff of the Senate majority leader in 1981. I worked in that capacity until 1986.

I was invited to be a legislative liaison-type official at the White House in the latter part of the Reagan administration. I did that. In 1986 Senator Baker was appointed chief of staff to the White House to President Reagan. In 1987 he asked me to run his office. I stayed in the White House until

the completion of the Reagan administration.

I was then invited to go to the Department of Energy by Admiral Watkins in the capacity as under secretary in 1989. I served in that capacity until January of '92.

And then I went to work for the law firm then called Baker Worthington, now called Baker, Donelson, Bearman & Caldwell.

Q So between 1973 and 1980 approximately you worked on the -- in the House of Representatives in some patronage position?

A Correct.

Q And then from '80 to '86 you worked in the Senate, is that correct?

A Correct.

Q And then from '86 to '89 you worked in the Reagan White House?

A Correct.

Q In any of those capacities did you have cause to review the performance of the Department of Energy?

A Not to -- No. I visited the Department of Energy. We had issues with the Department of Energy in

Moore?

A Not specifically, but I am certain that those kinds of discussions took place.

Q I wonder if you could look at the second page of Exhibit 1431. This is a draft memorandum from Mr. Twining to you. I'd like to refer you to the second paragraph.

MR. HESCH: What page?

MR. KOENIGS: Second page of Exhibit 1431.

Q It refers about five lines down "In view of our changing philosophy in the application of Department of Energy (DOE) performance standards and the level of DOE expectations." Do you see that?

A Yes.

Q Did you have an understanding at that time that there was in fact a changing philosophy in the application of DOE performance standards and the level of DOE expectations --

MR. HESCH: Objection.

Q -- for contractor award fees?

MR. HESCH: Form. Foundation.

A Well, we -- Admiral Watkins in late June I believe or thereabouts made an announcement of how the award fee would move from emphasis on production to emphasis on environment, safety, and health, and at least 51 percent of the award fee would be on the latter: environment, safety, and health.

That was a change -- I think that's what Twining's draft memorandum alludes to, our changing philosophy in the application of DOE performance standards and the DOE expectations. Moving away from production, moving toward the greater emphasis for environment, safety, and health.

Q And your recollection is that Admiral Watkins announced that change in approximately June of 1989?

A I think I remember that in that time frame because we were getting ready to visit the waste isolation program, and that was a major announcement by the department just as Admiral Watkins left the department to go to New Mexico.

(Deposition Exhibit 1432 was marked.)

Q I've handed you what's been marked as Exhibit 1432. Do you believe you received a copy of this

PL. SUPP. EX. 91

ROCKY FLATS OFFICE DIVISION OF ADMINISTRATION
CONTRACTS AND SERVICES BRANCH

# RECORD OF TELEPHONE CONVERSATION

DATE: 1/11/90 TIME: 8 AM PAGE: 1 of 1

RE: CONTRACT NO.: DE-AC04-76DP03533 (Rockwell CPAF)

SUBJECT: HQ Concurrence on Award Fee for Period 89/2

CALL INITIATED BY: Rush Inlow, HQ Production (on 90 day detail)

CALL RECEIVED BY: Terrel Agy (Rush returned my call)

NOTES OF CALL:

(At request of Marshall Bishop, I called Rush to get status of HQ actions re our 12/6/89 request for concurrence to our AF package and Rush's 12/20/89 telecon to Hugh Miller)

According to Inlow, Barr (DP-20) instructed his staff to recalculate the award fee to a level not higher than for the period ending March 31, 1989, for Plant. On PRMP/PROVE the information was given to Brown Birnbaum and he "beat on it."

Inlow had the impression that it would be discussed with Simonson by Arondale and Willett (both of DP-20) on 1/11/90, but that it pretty much was decided on already: the HQ changes were going to be forced on us.

CONTINUED ON PAGE

DISPOSITION OF INFORMATION:

Above information was discussed with Hugh Miller and Marshall Bishop about 8:30 on 1/11/90.

CSB:TA:10/16/89

PLAINTIFF'S EXHIBIT 34 11/9/92

E 000014

PL. SUPP. EX. 92

SUBJECT: Award Fee - Rockwell International - Apr 1 through Sep 30, 1989.

TO: Dave Simonson
Manager, RFO

CC: Don Riley
George Werkema
Marshall Bishop
Terrel Agy

I received a call from Rush Inlow at 0905, 20 Dec 89. He was relaying Admiral Barr's remarks concerning subject award fee. He does not concur with giving Rockwell an increase in award fee over the last period. He wants to see the percent of available fee being awarded not exceed the percent of available fee awarded the last period. He also stated that we might want to reconsider the PROVE/PRMP award although no specific mention was made of it by the Admiral.

An informal non-concurrence letter to the RFO letter submitted Dec 6, 1989, is being circulated at HQ and a copy will be provided to the RFO.

We are to come up with a way to reduce the fee recommended for award so it will not exceed the percentage of available fee awarded the last period.

Rush Inlow's phone is FTS 233-3441.

Hugh Miller
7411

EXHIBIT 81

PL. SUPP. EX. 93

CERTIFIED COPY

No. 91-1362 C

UNITED STATES CLAIMS COURT

- oOo -

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

===============================================================

DEPOSITION OF

RUSH OSBORNE INLOW

Tuesday, December 1st, 1992

Albuquerque, New Mexico

Reported by:

ARLETTE McCLAIN, CSR #85

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025
310/477-8867 FAX 310/479-0412

A. I was the director for all of the weapon activities in the Albuquerque Field Office.
Q. How long were you in that job?
A. I was in that position until, to the best of my memory, about October of 1988.
Q. And what position did you have after that?
A. I was laterally reassigned to director of Production Operations Division.
Q. Was that also in Albuquerque?
A. Yes, it was.
Q. What were your responsibilities in that position?
A. I was responsible for the weapon production activities in the laboratories and plants, which were assigned to the Albuquerque Field Office.
Q. Did those plants include the Rocky Flats plant?
A. Yes, they did.
Q. What was your next position?
A. In April of 1989 I was asked by the manager of the Albuquerque Field Office to transfer and become the area manager at the Rocky Flats area office.
Q. Who was the manager of the Albuquerque Field Office who asked you to transfer?
A. Bruce Twining.
Q. And this was in April of 1989?
A. Yes.

Q. Did you accept that position?
A. Yes, I did.
Q. When did you take that position?
A. On about April 15th I went up to Rocky Flats to overlap with Earl Whiteman, who was the area manager at that time. And the plan was that I would have a two-week overlap with him, and then assume duties on a temporary assignment basis as the area manager on about May 1st of '89.
Q. Did you assume those duties on about May 1st of '89?
A. Yes, I did.
Q. When you took that position, was it your understanding that would be a temporary position?
A. The way reassignments in the senior executive service work, is they have to be processed and approved by our headquarters organization. So the plan in this case was that I would take that assignment on a temporary basis until the appropriate paperwork had been prepared and sent through the chain of command at DOE headquarters. So I took the assignment on a temporary basis, with the understanding that we would be processing it for a permanent reassignment.
Q. And how long did you stay in that position?
A. I was at Rocky Flats on the morning of June the 6th when the FBI and EPA raided the plant, and on that morning I was given a letter by Henson Borg, who was the

Deputy Secretary of Energy, relieving me of that temporary assignment.

I was asked to stay on for a few days to help the FBI and the team of DOE people who came in identify certain buildings, and supply some knowledge on plant operations. And on that Friday, which I believe was June the 9th, I was released and returned to Albuquerque.

Q. Do you know at what stage was the paperwork that was making your position permanent on June 6th?

A. No, I don't know.

Q. Prior to June 6th was it your understanding that the paperwork to make your position permanent was being implemented?

A. I think it was planned. I'm not sure that it was implemented. These SCS reassignments are normally a quite lengthy process, and it would not be unusual to be in a temporary status for six or eight months.

Q. Did you have any idea, before June 6th, that you would be relieved of the position at Rocky Flats?

A. None whatsoever. It was a complete surprise.

Q. Did you find out on June 6th that you would be released?

A. Yes. It was the first thing that Mr. Moore did upon arriving in the area office conference room, was to present me with a letter from the undersecretary, relieving

me of that assignment.

Q. You stayed on at the plant for a few days; is that right?

A. Yes, that is correct.

Q. What did you do after that?

A. I returned to Albuquerque and resumed my permanently assigned position as director of Production Operations Division.

Q. Do you still hold that position?

A. No.

Q. When did you change from that position?

A. There are a few details to that. In October of '89 I was temporarily reassigned to headquarters to work in defense programs. I returned from that assignment in January of '90, and I was then temporarily assigned to work as assistant manager for Environment Safety and Health for about three months. And in April of 1990 I was temporarily assigned as assistant manager for Safeguards and Security. The paperwork was initiated to make that assignment permanent, and in October of 1990 I was permanently reassigned as the assistant manager for Safeguards and Security.

I have been in that position from October of '90 to date.

Q. Is your current position a promotion from

really significant issues that they wanted to be brought to the attention of the contractor, but it wasn't a rigorous process as the end point evaluation was.

Q. Did Albuquerque provide input for previous midterm reviews at Rocky Flats?

A. At Rocky Flats, I can't say. I don't have any direct knowledge of who did and who didn't, and when.

Q. Mr. Inlow, you stated earlier that you went to Washington for assignment about October 15th, 1989; is that right?

A. Yes, that is correct.

Q. How long were you in Washington at that point?

A. I was in Washington until about the middle of January, when my assignment was finished.

Q. Mr. Inlow, I'm handing you a document that is being marked as Exhibit 81.

(THEREUPON, Deposition Exhibit Number 81 was marked for identification.)

Q. Which is a memorandum from Hugh Miller to Dave Simonson, and it references a phone call that Mr. Miller received from you on December 20th, 1989. Do you recall having a telephone conversation with Mr. Miller on December 20th, 1989?

A. No, I don't. Although I won't dispute what is in here, I don't recall having made that phone call.

Q. Do you recall talking with Mr. Miller at any time concerning the subject that is discussed in Exhibit 81?

A. No, I don't recall any conversations with Hugh Miller.

Q. Do you recall Mr. -- Admiral Barr making remarks about Rockwell's award fee during the time you were in Washington?

A. I don't recall this specific direction from him, although, again, I won't dispute the statements that Hugh Miller has made here. It is entirely possible that those were relayed to the Rocky Flats office.

Q. What are the specific directions identified in this document?

A. Well, the specific message that is being relayed to the Albuquerque -- or to the office manager is that Admiral Barr didn't feel that an increase in the award fee over the previous period was warranted, and more specifically -- I can read the sentence. He wants to see the percent of available fee being awarded not exceed the percent of available fee awarded the last period.

Q. Do you remember Admiral Barr ever making comments like that?

A. As I said, I'm afraid I can't remember the specific instance. We had late night phone calls with the Rocky Flats office several nights a week during my

assignment at headquarters. And it is entirely possible that during his absence some evening I was asked to relay this message to the Rocky Flats office, but I'm blank on the specifics of it.

Q. Do you remember speaking directly to Admiral Barr about Rockwell's award fee?

A. We discussed many times the general status of the Rocky Flats plant. I'm sure that the award fee concurrence came up as a topic of discussion, but I don't recall a specific instance.

Q. Did you ever discuss with Admiral Barr, Rockwell's award fee for the period for the first half of fiscal year 1989?

A. Not to my recollection. I would not have been in headquarters, as far as I know, when that subject was being worked.

Q. But even after you went to Washington, to headquarters, did Admiral Barr ever discuss with you Rockwell's award fee for the earlier period, the period for the first half of fiscal year '89?

A. If the statement in this memo is accurate, he discussed it in terms of comparing the previous periods of award fee with the second half award fee, but I don't recall any specific details of it.

Q. Do you recall anything generally about Admiral

Barr's view of Rockwell's award fee?

A. Not of his views on the award fee as a subject, no. I can say that Admiral Barr was not satisfied with the performance of the Rocky Flats plant.

Q. Why was he not satisfied?

A. The general reason for his dissatisfaction was the slippage of schedules for certain activities that were supposed to be accomplished out there to improve the operation, especially in the plutonium facilities.

Q. Did Admiral Barr ever discuss with you his views on Rockwell's performance at the Rocky Flats plant during the time you were acting manager?

A. No, I don't recall any discussion of how Rockwell had done then. He did go over with me the events connected with the raid and that sort of thing, but I don't recall any discussions about Rockwell's performance.

Q. Did Admiral Barr ever tell you that the Rocky Flats area office's award fee recommendation for the first half of fiscal '89 had been too high?

A. You said for the first half of fiscal '89?

Q. Yes.

A. No, not that I can recall.

Q. In December of 1989 what was your position at headquarters?

A. I was one of Admiral Barr's primary staff, and my

title was acting director of weapon production.

Q. Was it in that capacity that you had occasion to communicate regularly with Rocky Flats?

A. Yes. Admiral Barr would assemble his office directors -- I think I remember that the time of the evening call would be about 6:30 headquarters time, so that we could catch the Rocky Flats office right at the end of their normal work day, which was 4:30 out there. We would get on a conference call with Dave Simonson and some of his more senior people and spend an hour, an hour-and-a-half going over issues, progress on schedules.

Q. Do you recall any of those conversations with Rocky Flats people discussing Rockwell's award fee?

A. No, I don't recall that. Although you have presented me with some evidence that at least one of them did, I don't recall that being a topic, I believe, of conversation.

Q. Would Mr. Miller have been one of the people you regularly communicated with at Rocky Flats?

A. No, not at all. Hugh was a junior staff member in the Rocky Flats office.

Q. Why would you have contacted him?

A. I have no idea. I really don't know.

Q. Who did you communicate with at Rocky Flats while you were in Washington?

A. Usually directly with Dave Simonson.

Q. And who else?

A. Occasionally with either George Werkema or Ron Foster, who were still there, normally in the deputy area manager jobs.

Q. And what was the purpose of your communications with Rocky Flats people?

A. Normally, information-gathering type of calls, or trying to get an answer to some question that Admiral Barr or some other senior people at headquarters wanted to get answered.

Q. Would you be gathering information from Rocky Flats; is that right?

A. From the Rocky Flats office, yes.

MR. STOUT: Could counsel indicate as a courtesy how he is doing on his schedule?

MR. KELLEY: Let's take a little break.

(THEREUPON, a recess was held.)

Q. Mr. Inlow, I'm handing you a document that has previously been marked as Exhibit 34, which is a record of a telephone conversation between you and Mr. Agy on January 11th, 1990.

Please review the document and tell me what you recall of your conversation with Mr. Agy.

A. Okay, I -- again, I don't remember the specific

phone call with Terrel Agy, but I'm not disputing the contents of this.

Q. According to this record of the phone conversation, what did you tell Mr. Agy?

A. According to the instructions here, Admiral Barr instructed his staff to recalculate the award fee to a level not higher than for the period ending March 31, 1989, for the plant on the PRMP/PROVE, the information was given to Bruce Bernbaum and he, quote, "beat on it," closed quote.

Q. What do you take that to mean, that he beat on it?

A. If you are asking my interpretation of that phrase, it looks like he asserted his own opinion as to what he thought the award fee for the PRMP/PROVE portion should be.

Q. Mr. Agy also records that you had the impression that there would be discussion with Mr. Simonson by Mr. Arondale and Mr. Willitt. Who was Mr. Arondale?

A. Mike Arondale was a junior staffer in Admiral Barr's group back there, and Lou Willitt was a more senior person, and Admiral Barr had assigned both of them to a team that he called the Rocky Flats action team. That team was to be his point of liaison with the Rocky Flats office on all of the activities at Rocky Flats plant.

Q. Were you on that Rocky Flats action team?

A. No, I was not. I was one of his office directors, and the action team was selected from different portions of his staff. Lou Willitt was the team leader.

Q. And the action team was to be the liaison between headquarters and the Rocky Flats staff?

A. Between headquarters, specifically DP20 which was Admiral Barr's organization, and the Rocky Flats staff, yes.

Q. Why wouldn't someone from the action team have contacted the Rocky Flats staff to tell them of Admiral Barr's intention?

A. I don't think I can answer that. I would surmise that for whatever reason Admiral Barr must have instructed me to do it.

Q. You believe you were instructed to call Rocky Flats and inform them of what is mentioned here in this record of telephone conversation?

A. That would certainly be my belief. Again, I can't specifically remember the phone conversation, but the nature of my position at headquarters would not have been such that I would have on my own initiative undertaken something like this.

Q. Is it possible that you would have called up the Rocky Flats office on your own initiative and told them this information?

A. I doubt it.

Q. Did Admiral Barr ever tell you that headquarters' changes to Rockwell's award fee were going to be forced on the Rocky Flats office?

A. I don't recall him ever making that statement, no.

Q. Did anyone at headquarters every make that statement to you?

A. Not to the best of my recollection.

Q. Other than Admiral Barr, did you discuss with anyone at headquarters Rockwell's award fee?

A. I don't remember a specific conversation, but it would have been logical that I might have discussed it with Lou Willitt and Bruce Bernbaum.

Q. What did you discuss with Mr. Willitt about Rockwell's award fee?

A. I don't know. I don't recall any specific conversations.

Q. What about Mr. Bernbaum?

A. Again, I don't recall any specifics. Mr. Bernbaum was the headquarters program manager for the PRMP/PROVE project, but I don't remember a conversation with him in which we discussed the award fee.

Q. Did you ever discuss Rockwell's award fee with Mr. Simonson?

A. I don't remember any such conversation, no. As I

said earlier, there were frequent conference calls with Mr. Simonson and his staff, and it is entirely possible that the topic came up during those telephone calls, but I can't recall specifically when.

Q. Were headquarterss changes to Rockwell's award fee forced on the Rocky Flats office?

A. I don't know the outcome of that determination. I believe that I finished my assignment at headquarters and left and returned to Albuquerque about the 15th of January, and I can't recall whether the final determination had been completed by the headquarters staff at that point or not.

Q. Was headquarters attempting to force changes on the Rocky Flats office in connection with Rockwell's award fee?

A. It was clear that headquarters was involved, and headquarters now had a role in the process, but my recollection is not that the process was one of forcing their opinion, but rather in reviewing the determination.

Q. Did you give Mr. Agy the impression that headquarters changes were going to be forced on the Rocky Flats office?

A. I don't recall using those words, but Mr. Agy made the record of the phone conversation, and it appears that he had that impression.

Q. Is Mr. Agy generally accurate in taking notes of

conversations or meetings?

A. I don't have any experience to the contrary. During the time he worked for me at Rocky Flats, I found him to be a conscientious staff member.

Q. And during your time at the Rocky Flats office, was Mr. Agy accurate in his reports to you?

A. To the best of my knowledge, he was.

Q. In fact, was Mr. Agy fairly meticulous about keeping notes and records of meetings and conversations?

A. To the best of my knowledge, Mr. Agy was meticulous, yes. The nature of his position as the award fee coordinator for the Rocky Flats area office required that.

MR. KELLEY: I have no further questions. Mr. Bruns?

MR. BRUNS: I have don't have any questions.

(THEREUPON, the deposition was concluded.)

PL. SUPP. EX. 94

12/28/89 13:47 DP 4TH FLOOR FORRESTAL

ROUTING AND TRANSMITTAL SLIP 12/14/89

| To: (Name, office symbol, room number, building, Agency/Post) | Initials | Date |
|---|---|---|
| 1. G. Leah Dever, EH-232/3G-092 | | 12-14 |
| 2. Kathleen I. Taimi, EH-232/3G-092 | | 12-14 |
| 3. John C. Tseng, EH-23/7A-075 | | 12/19 |
| 4. Raymond P. Berube, EH-20/7A-075 | RPB | 12/26 |
| 5. Geoffrey J. Judge, EH-10/GB-096A (Peter Brush, act'g) | | |

| | Action | | File | | Note and Return |
|---|---|---|---|---|---|
| | Approval | | For Clearance | | Per Conversation |
| | As Requested | | For Correction | | Prepare Reply |
| | Circulate | | For Your Information | | See Me |
| | Comment | | Investigate | | Signature |
| | Coordination | | Justify | | |

Re: Proposed Award Fee Determinations for Kansas City, Mound, Pantex, Pinellas and Rocky Flats

EH-232 has reviewed the referenced packages and recommends EH-1 concurrence on all determinations except Pinellas.

The SEN-7 Reports prepared by the Pinellas Area Office have raised concerns that..."the ES&H Program within the Pinellas Plant is not being given the level of management commitment commensurate with the emphasis being placed in this area by DOE... It is evident that this new culture will take time." No mention of these substantive concerns is raised within the award fee package, and a 90% rating in the ES&H area seems to indicate that little to no consideration was given to the concerns when rating contractor performance.

I am also concerned about the RF's rating for Rockwell in the ES&H area. I don't believe Rockwell's envir. performance was so good to offset safety deficiencies and some. We should consider holding Rockwell to previous levels.

Jh—.

I agree. RPB 12/26

#510

FROM: (Name, org. symbol, Agency/Post) Robert D. Quinn, EH-232/3G-092

Room No.—Bldg.

Phone No.

OPTIONAL FORM 41 (Rev. 7-76)

DEC 15 RECD

Plaintiff/Defendant Deposition Exhibit 1169 Case # 91-1362C Date 10-11-92

E 001840

PL. SUPP. EX. 95

Department of Energy

ROCKY FLATS OFFICE
P.O. BOX 928
GOLDEN, COLORADO 80402-0928

February 26, 1990 90-DOE-5212

Mr. Dominick J. Sanchini
Vice President, Major Programs
Rockwell International Corporation
Department 001, Mail Code D-37
2230 East Imperial Highway
El Segundo, CA 90245

Dear Mr. Sanchini:

In accordance with Appendix D of Contract DE-AC04-76DP03533, the Department of Energy (DOE) hereby determines that Rockwell International Corporation (Rockwell) has earned an award fee of $1,241,604 for Plant and $338,035 for PRMP/PROVE, for a total of $1,579,639. The enclosed Performance Evaluation Report for the period April 1, 1989 through September 30, 1989, provides the basis for the DOE award fee determination.

The award fee approved by the DOE for payment to Rockwell is pursuant to an award fee plan previously developed to cover the period April 1, 1989 to September 30, 1989. This was prior to the institution by the DOE of stronger and tougher award fee plans to reward improvements in environment, safety, and health (ES&H) and substantially increase the proportion of the fee attributable to ES&H performance. Under the old contract provisions, however, the DOE was constrained as to the weight that might be given to ES&H performance in setting the fee for the six month period covered.

In the old award fee plan, which includes this period, up to 20% of the total amount of fee paid could be attributable to performance in the ES&H area. By reducing the award fee rating for ES&H to "Unsatisfactory," the DOE is indicating to Rockwell that its ES&H performance was unacceptable. In addition, by reducing the award fee rating for general management to "Marginal," the DOE is indicating to Rockwell that its general management performance was deficient.

As specified in the Contract, you may, within five working days after receipt of this letter, request an opportunity to present to the DOE an analysis of your performance under the Contract. Otherwise, after this period we will provide you the award fee amount, plus a base fee of $432,850, for a total fee of $2,012,489.

If you wish to meet with us, please contact this office in order to coordinate those arrangements for you.

Sincerely,

Robert M. Nelson, Jr.
Robert M. Nelson, Jr.
Manager

Enclosures

PERFORMANCE EVALUATION REPORT
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

The overall performance of Rockwell International Corporation (Rockwell) was maintained at least at the level of "Satisfactory" during the period April 1 through September 30, 1989.

The following are separate evaluations of the performance of Rockwell relative to the management and operation of the Rocky Flats Plant and the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the selected Functional Performance Areas (FPA's). The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's have been evaluated in accordance with the contract Award Fee Plan, and the following summary of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

PLANT

GENERAL MANAGEMENT: There was considerable evidence of Rockwell management's inability to effectively manage this facility, and this was seen by DOE to be a serious, major deficiency. This deficiency was manifested in lack of progress in integrating safety responsibility and accountability at all working levels and also by deficient lines of responsibility, procedures, discipline/work ethic, training, on-floor supervision, and problem investigation/resolution. Numerous incidents provide evidence of the above deficiencies. A continuing lack of priority attention to safety and health, as evidenced by the open status of many of the safety concerns documented during the period, was a clear indication of poor management. Additionally, despite an increase in nitrate concentrations on the 750 Pad, little action was taken to contain saltcrete after precipitation events. The preparation for the annual DOE inventory of Special Nuclear Material at Rocky Flats was unsatisfactory.

ENVIRONMENT, SAFETY & HEALTH: Long term understaffing in the Health, Safety and Environment organization resulted in less than adequate attention applied to several essential projects and safety functions. Rockwell was unsuccessful in reaching their Plant Performance Goal for recordable injuries and in reducing the total number of workplace contamination incidents. Rockwell continued to have problems in the construction safety area. Rockwell failed to exercise an acceptable level of program management in the development of official recommendations for restart of the Building 374 evaporator. A criticality safety assessment performed in August 1989, noted many aspects of the criticality safety program which needed improvement. Rockwell failed to exercise an acceptable level of program management in dealing with pondcrete and saltcrete. Rockwell's oversight of the environmental subcontractors performing routine environmental monitoring was deficient. As identified in the DOE-HQ assessment team report, deficiencies in the RFP effluent air monitoring program may adversely affect determination of radioactive materials released to the atmosphere. Waste shipments to Idaho and Nevada were marked by errors in manifests and contamination on waste packages, which jeopardized the future of offsite disposal plans.



E 002138

QUALITY: The plant-wide implementation of DOE non-weapons quality assurance requirements did not progress at the accelerated rate expected.

The Rockwell Final Product Acceptance group performed effectively after only one year of having the responsibility for most product acceptance. Lot rejects and Final Product Acceptance observations decreased during the second half of FY89.

COST MANAGEMENT: Rockwell provided excellent support to both the Environmental Restoration and Waste Management Five-Year Plan and to the Modernization Study. Rockwell did an extraordinary job of collecting information, categorizing and documenting the large number of new funding requirements created by the FBI/EPA investigation, the DOE Tiger teams, and the DOE/CDH Agreement. All validated construction line item projects were included in the Department's 1991 budget request.

PRODUCTION OPERATIONS: The processing of procured finished machined products was consolidated within Building 460 to reduce overall process times and decrease costs. Rockwell was effective in reducing halogenated solvent usage, and continued to make progress with its new scheduling philosophy which was designed to minimize work-in-process inventories by managing bottlenecks.

The self-appraisal program instituted in all Production Operations buildings, an adaptation of the Building 771 Restart Criteria, did not receive sufficient management attention or "ownership" and was ineffective.

CHEMICAL OPERATIONS: Plutonium Recovery Operations and Production Operations worked in conjunction to develop the Nuclear Facility Operation Manual, which was to establish the standard of excellence for operations of Rocky Flats facilities. As a result of the deliverables that Rockwell had to complete before Building 771 restart approval was granted, a number of procedures were changed or developed and implemented. This implementation was successful, and the building management team continued to develop and implement improvements to those procedures.

Rockwell's management controls and directives in areas such as recovery operations planning, work breakdown structure and scheduling systems, and cost control systems result in implementation/installation/operation delays and other problems. There continued to be a failure to establish performance goals for process operations and to measure process performance; therefore, operations were not baselined to provide for improved performance.

PRMP/PROVE

PROJECT MANAGEMENT: Rockwell took an active role in establishing Los Alamos National Laboratory technical personnel as a part of the PRMP structure. Provisional agreement was reached by the Senior Management Review Board on the baseline PRMP process technologies.

Rockwell did not provide an adequate system to produce timely and accurate project control information. Integration of an essential, computerized, three-dimensional Plant Configuration Model into the overall PRMP design strategy has been slow.

COST MANAGEMENT: Rockwell took positive action to reduce the cost of A-E services, including reducing overhead, requiring the A-E to meet commitments, and upgrading control measures over the scope of A-E work.

The Cost and Schedule Reduction Precursor activity incurred over $100,000 cost without any visible or deliverable product, which indicates an unacceptable lack of cost controls.

SCHEDULE PERFORMANCE: The PROVE test schedule was prepared as an integrated effort between Plutonium Operations and PROVE engineering. Detailed schedules were developed for activities preliminary to PRMP construction to provide a base for performance measurement.

Schedule reports were not provided in a form which ensured timely reporting and accuracy to the overall project schedules.

SUBCONTRACT MANAGEMENT: Rockwell took positive action to develop an A-E Statement of Work which provided for their required services at an appropriate level of detail.

Inadequate Quality Assurance/Quality Control oversight of the glovebox subcontractor resulted in extra costs and delivery delays to the Government.

DESIGN QUALITY: PRMP Technical Baseline documentation was of unacceptable quality and behind schedule.

TECHNICAL PRODUCT QUALITY: Rockwell did not require periodic, independent audit of NQA-1 compliance and Non-Conformance Report actions to ensure that quality actions were completed without prejudice. A QA plan for PRMP, required prior to start of the full design effort and Title I activities, was not completed.