PL. SUPP. EX. 47

## WITNESSES

| Name | Title(s) or Position(s) |
| --- | --- |
| Agy, Terrel | Mr. Agy was a DOE Program Analyst at the Rocky Flats Area Office[1] from about February 1989 to November 1990. *See* Agy Dep. at 6-9, 12-13, 15. In that position, he coordinated the award fee activities for the Rockwell contract. *See id.* at 8-9, 20. Mr. Agy was supervised by Mr. Barkmeier and Mr. Barkmeier's successor, Mr. Bishop. *See id.* at 17-18, 76, 229. |
| Barkmeier, Claude Hudgel | Mr. Barkmeier was Chief of the Administrative Branch at the Rocky Flats Area Office from February 1974 to fall of 1989. *See* Barkmeier Dep. at 7, 11; Agy Dep. at 18-20. He then became Director of Administration at the Rocky Flats Area Office, a position he held until he retired in December 1989. *See* Barkmeier Dep. at 7; Agy Dep. at 18-19. |
| Barr, Jon Michael | Admiral Barr became Deputy Assistant Secretary for Military Applications on July 5, 1989. *See* Barr Dep. at 7, 12. He held that position for "almost exactly two years." *See id.* at 12. |

---

1 At some point, the Rocky Flats Area Office was renamed the Rocky Flats Office. *See* Agy Dep. at 32-33, 69. Both are referred to collectively as the "Rocky Flats Area Office" herein and in Rockwell's Supplemental Submission on Cross-Motions for Summary Judgment.

| Name | Title(s) or Position(s) |
| --- | --- |
| Beall, Donald R. | Mr. Beall was Rockwell's Chairman and Chief Executive Officer during the 89/1 and 89/2 Periods. *See* Beall Dep. at 4-5. |
| Bishop, Marshall L. | Mr. Bishop succeeded Mr. Barkmeier as Director of the administrative division at the Rocky Flats Area Office. *See* Bishop Dep. at 16, 19. |
| Goldberg, Edward S. | Mr. Goldberg was acting Manager of the Rocky Flats Area Office from June 6, 1989, to September 1989. *See* Goldberg Dep. at 13-14; DPFOUF ¶¶ 30, 76. |
| Hill, Theetis V. | Mr. Hill was Executive Secretary to the PERB from May 1987 to October 1990. *See* Hill Dep. at 9-11. |
| Iacobellis, Sam | Mr. Iacobellis reported to Mr. Beall and had responsibility for Rocky Flats. *See* Iacobellis Dep. at 7-9; Beall Dep. at 6-7. In 1989, Mr. Iacobellis's titles were (prior to July 13) president, Aerospace Operations and (after July 13) Executive Vice President and Chief Operating Officer. *See* Iacobellis Dep. at 7. |
| Inlow, Rush Osborne | Mr. Inlow was acting Manager of the Rocky Flats Area Office from on or about May 1, 1989, to June 6, 1989. *See* Inlow Dep. at 8-10. From October 1989 to January 1990, he was temporarily assigned to headquarters to work in Defense Programs. *See id.* at 11. |

| **Name** | **Title(s) or Position(s)** |
|---|---|
| Meinhardt, John L. | In 1989, Mr. Meinhardt was the Principal Deputy Assistant Secretary for Defense Programs, until July 1, 1989, when he became the Acting Assistant Secretary for Defense Programs. *See* Meinhardt Dep. at 7-9. |
| Moore, W. Henson | Mr. Moore was Deputy Secretary of Energy between 1989 and 1992. *See* Moore Dep. in *Stone* at 5. |
| Nelson, Jr., Robert M. | Mr. Nelson replaced Mr. Simonson as the Manager of the Rocky Flats Area Office, and served in that position from on or about January 28, 1990, to April 1992. *See* Nelson Dep. at 9, 16-17, 22-25. |
| Simonson, David P. | Mr. Simonson was the Manager of the Rocky Flats Area Office who replaced Mr. Goldberg. *See* Simonson Dep. at 12. After Mr. Nelson replaced Mr. Simonson as Manager of the Rocky Flats Area Office, Mr. Simonson was demoted to Deputy Manager. *See* Bishop Dep. at 140-42. |
| Stout, James A. | Mr. Stout was chief counsel at DOE's Albuquerque Operations Office from 1985 to 1994. *See* Stout Dep. in *Stone* at 8-9. He provided legal advice to DOE relating to the award fees paid to Rockwell between 1987 and 1990. *See id.* at 135-37. |
| Tuck, John | Mr. Tuck was Admiral Watkins's Under Secretary from 1989 to January 1992. *See* Tuck Dep. in *Stone* at 17-18. |

| **Name** | **Title(s) or Position(s)** |
| --- | --- |
| Twining, Bruce G. | Mr. Twining became Manager of the Albuquerque Operations Office in April 1988 and was still in that position as of his deposition on February 23, 1993. *See* Twining Dep. at 5. |
| Wade, Troy E. | Mr. Wade was DOE's Acting Assistant Secretary from July 1987 to June 1989. *See* Wade Dep. at 10-11; Pl. Supp. Ex. 41, memorandum from T. Wade to Manager, Albuquerque Operations Office, June 21, 1989. |
| Watkins, James D. | Admiral Watkins was sworn in as DOE Secretary on March 1, 1989. *See* Watkins Dep. at 8. |
| Whiteman, Albert Earl | Mr. Whiteman was the Manager of the Rocky Flats Area Office from November 1985 to April 1989, when he was succeeded by Mr. Inlow. *See* Whiteman Dep. at 9-11. |

PL. SUPP. EX. 48

UNITED STATES COURT OF FEDERAL CLAIMS

ROCKWELL INTERNATIONAL CORPORATION, )
)
Plaintiff, )
)
vs. ) No. 91-1362 C
) (Judge Yock)
UNITED STATES OF AMERICA, )
)
Defendant. )

ORIGINAL

DEPOSITION OF:

BRUCE G. TWINING

Tuesday, February 23, 1993

10:00 A.M.

Reported by:

BARBARA K. HARRIS

CSR # 93

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025
310/477-8867 FAX 310/478-8412

are unclear as to what I'm driving at, then please ask me to clarify. Do you understand that?

A. Yes.

Q. If you want to take a break at any time, just speak up.

A. Okay.

Q. What is your current position, Mr. Twining?

A. I'm the Manager of the DOE's Albuquerque Field Office.

Q. And how long have you been manager at Albuquerque?

A. Since April of 1988.

Q. And what was your position immediately prior to becoming manager at Albuquerque?

A. I was on a temporary detail to Washington, D.C. as the Deputy Assistant Secretary for Nuclear Materials, and that lasted about eight or nine months.

Q. When you became manager in April, 1988, did you play a role in the award fee determination for the first six-month period of fiscal year 1988 for Rockwell?

A. Yes, I did.

Q. And you would also have played a role, then, in the second six-month period for 1988.

A. Yes.

Q. Would you describe for me your education since high school.

final score.

Q. And if you would turn to page 5 of 9 of the attachment, and on that page is a rating plan?

A. Yes.

Q. And describe to me what the rating plan is.

A. That is an attempt to define, again, guidance for the board to use in determining and talking about a certain area, what kind of performance is expected in order to get a certain grade. And this is actually one of the areas that has evolved quite a bit over time in the last several years, but this is what it was at that point.

Q. And in this rating plan, under the heading "Definitions," depending on what grade you are looking at, there are references to achievements and deficiencies.

A. Yes.

Q. And could you explain to me how achievements and deficiencies work vis-a-vis a grade, under the rating plan, at least in a general sense?

A. In a general sense -- and I will talk about what we have got today. I am not sure how it relates to what was done here. But in a performance area, the performance evaluation board deals with something they call observations, which can be slightly positive or slightly negative, but don't really count in the score; achievements, which are positive; significant achievements, which are what

the word implies, significant; deficiencies, which are negative; and significant deficiencies.

Over time, we may have changed, there may be notables as an adjective there. It's changed over time. But what the PERB tries to do in a given functional area, general management, for example, is look at the performance over the rating period, and what the contractor did that was really good, what did they do that was good, you know, what did we just observe going on, and then identify the weaknesses and the major weaknesses. And once that was done, they attempted to correlate from the number of things in those categories to this score. It's not a precise science. It is a subjective evaluation.

Q. So the score is the result of the assessment of achievements and deficiencies in the particular areas.

A. Yes, it is.

Q. It's not the other way around, you come up with a score and then you develop --

A. No.

Q. The rating plan that we are looking at in Appendix A, that is the rating plan that was in effect for the Rockwell contract for fiscal year 1989; is that correct?

A. Yes.

Q. Do you know what functional performance elements are?

A. It's not in the format that would come to me.
Q. It says in the top right "Prepared by Lawrence R. Oliver." Do you know who he is?
A. No, I don't.
Q. Also it says under his name "DP-50." What does that stand for?
A. DP-50 is an organization in Defense Programs in headquarters.
Q. DP-50 stands for Defense Programs, or is it part of Defense Programs? I didn't understand your response.
A. DP is Defense Programs. 50 is an organizational number; they are resource management or -- I don't know the title.
Q. Now, when you received the PERB recommendation, what did you do with it?
A. I think this was a period in which we packaged them all up and sent them to headquarters for concurrence. What I would have done first is determined that I was satisfied with what the PERB did.
Q. So you reviewed it.
A. I reviewed it.
Q. Were you given a briefing about it?
A. I believe in every case I have had a report given to me and a briefing by PERB.
Q. And who would have made the briefing to you?

Q. You don't remember one way or the other?
A. I don't remember.
Q. Do you remember if you asked the PERB to go back and redo its report?
A. No.
Q. Have you ever asked the PERB at Albuquerque to go back and redo its report?
A. I have asked questions that have caused the PERB to redo their report.
Q. Do you recall whether that happened in this case?
A. No, I don't.
Q. And you believe in this instance you would have sent a recommendation to headquarters, is that correct, for this award fee period?
A. I believe this is the first cycle that we did that.
Q. And that recommendation would have reflected your review of the PERB's recommendation to you?
A. Yes.
Q. And possibly changes that you made on your own.
A. Yes.
Q. And you would have been comfortable with that recommendation prior to sending it to headquarters?
A. Based on the information I had up to that point.
Q. Which would have come from the PERB?

A. The area office manager, the functional people that input to that, the PERB.

Q. Do you recall having any criticisms of the PERB with respect to the report it gave you and its recommendation?

A. Not in this specific case, I don't recall.

Q. Let me show you a document that has been marked as Plaintiff's Exhibit 9, and please review it and then I'll ask you whether you have ever seen it before.

A. No, I haven't seen it.

Q. Who is Mr. Beiriger, is that the way you pronounce it, or do you know who Mr. Beiriger is?

A. I don't know him.

Q. So you don't know why he was asking this information.

A. No, I don't.

Q. I show you what has been marked as Exhibit 12, which is a memorandum addressed to Troy E. Wade, Acting Assistant Secretary for Defense Programs. It appears to be from you.

A. Okay.

Q. Have you seen this document before?

A. Yes.

Q. And is that your signature on page 5?

A. Yes.

A. I don't recall where the guidance came from.
Q. Who drafted this memorandum?
A. Our Contracts Division.
Q. Do you know who within that division would have drafted it?
A. No, I don't.
Q. And you have various award fees proposed for Rockwell as well as other contractors in this memorandum; is that right?
A. Yes.
Q. Up to this point in the award fee process, Mr. Twining, where, take Rockwell, you have a proposed number, was the process in reaching that number similar to the process that would have taken place during 1988 when you were in Albuquerque?
A. I have said it could have been somewhat different because of the evolving nature of the process.
Q. As you sit here today, do you recall any differences between coming up with the proposed number for Rockwell for fiscal year 1989 and the methodology in which you came up with numbers during 1988?
A. No.
Q. So that the same thought and attention on your part that went into this number went into the numbers in 1988 as well.

A. Yes. I would have had a little more firsthand experience in the job with Rocky Flats than I did during that first determination.

Q. When you said "more firsthand experience," you are referring to the first half of 1989, versus 1988.

A. Yes.

Q. And you proposed on the plant for Rockwell one million -- excuse me, $5,176,482?

A. Yes.

Q. And if you go back to look at Exhibit 91, which was the PERB's recommended fee, which was 5,326,482, it would appear that you made a reduction to the PERB's recommendation for the plant.

A. It appears so.

Q. It would appear that the reduction was $150,000.

A. Yes.

Q. Do you recall the basis for that reduction?

A. I'm going to speculate again. It might have been the model shop, but I don't recall specifically.

Q. Okay. And on the PRMP/PROVE, you proposed an award fee for headquarters' concurrence of $186,591; is that correct?

A. Yes.

Q. And that is the same amount that was recommended by the PERB.

A. No.
Q. When you proposed an award fee for concurrence and Mr. Wade withheld concurrence, what happens next?
A. Well, I think that -- this is the period that the raid happened. The management arrangement shifted during that period. The area office, rather than reporting into Albuquerque, became directly connected with headquarters. Another management team was brought in. And I don't recall exactly what the steps were that happened after that, that nonconcurrence.
The management situation around Rocky Flats was pretty confused at that point, at the point of the raid.
Q. On the first page of Exhibit 12, I guess in the second paragraph, the second sentence states, "The performance evaluation reports, which will be sent to each contractor, are attached." Do you see that sentence? In document production, we didn't have any performance evaluation reports attached.
Is it your understanding that would have been the performance evaluation report of the PERB that would have been attached, or don't you know?
A. Again, I can't remember where we were in the process, but you highlighted a summary in an earlier exhibit. I would guess that is what was attached.
Q. Would headquarters have first learned of your

that in a number of areas, but in operational areas or major ES & H areas, there was a period of very little interaction between our staffs.

Q. This memo states that Mr. Goldberg will report to the Undersecretary of Energy, John C. Tuck, with regard to operations of Rocky Flats.

A. Yes.

Q. Was that a change of prior procedures, or prior reporting responsibilities?

A. Well, prior to this memo that area office reported to me.

Q. Who do you report to, or in 1989 who did you report to as manager at Albuquerque?

A. I believe at that time all the field managers plugged into the box that had the secretary, the deputy secretary, and the undersecretary, and I did have some daily interactions with John Tuck.

Q. When did you first hear about the raid at Rocky Flats?

A. The day before it happened. It might even have been the morning it happened.

Q. Were you told at that time that Mr. Goldberg would come in as area manager?

A. Yes, I was.

Q. Were you also told at that time that he would be

reporting directly to headquarters?

A. Yes.

Q. After Mr. Goldberg's appointment, did you consider Rocky Flats still to be under the supervision of Albuquerque?

A. I considered this memo to be the effective document. That office reported to headquarters, and we were to do everything we could to help make things work.

Q. So the answer is no, you did not consider --

A. No, I did not --

Q. -- Rocky Flats to be under your jurisdiction.

A. No.

Q. Let me show you a document that has been marked as Plaintiff's Exhibit 49. It's a memorandum from Mr. Troell directed to you, dated July 10, 1989.

A. Okay.

Q. Have you seen this memorandum before?

A. Yes, I think I have.

Q. Why did Mr. Troell draft this memorandum?

MR. KOLAR: Objection, lack of foundation. It calls for testimony about what was in Mr. Troell's mind.

Q. Go ahead. You can answer.

A. As I recall this process, we got a recommendation from Mr. Goldberg based on the period of time that he had been at Rocky Flats, and we also had the nonconcurrence from

MR. KOLAR: Objection; again calls for speculation, lack of foundation.

MR. NYE: Well, the foundation is Mr. Troell's memorandum that refers to a grade of 87 and I'm asking how he learned -- if he knows. He either does or doesn't --

MR. KOLAR: I will limit my objection to calls for speculation because it's asking how Mr. Troell knew.

Q. If you have knowledge. Don't speculate. If you know.

A. I cannot explain the date on this memo being July 27 and the date on Mr. Troell's memo being July 10th. My recollection of this process is we got a recommendation from Goldberg, the PERB considered that recommendation, and we went into headquarters with a modified proposal.

Q. Did you have conversations with Mr. Goldberg on the subject of his recommendation of '87?

A. I don't think so before we got the letter.

Q. Okay.

A. The conversations that I had with Mr. Goldberg, after he took over at Rocky Flats, were trying to have us continue to provide support in areas that he wasn't equipped to deal with in this new management arrangement that had been implemented by the Tuck memo.

Q. At any time have you had discussions with Mr. Goldberg with respect to Mr. Goldberg's recommendation of 87 as the award fee grade for Rockwell for the first period in 1989?

A. I don't recall. I don't recall those conversations.

Q. One way or the other.

A. One way or the other.

Q. On the first page of Exhibit 49, in the last sentence, it states that "Subsequently," and I think in context that means subsequent to the PERB making its recommendation to you, "much more stringent expectations of contractor performance have been mandated by the secretary and other DOE policy makers' statements and issuances." Do you know what is being referred to there?

A. Well, when Secretary Watkins came in he made it very clear that he was going to put a major priority on ES & H, and the level of DOE's performance in those areas. And I think that is what he is referring to.

Q. As of July 10, how long would Mr. Goldberg have been at Rocky Flats?

A. Well, a little over a month.

Q. Do you know what sources of input Mr. Goldberg was receiving at Rocky Flats with respect to Rockwell's performance over the first award fee period for '89?

MR. KOLAR: Objection, calls for speculation.

MR. NYE: No, it doesn't call for speculation. He either knows or he doesn't. If he knows, then it wouldn't be speculation.

MR. KOLAR: He is not Mr. Goldberg. How could he know what Mr. Goldberg is getting in terms of input?

MR. NYE: He could very easily know. He could be giving input to Mr. Goldberg.

MR. KOLAR: Is the question what did Mr. Goldberg communicate to you what sources of input he was receiving?

MR. NYE: I asked if he knew what sources of input Mr. Goldberg had.

A. Not in detail.

Q. How about generally?

A. There was a, quote unquote, tiger team of people that was put together to come in and help Mr. Goldberg dig into the ongoing operations at Rocky Flats.

Q. Do you know how many people were on that team?

A. No.

Q. Did Mr. Goldberg ever communicate to you any bases for reducing the Rockwell grade from the 92.1 or .2, that you had recommended, to 87?

A. Just this letter is all I recall.
Q. Was there anything in that letter that you didn't know about before in the process of making your own recommended grade?
MR. KOLAR: Take your time and read the letter through.
A. I would say there are details here that I wasn't aware of.
Q. And these would be details that were not included in the material that you received from the PERB?
A. I'm not sure.
Q. You don't know one way or the other without --
A. Without going back and doing it.
Q. -- and studying it. And Mr. Troell, looking at Exhibit 49, makes a suggestion to you, is that a fair characterization, that "Since Mr. Goldberg" -- I'm looking at the last paragraph -- "has been on-site for several weeks, that he would have greater insight into the current conditions at the plant, and, accordingly, we," I take it that's the PERB, "do not believe you are in a position to offer an informed alternative to his proposal"?
A. Yes.
Q. Did you concur with that recommendation?
A. Yes.
Q. Let me show you what has been marked as

think I can demonstrate for you later that this memorandum probably went to headquarters. Having laid that as a predicate, what did you mean, or what was meant by "changing circumstances"?

A. The memo was drafted by CPD. I would be speculating about what they were thinking about on "changing circumstances." They could have been referring to the nonconcurrence from headquarters. I don't know.

Q. In the second paragraph in this memorandum that bears your name, if not signature, there is a reference to changing philosophy in the application of Department of Energy performance standards and the level of DOE expectations. It's in the middle of that second paragraph. Do you know what is referred to there?

A. The secretary's expectations on excellence in ES & H and compliance with ES & H laws.

Q. And they were different, or they were changing from something. What were they changing from?

A. They were changing from a period of time in the prior administration when we were discovering problems, and trying to get them fixed, and, you know, with considerable priority placed on those kind of things in the prior administration, to this is one of the major initiatives of this Secretary as he came in, to get the DOE complex up to the point where we could defend our level of operations to

anybody.

Q. Did you do any form of an analysis as to how Mr. Goldberg came up with the grade of 87?

A. No, I didn't. My recollection, and I cannot explain the dates, my recollection is we got a recommendation from Goldberg, the PERB looked at it, the PERB advised me that there was much more in what was going on at Rocky Flats than we had been able to provide, and that we had no basis, really, to argue with the kind of findings that were coming out of Rocky Flats after those first several days and weeks and months of the raid.

Q. What findings were those?

A. The levels of detail, changing filters with significant safety implications without having building managers know about it; just the -- we had been focusing on really radiological protection, and around this time, mostly around 771, and I don't believe my staff was aware of the magnitude of some of the other issues that came out right after the raid.

Q. So, it's your testimony that, while you don't understand the dates, you believe that the PERB, prior to its memorandum to you of July 10, had received some form of rationale from Goldberg on the 87?

A. I'm quite sure they must have.

Q. Did the PERB ever change its report to you on the

I' not sure exactly what his title was.
Q. Do you recall whether you ever had any discussions with him about Mr. Goldberg's recommended fee of 87?
A. No, I don't think I did.
Q. I show you a document that has been marked as Plaintiff's Exhibit 57.
A. There is the day we were talking about before. Okay.
Q. Have you ever seen these documents before?
A. No.
Q. Now, in these documents, Mr. Meinhardt, the Acting Assistant Secretary for the Defense Programs, is recommending that the Rockwell award fee be reduced from 3.8 million down to 2.9 million, approximately $871,496. Did Mr. Meinhardt ever discuss that proposed reduction with you?
A. I believe he might have sent a letter to that effect. We might have talked about it on the phone.
Q. What do you recall?
A. I am pretty sure we got a letter to that effect.
MR. KOLAR: What Exhibit Number is this? Oh, 57.
MR. NYE: Fifty-seven.
MR. KOLAR: Thank you.
Q. On the page that has the Bates number E 001552, under "Discussion" -- do you see the heading "Discussion"?

A. Yes.

Q. The first sentence says, after implementing the ASDP nonconcurrence in the Rockwell proposed award fee and its transmittal of May 31, 1989, requested Mr. Edward S. Goldberg, acting area manager Rocky Flats office, to reevaluate Rockwell's performance for the period covered by the award fee plan. Did you ask Mr. Goldberg to reevaluate Rockwell's performance vis-a-vis an award fee?

A. I don't recall doing that. I may have. I don't recall, though.

Q. If you did it, would it have been in writing?

MR. KOLAR: Objection; lack of foundation. He testified he doesn't recall doing it.

A. I don't recall asking Mr. Goldberg. You know, looking back on it, it's not a bad thing to do, given the circumstances, but I don't recall doing it.

Q. I have seen no writing. I'm not trying to hide anything from you. In this memorandum, Mr. Meinhardt is requesting the agreement of the Deputy Secretary S-2. Who would that be?

A. The Deputy Secretary at that time would have been Henson Moore.

Q. You testified that you do recall receiving a letter from Meinhardt on the subject of a further reduction in a Rockwell award fee from Mr. Goldberg's 87. I believe

you testified to that.

A. I believe so, yes.

Q. Would that have been before Mr. Meinhardt received the agreement or disagreement from Mr. Moore? In other words -- I'll try to help you out. You frowned. This memorandum was prepared by Mr. Meinhardt at a time when he was -- prepared for the purpose of seeking a concurrence from Henson Moore; is that right?

A. This looks like a paper that was going to the Deputy Secretary. I don't see a date on it.

Q. I don't see a date on it either, but I'm not sure why that has anything to do with my question. My question is this memorandum --

A. Okay.

Q. -- was Mr. Meinhardt's effort to obtain a concurrence from the Deputy Secretary S-2, who you identified as Henson Moore; right? My question to you is, when you received a letter from Mr. Meinhardt on the subject of a further reduction in the award fee, was that at a time before Henson Moore had approved that further reduction?

A. I don't know what the whole headquarters process was that led to Meinhardt's letter. I don't know what happened here. I didn't get into that.

Q. In this letter that you received from Meinhardt, was Meinhardt at that time still seeking approvals that he

needed at headquarters?

A. Not as I recall.

Q. He had already received the approvals, is that what you mean?

A. I don't know what his process was. He was giving me his view on what the award fee ought to be.

Q. Was he telling you it was a done deal, as far as headquarters goes?

A. There wasn't much room for interpreting that letter. It was pretty clear.

Q. That it was --

A. They were approving a certain award fee.

Q. Let me show you a document that has been marked as Plaintiff's Exhibit 51, which is another copy of Mr. Goldberg's July 27, 1989 memorandum to you.

A. Okay.

Q. And I ask you to turn to, I guess, the fourth page, that is Bates number E 001598, and you can see there is some handwritten annotations there.

A. Yes.

Q. Do you know whose handwriting that is?

A. No.

Q. They appear to be the initials J.M. Can you think of anyone other than Meinhardt?

MR. KOLAR: Objection to the form of the

question.

Q. Let me rephrase that question. That was a good objection. Do you have any ideas who J.M. is?

A. I --

MR. KOLAR: Only if you know. Don't speculate.

A. No, I don't know.

Q. Okay. Have you ever seen this document before with the handwritten annotation?

A. No.

Q. And I believe you testified that you don't recall ever having a telephone conversation with Mr. Meinhardt where Mr. Meinhardt was expressing a view that Mr. Goldberg's 87 recommendation was too high a grade?

A. No, I don't recall that.

Q. Who is Admiral Barr?

A. He was the Assistant Secretary for Weapons Programs, DP-20. I'm not sure of his exact title. That position is a military officer that serves in DOE for a period of, I think, two years at a time.

Q. And who would he report to?

A. The Assistant Secretary for Defense Programs.

Q. So Admiral Barr reported to Mr. Meinhardt at the time?

A. Mr. Meinhardt was Acting Assistant Secretary for

Defense Programs for a period of time, yes.

Q. Let me show you a document that has been marked as Plaintiff's Exhibit 52.

A. Okay.

Q. Have you seen that document before?

A. No.

Q. Did you have any conversations with Mr. Barr with respect to his view on the proposed award fee for Rockwell?

A. Not that I recall.

Q. On the page that has the Bates number E 001446, Mr. Barr states that he bases his position, and he lists four points. Were those four points information, new information to you?

A. Points one and four were not. I don't recall those other two. We had ongoing tracking of TSE action items, and I don't know whether that was the same information that we were dealing with or not.

Q. Your PERB had a lot of information before it, didn't it?

A. Yes.

Q. Do you believe your PERB did a thorough job in reaching its original recommendation for you?

A. They did a thorough job based on the information they had available at the time they did the review. We knew about 771. We knew about the chromic acid spill. We should

have known about the tiger team findings. But I am quite sure we did not know the details of some of the operational issues that were being uncovered at Rocky Flats by the people that were brought in with Goldberg.

Q. Would that have been information not known as well to the DOE personnel in the area office at Rocky Flats?

MR. KOLAR: Objection, calls for speculation.

Q. To the extent you know.

A. I'm not sure whether you are talking before the Whiteman input to the PERB or the Goldberg input.

Q. Before the Whiteman input.

A. I'm quite sure that the insight that Whiteman's people had into Rocky Flats in a lot of the detailed operational areas was not as extensive as that uncovered by the tiger team.

Q. Who made up the tiger team?

A. A number of people from within DOE that had technical credentials in a whole myriad of areas.

Q. Do you know how much time they spent at Rocky Flats facility between June 6 and July 10?

A. Not offhand. Well, yes.

Q. Let me show you a document that has been marked Plaintiff's Exhibit 53. It's a memorandum from you to Mr. Meinhardt dated August 8, 1989.

A. Okay.

Q. Have you seen this document before?
A. Yes.
Q. Is that your signature on it?
A. Yes.
Q. You note that in the third paragraph it states that, "As stated in my draft memorandum to John C. Tuck dated July 10, '89"?
A. Yes.
Q. Does that refresh your recollection that that memorandum, indeed, went to Mr. Tuck?
A. I would say that's one way to interpret that. I'm a little surprised that we reference a draft memorandum as an official memorandum, but that...
Q. You state that, "I am not" -- you being Mr. Twining -- "am not in a position to offer an informed alternative to his proposal, especially in view of our changing philosophy in the application of Department of Energy performance standards and level of DOE expectations."
What do you mean by that, that you were "not in a position to offer an informed alternative"?
A. What I meant is at this point there were many more people looking at that plant in intimate detail than there had been before the raid, and that since Albuquerque was no longer in the loop and we didn't have access to the site, I didn't have any way to validate what they are finding. So I

was accepting what other federal employees, who were on site, were discovering during this period after the raid.

Q. What is the purpose of this memorandum to Mr. Meinhardt?

A. Well, the purpose of this memorandum was to respond to the nonconcurrence around my prior recommendation, and to provide a new recommendation for headquarters' consideration, and this new recommendation reflected the input from Ed Goldberg who was the acting area manager of Rocky Flats.

Q. At the time you sent this memorandum, did you have any information that headquarters was considering an even lower award fee?

A. No.

Q. Let me show you a document that has been marked Plaintiff's Deposition Exhibit 150.

A. Okay.

Q. Who would have prepared this letter?

A. Well, I can't tell because there is not an organizational code on it, but probably our contracts people.

Q. Did they have forms in their word processor for these award fee letters to contractors?

A. I don't know.

Q. Do you know when this letter was prepared?

MR. KOLAR: Let me have a moment. Okay.

Q. If you will look at the top page that has the Bates number E 000936, and going over to 937, that is a memorandum to you from Mr. Meinhardt; correct?

A. Yes.

Q. And in that Mr. Meinhardt proposes a Rockwell award fee.

A. Yes, he does.

Q. Now, would this be the communication that you testified to earlier that you believe you received some memo from Mr. Meinhardt on a lower award fee?

A. Yes.

Q. This would be it?

A. Yes.

Q. Now the memorandum to you from Mr. Meinhardt is dated September 20, 1989.

A. Yes.

Q. Do you recall whether you had any discussions with Mr. Meinhardt prior to September 20 in connection with this proposed award fee?

A. I don't recall specifically.

Q. Which means you don't recall one way or the other?

A. No.

Q. No, you don't recall one way or the other?

A. No, I do not recall one way or the other.

provided comments that were of concern to them and that we have incorporated.

Q. Have they ever drafted a letter that says "Dear Mr."?

A. Not that I recall.

Q. In Mr. Meinhardt's memorandum to you, on the page that is E 000936 --

A. Yes.

Q. -- the last sentence on that page states, "Admiral Watkins concurs in this recommendation."

A. Yes.

Q. Was there some significance from your point of view for a reference to Admiral Watkins?

A. Not really, other than to give me an indication that this response had been staffed within the department.

Q. Had been what?

A. Had been staffed within the department.

Q. What does that mean, "staffed"? I assume Admiral Watkins isn't on somebody's staff.

A. That means that DP had taken it to the people who were interested and gotten their agreement in it.

Q. Had you ever had any conversations with Admiral Watkins concerning Rockwell's award fee?

A. No.

Q. Now, on this exhibit, the first two pages of it,

the one E 000934 and 935, it says on the bottom, "Official file copy."

A. Yes.

Q. This would be a copy of the letter that you signed that went to Mr. Sanchini?

A. Yes.

Q. Did you prepare this letter?

A. No.

Q. Who would have prepared it?

A. Ted Cone.

Q. How did you figure that out?

A. Well, the author of the letter is the first person on the concurrence block.

Q. I see. Now this letter is substantially the same, is it not, as the draft that was prepared by Mr. Twining? And take a look and review it yourself, if you don't recall.

A. I would say it would be fair to say it is substantially the same. The numbers are a little bit different.

Q. Do you recall the explanation for the difference in the numbers?

A. No.

Q. In the draft that was prepared by Mr. Meinhardt, E 000938 --

A. Yes.
Q. -- in the first line of that, he states, "In accordance with Appendix D of Contract DE-AC04-76-DP03533, I hereby determine that Rockwell International has earned an award fee," and then it goes on. If you turn now to your official file copy, in the first line, again, in accordance with the contract, it now states "The Department of Energy hereby determines."
A. Yes.
Q. Do you recall that change being made?
A. No.
Q. Do you recall any discussions about that change?
A. No.
Q. When you received this package from, or the memorandum from Mr. Meinhardt, did you call your PERB back into session to decide whether you would go along with it or not?
A. I don't recall whether the PERB was called back into session or not. I'm sure I consulted with the chairman of the PERB.
Q. Do you recall any discussions with Mr. Troell concerning --
A. Not specifically, no.
Q. You don't recall as you sit here today any discussions of what was said?

Q. Do you recall?
A. I don't know.
Q. I show you Exhibit 150, which was your draft letter proposing another award fee, and in there you refer to "I hereby determine." Does that help you in any way?
A. It would be very, very straightforward to go through a sample of award fee letters and see what we usually do. I don't know.
Q. Okay. Thank you.
A. I focus more on the content of what we do rather than the specific wording of the letters.
Q. Did you talk to Mr. Goldberg about the fee that Mr. Meinhardt came up with?
A. I don't recall having discussions with either Mr. Meinhardt or Mr. Goldberg as this process was proceeding.
Q. Let me mark as Plaintiff's Exhibit 174 a document that bears Bates numbers E 000978 through 987.
A. Okay.
(THEREUPON, Deposition Exhibit Number 174 was marked for identification.)
MR. KOLAR: Just give us a second to look at it.
Q. Okay?
A. All right.

whether it was written or verbal or who it came from, but I'm quite sure we got it because that's why we sent the packages to headquarters.

Q. Are you aware of any contracts with your M & O contractors that were amended to reflect the fact that headquarters' concurrence was required for award fees?

MR. KOLAR: In what time frame are we talking about?

MR. NYE: I'll take any time frame.

MR. KOLAR: All right.

MR. NYE: But I assume we are talking about since 1989.

Q. I think it's better to specify.

A. The major contract changes that came out of this overall contractual management improvement effort was the accountability rule, the new award fee curves, the 51 percent on ES & H. I think that occurred after this time frame. I'm not aware of any contractual changes that were made just to reflect the fact that we needed to get headquarters' concurrence.

Q. In your current M & O contracts, or under your auspices, did they refer to the fact in the award fee plan or elsewhere in the contract that headquarters' concurrence is part of the award fee possess?

A. I don't know whether they are in the contracts or

that right?

A. That's what it appears to be.

Q. And I believe your testimony this morning is that a document such as this would not be forwarded to your attention?

A. No.

Q. Would Albuquerque's functions provide input to the area office in connection with the mid term evaluations?

A. Normally they would. Rocky Flats was not a normal situation, and, frankly, I'm a little surprised that they were sending this report to Albuquerque in the first place.

Q. Why is that?

A. Because I think that I delegated the FDO authority for this period to the area manager up at Rocky Flats. It was very difficult for us to do an award fee if we don't have virtually any interactions with a site.

Q. And that lack of interaction began on June 6th.

A. June 6th.

Q. So that going back now to the first award fee period in '89, did you feel that it was difficult to do the award fee once June 6 came along?

A. It was difficult, yes. It was a very difficult situation.

Q. And you were really out of the loop in Albuquerque vis-a-vis Rocky Flats after June 6.

A. On the operational issues going on at the plant, we were out of the loop. We were still doing financial support and budgeting support and helping them on contracts, but as far as Albuquerque having direct access to the site, firsthand knowledge, that ended with the Tuck memo.

Q. Let me show you what has been marked as Exhibit 80, which is an August 30, 1989 memorandum from Mr. Troell to a long list of addressees.

A. Okay.

Q. Do you recall ever seeing this memorandum?

A. No.

Q. As of the date this was signed, August 30th, was there doubt as to who would be the award fee determination official for Rockwell for the second half of fiscal year 1989?

A. There didn't appear to be in Mr. Troell's mind.

Q. How about in your mind, if you recall?

A. I will repeat what I said. I don't know how I could do an award fee evaluation without having direct access to the site.

Q. You just did it for the first award fee period.

A. No, we had direct access to the site during the first evaluation. We had input from Mr. Goldberg and a lot of people that were brought in to help him. That doesn't mean it was easy, and it's not the way an award fee ought to

be done in the long term.

Q. In the second sentence of the second paragraph, it says, "It has not been determined what our future involvement with regard to CPAF support to Rocky Flats will be for fiscal year 1989 and beyond." Was that a subject of discussion at the time as to what the future role of Albuquerque would be in the Rocky Flats award fee process.

A. Well, there were a lot of things being discussed, at this time and over the next several months, and, in fact, there is an MOU that was formulated between ourselves and headquarters and the Rocky Flats office that gives a schedule on how various areas of support that we were providing would transition to the Rocky Flats office as they grew. And so beginning with the June 6 Tuck memo, there was, you know, an evolution of Albuquerque getting out of the Rocky Flats business.

Now, I don't know what the date on the MOU was, but these kind of discussions were going on in all of the areas that Albuquerque was involved in, personnel security, project management, financial management. We still have a financial role.

Q. Was that MOU in the package that was put together for your review by your contracts and pricing people for this deposition?

A. No.

Q. Were "Award Fee Reporting Procedures and Key Milestones," which is the title of Exhibit 71, were they prepared for other award fee periods prior to the second half of '89?
A. I don't recall specifically, but I think so.
Q. And I take it if they were, they would not, however, have included items on the milestones numbers eight and nine which refer to seeking and obtaining concurrence from the Assistant Secretary?
A. That was a new requirement. It wouldn't have included that.
Q. I believe you alluded in prior testimony that the award fee decision-making authority was delegated by you to the manager at Rocky Flats for the second half of '89?
A. Right.
Q. How did that decision come about?
A. I don't recall the specifics.
Q. Was it your decision?
A. I think so, but I don't recall. I mean, it puts me in an untenable position to be determining the award fee on a site where we haven't had access. I felt fairly strongly that I shouldn't be the award fee determining official, the contracting officer, or the financial management allottee, because I don't have the ability to control what a person ought to control with those roles.

the initiative with respect to the delegation.

A. I don't remember the specifics.

Q. Do you know who learned first of the delegation, you or Mr. Simonson?

A. No.

Q. Did you inform Rockwell at the time that there was a delegation?

A. I don't know whether they would have gotten a copy of that letter or not. It doesn't look like it, and I don't know whether there was another letter that went to them.

Q. After this delegation on October 13, were you consulted further with respect to the award fees for the second half of 1989 for Rocky Flats?

A. I wasn't.

Q. What about Albuquerque, if you know?

A. Well, I think there would still have been some areas where it was legitimate to get functional input from some of my people. I don't know whether the Rocky Flats office did that or not.

Q. Let me show you a document that has been marked as Exhibit 142, a memorandum from Mr. Agy to Mr. Miller, dated February 7, 1990.

THE WITNESS: If that's his question, that's an easy answer.

MR. KOLAR: Hold on a second.

PL. SUPP. EX. 49

CERTIFIED COPY



No. 91-1362 C

UNITED STATES CLAIMS COURT

-oOo-

ROCKWELL INTERNATIONAL CORPORATION, :
Plaintiff, :
vs. :
UNITED STATES OF AMERICA, :
Defendant. :

---

DEPOSITION OF

EDWARD S. GOLDBERG

Tuesday, November 10, 1992

Reno, Nevada

Reported by:

NANCY J. REIGLE, CSR #266, RPR, CP
CALIFORNIA CSR #7643

TEARNEY & TEARNEY
Certified Shorthand Reporters

deputy to three deputies at that time.

Q When did you first become a deputy manager at Handford?

A 1984.

Q What were your responsibilities as the deputy manager of site resources?

A I was responsible for all administrative activities for the site, I also had responsibility for environment, safety and health oversight of the entire site.

Q Was that a promotion from your previous position?

A No.

Q What was your next position?

A I retired.

Q When did you retire?

A Retired effective March 1st, 1992.

Q Sometime during 1989 you were given responsibilities in connection with the Rocky Flats Plant; is that right?

A That is correct. I was detailed to acting manager of the Rocky Flats Plant.

Q When was that?

A That was beginning June 6th and ending sometime in September of 1992. I do not recall the

exact date.

Q So by--

MR. BRUNS: I'm sorry. What year did you mean, Mr. Goldberg?

THE WITNESS: Oh, excuse me, 1989. I said '92. I think he wrote '89 down. I think it was '89.

MR. BORNHOFT: I heard '92, so--

THE WITNESS: I did say '92.

BY MR. KELLEY:

Q By detailed to the Rocky Flats Plant, do you mean that you were assigned summarily?

A Yes. I maintained my position as deputy manager at Handford.

Q Other than what you described to me as your positions, were you detailed to any other positions?

A Yes.

Q What were they?

A I don't recall all of them because they go back through my whole career, but I'll give you some of the more recent ones.

I was detailed in the 1986-87 period to head a major task force for the Department of Energy called the Strategics Issue Analysis Facilities. And I was also detailed--

Q Did you have any experience similar to what took place at the Rocky Flats Plant on June 6th?

A No.

Q At the meeting in Denver, did Mr. Moore say anything about Rockwell's award fee?

A I don't recall that anything came up with regard to the award fee at that meeting.

Q No one mentioned it; is that correct?

A I don't recall that anyone mentioned award fee at that meeting; if they did, it just never stuck, but I just don't recall that that came up in that meeting really. The FBI and EPA was just too big a thing to bring in any ancillary items, and I wouldn't have paid much attention to them at any rate. It was just a very, very big thing.

Q Did you go on site at Rocky Flats on June 6th?

A Yes.

MR. KELLEY: Can we go off the record? Let's take a little break here.

(Exhibit 48 was marked.)

BY MR. KELLEY:

Q Mr. Goldberg, I'm handing you a document that has been marked as Exhibit 48 which is a memorandum from John Tuck to Bruce Twining and yourself

dated June 6th, 1989.

Would you please review the document and tell me if you've ever seen it before.

A Yes.

Q Is this the document that formally assigned you to the Rocky Flats Plant?

A To the best of my recollection this is the document, although there was other formal paperwork that goes to the administrative-- through the administrative channel which defines the detail.

Q What other paperwork is there that defines the detail?

A It's just what I explained to you. There's normal informational paperwork. It has to go through the administrative channel so you get your paycheck and the administrative side knows where you are all the time.

Q Does this explain the details of your duties or responsibilities?

A No. It just says you're detailed to such and such a job from such and such a job effective such and such a date to such and such a date, and so just a formal administrative document.

Q Mr. Goldberg, I'm handing you a document that's been marked as Exhibit 49 which is a memorandum

Q But you never saw any documentation on that?

A I don't recall seeing it at this point in time. It's just something that I just don't recall. You will have to look at the files and see if there was a piece of paper that came back to the Rocky Flats office. I just do not recall it.

Q Did you ever find out what Rockwell eventually received as an award fee?

A I don't know, you know, just sitting here at this point in time I just don't know. Only thing I do know is that it was reduced, and I do not remember or recall that I saw what the final number was, and I don't know why I don't recall, but I just don't.

Q After you sent your recommendation to Mr. Twining, did you speak with anyone at Albuquerque about Rockwell's award fee?

A Mr. Twining and I might have had some discussions, but specifically I don't recall anyone else. He might have called, and I just don't specifically recollect what took place after I sent the recommendation to Mr. Twining.

Q Did Mr. Twining call you or did you call Mr. Twining?

A It could have been either way.

Q What did you two discuss?

A I don't recall any of the discussions. What I'm saying is that he could have called for clarifications and so on; I just don't recall.

Q Did he ever express to you whether he agreed or disagreed with your recommendation?

A I don't recall.

Q After sending your recommendation on Rockwell's award fee to Mr. Twining, did you ever speak with anyone at DOE headquarters about Rockwell's award fee?

A I don't remember. It would only have been if I did to the extent that I've done the job, and that's it. I would not have discussed any details, but I specifically do not recall talking to anyone at headquarters.

Q Prior to sending your recommendation on Rockwell's award fee to Mr. Twining, did you speak with Mr. Twining about Rockwell's award fee?

A Mr. Twining and I had many conversations. I don't recall specifically the ones where the award fee might have come up. I just do not. But we talked because he was responsible for supplying considerable assistance to me, and as the budget was part of that assistance he was interested in what we were doing,

'cause the money was coming out of his budget. So we had many conversations, and the award fee could have come up in those conversations and discussed what we were doing, where we were going, but I do not specifically recall any of those conversations.

Q Was it your understanding that Mr. Twining was to provide you assistance in connection with Rockwell's award fee?

A Not specifically. Mr. Barkmeier was handling that, and I don't recall that he asked for any assistance from Mr. Twining. I certainly did not.

Q Did Mr. Twining ever tell you what he thought should be Rockwell's award fee?

A I certainly saw what he had initially recommended, but beyond what was written in that document he did not, to my-- best of my knowledge recommend anything to me after we initiated the relook.

Q Did he ever recommend anything different from what he had had in his written recommendation?

A As far as I know he made a recommendation to headquarters after I made my recommendation to him, and I don't recall what that was.

Q Prior to sending your recommendation on Rockwell's award fee to Mr. Twining, did you speak to anyone from headquarters about Rockwell's award fee?

Q You sent your recommendation for Rockwell's award fee to Mr. Twining; is that right?
A Yes.
Q Why did you send it to Mr. Twining?
A He was the fee determining official.
Q How did you learn that?
A How did I learn he was the fee determining official?
Q Yes.
A The manager of Albuquerque is the fee determining official.
Q Did somebody tell you?
A I guess I just knew it. The manager is the fee determining official, and the fact that Albuquerque was responsible for operations at Rocky Flats, it was just a fact. The manager is the fee determining official. I don't think anybody specifically told me that, but it's just something I knew intuitively.
Q Was it the case at any of the other places you worked at other than Rocky Flats that the award fee determination official was someone at another office?
A No.
Q Mr. Goldberg, I'm handing you a document that is being marked as Exhibit 55.

PL. SUPP. EX. 50

DOE F 1325.8

United States Government

Department of Energy

# memorandum

Albuquerque Operations Office

Rocky Flats Area Office

DATE: SEP 2 [illegible]

REPLY TO ATTN OF: ADM:TA

SUBJECT: Schedule of Award Fee Evaluation, Second Half of FY89

TO: RFO Assistant Managers (2)
RFO PRMP Project Manager (1)
RFO Division Directors (7)
RFO Branch Chiefs (13)

RFO will be performing an evaluation of Rockwell's performance under the Cost Plus Award Fee contract at the conclusion of the six-month award fee evaluation period of April 1, 1989 through September 30, 1989. The evaluation process used will be the approach developed by AL and used in our previous evaluations of Rockwell. This evaluation will result in an award of fee and the evaluation report, in the form of a recommendation, will be provided by RFO to the Chairman of the AL Performance Evaluation Review Board (PERB). The PERB, in turn, with make an award fee recommendation to the Manager, AL. The final award fee determination for this period will be made by the Manager, AL.

Meetings have been scheduled as follows:

| | |
|---|---|
| 1st RFO Meeting: | Tuesday, October 3<br>8:00-10:00 am<br>DOE Conference Room |
| Rockwell Meetings: | October 3(pm), 4, 5, or 6<br>Times to be Determined |
| 2nd RFO Meeting: | Tuesday, October 10<br>12:30-2:30 pm<br>DOE Conference Room |

Plaintiff/Defendant Deposition Exhibit 109
Case # 91-1362C
Date 12-7-92
Hyatt Court Reporting

<u>Preparing for the 1st RFO Meeting</u>

This meeting and the 2nd RFO meeting will be attended by the Manager, Assistant Managers, the Project Manager, Directors, and the Chief of the Contracts & Services Branch. The Contract Administrator (Terrel Agy) within the Contracts & Services Branch will be the coordinator for the RFO meetings and for the award fee package sent to AL.

The purpose of the 1st RFO meeting will be to decide on the language to be used in the evaluation version to be discussed with your Rockwell counterpart. In preparation for the 1st RFO meeting, Division Directors [those with Functional Performance Areas (FPA's)] and the Project Manager will be expected to prepare an evaluation of their FPA's in the correct format. These should be prepared based on imput from AL Directors and Branch Chiefs and/or other imput or knowledge. The evaluation should be based on achievements or lack thereof against the Goals and Objectives (G&O's) letter sent to Dom Sanchini on April 18, 1989. Comments can also be made on areas not covered by the G&O's where, for example, important achievements or failures need to be noted.

A Director without an FPA is expected to submit evaluations in their area of responsibility for inclusion in the General Management (GM) FPA. Assistant Managers, Directors and the Project Manager should submit comments for the GM FPA when the comments would be more appropriate there or when the comment does not fit within their own FPA.

As the input from the AL Directors (due by September 29) is received, the Division of Administration will assure that the appropriate Assistant Manager, Project Manager, Director, and Branch Chief receive a copy. Please provide the Division of Administration with a copy of any AL Director input that is received by you directly. The Coordinator will be compiling a complete record of the AL input. Useable input from the AL Directors should be included in the evaluation and efforts should be made to resolve significant differences of opinion with the AL Directors.

Five pieces of correspondence on FPA's and Goals & Objectives for the period under review are attached. These items should help in bringing the newer RFO supervisors up to date.

The Coordinator will be responsible for gathering together a complete evaluation package to hand out to each attendee at the RFO meetings. He will also be compiling the comments for the GM FPA. To facilitate this effort, please provide Terrel with 15 copies of each FPA evaluation by COB October 2. Your GM FPA comments also need to be provided by that time on a disk in the Microsoft Word format for the Macintosh. Copies of all evaluations initiated at RFO this period should be marked both "Predecisional" and "Official Use Only."

Meeting with Rockwell

Dave Fergason of Rockwell Contract Administration has been informed of the RFAO meeting dates and will be arranging meeting times between the Rockwell Directors and the RFO Directors/ Assistant Managers/Project Manager, as appropriate, to discuss RFO preliminary evaluation positions and findings. You may be receiving a telephone call from Dave in connection with the meeting times. The meetings will start on October 4 and all meetings will be completed no later than the morning of October 10. Changes to the meeting

dates can be coordinated through Terrel. You will be provided with a copy of the meeting schedule with Rockwell.

The preliminary evaluations discussed with Rockwell cannot contain the adjectival or numerical grade and a copy of the evaluation should not be provided to Rockwell, informally or otherwise, for retention at the meeting.

The 2nd RFO Meeting

The Directors/Project Manager should be prepared with a revision of their evaluation if their discussions with Rockwell deserve such a revision. Otherwise, attendees should come to this meeting prepared to discuss the Rockwell reaction and what influence, if any, it should have on the evaluation. At this meeting the final version of the RFO evaluation recommendation is determined.

In preparation for this meeting, 15 copies of the revised evaluation needs to be furnished to Terrel at least two hours prior to the meeting.

Following the 2nd RFO meeting, the final RFO recommended version of the FPA evaluations (as revised by decisions made at the 2nd RFO meeting) should be furnished to Terrel on a disk by the Project Manager and appropriate Directors. Subsequently, I will be having a meeting with Dom Sanchini to cover the GM and other FPA's, as appropriate.

Questions about these meetings or about the award fee process can be directed to Claude Barkmeier, Hugh Miller or Terrel Agy.

David P. Simonson

David P. Simonson
Manager

Attachments (5)

cc:
Terrel Agy

PL. SUPP. EX. 51

United States Government Department of Energy

# memorandum

DATE: SEP 22 1989

REPLY TO ATTN OF: SPD

SUBJECT: CPAF Input - April 1 through September 30, 1989

TO: D. P. Simonson, Manager, RFO

The attached input is provided for your use in the CPAF process in which 20% has been established as an FPA in ES&H.

If there are any questions, please call Ray Miller at FTS 844-7877.

John J. Schinkle
Director
Safety Programs Division

Attachment

RFO DISTRIBUTION

FOSTER
SCHASSBURGER
ALDRICH
OSTMEYER
Agy

Plaintiff/Defendant Deposition Exhibit 112
Case # 91-1362C
Date 12-7-93
Hyatt Court Reporting

CPAF INPUT
ROCKWELL INTERNATIONAL
ROCKY FLATS PLANT
APRIL 1 - SEPTEMBER 30, 1989

## ELECTRICAL SAFETY

1. Summary

The Contractor has placed greater emphasis on the electrical safety program for the Rocky Flats Plant as a result of issues, identified through HQ Technical Safety Appraisals (TSAs), AL appraisals, and focus by the EH site representative.

There were no noteworthy achievements and no notable deficiencies.

Suggested Adjectival Grade: Very Good

2. Achievements

None

3. Deficiencies

None

4. Observations

The Contractor continues corrective action on electrical system deficiencies. There was one Unusual Occurrence Report (UOR) in this period that involved a contract electrician who cut into a live 480-volt cable. Seven other UORs included two contamination incidents; three releases of acid or acid fumes; and two involving fire protection (See element - Fire Protection).

## FIREARMS SAFETY

1. Summary

Rockwell International has not submitted a quarterly status report on the February Firearms Safety Appraisal. The East firing range has been reopened without an approved Safety Analysis Report (SAR) or risk analysis, even though a preliminary analysis indicated a hazard to the public. Corrective action plans for the February 1989 Firearms Safety Appraisal were acceptable.

There were no noteworthy achievements and some notable deficiencies.

Suggested Adjectival Grade: Good

2. Achievements

None

3. Deficiencies

   a. The East firing range has been reopened without an approved SAR or risk analysis, even though a preliminary analysis indicated a hazard to the public.

   b. Rockwell International was late in preparing an action plan in response to a February 1989, Firearms Safety Appraisal.

   c. Rockwell International has not submitted a quarterly status report on the 1989 Firearms Safety Appraisal.

4. Observations

   None

FIRE PROTECTION

1. Summary

   AL fire protection appraisals have identified the need for additional fire protection engineering staff. In terms of fire loss, the program has been extremely successful with a cumulative fire loss ratio over the last ten years of 0.02 cents per $100 plant valuation compared to an expected Improved Risk loss ratio of 3.0 cents. There is one notable deficiency dating back to 1985 regarding the need for additional fire protection engineering staff as mentioned above.

   There was one noteworthy achievement and one notable deficiency.

   Suggested Adjectival Grade: Very Good

2. Achievements

   The low fire loss record over the last ten years continued for this reporting period.

3. Deficiencies

   One major deficiency has been identified by AL related to the need for increased staffing in the fire protection engineering function. A recommendation was made in a 1985 AL Fire Protection Engineering Appraisal Report and has not been satisfied by Rockwell International. The recommendation remains outstanding.

4. Observations

   a. There have been two UORs related to fire protection during this period. There was one small metal duct fire with minimum damage. Of significance was the fact that an employee had previously notified both the Contractor and Area Office of specifics regarding the potential for an event. The other UOR related to the failure of a glovebox overheat detection system.

b. Rockwell International is presently in the process of developing internal programs to control combustible fuel loads and poor housekeeping in building areas, the identification of fire wall penetrations, and the improvement of supervision over these concerns. These developments are in response to deficiencies noted in past TSAs.

NUCLEAR FACILITIES SAFETY (FPE)

1. Summary

The Contractor's program for nuclear facilities safety is effective. Recommendations from previous Technical Safety Appraisals have been vigorously implemented in the nuclear facilities and most of them were closed in a satisfactory manner. All AL recommendations have been expeditiously implemented. Safety and housekeeping in the nuclear facilities at the plant have been significantly improved.

There have been some noteworthy achievements and some notable minor deficiencies.

Suggested Adjectival Grade: Very Good

2. Achievements

Significant efforts at the nuclear facilities have been made in response to the concerns of the Technical Safety Appraisals. Most of the concerns have been implemented and closed. Those concerns remaining open are being worked in an expeditious manner.

Detailed audits continue to be made by both operating and overview group at the Plant and these audits are effective in identifying problems and concerns. Problems and concerns so identified are reviewed by a qualified technical staff and corrective actions are identified for resolution. The audits involve physical building walk-through as well as paper review activities.

3. Deficiencies

Some AL appraisal closeouts have not been attended by the appropriate level of Rockwell Management. Although it is understood that time is limited in a busy schedule, extra effort should be taken by management to attend closeouts.

Building 771 was shut down for three months from October 1988 to January 1989, in order to upgrade safety procedures and practices. Phase I and Phase II of the restart have been completed, and Phase III is being worked.

4. Observations

There are no incomplete actions from previous AL appraisals. The Nuclear Safety Programs at the Plant are performed in a professional manner and personnel attitude toward safety is very good.

SAFETY ANALYSIS REVIEW PROGRAM

1. Summary

In keeping with prior review and analysis, Rockwell International has maintained an excellent Safety Analysis Program. Their program has been implemented effectively and the interface with AL on safety analysis issues is considered very good.

There were some noteworthy achievements and one notable deficiency.

Suggested Adjectival Grade: Very Good

2. Achievements

Rockwell International is continuing to maintain and implement their Safety Analysis Program and is continuing dialogue with DOE/AL on past items of mutual concern.

3. Deficiencies

More resources have been judged needed to complete safety analysis projects in a timely manner and to correct noted program minor discrepancies.

4. Observations

Rockwell has made every effort to try and meet DOE's new and existing safety analysis requirements within available resources. However, Rockwell's resources may be unable to meet the new safety analysis requirements now being promulgated by DOE and other agencies. Organization and responsibility changes in DOE make it difficult to identify resources needed for the future of the Rockwell safety program.

PL. SUPP. EX. 52

IN THE UNITED STATES

CLAIMS COURT

ROCKWELL INTERNATIONAL )
CORPORATION, )
Plaintiff, ) Case No.
vs. ) 91-1362C
THE UNITED STATES, ) Pages 1 - 114
Defendant. )

DEPOSITION OF:

ROBERT M. NELSON, JR.
MONDAY, NOVEMBER 9, 1992
10:25 A.M.

Reported by:
ROBERTA L. THIBODEAU
CA C.S.R. No. 8263
NV C.S.R. No. 358

Q. Is there any other limitation that would affect your ability to testify here today?
A. No.
Q. Do you understand everything I've said?
A. Yes.
Q. What is your current work address?
A. I have two current work addresses. I am the deputy manager of the Nevada field office of the Department of Energy, and the address is on Mr. Bornhoft's card here. It's a post office box. It's physically located at 2753 South Highland Avenue. I'm also the manager of the Rocky Flats DOE office on detail. So it's a collateral assignment.
Q. About how much time do you spend in the two different offices?
A. Physically I spend four days a week at the Rocky Flats plant and one day a week here. Much of my time on the one day here is spent on Rocky Flats business.
Q. What is your current home address?
A. My current home address is 3609 Casa Grande Avenue, Las Vegas, Nevada 89102.
Q. Mr. Nelson, please describe your formal education since graduating from high school.
A. I went one year to UCLA, enlisted in the

Q. And how long did you hold that position?

A. About -- I'm going to have to guess now. About -- must have been about three years. About three years to be -- and then I was -- I was moved laterally from assistant manager of operations to the assistant manager for administration, and -- and must have been around -- we could get precise dates. I just can't remember exactly, but I spent about three years in the operations job, and then about a like period of time in the -- in the administration job.

Q. And what position did you hold after the administrative job?

A. The deputy manager. What I have now.

Q. So when did you first hold that position? Would that have been around 1985?

A. When did I hold that position of -- must have been about -- about '85 to become the assistant manager for administration, and then about '88 I think I became the deputy manager.

Q. And have you held that position constantly since 1988?

A. Yes, recognizing that I've been put off on this detail. Now, a little nuance of the detail. The first year on the detail, I really was full time in Denver from -- from like January -- the end of

January 1990 for about a year. Probably January time frame in 1991 I came home about once a month. And so it was basically full time in the Denver area.

After that I -- I told them -- I had been sent up there for a six-month assignment, which clearly after a year was going to last longer than six months. And I told them that obviously because of family and other things I really needed to come home more often. And so at that point they changed my detail to be a collateral assignment, which really required me to be at both places during parts of the week.

So starting in January of '91, I was on this kind of a -- well, what I have now except that that lasted until April of '92. In April of '92 I was replaced at Rocky Flats and then was asked to go back again about a month ago. And so I'm -- I'm back on doing that collateral assignment now.

Q. And what was your position for the whole time you were at Rocky Flats?

A. Manager of the DOE office.

Q. Did you ever hold any other position at Rocky Flats?

A. Never.

Q. In any of your positions other than your

on how you define the word "involvement with," when I was the assistant manager for operations, starting in 1982, I started sitting on those boards. But I was in more of a leadership role as being the -- the contracting officer from 1985 on.

Q. In your operations position, did you submit input to the boards?

A. Yes.

Q. In the contracts in Nevada in which you have played some part in an award fee, what official was the fee determining official?

A. The manager of the office is almost always the fee determining official.

Q. The manager of the Nevada office?

A. Uh-huh.

Q. I believe you stated, Mr. Nelson, that you first became involved with the Rocky Flats plant at the end of January 1990; is that right?

A. That's correct.

Q. When were you first informed that you would be assigned to the Rocky Flats plant?

A. The precise date -- let me give you an about date. I would say it was about the 25th or so of January of 1990 I received a telephone call from the deputy assistant secretary for military

application in Washington which asked me to come to Washington and -- and meet with people, at that point undefined, for a reason he could not tell me on the phone. One of those very scary phone calls.

Q. Who was the deputy secretary?

A. That was Admiral Mike Barr. I -- of course, when you get a call like that, unless for, you know, overriding reason, I said, "Of course." I went on a plane the next day. And again, I can't be exactly precise, but it was that week. I -- I went the next day. I met with the -- I met with Admiral Barr. I met with the under secretary of energy, John Tuck, and then ultimately with the secretary of energy, Admiral Watkins. And at that point Admiral Watkins asked me to come to Rocky Flats for about six months. So it was and how fast could I get there, and I told them the next month. So whatever the month is, around the 28th or 29th of January of 1990 was the first day I had ever set foot on the place. So I had about a day's -- couple days' opportunity to pack bags and that kind of stuff.

Q. How long did you meet with the various people in Washington?

A. Well, it was -- it was a one-day affair. I would say I probably spent a couple hours with

Admiral Barr. I spent probably 15 minutes with the under secretary and probably a few minutes with the secretary.

Q. What did you discuss with Mr. Barr?

A. Well, first, he gave me the -- the idea that they would like me to go -- potentially go to Rocky Flats. Was there any reason I couldn't do that? There was a new contractor there, EG&G. I had had -- one of the five contracts here in Nevada is EG&G, a different company of EG&G, but certainly a company that I'm familiar with, a corporation I'm familiar with. A sense of -- of a lot of problems being at Rocky Flats, but nothing specific is my -- I don't recall any details. Mostly dealing with could I do that job, and would I be willing to do that job, and what would I want personnelwise kind of issues.

For example, David Simonson was my predecessor. There was another person named Ed Blackburn, I think, who was -- who had been Dave's deputy. What would I want them to do with those people kind of discussions if I were to go. And I asked them certainly to keep Dave Simonson there if he was willing. If I was going to replace him, I knew that would be an awkward situation, but I knew also -- I had known Dave before casually, but I knew who he

was anyway. And I knew he had been there about six months as the manager or some number of months as the manager, and I felt I could really use his knowledge of the plant.

It was a rather rapid turnover. So part of that -- as a matter of fact, Dave Simonson was at Washington that day for some reason which I don't know today, and I had an opportunity to sit down with him and ask him to stay and help me.

Q. Did Mr. Simonson end up staying?

A. Uh-huh. Still there.

Q. What was his position after you arrived at Rocky Flats?

A. I made him my deputy. He stayed my deputy for about six months.

Q. Did Mr. Barr discuss with you what your duties or responsibilities would be at Rocky Flats?

A. Yes. In very general terms a manager is responsible for everything that goes on in the plant. And certainly we talked about the focus was to take this new contractor and get them to fix the -- the various problems that had caused the transition of Rockwell to EG&G. We had the Tiger Team of the previous year with a lot of findings, and there were a lot of -- there had been over that period of time

Q. Let me draw your attention to Appendix D in this document.
A. Uh-huh.
Q. The page that is labeled E 001278.
A. Yes, okay.
Q. And let me further draw your attention to section No. 2, Introduction, on that page, and in particular the first sentence --
A. Uh-huh.
Q. -- which reads: "The award fee determination official (manager or anyone acting as manager, Albuquerque operations)."
A. Uh-huh.
Q. Were you aware that the manager of the Albuquerque operations was the award fee determination official for the Rockwell contract?
A. Yes.
Q. And you were aware of that in February of 1990?
A. Yes.
Q. Mr. Nelson, I'm handing you a document --
A. Do you want these back?
Q. Yes, please.
I'm handing you a document that has been

A. Must have been around December of '90. Hold on just a second. Okay.
Q. Did you prepare the letter?
A. No.
Q. Did you assist in drafting the letter?
A. No.
Q. Did anyone consult with you in preparation of the letter?
A. No.
Q. Were you the manager of the Rocky Flats office in December of 1990?
A. Yes.
Q. What was Mr. Twining's position at that time?
A. Manager of the Albuquerque office, and, of course, still the contracting officer, I believe, for the Rockwell contract.
Q. Were you the award fee determination official in December of 1990 with respect to Rockwell?
A. I don't think so. As I mentioned to you, I was to be the award fee official for that one six-month period and the close out of that remaining part of that year, and before that were Mr. Twining's responsibility.
Q. Does this letter relate to the

PL. SUPP. EX. 53

Plaintiff/Defendant
Deposition Exhibit
2
Case # 91-1362 C
Date 10-21-92

# HANDBOOK FOR AWARD FEE PERFORMANCE EVALUATION AND REVIEW PROCESS

ALBUQUERQUE OPERATIONS OFFICE

UNITED STATES ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION

# ALBUQUERQUE OPERATIONS OFFICE (AL)

## HANDBOOK FOR

## AWARD FEE PERFORMANCE EVALUATION AND REVIEW PROCESS

APPROVED: Herman E. Roser

Herman E. Roser
Manager, AL

Date: June 24, 1977

# PREFACE

This Handbook contains the policy and procedural guidelines to be used in the evaluation and review process associated with Cost-Plus-Award-Fee (CPAF) contracts applied to Albuquerque Operations Office (AL) GOCO production contractors within the weapons production complex.

The Handbook is to be used by all AL Headquarters and Area Office personnel who have a responsibility for and participate in the evaluation and review of AL GOCO production contractors' performance under the provisions of applicable CPAF contracts.

TABLE OF CONTENTS

PREFACE. . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. GENERAL. . . . . . . . . . . . . . . . . . . . . . . . 1

A. Introduction . . . . . . . . . . . . . . . . . . . . 1
B. Objective . . . . . . . . . . . . . . . . . . . . . 2

II. PLANNING FOR CPAF IMPLEMENTATION . . . . . . . . . . . . 4

A. Interface With Contractors . . . . . . . . . . . . 4
B. Performance Evaluation Plan . . . . . . . . . . . . 4
C. Award Fee Plan . . . . . . . . . . . . . . . . . . 7
D. Evaluation Administration Plan . . . . . . . . . . 7

III. EVALUATION AND REVIEW - ORGANIZATION AND ADMINISTRATION 9

A. Organization And Administration . . . . . . . . . . 9
B. Performance Evaluators And Monitors . . . . . . . . 9
C. Area Office Managers . . . . . . . . . . . . . . . 9
D. AL Division Directors . . . . . . . . . . . . . . . 10
E. Performance Evaluation Committees (PECs) . . . . . 10
F. Performance Evaluation Review Boards (PERBs) . . . 12
G. Contracting Officer (Fee Determination Official) . 13

IV. IMPLEMENTATION OF EVALUATION PROCESS . . . . . . . . . 14

A. Monitoring Process . . . . . . . . . . . . . . . . 14
B. Making An Evaluation . . . . . . . . . . . . . . . 18
C. Role Of Performance Evaluation Committee (PEC) . . 22
D. Role Of Performance Evaluation Review Board (PERB) 23
E. Role Of Contracting Officer (CO) . . . . . . . . . 24

V. CONTINUING EVALUATION PROCESS . . . . . . . . . . . . . 26

A. General . . . . . . . . . . . . . . . . . . . . . . 26
B. Changes To Performance Evaluation Plan . . . . . . 26
C. Changes to Evaluation Administration Plan . . . . 27



E 001014

VI. NOTIFICATIONS . . . . . . . . . . . . . . . . . . . . 28

A. Area Office Manager Responsibilities . . . . . . . . 28
B. Other Notification Responsibilities . . . . . . . . . 29

VII. ANNUAL APPRAISAL . . . . . . . . . . . . . . . . . . . 30

A. General . . . . . . . . . . . . . . . . . . . . . . 30
B. Evaluation . . . . . . . . . . . . . . . . . . . . . 30
C. Annual Appraisal Report . . . . . . . . . . . . . . 32

Appendix A. MASTER LIST OF FUNCTIONAL PERFORMANCE AREAS (FPAs) . . . . . . . . . . . . . . . . . . 36

Appendix B. SAMPLE AWARD FEE PLAN . . . . . . . . . . . . . 42

Appendix C. RATING PLAN . . . . . . . . . . . . . . . . . . 51

GLOSSARY OF TERMS . . . . . . . . . . . . . . . . . . . . . 52



E 001015

# I. GENERAL

## A. Introduction

This Handbook is intended as a guide to be utilized in the preparation and implementation of the performance evaluation and review process applicable to Cost-Plus-Award-Fee (CPAF) contracts with AL GOCO production contractors within the weapon production complex. The provisions contained herein may be applied in connection with other CPAF contracts administered within the AL system at the discretion of responsible officials. The purpose of the Handbook is to provide a uniform structure within which all those involved in the CPAF evaluation and review process may operate. Such standardization is necessary in order that the methodology, terminology, procedures, and practices can accommodate the several contracts within the weapons production complex and facilitate participation by the various parties who will be involved. On the other hand, it is necessary to allow maximum flexibility in the details of implementation of each CPAF Award Fee Plan due to the variations between each contractor's management, organization, and operations and between AL objectives for each facility. Therefore, application of CPAF Award Fee Plans must be tailored to meet individual considerations associated with each contractor. Substantive exceptions to the requirements of this Handbook may be authorized by the Contracting

Officer or the Performance Evaluation Review Board (PERB) Chairman when such variations are determined to be appropriate for a particular CPAF contract.

B. Objective

The AL objective in entering into CPAF contracts with the weapons production complex GOCO production contractors is to achieve optimum performance levels, affording the contractors an opportunity to earn increased fee in the pursuit of this objective. Optimum performance does not necessarily connote the very best operating level which could possibly be achieved in each functional area; rather, it represents the most favorable degree of performance considering the objectives to be realized balanced by the most effective utilization of available resources.

In applying CPAF contracts to the contractors within the weapons production complex, the level of performance attained by the individual contractors and the long association of these contractors with AL under the Cost-Plus-Fixed-Fee (CPFF) arrangement must be considered. In doing so, it is AL's intention to apply the CPAF concept in a manner compatible with the unique weapons production complex arrangement, with the expectation of mutual benefits to AL and the contractors. In

implementing the evaluation process under the CPAF arrangement, the AL expectation is to provide a fair assessment of contractors' performance without imposing an excessive, burdensome monitoring and documentation system which would encroach upon the limited manpower resources available to both AL and the contractors. The evaluation process outlined in this Handbook relies heavily on existing organizations, established survey and appraisal techniques, and personnel who are assigned management, administrative, and operating responsibilities in connection with the ongoing AL missions and operations. Within these constraints, every attempt will be made to elicit enough information to introduce as much specificity and objectivity into the evaluation process as possible.

## II. PLANNING FOR CPAF IMPLEMENTATION

### A. Interface With Contractors

The first step in the application and implementation of a CPAF contract arrangement with a particular contractor should be a discussion with that contractor to explain the approach which AL intends to use in the formulation, application, and implementation of an Award Fee Plan and the procedures and processes associated therewith. These discussions should occur early in the planning stage between management representatives of AL and the contractor so that agreement in principle may be achieved. Subsequently, the definitive provisions of the Award Fee Plan and the Performance Evaluation Plan should be developed in consultation with the contractor in order to facilitate a common understanding of intent prior to the contract negotiations and the implementation of the CPAF concept. The Award Fee Plan itself will become an appendix to the contract.

### B. Performance Evaluation Plan

The Area Office Manager, during the planning stages, will be responsible for preparing a proposed Performance Evaluation Plan applicable for the initial evaluation period under the CPAF contract. The Plan should normally be composed of from 5 to 10 Functional Performance Areas (FPAs) selected from the "Master List Of Functional Performance Areas (FPAs)"

included in this Handbook (see Appendix A). In all cases, the FPA entitled "General Management" will be included as a part of the Plan. The selection of the other FPAs shall be based upon specific considerations associated with the contractor's mission, performance level, and the degree to which AL wishes to stimulate or emphasize performance in any specific areas without lowering the level of performance in other areas. Normally, an FPA would be selected to either encourage an improvement in performance which has not been at the desired level or to emphasize the importance of performance in a particular area in the context of existing conditions. It is not necessary--at times perhaps not even desirable--to include certain so-called "main mission" FPAs in a Performance Evaluation Plan for any particular evaluation period. The advantages inherent in covering a wide spectrum of contractor activities in a Performance Evaluation Plan should be considered. There are provisions, which are discussed in other sections of this Handbook, for changing FPAs from evaluation period to evaluation period; so there is no need to get "locked in" on any specific group of FPAs. Certain FPAs, by virtue of their prominence and the administrative and operational requirements surrounding them, inherently demand a high level of performance and receive a great deal of visibility on a continuing basis. Therefore,

contractor performance in connection with such FPAs may not have to be stimulated or monitored under the award fee concept.

In addition to designating the FPAs, the proposed Performance Evaluation Plan shall include the Area Manager's recommended weighting for each FPA (including "General Management") with the sum of the individual allocations totaling 100%. After the Plan has been drafted, it shall be forwarded to the Chairman of the Performance Evaluation Review Board (PERB) for review. The rationale indicating why specific FPAs and weightings were selected should be submitted with the Plan for the edification of the PERB. The Chairman of the PERB will coordinate review of the Area Office Manager's proposal with the other PERB members; will discuss all proposed changes with the Area Office Manager; and, with PERB concurrence, will approve the Plan to be implemented.

After the Performance Evaluation Plan has been approved by the PERB, the Area Office Manager shall notify the contractor of the Plan at least 30 days prior to commencement of the evaluation period or as specified by the contract. In addition, the Area Office Manager shall notify the concerned AL Divisions of the FPAs to be evaluated to facilitate the Divisions' planning for and participation in the evaluation process.

C. Award Fee Plan

The Award Fee Plan, which will become an appendix to the contract, will be developed by the AL Contracts and Procurement Division in consultation with the Area Office Manager. It will include such elements as the Performance Evaluation Plan, the Rating Plan and associated grades and definitions, an award fee performance table, and a description of the administrative procedures which are to be applied. A format for, and sample provisions of, an Award Fee Plan are included in this Handbook as Appendix B. The specifics of an Award Fee Plan, including the fee provisions applicable to each contract, will be negotiated with the contractor during the contract negotiation phase and, normally, will be renegotiated each year.

D. Evaluation Administration Plan (EAP)

After a Performance Evaluation Plan has been approved by the PERB, the Area Office Manager will construct an Evaluation Administration Plan (EAP) to facilitate implementation of the evaluation and review process associated with the Performance Evaluation Plan. The Evaluation Administration Plan will be designed to meet the requirements of each contract situation. The Plan shall contain the FPAs to be evaluated, the Functional Performance Elements (FPEs) associated with these FPAs, and any additional information or instructions related thereto

which the Area Office Manager chooses to include. The Functional Performance Elements (FPEs) are listed in Appendix A. In addition, the Plan shall normally include the designation of Performance Monitors and Performance Evaluation Coordinators and the areas for which they are responsible. Methods, procedures, and instructions to be utilized by the Performance Monitors and Performance Evaluation Coordinators should also be a part of the Evaluation Administration Plan. The Plan shall denote the intended frequency of meetings with the contractor during each evaluation period (no less frequent than bi-monthly) to discuss the contractor's performance. These meetings are intended to facilitate a mutual exchange of information and views concerning contractor performance. The procedures, level of attendance, and documentation of such meetings shall be established by mutual agreement between the Area Office and the contractor.

## III. EVALUATION AND REVIEW - ORGANIZATION AND ADMINISTRATION

### A. Organization and Administration

Organizational and administrative responsibilities for the award fee evaluation, review, and fee determination process will involve: (1) Performance Evaluators and Performance Monitors, (2) Area Office Managers, (3) AL Division Directors, (4) Performance Evaluation Committees, (5) Performance Evaluation Review Boards, and (6) the Contracting Officer.

### B. Performance Evaluators And Monitors

Performance Evaluators and Performance Monitors are those personnel responsible for gathering and assessing evaluation information relative to contractor performance of specific FPAs. A Monitor is an on-site AL representative (normally Area Office staff) who performs assigned evaluation functions on a continuing basis. An Evaluator is an off-site AL representative (normally AL Division staff) who performs evaluation functions on a periodic basis. The roles of Evaluators and Monitors are further delineated in other sections of this Handbook.

### C. Area Office Managers

Each Area Office Manager is responsible for implementation of the award fee evaluation process at the site of the contractor's operations. The Area Office Manager shall assure

that evaluation material is accumulated and consolidated so as to facilitate on-going and subsequent review in the evaluation process. The Area Office Manager shall also serve as Chairman of the Performance Evaluation Committee (PEC) and shall be responsible for notifications to the contractor and concerned AL Divisions of pertinent information associated with the award fee evaluation process. The roles of the Area Office Managers are further delineated in other sections of this Handbook.

D. <u>AL Division Directors</u>

AL Division Directors are responsible for AL Headquarters' evaluations of contractor performance relative to the specific FPAs for which an individual Division has a responsibility. Each AL Division Director involved in the evaluation of one or more FPAs shall assure that evaluation material is collected and assessed by Performance Evaluators to facilitate on-going and subsequent review in the evaluation process. The roles of the AL Division Directors are further delineated in other sections of this Handbook.

E. <u>Performance Evaluation Committees (PECs)</u>

A Performance Evaluation Committee (PEC) will be appointed by the Contracting Officer for each CPAF contract. A PEC shall normally be composed of three to six members, with

representatives from both the Area Office and AL Headquarters. The PEC Chairman shall be the Area Office Manager and the AL Headquarters' representatives shall normally be at the Division Director level. The PEC responsibility is to accumulate, review, and consolidate evaluation material submitted by the Area Office Manager and the AL Division Directors. Specifically, for each evaluation period, the PEC shall assess reports provided by the Area Office Manager and involved AL Division Directors, develop a composite evaluation, rate the contractor's performance, and apply appropriate adjectival and numerical grades to each of the FPAs consistent with the definitions in the Award Fee Plan. The PEC shall seek clarifications or additional information from organizations that submitted evaluation material as necessary to assure a fair and complete evaluation of the contractor in connection with each of the FPAs. Following this evaluation and the rating process, the PEC shall prepare a written Performance Evaluation Report summarizing the results of the evaluation based on the input received. As a part of the Report, the PEC shall be responsible for evaluation commentary for the "General Management" portion of the Report based upon its overall perspective of the contractor's management and the perspective gleaned from the total evaluation material available to the PEC. The Report shall include a write-up for each FPA,

with an adjectival summary grade for each FPA. The PEC shall also compute a proposed award fee utilizing the numerical grades and the weightings assigned to the FPAs. The PEC Performance Evaluation Report and the award fee recommendation shall be transmitted to the PERB as early as possible within the time frame specified in the Award Fee Plan. In addition, the PEC shall forward to the PERB the numerical grade for each FPA and the computation sheet indicating how the award fee recommendation was determined.

F. <u>Performance Evaluation Review Boards (PERBs)</u>

A Performance Evaluation Review Board (PERB) will be appointed by the Contracting Officer for each CPAF contract. A PERB shall normally be composed of two to five members of the AL Manager's senior staff. The PERB shall review the Performance Evaluation Report prepared by the PEC and the PEC's award fee computation and recommendation. This review should assure that the write-ups for each FPA are clear and substantiate the adjectival and numerical grades associated therewith. With respect to the "General Management" section, the PERB should introduce the perspective of the PERB members to complement the views expressed by the PEC. In the event that the PERB requires clarifications or additional information, the PERB Chairman will obtain the necessary information from the PEC Chairman. After completing its review and arriving

at its conclusions, the PERB shall provide a Performance Evaluation Report to the Contracting Officer along with a recommendation regarding the amount of award fee to which the contractor is entitled for the evaluation period. If the award fee recommendation submitted to the Contracting Officer by the PERB is different from that recommended by the PEC, the PERB will provide a written statement to the Contracting Officer explaining the rationale for the difference.

G. Contracting Officer (Fee Determination Official)

The Manager, AL, who is the Contracting Officer (CO), will review the material submitted by the PERB. When the Contracting Officer is satisfied that the Performance Evaluation Report adequately describes the contractor's performance and supports the conclusions contained therein, the Report will be forwarded to the contractor for review and comment as provided by provisions of the contract. After provisions of the contract related to notification of the contractor and its response option have been satisfied, the Contracting Officer will make a final award fee determination and will confirm such determination to the contractor in writing.

## IV. IMPLEMENTATION OF EVALUATION PROCESS

### A. Monitoring Process

After the Performance Evaluation Plan has been developed and approved and the contractor and concerned AL Divisions have been appropriately notified by the Area Office Manager, the monitoring of contractor performance for the selected FPAs begins at the start of the evaluation period. At the Area Office level, the Evaluation Administration Plan (EAP), previously prepared, should indicate the responsibilities of Area Office personnel in connection with award fee evaluation activities. The structure of the Area Office evaluation system is left to each Area Office Manager so as to permit optimum utilization of available resources. The Area Office Manager may designate Performance Evaluation Monitors for groups of FPAs, individual FPAs, or portions of FPAs (i.e., selected Functional Performance Elements). A Monitor is an on-site AL representative (normally Area Office staff) responsible for gathering and assessing evaluation information relative to contractor performance of FPAs, or portions thereof, on a continuing basis. Performance Evaluation Coordinators may also be appointed at the discretion of the Area Office Manager to coordinate the Monitors' activities. The Evaluation Administration Plan should also include instructions to the Monitors as to how evaluations are to be conducted and the extent to which documentation is required.

The Area Office Performance Monitors are the heart of the evalu ation process. They represent the specific, continuing interface with the contractor in those functional areas for which an award fee determination will be made. Therefore, their efforts must be as objective and comprehensive as possibl Each Monitor must ultimately provide his or her evaluation judgment to the Area Office Manager in terms of a narrative, adjectival grade, and a numerical grade. The adjectival grades, numerical grades, and associated definitions which will be used are noted in Appendix C.

Besides the evaluation information developed at the Area Office level, the contractor's performsnce for specified FPAs will be evaluated by the AL Divisions that have a responsibility for the designated areas. Personnel within these Divisions who participate in the evaluations related to specific FPAs are Performance Evaluators. A Performance Evaluator is an off-site AL representative responsible for gathering and assessing evaluation information on a periodic basis. These Evaluators may provide information in several forms to the Division Director who, in turn, will be responsible to see that appropriate evaluation material is made available to the Area Office Manager or other Area Office personnel designated to receive it. One means of providing evaluation

information will be through normal audits, surveys, and appraisals of the contractor. In addition, the Evaluators may provide other written or oral assessments to their respective Division Directors based on their observations or information available to them. It is incumbent upon the AL Division Director to provide appropriate current evaluation material to the Area Office during the evaluation period. Such material should include the "noteworthy achievements" and "notable deficiencies" associated with the individual FPAs. Evaluation information may be transmitted orally or in writing from a Division Director (or specified representative) to an Area Office Manager (or specified representative). Oral transmissions shall clearly indicate that the information being furnished is applicable for award fee evaluation purposes and represents the views of the responsible Division Director. It is also incumbent upon the Area Office Manager to consolidate such information with the Area Office evaluation material--consulting with the Division Director as necessary--and to reflect a composite AL viewpoint when discussing with the contractor its performance. The Area Office Manager may provide evaluation information to participating AL Divisions periodically and request "feedback" from such Divisions to facilitate an accurate, in-process assessment of contractor performance.

During an evaluation period, the Area Office Manager must assure that periodic meetings are held with the contractor to mutually discuss contractor performance. These meetings must be held no less often than bi-monthly. The procedures, level of attendance, and documentation of such meetings shall be established by mutual agreement between the Area Office and the contractor.

At or near the end of each evaluation period, on a schedule specified by the PEC Chairman, the Area Office Manager and each AL Division Director responsible for evaluating performance in an FPA must provide to the PEC a summarization of the applicable evaluation. This summarization must include a narrative statement, an adjectival grade, and a numerical grade for each FPA under consideration. It is important that any adjectives used in the narratives denoting levels of performance are consistent with the terms used in the Award Fee Pl (see Appendix C). Evaluation summaries provided to the PEC by the concerned AL Division Directors at the conclusion of an evaluation period must reflect, and be consistent with, materia provided to the Area Office <u>during</u> the evaluation period. No material which was not previously provided to the Area Office will be considered or utilized by the PEC unless such informati was not available to the AL Division until near or at the end

of the evaluation period. This procedure is necessary in order to preclude "surprises" to the contractor who is entitled to be kept advised periodically of the AL view of its performance. Ideally, it would be desirable for the AL Divisions that participate in the award fee evaluation process to prepare a monthly or bi-monthly summary evaluation for each applicable FPA to facilitate timely input to the Area Office. However, these or other options are left to the discretion of the individu AL Division Directors.

The Area Office Manager and AL Division Directors may provide evaluation material to the PEC in connection with the "General Management" FPA. Such material shall be considered by the PEC in formulating the "General Management" section of the Performance Evaluation Report.

B. Making An Evaluation

The key to the success of the award fee process is the quality of the evaluation determination for each and all the FPAs included in the Performance Evaluation Plan. Thousands of dollars of available award fee may be at stake in connection with judgments applied against a single FPA. Therefore, it is extremely important that Monitors and Evaluators assigned an evaluation role be qualified and knowledgeable in the areas

for which they have a responsibility. The specific performance data upon which the ultimate award fee determination will be based must emanate from those personnel closest to and most intimately familiar with the contractors' activities.

In evaluating each FPA, the following Function Performance Factors (FPFs) should be considered to the extent possible and where they are applicable:

1. Planning
2. Organizing
3. Control
4. Staffing
5. Coordination and integration
6. Cost-effectiveness
7. Execution

"Execution" includes all procedural, programmatic, and operational aspects of the activities which fall within each FPA.

The Monitors and Evaluators must think in terms of "findings" or facts (including "achievements" and "deficiencies") while assessing contractor performance. Only after the "findings" or facts have been determined should the Monitor or Evaluator consider "grades" - either adjectival or numerical. The

"findings" or facts, after they have been quantified, should be reasonably easy to convert to "grades" using the definitions in or referenced in the Award Fee Plan. Appendix C contains the "grades" and definitions which will be used. Obviously, the professional judgments of the Monitors and Evaluators will be necessary in order to arrive at conclusions regarding the significance of specific "achievements" or "deficiencies" - that's why qualified personnel must be employed in the evaluation process.

Facts or "findings" upon which the Monitor or Evaluator will make his or her judgments may come from a variety of sources. Direct observations of contractor performance by the Monitor or Evaluator or other personnel are, of course, one principal source. Reports, other documents, and applicable data may also be used. Any information which is germane and accurate is appropriate for consideration - hearsay is not. It is not necessary or expected that a Monitor or Evaluator assigned to evaluate an FPA must personally observe all performance or directly derive all information related thereto.

One very important point to recognize in connection with award fee evaluation determinations is that the contractor's performance is not to be judged against a theoretically perfect

performance in an area. It is to be judged against a performance which could realistically be achieved considering limitations imposed on a contractor over which it has little or no control. Lack of funds or late deliveries of material from another AL contractor are examples which may be considered as limitations. Therefore, in collecting data from which to make an informed judgment, the Monitor or Evaluator must know "why" the contractor's performance is at a certain level.

Ultimately the Monitor or Evaluator must develop a narrative conclusion and grade relative to the contractor's performance in an FPA. In connection with the narrative conclusion as to performance, the Monitor or Evaluator must not only indicate the level of actual performance, but must also identify circumstances which influenced that performance; that is, the factors which enhanced or limited the contractor's ability to perform.

It is important that the Monitors and Evaluators assign grades consistent with the rating plan definitions in or referenced in the contract. It is intended that a grade of 100 is realistically achievable and there should be no hesitancy to assign a grade at any level if performance falls within the range of a specific definition.

C. Role Of Performance Evaluation Committee (PEC)

The Chairman of the PEC will be responsible to assure that all AL Divisions that will participate in the award fee evaluation process are advised of the due date for evaluation summaries which are required at the conclusion of each evaluation period. After the evaluation summaries are received from the Area Office Manager and the AL Division Directors, the PEC shall assess the reports, question the inputs as appropriate, and ultimately prepare a summary evaluation in the form of a Performance Evaluation Report. In the event that there is a substantive difference between input material from an AL Division Director and the Area Office Manager conclusion for a specific FPA, it will be the responsibility of the PEC to reconcile the difference with the responsible parties. If reconciliation is not possible, the matter should be referred to the AL Assistant Manager(s) having jurisdictional responsibility for the FPA for resolution. The PEC shall be responsible for evaluation commentary for the "General Management" portion of the Report based upon its overall perspective of the contractor's management and the perspective gleaned from the total evaluation material available to the PEC.

The Performance Evaluation Report shall include a narrative for each FPA with an adjectival summary grade for each FPA. The

PEC shall also compute a proposed award fee utilizing the information in the Area Office Manager and AL Division Directors reports and the weightings assigned to the FPAs in the Performance Evaluation Plan. The PEC Report and the award fee recommendation shall be forwarded to the PERB as early as possible within the time frame specified in the contract. In addition, the PEC shall transmit to the PERB the numerical grades for each FPA and the computation sheet indicating how the award fee recommendation was determined.

D. Role Of Performance Evaluation Review Board (PERB)

The PERB will be responsible to provide a management overview of the work of the PEC. The Board will review the Performance Evaluation Report prepared by the PEC as well as the PEC's award fee computation and recommendation. This review should assure that the commentary associated with each FPA is clear and substantiates the adjectival and numerical grades provided by the PEC. The PERB should place particular emphasis on the "General Management" section, assuring that this section is supported by the overall report as well as reflecting other pertinent information available to the Board. Any dissatisfactions or questions that arise in connection with the material submitted by the PEC shall be communicated to the

PEC with the intent to derive clarifications or resolve questions raised. Subsequent to its review and satisfactory resolution of any questions, the PERB shall provide a Performance Evaluation Report to the Contracting Officer along with a recommended award fee. If the award fee recommendation submitted to the Contracting Officer by the Board is different from that recommended by the PEC, the PERB will provide a written statement to the Contracting Officer explaining the rationale for the different recommendation.

E. Role Of Contracting Officer (CO)

The Manager, AL, who is the Contracting Officer (CO), will review the material submitted by the PERB and, if satisfied, will see that the Performance Evaluation Report is forwarded to the contractor. If the Report is not deemed satisfactory, the Contracting Officer shall consult with the Chairman of the PERB to resolve any questions. Ultimately, a Report satisfactory to the Contracting Officer shall be forwarded to the contractor.

After provisions of the contract related to notification of the contractor and its response option have been satisfied, the Contracting Officer will make a final award fee determination and will confirm such determination to the contractor in writing.

A simplified "Schematic of Award Fee Evaluation and Review Process" is included in Figure 1.

# SCHEMATIC OF AWARD FEE EVALUATION AND REVIEW PROCESS




Figure 1



E 001040

V. CONTINUING EVALUATION PROCESS

A. General

Once a CPAF contract has been negotiated and the Award Fee Plan initially implemented, the evaluation and review process will be essentially repeated for each specified evaluation period. Changes in the Award Fee Plan and the Performance Evaluation Plan may be made, as provided by the contract, prior to commencement of the next evaluation period. These changes must be communicated to the contractor in the time frame and in the manner specified by the contract.

B. Changes To Performance Evaluation Plan

Normally, the currently effective Performance Evaluation Plan will be reviewed before the next evaluation period begins in the context of determining the desirability and appropriateness of making changes in the FPAs specified in connection with award fee applicability. FPAs can be changed periodically from evaluation period to evaluation period, as permitted by the Award Fee Plan, when: (1) AL wishes to place particular emphasis on one or more other FPAs, (2) the contractor's past performance in any area(s) warrants a change in FPAs, or (3) other conditions suggest that a rearrangement of FPAs is in order. The weightings of the FPAs shall also be reviewed and may be revised unilaterally

to reflect the degree of emphasis AL chooses to place on each FPA. It will be the responsibility of the Chairman of the PEC to conduct the reviews heretofore indicated and propose revisions in the Performance Evaluation Plan to the PERB for approval. This must be done in a time frame compatible with the contract requirement to provide advance notification to the contractor of changes in the Plan before the next evaluation period. The AL Divisions that will be involved in the evaluation process for the forthcoming evaluation period shall be so advised by the Area Office Manager.

C. Changes To Evaluation Administration Plan

When the Performance Evaluation Plan is changed for a forthcoming evaluation period, the Area Office Manager must revise the Evaluation Administration Plan to facilitate the evaluation of the FPAs selected. Normally, this will involve a redesignation of Performance Monitors and Performance Evaluation Coordinators to accommodate changes made in the Performance Evaluation Plan. Other revisions to the Plan which the Area Office Manager considers appropriate should be made prior to the beginning of the impending evaluation period. Changes which involve direct contractor participation, such as the frequency and conduct of meetings between the Area Office and the contractor, should be coordinated with the contractor in advance.

VI. NOTIFICATIONS

A. Area Office Manager Responsibilities

In order for the award fee evaluation and review process to operate effectively, all participating organizations must receive timely notifications regarding those FPAs selected for evaluations and the due dates for evaluation input. The Area Office Manager, as Chairman of the Performance Evaluation Committee (PEC), is responsible for providing such notifications. In this regard, the Area Office Manager shall:

1. provide the contractor with the PERB-approved Performance Evaluation Plan prior to the commencement of each evaluation period and as required by the contract;
2. notify concerned AL Divisions of the FPAs selected for evaluation in connection with the award fee process prior to the commencement of each evaluation period;
3. notify concerned AL Divisions of the frequency and timing of meetings to be held with the contractor during each evaluation period to discuss contractor performance;
4. notify concerned AL Divisions of the due dates for evaluation summaries to be utilized in the preparation of a Performance Evaluation Report at the conclusion of each evaluation period;

5. notify <u>all</u> AL Divisions of the due dates for evaluation summaries to be utilized in the preparation of an Annual Appraisal Report of the contractor's overall performance. (See Part VII of this Handbook for annual appraisal requirements.)

The actions required following the notifications listed above are described in other parts of this Handbook.

B. <u>Other Notification Responsibilities</u>

Other notification responsibilities and associated actions are delineated throughout this Handbook in the context of the total evaluation, review, and approval process. These responsibilities pertain to: (1) the preparation, review, and approval of the Performance Evaluation Plan and changes thereto, (2) the development of an Evaluation Administration Plan and changes thereto, (3) the preparation, review, approval, and transmittal to the contractor of a Performance Evaluation Report, and (4) the computation, proposal, determination, and notification to the contractor of an award fee.

VII. ANNUAL APPRAISAL

A. General

The evaluation and review process described in Parts I through VI of this Handbook applies only to selected FPAs included in the Performance Evaluation Plan. However, contractor performance in all areas (all FPAs included in Appendix A as applicable to a particular contractor) must be maintained at least at an overall "satisfactory" level in order for the contractor to be eligible for any award fee in addition to the base fee provided for in the contract. The level "satisfactory" is defined in the Award Fee Plan. In order to determine whether the contractor has achieved and is maintaining at least the overall "satisfactory" level of performance, it is necessary for AL to maintain continual surveillance over the contractor's performance in all areas. Further, it is necessary to specify certain procedures to assure that surveillance observations and conclusions of a significant nature are promptly brought to AL Management's attention. In addition, a formalized summarization of the contractor's overall performance must be documented annually.

B. Evaluation

The process of maintaining continual surveillance of essentially all of a contractor's activities is inherent in the responsibiliti

assigned to AL Headquarters and Area Office personnel in their normal administrative and operational functions. The contractors' performances have been evaluated in this context in the past under the CPFF contract arrangements. No significant change in the current evaluation process is contemplated. Each AL organization will continue to function, in an appraisal sense, consistent with Manual Chapter and other directives and requirements--conducting audits, surveys, data collection and analyses, studies, and observations. However, in order to accommodate the CPAF contract concept and associated requirements, each AL Division Director and Area Office Manager shall formally report any significant degradation in contractor performance or any performance of an FPA which appears to be less than "satisfactory." Such reports shall be made promptly to the AL Assistant Manager(s) having jurisdictional responsibility for the FPA involved. The Assistant Manager so advised will make an evaluation of the situation, collecting whatever additional information is necessary to reach an informed conclusion. The Assistant Manager will consult with the cognizant Area Office Manager as appropriate and take those actions deemed necessary--including notifying the Contracting Officer. Should information be assembled which indicates that

a contractor's <u>overall</u> performance might be at, or be approaching, a less than "satisfactory" level; the Contracting Officer shall make an evaluation of the situation and render a judgment. If such judgment is that a less than overall "satisfactory" level of performance exists, the Contracting Officer shall notify the contractor of same. The specific contract terms will be used to determine what effect such a judgment will have on the award fee. The award fee for performance during the previous evaluation period(s) will not be affected.

C. <u>Annual Appraisal Report</u>

At the end of each 12 months, normally encompassing 2 award fee evaluation periods, an Annual Appraisal Report of the contractor's overall performance will be prepared. The 12-month interval may vary in some cases. This Report is to summarize the contractor's overall level of performance which has been evaluated on a continuing basis during the year. The PEC will be responsible for preparing the Annual Appraisal Report. Evaluation input for the annual appraisal will be provided to the PEC on time scales normally compatible with alternate award fee evaluation periods and as specified by the responsible PEC Chairman. Each AL Division Director shall provide to the

PEC a summary statement in connection with the FPAs for which that Division has a responsibility. These statements must include a short narrative highlighting "noteworthy achievements" and/or "significant deficiencies" and must conclude with an adjectival grade for each FPA (see Appendix C for the grades and definitions).

The Area Office Manager will consider all FPAs applicable to the contractor's activities and shall provide a summary report to the PEC indicating the "noteworthy achievements" and/or "significant deficiencies" associated with specific FPAs.

The PEC will consolidate the annual appraisal information received from the AL Division Directors and Area Office Manager and will summarize this material in an Annual Appraisal Report. This report shall be prepared in four sections:

1. General Management
2. Technical/Program Operations
3. Operational Support, and
4. Administrative Support.

Within these sections the PEC will summarize overall performance relating to the applicable FPAs identified for each section in the "Master List of FPAs" included in this Handbook as Appendix A. Within each section, the PEC shall summarize

"noteworthy achievements" and/or "significant deficiencies" related to the applicable FPAs. It is not intended that all the FPAs be individually addressed in the Annual Appraisal Report. A general statement regarding performance of the FPAs as a group within a section is all that is required, as well as a conclusion regarding each section in terms indicating whether overall performance of the FPAs represented by that section has been at least "satisfactory." The Report shall conclude with a statement as to whether overall contractor performance for all applicable FPAs (covered in the four sections) has been at least "satisfactory."

The Annual Appraisal Report prepared by the PEC shall be forwarded to the PERB. The PERB will evaluate the Report and contact the PEC if there are any questions or problems which need to be resolved before a report is submitted to the Contracting Officer. The PERB will submit an Annual Appraisal Report to the Contracting Officer for approval.

The Contracting Officer shall review the Annual Appraisal Report submitted by the PERB and shall consult with the PERB to resolve any questions or concerns. When a Report has been prepared which is acceptable to the Contracting Officer, it will be forwarded to the contractor. It is anticipated that the

Contracting Officer and his senior staff will meet with the contractor management annually to discuss the Annual Appraisal Report, matters related to the award fee process, and other items of mutual management interest.

# APPENDIX A

## MASTER LIST OF
## FUNCTIONAL PERFORMANCE AREAS (FPAs)

The following Functional Performance Areas (FPAs) are to be used, as they are applicable, to develop the Performance Evaluation Plans for each award fee contract. The Elements associated with each FPA are included to generally define the scope of each area to be evaluated. In the actual evaluation process, each FPA is to be assessed, to the extent possible and applicable, in terms of the following Functional Performance Factors (FPFs):

1. Planning
2. Organizing
3. Control
4. Staffing
5. Coordination and integration
6. Cost-effectiveness
7. Execution

"Execution" includes all procedural, programmatic, and operational aspects of the activities which fall within the definition of each FPA.

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| A. GENERAL MANAGEMENT | Consideration of the performance factors listed above in the context of overall management of plant operations and activities |



E 001052

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
| --- | --- |
| B. TECHNICAL/PROGRAM OPERATIONS | |
| Delivery Performance (Weapons Related) | 1. New build<br>2. Disassembly and rebuild<br>3. Retirement disposal |
| Production Support (Weapons Related) | 1. Manufacturing<br>2. Production control<br>3. Program control<br>4. Tooling fabrication<br>5. Material handling<br>6. Test equipment fabrication |
| Chemical Operations | 1. Material output<br>2. Minimum inventory levels<br>3. Process capability |
| Technical Support | 1. Product engineering<br>2. Industrial engineering<br>3. Tool and gage design |
| Quality Control | 1. Quality control engineering<br>2. Quality control operations<br>3. Standards and calibration<br>4. Product inspection |
| Development Work | 1. Internal process development<br>2. Development activities for Design Laboratories<br>3. Cost/design trade-offs |
| Nuclear Materials Management | 1. Nuclear material transactions<br>2. Forecasts of special nuclear materials requirements<br>3. Nuclear material allotment control<br>4. Inventory justification and utilization of nuclear material<br>5. Disposition of scrap and excess nuclear material |
| Nuclear Waste Management | 1. Control of nuclear waste<br>2. Maintenance of burial ground/ storage for nuclear waste |
| Non-Weapon Programs | 1. To be defined for each contractor |

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| C. OPERATIONAL SUPPORT | |
| Transportation Safeguards | 1. Maintenance Support<br>2. Shipment planning<br>3. Shipment operational support |
| Security | 1. Personnel security<br>2. Physical security<br>3. Technical security |
| Safeguards | 1. Physical control of nuclear material<br>2. Accountability of nuclear material |
| Facilities Engineering and Construction Management | 1. Pre-project authorization activities<br>2. Pre-project directive activities<br>3. Project directive activities<br>4. Project management overview |
| Facilities Maintenance, Utilities, and Energy Conservation Management | 1. Maintenance management plan<br>2. Energy conservation program<br>3. Operating plan for utilities<br>4. Equipment maintenance program<br>5. Job planning and scheduling<br>6. Physical condition of plant and equipment |
| Industrial Safety | 1. Employee safety<br>2. Property protection<br>3. Construction safety |
| Fire Protection | 1. Fire prevention program<br>2. Fire protection engineering<br>3. Facility protection<br>4. Fire suppression capability |
| Health Protection | 1. Health physics<br>2. Occupational medicine<br>3. Industrial hygiene<br>4. Sanitation |
| Environmental Protection | 1. Radioactive/toxic material pollution control<br>2. Environmental monitoring<br>3. Environmental assessments/ impact statements |

E 001054

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| Emergency Preparedness | 1. Emergency plans and procedures<br>2. Resources<br>3. Liaison and coordination with other agencies |
| Nuclear Criticality | 1. Nuclear material handling and storage<br>2. Facility design<br>3. Packaging and transportation |
| Nuclear Explosives Safety | 1. Personnel assurance plan<br>2. Nuclear safety operations<br>3. Tester control program |
| Facilities Safety | 1. Facilities design<br>2. Safety analysis |

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| D. ADMINISTRATIVE SUPPORT | |
| Operating & Capital Resources Management | 1. Resources forecasting<br>2. Budgeting<br>3. Resources analysis<br>4. Financial Plan control<br>5. Resources utilization<br>6. Cost management |
| Financial Management | 1. Financial/custodial accounting<br>2. Performance/decision accounting |
| Internal Auditing | 1. Audit program<br>2. Adherence to generally accepted auditing standards<br>3. Reporting<br>4. Follow-up action |
| Automated Data Processing | 1. ADP resources projections<br>2. Acquisition of ADP resources<br>3. Operation and maintenance of ADP resources<br>4. Software support |
| Telecommunications | 1. Data communications services<br>2. Telephone services<br>3. Radio services<br>4. Miscellaneous telecommunications systems and services |
| Records Management | 1. Current record control<br>2. Low cost record control<br>3. Destruction of records<br>4. Word processing management |
| Property Management | 1. Stores management<br>2. Storage management<br>3. Vehicle management<br>4. Traffic management<br>5. Personal property management |

| Functional Performance Areas (FPAs) | Functional Performance Elements (FPEs) |
|---|---|
| Procurement Management | 1. Purchasing procedures and purchasing operations<br>2. Findings and observations of Contract Review Board<br>3. Small and minority business support<br>4. Reporting against ERDA report requirements<br>5. Response to ERDA requests for information, comments, or directives |
| Industrial Relations | 1. Labor relations<br>2. Wage and salary administration<br>3. Fringe benefits administration<br>4. Employment and placement<br>5. Training<br>6. Employee relations |
| Equal Employment Opportunity | 1. Establishment and implementation of Affirmative Action Plan<br>2. Resolution of discrimination complaints |
| Administrative/Services | 1. To be defined for each contractor |
| Public Affairs | 1. Communications with public, public officials, news media, and employees<br>2. Participation in community relation[s] |
| Classification | 1. Classification guides<br>2. Policy and procedures<br>3. Employee classification indoctrinati[on]<br>4. Classification application<br>5. Use of classification board and authorized classifiers |
| Technical Information | 1. Dissemination of technical and scientific information to others<br>2. Receipt and availability of technical and scientific information from others<br>3. Preparation of required reports covering technical activities |

# APPENDIX B

SAMPLE AWARD FEE PLAN

APPENDIX
TO
CONTRACT ____________
MODIFICATION__

AWARD FEE PLAN

1. PURPOSE

This Cost-Plus-Award-Fee (CPAF) contract has been employed to provide an incentive, in the form of an available award fee, which is sufficient to encourage the attainment of and to reward the Contractor for increased proficiency in the performance of the contract. The Award Fee Plan, as set forth in this Appendix, constitutes the substantive and procedural provisions which will be utilized in arriving at the amount of the award fee to which the Contractor is entitled for each evaluation period.

2. INTRODUCTION

The Contracting Officer will evaluate the Contractor's performance during each evaluation period and will determine the amount of award fee to be paid the Contractor for that evaluation period. Evaluation of the Contractor's performance will be based upon the Performance Evaluation Plan established for the evaluation period by the Contracting Officer, after consultation with the Contractor. The

Performance Evaluation Plan will consist of (i) a limited number (approximately 5-10) of identifiable areas of contract work which are designated as "Functional Performance Areas" (FPAs) and (ii) the specified weighting assigned to each FPA. The Contractor's performance of each FPA will be evaluated in terms of a numerical grade taken from the Rating Plan set forth in Section 4. Using the numerical grades and weights assigned each FPA, the award fee to which the Contractor is entitled will then be determined in accordance with the provisions of Section 5. The Contractor will receive an evaluation report which will include the adjectival grade for each FPA and will be given an opportunity to comment on said report. Section 6. outlines the basic administrative procedures which will be followed in the process of arriving at the determination of the amount of award fee to which the Contractor is entitled for each evaluation period.

3. PERFORMANCE EVALUATION PLAN

The following FPAs with specified weightings will be used in evaluating the Contractor's performance:

(THE FOLLOWING IS AN EXAMPLE ONLY)

| Functional Performance Areas | Weighting |
| --- | --- |
| General Management | 15% |
| Development Work | 10% |
| Production Support (Weapons Related) | 20% |
| Quality Control | 10% |
| Safeguards | 15% |
| Facilities Maintenance, Utilities and Energy Conservation Management | 5% |
| Operating and Capital Resources Management | 15% |
| Fire Protection | 5% |
| Procurement Management | 5% |
| | 100% |

The Albuquerque Operations Office (AL) award fee evaluation process will require that a grade be given for each FPA consistent with the Rating Plan definitions which are set forth in Section 4.

In arriving at a grade for each FPA, consideration will be given to (i) planning, (ii) organizing, (iii) control, (iv) staffing, (v) coordination and integration, (vi) cost-effectiveness, and (vii) execution. "Execution" includes all procedural, programmatic, and operational aspects of the activities which fall within each FPA.

The FPAs and weightings may be changed for subsequent evaluation periods in accordance with Paragraph 2.c. of the contract article entitled "Allowable Costs, Base Fee and Award Fee." A breakdown of the work elements which comprise each FPA for a given evaluation period will be furnished to the Contractor prior to the commencement of that evaluation period.

4. RATING PLAN

Evaluation of the Contractor's performance, for award fee purposes, shall be made in accordance with the following Rating Plan:

# RATING PLAN

| ADJECTIVAL GRADES | NUMERICAL GRADES | DEFINITIONS* |
|---|---|---|
| Outstanding | 96-100 | Substantially exceeds expected performance level. Several noteworthy achievements or some especially noteworthy achievements. No notable deficiencies. |
| Excellent | 91-95 | Exceeds expected performance level Some noteworthy achievements. No notable deficiencies. |
| Very Good | 86-90 | Expected performance level. Some noteworthy achievements. Some notable minor deficiencies. **or** No noteworthy achievements. No notable deficiencies. |
| Good | 81-85 | Minimum expected performance level. No noteworthy achievements. Some notable minor deficiencies. **or** Some noteworthy achievements. Several notable minor deficiencies. |
| Moderately Good | 76-80 | Exceeds acceptable performance level. No noteworthy achievements. Several notable minor deficiencies. **or** Some noteworthy achievements. Some notable significant deficiencies. |
| Satisfactory | 71-75 | Acceptable performance level. No noteworthy achievements. Some notable significant deficiencies. |
| Marginal | 66-70 | Minimum acceptable performance level. Several notable significant deficiencies. |
| Unsatisfactory | 65 and below | Unacceptable performance level. Notable serious major deficiencies. |

***NOTES:** 1. *A "noteworthy achievement" is some accomplishment beyond the routine performance associated with a function or activity.*

2. *A "notable deficiency" is something more than an incidental deficiency. While its significance may vary, it is considered worthy of mention. The absence of "notable deficiencies" does not imply that there are no deficiencies at all.*

5. APPLICATION OF RATING PLAN TO PERFORMANCE EVALUATION PLAN

The performance of each FPA will be evaluated in terms of the Rating Plan set forth in Section 4. The performance evaluation determination will be equated to a numerical grade which will then be multiplied by the weighting assigned to that FPA. The sum of the resulting products computed for each FPA will consitute the numerical grade evaluation of the Contractor's performance for the evaluation period. If the sum of the numerical grades for all the FPAs is seventy (70) or less, the Contractor will not be entitled to any award fee for that evaluation period. If such sum is over seventy (70) and the overall performance under the contract is not less than "satisfactory," the Contractor will be entitled to a proportionate share of the maximum available award fee.

The proportionate share of the maximum available award fee to which the Contractor will be entitled for each of the first two (2) evaluati periods shall be computed in accordance with the following table.

AWARD FEE PERFORMANCE TABLE

| Performance Points Earned | Amount of Maximum Available Award Fee Per Point | Total Maximum Available Award Fee | Percent of Ma: mum Availabl Award Fee |
|---|---|---|---|
| 0 thru 70 | $ -0- | $ -0- | 0 |
| 71 thru 75 | | | |
| 76 thru 80 | | | |
| 81 thru 85 | | | |
| 86 thru 90 | | | |
| 91 thru 95 | | | |
| 96 thru 100 | | | |



E 001064

6. ADMINISTRATIVE PROCEDURES

The award fee evaluation process will be administered for the Contracting Officer by a Performance Evaluation Committee (PEC) and a Performance Evaluation Review Board (PERB), each appointed by the Contracting Officer.

For each evaluation period, the PEC shall assess reports which summarize evaluation information accumulated by performance evaluators and monitors, shall rate the Contractor's performance, and shall apply appropriate adjectival and numerical grades to each of the FPAs. Following this evaluation and rating process, the PEC shall prepare a written report summarizing the results of the evaluation and shall compute a proposed award fee. The PEC report and an award fee recommendation shall be transmitted to the PERB by the twenty-fifth (25th) working day following the end of each evaluation period. During each evaluation period, the PEC Chairman, or his designee(s), will meet with the Contractor periodically, but not less often than bi-monthly, to discuss the Contractor's performance to date and to give the Contractor an opportunity to present performance evidence in its behalf.

The PERB shall review the performance evaluation report prepared by the PEC and the PEC's award fee computation and recommendation. Based on its findings and conclusions, the PERB shall provide a performance evaluation report to the Contracting Officer and a recommendation

regarding the amount of award fee to which the Contractor is entitled for the evaluation period.

The Contracting Officer will evaluate the Contractor's performance and, within thirty-five (35) working days after the end of the evaluation period, will transmit to the Contractor a final written evaluation report which includes adjectival grades for each FPA. In the event it has been determined that the Contractor's overall performance of the contract is less than "Satisfactory" as that term is defined in Section 4., the final written evaluation report will also include the bases for that determination.

Within five (5) working days after receipt of said report, the Contractor may request an opportunity to present to the Contracting Officer a brief oral analysis of its performance. Upon receipt of such request, the Contracting Officer shall specify a time and place for the Contractor to make its presentation. The time specified must be not later than ten (10) working days after receipt of the Contractor's request, unless the parties otherwise agree. At least two (2) working days prior to such presentation, the Contractor shall have provided the Contracting Officer with a brief written summary of the points to be covered in the presentation. Within ten (10) working days after the Contractor's presentation, or if no request for presentation is made, immediately upon the expiration of the time

within which the Contractor could have made such a request, the Contracting Officer shall determine the amount of the award fee to which the Contractor is entitled for the evaluation period and shall notify the Contractor. Such determination shall be confirmed in writing to the Contractor.

APPENDIX C

# GLOSSARY OF TERMS

# RATING PLAN

| ADJECTIVAL GRADES | NUMERICAL GRADES | DEFINITIONS* |
|---|---|---|
| Outstanding | 96-100 | Substantially exceeds expected performance level.<br>Several noteworthy achievements or some especially noteworthy achievements.<br>No notable deficiencies. |
| Excellent | 91-95 | Exceeds expected performance level<br>Some noteworthy achievements.<br>No notable deficiencies. |
| Very Good | 86-90 | Expected performance level.<br>Some noteworthy achievements.<br>Some notable [redacted] deficiencies.<br>or<br>No noteworthy achievements.<br>No notable deficiencies. |
| Good | 81-85 | Minimum expected performance level.<br>No noteworthy achievements.<br>Some notable [redacted] deficiencies.<br>or<br>Some noteworthy achievements.<br>Several notable [redacted] deficiencies. |
| Moderately Good | 76-80 | Exceeds acceptable performance level.<br>No noteworthy achievements.<br>Several notable [redacted] deficiencies.<br>or<br>Some noteworthy achievements.<br>Some notable significant deficiencies. |
| Satisfactory | 71-75 | Acceptable performance level.<br>No noteworthy achievements.<br>Some notable significant deficiencies. |
| Marginal | 66-70 | Minimum acceptable performance level.<br>Several notable significant deficiencies. |
| Unsatisfactory | 65 and below | Unacceptable performance level.<br>Notable serious major deficiencies. |

*NOTES: 1. *A "noteworthy achievement" is some accomplishment beyond the routine performance associated with a function or activity.*

2. *A "notable deficiency" is something more than an incidental deficiency. While its significance may vary, it is considered worthy of mention. The absence of "notable deficiencies" does not imply that there are no deficiencies at all.*

## GLOSSARY OF TERMS

Annual Appraisal Report. A report, prepared annually and normally encompassing 2 award fee evaluation periods, which summarizes a contractor's overall performance of all Functional Performance Areas (FPAs)--not just those associated with the award fee provisions of a specific contract. An Annual Appraisal Report satisfactory to the Contracting Officer is forwarded to the contractor.

Award Fee Plan. A formal plan which contains the policies and procedures applicable for the award fee provisions of a specific contract. In addition, this Plan includes such elements as the Performance Evaluation Plan, the Rating Plan and associated grades and definitions, and an award fee performance table. The Award Fee Plan is negotiated as a part of a contract.

Contracting Officer (CO). The Manager, Albuquerque Operations Office. In some incentive fee contracts the CO is referred to as the Fee Determination Official (FDO).

Cost-Plus-Award-Fee (CPAF) Contract. A cost type contract with special fee provisions to motivate a contractor to achieve a high or higher level of performance.

Cost-Plus-Fixed-Fee (CPFF) Contract. A cost type contract which provides for the payment of a negotiated fixed fee to a contractor.

Evaluation Administration Plan (EAP). A plan developed at the Area Office level to facilitate implementation of the evaluation and review process associated with an approved Performance Evaluation Plan. The EAP contains the Functional Performance Areas (FPAs) to be evaluated, the Functional Performance Elements (FPEs) associated with these FPAs, assignments of Performance Monitors, and additional information and instructions relative to the evaluation process.

Functional Performance Area (FPA). A specific category representing a group of activities or functions (managerial, administrative, or operational) in which a contractor is required to perform.

Functional Performance Element (FPE). A specific activity or function (managerial, administrative, or operational) which a contractor is required to perform. Several related FPEs generally define the scope of a Functional Performance Area (FPA).

Functional Performance Factor (FPF). One of several identified factors (such as cost-effectiveness) that normally contributes to desired end results and which is considered, to the extent possible and applicable, in evaluating contractor performance within a Functional Performance Area (FPA).

Notable Deficiency. A deficiency which is something more than an incidental deficiency. While its significance may vary, it is considered worthy of mention. The absence of "notable deficiencies" does not imply that there are no deficiencies at all.

Noteworthy Achievement. Some accomplishment beyond the routine performance associated with a function or activity. It is worthy of mention as a "credit" to contractor performance in the evaluation process.

Performance Evaluation Committee (PEC). A Committee appointed by the Contracting Officer for each CPAF contract to accumulate, review, and consolidate evaluation material submitted by an Area Office and AL Divisions. A PEC is normally composed of Area Office and AL Division personnel. This Committee prepares a proposed Performance Evaluation Report and computes a proposed award fee for subsequent consideration by the Performance Evaluation Review Board (PERB).

Performance Evaluation Coordinator. An individual appointed at the discretion of an Area Office Manager to assist in the coordination of Performance Monitors' activities and to consolidate evaluation material provided by such Monitors.

Performance Evaluation Plan. A plan which identifies the specific Functional Performance Areas (FPAs) in which a contractor's performance is evaluated during a particular evaluation period in connection with an award fee determination. This plan also specifies the "weighting" assigned to each FPA for award fee computation purposes. A Performance Evaluation Plan is a part of an Award Fee Plan.

Performance Evaluation Report. A report, prepared at the conclusion of each evaluation period in connection with the award fee evaluation and review process, which summarizes contractor performance in the applicable Functional Performance Areas (FPAs). The report includes a narrative and an adjectival summary grade for each FPA. A Performance Evaluation Report satisfactory to the Contracting Officer is forwarded to the contractor after the evaluation period has been completed.

<u>Performance Evaluation Review Board</u> (PERB). A Committee appointed by the Contracting Officer for each CPAF contract to provide a management overview of the work of the Performance Evaluation Committee (PEC). A PERB is normally composed of members of the AL Manager's senior staff. This Board reviews the Performance Evaluation Report and the proposed award fee submitted by the PEC and provides a Performance Evaluation Report and an award fee recommendation to the Contracting Officer.

<u>Performance Evaluator</u>. An off-site (remote from contractor) AL representative (normally AL Division staff) responsible for gathering and assessing evaluation information on a periodic basis relative to a contractor's performance in specified Functional Performance Areas (FPAs).

<u>Performance Monitor</u>. An on-site (contractor location) AL representative (normally Area Office staff) responsible for gathering and assessing evaluation information on a continuing basis relative to a contractor's performance in specified Functional Performance Areas (FPAs).

<u>Rating Plan</u>. That section of an Award Fee Plan which delineates the adjectival grades, numerical grades, and the definitions thereof which are used in the evaluation process. The Rating Plan facilitates the award fee computation based upon the translation of evaluation information into definitive grades.