PL. SUPP. EX. 54

# ALBUQUERQUE OPERATIONS OFFICE

# HANDBOOK FOR

# AWARD FEE ADMINISTRATION

APPROVED: [signature]

James W. Culpepper
Chairman, Performance Evaluation
Review Board

Date: 2/16/90

PLAINTIFF'S EXHIBIT
30
11/9/92

E 001074

# PREFACE

This Handbook contains the policy and procedural guidelines to be used in the evaluation and review process associated with Cost-Plus-Award-Fee (CPAF) contracts applied to Albuquerque Operations Office (AL) Management and Operating (M&O) Contractors within the weapons production complex and as a general guide for other AL CPAF contracts.

The Handbook is to be used by AL (Headquarters and Area Office) personnel who have a responsibility for and participate in the evaluation and review of AL M&O Contractors' performance under the provisions of applicable CPAF contracts.
(Note: Where roles of the AL Headquarters and Area Office differ, those terms will be used in lieu of AL.)

This Handbook supersedes the "AL Handbook for Award Fee Performance Evaluation Review Process," dated June 24, 1977.

# TABLE OF CONTENTS


PAGE

PREFACE .................................................. ii

I. GENERAL .................................................. I-1

A. Purpose .................................................. I-1
B. Background .................................................. I-1
C. Objectives .................................................. I-2
1. Achieve Optimum Performance .................................................. I-2
2. Communications Vehicle .................................................. I-2
D. Evaluation Process Overview .................................................. I-2
E. Fair Assessment .................................................. I-3
F. Handbook Changes .................................................. I-3

II. PERFORMANCE EVALUATION PLAN .................................................. II-1

A. Background .................................................. II-1
B. Performance Evaluation Plan .................................................. II-1
C. Criteria .................................................. II-2
1. General .................................................. II-2
2. Criteria Development .................................................. II-3
D. Contractor Notification .................................................. II-4
E. Goal Achievement Objectives .................................................. II-4
1. General .................................................. II-4
2. When Used .................................................. II-5
3. Constraints .................................................. II-5
4. Procedures .................................................. II-6

III. ORGANIZATION AND IMPLEMENTATION OF EVALUATION PROCESS .................................................. III-1

A. Organization and Administration .................................................. III-1
B. Evaluation Process .................................................. III-1
1. Basic Process .................................................. III-1
2. General Instructions .................................................. III-1
3. On-site Evaluators .................................................. III-3
4. Off-site Evaluators .................................................. III-3
5. Ongoing Communications. ..................................................
6. Initiatives and Milestones .................................................. III-4
7. AL Division Evaluation .................................................. III-4
8. Resolving Differences .................................................. III-5
9. Establishing the Recommended FPG Grade .................................................. III-5
10. Contractor Self-Assessment .................................................. III-6
C. Evaluation .................................................. III-6
1. Evaluation Importance .................................................. III-6
2. Evaluator Findings .................................................. III-6

3. Evaluation Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . III-7
4. Observations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III-7
5. Sources of Information . . . . . . . . . . . . . . . . . . . . . . . . III-8
6. Narrative Summary . . . . . . . . . . . . . . . . . . . . . . . . . . III-8
D. Role of Area Office Manager (AOM). . . . . . . . . . . . . . . . . . III-8
E. Role of Performance Evaluation Review Board (PERB) . . . . III-9
1. Appointment of PERB . . . . . . . . . . . . . . . . . . . . . . . . . III-9
2. FPG Manager Responsibility . . . . . . . . . . . . . . . . . . . . III-9
3. PERB Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . III-10
F. Role of PERB Executive Secretary . . . . . . . . . . . . . . . . . . III-10
G. Role of Fee Determination Official (FDO) . . . . . . . . . . . . . . III-10

IV. SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IV-1

APPENDIX A - Master List of Functional Performance Groups (FPG's)
APPENDIX B - Sample Performance Evaluation Plan and Related Contract Provisions
APPENDIX C - Fee Negotiation Process
APPENDIX D - Evaluator Rating Guide
APPENDIX E - Glossary of Terms
APPENDIX F - Performance Evaluation Report Format and Format for AL Division Evaluation
APPENDIX G - FPG Grading Guideline

# SECTION I. GENERAL

## A. Purpose

This Handbook is intended as a guide to be utilized in the preparation and implementation of the performance evaluation and review process applicable to Cost-Plus-Award-Fee (CPAF) contracts with Albuquerque Operations Office (AL) Management and Operating (M&O) Contractors within the weapons production complex. The provisions contained herein may be applied in connection with other CPAF contracts administered within the AL system at the discretion of responsible officials. The purpose of the Handbook is to provide a uniform structure within which all those involved in the CPAF evaluation and review process may operate. Such standardization is necessary in order that the methodology, terminology, procedures, and practices can accommodate the several contracts within the weapons production complex and facilitate participation by the various parties who will be involved. On the other hand, it is necessary to allow maximum flexibility in the details of implementation of each CPAF plan due to the variations among each Contractor's mission, organization, and operation and among the objectives for each facility. Therefore, application of the CPAF Performance Evaluation Plan (PEP) must be tailored to meet individual considerations associated with each Contractor. Any exception to the requirements of this Handbook will be coordinated with AL/Contracts and Procurement Division (CPD). Major exceptions to the requirements of this Handbook must be authorized by the Fee Determination Official (FDO) or the Performance Evaluation Review Board (PERB) Chairman when such variations are determined to be appropriate for a particular CPAF contract.

## B. Background

A CPAF contract is a cost-reimbursement contract that provides for a fee consisting of (i) a base amount fixed at inception of a contract period and (ii) an award amount that the Contractor may earn in whole or in part at the end of the performance evaluation period and is sufficient to provide motivation for excellence in performance. The amount of award fee, if any, to be paid is determined by the FDO's evaluation of the Contractor's performance in terms of

the PEP stated in the contract. The FDO is the Manager, AL. The base fee and maximum available award fee for any M&O contract will be established in accordance with Department of Energy (DOE) fee policy set forth in Department of Energy Acquisition Regulation (DEAR) 970.1509.

C. Objectives

1. Achieve Optimum Performance

In an M&O contract the Government contracts for the operation, maintenance, or support, on its behalf, of Government-owned, or controlled research, development, production, or testing establishment wholly or principally devoted to one or more major programs. The AL objective in entering into CPAF contracts with the M&O Contractor is to achieve optimum performance while affording the Contractor an opportunity to earn increased fee in the pursuit of this objective. Optimum performance does not necessarily connote the maximum achievable operating level for any single functional area; rather, it represents the most favorable degree of overall performance considering established objectives to be realized within the limits of available resources. Properly applied, a CPAF contract provides a unique combination of flexibility and potential for Contractor motivation not generally present in other types of contractual arrangements.

2. Communications Vehicle

A CPAF contract also serves as a vehicle for communication between the Contractor and AL. Properly used, it enables AL to place management emphasis in particular areas and to convey this emphasis to the Contractor. Over the life of the contract, as areas of emphasis change, the CPAF contract is flexible enough to accommodate such revisions.

D. Evaluation Process Overview

AL will adhere to the basic principles of CPAF contracting in the administration of its M&O contracts. First among the principles of CPAF contracting is that the

Contractor's performance will be subjectively evaluated within clearly defined parameters. The contract PEP and the AL "Handbook for Award Fee Administration" define the contractual requirements and administrative procedures for the administration of AL award fee contracts. Specific performance areas to be evaluated and their relative importance are communicated to the Contractor as Functional Performance Groups (FPG's) that are numerically weighted.

E. Fair Assessment

It is AL's intention to apply the CPAF concept in a manner compatible with the unique weapons production complex arrangement, with the expectation of mutual benefits to AL and the Contractor. In implementing the evaluation process under the CPAF arrangement, the AL expectation is to provide a fair assessment of the Contractor's performance without imposing an excessive, burdensome monitoring and documentation system which would encroach upon the limited manpower resources available to both AL and the Contractors. The evaluation process outlined in this Handbook relies heavily on existing organizations, established survey and appraisal techniques, and personnel who are assigned management, administrative, and operating responsibilities in connection with the ongoing AL missions and operations. Within these constraints, every attempt will be made to elicit enough information to introduce as much specificity and objectivity into the evaluation process as possible.

F. Handbook Changes

Any suggested changes to the Handbook shall be directed to the Chief, Management and Operating Contracts Branch, CPD, AL.

# SECTION II. PERFORMANCE EVALUATION PLAN

## A. Background

The Performance Evaluation Plan (PEP) sets forth the manner in which the award fee determination will be made. The PEP is incorporated as an appendix to the contract. It will include such elements as the rating plan and definitions, and a description of the administrative procedures to be followed. A format for, and sample provisions of, a PEP is included in this Handbook in Appendix B.

## B. Performance Evaluation Plan

Area Office Managers (AOM) and the Waste Isolation Pilot Plant (WIPP) Program Manager shall submit for approval, recommended Functional Performance Group (FPG) weightings, Special Criteria, and the appropriate supporting rationale to the Performance Evaluation Review Board (PERB) in accordance with Section VI of this Handbook. The weight associated with Environment, Safety and Health related activities shall be at least 51 percent of the total available weight and will be calculated by summing the weights included for the FPG of Environment, Safety, and Health; Waste Management, Operational Surety, and Environmental Restoration; and at least one-half of the General Management weight. In order to have sufficient weight to incentivize a Contractor, a weight of less than 10 percent per FPG should normally not be used. The Chairman of the PERB will: coordinate review of the AOM's proposal with the other PERB members; discuss all proposed changes with the AOM; and, with the Fee Determination Official's (FDO) concurrence, approve the PEP criteria and weights to be implemented. The AL approved PEP criteria and weights are then submitted to Department of Energy (DOE) Headquarters for concurrence (see Figure II-1).

Note: Individuals involved in the Cost-Plus-Award-Fee (CPAF) process should refer to the PEP of the particular Management and Operating (M&O) contract and the terms and conditions of the said contract particularly the clauses entitled "Award Fee," and "Allowable Cost, Base Fee, and Award Fee" (examples of these documents are provided in Appendix B).

# DEVELOPMENT OF CRITERIA and FPG WEIGHTS




FIGURE II-1

## C. Criteria

### 1. General

A CPAF contract type is useful when the Government is unable to specify precisely the work to be performed and the resources necessary for accomplishment; yet the Government desires to motivate the Contractor to improve contract performance. Contractor performance is based upon a subjective, comprehensive evaluation by the Government. It is, therefore, important that Contractors have a clear understanding of what is expected of them and that DOE perform a fair and accurate assessment of performance. By emphasizing well-defined criteria, the expected level of performance can be conveyed to the Contractor and performance more readily assessed. The greater the ability to identify and quantify the facts



E 001082

considered in arriving at performance evaluation, the more credible these judgments are likely to be.

2. Criteria Development

Contractor performance areas shall be evaluated against FPG's, Functional Performance Areas (FPA's), Functional Performance Elements (FPE's) and Special Criteria.

FPG's are defined by FPA's, which in turn are more specifically defined by FPE's. FPG's are intended to define the total performance requirements of the AL M&O contracts that will be evaluated by Albuquerque Operations Office (AL) during each contractual award fee period. The FPG's and their subelements, which are defined in Appendix A, will normally remain static throughout the term of the M&O contract, although AL can revise them at any time with 30 days prior notice to the Contractor.

The Contractor will also be evaluated against "Special Criteria," which will be developed every period to further define the FPG. These Special Criteria address significant issues and priorities of the Department. These Special Criteria should be developed at the FPG level, be relatively broad in nature, and should discuss special issues or priorities within each FPG where special emphasis should be placed during the upcoming period. These criteria should be reflective of those significant issues and priorities at the Departmental level. These Special Criteria are to supplement the General Criteria as described by the FPA's and FPE's. Two-to-five Special Criteria for each FPG should be appropriate.

AOM's will be the focal point for developing FPA's, FPE's, and Special Criteria. These may be developed from input from Headquarters, AL Divisions, Area Office personnel, or the Contractor. The Contractor's input will be coordinated with the responsible AL Division. AL Divisions desiring to establish criteria for specific FPG's to be evaluated during the next evaluation period should submit input to the AOM.

Moreover, in the evaluation process, AL will use as an evaluation tool applicable plans, orders, laws, regulations, etc. A good example of how AL communicates contract requirements is contained in the "AL Development and Production Manual." This manual defines the AL "policies for the development, production, modification, repair, stockpile support, and retirement disposal of nuclear weapons." The policies contained in this manual apply to all DOE Contractors responsible for executing any phase of the AL nuclear weapon programs. It is through the system established by this manual that many of AL's goals, objectives, schedules, etc., are communicated to the Contractor. The accomplishment of the performance requirements defined in this manual are evaluated under the appropriate award fee FPG's.

D. Contractor Notification

After approval, the criteria and associated weights shall be provided by letter from the AOM to the Contractor at least 30 days prior to commencement of the evaluation period or as specified by the contract. The PERB Executive Secretary shall provide to the AL Divisions a copy of the approved PEP criteria and weights (for each facility) in order to facilitate the Divisions' planning for and participation in the evaluation process.

E. Goal Achievement Objectives

1. General

The PEP provides for a concept called Goal Achievement Objectives (GAO's). The use of GAO's is an optional method which may be used to provide additional incentives for specific areas of performance. The significant parts of the GAO contract provisions read as follows:

"Goal Achievement Objectives (hereinafter called "Objectives") are one or more specific performance objectives assigned to the Contractor, which are used to motivate the Contractor to attain a higher level of performance and to achieve specific Government programmatic objectives that may periodically arise. The use of

these Objectives is an optional method, which may be utilized by the Government as a supplement to the Performance Evaluation Plan.

While it is recognized that the Objectives may likely fall under FPG's referred to in the Performance Evaluation Plan, these Objectives generally reflect increasingly stringent or changing Government requirements and can be evaluated by definable, measurable, quantifiable indices . . . ."

2. <u>When Used</u>

Based on the contract provisions, GAO's should be used for <u>unusual</u> situations which periodically arise during the performance of a contract. They will be used by the <u>Government</u> to motivate the Contractor to achieve a higher level of performance in a specific area. GAO's are very specific in their requirements and "can be evaluated by definable, measurable, quantifiable indices." GAO's are not to be used for ongoing performance requirements that are adequately covered by contract award fee provisions. They are not a mechanism for providing additional fee to a Contractor. They are a tool to be used by the Government to motivate Contractors to perform new and critical tasks under unusual and stringent conditions.

3. <u>Constraints</u>

The contract provision contains several constraints in the use of GAO's. First, in order to be eligible to earn fee from a GAO, the Contractor must receive a minimum performance rating of 88 and no single FPG rated unsatisfactory for the GAO performance period. Secondly, the Government may withdraw a GAO at its sole discretion and the Contractor would then receive an amount based upon achieved milestones, assuming overall performance is at the minimum standard set forth above. Finally, since GAO's are funded with unearned award fee dollars, payment on a GAO is subject to the availability of unearned award fee funds during the period in which the GAO is to be paid.

4. Procedures

a. The Government identifies a new or more stringent requirement which might be a candidate for a GAO. This procedure does not contemplate proposals from the Contractor. The AOM is consulted to determine if the proposed objective truly meets the criterion of a GAO, or if the objective should be an Initiative and Milestone. If, in the AOM's assessment, it is in fact a candidate for a GAO, the GAO is prepared and is coordinated by the AOM with the cognizant AL Division(s) and with the Contractor. The GAO is then sent to AL/Contracts and Procurement Division (CPD) for processing through the cognizant AL Division(s) and obtaining the Contracting Officer's approval.

b. After the performance period is completed, the AOM will determine if the GAO was completed successfully and will send a memo to the Director, AL/CPD, indicating whether performance criteria were met. AL/CPD will ensure award fee dollars are available, award fee performance minimums were met, coordinate with the cognizant AL Divisions, and recommend approval or disapproval to the Contracting Officer.

# SECTION III. ORGANIZATION AND IMPLEMENTATION OF EVALUATION PROCESS

## A. Organization and Administration

Organizational and administrative responsibilities for the award fee evaluation, review, and fee determination process will involve: On-site Evaluators, Off-site Evaluators, Area Office Managers (AOM), Albuquerque Operations Office (AL) Division Directors, Performance Evaluation Review Board (PERB), the Fee Determination Official (FDO), and Headquarters (HQ).

## B. Evaluation Process

### 1. Basic Process

A simplified "Schematic of Award Fee Evaluation and Review Process," Figure III-1, illustrates the basic steps to be followed.

### 2. General Instructions

AL will determine the amount of award fee to be paid to the Contractor through periodic evaluations. In general, all those involved in the evaluation process are responsible for monitoring, reviewing, and evaluating the Contractor's performance against the criteria (including adherence to generally accepted standards of performance), and translating these evaluations into the Performance Evaluation Report (PER). Evaluators will utilize all available performance information (e.g., audits, appraisals, task force reports, etc.) as sources of input to their reports. The evaluation will consider the Contractor's compliance with appropriate laws, regulations, and other requirements. The evaluation will also appraise a combination of the Contractor's diligence in developing written procedures for all aspects of the Contractor's operation and the degree of adherence to these procedures by the Contractor's employees.

# CPAF EVALUATION PROCESS




JR/CPD
2/6/90



E 001088

3. On-site Evaluators

The AOM will designate On-site Evaluators to monitor and evaluate the Contractor's performance. An On-site AL Evaluator (Area Office Staff) is responsible for gathering and assessing evaluation information relative to Contractor performance on a continuing basis. They represent the specific, continuing interface with the Contractor in those areas for which an award fee determination will be made. Therefore, their efforts must be objective and comprehensive. Each On-site Evaluator must ultimately provide his or her evaluation to the AOM in terms of a narrative providing achievements, deficiencies and observation, and adjectival and numerical grades (see Appendix D, Evaluator Rating Guide).

4. Off-site Evaluators

Besides the evaluation information developed at the Area Office level, the Contractor's performance will also be evaluated by the AL Divisions and by appropriate Department of Energy (DOE) HQ Offices. Off-site Evaluators are personnel within these Divisions/Offices who participate in gathering and assessing information on a periodic basis. They are expected to have a more detailed level of expertise in specialized areas and provide a broader complex-wide perspective on issues related to Contractor performance. In general, a blend of off-site and on-site viewpoints results in the best possible Contractor evaluations.

5. Ongoing Communications

The AOM must ensure that ongoing communications are held with the Contractor throughout the period to discuss findings related to the Contractor's performance. Meetings shall be held as often as required. The procedures, level of attendance, and documentation of such meetings shall be established by mutual agreement with the Contractor.

As a part of this communications process, it is incumbent upon the AL Division Directors and DOE HQ Office Managers to ensure that appropriate evaluation material is provided to the Area Offices during the

evaluation period. Evaluation information may be transmitted orally or in writing from a Division Director (or specified representative). Oral transmissions shall clearly indicate that the information being furnished represents the views of the responsible Division Director/ Office Manager.

It is also incumbent upon the AOM to consider and consolidate such information with the Area Office evaluation material--consulting with the Division Director/Office Manager as necessary--and to reflect a composite DOE viewpoint when discussing performance with the Contractor. The AOM may provide evaluation information to participating AL Divisions and HQ Offices periodically and request "feedback" to facilitate an accurate, in-process assessment of Contractor performance.

6. <u>Initiatives and Milestones</u>

At the beginning of each six-month evaluation period, the AOM, after coordination with the Contractor, may provide to the Contractor the Initiatives and Milestones for that period. Initiatives and Milestones are performance goals and requirements that the AOM wishes to emphasize. The accomplishment of most Initiatives and Milestones can be objectively measured. Because of their nature, Initiatives and Milestones can be revised, eliminated, increased in number, etc., by the AOM throughout the six-month period in order to focus on current situations. At the end of the performance period, the Contractor's performance in accomplishing the defined Initiatives and Milestones will be considered as a part of the evaluation of the Contractor's overall performance under the Functional Performance Groups (FPG's) with which they are related.

7. <u>AL Division Evaluation</u>

At or near the end of each evaluation period, but not later than the last day of the evaluation period, each AL Division Director responsible for evaluating performance must provide to the AOM an evaluation. Appendix A sets forth FPG's, Functional Performance Areas (FPA's), and Functional Performance Elements (FPE's) for both the Production Plants and Waste Isolation Pilot Plant. The Primary AL Responsible

Division listed shall be the AL focal point for gathering together information for that FPA and submitting input to the AOM. Any AL Division desiring to provide input for an FPA shall submit the input through the Primary Responsible Division. This evaluation shall include the particular criteria being evaluated, the achievements, deficiencies, observations, and adjectival and numerical grades. It is very important that any adjectives used in the evaluation denoting levels of performance and the categorization of achievements and deficiencies are consistent with the terms used in Appendix D. These evaluations must reflect, and be consistent with, material provided to the Area Office <u>during</u> the evaluation period or differences explained. This is necessary in order to preclude "surprises" to the Contractor who is entitled to be kept advised periodically of the AL view of its performance. The AL Division Directors <u>may</u> provide evaluation material to the AOM in connection with the "General Management" FPG with a copy to the cognizant FPG Manager. Such material shall be considered by the AOM in formulating the "General Management" FPG of the PER. The format for preparation of the AL Division Evaluation is shown in Appendix F.

8. <u>Resolving Differences</u>

It is important that the AOM and AL Division Director(s) attempt to resolve any performance evaluation differences prior to preparation and distribution of the final draft of the PER. Substantive changes to AL Division input must be coordinated with the AL Division. AOM's are responsible for resolution of any differences with AL Division prior to the PERB meeting. In the event that satisfactory resolution is not attained, the matter should be referred to the appropriate FPG Manager for resolution or referral to the PERB. A minority opinion or report may be submitted to the FDO.

9. <u>Establishing the Recommended FPG Grade</u>

After the AOM's have completed their efforts to resolve differences, they must then determine a grade for each FPG and an overall grade for the period. The guideline to be used for this process is provided in Appendix G.

10. Contractor Self-Assessment

Pursuant to the Award Fee clause set forth in each Management and Operating contract, the Contractor must submit a self-assessment to the PERB Chairman (AL Deputy Manager) in accordance with the Performance Evaluation Plan.

The PERB Chairman will provide a copy of the self-assessment to the AOM. The AOM shall evaluate the Contractor's self-assessment and consider its realism as a part of his evaluation of the Contractor's performance. This evaluation shall be documented in an attachment to the PER. If it is found that the Contractor's self-assessment is unrealistic, such finding shall be documented and shall result in a lower grade for the specific FPG.

C. Evaluation

1. Evaluation Importance

The key to the success of the award fee process is the quality of the evaluation determination for each criteria being evaluated. Thousands of dollars of available award fee may be at stake in connection with judgments applied against the criteria. Therefore, it is extremely important that On-site and Off-site Evaluators (referred to as "Evaluators" in this section) assigned an evaluation role be qualified and knowledgeable in the areas for which they have a responsibility. The specific performance data upon which the ultimate award fee determination will be based must emanate from those personnel closest to and most intimately familiar with the Contractors' activities.

2. Evaluator Findings

The Evaluator must think in terms of "findings" or facts (including "achievements" and "deficiencies") while assessing Contractor performance. Only after the "findings" or facts have been determined and

summarized should the Evaluators consider "grades" - adjectival and numerical. The "findings" or facts, after they have been quantified, should be reasonably easy to convert to "grades" using the definitions in the Evaluator Rating Guide, Appendix D, which contains the "grades" and definitions which will be used. Obviously, the professional judgments of the Evaluators will be necessary in order to arrive at conclusions regarding the significance of specific "achievements" or "deficiencies" - that is why qualified personnel must be employed in the evaluation process.

3. Evaluation Standard

One very important point to recognize in connection with award fee evaluation determinations is that the Contractor's performance is not to be judged against a theoretically perfect performance in an area. It is to be judged against a performance which could realistically be achieved considering limitations imposed on a Contractor over which it has little or no control. Lack of funds or late deliveries of material from another AL Contractor are examples which may be considered as limitations. Therefore, in collecting data from which to make an informed judgment, the Evaluator must know "why" the Contractor's performance is at a certain level.

It is important that the Evaluators assign adjectival and numerical grades consistent with the Appendix D definitions. It is intended that grades be realistically achievable and there should be no hesitancy to assign a grade at any level if performance falls within the range of a specific definition.

4. Observations

During the data collection process, certain facts or findings may be noted (observations) by an Evaluator which do not appear appropriate to classify as "achievements" or "deficiencies." These "observations," however, can be used as an effective tool to communicate such information as: a message; positive or negative trends; and impressions of Contractor

performance. Some "observations" may be appropriate to pass on to a Contractor for its information. Today's "observation" could turn into tomorrow's "deficiency" or "achievement." Quite simply, a provision for "observations" permits an Evaluator to note or provide information which may not deserve any other classification at a particular point in time.

5. Sources of Information

Facts or findings upon which the Evaluators will make judgments may come from a variety of sources. Direct observations of Contractor performance by the Evaluator or other personnel are, of course, one principal source. Reports, other documents, and applicable data may also be used. Any information which is germane and can be authenticated is appropriate for consideration. It is not necessary or expected that an Evaluator must personally observe all performance or directly derive all information related thereto.

6. Narrative Summary

Ultimately the Evaluator must develop a narrative conclusion relative to the Contractor's performance. In connection with the narrative conclusion as to performance, the Evaluator must not only indicate the level of actual performance, but must also identify circumstances which influenced that performance; that is, the factors which enhanced or limited the Contractor's ability to perform.

D. Role of Area Office Manager (AOM)

Each AOM, who is a member of the PERB, is responsible for implementation of the award fee evaluation process at the site of the Contractor's operations. After the Performance Evaluation Plan (PEP) has been established, the AOM should develop an internal plan to facilitate implementation of the evaluation and review process. The AOM shall assure that evaluation material is accumulated from both On-site and Off-site Evaluators, including any DOE HQ input, and consolidated so as to facilitate ongoing and subsequent review in the evaluation process. The AOM will assist in the evaluation of the Contractor's self-

assessment and will consider its realism in making the recommendation to the PERB, and will include a specific discussion concerning the realism of the self-evaluation in the PERB recommendations. The AOM shall develop a method of tracking audits, reviews, etc., and shall consider this information as a part of the evaluation. The Performance Evaluation Report (PER) shall include a positive statement that all such information was considered. The AOM shall then prepare a draft PER, in the format prescribed in Appendix F with recommended scores for each FPG, using the guidance provided in Appendix G. Please note that the FPG grade is not simply a numerical average of the scores for FPA's since in the judgment of the AOM, FPA's may vary in importance. The AOM will then brief the PERB as to the contents of the report. The AOM shall be responsible for notifications to the Contractor of pertinent information associated with the award fee evaluation process. The roles of the AOM's are further delineated in other sections of this Handbook.

E. <u>Role of Performance Evaluation Review Board (PERB)</u>

1. <u>Appointment of PERB</u>

A PERB will be appointed by the FDO for each Cost-Plus-Award-Fee contract. The PERB is generally composed of a chairman appointed by the FDO, the Assistant Managers, the AOM, and other selected senior staff members that the FDO chooses to participate.

2. <u>FPG Manager Responsibility</u>

The FPG Manager, a member of the PERB, is responsible for overseeing the FPA's that fall under the purview of that FPG. Prior to the start of the period, the FPG Manager will be involved in developing FPG weights and criteria by providing an overview. With regards to evaluation of Contractor performance, the FPG Manager will assure the FPG grade is appropriate and the FPA's are adequately addressed, resolve any problems that the divisions and the Area Office cannot, be knowledgeable of issues from both an AL and HQ perspective, and assist the PERB Chairman in the evaluation of the Contractor self-assessment.

3. PERB Responsibility

The PERB will be responsible for providing a management overview of the award fee process. The PERB will review the draft PER prepared by the AOM. At the same time, the draft PER is furnished to the PERB for review, the AOM will furnish a copy to all the AL Division Directors. Prior to the PERB meeting, it will be the responsibility of the AL Division Directors to brief the appropriate FPG Managers on any issues that should be discussed at the meeting. This review should assure that the commentary is clear and substantiates the adjectival and numerical grades. Any conflicts or questions that arise in connection with the material submitted by the AOM may be discussed with the appropriate AL Division Director with the intent to derive clarifications or resolve questions raised. Subsequent to the PERB's review and satisfactory resolution of any questions, the PERB Chairman shall present a draft PER and recommended award fee to the FDO.

F. Role of PERB Executive Secretary

The PERB Executive Secretary provides staff support to the PERB and FDO. This includes establishing schedules, coordinating meetings, interfacing between the PERB and Area Offices, and ensuring the final PER reflects all changes made by the PERB and FDO. Also, he shall assist in coordination with DOE HQ.

G. Role of Fee Determination Official (FDO)

The FDO is responsible for the award fee process. The FDO will review the material submitted by the PERB and, when satisfied, will approve the PER and make the award fee determination. The FDO will obtain appropriate DOE HQ concurrence prior to providing the award fee determination to the Contractor.

## SECTION IV. SUMMARY

The following is a summary of the general steps to be followed in the Cost-Plus-Award-Fee (CPAF) Evaluation Process. Figure IV-1 below illustrates the general process.

FIGURE IV-1
AWARD FEE SCHEDULE

| | JUL | AUG | SEP | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. FINAL INPUT | | | | X | | | | | | X | | |
| 2. AOM ASSESS INPUT | | | | X | | | | | | X | | |
| 3. PRELIM. BRIEFING TO CONTRACTOR | | | | X | | | | | | X | | |
| 4. SUBMIT REPORT TO PERB/DIV. DIR. | | | | X | | | | | | X | | |
| 5. FPG. MGR.'s/DIV. DIR. PRELIM. MEETING | | | | X | | | | | | X | | |
| 6. PERB MEETING | | | | X | | | | | | X | | |
| 7. PERB CHAIRMAN BRIEFS FDO | | | | | X | | | | | | X | |
| 8. FDO FEE DECISION | | | | | X | | | | | | X | |
| 9. FEE DECISION TO HQ. FOR AGREEMENT | | | | | X | | | | | | X | |
| 10. HQ. AGREEMENT ON FEE | | | | | X | | | | | | | |
| 11. NOTIFY CONTRACTOR | | | | | X | | | | | | | |
| 12. CPD REQ. WEIGHTS/ CRITERIA FROM AOM | X | | | | | | X | | | | | |
| 13. AOM's SUBMIT WEIGHTS/CRITERIA | X | | | | | | X | | | | | |
| 14. PERB REV./APPROVE WEIGHTS/CRITERIA | X | | | | | | X | | | | | |
| 15. WEIGHTS/CRITERIA TO HQ. for CONCURRENCE | | X | | | | | | X | | | | |
| 16. RECEIVE HQ. CONCURRENCE | | X | | | | | | X | | | | |
| 17. NOTIFY CONTRACTOR | | X | | | | | | X | | | | |



E 001097

Following is a discussion of the individual steps identified above.

1. At the end of the award fee period, the On-site and Off-site Evaluators are responsible for gathering, assessing, and providing evaluation information relative to the Contractor's performance. It is important that all external reviews be considered in providing input. In addition, Functional Performance Group (FPG) Managers are to ensure that any input received as a result of continuous dialogue with DOE Headquarters (HQ) is conveyed to the Area Office Manager (AOM). This input is to be submitted to the AOM by the last day of the reporting period, necessitating a prior cutoff date. If after this cutoff date and prior to the last day of the reporting period something significant occurs which changes the evaluation, contact the AOM immediately.

2. The AOM is responsible for evaluating the input from the various Evaluators and preparing the initial draft Performance Evaluation Report (PER), and proposing a recommended grade (both adjectival and numerical) for the performance period. Due to the time constraints, it is imperative that the PER be prepared in a standard format that can be readily reviewed and modified. Appendix F contains report preparation instructions.

3. The AOM provides a preliminary briefing to the Contractor on the draft PER (without an adjectival rating or grades).

4. The AOM submits the draft PER, recommended grades, and supporting documentation to the Performance Evaluation Review Board (PERB) Executive Secretary for distribution to PERB members. The PERB Executive Secretary will distribute to all Albuquerque Operations Office (AL) Division Directors only a copy of the draft PER.

5. The AL Division Directors will brief their respective FPG Manager on any issues that should be discussed at the PERB meeting.

6. The PERB will meet to discuss the draft PER submitted by the AOM. The AOM makes necessary changes to finalize the PER. The PERB Executive Secretary

will assist the AOM in the finalization of the PER for the PERB Chairman's approval.

7. The PERB Chairman or his designee makes a presentation to the Fee Determination Official (FDO) and recommends a grade for the Contractor.

8. The PER is submitted to the FDO for approval. An "Award Fee Determination" sheet signed by the PERB Chairman is presented to the FDO. This document shows a listing of the FPG's, adjectival grade, numerical grade, weight for each FPG, score of each FPG, total score and the PERB's recommended award fee.

9. The FDO will forward the PER and fee determination to the DOE HQ for agreement.

10. After review of the data and DOE HQ concurrence, the FDO will make his award fee determination.

11. The PERB Executive Secretary will make necessary copies and transmit the PER and the FDO's award fee determination to the Contractor and to others on distribution.

The following steps to be followed pertain to the next award fee period.

12. The PERB Executive Secretary will request from the AOM the criteria and weights. This call will be issued approximately 75 days before the start of the new award fee period.

13. The AOM is to submit the criteria and weights not later than 45 days before the start of the new award fee period.

14. The AOM may request the Contractor provide proposed Initiatives and Milestones for those FPG's listed in the Performance Evaluation Plan (PEP).

15. The PERB Chairman and members will review and approve the criteria and weights.

Also, the PERB Executive Secretary will provide the approved PEP to all AL Divisions.

17. Initiatives and Milestones for each FPG may be developed jointly with the Contractor to provide a tool for use in evaluation during the performance period and are furnished to the cognizant AL Division Directors.

# APPENDIX A

## MASTER LIST OF FUNCTIONAL PERFORMANCE GROUPS (FPG'S)

# APPENDIX A

## MASTER LIST OF FUNCTIONAL PERFORMANCE GROUPS

### INTRODUCTION

This Appendix A provides a Master List of Functional Performance Groups (FPG's) applicable to Albuquerque Operations Office (AL) Management and Operating (M&O) award fee contracts for both the Production Plants and the Waste Isolation Pilot Plant (WIPP). Also shown are the FPG Managers and Primary AL Responsible Divisions for the various Functional Performance Areas (FPA's). The FPG's and their constituent FPA's are to be used, as applicable, to evaluate AL's award fee contracts. The Functional Performance Elements (FPE's) associated with each FPA are included to generally define the scope of each area to be evaluated. In the actual evaluation process, each FPA is to be assessed, to the extent possible and applicable, in terms of the following factors:

(1) Planning

(2) Organizing

(3) Control

(4) Staffing

(5) Coordination and integration

(6) Cost-effectiveness

(7) Execution

"Execution" includes all procedural, programmatic, and operational aspects of the activities which fall within the definition of each FPA.

REPORTING RESPONSIBILITIES
PRODUCTION PLANTS

| FUNCTIONAL PERFORMANCE GROUPS (FPG'S) | PRIMARY AL RESPONSIBLE DIVISION |
|---|---|
| **GENERAL MANAGEMENT** | |
| A. OVERALL OPERATIONS AND ACTIVITIES (FPG MGR: OFC DIR, OMPA) | |
| STRATEGIC PLANNING | APD |
| LEGAL | OCC |
| INTERNAL AUDITING | MRD |
| PUBLIC AFFAIRS | OIEA |
| TECHNICAL INFORMATION | OIEA |
| EMERGENCY MANAGEMENT | GAOD |
| TECHNOLOGY TRANSFER | TT&C |
| COMPUTER INTEGRATED MANUFACTURING | POD |
| B. OVERALL MANAGEMENT OF ES&H (FPG MGR: ASST MGR, OESH) | -- |
| **OPERATIONS AND WEAPONS (FPG MGR: ASST MGR, OOW)** | |
| WEAPON PROGRAM PERFORMANCE | POD |
| PRODUCTION OPERATIONS | POD |
| WEAPON QUALITY | WQD |
| NUCLEAR MATERIALS MANAGEMENT | POD |
| **WASTE MANAGEMENT, OPERATIONAL SURETY, AND ENVIRONMENTAL RESTORATION (FPG MGR: ASST MGR, OOW)** | |
| WASTE PLANNING | WMOSD |
| WASTE OPERATIONS | WMOSD |
| WASTE TECHNOLOGY | WMOSD |
| OPERATIONAL SURETY | WMOSD |
| ENVIRONMENTAL RESTORATION | ERPO |
| **ENVIRONMENT, SAFETY, AND HEALTH (FPG MGR: ASST MGR, OESH)** | |
| ENVIRONMENTAL PROTECTION | EHD |
| SAFETY | SPD |
| HEALTH PROTECTION | EHD |
| NUCLEAR EXPLOSIVE SAFETY | NESD |
| OPERATIONS QUALITY | OQD |
| **SAFEGUARDS AND SECURITY (FPG MGR: ASST MGR, OSS)** | |
| SECURITY | SNSD |
| NUCLEAR SAFEGUARDS | SNSD |
| TRANSPORTATION SAFEGUARDS | TSD |
| CLASSIFICATION | OIEA |
| **RESOURCES AND BUSINESS MANAGEMENT (FPG MGR: ASST MGR, OMA)** | |
| BUDGET AND COST MANAGEMENT | BRMD |
| FINANCIAL MANAGEMENT | FMD |
| CONTRACTS AND PROCUREMENT MANAGEMENT | CPD |
| INDUSTRIAL RELATIONS | PIRD |
| FACILITIES, MODERNIZATION, AND PROJECT MANAGEMENT | PMD |
| INFORMATION MANAGEMENT | IMD |
| NON-DOE FUNDED WORK | FMD |
| MAINTENANCE MANAGEMENT | FPMD |

## REPORTING RESPONSIBILITIES
## WIPP

| FUNCTIONAL PERFORMANCE GROUPS (FPG'S) | PRIMARY AL RESPONSIBLE DIVISION |
|---|---|
| GENERAL MANAGEMENT | |
| A. OVERALL OPERATIONS AND ACTIVITIES (FPG MGR: OFC DIR, OMPA) | |
| STRATEGIC PLANNING | APD |
| LEGAL | OCC |
| INTERNAL AUDITING | MRD |
| PUBLIC AFFAIRS AND INTERGOVERNMENTAL AFFAIRS | OIEA |
| TECHNICAL INFORMATION | OIEA |
| EMERGENCY MANAGEMENT | GAOD |
| TECHNOLOGY TRANSFER | TT&C |
| B. OVERALL MANAGEMENT OF ES&H (FPG MGR: ASST MGR, OESH) | -- |
| OPERATIONS (FPG MGR: ASST MGR, OESP) | |
| GENERAL FACILITY OPERATIONS | -- |
| TRU WASTE OPERATIONS | -- |
| FACILITY MINING | -- |
| MAINTENANCE MANAGEMENT | FPMD |
| OPERATIONS | -- |
| WASTE MANAGEMENT, OPERATIONAL SURETY, AND ENVIRONMENTAL RESTORATION (FPG MGR: ASST MGR, OESP) | |
| WASTE PLANNING | OESP |
| WASTE OPERATIONS - SITE GENERATED | ENV. MGT. STAFF |
| WASTE TECHNOLOGY | ENV. MGT. STAFF |
| OPERATIONAL SURETY | OESP |
| ENVIRONMENTAL RESTORATION | ERPO |
| TRU PROGRAM MANAGEMENT | ESP |
| TRANSPORTATION PACKAGE DEVELOPMENT AND FABRICATION | ENV. MGT. STAFF |
| ENVIRONMENT, SAFETY, AND HEALTH (FPG MGR: ASST MGR, OESH) | |
| ENVIRONMENTAL PROTECTION | EHD |
| SAFETY | SPD |
| HEALTH PROTECTION | EHD |
| OPERATIONS QUALITY | OQD |
| SAFEGUARDS AND SECURITY (FPG MGR: ASST MGR, OSS) | |
| SECURITY | SNSD |
| RESOURCES AND BUSINESS MANAGEMENT (FPG MGR: ASST MGR, OMA) | |
| BUDGET AND COST MANAGEMENT | BRMD |
| FINANCIAL MANAGEMENT | FMD |
| CONTRACTS AND PROCUREMENT MANAGEMENT | CPD |
| INDUSTRIAL RELATIONS | PIRD |
| FACILITIES, MODERNIZATION, AND PROJECT MANAGEMENT | PMD |
| INFORMATION MANAGEMENT | IMD |

## FUNCTIONAL PERFORMANCE GROUPS*

### A. FPG: General Management

This FPG is intended to address the overall management of plant operations and activities. General management performance is best evaluated in terms of essential generic principles of operation. The following seven criteria and the principles on which they are based address management's basic attitudes toward safe operation, explore their underlying motivation, and examine the force of the example given to the rest of the organization. In addition to testing present fitness to operate, these criteria can also tell us something about how management is likely to respond to future events.

The criteria are briefly described in the following paragraphs:

(1) Rising Standard of Adequacy. Excellence in operating nuclear weapons production plants cannot be achieved merely by meeting a set of minimum standards. Excellence is achieved by raising standards and goals when lower thresholds of competence have been reached. The competence of management must be measured not only by success in reaching prescribed minimum standards, but by its determination and success in exceeding them.

(2) Technical Self-Sufficiency. Nuclear weapons production involves technology whose complexity far exceeds that used in most other common manufacturing plants. This technology is relatively new and is still evolving and changing. It is essential that decision-making managers not only have extensive technical training themselves, but that they also have expert analytical and engineering resources readily available within their own organization. It is insufficient to rely solely, or even primarily, on outside contractors or consultants for technical support. A nuclear weapons production plant must have its own broad-based technical staff capable of all but the most specialized services.

(3) Facing Facts. A problem cannot be solved until it is transmitted to and acknowledged at the organizational level where it can be properly addressed. Unfortunately, there is a disposition common to all operating organizations to minimize the potential consequences of problems, especially when blame may attach to the reporter or when the solution may require higher level assistance. Facing up to difficulties, regularly informing higher levels of management of them, and determining and correcting their root causes involve attitudes and practices which are essential to operating competence.

(4) Respect for Radiation. It is incumbent on nuclear weapons production operators to minimize personnel radiation exposure by all reasonable means. A constant concern for the undesirable biological consequences of even small amounts of radiation and an insistence on reducing them are characteristics of competent nuclear management. Since exposure levels allowed by regulations are seldom approached in practice, management's intent and ability to accomplish the purposes of the "As Low as Reasonably Attainable" (ALARA) program can be tested by examining its Radiological Control Program and the measures which it has adopted to minimize exposures.

*Those FPG's, FPA's, and FPE's unique to WIPP will be covered by a revision to the Handbook.

(5) The Importance of Training. The selection and training of personnel is at least as important as any other element of safe plant operations. It is vital that the mental abilities, qualities of judgment, and level of training be commensurate with the responsibility involved in operating a nuclear weapons production plant. Management's attitude toward excellence in operation and its understanding of how to achieve excellence are both revealed in the quality of training provided.

(6) Concept of Total Responsibility. Operating nuclear weapons plants safely requires adherence to a total concept wherein all elements are recognized as important and each is constantly reinforced. Training, equipment maintenance, technical support, radiological control, and quality control are essential elements, but safety is achieved through integrating them effectively in operating decisions. Management's understanding of this principle at the corporate and plant levels is a valid measure of competence. The organizational structure gives some indication of management's awareness, but is less important than understanding and applying the principle.

(7) Capacity to Learn from Experience. Since we are dealing with persons and machines which cannot be made perfect, it is important to recognize that mistakes will be made. We must do our best to design machines having tolerance for mistakes and to continue to improve them through experience. This process of evolutionary improvement, the basis for much of our most useful technology, depends on a capacity to acknowledge mistakes and to determine and correct their underlying causes, whatever the cost. An inability or unwillingness to learn from experience is intolerable in nuclear weapons Production Plants and WIPP.

This FPG should be addressed in terms of two FPA's as follows:

| Functional Performance Areas (FPA's) | Functional Performance Elements (FPE's) |
|---|---|
| A. Overall Operations and Activities | Consideration of the performance factors listed above in the context of overall management of all plant operations and activities excepting those defined in Part B. This includes the activities of strategic planning, legal, internal auditing, public affairs, technical information, emergency management, and technology transfer. |
| B. Overall Management of Environment, Safety, and Health | Consideration of the performance factors and criteria listed above in the context of the overall management of operations and activities related to environment, safety, health, waste management, operational surety, and environmental restoration. |

B. FPG: Operations and Weapons

| Functional Performance Areas (FPA's) | Functional Performance Elements (FPE's) |
|---|---|
| Weapon Program Performance | 1. Regular production<br>2. Special production<br>3. Program control<br>4. Development support |
| Production Operations | 1. Production control<br>2. Manufacturing<br>3. Tool, gauge, and tester management<br>4. Product engineering<br>5. Industrial engineering<br>6. Process development<br>7. Vendor support<br>8. Make or buy decisions |
| Weapon Quality | 1. Quality control engineering<br>2. Quality control operations<br>3. Standards and calibration<br>4. Product inspection<br>5. Loss due to nonconforming material |
| Nuclear Materials Management | 1. Nuclear material transactions<br>2. Forecasts of special nuclear material requirements<br>3. Nuclear material allotment control<br>4. Inventory justification and utilization of nuclear material<br>5. Disposition of scrap and excess nuclear material |

C. FPG: Waste Management, Operational Surety, and Environmental Restoration

| Functional Performance Areas (FPA's) | Functional Performance Elements (FPE's) |
|---|---|
| Waste Planning | 1. Implementation plans (DOE 5820.2A)<br>2. Annual waste management site plans<br>3. Waste minimization<br>4. Programmatic waste quality assurance<br>5. Environmental restoration/waste management five-year plan<br>6. Waste stream identification and characterization<br>7. Training<br>8. Regulatory reporting<br>9. Permitting |
| Waste Operations | 1. Waste storage<br>2. Waste treatment<br>3. Waste disposal<br>4. Waste minimization<br>5. Continuity of waste operations |
| Waste Technology | 1. Planning<br>2. Implementation<br>3. Storage<br>4. Treatment<br>5. Disposal<br>6. Minimization<br>7. Transportation |
| Operational Surety | 1. Formality of operations<br>2. Competency of work force<br>3. Management of corrective actions |
| Environmental Restoration | FPE's to be determined |

D. FPG: Environment, Safety, and Health

| Functional Performance Areas (FPA's) | Functional Performance Elements (FPE's) |
|---|---|
| Environmental Protection | 1. Groundwater monitoring and evaluation<br>2. Potable water assurance, cross-connection prevention<br>3. Sanitary and industrial wastewater treatment and NPDES permitting<br>4. Air quality monitoring, evaluation, and regulatory compliance<br>5. Radioactive effluent and environmental monitoring<br>6. Sanitary and industrial waste operations regulatory compliance and environmental performance<br>7. NEPA compliance and document preparation<br>8. Pesticide and herbicide management<br>9. Specialized areas of environmental compliance and evaluation |
| Safety | 1. Industrial Safety<br>2. Fire Protection<br>3. Nuclear Facilities Safety<br>4. Hazardous Materials Packaging<br>5. ES&H Facility Planning<br>6. Safety Analysis Review System<br>7. Incident/Occurrence Reporting<br>8. Nuclear Reactor Safety<br>9. Firearms Safety |
| Health Protection | 1. Radiological protection<br>2. Industrial hygiene<br>3. Occupational medicine |
| Nuclear Explosives Safety | 1. Personnel assurance program<br>2. Nuclear explosives safety operations<br>3. Tester control program<br>4. Packaging/transportation of nuclear explosives and special assemblies |
| Operations Quality | 1. Documented QA program plans<br>2. Personnel training<br>3. Self-appraisal system to include management evaluation<br>4. Corrective action tracking system |

E. FPG: Safeguards and Security

| Functional Performance Areas (FPA's) | Functional Performance Elements (FPE's) |
|---|---|
| Nuclear Safeguards | 1. Physical control of nuclear material<br>2. Accountability of nuclear material |
| Security | 1. Personnel security<br>2. Physical security<br>3. Technical security |
| Transportation Safeguards | 1. Maintenance support<br>2. Shipment planning<br>3. Shipment Operational Support |
| Classification | 1. Classification guides<br>2. Policy and procedures<br>3. Employee classification indoctrination<br>4. Classification application<br>5. Use of classification board and authorized classifiers<br>6. Sensitive unclassified information |

F. FPG: Resources and Business Management

| Functional Performance Areas (FPA's) | Functional Performance Elements (FPE's) |
| --- | --- |
| Cost Management | 1. Integrated cost/schedule control systems<br>2. Direct and indirect cost management<br>3. Baseline cost management<br>4. Resources utilization (operation/ capital)<br>5. Budgeting<br>6. Approved funding program<br>7. Resource forecasting/estimating/ analysis |
| Financial Management | 1. Financial/custodial accounting<br>2. Performance/decision accounting |
| Contracts and Procurement Management | 1. Purchasing procedures and purchasing operations<br>2. Findings and observations of Contract Review Board<br>3. Small and disadvantaged business support<br>4. Reporting against DOE report requirements<br>5. Response to DOE requests for information, comments, or directives |
| Industrial Relations | 1. Labor relations<br>2. Wage and salary administration<br>3. Fringe benefits administration<br>4. Employment and placement<br>5. Training<br>6. Employee relations<br>7. Equal Employment Opportunity |
| Facilities, Modernization, and Project Management | 1. Construction management<br>2. Site development<br>3. Construction quality assurance<br>4. Utilities management<br>5. Engineering management<br>6. Real Estate and Property management<br>7. Design review<br>8. Cost estimating/validation and control |

| | |
|---|---|
| Information Management | 1. Automated Data Processing<br>2. Telecommunications<br>3. Records Management |
| Non-DOE Funded Work | 1. Federally Funded Work<br>2. Non-Federally Funded Work |
| Maintenance Management | 1. BMAR breakout and reporting<br>2. Productivity improvement initiatives<br>3. Preventive maintenance<br>4. Formal job planning<br>5. Performance measurement and improvement<br>6. Plant condition (facility, inspections, etc.)<br>7. All other DOE Maintenance Handbook Elements<br>8. Action by contractor addressing appraisal findings/recommendations |

# APPENDIX B

## SAMPLE PERFORMANCE EVALUATION PLAN

## AND

## RELATED CONTRACT PROVISIONS

- PART I SAMPLE PERFORMANCE EVALUATION PLAN
- PART II AWARD FEE CLAUSE
- PART III SAMPLE ALLOWABLE COST, BASE FEE, AND AWARD FEE CLAUSE

Sample

Performance Evaluation Plan

(Included as Appendix D
to AL's M&O Contract)

1. Purpose

a. The Cost-Plus-Award-Fee (CPAF) type of contract has been employed to provide an incentive, in the form of an available award fee, which is sufficient to encourage the attainment of, and to reward the Contractor for, increased proficiency in the performance of the contract. The Performance Evaluation Plan, as set forth in this Appendix D, constitutes the substantive and procedural provisions which shall be utilized in arriving at the amount of award fee to which the Contractor is entitled for each evaluation period.

b. The objective of the award fee provisions of this Contract is to afford the Contractor an opportunity to earn increased fee commensurate with the achievement of optimum contract performance. Optimum performance is not necessarily equated with the highest level of performance achievable in all incentivized areas. Rather, it represents the most favorable degree of performance obtainable in light of the Contractor's most effective utilization of available resources (see Note (1) in Section 3, below). The DOE expects the Contractor to exceed minimum performance standards and equates this level of performance with a "good" performance rating. The Contractor is responsible for striving to attain the highest standards of excellence in executing its responsibilities under the contract as measured against performance standards consistent with best available practices.

2. Administration

a. The procedure for (a) evaluating Contractor performance and (b) the determination of award fee is described in the "Albuquerque Operations Office (AL) Handbook for Award Fee Administration," as it may be amended from time to time by DOE at its discretion. A current copy of said Handbook will be furnished to the Contractor. The Handbook is a compilation of existing policies and procedures that govern the manner in which AL will determine the Award Fee under Cost-Plus-Award-Fee contracts.

b. The Functional Performance Groups (FPG's) as set forth in the above described Handbook shall be considered a part of this Performance Evaluation Plan. These FPG's shall encompass all areas of effort which are the Contractor's responsibility. The Contractor's performance on each FPG shall be evaluated in terms of a numerical grade taken from the Rating Plan set forth in Section 3, below. Pursuant to paragraph (d) of the clause of this contract entitled "Award Fee," the criteria to be considered in evaluating the FPG's shall be the Functional Performance Areas (FPA's) and the Functional Performance Elements (FPE's) set forth in the Handbook, and Special Criteria furnished to the Contractor, if any, established for the FPG's. Using the numerical grades and weights

assigned each FPG, the award fee shall then be determined in accordance with the provisions of Section 4.

c. The Contractor shall have a strong self-assessment program to measure progress against the standard of excellence. In accordance with the clause entitled "Award Fee," the contractor must submit a self-assessment to the Deputy Manager, AL, by the 10th working day after the end of the period. The self-assessment shall be limited to approximately two pages per FPG and a one page Executive Summary, and must be written to the FPG level. The contractor shall assess its performance, including any achievements, deficiencies, strengths and weaknesses during the evaluation period. Where deficiencies are noted, the contractor shall describe the actions planned or taken to correct the deficiencies and avoid their recurrence. The Contractor will receive a favorable rating for identifying problems to DOE and developing and implementing corrective action.

d. Pursuant to paragraph (f) of the clause of this contract entitled "Award Fee," the final award fee determination will be made by the Fee Determination Official (FDO) within 60 calendar days after receipt of the Contractor's self-assessment.

e. The FPG's and weights shall be provided to the Contractor by letter from the FDO 30 calendar days in advance of the period in which the Contractor's performance is to be evaluated utilizing such FPG's and weights.

f. The DOE award fee evaluation process shall require that a grade be given for each FPG consistent with the Rating Plan definitions which are set forth in Section 3, below. In arriving at a grade for each FPG, consideration shall be given to (i) planning, (ii) organizing, (iii) control, (iv) staffing, (v) coordination and integration, (vi) compliance with all applicable Laws, Regulations, and Orders, (vii) cost-effectiveness, and (viii) execution. "Execution" includes all procedural, programmatic, and operational aspects of the activities which fall within each FPG.

3. Rating Plan

General guidelines to be used for Contractor performance evaluation are shown below. Management judgment is essential in applying these guidelines when determining the quality of performance.

| Adjective Grade | Numerical Grade | Performance Description |
|---|---|---|
| Outstanding | 96-100 | Performance substantially exceeds expected levels of performance. |
| Excellent | 91-95 | Performance exceeds expected levels. |
| Good | 86-90 | Performance meets expected levels. Minimum standards are exceeded and "good practices" are evident in contract operations. |

| Adjective Grade | Numerical Grade | Performance Description |
|---|---|---|
| Marginal | 70-85 | Performance is less than expected. |
| Unsatisfactory | Below 70 | Performance is below minimum acceptable levels and is sufficiently below expected levels that improvements in performance are required to avoid possible termination action. |

Notes:

(1) The standard expected level of rating of a qualified, competent, and successful Contractor is Good. This corresponds to a numerical rating of 86 points on the rating scale and to earning approximately 50 percent of the available award fee pool dollars. Performance points will reflect deviations from this expected level in the direction of either better or worse performance. Performance ratings above the expected level will reflect the extent to which the Contractor, on its own initiative, is actively involved in performance improvement activities and the extent to which these actions contribute to more efficient, effective, and economical operations. However, a rating above the expected level (86 points) may be justified by a high level of sustained performance where further improvements in performance would not be cost effective.

(2) The DOE expects the Contractor to exercise due diligence in the conduct of all contract activities. It is expected that management systems will be in place and enforced to assure that effective procedures are developed and implemented. The Contractor's failure to oversee, through acts of commission or omission, the conduct of its operations and all of its employees, which potentially or actually causes property damage, losses, endangers the environment, safety or health or compromises the ability of DOE to carry out its mission, will be weighted heavily in the performance ratings. By the same standard, the performance ratings will not be adversely affected if the Contractor raises environmental, safety, or health issues to the appropriate DOE official for resolution. Furthermore, the performance ratings will not be adversely affected if the Contractor stops an activity which is deemed inadequate even though the Contractor's action may appear to be contrary to DOE direction.

(3) A performance rating below 70 points for total performance in any FPG is a matter of grave concern to DOE. This is particularly true in the performance of Environment, Safety and Health related FPG(s), where inadequate levels of performance could cause immediate and detrimental impact upon the environment, safety or health and could result in unsatisfactory programmatic impacts. Similarly, inadequate levels of performance in FPG's related to production, operations or construction could have unacceptable programmatic effects potentially impacting national security. For these reasons, in the event that the FDO determines the Contractor's performance to be unacceptable in any area contract performance which is specified in the Performance Evaluation Plan, even if no weight or fee is specifically assigned, the FDO may at his/her discretion determine the Contractor's overall performance to be unacceptable and, accordingly, may withhold the entire award fee for the evaluation period.

4. Application of Rating Plan to Performance Evaluation Plan

The performance of each FPG shall be evaluated in terms of the Rating Plan set forth in Section 3, above. The performance evaluation determination shall be equated to a numerical grade which shall then be multiplied by the weighting assigned to the FPG. The sum of the resulting products computed for each FPG shall constitute the numerical grade evaluation of the Contractor's performance for the evaluation period. If the sum of the numerical grades for all the FPG's is below 70, the Contractor shall not be entitled to any award fee for that evaluation period. Except as set forth in Note (3) in Section 3 above, if such sum is over seventy, the Contractor shall be awarded a proportionate share of the maximum available award fee, based on the Award Fee Distribution Table contained in the contract clause entitled "Allowable Cost, Base Fee and Award Fee," subject to the fee determination of the FDO. The amount determined may not result solely from mathematical summing, averaging, or the application of a formula.

5. Goal Achievement Objectives (GAO's)

a. GAO's are one or more specific performance objectives assigned to the Contractor which are used to motivate the Contractor to attain a higher level of performance and to achieve specific Government programmatic objectives that may periodically arise. The use of GAO's is an optional method which may be utilized by the Government as a supplement to the Award Fee process.

b. While it is recognized that GAO's fall under FPG's included in the Performance Evaluation Plan, these GAO's generally reflect increasingly stringent or changing Government requirements and can be evaluated by definable, measurable and quantifiable indices. The grading for the GAO's shall be rated separately from any of the FPG's. In order to motivate the Contractor to a high level of performance and to avoid encouraging the Contractor to achieve the GAO's at the expense of overall performance, a minimum Performance Evaluation Plan rating of 88 is required to be eligible to earn fee from achievement of the GAO's, and no single FPG may be rated unsatisfactory or a determination of "unacceptable" is given to any area of contract performance, as discussed in Note 3, above.

c. GAO's can be instituted at any time by the Government at its sole discretion. The GAO's shall be communicated to the Contractor via letter. The letter shall contain the GAO, milestone requirements, goal achievement standards, and the amount of fee (including partial awards, if any) to be earned.

d. If the period of performance to achieve a GAO overlaps more than one six-month award fee evaluation period, the GAO shall be carried over into each succeeding evaluation period until the GAO period of performance expires. Fee earned shall be paid to the Contractor within 30 days after a Government determination that the GAO has been attained successfully, provided, the Contractor meets the conditions specified in paragraph 5.b. above for the GAO performance period(s).

e. The Government, at its sole discretion, may withdraw a GAO at any time. In such an event, the Contractor shall receive an award amount based on performance achieved in accordance with the standards and milestones set forth in the letter from the Government to the Contractor communicating the GAO, assuming that the Contractor meets the conditions specified in paragraph 5.b., above, for the award fee evaluation period during which the Government withdrew the GAO.

f. The Contractor shall be afforded the opportunity to provide to the Government an oral analysis of its progress prior to the Government's determination on the Contractor's performance, whether the GAO was completed or withdrawn. This determination shall not be subject to the "Disputes" clause of this contract.

970.5204-51 [Reserved]

970.5204-52 Foreign Travel.
See 952.247-70.

970.5204-53 Contractor employee travel discounts

Insert the contract clause at 952.251-70 when the circumstances described in 951.7002 apply.

970.5204-54 Award fee.

(a) *Base Fee and Award Fee.* It is herewith agreed that a base fee and an award fee, to be determined in accordance with the provisions of this clause, are available for payment in accordance with the clause of this contract entitled Payment, and Advances.

(b) *Fee Negotiations.* Prior to the beginning of each fiscal year under this contract, or other appropriate period as mutually agreed upon, the contracting officer and contractor shall enter into negotiation of a base and award fee in accordance with appropriate provisions for management and operating contract fees set forth in the Department of Energy Acquisition Regulation. This contract shall be modified at the conclusion of each negotiation to reflect the negotiated amonts for base and award fees. It is herein agreed the award fee amount shall be assigned to evaluation periods six months in duration. If the parties are unable to agree on a reasonable fee, the contracting officer shall determine the base and award fee unilaterally, in accordance with the clause of this contract entitled Disputes.

(c) *Determination of Award Fee Earned.* (1) The Government shall at the conclusion of each specified evaluation period evaluate the contractor's performance for a determination of award fee earned.

(2) For this contract, the Government Fee Determination Official (FDO) will be (insert title of FDO). The contractor agrees that the determination as to the amount of award fee earned will be made by the Government FDO and such determination is binding on both parties and shall not be subject to appeal under the "Disputes" clause or any other appeal clause.

(3) The evaluation of contractor performance shall be in accordance with the Performance Evaluation Plan described in subparagraph (d), below. The contractor shall be promptly advised in writing of the determination, and the reasons why the award fee was or was not earned. While it is recognized that the basis for determination of the fee shall be the evaluation by the government, in accordance with the Performance Evaluation Plan, the FDO may also consider any information available to him or her which relates to the contractor's performance of contract requirements. In the event that the contractor's performance is considered unacceptable in any area of contract performance which is specified in the Performance Evaluation Plan; even if no weight or fee is specifically assigned to the particular performance area, the FDO may at his/her discretion determine the contractor's overall performance to be unacceptable, and accordingly may withhold the entire award fee for the evaluation period.

(4) Unearned award may be carried over within a single fiscal year, or other two-period fee negotiation cycle as may have been agreed upon. The FDO may, at their sole discretion, specify in a fee determination that award fee not earned during the first evaluation period of a two-period fee cycle may be allocated to the second fee period in that fee cycle. The contractor shall not, however, be entitled to earn any of this "carry-over" fee if its overall performance in the latter evaluation period does not reflect an improvement over the prior evaluation period. Overall performance evaluations in the second period which are equal to or the same as those in the first period shall not be considered as improvements providing entitlement to the carry-over portion of the award fee pool. If the single negotiation of a base and award fee amount (fee cycle) will be for more than two evaluation periods, unearned award fees in any one of the evaluation periods established by that negotiation may be carried over only to the next period covered by that negotiation. Fees unearned under one fee cycle may not be carried forward to another fee cycle.

(d) *Performance Evaluation Plan.* (1) The Government shall establish unilaterally a Performance Evaluation Plan upon which the determination of award fee shall be based. Such Plan shall include the criteria to be considered under each area evaluated and, the percentage of award fee, if any, available for each area. A copy of the plan shall be provided to the contractor thirty (30) calendar days prior to the start of an evaluation period.

(2) The Performance Evaluation Plan will set forth the criteria upon which the contractor will be evaluated for performance relating to any technical, schedule, management, and/or cost functions selected for evaluation.

(3) The Performance Evaluation Plan may, consistent with the contract statement of work, be revised unilaterally by the Government at any time during the period of performance. Notification of such changes shall be provided to the contractor at least thirty (30) calendar days prior to the start of the evaluation period to which the change will apply.

(e) *Contractor Self-Assessment.* Following each evaluation period, the contractor shall submit a self-assessment within (Insert Number) calendar days after the end of the period. This self- assessment shall address both the strengths and weaknesses of the contractor's performance during the evaluation period. Where deficiencies in performance are noted, the contractor shall describe the actions planned or taken to

correct such deficiencies and avoid their recurrence. The FDO will review the contractor's self-assessment as part of their evaluation of the contractor's management during the period. An unrealistic self-assessment will result in lower award fee determinations. The contractor will not be penalized for a realistic self-assessment, although deficiencies noted by the contractor may be reflected in the Government's evaluation. The self-assessment itself will not be the basis for the award fee determination.

(f) *Schedule for Award Determinations.* The FDO shall issue the final award fee determination in accordance with a schedule set forth in the Performance Evaluation Plan. However, a determination must be made within sixty (60) calendar days after the receipt by the contracting officer of the contractor's self-assessment discussed in paragraph (e), above. If the determination is delayed beyond that date, the contractor shall be entitled to interest on the determined award fee amount at the rate established by the Secretary of the Treasury under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. 611) that is in effect on the payment date. This rate is referred to as the "Renegotiation Board Interest Rate," and is published in the Federal Register semiannually on or about January 1 and July 1. The interest on any late award fee determination amount will accrue daily and be compounded in 30- day increments inclusive from the first day after the schedule determination date through the actual date the determination is issued. That is, interest accrued at the end of any 30-day period will be added to the determined amount of award fee and be subject to interest if not paid in the succeeding 30-day period.

## Subpart 970.70-Use of DOE Facilities for Work for Others

### 970.7000 Mission-oriented solicitation.

Contractors shall be required to promptly advise the DOE contracting officer of any advance notices of, or solicitations for, requirements which would logically involve DOE facilities or resources operated or managed by the contractor, received from other agencies pursuant to FAR 34.005. Management and operating contracts shall provide that the contractor shall not respond or otherwise propose to participate in response to the requirements of such solicitations unless the contractor shall have first obtained the written approval of the DOE manager of the field activity having cognizance over the contract. Such approval shall not be given except in compliance with DOE directives and with the concurrence of the appropriate Senior Program Official.

## Subpart 970.71-Management and Operating Contractor Purchasing

### 970.7101 General.

(a) The Department of Energy contracts for the management and operation of DOE facilities, the design and production of nuclear weapons, energy research and development, and the performance of other services. These management and operating (M&O) contractors have been selected for their technical and managerial expertise and are expected to bring to bear these technical and managerial skills to accomplish the significant Federal mission(s) described in their contracts with, and work plans approved by, DOE.

(b) Purchasing done by management and operating contractors is one area in which the particular skills of the contractors will be brought to bear in order to more readily accomplish the contractors' assigned missions. The contracting procedures of the contractor's organization, therefore, form the basis for the development of a purchasing system and methods that will comply with its contract with DOE and this subpart.

(c) Completion is fundamental to M&O contractor purchasing.

(d) The Federal Acquisition Regulation generally is not directly applicable to the purchasing activities of management and operating contractors. There are, however, certain Federal laws, Executive Orders and Federal and DOE regulations which do pertain to and apply to purchases by management and operating contractors and thus should be reflected in the contractor's purchasing system and methods. These requirements are identified in this subpart.

### 970.7102 DOE responsibility.

(a) In the Department of Energy, overall responsibility for the oversight of the performance of management and operating contractors, including their purchasing activities, rests with the cognizant DOE contracting activity and, in particular, the Head of Contracting Activity (HCA). Contracting officers are responsible for management and operating contractors' conformance with this subpart and their contracts, and for determining whether those purchasing activities provide timely and effective support to DOE programs. (For the purposes of this subpart, the term "Head of Contracting Activity" includes his or her duly authorized representative except for the HCA actions identified in 970.7104-8(a), 970.7104-9(b), 970.7104-22(c), 970.7104-28(f)(1), and 970.7108(a), which actions are nondelegable. Further, when the term "contracting officer" is used in this subpart, it refers to that individual who has been delegated authority by the HCA for the day-to-day oversight of a

SAMPLE

Clause ~~- 970.5204-13 Allowable Costs, Base Fee and Award Fee, subparagraphs (b)(1), (b)(2), (b)(4), and (d)(15) are provided as an example.

(b)(1) Base Fee and Award Fee. The base fee payable to the Contractor for the performance of the work during the period October 1, 1989, through September 30, 1990, is ______________ and the maximum award fee available for payment to the Contractor during said period is __________. The amount of the award fee actually to be paid to the Contractor shall be determined by the Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations) in accordance with the provisions of subparagraph (b)(2) of this clause. Prior to October 1 of each year during the term of this contract, the DOE and the Contractor shall commence negotiations for the base fee and the maximum available award fee for the ensuing contract year (October 1 through September 30). Upon agreement of the parties, the contract shall be modified in writing accordingly.

(2) Determination of Award Fee. The award fee available to be earned by the Contractor ranges from zero to ____________, which is hereby established as the maximum amount of such fee that the Contractor may earn during the period from October 1, 1989, through September 30, 1990. Determinations of award fee shall be made every six months, or at the end of such other evaluation periods as the Fee Determination Official may determine are appropriate after consultation with the Contractor. The Fee Determination Official shall notify the Contractor in writing of any changes in the duration of such periods thirty days in advance of the Contractor's commencement of performance in such period. The award fee shall be determined subjectively by the Fee Determination Official based on Contractor performance in accordance with the Performance Evaluation Plan set forth in Appendix D, which is hereby incorporated by reference and made a part of this contract.

The proportionate share of the maximum available award fee to which the Contractor shall be entitled for each of the two (2) evaluation periods during Fiscal Year 1990 shall be computed in accordance with the following Award Fee Performance Table.

| Performance Points Earned | Amount of Maximum Available Award Fee Per Point | Total Maximum Available Award Fee | Percent of Maximum Available Award Fee |
|---|---|---|---|
| 0 thru 70 | $-0- | $-0- | 0 |
| 71 thru 85 | | | 46% |
| 86 thru 90 | | | 20% |
| 91 thru 95 | | | 30% |
| 96 thru 100 | | | 4% |
| Total Maximum Available Award Fee for each Six-month Period | | | 100% |

E 001121

C012460

The amount of award fee, if any, earned by the Contractor, as determined by the Fee Determination Official, is not subject to appeal under the clause entitled, "Disputes" or to claim of suit in the United States Claims Court.

(4) Estimated Cost. In agreeing upon the base fee and the maximum available award fee to be paid, the amount and character of the work which the parties contemplated would be performed by the Contractor during the period October 1, 1989, through September 30, 1990, is that reflected in the work assumptions set forth in the document entitled, "FY-1990 Fee Base Calculation Summary," which was an attachment to the ______________, memorandum from __________ to ________________. The presently estimated cost of such work is ____________. There shall be no adjustment in the amount of the Contractor's base fee or in the maximum available award fee by reason of differences between any estimate of cost for performance of the work under this contract and the actual cost for performance of that work.

(d)(15) Establishment and maintenance of bank accounts in connection with the work hereunder, including, but not limited to. service charges, the cost of disbursing cash, necessary guards, cashiers, and paymasters. If payments are made by check, facilities and arrangements for cashing checks may be provided without expense to the employees, subject to the approval of the Contracting Officer.

# APPENDIX C

## Fee Negotiation Process

# APPENDIX C

## Fee Negotiation Process

The following discussion provides an overview of the annual fee negotiation process which precedes evaluation of an award fee contract. An example is provided to illustrate the process. Also included is a summary of the steps followed in determining the amount of award fee earned.

1. Fee Base Established

The fee base represents that estimate of necessary allowable costs, for work, which are to be incurred for the upcoming period, exclusive of certain costs set forth in DEAR 970.1509-6. The Contractor and DOE (Area Office, Budget Resource Management Division and CPD) must agree to an estimated cost for the upcoming Fiscal Year and the costs to be excluded from the fee base. These costs, comprising the total fee base, are broken down into such categories as those shown in the following example:

Figure C-1
Estimated Annual Fee Base (EXAMPLE)

| Fee Base Elements | Estimated Annual Amount |
|---|---|
| a. Production | $400,000,000 |
| b. Research and Development | 100,000,000 |
| c. Special Equipment | 25,000,000 |
| d. Construction Management | 1,000,000 |
| e. Construction by Subcontract | 15,000,000 |
| Total Fee Base | $541,000,000 |

## 2. Calculation of Cost-Plus-Fixed-Fee (CPFF) Maximum Allowable Fee

Using the fee schedules set forth in the DEAR for the various categories of cost, the CPFF Maximum Allowable Fee is calculated. Shown below are the various fee schedules from the DEAR.

### Table 1 - DEAR 970.1509-5

CONSTRUCTION MANAGEMENT CONTRACTS SCHEDULE

| Fee base | Fee | Fee, percent | Increment, percent |
|---|---|---|---|
| $100,000 | $5,400 | 5.40 | 5.25 |
| $300,000 | 15,900 | 5.30 | 5.00 |
| $500,000 | 25,900 | 5.18 | 4.72 |
| $1,000,000 | 49,300 | 4.95 | 3.33 |
| $3,000,000 | 116,100 | 3.87 | 2.82 |
| $3,000,000 | 172,500 | 3.45 | 2.53 |
| $10,000,000 | 299,000 | 2.99 | 2.18 |
| $15,000,000 | 408,000 | 2.72 | 1.90 |
| $25,000,000 | 598,000 | 2.39 | 1.68 |
| $40,000,000 | 850,000 | 2.13 | 1.46 |
| $40,000,000 | 1,142,000 | 1.90 | 1.28 |
| $80,000,000 | 1,398,000 | 1.75 | 1.24 |
| $100,000,000 | 1,646,000 | 1.65 | 1.03 |
| Over $100,000,000 | 1,646,000 | | [1] 1.03 |

CONSTRUCTION CONTRACTS SCHEDULE

| Fee base | Fee | Fee, percent | Increment, percent |
|---|---|---|---|
| $100,000 | $5,400 | 5.40 | 5.25 |
| $300,000 | 15,900 | 5.30 | 5.00 |
| $500,000 | 25,900 | 5.18 | 4.72 |
| $1,000,000 | 49,500 | 4.95 | 3.33 |
| $3,000,000 | 116,100 | 3.87 | 2.82 |
| $5,000,000 | 172,500 | 3.45 | 2.53 |
| $10,000,000 | 299,000 | 2.99 | 2.18 |
| $15,000,000 | 408,000 | 2.72 | 1.90 |
| $25,000,000 | 598,000 | 2.39 | 1.68 |
| $40,000,000 | 850,000 | 2.13 | 1.46 |
| $40,000,000 | 1,142,000 | 1.90 | 1.28 |
| $80,000,000 | 1,398,000 | 1.75 | 1.24 |
| $100,000,000 | 1,646,000 | 1.65 | 1.03 |
| $180,000,000 | 2,161,000 | 1.44 | .80 |
| $200,000,000 | 2,561,000 | 1.28 | .65 |
| $300,000,000 | 3,211,000 | 1.07 | .50 |
| $400,000,000 | 3,711,000 | .93 | .35 |
| $500,000,000 | 4,061,000 | .81 | |
| $Over $500 m | 4,061,000 | | [1] .35 |

SPECIAL EQUIPMENT PURCHASES/ SUBCONTACT WORK SCHEDULE

| Fee base | Fee | Fee, percent | Increment, percent |
|---|---|---|---|
| $100,000 | $1,300 | 1.50 | 1.50 |
| $200,000 | 3,000 | 1.50 | 1.47 |
| $400,000 | 5,940 | 1.48 | 1.39 |
| $400,000 | 8,720 | 1.45 | 1.29 |
| $800,000 | 11,300 | 1.41 | 1.15 |
| $1,000,000 | 13,600 | 1.36 | 1.00 |
| $2,000,000 | 23,600 | 1.18 | .80 |
| $4,000,000 | 39,600 | .99 | .62 |
| $6,000,000 | 52,000 | .87 | .62 |
| $6,000,000 | 64,400 | .81 | .57 |
| $10,000,000 | 75,800 | .76 | .53 |
| $15,000,000 | 102,300 | .68 | .45 |
| $25,000,000 | 147,300 | .59 | .42 |
| $40,000,000 | 210,300 | .53 | .36 |
| $60,000,000 | 282,300 | .47 | .33 |
| $60,000,000 | 348,300 | .44 | .28 |
| $100,000,000 | 404,800 | .41 | .22 |
| $150,000,000 | 514,300 | .34 | .15 |
| $200,000,000 | 589,300 | .29 | .09 |
| $300,000,000 | 679,300 | .23 | |
| Over $300 million | 679,300 | | [1] .09 |

### Table 2 - DEAR 915.971-5

RESEARCH AND DEVELOPMENT EFFORTS

| Fee base | Fee | Fee (percent) | Increment (percent) |
|---|---|---|---|
| $25,000 | $2,500 | 10.00 | 9.74 |
| 50,000 | 4,938 | 9.87 | 8.97 |
| 100,000 | 9,420 | 9.42 | 8.22 |
| 200,000 | 17,640 | 8.82 | 7.64 |
| 400,000 | 32,920 | 8.23 | 7.28 |
| 400,000 | 47,480 | 7.91 | 6.92 |
| 800,000 | 61,320 | 7.67 | 6.69 |
| 1,000,000 | 74,700 | 7.47 | 6.38 |
| 3,000,000 | 202,300 | 6.74 | 6.11 |
| 5,000,000 | 324,500 | 6.49 | 5.53 |
| 10,000,000 | 601,000 | 6.01 | 4.82 |
| 15,000,000 | 842,000 | 5.61 | 4.15 |
| 25,000,000 | 1,257,000 | 5.03 | 3.60 |
| 40,000,000 | 1,797,000 | 4.49 | 3.10 |
| 60,000,000 | 2,417,000 | 4.03 | 2.40 |
| 80,000,000 | 2,897,000 | 3.62 | 1.88 |
| 100,000,000 | 3,273,000 | 3.27 | 1.12 |
| 150,000,000 | 3,833,000 | 2.56 | .65 |
| 200,000,000 | 4,158,000 | 2.08 | .55 |
| 300,000,000 | 4,708,000 | 1.57 | .45 |
| 400,000,000 | 5,158,000 | 1.29 | .35 |
| 500,000,000 | 5,508,000 | 1.10 | |
| Over 500M | 5,580,000 | [1]+.35 | |

PRODUCTION EFFORTS

| Fee base | Fee | Fee (percent) | Increment (percent) |
|---|---|---|---|
| Up to $1 million | | 7.00 | 7.00 |
| 1,000,000 | $70,000 | 7.00 | 6.05 |
| 3,000,000 | 191,000 | 6.37 | 5.25 |
| 5,000,000 | 296,000 | 5.92 | 4.18 |
| 10,000,000 | 505,000 | 5.05 | 3.50 |
| 15,000,000 | 680,000 | 4.53 | 3.30 |
| 25,000,000 | 1,010,000 | 4.04 | 2.86 |
| 40,000,000 | 1,439,000 | 3.60 | 2.41 |
| 60,000,000 | 1,921,000 | 3.20 | 2.07 |
| 80,000,000 | 2,335,000 | 2.92 | 1.30 |
| 100,000,000 | 2,635,000 | 2.64 | 1.10 |
| 150,000,000 | 3,185,000 | 2.12 | .60 |
| 200,000,000 | 3,485,000 | 1.74 | .50 |
| 300,000,000 | 3,985,000 | 1.33 | .40 |
| 400,000,000 | 4,385,000 | 1.10 | .30 |
| 500,000,000 | 4,685,000 | .94 | |
| Over 500M | 4,685,000 | [1]+.30 | |

[1] Excess.



E 001125

The CPFF Maximum Allowable Fee represents the maximum fee if the contract were CPFF and is a standard fee allowance which cannot be exceeded without approval by the DOE Procurement Executive. Continuing the example, the CPFF Maximum Allowable Fee is obtained as follows:

Figure C-2
Calculation of CPFF Maximum Allowable Fee (EXAMPLE)

| | Fee Base Element and Estimated Amount | Fee Amount |
|---|---|---|
| a. | Production<br>$400,000,000 | $4,385,000 (1) |
| b. | R&D<br>$100,000,000 | $3,273,000 (1) |
| c. | Special Equipment<br>$25,000,000 | $ 147,300 (2) |
| d. | Construction Management<br>$1,000,000 | $ 49,500 (2) |
| e. | Construction by Subcontract<br>$15,000,000 | $ 102,300 (2) |
| | CPFF Maximum Allowable Fee | $7,957,100 |

(1) From Table 1
(2) From Table 2

3. Application of Reference Fee Potential

It is the policy of DOE that fee is remuneration to Contractors for organizing and managing resources, the use of Contractor resources, and the risk that all costs incurred may not be reimbursed. Since DOE M&O Contractors typically have a limited level of Contractor cost, capital goods, and operating capital outlays for

performance of such contracts, a purely cost-based approach to a determination of fee is inappropriate. Instead of being solely cost-based, the more desirable approach calls for a structure that allows judgmental evaluation of significant factors and values. Therefore, a structured approach to the determination of a fee negotiation objective was established for each M&O Contractor. The structured approach involves the evaluation of each production Contractor against the following factors and weights:

Figure C-3
Establishing Reference Fee Potential

| | Factor | Maximum Weights | Example Contract |
|---|---|---|---|
| a. | ES&H | 12% | 10% |
| b. | S&S | 5 | 3 |
| c. | Difficulty | 5 | 5 |
| d. | Diversity | 4 | 4 |
| e. | Corporate Effective | 2 | 2 |
| f. | Size of Operation | 2 | 2 |
| | Total Factors | 30% | 26% |
| | Reference Fee Base (1) | 70% | 70% |
| | Reference Fee Potential | 100% | 96% |

(1)The reference fee minimum of 70 percent represents equal rewards to all award fee Management and Operating Contractors for those eleven factors set forth in DEAR 970.1509-4.

AL will periodically evaluate each CPAF contract against these factors and arrive at a specific reference fee potential for that contract. Thus, in developing a fee objective for negotiations, judgmental consideration of the above weighted factors are recognized. CPD will request input from the AOM and other AL organizations in developing the negotiation position for the referenced fee potential. Continuing the example, using the CPFF maximum allowable fee calculated in Figure C-2, and assuming that 90 percent Reference Fee Factor has been established for this contract, the Reference Fee is calculated as follows:

Reference Fee Potential x CPFF Maximum Allowable Fee = Reference Fee

| | | | | |
|---|---|---|---|---|
| 96% | x | $7,957,100 | | = $7,638,816 |

4. <u>Establishing Total Available Fee</u>

A CPAF contract has two elements of fee, a base fee and an award fee. The base fee is designed to compensate the Contractor for minimum performance and is subject to limits set forth in the DEAR. Normally, the base fee may range from 0 to 50 percent of the fixed fee amount. The award fee pool, which is a function of the base fee amount, represents the additional amount to reward the Contractor for performance above the minimum acceptable performance level in those areas described in the evaluation plan. The following Figure C-4 shows the maximum potential award fee corresponding to a given base fee.

FIGURE C-4
MAXIMUM TOTAL FEE
(AS % OF REFERENCE FEE)

| BASE FEE | AWARD FEE | TOTAL |
|---|---|---|
| 50% | 100% | 150% |
| 40% | 120% | 160% |
| 30% | 140% | 170% |
| 20% | 160% | 180% |
| 10% | 180% | 190% |
| 0% | 200% | 200% |






E 001128

The base fee plus the amount included in the award fee should normally not exceed the fixed fee amount by more than 50 percent (a 50 percent/100 percent base fee ratio). A smaller base fee/award fee ratio (resulting in a larger maximum total) may be negotiated if AL desires to motivate the Contractor to higher performance levels and the Contractor is willing to accept a higher level of risk. Negotiation of a smaller base fee/award fee ratio must be approved by the FDO, the Manager, AL.

The total available fee represents the total fee the Contractor might receive for the upcoming year. Continuing the example, the total available fee is calculated as follows assuming a 40 percent/120 percent Base Fee/ Award Fee ratio is negotiated and using the Reference Fee Potential computed earlier.

| Reference Fee | x | Base Fee % | = | Base Fee (1) |
|---|---|---|---|---|
| $7,638,816 | x | 40% | = | $ 3,055,526 |
| Reference Fee | x | Award Fee % | = | Maximum Available Award Fee(2) |
| $7,638,816 | x | 120% | = | $ 9,166,579 |
| Total Available Fee | | | | $12,222,105 |

(1)Paid on a monthly basis

(2)Total Maximum Available Award Fee = $9,166,579/ 2 = $4,583,289 (for Each six-Month Period)

5. Award Fee Performance Table

After the maximum available award fee is determined, an Award Fee Performance Table is established. This table converts performance points earned to a percentage of maximum available award fee. As can be seen in Figure C-5 below, the Total Maximum Available Award Fee is not distributed evenly among the 30 performance points. Instead, the award fee curve, Figure C-6, graphically shows an award fee curve which corresponds to the table shown in Figure C-5. The fee curve can be varied when more incentive is

required at some levels of the performance range and less in others (to illustrate, the curves of 50/100, 40/120 and 0/200 are shown in Figure C-6).

Figure C-5
Award Fee Performance Table for Each Six-Month Period
Fiscal Year 19XX (EXAMPLE)

| Performance Point Earned | Amount of Maximum Available Award Fee Per Point | Total Maximum Available Award Fee | Percent of Maximum Available Award Fee |
|---|---|---|---|
| 0 thru 70 | $ 0 | $ 0 | 0% |
| 71 thru 85 | $152,776 | 2,291,645 | 50 |
| 86 thru 90 | $201,665 | 1,008,324 | 22 |
| 91 thru 95 | $210,831 | 1,054,156 | 23 |
| 96 thru 100 | $ 45,833 | 229,164 | 5 |
| Total Maximum Available Award Fee for Each Six-Month Period | | $4,583,289 | 100% |

## Figure C-6
## Performance Curves

RESERVED

6. FDO Approval of Fee Negotiation Objective

Once a Base Fee and an Award Fee negotiation objective is developed, CPD will request approval by the FDO. Upon approval, CPD, in consultation with the Area Manager, will negotiate a Base Fee and Award Fee with the Contractor for the upcoming year.

7. Award Fee Determination

The amount of award fee to be paid to a Contractor is based upon a judgmental assessment by the FDO of Contractor performance. The assessment of Contractor performance is based upon the Performance Evaluation Plan (PEP) established for the evaluation period. After the evaluation period is complete, the FDO makes a determination as to the amount of award fee the Contractor is to receive. Each FPG is evaluated in terms of the rating plan set forth in the PEP (an Appendix of the contract). The performance evaluation determination is equated to a numerical score and then multiplied by the weighting assigned to that FPG. The sum of scores for each FPG, represents a weighted average and constitutes the numerical grade for the evaluation period. The proportionate share of the maximum available award fee for the evaluation period is computed in accordance with the Award Fee Performance Table (see Figure C-5). If the numerical score is below seventy (70), the Contractor shall not be entitled to any award fee for that evaluation period. The example in Figure C-7 below illustrates how a weighted grade is calculated and used to develop an award fee recommendation to the FDO.

## Figure C-7
## Recommended Award Fee Calculation for Six-Month Period (EXAMPLE)

| Functional Performance Groups | Weight | x | Grade | = | Weighted Grade |
|---|---|---|---|---|---|
| General Management | .15 | | 95 | | 14.25 |
| Operations and Weapons | .22 | | 92 | | 20.24 |
| Environment, Safety & Health | .23 | | 90 | | 20.70 |
| Safeguards and Security | .10 | | 89 | | 8.9 |
| Resource and Business Management | .10 | | 90 | | 9.0 |
| Waste Mgmt. and Operations Surety | .20 | | 91 | | 18.2 |
| Total | 1.00 | | | | 91.29 |

Given an overall weighted grade of 91.29 for this example and using the Award Performance Table shown in Figure C-5, the award fee earned for the six-month period is calculated as follows:

## Figure C-8
## Calculating Award Fee Earned (EXAMPLE)

| Performance Points Earned | Award Fee Per Point | Award Fee Earned |
|---|---|---|
| Below 70 | $ 0 x | $ 0 |
| 81-85 | $152,776 x 15 | 2,291,645 |
| 86-90 | $201,665 x 5 | 1,008,324 |
| 91-91.29 | $210,831 x 1.29 | 271,972 |
| Total | | $3,571,941 |

# APPENDIX D

## EVALUATOR RATING GUIDE

## Appendix D

## Evaluator Rating Guide

The information provided in this appendix is only intended as general guidelines to assist evaluators in establishing adjectival and numerical scores for Contractor performance. Management judgment is essential in applying these guidelines when determining the quality of achievements/deficiencies and whether achievements might offset deficiencies or vice versa.

1. Rating Guide

| Adjective Grade | Numerical Grade | Performance Description |
|---|---|---|
| Outstanding | 96-100 | Performance substantially exceeds expected level. Some significant achievements and/or several achievements. No deficiencies of any kind. |
| Excellent | 91-95 | Performance exceeds expected level. Some achievements and no deficiencies . . . or . . . some deficiencies, but these are more than offset by several achievements or some significant achievements. No significant deficiencies. |
| Good | 86-90 | Performance meets expected levels. Minimum standards are exceeded and "good practices" are evident in contract operations. Some achievements and some deficiencies . . . or . . . no achievements or deficiencies. |
| Marginal | 70-85 | Performance is less than expected. No achievements and some deficiencies . . . or . . . some achievements, but these are more than offset by several deficiencies or some significant deficiencies. |
| Unsatisfactory | Below 70 | Performance is below minimum acceptable levels and is sufficiently below expected levels that improvements in performance are required to avoid possible termination action. Significant deficiencies causing severe impacts on mission capabilities. |

Notes:

(1) In general, "some" means one to four items and "several" means five or more.

(2) The standard expected level of rating of a qualified, competent, and successful Contractor is Good. This corresponds to a numerical rating

of 86 points on the rating scale and to earning approximately 50 percent of the available award fee pool dollars. Performance points will reflect deviations from this expected level in the direction of either better or worse performance. Performance ratings above the expected level will reflect the extent to which the Contractor, on its own initiative, is actively involved in performance improvement activities and the extent to which these actions contribute to more efficient, effective, and economical operations. However, a rating above the expected level (86 points) may be justified by a high level of sustained performance where further improvements in performance would not be cost effective.

(3) The Department of Energy (DOE) expects the Contractor to exercise due diligence in the conduct of all contract activities. It is expected that management systems will be in place and enforced to assure that effective procedures are developed and implemented. The Contractor's failure to oversee, through acts of commission or omission, the conduct of its operations and all of its employees, which potentially or actually causes property damage, losses, endangers the environment, safety or health, or compromises the ability of DOE to carry out its mission, will be weighted heavily in the performance ratings. By the same standard, the performance ratings will not be adversely affected if the Contractor raises environmental, safety, or health issues to the appropriate DOE official for resolution. Furthermore, the performance ratings will not be adversely affected if the Contractor stops an activity which is deemed inadequate even though the Contractor's action may appear to be contrary to DOE direction.

(4) A performance rating below 70 points for total performance in any Functional Performance Group (FPG) is a matter of grave concern to DOE. This is particularly true in the performance of Environment, Safety and Health related FPG(s), where inadequate levels of performance could cause immediate and detrimental impact upon the environment, safety, or health and could result in unsatisfactory programmatic impacts. Similarly, inadequate levels of performance in FPG's related to production, operations, or construction could have unacceptable programmatic effects potentially impacting national security. For these reasons, in the event that the FDO determines the Contractor's performance to be unacceptable in any area of contract performance which is specified in the Performance Evaluation Plan, even if no weight or fee is specifically asigned, the FDO may at his/her discretion determine the Contractor's overall performance to be unacceptable and, accordingly, may withhold the entire award fee for the evaluation period.

2. <u>Criteria Guidelines</u> - The purpose of the below guidelines is to provide assistance in categorizing achievements and deficiencies, thereby making the criteria more objective. Therefore, evaluators should consider the description provided herein in ascertaining whether an achievement/deficiency should be considered as significant.

| FPG | Achievements | Significant Achievements |
|---|---|---|
| GM | A timely response in meeting a new (or changing) requirement, resolving a problem, or fostering general improvement through training, leadership and management direction to the work force . . . or . . . execution of a specific management initiative, e.g., quality improvement process. | Execution of important system changes which result in significantly improved functional indicators in general plant operations, e.g., unusual occurrence reports, recordable injuries, lost workdays, cycle time reduction, work in-process maintenance backlog. |
| ES&H | Sustained operations over the award fee period which complied with requirements . . . or . . . timely execution of an action plan which resulted in compliance with a requirement. | Execution of operations resulting in performance beyond compliance and aimed at achieving lowest practical levels of risk. |
| WM/OSP/ ER | Sustained operations over the award fee period which complied with requirements . . . or . . . timely execution of an action plan which resulted in compliance with a requirement. | Execution of operations resulting in performance beyond compliance and aimed at achieving lowest practical levels of risk or liability . . . or successful, cost-effective, and timely execution of an ER action plan or project. |
| OPNS/ WPNS | Compliance with all directive schedules with only temporary deviations from full lead time . . . or . . . improvements within a functional area, e.g., a general decrease in cost of nonconformance. | Compliance with all directive schedules with no deviation from full lead time . . . or . . . innovative important changes in the system which result in significant continuous improvement within a functional area, e.g., production operations. |
| S&S | Sustained operations over the award fee period which complied with requirements . . . or . . . timely execution of an action plan which resulted in compliance with a requirement. | Execution of operations resulting in performance beyond compliance and aimed at achieving lowest practical level of risk. |
| RES/BDGT/ MGMT | Execution of a well-balanced application of resources which takes into account the interaction and importance of DOE requirements and priorities . . . or . . . execution of an initiative that results in improvement, e.g., a clear process of prioritization of requirements that drive a budget. | Innovative important change to the system of managing which results in major improvements in functional indicators, e.g., headcount, gross budget, productivity through use of capital equipment. |

| FPG | Deficiencies | Significant Deficiencies |
|---|---|---|
| GM | General lack of timely management actions designed to identify, correct, or avoid problems . . . or . . . a negative trend in performance of management processes. | An important failure of the system of managing which results in major impacts or high risk to personnel, facilities, or operations . . . or . . . a significant negative trend in management performance which remains unresolved or unrecognized due to a lack of management attention. |
| ES&H | Deviations from ES&H requirements which result in low risk to the public, work force, and environment and for which timely plans for resolution were not developed or adequately executed . . . or . . . a negative trend in ES&H performance. | Deviations from ES&H requirements, which could result in high risk to the public, work force, and environment . . . or . . . a significant negative trend in ES&H performance which remains unresolved or unrecognized. |
| WM/OSP/ ER | Deviations from requirements for which timely plans for resolution were not developed . . . or . . . a negative trend in performance. | Deviations from requirements, which could result in high risk to continued operations . . . or . . . a significant negative trend in deviations from requirements. |
| OPNS/ WPNS | Failure to comply with requirements which results in workarounds or other impacts . . . or . . . a negative trend in performance. | Failure to comply with lead time requirement resulting in major impact . . . or . . . a significant negative trend of the system which remains unresolved or unrecognized . . . or . . . a pattern of operations which results in chronic failure to comply with requirements, e.g., rarely or never achieving full lead on a weapon production program. |
| RES/BDGT/ MGMT | Failure to apply resources in a well-balanced process which impacts the achievement of DOE requirements and priorities . . . or . . . failure to execute a specific plan of action or requirement, e.g., cost overruns, improper application of procurement regulations, minority business plans. | An important failure of the system which results in a major impact on plant functions or DOE requirements . . . or . . . a significant negative trend that remains unresolved or unrecognized. |

| FPG | Deficiencies | Significant Deficiencies |
| --- | --- | --- |
| S&S | Deviations from requirements which result in low risk to the security of facilities, classified material, classified documents or SNM and for which timely plans for resolution were not developed . . . or . . . a negative trend in the level of performance. | Deviations from requirements result in high risk to the security of facilities, classified material, classified documents or SNM . . . or . . . a significant negative trend that remains unresolved or unrecognized. |

Notes:

(1) "Significant" signifies a major event or sustained level of performance which, due to its importance, is exceptionally good or poor and deserves to be brought to the Manager's attention for fee determination purposes.

(2) The word "requirement" appears frequently in the criteria. Requirement is used in the general sense for brevity. A requirement can be a law, regulation, DOE Order, directive schedule, a policy such as QC-1, a notice as in SEN-7, etc.

The left-hand column (achievements and deficiencies) usually applies to: (a) an action, event, or singular achievement or deficiency. Example: ES&H, Noteworthy Achievement - ". . . timely execution of an action plan which resulted in compliance with a requirement." or (b) is compliance-oriented (see same example above).

(3) The right-hand column of the Criteria Guidelines (Significant Achievements and Significant Deficiencies) usually applies to: (a) more general, broad-based achievements or deficiencies such as a beneficial system change or a detrimental system failure.

Example: Resource/Budget Management, Significant Achievement - ". . . innovative important <u>change to the system</u> of managing which results in <u>major improvements</u> in functional indicators (e.g., headcount, gross budget, productivity through use of capital equipment. . . ."

Example: General Management, Significant Deficiency ". . . an important failure of the system which results in major impacts or high risk to personnel, facilities, or operations . . ." or (b) an achievement that is <u>not</u> compliance-oriented but is aimed at excellence.

Example: Waste Management, Operational Surety, Environmental Restoration - ". . .execution of operations resulting in performance beyond compliance and aimed at achieving lowest practical levels of risk or liability. . . ."

(4) The Criteria Guidelines are also meant to illustrate the spectrum of items which can be involved. For instance, a notable achievement can recognize a sustained high level of performance. See Waste Management, Operational Surety and Environmental Restoration. "Sustained operations over the award fee period which complied with requirements . . ." or a notable achievement can be narrow in scope and relate to improvements which have or will yield a higher level of performance. See the continuation of the Waste

Management, Operational Surety and Environmental Restoration statement above: or ". . . timely execution of an action plan which resulted in compliance with a requirement."

# APPENDIX E

## GLOSSARY OF TERMS

# Appendix E

## Glossary of Terms

Area Office Managers (AOM). The Performance Evaluation Review Board (PERB) member responsible to accumulate, review, and consolidate evaluation material submitted by Performance Evaluators and Monitors and prepare the initial Performance Evaluation Report (PER) and recommended award fee.

Cost-Plus-Award-Fee (CPAF) Contract. A cost type contract with special fee provisions to motivate a Contractor to achieve a high or higher level of performance.

Cost-Plus-Fixed-Fee (CPFF) Contract. A cost type contract which provides for the payment of a negotiated fixed fee to a Contractor.

Fee Determination Official (FDO). The Manager, or anyone acting as Manager, Albuquerque Operations.

Functional Performance Groups (FPG). A grouping with an assigned weight, consisting of FPA's. Normally, each AL award fee Management and Operating Contract will consist of five or six very broad FPG's.

Functional Performance Area (FPA). The specific category representing a group of activities or functions (managerial, administrative, or operational) within a FPG in which a Contractor is required to perform.

Functional Performance Element (FPE). A specific activity or function (managerial, administrative, or operational) which a Contractor is required to perform. Several related FPE's generally define the scope of a FPA.

Management & Operating (M&O) Contracts. An agreement under which the Government contracts for the operation, maintenance, or support, on its behalf of a Government-owned or -controlled facility.

Observation. Facts or findings noted by a monitor/evaluator which do not appear appropriate to classify as an achievement or deficiency, but may be useful in communicating a message to the Contractor.

Off-site Evaluator. An off-site (remote from Contractor) AL representative (normally AL Division staff) responsible for gathering and assessing evaluation information on a periodic basis relative to a Contractor's performance in specified FPA's.

On-site Evaluator. An on-site (Contractor location) AL representative (normally Area Office staff) responsible for gathering and assessing evaluation information on a continuing basis relative to a Contractor's performance in specified FPA's.

Performance Evaluation Plan (PEP). A formal plan which contains the policies and procedures applicable for the award fee provisions of a specific contract.

Performance Evaluation Report (PER). A report, prepared at the conclusion of each evaluation period in connection with the award fee evaluation and review process, which summarizes Contractor performance in the applicable FPG. The report includes a narrative and an adjectival summary grade for each FPG. A PER satisfactory to the Fee Determination Official will be forwarded to the Contractor after the evaluation period has been completed.

Performance Evaluation Review Board (PERB). A Board appointed by the Fee Determination Official for each CPAF contract to provide a management overview of the Performance Evaluation Report prepared by the AOM. A PERB is normally composed of members of the AL Manager's senior staff, including the appropriate AOM. This Board reviews the PER and the proposed award fee submitted by the AOM and provides a PER and an award fee recommendation to the Fee Determination Official.

PERB Executive Secretary. An Albuquerque Operations Office (AL) representative from the Contracts and Procurement Division (CPD), Management and Operating Contracts Branch, responsible for the administration of the award fee performance program.

Rating Plan. That section of an Award Fee Plan which delineates the adjectival grades, numerical grades, and the definitions thereof which are used in the evaluation process. The Rating Plan facilitates the award fee computation based upon the translation of evaluation information into definitive grades.

Special Criteria - Criteria developed each period to define the FPG which address significant issues and priorities of the Department.

# APPENDIX F

## PERFORMANCE EVALUATION REPORT FORMAT

## AND

## FORMAT FOR AL DIVISION EVALUATION

# Appendix F

## Performance Evaluation Report Format

### Instructions

Submit data on IBM-PC disks (Multimate Format). If unable to use or transfer onto IBM-PC disks, please indicate type of system to be used. When submitting data, please verify all data before mailing disk. Also, ensure disks are well wrapped (cardboard on both sides). If disks are to be handcarried, do not let them go through metal detectors at the airport since data may be erased.

Use prestige elite type.

Flush left margin at 12 spaces.

Leave at least six lines at top of each page and six lines at bottom of page.

Page Numbering - First page and remaining pages should be numbered at the BOTTOM. Recommended Award Fee Calculation Sheet is the last page of report. Page should NOT be numbered or stamped with classification markings. Numerical grade is required.

Stamped documentation goes on first page of report. Leave extra space at top and bottom of signature and first page. These documents have to be reproduced so STAMP WITH BLACK INK.

Introductory paragraph should not give a numerical grade - just an adjectival grade for overall performance.

Header on first page of report should read as follows:

PERFORMANCE EVALUATION
(NAME OF Contractor)
FOR THE PERIOD ___________, 199_ THROUGH _____________, 199_

The overall performance of (Contractor's Name) has been maintained at least at a level of "Satisfactory" during the period ___________, 198_ through ___________, 199_.

The following is an evaluation of the performance of (Contractor's Name) in the FPA's selected for award fee evaluation.

FPG: (IN CAPS)

Adjectival/Numerical Grade: (IN CAPS)

Second and Subsequent FPG's

FPG: (IN CAPS)

Adjectival/Numerical Grade: (IN CAPS)

List in order of importance: Significant Achievements
Achievements
Significant Deficiencies
Deficiencies
Observations

If none exist, show "None" under the subheader.

Subheaders should be initial capped, with a line between subheader and body. If only one activity under subheader, DO NOT NUMBER - start flush with left hand margin.

EACH FPA SHOULD BE ON A SEPARATE PAGE.

# Format for AL Division Evaluation

## Contractor's Name, (X) Half FY (XX)

FPA

Summary statement with adjective and numerical grade; e.g., performance exceeded the expected level with two achievements, no deficiencies and four observations. The rating is Excellent - 92 percent.

Significant Achievements

Achievements

Significant Deficiencies

Deficiencies

Observations

Note: Inputs submitted for the FPA of General Management should not include an adjective or numerical grade since they must be integrated with others by the Area Manager.

# APPENDIX G

## FPG GRADING GUIDELINE

## Appendix G

## FPG Grading Guideline

The following discussion provides a guideline of the methodology to be used in developing an overall Cost-Plus-Award-Fee grade for the Fee Determination Official to consider.

1. FPG Grades

The performance evaluation process is basically subjective and its effectiveness depends upon the mature judgment of the evaluators. No simple "chug and plug" formulas will suffice. In a similar manner, the system for determining an FPG grade from its constituent FPA's must allow room for judgment and not be overly prescriptive. Nevertheless, some standardized methodology is required in order to ensure consistency among the sites and over time.

This balance between flexibility and standardization will be accomplished in two steps. The first step is standardized and simply requires finding the average numerical grade of the FPA's within an FPG. The second step is more difficult in that it requires judgment. Specifically, it requires evaluating the relative importance of the FPA's with an FPG. The importance of an FPA in a given period is a function of many factors such as the number of initiatives and milestones and their significance, the volume of activity, and the gravity of issues. With these factors in mind, the FPG grade may be shifted as appropriate from the numerical average in the direction of the more important FPA's. An example of this methodology is shown in Figure 1.

### Figure 1

### FPG Grading System: Example

*FPG - Environment, Safety, and Health

| | | | |
|---|---|---|---|
| FPA's - (1) | Environmental Protection | 86 | - Good |
| (2) | Safety | 92 | - Excellent |
| (3) | Health Protection | 90 | - Good |
| (4) | Nuclear Explosive Safety | 91 | - Excellent |
| (5) | Operations Quality | 96 | - Outstanding |
| *Determine FPA Average | | 91 | - Excellent |
| *Apply Judgment: e.g., If (1) is more important than (5), could reduce FPG grade. | | 90 | - Good |

Relative Importance Adjustment: The rationale for any shifts from the numerical average should be submitted as part of the draft Performance Evaluation Review Board recommendations.

E 001149

2. Overall Grade

The overall grade shall be determined by multiplying the FPG grades by their assigned weights as defined in the Performance Evaluation Plan and taking the sum of these products. An example of this calculation is shown in Figure 2.

Figure 2

Overall Grade Calculation: Example

| FPG | Weight | Grade | |
|---|---|---|---|
| General Management | | | |
| A. Overall Operations and Activities | 9% | 93 | 8.37 |
| B. Overall Management of ES&H | 11% | 89 | 9.29 |
| Operations and Weapons | 20% | 92 | 18.40 |
| Waste Management, Operational Surety, and Environmental Restoration | 20% | 88 | 17.60 |
| Environment, Safety, and Health | 20% | 93 | 18.60 |
| Safeguards and Security | 10% | 96 | 9.60 |
| Resources and Business Management | 10% | 94 | 9.40 |
| Totals | 100% | | 91.26 |

3. Award Fee Calculation

The proportionate share of the Maximum Available Award Fee for the evaluation period is computed in accordance with the Award Fee Performance Table set forth in the contract and negotiated annually.

PL. SUPP. EX. 55

UNITED STATES CLAIMS COURT

Case No. 91-1362 C,

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF CLAUDE HUDGEL BARKMEIER
VOLUME I

October 23, 1992

Pursuant to Notice taken on behalf of Plaintiff at 150 East Tenth Avenue, Denver, Colorado 80203, at 9:35 a.m., before Judy L. Busbee, Registered Professional Reporter and Notary Public within Colorado.

Q. Is there any other reason that would affect your ability to testify here today?
A. No.
Q. Mr. Agy, are you currently employed?
MR. BRUNS: Mr. Barkmeier.
A. My name is not Agy.
Q. (BY MR. KELLEY) Mr. Barkmeier. I'm sorry. Are you currently employed?
A. No, I'm not.
Q. Are you retired?
A. Yes. I'm a retired federal employee.
Q. What agency did you retire from?
A. Department of Energy.
Q. When did you retire?
A. December 1989.
Q. What position did you hold at the time you retired?
A. I was Director of Administration of the Rocky Flats office.
Q. What were your duties in connection with that position?
A. I was responsible for most administrative functions; that included budgeting, contracting, property management, office services, cost management, federal personnel, contractor industrial relations. That's about

those were primarily fixed-price construction contracts, although there was a cost-plus-fixed-fee construction contract. And I was responsible for surveillance of the--it was the Atomic Energy Commission at the time--operating contractor's procurement activities and property management activities.

Q. What was your next position?

A. After I left the one in Kansas City--

Q. Yes.

A. --is that the question? Chief of the Administrative Branch at the Rocky Flats office. It was the Atomic Energy Commission at the time.

Q. And when did you begin that job?

A. That was in February 1974.

Q. Did you retain that position until you retired?

A. More or less. There were a couple of changes at various points in time. When I initially went into it, I was not responsible for federal personnel or contractor industrial relations. And that was given to me, oh, I don't know, maybe a couple of years later. And then at a later point in time, I would say about 1980, '81, I was given responsibility for security. And I had that, oh, probably for about two years, and then that was assigned to someone else. Other than that, the duties

Performance Evaluation Committee?

A. Yes.

Q. How many branch chiefs were there during the period of the first award fee in 1979?

A. I can't say for sure, because I don't recall exactly how the office was organized at that point in time.

Q. Do you recall approximately how many?

A. Yeah. Half a dozen. Six. Might have been one or two more or one or two less. Well, it wouldn't have been one or two less. It might have been one less.

Q. What was the function of the Rocky--no, strike that. What was the function of the Performance Evaluation Committee in 1979 in the process of determining Rockwell's award fee?

A. The preparation of a draft report of findings, deficiencies, observation, and formulation of a recommended grade, which in turn computed into an award fee amount.

Q. Who was it who made--

(A break was taken, during which Mr. Bruns left the deposition room.)

Q. Mr. Barkmeier, could you explain to me what were the steps taken in the Rocky Flats office in 1979 in connection with determining Rockwell's award fee?

A. Well, first, the branch chiefs were advised that they were to prepare draft reports for their areas of responsibility. Then the branch chiefs were assembled into a meeting with the manager, the assistant manager, and the secretary of the Performance Evaluation Committee. Each of the drafts was discussed, and we also--the branch chiefs also provided at that time any recommendations they had regarding items that should be included in the report for the general management area. And the manager sometimes provided a draft of that area at that meeting, and sometimes did not. Sometimes that came later.

Anyway, the group met, discussed each of the recommendations that had been made, made any revisions of--that the group felt necessary, with the manager having the majority vote on each of those recommendations. At that point, a draft report was prepared--

Q. Did all those inputs and recommendations take place at one meeting?

A. There were two meetings. But a complete set did take place at the first meeting, with the possible exception of the general management area.

Q. Please continue.

A. Okay. Then after a draft report had been

produced, each of the branch chiefs met with their contractor division director counterpart to discuss the achievements, deficiencies, and observations regarding that person's area.

When that process had been completed, the Performance Evaluation Committee met again and considered any comments that the Rockwell directors had provided or any changes that the branch chiefs had decided to make as a result of their discussions with the contractor's directors.

The general management section would be more or less finalized--be completed, anyway, in a draft form. Another draft report was produced. The manager then met with the contractor's plant manager, and discussed the entire report. As a result of that meeting, sometimes some changes were made, and sometimes no changes were made.

At that point, the Rocky Flats' input to the report was finalized. It was forwarded to Albuquerque to a Performance Evaluation Review Board with recommended scores and the fee computations resulting from those scores. The Albuquerque Performance Evaluation Review Board met, either did or didn't make recommended changes. The manager of Rocky Flats was a member of that body. If they had recommended changes, those were discussed with

whoever at Rocky Flats was responsible for the area, and sometimes the changes were made without further discussion, sometimes they were discussed and modified, and sometimes they were rejected.

That Performance Evaluation Board then forwarded a report with a recommendation on the amount of award fee to the manager, Albuquerque, who was the fee determination official. He then made the fee determination, and his option at that point was to either accept the recommendation of the Performance Evaluation Review Board, or change the award fee, since the entire process was aimed at producing an award fee. And they sometimes did increase or decrease the award fee amount recommended by Rocky Flats and the Performance Evaluation Review Board.

Q. Is what you have described the procedure that was in place in 1979?

A. I don't think I heard the entire question.

Q. Is the procedure that you just described the procedure that was in place in 1979?

A. Yes, it is.

Q. Was the procedure different at the time you retired in 1989?

A. Yes, it was.

Q. When did it change?

A. In the second performance period for 1989. That's for fiscal year 1989.

Q. Up until the second half of fiscal year 1989, was the procedure for determining Rockwell's award fee the same as you have described for 1979?

A. With one exception; in the first period in 1989, the Secretary of Energy claimed the right to review the award fee recommendation before the manager of Albuquerque finalized it.

Q. Had the Secretary of Energy ever claimed that right before 1989?

A. No.

Q. Mr. Barkmeier, I'm handing you a document that has been marked as Plaintiff's Exhibit No. 1, which is modification No. M128 to the Rocky Flats contract. Would you please take a moment to review this document.

(A pause occurred in the proceedings.)

A. Okay.

Q. Have you ever seen this document before?

A. Yes, I have.

Q. In your own words, what is this document?

A. This document is the modification to the contract which establishes the award fee conditions for fiscal year 1989.

Q. Was this a document that you used in the

process of determining Rockwell's award fee for the fiscal year 1989?

A. Yes, it is.

Q. Let me draw your attention to page 2 of Exhibit 1, subparagraph (b) (1), entitled Base Fee and Award Fee, and specifically to the sentence in the middle of that subparagraph that begins "The amount of the award fee" . . .

A. Okay.

Q. Would you please read that sentence aloud.

A. "The amount of the award fee actually to be paid to the contractor shall be determined by the Award Fee Determination Official, (Manager, or anyone acting as Manager, Albuquerque Operations) in accordance with the provisions of Subparagraph (b) (2) of this clause."

Q. Did you ever have occasion to discuss that sentence with anyone?

A. No.

Q. Who was the manager or the person acting as manager of Albuquerque operations for the first half of fiscal year 1989?

A. Bruce Twining.

Q. Who was the person who was manager or the person acting as manager of Albuquerque operations for the second half of fiscal year 1989?

A. Bruce Twining.

Q. Let me draw your attention to Appendix D, which is part of Exhibit 1. On the first page of Appendix D, under the section entitled "Introduction," the document describes the terms "functional performance areas" and "functional performance elements," and makes reference to the Albuquerque Operations Handbook for award fee performance evaluation and review process. Are you familiar with functional performance areas?

A. Yes, I am.

Q. Let me draw your attention to the page of Exhibit 1 that is page 3 of 9, Appendix D.

A. Okay.

Q. At the bottom of that page, and continuing on to the next page, there is a list of functional performance areas, and a corresponding column with weightings in terms of percentages.

A. Yes.

Q. What was the role of those functional performance areas in determining Rockwell's award fee for the period ending March 31, 1989?

A. These were the areas of Rockwell's performance that were evaluated and graded for purposes of establishing the award fee.

Q. In fact, when you made your recommendation

A. Yes, it is.

Q. Was that changed procedure also applied to the award fee period for the second half of fiscal year 1989?

A. I was no longer working for the Department of Energy when the process was completed for that second period, so I'm not certain.

Q. At the time you retired, were you aware of headquarters interjecting itself into the award fee process for the second half of fiscal year 1989?

A. Yes.

Q. At the time you retired, had any changes to the handbook formally been issued?

A. No.

Q. At the time that you retired, had a new handbook been issued?

A. No.

Q. With respect to the first half of fiscal year 1989, how did Secretary Watkins interject himself into the award fee process?

A. My understanding is that he required that the recommended award fee be approved by him prior to being issued--prior to a determination being issued by the manager, Albuquerque.

Q. Based on your understanding of the Rocky

this independent report?

A. I don't recall that he did instruct me to, but I'm--I know no other reason why I would have prepared it.

Q. Did you report directly to Mr. Goldberg?

A. Yes, I did.

Q. When Mr. Whiteman was the Rocky Flats area office manager, did you report directly to Mr. Whiteman?

A. Yes, I did.

Q. When Mr. White--strike that. When Mr. Inlow was acting area manager at Rocky Flats, did you report to Mr. Inlow?

A. Yes.

Q. Did Mr. Inlow cease being the acting area manager on the same day that Mr. Goldberg was appointed to that position?

A. I don't know. I believe that happened on the same day, but there may have been a lapse of less than a week between the two events.

Q. For any of the award fee periods prior to the first half of fiscal year 1989, were you ever asked to prepare an independent report of the type that you were asked to prepare by Mr. Goldberg?

A. With the exception that I don't recall Mr. Goldberg asking me to prepare it, no, I never

prepared a report independently.

Q. For any of the periods prior to the first half of fiscal year 1989, were you aware of anyone preparing any report independent of the PEC report?

A. No.

Q. Did you discuss with anyone at the time you were preparing the independent report on Rockwell's award fee the fact that you were preparing an independent report?

A. I recall discussing it with Ed Goldberg. I believe I would have discussed it with Terrel Agy.

Q. Anyone else?

A. I'm not sure. I don't recall.

Q. What were your discussions with Mr. Agy about the independent report?

A. I don't actually recall discussions, but consistent with my method of operations, since it was his area of responsibility, I believe I would have told him what I was doing and why.

Q. What would you have told him?

A. That I was trying to prepare a report that we could support and that headquarters would accept.

Q. Did you inform Mr. Agy that headquarters would not accept the number that had been recommended by the PEC?

A. Once again, I don't recall that, but I believe that I would have.

Q. Did you consider that the fact you were preparing an independent report to be unusual?

A. Certainly.

Q. What did you discuss with Mr. Goldberg about your preparation of this independent report?

A. I don't recall. Well, let me correct myself. I recall going through the revised scores and fee calculations with Mr. Goldberg after I had completed my work on it.

Q. What did Mr. Goldberg tell you about the revised calculations?

A. I don't recall.

Q. What did you tell him about the calculations?

A. How I had arrived at them, and what the results were.

Q. Were you comfortable with those results?

A. No.

Q. Did you express that to Mr. Goldberg?

A. I'm sure I did, but I don't recall that I did.

Q. Do you know what his reaction was when you expressed that?

A. No.

Q. Did you express your discomfort to Mr. Agy?

A. Probably. Although, again, I don't recall.

Q. Why were you uncomfortable with the results contained in your independent report?

A. Because they were forced to satisfy DOE headquarters based on events that occurred after the period being evaluated.

Q. What were those events?

A. The FBI/EPA raid, and subsequent review of operations at the plant by teams of DOE and DOE contractor personnel.

Q. What were these DOE teams or DOE contractor personnel teams?

A. Well, they were called Tiger Teams, and they were teams established by the Secretary of Energy to do a thorough review of plant operations, particularly in the environment, safety and health areas.

Q. For any of the award fee periods prior to the first half of fiscal year 1989, were there investigations by any Tiger Teams or any similar DOE teams?

A. Can you ask the question again? I'm not sure that I can answer it in the form that you asked it.

Q. You stated that there were Tiger Teams

Q. Were you uncomfortable with the summary that you prepared?
A. I'm sure I was.
Q. Did you consider that the award fee dollars contained in your independent report were lower than deserved?
A. I don't know.
Q. You don't recall?
A. Well, okay, let me explain myself. I felt that they violated the process because they were based on things that became known after the period had ended. That was contrary to the process. So I was uncomfortable with that. I am a person that likes an orderly process that works the way it's set out to work. As far as what was or wasn't deserved, I don't have a firm opinion.
Q. Was preparing your independent report clearly outside the proper process of determining Rockwell's award fee?
A. I believe it was.
Q. What happened with the numbers contained in your independent report to Mr. Goldberg?
A. I don't know. I don't know whether that was resolved before or after I left the Department of Energy.
Q. Were the award fee grades contained in your independent report passed on to the Department of Energy

headquarters?

A. I believe that they were, but I'm not certain.

Q. After you completed your report and provided it to Mr. Goldberg, did you have any involvement with the award fee process for the first half of fiscal year 1989?

A. No. I guess I should modify that to say that I don't recall whether I did.

I would like to take another short break.

MR. KELLEY: I was going to go off the record.

(Discussion off the record.)

(A break was taken from 1:00 p.m. to 2:05 p.m.)

Q. (BY MR. KELLEY) Mr. Barkmeier, you were telling me this morning that, subsequent to the PEC's recommendation of an award fee for the first half of fiscal year 1989, you prepared an independent report that contained grades different from what had been recommended by the PERB; is that right?

A. That's correct.

Q. Mr. Barkmeier, I'm handing you a document that has been marked as Exhibit 14, which is a DOE memorandum from Edward S. Goldberg to Bruce G. Twining, dated July 27, 1989. Would you please review this document, and when you are finished reviewing it, state

that?

A. I told him what the revised grades were, and what had been done to the summary report in order to support those revised grades.

Q. Did Mr. Goldberg express to you any concern that the PEC and the PERB recommendations were different from what you were presenting in this calculation contained on page E 001546?

A. I don't believe that he did. I don't recall for sure, though.

Q. Did you express to him any concerns about that?

A. I don't recall.

Q. Did you have any concerns about that?

A. Yes.

Q. What were those concerns?

A. That the scores were being changed at a later point in the period than the contract provided for the scores to be finalized.

Q. Did Mr. Goldberg express to you that he was in agreement with the overall score of 87 and the overall recommended fee that's reflected in Exhibit 14?

A. I don't remember.

Q. Did Mr. Goldberg express to you whether DOE headquarters would approve the scores reflected in

A. I don't know.
Q. Do you remember whether you drafted these three pages from scratch to provide to Mr. Goldberg?
A. I do not believe that I did. I think I probably worked from an existing version of this summary report.
Q. And made changes to the existing summary; is that right?
A. Yes.
Q. And on what basis did you make those changes?
A. In order to support the revisions in the scores that are reflected in this same document.
Q. Exhibit 14 was sent to Mr. Twining; is that correct?
A. I'm sorry, I didn't--
Q. Exhibit 14 was sent to Mr. Twining; is that correct?
A. Is this Exhibit 14? It doesn't have an exhibit number on my copy.
Q. Yes.
A. Yes.
Q. Who was Mr. Twining at that time?
A. He was the same person he is now. He was the Manager of Albuquerque operations office.

Q. Was he the award fee determination official?
A. Yes, he was.
Q. Why were you sending this memorandum to Mr. Twining?
A. Because he was the award fee determination official.
Q. Had Mr. Twining asked for this memorandum or asked that it be prepared?
A. I have no knowledge of that.
Q. Did you ever speak directly with Mr. Twining concerning Rockwell's award fee for the first half of fiscal year 1989?
A. No, I did not.
Q. Did Mr. Goldberg ever tell you that he had spoken directly with Mr. Twining concerning Rockwell's award fee for that period?
A. I don't recall.
Q. Do you know whether the scores contained in Exhibit 14 were ever provided to anyone at DOE headquarters?
A. As a result of my review of documents a couple of weeks ago, I know that they were.
Q. Did you know that at any time in 1989?
A. I don't recall. I probably did, but I don't recall.

A. Probably because I believed it.
Q. Did somebody tell you that?
A. The input that we received for these things was generally worthless, or close to it, so it tended to clutter up the files more than it helped us with the process.
Q. Now Mr. Agy's note in which he describes what you told him is dated 7-5-89, or at least it looks from his note as though that's when you told Mr. Agy what you had told Mr. Hill.
A. Yeah, I believe so.
Q. Was that after Mr. Goldberg took over as acting manager?
A. Yes, it was.
Q. Was that after the Rocky Flats office began reporting directly to DOE headquarters?
A. Yes, it was.
Q. Were you advising Mr. Hill that it didn't matter if Albuquerque sent input on the midterm evaluations because their role had been usurped by DOE headquarters?
A. I'm not sure. I don't know.
Q. Is that a possibility?
A. It's a possibility.
Q. Mr. Barkmeier, I'm handing you a document

that has been marked Exhibit 25, which is a memorandum or letter from Edward S. Goldberg to Dominick J. Sanchini dated July 27, 1989. Have you ever seen this document before?

A. Yes.

Q. When did you see it?

A. Sometime between July 25, 1989, and July 27, 1989, although I authored it, and I probably did that on July 25, 1989.

Q. You authored this document?

A. Yes.

Q. Did Mr. Goldberg tell you to prepare this document?

A. I don't recall.

Q. Did Mr. Goldberg sign the document?

A. I can't tell. Someone signed it for him if he didn't sign it, but I can't tell whether he's the one that signed it or not.

Q. Did you prepare this document for Mr. Goldberg's signature?

A. Yes, I did.

Q. What was the purpose of this document?

A. At that point in time, there was a directive by DOE headquarters regarding the weighting that was to be given to Environment, Safety and Health in evaluating

performance. And I am not sure what weighting was required. It may have been more than 50 percent or it may have been something more specific than that. Anyway, this memo was originated for the purpose of advising Rockwell and documenting the file to the effect that General Management; Quality Assurance; and Environment, Safety and Health were all considered Environment, Safety and Health in their evaluations, in order to comply with this headquarters directive. And I don't recall the percentage that was contained in that, or whether it was in writing or not.

Q. Were the FPA weightings being changed?

A. No.

Q. Had Rockwell already been informed as to what the FPA--

A. Yes, they had.

Q. --weightings would be?

A. They had.

Q. Could you please read the first sentence of this memorandum.

A. "As you are aware, Secretary of Energy, James D. Watkins, has placed a heavy emphasis on Environment, Safety and Health in DOE's evaluation of its Contractors."

Q. Was Environment, Safety and Health a

functional performance area on which Rockwell was to be evaluated for the first half of fiscal year 1989?

A. Yes, it was.

Q. Was it also an area on which Rockwell was to be evaluated for the second half of fiscal year 1989?

A. Yes, it was.

Q. Why then is Mr. Goldberg informing Mr. Sanchini that Secretary Watkins has placed a heavy emphasis on Environment, Safety and Health in evaluating contractors?

A. The purpose of the memo was to advise Rockwell that in the three functional performance areas: General Management; Quality Assurance; and Environment, Safety and Health, Environment, Safety and Health would be considered.

Q. Had that not been explained to Rockwell prior to this July 27 memorandum?

A. I don't know. I don't know what the sequence of events was.

Q. The next two sentences in this memorandum refer to goals and objectives that were reaffirmed in Mr. Whiteman's April 18, 1989, memorandum. Is the memorandum being referred to as the April 18, 1989, memorandum the document that I showed you which is marked as Exhibit 21?

UNITED STATES CLAIMS COURT

Case No. 91-1362 C

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF CLAUDE HUDGEL BARKMEIER
VOLUME II

December 7, 1992

Pursuant to Notice taken on behalf of the Plaintiff at 1719 Emerson Street, Denver, Colorado 80218, at 9:33 a.m., before Donna E. French, Registered Professional Reporter and Notary Public within Colorado.

(Plaintiff's Deposition Exhibit 108 was marked.)

A. Yeah. I wouldn't have seen this. This is after the time I retired.

Q. For the record, Exhibit 108 is a letter from Mr. Sanchini to Mr. Simonson, dated December 22, 1989, with attachments. Let me direct your attention to the page that is stamped E 000220.

A. Okay.

Q. Please review that page and tell me if that refreshes your recollection as to whether Rockwell achieved the goal achievement objectives for the first half of fiscal year 1989.

A. No.

Q. Do you have any reason to doubt the figures that are contained on that page?

A. Well, because they were generated by Rockwell, I would have needed somebody from the Department of Energy to verify them before I would have accepted them. Generally, the information that Rockwell provided was accurate.

Q. When did you retire, Mr. Barkmeier?

A. December 1, '89.

Q. Mr. Barkmeier, I'm handing you a document that's previously been marked as Exhibit 54, which is a

memorandum from Mr. Moore to various assistant secretaries and others, dated August 21, 1989. Please review the document and tell me if you have ever seen it before.

A. I'm just not sure.

Q. During the summer of 1989, did headquarters institute a process where an award fee would go to headquarters for concurrence before it went to the contractor?

A. Yes, they did.

Q. Did they ever have that process in place before the summer of 1989?

A. No.

Q. Why did they make that change?

A. I can't say. I don't really know.

Q. Do you have any idea why they did?

A. Well, my assumption would be that Secretary of Energy Watkins wanted more control over things that took place in the field than his predecessors had exercised. But I really don't know.

Q. Mr. Barkmeier, I'm handing you a document that has previously been marked as Exhibit 49, which is a memorandum from Mr. Troell to Mr. Twining, dated July 10, 1989. Please review the document and tell me if you've ever seen it before.

PL. SUPP. EX. 56

UNITED STATES CLAIMS COURT

Case No. 91-1362 C

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF MARSHALL L. BISHOP

December 8, 1992

Pursuant to Notice taken on behalf of the Plaintiff at 1719 Emerson Street, Denver, Colorado 80218, at 9:30 a.m., before Donna E. French, Registered Professional Reporter and Notary Public within Colorado.

A. Approximately two years.
Q. What was your next position?
A. I was promoted to the director, administrative division, Rocky Flats office.
Q. When did that take place?
A. I reported for duty to Rocky Flats on--during January of 1990.
Q. And how long were you in that position?
A. I am actually still in that position with the proviso that it has been expanded and I am now the assistant manager for administration.
Q. What were your duties and responsibilities as the director of the administrative division at Rocky Flats?
A. Basically managed in concert with the Albuquerque field office all of the administrative functions at Rocky Flats, budget, finance, procurement, records, property management, and others.
Q. And what are your duties and responsibilities as the assistant manager of administration?
A. We have transitioned the majority of those functions so that there is no longer an involvement of the Albuquerque operations office, and we primarily have the total responsibility for those.

open?

A. It was announced in the normal DOE government announcements.

Q. Did you replace Mr. Barkmeier at the Rocky Flats office?

A. That's true. He had retired or was in the process of retiring.

Q. Prior--strike that. Other than when you went to the Rocky Flats office beginning in January of 1990 and the one-week detail December of 1989, were you ever on site at the Rocky Flats plant?

A. No.

Q. Other than the positions that you've held, including the detail at the Rocky Flats plant, did you ever have any involvement with an award fee?

A. When I was at the Hanford operations office, I was a performance monitor for the procurement systems within the procurement division.

Q. How was that involved in an award fee?

A. Based upon my oversight of the M&O contractor, I would prepare reports and send those to the operations office. I who would then incorporate those into the overall fee evaluation.

Q. For how many contracts did you perform that function?

submitted to headquarters, the recommendation did come back and was changed.

Q. Rockwell's award fee for the second half of fiscal year 1989?

A. Yes.

Q. At the time you prepared this executive summary or at the time that this executive summary was prepared, were you aware of those changes?

A. To the best of my recollection, I was not.

Q. Was it your view in 1990 that changes to an award fee that were mandated by headquarters would be difficult to justify or defend?

A. During the early parts of 1990, that is correct. In the latter parts of 1990, no.

Q. During January and February of 1990, was that your view?

A. Yes, it was.

Q. Why was that your view?

A. I'll have to speculate on the interpretation of the contract.

THE DEPONENT: Is that okay?

Q. What was your view on the contract?

A. My view on the contract in the way it was structured was that the performance evaluation plan had

been incorporated into the contract and that except by subsequent letters from Albuquerque, the process had not been changed. Notwithstanding the fact that those letters were signed by Bruce Twining, who is a contracting officer, I felt that it would be difficult to support the headquarters' involvement.

Q. And what was this view based on?

A. As I recall, during the reevaluation of the award fee, the modification to the contract which had incorporated the performance evaluation plan had been reviewed and--I reviewed it, and based upon the review of that modification, that was the basis for my opinion.

Q. Your opinion that--

A. That it would be difficult to justify headquarters' approval in the award fee process.

Q. That was based on your review of the Rockwell contract; is that right?

A. Specifically the modification incorporating the award fee plan.

Q. Is that the modification that you reviewed earlier, which is Exhibit 1?

A. Yes, it is.

Q. Does this modification provide for headquarters' involvement?

A. To the best of my knowledge, it does not.

Q. Was the Rockwell contract modified subsequent to the modification that is Exhibit 1?

A. With respect to the fee determination official, the letter that Bruce Twining signed designating fee determinations officials does constitute a modification to the contract.

Q. In your view, did Mr. Twining's letter modify the contract with respect to headquarters' involvement in the award fee process?

A. No, it did not.

Q. Mr. Bishop, in addition to award fee based on plant performance and PRMP/PROVE, Rockwell was also eligible for an award based on goal achievement objectives; is that right?

A. I have been told that that is true, yes.

Q. In 1990, were you familiar with the goal achievement objectives for Rockwell?

A. No, I was not.

Q. I'm handing you a document that's previously been marked as Exhibit 108, which is a memorandum from Mr. Sanchini to Mr. Simonson dated December 22, 1989. Please review the document and tell me if you've ever seen it before. I note that the last page of the exhibit contains a distribution list.

Exhibit 140?

A. That's correct.

Q. In 1990, did you discuss Mr. Tuck's February 22 memorandum with anyone?

A. It would appear certain that I did. I have no specific recollection of that, though.

Q. Who did you discuss it with?

A. I'm sorry, I don't remember.

Q. Did you discuss it with Mr. Agy?

A. It's possible. I have no specific recollection of that.

Q. With Mr. Nelson?

A. Yes, Mr. Nelson was there and that's certainly a possibility.

Q. Mr. Simonson?

A. Oh, he was the deputy manager at that time and that's certainly a possibility.

Q. Anyone else you can think of?

A. There could have been any number of people, including the committee we chaired for the reevaluation, performance monitors.

Q. Did you ever express any views to anyone regarding Mr. Tuck's February 22 memorandum?

A. Yes. I have a vague recollection of discussing the propriety of this approach with Terrel.

Q. What did you tell Terrel?

A. In my opinion, that this was inconsistent with the contract with Rockwell.

Q. What was it that was inconsistent?

A. The headquarters' approval and determination of the award fee.

Q. Did Mr. Terrel express to you any view on that subject?

A. I don't recall what it was if he did.

Q. Did anyone else express any views to you on that subject?

A. Not that I remember.

Q. Mr. Bishop, I'm handing you a document that is being marked as Exhibit 143.

(Plaintiff's Deposition Exhibit 143 was marked.)

Q. Which is a memorandum from Mr. Tuck to the deputy secretary. It's dated February 22, 1990. Have you ever seen this document before?

A. Yes, I have.

Q. When did you first see it?

A. It had to be the February, March time frame.

Q. Of 1990?

A. Yes.

A. Yes, I was.
Q. Why was Mr. Simonson replaced as manager of Rocky Flats?
A. I do not know.
Q. Did you ever hear any reason why he was replaced?
A. Not anything other than gossip.
Q. What did you hear?
A. In the vernacular, that he had pissed off the wrong people at headquarters.
Q. That Mr. Simonson had?
A. Yes.
Q. In what way?
A. I'm sorry, I don't know.
Q. Did you hear anything about that?
A. No.
Q. Did it have anything to do with Rockwell's award fee?
A. I don't have any idea.
Q. Did you know Mr. Nelson before he came to Rocky Flats?
A. No.
Q. Why was Mr. Nelson chosen to replace Mr. Simonson?
A. I have no idea.

Q. Did you ever hear any reason?

A. Speculation amongst the office because of his background in the nuclear Navy in association with Admiral Rickover and his work at the Arvada test site with nuclear weapons.

Q. Did Mr. Simonson stay on at the Rocky Flats office after he was replaced as manager?

A. Yes, he did.

Q. Did he become the deputy manager?

A. That's true.

Q. Did you ever talk to Mr. Simonson about his being replaced as manager?

A. No, not specifically with respect to him being replaced.

Q. What did you talk to him about in that regard?

A. Events that affected him because he had been replaced.

Q. What were those events?

A. Changes in his personnel records that I had to make because of the change to deputy manager and then the subsequent change to special technical advisor.

Q. When did he become a special technical advisor?

A. I can't even remember the date, but approximately eight months to a year ago.
Q. From today?
A. Um-hum.
Q. Was Mr. Simonson's change from being manager to deputy manager a demotion?
A. Not in pay or personnel matters. In perception, yes, and in the organizational order of the office, yes.
Q. Was Mr. Simonson's change from being deputy manager to a special technical advisor a demotion?
A. No. It's a basic change in career ladder, I guess you would call it. He went from the senior executive service into a special pay and grade classification.
Q. Did you ever receive an evaluation of your performance at the Rocky Flats plant for the first half of calendar year 1990?
A. I received my first evaluation, I believe, in July of 1990, which would have covered that period.
Q. From the date you first reported, January 4?
A. Yes.
Q. Who gave you that evaluation?

here, though.

Q. Did you provide any assistance in preparing this letter?

A. No.

Q. Were you ever consulted for the preparation of this letter?

A. Not that I recall.

Q. Were you aware that this letter was being prepared?

A. No, not that I recall.

Q. What issues in this letter were you familiar with?

A. The disputes portion relative to the fee determination and the breach issue relative to the contract.

Q. Did you discuss those issues with anyone?

A. These are similar to the issues that I had discussed with Terrel Agy previously.

Q. Did you express your view concerning those issues to anyone?

A. To Terrel.

Q. What did you tell Terrel?

A. That I did not believe that it was proper for headquarters to be involved in the award fee to the extent that they were and that was over providing just

recommendations and evaluations for the period because the performance evaluation plan had been incorporated into the Rockwell contract.

Q. Did you tell Mr. Agy anything else?

A. I'm sure that we discussed it, but I don't recall what we discussed at this time.

Q. Did Mr. Agy tell you his views on the matter?

A. I don't recall Terrel responding.

Q. Did you ever express to anyone any views on the matter other than what you've just stated?

A. Not that I can recall.

Q. Did you ever express your views on the matter to anyone other than Mr. Agy?

A. I cannot recall having done that with anyone; that there would have been opportunities for me to have done that, but I do not recall it.

Q. When did you express your views on the matter to Mr. Agy?

A. As I recall, when we received the Tuck letter.

Q. At any time subsequent to that?

A. There have been subsequent discussions that I vaguely recall that it's come up in conversation, yes.

Q. And have you ever expressed your views during those conversations?
A. Yes.
Q. Are the views that you expressed during those conversations the same that you expressed to Mr. Agy after seeing the Tuck memorandum?
A. To the best of my memory. My opinion has not changed.
Q. You retain the same views of the matter today; is that right?
A. Yes.
Q. The same as you had in February of 1990?
A. To the extent that the contractual issues were, in my opinion, not appropriately handled, yes.
MR. KELLEY: I have no further questions. Mr. Bruns?
MR. BRUNS: Can I have a chance to talk with Mr. Bishop just for a second?
MR. KELLEY: Off the record?
MR. BRUNS: Yes, please.
(Discussion off the record.)
MR. BRUNS: I don't have any questions.