PL. SUPP. EX. 57

UNITED STATES CLAIMS COURT

Case No. 91-1362 C,

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF TERREL JOHN AGY
VOLUME I

October 21, 1992

Pursuant to Notice taken on behalf of Plaintiff at 150 East Tenth Avenue, Denver, Colorado 80203, at 9:50 a.m., before Judy L. Busbee, Registered Professional Reporter and Notary Public within Colorado.

which can't be taken down; do you understand?

A. Yes, I do.

Q. If at any time you would like a recess, it's appropriate for you to ask for one; do you understand?

A. Yes, I do.

Q. Are you taking any medications that would affect your ability to testify here today?

A. No.

Q. Are there any other limitations which would affect your ability to testify truthfully here today?

A. No.

Q. Do you have any questions about what I have just gone over?

A. No.

Q. Okay. What is your current position with the United States Department of Energy?

A. As a--I'm employed as a contract specialist.

Q. And what do you do in that capacity?

A. Currently, I'm involved in aspects of M and O contractors, which are management and operations contractors, at the Rocky Flats plant. In general terms, contract administration.

Q. How long have you had this position?

A. Since December '90, I believe it is, as a contract specialist.

Q. And what position did you hold before that?
A. As a program analyst position, doing essentially the same work.
Q. Was the contracts specialist a promotion from the program analyst?
A. No.
Q. How long were you a program analyst?
A. Approximately one year.
Q. And what was your position before being a program analyst?
A. A security specialist.
Q. And what did that job entail?
A. Monitoring the M and O contracts--contractors, excuse me, in their carrying out of security responsibilities and safeguards responsibilities at the Rocky Flats plant.
Q. Was that position, then, a more confined position, or more restricted, than program analyst or a contract specialist, in terms of your responsibilities?
A. I guess I don't understand your question.
Q. As a contract specialist, do you have a general or broad responsibility with respect to contract administration?
A. No.
Q. Is it confined to certain limited aspects of

administration?

A. Yes.

Q. Could you describe the particular aspects that it is confined to.

A. Do you mean currently?

A. Yes, currently.

A. Currently, I'm involved in two areas within the M and O contracting activity, and that's something the Department of Energy calls task order contracting, which could be generally described as the putting together of a statement of work for the M and O contractors. The second duty I have now is in connection with what is known in the department as the accountability rule, which in essence is an area where the contractors are subject to a decision by the contracting officer as to whether they incur costs that could be avoidable. And I get involved in assisting the contracting officer in reviewing those areas.

Q. Do you have any other particular tasks in your current position?

A. Those are the main two.

Q. Were there other or different particular tasks in your position as a program analyst?

A. Yes. The two main tasks I had in that position as a program analyst, I coordinated the award

fee activities for Rockwell--the Rockwell contract, that is, and I interfaced with Rockwell's procurement group, because we have some responsibility in monitoring their subcontractor or subcontracting activities.

Q. Do you remember when you became a program analyst?

A. I believe it was August 1989.

Q. What were your particular tasks in your position as a security specialist?

A. Mainly reviewing Rockwell's activities in the security area and safeguards area, their compliance with DOE order requirements.

Q. Was your change in position from the security specialist to a program analyst a promotion?

A. No, it was not.

Q. Could you describe for me your formal education since graduating from high school.

A. I have a bachelor of science degree in business administration with emphasis in accounting.

Q. And where was that from?

A. I graduated from Colorado State University.

Q. In what year?

A. 1968.

Q. Do you have any formal postgraduate education?

were you evaluating Rockwell's performance yourself?

A. Generally those were my comments.

Q. Were you the person primarily responsible for evaluating Rockwell's performance in the security and safeguards area?

A. No.

Q. Who would that have been?

A. Everybody above me.

Q. Who was your supervisor in 1981?

A. George Carnahan.

Q. Until what year did you evaluate Rockwell's performance in the security and safeguards area?

A. Through 1988. I believe probably through the end of 1988.

Q. Through December of 1988?

A. Roughly, yes.

Q. Would that have been after you became a program analyst?

A. No. Can I correct something?

Q. Certainly.

A. I started functioning as a program analyst in about February of '89. Around February, yes. I think I--I believe I said August before, but sometimes the paperwork--I got confused with the paperwork. But I've functioned in that position since February of '89.

Q. Is it the case that you were not formally appointed to that position until August?

A. I don't recall when I was formally appointed.

Q. But you did start functioning as a program analyst in February of 1989?

A. Yes, sir. Approximately February. It was either February or March.

Q. During the time you were employed at the Rocky Flats plant, did the award fee process always take place on the basis of the government's fiscal years running from October 1 of the year through the following September 30?

A. I believe that's true.

Q. And were the award fees always determined at six-month intervals during that fiscal year?

A. I believe that's true.

Q. Now, for the fiscal year beginning October 1, 1988, did you make evaluations of Rockwell's performance in the security and safety areas?

A. Not as you phrased it.

Q. How would you explain your function in these safety areas for the fiscal year ending September 30, 1989?

A. I had nothing to do with safety. You're

using the word "safety."

Q. Oh. Please explain what areas you did have.

A. Security.

Q. Security?

A. Security and safeguards. Those two areas.

Q. Did you evaluate Rockwell's performance in security and safeguards for the first half of fiscal year 1989?

A. I was involved to some extent.

Q. Were you involved during the first half of fiscal year 1989 in evaluating any other areas of Rockwell's performance?

A. No, I didn't personally evaluate them in other areas, and in the safeguards and security area, that's not done until after the end of March 31. I wasn't in safeguards and security at that time, so--but there was, I believe, an interim evaluation during that period, too, that I may have been involved in.

Q. During the first half of fiscal 1989?

A. Yes.

Q. Did you evaluate Rockwell's performance in any area during the second half of fiscal year 1989?

A. Not personally evaluate their performance, no.

Q. Is it correct to say that you personally

evaluated Rockwell's performance in the security and safeguards area from 1981 until December of 1988?

A. Yes, to the extent that I made my comments available to my supervisor.

Q. Did you ever personally evaluate Rockwell's performance in any area other than security and safeguard?

A. No, I don't recall ever doing that.

Q. Are you currently familiar with the general procedures that were used to evaluate Rockwell's performance under its contract at the Rocky Flats plant?

A. Generally, yes.

Q. When did you become familiar with the procedures for evaluating Rockwell's performance?

A. To a limited extent, in 1981. To a greater extent, in--when I became a program analyst.

Q. Which would have been in February of 1989?

A. Approximately, yes.

Q. What was the reason that you became more familiar with the evaluation process when you became a program analyst?

A. That's the first time I had access to guidance that was given to the area offices that were under the Albuquerque operations office, and to the contract with Rockwell, and to the contract modifications

discussions with the Albuquerque counterparts, Albuquerque operations counterparts.

Q. Did the branch chiefs have personal knowledge of Rockwell's performance at the Rocky Flats plant?

A. I don't know if I can answer that question. I'm not sure I know the answer.

Q. Do you know the answer as it pertains to the area of security and safeguards?

A. Yeah, I believe that's true in safeguards and security.

Q. Who was the branch chief for the first half of fiscal year 1989 in the area of security and safeguards?

A. I think his name was Nick Roberts.

Q. When you became a program analyst in February of 1989, who was your supervisor?

A. Claude Barkmeier.

Q. Who was your supervisor immediately prior to Claude Barkmeier?

A. That's a difficult question. We were without a supervisor, so in effect, I guess I reported to the area manager, Earl Whiteman, or someone acting in the capacity of the supervisor for that branch. At times that was various people.

Q. That branch being security and safeguards?
A. Yes.
Q. Prior to your appointment in February of 1989 as a program analyst, did you report your evaluations in the security and safeguards area to Mr. Whiteman?
A. To my supervisor. No, I guess, is the answer, not generally to my supervisor.
Q. Well, who did you report your evaluations to during the period when you did not have a branch chief?
A. They would have been given by the acting supervisor to Whiteman.
Q. Until when was Mr. Barkmeier your supervisor?
A. I believe until the end of November 1989.
Q. And who became your supervisor after that time?
A. I have to correct that a little bit. Barkmeier was still supervisor. However, there was a--my immediate supervisor sometime in the fall of '89 became Hugh Miller, who himself reported to Barkmeier. Hugh Miller was actually my supervisor--my immediate supervisor in the fall of '89.
Q. Do you remember what month?
A. I would say approximately September.

A. In early '89, when I first became a program analyst, he was the chief of the administrative branch.

Q. Did he continue in that position until the time Mr. Miller became your supervisor?

A. Yes, to my knowledge.

Q. In February of 1989, what were your responsibilities with respect to Rockwell's award fee?

A. When I started as a program analyst, I was to coordinate the award fee activities as directed by Mr. Barkmeier in interface with the Albuquerque operations office in order to supply them with the necessary paperwork.

Q. What type of coordination did you perform in this role?

A. Well, for example, to the extent that Mr. Barkmeier didn't coordinate it, I would see that the branch chiefs submitted their evaluation and put in the time frames required by the--by Barkmeier to enable the meeting to take place to discuss the material.

Q. How many branch chiefs were there?

A. I believe there were five. Around that.

Q. Do you recall by what date the branch chiefs were supposed to give their input to Mr. Barkmeier?

A. No.

Q. Was it difficult to get the branch chiefs to

Q. What was discussed at the meeting?
A. Rockwell's accomplishments and deficiencies, and any other observations about performance, whether positive or negative, that the branch chiefs wanted to include in the evaluation.
Q. Was the discussion confined to Rockwell's performance for the period October 1, 1988, through March 31, 1989?
A. I believe so.
Q. When did this meeting take place?
A. I don't know precisely, but it would have taken place in early April 1989.
Q. Did each branch chief provide a presentation with respect to an evaluation on his or her particular area?
A. The branch chiefs did not present--make a formal presentation. They brought--they made available to the other attendees a copy of what--of their evaluation, which generally was typed and sometimes was handwritten, and they discussed, you know, each of their evaluations as they went around the table.
Q. Did each branch chief have responsibility over certain areas of Rockwell's performance?
A. Generally that was true, although sometimes there was some overlap.

Q. What were the areas?

A. I don't understand the question.

Q. Well, you have explained that there were five branch chiefs. Were there five corresponding areas of Rockwell's performance that was being evaluated?

A. Not necessarily: It didn't always correlate that way.

Q. What were the titles of the branch chiefs?

A. Well, I'll try to remember. There was a branch chief in Safeguards and Security; Operations; one called Engineering and Construction, I believe; one called Quality Assurance; one called Health and Safety branch, I believe it was titled; and the Administrative branch.

Q. I'm sorry, I didn't hear.

A. Administrative branch. I believe that's it.

Q. That's six different branches; is that right?

A. Yes, I believe that must have been it. Must have been six.

Q. And did a branch chief from each of these areas attend the meeting that you were referring to?

A. As I recall, a branch chief or a representative of the branch chief attended.

Q. How long did the meeting last?

A. I don't recall.

Q. Was it more than one day?

A. I would guess an hour, hour and a half maybe.

Q. Was there much discussion of the evaluations that had been provided by each of the branch chiefs?

A. The procedure was to read each other's input, then discuss it to the extent necessary to be sure that it was correct or a correct assessment.

Q. At this meeting in April of '89, was there much disagreement with any of the evaluations that were provided by any of the branch chiefs?

A. I don't recall. And like I earlier said, there may have been more than one meeting, but I don't recall that either.

Q. Do you remember any particular issues that were discussed at this meeting or this series of meetings?

A. No, I don't.

Q. Was it a relatively smooth process?

A. As I recall, it was. And I just thought of another name. There was an individual involved in the--what was called the PRMP project. He would have been at the meeting too. He was equivalent of a branch chief.

Q. Did he submit a written evaluation?
A. Yes. It's also possible the deputy manager may have been there, but I don't know. I don't recall.
Q. The deputy manager?
A. Deputy area manager, I'm sorry. Deputy area manager.
Q. For the Rocky Flats area?
A. For the Rocky Flats area office. Mr. Whiteman's deputy.
Q. Who was that?
A. I'm not sure I remember, but I believe it was John Whitsit at that time, but I'm not sure. Whitsit was detailed to the Savannah River office sometime around then, so he may not have been around.
Q. At the end of this meeting or series of meetings, was some written report produced describing the outcome of the meetings?
A. Only in the form of--well, the outgrowth of the meeting was some paperwork submitted to Albuquerque that the area manager would have to agree with making his recommendation for Rockwell for that period as the area manager.
Q. Did the branch chiefs first make a recommendation to Mr. Whiteman, who then in turn made a recommendation on an award fee to Albuquerque?

A. In essence, yes. But the recommendation to Whiteman was not a formal recommendation, it was a compilation of what the branch chiefs felt was a proper evaluation.
Q. How was--
A. And he got--he would change it as he saw fit.
Q. How was the branch chief's recommendation presented to Mr. Whiteman?
A. As I recall, at some point the area manager, assuming it was Mr. Whiteman, I believe it was, got involved probably either at the end of the meeting or--I just don't remember precisely. But Mr. Whiteman would have gotten involved either at the meeting or shortly thereafter, and looked at the paperwork and decided. He would have told Mr. Barkmeier to go ahead.
Q. Go ahead and--
A. Put the paperwork necessary to send to Albuquerque together, and he would sign it. Most likely it would happen something like that. Mr. Barkmeier and his branch was responsible for sending the paperwork for Albuquerque--preparing the paperwork for Mr. Whiteman's signature.
Q. Now, what was the paperwork that came out of the meeting of the branch chiefs?

A. After they decided what the narrative should be and what the recommended scores should be in each of the areas, and changed it to the extent that Mr. Whiteman wanted it changed, and I'm not sure what changes there were for Mr. Whiteman, we prepared a report--you might refer to it as a report, anyway--similar to what the board--the Performance Evaluation Review Board in Albuquerque would eventually issue in that same format, which was submitted to the Albuquerque operations office, which included the suggested achievements, deficiencies, and observations in the areas being evaluated. And, if I didn't say it already, the suggested score for each area.

Q. So, Whiteman then suggested scores, as well as a narrative, to Albuquerque?

A. As I recall, yes.

Q. Were these numerical scores or adjectival ratings or both?

A. Well, really both.

Q. Did the branch chiefs, in presenting their report to Mr. Whiteman, present both a narrative and scores?

A. As I recall, they came to the meeting or meetings with a general idea of what they felt the score should be. It was one of the items that they discussed, and decided on what number they wanted to recommend for

each of the areas, after they analyzed the achievements and deficiencies among the group. I don't recall the numbers being on the paperwork they brought to the meeting.

Q. So did they arrive at numbers during the course of the meeting?

A. Yes, that--generally, that's what they would have done. A suggested number for the manager--for the manager's review.

Q. Was there a number arrived at for each area which was under evaluation or was it just an overall number that was--

A. Each area.

Q. Were the numbers arrived at as a consensus of the entire group?

A. Not that I recall.

Q. Did the branch managers vote on the numbers?

A. No. I recall that they discussed the numbers, and how they each felt about it, you know, generally. That's how the discussions went. I don't recall any votes.

Q. Did each of the branch managers agree with all the numbers that were recommended to Mr. Whiteman?

A. I don't know if they all agreed. I don't know of any requirement that they all agree.

Q. Did any of them voice strong disagreement with any of the numbers that were recommended to Mr. Whiteman?

A. Not that I recall.

Q. Did any of them voice any disagreement with the numbers that were recommended to Mr. Whiteman?

A. I don't recall.

Q. Had you ever attended a meeting of the branch chiefs before this meeting or meetings in April of 1989 where the branch chiefs determined numbers to recommend to the area manager for Rockwell's award fee?

A. I don't believe I ever had, although--I don't recall. I may have. I may have in the security.

Q. When you were a security specialist?

A. Yes. I may have.

Q. Would you have been representing the security and safeguard branch?

A. Yes, if I would have attended. Like I said, we were without a branch chief for quite a while, so it's possible that I could have in '88--early '88. I don't recall.

Q. Do you know if prior to April of 1989 the procedures for determining Rockwell's award fee as recommended by the branch chiefs was the same as what occurred in April of '89?

A. It was my understanding that that's the way the process had worked.

Q. And what was that understanding based on?

A. I believe it was discussions with Mr. Barkmeier, and with the individual who coordinated those activities prior to me. Right before he left, I talked to him.

Q. Who was that individual?

A. His name was Ed Green.

Q. Are you familiar with the term "Performance Evaluation Committee"?

A. I've heard the term. I'm somewhat familiar.

Q. What is the Performance Evaluation Committee or what was the Performance Evaluation Committee with respect to the first half of fiscal year 1989?

A. I never personally interfaced with them. They were, as I understood it, a group of directors representing the Albuquerque operations office, I think, that made the recommendation or reviewed these evaluations that came in from the area offices. They made recommendations to the Albuquerque board, the Performance Evaluation Review Board. I think that's the way it worked.

Q. Did Mr. Whiteman send his recommendation on Rockwell's award fee for the first half of fiscal year

1989 to the Performance Evaluation Committee?

A. As I recall, that's how it worked.

Q. But you don't recall having any dealings with the Performance Evaluation Committee; is that correct?

A. I'm having trouble recalling, but it seems like that you're correct that we did send that down--that Whiteman did send that down to that committee, and if so, I would have got the paperwork ready to send it down. And that's probably who we addressed it to. Seems like it went to a lot of people down in Albuquerque. I don't remember all of who we sent it to.

Q. Was anyone in the Rocky Flats office a member of this Performance Evaluation Committee?

A. Not to my knowledge.

Q. It was made exclusively--excuse me, it was made up exclusively of Albuquerque people?

A. That's how I recall it.

Q. And those Albuquerque people consisted of certain Albuquerque directors?

A. As I recall, that's correct.

Q. What were Albuquerque directors?

A. Individuals who were responsible for various areas of interest; such as safeguards and security, safeguards and security director that in the safeguards

and security branch at Rocky Flats area office had--it just dawned on me when I said that that it used to be called the Rocky Flats area office, and now it's called Rocky Flats office. The word "area" has been dropped. But, anyway, we would interface with that division director. It's a director of a division.

Q. For each branch chief at the Rocky Flats area office, was there a counterpart director in the Albuquerque office?

A. Generally that was true, yes. And then some.

Q. Was that the case in the security and safeguard area?

A. Yes. There was a director of safeguards and security in Albuquerque.

Q. Did you ever have any contact with that person?

A. Do you mean direct contact?

A. Yes, direct contact.

Q. Yes, I've spoken to that person. Not on a routine basis.

Q. Did the subject of your discussion with the Albuquerque director involve Rockwell's award fee?

A. No, I don't recall it ever involving that.

Q. When Mr. Whiteman sent his recommendation to

Albuquerque on Rockwell's award fee for the first half of fiscal year 1989, did he delegate to you directly the responsibility to put the paperwork together and send it to Albuquerque?

A. No.

Q. Did Mr. Barkmeier delegate that responsibility to you?

A. I worked under Mr. Barkmeier's direction.

Q. Did Mr. Barkmeier direct you to send Mr. Whiteman's recommendation to Albuquerque?

A. No. Mr. Barkmeier would have told me to prepare the paperwork in coordination with the Albuquerque--excuse me, in coordination with my counterpart in Albuquerque, working with him preparing the paperwork necessary for Whiteman's signature.

Q. Who was your counterpart in Albuquerque?

A. Ted Hill. Theetis Hill.

Q. Did you have direct contact with Mr. Hill regarding Rockwell's award fee?

A. Yes.

Q. Did you speak with him on the phone?

A. Exclusively.

Q. During what time period did your contact with Mr. Hill continue?

A. I believe that I started talking to Mr. Hill

shortly after I took over as a program analyst. He would have been sending me paperwork instructions on how to proceed with the evaluation or what their expectations were as far as paperwork, and when they wanted the paperwork. And I continued talking to him--well, he retired. I don't remember exactly when. I don't remember when he retired. Seems like it was in 1990 sometime.

Q. But you would have had contact with him up until the time he retired?

A. Yes.

Q. Did your initial contact with Mr. Hill take place before the April 1989 meeting of the branch chiefs?

A. I'm sure it did.

Q. What was your first contact with Mr. Hill?

A. I don't recall precisely.

Q. Prior to the April 1989 meeting of the branch chiefs, did Mr. Hill request any information from you?

A. Yes.

Q. What kind of information?

A. Well, his request took the form of a schedule of due dates for the award fee process to be completed.

Q. Was that a written schedule?

A. In accordance with Albuquerque's schedules.
Q. Did Mr. Hill provide you with a written schedule?
A. Yes.
Q. When did he provide you with this schedule?
A. I don't recall precisely, but it would have been before March 31 of 1989. It's not--wouldn't have been addressed to me. It would have been addressed to Barkmeier or Whiteman or whatever.
Q. But you received a copy?
A. Yes.
Q. Did this schedule call for the Rocky Flats area office to provide Albuquerque with information on certain dates?
A. Yes. As I recall, we had a specified date when our material was due.
Q. What was that date?
A. I don't recall precisely.
Q. Would it have been after March 31 of 1989?
A. Yes, it would have.
Q. Was it sometime in April of 1989?
A. Yes.
Q. Do you know why Albuquerque wanted this information from the Rocky Flats area office during--or not later than April of 1989?

A. Not precisely. I believe it was dealing with the contract provisions.

Q. What information is it that Albuquerque wanted from the Rocky Flats area manager not later than the end of April, 1989?

A. That was the date within sometime in April, and they wanted his recommendation.

Q. Mr. Whiteman's recommendation?

A. His evaluation and recommendations in connection with the Rockwell's performance for the six months ending March 31, 1989.

Q. This would be Mr. Whiteman's recommendation?

A. Yes.

Q. What other tasks were on the schedule provided by Mr. Hill to be completed or performed by the Rocky Flats area office?

A. I don't recall any other. That was the culmination of our effort at that office for that evaluation, was to submit it to Albuquerque, at which time they took it from there.

Q. What other events were listed on this schedule other than the due date for the Rocky Flats area office to submit its recommendation to Albuquerque?

A. As I recall, it even indicated--the schedule even indicated when the Performance Evaluation Review

fee. But I stopped myself from saying that, because I have a feeling it involved the preparation of an award fee planned for the period beginning October 1, 1989, and some format that had been developed by Savannah River operations office for a plan--an evaluation plan or award fee plan, it's known by several terms. And the more I think about it, I think it had to do with that, rather than--although that's related to the Rockwell award fee also at that time, because they were still going to be the contractor after October 1. And I was involved in trying to put together or coordinate the preparation of that plan, and as I recall, I presented him with what I proposed to do in that area, or something, in that plan. He wanted to know some background about the planning process, something like that anyway. That's not to say that the Rockwell fee for the first period of 1989 didn't come up. I just don't recall.

Q. Did you prepare a plan for Rockwell's award fee for the period starting October 1, 1989?

A. As I recall, we were in the process of preparing a plan. The plan was never--I don't believe the plan was ever completed.

Q. What was the purpose of creating this plan?

A. The plan is the--what we refer to as a performance evaluation plan currently. I don't remember

what exactly it was called in 1989. But it's used as the basis for determining the fee evaluation process, the basis for doing our evaluation of the contractor, and it lays out the administrative procedures we go through, and how the contract will be evaluated.

Q. Was there a performance evaluation plan that applied to the award fee for fiscal year 1989?

A. There was some paperwork that constituted about the same thing. It was part of a modification to the contract, which was supplemented by direction from the area manager to the contractor as to what his expectations were as far as performance for 1989.

Q. In this meeting with Mr. Goldberg, were you discussing changing the existing plan?

A. As I recall the discussion, assuming I'm thinking about the right meeting, it was--we were being asked to prepare a plan that was in the format of a boilerplate, to have a boilerplate that had been established by Savannah River for award fee periods beginning October 1, 1989, and thereafter.

Q. Was the plan you were creating going to change the existing procedures for determining Rockwell's award fee?

A. Yes, there were changes from the previous approach.

Q. What were those changes?

A. I can't say that I even remember them all, but one of them was that there was going to be a performance evaluation plan that was referred to in the contract, but separate from the contract, and it laid out objectives and criteria that the contract would be evaluated on, and as I recall, included headquarters' involvement in the decision. Let me rephrase that. It required, as I recall, the fee determination official to seek concurrence from headquarters on decisions that--prior to his decision.

Q. Do you recall any other changes that were being made in preparing this plan which was to come into effect beginning for the fiscal year 1990?

A. No, not anything significant as I recall.

Q. What do you consider was insignificant that was being changed?

A. Nothing that I recall. I just can't remember anything, any more details about the differences between those two approaches.

Q. You said that one of the changes was that the performance evaluation plan was to lay out objectives and criteria for evaluating Rockwell's performance under the contract. Was it your understanding that for the fiscal year 1989 there were no objectives or criteria

laid out for that evaluation?

A. No, they were--as I stated earlier, they were in the form of letters from the area manager to Rockwell that supplemented the contract modification award fee.

Q. So in the new plan that you were preparing, was that changing the objectives and criteria?

A. No. It didn't change anything for fiscal year 1989, if that's what your question is.

Q. No, my question is did the plan that you were preparing set out different objectives and criteria for fiscal year 1990 than had existed for fiscal year 1989?

A. Yes.

Q. What were the changes in those objectives and criteria?

A. Well, I believe it could be characterized as a more formal approach to establishing objectives and criteria. But as far as me being able to tell you what the changes--what the differences were, I can't tell you, because we never finalized that plan. There were several versions of it, but we never finalized it. So I can't tell you what the differences were.

Q. Was there a consideration to make the environmental safety and health area a more significant

area for evaluation?

A. Yes, I believe there was.

Q. Did the new plan call for other areas to be weighed to a different extent than they had been weighed for fiscal year 1989?

A. Do you mean by giving a percentage of the total award fee available; is that what you mean by "weighed"?

Q. Yes, um-hum.

A. There may have been. I don't really recall. I know there was at some point a direction from headquarters to weigh SAE at a certain level, but I don't remember when that came to us. I don't remember the time period. So I don't know whether we had that at the time we were preparing this plan that was to be effective October 1, 1989.

Q. Was preparation of the plan being directed by headquarters?

A. Do you mean the format?

Q. Let me reask the question. Was headquarters instructing the Rocky Flats area office to prepare a new plan?

A. That was my understanding. That was because that at that time--it was my understanding that we reported directly to headquarters starting in the fall of

'89 sometime.
Q. Prior to that period?
A. So it would have been--it was my understanding that we were preparing it in the Savannah River format, at headquarters' request.
Q. Prior to that period, the Rocky Flats area office had reported to Albuquerque; is that correct?
A. That's correct.
Q. And after the changes took place in the fall of 1989, the Rocky Flats area office reported directly to headquarters; is that correct?
A. That's correct. And I believe they changed our name to the Rocky Flats office at that time, in the fall of' 89.
Q. Was headquarters requesting that specific objectives or criteria be implemented in this plan that you were preparing?
A. I'm sorry, but I don't recall.
Q. Now, is it true that your role in preparing this plan was one of a coordinator?
A. Yes.
Q. Did you have any other role in preparing the plan?
A. No, I don't--
Q. Who told you to begin preparing the plan?

A. Probably Mr. Barkmeier.

Q. When was that?

A. As I recall, I started doing that in--I can only guess, but I think it was September of 1989. It could have been August, but I just don't recall.

Q. How did you go about preparing the plan?

A. Well, I started going about coordinating its preparation by obtaining a copy of the Savannah River plan that had been sent to our office or obtained by the area manager. Anyway, I was given a copy of it. And we distributed that to the branch chiefs, and as I recall, we asked them to prepare objectives and criteria in their areas, similar to the approach used by Savannah River. And at the same time, Mr. Barkmeier and I and this Mr. John Wilcynski were preparing the administrative procedures part of that. There's actually two sections of that plan; the first plan covers how the process works, the second part covered objectives and criteria that laid out the goals for the contractor. So we, the three of us, worked on that first part, and revised it several times. And the branch chiefs were responsible--or the directors, whatever they were called at that time--were responsible for preparing some proposed objectives and criterias in the various areas of performance, which I don't recall what they were even.

Q. Of the three changes you talked about that were going to be implemented through this plan, the first you mentioned was that the performance evaluation plan was to be referred to in the contract by a separate document from the contract. Would that have been in part one of the plan?

A. As I recall, it was--I guess I don't understand the question. Would you try it one more time.

Q. You mentioned that there were three changes that you recall that were being made in the plan that you were coordinating in its preparation, and one of those changes was to make the plan a more formal document, and referred to in the contract by a separate document from the contract. How was that change to be implemented?

A. As I recall, when we were under Albuquerque, those kind of things were addressed in a contract modification--an annual contract modification that laid out the fee for that fiscal year, and the rules for earning that fee for that year.

Q. So do you think that would have been implemented through a contract modification?

A. Yeah. And I think the difference is that we would have had a contract modification that would have--where we would have agreed to the fee, and it would have referred to a plan, and all those words about how

the process worked and all that, and how they would be in this plan that was just referenced in the contract. That's the way it is now, so I think that's what was being contemplated at the time.

Q. Did you ever assist in preparing a modification to the contract to implement those changes?

A. No. I don't recall ever working on one.

Q. The second change that you mentioned was a change in the objectives and criteria for evaluating Rockwell's performance under the contract. Is it correct that those changes would have been made by the branch chiefs, or whatever they were called at that time?

A. Yes. Like I said, they were expected to submit suggested performance objectives and performance criteria under each objective. Whereas for 1989--that would have been different than the way we did it in 1989, yes.

Q. The third change you mentioned was requiring the award fee determination official to seek headquarters' concurrence in making an award fee determination. Would that have been implemented through part one of the plan you were preparing?

A. Yes, it would have addressed it in part one.

Q. Did you ever discuss the change relating to headquarters' involvement with Mr. Goldberg?

A. No.

Q. Did you ever discuss that change with Mr. Barkmeier?

A. Well, as a direct report to Mr. Barkmeier during most of this period, I assume I did. I don't remember the discussions.

Q. Do you remember the substance of them?

A. Again, the discussions about the headquarters--would you help me out? What do you want me to respond to?

Q. Did you ever discuss with Mr. Barkmeier the change that was being made to the plan that related to headquarters' involvement in the award fee process?

A. I really don't recall any discussions with him on that subject, although I know we wrote that part one, and it is, as I recall, included in there. But I don't remember discussing it with him.

Q. Now why was that included in part one?

A. As I recall, it was in the Savannah River boilerplate.

Q. And you were given the Savannah River boilerplate to include in the Rocky Flats plan; is that right?

A. Yes.

MR. KELLEY: Off the record.

Q. Anyone else?
A. My supervisors.
Q. And who would they be?
A. Hugh Miller, Jerri Adams, that's J-e-r-r-i, Adams, and Marshall Bishop.
Q. Anyone else?
A. I don't understand whether it's anybody I ever discussed the subject with or--
Q. Yes, anyone who you have discussed--
A. --or mentioned the word or--
Q. --the subject of the litigation with. Not--now I'm not asking you for all the people with whom you have discussed Rockwell's award fee, but I'm asking you with whom you have discussed the litigation connected with Rockwell's award fee.
A. I mentioned it to several people that I was getting deposed today, but that's--I don't know if you consider that discussing.
Q. So you didn't have any substantive discussions with those people about the litigation?
A. No.
Q. But you did have substantive discussions with the six people that you named concerning the subject of litigation?
A. No, I don't believe that you would define it

UNITED STATES CLAIMS COURT

Case No. 91-1362 C

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

<u>DEPOSITION OF TERREL AGY</u>
VOLUME II

December 9, 1992

Pursuant to Notice taken on behalf of the Plaintiff at 1719 Emerson, Denver, Colorado 80218, at 9:40 a.m., before Donna E. French, Registered Professional Reporter and Notary Public within Colorado.

information"--I mean, "award fee evaluation and recommendations to Albuquerque. Upon the delegation to RFO of the AFDO designation, parenthesis, see Twining, slash, Simonson memo of 10/13/89, this 9/21/89 memo became obsolete and was superseded by the October 6, '89, memo from C. Barkmeier to staff. The meeting was brought--was held on October 13, 1989, by Simonson."

Q. Mr. Agy, I'm handing you a document that's previously been marked as Exhibit 27. Is this the October 6 memorandum that is referred to in the note you just read?

A. I believe it is.

Q. Mr. Agy, as of October 3, 1989, was it still your understanding that the Albuquerque office would be playing the lead role in the award fee process to Rocky Flats?

A. I don't know. I don't remember. That's only three days before this memo. I don't remember the time frames that closely.

Q. I'm handing you a document that has previously been marked as Exhibit 116. Would you please look at the first page and tell me whether the handwriting on that page is yours.

A. Yes, it's mine.

Q. What does the note at the upper right-hand

corner say?

A. "For first RFO CPAF meeting, 10/3/89."

Q. Was there a meeting held at the Rocky Flats office with respect to Rockwell's award fee on October 3, 1989?

A. That appears to be the case according to my note anyway. Would you please rephrase--I mean, restate the question so I make sure I'm answering precisely what you asked.

Q. Was there a meeting at the Rocky Flats office with respect to Rockwell's award fee on October 3, 1989?

A. Yes, it appears to be, like I said earlier, yes.

Q. Was the document that is marked 116 prepared by you?

A. I believe it was. Has my name and date.

Q. Was that document prepared for the October 3 meeting?

A. Yeah. This document does appear to be something I put together for a meeting at Rocky Flats on October the 3rd. It's a compilation of input. That appears to be all dated that same day and prepared for that meeting apparently.

Q. How did you receive the input?

A. I assume you are referring to the attachments in a different--

Q. Well, you just mentioned that the document is a compilation of input.

A. Yes.

Q. Where did the input come from?

A. From the--from the branch chiefs of the Rocky Flats area office. I believe they were called branch chiefs at that time.

Q. Who were the branch chiefs at that time?

A. In looking at the names on the submissions here--it doesn't say. I guess I don't recall all the names of the branch chiefs, but I just read attendees that I have listed here on the front page of this document, and I see that there--they weren't all branch chiefs that attended the meeting. And the names on some of these documents are higher than branch chief level.

Q. Who were the people who attended the meeting?

A. The list says here Werkema, Foster, O'Brien, Witherill, Barkmeier, Miller, and Agy.

Q. And you are reading from your handwritten list on the first page of the document?

A. Yes, I am.

Q. Were there any other attendees you can think of who are not included on the handwritten list?

A. Not that I recall.

Q. Did all of the attendees provide input to this document?

A. Generally they were all--they would have all supplied something, some input from the meeting, but I can't tell from what we have in--what I have in front of me as to whether they all provided something. Several of them did. I'm not sure that all of them did.

Q. Who can you tell with any certainty did provide input?

A. O'Brien, Miller, Barkmeier, Werkema, Foster, and I guess the only one I'm not sure about is Witherill. I don't see anything that's--with his name on it or any reference to his name.

Q. Did anyone not included on the list provide input to the document?

A. Normally this input would have been put together by the branch chiefs or members of the branch chiefs' staffs. And it possibly could have been edited by them and by the person who brought it to the meeting after the branch chief got done with it if it wasn't the branch chief that attended the meeting.

So I guess the answer to this, obviously, based on previous practice, it has to be yes, that there were other people who input here, but their names wouldn't be known to me.

Q. These people would be on the staff of the various branch chiefs; is that right?

A. Yes, they would be DOE employees on the staff of one of the branches.

Q. Which of the people listed of the attendees were branch chiefs?

A. I believe Mr. Miller was a branch chief at that time.

Q. What was he branch chief of?

A. Contracts and something to do with contracts. I don't remember the exact title at that time.

Q. Who else?

A. I'm having trouble answering your question because I--as I recall, around this time there was a reorganization, and some of these individuals were called directors and maybe even assistant managers. And so I don't know what to call them at this moment because I don't remember what their titles were at that time.

Q. Were all of the people listed here either

branch chiefs or directors or assistant managers?

A. I believe they were and it may have been some of them in acting capacities, other than myself, that is. I'm not a branch chief.

Q. Let me direct your attention to the page in Exhibit 116 that is stamped at the bottom right-hand corner E 000631. That page contains handwriting. Do you know whose handwriting that is?

A. That appears to be my writing.

Q. Did you place that handwriting on the document during the October 3 meeting?

A. I don't exactly recall, but I assume that's the case, that I wouldn't have any basis for doing it prior to the meeting.

Q. Why would you have put the handwriting on the document?

A. I don't precisely recall, but it--most likely it's based on discussions at that meeting and reclassifications of these things by the members at that meeting. It reflects their wishes or would have reflected their wishes.

Q. Did it reflect a consensus of the members of the meeting?

A. That was generally the case, yes, they would discuss it. I don't recall precisely on this,

but that was generally the case.

Q. Did the attendees of this meeting constitute the performance evaluation committee?

A. It doesn't say. I don't recall.

Q. Directing your attention to the pages that are stamped E 000632, 633, and 634, those pages also contain handwriting. Is the handwriting on those pages yours?

A. It appears to be mine, yes.

Q. Was the handwriting on those pages also placed there by you during the October 3 meeting?

A. Most likely.

Q. Why was the award fee process transferred from Albuquerque to Rocky Flats?

A. Was your first word "how"?

Q. Why.

A. Why. I don't believe I have firsthand knowledge of why.

Q. Did you ever hear a reason why?

A. I have a general recollection of, I suppose, things I heard that--

Q. What is that recollection?

A. I believe I heard that Mr. Twining thought it would be more appropriate for the Rocky Flats office to make those decisions. Exactly why he felt that way,

I don't know.

Q. Do you have a general understanding why?

A. Well, I assume it's because he--he didn't have a lot of control over that office anymore.

Q. Over the Rocky Flats office?

A. Yes. That's my understanding.

Q. After June 6, 1989?

A. Yes, that's my understanding.

Q. Mr. Agy, I'm handing you a document that's previously been marked as Exhibit 117, which, like Exhibit 116, is also entitled Performance Appraisal, Rockwell International. This document contains handwriting on the first page. Is that handwriting yours?

A. It appears to be. I can't read all of it, but it appears to be my handwriteing.

Q. Can you read the note at the upper right-hand corner? It's not very clear on this copy. Unfortunately this is the only copy I received from the--

A. I'm not sure if you want me to guess. I think it says, "PEC meeting." PEC meeting.

Q. Is there a date in front of that?

A. Yes. It appears to be a date 10/10/89, would be a guess, but it's not clear.

Q. Below that there's a list of names. Were those the people who attended that meeting?

A. Most likely, yes, sir.

Q. Was there a meeting on that date?

A. Apparently. It appears to be 10/10/89, but I'm not sure. And it generally was reflective of a meeting, yes. When I list the attendees, that would be a meeting.

Q. Did you prepare this document?

A. It appears that I did. My name is on the bottom of it.

Q. And did you prepare it on October 6, 1989?

A. Yes, I believe I probably did. That's how I generally did it. I dated them the day I prepared them or the day I assembled that information.

Q. Was this document put together by you in preparation for the 10/10/89 PEC meeting?

A. It would appear that I put it together for that meeting. I believe it says, "PEC." I'm not positive about that.

Q. Directing your attention to Exhibit 116 once more, I note in this document there are no adjectival grades listed; is that right?

A. I just leafed through the document, and you seem to be right. I don't see any adjectival

grades.

Q. In Exhibit 117 there do appear adjectival as well as numerical grades, sometimes written in hand, sometimes typed. Where did you obtain the adjectival and numerical grades to put in Exhibit 117?

A. The normal procedure would be to have received those from whoever was inputting this information. It would--either they'd put them there or they told me what they wanted to be put there.

Q. Who were the people providing input to the document that is Exhibit 117?

A. Well, normally that would be various people. Could be anybody that worked for DOE at Rocky Flats that would have initially written some of these things. Like I said earlier, they would have run--been reviewed by their supervisors and then in turn that person's supervisors. And I'm not specifically--I don't--let me rephrase that. I'm not sure exactly who wrote all this, but the people listed as the attendees would be the ones who are representing those--whoever has written it.

Q. Could you read off the people who attended the meeting who you believe provided input to the document.

A. It's a hard question to answer. Obviously

Rosseau and Werkema--well, wait a minute. That's not--you are asking who on the list provided--

Q. Well, why don't you just name for me all the people you can who provided input to this document.

A. Bill Rosseau and George Werkema, Claude Barkmeier, Jack O'Brien, Hugh Miller, Don Riley, Vern Witherill, Bill Rask. I'm just reading the names that are noted here. Ron Foster, Hugh Miller--I may have mentioned his name already, but--that's the only ones that are noted here. I'm not sure if there's others.

Q. I note that included in your list of attendees is a Mr. Ostmeyer. Did he provide input to the document?

A. I don't recall.

Q. Did Mr. Simonson?

A. I don't recall. His name isn't noted here as--like some others are.

Q. By being noted in the document, do you mean included in parentheses?

A. Yes.

Q. Within individual paragraphs?

A. Yes. And that would have been the person who submitted that or wrote it or--generally wrote it in or submitted it.

Q. Were the attendees that you have listed members of the performance evaluation committee?

A. I don't recall the--whether there was a membership list. I don't--I don't remember.

Q. On the first page of the document under the FPA General Management and next to the heading Adjectival Grade, there's some handwriting. Is that your handwriting?

A. It appears to be.

Q. Can you read it?

A. It says, "Good"--there's another word there, but I--it's not readable. And then there's a numerical grade 80 something, but I can't read it either since the second number is not clear.

Q. Down farther on that page in the left-hand margin there's also some handwriting. Is that yours?

A. It appears to be.

Q. What does that say?

A. It says "To o-b-s," but it's--that would have meant that we were transferring that from an achievement to an observation.

Q. Would that kind of a comment have been made during the October 10 meeting?

A. Most likely, yes.

Q. Would that have been the consensus of the

attendees of the meeting?

A. Yes, that was generally the case. I don't remember precisely, but that was generally the case.

Q. Is that also the case with the handwritten adjectival grade and numerical score that's placed under General Management? In other words, were those arrived at during the meeting?

A. I don't recall precisely, but I assume that that was the case, yes, that there was a consensus that that's what the score should be and--yes, or at least that's what the recommended rating was.

Q. Please direct your attention to the page that is stamped E 000595. This page was to the FPA cost management, and after adjectival grade is typed "excellent" and, parentheses, "93," and written in hand after that appears to be the letters "O-K." Is that your handwriting?

A. It appears to be.

Q. Does that say, "OK"?

A. Yes, it does.

Q. Why would you have placed that there?

A. Well, I don't recall precisely writing it there, but generally it would reflect that the board looked at that or the--this committee or whatever it was looked at that and agreed with that number, that

adjectival rating. So I made a notation probably that they had at least at this point thought that was a fair score.

Q. Was it one of the purposes of this meeting to arrive at a recommended adjectival and numerical grade for the various FPAs?

A. Yeah. Part of the recommendation process would have been to recommend to the manager what the adjectival and numerical scores--to recommend an adjectival and numerical score for his consideration.

Q. Please direct your attention to the following page, which is stamped E 000596. This page relates to the FPA quality and adjectival grade. It's typed in "excellent" and in parentheses, "91"; is that right?

A. Yes, that's what it means.

Q. There's a handwritten note to the right of that. Is that your handwriting?

A. Yes, it appears to be mine.

Q. What does that say?

A. It says, "Grade may not hold when ES&H is considered."

Q. Why did you write that?

A. I don't recall precisely, but I assume it's a comment made at the meeting that I more or less

recorded for the record.

Q. Do you recall what that comment related to?

A. No, I don't recall.

Q. Please direct your attention to the page in the exhibit that is stamped E 000598, which relates to the FPA chemical operations. What is the adjectival and numerical grades that are typed on that page?

A. Would you repeat that, please.

Q. What are the adjectival and numerical grades that are typed on the page for the FPA chemical operations?

A. It says, "very good" with a grade of "90."

Q. There's some handwriting next to that. Is that your handwriting?

A. It appears to be mine.

Q. The 90 has a circle drawn around it and a line drawn through it. Did you make those notations?

A. Most likely.

Q. There's also some writing immediately adjacent to those notations. What does that say?

A. It says, "86 per Rask."

Q. Now, I'm referring to the handwriting immediately adjacent to the circle.

A. It says, "Werkema," as in George Werkema.

Q. Why did you draw a circle and a line through the 90?

A. Well, I don't remember precisely, but I think it was probably because I was--that was Werkema's initial recommendation.

Q. And what does the "86 per Rask" mean?

A. Most likely that was what Mr. Rask recommended after discussion with the committee or board.

Q. Please direct your attention to the page in the document that is stamped E 000602, which relates to the FPA production operations. What are the adjectival and numerical scores that are typed on that page?

A. Very good, and the numerical score says, "86, dash, 90."

Q. Now, there's some handwriting immediately around those scores. Is that your handwriting?

A. Well, I assume it is, but I'm not sure about that. Doesn't quite look like mine in this case, but there's a good chance it is anyway.

Q. What does the handwriting say?

A. It apparently says--changed the very good to an excellent.

Q. What did you do with the numerical score?

A. Apparently the numerical score was settled on at a 91.

Q. Settled on at the meeting?

A. Yes. At apparently the meeting the recommendation was that it be a 92, at least that's what the notes indicate, and these are generally the notes that I took during the meeting.

Q. Is the typed parenthetical to the right of the numerical score stricken out by the parenthetical which reads, At first meeting was 95 but def was since added? "Def," I assume, meaning deficiency?

A. Yes, you assume correct. And yes, it does appear to be scratched out, which means it wouldn't be included on the next version.

Q. Please direct your attention to the page in the document stamped E 000605, which relates to the FPA environment, safety, and health. Next to the typed words "adjectival grade" is handwriting. Is that your handwriting?

A. Yes, it appears to be mine.

Q. What does that handwriting say?

A. I don't precisely recall the writing on this or precisely what it meant, but it appears to mean that--appears to indicate that Mr. Ron Foster

recommended an 81. And that's contrasted with Mr. Goldberg's recommendation for the previous period, which was apparently a 79. And yet there's another score that says 78, and I believe it says "Simonson" above that.

Q. That--that score and name is circled.

A. Um-hum.

Q. What does the circle mean?

A. I'm not sure. I would have to look at the next version to see whether--which one I picked up and used.

Q. What does the rest of the handwriting say?

A. It appears to say, "Simonson, colon, add critical report information as deficiency." Then there's a parentheses, but I'm not sure what that says. It appears to say, "Ron," who was the same Ron as Ron Foster, but I'm not sure that's what that says. It appears to be cut off.

Q. Do you know what that note means?

A. Well, appears to be telling us to add a deficiency concerning the crit report. It says, "Add crit report," but I don't know what the objective of that was.

Q. Does the note indicate that that comment

came from Mr. Simonson?

A. It does tend to indicate that, yes.

Q. Please direct your attention to the page in the document stamped E 000607. There's some handwriting on the left margin on that page. Is that your handwriting?

A. I believe it is.

Q. What does that note mean?

A. Well, I just looked at--it refers to general management Deficiency No. 3, and I turned up to page E 000592 and looked at that one, but offhand I don't see any correlation, so I--I'm not sure what it means.

Q. Now, were all the handwritten markings on this document placed there by you at the October 10 meeting?

A. I believe that's generally true. I--I don't know how I could tell you exactly yes or no at this point, but I see one notation on the front that says something about Claude Barkmeier on the 11th, so I guess I may have made that notation on the 11th. But I think for the most part that's probably true, that these notes were made at the meeting which apparently was on the 10th.

Q. Mr. Agy, I'm handing you a document that

has previously been marked as Exhibit 118, which is a memorandum from Mr. Barkmeier to Michael Frietze, dated October 12, 1989, with attachment. Please review the document and tell me if you've ever seen it before.

A. Yes, I've seen it.

Q. There's handwriting on the front page of the exhibit. Is that yours?

A. Yes, it is.

Q. What is the handwriting referring to on the first page?

A. It's referring to Albuquerque's--let me start all over. It's referring to our--the opportunity we gave Albuquerque to comment on the PEC report and the fact that they're not going to comment.

Q. They did not comment on the report; is that right?

A. That's what my note indicates.

Q. Do you know why they didn't comment?

A. No, I don't have personal knowledge as to why they didn't.

Q. Did you remember a reason why they didn't?

A. I don't recall.

Q. Do you have any idea why they did not comment?

A. No, I really don't know why they didn't

comment.

Q. What was the purpose of this document?

A. Well, like it says in the letter, some of the--it--this document includes some of the initial evaluation comments made by Albuquerque directors because that was the process, we always sought their input. And it was just a courtesy, I assume, to run this past them and see if they had any comments on the complete report.

Q. Is the attached performance appraisal the recommendation of the performance evaluation committee at Rocky Flats for the award fee for the second half of fiscal year 1989?

A. Well, it's not--it doesn't appear to be the formal one because it would have a cover sheet on the front signed by the chairman. It was probably a--as it shows here, it was one of the many versions. This is Version 6. But it was apparently at such a point that Mr. Barkmeier wanted to get Albuquerque's reaction to it.

Q. Now, I'll show you later a document that is signed by Mr. Barkmeier that contains the performance evaluation review board recommended award fee. Did the performance evaluation committee ever prepare a recommended award fee that was signed by the

chairman of the performance evaluation committee?

A. Not that I recall. I don't believe that there was ever such a report that was signed.

Q. So this is the performance evaluation committee's recommendation; is that right? And I direct your attention to--

A. That's what it indicates, yes.

Q. That's what the memorandum indicates, doesn't it?

A. Yes.

Q. Please direct your attention to the page in the document that is stamped E 000559. There is handwriting on that page. Is that your handwriting?

A. It appears to be mine.

Q. Can you read the note at the upper right?

A. Yeah. That was just some notes that I had made trying to determine whether the unclassified control nuclear information was in the report.

Q. In the box at the top of the page of the right-hand side is typed "V.6." What does that mean?

A. It stands for Version 6. It was an attempt by me to keep track of the various versions so I didn't lose track of which ones had been superseded.

Q. And also in that box is typed "RFO PEC Draft." Does this mean Rocky Flats office performance

evaluation committee draft?

A. Yes, that's what it stands for.

Q. Does this draft contain any numerical scores for the various FPAs?

A. I'd have to leaf through it to find that out, but it doesn't appear to have any. It just has adjectival grade recommendations.

Q. Toward the end of the document are two pages. Let me direct your attention to those. They are pages stamped E 000585 and 586. Those pages contain numerical scores, don't they?

A. Yes. So that the report does include numerical recommendations, yes.

Q. But not within the text; is that right?

A. Yeah, I believe you are right. I didn't see any in the text; just as an attachment.

Q. Are the numerical scores that are contained on the pages E 000585 and 586 the performance evaluation committee's recommendation of award fee scores for Rocky Flats?

A. Yes, that's what it appears to be.

Q. For the second half of fiscal year 1989; is that right?

A. Yes.

Q. What is the overall grade recommended by

the performance evaluation committee for plant?
A. For plant it's--appears to be 85.7.
Q. What dollar award fee does that correspond to?
A. It indicates here that it's calculated to be $3,167,000 approximately.
Q. What is it precisely?
A. $3,167,456.
Q. What is the overall grade recommended by the performance evaluation committee for PRMP, slash, PROVE?
A. Indicates on this document that it's 89.4.
Q. And what dollar award fee does that correspond with?
A. $636,543.
Q. Let me direct your attention to the last two pages of the exhibit, which are stamped E 000587 and 588. Did you prepare those two pages?
A. Yes, I must have. I didn't even remember this, but yes.
Q. Are they your minutes of the PEC meeting that took place on October 10, 1989?
A. Yes, that's what the document indicates.
Q. Were the people listed at the top of the

page stamped E 000587 members of the performance evaluation committee?

A. Some of them are members apparently and some of them are not.

Q. Who were members?

A. It indicates that Mr. Foster, Mr. Rask, Mr. Ostmeyer, and Mr. O'Brien were members, as well as Mr. Barkmeier, who was the chairman.

Q. Were you a member?

A. No.

Q. What was your position?

A. It indicates there that I was executive secretary.

Q. Of the PEC?

A. Yes, that's what it says. That's what it says, all right.

Q. Do these minutes accurately reflect what took place at the PEC meeting on October 10, 1989?

A. As I recall, they do. It was certainly my intention to reflect that.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 119. Please review the document and tell me if you prepared that document.

A. Yes, I prepared this document.

Q. What is the document?

A. It's another version of the recommendation being made to the manager by the--but I'm not sure whether it's the board or the PERB or the PEC. It doesn't say.

Q. Now, I note that in the box at the top of the first page on the right-hand side of the box is typed "V.6 w/o." The previous exhibit we looked at you said was Version 6.

A. Yes.

Q. What does the "V.6 w/o" mean?

A. As I recall, the only difference would have been that this is Version 6 without the scores.

Q. Without the adjectival grades?

A. Without any of the scores being identified. Now, it may not read precisely like 6 did, but there may have been some changes. But without reading it and comparing it, I wouldn't be able to tell you that.

Q. Why was this document prepared?

A. Why?

Q. Yes. Why was it prepared, that it didn't have adjectival or numerical scores?

A. As I recall, this was the version that was shown to and discussed with Rockwell by--I'm not sure

who. Apparently Mr. Simonson.
Q. Is the handwriting on the first page of the document yours?
A. Yes, it appears--well, some of it is. The top one is.
Q. The one that starts "From CB"?
A. Yes.
Q. What about the note just underneath that that starts, "Response"?
A. That doesn't appear to be mine.
Q. What about the handwriting on the left-hand margin--
A. No.
Q. --that says, "Insert"?
A. No, that's not my handwriting.
Q. What does your note say on the front page?
A. It says, "From CB 10/26/89. Changes requested by D. Simonson as result of 10/13/89 meeting with Rockwell. Per CB, no written comments were"--and I believe that's supposed to say sent or received. It probably said received, "recd." I bet that is--that's a guess, but I believe it says, "no written comments were received from Rockwell."
Q. Who is CB?

A. That's Claude Barkmeier.
Q. Were written comments received from Rockwell on this draft?
A. Not to my recollection.
Q. Did you prepare this draft on October 13, 1989?
A. The date on the bottom of it would indicate that I did, so I generally did reflective of the date I prepared it, so I assume it was done so on that day.
Q. Are any of the handwritten comments following the first page made by you?
A. Looks like there's a note on E 000506 where I--looks like I signed it and dated it, but I can't read the note.
Q. That's the note on the left-hand margin?
A. Yes, in the center.
Q. Is anything else on that page yours?
A. It doesn't appear to be mine. I don't recognize that. The writing isn't mine. The rest of it isn't anyway. I should probably point out that these check marks are probably mine.
Q. The check marks on--that are on a number of the pages?
A. Most likely those are mine. I generally

checked them off as I incorporated them into the next version so I would keep track of where I'm at.

Q. Other than the check marks and the note on the front page, which is E 000497, and the one note on the page that's stamped E 000506, are any of the handwritten marks yours?

A. No, I don't believe they are.

Q. So do the check marks on Exhibit 119 indicate that you incorporated the changes that were indicated in that draft in the next draft?

A. That's generally what they would mean, yes. I can't say that I--that they are reflected in the next one, but that would--that--

Q. That was your practice?

A. That's a notation that I made to me to keep track of where I was at to make sure I incorporated all the changes in the next version.

Q. That was your practice?

A. That was my practice, yes, sir.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 120. Did you prepare that document?

A. Yes, I believe I did.

Q. Is that your signature at the bottom?

A. Yes, it is.

Q. What was the purpose of the document?

A. I believe the purpose of the document was just to record for the--my information the--the information I knew about the meeting with Rockwell that had taken place.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 121, which is entitled RF PERB meeting October 27, 1989, Agenda Suggestions. Have you ever seen that document before?

A. Yes.

Q. Did you prepare the document?

A. Yes, apparently.

Q. What is this document?

A. In general, it's a suggestion to the board as to things that need to be considered during their meeting.

Q. Is all of the handwriting contained on Exhibit 121 yours?

A. It appears to be mine, yes.

Q. Next to the first paragraph in the left-hand margin is some handwriting. What does that say?

A. Next to Item No. 1?

Q. Yes, next to Item No. 1.

A. It says, "None received."

Q. What does that refer to?
A. It refers to the fact that Albuquerque didn't respond to the October 12, 1989, memo from Mr. Barkmeier.
Q. And that memo solicited comments?
A. Yes.
Q. When did you place that handwritten note on the document?
A. I don't recall precisely, but I assume that this reflects the notes that I took at the meeting or meetings that apparently took place on this subject.
Q. Is that true of all of the handwritten notes that you placed on the document? Were they all placed there during the meeting or meetings of the PERB?
A. I believe that's true.
Q. Paragraph No. 2 is entitled Entertain Verbal Comments from AL Representatives. What is the handwritten note that you have next to that?
A. It says, "No show." That indicates that no Albuquerque representative attended the meeting.
Q. Why didn't they?
A. I don't know if I have an answer to that question. I didn't--I don't have any firsthand

information as to why they didn't.

Q. Did you ever hear why they didn't?

A. I don't believe I did.

Q. Paragraph No. 3 is entitled Reconsideration of GM Notable Deficiency No. 2, and you have some handwriting next to that. What does that handwriting say?

A. It says, "Adopt per 10/27/89 meeting."

Q. What does that mean?

A. I'll have to think about it for a second here. Now, this was a suggestion made by Vern Witherill that a deficiency that was identified at the midterm--in a midterm evaluation for this period be recognized as an observation for the final evaluation rather than a deficiency because of apparent improvements that Rockwell made since the midterm evaluation was made.

Q. What does your handwritten note mean, then?

A. Means that the board agreed with Vern and adopted his suggestion.

Q. You attended this PERB meeting; is that right?

A. Yes.

Q. How would that suggestion be adopted? Was

it put to a vote?

A. Generally not as a formal show of hands or--as I recall, it would be discussed, and if no one objected, then someone would say, "Well, let's go ahead with that."

Q. What happened if someone objected?

A. They would generally discuss it more, and they would generally reach a consensus as to what everybody wanted to do.

Q. Paragraph that is typed No. 4 reads, "Consider other changes and suggestions to the PEC draft evaluation report." There's some handwriting next to that. What does that say?

A. It's not all there. Some of it's crossed out--cut off, but I believe it says, "None offered other than from PERB members verbally," with a note on that that says, "See No. 5 below."

Q. What does that note mean?

A. I'm not sure at this time. I--I believe it probably means that item--agenda Item 5 there says that they were to review and approve the final approved version of the board report, which would most likely have included all the verbal changes that the PERB members had made and since the last time they had met. And by approving that, they approved all the changes

A. Well, assuming I read that properly, I think that says RAT. I'm not sure. I'm not--this note doesn't make any sense to me at this time. There was a RAT team based out of Idaho. DOE office in Idaho, there was some sort of response team to environmental problems. That's my recollection, anyway. And if it was used in some other sense, I'm not sure what it meant. But like I say, it doesn't make sense to me at this point. I don't know why that note is on there.

Q. Did you prepare this document on October 27, 1989?

A. I would--the document would indicate that I did, yes. It says I did. That's generally the way I put my name on it and put the date on it I prepared it, so I assume I did, yes.

Q. What does the handwritten note on the upper right-hand corner say?

A. Well, it indicates that this was my copy of the agenda. And then it says also "10/31/89," also "11/1/89." So I assume my recollection is that we must have met three different times, on the 27th, the 31st of October, and then on the 1st of November also and it just took three meetings before we got through the agenda. That's my guess.

Q. Mr. Agy, I'm handing you a document that

has previously been marked as Exhibit 122. Have you ever seen this document before?

A. Yes. I prepared this document.

Q. Now, this document indicates that--well, strike that. According to this document, how many meetings of the PERB were there?

A. It says we met three times.

Q. What were the dates?

A. October 27, 28--

Q. Is that 28 or 29?

A. Oh, I'm reading--I'm sorry. I'm reading the wrong paragraph. Yeah. May be a discrepancy in the memo. Yeah. The first paragraph says that we met on the 27, 29, and on November 1.

Q. Does the body of the memo say something different?

A. Yeah. After the names of the attendees are listed, there's some indication there that we may have met on the 28th rather than the 29th. It's not--I'm assuming it doesn't make any difference.

Q. Directing your attention back to Exhibit 121 and the dates in the upper right-hand corner--

A. Seems to be a difference all right. There's the 31st mentioned here, so I couldn't

explain--let's see. Yeah. I agree that there's a discrepancy. I don't know how to resolve it at this point.

Q. Do you recall that there were three meetings of the PERB?

A. I think that's really clear that there were three meetings.

Q. Directing your attention to Exhibit 122, there are five names identified at the top of the first page. Were those people members of the PERB?

A. I don't recall whether there was any--ever a formal list of the members, but it indicates that the first two individuals were members, Mr. Barkmeier and Mr. Werkema, with Mr. Barkmeier being the chairman. Apparently the other two individuals, Aldrich and Reed, substituted for someone else, but I don't remember who they substituted for.

Q. And you were executive secretary to the PERB; is that right?

A. Yes.

Q. Does this document accurately reflect what took place at the PERB meetings?

A. I believe it was my intention to have it accurately reflect that. I--to the best of my knowledge, it does.

that's who Mr. Aldrich--if Mr. Foster was there. He left at some point, I don't remember when that was, left employment at Rocky Flats. Maybe Mr. Aldrich sat in for him. But seems like there was two acting assistant managers and then the PRMP project manager, as well as the division director of administration. I believe they were the members, as I recall. I think there was only four, but I don't recall precisely.

Q. Did you attend all of the meetings of the PERB for the second half of fiscal year 1989?

A. It's my recollection that I attended all the formal meetings at the PERB, yeah.

Q. Were there any informal meetings of the PERB that you were aware of?

A. No. There weren't any that I'm aware of.

Q. Let's take a break.

(A break was taken.)

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 123. Please review the document and tell me whether you prepared the document.

A. Yes, I--yes, I did.

Q. Did you prepare it on October 27, 1989?

A. It appears I did, yes.

Q. Directing your attention back to

Exhibit 122, was the first meeting of the PERB on October 27, 1989?
A. That's what it indicates, yes.
Q. Was Exhibit 123 prepared in preparation for the PERB meeting?
A. I believe so.
Q. The box at the top of the first page contains the typing "V.7." Does that mean this is Version 7?
A. Yes.
Q. And was this version the Rocky Flats office PEC draft prepared subsequent to discussions with Rockwell?
A. Yes, that's what it indicates. I believe that's the case.
Q. Is the handwriting on the first page of Exhibit 123 yours?
A. I believe it is.
Q. When did you place the handwriting on this document?
A. Well, like others, it's not dated, so it's not evident, but I believe it was done during the meeting of the board.
Q. Of the PERB?
A. At the PERB, yes. And it's one of those

three meetings.

Q. Were these comments put on during only one of the three meetings, or were there some comments that were placed on here as a result of all the three meetings?

A. I don't recall.

Q. How is it you would have marked up this draft at the meeting? Did somebody tell you to?

A. Most likely. Generally the board would review these documents, sometimes paragraph by paragraph. And if they saw something that they wanted to rephrase or delete or whatever, they would discuss it and decide on how they wanted it to read. I see some of the notations are abbreviations and things like that that I may have added myself, not necessarily at the meeting, where I was trying to identify all acronyms and so that it would read a little clearer.

Q. Would any of the substantive comments have been decided on by the PERB?

A. I believe all the substantive comments were made by the PERB.

Q. Did the PERB review Exhibit 123 paragraph by paragraph?

A. I don't recall. It does appear that way, but--with all the comments, but it's--I don't recall

whether they looked at every paragraph. They looked at the paragraphs that they wanted to look at.

Q. Do the check marks contained in Exhibit 123 indicate that you incorporated the changes by those check marks into the next draft?

A. That was my practice for doing that. I believe that's what they indicate. I'm not positive that each and every one of them indicates that, though.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 124. Did you prepare that document?

A. Yes, I believe I did.

Q. Did you prepare it on November 2, 1989?

A. I believe I did, yes. That's what it indicates.

Q. Is this document Version 9 of the performance appraisal of Rockwell?

A. Yes, that's what it indicates.

Q. And what is this document?

A. This apparently is the final draft of the PERB report after the--those series of three meetings were completed and my attempt to incorporate all their changes into the document they made at those meetings and anything subsequent to those meetings that they

told me to incorporate, which I'm not sure it's clear from here.

Q. This draft contains adjectival grades for the FPAs; is that right?

A. Yes.

Q. Were those adjectival grades decided on by the PERB?

A. Yes.

Q. Was each of the FPAs discussed by the PERB?

A. As I recall, they were, although there were so many in the PRMP area, they may not have discussed each and every one of them. I remember there was lots of them. As I recall, they did discuss them, though. But it's not clear from here.

Q. But your recollection is that they did discuss each one?

A. Yes, they generally did discuss each and every one.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 31, which is a memorandum from Mr. Barkmeier to Mr. Simonson, dated November 7, 1989, with attachment.

A. Yes.

Q. Have you ever seen this document before?

this type of a change, does that indicate that the person reviewed the document and concurred with it?

A. To me, it would indicate that they didn't object to its issuance, so I'm not sure that that indicated that they reviewed it.

Q. Were you aware of any PERB member who disagreed with the issuance of the recommendation to the manager that is Exhibit 31?

A. I don't recall any of the members objecting to it.

Q. Did any member ever express to you dissatisfaction with the PERB recommendation to the manager?

A. Not that I recall.

Q. Please direct your attention to the page in the exhibit that is stamped E 000332. That page contains a handwritten note. Is that note by you?

A. Yes, it is.

Q. The second sentence of the note talks about a "disk with all calculations, reports, forms, and letters for this evaluation," period; is that correct?

A. Yeah. I would have had it on a disk, yeah.

Q. What does that mean?

A. Yes.

Q. What does the note below that say?

A. It says that Hugh mailed a copy to Bishop on or about December 7, 1989, which indicates that my immediate supervisor, Hugh Miller, mailed a copy of it to Marshall Bishop, who was his immediate supervisor, or supervisor to be as the case may be. I think he must have been coming in about that time. And wherever Bishop was, he mailed him a copy so he could see what was going on.

Q. Mr. Bishop was to replace Mr. Barkmeier; is that correct?

A. Yes, that's correct, as a director.

Q. Do you remember when Mr. Bishop arrived at the Rocky Flats plant?

A. No, sir, I don't.

Q. Was it in December of 1989 or January of 1990?

A. As I recall, it was sometime in December.

Q. Did you ever speak with Mr. Bishop about the document that is Exhibit 32?

A. I assume I have. I don't recall the instances when I did, but I--because it did come up, as I recall, later.

Q. What was the nature of those discussions?

Q. What were the changes being mandated by headquarters?
A. At the time we wrote this memo, which appears to be January 10, 1990, I'm not sure we knew.
Q. Had Mr. Inlow already had his telephone conversation with Mr. Miller at this point?
A. Yes.
Q. Was that one of the changes being mandated by headquarters?
A. That was apparently a potential change. I don't know if we knew any more specifics than that, though, at the time.
Q. Mr. Agy, I'm handing you a document that's previously been marked as Exhibit 34, which is a record of telephone conversation, dated January 11, 1990, with a time of 8 a.m. Did you prepare that document?
A. Yes, I did.
Q. On January 11, 1990, at 8 a.m., did you have a telephone conversation with Mr. Inlow?
A. Would you repeat that, please.
Q. On January 11, 1990, at 8 a.m., did you have a telephone conversation with Mr. Inlow?
A. Yes. My record of telephone conversation indicates that.
Q. Why did you place that call to Mr. Inlow?

Or did you place the call to Mr. Inlow?

A. Yes, I placed a call to Mr. Inlow.

Q. And he returned your call; is that right?

A. Yes, I believe that's what the memo indicates.

Q. Why did you call Mr. Inlow?

A. Well, the memo indicates that Mr. Bishop asked me to do so and that we wanted to get the status of headquarters' actions regarding our manager's--that is the December 6, '89, request for concurrence, what the status of headquarters' actions was on that package, I guess.

Q. Were you also calling Mr. Inlow to discuss his telephone conversation with Mr. Miller of December 20?

A. Yes. That's what my memo indicates.

Q. What did you talk to Mr. Inlow about concerning Mr. Inlow's December 20, 1989, telephone conference with Mr. Miller?

A. I don't remember a whole lot about it, but I--obviously my memo says that Inlow advised us that Mr. Barr had instructed his staff to recalculate the award fee to a level not higher than the period ending March 31, 1989, for plant, and that on the PRMP/PROVE award fee pool, that the information had been given to

Bruce Birnbaum and he had beat on it.

Q. Who was Mr.--is it Birnbaum?

A. I believe it is. B-i-r-n-b-a-u-m.

Q. Who is he?

A. I don't believe I ever met the gentleman, but he was, as I understand it, a headquarters' employee in the defense program's organization involved with oversight of the PRMP/PROVE project at Rocky Flats.

Q. He was at headquarters, then, right?

A. Yes.

Q. What did you mean when you state here that Mr. Birnbaum was to beat on PRMP/PROVE?

A. Well, I assume since I have "beat on it" in quotes, that that's something that Mr. Inlow had said. And I assume that it means that he was preparing to reduce the score in that area for whatever reason.

Q. Did Mr. Inlow tell you the reason?

A. If he did, I don't recall.

Q. So it was your understanding at the time Mr. Birnbaum was going to reduce the PRMP/PROVE award fee; is that right?

A. Yes, that was my understanding.

Q. Was the plant award fee also going to be reduced?

A. Apparently they were going to recommend to their own--some higher level in DP than they were to be reduced or at least reduced from the level that had been recommended by the manager.

Q. To a level not higher than for the first half of fiscal year 1989; is that right?

A. That's what it indicates, yes, sir.

Q. And that's for the plant portion, isn't it?

A. Yes.

Q. Please read aloud the last paragraph of the memorandum.

A. It says, "Inlow had the impression that it would be discussed with Simonson by Arendale and Willett, parenthesis, both of DP-20, end parenthesis, on 1/11/90, but that it pretty much was decided on already, colon, the headquarters' changes were going to be forced on us." End.

Q. Was that what Mr. Inlow told you in the telephone conversation?

A. Well, since I don't have it in quotes, I couldn't testify that that's what he told me. I must have had that impression from what he told me, though, that that was pretty much the--as he saw it. But it's not clear there that--exactly what he said, but that's

the impression I was left with after the telephone conversation anyway.

Q. So these may not be the words verbatim that Mr. Inlow used; is that right?

A. I believe that would be true, yes, they are not.

Q. But they do reflect what Mr. Inlow told you accurately; is that right?

A. Would you restate that, please.

Q. Do the words in your note accurately reflect the substance of what Mr. Inlow told you?

A. I believe so.

Q. What did you understand were the "headquarters' changes that were going to be forced on us"? And by "us," I take it you meant the Rocky Flats office?

A. Yes. Or on the manager, actually.

Q. What were those changes that were going to be forced on the Rocky Flats office or the manager?

A. At that time, I'm not sure I knew specifically except that his staff was going to review that information. So I think later we learned what some of their positions were, but I don't believe I knew at that time.

Q. Did you know at that time that the changes

were going to be reducing the award fee?

A. Yes, that was my understanding.

Q. Was it your understanding that the changes that were going to be directed from headquarters were going to be mandated on the Rocky Flats office?

A. I guess I had that impression, but I don't really--I never really knew how much legal room the manager had.

Q. After your conversation with Mr. Inlow, was it your understanding that the Rocky Flats office would have much legal room?

A. It didn't appear that we would have.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 133. Would you please review the document and tell me if you've ever seen it before.

A. Yes, I have seen all this information.

Q. Did you provide this information to Mr. Bishop on January 17, 1990?

A. Yes, it appears that I did. I don't remember doing it, but my note indicates that I did provide Mr. Bishop with a copy on January 17, 1990.

Q. Did you later make a presentation to the manager with respect to Rockwell's award fee?

A. My handwritten note indicates that there

headquarters' numbers; is that right?
A. Yes.
Q. So if you adopted the headquarters' numbers, you would have to rewrite the performance evaluation report; is that right?
A. That was my opinion.
Q. Is that normally the way the process worked, that the numbers were arrived at first and then the text for the performance evaluation report was written?
A. Well, since this is the first time that I have been--the first time we had our own board at Rocky Flats, I'm not sure I could state what the normal practice was.
Q. Was that how the PEC came up with its recommendation?
A. No.
Q. Is that how the PERB came up with its recommendation?
A. Generally the narrative--the achievements and deficiencies were identified first and then a score was discussed later.
Q. Can you think of any instance where the PERB came up with its recommendation other than that way?

A. Not during this period anyway. At Rocky Flats it wasn't done that way.

Q. With respect to any of the FPA categories listed on this page, had anyone from the PERB requested that you change any of the observations, achievements, or deficiencies?

A. I don't recall any of them having suggested that I do that. I mean, I--I wasn't doing this at their direction. I don't even think any of them were around anymore at this time.

Q. Had anyone requested you to change any of the observations, deficiencies, or achievements?

A. Did you say directed me or--

Q. Requested that you make those changes.

A. I don't recall that they did that. I wouldn't have the authority to change anything anyway.

Q. So you were making suggestions on how to conform to the rating plan if the headquarters' numbers were being adopted; is that right?

A. Yes, I agree that's a fair characterization.

Q. Turning to the next two pages in the exhibit, those stamped E 000253 and 254, did you prepare those two documents?

A. I believe I did.

the process. So in that respect, it added some time to it.

Q. It took away some control?

A. And it took--if not, it gave it a different flavor, anyway.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 136, which is a copy of the two top memos that are Exhibit 134 and 135, but Exhibit 136 has some handwriting on the front page. Is that your handwriting?

A. Yes, it is.

Q. What does your handwriting state?

A. It indicates that this document was originally received by Simonson from Admiral Barr on January 11, 1990, and that Mr. Miller had given it to me on January the 12th of 1990.

Q. Was Mr.--was Admiral Barr at the Rocky Flats plant on January 11?

A. I don't recall, but this note says, quote--it says that it's hand carried, so I assume that probably indicates that Mr. Simonson was in headquarters on that day, then carrying it back with him, but I'm not sure.

Q. And you received it the following day from your supervisor; is that right?

A. Yes, that's what my note indicates.

Q. January 12, 1990?

A. Yes.

Q. What does the rest of your note say?

A. It says, "Per Miller, Simonson does not agree with this and wants comparison with our proposal so RFO position can be developed."

Q. What does that note mean?

A. Well, apparently that was my marching orders for preparing that analysis I did on Exhibit 133. That's an assumption on my part. I don't remember, but I assume that was the information I had to go do this analysis.

Q. What did Mr. Simonson not agree with?

A. Well, I don't have any personal knowledge of what he didn't agree with. I didn't talk to him.

Q. You talked to Mr. Miller; is that right?

A. I talked to Mr. Miller. So I'm just kind of assuming that I had my facts straight when I wrote this note, but that's--I don't know exactly what he didn't agree with. It doesn't say.

Q. Would "this" refer to Mr. Tuck's memorandum?

A. You mean him not agreeing with--

Q. Yes.

A. The item that he didn't agree with?
Q. Yes.
A. I--well, yeah. He says he "does not agree with this," so it's on this document, so I assume it's--he supposedly didn't agree with Exhibit 136. But--but that's an assumption on my part or based on a discussion I had with Mr. Miller.
Q. What did Mr. Miller tell you that Mr. Simonson's view was?
A. I don't remember the discussion at all, but all my note here says that he indicated that he didn't agree with it, so--to what extent, I don't know.
Q. When you wrote notes on documents concerning conversations that took place, did your notes generally reflect accurately those conversations?
A. Well, they were intended to. They were intended to refresh my own memory. They were more or less personal notes that I wrote to trigger my own memory so I could--if questioned about how something went down, you know, how something came about, why it happened the way it did, I could go back and hopefully explain it. And to some extent it was covering my own tail, you know. I was leaving a track so I could--a trail so I could remember what happened and why it

happened the way it did.

But I--in answer to your question, they were notes for me and not for, you know, anybody else really. So there's no reason not to put it down like I saw it and like I understood it, which is not necessarily to say that I understood it correctly.

Q. But you have no reason to believe that any of the notes you took recording conversations or telephone calls or meetings did not accurately reflect the substance of those things, do you?

A. Yeah. They--I think you are right, that they--at least they reflected my interpretation of what those folks had said on the assumption that, you know, I interpreted it--their feelings correctly.

Q. What was the Rocky Flats office position that was to be developed that's mentioned in your note on Exhibit 136?

A. Well, I assume--and I don't know exactly what I meant by that, but I assume that we were--we worked for Mr. Simonson. And Simonson was--had to respond to this thing, so we were--it was an effort on our part to help him with some information so he could develop his position.

Q. Would that be developing the Rocky Flats office position on Rockwell's award fee that would take

into account the information from headquarters that's contained in Exhibit 136?

A. I'm not sure I completely understood the question, but it was--it was to help Mr. Simonson develop a supportable position in case he, I assume, wanted to disagree with something, he needed to understand just what it was, how it impacted his recommendation, and put him in a position so he could intelligently discuss it with headquarters.

I am not--I don't want to imply that he--it was his intention to adopt their position because I don't know what his intention was.

Q. What was your view as to whether Mr. Simonson was going to adopt headquarters' position?

A. Well, like I indicate, I didn't talk to Mr. Simonson myself, so I didn't know what his position was, but I was operating under the assumption that--on the one hand that he apparently didn't agree, but the other hand, I wanted to provide him with the options that--at least some of the options he had available to him in case he had to--or wanted to change his original fee recommendation.

Q. And you had already been told by Mr. Inlow, hadn't you, that the headquarters' changes

were going to be forced on the Rocky Flats office?
A. That was my understanding, yes.
Q. Mr. Agy, I'm handing you a document that previously has been marked as Exhibit 137. Did you prepare that document?
A. I believe I did. It says I did anyway.
Q. Did you prepare it on January 12, 1990?
A. Looks like it.
Q. Was that part of the package that you provided to Mr. Bishop?
A. I didn't see it in that exhibit you showed me, so I'm not sure it was part of that package or not. I don't believe this contains any information that wasn't--isn't on the Exhibit 133.
Q. And would you, please, compare the scores contained in Exhibit 137 with the scores provided by headquarters in Exhibit 135.
A. Yeah, this seems to--that is, Exhibit 137 scores at the top of the page for PRMP and plant seem to be the same scores that were being suggested by DP-20 around the 11th of January.
Q. Is that true for all of the individual FPAs?
A. It--I compared them and I didn't see any differences, so I--yeah, I believe that's true.

A. Um-hum.
Q. Would you please read that aloud.
A. Third paragraph, "Although we would welcome any comments you may have on the Rockwell memo, our main concern at this point are issues of fact. Therefore, please identify any new factual information disclosed in the Rockwell memo which might impact our previous evaluation."
Q. Why was your main concern at this point issues of fact?
A. I don't remember exactly why or why we used those words, but I assume that we are talking about issues and facts that were relevant to the period under review, not before or after that period.
Q. The period under review being April 1--
A. April 1 through September 30 of 1989.
Q. Because it was only facts that took place during that time period that would be relevant; is that right?
A. I believe that's what we intended, yes.
Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 138. Did you prepare this document?
A. Yes, I believe I did put this document together.

Q. What is--is that your handwriting on the first page?

A. Yes, it appears to be.

Q. What does the handwriting in the upper right-hand corner say?

A. It says, "Presented to Simonson and Bishop."

Q. Did you present this document to Mr. Simonson and Mr. Bishop?

A. I believe that that's what that infers. I don't remember doing it, but I--I believe that's probably the case.

Q. Did you prepare this document on January 19, 1990?

A. Most likely. That's the date I have entered in on the bottom of that first page anyway.

Q. Earlier we saw a reference on Exhibit 133 to a January 19, 1990, manager presentation.

A. Um-hum.

Q. Would Exhibit 138 be the presentation that is referred to in Exhibit 133?

A. I'm not positive about it, but I would assume that that would be the case. And I assume the presentation took place, but I--like I said, I don't really remember. Hopefully that reflects the actual

situation.

Q. Would you please read your other note on Exhibit 138 on the front page.

A. It's a note dated July 10 of 1990, and it says, "Prepared prior to final headquarters' recommendation of 2/22/90, parenthesis, where headquarters lowered award fee dollars they were considering earlier, end parenthesis."

Q. When did you write that note?

A. It says--it indicates I wrote it on July 10 and, again, probably just a note to myself so I could keep track of what version this was.

Q. So headquarters later reduced further the award fee from the DP-20 input that you received that was contained in Exhibit 135; is that correct?

A. That's what my note says. And as I recall, that's what the situation was, but I--I'm sure we'll get to the specifics.

Q. Please turn to the last page of Exhibit 138, which is a page stamped E 000246. Did you prepare that page?

A. Mr. Bishop and I prepared that page.

Q. What does this page represent?

A. It's intended to represent the kind of things that the award fee determination official or the

A. As I recall, I made an index of what it was in the binder for easy reference. I don't see it attached here.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 37, which is a memorandum from John Tuck to deputy secretary, dated February 22, 1990, with attachment. Have you ever seen that document before?

A. Yes, I've seen this document.

Q. When did you first see that document?

A. Well, it's not clear to me. It doesn't say. In the latter part of February of 1990 probably.

Q. Does this document contain the later headquarters' award fee numbers that were lower than the initial input from headquarters?

A. Yes.

Q. Did you ever discuss this document with anyone?

A. Yeah, I believe this is the document that I must have had when I put together the attachment to the determination letter that went to Rockwell in, I believe, this same month. I forget the exact date that the determination letter went out or when it was signed by Mr. Nelson.

Q. The letter signed by Mr. Nelson was dated

February 26, 1990.

A. So I probably had this when I put that attachment together when--or the attachment to that letter of February 26.

Q. According to this February 22 memorandum, what is the headquarters' overall award fee grade for plant operations?

A. Well, according to page E 000023, it's--it was 78.4.

Q. And what is it for PRMP/PROVE?

A. 83.

Q. And what dollar amounts do those grades correspond with?

A. For plant operations, was $1,241,406.

Q. And or PRMP/PROVE?

A. It was apparently $338--I'm sorry, 338,035.

Q. Did you discuss this memorandum with anyone?

A. I'm sure I did. Probably during the period when I was--prior to--or and including the 26th of February. Probably Mr. Miller. As I recall, I discussed it with their--was mentioned, anyway, by Jerry Duffy. Gerald Duffy.

Q. Who was he?

A. He was a branch chief working for Mr. Bishop; same level as Mr. Miller. And as I recall, I discussed it with Mr. Fess and Mr. Simonson.

Q. Who was Mr. Fess?

A. The chief counsel at Rocky Flats office.

(A break was taken.)

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 143. Have you ever seen that document before?

A. Yes.

Q. Did you see that document in late February of 1990?

A. I believe I did.

Q. What is the recommendation made in this document?

A. It says, "Concur in the headquarters' decrease in total fee for RI."

Q. And what is the issue listed in this document?

A. On the issue line it says, "Should RI's award fee be reduced from $4,176,077 to $2,012,489?"

Q. Is the $2,012,489 the same award fee that is being recommended by Mr. Tuck in Exhibit 37?

A. Yes, on page E 000021.

Q. Did Exhibit 143 accompany Exhibit 37 when

you first saw them?

A. Well, they are definitely related, but I don't recall whether I got them at the same time or not.

Q. Was Rockwell's award fee reduced to $2,012,489?

A. As I recall, that was the number on the February 26 memo to Rockwell. I don't have that in front of me, so I'm not positive. But I sort of recall that was the number that was used for the award fee.

Q. Let me show you what has previously been marked as Exhibit 28. Is that the letter that was sent informing Rockwell of the award fee for second half of fiscal year 1989?

A. That looks like the letter all right. Yes, I believe it is.

Q. What award fee is being issued to Rockwell for plant and PRMP/PROVE?

A. This is for the period April 1, '89, to September 30, '89. And for plant, the fee determination official awarded $1,241,604 for plant award fee and $338,035 for the award fee related to PRMP/PROVE.

Q. Are those numbers the same as the headquarters' numbers in Mr. Tuck's February 22

memorandum that is Exhibit 37?

A. Yes, they are.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 144, which is a DOE news release dated February 26, 1990. Have you ever seen that document before?

A. I believe I did see that, yes.

Q. Did you see it in February of 1990?

A. As I recall, I saw it shortly after we issued the letter of February 26 to Mr. Sanchini.

Q. That was Exhibit 28?

A. Yes.

Q. Did you--

A. Or the attachment to the 28 anyway.

Q. Did you ever see any drafts of the news release that is Exhibit 144?

A. I don't believe so. This was drawn up by headquarters. I don't remember ever seeing a draft of it. At least it's not something that I'd normally see.

Q. Mr. Agy, I'm handing you a document that is being marked as Exhibit 148.

(Plaintiff's Deposition Exhibit 148 was marked.)

Q. Which consists of several drafts of a news

A. I don't believe I ever heard.

Q. Do you have any idea why he was replaced?

A. Well, it's not that I hadn't asked, but I guess I never asked anybody that knew or was willing to share that with me.

Q. Did anybody ever tell you a reason why they thought Mr. Simonson was replaced?

A. I don't recall specifically, but as I recall, somebody mentioned that it was--that he most likely got on somebody's bad side, but I don't know any more than that. That's just--that's a rumor. I don't know what the facts are.

Q. Did you ever hear that Mr. Simonson's being replaced had anything to do with the Rockwell award fee?

A. No, I'd never heard that.

Q. Was the letter sent to Rockwell announcing the award fee for the second half of fiscal year 1989 sent out on February 26 of 1990?

A. Yes, that's what it was dated, so that's the day it went out.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 36, which is a record of a meeting. The date given is February 26, 1990, and the time given is 6:55 a.m. Did you prepare

this document?

A. Yes, I prepared the document. 6:55 a.m., though, instead of p.m.

Q. Did you have a meeting with Jerry Duffy at 6:55 a.m. on February 22nd--excuse me, February 26, 1990?

A. Yes. It indicates that Mr. Duffy contacted me that morning.

Q. Was Mr. Bishop also at that meeting?

A. Well, this is the kind of matter that would have been handled by Mr. Bishop had he been there, so I assume that Mr.--well, in fact, it says that Mr. Duffy was acting director that day, so that's why I was talking to Duffy rather than Bishop.

Q. I note under Attendees it lists both you and Marshall Bishop.

A. Yes. I failed to notice that myself. Hum.

Q. Did the three of you meet that morning?

A. Well, something's wrong with the way I wrote this if Mr. Bishop was present. And I have Mr. Duffy identified as acting because Mr. Bishop is the director. So anyway, I had better take a minute and read the memo.

Q. Please do.

A. Okay. I've read the memo. What was your question, please?

Q. Did you speak with Mr. Duffy at 6:55 a.m. on February 26, 1990?

A. Yes. The memo indicates I did.

Q. Was Mr. Bishop included in that discussion?

A. The memo indicates he was, but I don't remember him being present, especially that time of the morning. He usually doesn't get there that early.

Q. The first sentence of your notes refers to a Tuck February 22, 1990, memo. Is that the memo that is Exhibit 37?

A. I believe it is this Exhibit 37 that we're referring to there.

Q. Does your first sentence indicate that that memo was received by the Rocky Flats office on February 23, 1990?

A. Yes, that's what it indicates. And that's probably confirmed by the fax data that's on the top of the Exhibit 37. It shows that it was faxed February 23.

Q. Would you please read aloud the second sentence of your notes in Exhibit 36.

A. "Headquarters called Greg Fess RFO chief

counsel"--actually, it says, "RFO GC," but I think he was the chief counsel. And that's an aside. Anyway, he says, "Headquarters called Greg Fess, RFO GC, told him AFDO determination letter must go out on Monday, 2/26/90 since Secretary Watkins will be issuing a press release 2/26/90 about the determination."

Q. Greg Fess was an attorney at the Rocky Flats office; is that right?

A. That's right.

Q. Why would headquarters call Greg Fess to tell him when the AFDO determination letter had to go out?

A. Well, I don't know. That's just what Mr. Duffy told me.

Q. Please read the first sentence in the second paragraph of your notes.

A. "Duffy informed me that Fess was coordinating this effort to get the determination out and that Fess and Eric Figi, headquarters GC, were writing the determination letter."

Q. Do you know Eric Figi?

A. No, I do not.

Q. Do you know what his position was at this time?

A. I don't know anything other than I

understood he was in the general counsel's office. I don't know what position he held.

Q. At headquarters?

A. At DOE headquarters.

Q. Prior to your discussion with Mr. Duffy on the morning of February 26, 1990, were you aware that Mr. Fess and Mr. Figi were writing the determination letter?

A. I think this is the first I learned of it.

Q. Why was it that two counsel were writing the determination letter?

A. I don't have any idea. As opposed to someone else, I don't know why. It wasn't something I was involved in.

Q. Were you surprised to learn that Mr. Fess and Mr. Figi were writing the letter?

A. No.

Q. Prior to learning that they were writing the letter, who would you have thought would write the letter?

A. I assumed, I guess, that they would probably ask me to do it, but that may be presumptious since it was beyond my level at that time and--but I don't know the reason why they--why those two gentlemen

wrote it. You know, it must--I have no problem with that.

Q. Prior to this, you had been preparing award-fee-related documents that were being prepared at Rocky Flats office; is that right?

A. Yes, but I'm at a much lower level than these gentlemen.

Q. Did you prepare Mr. Simonson's December 6 memo to Mr. Tuck?

A. Yes, I put that together for him.

Q. So were you surprised to learn that you would not be preparing the letter to be signed by Mr. Nelson?

MR. BRUNS: Asked and answered.

MR. KELLEY: I don't believe Mr. Agy answered whether he was surprised that he would not be writing that letter.

Q. (BY MR. KELLEY) Were you surprised?

A. No, I can't say I was.

Q. But you would have expected that you would write it; is that right?

A. Well, I was normally involved in those things, but, you know, only to assist them. If they chose to write it at our level, I was there.

Q. Mr. Simonson chose to have you prepare his

letter to Mr. Tuck on December 6; is that right?

A. Yes. Actually, Mr. Barkmeier directed me to do it.

Q. The last sentence of the first paragraph of your notes states that, and I quote, Secretary Watkins will be issuing a press release 2/26/90 about the determination, end quote.

Prior to speaking with Mr. Duffy on the morning of the 26th, were you aware that Secretary Watkins was going to issue a press release about the Rockwell award fee?

A. It's my recollection that this was the first time I heard about that and that, you know, which was the driver for--to get our letter out. I don't--I assume if I had known before this, that I would have been in on the weekend working on this thing.

Q. So you did not know before the 26th that the letter had to go out on the 26th?

A. As I recall, that was the situation all right.

Q. Please read aloud the second sentence in the second paragraph of your notes.

A. Second sentence in the second paragraph, "Duffy told me I needed to take a look at the 2/22/90 input from headquarters and revise the three-page

performance evaluation report, as appropriate, so that it can be attached to the determination letter today."

Q. Did you do that?

A. Yes, I did.

Q. And is the February 22, 1990, input from headquarters the memorandum from Mr. Tuck that is Exhibit 37?

A. I believe that's what we were referring to there, yes.

Q. So you revised the three-page performance evaluation report to incorporate information from Exhibit 37; is that right?

A. Yes, I believe that's a correct interpretation of what that means.

Q. Please read aloud the third paragraph of your notes.

A. "Duffy says Simonson and Fess decided we were going to issue the determination letter to reflect headquarters' position on award fee and we were not going to include a copy of Tuck's 2/22/90 memo as an attachment."

Q. Did what you state in that sentence take place?

A. Yes, I believe it did.

Q. Other than what is contained in your notes

of meeting, which are contained in Exhibit 36, do you recall anything else that you discussed with Mr. Duffy or Mr. Bishop at this meeting that is reflected in Exhibit 36?

A. That's not reflected in Exhibit 36?

Q. Yes, that is not reflected in your notes of the meeting on Exhibit 36. Do you recall anything else that was discussed?

A. With Mr. Bishop and Mr. Duffy, is that--I'm sorry.

Q. Yes, that's right.

A. Those two gentlemen?

Q. Or either of them.

A. I don't think so. I don't--can't remember anything. It seems like after this discussion took place, that I was working with Mr. Simonson and Mr. Fess and not Mr. Duffy and Mr. Bishop, working with them to accomplish this--to getting the determination letter out.

Q. Subsequent to this meeting, that is?

A. Yes. They probably got me this as I walked in the door, and then I went to work on it.

Q. What time did you normally arrive at work in February of 1990?

A. I usually started at 7 a.m.

Q. So it would be normal for you to be in the office five minutes early at 6:55; is that right?
A. It was either 7 or 7:15 was my starting time. I can't remember exactly, but yeah. And I usually got there early.
Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 38, which is a record of meeting. And the date given is February 26, 1990. The time listed is approximately 9 a.m. Did you prepare this document?
A. Yes.
Q. Did you have a meeting with Robert Ostmeyer at about 9 a.m. on February 26, 1990?
A. Yes, I did.
Q. Was that meeting related to Rockwell's award fee?
A. Yes, it was.
Q. Did you initiate the meeting?
A. Yes, I did.
Q. Please read aloud the first sentence of your notes.
A. "I called upon Ostmeyer with the 2/22/90 Tuck memo in hand to ask about the legitimacy of the headquarters' comments regarding safety and their useability in the performance evaluation report to be

issued today by the manager, RFO."

Q. Does that accurately reflect the reason you called upon Mr. Ostmeyer?

A. Yeah. I don't remember the specifics, but apparently there was headquarters' comments about safety. I mean, I see it's on page E 000018.

Q. And that's in Exhibit--

A. 37. I assume that's the ones I was referring to and, of course, if--

Q. Which are those comments? Are they the ones under which paragraph?

A. Under Plant Operations, apparently Items 1 and then the first bullet under 2 on that page about fire protection and I guess the others in general, says--according to my note.

Q. The other comments contained in Exhibit 37?

A. Yes, are related to safety that Mr. Ostmeyer would have been knowledgeable about.

Q. Prior to February 26, 1990, had you ever spoken to Mr. Ostmeyer about Mr. Tuck's February 22 memo?

A. Oh, I'm sure I didn't. We only got it--you mean--we only got the memo the 22nd. No, this is the first time since the 22nd of February I have

talked to him.

Q. Why was it on February 26 that you decided to call upon Mr. Ostmeyer?

A. Because I was tasked to put together the attachment to the determination letter, the narrative that spelled out the--an explanation of why the grades were the way they were. And I was attempting to review with Mr. Ostmeyer some headquarters' comments that we may want to incorporate into that--that attachment. And before I included them, I wanted to make sure he--I wanted to get his feelings about how I should proceed in doing that.

Q. And did you decide to call upon Mr. Ostmeyer that morning because it was that morning you found out that the determination letter had to be sent out that day?

A. Yes.

Q. Was Mr. Ostmeyer a branch chief at the Rocky Flats office?

A. I believe that was his position at that time. Oh, yes, it says that he was chief of--on the memo, Exhibit 30, it says he is the chief of the--I think that stands for industrial safety branch.

Q. Please read the second bullet in the second paragraph aloud.

A. "He was not comfortable with the headquarters' criticism of fire protection."

Q. Which item in the February 22 Tuck memo dealt with fire protection?

A. Well, appears to be the second--first bullet under Item No. 2 on page E 000018.

Q. Would you please read that item aloud.

A. Yeah, from Exhibit 37 it says "Inadequacies of a fire protection program and a continuing presence of fire hazards in Buildings 460 and 881."

Q. Do you recall anything else that Mr. Ostmeyer told you on February 26, 1990, about his discomfort with headquarters' criticism of fire protection, other than what is stated in your record of meeting which is Exhibit 38?

A. No, I don't recall anything else that he said about fire protection.

Q. Did you discuss with anyone on February 26, 1990, Mr. Ostmeyer's comments on the February 22 Tuck memo?

A. No, at least I don't remember talking to anybody about it.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 39, which is a

record of telephone conversation. The date given is February 26, 1990, and the time listed is 10:30 a.m. Did you prepare that document?

A. Yes. It's a document I prepared, a memo, a record of telephone conversation.

Q. Did you call Mr. Lockhart at 10:30 a.m. on February 26, 1990?

A. Yes, I believe I did. The memo indicates I did.

Q. Would you please read the first sentence of your notes.

A. "In process of revising the performance evaluation report to conform with the rating plan, I had to eliminate many achievements and add many deficiencies."

Q. And proceed with the next sentence.

A. "The deficiencies I added were obtained by reviewing negative observations found in the PERB report for the period."

Q. Is the word "reviewing" or "rewriting"?

A. I'm sorry. You are right. It does say "rewriting."

Q. Were you rewriting the performance evaluation report so that report would fit with the adjectival and numerical grades that were being given

Rockwell?

A. In so many words, yes.

Q. Please read the next sentence in your notes aloud.

A. "Lockhart was called when I couldn't find any deficiencies in the design quality FPA under PRMP/PROVE."

Q. Was the design quality FPA under PRMP/PROVE one of the FPAs where headquarters was recommending a change in the number that the Rocky Flats office had recommended?

A. Yes, it was.

Q. Who was Mr. Lockhart?

A. It says he was the acting project manager for PRMP RFO. He was a DOE employee, and we had a project there called PRMP/PROVE. And he was the project manager of that--or acting project manager.

Q. Please read the next sentence aloud.

A. The second sentence in the second paragraph says, "Lockhart faxed me the attached to assist me in my effort and stated the attachment was done by SMS, contained many deficiencies, but had been changed extensively later by D. R. Riley, former PM, comma, PRMP," which stands for project manager of PRMP, "for his input to the PERB report."

Q. What does SMS stand for?

A. That's a support services contractor employed by the Department of Energy to assist in that project, PRMP/PROVE. They assisted the project manager.

Q. I take it from your sentence here that SMS had provided some kind of an evaluation with respect to PRMP/PROVE and that that had been provided to Mr. Riley; is that right?

A. Yes. That's my understanding.

Q. I also take it from this sentence that Mr. Riley had changed extensively the evaluation given by SMS; is that right?

A. That was my understanding also.

Q. And I also take it that Mr. Riley used his own analysis which he had changed from the SMS evaluation for his input to the PERB report; is that right?

A. I don't know if I could speak to that. I don't know what he used. I guess it reflected his own feelings rather than what he had--the information he received from the SMS. I assume that to be true, but I don't know what--his total basis for his analysis.

Q. Whatever it was that Mr. Riley used for his input to the PERB, it had been changed extensively

from the SMS evaluation; is that right?
A. That was the--what Mr. Lockhart had told me.
Q. Did you ever talk to Mr. Riley on February 26, 1990?
A. No, I did not.
Q. Did Mr. Riley ever tell you that he had changed his view on PRMP/PROVE from his input to the PERB report?
A. No, I don't recall him ever talking to me about it.
Q. Was the SMS evaluation the only information that Mr. Riley had when he gave his input to the PERB report with respect to PRMP/PROVE?
A. I don't know what Mr. Riley had available to him.
Q. Would you please read the next sentence aloud.
A. The third paragraph?
Q. Yes.
A. "My effort was made necessary due to the fact that headquarters had insisted we lower the grade from 91 to 80 on three FPAs with PRMP/PROVE and headquarters failed to provide any real justification."
Q. How did you learn that headquarters had

insisted that "we lower the grade from 91 to 80"? I take it that "we" means the Rocky Flats office; is that right?

A. Yes, I believe that's what we meant by "we."

Q. How did you learn that?

A. Well, I may have overstated that. I guess I--that was my interpretation of what they were--what their position was.

Q. Of what Mr. Bishop had told you?

A. February 22--a reading--my reading of the February 22, 1990, memo gave me that impression.

Q. Did you also gain that impression from your discussion with Mr. Bishop?

A. No, I don't believe so. I probably--that probably reflects my own personal feeling of what was happening and may not necessarily reflect the position of those above me.

Q. But that was the impression that you gained from all the information that you had learned throughout January and February of 1990; is that correct?

A. Yes, I think that's probably correct. That was my overall impression of what was happening.

Q. Was it your view when you wrote this

memorandum that headquarters had failed to provide any real justification for lowering the PRMP/PROVE grade from 91 to 80?

A. Well, I think that was poorly worded. What I think I was trying to say there was that they didn't supply a real usable narrative to go along with their numbers that they were recommending so we could have a better understanding of why they felt the numbers should be the way they are--the way they recommended it. So without--so we didn't know their reasoning. That doesn't mean it didn't exist.

Q. Did you ever attempt to find out the reasoning at headquarters for lowering the score from 91 to 80?

A. No, I never personally attempted to find it out.

Q. Did you ever ask anyone to find out headquarters' reasoning for lowering the score from 91 to 80?

A. I wasn't in a position to question the headquarters.

Q. Did anyone ever tell you why headquarters was lowering the score from 91 to 80?

A. I only had the February 22 memo. That's the only reason I had. But other than that, no, no one

told me.

Q. Please read aloud the last sentence in your memorandum.

A. "Using the attached information, I revised the FPAs for design quality and technical product quality."

Q. The attached information was the SMS report or evaluation; is that right?

A. Yes, that's what I was referring to.

Q. Did you use any other information in revising the FPAs for design quality and technical product quality?

A. I don't believe I did. And if I did, it's not noted here, but I don't remember.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 40, which is a record of meeting. The date given is February 26, 1990. The time listed is 11:15 a.m. Did you prepare this document?

A. Yes.

Q. Did you meet with Greg Fess and Dave Simonson at 11:15 on February 26, 1990?

A. Yes.

Q. Please read aloud the first sentence in your note.

A. "I showed Fess a draft of the revised performance report."

Q. And the second sentence?

A. "He made some minor changes and I put it in final form for him after making the changes he wanted."

Q. Did you speak--strike that. Did you show anyone other than Mr. Fess a draft of the revised performance report that you prepared on February 26, 1990?

A. Not before I put it in final form. I don't--at least I don't remember showing it to anybody else. There wasn't time.

Q. Please read aloud the second paragraph of your memorandum.

A. "We then met with Simonson who read the final form of the revised performance evaluation report."

Q. And the next sentence.

A. "After reading it, Simonson stated, 'This is fine.'"

Q. How long did Mr. Simonson take to review the revised performance evaluation report?

A. I don't recall.

Q. Was it more than an hour?

A. No, it was less than an hour. It was--I don't remember--several minutes. I don't know. It doesn't say, so--but it's only three pages long.

Q. Please read aloud the third paragraph of your memorandum.

A. "Fess, who had already obtained R. M. Nelson's signature on the determination letter he had drafted for Nelson, then gave a copy of the performance evaluation report to Jean Finch for inclusion in mailing with the determination letter."

Q. Did Mr. Nelson sign the determination letter prior to your finalizing the performance evaluation report?

A. Well, my note tends to indicate that, but I'm not sure what Mr. Nelson reviewed.

Q. Who is Jean Finch?

A. Mr. Nelson's secretary. And obviously Jean Finch wasn't at the meeting, so some of this took place after the meeting. It just appears to take place all in that half hour, but it obviously didn't.

Q. Why do you say half hour?

A. Because I say the meeting ended at about 11:45. So the way I wrote that--

Q. The meeting began at 11:15; is that right?

A. Yeah, that's about right. So I assume

that--probably that last sentence about the meeting ending probably should have been the third paragraph and last two, the third and fourth paragraphs, ought to have followed it. And that's probably the way it really happened, but it's not written that way.

Q. It's not written that way?

A. It implies that all that took place during that half hour, like I followed Fess around, but I didn't.

Q. Mr. Fess was the one preparing the letter for Mr. Nelson to sign; is that right?

A. That's the impression I had.

Q. Did Mr. Fess ever discuss with you preparation of the letter that Mr. Nelson was to sign?

MR. BRUNS: Objection. Calls for attorney-client privilege.

MR. KELLEY: Even if there was some kind of privilege in the communications between Mr. Fess and Mr. Agy, I am certainly entitled to discover the subject of those discussions.

Q. (BY MR. KELLEY) Mr. Agy, did Mr. Fess ever discuss with you the preparation of the letter that Mr. Nelson was to sign on February 26, 1990?

A. As I recall, we may have discussed it. I don't know whether it was that day or maybe earlier as

to how it ought to be done. But I don't--I really don't remember. It seems like it may have happened.

Q. Did you assist in any way on February 26, 1990, in the preparation of the letter that Mr. Nelson eventually signed?

A. I don't recall getting involved in that--

Q. At all?

A. --on that day.

Q. Not at all?

A. I don't believe I did. I was busy doing the other.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 29, which is a memorandum from Bruce Twining to Robert Nelson, dated February 26, 1990. Have you ever seen that document before?

A. Yes, I have.

Q. Did you see it in February of 1990?

A. Probably. I have a copy of it in my file, so I know I had it, but I don't remember exactly when I got it. It was probably in February, although there weren't too many days left from the 26th on, but I think so.

Q. Prior to seeing this memorandum, what was your understanding as to who was the award fee

determination official for Rockwell for the second half of fiscal year 1989?

A. I'm sorry. Prior to when?

Q. Prior to seeing this memorandum.

A. Well, there was an earlier memo issued to Mr. Simonson for the same purpose.

Q. Now, I believe you testified earlier that Mr. Simonson was replaced by Mr. Nelson in January 1990 as the manager at Rocky Flats; is that right?

A. Yes. As I recall, it was January of 1990.

Q. This memorandum designating Mr. Nelson is dated February 26, 1990. Is that approximately a month after Mr. Nelson became the manager?

A. Approximately.

Q. What was your understanding as to who was the award fee determination official after Mr. Nelson became manager and prior to seeing this memorandum that is Exhibit 29?

A. I assumed it was Mr. Nelson.

Q. After he was apointed--

A. After he became manager, he should have assumed the--he would automatically become the fee determination official, in my mind, but--

Q. Mr. Agy, I'm showing you again the

document that has previously been marked as Exhibit 28, which is the letter from Mr. Nelson to Mr. Sanchini, dated February 26, 1990. Did you prepare the three pages with the title Performance Evaluation Report that are attached to Mr. Nelson's letter? Those pages are stamped E 000200 through E 000202.

A. Prepared is probably an overstatement. Those pages existed even when Simonson sent his recommendation to headquarters in December. What I did was revise them to some extent.

Q. You had revised them earlier that day; is that right?

A. Yes. On the 26th.

Q. Is that the final form of the performance report--

A. Yes.

Q. --that you mentioned in your record of meeting that is Exhibit 40?

A. Yes, it would be.

Q. Is that the version that you showed Mr. Simonson?

A. Yes.

Q. During your meeting on that morning that began at 11:15 a.m.?

A. Yes, that's correct.

Q. Were there any changes made to the document after that time?

A. Not that I'm aware of.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 145. Have you ever seen that document before?

A. I believe I have seen this in responding to--

Q. Do you know why headquarters was asking for the information that's listed on the attachment, which is page E 000044?

A. Well, I--the only thing I can tell you is what it says here, establishing a data base. So they wanted this for historical purposes for some reason.

Q. Do you know why they were establishing a data base?

A. No, I don't.

Q. Mr. Agy, I'm handing you a document that has previously been marked as Exhibit 146. Have you ever seen this document before?

A. Yes. I prepared it.

Q. Did you send this document to headquarters on March 27, 1990?

A. Yes, I did.

Q. Did you ever speak with Paul Grimes or Jim

PL. SUPP. EX. 58

UNITED STATES CLAIMS COURT

Case No. 91-1362 C

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION DAVID P. SIMONSON
VOLUME I

December 10, 1992

Pursuant to Notice taken on behalf of the Plaintiff at 1719 Emerson Street, Denver, Colorado 80218, at 9:30 a.m., before Lori D. Porter, Registered Professional Reporter and Notary Public within Colorado.

that as a recommendation to the fee determining official. And I was both providing--depending on where I was at what time, I was both providing data to that committee and also being part of it.

Q. So if I understand it right, at times you were a source--one of the sources for input to a committee that would make a recommendation to an award fee--

A. That's correct.

Q. --official, and then at other times you were actually a member of the committee that was making a recommendation to the award fee official?

A. Yes, that's correct.

Q. Okay. And in 1989, you were transferred from the headquarters position to Rocky Flats; is that correct?

A. That's correct. That's correct.

Q. What was your position at Rocky Flats at that time?

A. I was--I was transferred out there as a manager at Rocky Flats.

Q. Who was your predecessor at Rocky Flats?

A. Ed Goldberg was out there as a temporary manager at that time and had been there, well, since about June.

particular date that was in effect at the time, what particular version was in effect at the time.

Q. But you are testifying that you would have reviewed the existing provision of the Rockwell contract that dealt with the award fee at the time you took on responsibility as manager; is that correct?

A. Yes. Well, at least during the process of determining the award fee, yes.

Q. When you were describing earlier the award fee process, at the end you stated that the determination of the fee determination official would be sent on to headquarters for concurrence?

A. That was our process, yes.

Q. Do you recall any discussions about that was a new process in 1989? Had it not taken place prior to that?

A. It was a new process. It may have been in place before 1989, but it was a new--the process was changed during the time I was in Washington, D.C., and so I was aware of some changes being made to the process from my responsibilities in Washington, D.C.

Q. And what time period would that have been?

A. That would have been a year and a half, approximately, before I went to Rocky Flats. May or

June of 1987. I may be off a year, but I was in Washington, D.C., about a year and a half before I went to Rocky Flats.

Q. Would you tell me about this change in process. What was the change?

A. As I recall, the change that was going on at that time was with the new administration, Secretary Watkins taking over responsibility for the department. He was driving for increased responsibility for what are called the programmatic secretarial offices in the department, which in this case would have been the assistant secretary for defense programs, and as part of that effort to increase their responsibility for their programs, they changed the award fee process to where a concurrence of that official was required before an award fee was actually finally determined.

Q. Do you recall when Admiral Watkins came in as secretary of the Department of Energy?

A. It would have been fairly soon after the--after President Bush took over as president.

Q. Does that help you in coming up with the time frame as to when this change took place?

A. Well, the--sure. You know, there was a period of time there, as any--as always, when new administrations come in, where there's changes made to

the way things are done. This is one of them. Whether that occurred immediately after he took over or whether that occurred six months or a year, you know, it was sometime in that time period.

Q. But it wouldn't have been 1987, would it?

A. Well, again, I may be off a year. I'll have to go back and think back through that and write it down. I went to Rocky in--in the fall of '89. I was in Washington a year and a half ahead of that, so I guess that would have been the spring of 1988.

Q. When was President Bush elected president?

A. Well, it would have been '88. He would have taken over in January of the next year.

Q. Of '89.

A. Yes.

Q. And when did Watkins come in as secretary?

A. Soon--soon thereafter. I don't remember exactly.

Q. So it would have been in '89, then, that Watkins became secretary of--

A. Again, the reason--the way I'm pinning down when that happened was it was during that year and a half I was in Washington. I just don't have any way

to tell you exactly.

Q. No, I understand, but you did testify that the change that would require award fee concurrence by headquarters emanated from Admiral Watkins.

A. That's correct.

Q. And I take it we can agree Admiral Watkins would have taken his position in 1989?

A. Yes. Okay.

Q. So would you then agree this change would have occurred sometime in 1989?

A. Yes, I would.

Q. How was the change--strike that, please. So that prior to this change we've been talking about, is it your testimony that concurrence from headquarters was not required for award fee determination?

A. My previous experience until the time I went to Washington was--in the award fee process was at the level of generating the recommendations made to the fee determining official. What the fee determining official did with those recommendations before he passed them on--you know, made the official determination, I am not familiar with or sure of. When I was in Washington, the requirement to get Washington concurrence was formalized.

Q. And that's--what you've been testifying

to, that occurred in 1989, after Secretary Watkins took over?

A. After Watkins took over, right.

Q. Do you know Mr. Whiteman?

A. I have acquaintance with him, yes.

Q. Have you ever talked to Mr. Whiteman about the award fee process at Rocky Flats?

A. No, sir.

Q. Getting back to this change that occurred in 1989 by headquarters, how was it implemented?

A. The first implementation that I'm familiar with was regarding the Savannah River award fee process, and I was involved in that a little bit from my headquarters responsibilities. And there was a document similar to this--similar to this document called the Handbook for Award Fee Administration, that is gen--that was generated by--again, I'm not sure of the title, but it was generated by Savannah River and included in it the requirement for headquarters' concurrence, the formal requirement for headquarters' concurrence in the award fee determination.

Q. Are you familiar with any department of contract--excuse me--Department of Energy contracts being modified to reflect this change in procedure that called for headquarters' concurrence in award fee

determinations?

A. I don't know whether they were modified or not. I don't know whether they would be required to be modified.

Q. But you know of--your testimony is you're unaware of any instance when a contract was modified to reflect concurrence by headquarters in the award fee determination?

A. I don't know of any.

Q. In the Rockwell contract at the time that you became manager at Rocky Flats, do you know who the fee determination official was designated to be in that contract?

A. As I recall, as it was the manager of Albuquerque operations office, who at the time was Bruce Twining.

Q. If you look at page 3 of Plaintiff's Deposition Exhibit 1, in the paragraph at the top, there's a sentence that reads, "The award fee shall be determined subjectively by the Award Fee Determination Official based on the Contractor's performance in accordance with the Award Fee Plan set forth in Appendix D." Have you ever read that sentence before?

A. I don't specifically recall. I would imagine that I've read that sentence.

first period.

Q. You also said you had conversations with Mr. Culpepper about who would be the award fee determination official for the second half of 1989.

A. Yes.

Q. What do you recall about your conversations with Mr. Culpepper?

A. Basically the same as Mr. Twining, whether it made sense to do it, whether we had the resources to do it.

Q. Was it your decision to make as to who would be the award fee determination official for the second half of 1989?

A. Was it my decision? I was the--I was involved in that decision. I couldn't have made it unilaterally, of course.

Q. Who had the final say on that particular issue?

A. I believe Mr. Twining, as contracting officer, and I think that would--final decision would lie there, I mean, the ultimate decision.

Q. There was no involvement of headquarters on this issue?

A. There was involvement with headquarters on--yes, on several issues regarding who was going to

do what at Rocky Flats, yes.

Q. Were you party in any communications with headquarters personnel on who would be the award fee determination official for the second half of 1989?

A. I don't recall any specific conversations. We were working on memorandum of understandings and things like that during that time period, which involved Admiral Barr, and the discussion--I just don't recall the specifics of those.

Q. What memorandum of understandings are you talking about?

A. Well, during this period of time when we were--when we were trying to establish the new office at Rocky Flats, we were using the document called memorandum of understanding to define what their role was and what our role was and what--and what--and what service they would provide to us and what we would do. I don't recall whether those were ever signed or not, but they were certainly the basis for the discussions.

MR. NEY: Mr. Bruns, we have never received any memorandum of understanding vis-a-vis the roles of Rocky Flats and Albuquerque in the document production. I believe they would certainly be called for by our document request. I'd ask that you would make a further inquiry on those documents.

to--for version, if that refreshes your recollection.
A. Doesn't refresh my recollection, but I would suspect he's right.
Q. Do you recall seeing this document?
A. Well, again, this is the document that's at least one version of the evaluation that was prepared of Rockwell's performance. As I previously stated, I would have seen some versions of this. I can't recall or tell you whether I saw V.5 or not or whichever other version there might be or which date.
Q. On the front page of V.5, there's in handwriting a list of people.
A. Yes.
Q. Your name is listed there.
A. Yes.
Q. Does that help you in recalling whether you participated in reviewing this draft?
A. Again, I would--as I said, I'm sure I saw versions of this performance evaluation criteria. I really can't tell you which ones I saw and which ones I didn't see.
Q. What exactly is this document, besides being a draft? It's a draft of what?
A. It's a draft of the appraisal of the performance that was done by the performance monitoring

people and reflects their view of Rockwell's performance, identifying deficiencies, identifying the seriousness of those deficiencies, identifying accomplishments, the significance of those accomplishments, having other observations, and also includes a suggested grade for the areas.

Q. Mr. Agy testified that he believed that this exhibit was the subject of discussion at a meeting on October 10, 1989, of the performance evaluation committee. Does that refresh your recollection in any way?

A. No. Again, I--I state again that I had conversations with the people doing the evaluation several times in several different meetings. I have looked at a lot of evaluation information such as this, but I cannot tell you which dates and which meetings on which dates I attended.

Q. What is the performance evaluation committee?

A. It's a committee made up of the monitors who start the evaluation process on--on the contractor's performance.

Q. And that is an entity that was created in this performance evaluation plan that we just talked about that was put in play once you, as manager--

A. Yes. But also there was similar committees--and, again, I'm not sure the terminology, but there was similar committees in place during previous plans, and so we adopted that to a new--to the new evaluation process.

Q. Keeping with the plan that we previously talked about, which is the attachment to Exhibit 27, the PEC would be the--if I understand you right, the entity that originally would come up with an evaluation and grading for Rockwell's award fee?

A. I'm not sure whether they did the grading. We can review the plan and see whether that's what it said or not.

Q. Okay.

A. I'm not sure where the grade was assigned.

A. This says that their responsibility includes commission of a draft PERB report, and the PERB was to have the proposed grading, so that would suggest that the PEC should have come up with the draft of the rating.

Q. And the PERB is the performance evaluation review board?

A. That's correct.

Q. And so the PERB would receive a

recommendation with a grading from the PEC; is that correct?

A. That's correct.

Q. And then what would the PERB do?

A. The PERB would evaluate that, decide whether it was correct or not, look at the ratings, provide a recommendation to the fee determining official.

Q. Who is you?

A. Yes, at this time.

Q. And then you would then approve, disapprove, change, or whatever the recommendation you received from the PERB; is that correct?

A. Yes. However, as I recall, in this instance, I had spent time with the members of the boards discussing their evaluation before they finished their report.

Q. So you had given--if I understand what you're saying correctly, you had given some input during the process leading up to the PERB providing you with the recommendation?

A. Yes. I had discussed what their view was and how they were coming up with their evaluation and how they were considering the different factors involved, since we were both--since I was new to the

organization.

Q. So when you received the PERB report ultimately, it came as no surprise to you?

A. That's correct.

Q. Now, going back to Exhibit 117, I would take it that this Version 5 is a draft of a report by the PEC, P-E-C?

A. Well, I can't tell that, again, which version that is. There may be--if we look through it, we can find some way to tell that, but, again, I can't tell that from this--from this memo.

Q. It's either the PEC or the PERB, right?

A. Yes. It is that--it is that report.

Q. Okay. And what adjective grade did they give under the FPA for general management under plant? Can you read that? It's in handwriting there.

A. It says "good." I don't know what the second word is. Perhaps you have a better copy.

Q. I believe it says 81 after--

A. Yes.

Q. I can't read what's after that either.

A. Yeah. 81, correct.

Q. Let me--just go through this, Mr. Simonson, with me page by page, or a few pages at a time.

was also a member of the PERB, was he not? Or not?

A. Well, depends on how you want to consider that. He was--was executive secretary and attended the meetings, participated in the discussion as he felt necessary, did a lot of the administration of pulling together the various reports, and things like that.

Q. Was his role limited to being a secretary, in contrast to someone such as Mr. Foster, listed as a PERB member?

A. Yes. There would have been a distinction there. Mr. Foster was a--had a much higher management position and would have been much more influential on determining--establishing Rockwell's performance.

Q. So Mr. Agy's role was more ministerial, as compared to a--

A. That's correct.

Q. --source of evaluation?

A. That's correct.

MR. NEY: Let me mark as Exhibit 161 another copy of this performance evaluation. This one says on it Volume 6 w/o, which I guess means "without," but maybe the witness will enlighten me. Bates numbers are E 000526 through E 000552. At the bottom it says Agy, October 13, 1989.

(Plaintiff's Deposition Exhibit 161 was

marked.)

Q. (BY MR. NEY) I'll ask the witness to review that exhibit. Do you know what the--first of all, do you know what it means, Version 6, w/o?

A. Well, I would say your assumption that it means "without" is probably a pretty good one. This version doesn't include the grades on it.

Q. Do you know why this particular version was generated?

A. No. I can tell you why it might have been generated. My view of the award fee performance evaluation was that it should include discussion with as many people as possible to make it as accurate as possible. That would have included the contractor. So there could have been a version generated without the grades for discussion of the facts with the contractor or other people even outside of the contractor, for example, Albuquerque or somebody.

Q. So--

A. In fact, we did discuss many of these facts with the contractor. I would imagine that's what this version is.

Q. So you believe that the PEC's recommendation without the adjective grades was discussed with Rockwell?

A. The--yes. Again, is it this version or a different version, I don't remember, but certainly the facts involved in the evaluation and the evaluation itself was discussed with the contractor in formal meetings.

Q. The version we did identify as the PEC's version is Volume 6?

A. Yes.

Q. Version 6?

A. Yes.

MR. NEY: Should we take a five-minute break now?

THE DEPONENT: If you like.

(A break was taken.)

Q. (BY MR. NEY) Let me show you a document that's been marked as Deposition Exhibit No. 119. It appears to be an annotated version of the performance evaluation, Version 6, without adjective grades. Do you know whose handwriting is on the first and second pages of this exhibit?

A. No, I don't. No, I don't know whose handwriting that is.

Q. Okay. Can you read the handwritten note on the right corner of the first page?

A. At the top? Yes. Yes. It says, "From

Version 7, which was not really the PEC, so I don't know which version, again, was sent to Admiral Barr.

Q. It was the version that was presented to the PERB?

A. To the PERB, so that's the way I would read this note. Yes.

Q. All right.

A. And that certainly would not have been unexpected. That would have been the standard practice.

Q. And what's your basis for saying it was standard practice?

A. If we were going to be asking for headquarters' concurrence on any action we were taking, we would--we would, as a standard practice, send it to them in a draft format for discussion ahead of time.

Q. But this is not your final recommendation, is it?

A. No. That's correct.

Q. It's still--the PERB hasn't even ruled on it yet; is that right?

A. That's correct. Again, like I said, it's standard practice if you're going to be asking for concurrence for an action from headquarters, you generally will provide them copies of the draft for

discussion.

Q. Even before you reach your own determination that you're seeking concurrence on it?

A. That's correct. That helps expedite the process.

Q. When you say "standard practice," what are you basing that on? Is that out of some manual?

A. No. It's just--

Q. Your practice?

A. Practice, that's right. That's my practice. In fact, I think the award fee plan says that happens after you've done the--that that first interaction with headquarters occurs--I don't know whether it says first action, but certainly says the formal submittal comes after the fee determining official has made his preliminary determination.

Q. Might be a little pointless, wouldn't it, to get headquarters involved early on if the final recommendation to headquarters substantially differs from earlier drafts?

A. Again, it's a practice that helps expedite the decisions and discussion.

Q. At this point in time were you reasonably confident that your recommendation would be at least close to the PEC's score?

A. Yes.

Q. Did you review the PERB report after it was submitted to you?

A. Yes.

Q. Did you ask for any of the backup that the PERB or the PEC used in coming up with their recommendations?

A. I don't recall asking for any of the backup. Again, as I discussed, I had been in several conversations and meetings with people doing the evaluation during the whole process, and I had a lot of conversations during that period of time.

Q. Going back to 000368, which is the draft of the memo to Mr. Tuck--

A. Yes.

Q. --in that draft, that has you, at least for draft purposes, approving the recommendations of your PERB; is that right?

A. That's correct.

Q. Did you believe that the PERB recommendation was a well-reasoned one?

A. Yes.

Q. Did you ultimately send it on as--the PERB recommendation as your recommendation to headquarters?

A. The recommendation that I made to

headquarters was in this--was in this range, approximately these numbers. There should be in the record an actual copy of the--of what I did recommend to headquarters.

Q. Prior to sending on your recommendation to headquarters, had you had any discussions with head-quarters about the award fee for the second half of 1989?

A. Yes.

Q. Can you enlighten me as to what those conversations entailed.

A. I had a series of conversations with Admiral Barr regarding the general evaluation.

Q. This is--I'm trying to at this point confine this to before you actually send your recommendation.

A. Yes.

Q. And what did Mr. Barr say to you in those conversations?

A. As I recall, in general terms, Admiral Barr thought this was probably a little too high, that it didn't adequately--wasn't--wasn't sufficiently critical of Rockwell's performance in the safety arena.

Q. What did you say to Admiral Barr?

A. Well, obviously I wouldn't have sent these if I didn't think they were right, and so I reiterated our view of that. And whether the conversation took place before or after we submitted this, the general tone of it was a difference as to the value of the contribution Rockwell was making to us and trying to get ourselves out of our environmental noncompliance problems versus the level of concern of their safety performance.

Q. Do you recall anything else that occurred in those conversations with Admiral Barr on the subject of the award fee prior to formally submitting your recommendation for concurrence?

A. No. That was the tone. I mean, that was the general tone of the discussion. And, of course, going along with the view of their performance, that the ES&H arena was the question as to given our difference of opinion on their performance in the ES&H arena, what did that reflect on the general management of Rockwell. So we talked about those basic areas of concern.

Q. Did Admiral Barr ever suggest in words to the effect that from a political point of view, you couldn't possibly give Rockwell a grade for environment, safety, and health for the second half of

1989 that was higher than for the first half of 1989?

A. I don't recall him suggesting for political reasons. Of course, as I mentioned to you, he wasn't--he thought we were being too generous in the environmental, safety, and health area. Admiral Barr was a--at that time had spent a fair amount of time at Rocky Flats, been out there with an evaluation team, and had a lot of his own data on the safety condition of Rocky Flats.

Q. How much time had he spent out--spent at Rocky Flats?

A. Admiral Barr? He had spent several weeks at Rocky Flats by this time.

Q. Of consecutive time, or did he come in for a day or two--

A. No. He would come in for a week or two and then go and come back for a few days and then go and come back again.

Q. And the members of the PEC and the PERB, how much time did they spend at Rocky Flats?

A. Essentially all their time.

Q. Prior to you submitting your recommendation to headquarters for concurrence, did you have conversations about the award fee with any other headquarters personnel other than Admiral Barr?

A. I don't remember any other conversations. I might have had them with Mr. Tuck or somebody, or maybe Dave Leclaire in the administrative side of the DP, but I don't--I don't recall. And clearly at that time the recommendation that was going to be made to the management back there would have come from Admiral Barr.

Q. That is who you were reporting to at that time, Admiral Barr?

A. Officially I reported to the assistant secretary, but in reality, for most things, my--Admiral Barr was the key manager in headquarters that I talked to and discussed things, and so at least informally, I reported to Admiral Barr.

Q. I'm a little confused. So who were you supposed to report to, at least from a formal point of view?

A. Formal paperwork, it was assistant secretary for defense programs.

Q. Who was that?

A. Well, a series of them during that period of time. I think that when I went to Rocky Flats, it was John Meinhardt, on an acting basis. It then became John Tuck on an acting basis. And I think during this period of time, it was Mr. Tuck.

early December sometime, so--

Q. This was before that?

A. This would have been before that, that's correct.

Q. Now, this review that Mr. Willett was performing, that was prompted by Admiral Barr; is that your recollection?

A. Well, Mr. Willett worked for Admiral Barr, so he would have taken his instructions from Admiral Barr.

Q. Let me show you another memo prepared by Mr. Agy. This one is dated November 29, 1989, and it's been previously marked as Deposition Exhibit 131. Do you recall the subject of this memo?

A. No. Again, this--as I indicated to you before, we gave copies of our reports at various times to headquarters before--before we transmitted them formally. This indicates that, in fact, did happen and is another--identifies what was done at least one time.

Q. So you see no inconsistency between Mr. Willett being tasked to review the determination for Admiral Barr, and as it's describing in Exhibit 131, that you provide Mr. Willett informally with the award fee determination package at least prior to its formal submission to headquarters?

A. No. It's consistent.

Q. Now, according to Exhibit 131, you had the award fee determination package with you while you were visiting headquarters during the week of November 13. Do you have--do you recall having the award fee package with you when you were visiting headquarters?

A. No. But, again, Willett and Admiral Barr were continuously in and out of Rocky Flats. This may be Terrel's conclusion as to when I gave that to Willett. I don't know if it's correct or not.

Q. It's based on what Mr. Barkmeier--apparently it's twice removed.

A. Yeah.

Q. Okay.

A. But, again, whether it was on November 13 or some other time, I had provided information to the headquarters people on our evaluation process and had had discussions with at least Mr. Willett's boss during that time period as well, who was Admiral Barr.

Q. Do you recall showing the award fee package to anyone at headquarters in addition to Admiral Barr and Mr. Willett?

A. I don't recall doing that. I don't even recall showing it to Mr. Willett, but I would not be surprised if I did because that would have been his

Q. Who is Jim Robbins?

A. I can't tell who Jim Robbins is.

Q. Is he in Albuquerque?

A. I don't know.

Q. And WIPP is what?

A. Waste Isolation Pilot Project.

Q. Would that have anything to do with Rockwell?

A. Minor connection that some point in time, Rock--Rocky Flats is expected to ship wastes to WIPP for ultimate disposal. And so there is some activity associated in--some activity at Rocky Flats associated with getting ready to do that and be sure that whatever waste we generate is, in fact, acceptable to the--to that facility. And there is some involvement, as a waste generator at Rocky Flats, in preparations for the initial test phase of that facility.

Q. Was there a different contractor operating WIPP at this time?

A. I believe WIPP is operated by Westinghouse. Continues to be so.

Q. If you turn to the second page that bears No. E 000273, and this indeed is the--is your transmission to Mr. Tuck.

A. Yes.

Q. The third paragraph that begins "as shown in the attachments." Do you see that?
A. Yes.
Q. Would you read that paragraph.
A. Says, "As shown in the attachments, Rockwell's performance was evaluated as equal to or less than the last period performance on all areas except two. The performance on the PRMP project improved significantly over this last period resulting in a higher award recommendation for the project. The second area of recommended higher performance rating is Environmental, Safety and Health performance area. As the evaluation indicates, the contractor's performance in the safety area continues to be unacceptable. However, this has been offset in our evaluation by the performance of Rockwell in assisting with the negotiations with EPA and the State on environmental agreements and in complying with these very aggressive agreements."
Q. Now, in Deposition Exhibit 31, which was the PERB recommendation to you, there was a draft of a transmission letter to Mr. Tuck.
A. That's correct.
Q. This paragraph that you just read was not included in that draft.

A. Yes.

Q. Do you recall any discussions as to why this paragraph should be included?

A. Yes. As I indicated before, the primary area of difference that existed between myself and Admiral Barr in our evaluation of Rockwell's performance was in the ES&H arena, and consequently, Rockwell's management performance associated with that. I felt it necessary, because of that disagreement, to clearly state why we had that disagreement and to clearly state my views on their performance in that area.

Q. Who was to make the determination as to the award fee for the period?

A. The determination is to be made by the fee determining official.

Q. But you felt it incumbent to beef up your position vis-a-vis--

A. Yes.

Q. --objections--let me finish so she gets it--objections you were receiving from Admiral Barr?

A. Yes.

Q. Now, did this entire package go to Tuck? I just want to make sure. I believe it was produced to us in this fashion. In other words--

A. That's right. This is also, of course, where the narrative ratings are turned into the actual amount of money that goes to the contractor, on these tables.

Q. And then after that, we have the formal PERB report that runs for 26 pages?

A. That's correct.

Q. And your recommended award is the same as the PERB's award; is that correct?

A. Yes. I recall those numbers are about the same. Yes.

Q. You keep saying "about the same." I believe they are the same, are they not?

A. Okay. It's just a matter of comparing them to tell, and that's easily done once we find the PERB report.

Well, the numbers that are in the letter that was attached to the PERB report are the same as in the letter that went forward, so . . .

Q. So you would--

A. They are, in fact, exactly the same.

MR. NEY: This would be a convenient time for me to break. Go off the record.

UNITED STATES CLAIMS COURT

Case No. 91-1362 C

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION DAVID P. SIMONSON
VOLUME II

December 11, 1992

Pursuant to Notice taken on behalf of the Plaintiff at 1719 Emerson Street, Denver, Colorado 80218, at 9:31 a.m., before Lori D. Porter, Registered Professional Reporter and Notary Public within Colorado.

Q. Now, would you regularly have communications with Mr. Willett with respect to any findings he was making or questions that he might have as head of the RAT team?

A. Yes. I would have had regular communications with Mr. Willett.

Q. And this would cover the period of time that the RAT team was in existence?

A. Yes.

Q. And do you recall any comments that Mr. Willett may have made to you with respect to Rocky Flats, any specific comments as we sit here today?

A. No, I don't.

Q. I believe you testified yesterday that before you submitted the Rockwell award fee to headquarters for concurrence, that you provided that recommendation to Mr. Willett to review on behalf of Admiral Barr; is that correct?

A. I think the--some of the documentation we looked at yesterday indicated that was the case. Again, I recall discussing it with Admiral Barr. I don't recall discussing it with Lou, but it's quite likely that Lou would have had it because of his position.

Q. Let's talk--go to your discussions with

Admiral Barr before you submitted the award fee for concurrence, I believe on December--it's dated December 6, 1989.

A. Correct.

Q. Did you have more than one conversation with Admiral Barr?

A. I remember a series of conversations.

Q. And I believe you testified yesterday that Admiral Barr expressed some disagreement with the PERB and your award fee evaluation at that time?

A. That's correct.

Q. And he thought you were being too high in the award fee that you were proposing for Rockwell?

A. That's correct.

Q. Can you give me any specifics that you recall that Admiral Barr might have provided to you as to why he thought you were being too high?

A. There was at the time we were going through this process a team of safety experts that were at Rocky Flats from headquarters and other offices and contractor people reviewing the--doing a detailed review of the safety position at Rocky Flats. Admiral Barr would have been giving me feedback from what that--what those teams were finding.

Q. Were those--would you communicate directly

with those teams?

A. I did occasionally, yes.

Q. So were you knowledgeable of the safety team's findings independent of what you were being told by Admiral Barr?

A. Yes.

Q. And do you recall specifically what Admiral Barr might have said with respect to these safety teams?

A. No. There was--not specifically, other than the discussions were in the general areas of the quality of the conduct of operations at the plant and the quality of the maintenance activities at the plant.

Q. Do you recall anything specific about the quality of the conduct and quality of the maintenance?

A. No. It was--there were concerns about the--whether the operators were following procedures, whether they had adequate procedures, whether they had adequate design documentation to support the procedures, whether the surveillances were being done--the surveillances of the safety systems were being done with adequate rigor. As I mentioned, it was concerns about the quality of the maintenance activities at the plant.

Q. Now, in addition to comments that Admiral

Barr may have made in connection with the safety teams--

A. Yes.

Q. --that you just testified to, do you recall specifically any other comments that Admiral Barr would have made in this time period prior to your submission of the award fee to headquarters?

A. No, I don't.

Q. Now, did you--strike that, please. In making the determination, as manager of Rocky Flats, as to the proposed award fee for Rockwell for the second half of fiscal year 1989, did you take into consideration at this time the comments that you received from Admiral Barr?

A. Yes.

Q. And as you testified yesterday, you nonetheless submitted on December--I believe December 6, the award fee that had been determined by your PERB and, I guess, embraced by you at that time; is that correct?

A. That's correct.

Q. Let me show you a document that's previously been marked as Plaintiff's Deposition Exhibit No. 81. It's a memorandum from Hugh Miller directed to you on the subject of award fee, Rockwell,

A. I'm not sure who all would have been on that concurrence.

Q. But you believe it would have been headquarters personnel in addition to Mr. Tuck?

A. Yes.

MR. NEY: Let me mark as Exhibit 169 a one-page document bearing Bates No. E 001840. It would appear to be from Robert D. Quinn, Q-u-i-n-n. Next to his name it says EH-232/3G-092.

(Plaintiff's Deposition Exhibit 169 was marked.)

Q. (BY MR. NEY) Is EH Environment, Health?

A. Yes. Yes.

Q. Note for the record that this document has a received date indicated at the bottom of December 15. At the top there's a fax stamp date of December 28, 1989. Have you ever seen this document before?

A. I don't recall ever seeing this document.

Q. The reference line to the document says Proposed Award Fee Determination for Kansas City, Mound, Pantex, Pinellas--that is P-i-n-e-l-l-a-s--and Rocky Flats. Below that it says, "EH-232 has reviewed the referenced packages and recommends EH-1 concurrence on all determinations except Pinellas." Who or what is

EH-232?

A. EH-232 is one of the organizations within the Environmental, Safety, and Health organization at headquarters. I can't tell you which one that is.

Q. And what about EH-1?

A. EH-1 would have referred to the assistant secretary for Environmental, Safety, and Health.

Q. There's also at the bottom of this single page a handwritten notation. Can you read that for the record, please.

A. "I am also concerned about the RF's rating for Rockwell in the ES&H area. I don't believe Rockwell's environmental performance was so good to offset safety deficiencies and some." That's how I read that. "Safety deficiencies. We should consider"--

Q. "Holding"?

A. "We should consider holding Rockwell to previous levels" is the way I would read that.

Q. Then it is signed?

A. It goes on to say, "I agree."

Q. Looks like there's a signature underneath that.

A. Yes. I don't know--I can't--I have no idea whose signature that is.

Q. Perhaps John?
A. Perhaps. Again, I can't really.
Q. Okay. Then underneath that--
A. Is another note that says, "I agree" with some initials, dated 12-26. I can't tell whose initials those are. Looks like the last letter is a B, but I can't--I can't tell who those are.
Q. Did you ever discuss Rockwell's award fee with Mr. Quinn?
A. I don't recall whether I discussed the award fee with Mr. Quinn or not.
Q. How about--
A. I don't recall any such discussions.
Q. How about John C. Tseng, T-s-e-n-g?
A. I don't remember any specific discussions with John Tseng regarding Rockwell's award fee.
Q. And Raymond P. Berube, B-e-r-u-b-e?
A. I don't remember any specific discussions with Mr. Berube regarding the award fee for Rockwell.
Q. What about Mr. Bush, Peter Bush?
A. No.
Q. And all of these individuals I've just indicated are headquarters individuals?
A. Tseng, Berube, Bush, Quinn are all headquarters individuals.

Willett (both of DP-20) on January 11, 1990, but that it was--but that it pretty much was decided on already. The headquarters changes were going to be forced on us." Who is Mr. Arendale?

A. I don't recall an Arendale at the moment.

Q. Now, according to the memo, at least, they were both of DP-20, so that would mean, if that's correct, that Mr. Arendale was on Admiral Barr's staff?

A. Yes.

Q. Now, do you recall on or around January 11, 1990, having a meeting with or a discussion with Messrs. Arendale and Willett on the subject of reducing the award fee?

A. I don't recall any particular conversation.

Q. Do you ever recall having a discussion with Mr. Arendale?

A. I can't recall right now who Mr. Arendale is, so I cannot recall any particular conversations with him. It may come back later as we talk.

Q. Let me show you a document that's been marked already as Plaintiff's Deposition Exhibit No. 136. It's entitled on the first page Summary Memorandum and has typed at the bottom John C. Tuck,

Under Secretary. There's an enclosure to the document that at the end of it says--has typed on it Admiral Barr's title and indicates that a copy was given to Mr. Simonson. Have you seen this document before, sir?

A. In my discussions with Admiral Barr, I can recall seeing drafts of similar documents. Whether it's this specific one or not, I cannot remember, but certainly documents similar to this.

Q. There's a handwritten note at the bottom right of the first page, the page that has the stamped No. E 000265, that states that "Received from Admiral Barr to Simonson on 1-11-90 (hand carried)." Does that at all refresh your recollection?

A. That would suggest that Admiral Barr gave this to me.

Q. And it's your testimony that you do recall receiving documents similar to this?

A. Yes.

Q. Although it may not necessarily be this exact document?

A. That's correct. That's correct.

Q. Okay. On the first page it states the issue. Do you see that?

A. Yes.

Q. Read for the record what the issue is.

A. The issue is stated as, "Should RI's award fee be reduced from $4,176,077 to $2,931,278?"

Q. RI is Rockwell International?

A. Yes.

Q. Would you read the paragraph entitled Discussion.

A. The paragraph reads, "A decrease is recommended in the award fee for RI as proposed by the Award Fee Determining Official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 30 percent lower than that proposed by the AFDO, and in our estimation more accurately reflects the level of performance of RI during the rating period. Specifically, we have recommended a total fee (award fee plus base fee) of $2,931,278 as compared to the award fee determining official recommendation of $4,176,077."

Q. Now, this page that you've been reading from at the bottom says John C. Tuck, under secretary.

A. Yes.

Q. And at the top, under--I guess under what says, Originating Office, it says DP-231, (M. Arendale). Do you see that?

A. Yes, I do.

Q. Can you explain to me the relationship in this memorandum between Mr. Arendale and Mr. Tuck?

A. Mr. Arendale is a member--apparently a member of the staff of DP-231, which is part of DP-20, which is Mr.--I believe which is, I believe, Admiral Barr's organization at the time. Mr. Barr, as the head of that organization, would have reported to the assistant secretary for defense programs, who I believe was Mr. Tuck acting in that position.

Q. So is--

A. Mr. Tuck also at the same time was, in fact, the under secretary.

Q. I'm just trying to understand the form of this memorandum. Is Admiral Barr's office in this summary memorandum requesting the concurrence of John C. Tuck, or is John C. Tuck requesting the concurrence of somebody else?

A. This memorandum would have been written where Mr. Tuck was requesting the concurrence of somebody else--I mean, or requesting the agreement or concurrence of somebody else. And that's--

Q. Now, what is the significance, then, of Mr. Arendale's name on it? Did he draft this for Mr. Tuck? Is that what it means?

A. That would be the appearance of it, yeah.

I mean, that's correct. I mean, I think that's correct.

Q. Now, it says at the top, "Secretarial Action Requested By:" Does that mean Mr. Tuck is requesting the concurrence of the secretary?

A. This is addressed to the deputy secretary as to--so that's the action--that's the person whose action Mr. Tuck is requesting.

Q. I see. The deputy secretary.

A. Yes.

Q. So Mr. Tuck is requesting the approval of the deputy secretary?

A. Yes.

Q. Who was that at the time?

A. Henson Moore.

Q. Okay. If you'd turn in this document to the page that's bears Bates No. E 000269. Do you see that?

A. Yes.

Q. And at the table at the top, it sets forth the AFDO's award fee for the plant. Do you see that?

A. Yes.

Q. And how much is that?

A. The total is listed as $4,176,077.

Q. Just the award fee.

A. Just the award fee is 3,743,200--

Q. Just for the plant.

A. I'm sorry. For the plant itself, which is in--is in--the award fee for the plant is listed as $3,114,200--$3,114,245.

Q. And that would have been the plant award fee contained in your December 6 submission; is that right?

A. Yes.

Q. And moving to the right on that column, what is--there's a number for what headquarters is recommending for the award fee for the plant.

A. Yes.

Q. And how much is that?

A. $2,160,393.

Q. And would you give me the same figures for PRMP/PROVE. First, what was the AFDO award fee for PRMP/PROVE?

A. $628,982.

Q. And what was the headquarters award fee for PROVE?

A. $338,035.

Q. And if you go to the very next page that bears Bates No. E 000270, there's a figure which would represent the award fee for the plant recommended by

the AFDO for the six-month period of the second half of 1989. I'm looking now at the numerical grade. Do you see what that is?

A. Yes.

Q. What is that?

A. For the plant, would have been 85.55 percent.

Q. And what was the headquarters grade for the plant?

A. 82.19.

Q. And looking at the functional performance areas, can you see the changes that headquarters was recommending versus what was in your award fee?

A. Yes.

Q. And where were their changes?

A. Changes in the general management.

Q. And what were the score changes?

A. The rating for general management recommended by the AFDO was 81. The headquarters recommended rating was 77.75.

Q. And is there a change--another change?

A. There is a change in the ES&H. The AFDO number for ES&H was 78, and the headquarters recommended rating was 65.25.

Q. Do you know how the 65.25 compares to the

ES&H rating for the first six-month award fee period in 1989?

A. Yes.

Q. And what is that?

A. Yes. That is listed on this chart also in the column called the Previous 6 Month Rate and is shown as 65.25 percent.

Q. And if you go to the last page on this document that bears Bates No. E 000271, can you tell me what the changes in the functional performance areas were for PRMP/PROVE from what you proposed and what headquarters was proposing.

A. Yes. In this case, there are several proposed changes. Project management, the AFDO number was 91. The headquarters recommended rating was 80. In schedule performance, the AFDO proposed rating was 90. The headquarters recommended rating was 85. In design quality, the AFDO recommended rating was 91. The headquarters recommended rating was 80. In technical product quality, the headquarters--the AFDO rating was 91. The headquarters recommended rating was 80.

Q. Thank you. You say you recall receiving some version of this memo similar to this.

A. Yes.

Q. Would those versions have had a proposed 30 percent reduction in the award fee?

A. In that ballpark, yes.

Q. Did you agree with that at the time you saw them?

A. No.

Q. Let me show you a document that bears Bates Nos. E 000240 through 246. These pages were part of, I believe, a somewhat larger document that's previously marked as Deposition Exhibit No. 138. And I'd ask you if you recall seeing this document before, Mr. Simonson.

A. You indicated this was an attachment to another exhibit? Have I seen that other exhibit?

Q. I don't believe so. I'll hand you now the full exhibit that's been marked as Exhibit 138. I'll note for the record that it's exactly what you have before you, except there are two pages that go before what I just handed to you that bear Bates Nos. E 000238 and 239.

A. I can recall discussions with members of my staff regarding this type of information. Whether I saw this exact assessment or not, I can't recall.

Q. Do you recall seeing a written analysis of the headquarters recommendation vis-a-vis your

Exhibit 170 the same as we previously talked about in Exhibit 136?

A. No.

Q. And what was the Rockwell award fee in Exhibit 136 that Mr. Tuck was proposing?

A. The issue in that draft--the issue in that draft memorandum states that the award fee would be reduced to $2,931,278.

Q. And what's he proposing in Exhibit 170?

A. $2,012,489.

Q. Now, would you read the paragraph titled Discussion on Exhibit 170.

A. Yes. "A decrease is recommended in the award fee for RI as proposed by the award fee determining official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 52 percent lower than that proposed by the AFDO and, in our estimation, more accurately reflects the level of performance of RI during the rating period. Specifically, we have recommended a total fee (award fee plus base fee) of $2,012,489 as compared to the AFDO recommendation of $4,176,077. For the previous 6-month period, RI was awarded a total fee of 3 million 336 million dollars and--$3,336,065 (see attachment 1 for comparison)."

Q. In Exhibit 170, Mr. Tuck says he's proposing a reduction of approximately 52 percent; is that correct?

A. That's correct.

Q. And what was the percentage reduction that he was proposing in Exhibit 136?

A. Approximately 30 percent.

Q. And I believe you testified earlier this morning that you disagreed with Mr. Tuck's proposal of approximately 30 percent reduction as shown in Exhibit 136; is that correct?

A. That's correct. Again, I would like to point out that this is an unsigned memo from Tuck. I don't know whether it represented his position or simply the position of Mr. Arendale and Admiral Barr.

Q. Did you agree with the proposed 52 percent reduction set forth in Deposition Exhibit 170?

A. By that time I was no longer the fee determining official, so there was no--I wasn't asked to agree or disagree with it.

Q. Did you have a view?

A. Yes.

Q. Did you agree with it?

A. No.

Q. And Mr. Nelson at this point in time--at

we had the--a determination made that was different than our previous determination and what were the administrative steps we needed to carry out to do that.

Q. And what do you recall about those discussions?

A. Again, we were talking about what our--I recall a conversation about what we should do with things like the PERB report, clearly a piece of that, although there was really no decision to be made. You do have to write a determination letter, but that is not a decision to do that or not to do that. The process requires that that be done.

Q. And in connection with the PERB report, do you recall--I take it you're saying you recall discussions that there was no reason to change the existing PERB report?

A. As I recall, we decided that we did not need to change the existing PERB report.

Q. Do you recall any discussions about not going along with Mr. Tuck's action item, February 22, 1990?

A. No, I don't. And, again, at this period of time, it wouldn't have been my decision. It would not have been my decision, would not have been a subject of conversation for me.