PL. SUPP. EX. 59

United States Government

# memorandum

**Department of Energy**
**Albuquerque Operations Office**
**Rocky Flats Area Office**

DATE: October 6, 1989

REPLY TO ATTN OF: ADM:TA

SUBJECT: Award Fee Evaluation/Determination - Second Half FY89

Plaintiff/Defendant Deposition Exhibit 27
Case # 91-1362 C
Date 10-23-92
Hyatt & Associates, Inc. 073

TO: Assistant Managers
PRMP Project Manage
Chief Counsel
Division Directors

Distribution 10/6/89
Memo - AF Evaluation/Determination

Simonson (Information Copy)
Currier
Barkmeier
Werkema
Foster (3)
Riley
Witherill
O'Brien
Roberts
Miller
Agy

We have reached an … rd fee
determination proce… ugh September 30,
1989. Although we … nded evaluation
of Rockwell to AL f… ion will take
place at Rocky Flat… Determination
Official. The loca… ollow the same
Performance Evaluat… eriod October 1,
1989 through March … EP is attached
for your informatio…

Changes in the sche… e as follows:

1. Tuesday, Octobe… the final meeting
of the RF Performan… Directors should
plan to attend this … t of the
evaluation is attac…

2. Wednesday, Octo… ation will be
forwarded to AL Ass… mment. The
Executive Secretary … the PEC and
prepare the trasnmit… e due to RF by
October 20, 1989.

3. Thursday, Octob… agement will be
held to discuss the

4. Friday, October … l meet and
finalize their recommendation to the Manager. Both AL Assistant Managers and Directors will be invited to this meeting.

Questions about the meetings or about the award fee evaluation process can be directed to Hugh Miller or Terrel Agy.

Claude H. Barkmeier
Claude H. Barkmeier
Director
Division of Administration

Attachments (2)

cc w/attch
D. P. Simonson

E 000704

United States Government

Department of Energy

# memorandum

Albuquerque Operations Office

Rocky Flats Area Office

DATE: October 6, 1989

REPLY TO ATTN OF: ADM:TA

SUBJECT: Award Fee Evaluation/Determination - Second Half FY89

TO: Assistant Managers
PRMP Project Manager
Chief Counsel
Division Directors

We have reached an agreement with AL concerning the award fee determination process for the period April 1, 1989 through September 30, 1989. Although we will submit a draft of an RF recommended evaluation of Rockwell to AL for comment, the award fee determination will take place at Rocky Flats and the RF Manager will be the Fee Determination Official. The local process for this evaluation will follow the same Performance Evaluation Plan (PEP) as approved for the period October 1, 1989 through March 31, 1990. A copy of Part I of the PEP is attached for your information.

Changes in the schedule issued on September 21, 1989 are as follows:

1. <u>Tuesday, October 10, 12:30 - 2:30 pm</u> This will be the final meeting of the RF Performance Evaluation Committee (PEC). All Directors should plan to attend this meeting. A copy of the latest draft of the evaluation is attached.

2. <u>Wednesday, October 11</u> The PEC evaluation recommendation will be forwarded to AL Assistant Managers and Directors for comment. The Executive Secretary will make the changes requested by the PEC and prepare the trasnmittal to AL. Comments from AL will be due to RF by October 20, 1989.

3. <u>Thursday, October 12</u> Discussions with Rockwell Management will be held to discuss the preliminary evaluation.

4. <u>Friday, October 27, 1:30 - 3:00 pm</u> The RF PERB will meet and finalize their recommendation to the Manager. Both AL Assistant Managers and Directors will be invited to this meeting.

Questions about the meetings or about the award fee evaluation process can be directed to Hugh Miller or Terrel Agy.

Claude H. Barkmeier
Claude H. Barkmeier
Director
Division of Administration

Attachments (2)

cc w/attch
D. P. Simonson

U.S. DEPARTMENT OF ENERGY
ROCKY FLATS OFFICE
GOLDEN, CO

# PERFORMANCE EVALUATION PLAN

FOR

ROCKWELL INTERNATIONAL CORPORATION

CONTRACT NO. DE-AC04-76DP03533

## PART I OF II

## BASIC PLAN

EVALUATION PERIOD: OCTOBER 1, 1989 THROUGH MARCH 31, 1990

# PART I

## CONTENTS


| Paragraph | | Page |
|---|---|---|
| A. | Introduction | 1 |
| B. | Organizational Structure for Award Fee Administration | 2 |
| C. | Method for Determining Award Fee | 5 |
| D. | Changes in Plan Coverage | 8 |
| E. | General Instructions For Performance Evaluation Committee (PEC) and Performance Monitors (PMs) | 9 |
| Attachments A - E | | 11 |
| Glossary and Summary of Acronyms | | 19 |

# PERFORMANCE EVALUATION PLAN

# CONTRACT NO. DE-AC04-76DP03533

## A. INTRODUCTION

1. This Performance Evaluation Plan (PEP) covers the administration of the award fee provisions of Contract No. DE-AC04-76DP03533, effective October 1, 1989, with Rockwell International Corporation.

2. The Contractor is required to manage, operate and maintain existing and new facilities of the U.S. Department of Energy (DOE) known as the Rocky Flats Plant, situated in Jefferson County, Colorado and Oxnard, California in accordance with the Scope of Work contained in the Contract and as may be directed by the Contracting Officer. The term of the Contract is from July 1, 1975 through December 31, 1993.

3. The objective of the award fee provisions of the Contract is to afford the Contractor an opportunity to earn increased fee commensurate with the achievement of optimum Contract performance. Optimum performance is not necessarily equated with the highest level of performance achievable in all incentivized areas. Rather, it represents the most favorable degree of performance obtainable in light of the Contractor's most effective utilization of available resources. (See the note on Attachment B, Grading Table.) The Department expects the Contractor to exceed minimum performance standards and equates this level of performance with a good performance rating. In addition to providing special management emphasis to the Performance Objectives and Criteria identified in this Plan, the Contractor is responsible for striving to attain the highest standards of excellence in executing its responsibilities under the Contract as measured against performance standards consistent with best available practices. The Contractor is expected to have a strong self-assessment program to measure progress against the standard of excellence. The Contractor will receive favorable ratings for identifying problems to DOE, and developing and implementing corrective actions.

## B. ORGANIZATIONAL STRUCTURE FOR AWARD FEE ADMINISTRATION

1. Fee Determination Official (FDO)

a. The FDO is the Manager, Rocky Flats Office (RF), his/her successor or assignee.

b. Primary FDO responsibilities are:

(1) Establishing this Performance Evaluation Plan.

(2) Determining the award fee earned and payable for each evaluation period as addressed in Paragraph D.

(3) Changing the matters covered in this Plan as addressed in Paragraph D., as appropriate.

(4) Appointing the Performance Evaluation Review Board (PERB) Chairperson.

2. Performance Evaluation Review Board (PERB)

a. Membership of the PERB shall consist of the Assistant Managers, the Plutonium Recovery Modification Project Manager and the Director, Division of Administration. The PERB Chairperson will be appointed by the Manager. The RF Chief Counsel and the Chief, Contracts and Services Branch, shall serve as non-voting advisors to the PERB. The Contract Administrator within the Division of Administration shall serve as Executive Secretary.

b. Primary responsibilities of the PERB are:

(1) Reviews and recommends the Performance Objectives and Criteria to the FDO.

(2) Reviewing the evaluation reports of the Performance Evaluation Committee (PEC) and functional evaluations regarding Contractor performance.

(3) Conducting independent, ongoing evaluations of Contractor performance.

(4) Submitting a PERB Report to the FDO covering the Board's findings regarding performance and containing a recommendation of fee earned for each evaluation period. The Report to the FDO shall include all minority opinions or reports.

(5) Considering proposed changes to this PEP and recommending those it considers appropriate to the FDO for incorporation into the PEP.

3. <u>Performance Evaluation Committee (PEC)</u>

a. Membership of the PEC will consist of the Division Directors with the Director, Division of Administration serving as Chairperson. The Chief, Contracts and Services Branch, shall serve as a non-voting advisor to the PEC and the Contract Administrator shall serve as Executive Secretary. The Albuquerque Operations Office (AL) may provide a voting representive to serve on the PEC.

b. The PEC will be responsible for complying with the General Instructions for the Performance Evaluation Committee and Performance Monitors set forth in Paragraph E of this PEP. Primary responsibilities of the PEC are:

(1) Prepare for each six month evaluation period a Draft Performance Objectives and Criteria stipulating requirements upon which performance will be assessed.

(2) Monitoring, evaluating and assessing the Contractor's performance in the Performance Objectives and Criteria set forth in Part II of this PEP.

(3) Meeting with the Contractor at least quarterly during each evaluation period to discuss the Contractor's performance relative to the established Performance Objectives and Criteria.

(4) Submission of a draft PERB Report, in the format specified in Attachment D, to the PERB at the end of each evaluation period for the Functional Performance Areas for the period. The draft PERB Report to the PERB shall include all minority opinions or reports. Evaluation input from AL Division Directors is to be

considered by the PEC members in preparation of the draft PERB Report.

(5) Recommending appropriate changes to this Plan to the PERB.

4. Performance Monitors (PMs)

a. Each Performance Evaluation Committee member shall be supported by Performance Monitors (PMs) who shall be Branch Chiefs supported by Staff members who have expertise relative to the Performance Objectives and Criteria set forth for the PEC to evaluate.

b. Primary responsibilities of PMs are:

(1) Recommending Performance Objectives and Criteria for areas important to the success of the RF mission.

(2) Monitoring, evaluating and assessing the Contractor's performance on the Performance Objectives and Criteria assigned to the PM.

(3) Consulting with other RF personnel, as appropriate, regarding the Contractor's performance in aspects of performance within a Performance Objective and Criteria which are not within the PM's expertise or have not been directly observed by the PM.

(4) Providing input, in a format specified by the PEC Chairperson, documenting the Contractor's performance within assigned Performance Objectives and Criteria.

(5) Recommending appropriate changes to this PEP to the PEC Chairperson.

C. METHOD FOR DETERMINING AWARD FEE

A determination of the award fee earned for each six-month evaluation period is scheduled to be made by the FDO within forty-five working days after the end of each period. The method to be followed in monitoring, evaluating, and assessing Contractor performance during the period, as well as for determining the award fee earned, is described below.

1. Five calendar days after the end of each evaluation period the Contractor shall provide a written, candid self-assessment of performance during the evaluation period. The self-assessment shall address both the strengths and weaknesses of the contractor during the evaluation period. Where deficiencies are noted, the contractor shall describe the actions planned or taken to correct such deficiencies and avoid their recurrence. The self-assessment should clearly assess the Contractor's measured performance against the standard of excellence. An original and 12 copies of the self-assessment will be provided to the PERB Chairperson for distribution to PERB members and to the PEC.

2. The PEC, PERB, and FDO shall evaluate the Contractors self-assessment and consider its realism as part of their evaluation of the Contractor's performance. An unrealistic self-assessment will result in lower award fee determinations. The contractor will not be penalized for a realistic self-assessment, although deficiencies noted by the contractor may be reflected in the government's evaluation. The self-assessment itself will not be the basis for the award fee determination.

3. The PEC, utilizing all available inputs, shall evaluate the Functional Performance Groups identified in Part II of this Plan based upon the Performance Objectives and Criteria set forth therein. The PEC shall submit a draft PERB Report to the PERB at the end of each evaluation period.

4. Not all areas of performance included in the Contract Statement of Work are covered under the Functional Performance Groups identified in Part II. Each RF Division Director who is responsible for a function not covered under a Functional Performance Group shall submit an evaluation of the Contractor's performance within the function to the PERB at the end of each award fee period. These evaluations shall be based upon good business practices, sound

management principles and adherence to generally accepted standards and procedures consistent with best available practices. These functional evaluations shall be considered as supplemental information by the PERB in their fee recommendation to the FDO. Generally, only significant variations in performance, either exceptionally good or poor, within a functional area will impact the PERB's award fee recommendation and the final fee determination by the FDO.

5. Each PEC member shall meet with the Contractor at least quarterly to discuss the Contractor's performance. These meetings shall be held within twenty working days after the end of each evaluation period.

6. After the end of the evaluation period the PERB will meet and consider all appropriate performance information it has obtained. The PERB Chairperson will then finalize the PERB Report for the period and submit it to the FDO. The Report will include a recommended award fee with supporting documentation and all minority opinions or reports.

7. The FDO will consider the PERB Report and discuss it with the PERB and other personnel, as appropriate. If requested by the Contractor, or if the FDO considers it appropriate, the FDO will meet with the Contractor for discussions. If requested by the FDO, the PERB and any other personnel involved in performance evaluation may be required to attend the meeting with the Contractor.

8. The FDO will determine the amount of award fee earned during the period. While it is recognized that the basis for determination of fee shall be the evaluation in accordance with the PEP, the FDO may rely upon the information provided by the PERB and PEC, as well as any other reports, including the Contractor's self-assessment or supplement this information with personal knowledge (or any other factors and information deemed appropriate) in determining the award fee earned. In the event that the FDO determines the contractor's performance to be unacceptable in any important area, critical to contract performance - whether or not that area is specified in the Performance Evaluation Plan, the FDO may at his/her discretion determine the contractor's overall performance to be unacceptable, and accordingly may withhold the entire award fee. The FDO's determination of the amount of award fee earned will be provided in an Award Fee Determination Statement (AFDS) letter to

the Contractor. Prior to the issuance of the AFDS, the FDO will brief the Assistant Secretary for Defense Programs (ASDP) and obtain his/her concurrence.

9. The following is a summary of the principal actions involved in determining the award fee for each evaluation period.

| Action | Schedule |
|---|---|
| 1. FDO provides Performance Evaluation Plan to Contractor. | Minimum of thirty calender days prior to start of the performance evaluation period. |
| 2. PM and PEC Members monitor performance. | Ongoing after start of period. |
| 3. PM's submit input to Division Directors (PEC); Division Directors input functional evaluations. | 5 working days after mid-point and end of period. |
| 4. Contractor submits self-assessment report. | 5 working days after end of evaluation period. |
| 5. DOE HQ ASDP and ASEH submit input to PERB. | 15 working days after end of evaluation period. |
| 6. PEC develops evaluation position; PEC RF members meet with Contractor to discuss findings and positions; PEC prepares draft PERB Report. | 20 working days after end of evaluation period. |
| 7. PERB evaluates draft PERB Report and submits recommendation to the FDO. | 30 working days after end of evaluation period. |
| 8. FDO develops fee position and obtains ASDP concurrence. | 40 working days after end of evaluation period. |
| 9. FDO sends AFDS to Contractor. | 45 Working days after end of evaluation period. |

## D. CHANGES IN PLAN COVERAGE

### 1. Right to Make Unilateral Changes

As authorized in Clause 62, Allowable Costs, Base Fee and Award Fee, paragraph (b)(2) Determination of Award Fee of the Contract, any matters covered in this Plan may be changed unilaterally by the FDO prior to the beginning of an evaluation period by timely notice of at least thirty calendar days to the Contractor in writing. The changes will be made without formal modification of the Contract.

### 2. Method for Changing Plan Coverage

The following is a summary of the principal actions involved in changing Plan coverage.

| | Action | Schedule (Calendar days) |
|---|---|---|
| 1. | PEC submits proposed changes to PERB. | 50 days prior to end of evaluation period. |
| 2. | PERB drafts proposed changes. | Ongoing. |
| 3. | PERB Coordinates proposed changes with Contractor. | Ongoing. |
| 4. | PERB submits recommended changes to FDO. | 40 days prior to end of each evaluation period. |
| 5. | FDO notifies Contractor of changes or that there are no changes. | 30 days before start of applicable evaluation period. |

## E. GENERAL INSTRUCTIONS FOR PERFORMANCE EVALUATION COMMITTEE (PEC) AND PERFORMANCE MONITORS (PM)

### 1. Monitoring and Assessing performance

The basic concept of CPAF Contracting is that Contractors are encouraged to work effectively to meet objectives, to control costs, and to assure the timeliness and quality of performance. In establishing the amount of the award fee to be paid the Contractor through periodic evaluations, RF will in essence determine the degree to which the Contractor has met these goals. The evaluation process consists of (1) formal semi-annual reviews of the Contractor's performance by the PEC; (2) semi-annual reviews of the evaluation reports and recommendations of earned fee by the PERB; and, (3) final award fee determination by the FDO. The evaluation process initiates with the PEC utilizing input from the PM's and from AL. The PEC is responsible for monitoring, reviewing and evaluating the Contractor's performance against established criteria, including adherence to generally accepted standards of practice and standard operating procedures, and translating these evaluations into draft reports for the PERB. The PEC will also utilize all available performance information (e.g., audits, appraisals, task force reports, etc.) as sources of input to their reports and will include an evaluation of the realism of the Contractor's self-evaluation in making their recommendation. The evaluation will also appraise a combination of the Contractor's diligence in developing written procedures for all aspects of the Contractor's operation and the degree of adherence of these procedures by the Contractor's employees.

### 2. Documenting Evaluation/Assessment

a. Performance monitors shall provide their input to the appropriate PEC members. PEC members shall be responsible for drafting the PERB Report after considering all available data including the performance monitor input and the contractor's self-assessment. The PEC will provide this documentation together with a fee recommendation to the PERB. The PERB will finalize the draft report and fee recommendation for submission to the FDO. The FDO will issue an Award Fee Determination Statement.

b. Copies of all official PM/AL/PEC evaluator documentations of evaluations and assessments shall be attached to the PEC Report as back-up information. This will permit the Award Fee Executive Secretary to maintain a complete history of the Contractor's performance during the evaluation period. If an evaluation or assessment identifies a problem or deficiency within a functional area, a copy must immediately be provided by the PEC/PM to the division director responsible for the functional area in order for appropriate performance direction to be issued.

c. All award fee documentation, including AL and PM evaluation reports, draft PERB and PERB Reports, shall be stamped or marked "PREDECISIONAL". The Award Fee Determination Statement provided to the Contractor is considered a public document and is releasable to the general public.

# ATTACHMENT A TO PEP

CONTRACT NO. DE-AC04-76DP03533

## AWARD FEE EVALUATION PERIODS

| No. | Period Covered |
|---|---|
| 1 | October 1, 1989 - March 31, 1990 |
| 2 | April 1 - September 30, 1990 |
| 3 | October 1, 1990 - March 31, 1991 |
| 4 | April 1 - September 30, 1991 |
| 5 | October 1, 1991 - March 31, 1992 |
| 6 | April 1 - September 30, 1992 |
| 7 | October 1, 1992 - March 31, 1993 |
| 8 | April 1 - September 30, 1993 |

# ATTACHMENT B TO PEP

## CONTRACT NO. DE-AC04-76DPO3533

### GRADING TABLE

| ADJECTIVAL GRADES | NUMERICAL GRADES | DESCRIPTIONS |
|---|---|---|
| OUTSTANDING | 96-100 | Performance exceeds standard by a substantial margin; with few elements for improvement, all of which are minor. Of exceptional merit; exemplary performance in a timely, efficient and economical manner. No notable deficiencies. |
| EXCELLENT | 86-95 | Performance exceeds standard. Some notable achievements exist. Although there may be some elements for improvement, these are more than offset by better performance in other elements. Fully responsive to contract requirements. |
| GOOD | 76-85 | Performance is standard in meeting the general requirements placed upon contractor. Areas of deficient performance are offset by areas of above standard performance. |
| MARGINAL | 61-75 | Performance is less than standard; and, although there are elements of standard-or-better performance, these are more than offset by lower graded performance in other elements. |

UNSATISFACTORY 0-60

Performance is significantly below the standard and requires immediate corrective action. There are many areas of poor performance and management. Satisfactory areas are more than offset by significant deficiencies.

Important Note:

The Department expects the Contractor to perform at the highest levels of excellence; however, the standard anticipated level of rating of a qualified, competent and successful Contractor is Good. This corresponds to a numerical rating of 80 points on the rating scale and to earning fifty percent (50%) of the available award fee pool dollars. Performance points will reflect deviations from this standard in the direction of either better or worse performance. Performance ratings above the standard level will reflect the extent to which the Contractor, on its own initiative, is actively involved in performance improvement activities and the extent to which these actions contribute to more efficient, effective, and economical operations. However, a rating above standard (80 points) may be justified by a high level of sustained performance where further improvements in performance would not be cost effective.

The Department expects the Contractor to exercise due diligence in the conduct of all Contract activities. It is expected that management systems will be in place and enforced to assure that effective procedures are developed and implemented. The Contractor's failure to oversee, through acts of commission or omission, the conduct of its operations and all of its employees, which potentially or actually causes property damage, losses, endangers the safety, health or environment, or compromises the ability of the Department or RF to carry out its mission, will be weighed heavily in the performance ratings. By the same standard, the performance ratings will not be adversely affected if the Contractor raises safety issues to the appropriate DOE Assistant Secretary, or his/her designee, for resolution. Furthermore, the performance ratings will not be adversely affected if the Contractor stops an activity which is deemed unsafe even though the Contractor's action may appear to be contrary to DOE direction.

A performance rating below 60 points for total performance, or within a single functional area, is a matter of grave concern to the Department. This is particularly true in the Environment, Safety and Health performance or functional area(s), where inadequate levels of performance could cause immediate and detrimental impact upon public health and safety, and could result in unacceptable programmatic impacts. Similarly, inadequate levels of performance in other functional areas, such as production, operations or construction, could have unacceptable programmatic effects potentially impacting national security. For these reasons, if a performance area or a functional area is rated "unsatisfactory," the FDO may determine that no award fee payment will be made to the Contractor.

ATTACHMENT C TO PEP
CONTRACT NUMBER DE-AC04-76DP03533

AWARD FEE CONVERSION CHART

| PERFORMANCE POINTS | | PERCENT OF AVAILABLE AWARD FEE |
|---|---|---|
| 100 | | 100.0 |
| 99 | | 97.5 |
| 98 | | 95.0 |
| 97 | OUTSTANDING | 92.5 |
| 96 | | 90.0 |
| 95 | | 87.5 |
| 94 | | 85.0 |
| 93 | | 82.5 |
| 92 | | 80.0 |
| 91 | EXCELLENT | 77.5 |
| 90 | | 75.0 |
| 89 | | 72.5 |
| 88 | | 70.0 |
| 87 | | 67.5 |
| 86 | | 65.0 |
| 85 | | 62.5 |
| 84 | | 60.0 |
| 83 | | 57.5 |
| 82 | | 55.0 |
| 81 | | 52.5 |
| 80 | GOOD | 50.0 |
| 79 | | 47.5 |
| 78 | | 45.0 |
| 77 | | 42.5 |
| 76 | | 40.0 |
| 75 | | 37.5 |
| 74 | | 35.0 |
| 73 | | 32.5 |
| 72 | | 30.0 |
| 71 | | 27.5 |
| 70 | MARGINAL | 25.0 |
| 69 | | 22.5 |
| 68 | | 20.0 |
| 67 | | 17.5 |
| 66 | | 15.0 |
| 65 | | 12.5 |
| 64 | | 10.0 |
| 63 | | 07.5 |
| 62 | | 05.0 |
| 61 | | 02.5 |
| 60 | UNSATISFACTORY | 00.0 |

# ATTACHMENT D TO PEP

CONTRACT NO. DE-AC04-76DP03533

AWARD FEE ORGANIZATION
AND DOCUMENT FLOW



# ATTACHMENT E TO PEP

CONTRACT NO. DE-AC04-76DP03533

## FORMAT FOR PERFORMANCE EVALUATION REVIEW BOARD REPORT

I. EXECUTIVE SUMMARY - The Executive Summary shall provide an overall summary of the Contractor's performance during the rating period and shall provide both an adjective and performance point rating. Any minority opinions or reports shall be identified.

II. ACHIEVEMENTS/DEFICIENCIES/OBSERVATIONS - This section of the report contains a listing of the Contractor's important achievements, performance deficiencies, and general performance observations during the period. It shall be presented in the following format for each Functional Performance Group.

- SIGNIFICANT ACHIEVEMENTS (if any) - List by Functional Performance Area.
- NOTABLE ACHIEVEMENTS (if any) - List by Functional Performance Area.
- SIGNIFICANT DEFICIENCIES (if any) - List by Functional Performance Area.
- NOTABLE DEFICIENCIES (if any) - List by Functional Performance Area.
- OBSERVATIONS (if any) - List by Functional Performance Area.

DEFINITIONS:

<u>Significant</u> - This term signifies a major event or sustained level of performance which due to its importance is exceptionally good or poor and deserves to be brought to the Manager's attention for fee determination purposes.

<u>Notable</u> - This term signifies an event or sustained level of performance which is of lesser importance than a "significant" event, but nonetheless deserves some recognition.

Identification of events/performance as "significant" or "notable" should be reserved for those events/levels of performance which are extraordinary and warrant the attention of both DOE and Contractor management.

III. DISCUSSION

a. Part I of this section shall identify in chart format each Functional Performance Area which were evaluated and shall provide an adjective and numerical rating for each.

b. A summary of the Contractor's performance within each Functional Performance Area shall be provided in Part II of this section.

c. A full discussion of the Contractor's performance in each Functional Performance Objective and Criteria is to be provided in Part III of this section. This discussion must address the Contractor's performance during the entire evaluation period. The overall rating should be based upon total performance, not simply on isolated examples of good or poor performance. Factors outside the Contractor's reasonable control contributing to performance weaknesses should be identified and taken into consideration in the rating. The discussion should provide sufficient information to fully and clearly support the performance ratings assigned. The PEC shall also include in its draft PERB Report an evaluation of the realism of the Contractor's self-assessment report.

d. Identify and fully discuss in Part IV of this section any other aspects of the Contractor's performance within the general coverage of the Functional Performance Group not specifically identified in the Criteria. The impact of this information on the overall rating must be specified.

e. Part V of this section shall discuss any minority opinions and/or include any minority reports.

# GLOSSARY AND SUMMARY OF ACRONYMS

## DEFINITIONS

FUNCTIONAL PERFORMANCE GROUP (FPG) - A major grouping of functions within the Contract Scope of Work identified as an area which is extremely important to the Department of Energy and the Rocky Flats Office (RF). The Contractor's performance under a Functional Performance Group will be the primary basis for payment of the award fee under the Contract. These aspects are defined in Part II of this PEP.

FUNCTIONAL PERFORMANCE AREA (FPA) - An aspect of the Contractor's performance responsibilities covered by the Contract Statement of Work.

PERFORMANCE OBJECTIVE - A very broad category of performance which will be evaluated under a Functional Performance Group. Normally it encompasses the performance of a total function or program.

PERFORMANCE CRITERIA - The basic aspects of performance within a Performance Objective which breaks down the Performance Objective into the important integral parts which will be evaluated for award fee determination purposes.

## ACRONYMS

| | |
|---|---|
| AFDS | Award Fee Determination Statement |
| AL | Albuquerque Operations Office, DOE |
| CPAF | Cost Plus Award Fee |
| DOE | U. S. Department of Energy |
| DP | Assistant Secretary for Defense Programs |
| EH | Assistant Secretary for Environment, Safety, and Health |
| FDO | Fee Determination Official |
| FPA | Functional Performance Area |
| FPG | Functional Performance Group |
| HQ | U. S. Department of Energy, Washington, D. C, |
| PEC | Performance Evaluation Committee |
| PERB | Performance Evaluation Review Board |
| PM | Performance Monitor |
| RF | Rocky Flats Office, DOE |

PL. SUPP. EX. 60

CERTIFIED COPY

No. 91-1362 C

UNITED STATES CLAIMS COURT

- oOo -

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

=====================================================================

DEPOSITION OF

THEETIS V. HILL

Wednesday, December 2nd, 1992

Albuquerque, New Mexico

Reported by:

ARLETTE McCLAIN, CSR #85

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025

Q. What division or branch were you branch chief of?

A. I don't remember the name of it right now. It involved awarding contracts for architect/engineer, construction, small value purchases, other contracts and some R&D work. It was primarily awarding contracts and administering contracts for that branch.

Q. And what did you do then after May of 1987?

A. I was in the management operating contractor branch, which was the branch that I stayed in until I retired in October of '90.

Q. And what were your duties and responsibilities in the management and operating contracting branch?

A. Negotiating fee and scope, on a lot of occasions the management operating contracts. I was executive secretary to the Performance Evaluation Review Board. Those were the primary things.

Q. When did you first become executive secretary to the Performance Evaluation Review Board?

A. In May of 1987.

Q. When did you first become involved in any way with an award fee under a government contract?

A. At the time I became secretary to the Performance Evaluation Review Board.

Q. Prior to that time you had had no involvement with an award fee; is that right?

A. That's right. I did have some involvement -- very minor involvement prior to that time. We had had an award fee contract at the time I negotiated fee and scope. We deleted the award fee from that contract. It was a regular fixed price -- not fixed price, but cost plus fixed fee contract. My involvement with award fee was very minor.

Q. Other than that experience, your involvement really began in May of 1987?

A. Yes.

Q. What was your involvement beginning in May of 1987 with the award fees?

A. As the secretary to the -- I'll call it the PERB, I was not in a position of making -- decision-making position. My position was to coordinate activities in support of the PERB, receive the performance evaluation review report from area managers. I would distribute it to the Performance Evaluation Review Board members, make arrangements for the meeting for the PERB meeting. I would attend the meeting, take notes, take minutes during the meeting and make any changes that might be required to the report -- the draft report, and coordinate those changes with all -- with the hearing officer and with the PERB members, and finalize the report for the chairman of the PERB, and prepare the minutes of the PERB meeting.

Q. Beginning in May of 1987, how many award fees

were you helping to administer in your role as executive secretary to the PERB?

A. Five.

Q. Did that number change over time?

A. The only change that I recall was in 1989, the second half, Rockwell International was handled through the office at Rocky Flats, rather than through AL. So at that time we had four.

Q. Did you keep your position as executive secretary of the PERB until the time you retired?

A. Yes.

Q. After the second half of fiscal year 1989, were you helping to administer four contracts with respect to their award fees through the time you a retired?

A. Yes. I was still the PERB secretary.

Q. And there were four contracts?

A. Yes.

Q. Did the award fee responsibilities for any contract, other than the Rockwell contract, become delegated away from the Albuquerque office during your tenure as executive secretary?

A. No.

Q. Only the Rockwell contract?

A. Yes.

Q. When you first became executive secretary in the

two months.

Q. Would it exceed one month?

A. It might.

Q. Was it less than one-month in some cases?

A. I don't remember.

Q. Prior to the first half of fiscal year 1989, were there any steps in the award fee process which you have described that would take place after the PERB meeting, other than what you have described?

A. No, not that I'm aware of.

Q. Beginning with the award fee period for the first half of fiscal year 1989, were steps added that included headquarter's involvement in the award fee process?

A. Yes.

Q. Was the first half of fiscal year 1989 the first time steps involving headquarters was included in the award fee process?

A. To the best of my memory, yes.

Q. Mr. Hill, I'm showing you a document that has previously been marked as Exhibit 12. Please review this document, and tell me if you have ever seen it before.

A. Yes, I have seen this.

Q. Did you prepare this document?

A. For the most part, yes.

Q. What was the purpose of this document?

office.

Q. Would Mr. Twining have told you directly?

A. I don't recall if he -- I don't recall if he told me directly. I mean, I don't recall if it was even conveyed before this letter -- before I got a copy of the letter.

Q. Did you ever discuss with Mr. Twining, Rockwell's award fee during 1989?

A. Discuss it in what manner?

Q. Did you ever discuss Rockwell's award fee in any manner, directly with Mr. Twining?

A. I don't recall -- no, I don't recall addressing -- discussing the award fee with him, other than -- I mean, I was not in a decision-making capacity. There would be no reason for him to discuss it with me.

Q. Did you always communicate to Mr. Twining through the chairman of the PERB?

A. Most of the time that's true. In this instance he did talk to me directly about preparing a letter.

Q. Preparing this memorandum to Mr. Wade?

A. Yeah.

Q. In any period prior to the first half of fiscal year 1989, did you ever prepare a memorandum similar to Exhibit 12, requesting the concurrence or nonconcurrence of award fees from someone at headquarters?

A. No.

Q. To your knowledge, had any such memorandum ever been sent before to anyone at headquarters?

A. No.

Q. Mr. Hill, I'm handing you a document that has previously been marked as Exhibit 9, which is a memorandum from Mr. Barkmeier to Mr. Berger dated May 23rd, 1989. On the face of the memorandum it indicates that a copy was sent to you. Did you receive this document?

A. I don't recall getting this specific document. I see a copy was sent to me. I don't remember the specific document. It did trigger my memory on one other point that you asked me about the timing. I believe the M&O contracts had a time in the contract which required the contract -- the award fee determination to be made within a 35-day period. I had forgotten that, but it just reminded me of that.

Q. That period is 35 working days after the end of the evaluation period.

A. Yes.

Q. Was that deadline met in the case of Rockwell's award fee for the first half of fiscal year 1989?

A. I don't think so.

Q. Why wasn't it met?

A. I believe the decision was delayed beyond that time period, the manager's decision.

page. Were these functional performance areas and the corresponding weightings used in arriving at the PERBs recommended award fee for Rockwell for the first half of fiscal year 1989?

A. Yes, this was effective October 1st of '88, which was the the beginning of the fiscal year, yes.

Q. Let me direct your attention to the page that is numbered at the bottom E001282. There is a rating plan that begins on that page and continues to the next page. Was that rating plan used in determining the PERBs recommended award fee for Rockwell for the first half of fiscal year 1989?

A. Yes, that is my recollection. I don't think it was changed during that period, so this would have been the plan that was used.

Q. Let me now direct your attention to the page that is marked in the lower right-hand corner 1278.

Would you please read aloud the first sentence under the section number two entitled "Introduction"?

A. "The award fee determination official (manager or anyone acting as manager Albuquerque operations) (AFDO), shall evaluate the contractor's performance during each evaluation period, and will determine the amount of award fee to be paid the contractor for that evaluation period.

Q. In 1989 who would you take it to mean by the

award fee determination official?

A. The manager of Albuquerque operations.

Q. Who was that?

A. Bruce Twining.

Q. Mr. Hill, I'm handing you a document that has been previously marked as Exhibit 2, which is the Albuquerque Operations Handbook for Award Fee Performance Evaluation and Review Process. It is dated on the second page June 24th, 1977. Have you ever seen this handbook before?

A. Yes.

Q. Was this handbook used in arriving at the PERBs recommended award fee for Rockwell for the first half of fiscal year 1989?

A. There was a change made to this handbook, and I don't remember the date that the change was made. In other words, there was a new handbook issued. I don't remember if that new handbook was issued before the first half of 1989 or after.

Q. I'm handing you a document that has previously been marked as Exhibit 30, which is a more recent Albuquerque handbook for award fee administration, dated February 16th, 1990. Is that the more recent handbook you are referring to?

A. Yes.

PL. SUPP. EX. 61

CERTIFIED COPY

No. 91-1362 C

UNITED STATES CLAIMS COURT

-o0o-

ROCKWELL INTERNATIONAL CORPORATION, :

Plaintiff, :

vs. :

UNITED STATES OF AMERICA, :

Defendant. :

=====================================================

DEPOSITION OF

ALBERT EARL WHITEMAN

Friday, December 4, 1992

Albuquerque, New Mexico

Reported by:

SUSAN M. HILTON, CSR, RPR, CP, CM
NEW MEXICO CSR #108

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025
310/477-8867 FAX [illegible]

check in the box with a signature.

Q. So you were the manager at Rocky Flats from sometime in 1985 until sometime in 1989; is that correct?

A. Yes. I don't remember the exact day I left. I know my wife and I drove to Washington, D.C., like the day after I left, and we reached Washington on May 1. I do remember that. So it would have been around the 20th to the 25th of April, something like that, when I left.

Q. How did the transfer from the Rocky Flats office to Washington come about? Did you put in for a position in Washington?

A. Well, about six months before, I indicated to Mr. Twining, who was my supervisor here in Albuquerque, that I desired to do something else, that I was starting to get burnt out. So as it turned out, with the new administration coming in at that time, it looked like a good time to spend a few months in Washington and then to come from there to Albuquerque. So I wasn't looking specifically for that position, but I was looking. I had begun looking for something about six months before that.

Q. And what position did you take in Washington for those four months?

A. It was called the field liaison for the secretary, and it was a new secretary, new administration that had just come in. For the first year or so they wanted

a senior person to be a liaison between the new secretary and his staff and the various field office people.

Q. Who replaced you at Rocky Flats?

A. Rush Inlow.

Q. Where did he come from?

A. Here in Albuquerque.

Q. After you left Rocky Flats to go to Washington in 1989, did you have any involvement with the award fee process?

A. No.

Q. For Rockwell?

A. No.

Q. Do you recall ever being consulted about the award fee process the day after you left?

A. No.

Q. And then after this four months in Washington, you came back to Albuquerque?

A. Right.

Q. What has been your position in Albuquerque since then?

A. Well, initially I took a position as a special assistant to Mr. Twining and did a number of projects for him over the next year. And then in, it would have been late summer of 1990, I took my present position, which is director of the weapons quality division.

Q. After you came back to Albuquerque and were reporting to Mr. Twining, were there occasions when you and Mr. Twining discussed the award fee process in connection with Rockwell?

A. No.

Q. I have a document that somebody put together that indicates that your tenure as manager at Rocky Flats was from November 7, 1985, through April 28, 1989. Do those dates sound correct to you?

A. Yes, that would fit.

Q. Let me show you a document that has been previously marked as Plaintiff's Deposition Exhibit No. 2. It's titled, "Handbook for Award Fee Performance, Evaluation Review Process." And on the second page it has a Bates stamp number E001012. There's a date of June 24, 1977 on it. Are you familiar with this document?

A. Well, I guess. I don't believe this was the current one when I was at Rocky Flats, but I could be wrong. But I have worked in the various positions I have been in, and I have worked in various aspects of the work fee process, so I would have reviewed the handbook for that, yes.

Q. But do you recall whether the June 24, 1977, edition of the handbook was the prevailing handbook during your term at Rocky Flats?

A. No. I thought there had been some changes, but I

don't know whether they were reflected in the new handbook or some other procedure. For example, looking at the table of contents, it references various points of evaluation committee, PEC. And I know that was abolished about the time I went to Rocky Flats and the process was changed. And the PERB remained, but the PEC was abolished. So I know there were changes to the process, I just don't know how they were reflected in a new handbook or modifications to it. I don't remember.

Q. Well, would you describe for me your understanding during the time that you were at Rocky Flats of how the award fee process worked from beginning to end.

A. Well, first, it was on a six-month cycle. At the beginning of the six-month period, DOE would provide to Rockwell a listing of the areas that were to be evaluated and the weighting to be applied to those areas. Typically, I would also try to provide to Rockwell some performance objectives for those various areas or objectives for improvements in those, and sometimes they were very detailed and sometimes very general. Halfway through that six-month process, my staff in the area office would prepare an evaluation report that was nonbinding. It was just a report card midterm.

Q. Excuse me for one second. When you refer to the area office, does that mean Albuquerque?

A. No, my office at Rocky Flats.
Q. Your office at Rocky Flats?
A. Yes. But we would prepare a midterm evaluation, and I would sit down with the Rockwell management and review that. And it didn't have a grade associated with it or a fee associated with it, but just to indicate progress. Then near the end of the six-month process, the various divisions, functional divisions here in Albuquerque that had program responsibilities at Rocky Flats, would provide a written evaluation. My staff would provide a written evaluation in their area generally trying to tie it to these performance improvement areas. If there were disagreements or whatnot, my staff would try to work with the staff people here in Albuquerque to come up with wording in the areas they thought were most important.
Then I would meet with my staff as senior staff to review this draft report. And if I agreed with it, then I would submit it as a draft to the Performance Evaluation Board here in Albuquerque. There would then be subsequent reviews by Albuquerque management of that resulting in a meeting of the Performance Evaluation Board here in Albuquerque that they would then both recommend the written report as well as a numerical evaluation from that to whoever the fee determination official, the manager here in Albuquerque was at the moment for him to approve.

Q. Then what?

A. Then that was the -- well, the fee determination official would determine whether to accept what the board said or to change it and he could. And whatever he decided was transmitted to the contractor.

Q. If you look at Exhibit 2, if you would turn to page 24. There's a paragraph under the heading, "Role of Contracting Officer," I would ask you, Mr. Whiteman, if you would just read that and see whether that comports to your understanding of the role of the contracting officer who is defined in the paragraph as the manager at Albuquerque.

A. Yes, that's my understanding.

Q. If you would turn to the next page, 25, there is a schematic drawing of the award fee process. Again, I would ask if that comports with your understanding of the process.

A. Well, the one difference, what I mentioned earlier about the Performance Evaluation Committee. At some point, that box was eliminated so that the arrow went directly over to the PERB, and it seems like it would have been early in the time I was at Rocky Flats, but I can't remember for sure. It doesn't substantively change the process, but it did eliminate that.

Q. That's the only point that you would take issue with?

A. That's the only one I see, yes.

Q. If I understand your testimony, you're saying that in lieu of the Performance Evaluation Committee, you would simply meet with your staff and come up with the recommendation that would be forwarded to the Performance Evaluation Review Board?

A. Well, no. The formal PEC was replaced with an informal process that the people who would normally have been on that committee, if there were issues in looking at a draft report, we would talk one-to-one on that. And then the other change was -- under this box, I would not have been a member of the PERB. I would have been perhaps chairman, I can't remember, of the PEC. I guess there was one substantive change because when we eliminated that box, I became a member of the PERB as it related to the Rockwell contract. So we essentially replaced that. This was only a coordination function, and we replaced the formal coordination with an informal one.

Q. You don't recall if the handbook changed to reflect what you believe to be the changes?

A. No, I don't. I assume it was written somewhere, but I have no idea in what way.

MR. NEY: Mr. Bruns, what we're talking about is the subject of our document request. And if there are other documents that reflect changes from this 1977 edition, I would request a copy of those documents.

Q. Mr. Whiteman, returning, again, to the paragraph you read concerning the role of the manager at Albuquerque and the schematic process, I note that there's no reference to any involvement by headquarters in the award fee process.
A. That's right.
Q. Prior to the first half of fiscal year 1989, to your knowledge, was headquarters involved in the award fee process?
A. They were never involved in any that I was involved in.
Q. So you have no knowledge of their involvement is your testimony?
A. No, I don't.
Q. What about in the first period of 1989 or first half of the year 1989, was headquarters involved in the award fee process for Rockwell and Rocky Flats?
A. They weren't in the time period I was involved, but would only have been involved in the very early stages, so I have no knowledge what happened after that.
Q. Have you ever heard any mention of headquarters being involved?
A. No.
Q. During the period that you were the area manager of Rocky Flats, are you aware of any deviations from this handbook other than what you have testified to, which I

believe you were characterizing as being changes that took place in the handbook over a period of time?

A. That's the only one I remember.

Q. Could anyone deviate from the handbook --

A. No.

Q. -- or would it have to have some authorization to do so?

A. No, it was a standard process for -- see, this PERB worked on five or six different contracts at the same time using the same process, and so it was a standard process that was used for all of them.

Q. Now, during your tenure at Rocky Flats in 1985 through 1988, were the award fees for Rockwell handled in the same fashion each period?

A. Yes.

Q. Do you recall any changes in the methodology of the award fees during your tenure at Rocky Flats?

A. No, not other than just the process we have talked about.

Q. Dealing with?

A. With the PEC.

Q. Let me show you a document that's been marked Plaintiff's Exhibit 30, which has on the cover page a title, "Albuquerque Operations Office Handbook for Award Fee Administration," and it has a date of February 16, 1990. And

determinations. I ask you if this comports with your understanding of how the process worked during the time you were the manager at Rocky Flats?

A. Yes.

Q. I notice that Mr. Barkmeier in this schedule ends with item 12 that's says, "Albuquerque PERB makes recommendation to the manager at Albuquerque." And then the final one is 13, "Fee determination issued to the contractor," and there is no mention of concurrence from headquarters. Is that your understanding of the way it worked when you were there?

A. Yes.

Q. That concurrence from headquarters was not a requirement?

A. That's right.

Q. Do you know who Mr. Beiriger is?

A. No, I don't.

Q. Do you know why he was asking for a schedule?

A. No, I don't.

Q. Now, am I correct that it's your testimony from this morning that you have no knowledge of any headquarters involvement in the award fee process for the first six-month period of 1989?

A. That's right.

Q. Did you ever have any communications with anyone

from DOE headquarters concerning Rockwell's award fee for the first half of fiscal year 89?

A. I don't remember any.

Q. Did you ever talk to Admiral Watkins?

A. No.

Q. Did you ever talk to him about any subject?

A. No.

Q. Let me show you what has been previously been marked as Plaintiff's Deposition Exhibit No. 12. It's a memorandum dated May 31, 1989, from Mr. Twining to Mr. Wade. Have you ever seen this document before?

A. No, I haven't.

Q. To your knowledge, was a document like this generated in prior award fee periods? By "a document like this," I mean from a manager at Albuquerque going to, in this case, an acting assistant secretary for headquarters seeking concurrence for recommended award fees.

A. I wasn't aware of such a thing.

Q. You have never seen one?

A. No.

Q. Have you ever heard about one?

A. No.

Q. On page three of this document bearing stamp E001504, at the bottom under Rockwell International Corporation, do you see the proposed fee, proposed award fee

official?

A. No, I know that was never the case.

Q. Did you ever talk to Mr. Twining about this letter?

A. No.

Q. Let me show you a document which has been previously marked as Plaintiff's Deposition Exhibit No. 54. It's a memorandum to operations office managers and various assistant secretaries from W. Henson Moore dated August 21, 1989. Have you seen this document before?

A. I believe I have.

Q. Do you know when you saw it?

A. It would have been soon after it was signed.

Q. Now, on the second line, there's reference to general accounting office and Congressional reports. Do you know what's being referred to?

A. The general office. I assume that goes back to the Rocky Flats report. The Congressional reports, I'm not sure what that is. I'm not sure what a Congressional report is in this context.

Q. Now, in the first paragraph, Mr. Moore states that, "We have instituted a review process whereby each award fee plan and fee determination will come to headquarters for review and concurrence prior to issuance of the contractor." In your view, is that a change from the past practice?

A. Yes.
Q. To your knowledge, were any of the DOE contracts changed or modified to reflect this new practice?
A. I don't know.
Q. Do you know what prompted this change in procedure?
A. I know that with the new administration with Secretary Henson and Mr. Moore, they had expressed a desire to be more involved in operational determinations. And so I would have interpreted this as being the continuation of that desire.
Q. Do you know how this change was implemented?
A. No, I do not.
Q. Let me put it this way. Was it implemented in some form beyond just this one memo?
A. If it was, I never saw it.
MR. NEY: Let me mark as Exhibits 104 and 105 two documents. The first one, 104, would be a memorandum from you, Mr. Whiteman, to Mr. Sanchini dated September 19, 1988, on the subject of goals and objectives for fiscal year 1989. Page numbers are E000738 through 740. And Exhibit 105 is a letter with an attachment from Mr. Sanchini to you, Mr. Whiteman, dated December 13, 1988, and the Bates numbers are E000789 through 810.
(Exhibits 104 and 105 marked)

PL. SUPP. EX. 62

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

----------------------------------
UNITED STATES OF AMERICA, EX REL; :
:
Plaintiff, : Civil Action
: No. 89-M-1154
-vs- :
:
ROCKWELL INTERNATIONAL CORP., : PAGES 1 - 155
ET AL, :
:
Defendants. :
----------------------------------

Deposition of W. HENSON MOORE

Washington, D.C.

Wednesday, April 15, 1998

Reported by: Nancy Bond Rowland

JOB NO. 106926

Thereupon,

W. HENSON MOORE

the witness, was called for examination by counsel for the Defendants, and, after having been sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. KOENIGS:

Q Would you state your name for the record please?

A William Henson Moore, III.

Q And your current address?

A Home address is 9605 Pinkney Court, Potomac, Maryland.

Q Where are you employed now?

A The American Forest and Paper Association, 1111 19th Street, suite 800, Washington, D.C.

Q I'm sorry, I didn't hear.

A The American Forest and Paper Association.

Q Forest and Paper, all right. You were deputy secretary of Energy between 1989 and 1992, is that correct?

A Yes.

bad, indifferent, they'd get reimbursed for it.

Q That was DOE's practice prior to your watch?

MR. HESCH: Objection. Form. Foundation.

A Yes.

Q And that practice was based upon the contract terms that existed prior to your watch?

MR. HESCH: Objection. Form. Foundation.

A That, and the interpretation by the operations manager and the area guy with what those words in the contract meant.

Q I wonder if you could look please at page 6 of your statement. Maybe just read to yourself that middle paragraph if you would please.

Now, this area of award fee reform I think you testified was an area for which you had principal responsibility?

A Part of the reformation considered both the contract itself and the award fee system.

Q And you had lead responsibility in the secretariat for that area?

A Yes.
Q You see the last sentence in the paragraph refers to a revolutionary new contract clause which provides that a contractor's failure to perform satisfactorily in any important area included in the performance evaluation plan may result in the forfeiture of the entire award fee available for that period?
A Yes.
Q Did you understand in fact that there was a revolutionary new contract clause?
MR. HESCH: Objection. Form. Foundation.
A Sure. Thought so.
Q Why did you implement that change?
A The way the award fee system worked was that, as I remember it, the area fellow for DOE would grade the contractor in certain areas. Based upon that grade you got a percentage. It was almost an automatic mathematical calculation. If you got for example, this is a hypothetical, if you scored 70 out of 100, you'd get 70 percent of the maximum award fee possible. And

then the operations manager would review that grading. Didn't come to headquarters. Stopped right there at the operations office level.

In this case Rocky Flats, as I remember, reported to the Albuquerque operations office. So those DOE officials would largely determine what the award fee was. There was no basis for denying the award fee entirely unless they scored zero. No contractor ever scored zero. Most of the scores were very high.

We were doing two things in this paragraph. To change the culture, both DOE personnel but certainly the personnel of our contractors. The first was to say over half your score now is going to be on environment, safety, and health that was never the case before. It was somewhere around 2 or 3 percent, if that. The way you got graded before is did you get the productions built on time. If you did, chances are you would get a 90 percent score. That kind of a thing.

We said no. We're changing the system. From here on out in the award fee system 51 percent of your score is how did you do on environment, safety, and

health. 49 percent is how did you do on the other stuff which used to be probably 100 percent how you would rate it.

Then we also had to put a provision in the contract that if we think you did really poor in one of these things, you won't get an award fee at all. It won't be done by that mathematical calculation of well, you scored 40 percent, so you still get 40 percent of the award fee. We left it within our purview to say if you really didn't do a good job in an area we consider important, you're going to get zero as an award fee.

As I remember, Eric Fygi would be the guy you'd need to depose further on that. As I remember it, our contract lawyers indicated we had to put that actually into the contracts because that's not the way the contracts had been written up to that point.

MR. HESCH: I'd ask you not disclose what advice lawyers gave you.

THE WITNESS: Okay.

MR. HESCH: Move to strike the testimony.

MR. KOENIGS: I don't think he was

The admiral was trying to find somebody to run Defense Programs. It was a very complicated technical position. And he went through those two and may even have been a third. I don't remember. And basically they didn't get the picture of the cultural change. They were of the mind-set that we were almost a miniature Department of Defense was the way they thought, and whatever the Department of Defense wanted, we did it. If they wanted 15 x-ray bombs by the 4th of May, we were going to make them, and come hell or high water they were going to have those bombs. That was their mentality.

So we started talking about environment, safety, and health, and it was clear we were speaking a different language to them. They were fine men and they had done a fine job in their career, but this required a different sensitivity which they simply didn't have.

Q Do you recall after the raid there was an issue of how much Rockwell's award fee would be?

A Yes.

Q Did you have involvement in the final

decision on the amount of Rockwell's award fees?

A Yes.

Q And there were two periods, one first half of fiscal year 1989 and second half, both of which the decision making process was made during your watch. Do you have recollection of that?

A Yes.

Q What can you tell me about your recollection of the processes?

MR. HESCH: Isn't that the subject of his prior deposition?

MR. KOENIGS: To some extent. I'm not going to go through all that by any means. I want a general recollection.

A What I can remember about it is simply that we had begun a change in the award fee system before the Rocky Flats raid. The Rocky Flats raid simply exacerbated the fact that we had to change the system and to do it now.

I was of the belief that this did not require waiting and changing a contract when a contract came up for renewal. The award fee system was a separate

mechanism for determining how much of an award fee the contract did call for was measured or was determined. And so we could change that system without waiting for a contract to come up.

And so I moved to change that system very quickly, and so that the first award fees that were due on our watch would by under the new system. And the first decision the admiral made himself which was I went to him and said "What degree do we want to have environment, safety, and health measured?" We both agreed it wasn't being measured enough, and I'm pretty confident he came up with 51 percent. May have been me but certainly together we did that. That was a major change to say that 51 percent of your grade is now going to be based on something totally different than it had been based on before.

We then required also because we were convinced that the culture wouldn't change immediately that award fees had to come to headquarters for approval. They hadn't ever before that time. And so when the Rocky Flats ones came up, they had to come to headquarters for approval. Bruce Twining couldn't set

them by himself or he wasn't the last review of an award fee determination.

Because of Rocky Flats they came to me, and for a while there as I remember all of them, whether those facilities were something I worked with or not, came to me for review to be sure the system was working like we had decided, the new system.

Nancy Wolicki as I remember was the person who would receive it, review it, go into great details, come in and brief me, and they would make a decision whether we agreed or disagreed with the Operations Office's determination. In the early years I think there were a number of them we sent back and said "We don't agree" or we set a new number for it. That happened on the Rockwell award fee.

Q You would get what, performance evaluation reports, kind of a short evaluation prepared by the Operations Office, and that would be reviewed by Nancy?

A The way the system worked after we designed it was the fact when the Operations Office finished its work, and everything up to that point was done as it always had been done with the exception of this 51

percent weighting factor being new, then it was sent to headquarters for us to approve or disapprove or change it. That was new.

And when it came to headquarters, I think it officially came to Defense Programs. I'm not sure which. I've forgotten what our procedure called for. But in reality Nancy would get it and would go over it and would come in and sit down with me and go over it, and we made a decision whether we agreed or disagreed with the finding of the Operations Office.

Q So you and Nancy would review these for all the award fee contracts held by DOE or all within the weapons complex?

A I think they were pretty much all of them there for a time period.

Q And how long was the time period roughly?

A I think a year or two. The idea was just to be sure that the changes we were making was being followed.

Q And during this time frame, one of the things you'd take into account is data that was gathered not merely by the Operations Office but by say Tiger Teams?

PL. SUPP. EX. 63

UNITED STATES CLAIMS COURT

ORIGINAL

- - - - - - - - - - - - - - - - - -

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

-vs-

UNITED STATES OF AMERICA,

Defendant.

- - - - - - - - - - - - - - - - - -

No. 91-1362-C

September 23, 1994
10:00 A.M.

DEPOSITION OF:

ADMIRAL JON MICHAEL BARR

CENTRAL VIRGINIA REPORTERS
PO BOX 12628
ROANOKE, VIRGINIA 24027
(703) 380-5017

Q Since graduating from the Naval Academy, have you been continuously in the service, in the United States Navy?

A I have.

Q At some point, you were assigned to the Department of Energy. Is that true?

A That's correct.

Q When was that?

A My first day on the job was the 5th of July 1989. I had before that in about the previous month visited, as I recall, the office for one reasonably brief period to talk to the officer I was relieving, who was going to retire before I got there and had made a tour of several facilities during one of my four-day off periods in my previous job.

Q Who was the person you were replacing?

A A Brigadier General, Paul Cavanare.

Q What position did you first take with the Department of Energy?

A Deputy Assistant Secretary for Military Application.

Q Prior to being assigned to the Department of Energy, could you briefly describe your career in the United States Navy.

A Oh, where my office was?

Q Yes.

A Yes. I had two offices. I had one office in a Germantown facility for DOE and one office in the Forestall Building in downtown Washington. I shared my time eventually probably 60 to 75 percent, probably closer to 75 percent of the time that I was in Washington and not traveling in the Forestall office.

Q How long were you with DOE?

A Almost exactly two years.

Q What were your different positions while you were at the DOE?

A It was one, only one, Deputy Assistant Secretary for Military Applications.

Q Mr. Barr, I would like you to take a look at this document, which is Plaintiff's Exhibit Number 1, and let me know if you have ever seen that before.

A Okay. Right. I could go through the whole thing, but I don't think I have ever seen this before. Virtually certain I have never seen that before.

Q This document is a supplemental agreement between the DOE and Rockwell International Corporation relating to award fees, and it's signed February of 1989. Would you please read aloud the sentence --

A Sure.

Q -- on Page 2, which is Bates labeled E001274.

A The amount of the award fee actually to be paid to the contractor shall be determined by the award fee determination official, manager or anyone acting as Manager, Albuquerque Operations, in accordance with the provisions of subparagraph (2)(B) of this clause.

Q Who was the Manager, Albuquerque Operations?

A Mr. Bruce Twining.

Q Mr. Barr, I am placing before you a document that has previously been marked as Plaintiff's Exhibit Number 2, which is entitled "Handbook for Award Fee Performance Evaluation and Review Process, Albuquerque Operations Office." Have you ever seen that document before?

A No, not to my recollection, at least.

Q Mr. Barr, I am showing you a document that has been previously marked as Plaintiff's Exhibit 102, which is a memorandum from Duffy to J.G. Hoyal dated November 23rd, 1988. Have you ever seen that document before?

A No.

Q The subject of this document as stated in the document is the GAO Review of Environment, Safety and Health Issues. In the contract award fee, it indicates, I

know there was great concern and the degree and concern at the Secretarial level and the degree to which the very senior levels of the Department of Energy had corresponded with Rockwell. Prior to this point, I don't have any knowledge.

Q Did you ever have any discussions with anyone at DOE regarding the propriety of Headquarters' insertion of itself into the award fee process?

A Not that I recall. I know I did have some discussions with Mr. Twining, and the exact time frame I don't recall, and his concern that things ought to stay basically the way that they were. So there was certainly some, at least in the field at Albuquerque, some concern.

Q What do you mean by "the way they were"?

A That the award fee determining official would essentially be the last word and with no meaningful review from Headquarters.

Q That's when Mr. Twining told you, that's the way things were?

A Not in so many words. That is what I took from our conversations, I mean, our conversations, as I recall them, were, I mean, I would consider him a friend of mine, so they were not adversarial. But his concern was that we were shifting things back to Headquarters which

belonged in the field. So I would summarize as I did, and to some degree putting words in his mouth.

Q Was it your view that Headquarters should insert itself into the award fee process?

A Absolutely.

Q And did you tell Mr. Twining that?

A I'm sure I did. I am sure I said that I agree with the trend that was going on at Headquarters, because I absolutely thought that was necessary. If Headquarters was going to be Headquarters, they had to get involved in things that were important, and there were few things more important as the award fee incentive that the contractor has to do well.

Q And that was Secretary Watkins' view as well?

A I would hate to put words in his mouth, but I think I could say yes without much hesitation.

(A two-page Memorandum dated July 17, 1989, to Peter N. Brush from Edward S. Goldberg was marked as Plaintiff's Exhibit Number 313 and included with the deposition.)

BY MR. KELLEY:

Q Mr. Barr, I am showing you a document that is

enumerated items; is that right?

MR. KOLAR: Objection. Asked and answered, as in the previous document.

You can go ahead and answer.

A Yes. I base my position on the following points, one, two, three, four. Overall I believe. Right. That's what it says.

Q Did you have any reason to believe that the award fee determination official did not take into consideration the four points you enumerated in your September 6 memorandum?

A Oh, I have every reason to believe that they did, as you pointed out, as you ran through these series of documents, that in fact they had been.

However, the question is and my judgment is that these were not adequately taken into account and that an adjectival grade of moderately good for ES&H with this kind of thing going on is more, more than a little questionable, and that the appropriate adjectival grade is unsatisfactory.

Now, that happens to be tied to a certain numerical award, a numerical number, and I believe that the numerical number we gave is very high unsat, about as high

and you can get and still be in the unsat category.

So it's a matter of difference in judgment as to whether the award fee should contain an indication that the environment, safety and health performance of Rockwell was moderately good during this period. It appeared to me at the time that it was not.

And, again, subsequent to that everything that I have learned, including now seeing for the first time that Ralph Erickson on the scene, DP-23, recommended only the base fee. If I should have seen that, I should have suggested even a lower fee. Everything I have seen is consistent with lowering the fee, at least that much, if not more.

Q Let me show you a document that has previously been marked as Exhibit 58 and ask if you have ever seen that before.

A I don't think so. I don't recall seeing it, at least.

Q Did you ever discuss with Mr. Erickson the subject of Rockwell's award fee?

A Probably, but I don't have any specific recollection of that, and I specifically do not have any recollection of him saying what he wrote there, and that is that, based on my five weeks observation that the award fee

letter make it pretty clear why he is, but other knowledge, other than what the letter itself contains, no.

Q Going back to your September 6 memorandum, as part of Exhibit 317, how did you arrive at the numerical grade of 66 for ES&H?

A It was, and I don't remember exactly how, but that is, as I recall, the upper limit on unsatisfactory, and that's probably the way I arrived at that.

As I have been saying here, I think, repeatedly, the concern was that the environment, safety and health area was evaluated as moderately good, when, in my judgment, it was unsatisfactory, and I thought unsatisfactory grade was appropriate. That's what was given. A 64.25, or whatever it is there, I think is within the range of unsatisfactory, and that's what happened. Why it wasn't 30 or 60 or 50, I don't know.

Q Did you ever review a rating plan for Rockwell's is award fee?

A Not that I can remember. I think just flat no, because the rating plan would have been prepared before I ever got there for all of the periods that Rockwell was at Rocky Flats.

Q In coming up with your number of 66, did you review Rockwell's rating plan?

A No, no. Not that I remember.

Q Let me go back to Exhibit 316 for a moment. The change that you made on the first page was in connection with the chromium spill incident; is that right?

A Yes, correct.

Q And I believe you read the writing before. Can you do that again?

A An operable alarm system was not repaired and eventually was a factor in the major environmental incident.

Q Is there more?

A Do you have the -- I can't read my own writing here. If you have the final one.

Eventually was a major factor -- a major factor in a major environmental incident on October 13, 1989, when chromic acid was released from Building 444 and contaminated the plant's holding ponds.

Q Does the final version reflect the changes that you made?

A Yes, it does, as I would expect.

Q Where did you obtain the information to make the changes that you made in the enumerated Item 4?

A From my knowledge of what had gone on. See, the difference here is, the initial way that that was, an

first time. This is EH, isn't it? EH-20. EH. That's what I thought. He worked in the environmental safety and health area, and at this point he was EH-20. Subsequently, as I recall, he became the Deputy EH. The second, number two man to the Assistant Secretary.

Q Did you ever have any discussions with Mr. Berube in the December 1989 time period regarding Rockwell's award fee for the second half of fiscal year 1989?

A Probably, but I don't specifically recall.

Q Do you recall generally?

A I don't recall talking to Mr. Berube on the specific or general category of award fee for Rocky Flats. But I would not be at all surprised if I did.

Q Let me show you a document that has previously been marked as Exhibit 81. I will ask if you have ever seen that before.

A Well, yes. It's in my package.

Q Did you see it in 1989?

A I don't remember. I don't think so, because this looks like a call. It's a write up of a call made by a Mr. Rush Inlow, who was working for me at that time.

Q The document describes a call that you made to Rush Inlow?

A I didn't make a call to Rush Inlow. I probably talked to him person to person. Mr. Inlow relieved temporarily, he was temporarily assigned to the Albuquerque Operations Office, and I needed a person to replace Mr. Erickson, who had left DOE in the DP-23 job. Mr. Inlow served in that capacity temporarily for about six months, and I suspect that I talked to him face to face regarding this issue.

Q Do you recall that conversation?

A No, not the specific conversation.

Q Do you remember generally talking with Mr. Inlow about Rockwell's award fee?

A Oh, sure. Again, and it is very difficult for me to remember specifically, but he would have been my point man on the Rockwell award fee for this period, and I am sure that I discussed this with him. And I don't dispute the gist of what he says here and what this write up is.

Q What is the gist of that?

A That the available award fee shouldn't exceed the percent of the available fee awarded the last period. Although I don't remember specifically saying it that way, it would not be an unreasonable evaluation of how I viewed Rocky Flats' performance.

Q Do you recall that you did not describe it that way?

A No, I don't recall that I did not describe it that way. I just don't think I would have said it in those words. I don't think I would have said don't come in higher than this. I might have. I don't think I would have.

(A recess was taken. Following the recess, the parties returned to the room and the deposition continued as follows.)

BY MR. KELLEY:

Q Let me show you a document that has previously been marked as Exhibit 168. The Handwriting -- somebody named Peter.

A Peter Brush. Okay. No, I don't think I have seen that.

Q Do you remember any discussions with Peter Brush concerning Rockwell's award fee?

A No. No, I don't.

Q Let me show you a document that has previously been marked as Plaintiff's Exhibit 33 and ask if you have seen that document before.

MR. KOLAR: I think that might be one of the ones in the package.

A Yes, it sure looks familiar.
Q Again, the package, referring to the package that Mr. Kolar provided?
A Yes, correct.
MR. KOLAR: It might be in the other binder clip. Yes, there it is.

A January 10.
Q Did you see that document in 1989?
A Let me read it. Just a second.
Q Please take your time.
A Right. You know, I saw it. I remember seeing it when it was given to me and Mr. Kolar. But I do not remember seeing it prior to that. Again, this is an internal Rocky Flats piece of paper, which I normally wouldn't see.
Q Let me direct your attention to this sentence in the document: By providing copies to the M&O, DOE could be placed in the position of having to defend changes initiated by RFO or mandated by H, I believe that's Q.
A Q probably.

Q Do you recall discussing with anyone the subject of having to defend changes mandated by the DOE Headquarters to Rockwell's award fee?

A No, but I certainly have sympathy with the sentiment that says your predecisional internal communications should stay just that.

Q Let me show you a document that has previously been marked as Plaintiff's Exhibit 34, which is a record of a telephone conversation by Terrell Agy. Let me ask you to read the text of the notes of the call which describes award fee conversations that involve you.

A Yes, I have that in the package. I had not seen any of these internal Rocky Flats records of conversations before. This looks like the same kind of thing we said before. Okay. I didn't see it back then. I have seen it recently.

Q Mr. Agy notes that, according to Inlow, you instructed your staff to recalculate the award fee to a level not higher than for the period ending March 31, 1989.

A Correct.

Q Does that help refresh your recollection as to whether you did give that instruction?

A No, because it is basically the same thing I think we had a couple of minutes ago. I am not saying I

did that. I may have. But it would not normally be the way I would instruct my staff to work.

Q This is a later date?

A Well, what was the other date? I don't have a date on this one. 20 December. Okay. Yes, it is 20 December. Right.

Q And Exhibit 34 is dated January 11, 1990?

MR. KOLAR: May I look at the document, please?

A I don't disagree with the sentiments. Whether I actually phrased it that way, I don't think so, because it would not normally be my style of operation.

Q Mr. Agy notes that the Headquarter changes were going to be forced on us.

A I don't know Mr. Agy. I can't answer for his choice of words. I think it's an unfortunate choice of words. Hopefully we would all come to a consensus and agree. That's what he wrote down.

Q Did you ever personally discuss Rockwell's award fee for the second half of fiscal year 1989 with anyone at the Rocky Flats Plant?

A Not that I recall. I probably did with Simonson, but I just don't recall.

of paper on.

Q Is it possible that you and your staff changed your recommendations at some point?

A Sure.

MR. KOLAR: Objection. Objection to the form of the question, "is it possible."

THE WITNESS: Should I answer?

MR. KOLAR: Go ahead and answer.

A Sure, it's possible. Do I remember doing it? No.

There were, what you have to recognize about this process is, there was a great deal of back and forth, and not a clean here is the recommendation going up the chain and being signed out. There were a lot of people with fingers in the pie, a lot of discussions.

Not only was there Rocky Flats, which by itself made it controversial, but it was one of the early attempts to carry out the direction that Headquarters get more involved in the award fee determination process. So I know that other people besides me, other assistant secretaries besides defense programs had substantial input.

Q Were there a lot of fingers in the pie at Headquarters?

A Yes, as was appropriate, because each one of the people who was involved had a different opportunity to look at Rockwell's performance, which I think was thoroughly appropriate.

Q Let me show you a document that has previously been marked as Exhibit 170. Does that appear to be a companion document to the document you just looked at, Exhibit 37?

A Yes, it sure does.

Q Is it recommending the same reduction in Rockwell's award fee?

A Let me make certain. Let me get to the last page. The total award plus base fee is the same. It does look like this was the forwarding memo for this letter, although I can't be certain.

Q Did you help prepare that document?

A Oh, yes. And, again, this was originated by Mr. Arondale, and anything originated by Mr. Arondale, unless I was indisposed and I don't believe I was, would have come through me.

Q And Exhibit 37 was originated by Mr. Arondale as well?

A Exactly. It would have come through me. But who it was that initiated the changes that were reflected

determination to Rockwell in February of 1990?

A I don't recall that.

Q Did you ever hear that Mr. Simonson did not agree with Headquarters' decision to reduce his recommended award fee?

A Yes, I think I knew that.

Q How did you know that?

A I remembered it. Several pieces of paper right here made it pretty clear, but I am sure Dave and I, Mr. Simonson and I had conversations in which he would have indicated that he thought the award fee which he recommended was appropriate. Otherwise he wouldn't have recommended it.

Q Had Mr. Simonson been on site at Rocky Flats for some time before making award fee determination?

A Let's see. If I can remember, he had probably been on site for -- I need to find out when he got there. I don't remember precisely, but I think it would have been late September, October. So he may well have gotten to the site after the award fee period was closed. Mr. Goldberg was there July, August and, I think, into September.

(A Facsimile Transmission Routing Sheet and attached Memorandum dated July 26, 1989, from Edward

perhaps October time frame, but he may have been. It is a matter of record. You can find that out.

Q So when you said he wasn't there until late September, October, you meant in the capacity as manager?

A That's what I meant, correct.

Q Do you know whether Mr. Simonson was on the plant site of Rocky Flats regularly during July of 1989?

A I don't know.

Q Did Mr. Simonson ever express to you directly any objection to DOE's determination of award fees for Rocky Flats?

A Again, I remember not specifically, but generally that Mr. Simonson was concerned that his award fee proposal had not been accepted. Specific conversations or specific contents of those conversations I don't recall.

Q Do you recall generally what you told him?

A I mean, I could surmise, because I know what my thinking was in general at the time. But I don't have any specific recollection.

Q Let me show you a document that has previously been marked as Plaintiff's Exhibit 29, which is a memorandum from Bruce W. Twining to Robert Nelson dated February 26, 1990. Let me ask you whether that document refreshes your recollection as to when Mr. Nelson was

appointed the manager of Rocky Flats Office?

A Yes. Looks like February -- the date of this thing is February 26, 1990. But, again, I don't know how long Mr. Nelson had been there before this piece of paper came out, and I would suggest, again, it is a matter of record as to when Mr. Nelson went out there, and somebody else knows that as a matter of record, a specific date, without my trying to remember.

Q Why did Mr. Nelson replace Mr. Simonson?

A It was felt that somebody with a little more aggressive attitude toward correction of deficiencies was needed.

Q Were you involved in that decision?

A I think the fair thing to say is only peripherally. My, as I recall, my direct opinion -- Barr, do you recommend we replace Simonson with Nelson? -- was never asked for.

Q Who made that determination?

A I don't know. Well, I do know. No, I don't know. I don't really know. That's the right answer.

Q Who do you believe made that determination?

A The Secretary. The Secretary had to approve. Now whether he initiated the determination, the change, he very definitely would have been in the approval loop to

PL. SUPP. EX. 64

COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------x

ROCKWELL INTERNATIONAL :
CORPORATION, :
:
Plaintiffs, :
: No. 91-1362C
v. : Judge York
:
THE UNITED STATES, :
:
Defendants. :
------------------------------x

Friday, April 29, 1994
Washington, D.C.

DEPOSITION OF:

HENSON MOORE,

a witness, called for examination by counsel for the Plaintiff, pursuant to notice of counsel, held at Chadbourne & Parke, 1101 Vermont Street, N.W., Washington, D.C. at 8:30 a.m. on Friday, April 29, 1994, before Thomas R. McPhail, CSR, Notary Public when were present on behalf of the parties:

It is a memorandum from you dated August 21, 1989. It is addressed to various assistant secretaries and among others the operations, office managers, the subject is award fee contracting process.

MR. KOLAR: Why don't we hold on to this here.

BY MR. NEY:

Q. Are you generally familiar with DOE's use of award fee contracts and how they work?

A. Yes.

Q. Are you familiar with Exhibit 54, which is before you?

A. Yes.

Q. And this is a memorandum that you issued?

A. Yes.

Q. In the first paragraph of Exhibit 54, you state that you are instituting a review process whereby each award fee determination will come to headquarters for review and concurrence prior to issuance to the contractor; do you see that?

A. Yes.

Q. Was that a new procedure?
A. I don't know if historically it had ever been done. It was certainly new for what was going on at that particular contract cycle.
Q. And I don't understand. What do you mean by it was new at that particular time in the contract cycle?
A. We did not have any contracts in existence when we came to the Department or any procedures when we came to the Department that called for review by the headquarters of award fees.
Q. If I understand you, does that mean that prior to you and Admiral Watkins becoming part of the Secretariat at the Department of Energy, there was not a requirement for award fees to be reviewed and concurred in by headquarters personnel prior to issuance to the contractor?
A. When we got there, that was not the practice or was not part of our award procedures. Whether that had ever been at some point in history, I don't know.
Q. Did this procedure requiring headquarter

there was going to be a raid?

A. I would say a matter of several weeks. I am not sure, but a matter of several weeks before.

Q. Again, just trying to refresh, possibly refresh your recollection, understanding as you did in the latter part of May, at least, 1989, that there was a forthcoming FBI, EPA raid on Rocky Flats facility, would that have caused you to have headquarters have a direct involvement on any possible award fee that might be going to Rockwell at around the same time?

A. No.

Q. Let me show you another memorandum signed by you, this one is dated November 21, 1989, again the subject is award fee determinations; again it went to several assistant secretaries as well as the operations office managers. And this document has been marked as Deposition Exhibit 128. Have you seen this exhibit before, sir?

A. Yes.

Q. And this is a memorandum that was issued

by you?

A. Yes.

Q. In the first paragraph there is a reference that the review process which calls for interaction by headquarters has resulted in some delays in the making of award fee determinations; do you see that?

A. Yes.

Q. What were the delays that you were referring to?

A. The best I can remember, the time fee -- correction, the award fee plan procedures called for certain time periods, decisions had to be made. This was a new process of requiring us to come into the headquarters, it didn't fit in the old award fee time line. What was happening, as best I can remember, is that the operations offices were using all of their time under the award fee process, and winding up sending it into the headquarters for review after the time had lapsed for the naming of the award fee or determination of the award fee. And that then

for the headquarters to look at it in any meaningful way was causing the award fee to then be delayed over the time it should have been awarded.

Q. The requirement for headquarter's concurrence was a new step that was not accounted for in the time allotted for making the determinations; is that right?

A. Yes.

Q. Do you know Ed Goldberg?

A. Yes.

Q. He became acting manager at Rocky Flats; is that correct?

A. Yes.

Q. Did you talk to Mr. Goldberg about what was expected of him at Rocky Flats?

A. Yes.

Q. And as best you can recall, what did you say to Mr. Goldberg?

A. Oh --

Q. Let me try to make it easier for you. What did you say to Mr. Goldberg when he first

PL. SUPP. EX. 65

COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------ x
ROCKWELL INTERNATIONAL CORPORATION, :
Plaintiffs, :
v. : No. 91-1362C
: Judge York
THE UNITED STATES, :
Defendants. :
------------------------------ x

Friday, April 29, 1994
Washington, D.C.

DEPOSITION OF:

JAMES D. WATKINS,

a witness, called for examination by counsel for the Plaintiff, pursuant to notice of counsel, held at Cadbourne & Parke, 1101 Vermont Street, N.W., Washington, D.C. at 1:30 p.m. on Friday, April 29, 1994, before Thomas R. McPhail, CSR, Notary Public when were present on behalf of the parties:

the president asked me to take over the chairmanship of that commission. That completed in August of 1988.

And at that point, I went back, tried to go back in the private sector, then I got tapped in January of 1989 by President Bush to be Secretary of Energy.

Q. When were you sworn in as Secretary of Energy?

A. I was sworn in officially on the 1st of March, 1989, and ceremonially by the President on 9 March, 1989. But for legal purposes, it was 1 March, 1989.

Q. Were you working full time at the Department prior to being sworn in on March 1, 1989?

A. Did I go in every day?

Q. Yes.

A. Yes, and commence my turnover, yes, I did.

Q. When did that begin?

A. Nominally, 1 February. I can't remember the date, it -- I am not sure about 1 February

It existed in a variety of ways, but certainly by my own personal beliefs, was way out of line with what modern business management would require if I went out to get a contract.

I don't think anybody in the private sector, I have had people in the private sector look at those contracts. Would you ever sign to a subcontractor such a contract with you a major organization like you have, would you sign? Absolutely not, they would say, almost to a person. And then I said, why should the DOE stick to the same contract that was 40 years old.

Q. What about --

A. I can't give you any more detail because I just don't remember, I am not a contract expert, but I know when I hear it and see it what the problems are.

Q. What about the DOE contract with Rockwell for the Rocky Flats facility, did you have occasion early on to review that contract?

A. No, I didn't.

Q. While you were Secretary, did you ever

reach any views about whether there were flaws or defects with that contract?

A. No, except in the generic sense that we set some contract criteria out of our review that came later on. Like I think we started a whole review in June of '89 because of the Rocky Flats catalyst that accelerated our review. When the FBI went in, we had a major team that had to go out there with them; we had a lot of things going on.

So with that impetus, we moved out expeditiously to go after the various ingredients that gave rise or could have given rise to this event, and one of which was required a relook at the contract. But it was looked at really in the context of the larger contract review that was underway by my own contract people. I mean we had already started that in process, but not at Rocky Flats. We were triggered into Rocky Flats only by the FBI event, which I was unalerted to until May, ten days before the event. I didn't know anything about it.

I knew that we had a disconnect between headquarters and field, because I would ask questions and have to go to the field to get the answers; I couldn't get it from my headquarters people; I knew that we had a disconnect. But my focus, my guns were focused on Savannah River until I was alerted that we had this serious situation emerging at Rocky Flats with the FBI and the Justice Department.

Q. Do you recall whether as a result of the review of the Rocky Flats contract any conclusions were reached as to whether changes were required or necessary?

A. I don't remember the specifics, but clearly the contract, as I recall at the time, was not in line with the new principles of application of the waiting factors. For example, we were in court all over the country and losing our court cases on environmental law violations. And environmental law, include health violations of health practices, particularly as they relate to radioactivity.

I reviewed some of those cases unconnected with Rocky Flats, and I felt that we were, again, seriously flawed in our inability to have a credible data base from which we could enter a court case and have any hopes of winning our case. We simply didn't have the data on a lot of things.

So to that extent, I said okay, herein after 51 percent of all award fees are going to be based on compliance with environmental safety and health laws and good business practices. I had some familiarity with good business practices by Rockwell International at one of our own facilities, excellent performance out on the west coast and up in Santa Suzanna Mountains or something, we have a rocket dyne place out there.

And so we had other performance that indicated -- I mean Rockwell International is a big organization, and I had seen it when I was in the military; good performance. And my feeling is that I anticipated that from the

Westinghouses, and the Martin Mariettas, and the Rockwell Internationals, and even Dupont, when I came in, I made an assumption that they were using best business practices. And so that was not what I was focusing on at the outset, not best business practices. I was focusing on contracts; it was a longer term review.

So when the shock came at Rocky Flats, I had to shift my sights over to Rocky Flats, because I was extremely worried about the unprecedented insertion of FBI agents into a production facility with the most hazardous, potentially hazardous materials in the world. We were a plutonium production factory there.

All of a sudden, I had to put all my resources almost totally on that particular event to make sure, one, the investigation got run right; that the entrance of all of the people that were involved was smoothly handled; that we didn't have a confrontation with security people. And this is why Henson Moore was

dispatched out there, along with some experts, Mr. Duffy and others, to get right into the middle of this and ensure that we were not in any way going to hinder the Justice Department actions.

And I told the Attorney General before I went in, when he called me over to the Justice Department's and we met, Henson and I met with him and his people alerting us to this. We said, we must pave the way for you to do this right, otherwise we could have a confrontation there that neither side needs.

So I almost put full time on Rocky Flats really for the next couple of months. Did nothing but worry a lot about the situation there and what the Department of Energy could do. I couldn't just let a bunch of agents run around in that plant. We had operations underway. And we had to be very cautious about an impending investigation at the time we were trying to do things with plutonium.

So that was the sense of urgency when we

shifted gears -- I don't remember the date of the insertion of the FBI agents, but it was right in that late May, early June time frame.

Q. Let me ask you this, at the time you became Secretary, did headquarters play a role in the determination of the dollar amount of an award fee that was to be awarded to contractors?

A. Very little.

Q. Did you change that?

A. I think the contracts that were written, for the most part that was done by the field office determining officer. And that was the practice which I, at the outset, would not have interfered with until we did our complete review; although I sensed that it was not my idea of a top down organization where line responsibilities started with headquarters ownership. You might say the appropriation ownership of the site should have had some say in the performance evaluation; but, nevertheless, that was the way contracts were written.

Q. Did you change that after you became

Secretary?

A. Yes, I did.

Q. How did you change it?

A. I changed it almost at once in terms of award fee weighting factors, and that changed at all sites. I forget when it was, but it was not long thereafter when I went into the ten point program, one of which was to establish 51 percent of ES&H, environment safety and health was going to be the award fee weighting factor. They were in there, but they were down at the 20 percent or some lower level and relatively insignificant. In other words, you could violate the law and get a very good -- okay, you could.

Q. Get a very good award?

A. Sure. Okay. So I said not on my watch.

Q. Because that is in the contract as written?

A. Well, I don't know how it was written in the contract with Rockwell International specifically --

Q. Yes.

A. -- but generally that was the case.
Q. Right. Right. Getting back to involvement by headquarters --
A. That was one of the flaws that I talked about earlier. That we had to set all set of principles that all future contracts were going to disallow that kind of outcome which we felt was a possibility here. We didn't know. We only knew when all of a sudden they felt there were grounds to go into Rocky Flats. I didn't know there were grounds to go into Rocky Flats. And even the allegation, we got nothing out of Albuquerque office. Everything was very good. All evaluations had been very good, very good, excellent. So everything is very good.
Well, the FBI said it was very bad. So I assumed they had some grounds to get their subpoena to go in there. So you know we -- so that was a shock to me. I mean I will have to say it was a shock to me. I knew it was bad because I had seen it from the Defense side looking over the fence, but I had no idea the

depth throughout the organization we had of lack of knowledge of what was going on in the field at headquarters level, like my level.

Q. Getting back to headquarters involvement in the award fee process. You testified they had very little involvement when you first became Secretary.

A. Right.

Q. Did you change that structure during your tenure?

A. Yes, I did. I think I notified Capitol Hill to that effect too. I mean, you know, they even asked me, what are you doing about looking at that. There were all kinds of allegations that would come down from Senator Glenn's office, the Oversight of the Senate, in the house, on our practices.

So we had all these inquiries kept coming in. Of course, Rocky Flats triggered off a lot more.

Q. Right.

A. And we had to answer those and that was

when I answered back, I think on this 51 percent fee.

Q. But in addition to the 51 percent, did you require award fees to come from the field to headquarters --

A. To be reviewed.

Q. -- before going out to the contractor?

A. For their efficacy, yes.

Q. Was that done early on in your term; do you recall?

A. I can't remember when it was done. There is a good paper trail on that when that was put into effect. I don't remember the dates of it. We generally tried not to interfere with existing contracts. That is my belief that we should not do that, so we did not interfere with existing contracts where we didn't have authority within the contract to renegotiate certain sections of it. I didn't believe in that. I thought, you know, so the first major contractor where we did a complete review of everything in the contract was Martin Marietta; that was later on. That was

a two year effort to go through that.

But in the process, there were certain things that I felt we could do within the contract renegotiations and award fees was one of them. Now, the process that we followed there, in my opinion, was in large measure, again, triggered, I don't think it would come as fast if we hadn't had Rocky Flats with the FBI. That accelerated that aspect of it because I felt in our own review of our Tiger Team in parallel to the FBI agents, there was sufficient grounds in my mind, sufficient grounds in my mind to raise serious questions as to the potential outcome of any Grand Jury or any other thing on that case.

And that is why I took a new area officer and put him in, had him report directly into us, and outside the Twining circuit, because Twining in my opinion was a potential party to the investigation underway. And in view of the severe problems that we found, other than that which was allocated by the FBI that brought them in in the first place on the incinerator issue.

My own experience has been when you have a situation where the superiors in the chain of command are potentially involved, you have to bypass that system without jeopardy at the time and take more positive control of the situation. And that is what I did.

Q. Mr. Goldberg, is he the new person you put in at Rocky Flats?

A. Yes. And he later had to be moved because of high blood pressure and potential heart problems and we had to get another alternative who we basically had nothing but acting area officers in there for a period of time even when Rockwell International left.

Q. Mr. Goldberg came in simultaneously on the day of the FBI raid; is that right?

A. Yes, that was my idea, to make sure that we had a new and totally independent DOE official in charge of that site. Because, again, without any jeopardy to incumbents or any other personnel in there, we had to have somebody who could talk to the FBI without any perception that we were

interfering with the investigation in any way, or a person could be party to that investigation.

Q. Did Mr. Goldberg have direct access to you after he became appointed?

A. He did. He was directed to either call me, at the outset, daily or to write me frequently, frequently was daily for a while. And then later on came later, and there should be a paper trail on that.

Q. So he had very active contact with you?

A. Very active contact with me and we almost had daily meetings at the Department of Energy with Henson Moore, Duffy, the other experts that I brought in to oversee, particularly for environment safety and health issues.

Q. Did the --

A. And which started a daily reporting system that triggered off the whole daily operation reporting system from the field. And we brought in teams of people that had knowledge of the field to come into the office and rotate on a three month basis and start reporting to me daily

on operational problems in the field. We never had anything like that. Rocky Flats was the genesis of that thing.

I would have done it anyway because that's the proper procedure in the Navy's nuclear reactor program. When you have operational activities in the field, you had better know what is going on on things radioactive. And I got that going, but again the process was accelerated by this event, but Rocky Flats came in daily.

And phone calls were made to me frequently about is the situation there, is it stable and so forth.

Q. Did the other area managers other than Mr. Goldberg have this kind of access to you?

A. Yes.

Q. They all could?

A. But they did by directive, they just didn't have access, I felt a responsibility and I made them report to me in a bi-weekly letter or at any time they felt they had to contact me on things dealing with environmental safety and

health at their sites, and that included reactor safety. And non reactor nuclear safety.

This is part of the whole program called the 10 point program that I put into effect, and I believe it was in June, it might have been July, but it was sometime in there; and that is a matter of record too. The 10 point program was announced, I did it at a press conference.

Again, in large measure that was triggered much more by Savannah River safety shutdown than it was Rocky Flats, but Rocky Flats added a nice additional incentive to get on with the 10 point program. And 10 points, I can't remember the 10 points, but they are all in the record and they surround the variety of issues that were rapidly emanating from my new reporting procedure, and my new teams that were going out into the field to tell me what the real ground truth was. We didn't know, and neither did Albuquerque know of Rocky Flats; and neither did the Savannah River know for Savannah River; and neither did the Hanford office know for Hanford.

So we had a whole new culture we had to develop in there. The culture was not there. And I don't blame contractors solely, obviously. I mean DOE had responsibility over these years, 40 years had not set -- had not learned the lessons at Three Mile Island. There was an '81 study by the Crawford Board that laid this all out, what we were doing wrong. Department of Energy didn't do anything about it.

There was another study by the National Academy in 1987, laid it all out; the Department didn't do anything about it. That is why Dr. Frank Press came to see me in June of '89, and said Jim, we're not going to do this anymore, your Department isn't doing it. I said, what are you talking about, Dr. Press? And he said here it is, and he was right.

Q. Who is Dr. Press?

A. Dr. Press is the President of the National Academy of Sciences. That triggered, that day, the 10 point program. I said I have had it. We don't know what ground truth is in the field. We

aren't getting honest reporting, not because they are dishonest, because nobody set a demand on them to report. Do you report a spill of 10 gallons of radioactive liquid containing plutonium? You are damn right you do. Tell me right now, did you report it to the state; did you report it to the federal authorities as required by law? The answer was no too many times. Or we made a determination not to.

Q. You are referring to DOE people?

A. DOE as a whole, that kind of thing was going on.

Q. Did you have any communications with Mr. Twining at or around the time that Mr. Goldberg became the acting head at Rocky Flats?

A. Absolutely, I can't remember if I did or Henson Moore did. Henson Moore did most of the work directly with Twining for me, but I was totally aware. Twining had to be told that he was no longer the oversight, and had no oversight responsibility for Rocky Flats, we had it. We

took it away at the time that Goldberg hit the site. And I had Mr. Duffy in there as my right arm who was an expert. I have known him for many many years. He was a former Westinghouse employee at the Idaho National Engineering Laboratory.

Q. Was Mr. Twining told why Mr. Goldberg was going to replace Mr. Twining in the Albuquerque office for direct oversight?

A. I believe so, but I don't remember -- I don't remember any official correspondence in that regard, but I just don't remember.

Q. Do you recall what he was told?

A. I don't know when he was told that. I do know he was told that Goldberg had charge the day it happened.

Q. Yes.

A. That he no longer had that oversight or responsibility, although he had supporting responsibility to Goldberg; I couldn't take that away. I mean he owed Goldberg the paychecks for the people; he owed him a lot of things. So he

had to continue to support Goldberg, but he didn't have the responsibility for site operations any longer, oversight of site operations.

Q. Did you ever talk to Mr. Goldberg about Rockwell's award fees?

A. I don't remember whether I did or not, because I talked to Henson Moore and my people in headquarters. To the best of my knowledge -- well, Goldberg came in sometimes. It could have been generally discussed at that time, I just don't remember. I don't recall any specific event. It doesn't stand out.

Q. Let me just --

A. I mean, I would not deny that I didn't, but I can't tell you that I did.

Q. Okay, I will just make --

A. There is just too much going on at the time, too many people -- Goldberg was in and out of the headquarters. We had him back to give the whole department to debrief on what was going on at Rocky Flats; what he had found; what the Tiger

Teams were doing; what he was doing about the Tiger Teams; there was a lot of work going on.

As I say, we had our own responsibilities to keep that site running safely in oversight along with Rockwell, and we knew that. We had a contract with Rockwell, and I knew that. And I had some discussions with the chairman, the CEO of Rockwell, both in writing and on the phone about it. And you know, he was serious about it too. He was extremely worried about it. So we both were and we both had responsibilities and we were -- I was trying to share those more with him because we knew it was a team effort, supposed to be a team effort out there.

And I don't remember ever being insensitive to the contractual relationship we had. Yet on the other hand, having a situation come up where perhaps violation of environmental law or other health, good health practices, something that would bring discredit to the Department, I felt that was pretty serious on the other side, that the perspective of DOE's

responsibility for perhaps inadequate oversight had, still were responsibilities there. So in many ways, I felt the contract in itself had been somewhat violated perhaps on both sides.

Q. Okay.

A. Me, maybe in award fee differences and changes and maybe the other side, in just violation of law. And you know, what is the chicken and the egg in this thing. That is why I had a discussion with the Chairman of the Board. I think we just -- we both recognized it was a problem and I don't think either was trying to be defensive at the time; we were trying to help resolve it. And I knew that I had heavy responsibilities on the DOE side when my subsequent review revealed we didn't do a very good job.

Q. Just let me make a representation to you and see if it refreshes your recollection at all. Mr. Twining, before the FBI raid, had made a recommendation for an award fee for Rockwell for the pertinent award fee period then in

PL. SUPP. EX. 66

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ROCKWELL INTERNATIONAL | : |
| CORPORATION, | : ORIGINAL |
| Plaintiff(s), | : No. 91-1362 C |
| v. | : Judge Yock |
| UNITED STATES OF AMERICA, | : |
| Defendant(s). | : |

Wednesday, September 21, 1994

Washington, D.C.

Deposition of:

TROY E. WADE,

a witness, called for examination by counsel for the plaintiff, pursuant to Notice, at 9:53 o'clock a.m., at the offices of the U.S. Department of Justice, 10th and Constitution, N.W., Washington, D.C., before Diane Shaw, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties.

A In June, I believe it was, of 1977.

Q At that time did you also cease being the director of the laboratory?

A That is correct.

Q What was your position? What did your position become in June of 1987?

A I was transferred back to Washington, D.C. where I became, once again, the principal Deputy Assistant Secretary of Energy for Defense Programs. I held that position for about a month. Then I became the Acting Assistant Secretary when the gentleman, Bob Foley, by name, Admiral Robert Foley, who was the Assistant Secretary, when he retired. I became the Acting Assistant Secretary.

Q That would be in approximately in July of 1987?

A July of '87.

Q How long did you stay in that position?

A Until June of '89.

Q When you retired?

A When I retired, that is correct.

Q Did you retire effective the last day

of June of 1989?

A I believe it was the last day of May of 1989.

Q How long were you actually in the position? Is there a difference between that date and the effective date of your retirement?

A I don't believe so. I was the Acting Assistant Secretary from July the 1st of -- from, I think, the 1st of July of '87 until I retired.

Q I'll show them to you later. I believe there were some documents that were addressed to you during June of 1989.

A Maybe it was June 30 and not May 30. I stand corrected.

Q The documents may help you recollect.

When you were assistant manager of operations in the Nevada office did you have occasion to be involved in the administration of contracts?

A Yes, I did.

Q Did that include cost-plus-award-fee contracts?

Q During your tenure under Mr. Foley, did Mr. Foley give or deny his concurrence in regard to any award fees for any contractors?

A Not to my knowledge.

Q When you became Assistant Secretary for Defense Programs in 1987, what were your duties in connection with award fees?

MR. KOLAR: I believe it was Acting Assistant Secretary.

THE WITNESS: Acting Assistant Secretary.

MR. KOLAR: Just to clarify the record.

THE WITNESS: What were my duties with respect to the award fee? I was certainly as the Assistant Secretary advised of the award-fee determinations that were made by all of the field offices, operations offices that reported to Defense Programs or through Defense Programs to the Undersecretary.

BY MR. KELLEY:

Q When you became Acting Assistant

Secretary of Defense Programs, were you asked to give concurrence to any award fees for any contractors?

MR. KOLAR: Objection, asked and answered. You can go ahead and answer.

THE WITNESS: I'm sorry?

MR. KOLAR: You can go ahead and answer. I just noted an objection for the record. It doesn't affect your answering the question.

THE WITNESS: No, I do not recall ever being required to concur in an award-fee determination.

BY MR. KELLEY:

Q Does that include up until the time you retired?

A With one possible exception, and that was an award-fee determination that I asked be postponed before it was announced, made official.

Q What award fee was that?

A That was at Rocky Flats in early '89.

Q Do you know who the award-fee determination official was for Rocky Flats in

1989?

A Bruce Twining, T-W-I-N-I-N-G. Bruce Twining who was the manager of the Albuquerque Operations Office.

Q Was this in connection with the award fee for the period October 1st, 1988, through March 31st, 1989?

A Yes. Yes, although I -- the reason I'm hesitating was I couldn't remember whether it was a six-month judgment. Some were six months, some were ninety days, some were nine months around the system. It was generally for that time period, yes.

Q Other than that one incident did you ever request concurrence for any award fee during your tenure as Acting Assistant Secretary for Defense Programs?

A Not to my specific recollection. There were discussions in '89 about award-fee determinations with regard to Savannah River, but I do not recall ever instructing anybody to do anything one way or the other with regard to

Savannah River.

Q Prior to the period of October 1st, 1988, through March 31st, 1989, did you ever instruct or require the award-fee determination official to obtain concurrence from Headquarters with regard to Rocky Flats?

A Not to the best of my knowledge.

Q Mr. Wade, I am handing you a document that has been previously marked as Exhibit 12.

A (Witness examining document) There I am. I signed it.

Q I see you have had a chance to review the document. Is that right?

A Yes. I just looked through it. That is correct.

Q What is this document?

A What is this document? Well, it's a compilation of the award-fee determinations for Albuquerque office operations.

Q It is being sent from Mr. Bruce Twining to you. Is that right?

A That is correct.

PL. SUPP. EX. 67

9-1-89
Draft
To: GLM
Fr: DBL

DP-542.1

Award Fee Determination for the Period October 1, 1988 through March 31, 1989, for Rockwell International Corporation

Deputy Secretary, S-2

**ISSUE:**

Payment of Award Fee to Rockwell International (RI) for the evaluation period October 1, 1988 through March 31, 1989, as operating contractor for the Rocky Flats Plant.

**DISCUSSION:**

- The contract with RI as operating contractor specifies that a performance evaluation be completed every six months and an award fee be paid based on said performance evaluation.
- The Award Fee Determination Official (AFDO) (Manager, Albuquerque Operations Office), based on Performance Evaluation Review Board reports, a special on-site review and evaluation by Mr. Goldberg, Acting Area Manager, and other information available to him, has determined that a numerical rating of 87 equating to an award fee of $3,815,213 is appropriate.
- The Headquarters Office of Weapons Production, DP-23, has reviewed the supporting documentation and recommends the Award Fee Determination Official's determination be reduced by $912,315 to a total of $2,902,898 due to Environment, Safety and Health (ES&H) issues existing during the review period.

**CONCERNS/SENSITIVITIES:**

- By contract, the Award Fee Determination Official is to transmit his determination of fee earned to the contractor within a specified period of time.

**RECOMMENDATION:**

Concur in an Award Fee Determination of $2,902,898.

John L. Meinhardt
Acting Assistant Secretary
for Defense Programs

Agree ______________

Disagree ______________

DP-542.1

**INFORMATION**: Award Fee Determination for the Period October 1, 1988 through March 31, 1989, for Rockwell International Corporation

Deputy Secretary, S-2

**BACKGROUND**:

Rockwell International Corporation (RI) is the Managing and Operating Contractor (M&O) for Plant Operations at Rocky Flats, Colorado. The Rocky Flats Plant (RFP) operates under the direction and supervision of the Albuquerque Operations Office (ALO). The Manager at ALO is the DOE Contracting Officer for the RI M&O contract at RFP.

On June 21, 1989, the Acting Assistant Secretary for Defense Programs (ASDP), concurred in ALO's Award Fee Determinations for the other M&O's under ALO, i.e., Allied Signal, Inc.; EG&G Mound Applied Technologies, Inc.; General Electric Company; Manson Hanger-Silas Mason, Inc.; and Westinghouse.

At that time, the ASDP stated that it was premature to concur in the proposed Rockwell award fee. The environmental investigations taking place indicated that further scrutiny might reveal environmental, safety and health problems that were systematic and as yet undiscovered. The current contract provides for an award fee based on contractor performance during the 6-month evaluation period, October 1, 1988 thru March 31, 1989. The objective of the award fee is to provide the contractor with the opportunity to earn an increased fee commensurate with the achievement of optimum performance in pursuit of contract goals and objectives.

The contractor's performance during the evaluation period is assessed and reported by a Performance Evaluation Review Board (PERB) established by ALO. The PERB evaluates contractor performance in specific Functional Performance Areas (FPA) identified in the award fee plan. The PERB in turn develops a report with recommendations for award fee which is transmitted to the Award Fee Determination Official (AFDO).

**DISCUSSION**:

The AFDO, implementing the ASDP nonconcurrence in the RI proposed award fee in his transmittal of May 31, 1989, requested Mr. Edward S. Goldberg, Acting Area Manager, Rocky Flats Area Office, to reevaluate RI's performance for the period covered by the Award Fee Plan. In a memorandum dated July 27, 1989, Mr. Goldberg transmitted to Mr. Twining, the AFDO, his assessment of RI's performance and resultant rating(s).
Mr. Goldberg's assessment of RI's performance differs from the

PERB's recommendations in the FPA's on General Management, Quality Assurance and Environment, Safety and Health (ES&H). As a result of this reevaluation, the overall numerical rating was reduced to "87" from the previous rating of "91.2". The numerical rating "87" translate into an award fee of $3,628,622, a downward adjustment of $1,697,859. The maximum available award fee for the period was $6,822,000.

The AFDO, not being in a position to offer an informed alternative, accepted Mr. Goldberg's assessment of RI's performance since he was on site at the RFP for several weeks and had gained considerable insight into the conditions existing at RFP.

FOr the portion of the RFP operations that had been split out for evaluation purposes, i.e., the Plutonium Recovery Modification Project (PRMP) and the Plutonium Recovery Option Verification Exercise (PROVE), Mr. Goldberg agreed with the May 31, 1989, recommendation of an award fee of $186,591. Thus, the total award fee for RI during the period evaluated is $3,815,213 ($3,628,622 plus $186,591).

The Headquarters Office of Weapons Production, DP-23, has reviewed the documentation supporting the proposed award fee and recommend a further reduction of $912,315 to $2,902,898 from the AFDO's determination of $3,815,214 due to ES&H issues existing during the review period.

<u>CONCLUSION</u>:

Concur in an Award Fee Determination of $2,902,898.

John L. Meinhardt
Acting Assistant Secretary
for Defense Programs

PL. SUPP. EX. 68

Uno lining identifies where legal made changes.

DP-23

Award Fee Determination for the Period October 1, 1988 through March 31, 1989, Rockwell International Corporation (RI)

Acting Assistant Secretary for Defense Programs, DP-1

The Award Fee Determination Official (Manger, Albuquerque Operations Office), based on Performance Evaluation Review Board reports and a special onsite review, evaluation, and recommendation by Edward Goldberg, Acting Area Manager, has determined that a numerical rating of "87" be given to RI in its performance as operating contractor for the Rocky Flats Plant. The numerical rating of "87" equates to an award fee of $3,815,213 (this includes a recommended award fee of $186,591 for the Plutonium Recovery Modification Project/Plutonium Recovery Option Verification Exercise (PROVE)). The available award fee for the period was $6,822,000.

Although the recommended amount represents only 53.19 percent of the available award fee, I recommend that an additional downward adjustment be made that reflects the environmental, safety, and health (ES&H) situation that existed at the Rocky Flats Plant during the appraisal period.

I base my position on the following points:

1. Cessation of operations in Building 771 in October 1988 due to inadequate safety procedures and radiological safety margins in the building. Although Rockwell pursued a very aggressive corrections effort after the fact, the mere existence of this situation demonstrated less than satisfactory attitudes, procedures, and awareness for safety on the part of Rockwell.

2. 91 out of 230 safety concerns documented by external reviews and an internal Rockwell review done prior to the valuation period were not addressed during the period. Again, this indicates that a lack of priority attention was being paid to safety and health by Rockwell.

3. During the period, 32 new safety concerns, including six classified as Type 2 (serious), were identified.

4. A major environmental incident occurred during the period when chromic acid was released from Building 444 and contaminated the plant's holding ponds. An inoperable alarm system and deficient operator vigilance contributed significantly to the seriousness of this incident.

13.2



Overall, I believe there is strong evidence that throughout the appraisal period there was a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities.

I recommend, therefore, the "moderately good" numerical grade of 79 given to RI for its performance ~~under~~ the ES&H category be downgraded to a numerical grade of ~~65.25~~ 66. Since ES&H carries an evaluation weight of 20 percent, the adjusted weighted score would now be ~~13.05~~ (65.25 X 20). The weighted score awarded by Mr. Goldberg was 15.80. The adjusted overall rating will now be ~~84.25~~ 84.4. This equates to an award fee of ~~$2,716,307~~. I totally support the award fee of $186,591 for PROVE. I, therefore, recommend awarding RI a fee of ~~$2,902,898~~. $2,943,717 $2,757,126

Paragraph deleted.

J. M. Barr
Rear Admiral, U.S. Navy
Deputy Assistant Secretary
for Military Application
Defense Programs

DP-231:JMarchetti:bc:3-3487:8/28/89 (Bonnie HDD--erick15)

Distribution:
so: Addressee
6bcc: Std DASMA

Correspondence Reviewer ___________

*PREVIOUS COORDINATION VALID

ALTERNATIVE (Beiriger's)

65 X .20 = 13

SUM OF ALL GRADE POINTS = 84.2

RESULTANT EARNED FEE = $2,703,123
+ 186,591
$2,889,714

PL. SUPP. EX. 69

DOE F 1325.8
(12-84)

2 turn to [illegible] Willett

United States Government

Department of Energy

# memorandum

DATE: SEP 6 1989

REPLY TO ATTN OF: DP-23

SUBJECT: Award Fee Determination for the Period October 1, 1988, through March 31, 1989, Rockwell International Corporation (RI)

TO: Acting Assistant Secretary for Defense Programs, DP-1

The Award Fee Determination Official (Manager, Albuquerque Operations Office), based on Performance Evaluation Review Board reports and a special onsite review, evaluation, and recommendation by Edward Goldberg, Acting Area Manager, has determined that a numerical rating of "87" be given to RI in its performance as operating contractor for the Rocky Flats Plant. The numerical rating of "87" equates to an award fee of $3,815,213 (this includes a recommended award fee of $186,591 for the Plutonium Recovery Modification Project/Plutonium Recovery Option Verification Exercise (PROVE)). The available award fee for the period was $6,822,000.

Although the recommended amount represents only 53.19 percent of the available award fee, I recommend that an additional downward adjustment be made that reflects the environmental, safety, and health (ES&H) situation that existed at the Rocky Flats Plant during the appraisal period.

I base my position on the following points:

1. Cessation of operations in Building 771 in October 1988 due to inadequate safety procedures and radiological safety margins in the building. Although Rockwell pursued a very aggressive corrections effort after the fact, the mere existence of this situation demonstrated less than satisfactory attitudes, procedures, and awareness for safety on the part of Rockwell.

2. Ninety one out of 230 safety concerns documented by external reviews (as well as by an internal Rockwell review) remained open during the period. Again, this indicates that a lack of priority attention was being paid to safety and health by Rockwell.

3. During the period, 32 new safety concerns, including 6 classified as Type 2 (serious), were identified.

4. An inoperable alarm system was not repaired and eventually was a factor in a major environmental incident on April 13, 1989, when chromic acid was released from Building 444 and contaminated the plant's holding ponds.

Overall, I believe there is strong evidence that throughout the appraisal period there was a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities.

I recommend, therefore, the "moderately good" numerical grade of 79 given to RI for its performance under the ES&H category be downgraded to a numerical grade of 66. Since ES&H carries an evaluation weight of 20 percent, the adjusted weighted score would now be 13.2 (66 X 20). The weighted score awarded by Mr. Goldberg was 15.80. The adjusted overall rating will now be 84.4. This equates to an award fee of $2,757,126. I totally support the award fee of $186,591 for PROVE. I, therefore, recommend awarding RI a fee of $2,943,717.

J. M. Barr
Rear Admiral, U.S. Navy
Deputy Assistant Secretary
for Military Application
Defense Programs