PL. SUPP. EX. 70

PAGES: 2
(not counting cover page)

DATE: 9/20/89

TO: Jim Culpepper
DOE Albuquerque Opns.

FROM: John Meinhardt, DP-1
DOE Washington

NOTE: Sender, please contact receiver to pick up message!

| LOCATION | FAX NO. | NOTES |
|---|---|---|
| FSTL DP-20 | 586-7260 | Bonnie — |
| GTN DP-20 | 353-5850 | Please pass this to |
| GTN DP-22 | 353-6417 | Mr. Culpepper as Mr. Meinhardt |
| GTN DP-32 | 353-6133 | has requested. |
| GTN DP-34 | 353-4164 | |
| GTN DP-50 | 353-2965 | |
| AL | 8-844-4197 | Thanks |
| CH | 8-972-2527 | |
| ID | 8-583-1184 | Tim Pflaum |
| OR | 8-626-1063 | |
| NV | 8-575-1371 | |
| RL | 8-444-8153 | |
| SAN | 8-536-6647 | |
| SR | 8-239-1259 | |

DRAFT

DP-23

Award Fee Determination for the Period October 1, 1988, through March 31, 1989, Rockwell International Corporation (RI)

Acting Assistant Secretary for Defense Programs, DP-1

The Award Fee Determination Official (Manager, Albuquerque Operations Office), based on Performance Evaluation Review Board reports and a special onsite review, evaluation, and recommendation by Edward Goldberg, Acting Area Manager, has determined that a numerical rating of "87" be given to RI in its performance as operating contractor for the Rocky Flats Plant. The numerical rating of "87" equates to an award fee of $3,815,213 (this includes a recommended award fee of $186,591 for the Plutonium Recovery Modification Project/Plutonium Recovery Option Verification Exercise (PROVE)). The available award fee for the period was $6,822,000.

Although the recommended amount represents only 53.19 percent of the available award fee, I recommend that an additional downward adjustment be made that reflects the environmental, safety, and health (ES&H) situation that existed at the Rocky Flats Plant during the appraisal period.

I base my position on the following points:

1. Cessation of operations in Building 771 in October 1988 due to inadequate safety procedures and radiological safety margins in the building. Although Rockwell pursued a very aggressive corrections effort after the fact, the existence of this situation indicated a less than satisfactory attitude, procedures, and awareness for safety on the part of Rockwell.

2. Ninety one out of 230 safety concerns documented by external reviews (as well as by an internal Rockwell review) remained open during the period. Again, this indicates that a lack of priority attention was being paid to safety and health by Rockwell.

3. During the period, 32 new safety concerns, including 6 classified as Type 2 (serious), were identified.

4. A major environmental incident occurred during the period when chronic acid was released from Building 444 and contaminated the plant's holding ponds. An inoperable alarm system and deficient operator vigilance contributed significantly to the seriousness of this incident.

Should be substituted for 1st ES&H paragraph of your attachment

E 001469

DASMA. DP-20

DRAFT

003

Overall, I believe there is strong evidence that throughout the appraisal period there was a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities.

I recommend, therefore, the "moderately good" numerical grade of 79 given to RI for its performance under the ES&H category be downgraded to a numerical grade of 65.25. Since ES&H carries an evaluation weight of 20 percent, the adjusted weighted score would now be 13.05 (65.25 X 20). The weighted score awarded by Mr. Goldberg was 15.80. The adjusted overall rating will now be 84.75. This equates to an award fee of $2,716,307. I totally support the award fee of $186,591 for PROVE. I, therefore, recommend awarding RI a fee of $2,902,898.

This review was based on limited staff and limited review time; future award fee reviews will be conducted in a more rigorous fashion by my staff.

J. M. Barr
Rear Admiral, U.S. Navy
Deputy Assistant Secretary
for Military Application
Defense Programs

DP-231:JMarchetti:bc:3-3487:8/28/89(Bonnie HDD--erick15)

Distribution:
so: Addressee
6bcc: Std DASMA

Correspondence Reviewer ________

*PREVIOUS COORDINATION VALID.

PL. SUPP. EX. 71

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA ex rel. James S. Stone,

Plaintiff,

v. No. 89-M-1154

ROCKWELL INTERNATIONAL CORPORATION, THE BOEING CORP., BOEING NORTH AMERICAN, INC.,

Defendants.

DEPOSITION OF JAMES A. STOUT
April 30, 1998
9:10 a.m.
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. MICHAEL A. WILLIAMS
ATTORNEY FOR THE DEFENDANTS

REPORTED BY: MARY ABERNATHY SEAL, RDR, CRR, NM CCR #69
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

5439-10 MAS

Albuquerque, and then over a little over a year ago, formed my own company.

Q. You told me the name. Tell me again.

A. Stout Group.

Q. Would you tell me what positions you held with the AEC?

A. I was an attorney in the office --

Q. I mean AEC, ERDA, and DOE.

A. Yes. These agencies just literally succeeded themselves by act of Congress.

Q. Preceded by what? Manhattan Engineer District, or --

A. Manhattan Engineer District, and I was never a part of that, okay?

Q. All right.

A. I was an attorney in the office of chief counsel here in Albuquerque for AEC, beginning late in 1966. And I became the counsel for the Rocky Flats Area Office of AEC in approximately 1972, and I left there in about 1978.

Q. You were onsite at Denver?

A. I was. I was at the Rocky Flats plant.

Q. At Rocky Flats? Okay.

A. I had a year as a congressional fellow in Washington, and I returned to Albuquerque as an assistant chief counsel. Then the deputy chief counsel, then the chief counsel, and that's the position I held until I retired in 1994. My

recollection is that I was appointed as the chief counsel in 1985.

Q. What were your duties when you were at Rocky Flats from 1972 to 1978?

A. I was the legal advisor to the manager of the Rocky Flats -- DOE's Rocky Flats Area Office, and working for the chief counsel in Albuquerque.

Q. Who was the chief counsel at that time?

A. A gentleman by the name of Leonard Jacobvitz.

Q. Who succeeded you at Rocky Flats in that position?

A. A gentleman by the name of Patrick Currier.

Q. In connection with the work you did there at Rocky Flats, did you have the occasion to interact with Rockwell personnel?

A. Yes, part of the time.

Q. Any particular people that you interacted with more than others or that come to mind?

A. When I went to Rocky Flats, the Dow Chemical Company was operating the facility, and in about 1975 there was a selection, competition, which was won by Rockwell International. There was a -- I have a recollection of only a few names. There was a gentleman by the name of R.O. Williams, who was an onsite manager. There was a gentleman by the name of Sam Iakobellis, who was a corporate official. And eventually, before I left the site, Rockwell International had

Q. Had to do with whether it was an accurate representation to have your views?
A. Yes. Might be someone else's views, but to the extent they characterized mine, it was inaccurate.
Q. Okay. Did you participate in any way in the awards fee process for Rocky Flats?
A. Yes.
Q. What was your role? How did you participate?
A. The award fee process was administered -- first of all, the award fee determining official was the manager of Albuquerque. His small staff included a gentleman by the name of Charles Troell, who was an assistant manager responsible for finance and contracts. He led a group called the Performance Evaluation Review Board that included the other key officials and members of the small staff, and I was one of those officials.
My role, if you will -- I mean, we each carried to the table our own specialties, so that when one evaluated a contractor's -- by the way, this was broader than Rocky Flats. It was every contract under DOE's --
Q. There were eight or ten, weren't there?
A. Six or eight, and it was done twice a year, and they were all done at one time, in a long two- or two-and-a-half-day session. Each contract -- as we took up Rocky Flats, for example, the staff, or at least the manager from Rocky Flats,

Q. And the what?

A. And the contract.

Q. And let's say prior to 1989, the weight assigned to ES&H matters was very small, was it not?

MR. HESCH: Objection. Form, foundation.

Q. (By Mr. Williams) I know we can dig it out, but it seems to me it's like 3 percent.

A. There was a time in the Watkins administration when all factors related to ES&H --

Q. I'm talking pre-Watkins?

A. Had to be 50 percent.

Q. I understand, but pre-Watkins, let's say pre-Watkins. Whatever that date was, pre-Watkins, by "relatively small," I would have been surprised to see much variation from 15 or 20 percent of the total fee for ES&H.

Q. Which of these is the originals?

A. So I think that's -- and the obvious -- there were categories in production, procurement. I can't remember all of them, but by comparison to the Watkins administration, they were much less than 50 percent, and perhaps that meets your definition of "very small."

Q. Well, I'm looking at Exhibit 701, which indicates that 1981 to 1985 ES&H average rate was 3 percent, and from 1985 to 1988, the average rate was 12 percent. I think that's where I got my sense. I think that's a record on your award

fees.
A. Well, I agree that this document says that. My time on the PERB would have been during the 1986-to-1988 time frame. I was chief counsel in 1985. And I would have remembered a higher number than 12 percent. That's my recollection. But this says 12, I grant you. Smaller by far than 50 percent.
Q. Yes. Well, I mean, Admiral Watkins, I think, has said publicly that he intended a major change and shift in emphasis.
A. Yes.
Q. And in fact, it's your observation that happened after he became Secretary; right?
A. No question.
MR. HESCH: Object. Form, foundation.
Q. (By Mr. Williams) Do you remember in the consideration of the award fees for 1988 any discussion about pondcrete?
A. No, not in that context. And again, attention to a year, in any case.
Q. Do you remember discussion about pondcrete in connection with award fees at all during the time that you were there?
A. Yes.
Q. Tell me about that.

morning that described a Savannah River -- a challenged amount in the range of some number like $64 million. I believe that was a question of willful misconduct or lack of good faith. But I don't recall any other specific allegations of fraud involving a DOE M&O contractor.

(Exhibit 1866 marked for identification.)

Q. I'm handing you what's been marked 1866. It's actually a declaration that I have prepared and submitted to the Court. I'm going to use it as an aid to ask you questions about communications and conversations you have had with Rockwell's counsel relating to this lawsuit or issues in this lawsuit.

MR. WILLIAMS: I'm going to object to that. The reason for my objection is that he's already testified that he didn't see it at any time before it was filed, and saw only portions of it last night, so I don't think it's an aid to him other than some kind of an outline for you to follow.

With that objection, obviously, you can proceed.

Q. (By Mr. Hesch) Well, let me start with just a little background. Was your title chief counsel at Albuquerque? Did I have that correct, or did I make --

A. The title is correct.

Q. You were chief counsel from what year to what year?

A. 1985 to April of 1994.

Q. Can you just briefly describe what the role and

duties of chief counsel are, what your duties and role as chief counsel were? And you don't have to refer to this document. I'm just going to ask you in general to state that.
A. Well, I served as a legal officer for the United States Department of Energy both with respect to the internal affairs of the agency, hiring, firing, compliance with the various federal requirements; and with respect to the business affairs of the agency, namely its contracts with other outside organizations.
Q. Were you the chief legal advisor for your office?
A. For the contracting officer and the manager of the ops office, yes.
Q. What percentage of your job was actually, then, involved with providing legal advice to your client, DOE? Was that substantially all of your job?
A. Yeah. Yes.
MR. JAKE CHAVEZ: Don't forget to look at the reporter when you answer the question.
A. Thank you, Jake. Being cruel again.
Q. (By Mr. Hesch) Would it be fair to state that part of your advice that you provided to the Department of Energy related to DOE's contract with Rockwell?
A. Yes.
Q. And you would have provided advice relating to the award fees paid by DOE to Rockwell between 1987 and 1990?

A. Yes.
Q. And you were involved in the determination by DOE whether to renew Rockwell's M&O contract in or about the 1987-1988 time period?
A. I'm sorry, I can't relate to the time frame involved, but as a general proposition, any time an M&O contract would be extended by Albuquerque, I would see or sign off on the documents related to that extension. So your specific reference to the dates -- I can't focus on that.
Q. But you provided legal guidance and opinions to DOE relating to contract renewal of Rockwell?
A. Yes.
Q. Did you provide guidance to Mr. Currier as counsel to the Rocky Flats area?
A. Mr. Currier, Mr. Patrick Currier, worked for me in the legal chain. I was his legal supervisor for matters of law and legal policy, and I think it would be fair to say that I provided guidance to him. He was a senior attorney, and oftentimes I provided guidance and response to his questions. He was alone and didn't require day-to-day supervision.
Q. Would it be fair to say that often, at least -- maybe you could tell me a different term if you don't agree with the term "often" -- but often your communications with him would have been confidential communications?
A. That would be a fair statement. Certainly not

PL. SUPP. EX. 72

UNITED STATES COURT OF

FEDERAL CLAIMS

ROCKWELL INTERNATIONAL CORPORATION, )
)
Plaintiff, )
)
vs. )
)
UNITED STATES OF AMERICA, )
)
Defendant. )
)

ORIGINAL

CASE NO. 91-1362

DEPOSITION OF DONALD R. BEALL

MONDAY, JULY 18, 1994

REPORTED BY:
JEANNETTE K. JESSUP
C.S.R. #8573

SIMS, SCHNEIDER & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
149 PALOS VERDES BOULEVARD
SUITE C
REDONDO BEACH, CALIFORNIA 90277
(310) 791-4466

SEAL BEACH, CALIFORNIA; MONDAY, JULY 18, 1994

2:15 P.M.

DONALD R. BEALL,

the witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. KOLAR:

Q. Would you go ahead, sir, and state your full name and spell it for the record.

A. Donald Ray, R-a-y, Beall, B-e-a, double "l."

Q. Mr. Beall, my name is Jack Kolar. I'm an attorney with the Department of Justice, civil division, representing the government in this matter, the lawsuit by Rockwell International against the United States. I would assume that your attorneys have met or Rockwell's attorneys, that is, have met with you and explained the deposition procedure. I'd be happy to give you a brief explanation if you'd like to do that, or we could simply move on.

A. I think we could move on.

Q. You're currently the Chairman of the Board

and Chief Executive Officer of Rockwell International Corporation; is that correct?

A. Yes.

Q. How long have you served in that job?

A. Since February 1988.

Q. Are you familiar with the Rocky Flats plant?

A. Yes.

Q. For the record, what is that?

A. It's a nuclear weapons -- it's part of the nuclear weapons complex.

Q. And at one point Rockwell International operated that plant for the Department of Energy; is that right?

A. That's right.

Q. On Tuesday, June 6th, 1989, agencies of the Federal Bureau of Investigation and the Environmental Protection Agency executed a search warrant at Rocky Flats. Do you recall that?

A. Yes.

Q. I'm going to refer to this, for shorthand, as the FBI raid. Were you aware of the raid before it occurred?

A. No.

Q. Was anyone in Rockwell International, to your knowledge, aware of the raid before it occurred?

A. No.

Q. How did you learn about it?

A. I got a phone call in -- I believe I was in London.

Q. And who called you?

A. I suppose it was our general counsel, but I don't -- or Sam Iacobellis. I don't recall.

Q. Who was the general counsel at the time? That's in June 1989.

A. Charles Harff.

Q. Is he still the general counsel?

A. Yes.

Q. Who is Mr. Sam Iacobellis?

A. Mr. Sam Iacobellis is today Executive V.P. and Special Deputy Chairman. At that time he was, among other things, accountable for Rocky Flats, in addition to other parts of the company, all our aircraft and space businesses.

Q. Was he one of a number of peers, or was he the second in command, as it were, to you?

A. He was one of a number of direct reporting subordinates who, among them, had accountability for all of Rockwell's businesses.

Q. And Mr. Iacobellis was the particular individual accountable for Rocky Flats, you said?

A. Yes.

Q. Did Mr. Iacobellis call you on the day of the raid?

A. I don't remember.

MR. NEY: Objection. He said Mr. Iacobellis or Mr. Harff, or he really didn't recall.

MR. KOLAR: All right. Excuse me.

Q. Was it on the day of the raid that you received the call, or was it sometime thereafter, to your recollection?

A. I don't recall. I don't recall specifically.

Q. And what were you told in this telephone call?

A. I really don't recall the specifics. I mean, I recall the allegations that were made at the time of the raid -- so-called raid, but I don't remember the specifics of the conversation.

Q. What do you recall about the allegations?

A. That we were, you know, releasing toxic and/or radioactive materials into waste streams and into the atmosphere through consideration and such things like that.

Q. And was this reported to you in that phone call, that these were the allegations that were made?

A. I don't recall specifically whether the

disclose it.

Q. Mr. Beall, we've looked at a number of items of correspondence between yourself and Admiral Watkins following the June 6th, 1989 FBI raid. And you've testified to a number of conversations that you've had with the Admiral. In summary, during any of those conversations or communications did the subject of award fees come up, to your recollection?

A. In those conversations I don't recall that specifically came up. I don't recall.

Q. Do you have a recollection of any conversations you had with Admiral Watkins in which award fees were talked about?

A. I only had two conversations with him, both of which we've discussed, and I don't recall that specifically coming up.

Q. You did talk to Admiral Watkins, however, about a number of issues involving management at Rocky Flats, whether Rockwell would continue as contractor there. You've testified to that. At any point did you object to Admiral Watkins' involvement in the issues relating to Rocky Flats?

MR. NEY: In the issues you just identified?

MR. KOLAR: In any of the issues related to Rocky Flats. I was simply characterizing what I felt he

PL. SUPP. EX. 73

UNITED STATES COURT OF FEDERAL CLAIMS

**ORIGINAL**

Rockwell International Corporation )
Plaintiff, )
vs. ) No. 91-1362
United States of America, )
Defendant. )

Deposition of Sam Iacobellis

July 19, 1994

SIMS, SCHNEIDER & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
149 PALOS VERDES BOULEVARD
SUITE C
REDONDO BEACH, CALIFORNIA 90277
(310) 791-4466

Reported by: Arthur M. Schneider CSR No. 4771

A Yes.

Q What was your title and duties in 1989?

A President -- I am going to give you two. It was either president, Aerospace Operations, or it was executive vice president and chief operating officer. I don't recall which it was.

Q We marked a document yesterday as Exhibit 104. I will show you a copy of it today and ask you whether that helps you clarify your recollection.

A What was the date you asked?

Q In 1989, the year 1989.

A Effective July 13 I -- my title was the latter, Executive Vice President and Chief Operating Officer. Prior to July 13 I was the other title. I had the other title, which was -- it doesn't say it here but president of the Aerospace Operations.

Q What were your duties generally as president of the Aerospace Operations?

A I was in charge of all of the aerospace activities of Rockwell.

Q Were you also in charge of the Rocky Flats plant?

A Yes.

Q For the record what was the Rocky Flats plant and what was Rockwell's relationship to it in 1989?

A In 1989, Rockwell was the operator of the government Rocky Flats facility in Golden, Colorado.

Q That's a nuclear weapons facility?

A Yes.

Q Did your duties change, and if so, in what way, after you became executive vice president and chief operating officer July 13, 1989?

MR. NEY: In general or with respect to Rocky Flats?

MR. KOLAR: First, in general.

THE WITNESS: Thank you. In general, it included all of the previous responsibilities, including some responsibilities that were corporate functions, and specifically relative to Rocky Flats, it continued the responsibility for that activity.

BY MR. KOLAR:

Q Did the nature of your responsibilities for Rocky Flats change at that point or did they continue to be the same as they had been before?

A Relative to Rocky Flats, I believe they continued as they were before. As an individual, I had a broad responsibility.

Q Do you recall that on Tuesday, June 6, 1989, the Federal Bureau of Investigation and Environmental Protection Agency executed a search warrant at Rocky Flats?

A Am I aware of that?

Q Yes.

A Yes.

Q I am going to refer to that for shorthand as the FBI raid.

A Okay.

Q How did you learn about the FBI raid, you yourself?

A I received a phone call from Dominick Sanchini.

Q Who was Dominick Sanchini at the time?

A He was the president and general manager, I believe his title was at the time, of Rocky Flats.

Q Did Mr. Sanchini in June of 1989 report directly to you or through intermediaries?

A Directly.

the phone calls.

Q Who do you know John Tuck to be?

A Someone in the Washington office of the DOE.

MR. KOLAR: I would like to mark this as Exhibit 111.

(The above-mentioned document was marked for identification by the Certified Shorthand Reporter, and is attached hereto.)

BY MR. KOLAR:

Q Exhibit 111 is Mr. Moore's report of a telephone conversation that he initiated to you on July 13. Do you recall that conversation?

A I don't recall a conversation.

Q Do you recall Mr. Moore at any time informing you that Department of Energy was delaying the pending award fee determination until August?

A I recall upon reflection and refreshing yesterday, that such a call did take place.

Q What was said during that call?

A That the award fee was going to be delayed. I don't recall how long or --

Q Do you recall how you responded to

that information?

A I acknowledged.

Q Did you acquiesce or agree?

A Yes.

Q Let's go ahead and mark this as Exhibit 112.

(The above-mentioned document was marked for identification by the Certified Shorthand Reporter, and is attached hereto.)

BY MR. KOLAR:

Q Before you look at that document, Mr. Iacobellis, going back to the conversation you just testified to, was that a conversation between you and Mr. Moore, Henson Moore, and who were the participants in that conversation?

A Under the nature of the previous question, I assume it was Mr. Moore. I have no reason to believe it was not Mr. Moore. I have no recollection of anybody else being on the phone call.

Q Why don't you go ahead then and peruse Exhibit 112.

A (Witness complies.)

Q I think if you look at the first

conditions?

A I don't recall. Was the next one -- I am asking you. Was the next one the phone call between Watkins and Beall?

Q To tell you the truth, I am not sure whether there weren't others, but let me simply ask you, do you have any recollection of Admiral Watkins telling Rockwell that he would terminate Rockwell if Rockwell suspended operations?

A No.

MR. KOLAR: Let me have a couple minutes to review what we have done so far, and I will be able to tell you. I may not have any additional questions.

MR. NEY: Why don't we take a five-minute break.

(Short recess).

BY MR. KOLAR:

Q I just have a couple summary questions, and I will be through. Do you have any recollection, Mr. Iacobellis, of discussing at any time in this period from June 1989 to September 1989, award fees with the Department of Energy?

A Yes. Only to the extent in line with what I already testified, that -- and refresh my

memory with these letters, that Henson Moore asked or told me or suggested that we would -- he was asking for a delay in the determinations. That's the extent of what I remember.

Q That's all you remember?

A Yes.

Q I think you indicated earlier you agreed to that; is that correct?

A Yes.

MR. KOLAR: I don't have anything else at this time.

MR. NEY: We have no questions.

PL. SUPP. EX. 74

United States Government

Department of Energy

# memorandum

Albuquerque Operations Office

Rocky Flats Area Office

DATE: APR 19 1989

REPLY TO ATTN OF: ADM:TA

SUBJECT: Draft Performance Evaluation Review Board Recommendations and Performance Evaluation Reports Summary on Rockwell International

TO: Theetis V. Hill, Executive Secretary for PERB, CPD/AL

In response to the February 24, 1989 memo from C. E. Troell, enclosed are items in the quantities agreed to in the April 10, 1989 telephone conservation between you and Terrel Agy of my staff. The reports cover the award fee evaluations on Rockwell International at the Rocky Flats Plant for both Plant and PRMP/PROVE performance during the rating period October 1, 1988 through March 31, 1989.

- Eleven (11) copies of the book to be used by the PERB members, including the RFAO Area Manager.

- Twenty-one (21) sets of the PERB Recommendations and Summary for distribution to the AL Division Directors.

Also included in the enclosure is one copy of a computer disk, using the IBM MultiMate format, containing the following information for this rating period:

- PERB Recommendations

- Performance Evaluation Reports Summary

- Fee Calculation for PLANT

- Fee Calculation for PRMP/PROVE

The original due date was April 18, 1989. An extension until April 20 was verbally requested by Claude Barkmeier and approved by you on April 13.

for Ron L Foster

Albert E. Whiteman
Area Manager

Attachment

SENT VIA FEDERAL EXPRESS ON 4/19/89

OFFICIAL USE ONLY

# AWARD FEE EVALUATION

# ROCKWELL INTERNATIONAL

# OCTOBER 1, 1988 - MARCH 31, 1989

CONTENTS

PERB Evaluation Report Summary

PERB Recommendations

Fee Calculations

AL Input

Rockwell Self Evaluation

Goals & Objectives

Contract Modification

OFFICIAL USE ONLY

OFFICIAL USE ONLY

PERFORMANCE EVALUATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD OCTOBER 1, 1988 - MARCH 31, 1989
CONTRACT NO. DE-AC04-76DP03533

The overall performance of Rockwell International Corporation (Rockwell) has been maintained at least at a level of "Satisfactory" during the period October 1, 1988 through March 31, 1989.

The following is an evaluation of the performance of Rockwell, relative to the management and operation of the Rocky Flats Plant, including the performance for PRMP/PROVE, in the Functional Performance Areas (FPA's) selected for award fee evaluation. The first section covers plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's for plant operations have been evaluated in accordance with the contract Award Fee Plan, and the following discussion of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

PLANT

GENERAL MANAGEMENT: Significant improvement has been made in many important plant functions during the appraisal period. While continued improvement is needed in all areas, Rockwell has done a remarkable job of pushing for and achieving recent improvements under extreme pressure. IP schedule compliance continued at 100% for the third consecutive rating period. There was a rapid resolution to the problem of obtaining DOT approval for using a modified ATMX railcar for making the first shipment of TRU mixed waste in 1989. The Emergency Preparedness organization has a well planned and effective program and continues in an active AL role and to make improvements. A Rockwell "We Do Care" program was developed to address the maintenance work order backlog. In less than four years, Rockwell has exceeded a ten year Energy Conservation Goal. In addition, Rockwell completed an automated logging system in all major production and support buildings.

COST MANAGEMENT: Good data and narratives provided by Rockwell to define DOE's unfunded ES&H reqirements in a FY 1989 supplemental budget request were also used to support DOE requests to Congress for additional FY 1990 funding. Rockwell has done an extraordinary job of tracking information and preparing responses to a large variety of budget information requests and of maintaining the current status of its requirements. In addition, construction project data sheets and conceptual design reports supporting Capital Budget requests were both of high quality and ahead of schedule. Budget narratives were improved and expanded and were helpful in DOE's analysis of Rockwell's resource requirements.



OFFICIAL USE ONLY

OFFICIAL USE ONLY

QUALITY: Significant progress has been made towards implementing the NWQA NQA-1 Standard at Rocky Flats. More specifically, NWQA activities conducted during the Building 771 restart have resulted in a significantly improved quality program to be used in the operation of the building. For WR QA, Rockwell is implementing Phase 2 of the Quality Improvement Plan which will continue a new culture in quality practices and should lead to further improvement in the QA program. In NDT, an alert technician identified an anomoly in the X-ray film which lead to the detection of a defective process in another AL plant. This kind of effort reflects a work ethic that ensures a quality product for the DOE.

There were three incidents which came to DOE's attention where Rockwell failed to provide the necessary measures to adequately control nonconforming product material.

CHEMICAL OPERATIONS: Noteworthy progress has been made towards the implementation of the Operational Readiness Review (ORR) program as demonstrated through ORR's in Building 771 and elsewhere. Rockwell has also successfully completed the development of a new extractant compound for use in the Molton Salt Extraction process.

PRODUCTION OPERATIONS: Significant progress has been made on the number one priority for this year, excellence in facility operations, by the development of a Nuclear Facility Operations Manual and the active support of the AL effort to develop an Operational Surety Program. Rockwell has taken several steps to reduce work in process inventories and process times by, among other things, reduced planned process times in Building 460, reduced pit assembly process time in Building 707 and reduced lot sizes on the 3T bodies.

ENVIRONMENT, SAFETY AND HEALTH: Progress towards achieving a high quality training program and the establishment of a new pilot radiation safety course are among the notable achievements in the radiation protection area. Rockwell has demonstrated good responsiveness in the preparation and coordination on National Emissions Standards for Hazardous Air Pollutants issues specific to the Rocky Flats Plant and has contributed to the DOE-wide review of this regulation. Significant progress has been made towards reducing both the rate of radiological incidents and personnel radiation exposure. In the safety program, substantial corrective actions are underway, including the development of an integrated safety program. A Safety Review Group has been established and its efforts during the period were commendable.

An unintentional release of dilute chromic acid revealed inadequate procedures for the reporting and coordination of discovered releases to the sewage treatment plant with downstream control of contamination. Rockwell's housekeeping of production buildings has not improved adequately. Although a downward trend has been achieved during the first five months of FY89, no significant progress in reducing the wound rate has yet occurred.

PRMP/PROVE

PROJECT MANAGEMENT: Rockwell has given PROVE renewed emphasis by separating responsibility for PROVE from that of the PRMP and placing it under a full



OFFICIAL USE ONLY 

OFFICIAL USE ONLY

time project manager. The recently implemented "Precursor Plan" represents an improvement in direction for the entire project and was implemented with professionalism and enthusiasm.

Inadequate PRMP management required significant PRMP management redirection to be consistent with allocated funding. In addition, inadequate project staffing continues to influence Rockwell performance.

COST MANAGEMENT: Cost development and baselining of costs for the "Precursor Plan" has been handled with the highest degree of quality. Rockwell's redirection of J. A. Jones' manpower planning on PROVE resulted in reduced costs and apparent increased construction productivity.

PROVE continues to demonstrate cost growth. PRMP cost planning far exceeded available project funding allocations.

SCHEDULE PERFORMANCE: Rockwell has successfully resolved several problems which were impacting schedule in the PROVE area. The diligent effort by Rockwell, Bechtel, and J. A. Jones in the joint development of the Precursor planning has resulted in a comprehensive schedule that should lead PRMP into the Line Item in a most suitable manner.

The PROVE schedule has deteriorated during the reporting period, extending the PROVE end date from 1/90 to 8/90.

SUBCONTRACT MANAGEMENT: Rockwell, consistent with project technical needs and evolved cost and schedules, has provided rapid and effective subcontract redirection of Bechtel. Subcontract management of J. A. Jones has ensured their participation in construction planning. Rockwell has been successful in obtaining active participation and commitment from the National laboratories and other Rockwell organizations on the PRMP Precursor Program.

The PECO subcontract work has resulted in the need for significant rework to the glovebox piping and piping penetration welds. Line Item and cost/schedule activities over the balance of the FY demand that Rockwell provide continuous site representation at Bechtel.

DESIGN QUALITY: The Precursor Program, geared toward improving PRMP design quality, has been initiated with broad based involvement. PROVE use of the Configuration Control System has been greatly improved.

The quality of the existing PROVE engineering has been poor, and change orders to correct poor initial design quality are reflected in cost growth.

TECHNICAL PRODUCT QUALITY: PROVE activities in addressing and rectifying glovebox welding problems are directed towards and should significantly improve technical product quality.

Welding problems recently surfacing on the PROVE glovebox indicates a signficant lack of technical product quality success.





OFFICIAL USE ONLY

OFFICIAL USE ONLY

PERFORMANCE APPRAISAL
ROCKWELL INTERNATIONAL
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD OCTOBER 1, 1988 - MARCH 31, 1989

The overall performance of the contractor has been maintained at least at a level of "Satisfactory" during the appraisal period. The following is the Performance Evaluation Review Board recommendations for the Functional Performance Areas (FPA's) selected for evaluation. The first section covers plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

**PLANT**

FPA: GENERAL MANAGEMENT

ADJECTIVAL GRADE: EXCELLENT

Noteworthy Achievements

1. Significant improvement has been made in important plant functions during the appraisal period. These improvements are covered in more detail in the FPA's for Environment, Safety and Health, Production Operations, Non-Weapons Quality, and Chemical Operations. While continued improvement is needed in all of these areas, Rockwell has done a remarkable job of pushing for and achieving recent improvements under extreme pressure.

2. IP schedule compliance continued at 100% for the third consecutive rating period. This performance was achieved despite material supply limitations generated by the shutdown of Building 771.

3. Rockwell achieved a rapid resolution to the problem of obtaining DOT approval for using a modified ATMX railcar for shipping the first shipment of TRU mixed waste in 1989 from the Rocky Flats Plant to the INEL. Several obstacles existed, both within DOE and DOT, to the granting of appropriate approvals. Due to Rockwell's persistence, the approval was granted for use of the modified railcars at the time proposed by DOE.

4. The Emergency Preparedness Organization was credited in the December 1988 Safety Performance Review with having a "...well planned, and effective program in meeting emergency readiness needs." In addition, Rockwell's emergency preparedness personnel have sustained a high level of participation in AL-wide emergency preparedness coordination activities, have supported the development of the AL emergency preparedness appraisal program in a significant manner, and have continued to identify and implement improvements in Emergency Operations Center capabilities and operations.

5. More than 60% (47,000 hours) of the maintenance work order backlog older than 90 days has been worked off. A team of 50 people, under the Rockwell "We Do Care" program, was established for this purpose.

E 002661

"REVIEWED FOR CLASSIFICATION
By Douglas K. Cox REAG
Date April 18, 1989 (U)



OFFICIAL USE ONLY

OFFICIAL USE ONLY

6. Rockwell has already exceeded the 10 year (1986-1995) Energy Conservation Goal of a 10% reduction in energy usage.

7. Rockwell has completed the development and installation of the Personnel Evacuation Logging System (PELS) in all major production and support buildings. This enhances the security and safety of the buildings serviced and provides a data base for emergency actions in specific areas.

Notable Deficiencies

None

Observations

1. The Management Oversight Group (MOG) reported needed changes in the management of the Plutonium Recovery Modification Project (PRMP) by Rockwell. A Precursor Program has been established with the DOE Project Manager to address the MOG concerns, and significant progress is being made. Further improvements are necessary by Rockwell for this high priority DOE project.

2. The redefinition of the Building Manager responsibilities has been a visible action which has enhanced the integration of functions. The Building Manager position is functioning to exercise responsibilities for all activities in the building. Development of an "in-house" safety program in Production Operations is evidence of the success that can be achieved by Building Managers. The Building Manager position should be further strengthened and supported to insure complete integration of all activities necessary for safety, quality, maintenance, training, security and production.

3. The shutdown of production and maintenance activities in Building 771 from October 1988 to January 1989 resulted in a significant impact to plutonium recovery schedules, as well as a slip in ongoing maintenance and facility upgrade schedules. With the exception of electrorefining, Rockwell is significantly behind recovery schedules established at the beginning of the fiscal year. The shutdown was made to allow Rockwell time to correct safety related problems in the building, most of which had been identified before the period began. Much work remains by Rockwell to make Building 771 operate to DOE standards. Accomplishing the restart requirements on schedule and maintaining the present restart schedule should avoid any impact to pit delivery schedules.

4. Training of waste generators and improved generation practices have reduced the quantity of reject waste drums, a major contributor to reducing the supplied air operations in the Size Reduction vault.

5. Rockwell has not made adequate progress to prepare for utilization of the TRUPACT II container when it becomes available. The final definition of modifications to Building 664 for handling TRUPACT II containers and submittal of the budget request was not completed in a timely manner.

6. Rockwell is developing a comprehensive plan for plantwide application of Building 771 Restart Criteria. The plan reviews each of the 771 Restart Criteria for potential applicability to other areas on plantsite, recommends items that should be implemented, determines the status of each


OFFICIAL USE ONLY

OFFICIAL USE ONLY

item, determines a rough order of magnitude of resources and manpower requirements, and finally recommends an action plan and management scheme.

7. The identification and timely resolution of problems by Rockwell is often slow. Examples include pondcrete storage monitoring, analysis of NPDES violations, complete dissemination of incident information within Rockwell, and TRU waste storage data. For example, in October, the Governor of Idaho curtailed shipments to Idaho of transuranic waste from Rocky Flats. The curtailment resulted in an immediate need for information on the TRU mixed waste at Rocky Flats available for shipment. The time required to obtain accurate information on the types and quantities of stored waste was too long for an issue of this importance.

8. The development of a training program leading to accreditation has been accelerated due to the anticipated release in mid-April 1989 of DOE Order 5480.XX. To date, Rockwell has appointed a Training Accreditation Coordinator, established a plant-wide Training Accreditation Task Team, made an initial assessment of plant positions to determine those which will need accreditation, and drafted a Gross Resource Plan. They have also supported an accreditation site assistance visit from EG&G personnel. While Rockwell's efforts have been satisfactory to date, continued emphasis will be required to assure implementation of DOE Order 5480.XX once it is published in its final form.

9. Rockwell has recently violated DOT regulations on two shipments to the Nevada Test Site (RF890154 and RF880951). One involved mis-counting the number of waste containers on a shipment to the NTS on 9/3/88, and the other involved incorrect drum numbers (due to exchange of a drum which was listed on the bill of lading with a drum which was not listed on the bill of lading) on 1/17/89.

10. Despite the knowledge that nitrate concentrations on the 750 pad have increased, little action has been taken to contain saltcrete (which has been identified as a major contributor to storage pad nitrate concentrations) after precipitation events. Data provided in March of 1989 indicated the highest nitrate concentrations ever observed on the pads.

11. Rockwell is still not placing sufficient emphasis on the timely establishment of the Rocky Flats Institute. The DOE considers this program, along with the Rocky Flats School, to be essential to enhancing the capabilities of building management personnel at Rocky Flats.

12. Rockwell has done a commendable job of establishing the Rocky Flats School. Continued top management emphasis is needed. The School has not been integrated into the Rockwell professional career development program as a recognized approach to enhancing the capabilities of building management personnel at Rocky Flats.

13. Successful preparations are being made for purchase and installation of the supercompactor. The decision to not perform operational testing in the form of a pilot study, but to go directly to full use may pose some problems at a future time. Some form of operational testing should be planned in a documented form which can be reviewed prior to startup.



OFFICIAL USE ONLY

OFFICIAL USE ONLY

14. The Waste Isolation Pilot Plant (WIPP) Waste Acceptance Criteria Committee performed an audit on Rocky Flat's transuranic waste activities. The positive results of this audit reflect diligence in waste analysis and quality assurance in packaging.

15. Rockwell has developed a Trauma Response Team (TRT) to respond to the emotional/psychological needs of employees exposed to traumatic incidents. This was done in advance of a March 6, 1989 AL letter suggesting the development of TRT team.

16. Several waste minimization efforts have led to reductions in wastes produced. The most dramatic effort has been the waste paper recycle program which has exceeded all expectations for the quantities of waste paper recycled. This has the added benefit of extending the useful life of the sanitary landfill.

17. Rockwell implemented an extensive on-site Information Technologies training program with considerable savings in cost over the previous off-site program. Classrooms have been equipped, courses developed and over 200 people have already received training. Significant cost savings are accruing by replacing off-site training. The course are also specifically directed to Rockwell objectives while contract courses were general in nature.

18. A significant disagreement has existed between DOE and Rockwell regarding the priority of PFMS work. This resulted in an AL decision to transfer portions of the work to Los Alamos.



OFFICIAL USE ONLY

OFFICIAL USE ONLY

FPA: COST MANAGEMENT

ADJECTIVAL GRADE: EXCELLENT

Noteworthy Achievements

1. Rockwell performed well in providing data and narratives to define DOE's unfunded ES&H requirements in support of a FY 1989 supplemental budget request. A significant portion of this data was used to support DOE requests to Congress for additional FY 1990 funding.

2. Rockwell has done an extraordinary job of tracking information and preparing responses to a large variety of budget information requests and of maintaining the current status of its requirements. The quality and consistency of information provided to the DOE has been exceptional considering the number of different funding options that have been addressed. Support provided for the on-site DOE review of requests for additional funding was excellent.

3. Rockwell construction project data sheets and conceptual design reports supporting its requests for the FY 1991/1992 Capital Budget were of high quality and were completed ahead of schedule. Rockwell is well-prepared for DOE Headquarters reviews of FY 1991 projects.

4. The FY 1991 budget narratives were improved and expanded by Rockwell. Detailed identification of program cost growth and impacts of Production and Surveillance target guidance was particularly helpful in DOE's analysis of Rockwell's resource requirements.

Notable Deficiencies

None

Observations

1. Rockwell's SACNET submission of budget schedules was late and its FY 1988 Schedule 1 and 2 actual costs were late and were also inaccurate in regard to New Material Flight Tests/Stockpile Flight Tests and New Material Laboratory Tests/Stockpile Lab Tests.

2. In deciding on final GPP allocations for the year, AL has reviewed the status of committed funds. The large dollar amount of uncommitted funds has adversely affected the support for the plant's FY 1989 GPP requirements.

3. Rockwell continues to be responsive to OCAD requirements and initiatives including indirect Cost Management, the Work Load Model initiative and Baseline Cost Management (particularly the W 89 Cost Call). Although Indirect Cost Management packages were submitted late, the quality of the packages was very good.


OFFICIAL USE ONLY

OFFICIAL USE ONLY

FPA: QUALITY CONTROL

ADJECTIVAL GRADE: EXCELLENT

Especially Noteworthy Achievement

The NWQA surveillance activities conducted during the Building 771 restart have been especially noteworthy in that they have resulted in the identification of and provide for corrective actions necessary for a more viable quality program. This early detection and correction of deficiencies in operations will provide for a greater assurance of the quality of our product.

Noteworthy Achievements

1. After two years of accomplishments, the continual improvement in the Rockwell Quality program has leveled off. As anticipated, a new phase of the Quality Improvement Plan is currently being implemented. This new phase is now being referred to as Phase 2 and will incorporate a new culture in quality practices. Rockwell has aggressively entered into Phase 2 with a Program Manager and a Continual Improvement Steering Committee to guide the effort. The steering committee is further supported with technical personnel, one being closely associated with Dr. W. Edward Deming.

2. Significant progress has been made towards implementing the NQA-1 Standard at Rocky Flats. The NWQA program office now has three reporting managers with established responsibilities. The Management Plan has been updated and eleven new positions added to the NWQA office. The Plant Level Control Systems portion of the implementation plan is divided into four parts and is mostly in place. Also, a manager has been assigned to facilitate the implementation of the Non-WR Calibration Program. Quality personnel associated with procurement of needed services and commodities for the plant, within the Quality Directorate and outside the Quality Directorate, have recently been reorganized into one group within the NWQA program office. This reorganization should increase the consistency of Non-WR and WR procurement activities.

3. Because of his exceptional attention to detail, a technician in the NDT Department was able to have defective material that was received from Pinellas removed from the production line before it could be further processed into the system. During a routine NDT examination of a Rocky Flats production process, the technician detected a suspected anomaly in a reservoir while evaluating X-ray film of a weld joint performed at Rocky Flats. After sectioning the suspected unit, it was learned that a weld, unrelated to the Rocky Flats weld, had been completed unsatisfactorily at the Pinellas Plant. The unsatisfactory weld was not detected during NDT at Pinellas and was accepted and forwarded to Rocky Flats for continued processing. The discovery of this defect is very praiseworthy because the Rocky Flats NDT set up was not optimized to evaluate the Pinellas weld joint. The alertness, attention to detail, attitude and discipline shown here depicts a work ethic that ensures a quality product.


OFFICIAL USE ONLY

OFFICIAL USE ONLY

Notable Deficiency

In three incidents, Rockwell failed to provide the necessary measures to adequately control nonconforming product material.

1) During the period, it was discovered that Rockwell had cancelled a deviation for a nonconforming component that had been properly deviated when accepted and released from Rocky Flats in FY 1988. Rockwell also failed to notify all affected DOE organizations that this action had taken place.

2) Five reject components were mistakenly accepted and released from Rocky Flats into the complex and subsequently had to be retrieved.

3) An acceptable reservoir was mistakenly reworked for defectiveness. A defective reservoir was then mistakenly accepted without being reworked and shipped to the next user.

The analysis of these incidents revealed that all these errors happened either from a breakdown of an existing system or that an inadequate system was in place.

Observations

1. The DOE is concerned with the low level of quality performance being displayed by the beryllium supplier. Deficiencies such as lack of subcontracting controls, poor manufacturing instructions, and failure to identify root causes of nonconformances were identified in a recent Rockwell survey of the beryllium supplier. Beyond these findings, a recent DOE, AL survey of the beryllium supplier found that the supplier's configuration management and product traceability systems were also operating poorly.

2. Approximately 272 QAS 2, 3 and 4 surveys were conducted during the period resulting in 55 complimentary observations and 66 findings. However, all eleven QC-1 elements were evaluated to be satisfactory or better. Four findings were considered to be significant. Three findings involved paperwork problems and the fourth was assigned for a part which failed the DOE verification inspection of the component. No findings were identified in two of the QC-1 elements and no negative trends were identified.

3. Rockwell continues to make excellent progress towards implementing the complete Quality Information System (QIS). Shortly the fifth module will be complete. Three additional modules are planned and scheduled to be complete during FY90.

4. Duplicate serial numbers have become an issue during the performance period. Three DOE plants have identified product from Rocky Flats with serial numbers which have been used twice. After significant investigation by the DOE and Rockwell, it has been found that only a small quantity of the identified serial numbers have actually been duplicated. The underlying problem is how each plant interprets the Engineering Procedure which governs the requirement. The resolution of this issue will be completed in a future meeting between contractor, design agency and DOE personnel.


OFFICIAL USE ONLY

FPA: CHEMICAL OPERATIONS

ADJECTIVAL GRADE: EXCELLENT

Noteworthy Achievements

1. The Plutonium Operations effort to implement an Operational Readiness Review (ORR) program is excellent. Progress toward implementation has been demonstrated through ORR's for the Building 771 Incinerator, Part V, and the Dicesium Hexachloroplutonate Molten Salt Extraction processes. These efforts support the top priority goal for excellence in facility operations and should be further developed and continued on a plant-wide bases.

2. Rockwell has successfully completed the development of a new extractant compound for use in the Molten Salt Extraction (MSE) process. Dicesium Hexachloroplutonate (DCHP) has the advantage of substantially reducing the gamma and neutron exposures to MSE operations personnel, eliminating magnesium contamination of the product plutonium buttons, and increasing the efficiency of the process to a single pass process. These last two changes also reduce the recycle residues produced. This development work was performed concurrently with the building 771 shutdown, safety improvements and the Building 771 restart activities.

Notable Deficiencies

None

Observations

1. DOE intends to evaluate the productivity of Chemical Operations in terms of Base Recovery Units (BRUs). Using this approach, Rockwell appears to be regaining productivity while concurrently executing new safety requirements. Because of the Building 771 shutdown, the most current metal production period was only three months in length. A comparison of that production period was made against the two previous periods as shown below:

| Period | Months | %Change | %Change |
|---|---|---|---|
| July 86 - July 87 | 13 | Base | --- |
| Aug 87 - June 88 | 11 | -12% | Base |
| Current | 3 | +8% | +22.6% |

When using the 13 month period as the base for comparison, the efficiency of recovery for the three month period increased by 8.0%. Using the 11 month period as the base for comparison shows in increase in efficiency of 22.6% for the 3 month period. In the first comparison, the 12% drop for the 11 month period resulted from the initiation of ES&H facility upgrades. The dramatic improvement seen when comparing the 3 month period against the 11 month period as base reflects an adjustment to the new ES&H requirements and increased efficiencies resulting from facility upgrades.

2. The establishment of a Self-Assessment Audit Program in Building 771 has enabled Rockwell to take a proactive role in identifying and correcting housekeeping and safety concerns. The emphasis on immediate corrective action

OFFICIAL USE ONLY

and recurrence control is a positive step toward implementing the surety of operations concept in Building 771. Rockwell's vigorous proactive self-assessment efforts in Building 771 are to be highly commended and encouraged throughout the plant-site.

3. The Building 771 Contamination Control Committee has continued to work at determining the root cause of mechanical and administrative failures which led to contamination incidents. New decontamination methods, new anti-contamination clothing, safer work methods, trend analyses and engineering enhancements are all measures being utilized by the Committee. During the last six months there has been only one possible inhalation case which was confirmed as negative. In addition, the number of contamination incidences appears to be staying low as production increases under the Restart Plan. However, further reductions in the number of contamination incidences are necessary.

4. Identification of process information has promoted identification of process shortcomings. Further analysis requires instrumentation, which has been delayed in some cases by the Building 771 shutdown. Continued process improvements through the Recovery Improvement Program (RIP) and Process Technology Development (PTD) support have also been impacted by the shutdown and some shifts in goals. However, there is still a need for continued efficiency and process improvements and these programs should be revitalized in some form.

5. Rockwell has successfully completed initial experiments with an electrolytic decontamination technique for use on fixed contamination on stainless steel and some other metals. The technique, coined electrodecontamination (EDC), has been highly successful on flat stainless steel surfaces in the first few trials. Further development of this technique for the decontamination of large surface areas, uneven surfaces and welds, without detrimental effects to the equipment decontaminated, would constitute a significant achievement.

6. The development of a budget planning process for chemical operations is considered to be essential to the improvement of the efficiency of the plutonium recovery processes, increased metal purity, decreased residue recycle and waste minimization. To date, Rockwell management has provided excellent support for establishing a budget development process. However, it is essential that Plutonium Operations line management provide a leadership role and be involved in the entire budget development process, not just provide support to the budget development process.


OFFICIAL USE ONLY

OFFICIAL USE ONLY

FPA: PRODUCTION OPERATIONS

ADJECTIVAL GRADE: OUTSTANDING

Noteworthy Achievements

1. Rockwell has made significant progress on the number one priority for this year, excellence in facility operations. They have made noteworthy contributions toward this goal in the two areas below:

a. The effort toward development of a Nuclear Facility Operations Manual (NFOM) directly supports the facility excellence goal. The NFOM Task Team has drafted and approved all procedures for the NFOM based on the original outline. The Task Team is committed and has an appropriate mix of members to insure a balanced perspective. With continued emphasis, this effort is expected to create a model document for the AL complex.

b. Rockwell has been very supportive of the AL effort to develop an Operational Surety Program. They have actively participated in meetings, presented briefings on request, and provided documents for application by other sites. RFP is currently recognized as a leader in Operational Surety within AL.

2. Rockwell has taken several steps to reduce work in process inventories and process times. Among these are:

a. Reduced planned process times by approximately 25% "across the board" in the production control system in Building 460. The result has been roughly a 50% reduction in work in process inventories in the building, measured by the number of components.

b. Reduced pit assembly process time in Building 707 by six weeks, from eight weeks total to two weeks.

c. Reduced lot sizes on the 3T bodies from approximately 50 to approximately 24 to reduce backlogs at the 4 and 5 axis mills.

Notable Deficiencies

None

Observations

1. Utilization of direct labor, as measured by productive time, efficiency and realization, has declined during this period. This decline is a result of changes required to implement new plant safety procedures. Rockwell's Industrial Engineering Group has conducted a study of possible approaches to improve labor utilization. In the long term, utilization should improve as experience is gained in the new operating procedures, and as the emphasis on training results in yield improvements. In addition, greater safety consciousness should result in fewer process interruptions.

2. Rockwell has responded effectively to DOE's initiatives on make or buy policy. Rockwell will soon be submitting their revised Capability Maintenance


OFFICIAL USE ONLY

OFFICIAL USE ONLY

Plan, now called the Make Or Buy Plan, and the supporting Baseline Capability Plan. They have also complied with the requirement to submit a "Buy Rate" calculation. The calculation for the first quarter in FY 1989 showed that the buy rate declined in comparison with FY 1988, but this is attributed to the "buy ahead" of a significant quantity of beryllium parts in FY 1988.

3. During March, Rockwell hosted a seminar to share information on their experience in eliminating halogenated solvents. Thirty-two representatives from twelve corporations attended. Feedback was positive and enthusiasm was expressed for continued information exchanges. This seminar was a constructive first step in the program for technology transfer from Rocky Flats to private industry and has significant potential for building a positive image for Rocky Flats within local communities.


OFFICIAL USE ONLY

OFFICIAL USE ONLY

FPA: ENVIRONMENT, SAFETY AND HEALTH

ADJECTIVAL GRADE: GOOD

Noteworthy Achievements

1. Rockwell has made good progress towards achieving a high quality radiation protection training program for Radiation Monitors which meets the requirements of DOE 5480.11. Other significant initiatives in radiation protection training have also occurred during this period, most notable being a new pilot radiation safety course for Radiation Worker Supervisors and plant Building Management. Rockwell has successfully completed many improvements and started several new initiatives above and beyond the DOE requirements in their radiation protection training programs.

2. Rockwell has demonstrated good responsiveness in the preparation and coordination on National Emissions Standards for Hazardous Air Pollutants (NESHAP) issues specific to the Rocky Flats Plant. Rockwell has also demonstrated a thorough understanding of the regulatory requirements through its contributions to the DOE-wide review of the NESHAP (Subpart H) regulation.

3. Rockwell has made significant progress towards reducing the rate of radiological incidents. The average monthly rate for Possible Inhalations (PI's) during FY88 was approximately seven per month. During the first five months of FY89, the rate of PI's was less than three per month. The FY88 monthly average rate for exceeding contamination limit criteria in both controlled and uncontrolled areas was about 37 occurrences each month. However, for the first five months of FY89, the monthly rate for this type of contamination incident has dropped to approximately twenty occurrences per month, well below the RFP performance goals. Though still much higher than DOE expectations, this performance is especially noteworthy when it is recognized that more stringent reporting of "area contamination" problems has occurred during this time frame due to implementation of DOE Order 5480.11.

4. Significant progress has been made towards reducing personnel radiation exposure. During the first four months of the rating period, personnel in the semi-monthly and monthly badge exchange groups used about 102 REM. This figure represents a reduction of approximately 29% below the projected goal of 143 REM. Although Building 771 process operations were curtailed most of this period, many other plantwide maintenance improvements and decontamination initiatives served to counterbalance exposure reduction occasioned by the Building 771 shutdown.

5. The comprehensive review of the TSA showed that Rockwell's safety program is in transition and open to change. Rockwell was commended for improvements in union/management relations and for developments in an integrated safety program. A definite change in culture was observed. Substantial corrective actions are underway, which when properly implemented should result in an exemplary safety program in the future. Rockwell also submitted it's TSA response document to DOE two weeks ahead of the schedule set by DOE.

6. In establishing the Safety Review Group, Rockwell has developed a dedicated investigative group that provides a coordinated systems approach to


OFFICIAL USE ONLY

unplanned event investigations that ensures that such events are investigated in a timely manner and enhance the safety awareness throughout the plant. Rockwell should be commended for the establishment of this group as well as for the SRG's efforts to date.

Notable Deficiencies

1. There was an unintentional release of dilute chromic acid on February 22, 1989, which upset the RFP's sanitary wastewater treatment plant, was partially applied to the RFP's spray irrigation site, and through surface runoff, wound up in Pond B-5. There are inadequate incident reporting procedures or operating procedures governing the coordination of the discovery of releases to the sewage treatment plant with downstream control of contamination. Furthermore, the incident shows the need for the development and implementation of adequate Spill Prevention Control and Countermeasures procedures and practices.

2. Rockwell's housekeeping of production buildings has not improved adequately. Most buildings do not compare to the standard set in Building 771. Rockwell is beginning to work the problem, however does not yet have a program to solve the problem.

3. The rate of wounds which occur in radiation controlled areas averaged about 60 per month during FY88, and though a downward trend has been achieved during the first five months of FY89, no significant progress in reducing the wound rate has yet occurred during FY89.

Observations

1. Rockwell, for the first time, has a 100% glove change compliance across the plantsite. The Y-12 Plant has requested a Rockwell employee visit their plant so that a review of their operations and recommendations on development of a glove change program similar to that at RFP can be made.

2. Rockwell has been proactive in establishing a NEPA compliance committee. Rockwell has reviewed the appropriate NEPA guidance documents and has established a logical method for reviewing plant projects in order to determine the level of NEPA action required for the project. Although the committee has just been established, its cross section of divisions will enable it to consider a wide range of plant projects with minimal chance of leaving out a project. The system for documenting the review of projects, the judgments made and the recommendation for NEPA action are thorough and track in a logical fashion.

3. The Colorado Department of Health and the Environmental Protection Agency conducted six waste storage audits under Resource Convservation and Recovery Act (RCRA) during the last three and a half months, and only minor findings resulted. Because of consistently good audit results, TRU mixed shipments to the INEL were reinstated and the frequency of future inspections will be reduced.

4. Rockwell has established a strategy for upgrading the air monitoring system at RFP. The strategy was the result of excellent analysis, successful peer review, and resulted in a significant reduction in projected costs.

OFFICIAL USE ONLY

5. Rockwell continues to successfully complete the requirements of RCRA and the Comprehensive Environmental Response Compensation and Liability Act.

6. Rockwell has made significant improvement in responsiveness to the AL safety appraisals. Although none to date have been turned in on time, the amount of tardiness has steadily decreased to the point that Rockwell has no outstanding responses at this time. Rockwell has initiated "Completion Certificates" for completed actions.

7. Rockwell established proposed plutonium and uranium maximum permissible contamination levels in oils and solvents which are defensible and practical for analytical evaluation. Although this is only a proposed method for establishing limits for a limited type of contaminated vs. non-contaminated waste materials, the need for these limits to be established has been indicated by the Environment & Health Program.

8. Rockwell has developed a Radiation Monitoring work schedule pilot program. This program is expected to cut Radiation Monitors overtime by 30-50%. The program was completed three weeks ahead of schedule in Building 776. Survey schedules have been maintained up to date. Plans are being developed for implementation of the work scheduling program across the plant site.

9. Rockwell has responded well in initial implementation of the more stringent requirements of DOE Order 5480.11, "Radiation Protection For Occupational Workers". Rockwell is developing an implementation plan to accurately assess the impact of full implementation


OFFICIAL USE ONLY

OFFICIAL USE ONLY

**PRMP/PROVE**

PRMP/PROVE FPA: PROJECT MANAGEMENT

ADJECTIVAL GRADE: MODERATELY GOOD

Noteworthy Achievements

1. Rockwell has given PROVE renewed emphasis. Rockwell has separated the responsibility for PROVE from that of the PRMP and placed it under a full time project manager. In addition, the Rockwell Plutonium Operations directorship has committed a top staff member to be the Chief PROVE Project Engineer.

2. Rockwell has recently developed and implemented a "Precursor Plan." This plan represents a marked improvement in direction for the entire project. The planning has been both detailed and complete. This "Precursor Plan" has been implemented by Rockwell with professionalism and enthusiasm.

Notable Significant Deficiency

Overall PRMP management attention to project technical, cost, schedule and manpower needs was inadequate.

Notable Deficiency

Inadequate project staffing continues to influence Rockwell PRMP performance. The above referenced "Precursor Plan" has made the staffing shortage obvious to all parties concerned.

Observations

1. The task of evaluating and incorporating PROVE's "Lessons Learned" is now a Precursor Plan activity with the anticipation that full benefit will be realized.

2. The degree to which Rockwell appropriately manages the Precursor Plan will directly impact PRMP's future success technically and administratively.



OFFICIAL USE ONLY

OFFICIAL USE ONLY

PRMP/PROVE FPA: COST MANAGEMENT

ADJECTIVAL GRADE: MODERATELY GOOD

Noteworthy Achievements

1. The cost development and baselining of those costs for the "Precursor Plan" has been handled with the highest degree of quality. Subcontractors have been integrally involved in this development and baselining.

2. Rockwell has redirected J. A. Jones' manpower planning on PROVE which has resulted in reduced costs and apparent increased construction productivity.

Notable Significant Deficiency

PROVE continues to demonstrate cost growth. Rockwell has increased their forecast for the Total Estimate at Completion on PROVE from less than $43 million at the beginning of FY89 to the current $45.6 million.

Notable Deficiency

PRMP cost planning did not take into account allocated funding availability, resulting in a disconnect in project activities.

Observations

1. Rockwell has restructured PROVE cost estimates to be able to use a realistic $45.6 million baseline.

2. The PROVE Cost Performance Reports (CPRs) have been timely and of a consistently high quality. Changes to the Performance Measurement Baseline have been incorporated accurately and in a timely fashion.

3. Rockwell's management of the Construction Plan, Cost and Schedule Reduction, System Design Descriptions, and Cost and Schedule Baseline Precursor Plan activities can have a favorable cost impact on PRMP.



OFFICIAL USE ONLY

OFFICIAL USE ONLY

PRMP/PROVE FPA: SCHEDULE PERFORMANCE

ADJECTIVAL GRADE: VERY GOOD

Noteworthy Achievements

1. Rockwell has addressed several problems impacting schedule in the PROVE area and brought them to successful resolution. Among these problems were the additional requirements imposed on the health physics monitors and engineering support to provide on-the-spot resolutions and aid to the construction personnel.

2. The diligent effort by Rockwell, Bechtel, and J. A. Jones in the joint development of the Precursor planning has resulted in a comprehensive schedule that should lead PRMP into the Line Item in a most suitable manner.

Notable Deficiency

The PROVE schedule has deteriorated during the reporting period. The PROVE end date was extended from 1/90 to 8/90. The Service Module redesign will reduce the material and work required and improve operability. Present activities should result in schedules that will be met.

Observations:

1. The intermediate Level PRMP Schedule was completed during this reporting period.

2. The direction Rockwell has given J. A. Jones in the PROVE area of manpower planning already has J. A. Jones working toward a potential schedule reduction of two months.

3. Rockwell's management of the Construction Plan, Cost and Schedule Reduction, System Design Description, and Cost and Schedule Baseline Precursor Plan activities can have a favorable schedule performance impact on PRMP.


OFFICIAL USE ONLY

OFFICIAL USE ONLY

PRMP/PROVE FPA: SUBCONTRACT MANAGEMENT

ADJECTIVAL GRADE: GOOD

Noteworthy Achievements

1. Rockwell, consistent with project technical needs and evolved cost and schedules, has provided rapid and effective subcontract redirection of Bechtel. The redirection included contractual changes, a rescheduling of resources, and the cost rebaselining.

2. Rockwell subcontract management of J. A. Jones has ensured their participation in construction planning. J. A. Jones' PRMP productivity has shown noticeable improvement since their inclusion in the teaming concept.

3. Rockwell has been successful in obtaining active participation and commitment from National laboratories and other Rockwell organizations on the PRMP Precursor Program.

Notable Deficiencies

1. The PECO subcontract work has resulted in the need for significant rework to the glovebox piping and piping penetration welds.

2. Rockwell has still not provided continuous site representation at Bechtel's location. The participation of Bechtel in the Precursor Program does not eliminate the necessity for such coverage to coordinate line item and cost/schedule activities.

Observation

1. The construction subcontractor on PROVE has been asked by Rockwell to develop a Performance Measurement System (PMS). The DOE PMO anticipates demonstration of the PMS early in the next six month evaluation period.

2. Rockwell management of PECO, the PROVE glovebox manufacturer, has resulted in favorable and timely response to redirection and changes to both schedule and configuration.


OFFICIAL USE ONLY

OFFICIAL USE ONLY

PRMP/PROVE FPA: DESIGN QUALITY

ADJECTIVAL GRADE: MODERATELY GOOD

Noteworthy Achievements

1. A significant effort, the PRMP Precursor Program, has been initiated by Rockwell with broad based involvement of subcontractors, other Rockwell operations and the National laboratories. The Precursor Program is geared toward improving PRMP design quality and should result in improved design quality and the ability to maintain that quality over the life of PRMP.

2. PROVE use of the Configuration Control System was greatly improved. The Engineering Review Board has met regularly and a timely disposition of the engineering changes has been accomplished, consistent with Rockwell procedures and the needs of the project.

Notable Significant Deficiency

The quality of the existing PROVE engineering has been poor. This quality condition continues to be felt at this late hour in the project. Change orders to correct poor initial design quality are reflected in cost growth of Design Engineering and PROVE construction.

Observations

1. The Technical Management Discipline (TMD) approach being undertaken by Rockwell through the Precursor Program and on PRMP/Line Items, should lead to improved design quality through time phased baselining, technical reviews, and appropriate change control.

2. PRMP project and PROVE, design quality, will be enhanced by the generation of a complete System Design Description for PROVE during the next period.

3. The recently added Configuration Management manager should add to TMD capability and Design Quality through the change control process.

4. Rockwell has completed and distributed the PROVE SO Test, Cold Test, and Hot Test procedures, and Test Plans have been completed and forwarded to this PMO.

5. PROVE Operations Procedures and Job Task Analysis are proceeding according to schedule.



OFFICIAL USE ONLY

OFFICIAL USE ONLY

PRMP/PROVE FPA: TECHNICAL PRODUCT QUALITY

ADJECTIVAL GRADE: MODERATELY GOOD

Noteworthy Achievement

PROVE activities in addressing and rectifying glovebox welding problems are directed towards and should significantly improve technical product quality. Specifically, the drive to fully understand the problem, root administrative and technical causes, and to implement needed changes in a timely manner, should result in improved technical product quality.

Notable Significant Deficiency

Welding problems recently surfacing on the PROVE glovebox indicates a significant lack of technical product quality success.

Observations

1. It is anticipated PROVE will take advantage of the most recent "Lessons Learned" in order to insure that similar significant deficiencies are not repeated on PRMP.

2. It is anticipated PROVE will take advantage of recent problems, will assess other vendor supplied areas for potential problems, and will shake down modules (dry) with operations and maintenance personnel as they are completed, in order to surface potential problems early.


OFFICIAL USE ONLY

OFFICIAL USE ONLY

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL
FOR PERIOD OCTOBER 1, 1988 THROUGH MARCH 31, 1989

PLANT

| FUNCTIONAL PERFORMANCE AREA | PREVIOUS 6 MONTHS WEIGHT | PREVIOUS 6 MONTHS RATING | CURRENT 6 MONTHS RECOMMENDED WEIGHTING WEIGHT | CURRENT 6 MONTHS RECOMMENDED WEIGHTING RATING | CURRENT 6 MONTHS RECOMMENDED WEIGHTING GRADE |
|---|---|---|---|---|---|
| GENERAL MANAGEMENT | .25 | 92 | .25 | 92 | 23.00 |
| COST MANAGEMENT | .15 | 97 | .15 | 95 | 14.25 |
| QUALITY | .15 | 97 | .15 | 95 | 14.25 |
| CHEMICAL OPERATIONS | .10 | 84 | .10 | 91 | 9.10 |
| PRODUCTION OPERATIONS | .15 | 97 | .15 | 96 | 14.40 |
| ENVIRONMENT, SAFETY AND HEALTH | .20 | 81 | .20 | 84 | 16.80 |
| TOTAL | 1.00 | 91.25 | 1.00 | | 91.80 |

| PERFORMANCE POINTS EARNED | AWARD FEE PER POINT | AWARD FEE |
|---|---|---|
| 0 - 70 | $ -0- | $ -0- |
| 71 - 75 | 109,152 x 5.0 | 545,760 |
| 76 - 80 | 204,660 x 5.0 | 1,023,300 |
| 81 - 85 | 270,015 x 5.0 | 1,350,075 |
| 86 - 90 | 354,744 x 5.0 | 1,773,720 |
| 91 | 532,457 x 1.0 | 532,457 |
| 92 | 505,851 x 0.8 | 404,681 |
| | | $5,629,993 |

| BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|
| $379,000 | $5,629,993 | $6,008,993 |

| BASE FEE | MAXIMUM AF | TOTAL |
|---|---|---|
| $379,000 | $6,822,000 | $7,201,000 |

% ACTUAL AWARD FEE VS. MAXIMUM AWARD FEE 82.53%

% OF TOTAL ACTUAL FEES VS. TOTAL MAXIMUM FEES 83.45%

OFFICIAL USE ONLY

OFFICIAL USE ONLY

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL
FOR PERIOD OCTOBER 1, 1988 THROUGH MARCH 31, 1989

PRMP/PROVE

| FUNCTIONAL PERFORMANCE AREA | PREVIOUS 6 MONTHS WEIGHT | PREVIOUS 6 MONTHS RATING | CURRENT 6 MONTHS RECOMMENDED WEIGHTING WEIGHT | RATING | GRADE |
|---|---|---|---|---|---|
| PROJECT MANAGEMENT | 0 | 0 | .25 | 76 | 19.00 |
| COST MANAGEMENT | 0 | 0 | .15 | 76 | 11.40 |
| SCHEDULE PERFORMANCE | 0 | 0 | .15 | 86 | 12.90 |
| SUBCONTRACT MANAGEMENT | 0 | 0 | .20 | 82 | 16.40 |
| DESIGN QUALITY | 0 | 0 | .15 | 78 | 11.70 |
| TECHNICAL PRODUCT QUALITY | 0 | 0 | .10 | 76 | 7.60 |
| TOTAL | 0 | 0 | 1.00 | | 79.00 |

| PERFORMANCE POINTS EARNED | AWARD FEE PER POINT | AWARD FEE |
|---|---|---|
| 0 - 70 | $ -0- | & -0- |
| 71 - 75 | 15,509 x 5.0 | 77,545 |
| 76 - 80 | 29,079 x 4.0 | 116,316 |
| | | $193,861 |

| BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|
| $53,850 | $193,861 | $247,711 |

| BASE FEE | MAXIMUM AF | TOTAL |
|---|---|---|
| $53,850 | $969,300 | $1,023,150 |

% ACTUAL AWARD FEE VS. MAXIMUM AWARD FEE 20.00%

% OF TOTAL ACTUAL FEES VS. TOTAL MAXIMUM FEES 24.21%

OFFICIAL USE ONLY

# HISTORY OF AWARD FEE PAYMENTS
# ROCKWELL INTERNATIONAL

## PLANT

| PERIOD | BASE FEE | AWARD FEE PAID | AF NOT AWARDED | POTENTIAL AWARD FEE | TOTAL FEE PAID | POTENTIAL TOTAL FEE | % AF AWD | % TTL AWD |
|---|---|---|---|---|---|---|---|---|
| 06/01/79 - 09/30/79 | $583,990 | $751,421 | $204,199 | $955,620 | $1,335,411 | $1,539,610 | 79% | 87% |
| 10/01/79 - 03/31/80 | $829,685 | $1,258,797 | $400,573 | $1,659,370 | $2,088,482 | $2,489,055 | 76% | 84% |
| 01/01/80 - 09/30/80 | $829,685 | $1,342,761 | $316,609 | $1,659,370 | $2,172,446 | $2,489,055 | 81% | 87% |
| 10/01/80 - 03/31/81 | $908,525 | $1,266,478 | $550,572 | $1,817,050 | $2,175,003 | $2,725,575 | 70% | 80% |
| 04/01/81 - 09/30/81 | $908,525 | $1,150,550 | $666,500 | $1,817,050 | $2,059,075 | $2,725,575 | 63% | 76% |
| 10/01/81 - 03/31/82 | $1,058,220 | $1,405,832 | $710,608 | $2,116,440 | $2,464,052 | $3,174,660 | 66% | 78% |
| 04/01/82 - 09/30/82 | $1,058,220 | $1,272,335 | $844,105 | $2,116,440 | $2,330,555 | $3,174,660 | 60% | 73% |
| 10/01/82 - 03/31/83 | $1,067,915 | $1,502,769 | $633,061 | $2,135,830 | $2,570,684 | $3,203,745 | 70% | 80% |
| 04/01/83 - 09/30/83 | $1,067,915 | $1,728,314 | $407,516 | $2,135,830 | $2,796,229 | $3,203,745 | 81% | 87% |
| 10/01/83 - 03/31/84 | $1,330,000 | $1,619,940 | $1,040,060 | $2,660,000 | $2,949,940 | $3,990,000 | 61% | 74% |
| 04/01/84 - 09/30/84 | $1,330,000 | $1,965,208 | $694,792 | $2,660,000 | $3,295,208 | $3,990,000 | 74% | 83% |
| 10/01/84 - 03/31/85 | $1,338,500 | $2,851,808 | $1,163,692 | $4,015,500 | $4,190,308 | $5,354,000 | 71% | 78% |
| 04/01/85 - 09/30/85 | $1,338,500 | $2,940,149 | $1,075,351 | $4,015,500 | $4,278,649 | $5,354,000 | 73% | 80% |
| 10/01/85 - 03/31/86 | $1,453,800 | $3,174,225 | $1,187,175 | $4,361,400 | $4,628,025 | $5,815,200 | 73% | 80% |
| 04/01/86 - 09/30/86 | $1,453,800 | $3,337,342 | $1,024,058 | $4,361,400 | $4,791,142 | $5,815,200 | 77% | 82% |
| 10/01/86 - 03/31/87 | $1,138,950 | $4,184,053 | $1,131,047 | $5,315,100 | $5,323,003 | $6,454,050 | 79% | 82% |
| 04/01/87 - 09/30/87 | $1,138,950 | $4,359,441 | $955,659 | $5,315,100 | $5,498,391 | $6,454,050 | 82% | 85% |
| 10/01/87 - 03/31/88 | $782,400 | $4,758,244 | $1,500,956 | $6,259,200 | $5,540,644 | $7,041,600 | 76% | 79% |
| 04/01/88 - 09/30/88 | $782,400 | $4,790,073 | $1,469,127 | $6,259,200 | $5,572,473 | $7,041,600 | 77% | 79% |
| TOTALS | $20,399,980 | $45,659,740 | $15,975,660 | $61,635,400 | $66,059,720 | $82,035,380 | 74% | 81% |

HISTORY OF AWARD FEE PAYMENTS
ROCKWELL INTERNATIONAL

PRMP/PROVE

| PERIOD | BASE FEE | AWARD FEE PAID | AF NOT AWARDED | POTENTIAL AWARD FEE | TOTAL FEE PAID | POTENTIAL TOTAL FEE | % AF AWD | % TTL AWD |
|---|---|---|---|---|---|---|---|---|
| 10/01/88 - 03/31/89 | | | | | | | | |

NOTE: THIS IS THE FIRST PERIOD THAT PRMP/PROVE HAS BEEN EVALUATED SEPERATELY

PL. SUPP. EX. 75

Rockwell International Corporation
Contract DE-AC04-76DP03533
Determination of Award Fee
Minutes of PERB Meeting May 10, 1989

The Performance Evaluation Review Board (PERB) met on May 10, 1989. Those in attendance were:

| | |
|---|---|
| C. E. Troell, AM/Management & Administration | Chairman |
| J. W. Culpepper, Deputy Manager | Observer |
| R. L. Hymer, AM/Operations & Weapons | Member |
| D. L. Krenz, AM/Environment, Safety & Health | Member |
| J. R. Roeder, AM/Safeguards & Security | Member |
| R. O. Inlow, Acting Area Manager, RFAO | Member |
| J. J. Szenasi, Acting AM/Projects & Energy Programs | Member |
| V. V. Berniklau, Director, OMPA | Member |
| W. Baer, Acting Director, OEPO | Member |
| J. A. Stout, Chief Counsel | Legal Advisor |
| J. G. Hoyal, Jr., Director, CPD | Procurement Advisor |
| T. V. Hill, CPD | Executive Secretary |
| M. J. Frietze, CPD | Dep. Exec. Secretary |
| L. L. Sanchez, CPD | Recording Secretary |

The purpose of the meeting was to discuss the Area Manager's Performance Evaluation Report and recommend award fee for the period October 1, 1988, through March 31, 1989. Copies of the report were given to the PERB members and Division Directors prior to the PERB meeting for their review and evaluation.

The Area Manager gave the highlights of the Performance Evaluation Report.

The PERB's deliberations were as follows:

I. Plant

1. Cost Management - The PERB noted that the recommended grade was two points below the previous six months (97-95). The primary reason was that the Contractor had accomplished some outstanding actions during the last period which were reflected in an Especially Noteworthy Achievement. Although there were four Noteworthy Achievements this period, there were no Outstanding actions reflected in the report.

2. Quality - Quality was rated as Outstanding for the previous period and Excellent for this period (97-95). There were no Notable Deficiencies for the last period but one deficiency was given for the current period. The deficiency was written as a Notable Deficiency, however, since the PERB considered this to be more in the incidental category, the PERB recommended deleting the word Notable and record it only as a Deficiency.



E 000975

3. Chemical Operations - The recommended grade for Chemical Operations was raised seven points from the last period (84-91), from Good to Excellent. There were three Notable Deficiencies last period relating to PROVE, recovery mission, and overall metal production in the various recovery processes. For the current period, there are no Notable Deficiencies and two Noteworthy Achievements. Also, the PRMP/PROVE was broken out as a separate project with its own Functional Performance Areas (FPA's) and award fee evaluation.

PRMP/PROVE was assigned to Rockwell as a turnkey project so that one organization will be responsible for design, construction, and operation of the facility.

If the PRMP/PROVE work were added to the plant work for fee purposes, the fixed fee for PRMP/PROVE would be at the lower end of the fee schedule for each fee base element. This would result in an unreasonably low fee for a Major System Acquisition whose success is highly critical to the continued successful operation of the Rocky Flats Plant. The project also has high visibility both within and outside of the Department. Considering this, the Assistant Manager for Management and Administration, AL, concurred in calculation of a separate fee for this effort in order to provide Rockwell with sufficient motivation and appropriate awards to ensure a high level of management effort toward the successful completion of the project. The Performance Evaluation Review Board met to consider this matter and the Board recommended calculation of a separate fee.

4. Production Operations - There is a one point drop in the recommended grade from last period (97-96). The recommendation is still within the excellent range. There were no deficiencies noted for either period and there were three Noteworthy Achievements for each period.

5. Environment, Safety and Health - There was considerable discussion on this area. The PERB asked that Noteworthy Achievement No. 3, relating to radiological incidents, be changed to reflect a positive trend rather than showing numbers and referring to goals. A Notable Deficiency was added with regard to shutdown of Building 771. Notable Deficiency No. 4 was changed to clarify that the downward trend was for the first five months of FY89; however, more progress is required.

The Area Manager recommended a grade of 84 which is three points higher than last period. There were two Noteworthy Achievements and five Notable Deficiencies last period and six Noteworthy Achievements and seven Notable Deficiencies this period. After consideration of all the data, and in view of the nature of the deficiencies, the Board was of the opinion that the grade should not be hgher than the last period and recommended a grade of 81.

## II. PRMP/PROVE

The Board reviewed the recommended grades for all of the PRMP/PROVE FPA's and concurred with those recommended with the exception of Project Management. The recommended grade was 76 which is the lowest grade for Moderately Good. The Board was of the opinion that in view of the performance under the other FPA's, Project Management should be rated as satisfactory rather than Moderately Good. The grade was lowered to 75.



E 000976

III. General Management

The recommended grade was 92 which is the same as last period. The Board concurred in this recommendation. Noteworthy Achievement No. 1 was rewritten to reflect that Building 771 is now an exemplary facility, after the shutdown, however, this improvement has not been translated accross the board to other areas of the Rocky Flats Plant.

Observations 3 and 6 were combined since they are related. Observations 8, 12, 13, 15, 17, and 18 were deleted since that large number tends to dilute the overall effect.

The PERB recommends a grade of 91.20 with an award fee of $5,326,482 for Plant and a grade of 78.75 with an award fee of $186,591 for PRMP/PROVE.

Theetis V. Hill
Theetis V. Hill
Executive Secretary

PL. SUPP. EX. 76

FAXED TO TED HILL 5/11/89

**Award Fee Evaluation of Rockwell International**

**Rating Period: October 1, 1988 - March 31, 1989**

**This is a 5/11/89 Notice from RFAO to Ted Hill, PERB ES, CPD/AL**

**Subject: Changes to Plant Recommendations and Summary.**

**Message A: The Noteworthy Achievements and Observations are revised as follows in the Plant FPA on General Management:**

To Noteworthy Achievement #1 completely replace the existing #1 with the following revised version:

1. Significant improvement has been made simultaneously in many important plant functions during the appraisal period. These improvements are covered in more detail in the FPA's for Environment, Safety and Health (ES&H), Production Operations, Non-Weapons Quality, and Chemical Operations. Most notable is the achievement of exemplary standards for operations in Building 771. These standards were achieved on compressed schedules while maintaining the other plant activities. While continued improvement is sought, Rockwell has done a remarkable job of pushing for and achieving the recent improvements while under extreme pressure.

To Observations No's 3 and 6, completely eliminate No. 6 and completely replace No. 3 with the following revised version (a combination of 3 & 6):

3. The shutdown of production and maintenance activities in Building 771 from October 1988 to January 1989 resulted in a significant impact to plutonium recovery schedules, as well as a slip in ongoing maintenance and facility upgrade schedules. With the exception of electrorefining, Rockwell is significantly behind recovery schedules established at the beginning of the fiscal year. This was the penalty for the shutdown made to correct safety problems. Rockwell's development of a comprehensive plan for plant-wide application of Building 771 Restart Criteria should continue vigorously. The plan reviews each of the 771 Restart Criteria for potential applicability to other areas on plant site, recommends items that should be implemented, determines the

status of each item, determines rough order of magnitude of resourses and manpower requirements, and finally recommends an action plan and management scheme. This effort will help preclude future shutdowns and resultant lost production.

To Observations, completely eliminate the following GM Observations:

Numbers 8,12,13,15,17,and 18 (Note: This will leave eleven observations and they will need to be renumbered)

**Message B: The Notable Deficiencies are revised as follows in the Plant FPA on ES&H:**

To the Notable Deficiencies, add a new #1, to read as follows:

1. The shutdown of Building 771 created major disruptions to the commitments for processing of plutonium, with resultant downstream and upstream impacts on nuclear material throughout the weapons complex. The shutdown was made to allow Rockwell time to correct safety related problems in the building, most of which had been identified before the period began. Although Rockwell's corrective action during shutdown was noteworthy, management should not have permitted the situation to degrade to the point of shutdown. Much work remains to make Building 771 and the other nuclear facilities at Rocky Flats operate in full compliance with DOE standards.

To the Notable Deficiencies, completely replace existing #3 with the following revised version:

3. The rate of wound occurence in radiation controlled areas averaged about 60 per month during FY88. Although a slight downward trend was achieved during the first five months of FY89, the rate of wound occurrence must still be significantly reduced during the remainder of the fiscal year.

To the existing Notable Deficiencies, renumber:

All existing deficiencies remain and should be numbered #2-#7.

**Message C: The Summary document should be revised as follows in the section on ES&H:**

Add this new sentence to the beginning of the second paragraph:

The shutdown of Building 771, resulting despite earlier identification of saftey problems, created major disruptions to the commitments for processing of plutonium.

Add this new sentence to the end of the second paragraph:

The ES&H management oversight of Building 771 operations after the January 19, 1989 phased restart was inadequate.

**The above changes to Plant GM and ES&H reflect the RFAO input of changes requested by the PERB at their 5/10/89 meeting on Rockwell International. These are the only changes RFAO was requested to input. We understand that other changes requested by the PERB will be made by the PERB ES.**

**We also understand that we will later receive from you a copy of the long form recommendations, the Summary, and a revised Fee Calculation reflecting the final scores for the period.**

**Call Terrel Agy, RFAO, at 320-2492 with any questions.**

PL. SUPP. EX. 77

OFFICIAL USE ONLY

U. S. Department of Energy
Albuquerque Operations Office

# AWARD FEE
# PERFORMANCE EVALUATION REVIEW
# BOARD RECOMMENDATION
# FOR THE PERIOD:

## October 1, 1988 Through March 31, 1989

## CONTRACT DE - AC04 - 76DP03533

## ROCKWELL INTERNATIONAL CORPORATION
## ROCKY FLATS PLANT

DATE: 5/17/89

Charles E. Troell
Assistant Manager For Management & Administration
Chairman, Performance Evaluation Review Board
Albuquerque Operations Office

CIRD JP MAY 89 111 030

OFFICIAL USE ONLY

PERFORMANCE APPRAISAL
ROCKWELL INTERNATIONAL
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD OCTOBER 1, 1988 - MARCH 31, 1989

The overall performance of the contractor has been maintained at least at a level of "Satisfactory" during the appraisal period. The following is the Performance Evaluation Review Board recommendations for the Functional Performance Areas (FPA's) selected for evaluation. The first section covers plant operations while the second section covers Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE). The General Management FPA was evaluated considering performance for both areas.

PLANT

FPA: GENERAL MANAGEMENT

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. Significant improvement has been made simultaneously in many important plant functions during the appraisal period. These improvements are covered in more detail in the FPA's for Environment, Safety and Health (ES&H), Production Operations, Non-Weapons Quality, and Chemical Operations. Most notable is the achievement of exemplary standards for operations in Building 771. These standards were achieved on compressed schedules while maintaining the other plant activities. While continued improvement is sought. Rockwell has done a remarkable job of pushing for and achieving recent improvements under extreme pressure.

2. Interplant schedule compliance continued at 100% for the third consecutive rating period. This performance was achieved despite material supply limitations generated by the shutdown of Building 771.

3. Rockwell achieved a rapid resolution to the problem of obtaining U. S. Department of Transportation (DOT) approval for using a modified ATMX railcar for shipping the first shipment of Transuranic (TRU) mixed waste in 1989 from the Rocky Flats Plant (RFP) to the Idaho National Engineering Laboratory. Several obstacles existed, both within the Department of Energy (DOE) and DOT, to the granting of appropriate approvals. Due to Rockwell's persistence, the approval was granted for use of the modified railcars at the time proposed by DOE.

4. The Emergency Preparedness Organization was credited in the December 1988 Safety Performance Review with having a "...well planned, and effective program in meeting emergency readiness needs." In addition, Rockwell's emergency preparedness personnel have sustained a high level of participation in Albuquerque Operations Office (AL)-wide emergency preparedness coordination

activities, have supported the development of the AL emergency preparedness appraisal program in a significant manner, and have continued to identify and implement improvements in Emergency Operations Center capabilities and operations.

5. More than 60% (47,000 hours) of the maintenance work order backlog older than 90 days has been worked off. A team of 50 people, under the Rockwell "We Do Care" program, was established for this purpose.

6. Rockwell has already exceeded the 10 year (1986-1995) Energy Conservation Goal of a 10% reduction in energy usage.

7. Rockwell has completed the development and installation of the Personnel Evacuation Logging System in all major production and support buildings. This enhances the security and safety of the buildings serviced and provides a data base for emergency actions in specific areas.

Notable Deficiencies

None

Observations

1. The Management Oversight Group (MOG) reported needed changes in the management of the PRMP by Rockwell. A Precursor Program has been established with the DOE Project Manager to address the MOG concerns, and significant progress is being made. Further improvements are necessary by Rockwell for this high priority DOE project.

2. The redefinition of the Building Manager responsiblities has been a visible action which has enhanced the integration of functions. The Building Manager position is functioning to exercise responsibilities for all activities in the building. Development of an "in-house" safety program in Production Operations is evidence of the success that can be achieved by Building Managers. The Building Manager position should be further strengthened and supported to insure complete integration of all activities necessary for safety, quality, maintenance, training, security, and production.

3. The shutdown of production and maintenance activities in Building 771 from October 1988 to January 1989 resulted in a significant impact to plutonium recovery schedules, as well as a slip in ongoing maintenance and facility upgrade schedules. With the exception of electrorefining, Rockwell is significantly behind recovery schedules established at the beginning of the fiscal year. This was the penalty for the shutdown made to correct safety problems. Rockwell's development of a comprehensive plan for plant-wide application of Building 771 Restart Criteria should continue vigorously. The plan reviews each of the 771 Restart Criteria for potential applicability to other areas on plant site, recommends items that should be implemented, determines the status of each item, determines rough order of magnitude of resources and manpower requirements, and finally recommends an action plan and management scheme. This effort will help preclude future shutdowns and resultant lost production.

4. Training of waste generators and improved generation practices have reduced the quantity of reject waste drums, a major contributor to reducing the supplied air operations in the Size Reduction vault.

5. Rockwell has not made adequate progress to prepare for utilization of the TRUPACT II container when it becomes available. The final definition of modifications to Building 664 for handling TRUPACT II containers and submittal of the budget request was not completed in a timely manner.

6. The identification and timely resolution of problems by Rockwell is often slow. Examples include pondcrete storage monitoring, analysis of National Pollutant Discharge Elimination System (NPDES) violations, complete dissemination of incident information within Rockwell, and TRU waste storage data. For example, in October the Governor of Idaho curtailed shipments to Idaho of TRU waste from Rocky Flats. The curtailment resulted in an immediate need for information on the TRU mixed waste at Rocky Flats available for shipment. The time required to obtain accurate information on the types and quantities of stored waste was too long for an issue of this importance.

7. Rockwell has recently violated DOT regulations on two shipments to the Nevada Test Site (NTS) (RF890154 and RF880951). One involved miscounting the number of waste containers on a shipment to the NTS on 9/3/88, and the other involved incorrect drum numbers (due to exchange of a drum which was listed on the bill of lading with a drum which was not listed on the bill of lading) on 1/17/89.

8. Despite the knowledge that nitrate concentrations on the 750 pad have increased, little action has been taken to contain saltcrete (which has been identified as a major contributor to storage pad nitrate concentrations) after precipitation events. Data provided in March of 1989 indicated the highest nitrate concentrations ever observed on the pads.

9. Rockwell is still not placing sufficient emphasis on the timely establishment of the Rocky Flats Institute. The DOE considers this program, along with the Rocky Flats School, to be essential to enhancing the capabilities of building management personnel at Rocky Flats.

10. The Waste Isolation Pilot Plant Waste Acceptance Criteria Committee performed an audit on Rocky Flat's TRU waste activities. The positive results of this audit reflect diligence in waste analysis and quality assurance in packaging.

11. Several waste minimization efforts have led to reductions in waste produced. The most dramatic effort has been the waste paper recycle program which has exceeded all expectations for the quantities of waste paper recycled. This has the added benefit of extending the useful life of the sanitary landfill.

FPA: COST MANAGEMENT

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. Rockwell performed well in providing data and narratives to define DOE's unfunded ES&H requirements in support of a FY89 supplemental budget request. A significant portion of this data was used to support DOE requests to Congress for additional FY90 funding.

2. Rockwell has done an extraordinary job of tracking information and preparing responses to a large variety of budget information requests and of maintaining the current status of its requirements. The quality and consistency of information provided to the DOE has been exceptional considering the number of different funding options that have been addressed. Support provided for the on-site DOE review of requests for additional funding was excellent.

3. Rockwell construction project data sheets and conceptual design reports supporting its requests for the FY91/92 Capital Budget were of high quality and were completed ahead of schedule. Rockwell is well prepared for DOE Headquarters reviews of FY91 projects.

4. The FY91 budget narratives were improved and expanded by Rockwell. Detailed identification of program cost growth and impacts of Production and Surveillance target guidance was particularly helpful in DOE's analysis of Rockwell's resource requirements.

Notable Deficiencies

None

Observations

1. Rockwell's SACNET submission of budget schedules was late and its FY88 Schedule 1 and 2 actual costs were late and were also inaccurate in regard to New Material Flight Tests/Stockpile Flight Tests and New Material Laboratory Tests/Stockpile Laboratory Tests costs.

2. In deciding on final General Plant Project (GPP) allocations for the year, AL has reviewed the status of committed funds. The large dollar amount of uncommitted funds has adversely affected the support for the plant's FY89 GPP requirements.

3. Rockwell continues to be responsive to OCAD requirements and initiatives including indirect Cost Management, the Work Load Model initiative and Baseline Cost Management (particularly the W 89 Cost Call). Although Indirect Cost Management packages were submitted late, the quality of the packages was very good.

OFFICIAL USE ONLY

FPA: QUALITY

Adjectival Grade: EXCELLENT

Especially Noteworthy Achievement

The Non-Weapons Quality Assurance (NWQA) surveillance activities conducted during the Building 771 restart have been especially noteworthy in that they have resulted in the identification of and provide for corrective actions necessary for a more viable quality program. This early detection and correction of deficiencies in operations will provide for a greater assurance of the quality of our product.

Noteworthy Achievements

1. After two years of accomplishments, the continual improvement in the Rockwell Quality program has leveled off. As anticipated, a new phase of the Quality Improvement Plan is currently being implemented. This new phase is now being referred to as Phase 2 and will incorporate a new culture in quality practices. Rockwell has aggressively entered into Phase 2 with a Program Manager and a Continual Improvement Steering Committee to guide the effort. The steering committee is further supported with technical personnel, one being closely associated with Dr. W. Edward Deming.

2. Significant progress has been made towards implementing the NQA-1 Standard at Rocky Flats. The NWQA program office now has three reporting managers with established responsibilities. The Management Plan has been updated and 11 new positions added to the NWQA office. The Plant Level Control Systems portion of the implementation plan is divided into four parts and is mostly in place. Also, a manager has been assigned to facilitate the implementation of the Non-War Reserve (WR) Calibration Program. Quality personnel associated with procurement of needed services and commodities for the plant, within the Quality Directorate and outside the Quality Directorate, have recently been reorganized into one group within the NWQA program office. This reorganization should increase the consistency of Non-WR and WR procurement activities.

3. Because of his exceptional attention to detail, a technician in the Nondestructive Testing (NDT) Department was able to have defective material that was received from Pinellas removed from the production line before it could be further processed into the system. During a routine NDT examination of a Rocky Flats production process, the technician detected a suspected anomaly in a reservoir while evaluating X-ray film of a weld joint performed at Rocky Flats. After sectioning the suspected unit, it was learned that a weld, unrelated to the Rocky Flats weld, had been completed unsatisfactorily at the Pinellas Plant. The unsatisfactory weld was not detected during NDT at Pinellas and was accepted and forwarded to Rocky Flats for continued processing. The discovery of this defect is very praiseworthy because the Rocky Flats NDT set up was not optimized to evaluate the Pinellas weld joint. The alertness, attention to detail, attitude, and discipline shown here depicts a work ethic that ensures a quality product.

Deficiencies

In three incidents, Rockwell failed to provide the necessary measures to adequately control nonconforming product material.

1) During the period, it was discovered that Rockwell had cancelled a deviation for a nonconforming component that had been properly deviated when accepted and released from Rocky Flats in FY88. Rockwell also failed to notify all affected DOE organizations that this action had taken place.

2) Five reject components were mistakenly accepted and released from Rocky Flats into the complex and subsequently had to be retrieved.

3) An acceptable reservoir was mistakenly reworked for defectiveness. A defective reservoir was then mistakenly accepted without being reworked and shipped to the next user.

The analysis of these incidents revealed that all these errors happened either from a breakdown of an existing system or that an inadequate system was in place.

Observations

1. The DOE is concerned with the low level of quality performance being displayed by the beryllium supplier. Deficiencies such as lack of subcontracting controls, poor manufacturing instructions, and failure to identify root causes of nonconformances were identified in a recent Rockwell survey of the beryllium supplier. Beyond these findings, a recent DOE, AL survey of the beryllium supplier found that the supplier's configuration management and product traceability systems were also operating poorly.

2. Approximately 272 Quality Assurance Survey (QAS) 2, 3 and 4 surveys were conducted during the period resulting in 55 complimentary observations and 66 findings. However, all 11 QC-1 elements were evaluated to be satisfactory or better. Four findings were considered to be significant. Three findings involved paperwork problems and the fourth was assigned for a part which failed the DOE verification inspection of the component. No findings were identified in two of the QC-1 elements and no negative trends were identified.

3. Rockwell continues to make excellent progress towards implementing the complete Quality Information System. Shortly, the fifth module will be complete. Three additional modules are planned and scheduled to be complete during FY90.

4. Duplicate serial numbers have become an issue during the performance period. Three DOE plants have identified product from Rocky Flats with serial numbers which have been used twice. After significant investigation by the DOE and Rockwell, it has been found that only a small quantity of the identified serial numbers have actually been duplicated. The resolution of this issue will be completed in a future meeting between contractor, design agency, and DOE personnel.

FPA: CHEMICAL OPERATIONS

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. The Plutonium Operations effort to implement an Operational Readiness Review (ORR) program is excellent. Progress toward implementation has been demonstrated through ORR's for the Building 771 Incinerator, Part V, and the Dicesium Hexachloroplutonate (DCHP) Molten Salt Extraction (MSE) processes. These efforts support the top priority goal for excellence in facility operations and should be further developed and continued on a plant-wide bases.

2. Rockwell has successfully completed the development of a new extractant compound for use in the MSE process. Dicesium Hexachloroplutonate has the advantage of substantially reducing the gamma and neutron exposures to MSE operations personnel, eliminating magnesium contamination of the product plutonium buttons, and increasing the efficiency of the process to a single pass process. These last two changes also reduce the recycle residues produced. This development work was performed concurrently with the Building 771 shutdown, safety improvements, and the Building 771 restart activities.

Notable Deficiencies

None

Observations

1. DOE intends to evaluate the productivity of Chemical Operations in terms of Base Recovery Units (BRU's). Using this approach, Rockwell appears to be regaining productivity while concurrently executing new safety requirements. Because of the Building 771 shutdown, the most current metal production period was only three months in length. A comparison of that production period was made against the two previous periods as shown below:

| Period | Months | %Change | %Change |
|---|---|---|---|
| July 86 - July 87 | 13 | Base | --- |
| Aug 87 - June 88 | 11 | -12% | Base |
| Current | 3 | +8% | +22.6% |

When using the 13 month period as the base for comparison, the efficiency of recovery for the three month period increased by 8.0%. Using the 11 month period as the base for comparison shows an increase in efficiency of 22.6% for the three month period. In the first comparison, the 12% drop for the 11 month period resulted from the initiation of ES&H and facility upgrades. The dramatic improvement seen when comparing the three month period against the 11 month period as base reflects an adjustment to the new ES&H requirements and increased efficiencies resulting from facility upgrades.

2. The establishment of a Self-Assessment Audit Program in Building 771 has enabled Rockwell to take a proactive role in identifying and correcting housekeeping and safety concerns. The emphasis on immediate corrective action and recurrence control is a positive step toward implementing the surety of operations concept in Building 771. Rockwell's vigorous proactive self-assessment efforts in Building 771 are to be highly commended and encouraged throughout the plant-site.

3. The Building 771 Contamination Control Committee has continued to work at determining the root cause of mechanical and administrative failures which led to contamination incidents. New decontamination methods, new anti-contamination clothing, safer work methods, trend analyses, and engineering enhancements are all measures being utilized by the Committee. During the last six months, there has been only one possible inhalation case which was confirmed as negative. In addition, the number of contamination incidences appears to be staying low as production increases under the Restart Plan. However, further reductions in the number of contamination incidences are necessary.

4. Identification of process information has promoted identification of process shortcomings. Further analysis requires instrumentation, which has been delayed in some cases by the Building 771 shutdown. Continued process improvements through the Recovery Improvement Program and Process Technology Development support have also been impacted by the shutdown and some shifts in goals. However, there is still a need for continued efficiency and process improvements and these programs should be revitalized in some form.

5. Rockwell has successfully completed initial experiments with an electrolytic decontamination technique for use on fixed contamination on stainless steel and some other metals. The technique, coined electro-decontamination, has been highly successful on flat stainless steel surfaces in the first few trials. Further development of this technique for the decontamination of large surface areas, uneven surfaces and welds, without detrimental effects to the equipment decontaminated, would constitute a significant achievement.

6. The development of a budget planning process for chemical operations is considered to be essential to the improvement of the efficiency of the plutonium recovery processes, increased metal purity, decreased residue recycle, and waste minimization. To date, Rockwell management has provided excellent support for establishing a budget development process. However, it is essential that Plutonium Operations line management provide a leadership role and be involved in the entire budget development process, not just provide support to the budget development process.

OFFICIAL USE ONLY

FPA: PRODUCTION OPERATIONS

Adjectival Grade: OUTSTANDING

Noteworthy Achievements

1. The number one priority for this period has been excellence in facility operations. The effort toward development of a Nuclear Facility Operations Manual (NFOM) directly supports the facility excellence goal. The NFOM Task Team has drafted and approved all procedures for the NFOM based on the original outline. The Task Team is commited and has an appropriate mix of members to insure a balanced perspective. With continued emphasis, this effort is expected to create a model document for the AL complex.

2. Rockwell has been very supportive of the AL effort to develop an Operational Surety Program. They have actively participated in meetings, presented briefings on request, and provided documents for application by other sites. Rocky Flats Plant is currently recognized as a leader in Operational Surety within AL.

3. Rockwell has taken several steps to reduce work in process inventories and process times. Among these are:

a. Reduced planned process times by approximately 25% "across the board" in the production control system in Building 460. The result has been roughly a 50% reduction in work in process inventories in the building, measured by the number of components. .

b. Reduced pit assembly process time in Building 707 by six weeks, from eight weeks total to two weeks.

c. Reduced lot sizes on the 3T bodies from approximately 50 to approximately 24 to reduce backlogs at the four and five axis mills.

Notable Deficiencies

None

Observations

1. Utilization of direct labor, as measured by productive time, efficiency, and realization, has declined during this period. This decline is a result of changes required to implement new plant safety procedures. Rockwell's Industrial Engineering Group has conducted a study of possible approaches to improve labor utilization. In the long term, utilization should improve as experience is gained in the new operating procedures, and as the emphasis on training results in yield improvements. In addition, greater safety consciousness should result in fewer process interruptions.

2. Rockwell has responded effectively to DOE's initiatives on make or buy policy. Rockwell will soon be submitting their revised Capability Maintenance Plan, now called the Make Or Buy Plan, and the supporting Baseline Capability Plan. They have also complied with the requirement to submit a "Buy Rate" calculation. The calculation for the first quarter in FY89 showed that the buy rate declined in comparison with FY88, but this is attributed to the "buy ahead" of a significant quantity of beryllium parts in FY88.

3. During March, Rockwell hosted a seminar to share information on their experience in eliminating halogenated solvents. Thirty-two representatives from 12 corporations attended. Feedback was positive and enthusiasm was expressed for continued information exchanges. This seminar was a constructive first step in the program for technology transfer from Rocky Flats to private industry and has significant potential for building a positive image for Rocky Flats within local communities.

FPA: ENVIRONMENT, SAFETY AND HEALTH

Adjectival Grade: GOOD

Noteworthy Achievements

1. Rockwell has made significant progress towards achieving a high quality radiation protection training program for Radiation Monitors which meets the requirements of DOE 5480.11. Other significant initiatives in radiation protection training have also occurred during this period, most notable being a new pilot radiation safety course for Radiation Worker Supervisors and plant Building Management. Rockwell has successfully completed many improvements and started several new initiatives above and beyond the DOE requirements in their radiation protection training programs.

2. Rockwell has demonstrated responsiveness in the preparation and coordination on National Emissions Standards for Hazardous Air Pollutants (NESHAP) issues specific to the RFP. Rockwell has also demonstrated a thorough understanding of the regulatory requirements through its contributions to the DOE-wide review of the NESHAP (Subpart H) regulation.

3. Rockwell has made significant progress towards reducing the rate of radiological incidents. The average monthly rate for Possible Inhalations (PI's) during FY88 was approximately seven per month. During the first five months of FY89, the rate of PI's was less than three per month. The FY88 monthly average rate for exceeding contamination limit criteria, in both controlled and uncontrolled areas, was about 37 occurrences each month. However, for the first five months of FY89, the monthly rate for this type of contamination incident has dropped well below the RFP FY88 rate. Progress to date in reducing incidents is noteworthy and is indicative of a positive trend. The DOE encourages continued improvement in this area.

4. Rockwell has taken several positive steps toward achievement of permanent reduction in plant personnel radiation exposure. A full-time As Low As Reasonably Achieveable (ALARA) Program Manager was hired, and completed the development of a basic plant-wide ALARA program. A Rem Reduction Plan describing various plant and building initiatives being taken to effect a permanent decreasing trend in radiation exposure is in its final stages of completion. During the first four months of the rating period, progress was achieved in reducing personnel radiation exposure in the semi-monthly and monthly badge exchange groups. These groups had a projected goal of about 143 Rem during this period, however, they accumulated 102 Rem; this is 41 Rem below the goal. Although some of this exposure decrease occurred due to a curtailment of Building 771 process operations, this was counterbalanced by the fact that during the same timeframe, Building 776 increased their production, and significant decontamination efforts were accomplished in Building 771.

5. The comprehensive review of the Technical Safety Appraisal (TSA) showed that Rockwell's safety program is in transition and open to change. Rockwell was commended for improvements in union/management relations and for developments in an integrated safety program. A definite change in culture was observed. Substantial corrective actions are underway which, when properly implemented, should result in an exemplary safety program in the future. Rockwell also submitted it's TSA response document to DOE two weeks ahead of the schedule set by DOE.

6. In establishing the Safety Review Group (SRG), Rockwell has developed a dedicated investigative group that provides a coordinated systems approach to unplanned event investigations that ensures that such events are investigated in a timely manner and enhance the safety awareness throughout the plant. Rockwell should be commended for the establishment of this group as well as for the SRG's efforts to date.

Notable Deficiencies

1. The shutdown of Building 771 created major disruptions to the commitments for processing of plutonium, with resultant downstream and upstream impacts on nuclear material throughout the weapons complex. The shutdown was made to allow Rockwell time to correct safety related problems in the building, most of which had been identified before the period began. Although Rockwell's corrective action during shutdown was noteworthy, management should not have permitted the situation to degrade to the point of shutdown. Much work needs to be done to export lessons learned from Building 771 to other Rocky Flats facilities.

2. There was an unintentional release of dilute chromic acid on February 22, 1989. The chromic acid upset the organic balance of the RFP's sanitary waste-water treatment plant. Subsequent to the release, water containing the chromic acid was spray irrigated on plantsite. Chromic acid contaminated water from the spray irrigation field was carried by runoff into Pond B-5, which was discharged offsite. There are inadequate incident reporting procedures or operating procedures governing the coordination of the discovery of releases to the sewage treatment plant with downstream control of contamination. Furthermore, the incident shows the need for the development and implementation of adequate Spill Prevention Control and Countermeasures procedures and practices.

3. Although Rockwell has shown improvement in housekeeping of production buildings, housekeeping is still inadequate. Housekeeping in the balance of the plant does not approach the standard set in Building 771. Rockwell is attempting to correct this, but has not yet established a successful approach.

4. The rate of wound occurrence in radiation controlled areas averaged about 60 per month during FY88. Although a slight downward trend was achieved during the first five months of FY89, the rate of wound occurrence must still be significantly reduced during the remainder of the fiscal year.

5. Rockwell has not been able to resolve the 1988 NPDES permit violations for five-day biochemical oxygen demand. Although there were several reasons for the violations, the lack of adequate sludge handling capacity and operation and maintenance deficiencies are foremost concerns. Rockwell's inability to comply with the limitations of the NPDES permit is considered serious because the discharges from the RFP go directly into the city of Broomfield's raw drinking water reservoir. Also, the policy of the Environmental Protection Agency (EPA) is to not renew NPDES permits which have outstanding violations, and the NPDES permit for the RFP expires on June 30, 1989. Unless these violations are resolved expeditiously, the renewal of the NPDES permit will be delayed. It is recognized that Rockwell has hired an outside consultant to identify the causes of the violations and the corresponding corrective actions which should correct the situation.

6. The DOE has been concerned about the safe operation of the East Firing Range. Rockwell has taken no actions to date to rectify the situation.

7. Rockwell ES&H management provided inadequate oversight of Building 771 operations after the January 19, 1989, phased restart. The overall assessment of the implementation of this radiological program indicated that the full intent of the comprehensive and multilevel operational assurances were not performed in an integrated and disciplined manner.

Observations

1. Rockwell, for the first time, has a 100% glove change compliance across the plant-site. The Y-12 Plant has requested a Rockwell employee visit their plant so that a review of their operations and recommendations on development of a glove change program similar to that at RFP can be made.

2. Rockwell has been proactive in establishing a National Environmental Policy Act (NEPA) compliance committee. Rockwell has reviewed the appropriate NEPA guidance documents and has established a logical method for reviewing plant projects in order to determine the level of NEPA action required for the project. Although the committee has just been established, its cross section of divisions will enable it to consider a wide range of plant projects with minimal chance of leaving out a project. The system for documenting the review of projects, the judgements made, and the recommendation for NEPA action are thorough and track in a logical fashion.

3. The Colorado Department of Health and the EPA conducted six waste storage audits under Resource Conservation and Recovery Act (RCRA) during the last three and a half months, and only minor findings resulted. Because of consistently good audit results, TRU mixed shipments to the INEL were reinstated and the frequency of future inspections will be reduced.

4. Rockwell has established a strategy for upgrading the air monitoring system at RFP. The strategy was the result of excellent analysis, successful peer review, and resulted in a significant reduction in projected costs.

5. Rockwell continues to successfully complete the requirements of RCRA and Comprehensive Environmental Response Compensation and Liability Act.

6. Rockwell has made significant improvement in responsiveness to the AL safety appraisals. Although none to date have been turned in on time, the amount of tardiness has steadily decreased to the point that Rockwell has no outstanding responses at this time. Rockwell has initiated "Completion Certificates" for completed actions.

7. Rockwell established proposed plutonium and uranium maximum permissible contamination levels in oils and solvents which are defensible and practical for analytical evaluation. Although this is only a proposed method for establishing limits for a limited type of contaminated vs. non-contaminated waste materials, the need for these limits to be established has been indicated by the Environment & Health Program.

8. Rockwell has developed a Radiation Monitoring work schedule pilot program. This program is expected to cut Radiation Monitors overtime by 30-50%. The program was completed three weeks ahead of schedule in Building 776. Survey schedules have been maintained up to date. Plans are being developed for implementation of the work scheduling program across the plant-site.

9. Rockwell has responded well in initial implementation of the more stringent requirements of DOE Order 5480.11, "Radiation Protection For Occupational Workers". Rockwell is developing an implementation plan to accurately assess the impact of full implementation.

10. Routine surveillance and characterization of potential occupational exposures to hazardous chemicals and carcinogens in the work place are not being performed on a regular basis. As more Industrial Hygiene staff are hired and cleared, this must be a high priority.

11. Preparation and submission of the final report on radon in the NDT Vault in Building 771 has taken excessively long. In that it was just received, there has not been enough time for a thorough review of the report by AL.

12. A 1985 Fire Protection Appraisal by AL had a finding regarding the replacement/hiring of a second fire protection engineer. Each AL appraisal since has identified the same need. No response to date has been provided by Rockwell to close out this finding.

PRMP/PROVE FPA: PROJECT MANAGEMENT

Adjectival Grade: SATISFACTORY

Achievements

1. Rockwell has given PROVE renewed emphasis. Rockwell has separated the responsibility for PROVE from that of the PRMP and placed it under a full time project manager. In addition, the Rockwell Plutonium Operations directorship has committed a top staff member to be the Chief PROVE Project Engineer.

2. Rockwell has recently developed and implemented a "Precursor Plan." This plan represents a marked improvement in direction for the entire project. The planning has been both detailed and complete. This "Precursor Plan" has been implemented by Rockwell with professionalism and enthusiasm.

Notable Significant Deficiency

Overall PRMP management attention to project technical, cost, schedule, and manpower needs was inadequate.

Notable Deficiency

Inadequate project staffing continues to influence Rockwell PRMP performance. The above referenced "Precursor Plan" has made the staffing shortage obvious to all parties concerned.

Observations

1. The task of evaluating and incorporating PROVE's "Lessons Learned" is now a Precursor Plan activity with the anticipation that full benefit will be realized.

2. The degree to which Rockwell appropriately manages the Precursor Plan will directly impact PRMP's future success technically and administratively.

PRMP/PROVE FPA: COST MANAGEMENT

Adjectival Grade: MODERATELY GOOD

Noteworthy Achievements

1. The cost development and baselining of those costs for the "Precursor Plan" has been handled with the highest degree of quality. Subcontractors have been integrally involved in this development and baselining.

2. Rockwell has redirected J. A. Jones' manpower planning on PROVE which has resulted in reduced costs and apparent increased construction productivity.

Notable Significant Deficiency

PROVE continues to demonstrate cost growth. Rockwell has increased their forecast for the Total Estimate at Completion on PROVE from less than $43 million at the beginning of FY89 to the current $45.6 million.

Notable Deficiency

PRMP cost planning did not take into account allocated funding availability, resulting in a disconnect in project activities.

Observations

1. Rockwell has restructured PROVE cost estimates to be able to use a realistic $45.6 million baseline.

2. The PROVE Cost Performance Reports have been timely and of a consistently high quality. Changes to the Performance Measurement Baseline have been incorporated accurately and in a timely fashion.

3. Rockwell's management of the Construction Plan, Cost and Schedule Reduction, System Design Descriptions, and Cost and Schedule Baseline Precursor Plan activities can have a favorable cost impact on PRMP.

PRMP/PROVE FPA: SCHEDULE PERFORMANCE

Adjectival Grade: VERY GOOD

Noteworthy Achievements

1. Rockwell has addressed several problems impacting schedule in the PROVE area and brought them to successful resolution. Among these problems were the additional requirements imposed on the health physics monitors and engineering support to provide on-the-spot resolutions and aid to the construction personnel.

2. The diligent effort by Rockwell, Bechtel, and J. A. Jones in the joint development of the Precursor planning has resulted in a comprehensive schedule that should provide a smooth transition from PROVE to the receipt of capital funding for PRMP.

Notable Deficiency

The PROVE schedule has deteriorated during the reporting period. The PROVE end date was extended from 1/90 to 8/90. The Service Module redesign will reduce the material and work required and improve operability. Present activities should result in schedules that will be met.

Observations:

1. The intermediate Level PRMP Schedule was completed during this reporting period.

2. The direction Rockwell has given J. A. Jones in the PROVE area of manpower planning already has J. A. Jones working toward a potential schedule reduction of two months.

3. Rockwell's management of the Construction Plan, Cost and Schedule Reduction, System Design Description, and Cost and Schedule Baseline Precursor Plan activities can have a favorable schedule performance impact on PRMP.

OFFICIAL USE ONLY

PRMP/PROVE FPA: SUBCONTRACT MANAGEMENT

Adjectival Grade: GOOD

Noteworthy Achievements

1. Rockwell, consistent with project technical needs and evolved cost and schedules, has provided rapid and effective subcontract redirection of Bechtel. The redirection included contractual changes, a rescheduling of resources, and the cost rebaselining.

2. Rockwell subcontract management of J. A. Jones has ensured J. A. Jones' participation in construction planning. J. A. Jones' PROVE productivity has shown noticeable improvement since their inclusion in the teaming concept.

3. Rockwell has been successful in obtaining active participation and commitment from National laboratories and other Rockwell organizations on the PRMP Precursor Program.

Notable Deficiencies

1. The subcontract work with the PROVE glovebox manufacturer has resulted in the need for significant rework to the glovebox piping and piping penetration welds.

2. Rockwell has still not provided continuous site representation at Bechtel's location. The participation of Bechtel in the Precursor Program does not eliminate the necessity for such coverage to coordinate line item and cost/schedule activities.

Observations

1. The construction subcontractor on PROVE has been asked by Rockwell to develop a Performance Measurement System (PMS). The DOE Project Management Office (PMO) anticipates demonstration of the PMS early in the next six month evaluation period.

2. Rockwell management of the PROVE glovebox manufacturer, has resulted in favorable and timely response to redirection and changes to both schedule and configuration.



OFFICIAL USE ONLY

PRMP/PROVE FPA: DESIGN QUALITY

Adjectival Grade: MODERATELY GOOD

Noteworthy Achievements

1. A significant effort, the PRMP Precursor Program, has been initiated by Rockwell with broad based involvement of subcontractors, other Rockwell operations, and the National laboratories. The Precursor Program is geared toward improving PRMP design quality and should result in improved design quality and the ability to maintain that quality over the life of PRMP.

2. Use of the Configuration Control System for PROVE was greatly improved. The Engineering Review Board has met regularly and a timely disposition of the engineering changes has been accomplished, consistent with Rockwell procedures and the needs of the project.

Notable Significant Deficiency

The quality of the existing PROVE engineering has been poor. This quality condition continues to be felt at this late hour in the project. Change orders to correct poor initial design quality are reflected in cost growth of Design Engineering and PROVE construction.

Observations

1. The Technical Management Discipline (TMD) approach being undertaken by Rockwell through the Precursor Program and on PRMP/Line Items, should lead to improved design quality through time phased baselining, technical reviews, and appropriate change control.

2. PRMP project and PROVE design quality will be enhanced by the generation of a complete System Design Description for PROVE during the next period.

3. The recently added Configuration Management manager should add to TMD capability and Design Quality through the change control process.

4. Rockwell has completed and distributed the PROVE System Operational Test, Cold Test, and Hot Test procedures, and Test Plans have been completed and forwarded to this PMO.

5. PROVE Operations Procedures and Job Task Analysis are proceeding according to schedule.

PRMP/PROVE FPA: TECHNICAL PRODUCT QUALITY

Adjectival Grade: MODERATELY GOOD

Noteworthy Achievement

PROVE activities in addressing and rectifying glovebox welding problems are directed towards, and should significantly improve, technical product quality. Specifically, the drive to fully understand the problem, root administrative and technical causes, and to implement needed changes in a timely manner, should result in improved technical product quality.

Notable Significant Deficiency

Welding problems recently surfacing on the PROVE glovebox indicates a significant lack of technical product quality success.

Observations

1. It is anticipated PROVE will take advantage of the most recent "Lessons Learned" in order to insure that similar significant deficiencies are not repeated on PRMP.

2. It is anticipated PROVE will take advantage of recent problems, will assess other vendor supplied areas for potential problems, and will shake down modules (dry) with operations and maintenance personnel as they are completed, in order to surface potential problems early.

PL. SUPP. EX. 78

AWARD FEE RECOMMENDATION

CONTRACT NO.: DE-AC04-76DP03533

CONTRACTOR: ROCKWELL INTERNATIONAL CORPORATION - PLANT

PERIOD: October 1, 1988 - March 31, 1989

PERFORMANCE EVALUATION REVIEW BOARD RECOMMENDATION

| FPA's | ADJECTIVAL GRADE | NUMERICAL GRADE | x | WEIGHT | = | SCORE |
|---|---|---|---|---|---|---|
| General Management | EXCELLENT | 92 | | 25% | | 23.00 |
| Production Operations | OUTSTANDING | 96 | | 15% | | 14.40 |
| Cost Management | EXCELLENT | 95 | | 15% | | 14.25 |
| Quality | EXCELLENT | 95 | | 15% | | 14.25 |
| Environment, Safety and Health | GOOD | 81 | | 20% | | 16.20 |
| Chemical Operations | EXCELLENT | 91 | | 10% | | 9.10 |
| | | | | 100% | | 91.20 |

Maximum Available Award Fee
$6,822,000

Recommended Fee
$5,326,482

Suggested Range of Fees

| | | |
|---|---|---|
| Minus One Point | $4,799,346 | (90.20) |
| Recommended Award Fee | $5,326,482 | (91.20) |
| Plus One Point | $5,799,383 | (92.20) |

Award Fee Determination Official Contractual Limitations

$ -0- to $6,822,000 (Maximum Available Award Fee)

[signature]
Chairman
Performance Evaluation Review Board

# AWARD FEE RECOMMENDATION

CONTRACT NO.: DE-AC04-76DP03533

CONTRACTOR: ROCKWELL INTERNATIONAL CORPORATION - PRMP/PROVE

PERIOD: October 1, 1988 - March 31, 1989

## PERFORMANCE EVALUATION REVIEW BOARD RECOMMENDATION

| FPA's | ADJECTIVAL GRADE | NUMERICAL GRADE | x | WEIGHT | = | SCORE |
|---|---|---|---|---|---|---|
| Project Management | SATISFACTORY | 75 | | 25% | | 18.75 |
| Cost Management | MODERATELY GOOD | 76 | | 15% | | 11.40 |
| Schedule Performance | VERY GOOD | 86 | | 15% | | 12.90 |
| Subcontract Management | GOOD | 82 | | 20% | | 16.40 |
| Design Quality | MODERATELY GOOD | 78 | | 15% | | 11.70 |
| Technical Product Quality | MODERATELY GOOD | 76 | | 10% | | 7.60 |
| | | | | 100% | | 78.75 |

Maximum Available Award Fee
$969,300

Recommended Fee
$186,591

### Suggested Range of Fees

| | | |
|---|---|---|
| Minus One Point | $157,511 | (77.75) |
| Recommended Award Fee | $186,591 | (78.75) |
| Plus One Point | $215,670 | (79.75) |

### Award Fee Determination Official Contractual Limitations

$ -0- to $969,300 (Maximum Available Award Fee)

[signature]
Chairman
Performance Evaluation Review Board

PL. SUPP. EX. 79

**Department of Energy**
Albuquerque Operations Office
P. O. Box 5400
Albuquerque, New Mexico 87115

SEP 27 1989

Mr. Dominick J. Sanchini
President
Rocky Flats Plant
North American Space Operations
Rockwell International Corporation
P. O. Box 464
Golden, CO 80402

Dear Mr. Sanchini:

In accordance with Appendix D of Contract DE-AC04-76DP03533, the Department of Energy (DOE) hereby determines that Rockwell International Corporation (Rockwell) has earned an award fee of $2,716,624 for Plant and $186,591 for PRMP/PROVE, for a total of $2,903,215. The enclosed Performance Evaluation Report for the period October 1, 1988 through March 31, 1989, and a Memorandum from the Acting Assistant Secretary for Defense Programs, provide the basis for the DOE award fee determination.

The award fee approved by the DOE for payment to Rockwell was pursuant to an award fee plan previously developed to cover the period October 1, 1988 to March 31, 1989. This was prior to the institution by the DOE of stronger and tougher award fee plans to reward improvements in environment, safety, and health (ES&H) and substantially increase the proportion of the fee attributable to ES&H performance. Under the old contract provisions, however, the DOE was constrained as to the weight that might be given to ES&H performance in setting the fee for the six month period covered.

In the old award fee plan, which includes this period, up to 20% of the total amount of fee paid could be attributable to performance in the ES&H area. By reducing the award fee for ES&H to "Unsatisfactory," the DOE is indicating to Rockwell that your ES&H performance is unacceptable. Under the new plan, effective for performance after October 1, 1989, failure in any important area critical to contract performance may result in the payment of no award fee.

As specified in the Contract, you may, within five working days after receipt of this letter, request an opportunity to present to the DOE an analysis of your performance under the Contract. Otherwise, you may withdraw funds as a net award fee in the above amount from your Special Bank Account.

If you wish to meet with the DOE, please contact the Rocky Flats Office which will coordinate those arrangements for you.

Sincerely,

Bruce G. Twining
Manager

Enclosures

cc w/enclosures:
David P. Simonson, Area Manager, RFO

PERFORMANCE EVALUATION
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD OCTOBER 1, 1988 - MARCH 31, 1989

The overall performance of Rockwell International Corporation (Rockwell) has been maintained at least at a level of "Satisfactory" during the period October 1, 1988, through March 31, 1989.

The following is an evaluation of the performance of Rockwell, relative to the management and operation of the Rocky Flats Plant, including the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the Functional Performance Areas (FPA's) selected for award fee evaluation. The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's for Plant operations have been evaluated in accordance with the contract Award Fee Plan, and the following discussion of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

PLANT

GENERAL MANAGEMENT: There was a rapid resolution to the problem of obtaining United States Department of Transportation (DOT) approval for using a modified ATMX railcar for making the first shipment of Transuranic mixed waste in 1989. Interplant schedule compliance continued at 100% for the third consecutive rating period. The Emergency Preparedness organization has a well-planned and effective program, is involved in Albuquerque Operations Office (AL)-wide coordination activities, and continues to make improvements. In less than four years, Rockwell has exceeded a ten-year Energy Conservation Goal.

Rockwell has not made adequate progress to prepare for utilization of the TRUPACT II container when it becomes available. The identification and timely resolution of problems by Rockwell is often slow. Rockwell has recently violated DOT regulations on two shipments to the Nevada Test Site. Despite the knowledge that nitrate concentrations on the 750 pad have increased, little action has been taken to contain saltcrete after precipitation events. Rockwell is still not placing sufficient emphasis on the timely establishment of the Rocky Flats Institute. Inadequate project staffing for the PRMP continues to influence Rockwell's performance.

COST MANAGEMENT: Good data and narratives provided by Rockwell to define Department of Energy (DOE) unfunded Environment, Safety, and Health requirements in an FY89 supplemental budget request were also used to support DOE requests to Congress for additional FY90 funding. Rockwell has done an extraordinary job of tracking information and preparing responses to a large variety of budget information requests and of maintaining the current status of its requirements. In addition, construction project data sheets and conceptual design reports supporting Capital Budget requests were both of high quality and ahead of schedule. Budget narratives were improved and expanded and were helpful in DOE's analysis of Rockwell's resource requirements.

QUALITY: Non-Weapons Quality Assurance activities conducted during the Building 771 restart have resulted in an improved quality program to be used in the operation of the building. For War Reserve Quality Assurance, Rockwell is implementing Phase 2 of the Quality Improvement Plan which will continue a new culture in quality practices and should lead to further improvement in the Quality Assurance program.

Rockwell failed to establish or make the necessary progress towards the establishment of a new standard of excellence and attendant requirements, procedures, and practices in nuclear facility operations. In addition, three incidents came to DOE's attention where Rockwell failed to provide the necessary measures to adequately control nonconforming product material.

CHEMICAL OPERATIONS: Noteworthy progress has been made towards the implementation of the Operational Readiness Review (ORR) program as demonstrated through ORR's in Building 771 and elsewhere. Rockwell has also successfully completed the development of a new extractant compound for use in the Molton Salt Extraction process. Both of these accomplishments will yield safer and more controlled production processes while maintaining or improving production performance.

PRODUCTION OPERATIONS: Significant progress has been made in the development of a Nuclear Facility Operations Manual. Rockwell has been supportive of the AL effort to develop an Operational Surety Program. Rockwell has taken several steps to reduce work in process inventories and process times by, among other things, reduced planned process times in Building 460, reduced pit assembly process time in Building 707, and reduced lot sizes on the 3T bodies.

ENVIRONMENT, SAFETY, AND HEALTH: Throughout the appraisal period, there was strong evidence of a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities. The operations in Building 771 were ceased in October 1988 due to inadequate safety procedures and radiological safety margins in the Building. Although Rockwell pursued a very aggressive corrections effort after the fact, the existence of this situation indicated a less than satisfactory attitude, procedures, and awareness for safety on the part of Rockwell. Ninety-one out of 230 safety concerns documented by external reviews (as well as by an internal Rockwell review) remained open during the period. Again, this indicates that a lack of priority attention was being paid to safety and health by Rockwell. During the period, 32 new safety concerns, including six classified as Type 2 (serious), were identified. A major environmental incident occurred during the period when chromic acid was released from Building 444 and contaminated the Plant's holding ponds. An inoperable alarm system and deficient operator vigilance contributed significantly to the seriousness of this incident.

PRMP/PROVE

PROJECT MANAGEMENT: Rockwell has given PROVE renewed emphasis by separating responsibility for PROVE from that of the PRMP and placing it under a full-time project manager. The recently implemented "Precursor Plan" represents an improvement in direction for the entire project and was implemented with professionalism and enthusiasm.

Overall PRMP management attention to project technical, cost, schedule, and manpower need was inadequate. In addition, inadequate project staffing continues to influence Rockwell's performance.

COST MANAGEMENT: Cost development and baselining of costs for the "Precursor Plan" have been handled with the highest degree of quality. Rockwell's redirection of J. A. Jones' manpower planning on PROVE resulted in reduced costs and apparent increased construction productivity.

PROVE continues to demonstrate cost growth. PRMP cost planning far exceeded available project funding allocations.

SCHEDULE PERFORMANCE: Rockwell has successfully resolved several problems which were impacting schedule in the PROVE area. The diligent effort by Rockwell, Bechtel, and J. A. Jones in the joint development of the Precursor planning has resulted in a comprehensive schedule that should provide a smooth transition from PROVE to the receipt of capital funding for PRMP.

The PROVE schedule has deteriorated during the reporting period, extending the PROVE end date from 1/90 to 8/90.

SUBCONTRACT MANAGEMENT: Rockwell, consistent with project technical needs and evolved cost and schedules, has provided rapid and effective subcontract redirection of Bechtel. Rockwell subcontract management of J. A. Jones has ensured J. A. Jones' participation in construction planning. Rockwell has been successful in obtaining active participation and commitment from the National Laboratories and other Rockwell organizations on the PRMP Precursor Program.

The subcontract work with the PROVE glovebox manufacturer has resulted in the need for significant rework to the glovebox piping and piping penetration welds. Line Item and cost/schedule activities over the balance of the FY89 demand that Rockwell provide continuous site representation at Bechtel.

DESIGN QUALITY: The Precursor Program, geared toward improving PRMP design quality, has been initiated with broad based involvement. Use of the Configuration Control System for PROVE has been greatly improved.

The quality of the existing PROVE engineering has been poor, and change orders to correct poor initial design quality are reflected in cost growth.

TECHNICAL PRODUCT QUALITY: PROVE activities in addressing and rectifying glovebox welding problems are directed towards, and should significantly improve, technical product quality.

Welding problems recently surfacing on the PROVE glovebox indicate a significant lack of technical product quality success.

PL. SUPP. EX. 80

COPY



UNITED STATES COURT OF FEDERAL CLAIMS

* * * * *

| | |
|---|---|
| ROCKWELL INTERNATIONAL CORPORATION,<br><br>PLAINTIFF,<br><br>VS.<br><br>THE UNITED STATES OF AMERICA,<br><br>DEFENDANT. | CASE NO. 91-1362 |

DEPOSITION OF JOHN L. MEINHARDT

TAKEN BY PLAINTIFF

DATE: TUESDAY, APRIL 26, 1994

TIME: 9:05 A.M.

LOCATION: OFFICES OF FREE LANCE COURT REPORTERS
915 EAST BONNEVILLE AVENUE
LAS VEGAS, NEVADA 89101

REPORTED BY: KAREN R. BENTLEY, RPR, CCR NO. 180
FREE LANCE COURT REPORTERS
915 EAST BONNEVILLE AVENUE
LAS VEGAS, NEVADA 89101 (702) 382-6082

HANDBOOK, THE OPERATOR'S HANDBOOK FOR THE TITAN MISSILE.

Q AND DURING YOUR YEARS IN THE SERVICE, WHAT EXACTLY WERE YOU DOING?

A SYSTEMS DEVELOPMENT. WELL, PREDOMINANTLY I WAS ASSOCIATED WITH THE RECONNAISSANCE SYSTEMS AND THE DEVELOPMENT OF RECONNAISSANCE SYSTEMS. PLANES SUCH AS THE U2 AND THE SR71.

Q FROM AN ENGINEERING POINT OF VIEW?

A OPERATIONAL TESTS, EVALUATION.

Q STARTING IN 1977, WHAT WERE YOUR POSITIONS AT D.O.E.?

A 1977, FIRST JOB WAS BASICALLY AS AN ANALYST. I MEAN, IF YOU LOOK AT THE EMPLOYMENT RECORD, I WOULD HAVE BEEN HIRED AS AN ANALYST. BECAME DIRECTOR OF INTELLIGENCE AND DIRECTOR OF WEAPONS PRODUCTION.

1984, I BECAME DIRECTOR OF NUCLEAR MATERIALS PRODUCTION. 1986, BECAME DEPUTY ASSISTANT SECRETARY FOR NUCLEAR MATERIALS. 1988 -- I THINK I'M GOING TO CHANGE THAT TO 1987, BECAME ACTING DIRECTOR -- OR ACTING DEPUTY ASSISTANT SECRETARY FOR MILITARY APPLICATIONS. 1988, DEPUTY ASSISTANT SECRETARY FOR PLANNING AND RESOURCE MANAGEMENT.

1989, PRINCIPAL DEPUTY ASSISTANT SECRETARY FOR DEFENSE PROGRAMS. AND THEN ACTING ASSISTANT SECRETARY FOR DEFENSE PROGRAMS.

Q BEFORE YOU BECAME ACTING ASSISTANT SECRETARY OF DEFENSE PROGRAMS, YOU WERE DEPUTY?
A PRINCIPAL DEPUTY.
Q PRINCIPAL DEPUTY. AND WHEN YOU WERE PRINCIPAL DEPUTY, YOU WOULD BE REPORTING TO WHO?
A TROY WADE. THERE'S ALSO -- THERE IS A LITTLE BUREAUCRATIC BACKGROUND YOU SHOULD KNOW. YOU CANNOT ACT AS AN ASSISTANT SECRETARY UNLESS YOU'RE HOLDING THE POSITION OF PRINCIPAL DEPUTY IN RECORD.
THE WAY IT WORKS, RIGHT?
Q LET ME SEE IF I HAVE THAT. YOU CANNOT ACT AS AN ASSISTANT SECRETARY UNLESS YOU HOLD THE POSITION OF PRINCIPAL DEPUTY?
A UNLESS YOU ARE APPOINTED TO A POSITION ABOVE THAT. LIKE AN UNDERSECRETARY COULD CERTAINLY SUBSUME A POSITION UNDERNEATH HIM. BUT IF YOU'RE ON THE UNDERSIDE OF THAT, YOU HAVE TO OCCUPY IN RECORD, YOU KNOW, THE SUBORDINATE POSITION.
Q SO IN 1988 YOU WERE THE PRINCIPAL DEPUTY --
A 1989.
Q 1989 YOU WERE THE PRINCIPAL DEPUTY --
A UM-HUM.
Q -- FOR DEFENSE PROGRAMS?
A RIGHT.
Q AND YOU ALSO WERE ASSISTANT SECRETARY OF DEFENSE

PROGRAMS?

A ACTING EFFECTIVE 1 JULY. TROY LEFT 1ST OF JULY. OR SOMEWHERE ABOUT THERE.

Q ON 1 JULY, YOU BECAME THE ACTING --

A ACTING ASSISTANT SECRETARY, THAT'S RIGHT.

Q AND BEFORE THAT, YOU WERE REPORTING TO MR. WADE?

A RIGHT.

Q YOU HAVE SOME FAMILIARITY, MR. MEINHARDT, WITH THE ROCKY FLATS FACILITY?

A I HAVE -- YES, AS DIRECTOR OF WEAPONS PRODUCTION DURING THE PERIOD '81 TO '84, I WOULD PROBABLY VISIT THERE ONCE A MONTH.

Q AND DID THERE EVER COME A TIME WHERE YOU BECAME INVOLVED IN THE DETERMINATION OF THE AWARD FEE FOR ROCKWELL INTERNATIONAL AS THE MANAGING AND OPERATING CONTRACTOR OF THE ROCKY FLATS FACILITY?

A WOULD YOU DEFINE THE WORD "INVOLVED" FOR ME?

Q DID YOU PARTICIPATE IN THE DETERMINATION OF THE AWARD FEE AT SOME POINT FOR ROCKWELL?

A THE ONLY -- THE FEE DETERMINING OFFICIAL FOR ROCKWELL IS THE MANAGER OF ALBUQUERQUE. THE MANAGER, HE CAN SEEK RECOMMENDATIONS ON THE AWARD FEE, AND TYPICALLY DOES, FROM NOT ONLY THE BOARD THAT HE'S APPOINTED TO DO THAT BUT ALSO WITHIN HIS REPORTING CHAIN.

IN THAT REGARD, FROM -- AND THIS AGAIN GOES

Q OKAY. DID YOU TALK TO MR. TWINING ABOUT HIS RECOMMENDATION CONTAINED IN EXHIBIT 53?

A I DO NOT RECALL TALKING TO BRUCE TWINING PERSONALLY WITH RESPECT TO THAT RECOMMENDATION. AGAIN, FOR THE REASON THAT THOSE WOULD NORMALLY BE STAFFED BY THE INDIVIDUAL WHO WAS RESPONSIBLE. IN THIS CASE, ADMIRAL BARR.

Q BUT THE MEMORANDUM IS ADDRESSED TO YOU, ISN'T IT?

A THE MEMORANDUM IS ADDRESSED TO ME. BUT I'M TRYING TO MAKE THE POINT THAT THERE IS A STAFF ACTIVITY THAT OCCURS AT LEVELS BELOW AND MOST OF THE CONVERSATION WOULD OCCUR AT THAT LEVEL.

Q IN THE THIRD FULL PARAGRAPH OF EXHIBIT 53, MR. TWINING STATES THAT "I," THAT BEING MR. TWINING, "AM NOT IN A POSITION TO OFFER AN INFORMED ALTERNATIVE TO HIS," BEING MR. GOLDBERG'S, "PROPOSAL, ESPECIALLY IN VIEW OF OUR CHANGING PHILOSOPHY IN THE APPLICATION OF DEPARTMENT OF ENERGY PERFORMANCE STANDARDS AND THE LEVEL OF D.O.E. EXPECTATIONS."

DO YOU KNOW WHAT MR. TWINING IS REFERRING TO WITH REGARD TO "CHANGING PHILOSOPHY"?

A MR. TWINING IS REFERRING TO ADMIRAL WATKINS' INITIATIVES TO EMPHASIZE ES&H IN THE AWARD FEE PROCESS RATHER THAN THE HISTORICAL EMPHASIS, WHICH WAS

FUNDAMENTALLY SPLIT BETWEEN PRODUCTION, ES&H, MANAGEMENT.

Q HOW DID ADMIRAL WATKINS SEEK TO IMPLEMENT THIS CHANGE?

A ULTIMATELY, THE CHANGE WAS TO GIVE ES&H MATTERS AT LEAST 51 PERCENT OF THE MECHANISM FOR DETERMINING AWARD FEE. THAT IS, ES&H WOULD BE -- REPRESENT 51 PERCENT OF AN AWARD FEE.

Q SO THAT A CONTRACTOR'S AWARD FEE PLAN WOULD BE CHANGED TO REFLECT THAT?

A THAT'S RIGHT.

Q LET ME MARK AS EXHIBIT 301, PLAINTIFF'S EXHIBIT 301, A ONE-PAGE DOCUMENT THAT HAS THE STAMP NUMBER E001592. IT APPEARS TO BE A ROUTING SLIP -- ROUTING AND TRANSMITTAL SLIP DATED AUGUST 10, 1989.

(PLAINTIFF'S EXHIBIT 301 WAS MARKED FOR IDENTIFICATION BY THE COURT REPORTER.)

Q (BY MR. NEY) HAVE YOU EVER SEEN THIS ROUTING AND TRANSMITTAL SLIP?

MR. KOLAR: WHY DON'T I OFFER THE WITNESS THE MARKED COPY.

THE WITNESS: I DO NOT RECALL HAVING -- HAVING READ THIS.

Q (BY MR. NEY) DOES ANY OF THE HANDWRITING APPEAR TO BE YOUR HANDWRITING, SIR?

A NO.

Q (BY MR. NEY) HAVE YOU SEEN THIS DOCUMENT BEFORE?
A CERTAINLY.
Q NOW, IN THIS EXHIBIT, AM I CORRECT THAT YOU'RE STATING THAT YOUR OFFICE IS MAKING AN ADDITIONAL DOWNWARD ADJUSTMENT TO THE PROPOSED ROCKWELL AWARD FEE IN THE AREA OF ENVIRONMENT, SAFETY AND HEALTH?
A THAT'S CORRECT.
Q IN THE SECOND PARAGRAPH OF THE SEPTEMBER 20, 1989 LETTER, YOU STATE THAT THE ADDITIONAL DOWNWARD ADJUSTMENT TO ES&H REFLECTS SEVERAL CONCERNS. AND THEN IN THE PARAGRAPH, THERE'S SOME DISCUSSION -- OR THERE IS DISCUSSION OF THOSE CONCERNS.
DO YOU SEE THAT, SIR?
A I DO, UM-HUM.
Q WERE THERE ANY OTHER BASES FOR THE ADDITIONAL DOWNWARD ADJUSTMENT IN ADDITION TO THOSE CONCERNS SET FORTH IN THE SECOND PARAGRAPH ON YOUR SEPTEMBER 20, 1989 LETTER?
A NOT THAT I'M AWARE OF.
Q SO YOU DIDN'T HAVE -- YOU DIDN'T -- STRIKE THAT.
IN PUTTING FORTH THE ADDITIONAL DOWNWARD ADJUSTMENT, YOU DIDN'T HAVE ANY BASES OTHER THAN WHAT WAS STATED IN THIS LETTER; IS THAT RIGHT?

A THAT'S CORRECT.

Q OKAY. AT THE VERY BOTTOM OF THE FIRST PAGE OF THE SEPTEMBER 20 LETTER, YOU SAY THAT -- LAST SENTENCE SAYS THAT "ADMIRAL WATKINS CONCURS IN THIS RECOMMENDATION."

WHY DID YOU SAY THAT?

A BECAUSE THE RECOMMENDATION, EITHER VERBALLY OR IN WRITING, AND I CAN'T RECALL WHICH, HAD BEEN, IN FACT, PASSED TO HIM THROUGH A MEETING, AND ON ADVICE OF THOSE HE CONSIDERED TO BE APPROPRIATE, IN FACT DID CONCUR IN THIS RECOMMENDATION.

Q IS THAT THE MEETING THAT YOU TESTIFIED TO A FEW MINUTES AGO?

A THAT'S CORRECT.

Q AND DID YOU THINK IT WAS IMPORTANT FOR MR. TWINING TO KNOW THAT ADMIRAL WATKINS CONCURRED?

A YES.

Q WHY?

A BECAUSE AT THE TIME THERE WAS -- AS THE RECORD STATES, THERE WAS A LOT OF REFLECTION IN THE HEADQUARTERS ABOUT THE AWARD FEE PROCESS IN GENERAL AND, QUOTE, CHANGING PHILOSOPHIES.

SO IT WAS APPROPRIATE THAT THAT WOULD -- THAT BRUCE WOULD BE INFORMED THAT, INDEED, THE HEADQUARTERS ALL THE WAY UP TO THE TOP HAD CONCURRED.

Q DID YOU HAVE ANY COMMUNICATIONS WITH MR. TWINING ABOUT EXHIBIT 103 OR ABOUT THE CONTENT OF EXHIBIT 103?

A CLARIFICATION. WHEN YOU'RE SAYING EXHIBIT 103, YOU'RE TALKING ABOUT IT AND ALL THE ATTACHMENTS?

Q I'M TALKING ABOUT -- YES. YES.

A YOU HAVE TO GIVE ME A MINUTE. OKAY? REFRESH MY MEMORY.

Q TAKE YOUR TIME.

(PAUSE IN THE PROCEEDINGS.)

THE WITNESS: YES.

Q (BY MR. NEY) WHEN DID THAT -- WAS THAT A DISCUSSION?

A I'D LIKE TO CLARIFY THE RECORD OR MAKE -- PERHAPS MAKE A CHANGE. I KNOW THERE WERE DISCUSSIONS BETWEEN ME AND EITHER THE MANAGER OR DEPUTY MANAGER.

NOW YOU ASKED ME WHETHER IT WAS MR. TWINING. IT COULD HAVE BEEN WITH EITHER HE OR HIS DEPUTY. BUT THERE WAS, IN FACT, A DISCUSSION SPECIFICALLY WITH RESPECT TO, CALL IT BEEFING UP THE ES&H SECTION OF THEIR -- OF THEIR ANALYSIS. WHICH IS REFLECTED AS THIS PERFORMANCE EVALUATION OF THE ROCKWELL INTERNATIONAL CORPORATION CONTRACT FOR THE PERIOD OCTOBER 1 THROUGH MARCH 31, '89.

Q SO YOU'RE SAYING THAT THE DISCUSSIONS WERE ADDRESSED TO THE CONTENT OF THE PERFORMANCE EVALUATION

REPORT?

A WITH RESPECT TO ES&H.

Q WITH RESPECT TO ES&H.

IT'S MY UNDERSTANDING THAT THAT REPORT IS SENT TO THE CONTRACTOR ALONG WITH THE AWARD FEE DETERMINATION.

A THAT'S CORRECT.

Q WAS THIS COMMUNICATION WITH THE AFDO, OR HIS DEPUTY, WAS THAT BY TELEPHONE?

A PROBABLY NOT. PROBABLY BOTH. PROBABLY IN WRITING AND -- AND BY TELEPHONE.

Q WHO WAS MR. TWINING'S DEPUTY AT THE TIME?

A JIM CULPEPPER.

Q WOULD YOU TESTIFY, PLEASE, AS TO WHATEVER YOU RECALL WAS STATED IN THIS COMMUNICATION.

A THERE WAS A SUMMARY DOCUMENT -- AND AGAIN, I DON'T KNOW IF IT WAS A DRAFT OR SIGNED OR WHATEVER ELSE -- THAT REFLECTED WHY ADMIRAL BARR AND HIS STAFF WERE RECOMMENDING A FURTHER DOWNGRADE OF THE ES&H SECTION.

IN THAT SECTION, THEY HAD CITED THE SPECIFICS THAT I REFERRED TO BEFORE AND I THINK ARE REFERRED TO UP HERE, BEING THE CHROMATE ACID SPILLS AND SOME OF THOSE THINGS. THAT SECTION NEEDED TO BE REFLECTED IN THIS PARTICULAR DOCUMENT. AND AS I RECALL, THAT'S WHAT I ASKED THEM TO DO.

NOW WHETHER THAT OCCURRED DIRECTLY FROM ME OR AS A RESULT OF MY TELLING SOMEBODY TO HAVE IT REFLECT THAT, I DON'T REMEMBER THE SPECIFICS.

Q DO YOU RECALL ANYTHING THAT WAS SAID BY MR. TWINING OR MR. CULPEPPER IN THIS COMMUNICATION?

A NO, NO.

Q DID EITHER ONE OF THEM EXPRESS ANY DISAGREEMENT WITH THE HEADQUARTERS DETERMINATION?

A THE FINAL DETERMINATION THAT WAS REFLECTED IN THIS LETTER, I'M NOT AWARE THAT THERE WAS ANY FORMAL REBUTTAL TO THIS EITHER VERBALLY OR IN WRITING.

Q DO YOU RECALL ANY REBUTTAL TO ANY RECOMMENDATION, EVEN IF IT WAS SOMETHING SHORT OF THE FINAL?

A NO, I DON'T RECALL ANY SPECIFIC DISCUSSIONS. BUT THOSE DISCUSSIONS COULD HAVE OCCURRED AT A LEVEL OTHER THAN MINE.

Q YEAH, BUT -- I'M JUST SEEKING ANYTHING THAT YOU MIGHT RECALL.

A NO.

Q OKAY. IN THIS EXHIBIT 103, IF YOU TURN TO THE SECOND PAGE OF YOUR LETTER.

A UM-HUM.

Q AT THE TOP, IT STATES THAT -- YOU SAY "WE HAVE ATTACHED A COPY OF YOUR," WHICH WOULD BE TO MR. TWINING,

"DRAFT LETTER TO ROCKWELL WHICH REFLECTS OUR CONCERNS IN THE ES&H AREA." YOU SEE THAT?

A YES.

Q THEN ATTACHED TO THIS DOCUMENT BEARING BATES NUMBER E00938 THROUGH 939 APPEARS TO BE A DRAFT LETTER FROM TWINING TO MR. DOMINICK J. SANCHINI. S-A-N-C-H-I-N-I.

IS THAT THE DRAFT LETTER THAT YOU'RE REFERRING TO IN YOUR LETTER?

A THAT'S CORRECT.

Q WHO DRAFTED THAT LETTER? I MEAN, DID YOU DRAFT IT?

A NO.

Q SOMEBODY REPORTING TO YOU?

A I HAVE NO KNOWLEDGE OF WHO DRAFTED THIS.

Q SOMEBODY HANDED IT TO YOU, I ASSUME, TO PASS ALONG TO --

A AS PART OF THIS PACKAGE.

Q PARDON ME?

A IT CAME AS PART OF THIS PACKAGE. NO DOUBT WHEN THIS PACKAGE WAS PRESENTED FOR SIGNATURE, THESE WERE ATTACHED TO IT.

Q SOMEBODY HANDED THIS DOCUMENT TO YOU FOR YOU TO SIGN AND SHIP OFF TO ALBUQUERQUE; IS THAT RIGHT?

A THROUGH THE NORMAL PROCESSES OF PURE CREDIT

ADMINISTRATION, YES.

Q DO YOU RECALL WHO HANDED IT TO YOU?

A NO.

Q AT THE TIME YOU SIGNED EXHIBIT 103, WERE YOU AWARE OF ANY MISREPRESENTATIONS OF FACT BY ROCKWELL?

A NO.

Q DID YOU HAVE ANY INFORMATION CONCERNING ROCKWELL'S PERFORMANCE DURING THE OCTOBER 1, 1988, MARCH 31, 1989 AWARD FEE PERIOD THAT WAS UNKNOWN TO D.O.E. PERSONNEL AT THE SITE AT ROCKY FLATS OR IN ALBUQUERQUE?

MR. KOLAR: OBJECTION. CALLS FOR SPECULATION.

Q (BY MR. NEY) DID YOU BELIEVE YOU DID?

A NO. I HAD NO KNOWLEDGE OF ANYTHING, NOR WOULD I BE EXPECTED TO.

Q LET ME SHOW YOU A DOCUMENT THAT'S BEEN MARKED AS EXHIBIT 56 IN THIS LITIGATION, WHICH APPEARS TO BE A -- FRONT PAGE IS A -- LOOKS LIKE A TELECOPIER TRANSMISSION COVER SHEET FROM YOU TO MR. CULPEPPER AT THE DEPARTMENT OF ENERGY IN ALBUQUERQUE.

HAVE YOU SEEN THIS DOCUMENT BEFORE, SIR?

A CERTAINLY.

Q AND WHAT IS THIS DOCUMENT ABOUT?

A IT'S A COMMENT ON A DRAFT OF THE AWARD FEE DETERMINATION FOR THE PERIOD REFERENCED PREVIOUSLY.

Q YOU TESTIFIED JUST ABOUT TWO MINUTES AGO ABOUT

COMMUNICATIONS WITH EITHER MR. CULPEPPER OR MR. TWINING ABOUT -- I'M PUTTING THIS IN MY WORDS; I CAN'T RECALL YOUR EXACT WORDS -- BEEFING UP THE PERFORMANCE EVALUATION REPORT TO REFLECT THE CONCERNS EXPRESSED BY HEADQUARTERS ON ES&H?

A UM-HUM.

Q IS THAT WHAT THIS DOCUMENT'S ABOUT?

A THAT'S EXACTLY WHAT I WAS REFERRING TO.

Q NOW, TO SEE IF I UNDERSTAND IT. YOU'VE TAKEN A MEMORANDUM TO YOU FROM ADMIRAL BARR --

A UM-HUM.

Q -- THAT BEARS BATES NUMBERS E001469 TO 70, AND YOU'VE BRACKETED CERTAIN LANGUAGE.

A UM-HUM.

Q AND YOU'RE SUGGESTING THAT CULPEPPER INCLUDE THAT LANGUAGE IN THE PERFORMANCE EVALUATION REPORT THAT'S GOING TO BE SENT TO ROCKWELL; IS THAT RIGHT?

A THAT'S CORRECT.

Q THIS MEMO FROM ADMIRAL BARR THAT'S ADDRESSED TO YOU, DID YOU RECEIVE THAT IN THE NORMAL COURSE OF EVENTS?

A I CERTAINLY RECEIVED IT.

Q UM-HUM. WAS YOUR SEPTEMBER 20 LETTER TO MR. TWINING, WHICH IS EXHIBIT 103, WAS THAT BASED ON THE BARR MEMO?

WHEN I SAY "THE BARR MEMO," I'M REFERRING

TO -- WHICH IS PART OF EXHIBIT 56.

I MIGHT NOTE -- YOU CAN LOOK FOR YOURSELF BUT -- THAT THE LANGUAGE IN YOUR LETTER TO MR. TWINING IN EXHIBIT 103 IS NEARLY IDENTICAL TO THE TEXT IN THE BARR MEMO. BUT I WANT YOUR TESTIMONY, NOT MINE.

A I NEED TO HAVE SOME CLARIFICATION. TELL ME WHAT YOU'RE REFERRING TO WHEN YOU SAY "THE BARR MEMO."

Q I'M REFERRING TO PART OF EXHIBIT 56, THE TWO PAGES.

A OKAY. CAN WE START OVER WITH YOUR QUESTION?

Q OKAY. I'LL JUST RESTATE IT INSTEAD OF READING IT BACK.

WAS YOUR LETTER TO MR. TWINING DATED SEPTEMBER 20, 1989, WHICH IS DEPOSITION EXHIBIT 103, WAS THAT BASED IN LARGE PART ON MR. BARR'S -- OR EXCUSE ME, ADMIRAL BARR'S MEMORANDUM TO YOU WHICH IS PART OF EXHIBIT 56?

A YES.

Q OKAY. AND TO YOUR KNOWLEDGE, WAS THE PERFORMANCE EVALUATION REPORT THAT WAS SENT BY THE AWARD FEE DETERMINATION OFFICIAL TO ROCKWELL CHANGED TO REFLECT THE STATEMENTS MADE BY ADMIRAL BARR IN HIS MEMORANDUM TO YOU WHICH IS PART OF EXHIBIT 56?

A YES.

Q LET ME SHOW YOU WHAT'S BEEN MARKED AS DEPOSITION

EXHIBIT 60 IN THIS ACTION, WHICH IS A LETTER DATED SEPTEMBER 27, 1989, FROM BRUCE TWINING TO ROCKWELL'S DOMINICK SANCHINI. AND THIS IS THE AWARD FEE DETERMINATION FOR THE OCTOBER 1, 1988 THROUGH MARCH 31, 1989 PERIOD.

DID YOU SEE -- HAVE YOU SEEN THIS LETTER BEFORE?

A I'M NOT SURE THAT I HAVE SEEN THIS LETTER IN THIS FORM BEFORE. THE FORM THAT I'M REFERRING TO IS THE -- I THINK WHICH IS -- JUST ON A QUICK SCAN, LOOKS LIKE IT'S -- THE SAME LANGUAGE WAS IN AN ATTACHMENT TO A LETTER I SENT TO BRUCE TWINING.

Q THAT'S EXHIBIT 103; IS THAT RIGHT?

MR. KOLAR: YEAH.

THE WITNESS: YES.

Q (BY MR. NEY) OKAY. YOU DON'T RECALL WHETHER YOU SAW THIS LETTER BEFORE THIS LAWSUIT GOT UNDERWAY? WHEN I SAY --

A NO.

Q -- "THIS LETTER," I'M SAYING THE ONE THAT WAS ACTUALLY SIGNED BY MR. TWINING.

A I DON'T RECALL HAVING SEEN THAT, NO.

Q DID YOU HAVE ANY REASON TO KNOW THAT MR. TWINING ADOPTED THE DRAFT LETTER THAT YOU SENT TO HIM AS PART OF EXHIBIT 103?

A I WOULD ASSUME THAT HE WOULD DO THAT, HE WOULD ADOPT THE WORDS THAT WERE SENT.

Q WHY WOULD YOU ASSUME THAT?

A BECAUSE HE WAS SUBORDINATE.

Q LET ME ASK YOU A QUESTION. WHICH, OF COURSE, I'VE BEEN DOING.

IN YOUR DRAFT LETTER TO MR. SANCHINI WHICH IS PART OF EXHIBIT 103, YOU STATE IN THE FIRST LINE THAT "I," THERE OF COURSE REFERRING TO MR. TWINING SINCE HE WOULD BE SIGNING IT -- "HEREBY DETERMINE WHAT ROCKWELL'S AWARD FEE IS."

IN THE LETTER THAT WENT OUT, WHICH IS TO ROCKWELL, EXHIBIT 60, IN THE FIRST LINE SAYS "THE DEPARTMENT OF ENERGY HEREBY DETERMINES ROCKWELL'S AWARD FEE."

HAD YOU EVER NOTICED THAT DISCREPANCY BETWEEN THE TWO LETTERS BEFORE TODAY?

MR. KOLAR: I'D OBJECT ON THE GROUND THAT THE LETTER -- THE DRAFT LETTER WAS CHARACTERIZED AS "YOUR LETTER," AND I THINK MR. MEINHARDT HAD TESTIFIED EARLIER THAT IT WAS PART OF A PACKAGE OF DOCUMENTS BUT HE DID NOT RECALL WHETHER HE OR SOMEONE ELSE DRAFTED THE LETTER.

MR. NEY: THAT'S RIGHT. BUT IT WAS INCLUDED IN A PACKAGE THAT HE SIGNED OFF ON.

I THINK THERE'S A QUESTION PENDING.

AS EXHIBIT 181, WHICH IS AN OCTOBER 13, 1989 MEMORANDUM FROM MR. TWINING TO MR. SIMONSON AND REFLECTS YOU AND ADMIRAL BARR RECEIVING COPIES OF.

HAVE YOU SEEN THIS DOCUMENT BEFORE, SIR?

A I CAN'T RECALL SPECIFICALLY HAVING SEEN IT. I'M CERTAIN I DID. IN THE POSITION I OCCUPIED, THINGS LIKE THIS WOULD ROUTINELY COME TO ME.

Q NOW IT'S MY UNDERSTANDING THAT MR. TWINING IS ATTEMPTING TO DELEGATE THE AWARD FEE DETERMINATION OFFICIAL RESPONSIBILITY TO MR. SIMONSON FOR THE AWARD FEE PERIOD OF APRIL 1, 1989, TO SEPTEMBER 30, 1989. IS THAT CORRECT?

A THAT'S CORRECT.

Q DO YOU RECALL HOW THIS DELEGATION CAME ABOUT?

A DELEGATION CAME ABOUT BECAUSE ADMIRAL WATKINS' DESIRE WAS TO CAUSE THE ROCKY FLATS AREA OFFICE TO REPORT DIRECTLY TO THE HEADQUARTERS.

Q DID YOU PARTICIPATE IN THIS DECISION MAKING?

A THE DECISION WAS MADE BY THE SECRETARY, AND I DO NOT RECALL ANY SPECIFIC CONVERSATIONS WITH THE SECRETARY.

Q ON THIS SUBJECT?

A ON THIS SUBJECT.

Q OKAY. WERE YOU EVER CONTACTED BY ANYONE IN THE GOVERNMENT OUTSIDE OF THE DEPARTMENT OF ENERGY ON THE SUBJECT OF ROCKWELL'S AWARD FEES?