PL. SUPP. EX. 81

United States Government

# Memorandum

DATE: November 7, 1989

REPLY TO
ATTN OF:

SUBJECT: PERB Recommendations to the Manager

TO: David P. Simonson, Manager, RFO

MR. SIMONSON: 11-7-89

THERE ARE 8 ATTACHMENTS. NOT INCLUDED ARE THE FORMAL DETERMINATION FORMS/LETTERS THAT WILL FOLLOW ASDP CONCURRENCE. I HAVE THE DISK WITH ALL CALCULATIONS, REPORTS, FORMS, & LETTERS FOR THIS EVALUATION PERIOD.

Terrel Agy
PERB EXECUTIVE SECRETARY

The Performance Evaluation Review Board has met and our performance evaluation and award fee recommendation are attached for your consideration. This evaluation of Rockwell International Corporation was for the period April 1 through September 30, 1989 under Contract DE-AC04-76DP03533.

The approach used in preparing our evaluation and recommendation was based on the Award Fee Plan set forth in Appendix D of the Contract negotiated for FY89. The DOE/AL reporting format was utilized to provide consistency with the first six months of the FY. The local evaluation process followed the approach described in Part I of the Performance Evaluation Plan for the Rocky Flats Office.

The attached information includes the PERB Report, award fee calculations and recommendations of the Board, as well as drafts of various forms and letters (including a summary evaluation) which will require your approval and signature.

A presentation of the PERB evaluation and recommendations can be arranged at your convenience.

Claude H. Barkmeier
Claude H. Barkmeier
Director, Division of Administration
Chairman,
Performance Evaluation Review Board

Enclosures (10)

PREDECISIONAL - OFFICIAL USE ONLY

U. S. Department of Energy

Rocky Flats Office

# AWARD FEE PERFORMANCE EVALUATION REVIEW BOARD RECOMMENDATION FOR THE PERIOD:

April 1 [illegible]

ROCK[illegible]

[illegible] Claude Barkmeier on 11/15/89: A copy of the PERB [illegible] with the recommendations/evaluation [illegible] removed [illegible] by [illegible] to Bill Whalen (Assistant Mgr [illegible]) [illegible] Barkmeier on 11/13/89. The [illegible] informed [illegible] Mgr D.P. Simonson [illegible]

[illegible]

Date: 11/7/89

Claude H. Barkmeier
Director, Division of Administration
Chairman, Performance Evaluation Review Board
Rocky Flats Office

PREDECISIONAL - OFFICIAL USE ONLY

E 000333

PREDECISIONAL - OFFICIAL USE ONLY

PERFORMANCE APPRAISAL
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

The overall performance of Rockwell International Corporation (Rockwell) has been at the level of "Satisfactory" during the period April 1 through September 30, 1989.

The following are seperate evaluations of the performance of Rockwell relative to the management and operation of the Rocky Flats Plant and the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the selected Functional Performance Areas (FPA's). The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's have been evaluated in accordance with the contract Award Fee Plan, and the following discussion of each FPA reflects an integrated assessment of all factors.

## PLANT

FPA: GENERAL MANAGEMENT

Adjectival Grade: GOOD

Noteworthy Achievements

1. The C-Centerline Project in Building 707 was an outstanding example of an integrated operating philosophy to assure safety and provide capability to continue operations of the production facilities. Excellent planning, communication, conformance to requirements, and fundamental execution allowed project completion eight days ahead of schedule without any contamination incidences, injuries or shutdowns due to safety concerns.

2. Rockwell successfully completed a complex central telephone system acquisition. A DOE protest was filed by one of the unsuccessful proposers. However, after a meeting with Rockwell, the protest was withdrawn with apologies.

3. Rockwell's logistical and security support of DOE "Tiger Team" activities and Rocky Flats Office (RFO) moves has been extraordinary. When DOE Headquarters Teams, the Federal Bureau of Investigation (FBI) and Environmental Protection Agency (EPA) arrived on plant-site on June 6, 1989, an immediate need arose for many types of support. Rockwell responded to all unusual security requests in an outstanding fashion. In almost all other instances, Rockwell's response was timely and provided the required material or services.

4. Rockwell has provided valuable support to DOE teams negotiating Resource Conservation and Recovery Act (RCRA)/Comprehensive Environmental Response Compensation and Liability Act (CERCLA) agreements with the EPA and the Colorado Department of Health (CDH). Initial efforts to implement those agreements have been prompt and appropriate.

E 000334



11/7/89

PREDECISIONAL - OFFICIAL USE ONLY

5. Information Systems Management (ISM) supported the Plant in a commendable manner.

a. ISM has developed and installed an automated Audit Tracking System for Health, Safety and Environment (HS&E), Operations and Planning. This system provides status information for HS&E management to help ensure timely responses to audit findings issued by oversight agencies.

b. ISM provided finite element analysis (FEA) support to Manufacturing Technology Development in the development of a gravity-fed graphite casting process. The combined effort resulted in a process which will realize significant material savings (estimated at $2.4 million, of which $600,000 is attributed to the FEA effort) over the life of one weapons systems program.

c. The ISM designed and developed Distributed Numerical Control System provides for remote loading and process monitoring of both Numerical Control tape images and associated working drawings.

d. Phase I of the automated Waste & Environmental Management System (WEMS) was completed. WEMS provides a bar-code driven on-line tracking and inventory reporting system for hazardous, radioactive and mixed wastes at Rocky Flats. It also provides for the collection and reporting of field and sample analysis data for the RCRA/CERCLA ground water, surface water, soil and sediment programs.

e. Via the Tool Scheduling and Reporting System, enhanced planning and scheduling of detailed operations in the fabrication of tools has been realized.

6. An automated maintenance work control system has been implemented which enhances planning processes, establishes priorities, supports integrated schedules and provides deficiency tracking. Coupled with material control improvements and pre-kitting operations this system has resulted in significant improvement in resource utilization and overall efficiency.

7. The quantity and quality of support to the PRMP project has increased dramatically over this reporting period. Cooperation between organizations has also increased, resulting in improved coordination and a stronger team approach to the project. The Rockwell commitment to the project is evident.

<u>Serious Major Deficiency:</u>

The DOE has had serious concerns regarding Rockwell management's ability to manage this facility because there is considerable evidence of:

- lack of clear lines of responsibility for safe operations.
- lack of adequate procedures to assure safe operations.
- lack of conformance to procedures.
- lack of adequate work ethic and mental discipline within the work force.
- lack of an adequate corrective system for non-weapons activities.
- lack of real progress in installing a new culture regarding safety.
- lack of an adequate training program.
- lack of adequate on-floor supervision.
- lack of ability to apply root cause analysis to investigation of unplanned events and to implement lessons-learned on a plant-wide basis. Approach has been to fix the immediate problem.



E 000335

11/7/89

PREDECISIONAL - OFFICIAL USE ONLY

The following incidents/situations provide examples of these concerns:

a. The Rockwell Management Plan submitted to Secretary Watkins failed to address bringing new management expertise or approaches. Instead, it only addressed tasks and accompanying resource requirements.
b. The Building 771 filter incident on June 21 which revealed it had been 11 months since filters were last changed in an area where "filters are supposed to be changed every 6 months."
c. Two construction jobs were shut down on June 13 and 21 due to safety violations - excavations not shored, spoils too close to the trench, inadequate escape ladders, and inadequate barricades. These are simple operations which present very real risks to workers and other plant employees. One job was being done by Rockwell maintenance forces and the other by a Rockwell subcontractor. Rockwell was not in control in either case.
d. Recordable injuries occured at the rate of approximately 16 per month.
e. The nitric acid spill in Building 771 during raschig ring inspection on April 13 and numerous other tank overflow incidents (most notably the chromic acid spill on February 28) indicate operators not assuring that their equipment and procedures are ready for safe operations.
f. Five years of failure to develop criteria for new plutonium recovery capability that meet safety, efficiency, and waste minimization objectives. Operating staff are still not involved in oversight of the installation of PROVE equipment or in the optimization of PRMP technologies.
g. A uniform, plant-wide system for managing waste does not exist.
h. Two improperly documented waste shipments were made to the Nevada Test Site (NTS) during the first three months of the period.

<u>Notable Deficiencies</u>

1. Despite an increase in nitrate concentrations on the 750 Pad, little action has been taken to contain saltcrete after precipitation events. Current evidence indicates that saltcrete is destabilizing and many spills have resulted. Better management of saltcrete is needed immediately.

2. The annual DOE inventory of Special Nuclear Material (SNM) at Rocky Flats was conducted during this evaluation period. The preparation for the inventory by Rockwell was less than satisfactory. This problem seems to have been caused by several factors including delayed operational cut-offs to allow interproject (IP) schedules to be met, lack of appropriate cleanup, conflict of scheduling with maintenance operations, etc.

<u>Observations</u>

1. The organizational structure for training has been restructured to assign the responsibility for all technical and safety training to the Director of Human Resources. Program management control for training is maintained over the line training organizations to assure uniform consistency in the development and implementation of performance based training programs. To supplement the organizational reconfiguration, an Executive Training Committee consisting of directors from HS&E, Human Resources, Production Operations, Plutonium Operations, Support Operations, Security and Safeguards and Quality Engineering and Control has been established to provide top level management review and approval of Plant training programs.

2. The Rocky Flats Institute has been implemented. Nine basic subject areas have been identified through needs analysis. Those basic subject areas include chemistry, physical-science, algebra, health-physics, industrial safety, metallurgy and hazardous materials

PREDECISIONAL - OFFICIAL USE ONLY

courses. The primary focus is upon developing technical foreman. However, courses in physical-science, chemistry and algebra are offered after-hours for those hourly employees interested in career growth and development through education. All courses are for college credit. Outcomes include enhanced capability of the work force through education and the career growth and development of employees. Currently there are 204 employees enrolled in ten courses offered onsite through Front Range Community College.

3. A top level Support Operations Directorate plan for a Non-weapons Quality Assurance plan has been developed and initial steps for implementation have been completed. This provides an integrated approach for implementing, managing, and evaluating an NQA program for the entire Rocky Flats Plant.

4. In response to a DOE concern related to timeliness of reporting, Rockwell has exhibited significant improvement. Major reports and documents required by regulation have been submitted in a timely manner, providing DOE sufficient review and transmittal time.

PREDECISIONAL - OFFICIAL USE ONLY

FPA: ENVIRONMENT, SAFETY & HEALTH

Adjectival Grade: MODERATELY GOOD

Noteworthy Achievements

1. Rockwell took positive actions to upgrade the overall quality, capability, and performance of the Rocky Flats radiation instrumentation systems in FY89. In April 1989, a joint DOE/DOE Contractor Conference on Alpha Air Monitoring Instrumentation was hosted by Rockwell at Rocky Flats Plant (RFP). This effort fostered strong coordination between several DOE Offices and DOE Contractors in the research, development and field testing of new generation alpha continuous air monitoring instruments. Rockwell purchased eight prototype alpha monitoring instruments and is on schedule for commencement of field testing and evaluation of these units in a production environment in early November, 1989. The outcome of these instrument proving tests will provide invaluable alpha instrument capability and performance data of benefit to the entire DOE complex. Several other enhancements to the Radiation Instrumentation Program include the recent hiring of an experienced Instrumentation Engineer, three additional Electronic Calibration Technicians, and selection of a Radiation Instrumentation Foreman for PM shift coverage. A new version of the presently used Alpha-Met instrument, having a lower limit of detection, is under field evaluation on plantsite, and purchase of approximately 1000 additional units of this type to replace existing Alpha-Mets is projected in FY90. Finally, Rockwell defined needs and allocated $260,000 in funding to purchase a new instrumentation calibration and recall system.

2. Rockwell developed and implemented a plantwide ALARA (As Low As Reasonably Achievable) Program exceeding the requirements of DOE ORDER 5480.11. Important aspects of the new ALARA program included setting specific exposure goals for 19 Dose Trend Groups, plus setting specific exposure goals for each of the major production buildings. Building specific ALARA committees were established with the charter of ongoing investigation, assessment and implementation of specific methods of reducing worker radiation exposure. The positive impact of the ALARA program was evidenced by the significant reduction in Plant exposure observed in FY89, after normalization for variations in-plant production workloads. During every quarter of FY89, Rockwell was successful in achieving their pre-established plantwide external dose objectives. The FY88 total exposure accrued by the semi-monthly and monthly badge exchange groups was about 506 person-rem. The FY89 person-rem total for these groups is projected to be approximately 300 person-rem. Approximately 50% of this difference is attributed to the ALARA program efforts.

3. Rockwell has responded in a very timely fashion to the new surface water release requirements imposed by the State of Colorado. The Facilities Engineering Group quickly implemented the activated charcoal treatment of the A and B series Ponds as well as the aeration treatment of Pond C-2. Both activities included all National Environmental Policy Act (NEPA) and RCRA required documentation.

4. The extent of the characterization of subsurface contamination has exceeded the requirements of the Agreement in Principle with the State of Colorado. As agreed between DOE and the CDH in the approved closure plans and characterization work plans, Rockwell has currently installed a total of 320 groundwater monitoring wells with 340 on schedule for the end of CY89. The Agreement in Principle with the State of Colorado required 260 wells by the end of the year.

E 000338



11/7/89

PREDECISIONAL - OFFICIAL USE ONLY

5. Rockwell assisted in the negotiations of the important Settlement Agreement and Compliance Order on Consent pertaining to interim status issues. In spite of extremely tight time frames, the Rockwell RCRA/CERCLA group assembled an excellent consolidated Part A which established the basis for interim status operations at RFP.

6. Rockwell has submitted all required environmental documentation pertaining to environmental restoration on schedule. These include twelve closure plans for RCRA regulated units, the Groundwater Assessment Plan, and the Interim Remedial Action Plan for the 903 Pad, Mound, and East Trenches Areas. The 881 Hillside Environmental Assessment was completed on time despite significant last minute changes.

7. Rockwell prepared a detailed Five Year Plan revision (8/31/89) in a very short time period. Rockwell staff provided excellent support to RFO staff in preparation for defense of the revision.

8. A new Rockwell Radiological Engineering group was created in FY89, comprised of the Manager of Radiological Engineering, the ALARA Program Manager, plus three experienced radiological engineers hired from other nuclear facilities. Notable achievements completed by the Radiological Engineering group include: 1) formalizing of the HS&E design review process for all Engineering Job Orders; 2) providing full time radiological engineering support for PRMP; and, 3) completion of numerous ALARA engineering improvements within the production buildings. Specific examples of radiological engineering improvements include: 1) design and installation of moveable curtain radiation shielding in Building 371 high level drum storage room; and, 2) design of shielding for a high level component transfer cart and development of a prototype shielded bag-out operation cart for use in Building 707.

Notable Deficiencies

1. Long term understaffing in the HS&E organization resulted in less than adequate attention applied to several essential projects and safety functions. Due to high turnover rates within the Criticality Engineering Group, the average Criticality Engineer experience level remains unacceptably low for a facility of this size and complexity. Continuous improvements in both the depth and quality of the Rocky Flats Criticality Safety Training Program have been deterred by insufficient staffing, as well as completion of Certification training for Criticality Engineers. There has not been sufficient manning nor time for important criticality safety preventative efforts such as the performance of in-depth root cause analysis of past criticality safety infractions. In the area of Safety Analysis, serious understaffing coupled with a significant expansion of the safety analysis workload has resulted in an enormous backlog of unfinished safety assessment tasks. Rockwell management efforts taken to date appear to have been unsuccessful in reversing this serious understaffing problem. Unless a significant realignment of manpower and resources is made, acceptable progress updating existing Safety Analysis Reports (SAR's), in the preparation of the Rocky Flats Plantsite SAR, and in formally documenting the Level 1 information which supports the existing final SAR's will be impossible. In addition, chronic understaffing deficiencies in the Radiation Protection organization have hampered critical Plant maintenance activities.

2. Rockwell was unsuccessful in reaching their Plant Performance Goal for recordable injuries during FY89. In FY88 the total number of recordable injuries for Rocky Flats Plant was 100, corresponding to an average monthly recordable injury rate of about 8.3 per month. As of September 30, 1989, the FYTD total for recordable injuries (including the Oxnard Facility) was 158.



E 000339

11/7/89

3. Rockwell failed to meet their internal Plant Performance Goal for reducing the number of contamination incidents for the period, and was unsuccessful in reducing the total number of workplace contamination incidents in FY89. In FY88 the total number of contamination incidents reported was 373. The FY89 total was 479 contamination incidents.

4. Rockwell continues to have problems in the construction safety area on plantsite. Subsequent to the construction shutdown in mid-July, and the resulting emphasis to be placed on construction safety overview, DOE personnel continue to observe construction safety problems and advise Rockwell of needed improvement in construction safety overview. Some of the violations noted to date, all of which have occurred within the Perimeter Security Zone (PSZ) and performed by subcontractors, include: Personnel riding on the fender of a backhoe traveling on the road by Building 750; personnel at the excavation west of T771E working around and above protruding rebar which did not have protective caps; and improper use of access ladders.

5. Rockwell failed to exercise an acceptable level of program management in the development of official recommendations for restart of the Building 374 evaporator, instead relying on the development of written DOE instructions. Although RFO had previously requested analysis of the operation, the first Rockwell analysis based on legal issues suggested continued shutdown of the unit rather than suggest restart criteria.

6. The Scientech Criticality Safety Assessment performed in August, 1989 noted many aspects of the criticality safety program which need improvement. Most prominent of these was the absence of a comprehensive glovebox exhaust fissile material holdup measurement program at Rocky Flats, which although rapidly instituted in response to the report, should have already been in existence. Several other important aspects of the criticality safety program which need strengthening include more in depth training of workers, increasing the experience level, pay, and staffing within the Criticality Engineering organization, and not performing meaningful analysis of past infractions.

7. Rockwell failed to exercise an acceptable level of program management in dealing with pondcrete and saltcrete. On September 29, 1989, Rockwell expressed interest in knowing the "DOE's future plan," rather than developing recommendations for dealing with these wastes.

8. Rockwell's oversight of the environmental subcontractors performing routine environmental monitoring is deficient. Organization of Rockwell subcontractors conducting specialized field sampling is poor and specific Rockwell guidance is less than satisfactory. Rockwell Environmental Management staffing remains inadequate to perform proper field oversight.

9. As identified in the DOE-HQ assessment team report, RFP effluent air monitoring program may adversely affect determination of radioactive materials released to the atmosphere (audit finding AF-2).

10. Rockwell successfully made all allowable (six) TRU waste shipments to Idaho. However, shipments to both Idaho and Nevada were marked by errors in manifests and contamination on waste packages which jeopardized the future of offsite disposal plans.

Observations

1. During FY87 and FY88, the number of Nuclear Material Safety Limit Infractions fluctuated between 2 and 3 per month. During the six month period ending September 30,

the number of infractions was approximately the same as in previous years. These statistics are an indication that no significant progress has been made in positively identifying the root causes which underlie these infractions, nor in evaluating the effectiveness of the recurrence control measures taken.

2. Rockwell reorganized the Radiation Monitoring Organization into a Radiation Protection Technologist (RPT) group and a Radiation Administrative and Technical Support group. The organization was enhanced through selection of a new Manager, addition of seven additional RPT Foreman and upgrading of the training and selection standards for RPT's. At the end of FY88, the Radiation Monitoring Organization had approximately 200 personnel on board. At the end of FY89, the Radiation Protection Organization encompassed approximately 265 salaried plus hourly personnel. Also, in FY89 the development and conduct of accelerated classroom and practical skills training for Radiation Protection Technologists and Radiation Workers was incorporated as part of the DOE 5480.11 Implementation Plan.

3. A thorough assessment of the entire spectrum of HS&E training needs, with appropriate emphasis upon radiation safety and industrial safety, needs to be made. Rockwell internal surveillances, and consultant assessments of Rockwell training, point consistently to the need for added emphasis on training processes and improvements in the depth, frequency and overall quality of worker safety training. The root causes of many unplanned events experienced at Rocky Flats continue to relate closely to inadequacies in worker safety training and qualification programs.

4. Rockwell maintained TRU mixed waste generation at less than 100 cubic yards/month (half of FY88 rate) and established a Limiting Condition of Operations (LCO) for TRU mixed waste storage.

5. At DOE's request, Rockwell has completed a RCRA approved decontamination facility for decontamination of field equipment.

6. Information flow, particularly analytical data, from Rockwell to the DOE-RFO has not been adequate to meet the new reporting requirements to the CDH and the EPA nor has it allowed efficient independent analysis of data. Lack of access to a centralized, controlled data base does not provide the DOE-RFO with a means to quickly respond to information requests or prepare environmental analyses as required by the Agreement in Principle.

7. Coordination between the Rockwell RCRA/CERCLA group and Waste Operations appears to be weak, affecting program management. As an example, some staff members in Waste Operations have recently advised RFO that pondcrete will likely not meet Land Disposal Restriction (LDR) requirements for several constituents, which does not conform with RCRA/CERCLA group's understanding of the situation. Also, RCRA related documentation, information, and requests are frequently submitted to RFO from the Waste Operations group apparently without coordination with the RCRA/CERCLA group.

8. Rockwell submitted completion certificates for 23 completed Technical Safety Appraisal (TSA) actions in the past nine months. Completion certificates for approximately 16 additional TSA action items are currently undergoing Rockwell verification prior to submittal to DOE. This is an indication that progress in addressing and resolving TSA deficiencies was sustained in spite of numerous external impacts.

9. Rockwell has demonstrated a willingness and the ability to deal effectively with State of Colorado oversight groups in the development of monitoring systems.

PREDECISIONAL - OFFICIAL USE ONLY

10. Rockwell's Maintenance department has placed major emphasis on repairing noted deficiencies in fire wall penetrations, fire doors, and in the completion of Engineering Job Orders for the repair of other fire protection deficiencies. Work packages and work permits were restructured to ensure that all fire wall penetrations created during maintenance jobs were closed by the end of the shift.

11. Rockwell needs to perform an assessment of the audible range of the PA system and all alarms on plantsite to determine whether they can be heard in all required areas. There have been several incidents of SAAM alarms that cannot be heard at the opposite end of the room in which they are located.

12. The HS&E organization completed preparation and issue of extensive Fire Loss Prevention Procedures as part of the Rockwell HS&E Manual. Application of the updated criteria, procedures and fire prevention practices addressed in this manual, when fully implemented, will significantly decrease the risk of fire loss and frequency of incidents at Rocky Flats.

13. Rockwell established the Industrial Safety Improvement Program to review and investigate all injuries and industrial illness, both recordable and non-recordable, and determine significant trends, root causes, and appropriate recurrence controls. Monthly trend reports summarizing injuries at the Director, Building, and Program levels were initiated to increase accountability of line management for instituting and taking ownership for effective accident prevention programs within their organizations.

14. Milestones for responding to CDH Compliance Order No. 89-06-07-01, have been met.

15. Rockwell completed the ATMX exemption request.

16. The Safety Review Group (SRG) has shown significant improvement in the quality of information presented in Unusual Occurrence and Critique Reports. The SRG staff was instrumental in obtaining substantial Rockwell participation in a DOE sponsored MORT/Accident Investigation Workshop. The Rockwell personnel that completed the training will be rotated through the SRG and will also serve as a reserve resource for the SRG. The SRG has been a driving force of the Unplanned Event Interagency Steering Committee. They have provided most of the preparatory work on the proposed Unplanned Event Information Center.

17. At RFO's request, the RCRA/CERCLA group has been more conscientious in allowing RFO adequate review time in the preparation of final documents (groundwater assessment plan).

18. The RCRA/CERCLA group is improving review of subcontractor products prior to submission to RFO (Part B for supercompactor), although some documents received still required significant improvement (draft groundwater assessment plan).

19. The RCRA/CERCLA group has responded to a DOE concern regarding field program oversight by contracting for personnel to conduct independent field oversight.

20. Rockwell has identified actions necessary to correct the National Emissions Standards for Hazardous Air Pollutants (NESHAPs) program deficiencies and included these actions in the Five Year Plan.

21. The Rockwell RCRA/CERCLA group is in the process of correcting errors in logging of geologic cores through independent reanalysis of existing core materials.

22. Development of the RCRA incident reporting scheme has been completed and submitted to CDH.

23. Rockwell has moved forward with an extremely aggressive schedule to prepare Air Pollution Emission Notices for the Rocky Flats Plant.

24. Rockwell has not been responsive in submitting and updating quarterly status reports on appraisals.

25. Rockwell has made every effort to meet DOE's new and existing safety analysis requirements within available resources. However, resources may be inadequate to support the new safety analysis requirements now being promulgated by DOE and other agencies. Organization and responsibility changes in DOE make it difficult to identify resources needed for the future of the safety program.

PREDECISIONAL - OFFICIAL USE ONLY

FPA: QUALITY

Adjectival Grade: VERY GOOD

Noteworthy Achievements

1. A review of Rockwell Final Product Acceptance (Final PA) was conducted in August after the first year of Rockwell having the responsibility for most product acceptance. The results of the review, conducted by Albuquerque Operations Office in conjunction with the Rocky Flats Office, indicated that the Rockwell Final PA group was performing effectively. There were no findings and few remarks in the report summarizing the review.

2. Lot rejects and Final PA observations decreased during the second half of FY89 as a result of Rockwell efforts directed toward improvement in these areas. Specific actions include elimination of unnecessary operations, relocation of finish machined vendor product operations, implementation of technical improvements, and an increase in non-weapons quality activities.

Notable Deficiency

While a considerable amount of effort has been applied and a great deal has been accomplished, the DOE assessment conducted in August 1989, confirmed that the plant-wide implementation of DOE Order 5700.6B in the non-weapons area has not progressed at the accelerated rate expected. A strong commitment is needed to implement the updated management plan and schedule.

Observations

1. Indicators for plant yield and deviation reflected improvement in both areas. This improvement occured in spite of the fact that yield and deviation rates were already at highly desirable levels. This was the result of directed engineering efforts and a better understanding of processes.

2. The quality program for tractors and trailers in the Modification Center is marginal. The problem of identifying and documenting discrepancies still exists even though an additional engineer has been assigned by Rockwell. Significant deficiencies have been identified by DOE after these units have been accepted by Rockwell quality engineers. Although the need for a new quality plan has been identified, there seems to be little urgency to accomplish this in a timely manner.

3. A lack of process control and process engineering was evident from the production of numerous defective jamb steel blanks. A complete lack of control occurred when the production of these units was switched from Maintenance to Production Operations. No engineering or process definition was performed and the operation was allowed to proceed resulting in the scrapping of two months' worth of production.

4. Nonconformance to procedural requirements has continued primarily affecting paperwork associated with product. Incorrect changes to product paperwork and omissions of quality evidence occurred many times as discovered during a DOE quality audit in Building 460.

5. A considerable number of responses to Incoming Material Reports have been late.

PREDECISIONAL - OFFICIAL USE ONLY

6. Progress continues in the development of the Quality Information System. This is expected to continue to provide valuable information for quality improvement efforts.

PREDECISIONAL - OFFICIAL USE ONLY

FPA: COST MANAGEMENT

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. Rockwell has provided excellent support to both the Environmental Restoration and Waste Management Five-Year Plan and to the Modernization Study. Each of these budgetary submissions required development of detailed support in a very short time frame. Rockwell prepared the required data in a timely manner and furnished all required information.

2. Rockwell has done an extraordinary job of collecting information, categorizing and documenting the large number of new funding requirements created by the FBI/EPA investigation, the DOE Tiger team, and the DOE/CDH Agreement. The quality and consistency of information provided to the DOE has been high considering the changing situation and the number of areas impacted. Coordination and cooperation with the DOE has been exceptional.

3. The quality of Rockwell's support for its FY91 construction line items resulted in all projects which were validated being accepted for inclusion in the Department's 1991 budget request. Rockwell performed well in presenting data and narratives to Headquarters justification and validation review teams for the FY91 budget. Validation requests for backup cost estimating data were provided promptly and resulted in a satisfactory resolution of questions.

Notable Deficiencies

None

Observations

1. In deciding on final GPP allocations for the year, AL has continued to review the status of committed funds. Although commitment of funds has improved year-by-year, the support for the Plant's FY89 GPP requirements has been adversely affected by the balance of uncommitted funds at key points during the year.

2. Rockwell's financial management systems generally conform to DOE accounting practices and procedures. The accounting systems provide a reliable check on the accuracy of data and adherence to established policies, effective financial internal controls, and meaningful cost accounting data to management. However, a recent cash embezzlement has resulted in Rockwell identifying several weaknesses with respect to the cashier's operation. Implementation of all recommendations to correct these weaknesses is substantially complete.

3. Rockwell has been very responsive to a large number of DOE information requests regarding its August 4, 1989, ten point funding request to DOE. The DOE analysis of requirements and Rockwell's effort to support it have been hampered by the number and magnitude of questions and by legal issues surrounding the Plant's operations.

PREDECISIONAL - OFFICIAL USE ONLY

FPA: PRODUCTION OPERATIONS

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. Rockwell is continuing to make progress with its new scheduling philosophy which is designed to minimize work-in-process (WIP) inventories by managing bottlenecks. In the past year WIP inventories have been cut approximately in half. Production throughput time has been reduced substantially, from 76 to 31 days, for an improvement of 59%. Accompanying this WIP reduction has been continued improvement in schedule performance by Building 460 Fabrication.

2. The processing of procured finished machined products was consolidated within Building 460 to reduce overall process times and decrease costs. The move to Building 460 from Building 991 was completed ahead of schedule on August 3. Particularly noteworthy is that 100% manufacturing schedule compliance was maintained throughout the move and continues to be achieved in Building 460.

3. The halogenated solvent elimination program, in place since October 1987, continues to accomplish reductions. There has been a 49% reduction in solvent use across the plantsite, including an 80% reduction in the non-PSZ areas. The program has recently focused its emphasis on carbon tetrachloride use in the plutonium manufacturing areas.

Notable Deficiencies

None

Observations

1. The self-appraisal program instituted in all Production Operations buildings is an appropriate adaptation of the Building 771 Restart Criteria. In this program each Building Manager is required to conduct monthly appraisals in the areas of safety, hazardous waste management, conformance to standard operating procedures, etc. The common checklist approach devised for use in all buildings should enhance communications and standardization. The program, however, lacks effectiveness. The repetition of non-conforming conduct of operations as evaluated in the Technical Safety Appraisals and the various DOE on-site appraisals indicates a non-disciplined attitude and implementation. Substantial safety management attention is required to affect the safety culture work habits of the managers, supervisors and workers. Ownership throughout entire line management is required to enhance implementation.

2. Rocky Flats has continued its outstanding performance against IP schedules during the current period. Through September, the Plant had 22 consecutive months of 100% IP performance, despite a variety of major obstacles. The plant exceeded all production commitments on the W88 Program despite large production quantities and the redesign of a component. However, numerous events have highlighted continuing problems associated with product control and workload planning. Consistently, at the end of each month a need for considerable overtime has been evident in order to meet IP schedules, resulting in errors and mistakes. Specifically, a) a "D" Test Stem was omitted from a shipment to Allied Signal, b) segregation of SP993 units for "D" test was not accomplished and they were shipped to Savannah River Plant before testing, c) there was a failure to provide adequate packaging for Interconnect Tube Assemblies, d) there was a mishandling and reporting of a Type 123 Pit in Building 707 and e) a war reserve part was delivered to the Pantex Plant

with a red "acceptance required" stamp over one of two different "diamond" acceptance stamps.

3. Building 707 embarked on extensive radiation reduction efforts, including careful analysis and use of shielding, improved production clothing, and other conventional projects. Some experimental projects have also been launched including the prototype shielded bagout cart. This project could have plant-wide application and result in significant radiation exposure reductions.

4. Building 707 is piloting a Safety Action Team on second shift. The Team includes representatives from each organization in the building and seeks both to better communicate the range of building activities to all employees and to obtain input and ideas from all levels on key safety goals. Second shift was selected to pilot the program because management believed second-shift employees felt isolated from the mainstream and wanted to assure that these employees felt personally involved in changing the plant culture. Once the program is established, it will be extended to first shift.

5. Rockwell is structuring a systematic approach for future planning through the following initiatives within Production Operations:

- The Make or Buy Committee was reinstituted with line management leadership to develop a well documented decision process and has defined its task as consisting of more than the traditional make or buy decision: the make or buy task is considered to end only when certified products are provided to the floor. With this in view, the committee is developing simplified and more standard processing and reexamining order quantities on all finished machined items to enable shorter process times and greater efficiency.
- The Manufacturing Resource Planning (MRP) working group which has been operating since December 1988, with representation from all affected line and staff organizations, is seeking to plan system enhancement and support efforts on the basis of total Plant priorities rather than inter-group competition. The working group has developed a plant-wide priority list for current projects and is developing a comparable list for the most promising future projects.
- A continuous improvement team has been established by the MRP working group to develop a workable approach toward configuration management. This team is currently developing a process map for configuration management activities and is seeking to design a simpler system that effectively balances configuration control with responsiveness to customer requirements.

6. Rockwell's complex-wide leadership in manufacturing systems was demonstrated recently in assignment of serial numbers. Rockwell was asked to lead a complex-wide team to develop a common approach toward serial number assignment. The team supported Rockwell's approach as the most capable of providing for optimal future systems development and integration.

7. Incoming Material Reports (IMR's) continue to be generated as a result of duplicate serial numbers on parts sent to other sites. This issue requires coordination with design laboratories and other production plants.

8. Rockwell has identified opportunities to optimize operations for greater efficiency by implementing a new Plant policy and procedure on process material compatibility. These actions were taken in response to RFO quality survey findings. The new approach

provides greater responsiveness and increased efficiency while ensuring that incompatible process materials do not reach the floor. The system minimizes new process materials and eliminates compatibility evaluations except as necessary.

9. Over twenty waste minimization programs are being investigated currently by Rockwell Production Operations for implementation during FY90. A team of production engineers is reviewing manufacturing processes, and a review board has been established which includes Waste Operations, Production Operations, and area management.

FPA: CHEMICAL OPERATIONS

Adjectival Grade: VERY GOOD

Noteworthy Achievements

1. Plutonium Recovery Operations and Production Operations have been working in conjunction to develop the Nuclear Facility Operation Manual (NFOM). This manual is to establish the standard of excellence for operations of Rocky Flats Facilities. Buildings 707, 771, 776, and 777 have been designated as the initial buildings for the implementation of NFOM.

A coordinator was assigned to facilitate the implementation of NFOM in Building 771 for a pilot program for the quarter ending September 30. Several requirements of the manual have been incorporated into the operating activities. Shift relief and turnover meetings are being held and are being modified to reflect the requirements identified in the manual. A Plan-Of-The-Day meeting has been established to communicate daily activities with all organizations within the building. A new tracking and control system for maintenance work was introduced to enhance the needed coordination and accountability. Activities conducted within the building will be documented through operating procedures as necessary to comply with NFOM requirements.

A team was formed to perform the operational readiness review for the PROVE project. The team is using the Process Operational Readiness methodology as developed by EG&G's Idaho System Safety Development Center.

2. The Building 771 Restart Criteria listed 46 specific deliverables that Rockwell had to complete before restart approval would be granted. As a result, a number of procedures were changed or developed and implemented. This implementation was successful, and the building management team continues to develop and implement improvements to those procedures. This is most evident in the area of routine surveys. The Radiation Monitoring organization has realigned its staff and work load in order to properly emphasize and ensure compliance with the new requirements. In addition, the self surveillance program has been greatly expanded to manage the building operations. Another area showing improvement is the communication networking between the operational, maintenance and other support groups.

The building procedures that were put in place as a result of the shutdown have been very successful. The implementation of the housekeeping procedure has identified several hundred deficiencies and has resulted in closing out corrective actions in a timely manner. The building communication and safety knowledge and attention level throughout the building management team have increased as a result of the safety surveillance meeting. The waste container management program has also been successful in moving drums and crates out of the building in a timely fashion. The weekly drum and crate inventory shows the success of the program.

Notable Deficiencies

1. Rockwell has not published a recovery operations plan that clearly identifies the integrated sequencing and disciplined approach necessary to ensure successful material management. The contractor has not developed a work breakdown structure and scheduling system which accurately outlines operational sequencing, integrates all support organizations and metal demands, and effectively responds to operational and requirements changes in a timely fashion. The contractor has not implemented a cost control system.

PREDECISIONAL - OFFICIAL USE ONLY

The lack of these management systems results in excessive time delays for implementation of newly developed technologies, long lead times for new equipment installations and operation, burdensome work procedures, inefficient recovery operations, etc.

2. Rockwell has not established performance goals for process operations or measured process performances. The lack of goals is evident in problems associated with PRMP and poor process efficiencies in chemical recovery. There is a lack of recovery unit process efficiency improvement and integrated process improvement in the overall flow sheet.

Rockwell has not effectively identified needs and developed clear future direction. Baselines for all process systems have not been established, nor has a disciplined configuration management system been established and demonstrated (operating envelope manuals not completed or kept up to date). Rockwell has not provided a sound basis of technology nor technical advocacy for recovery operations. It did not provide sound technical requirements and conceptual design baselines for the PROVE, PRMP, and Building 771/776 upgrade projects. They did not provide a comprehensive, integrated development and demonstration program which supports design need dates with technical decisions for the PROVE, PRMP, and Building 771/776 improvements. Rockwell has not demonstrated a quality assurance management system in compliance with NQA-1 requirements that measures program effectiveness and compliance for designing, purchasing, developing, fabricating, installing, inspecting, testing, training, operating, etc.

Plans are in place to develop and implement a program for all Plutonium Recovery Operations activities (the Plutonium Recovery Operations Program). The preliminary document incorporating program objectives, activities, budget methodology, and resource requirements was released as a supplement to the FY91-92 Budget Submittal, the "Operating Budget for Plutonium Recovery Operations Program: Management Summary and Narrative."

## Observations

1. Building 771 management's development of a strategic plan is a positive step toward providing specific direction through the formulation of short and long-term goals for achieving continuous improvement. Implementation of the plan will support DOE's goal of excellence in facility operations through the development of performance goals, strengthening the building manager concept, Nuclear Facility Operation Manual implementation, and reinforcing an attitude of continuous improvement.

2. Building 771 management continues to take an aggressive, pro-active position on improving housekeeping and giving attention to details when performing daily operations. A number of efforts have been initiated that track, control, and correct deficiencies in facility condition or housekeeping. The basis is a building procedure that defines the housekeeping expectations and surveillance requirements. Communication channels have been put in place to facilitate problem identification and resolution.

3. Plutonium Operations has taken an aggressive role in implementing Building 771 Restart Criteria in the other recovery and waste processing buildings. All building management plans (including Housekeeping, Waste Container Management, Removal of Excess Equipment, Management Safety Surveillance, and Improved Working Environment) have been completed or are scheduled for completion in the near future.

4. Plutonium Recovery Operations successfully planned and executed a thorough radiation exposure analysis of the Building 776 recovery operations. Root causes of the elevated

radiation exposures were determined through the performance of non-operational baseline survey followed by operational phased startup survey. Final analysis is required to complete the identification of corrective actions. The surveys were professionally performed, with an enhanced cooperative effort between the hands-on workers and the technical staff.

5. Plutonium Operations was able to support Building 707 Production Operations metal requirements. However, Molten Salt Extraction (MSE), Electrorefining (ER) and Aqueous processing are all behind schedule. Rockwell's performance against pit disassembly schedules has fallen off during this period and is only about 20% of the committed schedule. This affects internal feed to molten salt extraction, as well as storage of retirement units at both Rocky Flats and Pantex. In addition, communications with DOE on problems and recovery plans have been less than optimum.

6. Plutonium Recovery Operations was successful in developing and producing dicesium hexachloroplutonate (DCHP) to significantly improve MSE process capacity and worker radiation safety. Despite a significant increase in metal throughput over last year, total cumulative penetrating radiation exposure has only increased 15% due to the use of DCHP. Overall contribution from neutron exposure to penetrating total exposure actually decreased. Total cumulative extremity radiation has only increased about 12%. However, the failure to develop written procedures for Material Control and Accountability measurements indicates a lack of discipline required of new process implementation for surety of operation.

7. A Plutonium Operations Quality Assurance Task Team was formed to develop a program to apply to all activities affecting quality in Plutonium Operations. This team developed a narrative form Quality Manual that identifies the requirements of the Non-Weapons Quality Manual to be applied to Plutonium Operations. All process operations and development as well as the associated equipment will be subject to quality assurance requirements plus various programmatic responsibilities within Plutonium Operations. Completion of the Plutonium Operations Quality Manual is scheduled for February 1990. An implementation plan for the Plutonium Operations Quality Assurance Program is currently being developed. A quality assurance plan is currently being written for Nuclear Materials Management.

8. A joint effort between Rockwell, United Nuclear Corporation, and Los Alamos National Laboratory (LANL) has been underway during FY89 to develop a detailed model of the material recovery and fabrication processes at Rocky Flats. The model is intended to provide scheduling support for development of the Master Nuclear Schedule and detailed two-week schedules for process planning. Rockwell has assumed the responsibility for program management of the project and is providing the primary coordination and direction for model development.

9. Plutonium Recovery Operations successfully developed and implemented the ER process, which became fully operational in October, 1988. ER has significantly increased Pyrochemical Operations ability to consistently produce high quality metal and support Building 707 foundry operations. In addition, the backlog of anode heels on plantsite was worked off by the end of April.

10. It should be noted that during this period the personnel in Building 886 have developed and installed a state-of-the-art device for performing inventories for liquid systems. This system has the potential for decreasing the uncertainty in the SNM liquid inventories by at least an order of magnitude. Implementation of this technology appears very appropriate for application in Building 771 and for the PRMP project.

PREDECISIONAL - OFFICIAL USE ONLY

# PRMP/PROVE

PRMP/PROVE FPA: PROJECT MANAGEMENT

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. Rockwell has taken an active role in establishing LANL technical personnel as a part of the PRMP structure. They have provided the opportunity for direct, immediate input by LANL staff in technical issues involving the project baseline. The initiative to place a LANL technical manager as an integral part of the PRMP staff is a landmark action for Rocky Flats/LANL cooperation.

2. Provisional agreement was reached by the Senior Management Review Board on the baseline PRMP process technologies. This agreement represents a significant milestone in the culmination of many months of effort by the full PRMP technical team to analyze and establish the optimum processes for the PRMP baseline.

3. The management of the PROVE project has improved substantially during this period. Rebaselining was requested to put the project on a credible basis and performance against the new base has exceeded expectation. Problems in worker productivity, glovebox quality, and project control were addressed aggressively to maintain project momentum. The PROVE project has experienced a visible improvement in overall management which has resulted in a more disciplined and success-oriented project.

Notable Deficiencies

None

Observations

1. The Rockwell NQA-1 verification plan is applauded as a positive step to enhance quality. We believe this plan will provide a certifiable, auditable process system after installation is complete. Application of the plan to PRMP quality is anticipated to benefit the project.

2. The first major process Operational Readiness Review at Rocky Flats Plant has been initiated for PROVE. The effort has been initiated as a cooperative effort involving PROVE and Plutonium Operations personnel, as well as other Plant support. This disciplined approach to the review of readiness for operations is a positive action and a good example for future Plant start-up activities.

3. Rockwell has not provided an adequate system to produce timely and accurate project control information. Network Critical Path Method schedules have not been developed and requested manpower staffing plans have not been provided. The control systems being used, as reflected in performance information provided to the Project Management Office (PMO), are not oriented toward accuracy and timely response as the top priorities.

4. Rockwell has been slow to integrate a computerized, three-dimensional Plant Configuration Model (PCM) into the overall PRMP design strategy. Such a system is essential for control of construction interference and project costs. Although some

PREDECISIONAL - OFFICIAL USE ONLY

provision for the PCM exists in the Architect-Engineer (A-E) statement of work, Rockwell has not aggressively pursued this valuable tool.

5. No plan has been developed for implementation of an automated system for control of project documentation. A computer based network is needed to provide paperless storage and revision of System Design Descriptions and other key project information. An automated system would allow accurate action tracking, current project statusing, and simplifies configuration control activities. The development of an automated system to maximize the productivity of project participants must be expedited.

PREDECISIONAL - OFFICIAL USE ONLY

PRMP/PROVE FPA: COST MANAGEMENT

Adjectival Grade: VERY GOOD

Noteworthy Achievement

Rockwell has taken positive action to reduce the cost of A-E services. Overhead has been reduced and non-essential A-E services either eliminated or shifted to lower cost providers. The A-E has been required to meet their commitments, thus avoiding additional charges. Control measures have been upgraded to prevent an expansion of A-E effort beyond project requirements.

Notable Deficiency

The Cost and Schedule Reduction Precursor activity incurred over $100,000 cost without any visible or deliverable product. This indicates a lack of cost control in this area which is unacceptable. Corrective action is needed to assure that goals are developed and expected performance is clearly defined prior to costs being incurred.

Observations

1. Positive steps have been taken to maximize the productive time of construction workers to control PROVE costs.

2. Cost reporting has steadily improved and is coming into compliance with requirements of the Uniform Reporting System (URS) beginning in FY90.

PREDECISIONAL - OFFICIAL USE ONLY

PRMP/PROVE FPA: SCHEDULE PERFORMANCE

Adjectival Grade: VERY GOOD

Noteworthy Achievements

1. The PROVE test schedule has been prepared as an integrated effort between Plutonium Operations and PROVE engineering. The schedules have been used to balance manpower requirements and ensure effective scheduling of the test effort. The test plan appears to provide a complete and well-coordinated plan for meeting the test goals.

2. Detailed schedules have been developed for activities which are preliminary to PRMP construction. These schedules have been modified and analyzed several times in response to adjustments in environmental and safety documentation strategies. The schedules permit clear, quick and accurate adjustment and will provide a solid base for performance measurement.

Notable Deficiency

Schedule reports have not been provided in a form which ensures accuracy to the overall project schedules. Most reports are manually generated to provide a particular graphic presentation. This method of schedule reporting is more labor intensive and provides the continual opportunity for error because of the manual transfer of information between computer systems. A reporting format which takes advantage of current computer tools to ensure accuracy and timely reporting is required.

Observations

1. Despite quality problems resulting in extensive rework of delivered PROVE gloveboxes, Rockwell has remained within schedule thresholds while maintaining costs at acceptable levels.

2. The PROVE project is currently being run in a controlled and disciplined fashion with a clear focus on schedule performance. Problems are addressed quickly to minimize cost and schedule impact. The schedule and cost control of the project has improved over the period.

3. PRMP Master Level Schedules have been prepared to support the cost estimate currently being prepared. Material densities and manpower densities have been included to make a solid basis for the schedule and cost.

E 000356



11/7/89

PREDECISIONAL - OFFICIAL USE ONLY

PRMP/PROVE FPA: SUBCONTRACT MANAGEMENT

Adjectival Grade: VERY GOOD

Noteworthy Achievement

Rockwell has taken positive action to develop an A-E Statement of Work (SOW) which provides for their required services at an appropriate level of detail. Delays in SOW development caused by PRMP redefinition were addressed with the development of a Bridge SOW to maintain the A-E effort during transition.

Notable Deficiency

Inadequate Quality Assurance/Quality Control oversight of the glovebox subcontractor resulted in extra costs and delivery delays to the Government. Serious defects in interior installed piping welds required rework by both the PROVE glovebox subcontractor and Rockwell personnel. The initial corrective action failed to solve the original problem. Delivered equipment continued to require extensive rework.

Observations

1. J. A. Jones has not developed a Project Management System (PMS) that is compliant with Cost and Schedule Control System Criteria despite having spent over $350,000 on this effort. J. A. Jones not been demonstrated full implementation of NQA-1 for PROVE.

2. The A-E has taken action to upgrade their technical capabilities and replace key managers on the project team. Initial observations indicate that a more competent and integrated team of professionals is now assigned to the PRMP design.

3. Rockwell has made progress toward developing an integrated team of Rockwell staff and subcontractors. Agreements by the Senior Management Review Board and integration of subcontractor inputs demonstrate this progress.

PREDECISIONAL - OFFICIAL USE ONLY

PRMP/PROVE FPA: DESIGN QUALITY

Adjectival Grade: EXCELLENT

Noteworthy Achievements

1. Rockwell developed and implemented a Nonconformance Status Reporting (NSR) system to support a PROVE Operational Readiness Review. The NSR tracks nonconforming items to completion, providing a verification that actions are being addressed to prepare for eventual project acceptance and operation. With further refinements, the system should be useful to support PRMP activities.

2. Rockwell has nearly developed a complete set of System Design Descriptions (SDD's) for the PRMP. These SDD's will establish the design basis of the overall PRMP at the conceptual design stage. Although behind the original schedule, these SDD's significantly increase the quality and completeness of the conceptual design documentation for the project. These SDD's are fundamental to the design and configuration control efforts throughout the life of the facility.

Notable Deficiencies

None

Observations

1. Over 2000 drawings have been verified to establish a set of valid, as-built drawings for use by Maintenance, Operations and Facility Engineering personnel. This effort has progressed ahead of schedule.

2. An SDD was developed for PROVE to provide full documentation for the design. An independent review was completed and identified problems with the SDD. Correction of the actions from the review is required to create the first comprehensive SDD at the Rocky Flats Plant.

3. Rockwell has taken action to evaluate the applicability of Nuclear Regulatory Commission Regulations to the PRMP and the level to which DOE Order 6430.1A, General Design Criteria, should be incorporated. This effort will place the project in a sound position for completing the design with minimal future impacts. It also provides a sound basis for the decisions needed to establish the technical baseline for design.

E 000358

PREDECISIONAL - OFFICIAL USE ONLY

PRMP/PROVE FPA: TECHNICAL PRODUCT QUALITY

Adjectival Grade: EXCELLENT

Noteworthy Achievement

The PRMP has made significant progress in developing the technical baseline for the project. Technology alternatives were analyzed by broad-based teams against the most current DOE goals and criteria. The proposed technologies were incorporated into an overall PRMP design which was integrated and balanced between individual processes. The product of this nearly complete effort is a comprehensive, disciplined analysis supporting the selection of the PRMP technology baseline. This technical baseline will support the future design and construction of PRMP and facilitate the validation of the project.

Notable Deficiencies

None

Observations

1. Rockwell does not currently require periodic, independent audit of NQA-1 compliance and Non-Conformance Report actions. Responsibility for resolution of Non-Conformance Report actions is within the project chain of management. QA staff independence is important to ensure that quality actions are completed without prejudice.

2. A QA plan for PRMP has not been completed. Completion of the QA plan is required prior to start of the full design effort and Title I activities.

3. Rockwell developed an aggressive schedule and effort to correct welding problems on the internal glovebox piping. Good progress has been made against this plan and the quality of the glovebox construction has been assured.

E 000359

PERFORMANCE APPRAISAL
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

The overall performance of Rockwell International Corporation (Rockwell) has been at the level of "Satisfactory" during the period April 1 through September 30, 1989.

The following are seperate evaluations of the performance of Rockwell relative to the management and operation of the Rocky Flats Plant and the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the selected Functional Performance Areas (FPA's). The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's have been evaluated in accordance with the contract Award Fee Plan, and the following summary of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

PLANT

GENERAL MANAGEMENT: There is considerable evidence of Rockwell management's inability to effectively manage this facility, and this is seen by DOE to be a serious, major deficiency. This serious, major deficiency is manifested in lack of progress in integrating safety responsibility and accountability at all working levels and also by deficient lines of responsibility, procedures, discipline/work ethic, training, on-floor supervision, and problem investigation/resolution. Numerous incidents provide evidence of the above deficiencies. Additionally, despite an increase in nitrate concentrations on the 750 Pad, little action has been taken to contain saltcrete after precipitation events. The preparation for the annual DOE inventory of Special Nuclear Material at Rocky Flats was less than satisfactory.

The C-Centerline Project in Building 707 was an outstanding example of an integrated operating philosophy that can assure safety while providing for the capability to continue operations of a production facility. Rockwell successfully completed a complex central telephone system acquisition. Rockwell's logistical and security support of DOE "Tiger Team" activities and Rocky Flats Office moves has been extraordinary. Rockwell has provided valuable support to DOE teams negotiating RCRA/CERCLA agreements with the Environmental Protection Agency (EPA) and the Colorado Department of Health (CDH). Notable progress was made in five areas involving system automation. A maintenance work control system has been automated and implemented which enhances planning processes, establishes priorities, supports integrated schedules and provides deficiency tracking. The quantity and quality of support to the PRMP project has increased dramatically over this reporting period.

ENVIRONMENT, SAFETY & HEALTH: Long term understaffing in the Health, Safety and Environment organization resulted in less than adequate attention applied to several essential projects and safety functions. Rockwell was unsuccessful in reaching their Plant Performance Goal for recordable injuries and in reducing the total number of workplace contamination incidents. Rockwell continues to have problems in the construction safety area. Rockwell failed to exercise an acceptable level of program management in the development of official recommendations for restart of the Building 374 evaporator. A

criticality safety assessment performed in August, 1989 noted many aspects of the criticality safety program which need improvement. Rockwell failed to exercise an acceptable level of program management in dealing with pondcrete and saltcrete. Rockwell's oversight of the environmental subcontractors performing routine environmental monitoring is deficient. As identified in the DOE-HQ assessment team report, deficiencies in the RFP effluent air monitoring program may adversely affect determination of radioactive materials released to the atmosphere. Waste shipments to Idaho and Nevada were marked by errors in manifests and contamination on waste packages which jeopardized the future of offsite disposal plans.

Rockwell took positive actions to upgrade the overall quality, capability, and performance of the Rocky Flats radiation instrumentation systems in FY89. Rockwell developed and implemented a plantwide ALARA (As Low As Reasonably Achievable) Program exceeding DOE requirements. Rockwell has responded in a very timely fashion to the new surface water release requirements imposed by the State of Colorado. The extent of the characterization of subsurface contamination has exceeded the requirements of the Agreement in Principle with the State of Colorado. Rockwell assisted in the negotiations of the important Settlement Agreement and Compliance Order on Consent pertaining to interim status issues. Rockwell has submitted all required documentation pertaining to environmental restoration on schedule. Rockwell prepared a detailed Five Year Plan revision (8/31/89) in a very short time period. A new Rockwell Radiological Engineering group was created in FY89 and several notable tasks have already successfully been completed.

QUALITY: The plant-wide implementation of DOE non-weapons quality assurance requirements has not progressed at the accelerated rate expected.

The Rockwell Final Product Acceptance group is performing effectively after the first year of having the responsibility for most product acceptance. Lot rejects and Final Product Acceptance observations decreased during the second half of FY89.

COST MANAGEMENT: Rockwell provided excellent support to both the Environmental Restoration and Waste Management Five-Year Plan and to the Modernization Study. Rockwell did an extraordinary job of collecting information, categorizing and documenting the large number of new funding requirements created by the FBI/EPA investigation, the DOE Tiger teams, and the DOE/CDH Agreement. All validated construction line item projects were included in the Department's 1991 budget request.

PRODUCTION OPERATIONS: The processing of procured finished machined products was consolidated within Building 460 to reduce overall process times and decrease costs. Rockwell has been effective in reducing halogenated solvent usage, and continues to make progress with its new scheduling philosophy which is designed to minimize work-in-process inventories by managing bottlenecks.

CHEMICAL OPERATIONS: Plutonium Recovery Operations and Production Operations have been working in conjunction to develop the Nuclear Facility Operation Manual, which is to establish the standard of excellence for operations of Rocky Flats facilities. As a result of the deliverables that Rockwell had to complete before Building 771 restart approval was granted, a number of procedures were changed or developed and implemented. This implementation was successful, and the building management team continues to develop and implement improvements to those procedures.

Rockwell's management controls and directives in areas such as recovery operations planning, work breakdown structure and scheduling systems, and cost control systems

result in implementation/installation/operation delays and other problems. There continues to be a failure to establish performance goals for process operations and to measure process performance; therefore, operations are not baselined to provide for improved performance.

PRMP/PROVE

PROJECT MANAGEMENT: Rockwell has taken an active role in establishing Los Alamos National Laboratory technical personnel as a part of the PRMP structure. Provisional agreement was reached by the Senior Management Review Board on the baseline PRMP process technologies. The PROVE project has experienced a visible improvement in overall management which has resulted in a more disciplined and success-oriented project.

COST MANAGEMENT: Rockwell has taken positive action to reduce the cost of A-E services, including reducing overhead, requiring the A-E to meet commitments, and upgrading control measures over the scope of A-E work.

The Cost and Schedule Reduction Precursor activity incurred over $100,000 cost without any visible or deliverable product, which indicates an unacceptable lack of cost controls.

SCHEDULE PERFORMANCE: The PROVE test schedule has been prepared as an integrated effort between Plutonium Operations and PROVE engineering. Detailed schedules have been developed for activities preliminary to PRMP construction and which will provide a solid base for performance measurement.

Schedule reports have not been provided in a form which ensures timely reporting and accuracy to the overall project schedules.

SUBCONTRACT MANAGEMENT: Rockwell has taken positive action to develop an A-E Statement of Work which provides for their required services at an appropriate level of detail.

Inadequate Quality Assurance/Quality Control oversight of the glovebox subcontractor resulted in extra costs and delivery delays to the Government.

DESIGN QUALITY: Rockwell developed and implemented a Nonconformance Status Reporting system to support a PROVE Operational Readiness Review. Rockwell nearly developed a complete set of System Design Descriptions which will significantly increase the quality and completeness of the conceptual design documentation for the project.

TECHNICAL PRODUCT QUALITY: The PRMP has made significant progress in developing the technical baseline which is expected to support the future design and construction of PRMP and facilitate the validation of the project.

PREDECISIONAL/OFFICIAL USE ONLY

AWARD FEE RECOMMENDATION

CONTRACT NO: DE-AC04-76DP03533

CONTRACTOR: ROCKWELL INTERNATIONAL CORPORATION - PLANT

PERIOD: APRIL 1 - SEPTEMBER 30, 1989

PERFORMANCE EVALUATION REVIEW BOARD RECOMMENDATION

| EPA's | ADJECTIVAL GRADE | NUMERICAL GRADE | X | WEIGHT | = | SCORE |
|---|---|---|---|---|---|---|
| General Management | GOOD | 81 | | 25% | | 20.25 |
| Environmental, Safety and Health | MODERATELY GOOD | 78 | | 20% | | 15.60 |
| Quality | VERY GOOD | 90 | | 15% | | 13.50 |
| Cost Management | EXCELLENT | 93 | | 15% | | 13.95 |
| Production Operations | EXCELLENT | 91 | | 15% | | 13.65 |
| Chemical Operations | VERY GOOD | 86 | | 10% | | 8.60 |
| | | | | 100% | | 85.55 |

Maximum Available Award Fee
$6,822,000

Recommended Fee
$3,114,245

Suggested Range of Fees

| | | | |
|---|---|---|---|
| Minus Two Points | $2,527,614 | 83.55 | (37.1%) |
| Minus One Point | $2,797,629 | 84.55 | (41.0%) |
| Recommended Award Fee | $3,114,245 | 85.55 | (45.7%) |
| Plus One Point | $3,468,989 | 86.55 | (50.9%) |
| Plus Two Points | $3,823,733 | 87.55 | (56.1%) |

Award Fee Determination Official Contractual Limitations

$ -0- to $6,822,000 (Maximum Available Award Fee)

Chairman
Performance Evaluation Review Board

PREDECISIONAL - OFFICIAL USE ONLY

# AWARD FEE RECOMMENDATION

CONTRACT NO: DE-AC04-76DP03533

CONTRACTOR: ROCKWELL INTERNATIONAL CORPORATION - PRMP/PROVE

PERIOD: APRIL 1 - SEPTEMBER 30, 1989

## PERFORMANCE EVALUATION REVIEW BOARD RECOMMENDATION

| FPA's | ADJECTIVAL GRADE | NUMERICAL GRADE | X | WEIGHT | = | SCORE |
|---|---|---|---|---|---|---|
| Project Management | EXCELLENT | 91 | | 25% | | 22.75 |
| Cost Management | VERY GOOD | 87 | | 15% | | 13.05 |
| Schedule Performance | VERY GOOD | 90 | | 15% | | 13.50 |
| Subcontract Management | VERY GOOD | 86 | | 20% | | 17.20 |
| Design Quality | EXCELLENT | 91 | | 15% | | 13.65 |
| Technical Product Quality | EXCELLENT | 91 | | 10% | | 9.10 |
| | | | | 100% | | 89.25 |

**Maximum Available Award Fee**
$969,300

**Recommended Fee**
$628,982

**Suggested Range of Fees**

| | | | |
|---|---|---|---|
| Minus Two Points | $528,174 | 87.25 | (54.5%) |
| Minus One Point | $578,578 | 88.25 | (59.7%) |
| Recommended Award Fee | $628,982 | 89.25 | (64.9%) |
| Plus One Point | $685,698 | 90.25 | (70.8%) |
| Plus Two Points | $761,352 | 91.25 | (78.6%) |

**Award Fee Determination Official Contractual Limitations**

$ -0- to $969,300 (Maximum Available Award Fee)

[signature]

Chairman
Performance Evaluation Review Board

PREDECISIONAL - OFFICIAL USE ONLY

PREDECISIONAL - OFFICIAL USE ONLY

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

PLANT

| FUNCTIONAL PERFORMANCE AREA | FY89 WEIGHT | PREVIOUS 6 MONTHS RATING | CURRENT 6 MONTHS ~~PERB~~ RECOMMENDED RATING | |
|---|---|---|---|---|
| | | | RATING | GRADE |
| General Management | .25 | 81 | 81 | 20.25 |
| Environmental, Safety and Health | .20 | 65.25 | 78 | 15.60 |
| Quality | .15 | 88 | 90 | 13.50 |
| Cost Management | .15 | 95 | 93 | 13.95 |
| Production Operations | .15 | 96 | 91 | 13.65 |
| Chemical Operations | .10 | 91 | 86 | 8.60 |
| | 1.00 | 84.25 | | 85.55 |

| PERFORMANCE POINTS EARNED | AWARD FEE PER POINT | AWARD FEE |
|---|---|---|
| 0 - 70 | $ -0- | -0- |
| 71 - 75 | 109,152 x 5.0 | $ 545,760 |
| 76 - 80 | 204,660 x 5.0 | 1,023,300 |
| 81 - 85 | 270,015 x 5.0 | 1,350,075 |
| 86 - 90 | 354,744 x .55 | 195,110 |
| | | $ 3,114,245 |

| BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|
| $379,000 | $3,114,245 | $3,493,245 |
| **BASE FEE** | **MAXIMUM AF** | **TOTAL** |
| $379,000 | $6,822,000 | $7,201,000 |

% RECOMMENDED AWARD FEE VS. MAXIMUM AWARD FEE 45.65%

% OF TOTAL RECOMMENDED FEES VS. TOTAL MAXIMUM FEES 48.51%

PREDECISIONAL - OFFICIAL USE ONLY

PREDECISIONAL - OFFICIAL USE ONLY

RECOMMENDED AWARD FEE CALCULATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

PRMP/PROVE

| FUNCTIONAL PERFORMANCE AREA | FY89 WEIGHT | PREVIOUS 6 MONTHS RATING | CURRENT 6 MONTHS *PERB RECOMMENDED RATING | |
|---|---|---|---|---|
| | | | RATING | GRADE |
| Project Management | .25 | 75 | 91 | 22.75 |
| Cost Management | .15 | 76 | 87 | 13.05 |
| Schedule Performance | .15 | 86 | 90 | 13.50 |
| Subcontract Management | .20 | 82 | 86 | 17.20 |
| Design Quality | .15 | 78 | 91 | 13.65 |
| Technical Product Quality | .10 | 76 | 91 | 9.10 |
| | 1.00 | 78.75 | | 89.25 |

| PERFORMANCE POINTS EARNED | AWARD FEE PER POINT | AWARD FEE |
|---|---|---|
| 0 - 70 | $ -0- | -0- |
| 71 - 75 | 15,509 x 5.0 | $ 77,545 |
| 76 - 80 | 29,079 x 5.0 | 145,395 |
| 81 - 85 | 38,365 x 5.0 | 191,825 |
| 86 - 90 | 50,404 x 4.25 | 214,217 |
| | | $ 628,982 |

| BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|
| $53,850 | $628,982 | $682,832 |
| **BASE FEE** | **MAXIMUM AF** | **TOTAL** |
| $53,850 | $969,300 | $1,023,150 |

% RECOMMENDED AWARD FEE VS. MAXIMUM AWARD FEE 64.89%

% OF TOTAL RECOMMENDED FEES VS. TOTAL MAXIMUM FEES 66.74%

PREDECISIONAL - OFFICIAL USE ONLY

PREDECISIONAL - OFFICIAL USE ONLY

RECOMMENDED AWARD FEES
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

SUMMARY

| | BASE FEE | RECOMMENDED AF | TOTAL |
|---|---|---|---|
| PLANT | $379,000 | $3,114,245 | $3,493,245 |
| PRMP/PROVE | 53,850 | 628,982 | 682,832 |
| TOTAL | $432,850 | $3,743,227 | $4,176,077 |

| | |
|---|---|
| MAXIMUM AWARD FEE FOR PLANT | $6,822,000 |
| MAXIMUM AWARD FEE FOR PRMP/PROVE | 969,300 |
| TOTAL MAXIMUM AWARD FEE | $7,791,300 |

% RECOMMENDED AWARD FEE VS. MAXIMUM AWARD FEE 48.04%

PREDECISIONAL - OFFICIAL USE ONLY

United States Government

# memorandum

Department of Energy
Rocky Flats Office

DATE:

REPLY TO
ATTN OF: ADM

SUBJECT: Rocky Flats Office Award Fee Determinations for the Period April 1 through September 30, 1989

TO: John C. Tuck
Acting Assistant Secretary for Defense Programs, DP-1, HQ

Rocky Flats Office has completed its award fee (AF) evaluation of Rockwell International for the subject period. The process included staff level assessment against the Award Fee Plan, consolidation of those assessments by the Performance Evaluation Committee, review and modification as appropriate by the Performance Evaluation Review Board, and presentation to me for a final determination.

My tentative findings are highlighted below for your concurrence. Attached is the Performance Evaluation Report which will be sent to Rockwell as well as other supporting information developed during the award fee process.

<u>Rockwell International Corporation - Rocky Flats Plant</u>

A. Award Fee for Plant

| Last Period | This Period |
|---|---|
| Actual AF - $2,716,624 | Proposed AF - $3,114,245 |
| % of AF Pool - 39.82% | % of AF Pool - 45.65% |
| % of Total Fee Pool - 42.99% | % of Total Fee Pool - 48.51% |

<u>Most Notable Deficiencies</u>

-- Managements inability to effectively manage this facility is seen as a serious, major deficiency
-- Little action taken to contain saltcrete after precipitation events
-- Inadequate attention to essential projects and safety functions as a result of long term understaffing in the HS&E organization
-- Implementation of non-weapons quality assurance requirements are not progressing at the accelerated rate expected

<u>Most Noteworthy Achievements</u>

-- Showed, in the C-Centerline project in Building 707, that an integrated operating philosophy is possible

-- Upgraded radiation instrumentation quality and performance
-- Developed and implemented a plant-wide ALARA program
-- Positive and prompt response to new agreements with and requirements from the State of Colorado
-- Developing a Nuclear Facility Operations Manual

B. Award Fee for PRMP/PROVE

| Last Period | This Period |
|---|---|
| Actual AF - $186,591 | Proposed AF - $628,982 |
| % of AF Pool - 19.25% | % of AF Pool - 64.89% |
| % of Total Fee Pool - 23.50% | % of Total Fee Pool - 66.74% |

Most Noteworthy Achievements

-- Dramatic increase in PRMP project support by management
-- Active role in establishing LANL technical personnel as part of the PRMP structure
-- Improved A-E cost control, commitments, and SOW development
-- Significant progress in developing technical baseline for PRMP

Most Notable Deficiencies

-- Unaccepatable cost control in the Cost and Schedule Reduction Precursor activity
-- Schedule reports not provided in form ensuring timely reporting and accuracy to the overall project schedules
-- Inadequate QA/QC oversight of glovebox subcontractor

Please indicate your concurrence/nonconcurrence below. If you have questions or if additional information is required, please let me know.

David P. Simonson
Manager

5 Attachments

[ ] Concur [ ] Nonconcur

John C. Tuck
Acting Assistant Secretary for
Defense Programs

PL. SUPP. EX. 82

**SUMMARY MEMORANDUM**

SECRETARIAL ACTION REQUESTED BY:

Date:

Orig. Office: DP-231 (M. Arendale, 3-2984)

Transmittal: <u>ACTION</u>: Award Fee Determination for Rockwell International Corporation (RI) at the Rocky Flats Plant under Contract No. DE-AC04-76DP03533, for the Period April 1 through September 30, 1989.

To: Deputy Secretary, S-2

Issue: Should RI's Award Fee be reduced from $4,176,077 to $2,931,278?

Timing: URGENT, prompt notification of award fee determination is required.

Discussion: A decrease is recommended in the award fee for RI as proposed by the Award Fee Determining Official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 30% lower than that proposed by the AFDO, and in our estimation more accurately reflects the level of performance of RI during the rating period.

Specifically, we have recommended a total fee (award fee plus base fee) of $2,931,278 as compared to the AFDO recommendation of $4,176,077.

Conclusion: Concur in the Headquarters decrease in total fee for RI.

Plaintiff/Defendant Deposition Exhibit 136
Case # 91-1362C
Date 12-8-92
Hyatt Court Reporting

John C. Tuck
Under Secretary

Agree ____________________

Disagree ____________________

Concurrence: EH____________________
Jan./ /90

Received from Admiral Baer to Simonson on 1/11/90 (Handcarried)

Agy Received 1/12/90 from H. Miller.

Per Miller, Simonson does not agree with this and wants comparison with our proposal so RFO position can be developed.

(Later revised by HQ)

PL. SUPP. EX. 83

ıed States Government **Department of Energy**

# memorandum

ES. 90-003243

SUMMARY MEMORANDUM

**Date:** February 22, 1990 **SECRETARIAL ACTION REQUESTED BY:** 02/27/90

Orig. Office: DP-231 (M. Arendale, 3-2984)

Transmittal: **ACTION:** Award Fee Determination for Rockwell International Corporation (RI) at the Rocky Flats Plant under Contract No. DE-AC04-76DP03533 for the Period April I through September 30, 1989.

To: Deputy Secretary, S-2

Issue: Should RI's award fee be reduced from $4,176,077 to $2,012,489?

Timing: URGENT, prompt notification of award fee determination is required.

Discussion: A decrease is recommended in the award fee for RI as proposed by the Award Fee Determining Official (AFDO), Manager, Rocky Flats Office. The overall reduction in total fee is approximately 52 percent lower than that proposed by the AFDO and, in our estimation, more accurately reflects the level of performance of RI during the rating period. Specifically, we have recommended a total fee (award fee plus base fee) of $2,012,489 as compared to the AFDO recommendation of $4,176,077. For the previous 6-month period, RI was awarded a total fee of $3,336,065 (see attachment 1 for comparison).

Recommendation: Concur in the Headquarters decrease in total fee for RI.

[signature]
John C. Tuck
Under Secretary

Agree [signature]

Disagree ______________ Date 2/23/90

Concurrence: EH/Brush (no objections)
Feb./22/90

Plaintiff/Defendant Deposition Exhibit 143
Case # 91-1362C
Date 12-8-92
Hyatt Court Reporting

E 001754

PL. SUPP. EX. 84

Jnited States Government MDVD EDSJ U1 45 U1 Department of Energy

# memorandum

DATE: August 21, 1989

REPLY TO ATTN OF: S-2

SUBJECT: Award Fee Contracting Process

TO: Assistant Secretary, Conservation and Renewable Energy
Assistant Secretary for Defense Programs
Assistant Secretary for Fossil Energy
Assistant Secretary for Nuclear Energy
Director of Energy Research
Operations Office Managers
Head of Contracting Activity, Headquarters (MA-45)

As we have discussed, internal Departmental reviews, as well as General Accounting Office and Congressional reports, have recommended that improving our award fee process for our management and operating contracts should include greater interaction between the Headquarters program officials and the Operations Office Managers. To encourage more interaction, we have, among other actions, instituted a review process whereby each award fee plan and fee determination will come to Headquarters for review and concurrence prior to issuance to the contractor.

These reviews, however, are not the final answer to the need for increased interface. To ensure that the award fee system is a truly effective tool in managing our major contractors, the award fee plan for each contract must reflect the Department's restructured objectives and priorities. This is your responsibility. To accomplish this, Operations Office Managers and the cognizant Assistant Secreteries must work together throughout the award fee process to establish meaningful, challenging objectives in the award fee plans; to ensure that the objectives are prioritized appropriately; and to make certain that the fee determination honestly reflects the Department's assessment of the contractor's performance against the objectives.

Your performance of these responsibilities is crucial to the success of our contracting system. Thank you for your cooperation in implementing these improvements in the award fee process.

W. Henson Moore
Deputy Secretary

EXHIBIT 54

E 001839

PL. SUPP. EX. 85

TEL No. Feb 27.90 4:21 P.02

United States Government

Department of Energy

# memorandum

Albuquerque Operations Office

DATE: FEB 26 1990

REPLY TO ATTN OF: CPD

SUBJECT: Fee Determination Official

TO: Robert M. Nelson, Jr., Manager, Rocky Flats Office

As Manager, Rocky Flats Office, you are hereby designated as the Fee Determination Official (FDO) for the Rockwell International Management and Operating Contract DE-AC04-76DP03533. As the FDO, you will be required to make award fee decisions for the appraisal periods specified in the Contract.

If you have any questions regarding this matter, please contact me at FTS 845-6049.

Bruce G. Twining
Manager

E 000701

PL. SUPP. EX. 86

JUL 27 1989

Plaintiff/Defendant Deposition Exhibit 25 Case # 91-1362 C Date 10-23-92

ADM:CHB

CPAF Evaluation for 2nd Half of FY 1989

Dominick J. Sanchini.
President
Rockwell International, AERO, RFP

As you are aware, Secretary of Energy, James D. Watkins, has placed a heavy emphasis on Environment, Safety and Health in DOE's evaluation of its Contractors. Goals and Objectives established for Rockwell in A. E. Whiteman's memorandum of January 12, 1989, "CPAF Goals and Objectives for FY89" correlates closely with this emphasis. This approach for the second half of FY 1989 was reaffirmed in our memorandum of April 18, 1989, signed by Ron L. Foster for Whiteman.

I am providing you with this memorandum to assure that there is no misunderstanding regarding the Rocky Flats Office's emphasis on Environment, Safety, and Health in evaluating your performance for the second half of FY 1989. The Functional Performance Areas (FPA's) which we will evaluate will by those established by Modification No. 128 to your contract. In evaluating those FPA's, the criteria established by the January 12 and April 18 memorandums will be heavily emphasized in our evaluations of the FPA's, General Management, Quality Assurance, and Environment, Safety and Health. These FPA's collectively account for sixty per cent of your CPAF score.

Please contact me or have your staff contact Claude Barkmeier of my staff on extension 4263 if you have further questions.

Edward S. Goldberg
Acting Area Manager

bcc: Terrell Cone, Jr., OCB, CPD, AL

| | | |
|---|---|---|
| CH/ADMIN BR | RL | ACT AREA MGR |
| Barkmeier:rd | Wilcynski | Goldberg |
| 07/25/89 | 07/ /89 | 07/ /89 |

RI Contract 6 (a) O&M 17

E 000777

PL. SUPP. EX. 87

APR 05 1989

ADM:TA

Functional Performance Areas - Second Half Fiscal Year 1989

Dominick J. Sanchini
President
Rockwell International, AERO, RFP

The list of approved FPA's for the second half of FY89 is as follows:

| Plant FPA's | Weight |
|---|---|
| General Management | 25% |
| Cost Management | 15% |
| Quality | 15% |
| Production Operations | 15% |
| Environment, Safety & Health | 20% |
| Chemical Operations | 10% |
| | 100% |

| PRMP/PROVE FPA's | Weight |
|---|---|
| Project Management | 25% |
| Cost Management | 15% |
| Schedule Performance | 15% |
| Subcontract Management | 20% |
| Design Quality | 15% |
| Technical Product Quality | 10% |
| | 100% |

Albert E. Whiteman
Area Manager

| ADMIN BR | CH/ADMIN BR | AREA MGR |
|---|---|---|
| Agy:rd | Barkmeier | Whiteman |
| 04/03/89 | 04/ /89 | 04/ /89 |

PL. SUPP. EX. 88

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

-oOo-

UNITED STATES OF AMERICA and
UNITED STATES OF AMERICA, ex
rel. James M. Stone,

Plaintiffs,

-vs- Case No. 89-M-1154

ROCKWELL INTERNATIONAL
CORPORATION, et al.,

Defendants.
________________________________/

DEPOSITION OF EDWARD S. GOLDBERG

called for examination by counsel for defendants pursuant to Notice, at the offices of Sierra Nevada Reporters, 332 Ryland Street, Reno, Nevada, at 9:00 a.m., Thursday, April 23, 1998, before Kristine A. Bokelmann, a certified court reporter.

APPEARANCES: (See Separate Page.)

Reported by: Kristine A. Bokelmann, CCR #165

Q Okay.
A It's the first half, no, I don't recall, yeah.
Q Okay.
A Right.
Q So the record's clear, you agree that the reference to September 30, 1989 refers to the end of the six-month period, correct?
A Right, right.
Q And that this particular document appears to relate to the first half of the six-month period?
A Right, you're correct.
Q Let me show you what's been marked as Exhibit 25 in the court of claims case.
A Okay.
Q Do you recall sending -- well, first of all, do you recall sending this letter to Rockwell on or about July 27th of 1989?
A I don't have a recollection.
Q Do you recall discussions with Rockwell about a different emphasis being placed upon environmental issues during the second half of fiscal 19 --
A I did have such a conversation, but I don't remember the specifics.
Q Okay. What generally do you recall about that conversation with Rockwell?

A It had to do with the emphasis on environment, safety, health, general quality assurances, based on my team and the fact that I needed to have the president, Mr. Sanchini, understanding exactly where the Department of Energy was coming from.

Q And that conversation would have been with Mr. Sanchini?

A Yes.

Q Do you have any further recollections of that subject matter being discussed?

A No, just generally that I had that conversation, and I remember that.

Q Thank you.

(Discussion off the record.)

BY MR. PLISSEY:

Q Back on the record.

I've asked the witness to review Exhibit 52 from his previous deposition in the claims case. Have you finished reviewing that document, sir?

A Yes, I have.

Q Do you remember receiving a copy of this document at any point in time prior to --

A I don't have any recollection of this document.

Q Okay. There's a reference to Bar's review, and the last two pages appear to be a draft letter from J.M. Bar.

PL. SUPP. EX. 89

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 90-K-181

-----------------------------
MERILYN COOK, et al.,

Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION,
and THE DOW CHEMICAL COMPANY,

Defendants.
-----------------------------

Washington, D.C.
Monday, April 22, 1996

Transcript of videotaped testimony of JAMES D. WATKINS, as taken by and before KATHLEEN A. PAGLIONE, Federally-Approved Registered Professional Reporter and Notary Public, at the offices of Cohen, Milstein, Hausfeld & Toll, 1100 New York Avenue, N.W. Suite 500, commencing at 10:05 o'clock in the forenoon.

- - -

-JAMES D. WATKINS-

as Secretary of Energy?

A. That's correct.

Q. Okay. And by the way, sir, the first three pages of this is a Department of Energy press release. Was it the practice at the DOE to issue press releases when important initiatives or announcements were made?

A. I had a press conference, so this release was coincident with the conference. I brought in every single writer that I could find, Washington Post, New York Times, you name it, all the people that had been criticizing and I said, we've stopped the process. We've gone back to new ground zero. We're going to go after these issues and we're taking a whole new turn in our approach to the culture that is necessary to change this department.

And this is only linked with the five-year plan in one element, which says, we got to get on with cleaning up

-JAMES D. WATKINS-

the mess. So the five-year plan you talked about that I wrote to Reilly on has only little to do with this. It is an important sub-element, but it's only one element.

Q. It's one of your ten initiatives?

A. It's one of my ten initiatives.

Q. Okay. Now, this -- both the press release that are the first three pages of this exhibit and then there are remarks which follow the remarks --

A. The remarks were made at the press conference.

Q. And you delivered these remark at the press conference?

A. I delivered the remarks at the press conference, I had all kinds of graphs, I had support from my people, major departmental expose' of this, and this was the key initiative triggered off by two events, the Rocky Flats raid, with

-JAMES D. WATKINS-

subsequent findings that were emerging by this time.

But it was also triggered off by a visit to me from the President of the National Academy, who said they'd gotten another request from Congress to do something to review the Waste Management Program of the Department of Energy, and Dr. Frank Press said, this was in June, I'm not going to do any more because DOE pays no attention to the National Academy, witness the '87 reports that I mentioned earlier in discussions this morning.

That was too much for me. I knew Frank Press. I know the National Academy. I've had many dealings with them. They're the best in the nation. And we weren't paying attention. It was the same cultural problems that I had outlined in my earlier speech. I didn't know how deep they were.

But the combination of those two, I'm now going to announce my

-JAMES D. WATKINS-

Ten-Point Plan. I'm tired of fooling around with it. And we got to get -- we got to get professional and serious about what we're doing here in this department, and that was it.

Q. Okay.

MR. KURTENBACH: Move to strike.

A. And from that point on, we moved out.

Q. And your press release took place on June 27th, 1989 as indicated on the press release under Remarks?

A. Yes, I have no reason to doubt that, I assume that's the correct date.

Q. Did you personally prepare the remarks which were delivered at that press conference, sir?

A. Probably not, but I certainly modified them.

I mean, the idea was people prepared -- this came up from seven different branches of my department. I

-JAMES D. WATKINS-

had a Nuclear Safety Office that I'd established. I had a new Environment, Safety and Health Czar in there. I had a new Environmental Restoration Waste Manager. I had a new Assistant Secretary of Defense. They were all in this. So they all, you know, fiddled with theirs and put their paragraphs in, and then it comes to me and I rework it and that's just staffing, and normal staffing.

Q. Sure, and I certainly --

A. The answer is, I don't give anything. I don't approve until everything I say in there, I believe in.

Q. That was going to be my question, sir.

A. Right.

Q. And everything that you -- that was contained in the remarks which are part of this exhibit, you believe in, sir --

A. Yes.

Q. -- is that correct?

-JAMES D. WATKINS-

A. Yes.

Q. All right. Sir, let's look at the press release, and then we'll go to your remarks. I just have a couple of questions.

Third paragraph, it said, "When the President asked me to take this job in January, he indicated that the problems faced by DOE were very serious in nature. The underlying operating philosophy and culture of DOE was that adequate production of defense nuclear materials and a healthy, safe environment were not compatible objectives. I strongly disagree with this thinking, Watkins says."

Do you see that, sir?

A. Yes, I do.

Q. And was that something in fact that you said at the time of this press conference?

A. Yes, it is.

Q. And was it your assessment --

-JAMES D. WATKINS-

A. Yes.

Q. -- that the DOE culture was that adequate production of defense nuclear materials was inconsistent with a healthy and safe environment?

MR. KURTENBACH: Form.

A. It was my belief that priority was given to continued operations irrespective of environmental, safety and health issues on the basis of national security that I thought were excessive and necessary, and that the objectives can be both carried out in a compatible way, that they do not have to be mutually exclusive.

Q. And in fact, sir, was that based on your experience in the nuclear Navy where --

A. Absolutely, that's the reason you haven't had any accidents.

Q. And for your career, sir, you operated in the nuclear Navy, which did not have accidents and you thought that that same culture could be --

-JAMES D. WATKINS-

A. Not only operated, I was a qualified nuclear power plant operator. I had to qualify on three different plants. I had to take engineer's examinations. I had to know what was going on in those plants across the board of all the technical issues.

I had to have the theoretical background to understand why things were happening that were happening, the things they didn't have at Chernobyl.

I had to know the design of the plant. I had to know that the plant was designed safely, that it would not violate environmental concerns if it, in fact, had a failure. I had to know all those things.

Q. Sir, on the initiatives on Page 2 of the press release, it says, on the top, "Resetting of priorities to reflect that environment, safety and health issues as more heavily weighted than production. As a result, DOE is

-JAMES D. WATKINS-

beginning negotiations with those states hosting DOE nuclear facilities to allow direct access and improve state monitoring capabilities."

Do you see that, sir?

A. Yes.

Q. And, sir, was it your understanding that this would be a change in practice whereby the states would have more direct influence and oversight responsibility for nuclear facilities in --

A. If you recall --

MR. KURTENBACH: Objection, foundation.

MR. RAFFMAN: Same objection.

A. -- the reason I set this priority was, in large measure, determined from my observations in the prior six months or nominally six months that I'd been there, heightened by the Rocky Flats experience, and I said that from now on, environment, safety and health would have

-JAMES D. WATKINS-

a weighting factor on award fees of 51 percent; that I wasn't going to tolerate a 20 percent or 10 percent weighting factor, have these unsatisfactory situations exist, and somehow a contractor gets a great grade. And I said I'm not going to tolerate it.

And if we -- and if we're sued, we're sued. Let's get on with it. I can't sit here and do that. That was the whole spathe that we had on the prior testimony that I gave years ago on this -- this thing here, whatever it was.

Q. The suit by Rockwell against the United States over the fees?

A. Rockwell versus USA deposition of James D. Watkins, so it's all in there, I don't want to repeat all that, but that's in my mind right here.

Q. And, sir, for the benefit --

A. It was shortly thereafter that we implemented the 51 percent rule. It might have been even concurrent with this,

-JAMES D. WATKINS-

I can't remember.

Q. Okay. Sir, for the benefit of people looking at this videotape that are not as familiar with what you and I are speaking of, the contractors including those at Rocky Flats were awarded a fee based on certain weighted percentages in the analysis, correct?

MR. KURTENBACH: Objection, vague as to time.

A. I don't -- there was a weighting regime on award fees that were determined by the awards fee determining officer who, in this case, I think in the case there would have been somebody at the Albuquerque office would have made that determination.

Q. Okay. And prior to your Ten-Point initiative, sir, the weighting factor given to environmental, health and safety factors in connection with calculating that fee was 20 percent?

A. I don't know. It was less

than 51 percent, I can guarantee you that. What it was specifically for Rocky Flats, I have no idea. They were at different sites.

Q. Okay. But in any event, it was less than 51 percent?

A. Yes.

Q. And whatever the numbers are --

MR. KURTENBACH: Objection. Objection to form.

BY MR. JACOBSEN:

Q. Whatever the numbers are, they would appear in some document someplace?

A. They appear in some document.

Q. And when you came in and announced your Ten-Point initiatives, you were going to make health, safety and environment a 51 percent weighting factor correct?

A. Yeah, and it was arbitrary, but it was to show that environment, safety and health are more important than

-JAMES D. WATKINS-

production, and in fact, at 51 percent, they're just slightly more important, but they're more important. So the image there was what I was looking for, not so much the detail of 51 percent. That was arbitrary.

Q. But my understanding, sir, and correct me if I'm wrong, is that in connection with the revised calculation or revised weighting of the fee, you also indicated that there could be a downward adjustment on the fee if the health -- withdraw that question. Withdraw it.

Sir, your second initiative, "Modifying the criteria for awarding contractor fees to reflect increased emphasis on environment, safety and health."

Do you see that, sir?

A. Yes.

Q. That's what you were just talking about --

A. Yes.

-JAMES D. WATKINS-

Q. -- in terms of the adjustment?

A. That's what I was just talking about.

Q. Okay. Third initiative, "Establishing independent, quote, Tiger teams, close quote, to conduct environmental compliance assessments."

Do you see that, sir?

A. Yes.

Q. And that relates to what we were talking about before?

A. Right.

Q. And the Rocky Flats was the first Tiger team?

A. The first Tiger team. It would not probably have been the first Tiger team had we not had the FBI insurgence. Rocky Flats didn't -- I didn't know Rocky Flats was any worse than anybody else.

I mean, I would have probably picked Savannah River just because they

-JAMES D. WATKINS-

had a reactor shut down for safety, so that was forced on me. I didn't -- I didn't select Rocky Flats because I knew the Rocky Flats situation. Not at all.

Q. Okay. But when you were informed of the Rocky Flats situation, at least as the Department of Justice perceived it, you sent out a Tiger team into that facility?

A. Right.

Q. And that was the first one?

A. Right. Department of Energy never heard of a Tiger team in their life and they didn't particularly like the idea, so another one of those cultural problems.

Q. Okay. If you could turn now, sir, to your remarks, I just have a couple of questions I'd like to ask you about those, your remarks which are attached to this --

A. Okay.

Q. -- document, and turn to Page

-JAMES D. WATKINS-

2, if you would, sir, of your remarks, the middle of the page, and we're now on Bates number 411047?

A. Yes.

Q. Right in the middle of the page, sir --

A. Yes.

Q. -- the paragraph, "For over four decades, DOE and its contractors have accepted these two objectives as being mutually exclusive," and if you want to refer to above, sir, what the two objectives are, certainly feel free to do it. It refers to the compatibility of health, safety and --

A. Yes, yes.

Q. -- and the environment and production. "Virtually all incentives and awards have been coupled to production...."

A. Right.

Q. " ... such more so than all other considerations combined."

-JAMES D. WATKINS-

A. Sure.

Q. "So, now, the chickens have finally come home to roost...."

A. Right.

Q. "... and years of inattention to changing standards and demands regarding the environment, safety and health are vividly exposed to public examination, almost daily."

A. Right.

Q. "I am certainly not proud or pleased over with what I have seen over my first few months in office. As a result, I must continue to implement measures that can lead the department to a new culture which takes pride in being good stewards of public lands, while demonstrating that our primary production mission can be achieved concurrently"?

A. Yes.

Q. Do you see that, sir?

A. Yes.

Q. And that was a view which you

-JAMES D. WATKINS-

held at the time of this press release?

A. Yes.

Q. Sir, Page 4, at the bottom of the page, "Deputy Secretary Henson Moore introduced the first of these initiatives on June 16th, 1989, when he announced that environment, safety and health objectives now take precedence over production objectives. This served as the basis for a comprehensive agreement between the Department of Energy and the State of Colorado regarding environmental compliance at the Rocky Flats plant...." in Denver "... near Denver," pardon me.

"That agreement is unprecedented in scope and in the degree of cooperation that it portends between DOE and the state. It will be a model for new DOE cooperation with the states."

Do you see that, sir?

A. Yes.

Q. What was that agreement, sir, that you were referring to?

-JAMES D. WATKINS-

A. I don't remember the detail of the agreement, but it was an effort on my part to stay closely associated with the State of Colorado, particularly the Governor and his office, who was extremely concerned about this issue at Rocky Flats.

Obviously, he's a politician, and didn't like the negativism that surrounded the Rocky Flats issue, so he had a -- he had a stake in the game, and I had to try to recover the production plan at that time. The evil empire was still in existence.

We were producing nuclear weaponry, D-5 warheads and so forth at Rocky Flats. Rocky Flats was measured on the number of warheads they could get out per unit time. That's what I talked about earlier. Production was important. We had to get back on line.

And so my -- my whole attempt here was to say I think I can do both, and

-JAMES D. WATKINS-

I wanted to convince the Governor that he was involved with me, that he could put people on site, that I wanted to have an openness with him so he would understand what we're doing, what we're trying to do to repair some of the past practices.

So that's what this is all about. And I didn't realize the dates of June 16th, but we talked about this earlier, the 51 percent issue, which was apparently announced prior to this press conference.

Q. Right. And by the evil empire in your statement, you're referring to the former Soviet Union?

A. The former Soviet Union.

Q. And at the time of this press conference, there had not been a determination as of yet to shut down production at Rocky Flats --

A. No.

Q. -- permanently, correct?

A. No, no, absolutely not.

-JAMES D. WATKINS-

Q. Okay.

A. We had an imperative, a national security imperative at that time just as we did with Savannah River, but I told the President that I was not going to be a part of bringing those plants back on line, trying to claim some sovereign immunity because I didn't feel it was necessary.

I looked at the data. I looked at the inventories. And I felt we could take the time to do it right.

Q. Okay. Sir, the next page, if you would, please, Page 5, and just more on the 51 percent, it says "First" -- right in the middle of the page, are you with me, sir?

A. Yes.

Q. Okay, Admiral. It says, "First, I am modifying the criteria for award fees to our defense production contractors so that not less than 51 percent of the available award will be

-JAMES D. WATKINS-

based on compliance with environmental, safety and health requirements, including requirements that derive from state environmental laws, regulations of the Environmental Protection Agency and the DOE, and actions set forth in tri-party Federal facility compliance agreements."

A. Yes.

Q. "A much smaller percentage is now the norm such as the 20 percent figure in the Rocky Flats contract."

Do you see that, sir?

A. Yes.

Q. Does that refresh your recollection --

A. Yes, it does, yes.

Q. -- to what the percentage --

A. Yes.

Q. -- in the existing Rocky Flats contract with Rockwell was weighted in favor of health, safety and the environment?

A. If you fail everything in

-JAMES D. WATKINS-

environment, safety and health, had the very worst situation you could possibly have in the world, you could still get 80 percent if you did everything else well. I found that offensive and I didn't think it had logic. I'm an engineer and it didn't make any sense to me.

Q. Okay. And, sir, you go on, under "Second," it says, "I am directing that a provision be included in departmental contracts stipulating that all," underscore all "... of the potential awards fee...."

A. Right.

Q. "... that may be earned will be at risk if a contractor fails in any of these three or other important award fee categories."

A. Right.

Q. Can you explain what that was to me, sir?

A. Well, that's a -- that's a -- that's a killer paragraph. None of the

PL. SUPP. EX. 90

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

------------------------------------X
UNITED STATES OF AMERICA, EX REL., :
:
Plaintiff, : Civil Action
: No. 89-M-1154
-vs- :
:
ROCKWELL INTERNATIONAL CORP., : PAGES 1 - 179
ET AL, :
:
Defendants. :
------------------------------------X

Deposition of JOHN TUCK

Washington, D.C.

Monday, April 27, 1998

Reported by: Nancy Bond Rowland

JOB NO. 107316

Q Would you describe please your work employment history?

A I graduated from Oakwood High School in 1963. I was in the Georgetown School of Foreign Service from 1963 to 1967.

In 1967 after completion of my undergraduate degree I went to work in the United States Navy. I stayed in the United States Navy until January of '73.

I went to work on the Hill in the patronage position on the House of Representatives side. Worked in several jobs over there for the Republican leadership of the House of Representatives.

The Senate went majority Republican in the 1980 elections. I was invited to be a part of the staff of the Senate majority leader in 1981. I worked in that capacity until 1986.

I was invited to be a legislative liaison-type official at the White House in the latter part of the Reagan administration. I did that. In 1986 Senator Baker was appointed chief of staff to the White House to President Reagan. In 1987 he asked me to run his office. I stayed in the White House until

the completion of the Reagan administration.

I was then invited to go to the Department of Energy by Admiral Watkins in the capacity as under secretary in 1989. I served in that capacity until January of '92.

And then I went to work for the law firm then called Baker Worthington, now called Baker, Donelson, Bearman & Caldwell.

Q So between 1973 and 1980 approximately you worked on the -- in the House of Representatives in some patronage position?

A Correct.

Q And then from '80 to '86 you worked in the Senate, is that correct?

A Correct.

Q And then from '86 to '89 you worked in the Reagan White House?

A Correct.

Q In any of those capacities did you have cause to review the performance of the Department of Energy?

A Not to -- No. I visited the Department of Energy. We had issues with the Department of Energy in

Moore?

A Not specifically, but I am certain that those kinds of discussions took place.

Q I wonder if you could look at the second page of Exhibit 1431. This is a draft memorandum from Mr. Twining to you. I'd like to refer you to the second paragraph.

MR. HESCH: What page?

MR. KOENIGS: Second page of Exhibit 1431.

Q It refers about five lines down "In view of our changing philosophy in the application of Department of Energy (DOE) performance standards and the level of DOE expectations." Do you see that?

A Yes.

Q Did you have an understanding at that time that there was in fact a changing philosophy in the application of DOE performance standards and the level of DOE expectations --

MR. HESCH: Objection.

Q -- for contractor award fees?

MR. HESCH: Form. Foundation.

A Well, we -- Admiral Watkins in late June I believe or thereabouts made an announcement of how the award fee would move from emphasis on production to emphasis on environment, safety, and health, and at least 51 percent of the award fee would be on the latter: environment, safety, and health.

That was a change -- I think that's what Twining's draft memorandum alludes to, our changing philosophy in the application of DOE performance standards and the DOE expectations. Moving away from production, moving toward the greater emphasis for environment, safety, and health.

Q And your recollection is that Admiral Watkins announced that change in approximately June of 1989?

A I think I remember that in that time frame because we were getting ready to visit the waste isolation program, and that was a major announcement by the department just as Admiral Watkins left the department to go to New Mexico.

(Deposition Exhibit 1432 was marked.)

Q I've handed you what's been marked as Exhibit 1432. Do you believe you received a copy of this

PL. SUPP. EX. 91

ROCKY FLATS OFFICE DIVISION OF ADMINISTRATION
CONTRACTS AND SERVICES BRANCH

# RECORD OF TELEPHONE CONVERSATION

DATE: 1/11/90 TIME: 8 AM PAGE: 1 of 1

RE: CONTRACT NO.: DE-AC04-76DP03533 (Rockwell CPAF)

SUBJECT: HQ Concurrence on Award Fee for Period 89/2

CALL INITIATED BY: Rush Inlow, HQ Production (on 90 day detail)

CALL RECEIVED BY: Terrel Agy (Rush returned my call)

NOTES OF CALL:

(At request of Marshall Bishop, I called Rush to get status of HQ actions re our 12/6/89 request for concurrence to our AF package and Rush's 12/20/89 telecon to Hugh Miller)

According to Inlow, Barr (DP-20) instructed his staff to recalculate the award fee to a level not higher than for the period ending March 31, 1989, for Plant. On PRMP/PROVE the information was given to Bruce Biensium and he "beat on it."

Inlow had the impression that it would be discussed with Simonson by Arondale and Willett (both of DP-20) on 1/11/90, but that it pretty much was decided on already: the HQ changes were going to be forced on us.

CONTINUED ON PAGE

DISPOSITION OF INFORMATION:

Above information was discussed with Hugh Miller and Marshall Bishop about 8:30 on 1/11/90.

CSB:TA:10/16/89

PLAINTIFF'S EXHIBIT 34 11/9/92

E 000014

PL. SUPP. EX. 92

SUBJECT: Award Fee - Rockwell International - Apr 1 through Sep 30, 1989.

TO: Dave Simonson
Manager, RFO

CC: Don Riley
George Werkema
Marshall Bishop
Terrel Agy

I received a call from Rush Inlow at 0905, 20 Dec 89. He was relaying Admiral Barr's remarks concerning subject award fee. He does not concur with giving Rockwell an increase in award fee over the last period. He wants to see the percent of available fee being awarded not exceed the percent of available fee awarded the last period. He also stated that we might want to reconsider the PROVE/PRMP award although no specific mention was made of it by the Admiral.

An informal non-concurrence letter to the RFO letter submitted Dec 6, 1989, is being circulated at HQ and a copy will be provided to the RFO.

We are to come up with a way to reduce the fee recommended for award so it will not exceed the percentage of available fee awarded the last period.

Rush Inlow's phone is FTS 233-3441.

Hugh Miller
7411

EXHIBIT
81

E 000313

PL. SUPP. EX. 93

CERTIFIED COPY

No. 91-1362 C

UNITED STATES CLAIMS COURT

- oOo -

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

==========================================================

DEPOSITION OF

RUSH OSBORNE INLOW

Tuesday, December 1st, 1992

Albuquerque, New Mexico

Reported by:

ARLETTE McCLAIN, CSR #85

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025
310/477-8867 FAX 310/478-0412

A. I was the director for all of the weapon activities in the Albuquerque Field Office.
Q. How long were you in that job?
A. I was in that position until, to the best of my memory, about October of 1988.
Q. And what position did you have after that?
A. I was laterally reassigned to director of Production Operations Division.
Q. Was that also in Albuquerque?
A. Yes, it was.
Q. What were your responsibilities in that position?
A. I was responsible for the weapon production activities in the laboratories and plants, which were assigned to the Albuquerque Field Office.
Q. Did those plants include the Rocky Flats plant?
A. Yes, they did.
Q. What was your next position?
A. In April of 1989 I was asked by the manager of the Albuquerque Field Office to transfer and become the area manager at the Rocky Flats area office.
Q. Who was the manager of the Albuquerque Field Office who asked you to transfer?
A. Bruce Twining.
Q. And this was in April of 1989?
A. Yes.

Q. Did you accept that position?

A. Yes, I did.

Q. When did you take that position?

A. On about April 15th I went up to Rocky Flats to overlap with Earl Whiteman, who was the area manager at that time. And the plan was that I would have a two-week overlap with him, and then assume duties on a temporary assignment basis as the area manager on about May 1st of '89.

Q. Did you assume those duties on about May 1st of '89?

A. Yes, I did.

Q. When you took that position, was it your understanding that would be a temporary position?

A. The way reassignments in the senior executive service work, is they have to be processed and approved by our headquarters organization. So the plan in this case was that I would take that assignment on a temporary basis until the appropriate paperwork had been prepared and sent through the chain of command at DOE headquarters. So I took the assignment on a temporary basis, with the understanding that we would be processing it for a permanent reassignment.

Q. And how long did you stay in that position?

A. I was at Rocky Flats on the morning of June the 6th when the FBI and EPA raided the plant, and on that morning I was given a letter by Henson Borg, who was the

Deputy Secretary of Energy, relieving me of that temporary assignment.

I was asked to stay on for a few days to help the FBI and the team of DOE people who came in identify certain buildings, and supply some knowledge on plant operations. And on that Friday, which I believe was June the 9th, I was released and returned to Albuquerque.

Q. Do you know at what stage was the paperwork that was making your position permanent on June 6th?

A. No, I don't know.

Q. Prior to June 6th was it your understanding that the paperwork to make your position permanent was being implemented?

A. I think it was planned. I'm not sure that it was implemented. These SCS reassignments are normally a quite lengthy process, and it would not be unusual to be in a temporary status for six or eight months.

Q. Did you have any idea, before June 6th, that you would be relieved of the position at Rocky Flats?

A. None whatsoever. It was a complete surprise.

Q. Did you find out on June 6th that you would be released?

A. Yes. It was the first thing that Mr. Moore did upon arriving in the area office conference room, was to present me with a letter from the undersecretary, relieving

me of that assignment.

Q. You stayed on at the plant for a few days; is that right?

A. Yes, that is correct.

Q. What did you do after that?

A. I returned to Albuquerque and resumed my permanently assigned position as director of Production Operations Division.

Q. Do you still hold that position?

A. No.

Q. When did you change from that position?

A. There are a few details to that. In October of '89 I was temporarily reassigned to headquarters to work in defense programs. I returned from that assignment in January of '90, and I was then temporarily assigned to work as assistant manager for Environment Safety and Health for about three months. And in April of 1990 I was temporarily assigned as assistant manager for Safeguards and Security. The paperwork was initiated to make that assignment permanent, and in October of 1990 I was permanently reassigned as the assistant manager for Safeguards and Security.

I have been in that position from October of '90 to date.

Q. Is your current position a promotion from

really significant issues that they wanted to be brought to the attention of the contractor, but it wasn't a rigorous process as the end point evaluation was.

Q. Did Albuquerque provide input for previous midterm reviews at Rocky Flats?

A. At Rocky Flats, I can't say. I don't have any direct knowledge of who did and who didn't, and when.

Q. Mr. Inlow, you stated earlier that you went to Washington for assignment about October 15th, 1989; is that right?

A. Yes, that is correct.

Q. How long were you in Washington at that point?

A. I was in Washington until about the middle of January, when my assignment was finished.

Q. Mr. Inlow, I'm handing you a document that is being marked as Exhibit 81.

(THEREUPON, Deposition Exhibit Number 81 was marked for identification.)

Q. Which is a memorandum from Hugh Miller to Dave Simonson, and it references a phone call that Mr. Miller received from you on December 20th, 1989. Do you recall having a telephone conversation with Mr. Miller on December 20th, 1989?

A. No, I don't. Although I won't dispute what is in here, I don't recall having made that phone call.

Q. Do you recall talking with Mr. Miller at any time concerning the subject that is discussed in Exhibit 81?

A. No, I don't recall any conversations with Hugh Miller.

Q. Do you recall Mr. -- Admiral Barr making remarks about Rockwell's award fee during the time you were in Washington?

A. I don't recall this specific direction from him, although, again, I won't dispute the statements that Hugh Miller has made here. It is entirely possible that those were relayed to the Rocky Flats office.

Q. What are the specific directions identified in this document?

A. Well, the specific message that is being relayed to the Albuquerque -- or to the office manager is that Admiral Barr didn't feel that an increase in the award fee over the previous period was warranted, and more specifically -- I can read the sentence. He wants to see the percent of available fee being awarded not exceed the percent of available fee awarded the last period.

Q. Do you remember Admiral Barr ever making comments like that?

A. As I said, I'm afraid I can't remember the specific instance. We had late night phone calls with the Rocky Flats office several nights a week during my

assignment at headquarters. And it is entirely possible that during his absence some evening I was asked to relay this message to the Rocky Flats office, but I'm blank on the specifics of it.

Q. Do you remember speaking directly to Admiral Barr about Rockwell's award fee?

A. We discussed many times the general status of the Rocky Flats plant. I'm sure that the award fee concurrence came up as a topic of discussion, but I don't recall a specific instance.

Q. Did you ever discuss with Admiral Barr, Rockwell's award fee for the period for the first half of fiscal year 1989?

A. Not to my recollection. I would not have been in headquarters, as far as I know, when that subject was being worked.

Q. But even after you went to Washington, to headquarters, did Admiral Barr ever discuss with you Rockwell's award fee for the earlier period, the period for the first half of fiscal year '89?

A. If the statement in this memo is accurate, he discussed it in terms of comparing the previous periods of award fee with the second half award fee, but I don't recall any specific details of it.

Q. Do you recall anything generally about Admiral

Barr's view of Rockwell's award fee?

A. Not of his views on the award fee as a subject, no. I can say that Admiral Barr was not satisfied with the performance of the Rocky Flats plant.

Q. Why was he not satisfied?

A. The general reason for his dissatisfaction was the slippage of schedules for certain activities that were supposed to be accomplished out there to improve the operation, especially in the plutonium facilities.

Q. Did Admiral Barr ever discuss with you his views on Rockwell's performance at the Rocky Flats plant during the time you were acting manager?

A. No, I don't recall any discussion of how Rockwell had done then. He did go over with me the events connected with the raid and that sort of thing, but I don't recall any discussions about Rockwell's performance.

Q. Did Admiral Barr ever tell you that the Rocky Flats area office's award fee recommendation for the first half of fiscal '89 had been too high?

A. You said for the first half of fiscal '89?

Q. Yes.

A. No, not that I can recall.

Q. In December of 1989 what was your position at headquarters?

A. I was one of Admiral Barr's primary staff, and my

title was acting director of weapon production.

Q. Was it in that capacity that you had occasion to communicate regularly with Rocky Flats?

A. Yes. Admiral Barr would assemble his office directors -- I think I remember that the time of the evening call would be about 6:30 headquarters time, so that we could catch the Rocky Flats office right at the end of their normal work day, which was 4:30 out there. We would get on a conference call with Dave Simonson and some of his more senior people and spend an hour, an hour-and-a-half going over issues, progress on schedules.

Q. Do you recall any of those conversations with Rocky Flats people discussing Rockwell's award fee?

A. No, I don't recall that. Although you have presented me with some evidence that at least one of them did, I don't recall that being a topic, I believe, of conversation.

Q. Would Mr. Miller have been one of the people you regularly communicated with at Rocky Flats?

A. No, not at all. Hugh was a junior staff member in the Rocky Flats office.

Q. Why would you have contacted him?

A. I have no idea. I really don't know.

Q. Who did you communicate with at Rocky Flats while you were in Washington?

A. Usually directly with Dave Simonson.

Q. And who else?

A. Occasionally with either George Werkema or Ron Foster, who were still there, normally in the deputy area manager jobs.

Q. And what was the purpose of your communications with Rocky Flats people?

A. Normally, information-gathering type of calls, or trying to get an answer to some question that Admiral Barr or some other senior people at headquarters wanted to get answered.

Q. Would you be gathering information from Rocky Flats; is that right?

A. From the Rocky Flats office, yes.

MR. STOUT: Could counsel indicate as a courtesy how he is doing on his schedule?

MR. KELLEY: Let's take a little break.

(THEREUPON, a recess was held.)

Q. Mr. Inlow, I'm handing you a document that has previously been marked as Exhibit 34, which is a record of a telephone conversation between you and Mr. Agy on January 11th, 1990.

Please review the document and tell me what you recall of your conversation with Mr. Agy.

A. Okay, I -- again, I don't remember the specific

phone call with Terrel Agy, but I'm not disputing the contents of this.

Q. According to this record of the phone conversation, what did you tell Mr. Agy?

A. According to the instructions here, Admiral Barr instructed his staff to recalculate the award fee to a level not higher than for the period ending March 31, 1989, for the plant on the PRMP/PROVE, the information was given to Bruce Bernbaum and he, quote, "beat on it," closed quote.

Q. What do you take that to mean, that he beat on it?

A. If you are asking my interpretation of that phrase, it looks like he asserted his own opinion as to what he thought the award fee for the PRMP/PROVE portion should be.

Q. Mr. Agy also records that you had the impression that there would be discussion with Mr. Simonson by Mr. Arondale and Mr. Willitt. Who was Mr. Arondale?

A. Mike Arondale was a junior staffer in Admiral Barr's group back there, and Lou Willitt was a more senior person, and Admiral Barr had assigned both of them to a team that he called the Rocky Flats action team. That team was to be his point of liaison with the Rocky Flats office on all of the activities at Rocky Flats plant.

Q. Were you on that Rocky Flats action team?

A. No, I was not. I was one of his office directors, and the action team was selected from different portions of his staff. Lou Willitt was the team leader.

Q. And the action team was to be the liaison between headquarters and the Rocky Flats staff?

A. Between headquarters, specifically DP20 which was Admiral Barr's organization, and the Rocky Flats staff, yes.

Q. Why wouldn't someone from the action team have contacted the Rocky Flats staff to tell them of Admiral Barr's intention?

A. I don't think I can answer that. I would surmise that for whatever reason Admiral Barr must have instructed me to do it.

Q. You believe you were instructed to call Rocky Flats and inform them of what is mentioned here in this record of telephone conversation?

A. That would certainly be my belief. Again, I can't specifically remember the phone conversation, but the nature of my position at headquarters would not have been such that I would have on my own initiative undertaken something like this.

Q. Is it possible that you would have called up the Rocky Flats office on your own initiative and told them this information?

A. I doubt it.

Q. Did Admiral Barr ever tell you that headquarters' changes to Rockwell's award fee were going to be forced on the Rocky Flats office?
A. I don't recall him ever making that statement, no.
Q. Did anyone at headquarters every make that statement to you?
A. Not to the best of my recollection.
Q. Other than Admiral Barr, did you discuss with anyone at headquarters Rockwell's award fee?
A. I don't remember a specific conversation, but it would have been logical that I might have discussed it with Lou Willitt and Bruce Bernbaum.
Q. What did you discuss with Mr. Willitt about Rockwell's award fee?
A. I don't know. I don't recall any specific conversations.
Q. What about Mr. Bernbaum?
A. Again, I don't recall any specifics. Mr. Bernbaum was the headquarters program manager for the PRMP/PROVE project, but I don't remember a conversation with him in which we discussed the award fee.
Q. Did you ever discuss Rockwell's award fee with Mr. Simonson?
A. I don't remember any such conversation, no. As I

said earlier, there were frequent conference calls with Mr. Simonson and his staff, and it is entirely possible that the topic came up during those telephone calls, but I can't recall specifically when.

Q. Were headquarterss changes to Rockwell's award fee forced on the Rocky Flats office?

A. I don't know the outcome of that determination. I believe that I finished my assignment at headquarters and left and returned to Albuquerque about the 15th of January, and I can't recall whether the final determination had been completed by the headquarters staff at that point or not.

Q. Was headquarters attempting to force changes on the Rocky Flats office in connection with Rockwell's award fee?

A. It was clear that headquarters was involved, and headquarters now had a role in the process, but my recollection is not that the process was one of forcing their opinion, but rather in reviewing the determination.

Q. Did you give Mr. Agy the impression that headquarters changes were going to be forced on the Rocky Flats office?

A. I don't recall using those words, but Mr. Agy made the record of the phone conversation, and it appears that he had that impression.

Q. Is Mr. Agy generally accurate in taking notes of

conversations or meetings?

A. I don't have any experience to the contrary. During the time he worked for me at Rocky Flats, I found him to be a conscientious staff member.

Q. And during your time at the Rocky Flats office, was Mr. Agy accurate in his reports to you?

A. To the best of my knowledge, he was.

Q. In fact, was Mr. Agy fairly meticulous about keeping notes and records of meetings and conversations?

A. To the best of my knowledge, Mr. Agy was meticulous, yes. The nature of his position as the award fee coordinator for the Rocky Flats area office required that.

MR. KELLEY: I have no further questions. Mr. Bruns?

MR. BRUNS: I have don't have any questions.

(THEREUPON, the deposition was concluded.)

PL. SUPP. EX. 94

12/28/89 13:47 DP 4TH FLOOR FORRESTAL

ROUTING AND TRANSMITTAL SLIP 12/14/89

| TO: (Name, office symbol, room number, building, Agency/Post) | Initials | Date |
|---|---|---|
| 1. G. Leah Dever, EH-232/3G-092 | | 12-14 |
| 2. Kathleen I. Taimi, EH-232/3G-092 | | 12-14 |
| 3. John C. Tseng, EH-23/7A-075 | | 12/19 |
| 4. Raymond P. Berube, EH-20/7A-075 | | 12/26 |
| 5. Geoffrey J. Judge, EH-10/GB-096A (Peter Brush, act'g) | | |

| | | | | | |
|---|---|---|---|---|---|
| Action | | File | | Note and Return | |
| Approval | | For Clearance | | Per Conversation | |
| As Requested | | For Correction | | Prepare Reply | |
| Circulate | | For Your Information | | See Me | |
| Comment | | Investigate | | Signature | |
| Coordination | | Justify | | | |

Re: Proposed Award Fee Determinations for Kansas City, Mound, Pantex, Pinellas and Rocky Flats

EH-232 has reviewed the referenced packages and recommends EH-1 concurrence on all determinations except Pinellas.

The SEN-7 Reports prepared by the Pinellas Area Office have raised concerns that..."the ES&H Program within the Pinellas Plant is not being given the level of management commitment commensurate with the emphasis being placed in this area by DOE... It is evident that this new culture will take time." No mention of these substantive concerns is raised within the award fee package, and a 90% rating in the ES&H area seems to indicate that little to no consideration was given to the concerns when rating contractor performance.

I am also concerned about the RF: rating for Rockwell in the ES&H area. I don't believe Rockwell's envir. performance was so good to offset safety deficiencies and some. We should consider holding Rockwell to previous levels.

Jh—.

I agree. RPB 12/26

#510

FROM: (Name, org. symbol, Agency/Post) | Room No.—Bldg.

Robert D. Quinn, EH-232/3G-092 | Phone No.

OPTIONAL FORM 41 (Rev. 7-76)

DEC 15 RECD

Plaintiff/Defendant Deposition Exhibit 1169 Case # 91-1362C Date 10-11-92

E 001840

PL. SUPP. EX. 95

Department of Energy

ROCKY FLATS OFFICE
P.O. BOX 928
GOLDEN, COLORADO 80402-0928

February 26, 1990 90-DOE-5212

Mr. Dominick J. Sanchini
Vice President, Major Programs
Rockwell International Corporation
Department 001, Mail Code D-37
2230 East Imperial Highway
El Segundo, CA 90245

Dear Mr. Sanchini:

In accordance with Appendix D of Contract DE-AC04-76DP03533, the Department of Energy (DOE) hereby determines that Rockwell International Corporation (Rockwell) has earned an award fee of $1,241,604 for Plant and $338,035 for PRMP/PROVE, for a total of $1,579,639. The enclosed Performance Evaluation Report for the period April 1, 1989 through September 30, 1989, provides the basis for the DOE award fee determination.

The award fee approved by the DOE for payment to Rockwell is pursuant to an award fee plan previously developed to cover the period April 1, 1989 to September 30, 1989. This was prior to the institution by the DOE of stronger and tougher award fee plans to reward improvements in environment, safety, and health (ES&H) and substantially increase the proportion of the fee attributable to ES&H performance. Under the old contract provisions, however, the DOE was constrained as to the weight that might be given to ES&H performance in setting the fee for the six month period covered.

In the old award fee plan, which includes this period, up to 20% of the total amount of fee paid could be attributable to performance in the ES&H area. By reducing the award fee rating for ES&H to "Unsatisfactory," the DOE is indicating to Rockwell that its ES&H performance was unacceptable. In addition, by reducing the award fee rating for general management to "Marginal," the DOE is indicating to Rockwell that its general management performance was deficient.

As specified in the Contract, you may, within five working days after receipt of this letter, request an opportunity to present to the DOE an analysis of your performance under the Contract. Otherwise, after this period we will provide you the award fee amount, plus a base fee of $432,850, for a total fee of $2,012,489.

If you wish to meet with us, please contact this office in order to coordinate those arrangements for you.

Sincerely,

Robert M. Nelson, Jr.

Robert M. Nelson, Jr.
Manager

Enclosures

PERFORMANCE EVALUATION REPORT
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

The overall performance of Rockwell International Corporation (Rockwell) was maintained at least at the level of "Satisfactory" during the period April 1 through September 30, 1989.

The following are separate evaluations of the performance of Rockwell relative to the management and operation of the Rocky Flats Plant and the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the selected Functional Performance Areas (FPA's). The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's have been evaluated in accordance with the contract Award Fee Plan, and the following summary of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

PLANT

GENERAL MANAGEMENT: There was considerable evidence of Rockwell management's inability to effectively manage this facility, and this was seen by DOE to be a serious, major deficiency. This deficiency was manifested in lack of progress in integrating safety responsibility and accountability at all working levels and also by deficient lines of responsibility, procedures, discipline/work ethic, training, on-floor supervision, and problem investigation/resolution. Numerous incidents provide evidence of the above deficiencies. A continuing lack of priority attention to safety and health, as evidenced by the open status of many of the safety concerns documented during the period, was a clear indication of poor management. Additionally, despite an increase in nitrate concentrations on the 750 Pad, little action was taken to contain saltcrete after precipitation events. The preparation for the annual DOE inventory of Special Nuclear Material at Rocky Flats was unsatisfactory.

ENVIRONMENT, SAFETY & HEALTH: Long term understaffing in the Health, Safety and Environment organization resulted in less than adequate attention applied to several essential projects and safety functions. Rockwell was unsuccessful in reaching their Plant Performance Goal for recordable injuries and in reducing the total number of workplace contamination incidents. Rockwell continued to have problems in the construction safety area. Rockwell failed to exercise an acceptable level of program management in the development of official recommendations for restart of the Building 374 evaporator. A criticality safety assessment performed in August 1989, noted many aspects of the criticality safety program which needed improvement. Rockwell failed to exercise an acceptable level of program management in dealing with pondcrete and saltcrete. Rockwell's oversight of the environmental subcontractors performing routine environmental monitoring was deficient. As identified in the DOE-HQ assessment team report, deficiencies in the RFP effluent air monitoring program may adversely affect determination of radioactive materials released to the atmosphere. Waste shipments to Idaho and Nevada were marked by errors in manifests and contamination on waste packages, which jeopardized the future of offsite disposal plans.



E 002138

QUALITY: The plant-wide implementation of DOE non-weapons quality assurance requirements did not progress at the accelerated rate expected.

The Rockwell Final Product Acceptance group performed effectively after only one year of having the responsibility for most product acceptance. Lot rejects and Final Product Acceptance observations decreased during the second half of FY89.

COST MANAGEMENT: Rockwell provided excellent support to both the Environmental Restoration and Waste Management Five-Year Plan and to the Modernization Study. Rockwell did an extraordinary job of collecting information, categorizing and documenting the large number of new funding requirements created by the FBI/EPA investigation, the DOE Tiger teams, and the DOE/CDH Agreement. All validated construction line item projects were included in the Department's 1991 budget request.

PRODUCTION OPERATIONS: The processing of procured finished machined products was consolidated within Building 460 to reduce overall process times and decrease costs. Rockwell was effective in reducing halogenated solvent usage, and continued to make progress with its new scheduling philosophy which was designed to minimize work-in-process inventories by managing bottlenecks.

The self-appraisal program instituted in all Production Operations buildings, an adaptation of the Building 771 Restart Criteria, did not receive sufficient management attention or "ownership" and was ineffective.

CHEMICAL OPERATIONS: Plutonium Recovery Operations and Production Operations worked in conjunction to develop the Nuclear Facility Operation Manual, which was to establish the standard of excellence for operations of Rocky Flats facilities. As a result of the deliverables that Rockwell had to complete before Building 771 restart approval was granted, a number of procedures were changed or developed and implemented. This implementation was successful, and the building management team continued to develop and implement improvements to those procedures.

Rockwell's management controls and directives in areas such as recovery operations planning, work breakdown structure and scheduling systems, and cost control systems result in implementation/installation/operation delays and other problems. There continued to be a failure to establish performance goals for process operations and to measure process performance; therefore, operations were not baselined to provide for improved performance.

PRMP/PROVE

PROJECT MANAGEMENT: Rockwell took an active role in establishing Los Alamos National Laboratory technical personnel as a part of the PRMP structure. Provisional agreement was reached by the Senior Management Review Board on the baseline PRMP process technologies.

Rockwell did not provide an adequate system to produce timely and accurate project control information. Integration of an essential, computerized, three-dimensional Plant Configuration Model into the overall PRMP design strategy has been slow.

COST MANAGEMENT: Rockwell took positive action to reduce the cost of A-E services, including reducing overhead, requiring the A-E to meet commitments, and upgrading control measures over the scope of A-E work.

The Cost and Schedule Reduction Precursor activity incurred over $100,000 cost without any visible or deliverable product, which indicates an unacceptable lack of cost controls.

SCHEDULE PERFORMANCE: The PROVE test schedule was prepared as an integrated effort between Plutonium Operations and PROVE engineering. Detailed schedules were developed for activities preliminary to PRMP construction to provide a base for performance measurement.

Schedule reports were not provided in a form which ensured timely reporting and accuracy to the overall project schedules.

SUBCONTRACT MANAGEMENT: Rockwell took positive action to develop an A-E Statement of Work which provided for their required services at an appropriate level of detail.

Inadequate Quality Assurance/Quality Control oversight of the glovebox subcontractor resulted in extra costs and delivery delays to the Government.

DESIGN QUALITY: PRMP Technical Baseline documentation was of unacceptable quality and behind schedule.

TECHNICAL PRODUCT QUALITY: Rockwell did not require periodic, independent audit of NQA-1 compliance and Non-Conformance Report actions to ensure that quality actions were completed without prejudice. A QA plan for PRMP, required prior to start of the full design effort and Title I activities, was not completed.