**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 91-1362 C<br>(Judge Lettow) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO ROCKWELL'S SUPPLEMENTAL SUBMISSION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

JOHN A. KOLAR
DONALD WILLIAMSON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 305-9301
Attorneys for Defendant

Dated: November 13, 2006

# TABLE OF CONTENTS

Page

INTRODUCTION . . . . . 1

ARGUMENT . . . . . 3

I. Under The Plain Meaning Of The Contract Language, The DOE Secretary Did Not Breach The Contract When He Assumed Mr. Twining's AFDO Authority And Exercised It In His Own Right . . . . . 3

II. DOE Did Not Breach The Contract In Any Of The Ways Newly Alleged By Rockwell . . . . . 10

A. The Secretary Did Not "Override" "Final" Award Fee "Determinations" By Twining And Simonson . . . . . 10

B. DOE's Headquarters Officials Complied With The Procedural Requirements Contained In The Contract . . . . . 14

1. The 89/1 Period . . . . . 16

2. The 89/2 Period . . . . . 18

C. DOE Did Not Breach The Contract's Weighting Requirements For ES&H. Nor Did DOE Breach The Contract By Making "Results-Oriented" Award Fee Decisions . . . . . 20

D. DOE Did Not Breach The Contract By Instituting A Headquarters Concurrence Policy . . . . . 26

III. DOE Also Did Not Breach The Contract Because Mr. Twining And Mr. Nelson, Who Replaced Mr. Simonson As Manager Of DOE's Rocky Flats Office, Subjectively Agreed With The Secretary's Determinations . . . . . 27

IV. In View Of The Fact That DOE Followed The Contractually-Mandated Procedures For Determining Rockwell's Award Fees, Rockwell's Claim Is Really A Dispute Over The Amount Of The Awards. However, The Award Fee Amounts Paid To Rockwell Were Entirely Within the Government's Discretion And Are Not Reviewable By The Court . . . . . 30

V. If DOE Breached, Rockwell Was Not Damaged, Or The Damages Are Less Than Rockwell Seeks In Its Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VI. The Summary Judgment Proof Submitted By the Government Establishes That Rockwell Waived Its Purported Right to Have Field Officials Determine Its Award Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

**Page**

Cases:

*Burnside-Ott Aviation Training Center v. Dalton*,
107 F.3d 854 (Fed. Cir. 1997) . . . . . . . . . . 30

*George Sollitt Constr. Co. v. United States*,
64 Fed. Cl. 229 (2005) . . . . . . . . . . 30

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 91-1362 C (Judge Lettow) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO ROCKWELL'S SUPPLEMENTAL SUBMISSION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Defendant the United States of America ("defendant" or "Government") respectfully submits this response to Rockwell's Supplemental Submission On Cross-Motions For Summary Judgment, dated October 30, 2006 ("Rockwell Supp. Submission").

**INTRODUCTION**

In its Supp. Submission, Rockwell raises several new alleged breaches of the contract by DOE in addition to the breach it claimed in its complaint, *i.e.*, that the "wrong" official determined the award fees. Rockwell alleges that DOE breached the contract because the award fees were determined through "group decision-making," rather than by a solo decision-maker. Rockwell contends that DOE breached the contract because Headquarters applied a weight of 50-51 percent to its Environmental, Safety and Health (ES&H) performance, when in fact the contract accorded that area only a 20 percent weight. Finally, Rockwell alleges that DOE engaged in "results-oriented" decision-making, that is, that DOE picked the award fee it wanted to grant Rockwell, and then backed into a rationale warranting that lower award fee. However,

Rockwell did not make these allegations in its complaint. Accordingly, the Court should not now allow what amounts to a constructive amendment of the complaint by Rockwell.

In Part I below we demonstrate that DOE also did not breach the contract when the Secretary *de facto* removed Mr. Twining's substantive authority as AFDO, and exercised that authority himself, because the Secretary was allowed to take such action under the plain meaning of language within the four corners of the contract. The Government relies on the plain meaning rule, and does not resort to extrinsic evidence to establish its non-breach theory as Rockwell asserts in its Supp. Submission.

As we also point out in Part I, in so doing, Secretary Watkins acted as a solo decision-maker; the award fee determinations in question were not "group decisions." It was Secretary Watkins who exercised the AFDO authority. Although other DOE officials–principally the Headquarters Office of Defense Programs participated in formulating a **recommendation**--that recommendation did not become a **final decision** until approved personally by Secretary Watkins, or Deputy Secretary Moore standing in for the Secretary (see below at pages 8-9).[1] DOE did not breach the contract, and the Court should grant summary judgment in the Government's favor.

In Part II below we demonstrate the lack of merit in Rockwell's new arguments that DOE breached the contract in ways other than by having the "wrong" official act as AFDO.

In Part III, we explain that, assuming *arguendo* that Rockwell's interpretation of the contract were the correct one, DOE did not breach the contract because the field officials, whom

[1] Defendant imprecisely suggested previously that the Secretary transferred Mr. Twining's AFDO authority to the Office of Defense Programs in Headquarters, but a careful assessment of the record shows that it was the Secretary, acting upon a recommendation by Defense Programs, who wielded the AFDO authority during the periods in question.

Rockwell argues were the only individuals permitted to decide the award fees, subjectively agreed with the figures arrived at by Headquarters.

In Part IV below, we address Rockwell's contention that the Court possesses the power to review the award fee decision. We demonstrate that it does not have that power where, as here, the undisputed facts show that DOE complied with the contractually-mandated procedures for determining Rockwell's award fee, and Rockwell is merely challenging the amount of the awards because it is unhappy that they were not higher. In Part V, we show that Rockwell was not damaged, or it was damaged in a lesser amount than pleaded in its complaint, even if DOE's conduct constituted a breach. In Part VI we show that, even if DOE breached and Rockwell was damaged, DOE's waiver/estoppel defense bars Rockwell from recovering.

For the reasons stated herein, and in the Government's earlier filings, the Court should grant summary judgment for the Government. In the event the Court does not grant the Government's motion for summary judgment, the Court should deny Rockwell's motion for summary judgment.

## ARGUMENT

### I. Under The Plain Meaning Of The Contract Language, The DOE Secretary Did Not Breach The Contract When He Assumed Mr. Twining's AFDO Authority And Exercised It In His Own Right

The sole question raised by Rockwell in its complaint is whether DOE breached the contract when Secretary Watkins removed *de facto* Mr. Twining's substantive authority as the AFDO, and exercised that authority in his own right. The answer to that question is "no."

Rockwell argues in its Supp. Submission at 8 that, when "there is only one reasonable interpretation discernible within the 'four corners' of an integrated agreement, the plain meaning

controls." Rockwell cites several decisions of the Court of Appeals for the Federal Circuit in support of this rule.

We agree with this rule. It is precisely the language within the four corners of the contract upon which the Government relies in arguing that the contract permitted the Secretary to do what he did. The Contract states that the award fee is to be decided by a contracting officer:

> Payment for the allowable costs as hereinafter defined and of the base fee and so much, if any of **the award fee as may be determined by the Contracting Officer**, as hereinafter provided, shall constitute full and complete compensation for the performance of the work and furnishing of services under this contract.[2]

In another clause, the contract provides:

> If performance of the work under this contract is terminated in whole by the Government, the base fee and award fee of the Contractor shall be prorated to and including the effective date of such termination. The **Contracting Officer** shall then determine the portion, if any, of the prorated maximum available award fee which shall be awarded to the Contractor for the evaluation period, or part thereof, which ends on the effective date of the termination.[3]

The Contract defines "Contracting Officer" as

> **a** person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings.[4]

Finally, the contract states:

---

[2] Pl. Ex. 1, p. 130, clause 62(a), p. 130 (emphasis added).

[3] Pl. Ex. 6, clause 84(b)(5) (emphasis supplied).

[4] Pl. Ex. 1, clause 1(b), p. 2 (emphasis supplied).

> The amount of the award fee actually to be paid to the Contractor shall be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations).[5]

It is clear that from the plain meaning of these contract provisions, taken together, that any duly designated contracting officer of DOE "acting as Manager, Albuquerque" could act as the AFDO. Accordingly, the Secretary, who was DOE's principal contracting officer, could act as AFDO once he removed responsibility for the substantive management of Rocky Flats from Mr. Twining. The Secretary of Energy acted consistently with the plain meaning of the contract language in removing the award fee authority from Mr. Twining, and "acting as Manager, Albuquerque" in his own right, once Mr. Twining came under investigation for possible complicity with Rockwell in committing environmental criminal offenses.

Rockwell cites cases for the proposition that "[l]anguage specifying the decision-maker's post will not be read out of a contract even where the Government eliminates the post or the post's relationship to the contractor." Rockwell's Supp. Submission at 11. Those cases are inapposite. In all of them, the contract actually specified that a particular decision would be made by a Government official holding a specified post.

The language of this contract was different. It stated that the award fee would be decided by an official holding a particular post, *i.e.,* the Manager of Albuquerque Operations, **or** by someone else–"anyone"–executing the role of the Manager for the subject matter in question, *i.e.,* oversight of Rocky Flats and Rockwell. Importantly, the contract does not say that the AFDO is the "Manager, or Acting Manager, Albuquerque. The word "acting" is used as a verb, rather than as an adjective modifying the title "Manager." Thus, the contract language means

[5] Pl. Ex. 1, pp. 130-131, clause 62(b)(1).

that anyone actually performing the activity of managing Rocky Flats and Rockwell may decide the award fee.

Rockwell argues that the Government's interpretation is circular. According to Rockwell, the Government is arguing that

> . . . award fee determination was a "function" that belonged to the Manager of Albuquerque. And because "the subject matter in question" was award fees, the Government's interpretation would define Award Fee Determination Official as the Manager of Albuquerque or "anyone [determining award fees]."

Rockwell's Supp. Submission at 4. This is a distortion of the Government's position.

The only reason the contract designated the Manager of Albuquerque as the AFDO was because he was responsible for managing and overseeing Rockwell's performance under what happened to be the extent organizational set-up of DOE at the time, which had Rocky Flats reporting to Albuquerque. It made sense that the DOE official responsible for evaluating Rockwell and setting the award fee should be the DOE official responsible for knowing what Rockwell was doing at Rocky Flats. When the Secretary, in response to the raid, removed Mr. Twining's responsibility for substantively overseeing Rockwell's work, and essentially began to exercise that oversight himself, it made sense for the Secretary also to remove Mr. Twining's AFDO responsibility as well and to exercise that authority himself as DOE's principal contracting officer.

Thus, there is nothing circular about the Government's interpretation. The Government does not interpret the contract as stating that the AFDO is the Manager of Albuquerque or "anyone [determining award fees]," as Rockwell asserts. Rather, the Government interprets the contract as stating that the AFDO is the Manager of Albuquerque or "anyone acting as Manager, Albuquerque," which is precisely what the contract language says. The determination of award

fees is a sub-function of the function of overseeing Rocky Flats. Once the Secretary effectively took over management of Rocky Flats, it was also in keeping with the plain language of the contract for the Secretary to exercise the AFDO role. In so doing, the Secretary did not breach the contract.

Rockwell also accuses the Government of improperly relying upon extrinsic evidence in attempting to reach the conclusion that the Secretary could exercise the AFDO authority. Rockwell argues:

> Thus, the reasonableness of Defendant's interpretation depends on the language of the contract itself and not on extrinsic matters, such as the Secretary's purportedly inherent authority, internal delegation orders, or circumstances relating to the June 6, 1989 raid.

Rockwell's Supp. Submission at 8-9. Rockwell's argument is devoid of merit and, at best, circular.

First, our argument relies solely upon the clear language within the four corners of the agreement, which vests the AFDO authority in a contracting officer with management oversight of Rocky Flats. The Government's interpretation of the contractual language as permitting the Secretary to *de facto* transfer a portion of Mr. Twining's duties to himself or others of his choosing, without removing Mr. Twining from office altogether, is more sensible than Rockwell's "all or nothing" interpretation. Rocky Flats and Rockwell were the plant and contractor affected by the raid. The other sites and contractors under Mr. Twining's jurisdiction were not implicated. Therefore, the Secretary acted properly and reasonably in removing Mr. Twining's substantive authority over Rocky Flats and Rockwell, and leaving the rest of his authority intact. Rockwell's interpretation of the contract--as precluding the Secretary from

taking such narrowly tailored action to respond to the crisis created by the raid–is the unreasonable reading.

Second, it is Rockwell's unreasonable interpretation that creates ambiguity in the contract which warrants the use of extrinsic evidence. Rockwell's insistence that only Mr. Twining could rate Rockwell's performance creates a vast unexplained gap in the contract when Mr. Twining is disabled from exercising his contractual authority. In Rockwell's interpretation, there is no rational explanation of how the rating of Rockwell is performed or decided if Mr. Twining is unavailable due to death, injury, retirement, separation, or, as here, when his authority is revoked. The purpose for the Government's citation to statute and regulation was to demonstrate that the Secretary, as the official with plenary responsibility for DOE contracts, organization and personnel, qualified as an official who could properly perform the task of managing Rocky Flats and deciding the award fee, after Mr. Twining was unavailable.

Finally, the undisputed facts here show that it was the Secretary who exercised the AFDO authority for the two award fee periods in question, as he was permitted to do by the contract. It was not a "group" of DOE officials who acted as the AFDO, as Rockwell argues. Rockwell's Supp. Submission at 10 and 30.

The recommendation for the 89/1 period that ultimately was approved by the Secretary was prepared by Admiral Jon Barr, the Deputy Assistant Secretary for Military Application in Defense Programs. Admiral Barr's evaluation of Rockwell's poor Environment, Safety and Health (ES&H) performance and his reduced award fee recommendation are reflected in his

September 6, 1989 memorandum to John Meinhardt, then Acting Assistant Secretary for Defense Programs.[6]

Barr's recommendation for 89/1 was personally approved by Secretary Watkins. In his memorandum to Mr. Twining of September 20, 1989, Mr. Meinhardt wrote: "Admiral Watkins concurs in this recommendation."[7] Mr. Meinhardt testified that he met with Secretary Watkins in person about this recommendation, and the Secretary personally approved it.[8] Thus, it is undisputed that Secretary Watkins acted as the AFDO for the 89/1 period.

For the 89/2 period, Under Secretary Tuck prepared the award fee recommendation that was ultimately approved by Deputy Secretary Moore as the final decision-maker acting for Secretary Watkins as the latter's alter ego.[9] Def. Supp. Ex. 77 is Under Secretary Tuck's memorandum of recommendation to the Deputy Secretary. Def. Supp. Ex. 78 is the

---

[6] Barr's memorandum is Def. Supp. Ex. 62.

[7] See Def. Supp. Ex. 65, p. 1, final paragraph. On the same date as Meinhardt's memorandum to Twining, Secretary Watkins wrote directly to Rockwell's CEO Beall informing him about the reduced award fee. Def. Ex. 47.

[8] Def. Supp. Ex. 89, April 26, 1994 Deposition of John L. Meinhardt, pp. 34-35, 49.

[9] In his April 29, 1994 deposition in this case, Deputy Secretary Moore testified:

> I assume that if he [Ed Goldberg] called for the Admiral [Watkins] and couldn't get him, he would get me. That is the way the Department ran is that I was the alter ego of the Admiral. If somebody called for him they were immediately bumped to me if he couldn't take the call or was out of town or was traveling, that would have applied to Ed Goldberg because we were following very closely what he was doing and his problems.

Def. Supp. Ex. 88, April 29, 1994 Deposition of Henson Moore, p. 25.

memorandum to the file reflecting Deputy Secretary Moore's sign-off on Tuck's recommended award fee for 89/2.

The contract placed no limitation upon the number of DOE officials who could be involved in formulating a **recommendation** regarding Rockwell's award fee, so long as the AFDO was a single official. Indeed, Rockwell does not challenge as a breach the fact that, during pre-raid award fee periods, a host of DOE Rocky Flats and Albuquerque officials were involved in forming recommendations to Mr. Twining when he was acting as the AFDO. Thus, the fact that multiple DOE officials in Headquarters participated in recommending action to the Secretary after he assumed the AFDO authority was not a breach. In this case, at the end of the day it was a single official–the Secretary–who acted as AFDO, as he was permitted to do under the plain language within the four corners of the contract.

Nor did DOE breach the contract in any of the other ways newly alleged by Rockwell.

## II. DOE Did Not Breach The Contract In Any Of The Ways Newly Alleged By Rockwell

### A. The Secretary Did Not "Override" "Final" Award Fee "Determinations" By Twining And Simonson

Rockwell argues that the Secretary breached the contract by "overriding" "final, enforceable" award fee decisions by Twining and Simonson. Rockwell further asserts that, once final decisions were made by the field officials, DOE Headquarters could not "undo" those decisions. Rockwell Supp. Submission at 29. The fallacy in this argument is that the conclusions drawn by Twining and Simonson were not final award fee determinations, as they themselves unequivocally recognized at the time.[10]

[10] At another point in its brief, Rockwell distorts the import of the stipulation. Rockwell says that "[d]efendant has stipulated that after Messrs. Twining and Simonson made their

Mr. Twining termed his May 31, 1989 recommendation to Headquarters his "“tentative finding” regarding Rockwell’s award fee.[11] He submitted it for Headquarters’ concurrence, which it never received.[12] An official with the Albuquerque Performance Evaluation Review Board (PERB) also referred to Mr. Twining’s May 31 conclusion as Twining’s “tentative finding.”[13] In July 1989, Mr. Twining wrote that Rockwell’s “performance evaluation and the associated award fee” for the 89/1 period were “still under consideration.”[14] Indeed, in July 1989, Mr. Twining recommended a reduction in the fee he had recommended on May 31, 1989 based upon additional information developed by Mr. Goldberg.[15] It is clear that Mr. Twining’s conclusion in May 1989 was not a final determination, even in his own estimation.

Similarly, Mr. Simonson’s December 6, 1989 recommendation for the 89/2 award fee was not a final determination. In his recommendation to Under Secretary Tuck, Simonson termed his conclusion regarding the award fee “[m]y tentative findings.”[16] Simonson’s memorandum contains boxes wherein Mr. Tuck could record his concurrence or nonconcurrence. The Performance Appraisal which Mr. Simonson sent along with his

---

respective award fee determinations, headquarters overrode them in favor of lower award fees.” Rockwell’s Supp. Submission at 3. The stipulation actually refers to the award fee activities of Mr. Twining and Mr. Simonson as their “conclusions,” not their “determinations.

[11] See Def. Ex. 32.

[12] Def. Supp. Ex. 52.

[13] Def. Supp. Ex. 55.

[14] Def. Supp. Ex. 87.

[15] Def. Supp. Ex. 60.

[16] See Def. Ex. 35.

memorandum is labeled "Predecisional." Again, the evidence clearly shows that Mr. Simonson never made a "final determination."

The only facts cited by Rockwell in arguing for the finality of the conclusions by Mr. Twining and Mr. Simonson is that those officials reached their conclusions after following the steps laid out in the 1977 Award Fee Handbook. See Rockwell's Supp. Submission at 17-22. The Handbook was not part of the contract, however. Therefore, the fact that they did or did not follow those steps is immaterial for purposes of deciding whether their recommendations were final within the meaning of the contract as Rockwell suggests.

The sole reference in the contract to the Handbook is the statement in Appendix D of the contract that:

> The Performance Evaluation Plan will consist of: (i) a limited number (approximately 5-10) of identifiable areas of contract work which are designated as "Functional Performance Areas" (FPA's); and (ii) the specific weighting assigned to each FPA. **The FPA's [Functional Performance Areas] and FPE's [Functional Performance Elements] are defined in Appendix A to the Albuquerque Operations' "Handbook for Award Fee Performance Evaluation and Review Process," which has been furnished to the Contractor.**[17]

This is not language of incorporation. Rockwell does not point to any other language in the contract purporting to incorporate the 1977 Handbook by reference. Thus, the detailed steps set forth in the Handbook for the procedure by which DOE would vet a draft contractor evaluation and award fee recommendation through the agency's hierarchy were internal guidelines for DOE's discretionary use in determining the fee. They were not contractual requirements for the benefit of Rockwell.

---

[17] Pl. Ex. 1, Appendix D, pp. 1-2 (emphasis added).

The Handbook itself confirms that DOE was entitled to make unilateral changes to the procedural steps for vetting award fees as set forth in the Handbook:

> Substantive exceptions to the requirements of this Handbook may be authorized by the Contracting Officer or the Performance Evaluation Review Board (PERB) when such variations are determined to be appropriate for a particular CPAF [Cost Plus Award Fee] contract."[18]

According to Mr. Twining, the 1977 Handbook was a "guidance" document and DOE was free to deviate from the procedures set forth therein if circumstances warranted.[19] Charles Troell, an Albuquerque contracts official, testified that the handbook was "a guidance document, especially in a period of transition where the department is changing its award fee process. Mr. Troell further stated:

> The PERB, I believe, was free to use the document as guidance and then do what they thought was right in a specific circumstance.[20]

Mr. Terrel Agy, an employee of DOE's Rocky Flats office who was involved in the award fee process, testified that, during the time Rocky Flats was under Albuquerque, the handbook was never in a final form. "[The handbook] was in a state of flux, in other words . . . ." Mr. Agy therefore did not consider the handbook something that had to be followed closely in determining Rockwell's award fee.[21]

---

[18] Pl. Supp. Ex. 44, 1977 Handbook, pp. 1-2.

[19] Def. Supp. Ex. 53, February 23, 1993 Deposition of Bruce G. Twining, pp. 15-16.

[20] Def. Supp. Ex. 64, March 2, 1993 Deposition of Charles Edward Troell, p. 15.

[21] Def. Supp. Ex. 81, October 21, 1992 Deposition of Terrel John Agy, Vol. I, pp. 85-89.

In summary, the procedures in the 1977 Handbook were not part of the contract, the Handbook did not create binding, enforceable requirements vis-a-vis the manner in which DOE officials vetted award fee determination, and a failure to follow the Handbook is not a basis for a breach of contract claim by Rockwell.[22] Nor is the fact that Twining and Simonson followed the Handbook procedures a basis for determining that their decisions were final and enforceable by Rockwell. As explained above, even Mr. Twining and Mr. Simonson regarded their conclusions as "tentative findings" only, not final determinations.

Because there never were any final, enforceable award fee determinations by the field officials, the Secretary's actions did not constitute an "overriding" or an "undoing" of previous determinations.

**B. DOE's Headquarters Officials Complied With The Procedural Requirements Contained In The Contract**

As for the procedural requirements that actually were contractually-mandated,[23] the Secretary's award fee determinations complied with those requirements.

It was mandatory under the contract that the AFDO (who was the Secretary for the two award fee periods in question, see Part I above) evaluate Rockwell's performance against the Award Fee Plan set forth in Appendix D to the contract.[24] The Award Fee Plan provided that

---

[22] As for those standards for award fee determinations that were part of the contract, DOE Headquarters' determinations complied with those requirements (see the next section).

[23] Again, the steps outlined in the 1977 Handbook were not part of the contract. See Section A above.

[24] See Pl. Ex. 1, at p. 131, contract clause 62(b)(2) ("The award fee shall be determined subjectively by the Award Fee Determination Official based on the Contractor's performance in accordance with the Award Fee Plan set forth in Appendix D.")

- Evaluation of Rockwell was to based upon the Performance Evaluation Plan established by the AFDO, after consultation with Rockwell, for the evaluation period in question;[25]

- The Performance Evaluation Plan was to consist of a limited number of FPAs [Functional Performance Areas] and the specified weighting assigned to each FPA;[26]

- Rockwell's performance of each FPA was to be evaluated in terms of a numerical grade assigned each FPA;[27]

- The numerical grade for each FPA was to be multiplied by the weighting assigned to each FPA;[28]

- The weighted grades for all the FPAs were to be added together, resulting in an overall numerical grade for the contractor's performance, which grade equated to an award fee of a specific dollar amount.[29]

The FPAs and weights agreed upon by Rockwell and the then AFDO (Mr. Twining) in advance of the award fee periods in question is reflected in Pl. Ex. 3, which is the executed modification covering those award fee periods including Appendix D. The FPAs for Plant Operations and the weights assigned to each such FPA appear at pp. 3-4 of Pl. Ex. 3. Those FPAs and weights were as follows:

---

[25] Pl. Ex. 1, p. 131, clause 62(b)(2).

[26] Pl. Ex. 1, Appendix D, p. 1, final paragraph.

[27] Pl. Ex 1, Appendix D, p. 2, carryover paragraph.

[28] Pl. Ex. 1, Appendix D, p. 5, final paragraph.

[29] Pl. Ex. 1, Appendix D, p. 5, id.

| FPA | Weight |
| --- | --- |
| General Management | 25% |
| Cost Management | 15% |
| Quality | 15% |
| Chemical Operations | 10% |
| Production Operations | 15% |
| Environmental, Safety, and Health | 20% |

DOE adhered to these FPAs and weights when the Secretary reached reduced award fee determinations during the 89/1 and 89/2 periods.

### 1. **The 89/1 Period**

When, in July 1989, Mr. Goldberg reduced the award fee Mr. Twining had proposed on May 31, 1989, Mr. Goldberg utilized the above-described FPAs and weights. Mr. Goldberg, however, assessed Rockwell's performance as having been poorer in three FPAs than Mr. Twining had concluded. Those three FPAs were General Management, Quality, and ES&H. Mr. Goldberg reduced the grade Mr. Twining had given Rockwell for General Management, 92, to 81. He reduced Mr. Twining's recommended grade of 95 in Quality to 88. Finally, he reduced the grade in ES&H from 81 given by Mr. Twining to 79.[30]

Goldberg documented in detail his reasons for recommending lower grades in these three FPAs. Mr. Goldberg's July 27, 1989 memorandum to Mr. Twining cited specific deficiencies which Mr. Goldberg had observed with regard to these FPAs. Mr. Goldberg wrote:

> The problems that I see in my review of Rockwell's ongoing operations tend to impact the three FPA's noted above for which I recommend [downwardly] revised scores, but the basic problem which underlies all FPA's is a lack of discipline in operation. This is apparent in Rockwell's failure to adequately define the entire

---

[30] Mr. Goldberg's grades are shown in the schedule which is the fourth page of Def. Supp. Ex. 58. Mr. Twining's recommended grades are reflected in the schedule which is Pl. Ex. 6.

> safety envelope for the operation of each facility. This should, but does not, manifest itself in a cohesive flow from Safety Analysis Reports to Operational Safety Requirements to limiting conditions for operations to detailed operator procedures. A lack of clear lines of responsibility for operations, safety, maintenance, etc. is apparent.

Mr. Goldberg also cited a lack of discipline in the Waste Management and Quality Assurance programs.[31]

Mr. Twining endorsed the lower grades and award fee recommendation given by Mr. Goldberg, and so recommended to Headquarters.[32] When Twining's downwardly revised recommendation arrived at Headquarters, John Meinhardt, the Acting Assistant Secretary for Defense Programs, concluded that Mr. Goldberg's recommendations were unduly high given the information available to Headquarters regarding Rockwell's performance. Mr. Meinhardt wrote a handwritten notation on a copy of Goldberg's recommendation:

> Too high! Based on what we know and Goldberg's comments, how can Ed arrive at these %?[33]

Mr. Meinhardt tasked Admiral Barr to draft a new recommendation,[34] and that recommendation became the basis for the final Headquarters fee determination for 89/1, after it was personally concurred in by Secretary Watkins, as explained above.

Admiral Barr, like Mr. Twining and Mr. Goldberg, utilized the FPAs and weights set forth in Appendix D to the contract. Admiral Barr's memorandum of recommendation is Def.

---

[31] Def. Supp. Ex. 58.

[32] See Def. Supp. Ex. 59.

[33] Def. Supp. Ex. 58.

[34] See Def. Supp. Ex. 61.

Supp. Ex. 62. This memorandum shows that Admiral Barr adopted Mr. Goldberg's reduced grades for General Management and Quality, but that he reduced the grade for the ES&H FPA still further from the 79 recommended by Mr. Goldberg to 66. This caused the reduction of the award fee for Plant Operations to $2,757,126, which together with the award fee for PRMP/PROVE which Mr. Goldberg had recommended, amounted to a total award fee for the 89/1 period of $2,943,717 based upon the weights set forth in the contract. Admiral Barr set forth in detail the rationale for the reduced ES&H grade citing specific deficiencies by Rockwell which led him to the conclusion that the grade should be lowered to 66.[35]

The inescapable conclusion is that in determining a lower award fee than Mr. Twining had recommended on May 31, 1989, DOE followed the procedural requirements of Appendix D. It utilized the FPAs and weights agreed upon in advance by the parties. The reduced award fee was merely the result of a different subjective assessment than Mr. Twining's by the officials tasked with preparing a recommendation after Secretary Watkins removed Mr. Twining's substantive authority over Rocky Flats.

**2. <u>The 89/2 Period</u>**

The same is true with respect to the second award fee period. For the 89/2 period, Mr. Simonson sent to Headquarters his draft recommendation on December 6, 1989. In making his recommendation, Mr. Simonson evaluated Rockwell in terms of the FPAs and weights set forth in Appendix D.[36] In particular, Mr. Simonson recommended a grade of 78 for ES&H, which

[35] Def. Supp. Ex. 62.

[36] Mr. Simonson's recommendation is Def. Ex. 35. His recommended grades and the weights for the various FPAs appear on the page bates-stamped "E 000280."

represented an increase over the ES&H grade for the previous period, which had been 66. He also recommended a grade in the General Management FPA of 81.

Following objections by DOE Headquarters Environment, Safety and Health officials that the ES&H grade should not be increased in the face of Mr. Simonson's finding that Rockwell's safety performance "continues to be unacceptable,"[37] Admiral Barr prepared a memorandum to the Acting Assistant Secretary for Defense Programs recommending that Rockwell's ratings in the FPAs for ES&H and General Management be reduced from the levels recommended by Mr. Simonson.[38] On February 22, 1990, Under Secretary Tuck sent a memorandum to Deputy Secretary Moore adopting Admiral Barr's description of the deficiencies in Rockwell's performance, and recommending a further lowering of its ratings in the ES&H and General Management FPAs.[39] On February 23, 1990, Deputy Secretary Moore signed off in this recommendation, as noted in Part I above.[40]

---

[37] For example, On December 28, 1989, Peter Brush, the Assistant Secretary for Environment, Safety and Health wrote a handwritten memorandum to Dave LeClaire in Defense Programs stating that

> For RFP [the Rocky Flats Plant] we cannot agree that some good actions in the environmental area offset an unacceptable safety rating. The Action Memo needs to reflect this.

Def. Supp. Ex. 73, handwritten note from "Peter" on letterhead of the Assistant Secretary, Environment, Safety and Health. "Peter" is identified as Peter Brush in Def. Supp. Ex. 74, which also reflects also bears a handwritten note indicating that office's nonconcurrence in the Simonson recommendation. Def. Supp. Ex. 74, 12/14/89 Routing and Transmittal Slip from Robert D. Quinn to a number of DOE Headquarters officials, including Peter Brush.

[38] Def. Supp. Ex. 75, p. 3, carryover paragraph.

[39] Def. Supp. Ex. 77.

[40] Def. Supp. Ex. 78.

Thus, with respect to the procedural requirements that actually were contractually-mandated, the Secretary's award fee determinations complied with those requirements.

**C. DOE Did Not Breach The Contract's Weighting Requirements For ES&H. Nor Did DOE Breach The Contract By Making "Results-Oriented" Award Fee Decisions**

Rockwell argues that DOE Headquarters breached the contract by initiating a policy of weighting ES&H at 50-51 percent of the award fee, rather than the 20 percent specified in the contract. Rockwell's Supp. Submission at 32. Rockwell also contends that DOE breached the contract by engaging in "results-oriented" decision-making. Rockwell cites as an example that Admiral Barr, after receiving Mr. Simonson's December 6, 1989 award fee recommendation for the 89/2 period, instructed his staff to lower the award fee to a level not higher than the fee for 89/1. Rockwell's Supp. Submission at 34. Both assertions are incorrect based on the undisputed factual record.

As established in the preceding section and in the documents cited in that section, DOE Headquarters accorded to ES&H the proper weight of 20 percent when it computed the award fees for 89/1 and 89/2. At the same time, it is true that Headquarters officials took into consideration Rockwell's poor performance in the ES&H area in evaluating how poorly Rockwell was doing with respect to the General Management and Quality FPAs during the 89/1 period, and the General Management FPA during the 89/2 period. They lowered Rockwell's ratings in those FPAs based upon the fact that Rockwell's ES&H failings were widespread and systematic, and Rockwell was not devoting sufficient attention to correcting its inadequate management approach. However, there was nothing in the contract prohibiting DOE from deeming Rockwell's ES&H deficiencies as also reflecting poorly on Rockwell's management and quality performance. Indeed, it would defy logic and common sense if the contract was

interpreted to require that systematic failures in the important environmental requirements of the contract could not affect the management rating.

Shortly after arriving at Rocky Flats, Mr. Goldberg had concluded:

> There is a serious concern regarding the adequacy of contractor management of the Rocky Flats Plant o assure continued safe operation. At present, there is insufficient formality of operations to be sure that the chance of a major event occurring has been precluded by the system in place. Management has not demanded that formality. A decision must be made regarding the most effective way to institute a major change in the contractor management philosophy relating to the operation of this facility.
>
> We have lost confidence in Rockwell management's ability to manage this facility because there is considerable evidence of
>
> - lack of clear lines of responsibility for safe operations
> - lack of adequate procedures to assure safe operations
> - lack of conformance to procedures
> - lack of adequate mental discipline within the workforce. The work ethic is in question. There is not a uniform attitude of willingness to work hard to do it right because "that's what we stand for."
> - lack of interest in improvement. There is a strong cultural sense that the plant has operated for 37 years and that there is no reason to change. New goals and reasons for change have not been effectively conveyed by management.
> - lack of an adequate training program
> - lack of adequate on-floor supervision
> - lack of ability to apply root cause analysis to investigation of unplanned events and to implement lessons learned on a plant-wide basis. Approach has been to fix the immediate problem.

Mr. Goldberg cited a series of specific examples illustrating his listing of management and quality inadequacies.[41]

In forwarding his views regarding Rockwell's award fee for 89/1 to Mr. Twining, Mr. Goldberg recommended reductions in the ES&H, General Management, and Quality FPAs, as compared to Mr. Twining's conclusion in Mr. Twining's May 31, 1989 recommendation to Headquarters. Mr. Goldberg wrote:

> The problems that I see in my review of Rockwell's ongoing operations then to impact the three FPA's noted above for which I recommend [downwardly] revised scores, but the basic problem which underlies all FPA's is a lack of discipline in operation. This is apparent in Rockwell's failure to adequately define the entire safety envelope for the operation of each facility. This should, but does not, manifest itself in a cohesive flow from Safety Analysis Reports to Operational Safety Requirements to limiting conditions for operations to detailed operator procedures. A lack of clear lines of responsibility for operations, safety, maintenance, etc. Is apparent. . . .
>
> The overall lack of discipline is also apparent in the Waste Management program. The system that exists to identify and track drums lacks formality. No uniform system exists from building to building to classify waste. The decisions regarding the distinctions between waste and residue appear to be arbitrary. An integrated waste management program is not really evident.
>
> With the exception of the weapons program, the implementation of a Quality Assurance program is inadequate. Operators on the floor do not consistently follow formal procedures. We have observed instances where operators signed off on procedures in "rote" fashion, evidently without reading them or receiving proper training on their implementation. We find no system in place to check adherence to operating procedures.

---

[41] See Def. Ex. 25, June 22, 1989 draft memorandum from Edward S. Goldberg to John C. Tuck, Under Secretary.

Mr. Goldberg then cited additional specific examples of deficiencies in the areas of ES&H, General Management, and Quality that he felt warranted a reduction in Rockwell's grades in those FPAs.[42]

In his September 6, 1989 memorandum to Mr. Meinhardt, Admiral Barr recommended that Mr. Goldberg's recommended grade in the ES&H FPA be further lowered. Admiral Barr cited specific examples to support his position, but he viewed these incidents as indicators of a broad management breakdown on Rockwell's part. Admiral Barr stated:

> Overall, I believe there is strong evidence that throughout the appraisal period there was a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities.[43]

Admiral Barr testified in his deposition that various ES&H incidents at Rocky Flats indicated across-the-board breakdowns in Rockwell's managerial competence implicating the entire plant:

> . . . But my point is that, while they [Albuquerque Operations] are quite correct in saying it [the chromic acid spill] was a notable deficiency, I believe they miss the point by just concentrating on that spill in isolation, because you had an improper approach to alarms and what you do to keep them operating and what you do if they are not operating. It showed an improper approach to how you operate valves, how you conduct procedures.
>
> * * * *
>
> Now, these items, while the example of the chromic acid spill is serious in and of itself, show that the whole plant was run that way. The criticality issue was another one which indicated the kinds of things.
>
> In another personal observation, I observed a mechanic repairing a pump in a waste water area that this pump, as I recall, its function

---

[42]Def. Supp. Ex. 58, July 27, 1988 memorandum from Edward S. Goldberg to Bruce G. Twining.

[43] See Def. Supp. Ex. 62.

> was to transfer water around to various tanks. And he had several red tags on valves and the pump was in a semidisassembled condition.
>
> I asked him, how do you know which valves to shut in order to completely isolate this pump so that you won't have a flow of water out when you take the pump out? Do you have any verified schematics of the systems attached to this pump. His answer was no.
>
> Well, how do you know?
>
> He said, I know because I have been here for 30 years.
>
> Well, when do you use red tags?
>
> Oh, I just tag them.
>
> Do you have a red tag sheet on which you fill out where you are going to hang these red tags which are used, to say Danger, Do Not Operate These Valves? Do you have this authorized, this red tag authorized, verifiable by anybody?
>
> The answer was no.
>
> How do you know you are putting the right parts into the pump? This is a fairly significant pump. How do you know you are using the right parts? And, again, the answer to my judgment was not satisfactory.
>
> And while this is an isolated case, I think that, along with other things, indicates that the plant was just not operated at a standard which in my judgment is appropriate for something with that degree of potential severity.[44]

With respect to the second award fee period, Admiral Barr recommended that Mr. Simonson's grades in ES&H and General Management be lowered. Again, Admiral Barr documented detailed reasons for his recommendation including specific deficiencies in the ES&H area. Admiral Barr noted that many of the problems observed by Mr. Goldberg as

---

[44] Def. Ex. 21, September 23, 1994 Deposition of Admiral Jon Michael Barr, pp. 38-40.

deficiencies in the 89/1 period apparently had remained problems during the 89/2 period. Admiral Barr wrote:

> There was no formalized conduct of operations as evidenced by:
>
> - Lack of standards and criteria for operations;
> - Lack of well documented procedures for operations;
> - Lack of clear lines of responsibility for safe operations;
> - Lack of adequate work ethic and mental discipline within the work-force;
> - Lack of adequate on-floor supervision;
> - Lack of ability to apply root cause analysis to investigation of unplanned events and to implement lessons-learned on a plant-wide basis.

Admiral Barr further noted that DOE had "identified several inadequate criticality safety conditions and practices at the Rocky Flats Plant. In addition, DOE is not satisfied with worker understanding of nuclear safety standards at the plant."[45]

Admiral Barr's belief that Rockwell had not improved its management of the site, or resolved numerous ES&H problems, from award fee period 89/1 to award fee period 89/2, not "results-oriented" decision-making, were the reasons he instructed his staff to recalculate Mr. Simonson's award fee recommendation to a level no higher than the 89/1 fee had been.

In summary, DOE Headquarters' evaluations did not alter the 20 percent weighting assigned by the contract to ES&H or constitute "results-oriented" decision-making. However, Headquarters officials did take into account Rockwell's extensive ES&H-related deficiencies in

---

[45] Def. Supp. Ex. 75, undated memorandum over Barr's typed name to the Acting Assistant Secretary for Defense Programs.

evaluating its performance in the separate FPAs for General Management and Quality. This was not a breach of the contract.

### D. DOE Did Not Breach The Contract By Instituting A Headquarters Concurrence Policy

Rockwell argues that DOE breached the contract when DOE Headquarters instituted a Headquarters concurrence policy, because no such policy was reflected in the 1977 Award Fee Handbook. However, as demonstrated in Section A above, the Handbook was not part of the contract, and did not place contractually-binding limitations upon the procedures DOE could use internally to vet award fee recommendations and determinations. The actual language of the contract regarding the award fee process merely required that the award fee

> shall be determined subjectively by the Award Fee Determination Official based on the Contractor's performance in accordance with the Award Fee Plan set forth in Appendix D.[46]

This language does not preclude Headquarters review, input, and/or concurrence, so long as the award fee is "determined subjectively" by the AFDO in the final analysis, and so long as DOE abides by the FPAs and weights in the Award Fee Plan, which DOE did in this case (see Section B above). The insertion of a Headquarters concurrence policy, therefore, did not constitute a breach of contract.

For the foregoing reasons, DOE did not breach the contract in any of the ways which Rockwell newly alleges in its Supp. Submission.

---

[46] Pl. Ex. 1, p. 131, clause 62(b)(2).

## III. DOE Also Did Not Breach The Contract Because Mr. Twining And Mr. Nelson, Who Replaced Mr. Simonson As Manager Of DOE's Rocky Flats Office, Subjectively Agreed With The Secretary's Determinations

In the Supp. Submission, Rockwell doggedly insists that the AFDO could be none other than Mr. Twining, or Mr. Simonson for the second award fee period. Rockwell's Supp. Submission at 4. Even if Rockwell were correct in this argument–which it is not for the reasons explained above and in the Government's earlier filings--DOE still did not breach the contract in this case.

Although the Government's stipulation describes the award fee decision for 89/1 as have been "mandated" by DOE Headquarters officials and states that those officials "caused" Mr. Twining to issue the award fee decision, the evidence shows that Mr. Twining subjectively agreed with the fee determined by Headquarters. Mr. Twining testified that he was comfortable with the 65.25 grade Meinhardt gave Rockwell for ES&H, based on the additional information that was coming out about Rocky Flats.[47] At the trial in the *Stone* case, Mr. Twining testified that he adopted the approximately $2.9 million award fee figure reflected in his September 27, 1989 letter to Rockwell after his staff, some of whom were members of the PERB, signaled their agreement with that figure by initialing off on the concurrence copy of the letter informing Rockwell of the fee.[48] Mr. Twining's subjective agreement with the award fee determined by Headquarters is memorialized in Def. Supp. Ex. 66, which is a memorandum by Mr. Twining to the file stating:

> I hereby determine an award fee of $2,903,215. This determination is based on the attached memorandum from John L.

---

[47] Def. Ex. 8, Deposition of Bruce Twining in this proceeding, 2/23/94, p. 111-112.

[48] Def. Supp. Ex. 71, Trial Testimony of Bruce Twining in *Stone*, pp. 3281-3282.

> Meinhardt, Acting Assistant Secretary for Defense Programs, and the attached Performance Evaluation Report.[49]

Similarly, although the Government's stipulation describes the award fee decision for 89/2 as having been "mandated" by DOE Headquarters officials and states that those officials "caused" Mr. Nelson, who replaced Mr. Simonson as head of the Rocky Flats Area Office, to issue the award fee decision, Mr. Nelson testified at the trial in *Stone* that, despite receiving input from other DOE officials, he ultimately decided for himself what amount Rockwell should earn for the 89/2 period.[50]

Moreover, in the case of both the 89/1 and 89/2 decisions, Rockwell appealed those decisions to Twining and Nelson, respectively, and those officials confirmed the earlier decisions.

In regard to the 89/1 award fee, Rockwell provided a written analysis in support of its effort to get the fee raised by Mr. Twining. Rockwell also made a verbal presentation on October 30, 1989 to Charles Troell, Mr. Twining's Assistant Manager for Management and Administration and James A. Stout, Chief Counsel of Albuquerque Operations.[51] On November 14, 1989, in a letter signed by Deputy Albuquerque Manager James Culpepper for Mr. Twining, Mr. Twining informed Rockwell that, "[a]fter due consideration of the [written and verbal presentations by Rockwell], I have determined that my original determination of an award fee in

---

[49] See Def. Supp. Ex. 66.

[50] . Def. Supp. Ex. 85, Trial Testimony of Robert M. Nelson, Jr. at 3482-3485.

[51] Def. Supp. Ex. 68, November 8, 1989 Memorandum from Bruce Twining to John L. Meinhardt.

the total amount of $2,903,215.00 for the performance period noted above, shall remain unchanged.[52]

With respect to 89/2, Rockwell provided written material to the Rocky Flats Office on May 3, 1990, and an oral presentation on July 10, 1990. In response, Mr. Nelson assembled a team of Rocky Flats employees knowledgeable about Rockwell's performance to review Rockwell's information. This team recommended to Mr. Nelson that Rockwell's award fee not be changed.[53] Accordingly, on July 26, 1990, Mr. Nelson sent Rockwell a letter confirming that the award fee would remain the same.[54]

Thus, even if, as Rockwell argues, the contract required that the AFDO be the responsible field official, and even if DOE Headquarters "mandated" and "caused" the decisions to be made as indicated in the stipulation, the evidence shows that Mr. Twining for the first period, and Mr. Nelson for the second, subjectively adopted Headquarters' decisions. Both testified that they agreed with the figures sent them by Headquarters. Moreover, in both cases, after appeals by Rockwell, these field officials again exercised their subjective judgment by reconfirming the original determinations. The contract requires only that "the award fee shall be determined subjectively by the Award Fee Determination Official."[55] The evidence shows that this is what occurred in this case in regard to both award fee periods. Accordingly, defendant is entitled to entry of summary judgment that it did not breach the contract.

---

[52] Def. Supp. Ex. 69.

[53] Def. Supp. Ex. 80.

[54] Def. Supp. Ex. 86.

[55] See clause 62(b)(2), Pl. Ex. 1.

## IV. In View Of The Fact That DOE Followed The Contractually-Mandated Procedures For Determining Rockwell's Award Fees, Rockwell's Claim Is Really A Dispute Over The Amount Of The Awards. However, The Award Fee Amounts Paid To Rockwell Were Entirely Within the Government's Discretion And Are Not Reviewable By The Court

As demonstrated above, DOE followed the contractually-mandated procedures in reaching the award fee determinations. DOE evaluated Rockwell's performance in terms of the FPAs and weights specified in the contract. DOE applied a 20 percent weight to the ES&H FPA as required by the contract, and DOE's decision-making was not "results-oriented." In short, DOE's determinations were procedurally regular, and there is no evidence suggesting that DOE abused its discretion or acted in an arbitrary and capricious manner.

Consequently, Rockwell's claim really comes down to a challenge to the award fee amounts determined by DOE under a contract which committed that decision to the agency's discretion. However, under *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 305 (2005) and *Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854, 859-60 (Fed. Cir. 1997), the Court lacks authority to overturn an exercise of discretion by the agency with regard to the amount of fees to be awarded a contractor.

Rockwell concedes that these decisions

> stand for the proposition that if a court determines that the Government's award fee does not conflict with "any part of the contract," the court is "limited to reviewing whether the Government's award fee decision was arbitrary or capricious."

Rockwell's Supp. Submission at 27. That is exactly the situation here. The Secretary's award fee determinations did not conflict with any part of the contract. Thus, the Court's review is limited to whether there was arbitrary or capricious conduct, which there was not in this case.

Accordingly, the Court lacks the authority to second-guess the agency and upwardly adjust Rockwell's award fees in the guise of awarding damages for an alleged breach.

## V. If DOE Breached, Rockwell Was Not Damaged, Or The Damages Are Less Than Rockwell Seeks In Its Motion

If DOE breached the contract, Rockwell was not damaged for the reasons stated in the Government's opening and reply briefs. Alternatively, if Rockwell was damaged at all, the damages are considerably less than the $5,333,606 to which it argues it is entitled in its summary judgment motion. See Plaintiff's Motion For Summary Judgment And Motion In Support Thereof, dated May 25, 2006, at 9-10.

Rockwell's damages computation is predicated on the notion that Mr. Twining reached a final determination of an award fee in the amount of $5,176482 for the Plant for 89/1 plus $710,160 for the Waste Management Goal Achievement Objective (GAO), but that the Secretary improperly lowered the fee to $2,716,624 for the Plant and eliminated the GAO altogether. However, as demonstrated above, Mr. Twining's initial May 31, 1989 recommendation never became an award fee "determination." Mr. Twining regarded his conclusion as tentative, and subsequently adopted Mr. Goldberg's reduced recommendation of $3,628,622.[56]

Of course, the latter figure also was merely Mr. Twining's "recommendation," and was not a "final determination." However, if a Twining recommendation is to be used as the starting point from which to measure damages, it is more reasonable to use the later-in-time recommendation, which Mr. Twining testified was predicated on Mr. Goldberg's superior knowledge regarding Rockwell's performance. The difference between Mr. Twining's second

[56] See Def. Supp. Ex. 60.

recommendation and the Headquarters determination is $3,628,622 - $2,716,624, or $911,998. This is the maximum damages suffered by Rockwell for the 89/1 period.

Rockwell argues that the damages for the second award fee period at issue should be measured by the difference between Mr. David Simonson's recommended figures of $3,114,245 for Plant and $628,982 for PRMP/PROVE, and the Secretary's determination of $1,241, 064 for Plant and $338,035 for PRMP/PROVE. As explained in its reply brief, however, Rockwell initially alleged in its complaint, and continues to believe, that Mr. Simonson's involvement in the award fee determination for 89/2 was in breach of the contract. Thus, there is no legal or logical reason that Mr. Simonson's recommendation, which was wholly nugatory under Rockwell's breach theory, should be used as the benchmark for measuring damages for the 89/2 period.

According to the logic of Rockwell's position, the only way to measure damages is by taking the difference between a Twining determination and the corresponding Headquarters determination. Since Mr. Twining never made any recommendation for the 89/2 period, there is no benchmark from which to measure damages for the 89/2 period. The Court has no way of knowing what Mr. Twining would have recommended for 89/2, had be been making the determination. Thus, Rockwell has not met its burden of showing that it suffered any damages for 89/2.

In summary, if Rockwell suffered any damages at all during the 89/1 period, they were $911,998 at most. Rockwell has failed to establish any damages whatsoever for 89/2.

## VI. The Summary Judgment Proof Submitted By the Government Establishes That Rockwell Waived Its Purported Right to Have Field Officials Determine its Award Fees

Rockwell essentially admits that it acquiesced in DOE Headquarter's post-raid decisions to assume direct oversight over, and require management changes, at Rocky Flats, and to delay the **timing** of the award fee decision, but argues that it never acquiesced in Headquarters' action of actually **determining** the award fees. Rockwell's Supp. Submission at 37-38. The uncontroverted proof submitted by the Government belies this assertion. DOE placed Rockwell clearly on notice that it was "the Department" and "the Secretary," to wit Headquarters officials, not Mr. Twining, who were actually deliberating over what its award fees should be.

On June 16, 1989, Deputy Secretary Moore publicly announced that DOE was suspending bonus payments for good performance by Rockwell at Rocky Flats. A news article reporting the announcement was headlined: "U.S. Suspends Bonus to Operator of Rocky Flats Plutonium Plant." It stated:

> W. Henson Moore, the Deputy Energy Secretary, said this afternoon that his department was suspending bonus payments for good performance by the company, the Rockwell International Corporation, for the period from September 1, 1988 [sic] to March 31, 1989.[57]

A few days later, on June 20, 1989, Mr. Moore wrote to Mr. Sam Iacobellis, President of Rockwell's Aerospace Operations, as follows:

> This letter will confirm our conversation of last week regarding the status of **the Department's determination** of Rockwell's award fee for the most recent completed evaluation period . . .
>
> As I mentioned during our conversation, the final determination has been suspended pending receipt **by the Secretary** of the report

[57] Def. Ex. 41, June 17, 1989 New York Times article.

> of the special departmental team that he dispatched to Rocky Flats. I anticipate that this report will have been rendered in sufficient time so that **the Department may make its determination of Rockwell's award fee** in approximately two to three weeks.
>
> I am sure you appreciate **our need to review this matter with care**, and **the Department will make its determination** as promptly as possible.[58]

"[O]ur need to review this matter with care" clearly meant that Secretary Watkins and Deputy Secretary Moore were reviewing "this matter," *i.e.*, the award fee determination, with care.

Mr. Moore's letter referenced a previous conversation he had had with Mr. Iacobellis. Mr. Moore testified:

> The best I can recall, he called very concerned about that delay and the awarding of the award fee and was asking for some kind of guidance as to when this was going to be made.

Mr. Moore testified further as follows:

> Q. Do you have any recollection as to how Mr. Iacobellis would have known that you had any involvement in the award fee process at this time?
>
> A. I don't think it would have been hard for him to find that out. All he had to do was to go to Ed Goldberg, and at that point he would be told, well, you understand these things are being reviewed in the headquarters first. I don't know when this press statement was made, but that indicated that I was taking some role to play in the award fee, so that was made before the letter, June 19th according to this Lexis.
>
> MR. KOLAR: June 17th.
>
> BY MR. NEY:
>
> Q. June 17th.

[58] Def. Ex. 42 (emphasis added).

> A. So it would not have been hard for him to find that out that, in fact, there was not going to be an award fee made until it cleared my desk.[59]

Further, on July 14, 1989, Mr. Moore wrote a memorandum to the file summarizing another phone conversation he had had with Mr. Iacobellis. Mr. Moore stated:

> I also informed Iacobellis that we were going to delay the pending award fee determination until sometime in August. Iacobellis agreed to the delay.[60]

In view of the foregoing evidence, it would strain credulity to suggest that Rockwell was unaware that Headquarters had taken over the award fee determination role.

Having been fairly and fully informed that DOE Headquarters was going to decide the award fee, Rockwell's failure to object was "wholly inconsistent" with its purported contract right to have the decision made by field officials, and "indicat[ed] its intent to abandon the [purported] contractual right." Rockwell's Reply at 28, *citing Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 679 (7th Cir. 2004). Rockwell's conduct constituted a waiver of this right, and the Court should enter summary judgment for the Government on that ground.

**CONCLUSION**

For the foregoing reasons, and those set forth in the Government's opening and reply pleadings, the Court should enter summary judgment for the Government. Alternatively, the Court should deny Rockwell's motion for summary judgment inasmuch as Rockwell has not demonstrated an absence of genuine issues of material fact or that it is entitled to judgment as a matter of law.

---

[59] Def. Supp. Ex. 83, April 29, 1994 Deposition of W. Henson Moore, p. 32.

[60] Def. Ex. 44.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

s/ John A. Kolar

JOHN A. KOLAR
DONALD WILLIAMSON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 305-9301
Attorneys for Defendant

Dated: November 13, 2006