ELECTRONICALLY FILED ON NOVEMBER 13, 2006

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 91-1362 C<br>(Judge Lettow) |

**ROCKWELL'S RESPONSE TO DEFENDANT'S SUPPLEMENTAL SUBMISSION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 2

I. DEFENDANT'S ASSERTION THAT MR. TWINING WAS A "NOMINAL" DECISION-MAKER FINDS NO SUPPORT IN THE CONTRACT'S PLAIN LANGUAGE, CASELAW, OR EXTRINSIC EVIDENCE ..... 2

II. MR. TWINING'S MAY 31, 1989, DETERMINATION AND MR. SIMONSON'S DECEMBER 6, 1989, DETERMINATION ARE FINAL, ENFORCEABLE DECISIONS ..... 4

A. Mr. Twining's May 31, 1989, Determination Was His Only Personal and Independent Decision Regarding the 89/1 Award Fee ..... 4

B. Mr. Nelson's Purported Agreement with Headquarters' Mandated Award Fee Is Irrelevant ..... 10

C. Damages Should Be Measured by the May 31 and December 6, 1989, Determinations ..... 12

III. ROCKWELL HAS ALLEGED AND SHOWN NUMEROUS BREACHES OF THE CONTRACT ..... 15

IV. DEFENDANT HAS NOT ALLEGED OR SHOWN THE INDUCEMENT REQUIRED TO ESTABLISH ITS ESTOPPEL BY WAIVER DEFENSE ..... 16

CONCLUSION ..... 18

# TABLE OF AUTHORITIES

Page

## CASES

*Gen. Elec. Co. v. United States*, 412 F.2d 1215 (Ct. Cl. 1969) ........................................... *passim*

*John A. Johnson Contracting Corp. v. United States*,
132 F. Supp. 698 (Ct. Cl. 1955).........................................................................................13

*Johnson Controls World Servs., Inc. v. United States*, 48 Fed. Cl. 479 (2001)..............................6

*Lyon Dev. Co. v. Bus. Men's Assur. Co. of Am.*, 76 F.3d 1118 (10th Cir. 1996)..........................17

*N.Y. Shipbuilding Corp. v. United States*, 385 F.2d 427 (Ct. Cl. 1967) .............................1, 10, 12

*Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479 (Fed. Cir. 1998) ........................................14

*Southern, Waldrip & Harvick Co. v. United States*, 334 F.2d 245 (Ct. Cl. 1964)..........................6

*Tex. Instruments Inc. v. United States*, 922 F.2d 810 (Fed. Cir. 1990).......................................6, 7

Pursuant to the Court's Scheduling Order dated September 21, 2006, Rockwell submits this memorandum in response to the government's supplemental submission on the parties' cross-motions for summary judgment, which was filed on October 30, 2006, ("Gov. Supp. Br.").

## PRELIMINARY STATEMENT

The parties agree that "the language of the contract is clear" and that this case is ripe for summary disposition. *See* Gov. Supp. Br. at 1-2; Pl. Supp. Br. at 3, 26-38. Contrary to the government's assertion (*see* Gov. Supp. Br. at 2, 3), this case is not about the Secretary's authority to reorganize the reporting lines at DOE. Rather, the issue is when such a department reorganization results in a contract breach, the agency must answer for any resulting damages. In this case, the question is whether headquarters' actions in overruling the decisions of Mr. Twining and Mr. Simonson breached the contract and, if so, the proper remedy. *See* Pl. Reply at 12-13. An agency's reorganization does not nullify the authority of a contractually designated decision-maker. *See Gen. Elec. Co. v. United States*, 412 F.2d 1215, 1218, 1219, 1222 (Ct. Cl. 1969) (enforcing contract's designation of "the Contracting Officer, Boston Procurement District" as decision-maker and nullifying decision of Army Weapons Command contracting officer even though "the previously delegated administrative authority with respect to this contract and others was removed from the Boston Procurement District and reverted to the Army Weapons Command"); *N.Y. Shipbuilding Corp. v. United States*, 385 F.2d 427, 433-34 (Ct. Cl. 1967) (concluding government could not substitute another decision-maker for "Nuclear Projects Officer" specified in contract even though government had abolished Nuclear Projects Office and Nuclear Projects Officer).

After all of this summary judgment briefing, what is most remarkable is the parties' agreement on the key facts. The government does not dispute that Messrs. Twining and

Simonson, each acting as AFDO, followed proper procedures in reaching their respective May 31 and December 6, 1989, award fee decisions. The government does not dispute that after execution of Rockwell's contract, DOE instituted a new policy requiring headquarters' concurrence in AFDO award fee determinations. The government does not dispute that the new concurrence policy never became part of Rockwell's contract. The government does not dispute that because of this new concurrence policy, Messrs. Twining and Simonson forwarded their respective award fee determinations to headquarters for concurrence. The government does not dispute that after Messrs. Twining and Simonson made their respective award fee determinations, each was succeeded as award fee decision-maker by a group of headquarters' personnel. The government does not dispute that after Messrs. Twining and Simonson made their respective award fee determinations, neither had any further substantive responsibility for Rockwell's award fees. Finally, the government does not dispute that headquarters' personnel caused award fees to be awarded to Rockwell in lower amounts than the award fees determined by Messrs. Twining and Simonson.

Based on the law, the Stipulation, and all of these undisputed facts, Rockwell is entitled to summary judgment.

## ARGUMENT

### I. DEFENDANT'S ASSERTION THAT MR. TWINING WAS A "NOMINAL" DECISION-MAKER FINDS NO SUPPORT IN THE CONTRACT'S PLAIN LANGUAGE, CASELAW, OR EXTRINSIC EVIDENCE

The government contends that headquarters did not breach the contract when it overruled Mr. Twining's May 31, 1989, determination because Mr. Twining was just the "nominal" AFDO. *See* Gov. Supp. Br. at 6, 9, 10, 34. In an effort to renege on its stipulation that award fees were "determined" and "mandated" by headquarters rather than the AFDO, Defendant distorts the contract's definition of the AFDO as "Manager, or anyone acting as Manager, Albuquerque



LA1 - 106913.05

Operations." Under Rockwell's interpretation of this provision, the AFDO is (1) the Manager of Albuquerque Operations or (2) if -- and only if -- there is no Manager of Albuquerque Operations, the individual who is performing the functions of Manager at Albuquerque Operations. *See* Pl. Supp. Br. at 3, 12-13; Pl. Reply at 4.[1]

Under Defendant's interpretation of this provision, the AFDO could be any official at DOE, more than one person, inside or outside of Albuquerque Operations, and someone with no connection to the Manager of Albuquerque Operations, thereby making that portion of the contract's definition inconsequential. *See* Pl. Supp. Br. at 9-11. The court should reject Defendant's proposed reading of the words "or anyone acting as Manager" because it contradicts the plain language of the contract, well-established jurisprudence, and extrinsic evidence. *See id.* at 3-17.

In its supplemental submission, Defendant cited no caselaw to support the theory that headquarters could treat the parties' contractually designated decision-maker as a "nominal" decision-maker. *See* Gov. Supp. Br. at ii. In earlier briefing on the non-breach argument, Defendant had cited only three inapposite decisions. *See* Pl. Supp. Br. at 7-8 n.3. The absence of judicial support for Defendant's proposed reading of the contract is telling. Indeed, numerous courts and boards have held that the government cannot bypass or overrule a contractually designated decision-maker, thereby making him only a "nominal" official, as Defendant proposes

---

1 Defendant contends that at the September 21, 2006, hearing, "Rockwell's counsel appeared to concede" that the contract's definition of the AFDO involved a "functional" rather than "formal" test. *See* Gov. Supp. Br. at 9. That's only one-half correct. While Rockwell's interpretation of the contract contemplates that the AFDO could be the individual performing the functions of the Manager at Albuquerque Operations, that situation would arise only if there were no actual Manager of Albuquerque Operations, which was admittedly not the case here. *See id.* (Secretary did not transfer title of "Manager of Albuquerque" from Twining). Moreover, under the "functional" test Defendant proposes, Messrs. Twining and Simonson were the AFDOs when they made their decisions on May 31 and December 6, 1989. *See* Pl. Supp. Br. at 4-5. These decisions were final and could not be overruled by successor decision-makers. *See id.* at 5-6 (citing cases).

here. *See* Mov. Br. at 22-24 (citing cases); Pl. Supp. Br. at 6-7, 24 (citing cases). Indeed, "nominal" is only a euphemism for a contractually designated decision-maker who has been improperly overridden or bypassed by another. The contract entitled Rockwell to the AFDO's personal and independent judgment of the appropriate award fees. *See* Mov. Br. at 21-22. Because the award fees were not decided by the AFDO, but were instead "determined" and "mandated" by headquarters, DOE breached the contract. *See id.* at 22-24.

## II. MR. TWINING'S MAY 31, 1989, DETERMINATION AND MR. SIMONSON'S DECEMBER 6, 1989, DETERMINATION ARE FINAL, ENFORCEABLE DECISIONS

### A. Mr. Twining's May 31, 1989, Determination Was His Only Personal and Independent Decision Regarding the 89/1 Award Fee

The record shows that Mr. Twining's May 31, 1989, determination represented his personal and independent judgment as to the appropriate award fees for the 89/1 Period. *See* Pl. Supp. Ex. 96, *Stone* Trial Tr., Mar. 15, 1999, at 3213-18 (Twining came up with his own assessment that the award fee should be $5.176 million based on his independent judgment, the PERB's recommendations, and oral briefing from PERB chair); *id.* at 3223-24 ("it was the judgment of the performance evaluation board then and myself that that [May 31, 1989, determination] was a fair and balanced assessment"); Pl. Supp. Ex. 48, Dep. of Bruce G. Twining, Feb. 23, 1993, ("Twining Dep.") at 53 (Twining was comfortable with his May 31, 1989, determination).[2] In rendering his May 31, 1989, determination, Mr. Twining followed the

---

[2] The exhibits referenced as "Def. Ex. __" are attached to the Declaration of John A. Kolar in Opposition to Rockwell's Summary Judgment Motion and in Support of the Government's Cross-Motion, filed July 27, 2006. The exhibits referenced as "Def. Supp. Ex. [52 to 86]" are attached to the government's supplemental submission, filed October 30, 2006. The exhibits referenced as "Pl. Ex. __" are attached to the Declaration of Richard J. Ney in Support of Plaintiff's Motion for Summary Judgment, filed May 31, 2006. The exhibits referenced as "Pl. Supp. Ex. [47 to 95]" are attached to the Declaration of S. Jean Kim in Support of Rockwell's Supplemental Submission on Cross-Motions for Summary Judgment, filed October 30, 2006. The exhibits referenced as "Pl. Supp. Ex. [96 to 110]" are attached to the Declaration of S. Jean Kim in Support of Rockwell's Response to Defendant's Supplemental Submission on

(cont'd on following page)

same process he had used to make his award fee determination for the 88/2 Period, applying the same thought and attention, along with more firsthand experience, to the May 31, 1989, decision. *See* Pl. Supp. Ex. 97, Twining Dep. at 16-27, 51-57. Thus, Mr. Twining's May 31, 1989, decision was as final as his 88/2 determination, which even Secretary Watkins agreed complied with the procedural standards required by the contract's award fee determination process. *See id.*; Pl. Supp. Ex. 98, Dep. of James D. Watkins, Apr. 29, 1994, ("Watkins Dep.") at 84, 86.

Defendant does not dispute that Mr. Twining forwarded his May 31, 1989, determination to headquarters' Mr. Wade for concurrence, not because he needed Mr. Wade's input, but because headquarters had adopted a new policy requiring such submissions. *See* Gov. Supp. Br. at 11 ("[i]t was pursuant to this [concurrence] requirement that Mr. Twining submitted his May 31, 1989 memorandum"); *cf.* Pl. Supp. Ex. 97, Twining Dep. at 23-24, 54-55; *id.* at 60-61 (May 31, 1989, memorandum was "formal communique under a new process that had apparently been requested"); Pl. Supp. Ex. 96, *Stone* Trial Tr., Mar. 15, 1999, at 3224-25 (Twining agreed that Rockwell had right to his decision on award fees "except that this headquarters review process had been put into the system").[3] Defendant, nonetheless, contends that the May 31, 1989,

---

(cont'd from previous page)

Cross-Motions for Summary Judgment, filed concurrently herewith.

[3] Defendant does not dispute that the concurrence policy came into existence under Secretary Watkins. *See* Gov. Supp. Br. at 11 (Twining believed the concurrence requirement resulted from a task force formed under Secretary Watkins). Thus, because Admiral Watkins was sworn in as Secretary on March 1, 1989, Defendant does not dispute that the concurrence policy came into existence after the parties amended the 1989 Contract in February 1989. *See* Pl. Supp. Ex. 98, Watkins Dep. at 8; Pl. Ex. 3 at 4. The policy had not been in place for award fee periods prior to 89/1. *See* Pl. Supp. Br. at 16 and 16 n.9; *see also* Pl. Supp. Ex. 99, Dep. of Bruce Twining in *Stone*, Apr. 7 and Apr. 8, 1998, ("Twining Dep. in *Stone*") at 73 (Twining did not believe his 88/2 award fee determinations were sent to headquarters); Pl. Supp. Ex. 96, *Stone* Trial Tr., Mar. 15, 1999, at 3215-16, 3221; Pl. Supp. Ex. 100, Dep. of Theetis V. Hill, Dec. 2, 1992, ("Hill Dep.") at 35-42, 47-48. Rockwell's contract was never modified to incorporate the concurrence policy. *See* Pl. Supp. Br. at 15. Thus, the contract specified that the AFDO (not headquarters) would have the final say in award fee determinations. *See* Pl. Ex. 3 at 2, 3; *id.* at Attach. A, pp. 1 and 2 of 9.

memorandum's reference to "tentative finding" indicates "that Mr. Twining understood that his conclusion did not constitute an actual award fee 'determination' unless and until it received Mr. Wade's concurrence." *See* Gov. Supp. Br. at 11 (referencing Def. Ex. 32); *see also id*. at 12 (Twining's recommendation "never did become a final award fee determination"); *id.* at 35 ("Twining regarded his conclusion as tentative"). This argument is wrong in at least three respects.

First, the law is clear that an agency's internal review procedure cannot divest a decision-maker of his or her authority to make a final decision. *See* Pl. Supp. Br. at 23-24 (discussing *Tex. Instruments Inc. v. United States*, 922 F.2d 810 (Fed. Cir. 1990) and *Gen. Elec*.). Second, the record shows that Mr. Twining "express[ed] a definite opinion on the merits" in his May 31, 1989, determination, exercising his contractual authority to render a final and conclusive decision on award fees. *Tex. Instruments*, 922 F.2d at 813; *see supra* at 4-5 (citing Twining's testimony about his May 31, 1989, determination); Def. Ex. 32 ("Albuquerque Operations Office has completed its award fee process for the [89/1 P]eriod. The process includes staff level assessment against an Award Fee Plan by both Area Office and Albuquerque functional organizations, consolidation of those assessments by the Area Office Managers, review and modification as appropriate by the Performance Evaluation Review Board, and presentation to me for a final determination."). And third, a contractual decision-maker's recommendation to a non-contractual concurring official suffices as a final decision. *See Gen. Elec.*, 412 F.2d at 1219-21 (contracting officer's signature under heading "CONCUR WITH RECOMMENDATION" constituted effective decision which could not be overruled by successor contracting officer); *Johnson Controls World Servs., Inc. v. United States*, 48 Fed. Cl. 479, 491 (2001) (contracting officer's letter "[r]equest[ing]" that action be taken constituted "decision"); *Southern, Waldrip & Harvick Co. v. United States*, 334 F.2d 245, 247, 249-50 (Ct. Cl. 1964) (contractual decision-maker's recommendation of award was determination that Washington, D.C., official had no authority to reverse). Under the contract, Mr. Twining had the legal authority to make a final and conclusive decision on award fees, which he did in his May 31, 1989, determination. *See* Pl.

Ex. 3 at 2-3; *id.* at Attach. A, p. 2 of 9; Pl. Supp. Br. at 3; *id.* at 18; *supra* at 4-5. Headquarters' internal concurrence policy could not divest him of that authority. *See* Pl. Supp. Br. at 23-24 (discussing *Tex. Instruments* and *Gen. Elec.*).

When Mr. Goldberg and headquarters reduced the award fees set forth in the May 31, 1989, determination, Mr. Twining was unable to "put his own mind to the problems and render his own decisions" about those reductions. *See* Pl. Supp. Br. at 19. As Defendant stipulated, headquarters "determined" and "mandated" the 89/1 award fees. *See* Pl. Ex. 5, Stipulation, ¶¶ 7, 8. The government tries to side-step this admitted breach of contract by suggesting that its "stipulation appears ambiguous when viewed in the context of the evidentiary record developed over the course of several years of discovery subsequent to its execution" and "that, in the face of such ambiguity, it is the evidence that should govern." *See* Gov. Supp. Br. at 21 n.12. But the stipulation is a binding admission and it could not be clearer. It confirms that, for the 89/1 and 89/2 Periods, (1) the AFDO "concluded" Rockwell's award fees should be certain amounts, (2) headquarters "determined" these amounts were "too high," (3) headquarters "determined" and "mandated" lower award fees, and (4) headquarters "caused" final award fee determinations to be issued in the "mandated" lower amounts. *See* Pl. Ex. 5. These stipulations of fact are clear and unambiguous, were made by Defendant's attorney of record, and are binding on the government. *See id.*; Mov. Br. at 7 n.4.[4]

---

[4] The government has no basis to complain that it "did not get the benefit of [its] bargain" as to the Stipulation. Gov. Supp. Br. at 21 n.12. Rockwell moved to compel the depositions of certain high-ranking DOE officials in order to gather evidence that headquarters had made the award fee decisions. *See* Pl. Supp. Ex. 101, Mem. in Supp. of Pl.'s Mot. to Compel Deps., lodged Mar. 9, 1993, ("Plaintiff's Motion to Compel") at 2. The government had resisted scheduling those depositions and had proposed that the evidence in question be elicited in a stipulation. *See id.* at 3-4 ("Mr. Kolar suggested to me that in lieu of Rockwell taking the seven depositions, the government might be willing to stipulate to the information that would otherwise be obtained through those depositions."). The parties later agreed that the government would execute the stipulation dated September 22, 1993, in exchange for Rockwell's withdrawal of Plaintiff's Motion to Compel. *See* Pl. Supp. Ex. 102, Pl.'s Further Status Report with Regard to Outstanding Discovery Mots. and Req. for Date for Oral Argument, lodged Sept. 3, 1993, ("Rockwell's Status Report") at 1, 2; Pl. Supp. Ex. 103,

(cont'd on following page)

The record fully confirms the facts set forth in the Stipulation. On or about September 20, 1989, headquarters sent Mr. Twining a draft award fee determination letter, which Mr. Meinhardt assumed Mr. Twining would adopt "[b]ecause he was a subordinate." *See* Gov. Supp. Br. at 17-18; Pl. Supp. Br. at 20 n.13. Mr. Twining didn't know the headquarters process that led to Mr. Meinhardt's communication to him on September 20, 1989, but testified that "[t]here wasn't much room for interpreting that letter. It was pretty clear. . . . They were approving a certain award fee." *See* Pl. Supp. Ex. 48, Twining Dep. at 83, 84-86, 95. Mr. Twining also testified that Admiral Watkins's September 20, 1989, letter to Mr. Beall (quoted in Gov. Supp. Br. at 18-19) informed Rockwell of the 89/1 award fee before giving Mr. Twining a chance to agree or disagree with it. *See* Pl. Supp. Ex. 96, *Stone* Trial Tr., Mar. 15, 1999, at 3255-57. Contrary to Defendant's assertion (*see* Gov. Supp. Br. at 10), the decision not to change the 89/1 award fee following Rockwell's appeal represented headquarters' wishes, not Mr. Twining's personal and independent decision. *See* Def. Supp. Ex. 69 at E 001999 (copy of Twining's letter to Sanchini with handwritten notations stating, *inter alia*, "Approved By Eric Fygi & John Meinhardt by telecon with Jim Stout on 11/7/89. Henson Moore consulted & approved."); Pl. Supp. Ex. 97, Twining Dep. at 116-17 (when asked why he needed Moore's approval on his

---

(cont'd from previous page)

Def.['s] Status Report, Sept. 3, 1993, ("Def.'s Status Report") ("Defendant concurs with the description of the [parties'] agreement as set forth in Rockwell's [S]tatus [R]eport."). But the parties' agreement also acknowledged that Rockwell reserved the right to re-notice the depositions in the event that the government was permitted to take discovery on issues that had not been identified in earlier status reports (*e.g.,* alleged misrepresentations, fraud, and breach of contract). *See* Pl. Supp. Ex. 102, Rockwell's Status Report at 2; Pl. Supp. Ex. 103, Def.'s Status Report. The government was allowed to take discovery (and ultimately amend its answer) on those issues and Rockwell re-noticed the depositions accordingly. *See* Pl. Ex. 32, Opinion and Order, Mar. 10, 2006, at 5-6; Pl. Supp. Ex. 104, Pl. Rockwell International Corporation's Renewal of Its Notice of Deps., Mar. 29, 1994.

response to Rockwell's appeal, Twining testified, "We probably worked with Mr. Meinhardt's staff and that's what they said they wanted.").[5]

Prior to June 6, 1989, Mr. Twining spent considerable time personally monitoring and evaluating Rockwell's performance at the Plant. *See* Pl. Supp. Ex. 99, Twining Dep. in *Stone* at 16-18; Pl. Supp. Ex. 96, *Stone* Trial Tr., Mar. 15, 1999, at 3124. But it is undisputed that Mr. Twining and Albuquerque Operations were taken "out of the loop" as to Rocky Flats one week after Mr. Twining made his May 31, 1989, determination. *See* Gov. Supp. Br. at 2-8; Pl. Supp. Br. at 4-5, 19. The resulting lack of access left Mr. Twining unable to provide his personal and independent judgment on changes to his award fee determination. *See* Pl. Supp. Br. at 19; Pl. Supp. Ex. 48, Twining Dep. at 126 ("I will repeat what I said. I don't know how I could do an award fee evaluation without having direct access to the site."); *id*. at 90-91 (when asked what he meant when he stated he was "not in a position to offer an informed alternative to [Goldberg's] proposal," Twining testified, "since Albuquerque was no longer in the loop and we didn't have access to the site, I didn't have any way to validate what they [were] finding").[6] Although Twining often conferred with the PERB about its recommendations before making his final judgment on award fees, he could not recall any such back and forth with Mr. Goldberg or with

---

5 The record does not corroborate Defendant's contention that a memo to file showed Mr. Twining "subjectively agreed with Headquarters' determinations." *Compare* Gov. Supp. Br. at 10 *and id.* at 22 (citing Def. Supp. Ex. 66) *with* Pl. Supp. Ex. 97, Twining Dep. at 101-02 (Twining testified that he wasn't sure of the purpose of Def. Supp. Ex. 66 and couldn't recall why he had signed it).

6 Albuquerque Operations' lack of access to Rocky Flats rendered the PERB similarly unable to assess independently Mr. Goldberg's reduction. *See* Pl. Supp. Ex. 99, Twining Dep. in *Stone* at 181 (PERB decided "they didn't have a basis to disagree with Mr. Goldberg"); Pl. Supp. Ex. 48, Twining Dep. at 76 (PERB advised Twining "we had no basis, really, to argue with the kind of findings that were coming out of Rocky Flats after those first several days and weeks and months of the raid"); Pl. Supp. Ex. 105, Dep. of Charles Edward Troell, Mar. 2, 1993, at 59-60 ("Goldberg was there, on the site, I hadn't been there on the site"); *id*. at 79 (Troell "had no basis for disagreeing with" Goldberg's assertion that he had seen things the PERB had not seen); *id.* at 123-24 ("the on-site presence and the additional information put [Goldberg] in a unique position, such that he should have been in a better position to judge and evaluate than those of us who weren't there").

headquarters. *See* Pl. Supp. Ex. 99, Twining Dep. in *Stone* at 62-63, 70-71, 120, 214 (Twining typically had follow up discussions with the PERB); Pl. Supp. Ex. 96, *Stone* Trial Tr., Mar. 15, 1999, at 3140-41 (Twining questioned PERB "so that I could feel like I really understood what I was signing up to in that award fee determination"); Pl. Supp. Ex. 99, Twining Dep. in *Stone* at 158-59, 160, 170-73, 180, 182 (Twining received Goldberg's July 27, 1989, memorandum, but could not recall award fee discussions with Wade, Goldberg, Barr, or Meinhardt); Pl. Supp. Ex. 97, Twining Dep. at 59-60, 70-73, 78, 83, 85, 87, 88, 95, 97, 100, 101, 106, 112, 114 (Twining received Goldberg's July 27, 1989, and Meinhardt's September 20, 1989, memoranda, but could not recall any other input or discussions with Goldberg or headquarters regarding their reductions); Pl. Supp. Ex. 96, *Stone* Trial Tr., Mar. 15, 1999, at 3219, 3237, 3240-41, 3252-53, 3272 (Twining could not recall award fee discussions with Wade, Goldberg, or Meinhardt). Mr. Twining described the 89/1 award fee process subsequent to his May 31, 1989, determination, as "a very contorted process." *See* Pl. Supp. Ex. 96, *Stone* Trial Tr., Mar. 15, 1999, at 3218-19; *see also* Pl. Supp. Ex. 48, Twining Dep. at 126-27 (89/1 was "not the away an award fee ought to be done").

This evidence fully corroborates the Stipulation and shows that Mr. Twining did not have "knowledge of the relevant facts" and could not "render his own decisions" regarding the reductions to his May 31, 1989, determination. *Gen. Elec.*, 412 F.2d at 1221; *N.Y. Shipbuilding*, 385 F.2d at 435.

### B. Mr. Nelson's Purported Agreement with Headquarters' Mandated Award Fee Is Irrelevant

Defendant asserts that the 89/2 award fee was proper because Mr. Nelson "subjectively agreed with Headquarters' determinations" and "subjectively determined that the award fee decisions should not be raised in response to Rockwell's appeals." *See* Gov. Supp. Br. at 10; *see also id.* at 25-27. The insignificance of Mr. Nelson's opinion of headquarters' "mandated" award fees is evidenced by Defendant's own admission that Mr. Nelson had no "substantive involvement in determining the award fees." Pl. Ex. 5, Stipulation, ¶ 11; Gov. Supp. Br. at 10.

Defendant's admission finds ample support in the record. Mr. Nelson had nothing to do with Rocky Flats until four months after the 89/2 Period ended. *See* Gov. Supp. Br. at 25 (headquarters decided to replace Simonson with Nelson around Jan. 25, 1990); Pl. Supp. Ex. 52, Dep. of Robert M. Nelson, Jr., Nov. 9, 1992, ("Nelson Dep.") at 22-23 ("around the 28th or 29th of January of 1990 was the first day I had ever set foot on the place"); Pl. Supp. Ex. 106, *Stone* Trial Tr., Mar. 16, 1999, at 3489-90 (Nelson had no prior experience with Rockwell when he started at Rocky Flats in late January 1990). Six months after his arrival at Rocky Flats, he had his first and only contact with Rockwell. *See* Pl. Supp. Ex. 107, Nelson Dep. at 102-03. Because Rockwell was no longer the Plant contractor when Mr. Nelson arrived at Rocky Flats, it "never even crossed [his] mind" that he would be Rockwell's AFDO. *See id.* at 30; *see also* Pl. Supp. Ex. 106, *Stone* Trial Tr., Mar. 16, 1999, at 3493 (Nelson did not want to be Rockwell's AFDO and resisted the appointment because he had no involvement with Rockwell's work at Rocky Flats). Mr. Nelson communicated headquarters' "mandated" award fee to Rockwell on February 26, 1990, the same day that he was delegated as AFDO. Pl. Ex. 5, Stipulation, ¶ 11; *see* Def. Supp. Ex. 79; Pl. Supp. Ex. 85; Pl. Supp. Ex. 106, *Stone* Trial Tr., Mar. 16, 1999, at 3502-03. He did not meet with the PERB before issuing the February 26, 1990, letter. *See* Pl. Supp. Ex. 107, Nelson Dep. at 53, 75; Pl. Supp. Ex. 106, *Stone* Trial Tr., Mar. 16, 1999, at 3504-05. He could recall discussing the award fee before issuing it in only one 60-90 minute meeting with Messrs. Bishop and Agy, two administrative personnel. *See* Pl. Supp. Ex. 107, Nelson Dep. at 45-46, 48-49, 54-56, 84-86, 94-95, 111-12; Pl. Supp. Ex. 106, *Stone* Trial Tr., Mar. 16, 1999, at 3505-07; Pl. Supp. Ex. 57, Dep. of Terrel Agy, Oct. 21, 1992, at 20; Pl. Supp. Ex. 56, Dep. of Marshall L. Bishop, Dec. 8, 1992, at 16.

Mr. Nelson's non-substantive involvement differs starkly from Mr. Simonson's experience as the AFDO. Mr. Simonson had worked at Rocky Flats for several months by the time he made his December 6, 1989, award fee determination. *See* Def. Ex. 34 (Simonson had been Acting Deputy Manager of Rocky Flats Area Office since July 12, 1989); *see also* Pl. Supp. Ex. 108, Dep. of David P. Simonson, Dec. 10, 1992, ("Simonson Dep.") at 1, 9, 13, 15, 16. In

making his determination, Mr. Simonson followed each step in the award fee procedure. *See* Pl. Supp. Br. at 17-18, 21-22. He considered input from the PEC, the PERB, Rockwell, and headquarters. *See id*. at 22. Unlike Mr. Twining's situation after June 6, 1989, Mr. Simonson had access to the same information as headquarters. *See* Pl. Supp. Ex. 109, Dep. of Admiral Jon Michael Barr, Sept. 23, 1994, at 173. Mr. Simonson had "knowledge of the relevant facts" and "render[ed] his own decisions" regarding the 89/2 award fee. *Gen. Elec.*, 412 F.2d at 1221; *N.Y. Shipbuilding*, 385 F.2d at 435; *see* Pl. Supp. Br. at 21-22, 25. He believed his December 6, 1989, determination was appropriate and did not agree with headquarters' two reductions to that determination. *See* Pl. Supp. Br. at 22. It is undisputed that Mr. Simonson was not succeeded as AFDO until after he made his December 6, 1989, decision. *See* Gov. Supp. Br. at 24-25 (noting that approximately two weeks after the Barr memorandum disagreeing with Simonson's determination was handcarried to Rocky Flats, Watkins *et al.* decided to replace Simonson with Nelson); Pl. Supp. Br. at 5. Whether Mr. Nelson subsequently agreed with headquarters' "mandated" award fee is irrelevant because once Mr. Simonson expressed his December 6, 1989, decision, it could not be overruled. *See Gen. Elec*., 412 F.2d at 1221 (when an authorized decision-maker expresses a definite opinion on the merits of a claim with knowledge of the relevant facts, a 'decision' has been made; such decision cannot be reversed by a successor decision-maker); Pl. Supp. Br. at 6 (citing cases); *id*. at 21 (Twining delegated his AFDO authority to Simonson with headquarters' approval); Pl. Supp. Ex. 97, Twining Dep. at 129-30 (Twining coordinated his delegation to Simonson with headquarters).

### C. Damages Should Be Measured by the May 31 and December 6, 1989, Determinations

Rockwell's damages should be measured by Mr. Twining's May 31, 1989, determination and Mr. Simonson's December 6, 1989, determination because those are the only "unfettered," personal and independent decisions the AFDOs made on award fees. *Gen. Elec.*, 412 F.2d at 1221-22 ("As we have emphasized numerous times, it is the unfettered opinion of the person delegated as decision-maker by the parties to the contract that is determinative. . . . [W]e cannot

substitute our judgment for that of the proper decision-maker . . . . If the court were to independently redetermine the [dispute], we would be ignoring the contractual delegation of responsibility by the parties, the same type of encroachment we have condemned . . . ."); Sections II.A and B, *supra*; *cf.* Pl. Ex. 5, Stipulation, ¶¶ 1, 9.

While Defendant contends that Mr. Twining "adopted" Mr. Goldberg's reduced scores and award fees (*see* Gov. Supp. Br. at 15, 17, 35), the record shows that Mr. Twining was cut out of the loop as of June 6, 1989, and did not have the relevant facts to make a personal and independent judgment about Mr. Goldberg's reduction. *See supra* at 7-10. Moreover, it is undisputed that the information Mr. Goldberg purportedly relied on in reducing Mr. Twining's May 31, 1989, determination emerged after the end of the 89/1 Period. *See* Gov. Supp. Br. at 12-13; Pl. Supp. Br. at 19 n.12. Thus, it should not have been considered in determining Rockwell's 89/1 award fee in any event. *See* Pl. Supp. Br. at 19-20 n.12. In contrast, the award fees set forth in Mr. Twining's May 31, 1989, determination represented his independent judgment and "a fair and balanced assessment." *See* Pl. Supp. Ex. 96, *Stone* Trial Tr., Mar. 15, 1999, at 3211-18 (Twining came up with his own assessment that the award fee should be $5.176 million based on his independent judgment, the PERB's recommendations, and oral briefing from PERB chair); *id.* at 3223-24 ("it was the judgment of the performance evaluation board then and myself that that [May 31, 1989, determination] was a fair and balanced assessment"). Thus, it is the May 31, 1989, decision that should control. *See Gen. Elec.*, 412 F.2d at 1221-22; *see also John A. Johnson Contracting Corp. v. United States*, 132 F. Supp. 698, 705-06 (Ct. Cl. 1955) (converting default termination to convenience termination as originally decided by contractual decision-maker "before he was overruled by the commanding officer and influenced by the lawyers").

Contrary to Defendant's assertion, there is a "benchmark from which to measure damages for the 89/2 [P]eriod." Gov. Supp. Br. at 36. Mr. Simonson's December 6, 1989, determination is the proper benchmark for numerous reasons. For starters, Mr. Twining delegated his AFDO authority to Mr. Simonson with headquarters' approval. *See* Pl. Supp. Br. at 21; *see also* Pl. Supp. Ex. 97, Twining Dep. at 129-30. In determining the appropriate award fee, Mr. Simonson

followed the same steps Mr. Twining had used in rendering the May 31, 1989, determination and the determination for 88/2. *Compare* Pl. Supp. Br. at 18 *with id*. at 21-22. As was the case with Mr. Twining's May 31, 1989, determination, Mr. Simonson's December 6, 1989, determination complied with every step of the award fee procedure. *See id*. at 17-18, 21-22. Because Mr. Simonson's award fee determination was authorized by headquarters and Mr. Twining, complied with the award fee procedure, and resulted from Mr. Simonson's personal and independent judgment, that decision should be determinative. *See Gen. Elec.*, 412 F.2d at 1221-22.

The 15-year duration of this action provides another reason to measure Rockwell's damages by the May 31 and December 6, 1989, determinations. An alternative remedy would require the Court or Mr. Twining to revisit the 89/1 and 89/2 award fee determinations 17 years after the conclusion of the 89/2 Period and Rockwell's transfer of its responsibilities to a successor contractor at Rocky Flats. The difficulties inherent in such an undertaking are obvious given that the witnesses had difficulty remembering relevant events when their depositions were taken over ten years ago. *See, e.g.,* Pl. Supp. Ex. 48, Twining Dep. at 53, 57, 84, 99; Pl. Supp. Ex. 110, Dep. of Edward S. Goldberg, Nov. 10, 1992 ("Goldberg Dep.") at 62-64.[7] Indeed, the Federal Circuit ruled that it "would be wasteful and costly" to try to estimate the appropriate award fee even four years after contract termination. *See Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1485 (Fed. Cir. 1998). Basing the appropriate award fees on the May 31 and December 6, 1989, determinations gives the parties the unfettered, personal and independent decisions of the AFDOs and "provides the soundest means for resolving this dispute." *Id.* at 1485.

---

[7] Pl. Supp. Ex. 110 also includes page 93 of the Goldberg Dep., which was cited in Pl. Supp. Br. at 5, but inadvertently omitted from Pl. Supp. Ex. 49.

## III. ROCKWELL HAS ALLEGED AND SHOWN NUMEROUS BREACHES OF THE CONTRACT

Contrary to Defendant's assertion, Rockwell has alleged and shown numerous breaches of contract provisions other than headquarters' usurpation of the contractually designated decision-maker. *Compare* Gov. Supp. Br. at 27-28 *with* Compl. ¶ 25 ("DOE's unilateral change requiring an Assistant Secretary to approve the AFDO's award-fee determinations for Rockwell is a breach of the Contract."); *id.* ¶ 12 ("The Contract explicitly provides that the 'award fee shall be determined subjectively by the Award Fee Determination Official based on the Contractor's performance in accordance with the Award Fee Plan set forth in Appendix D.' Contract, Clause 54, subparagraph (b)(2)."); *id.* ¶ 32 ("The AFDO's purported award-fee determination of September 27, 1989 for the October 1, 1988 through March 31, 1989 period was in plain contravention of the Contract's award-fee provisions and contrary to law."); *id.* ¶ 36 ("The Manager of DOE's Rocky Flats Office's purported award-fee determination of February 26, 1990 for the April 1, 1989 through September 30, 1989 period was in plain contravention of the Contract's award-fee provisions and contrary to law."); Pl. Supp. Br. at 29-35 (setting forth various breaches of contract).

Defendant does not dispute that Secretary Watkins never designated one headquarters official as the AFDO, which breached the contract's requirement that award fees be determined by one final decision-maker. *See* Gov. Supp. Br. at 2, 5 n.5, 10, 15-19, 24-26 (multiple headquarters officials determined Rockwell's award fees); Pl. Supp. Br. at 30 (DOE breached contract requirement that the AFDO be a single, final decision-maker). And Defendant concedes that Mr. Goldberg reduced the ratings for the three FPAs mentioned in his July 27, 1989, letter, thereby reducing the overall recommended award fee. *See* Gov. Supp. Br. at 14; *see generally* Pl. Supp. Br. at 31-33 (DOE breached contract's 20% weighting for ES&H by treating three separate FPAs as ES&H to comply with headquarters' directive to weigh ES&H at 50-51%).

Headquarters made "a major change" in Rockwell's award fee determination by elevating the weighting of ES&H to 50-51 percent, in place of the 20 percent specified in the contract. *See*

Pl. Supp. Br. at 32 (quoting headquarters' Moore). This breached the contract's Performance Evaluation Plan and the provisions regarding changes to the specified weightings. *See id.* at 31-33; Pl. Supp. Ex. 99, Twining Dep. in *Stone* at 164-70 (where expectations change significantly during evaluation period, contract's award fee plan should be changed as well); Pl. Supp. Ex. 100, Hill Dep. at 86-88 (if FPAs were changed, contractor would have to be notified in advance; contract reflected FPAs and weightings for 89/1 and 89/2).

Rockwell does not allege that headquarters' failure to adhere to the 1977 Handbook in itself breached the contract. *Cf.* Gov. Supp. Br. at 28-31 (arguing 1977 Handbook was not part of the contract). That's because the 1977 Handbook is entirely consistent with Rockwell's interpretation of the contract's provision defining the AFDO as the Manager of Albuquerque Operations, and not a headquarters official. *See* Pl. Supp. Br. at 14. In addition, the 1977 Handbook shows that Messrs. Twining and Simonson followed DOE's own procedures in making their May 31 and December 6, 1989, determinations and that those determinations were the final steps in the award fee process. *See id.* at 17-18, 21-22. Moreover, the 1977 and 1990 Handbooks together provide evidence that headquarters' concurrence policy did not exist when the 1989 Contract was amended in February 1989. *See id.* at 14-15; *cf.* Gov. Supp. Br. at 31 (acknowledging 1977 Handbook did not provide for headquarters' concurrence).

## IV. DEFENDANT HAS NOT ALLEGED OR SHOWN THE INDUCEMENT REQUIRED TO ESTABLISH ITS ESTOPPEL BY WAIVER DEFENSE

Defendant's argument that DOE did not conceal headquarters' involvement in the award fee determination process (*see* Gov. Supp. Br. at 32-35) is far too generalized. Rockwell was never advised that, contrary to the contract, headquarters, rather than Mr. Twining, would make the final decision on award fees. Indeed, on September 20, 1989, headquarters issued a draft award fee determination letter to Mr. Twining at the same time it issued a letter informing Mr. Beall that Rockwell would "be advised of the particulars of the award fee determination of the Department by the appropriate contracting officer, as is the normal procedure." *See id.* at 17-19

(discussing Def. Exs. 65 and 49); Def. Ex. 49 at 1. In short, as of September 20, 1989, even DOE headquarters understood that a determination by Mr. Twining was the "appropriate" and "normal procedure."

Defendant still has not shown, or even alleged, that Rockwell's alleged acquiescence induced headquarters to usurp the AFDO's authority. That simply was not the sequence of events. According to Defendant, headquarters required its concurrence in award fee determinations as of May 31, 1989. *See* Gov. Supp. Br. at 11 n.6. Thus, before any of the communications Defendant relies on even took place, DOE had already changed its position. *See id.* at 32-35 (referencing communications from June 16 to Sept. 27, 1989); DPFOUF ¶¶ 81-90 (referencing communications from June 13 to Sept. 20, 1989). And absent inducement to a party's detriment, there can be no estoppel. *See* Pl. Reply at 22-25; Mov. Br. at 36-37.

In addition, these communications did not indicate that an official other than the Department's Manager of Albuquerque Operations would make the Department's determination on award fees, as the contract required. By taking part in such communications, Rockwell did not engage in conduct "so consistent with intent to waive [its right to a determination by the Manager of Albuquerque Operations] that no other reasonable explanation is possible." *Lyon Dev. Co. v. Bus. Men's Assur. Co. of Am.*, 76 F.3d 1118, 1125 (10th Cir. 1996). As such, the government's purported waiver defense -- which in any event is barred by the Court's March 10, 2006, Order -- fails as a matter of law. *See* Pl. Supp. Br. at 37-38; Pl. Reply at 22-29.

/ / /

**CONCLUSION**

For the reasons set forth in Plaintiff's Motion for Summary Judgment and Memorandum in Support Thereof, in Plaintiff's Memorandum in Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Cross-Motion for Summary Judgment, in Plaintiff's Supplemental Submission on Cross-Motions for Summary Judgment, and herein, Rockwell respectfully requests that the Court grant its motion for summary judgment for $5,333,606 of additional award fees, plus interest as allowed by law.

November 13, 2006

CHADBOURNE & PARKE LLP
RICHARD J. NEY
Attorney of Record

By: s/ Richard J. Ney
Richard J. Ney
S. Jean Kim
350 South Grand Avenue, Suite 3300
Los Angeles, CA 90071
Telephone: (213) 892-1000
Facsimile: (213) 622-9865

Attorneys for Plaintiff
THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION