ELECTRONICALLY FILED ON NOVEMBER 13, 2006

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 91-1362 C<br>(Judge Lettow)<br><br>**DECLARATION OF S. JEAN KIM IN SUPPORT OF ROCKWELL'S RESPONSE TO DEFENDANT'S SUPPLEMENTAL SUBMISSION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

I, S. JEAN KIM, declare and state as follows:

1. I am an attorney with the law firm of Chadbourne & Parke LLP, which represents Plaintiff The Boeing Company, Successor-in-Interest to Rockwell International Corporation, ("Rockwell") in these proceedings. I make this declaration on my personal knowledge and could competently testify to the matters set forth herein, if necessary.

2. Attached hereto as Exhibit 96 is a copy of selected pages from the transcript of the trial in *United States ex rel. Stone v. Rockwell International Corp.*, No. 89 M 1154 (D. Colo.) ("*Stone*"), on March 15, 1999.

3. Attached hereto as Exhibit 97 is a copy of selected pages from the transcript of the deposition of Bruce G. Twining on February 23, 1993.

4. Attached hereto as Exhibit 98 is a copy of selected pages from the transcript of the deposition of James D. Watkins on April 29, 1994.

5. Attached hereto as Exhibit 99 is a copy of selected pages from the transcript of the deposition of Bruce Twining in *Stone* on April 7 and April 8, 1998.

6. Attached hereto as Exhibit 100 is a copy of selected pages from the transcript of the deposition of Theetis V. Hill on December 2, 1992.

7. Attached hereto as Exhibit 101 is a copy of Memorandum in Support of Plaintiff's Motion to Compel Depositions, dated March 5, 1993, and lodged March 9, 1993.

8. Attached hereto as Exhibit 102 is a copy of Plaintiff's Further Status Report with Regard to Outstanding Discovery Motions and Request for Date for Oral Argument, dated September 2, 1993, and lodged September 3, 1993.

9. Attached hereto as Exhibit 103 is a copy of Defendant['s] Status Report, dated September 3, 1993.

10. Attached hereto as Exhibit 104 is a copy of Plaintiff Rockwell International Corporation's Renewal of Its Notice of Depositions, dated March 29, 1994.

11. Attached hereto as Exhibit 105 is a copy of selected pages from the transcript of the deposition of Charles Edward Troell on March 2, 1993.

12. Attached hereto as Exhibit 106 is a copy of selected pages from the transcript of the trial in *Stone* on March 16, 1999.

13. Attached hereto as Exhibit 107 is a copy of selected pages from the transcript of the deposition of Robert M. Nelson, Jr., on November 9, 1992.

14. Attached hereto as Exhibit 108 is a copy of selected pages from the transcript of the deposition of David P. Simonson on December 10, 1992.

15. Attached hereto as Exhibit 109 is a copy of selected pages from the transcript of the deposition of Admiral Jon Michael Barr on September 23, 1994.

16. Attached hereto as Exhibit 110 is a copy of selected pages from the transcript of the deposition of Edward S. Goldberg on November 10, 1992.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Los Angeles, California, on November 13, 2006.

S. Jean Kim

PL. SUPP. EX. 96

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA and
UNITED STATES OF AMERICA, ex rel.
JAMES S. STONE,

Plaintiffs,

vs. ) 89 M 1154

ROCKWELL INTERNATIONAL CORPORATION, et al.,

Defendants.

---

TRIAL TO JURY - DAY 14
TRANSCRIPT OF PROCEEDINGS

---

Proceedings held before the HONORABLE RICHARD P. MATSCH, U.S. District Judge for the District of Colorado, beginning at 8:55 a.m. on the 15th day of March, 1999, in Courtroom C-204, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs: Maria T. Vullo, Esq.
Jeannie S. Kang, Esq.
Matthew Chevez, Esq.
Robert E. Montgomery, Jr., Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
Suite 2607
New York, New York 10019

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

2531, and, in particular, do you see the first page there?
A Yes, I do.
Q Do you see this refers to a visit to Rocky Flats by you on March 10, 1988?
A Yes.
Q Do you recall that shortly after you became manager of DOE's Albuquerque office you visited each of the plants under Albuquerque's jurisdiction?
A Yes, I did. I visited Rocky Flats probably more frequently than the other places during that first year I was in Albuquerque.
Q Okay. So do you believe this visit referred to in this stipulated exhibit was your first visit to Rocky Flats?
A I don't--it's obviously my visit to Rocky Flats. I don't know whether I was still working in Washington at this time or whether I was already in Albuquerque.
Q Okay. So you might have made the visit before coming out but in anticipation--
A I could have, yes.
Q --of your becoming the head person? All right. Do you recall, in one of your first visits to the plant, taking a driving tour of kind of the key areas of the plant?
A Yes.
Q And I wonder if you could look at the second page of this exhibit. Do you see that's an agenda for your March 10,

Q And, actually, to change significantly the recommendation of the performance evaluation review board, you'd have to have pretty significant new information? That was your view of the thing?
A It isn't that unusual for me to question the performance evaluation board on how they came up with a particular score or evaluation, and sometimes that questioning would cause them to change their assessment. But I would say, typically in every cycle, there's one or two questions spread across all of the plants that I asked the board to go back and explain to me in more detail.
Q Okay. By which you mean it would be kind of a common issue and you'd ask them to look at it with commonality: namely, why are all our sites having this problem or why are they all being graded this way?
A Or if there was something that went on at a site that I didn't see really reflected in the report, I would ask why not. Or if it went on and I had a feeling for how serious it was and in the report they didn't rate it serious enough, I would say how come. And it was that kind of questioning. Just so that I could feel like I really understood what I was signing up to in that award fee determination.
Q Okay. And this would sometimes result in a change in the actual award fee from--
A Yeah, sometimes.

Q But, typically, it would be a small change; is that right?

A Typically.

Q And in this instance, we looked at it before, but the upshot of the award fee process, I wonder if you could actually look at this in this book that you have. It's Defendant's Exhibit, stipulated, I believe it's, yeah, D117.

A Okay.

Q Now, this is the letter by which you transmitted the award fee forward recommendation to Rockwell; is that right?

A Yes, it is.

Q And we've looked at this. This is the cover sheet showing Charlie Troell signing off on it November of 1988?

A Yes.

Q The particular area in which Rockwell's pondcrete performance was evaluated was general management--is that correct?--for this award fee period? And I'm looking at the first and second pages of the evaluation itself.

A It appears to be under "General Management," yes.

Q Okay. And do you see--and that was because waste management was not actually a separate functional performance area for this area?

A Apparently not at this time.

Q I'd like you to look at the heading on the first page here. Rockwell received a deficiency for this performance in

it by DOE?
A Yes.
Q And then you see that the total score when you get all the ratings and all the weights is 91.8; do you see that?
A Yes.
Q Okay. And then that translates into a recommended award fee of $5.6 million? I'm looking down there below the performance points in the middle of the page towards the bottom.
A Yes.
Q So that was the recommendation Earl Whiteman made to the board?
A Yes.
Q Okay. Now, the board met and discussed this recommendation on May 10, 1989, and that's at Tab--the document I showed you earlier at Tab 38, Defendant's Exhibit D131.
A Okay.
Q And, again, they're on schedule, the deadline is May 19th for getting this out to Rockwell; right?
A Yes.
Q And there's a lot of people here attending this meeting, and the jury--we have seen an earlier one, but I'd like to look now for the first time at this one that we haven't seen before. All of these people, there's about 15 of them,

participate and attend this PERB meeting; is that right?
A Yes, I'd say so.
Q And they attended because they have insight into Rockwell's performance, and in addition, they have insight into the performance of the other contractors under Albuquerque's jurisdiction?
A Yes, they do.
Q And do you see there's a reference to the fact that the copies of Mr. Whiteman's report have been distributed; do you see that?
A Yes.
Q Now, on the second page, there's discussion from these minutes of this meeting on May 10 of Environment, Safety and Health, and I'd like to draw your attention to that. It's under numbered Paragraph 5 on the second page. Do you see the person taking these minutes, who I believe is Mr. Hill, says, "There was considerable discussion on this area of ES&H," and of course that's the job of the PERB, is to--
A Yes.
Q --to evaluate all that data. And then in the second paragraph, it says, "The area manager recommended a grade of 84." And remember we just saw that on his recommendation?
A Yes.
Q "Which is three points higher than the last period." They go and say the number of noteworthy achievements and

notable deficiencies, and then they say, "After consideration of all the data, and in view of the nature of the deficiencies, the board was of the opinion that the grade should not be higher than the last period, and recommended a grade of 81." Do you see that?
A Yes.
Q So this is exactly what you would expect this PERB to do, to bring to bear all of its information and make an independent assessment that it would then bring to you?
A Yes.
Q Now, looking at the last page of these minutes, do you see the minutes say that the PERB recommends a grade of 91.20. Now, do you see that's lower than the one that Mr. Whiteman had recommended by about six-tenths of a point?
A Yes.
Q And an award of 5.3 million. And that again is lower than the one that Mr. Whiteman--
A Yes.
Q Okay. Now, this--the result of that is a revised spreadsheet, and I'll show you this one, which is at Tab 39, and it's stipulated D124. Do you see Mr. Troell has created a revised spreadsheet which shows these new numbers for, among other things, ES&H, and it shows that it's been lowered to 81. That lowers that score, lowers the score to 91.2, and they have a lower recommended fee of 5.3?

A Yes.
Q Now, this form right here is one of the pieces of information you would get from the PERB and from Mr. Troell to figure out what you thought was a fair and appropriate award fee?
A Yes, it is.
Q And the other piece of information that you would get and did get is at Tab 40, is it not? And this is Defendant's Exhibit A467, and it's stipulated.
A Yes, that looks like the full report.
Q And it was your practice to read the full report that you received?
A Yes.
Q And do you see it's dated at the bottom on that first page May 17, 1989?
A Yes.
Q That's two days before the contractual due date for issuance of the report to Rockwell?
A Yes.
Q And you'd read this and the other, that spreadsheet that we just looked at that Mr. Troell signed, and you'd make your own independent assessment of what you thought the appropriate award fee was?
A Yeah, I was generally briefed verbally about the report, too. Between getting the report and making that

determination, I was briefed by the--a few members of the performance evaluation board.

Q Okay. So in addition to having this written report and the written spreadsheet, you got an oral briefing?

A Yes, sir.

Q Okay. And then based on that oral briefing, you came up with your own assessment of what the award fee should be, because that was your responsibility as the AFDO, award fee determination?

A Yes.

Q Now, did you in fact issue to Rockwell its award fee on the contractually required date, namely May 19, 1989?

A I don't think I did. I believe that there was a requirement to go to Headquarters for approval.

Q Had there in any previous award fee period been a requirement imposed by Headquarters that you can recall that the draft reports or information about them go back to Headquarters?

A I don't think so. I think that was a new requirement that had been imposed.

Q Okay. And, in fact, you did submit a summary memo back to Headquarters sometime after the due date for Rockwell in which you advised headquarters of the award fee you planned to give to each of the contractors under Albuquerque's jurisdiction?

A I don't recall what the date is, but I believe that that was the process that we went through.
Q And this was the first time you'd gone through it to your recollection?
A I think so.
Q I wonder if you could look at Tab 41, which is a stipulated exhibit A470? Do you see this is a memorandum from you dated May 31, 1989?
A Yes.
Q And that is, what, about one week before the FBI raid?
A Yes.
Q And this is to Troy Wade. Who was he again?
A He was the acting assistant secretary for defense programs.
Q Was he a direct report to the Secretary of Energy?
A Yes, he was.
Q And the Secretary of Energy at that point was Admiral Watkins?
A Watkins, yes.
Q Now, do you see in the first paragraph, you state, "Albuquerque Operations Office has completed its award fee process for the subject period. The process includes staff level assessment against an award fee plan by both the area office and the Albuquerque functional organizations, consolidation of those assessments by the area office

managers, review and modification as appropriate by the performance evaluation review board, and presentation to me for a final determination."
Do you see that?
A Yes.
Q And all those steps had in fact been fulfilled?
A Yes, they had.
Q And then you set forth for each of the facilities, and there's the Kansas City plant, the Mound plant, the Pinellas plant, the Rocky Flats plant, and the WIPP plant; do you see that?
A Yes.
Q And you set forth your recommendation for each, and I'd like to draw your attention to the Rocky Flats plant, which is at Page 3 toward the bottom. Do you see that?
A Yes.
Q And do you see at the very bottom, you're talking about the award fee for last period, which was in the amount of 4.8 million roughly, and we've already talked about that, and then your recommended proposed award fee is 5.2 million.
Do you see that at the very bottom of Page 3?
A 5.176 million, yes.
Q Right. And do you recall that's slightly lower than the recommendation of the PERB?
A Yes.

Q And that's because you had independently brought to bear your information about everything and decided it should be slightly lower?
A Yes.
Q But it still was significantly higher than the preceding one. Do you see that?
A Yes.
Q And wasn't it in fact a record award fee?
A I don't know.
Q Okay, why don't you look with me, if you would, please, at Tab 37, the very--well, four pages from the back. It bears Bate Number E2583. This was the document that was provided by Mr. Whiteman to the PERB.
A Okay.
Q Do you see that in fact through the--that period, the highest ever given was 4.8 million? You can look through the whole list of the first ten years. I've only highlighted part of it.
A Yeah, 4.79 million.
Q And then you're recommending here to Headquarters an award of 5.1 million?
A Yes.
Q Okay. Now, do you recall what you heard back from Mr. Wade when you gave him this list of your proposed award fees for all of the contractors under Albuquerque's jurisdiction?

A I don't really recall specifically, but I know this was a very contorted process, because the raid did take place in that timeframe, and there were new people brought to the site and new information was provided in the process.
Q Wonder if you could look at the last page of the document at tab 41, which was your memo to Mr. Wade a week before the raid? And it's Exhibit number A470. Do you see that Mr. Wade's signature appears there in the bottom left corner?
A Yes, I do.
Q That's below the place where you signed your letter to him.
A Yes.
Q Do you see it says "concur with exception of Rockwell?"
A Yes.
Q Do you recall discussing with Mr. Wade his decision to agree to every other award fee that you recommended except that for Rockwell?
A I don't really recall discussions with Mr. Wade on this topic.
Q Now the performance evaluation that you approved is at tab 40, and I want to look with you on just a couple of matters that relate to pondcrete and saltcrete if I may. They're on--I'm looking at defendant's Exhibit A467, and in particular at page--four pages in--it's E2277. Do you see

A Yes.
Q And do you have any idea, sir, what you think Rockwell should have done to contain the leaching of nitrates from the saltcrete that were stored outdoors and exposed to rain and snow?
A I don't know what my people thought the right approach would have been done other than more aggressive action on both the basic process and berming or whatever. I don't know what the disappointment was here.
Q More aggressive action as in perhaps keeping them from getting exposed to rain and snow?
A Yeah, or berming.
Q Or shipping it off-site?
A Yes.
Q Just so we're clear, do you recall--we've seen that your memo back to headquarters was written seven days before the raid. Do you recall when it was that you learned that you needed the concurrence of headquarters?
A No, but I--the fact that we wrote the kind of letter we did for all of the plants leads me to be believe it was a part of new processes that Admiral Watkins brought in. And I don't know when he did that.
Q All you know is that seven days before the raid is when you wrote the memo.
A Yeah.

view to your recollection?
A Yes.
Q Now there were two possible culprits. I mean if there were environmental violations going on out there, was it your understanding that there were two possible entities that might have been responsible, namely DOE and Rockwell?
A Yes, we were--yeah.
Q And you understood that Congress set the Department of Energy's budget each gave, gave DOE the money it had to spend?
A Yes.
Q And that Congress also determined how much autonomy the Department of Energy had?
A I don't know what you mean by that.
Q Well how much oversight there would be of that department and its facilities by the EPA and by others.
A Yes.
Q Do you recall having any concern at the time that you sent that memo to Mr. Wade and got back Mr. Wade's statement that he agreed with everything except Rocky Flats, being concerned about the possibility that if in fact you did what you planned to do--namely give Rockwell a record award fee for the period immediately preceding the raid--that it would be apparent that DOE was aware of whatever conditions went on there and in effect said they were all right?

A At the time that we did the award fee we were dealing with the best information we had at the time. And I think you've gone through some paragraphs that talked about what our concerns were. There were other areas where we were fairly pleased with Rocky Flats performance, and I think it was the judgment of the performance evaluation board then and myself that that was a fair and balanced assessment.
Q The one that you had--
A Based on the information we had at that time, yes.
Q Right. And my question is after the raid, did it occur to you that if in fact DOE did the opposite--DOE slashed Rockwell's award fees--that there would be a lot of public attention given to the award fee ultimately derived and awarded?
A I was really mostly worried about those spectacular allegations and could that have possibly been going on at that site, and frankly in the weeks after the raid the award fee wasn't one of those things that was on the top of my mind.
Q Well whether it was in the immediate period following it or thereafter, you remained the award fee determination official.
A Yes, I did.
Q So sooner or later you were going to have to decide what was the appropriate award fee.

A That's right.
Q That was your call to make and Rockwell was entitled to have you make that decision.
A That's right, except that this headquarters review process had been put into the system.
Q And my question is, in deciding what the appropriate award fee would be, did you take into account, Mr. Twining, the fact that if you slashed the award fees the public when it learned about it might draw the conclusion that you learned after the raid about the problems at the plant and decided "we're shocked, now that we know this we're going to cut the award fees?"
A That wasn't one of the things that went into my thinking.
Q I believe you indicated that it was important that there be a relationship of trust between DOE and Rockwell?
A That's right.
Q And that was because this was an important project and you had to be able to rely on one another to be truthful and be candid with one another?
A That's right.
Q And as you sit here today are you aware of any facts that indicate to you that Rockwell breached that trust?
A No, I'm not.
Q And again there had to be as well a trusting

A Yes.
Q "--for which I recommend revised scores. But the basic problem which underlies all FPAs is a lack of discipline in operation. This is apparent in Rockwell's failure adequately to define the entire safety envelope for the operation of each facility." Do you see that?
A Yes.
Q Now again you were the guy responsible for making the award fee determination, is that right?
A Yes.
Q Do you recall calling Mr. Goldberg and saying "What do you mean by Rockwell's failure to adequately define the entire safety envelope for the operation of each facility?"
A I recall having discussions with Mr. Goldberg after he got to Rocky Flats. I don't remember the specific discussions I had. There were a lot of things that were in transition during that period of time. I don't remember talking to him about that statement.
Q I wonder if you could look at the top of the second page of Mr. Goldberg's memo to you, the top paragraph. Looking at the third line down, it says "The headquarters EH on-site representative"--do you see that language? It says "routinely observe and report problems which in-plant supervision should identify and correct without outside intervention. Again these are systematic problems indicating

Q "Although nitrate concentrations on the 750 Pad increased and reached an all time high, Rockwell took little action to contain the major contributor, saltcrete." Do you see that?

A Yes.

Q And isn't that likewise the very same thing that you considered and the PERB considered and Mr. Whiteman considered and everybody considered in determining that an appropriate award fee was $5.1 million?

A Yes, I think it was.

Q Then lower down under the heading Environment Safety and Health, do you see that Mr. Goldberg, who obviously has the report, the previous report, right--because he's referring to it here--he says "The PERB report under the heading ES&H contains seven notable deficiencies. I believe the first two are properly categorized as Notable Significant Deficiencies." Do you see that?

A Yes.

Q Now one effect of changing the label on the exact same conduct is to--one possible effect is to lower the award fee for that category.

A Yes.

Q And do you recall talking to Mr. Goldberg at all about whether it was appropriate to lower that in light of all of the circumstances confronting Rockwell at the relevant time

period when Mr. Goldberg wasn't even there?
A I don't--I've said I don't recall talking to Mr. Goldberg about his recommendation on the award fee.
Q Do you see he does then attach though a revised calculation of the award fee for the period, do you see that? And it is attached and signed by him.
A Yes.
Q Okay. And this is in a form very similar to the form we looked at before.
A Yes.
Q And do you see now ES&H is at a level of moderately good and the numerical grade is 79?
A Yes.
Q And the general management up top is now down to a grade of Good. And remember when we first saw it, it was Excellent?
A Yes.
Q And it's at a score of 81. Do you see that?
A Yes.
Q And then that has an impact and it brings the score down to 87--
A Yes.
Q --down at the very bottom. And these points count for so much that the effect of that is to reduce the award fee down from $5.1 million to $3.6 million.

A It could be John Meinhardt. I don't know.
Q I wonder if you could look at tab 55, which is stipulated defendant's Exhibit A511. Do you see this one is a memorandum from Mr. Meinhardt at headquarters to you dated September 20, 1989?
A Yes.
Q And this is about four months after Rockwell was contractually entitled to receive its award fee.
A Yes.
Q And he refers to your memorandum, and what he tells you is that headquarters is essentially in concurrence with your recommendations with an additional downward adjustment in the area of environment, safety and health. Do you see that? I'm looking at the first full paragraph.
A Yes.
Q Okay. And then at the bottom of the second full paragraph, Mr. Meinhardt tell you "Overall there is strong evidence that throughout the award fee period there was a continuing pattern of lax attitudes, inadequate procedures and lack of consideration of ES&H issues." Do you see that?
A Yes.
Q Do you recall calling Mr. Meinhardt and saying "You know, that's contrary to every scrap of information that we had. Let's talk about this."
A I don't recall any specific conversations with Mr.

Meinhardt. I know that I talked to him fairly frequently, but I don't remember specific discussions of award fees.
Q Then do you see he goes on in the bottom paragraph to say that the "right grade was 79"--I apologize, I kind of cut that off--"for its performance under the ES&H category, that that should be downgraded to a grade of 65.25"--
A Yes.
Q --"and the effect of that is to cut Rockwell's award fee further, and now it's down to $2.9 million." Do you see that?
A Yes.
Q And he says at the end, "Admiral Watkins concurs in this recommendation."
A Yes.
Q Now the whole idea of the award fee process was to make sure that the people most knowledgeable about the performance of the contractor during the relevant time period were given substantial weight on the assessment of the award fee.
A That's right.
Q And the people most knowledgeable--had Admiral Watkins been out there? He wasn't even the Secretary of Energy at that time, was he--the time of the award fee?
A I believe he was Secretary of Energy toward the end of that period, but I'm not sure.
Q Do you recall whether he had visited the plant at all

the person to actually ultimately decide under the contract the award fee, right?

A Yes.

Q What new information did you personally have that caused you to think yes, it's appropriate to cut the award fee from the $5.1 million I recommended seven days before the raid to the $2.9 million that I'm now being asked to sign off on?

A It was the interaction between my staff and Mr. Goldberg's staff, and the interactions with headquarters, trying to come up with a corporate decision on what the award fee should be for that period.

Q Now you see this memorandum to you is dated September 20, and Mr. Meinhardt is kind enough to actually send you a draft of the letter that you're to send as AFDO to Mr. Sanchini. And I'll draw your attention to the last paragraph of Mr. Meinhardt's letter, on top of page 2 of his letter to you?

A Yes.

Q He says "In order to facilitate the dissemination of this information to Rockwell International and coordinate it with a letter from Admiral Watkins to Chairman Beall--

A Okay, hold it, hold it, hold it.

Q I apologize.

A Okay, Meinhardt's letter, okay.

Q "--to coordinate it with a letter from Admiral Watkins

to Chairman Beall of today's date, we have attached a copy of your draft letter to Rockwell International which reflects our concerns in the ES&H area." Do you see that?
A Yes.
Q Now was this the first you'd actually seen your draft letter was when you received it?
A I don't recall.
Q Would you look please at the next tab, which is defendant's Exhibit D173?
A Yes.
Q Now that is a letter from Admiral Watkins to Don Beall of Rockwell?
A Yes.
Q And Don Beall was the chairman of the board and the chief executive officer of Rockwell?
A Yes, he was.
Q And Admiral Watkins is actually sending this letter to Don Beall about the amount of the award fee on the same day that he's sending you--or that Mr. Meinhardt is sending you a letter which sets forth the amount that the award fee's going to be, right? I'm looking at the previous tab 55.
A Yes.
Q So basically simultaneously with telling you what the award fee is supposed to be, Admiral Watkins sends Don Beall a letter telling him what the award fee is supposed to be.

A Yes.
Q But in fact this was under the contract supposed to be your own independent judgment, right?
A Well it's my judgment as an employee of the Department of Energy working with other people that have an interest in our operations. I mean I worked for Admiral Watkins.
Q And if he tells you cut the award fee that's something you're going to do.
A If collectively we're working as a Department to figure out what the right thing to do is here, I felt okay doing this.
Q But the award fee that you had recommended until the day you got this letter was significantly higher than the amount set forth here.
A That's right. That's right.
Q Okay, and without even waiting for you to say yea or nay, Admiral Watkins is sending a letter to Don Beall saying this is what we've done.
A Yes.
Q Is that correct?
A Yeah.
Q Would you turn please to tab 57, which is defendant's Exhibit A513. This is stipulated.
A Yes.
Q Now is this a letter that you sent to Mr. Sanchini at

Doesn't tolerate it at Rocky Flats. Does he tolerate it at the other facilities, Mr. Twining?
A No.
Q Does he change the award fee for any other facility for that six-month period besides Rocky Flats?
A I can't speak to anything outside the Albuquerque system, but he didn't change anything at Albuquerque.
Q He did not did he?
A No.
Q Now, there was no way that Mr. Goldberg, when he made his recommendation to you, could assess what would be fair at Rocky Flats vis a vis the other facilities, because he hadn't been at the other Albuquerque facilities?
A That's right.
Q Did you point that out to him at anytime?
A I don't recall having specific discussions with Mr. Goldberg on award fee issues.
Q Now, after the incidents we've been discussing, which carries us through the end of '89 when this change--there came a time did there not when Congress asked DOE to conduct an evaluation of whether or not there was any fraud in the award fee process. Do you recall that?
A Not specifically.
Q Okay. I wonder if I could draw your attention to Tab 43 which is Defendant's Exhibit A561. It's stipulated.

PL. SUPP. EX. 97

UNITED STATES COURT OF FEDERAL CLAIMS

ROCKWELL INTERNATIONAL CORPORATION, )
)
)
Plaintiff, )
)
)
vs. ) No. 91-1362 C
) (Judge Yock)
UNITED STATES OF AMERICA, )
)
)
Defendant. )

ORIGINAL

DEPOSITION OF:

BRUCE G. TWINING

Tuesday, February 23, 1993

10:00 A.M.

Reported by:

BARBARA K. HARRIS

CSR # 93

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025
310/477-8867 FAX 310/478-8412

Q. Generally the PERB was perfectly free to deviate from the letter of this handbook.

MR. KOLAR: Objection on grounds of vagueness.

Q. That's fine. You may answer.

A. I would view that handbook as a guidance document, that laid out the process. My opinion on where we were in this process is that this handbook, which was dated 1977, was likely becoming obsolete, and led to this 1990 revision.

Q. Would you, Mr. Twining, describe for me how the award fee process worked at Albuquerque. Take your time and go from step one to the issuance of the actual fee to the M & O contractor.

A. Well, again, I said the award fee process has been evolving.

Q. Let's start with 1988 when you first arrived here.

A. In general, my view of how that award fee process worked at that time is that the area manager was responsible for pulling together the award fee report.

Q. Now, the area manager in connection with Rockwell would be the manager at the Rocky Flats facility in Colorado?

A. Yes. The area manager actually pulled together the report. In pulling together a report, he would have

considered input from the people in his area office. He would have also been expected to consider input from people in functional divisions in Albuquerque.

For example, he would get input from the Weapons Quality Division that would deal with the quality of the product that Rockwell was producing in the plant. He would have been expected to get input from our ES & H people to reflect the kind of reviews and appraisals that had been done by both our people and headquarters people. And then he would incorporate that into a draft report.

He would then come to the PERB meeting, and be prepared to talk to that report. The other members of the PERB, which were -- and I'm not sure whether at this time the PERB was chaired by Jim Culpepper or Charlie Troell, but there was a chairman and other functional assistant managers on the PERB, and the PERB as a whole would listen to what the area manager had to say, make an assessment on whether it fairly characterized the input from their own functional people, as well as whether it, you know, fairly characterized Rockwell's performance from their point of view.

Q. Who were the members of the PERB?

A. Well, typically it would be the chairman, and I'm not sure whether at that time it was Charlie Troell or Jim Culpepper; the assistant manager for Operations and Weapons

would be on the PERB, the assistant manager for ES & H, all of our assistant managers that have a functional interest in what went on at the site.

There is, I believe, a PERB secretariat which is from the Contracts Division, but the board itself is the decision-making body. I think we probably have an attorney advisor to the PERB. Again, that was changed over time, I think.

But the PERB reviews what the area manager has to say, changes it if appropriate, and then I was given and am still given a report with a proposed award fee determination and a briefing. I look through that, ask my questions. If my concerns haven't been reflected, the PERB may or may not meet again to reflect the input I have or the questions I ask. But when we are all finished, I make an award fee determination.

And at the time of this award fee, we had just gotten into a process of formally sending those proposed determinations to headquarters for concurrence.

Now, over time, we have gotten much more formalized about determining what the performance objectives are that we are going to be interested in in the award fee process, and I am not sure what the practice was back in this period, but today we review those performance objectives, or performance criteria, the PERB agrees to them, they run them

by me. We go to headquarters for concurrence on those, and then the award fee process is pretty closely tied to those.

That has been evolving basically through the whole time I have been in Albuquerque, and I can't tell you exactly when we made each change.

Q. Have we finished basically this picture from beginning to end?

A. Yes.

Q. Going back to the area manager, he would get input from people on his staff?

A. Yes.

Q. And would these be people with, I assume, expertise in particular areas?

A. Yes.

Q. And would you have any idea how many people he would draw upon for expertise from his own staff in --

A. As part of the award fee process itself, I really don't know.

Q. It would be more than a couple, though, wouldn't it?

A. Probably, yes.

Q. And he would also get input from the functional divisions in Albuquerque?

A. Yes.

Q. And do you know how many of those people or how

many functional divisions are involved? I believe you mentioned Weapons, Quality and ES & H.

A. Eight or ten divisions, typically. Maybe more when you include the administrative areas.

Q. And this input would be coming from people with expertise in the particular discipline that they were evaluating?

A. Yes.

Q. These individuals at DOE were long-time government employees, weren't they?

A. I think we have a reasonable mix between long-time government employees and new employees.

Q. Did you believe in 1989 that the personnel that made up the functional divisions at Albuquerque were a competent group?

A. Yes, by and large. Yes.

Q. Going back to Exhibit 2, that you have in front of you, if you would turn to page 24 of the handbook that bears Bates number at the bottom E 001039, and there is a paragraph called "The Role of a Contracting Officer," and I would ask you, Mr. Twining, to read that paragraph.

A. Yes.

MR. KOLAR: I would like a second to look at it.

Q. That paragraph refers to the manager of

Albuquerque who was the contracting officer --

A. Yes, it does.

Q. -- during 1989 you were the manager; is that correct?

A. Yes.

Q. If you would turn to the following page, page number E 001040, there is a schematic of the award fee evaluation review process, showing how it starts and ends. Take a moment to review that.

A. Yes.

Q. Now, does the paragraph that you read on the role of the contracting officer, as well as the schematic, do they comport with your understanding of how the process worked?

A. Well, as I mentioned, during this period, there had been another step in the process, and that was getting concurrence from headquarters, which is not included in this --

Q. Which is not mentioned here in this chart, is it?

A. That's right. Again, the other thing is I am not sure at this point that we had PERBs. Maybe we did, maybe we didn't.

MR. KOLAR: For the record, this document is dated in 1977.

MR. NYE: That's in the record, yes.

Q. If you would look at the handbook that superseded the 1977 handbook, which is Exhibit 30, if you would look at page Roman III-10, it bears Bates number E 001096, and is entitled, there is a paragraph entitled, "Role of Fee Determination Official," and I would ask that you read that, Mr. Twining.

A. Yes.

Q. And on the following page there is a summary of the steps involved in the award fee process, and I would ask if you would look at that.

A. Yes.

Q. Now, does that paragraph comport to your understanding of how the process worked as well as the summary?

A. I think that paragraphs is fairly consistent with what I said.

Q. All right. So that the handbook, as it existed prior to the February 16, 1990 edition, makes no reference to headquarters' concurrence.

A. That's right.

Q. And the February 16, 1990 edition, which is Exhibit 30, does make explicit reference to headquarters' concurrence.

A. Yes.

Q. And I believe you have testified that the process

of headquarters' concurrence was an evolving one; is that fair?

A. Yes. Basically there was a task force that looked at the whole award fee process. One of their recommendations was that there ought to be a formalized headquarters' input, and it was not unusual for me to call and get input or the PERB to call and get input from headquarters before. But a formalized headquarters' input, I don't know exactly when we got guidance from headquarters that said, "From here forward you will send these forward for concurrence." But once we got that guidance, we did it. The handbook revision would have come later.

Q. So at some point before the February 1990 handbook, you would have received some directive from headquarters saying that award fee recommendations would have to go to headquarters for concurrence; is that correct?

A. I believe that's the case.

Q. Now, let's go back to 1988 when you arrived on the scene in Albuquerque, and I believe you testified you were involved in both award fee determinations for the six months of fiscal year '88. At that point in time, was there a formal requirement for headquarters' concurrence?

A. I don't recall, but I don't think so. I can't be absolutely sure. I do not believe that first award fee determination went to headquarters.

Q. In '88.

A. The determination that would have been made right after I got there, which would have been for the period that ended in March of '88.

Q. And what about the second half of 1988, that would be the award fee going from April 1 through September 30, 1988, did that go to headquarters for concurrence?

A. I don't recall. I don't know. I don't know for sure. I would say no because the task force was really started under the new administration, which came in in January of '89.

Q. As of the time that Admiral Watkins became the Secretary.

A. Yes.

MR. KOLAR: Give me a second, please.

(WHEREUPON, there were proceedings held off the record.)

Q. Now, it's your testimony, or your recollection, that for the two award fee periods in 1988, concurrence from headquarters is not required. Was headquarters informed at some point of the determinations that were being made for Rockwell, as well as the other M & O contractors under the supervision of Albuquerque?

A. It was not -- before I came to Albuquerque, there had been a technical safety appraisal at Rockwell, at Rocky

Flats, that was very critical, and so one of the real high visibility issues after I got to Albuquerque was radiation protection and the response to the rest of that technical safety appraisal. And I believe there were follow-up appraisals that were done during the early period that I was there.

So there were other headquarters people that had insight and opinions on what was going on at the plant, and on a number of occasions I remember talking to Rich Sterasteci, for example, to get his input in the ES & H area.

Those kind of inputs could also have typically been developed by individuals on the PERB, in areas that were of interest to headquarters, because, of course, what we were doing in the plants was to meet a headquarters program. That process was not formalized.

Q. And that response was in the context of 1988, I take it?

A. Yes.

Q. So that in an informal way, either you or others involved in the process, would elicit input from headquarters as well as, I assume, other sources.

A. Yes.

Q. Getting back to my question, though, in 1988, the PERB would make its recommendation to you and you would

either endorse it or make some change in it, and come up with your determination of what the appropriate award fee would be.

A. Yes.

Q. Was headquarters informed at some point as to what your determination was?

A. Not formally. Again, I would have gotten input about what was perceived to have been done well and not so well in a couple of functional areas that at the time were real high visibility.

Q. I understand that, but then I'm understanding your testimony that, after the process reached its end and all the input had come in and you had evaluated what the PERB recommendation was and had reached your own determination, that the award fee would then be made, or the letter would go out from you to the M & O contractor, without necessarily having prior consultation with headquarters?

A. I don't recall whether I would have consulted with a high level official in Defense Programs, for example, that says, "Here is what my total fee determination is going to be and here is why." I might have done that, but I don't recall.

Q. You don't recall.

A. No.

Q. During '88, do you ever recall your determination

being changed at all by headquarters?
A. No.
Q. And that question covers not just Rockwell but the other M & O contractors under Albuquerque's control.
A. I don't recall that happening.
Q. Do you recall headquarters ever changing an award fee determination decision while you were at Savannah?
A. No, but headquarters wouldn't have been very interested in a security contract, really, at that point.
Q. What about San Francisco?
A. No.
Q. Now you testified that when the new administration came in in January, 1989, at some time after that headquarters became more involved in the award fee process; is that a fair statement?
A. Yes.
Q. And do you recall how that came about?
A. Well, it was like I said, there was a task force formed to look at the whole award fee process and make recommendations, and Jim Culpepper, who was my deputy, was one of the people on that task force, who was both field and headquarters people, and the purpose was to deal with what were perceived as being a number of weaknesses in the process.
Q. And that task force came up with recommendations?

A. It's not in the format that would come to me.
Q. It says in the top right "Prepared by Lawrence R. Oliver." Do you know who he is?
A. No, I don't.
Q. Also it says under his name "DP-50." What does that stand for?
A. DP-50 is an organization in Defense Programs in headquarters.
Q. DP-50 stands for Defense Programs, or is it part of Defense Programs? I didn't understand your response.
A. DP is Defense Programs. 50 is an organizational number; they are resource management or -- I don't know the title.
Q. Now, when you received the PERB recommendation, what did you do with it?
A. I think this was a period in which we packaged them all up and sent them to headquarters for concurrence. What I would have done first is determined that I was satisfied with what the PERB did.
Q. So you reviewed it.
A. I reviewed it.
Q. Were you given a briefing about it?
A. I believe in every case I have had a report given to me and a briefing by PERB.
Q. And who would have made the briefing to you?

A. Probably the PERB chairman. I can't recall in this period.
Q. That would be Mr. Troell?
A. Yes.
Q. It would not have been by the entire body that made up the PERB?
A. No.
Q. Now, for this particular period were you satisfied with the study done by the PERB and the recommendation they made to you?
A. I don't recall whether I asked a question or whether the PERB changed the report or not. There are a couple of cases where I have taken a PERB report and, based on what I knew, I have either added or subtracted from what the PERB recommended.
If you will note on this, there is an indication of the recommended fee plus one point, minus one point, that is an indication that the PERB is giving me an opportunity, if I don't agree with their judgment -- that is not the range that I have to operate in, but it gives me a sense that, if I increase the score by a point or decrease by a point, what would happen to the award fee.
Q. Do you remember with respect to this award fee whether you made any change in the PERB recommendation?
A. No, I don't.

Q. You don't remember one way or the other?
A. I don't remember.
Q. Do you remember if you asked the PERB to go back and redo its report?
A. No.
Q. Have you ever asked the PERB at Albuquerque to go back and redo its report?
A. I have asked questions that have caused the PERB to redo their report.
Q. Do you recall whether that happened in this case?
A. No, I don't.
Q. And you believe in this instance you would have sent a recommendation to headquarters, is that correct, for this award fee period?
A. I believe this is the first cycle that we did that.
Q. And that recommendation would have reflected your review of the PERB's recommendation to you?
A. Yes.
Q. And possibly changes that you made on your own.
A. Yes.
Q. And you would have been comfortable with that recommendation prior to sending it to headquarters?
A. Based on the information I had up to that point.
Q. Which would have come from the PERB?

A. The area office manager, the functional people that input to that, the PERB.

Q. Do you recall having any criticisms of the PERB with respect to the report it gave you and its recommendation?

A. Not in this specific case, I don't recall.

Q. Let me show you a document that has been marked as Plaintiff's Exhibit 9, and please review it and then I'll ask you whether you have ever seen it before.

A. No, I haven't seen it.

Q. Who is Mr. Beiriger, is that the way you pronounce it, or do you know who Mr. Beiriger is?

A. I don't know him.

Q. So you don't know why he was asking this information.

A. No, I don't.

Q. I show you what has been marked as Exhibit 12, which is a memorandum addressed to Troy E. Wade, Acting Assistant Secretary for Defense Programs. It appears to be from you.

A. Okay.

Q. Have you seen this document before?

A. Yes.

Q. And is that your signature on page 5?

A. Yes.

Q. Now, in this document you are asking for concurrence on proposed award fees for the first half of fiscal year '89; is that correct?
A. Yes.
Q. And this applies not only to Rockwell but to the other M & O contractors under Albuquerque's supervision.
A. Yes.
Q. Had you ever sent a concurrence memorandum like this before this May 31, 1989 memo?
A. I have said I think this is the first time we formally did that.
Q. So that sometime before May 31, 1989, somebody gave you some kind of direction to send a concurrence memorandum to headquarters; is that correct?
A. I think so.
Q. And you don't have any recollection as to what form that direction took?
A. I don't recall whether that was guidance from DP or from the department, or whether it was written or verbal.
Q. Do you have any recollection as to whom this guidance would have come from, putting aside whether it was written or verbal? I mean what individual.
MR. KOLAR: If you know.
A. I don't recall.
Q. Do you recall what office it would have come from?

A. I don't recall where the guidance came from.

Q. Who drafted this memorandum?

A. Our Contracts Division.

Q. Do you know who within that division would have drafted it?

A. No, I don't.

Q. And you have various award fees proposed for Rockwell as well as other contractors in this memorandum; is that right?

A. Yes.

Q. Up to this point in the award fee process, Mr. Twining, where, take Rockwell, you have a proposed number, was the process in reaching that number similar to the process that would have taken place during 1988 when you were in Albuquerque?

A. I have said it could have been somewhat different because of the evolving nature of the process.

Q. As you sit here today, do you recall any differences between coming up with the proposed number for Rockwell for fiscal year 1989 and the methodology in which you came up with numbers during 1988?

A. No.

Q. So that the same thought and attention on your part that went into this number went into the numbers in 1988 as well.

A. Yes. I would have had a little more firsthand experience in the job with Rocky Flats than I did during that first determination.

Q. When you said "more firsthand experience," you are referring to the first half of 1989, versus 1988.

A. Yes.

Q. And you proposed on the plant for Rockwell one million -- excuse me, $5,176,482?

A. Yes.

Q. And if you go back to look at Exhibit 91, which was the PERB's recommended fee, which was 5,326,482, it would appear that you made a reduction to the PERB's recommendation for the plant.

A. It appears so.

Q. It would appear that the reduction was $150,000.

A. Yes.

Q. Do you recall the basis for that reduction?

A. I'm going to speculate again. It might have been the model shop, but I don't recall specifically.

Q. Okay. And on the PRMP/PROVE, you proposed an award fee for headquarters' concurrence of $186,591; is that correct?

A. Yes.

Q. And that is the same amount that was recommended by the PERB.

from Mr. Wade or Mr. Wade's office on the subject of the nonconcurrence on Rockwell?

A. Other than this?

Q. Yes.

A. Not specifically, but there usually is a letter that comes back from -- I mean, now in today's process, there is a formal letter that comes back and gives the determination on all of our proposals. I would have expected a letter with this.

MR. NYE: Mr. Kolar, we, in document production, did not receive any kind of memo that would have accompanied the nonconcurrence. If you happen to be aware of one, I would just point out that it was not produced to us and we would request it.

MR. KOLAR: Let me just respond on the record. I am not aware at this time that such exists. If it does, and it's not subject to privilege for some reason, I have no problem with producing it to you.

MR. NYE: Thank you.

Q. Do you recall having any conversations with Mr. Wade at the time that you first learned that he was not concurring with the Rockwell award fee?

A. I don't recall the specific conversations.

Q. Do you recall anyone explaining to you why Mr. Wade was withholding concurrence?

A. No.

Q. When you proposed an award fee for concurrence and Mr. Wade withheld concurrence, what happens next?

A. Well, I think that -- this is the period that the raid happened. The management arrangement shifted during that period. The area office, rather than reporting into Albuquerque, became directly connected with headquarters. Another management team was brought in. And I don't recall exactly what the steps were that happened after that, that nonconcurrence.

The management situation around Rocky Flats was pretty confused at that point, at the point of the raid.

Q. On the first page of Exhibit 12, I guess in the second paragraph, the second sentence states, "The performance evaluation reports, which will be sent to each contractor, are attached." Do you see that sentence? In document production, we didn't have any performance evaluation reports attached.

Is it your understanding that would have been the performance evaluation report of the PERB that would have been attached, or don't you know?

A. Again, I can't remember where we were in the process, but you highlighted a summary in an earlier exhibit. I would guess that is what was attached.

Q. Would headquarters have first learned of your

proposed award fee for Rockwell when it received Exhibit 12?
A. Yes.
Q. You have no recollection of telling them a week earlier, "Here's what I am proposing"?
A. Here is the formal communique under a new process that had apparently been requested.
Q. So it's your testimony, as of today, that after you received the nonconcur memo, you don't recall having any conversations or meetings with headquarters in an effort to break the stalemate, if you will?
MR. KOLAR: Objection to the characterization of the situation as a "stalemate."
A. I don't recall exactly what the steps were right after we got this nonconcurrence back on Rockwell.
Q. Let me show you what has been marked as Exhibit 48, that is Plaintiff's Exhibit 48, which is a June 6 memorandum from Mr. Tuck to you and Mr. Goldberg. Have you seen that document before?
A. I sure have.
Q. Now the document refers to Mr. Inlow.
A. Yes.
Q. Who is he?
A. He was the acting area manager at Rocky Flats at the time.
Q. And he had replaced Mr. Whiteman; is that right?

MR. KOLAR: Objection; again calls for speculation, lack of foundation.

MR. NYE: Well, the foundation is Mr. Troell's memorandum that refers to a grade of 87 and I'm asking how he learned -- if he knows. He either does or doesn't --

MR. KOLAR: I will limit my objection to calls for speculation because it's asking how Mr. Troell knew.

Q. If you have knowledge. Don't speculate. If you know.

A. I cannot explain the date on this memo being July 27 and the date on Mr. Troell's memo being July 10th. My recollection of this process is we got a recommendation from Goldberg, the PERB considered that recommendation, and we went into headquarters with a modified proposal.

Q. Did you have conversations with Mr. Goldberg on the subject of his recommendation of '87?

A. I don't think so before we got the letter.

Q. Okay.

A. The conversations that I had with Mr. Goldberg, after he took over at Rocky Flats, were trying to have us continue to provide support in areas that he wasn't equipped to deal with in this new management arrangement that had been implemented by the Tuck memo.

Q. At any time have you had discussions with Mr. Goldberg with respect to Mr. Goldberg's recommendation of 87 as the award fee grade for Rockwell for the first period in 1989?

A. I don't recall. I don't recall those conversations.

Q. One way or the other.

A. One way or the other.

Q. On the first page of Exhibit 49, in the last sentence, it states that "Subsequently," and I think in context that means subsequent to the PERB making its recommendation to you, "much more stringent expectations of contractor performance have been mandated by the secretary and other DOE policy makers' statements and issuances." Do you know what is being referred to there?

A. Well, when Secretary Watkins came in he made it very clear that he was going to put a major priority on ES & H, and the level of DOE's performance in those areas. And I think that is what he is referring to.

Q. As of July 10, how long would Mr. Goldberg have been at Rocky Flats?

A. Well, a little over a month.

Q. Do you know what sources of input Mr. Goldberg was receiving at Rocky Flats with respect to Rockwell's performance over the first award fee period for '89?

MR. KOLAR: Objection, calls for speculation.

MR. NYE: No, it doesn't call for speculation. He either knows or he doesn't. If he knows, then it wouldn't be speculation.

MR. KOLAR: He is not Mr. Goldberg. How could he know what Mr. Goldberg is getting in terms of input?

MR. NYE: He could very easily know. He could be giving input to Mr. Goldberg.

MR. KOLAR: Is the question what did Mr. Goldberg communicate to you what sources of input he was receiving?

MR. NYE: I asked if he knew what sources of input Mr. Goldberg had.

A. Not in detail.

Q. How about generally?

A. There was a, quote unquote, tiger team of people that was put together to come in and help Mr. Goldberg dig into the ongoing operations at Rocky Flats.

Q. Do you know how many people were on that team?

A. No.

Q. Did Mr. Goldberg ever communicate to you any bases for reducing the Rockwell grade from the 92.1 or .2, that you had recommended, to 87?

A. Just this letter is all I recall.
Q. Was there anything in that letter that you didn't know about before in the process of making your own recommended grade?
MR. KOLAR: Take your time and read the letter through.
A. I would say there are details here that I wasn't aware of.
Q. And these would be details that were not included in the material that you received from the PERB?
A. I'm not sure.
Q. You don't know one way or the other without --
A. Without going back and doing it.
Q. -- and studying it. And Mr. Troell, looking at Exhibit 49, makes a suggestion to you, is that a fair characterization, that "Since Mr. Goldberg" -- I'm looking at the last paragraph -- "has been on-site for several weeks, that he would have greater insight into the current conditions at the plant, and, accordingly, we," I take it that's the PERB, "do not believe you are in a position to offer an informed alternative to his proposal"?
A. Yes.
Q. Did you concur with that recommendation?
A. Yes.
Q. Let me show you what has been marked as

BY MR. NYE:

Q. Mr. Twining, I want to ask you just a few more questions on this July 10 memorandum before we move on. Prior to your July 10 draft memorandum, which is Exhibit 55, did you talk to headquarters or anyone in headquarters about Mr. Goldberg's recommended grade of 87?

A. I don't recall.

Q. One way or the other.

A. No.

Q. The PERB's original recommendation to you was in mid May of 1989, and your request for concurrence to headquarters was May 31, 1989. In looking at Exhibit 55, the reference that we were talking about earlier to the PERB preparing a memorandum as a result of the changing circumstances related to Rockwell's award fee, would those changing circumstances be changes occurring subsequent to the PERB's initial report of mid May?

A. Where was that passage again on here?

Q. The end of the first full paragraph.

A. Okay. Again, the best I can come up with on that is this reflects the fact that we had a nonconcurrence from headquarters on the Rockwell award fee, and also probably tied to the Goldberg input, and I can't explain the date difference.

Q. So that the nonconcurrence from headquarters and

I' not sure exactly what his title was.

Q. Do you recall whether you ever had any discussions with him about Mr. Goldberg's recommended fee of 87?

A. No, I don't think I did.

Q. I show you a document that has been marked as Plaintiff's Exhibit 57.

A. There is the day we were talking about before. Okay.

Q. Have you ever seen these documents before?

A. No.

Q. Now, in these documents, Mr. Meinhardt, the Acting Assistant Secretary for the Defense Programs, is recommending that the Rockwell award fee be reduced from 3.8 million down to 2.9 million, approximately $871,496. Did Mr. Meinhardt ever discuss that proposed reduction with you?

A. I believe he might have sent a letter to that effect. We might have talked about it on the phone.

Q. What do you recall?

A. I am pretty sure we got a letter to that effect.

MR. KOLAR: What Exhibit Number is this? Oh, 57.

MR. NYE: Fifty-seven.

MR. KOLAR: Thank you.

Q. On the page that has the Bates number E 001552, under "Discussion" -- do you see the heading "Discussion"?

you testified to that.

A. I believe so, yes.

Q. Would that have been before Mr. Meinhardt received the agreement or disagreement from Mr. Moore? In other words -- I'll try to help you out. You frowned. This memorandum was prepared by Mr. Meinhardt at a time when he was -- prepared for the purpose of seeking a concurrence from Henson Moore; is that right?

A. This looks like a paper that was going to the Deputy Secretary. I don't see a date on it.

Q. I don't see a date on it either, but I'm not sure why that has anything to do with my question. My question is this memorandum --

A. Okay.

Q. -- was Mr. Meinhardt's effort to obtain a concurrence from the Deputy Secretary S-2, who you identified as Henson Moore; right? My question to you is, when you received a letter from Mr. Meinhardt on the subject of a further reduction in the award fee, was that at a time before Henson Moore had approved that further reduction?

A. I don't know what the whole headquarters process was that led to Meinhardt's letter. I don't know what happened here. I didn't get into that.

Q. In this letter that you received from Meinhardt, was Meinhardt at that time still seeking approvals that he

question.

Q. Let me rephrase that question. That was a good objection. Do you have any ideas who J.M. is?

A. I --

MR. KOLAR: Only if you know. Don't speculate.

A. No, I don't know.

Q. Okay. Have you ever seen this document before with the handwritten annotation?

A. No.

Q. And I believe you testified that you don't recall ever having a telephone conversation with Mr. Meinhardt where Mr. Meinhardt was expressing a view that Mr. Goldberg's 87 recommendation was too high a grade?

A. No, I don't recall that.

Q. Who is Admiral Barr?

A. He was the Assistant Secretary for Weapons Programs, DP-20. I'm not sure of his exact title. That position is a military officer that serves in DOE for a period of, I think, two years at a time.

Q. And who would he report to?

A. The Assistant Secretary for Defense Programs.

Q. So Admiral Barr reported to Mr. Meinhardt at the time?

A. Mr. Meinhardt was Acting Assistant Secretary for

Defense Programs for a period of time, yes.

Q. Let me show you a document that has been marked as Plaintiff's Exhibit 52.

A. Okay.

Q. Have you seen that document before?

A. No.

Q. Did you have any conversations with Mr. Barr with respect to his view on the proposed award fee for Rockwell?

A. Not that I recall.

Q. On the page that has the Bates number E 001446, Mr. Barr states that he bases his position, and he lists four points. Were those four points information, new information to you?

A. Points one and four were not. I don't recall those other two. We had ongoing tracking of TSE action items, and I don't know whether that was the same information that we were dealing with or not.

Q. Your PERB had a lot of information before it, didn't it?

A. Yes.

Q. Do you believe your PERB did a thorough job in reaching its original recommendation for you?

A. They did a thorough job based on the information they had available at the time they did the review. We knew about 771. We knew about the chromic acid spill. We should

MR. KOLAR: Let me have a moment. Okay.

Q. If you will look at the top page that has the Bates number E 000936, and going over to 937, that is a memorandum to you from Mr. Meinhardt; correct?

A. Yes.

Q. And in that Mr. Meinhardt proposes a Rockwell award fee.

A. Yes, he does.

Q. Now, would this be the communication that you testified to earlier that you believe you received some memo from Mr. Meinhardt on a lower award fee?

A. Yes.

Q. This would be it?

A. Yes.

Q. Now the memorandum to you from Mr. Meinhardt is dated September 20, 1989.

A. Yes.

Q. Do you recall whether you had any discussions with Mr. Meinhardt prior to September 20 in connection with this proposed award fee?

A. I don't recall specifically.

Q. Which means you don't recall one way or the other?

A. No.

Q. No, you don't recall one way or the other?

A. No, I do not recall one way or the other.

provided comments that were of concern to them and that we have incorporated.

Q. Have they ever drafted a letter that says "Dear Mr."?

A. Not that I recall.

Q. In Mr. Meinhardt's memorandum to you, on the page that is E 000936 --

A. Yes.

Q. -- the last sentence on that page states, "Admiral Watkins concurs in this recommendation."

A. Yes.

Q. Was there some significance from your point of view for a reference to Admiral Watkins?

A. Not really, other than to give me an indication that this response had been staffed within the department.

Q. Had been what?

A. Had been staffed within the department.

Q. What does that mean, "staffed"? I assume Admiral Watkins isn't on somebody's staff.

A. That means that DP had taken it to the people who were interested and gotten their agreement in it.

Q. Had you ever had any conversations with Admiral Watkins concerning Rockwell's award fee?

A. No.

Q. Now, on this exhibit, the first two pages of it,

A. No.

Q. Did you have any conversations with Mr. Meinhardt about his memorandum and the proposed fee, after you received this communication?

A. I told you I don't recall any specific telephone discussions or face-to-face discussions with Meinhardt on the award fee. It doesn't mean they didn't happen.

Q. On the first page of your official file copy, it says in the bottom, in quotes, "Previous concurrence remains valid." Do you see that?

A. Yes.

Q. What does that refer to?

A. That could refer to the fact that this memo made it partway through the chain and then somebody suggested a change, and the author decided that that change didn't merit going back through the whole concurrence chain again.

Q. You're the author, aren't you?

A. No, Ted Cone is the author.

Q. Even though it's your --

A. It was written for me to send to Dominick Sanchini.

Q. When you sent letters on the award fee, was it customary for you to say "The Department of Energy determines"?

MR. KOLAR: If you had a custom.

Q. Do you recall?
A. I don't know.
Q. I show you Exhibit 150, which was your draft letter proposing another award fee, and in there you refer to "I hereby determine." Does that help you in any way?
A. It would be very, very straightforward to go through a sample of award fee letters and see what we usually do. I don't know.
Q. Okay. Thank you.
A. I focus more on the content of what we do rather than the specific wording of the letters.
Q. Did you talk to Mr. Goldberg about the fee that Mr. Meinhardt came up with?
A. I don't recall having discussions with either Mr. Meinhardt or Mr. Goldberg as this process was proceeding.
Q. Let me mark as Plaintiff's Exhibit 174 a document that bears Bates numbers E 000978 through 987.
A. Okay.
(THEREUPON, Deposition Exhibit Number 174 was marked for identification.)
MR. KOLAR: Just give us a second to look at it.
Q. Okay?
A. All right.

Q. What is the purpose of this document?
A. Well, I'm not sure. It looks like it is a documentation for the file that brings this whole issue to a close.
Q. Is this your signature on the first page?
A. Yes, it is.
Q. Do you know whether you signed a comparable document in connection with Rockwell for this award fee period with a higher award fee than what appears on this exhibit?
A. I don't usually sign this kind of document. I usually sign the letters to the contractors.
Q. And you don't recall why, in this instance, you did sign the document?
A. No.
Q. You state on this exhibit, the first sentence, "I hereby determine an award fee of 2,903,215." And that is in connection with the plant. You then say that "This determination is based on the attached memorandum from John L. Meinhardt, Acting Assistant secretary For Defense Programs, and the attached performance evaluation report."
On the document that was produced to us, Mr. Meinhardt's memo was not attached. Would I be right that that would be the memo that was attached to the prior exhibit dated September 20 that we looked at?

don't recall specifically whether the PERB met after getting the Meinhardt memo or not, but clearly the work would have been done by the chairman of the PERB in association with our contracts people.

Q. Mr. Meinhardt's memo called for a lower grade for Rockwell in the functional performance area of ES & H.

A. Yes.

Q. Do you recall that Mr. Meinhardt's lower grade in ES & H required a rewrite of the performance evaluation report so that it would be consistent with the grade?

A. Well, the way I view that is we got additional input from headquarters in the ES & H arena, and what we needed to send the contractor needed to reflect how the department came out of this very complex process that we have been going through. So, I mean, it doesn't surprise me it was rewritten.

Q. Do you recall that or is this just what you find is a logical conclusion?

A. I don't recall the specific, you know, day-to-day details of how we dealt with this whole situation. It was several years ago at this point.

Q. You said that you got new input from headquarters?

A. In the form of the Meinhardt letter.

Q. That's the input, his letter.

A. Yes.

on the table.

Q. At the time. At the time you were comfortable with the 81?

A. Yes.

MR. KOLAR: Let me just clarify something. Is there a similar proviso to the other two answers you gave, that you were comfortable, at the time?

THE WITNESS: Based on the information that was coming out around Rocky Flats, I believe our PERB graded Rockwell too high on the ES & H when they met the first time.

Q. What input, or new information, was provided by Mr. Meinhardt as compared to Mr. Goldberg on his ES & H reduction?

A. Just his letter.

(THEREUPON, Deposition Exhibit Number 176 was marked for identification.)

Q. I will mark this as 176.

A. Okay.

Q. Have you seen this fax before?

A. Not the fax.

Q. Who is Mr. Cone?

A. I believe he was one of our contracts people.

Q. And who is Mr. Larry Oliver?

A. I don't know him. I think this indicates that he

20, 1989 memorandum to you.
A. Yes.
Q. On the second page, there is a reference to a letter from Admiral Watkins to Chairman Beall.
A. Right.
Q. So it's your testimony that, other than this reference, you had no idea, at the time, what was in the communication to Mr. Beall.
A. No.
Q. Do you recall Mr. Meinhardt ever mentioning to you orally the fact that that letter was going out?
A. No.
Q. I believe I have asked you already whether you ever had any communications with Admiral Watkins concerning the Rockwell award fee and you answered no.
A. I think I said no.
(THEREUPON, Deposition Exhibit Number 177 was marked for identification.)
Q. Let me mark as Exhibit 177 a letter signed by Mr. Culpepper on your behalf to Mr. Sanchini, dated, it looks like October 15, 1989.
A. Okay.
Q. Have you ever seen that letter before?
A. Yes.
Q. And why did Mr. Culpepper sign this letter?

(THEREUPON, Deposition Exhibit Number 178
was marked for identification.)

Q. Let me mark this as Exhibit 178. This is a memorandum from you to Mr. Meinhardt. It bears Bates numbers E 000917 through 919.

A. Okay.

Q. Have you seen this memorandum before?

A. Yes.

Q. Is that your signature?

A. Yes, it is.

Q. Why did you need Mr. Moore's approval on your response to Rockwell on the award fee?

MR. KOLAR: This is addressed to Mr. Meinhardt?

MR. NYE: That's what it says. But also on page 2 it says "Approved," with a line for Mr. Moore.

A. I don't know why Mr. Moore's signature line is on here. We probably worked with Mr. Meinhardt's staff and that's what they said they wanted. But recall that the day the FBI invaded Rockwell, Rocky Flats, the management arrangements around the day-to-day operations shifted, and from that point forward there was a lot of communication going on within DOE about what the department's position was going to be on various issues.

And I think it's very appropriate, given the

circumstance around the plant at that time, that before we made a final determination, that we advise headquarters what our view was and get their input again. And that was the purpose of this letter.

Q. Did you draft this memorandum?

A. No.

Q. Did you review Rockwell's written submission that went to Mr. Troell and --

A. Yes.

Q. Who else did it go to? Mr. Troell and Mr. --

A. Stout.

Q. At the top where it says, "Reply to the attention of," it says "OCC (James A. Stout.)"

A. Yes.

Q. What does that mean?

A. That means that this was originated in the office of chief counsel, this letter.

Q. On the third page, there is a listing of c.c.s.

A. Yes.

Q. Who is Mr. Wakefield?

A. He is the general counsel for headquarters, or he was at that time.

(THEREUPON, Deposition Exhibit Number 179 was marked for identification.)

Let me mark as 179 a November 14, 1989 letter from

Q. Were "Award Fee Reporting Procedures and Key Milestones," which is the title of Exhibit 71, were they prepared for other award fee periods prior to the second half of '89?

A. I don't recall specifically, but I think so.

Q. And I take it if they were, they would not, however, have included items on the milestones numbers eight and nine which refer to seeking and obtaining concurrence from the Assistant Secretary?

A. That was a new requirement. It wouldn't have included that.

Q. I believe you alluded in prior testimony that the award fee decision-making authority was delegated by you to the manager at Rocky Flats for the second half of '89?

A. Right.

Q. How did that decision come about?

A. I don't recall the specifics.

Q. Was it your decision?

A. I think so, but I don't recall. I mean, it puts me in an untenable position to be determining the award fee on a site where we haven't had access. I felt fairly strongly that I shouldn't be the award fee determining official, the contracting officer, or the financial management allottee, because I don't have the ability to control what a person ought to control with those roles.

We had managed to delegate the award fee determining authority, the contracting officer authority, and we were working on the allottee business.

Q. Could you have made this delegation without approval of headquarters?

A. I believe I could have, but I'm sure we coordinated it with them.

Q. Was Mr. Goldberg or Mr. Simonson seeking to become the award fee determination official for the second part of 1989, the second half of '89?

A. I don't know.

Q. Do you recall getting approval of headquarters?

A. Not specifically.

Q. Do you recall who you would have sought approval from at headquarters?

A. It would have been DP.

Q. And who was head of DP at that time?

A. Well, I'm not sure. John Meinhardt or his successor.

Q. Now, the second award fee period began March 1 and ran to September 30; right?

MR. KOLAR: I think it's April 1.

A. April 1.

Q. Excuse me. April 1. Thank you. Do you recall when you would have received this approval to delegate to

PL. SUPP. EX. 98

COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ROCKWELL INTERNATIONAL CORPORATION, Plaintiffs, v. THE UNITED STATES, Defendants. | No. 91-1362C<br>Judge York |

Friday, April 29, 1994
Washington, D.C.

DEPOSITION OF:

JAMES D. WATKINS,

a witness, called for examination by counsel for the Plaintiff, pursuant to notice of counsel, held at Cadbourne & Parke, 1101 Vermont Street, N.W., Washington, D.C. at 1:30 p.m. on Friday, April 29, 1994, before Thomas R. McPhail, CSR, Notary Public when were present on behalf of the parties:

the president asked me to take over the chairmanship of that commission. That completed in August of 1988.

And at that point, I went back, tried to go back in the private sector, then I got tapped in January of 1989 by President Bush to be Secretary of Energy.

Q. When were you sworn in as Secretary of Energy?

A. I was sworn in officially on the 1st of March, 1989, and ceremonially by the President on 9 March, 1989. But for legal purposes, it was 1 March, 1989.

Q. Were you working full time at the Department prior to being sworn in on March 1, 1989?

A. Did I go in every day?

Q. Yes.

A. Yes, and commence my turnover, yes, I did.

Q. When did that begin?

A. Nominally, 1 February. I can't remember the date, it -- I am not sure about 1 February

internal DOE documents, you could probably still find who was on the chop chain. I have no idea. But I would guess a significant group of individuals were in on this.

Q. Did you review the report before it was passed on to Congress?

A. Yes. I never sign anything that I don't read. I don't know that I verified every single piece of data in here.

Q. You did testify to that, didn't you. On page 10 of the report.

A. Yes.

Q. In the fifth line from the top of the page?

A. Yes.

Q. There is a sentence that says, "the Department recently has surveyed individuals involved in the evaluation process, and they believe there is no evidence to suggest that Rockwell provided misleading information in order to obtain a higher rating." Do you see that statement?

Q. I guess the second paragraph, third line, there is a sentence that reads, "Furthermore, the process" -- I think from the sense of it that you are talking about the award fee process -- "is spelled out in advance and made part of the contract."
A. Yes.
Q. The contract requirements and the award fee determination for Rocky Flats in the fiscal year 1981 to fiscal year 1988 period were examined and showed that the Albuquerque operations office and the Rocky Flats area office followed and applied the procedural standards required by the contract in the award fees determinations process. Do you see that statement?
A. Yes.
Q. Did you agree with that statement when it was made?
A. Yes. That doesn't mean I thought the process was other than flawed.
Q. I understand that.

PL. SUPP. EX. 99

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA ex rel. James S. Stone,

Plaintiff,

v. No. 89-M-1154

ROCKWELL INTERNATIONAL CORPORATION, THE BOEING CORP., BOEING NORTH AMERICAN, INC.,

Defendants.

VIDEO DEPOSITION OF BRUCE TWINING
VOLUME I
April 7, 1998
9:00 a.m.
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. CHRISTOPHER J. KOENIGS
ATTORNEY FOR THE DEFENDANTS

REPORTED BY: MARY ABERNATHY SEAL, RDR, CRR, NM CCR #69
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

5434-2 MAS

Q. And you don't understand either of them to be representing you?

A. No.

I do have allergies today, so some of your video is going to be a little disgusting.

Q. In your capacity as contracting officer of the six facilities, weapons facilities, did you periodically visit the sites?

A. Yes.

Q. And did you do that on a regular basis, or otherwise?

A. I wouldn't say it was on a regular basis. And there were some sites that I visited more than others because of what was going on. But during the early period of time in my tenure at Albuquerque, I made visits to become familiar with what the sites did, and then we had periodic area plant manager meetings that kind of rotated between the sites. And I did spend a lot of time up at Rocky Flats, because it was in a transition, both in the environmental area that I spoke about, but mainly it was in a transition, as far as I was concerned, in the safety arena, relative to formality of operations.

Q. So when you became manager of the Albuquerque Operations Office in April of 1988, shortly thereafter, you visited each of the weapons facilities to familiarize yourself?

A. Yes.

Q. And did you do that within, say, the first month or

two of your arrival?
A. I don't recall the exact schedule, but it was very quickly. I tried to get around to all the sites.
Q. Do you recall how much time you spent at each site?
A. Typically, a day.
Q. Do you recall anything about your orientation meeting, if I may use that word -- if that's incorrect, let me know -- at Rocky Flats?
A. Not really.
Q. Do you recall what generally you did on each of these introductory meetings at each of these facilities?
A. Not specifically. It was a briefing on what they did, and then a tour, but I don't recall the specifics.
Q. So typically, it included a briefing by the area manager?
A. I don't know. I don't remember.
Q. You don't remember who you met with?
A. No.
Q. It typically included a tour of the facility?
A. Uh-huh.
Q. Is that a yes, for the court reporter?
A. Yes. Yes, it is.
MR. HESCH: Object to the form, foundation of the last two questions.
Q. (By Mr. Koenigs) And then you indicated that you

went to the Rocky Flats office, in addition to that first trip, with some -- on a number of occasions; is that right?

A. Yes, I did.

Q. And why did you go there on a number of occasions?

A. The department was concerned about the formality of operations at Rocky Flats. We were concerned about whether they really had the safety culture that we wanted, and when I came to Albuquerque, I spoke to a lot of people in the department about where they saw Rocky Flats, and it was clear that the safety transition was very important to people. So I went up there more frequently than I did the other plants to make sure they understood how important I thought that was, and to kind of hear how well they were doing in transition.

Q. And on these occasions when you traveled up to Rocky Flats, did you typically meet with the area manager?

A. Yes.

MR. HESCH: Objection, form.

A. Yes.

Q. (By Mr. Koenigs) Did you typically meet with the plant manager for Rockwell, namely, Dominick Sanchini?

A. Yes.

Q. Do you recall how frequently during Rockwell's tenure there, while you were manager -- namely, from April 1988 to December of 1989 -- how frequently you visited Rocky Flats?

A. Well, let me correct one thing you said. And I don't

A. Yes.
Q. For each of the six facilities you mentioned?
A. Yes.
Q. And then would you typically read the Performance Evaluation Review Board recommendations?
A. Yes, I would.
Q. And then it was after this opportunity to read these things that you'd meet with the individuals whom you can't now identify?
A. That's right.
Q. And those individuals would discuss all six facilities? It would be one meeting about all six?
A. They would kind of summarize the overall PERB process, performance review process. If there were special issues on one plant or another, they would discuss what those were and what the discussions were. And it was also an opportunity -- I read these, and I typically had a number of questions that I would ask. You know, what was the thought process behind this? Or what was the discussion behind this?
And it wasn't unusual for me to say, "Hey, I want you to go talk about this again. I don't understand this. This doesn't seem to mesh with my understanding of the situation."
Q. And on those occasions, were you seeking to have the PERB reconvene?
A. Sometimes they would reconvene the whole PERB.

Sometimes there would be a more limited discussion between typically the director of Contracts, if he was the primary functional person that was in meeting with me, the area manager, and the functional person responsible for the area that I was questioning.

Q. And this would occur on occasions when you didn't understand why, for example, a contractor received a particular adjectival or numerical grade?

MR. HESCH: Objection. Form, foundation.

A. Or there might have been an achievement or a deficiency that I -- you know, from what I understood, maybe they underrated an achievement, I thought it was a bigger deal, or they overrated an achievement or understated or overstated a deficiency. And I would say, "I don't understand that. I need to hear more about it."

Q. (By Mr. Koenigs) Okay. And when you say overstate or understate either an achievement or deficiency, are you referring to the fact that achievements can be characterized in different ways?

A. Yes.

Q. And what are the different ways in which achievements can be characterized?

A. I don't recall what they were then. But typically, it might be significant accomplishment, notable accomplishment, significant deficiency, or a notable deficiency. Or just this

recollection of increasing the award fee for Rockwell for this six-month period from April 1, 1988, through September 30, 1988.

A. You mean increasing it from the 4.7 to the 4.9?

Q. Right.

A. No.

Q. Do you recall whether it was the practice when you got that packet of materials to review whether the document entitled "Award fee recommendation" was actually signed by Mr. Troell?

A. I think they typically might have been, but not necessarily always.

Q. Was it sometimes the case -- and I think you said this already -- that you would say, "Look, I'd like" -- well, you didn't say this before. Was it sometimes the case that you would say, "I think that numerical grade for a particular functional performance area should be increased based on what I read?" Is that sometimes --

A. No, I would typically question a particular accomplishment or deficiency, and what was the discussion -- "What transpired to have you guys call this a notable or a significant or just an observation? Because it seems like you overrated it or underrated it, based on what I know."

And nine times out of ten, they would go through that rationale and I would be satisfied with it. Occasionally, they

would go back and say, "You're right. That was a bigger deal than we thought," and they would change the write-up, and then if they needed to change the grade, they'd go back and change the grade, as well.

Q. But the process of changing a grade on a particular FPA was typically not one you were involved in?

A. No.

Q. So the process of, for example, marking up a sheet, you didn't typically mark up a recommended award fee calculation sheet?

A. No, no. No.

Q. And then whenever the adjustment, if any, was made, a new, revised Performance Evaluation Review Board recommendation would come back to you?

A. Yes.

Q. And a revised calculation sheet, such as this award fee recommendation sheets I have shown you, would come back to you?

A. Yes.

Q. And then you would say, "This is acceptable to me"?

A. Yeah.

Q. Did your approval of it take the form of any documentation other than the letter to the contractor?

MR. HESCH: Can you read back the question?

(The record was read by the reporter.)

A. Yeah.

Q. What is the date of the PERB board meeting? I'm sorry, I don't have that exhibit, but it's in front of you. The PERB board meeting. We have the minutes.

A. It says November 9.

Q. Okay.

A. 1988.

Q. So sometime between November 9, 1988, and December 8, 1988, you would have received and reviewed the PERB's Performance Evaluation Review Board recommendation?

A. Yes.

Q. Do you have any sense of timing between the PERB meeting and the time you sent out the letter? Is it typically pretty closely after the PERB meeting that you receive the recommendation?

A. I don't remember what the process was then. Today we have to go to headquarters for a quick review of my award fee determinations. And so there would be a longer period between when I review something and when we send it out to the contractor. I don't believe we were doing that back then, so there would have been a very short period of time.

Q. Okay. If you could look, please, at the first page of the report after the cover page, do you see the grade under FPA general management is "excellent"?

A. Yes.

Mr. Krenz?
A. No.
Q. Do you recall whether you were generally satisfied with Mr. Krenz' performance?
A. As far as I -- as far as I can recall. Again, what I actually felt at the time would be in the records from that time, and I just don't remember what they were.
Q. Is Exhibit 852 a copy of the award fee Performance Evaluation Review Board recommendation for the period October 1, 1988 through March 31, 1989?
A. Yes, it is.
Q. And do you believe you received a copy of this document on or after May 17, 1989?
A. Yes.
Q. Do you believe you read it when you received it?
A. In all likelihood.
Q. Do you recall, as you sit here today, whether you disagreed with any aspect of this report?
A. I don't recall how I came out on it. Let me say this. More often than not, as I read these, I would have questions on one or two or three items that would require a follow-up.
Q. And those questions would you reduce to writing or merely orally communicate them to the appropriate personnel?
A. I would orally communicate them, based on stickies I

the words, "Concur, with exception of Rockwell." Do you see that?

A. Yes.

Q. Do you recall when you learned that Mr. Wade concurred in your recommendations with the exception of Rockwell?

A. No.

Q. Do you recall particularly whether it was before or after the raid with Rocky Flats?

A. When was the raid?

Q. June 6, 1989.

A. I don't know when Mr. Wade signed this.

Q. My question, of course, is when you learned about it.

A. I don't recall.

Q. Do you recall any discussions with Mr. Wade about why he declined to concur in your recommendation with respect to Rockwell?

A. No.

(Exhibit 857 marked for identification.)

Q. I have handed you what's been marked Exhibit 857, which is a memorandum from Mr. Wade to the manager of the Albuquerque Operations Office dated June 21, 1989, with attachments. Did you receive a copy of this memorandum on or about June 21, 1989?

A. I don't recall the specifics, but I probably did.

Q. Do you believe you received the memo itself, as opposed to the attachments, at the time you received it?

A. I don't know whether the attachment came along with the memo or not.

Q. Right. And my question was only whether you reviewed the memo itself, without reference to the attachments. Did you review the one-page memo at the time you received it?

A. I don't recall getting it, but I'm sure I would have seen this, and it would have come to me, and I would have read it.

Q. And again, now that you have seen this, does this refresh your recollection at all about whether you had communications with Mr. Wade about why he was not concurring in your recommendation as to Rocky Flats? And I'm referring -- frankly, I'll refer you only to the first page.

A. I don't recall talking to Troy directly about this. You know, typically, in this concurrence process, there can be a lot of questions that get asked and clarified before headquarters concurs, and you know, a lot of that is done with a staff level. Most of it -- all of it -- is done at the staff level, and I just don't remember any -- I could well have talked to him, but I just don't recall.

(Exhibit 858 marked for identification.)

Q. Is Exhibit 858 a copy of a memorandum -- a draft of a memorandum from you to Mr. Tuck?

A. Okay.

Q. Is that a draft of a memorandum from you to Mr. Tuck dated July 10, 1989?

A. Yes.

Q. Do you believe that you prepared this memorandum?

A. I didn't prepare it. It looks like it was prepared by somebody in the Contracts and Procurement Division. I do recall seeing a memo like this. I don't recall whether it was ever signed or not.

Q. Do you recall why a draft of this memorandum was prepared for your signature?

A. I think it's described in that second paragraph, and it has to do with the things that were being discovered at Rocky Flats, after the raid, by Ed Goldberg and the other people that were up there at that time.

Q. Now, had Mr. Goldberg, to your knowledge, been up at Rocky Flats during the award fee period in question, namely the period from October 1, 1988, through March 31, 1989?

A. No. Mr. Goldberg came after the raid.

Q. Had you discussed with Mr. Goldberg at any time his evaluation of Rockwell's performance during the period October 1, 1988, through March 31, 1989?

A. I don't recall discussing things directly with Mr. Goldberg. I may have.

MR. HESCH: Didn't Rockwell take the deposition

A. No, I don't recall -- the external interest that I recall on the award fee process was relative to the congressional hearing, and I don't even remember when that was, relative to the raid in this period.

Q. Okay. Do you recall that there was congressional interest even during this time frame, June, July of 1989, in the amount of the award fee?

A. Not specifically.

Q. Do you see the last sentence on the first page of this Exhibit 860 says, "Subsequently, much more stringent expectations of contractor performance have been mandated by the secretary and other DOE policymakers, statements, and issuances."

Do you see that language?

A. Yes.

Q. Was it the case that after this award fee period of October 1, 1988, through March 31, 1989, much more stringent expectations of contractor performance were mandated by the Secretary of Energy and other DOE policymakers?

MR. HESCH: Objection. Form, foundation.

A. I think Admiral Watkins had a different level of performance expectation that he started trying to implement in the department from the day he came in. And I don't recall, you know, the exact timing of when he said what relative to the raid. But we were clearly in the process of raising the

formality of operations up to a new level.

Q. (By Mr. Koenigs) And you were doing so after Admiral Watkins came on board?

A. Yes.

Q. Do you recall you yourself telling Rockwell, in the meantime, that the standards by which they were being judged were changing?

A. That kind of thing would clearly be the subject of the kind of area plant manager meetings that I talked about. Because we tried to deal with those kind of things in those meetings. I don't recall, you know, from the contractual documentation whether there was that kind of notification that occurred. I'm sure that as time happened, one could look at the award fee performance expectations and see new expectations in these areas of formality and discipline.

Q. You indicated that this was a subject that may have been raised in these periodic area manager/plant manager meetings?

A. Yes.

Q. Those meetings occurred approximately twice a year?

A. Yes.

Q. I wonder if you could take a look at Exhibit 842, which we marked close to the beginning of the deposition. It's probably at the bottom of the stack.

MS. REYNOLDS: It's the very first one.

Q. (By Mr. Koenigs) Now, there was an area/plant managers' meeting in May, early May 1989; is that right?
A. Yes.
Q. Now, that's after the award fee period we're looking at here, namely, October 1, 1988, through March 31, 1989; is that right?
A. Yes, it is.
Q. You say these meetings took place about every six months?
A. Yes.
Q. So the preceding one would have taken place towards the end of 1988?
A. Yes.
Q. The preceding one, Secretary Watkins was not then secretary; is that right?
A. That's correct.
Q. So to the extent you advised Rockwell at an area/plant managers meeting of the new expectations imposed by Secretary Watkins, the first such meeting after Watkins became secretary was this one in May of 1989?
A. That sounds reasonable.
Q. Do you have a recollection of whether that subject arose at this May 1989 meeting?
A. Well, I think if you look at the opening remarks, I talk about the initiatives of the secretary, I talk about his

emphasizing line accountability, and the distinction between program responsibility and oversight responsibility. The high expectations. Reviewing the award fee process through a committee chaired by Jim Culpepper, who was my deputy.

Q. And I'm sorry, I recall this, but where are you looking?

A. On page 1 of those minutes, under "Opening remarks by AO, Bruce Twining."

Q. So you believe some of these subjects were -- the subjects you have identified were covered at the May 3 and 4, 1989 meeting?

A. They're in the minutes.

Q. Right. And do you believe that Rockwell was entitled to fair notice before an award fee period of the expectations that they were dissatisfied? Before the award fee period, as opposed to afterward?

MR. HESCH: Objection. Form, foundation.

A. You know, our process was to try to tell people what was going on in the department as near real time as we could. And I clearly used these meetings to do that. And I don't know whether Dom was at this meeting or not. I suspect he was.

Q. (By Mr. Koenigs) I believe that there's a reference to him on page 3.

A. And so, you know, this was my attempt and my office's attempt to say, "We're managing a program. There are some new

things that are going to be happening and that we're going to be dealing with, and this is an opportunity to talk to you about it."

And then as time went on, you know, this got rolled into all the formal documentation.

Q. Right. But you're aware generally that Rockwell's award fee for the six-month period between October 1 of 1988 and March 31 of 1989 was cut by several million dollars.

A. I think that's where we were getting to in the last discussions.

Q. Right. And you have a general recollection that that's the case?

A. Yes.

Q. And what I'm trying to figure out is: Do you recall telling Rockwell at any time before May of 1989 of these new expectations?

A. No, I don't.

Q. And as you sit here today, do you believe it was fair that Rockwell's performance in the preceding six-month period to have -- its performance evaluated based on expectations that it didn't know about until May of 1989?

MR. HESCH: Objection. Form, foundation.

A. As I said, this was a difficult period, and the way that I tried to rationalize to myself what was going on at the time is that in the first performance evaluation board meeting,

we dealt with that in a kind of a routine way. The area manager put together the input. He got input from the staff people. The board dealt with that. They came up with one assessment.

Between that and the final determination, there was a raid. There were questions asked. There was a new management team up there. There were a lot more DOE people up there. And they basically -- including some of the people that were involved in the first cycle, because the area office people were largely the same -- put together a revised assessment of performance.

I'm not clear really whether they were measuring against a different level of expectation or whether they were dealing with a lot more information relative to the expectations that were there. I would tend to believe it was the latter rather than the former.

Q. (By Mr. Koenigs) You would tend to believe that they were not applying different expectations, but instead, dealing with new --

A. A higher level of information relative to the expectations that were there.

Q. Right. My question, I think, was: Would it be fair for them to be looking at new expectations of which Rockwell had not been apprised during the relevant time period in determining what's the appropriate award fee?

MR. HESCH: You mean in a hypothetical sense, not an actuality? Object to the form, foundation, speculation.

A. The way the award fee process is supposed to work is that there are expectations developed at the beginning of the period, and the evaluation that's done at the end of the period is done against those expectations. And if the expectations change in a significant way during the period, we ought to change the contractual documentation.

Q. (By Mr. Koenigs) And you ought to --

A. I don't recall whether that was done or not.

Q. And you ought to tell Rockwell that about the expectation?

A. Yes. That's what I mean by changing the contractual documentation.

(A discussion was held off the record.)

Q. And the documentation to which you're referring includes what?

A. The award fee plan.

(Exhibit 861 marked for identification.)

Q. Just so I'm clear, as you sit here today, you don't recall any occasion at which Mr. Goldberg called -- spoke to you and said, "You know, Bruce, here's what I thinking of doing. Does this strike you as reasonable or fair?"

MR. HESCH: Objection. Form, foundation.

A. I don't recall those kind of discussions. It doesn't

mean they didn't happen.

Q. (By Mr. Koenigs) I wonder if you could look at Exhibit 861, which appears to be a document with the name of Admiral Barr. Do you recall ever seeing a copy of this document during the relevant time period?

A. No, I don't. Is this --

Q. That's fine.

A. I know who Barr was, but I don't -- there's only one line here.

Q. Pardon me?

A. There's only one line that says, "See attached."

Q. Do you recall having any conversations with Admiral Barr in which he said to you, "Bruce, I'm thinking of recommending this award fee for the period of October 1988 through March of 1989. What do you think?"

A. I well could have. I just don't recall. I talked to Barr frequently. He was one of the principal customers we had at that time.

MR. HESCH: Same objection to that question.

Q. (By Mr. Koenigs) But as you sit here today, you don't recall a conversation with him in which he sought your input about the award fee he was going to recommend to anybody for Rockwell?

A. I frankly don't remember your chronology and all the things that were done to get to a final award fee during this

period. Now, I'm sure it's in the documentation, but you know, I'm not sure that I have seen the final documentation, yet as opposed to a lot of draft stuff that was leading up to that.

Q. You mean from me during this deposition?

A. Right.

Q. Well, that's accurate. And believe me, I'm not trying to -- I just want to find out if you recall conversations with him in which he sought your input on the award fee, as opposed to documentation.

MR. HESCH: Objection, form.

A. I could well have had those conversations. I just --

Q. (By Mr. Koenigs) You just don't recall at this time?

A. The exact chronology of how we got through this difficult time I just don't remember.

(Exhibit 862 marked for identification.)

Q. Is Exhibit 862 a copy of a memorandum from Mr. Goldberg to you dated July 27, 1989?

A. Okay.

Q. Did you receive a copy of this memorandum from Mr. Goldberg on or about July 27, 1989?

A. I'm sure I did.

Q. Do you believe you read it at that time?

A. Yes.

Q. Do you believe the document, the award fee recommendation chart attached to the memo bearing Bates number

E001546, was attached to Mr. Goldberg's memo to you?

MR. HESCH: Objection.

A. It probably was.

Q. (By Mr. Koenigs) Do you recognize the handwriting on that?

A. No, I don't.

Q. Do you recall whether you discussed this memorandum with Mr. Goldberg?

A. No, not specifically.

Q. Do you see that Mr. Goldberg's recommending an award fee of $3.6 million, roughly?

A. Where is that?

Q. On the chart attached to the memo.

A. Okay. $3.628 million, yes.

Q. Do you recall whether you had a view at the time you received Mr. Goldberg's memo as to whether this fee was the appropriate level of fee?

A. I don't recall. I seem to recall. I'm not sure, but I think my performance evaluation board considered this, and I don't know whether they modified it or accepted what Goldberg suggested.

(Exhibit 863 marked for identification.)

Q. I have handed you what's been marked Exhibit 863. Can you identify this document?

A. Not specifically, but it appears to be the kind of

A. That's right.
Q. I wonder if you could tell me what additional information you yourself had that caused you to propose this additional -- or this reduction in the award fee.
MR. HESCH: Isn't that covered in the claims court case, Chris, at length? You're rehashing the same stuff over and over.
Q. (By Mr. Koenigs) Go ahead.
A. It was the input from Goldberg and the people that he had onsite.
Q. And you obtained that input in what form? That document that we looked at earlier?
A. Yes.
Q. Anything else that you recall?
A. Not that I recall.
Q. Was there anything else besides that input from Mr. Goldberg that caused you to believe that this was appropriate?
A. It appears that at least part of the process we went through here, there was an original performance evaluation board recommendation. There was a period during which time the raid took place. A lot more people were looking. And by the time that I sent my recommendation for concurrence in to headquarters, people said, "Hey, wait. We have got new issues here. Let's see how that unfolds."

Mr. Goldberg provided his views on that to me, one of the things that we've gone through here. And the PERB went back and looked at Mr. Goldberg's input and decided that there were more people looking closer and they didn't have a basis to disagree with Mr. Goldberg. I mean, that's what it looks like this documentation trail constructs.

(Exhibit 869 marked for identification.)

Q. Is Exhibit 869 a copy of a memorandum that you received from Mr. Meinhardt on or about September 20, 1989?

A. Okay.

Q. Did you receive a copy of this memorandum from Mr. Meinhardt on or about September 20, 1989?

A. I'm sure I did.

Q. You see the memorandum from Mr. Meinhardt refers to an attached copy of a draft letter to Rockwell, International.

A. Yes.

Q. Do you believe that the document attached to Exhibit 69, the two-page draft letter to Mr. Sanchini, is, in fact, the letter that was attached to Mr. Meinhardt's memo to you?

A. I don't have any reason to disagree with that, but, you know, I can't -- I'm not sure.

Q. Do you recall that Mr. Meinhardt or somebody in his office, in fact, drafted a letter for your review and signature to Mr. Sanchini concerning the award fee for the period in question?

A. That appears to be implied from this letter.
Q. But you don't have a recollection?
MR. HESCH: Can you read the question and answer back, please?
(The record was read by the reporter.)
MR. HESCH: Thank you.
Q. (By Mr. Koenigs) Do you see Mr. Meinhardt's memo to you states in the first paragraph -- the last sentence in that paragraph says, "The office is essentially in concurrence with your recommendations with an additional downward adjustment in the area of environment, safety and health," and then at the bottom of the page, it refers to a total fee of approximately $2.9 million. Do you see that?
A. Yes.
Q. So did you understand that Mr. Meinhardt did not concur with your office's most recent recommendation and instead made an additional downward reduction?
A. It appears they reduced the S&H category further, yes.
Q. Right. And do you recall having any discussions with Mr. Meinhardt or anybody in his office about this additional reduction?
A. Not really, no.
(Exhibit 870 marked for identification.)
(A discussion was held off the record.)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA ex rel. James S. Stone,

Plaintiff,

v. No. 89-M-1154

ROCKWELL INTERNATIONAL CORPORATION, THE BOEING CORP., BOEING NORTH AMERICAN, INC.,

Defendants.

VIDEO DEPOSITION OF BRUCE TWINING
VOLUME II
April 8, 1998
9:10 a.m.
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. CHRISTOPHER J. KOENIGS
ATTORNEY FOR THE DEFENDANTS

REPORTED BY: MARY ABERNATHY SEAL, RDR, CRR, NM CCR #69
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

5434-7 MAS

MR. HESCH: Objection. Form, foundation.
A. I would have focused on that part of the award fee board recommendation that came to me that dealt with the tiger team report, to just see if it looked right to me.
Q. (By Mr. Koenigs) I'm sorry, that portion of the award fee --
A. Yes.
Q. Okay, got it. And if it didn't look right, if it didn't appear to you that the assessment of the area manager with respect to the impact of the tiger team report on award fees -- if it didn't look like he'd adequately assessed the impact of the tiger team findings on the award fees, you would make an -- you would recommend an adjustment be made?
MR. HESCH: Objection. Form, foundation.
A. As I said yesterday, what I typically did is: I raised a question. If there was a good answer right away from the people that were briefing me, we didn't do any more. Sometimes they had to go do some homework and get back to me. I rarely -- I don't recall ever unilaterally saying, "Change the score." It was more like, "You guys that are familiar with this, go back and look at this again and see if you can explain why you came out the way you did."
Q. (By Mr. Koenigs) But in your own -- you're the one who determined the amount of the award fee at these facilities?
A. I was the fee-determining official, yes.

PL. SUPP. EX. 100

CERTIFIED COPY

No. 91-1362 C

UNITED STATES CLAIMS COURT

- oOo -

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

==============================================================

DEPOSITION OF

THEETIS V. HILL

Wednesday, December 2nd, 1992

Albuquerque, New Mexico

Reported by:

ARLETTE McCLAIN, CSR #85

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025
310/477-8867 FAX 310/478-8412

Q. Did he attend the May 10th meeting?
A. I have listed those who attended here. If he would have attended, I would have listed him here. I don't have him listed here.
Q. Did Mr. Edward Goldberg ever attend a meeting of the PERB?
A. No, I don't recall him ever attending a meeting of the PERB that I was in.
Q. What was the next step in the award process after the PERB meet on May 10th, 1989?
A. The next would have been to finalize the PERB report.
Q. Mr. Hill, I'm handing you a document that has previously been marked as Exhibit 10. Please review that document and tell me whether this is the final PERB report for the Rockwell award fee for the first half of fiscal year 1989?
A. Yes, from reading the cover page, I believe it to be the PERB's report.
Q. I'm handing you a document that has previously been marked as Exhibit 11. Were these two pages also part of the final PERB report?
A. I don't remember the numbers contained in here, but it having been signed by the chairman, I would say yes.
Q. Let me redirect your attention to the document

that is marked Exhibit 76, and in particular the last sentence, which you read earlier. Are the grades noted in your minutes the same as the scores noted in Exhibit 11?

A. Yes.

Q. And those are 91.20 for the plant and 78.75 for the PRMP/PROVE; is that right?

A. Yes.

Q. Did you prepare exhibit -- the document that is marked Exhibit 10?

A. Yes, I prepared these reports.

Q. Did you prepare the exhibit marked as Exhibit 11?

A. Yes. Now the content of Exhibit 10, I mean, that was not my input. This was based on input from the area manager, plus the PERB, and all I did was finalize the report. It is not my content in Exhibit 11.

Q. And the same holds true for Exhibit 10; is that right?

A. Yes.

Q. After you finalized Exhibits 10 and 11, what was the next step?

A. The next step would have been to -- for the chairman to brief the manager of the Albuquerque Operations Office on the deliberations of the PERB.

Q. Were Exhibits 10 and 11 sent to the manager of the Albuquerque office?

A. I believe they were. That was our normal procedure.

Q. Were you involved in briefing the manager of the Albuquerque office on Rockwell's award fee for the first half of fiscal year 1989?

A. I don't remember if I was.

Q. Would Mr. Troell have been at that meeting?

A. Yes. It was the chairman that briefed the manager.

Q. Was Mr. Troell the chairman?

A. He was the chairman.

Q. Would other people brief the manager, as well as the chairman?

A. That would have been up to the chairman, if he wanted other people in the meeting with the manager.

Q. Did you ever attend a meeting in which the chairman of the PERB briefed the manager?

A. Yes, I have.

Q. Were you ever at a meeting in which the chairman briefed the manager with respect to an award fee for Rockwell?

A. I believe that I have been, because that was the normal practice, is for the executive secretary to have come to the chairman to be briefed.

Q. That was the normal practice, for you to attend?

A. Yes.
Q. How long after finalizing the PERB report would the meeting take place in which the manager was briefed?
A. We did not have an established time. I recall it was within a two- to three-week period, generally.
Q. What would typically be the course of the meeting in which the chairman briefed the manager on award fees?
A. Typically, the chairman would brief the manager on any significant items that he felt were significant in the report. I would have viewgraphs. As I recall, I would have viewgraphs of these -- these pages.
Q. You are referring to Exhibit 11?
A. Exhibit 11, to show the manager, and the chairman would discuss it, discuss each area with the manager -- each FPA.
Q. Would you present any viewgraphs, other than what is represented by Exhibit 11?
A. There -- yes, at times there would be other viewgraphs showing the history, such as -- I don't remember the number of the exhibit, but possibly other viewgraphs showing the history of that particular contractor's award fee experience.
Q. I believe you are referring to Exhibit 74, which contains viewgraphs; is that right?
A. Yes. We may not present all of these to the

manager, but those that show a historical basis, historical trend, we would show him.

Q. Did you present viewgraphs showing historical trends to Mr. Twining in the summer of 1989 for Rockwell's award fee?

A. I don't recall that specific meeting. I don't recall.

Q. During the meeting in which the chairman would brief the manager with respect to award fees, would the manager come to some decision regarding the award fee?

A. Not at that meeting.

Q. He would decide at some later point?

A. Yes.

Q. When would the manager decide?

A. There was no set time when he would decide. It could be a few days, or a few weeks. There was no specific time.

Q. Would you find out when the manager had made a decision?

A. Yes.

Q. How would you find out?

A. He would communicate his decision to the chairman, and then I would be notified to prepare or complete the correspondence going back to the area manager and contractor.

Q. What would that correspondence consist of?
A. What I remember is that we would prepare a letter to the plant manager, from the manager, stating what the award fee decision was for that period.
Q. Would you prepare a letter to be signed by the manager and sent to the contractor to inform the contractor of the award fee?
A. Yes.
Q. Did you prepare correspondence for Mr. Twining's signature for the first half of fiscal year 1989, to be sent to Rockwell, informing Rockwell of the award fee?
A. I don't remember specifically, but I -- the normal practice was that I would prepare a letter to each contractor, and at that time there were five of them. I would send them all to the manager at the same time, at the time of the briefing by the chairman.
Q. Would you prepare the correspondence to the contractor prior to the briefing by the chairman?
A. No, it was after. After the determination was made by the manager, as I remember it, then the correspondence were to be prepared and sent back to the manager for signature.
Q. After you had been notified that the manager had made a decision, and notified what that decision was, how long would it take you to prepare the correspondence to go

to the contractor?

A. It would be just a matter of, I would say, a couple of days to prepare the whole thing -- two or three days to prepare all five at the same time, generally.

Q. How long would it take after you prepared the correspondence, for the manager to sign the correspondence informing the contractor of the award fee?

A. I don't remember any specific time. It would usually -- it was not an extended period of time, but it would just be the normal course of business, he would sign those. It would depend on, I guess -- it would have to go through the chairman, and then to the manager, so it could take two or three days, or up to a week or even more, I suppose.

Q. After the PERB meeting, how much time would generally elapse before the correspondence was sent to the contractor, informing the contractor of the award fee?

A. Well, it would depend on the work loads of the individuals, my work load and how much I had to do to prepare the -- you said after the PERB meeting?

Q. After the PERB meeting.

A. How much work I would have to do as far as revising PERB reports?

Q. Would it be more than two months?

A. Generally, no. I would say it would not exceed

two months.

Q. Would it exceed one month?

A. It might.

Q. Was it less than one-month in some cases?

A. I don't remember.

Q. Prior to the first half of fiscal year 1989, were there any steps in the award fee process which you have described that would take place after the PERB meeting, other than what you have described?

A. No, not that I'm aware of.

Q. Beginning with the award fee period for the first half of fiscal year 1989, were steps added that included headquarter's involvement in the award fee process?

A. Yes.

Q. Was the first half of fiscal year 1989 the first time steps involving headquarters was included in the award fee process?

A. To the best of my memory, yes.

Q. Mr. Hill, I'm showing you a document that has previously been marked as Exhibit 12. Please review this document, and tell me if you have ever seen it before.

A. Yes, I have seen this.

Q. Did you prepare this document?

A. For the most part, yes.

Q. What was the purpose of this document?

office.

Q. Would Mr. Twining have told you directly?

A. I don't recall if he -- I don't recall if he told me directly. I mean, I don't recall if it was even conveyed before this letter -- before I got a copy of the letter.

Q. Did you ever discuss with Mr. Twining, Rockwell's award fee during 1989?

A. Discuss it in what manner?

Q. Did you ever discuss Rockwell's award fee in any manner, directly with Mr. Twining?

A. I don't recall -- no, I don't recall addressing -- discussing the award fee with him, other than -- I mean, I was not in a decision-making capacity. There would be no reason for him to discuss it with me.

Q. Did you always communicate to Mr. Twining through the chairman of the PERB?

A. Most of the time that's true. In this instance he did talk to me directly about preparing a letter.

Q. Preparing this memorandum to Mr. Wade?

A. Yeah.

Q. In any period prior to the first half of fiscal year 1989, did you ever prepare a memorandum similar to Exhibit 12, requesting the concurrence or nonconcurrence of award fees from someone at headquarters?

A. No.

Q. To your knowledge, had any such memorandum ever been sent before to anyone at headquarters?

A. No.

Q. Mr. Hill, I'm handing you a document that has previously been marked as Exhibit 9, which is a memorandum from Mr. Barkmeier to Mr. Berger dated May 23rd, 1989. On the face of the memorandum it indicates that a copy was sent to you. Did you receive this document?

A. I don't recall getting this specific document. I see a copy was sent to me. I don't remember the specific document. It did trigger my memory on one other point that you asked me about the timing. I believe the M&O contracts had a time in the contract which required the contract -- the award fee determination to be made within a 35-day period. I had forgotten that, but it just reminded me of that.

Q. That period is 35 working days after the end of the evaluation period.

A. Yes.

Q. Was that deadline met in the case of Rockwell's award fee for the first half of fiscal year 1989?

A. I don't think so.

Q. Why wasn't it met?

A. I believe the decision was delayed beyond that time period, the manager's decision.

functional performance areas for PERB review for the second half of fiscal year 1989.

Q. Why did you want the area managers to submit their functional performance areas to you?

A. Because that -- those functional performance areas were reviewed and concurred in by the PERB, and so the PERB -- I would be able to distribute those to the PERB members for their review prior to the PERB meeting.

Q. If there were any changes being made to the functional performance areas, would the contractor have to be notified of those changes?

A. Any changes at this point -- the FPAs were furnished prior to the beginning of each -- either the first or second half of the fiscal year, and they could be changed from the previous period. That was the purpose of notifying them prior to the beginning of an evaluation period, so that they would know what they are being evaluated against for that period.

Q. The contractor then would have to be notified before the beginning of an evaluation period, of any changes in the FPAs for that period; is that right?

A. For the following period, yes. That triggered my memory. You asked earlier how many times a year the PERB meets. I said twice. I had forgotten that they also meet to review the FPAs.

Q. Is that the second PERB meeting that you were thinking about earlier?
A. No. That is an additional PERB meeting, before the beginning of each period, each evaluation period.
Q. So the PERB would meet regularly four times a year; is that right?
A. Yes.
Q. Once to determine FPAs for a six-month period, once to determine recommended award fee for that six-month period?
A. Yes.
Q. Mr. Hill, I'm handing you a document that has previously been marked as Exhibit 19, which is a memorandum from you to Mr. Whiteman dated February 23rd, 1989. Please review the document and indicate whether you prepared it?
A. Yes, I did.
Q. Why did you prepare this memo?
A. To notify the area manager that approved functional performance areas for the second half of fiscal year 1989.
Q. Mr. Hill, I'm going to ask you to compare the FPAs and the relative weights that are contained in your February 23rd, 1989, memorandum with the FPAs and relative weights contained in modification number M128 to the contract. Please tell me whether they are the same or

different?

A. They are the same.

Q. Is it true that the FPAs contained in the Rockwell contract, which is Exhibit 1, and the relative weights are the same as the FPAs and relative weights contained in your February 23rd, '89, memorandum that is Exhibit 19?

A. Yes.

Q. The FPAs and relative weights for the second half of fiscal year 1989, therefore, were the same as for the first half of fiscal year '89; is that right?

A. Yes.

Q. Mr. Hill, I'm handing you a document that has previously been marked as Exhibit 21, which is a memorandum from Mr. Whiteman to Mr. Sanchini, dated April 18th, 1989. Please review the document and indicate whether you have ever seen it?

A. If I received a copy of it, I presume that I have seen it.

Q. In 1989 were you familiar with Rockwell's award fee goals and objectives?

A. Their goals and objectives are different than the FPAs. I'm not certain that I was. I don't remember. I think that I had seen them. I don't remember being very familiar with them.

PL. SUPP. EX. 101

RECEIVED
MAR 9 1993
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ROCKWELL INTERNATIONAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 91-1362 C<br>(Judge Yock)<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL DEPOSITIONS** |

On December 29, 1992, Rockwell served on the government a notice of depositions of seven current or former employees of the United States Department of Energy ("DOE"). A true and correct copy of Rockwell's deposition notice is attached as Exhibit A. For the past two months, the government's counsel has given every indication of producing those seven individuals, just as the government has in fact produced ten other former and current DOE employees for depositions. On March, 5, 1993, however, less than a month before the discovery deadline of March 31, 1993, the government's counsel announced that he would

not contact any of the seven named deponents to arrange for their depositions. The government's refusal to cooperate in this discovery should not be countenanced. The Court should compel the government to produce the seven individuals for depositions.

The gist of Rockwell's case is that under its contract with the DOE to maintain and operate the Rocky Flats Plant, Rockwell was entitled to award fees as determined independently by the award fee determination official identified in the contract. That official determined what Rockwell's award fees should be for the two periods in question -- the two halves of fiscal year 1989. Those determinations, however, were subverted when officials at DOE headquarters imposed their own award-fee determinations on Rockwell, denying Rockwell the independent judgment of the contractually designated official. It is a fundamental principle of contract law that when a contract places decision-making authority in a specified individual of one of the contracting parties, the other contracting party has a contract right for that individual's independent decisions. That contract right was breached in this case.

The individuals listed in Rockwell's December 29, 1992 deposition notice are integral to Rockwell's case. Six of the seven noticed deponents were DOE headquarters officials during the relevant time period. Documents produced by the government indicate that each of those six individuals was involved in the determination of Rockwell's award fees. The seventh noticed individual appears to have been involved in conveying or implementing DOE headquarters' award-fee mandate.

Rockwell's deposition notice listed seven dates in January 1993 for the seven depositions. Prior to the first of these dates, the government's counsel, John Kolar, telephoned William Kelley of my office to request that the deposition be rescheduled for later dates. Mr. Kolar indicated, as he did on several other occasions, that he had provided the deposition notice to DOE attorneys who would contact the deponents and arrange dates for their depositions.

We were, therefore, fully under the impression that the government would produce the named individuals for depositions. The government had earlier produced former as well as current DOE employees for depositions pursuant to Rockwell's first deposition notice dated July 20, 1992. There was no indication from the government that any different procedure would be employed for the December 1992 notice.

We agreed to postpone the seven depositions to allow the government to contact the individuals and set up mutually convenient dates. The first hint we received that the government was not attempting to arrange deposition dates was on Tuesday, February 23, 1993. Mr. Kolar suggested to me that in lieu of Rockwell taking the seven depositions, the government might be willing to stipulate to the information that would otherwise be obtained through those depositions. I told Mr. Kolar that I was willing to consider his idea, but was somewhat dubious the government would stipulate to what I hoped to obtain from the depositions. Mr. Kolar said he wanted to think more about what the government would stipulate to. On Friday, February 26, 1993, Mr. Kolar, in a telephone conversation with me, offered to

prepare a draft of a stipulation within two weeks and expressed optimism that the stipulation would satisfy my needs for deposing the noticed DOE officials. I stated that we were very willing to work with him on a stipulation, but that he should continue to arrange deposition dates so that if it appeared a mutually agreeable stipulation could not be worked out, Rockwell would not be prejudiced and could still depose the seven individuals before the March 31, 1993 discovery cut-off. Mr. Kolar told me he would consider it further and get back to me on Monday, March 1.

On March 5, 1993, Mr. Kolar returned my telephone call of the previous day. He stated that he did not want to contact the DOE deponents and that contacting them was inconsistent with the purpose of the stipulation which was to avoid bothering those individuals with depositions. I told Mr. Kolar that I would work in good faith toward a satisfactory stipulation, but I did not believe I was asking too much for him to arrange deposition dates in the event a stipulation could not be agreed to. Mr. Kolar responded that he was not going to contact the deponents for the purpose of setting deposition dates. When I insisted that he contact the individuals to schedule their depositions, Mr. Kolar flatly refused. Pursuant to Appendix G, ¶ 8 of the Rules of the United States Court of Federal Claims, through the course of these several telephone conversations, counsel for both parties have attempted in good faith, but failed, to resolve the matter in dispute.

It is manifestly improper for the government to decide, unilaterally, that it will first attempt to provide a stipulation of information before setting dates for the depositions of

noticed individuals. The government's action, if permitted, would place Rockwell in a precarious position. At this point, only the government knows what information it will stipulate to. Rockwell is invited to take on faith that the government will stipulate to information as useful as could be obtained through depositions. Meanwhile, the government refuses to schedule deposition dates, even as a backup in the event the stipulation does not work out.

Rockwell is entitled to take the depositions of the seven individuals identified in the December 29, 1992 deposition notice. We would be willing to accept a stipulation by the government that would obviate the need to take the seven depositions, but experience has proven that stipulations of this sort are difficult to come by. The discovery deadline is fast approaching, and, in any event, the government should be required to schedule dates to produce the deponents so the depositions can go forward in a timely manner in the event the parties can not agree on a stipulation.

## CONCLUSION

The Court should order the government to establish dates, prior to the discovery deadline, on which the government

will produce the seven individuals named in the notice of depositions dated December 29, 1992.

Dated: March 5, 1993

Respectfully submitted,

CHADBOURNE & PARKE
RICHARD J. NEY
WILLIAM J. KELLEY, III

Richard J. Ney
Attorneys for Plaintiff Rockwell International Corporation
601 South Figueroa Street
16th Floor
Los Angeles, California 90017
(213) 892-1000

3175d

CERTIFICATE OF SERVICE

I certify under penalty of perjury that I am in the employ of Chadbourne & Parke, attorneys for plaintiff Rockwell International Corporation; my business address is 601 South Figueroa Street, 16th Floor, Los Angeles, California 90017; I am over the age of eighteen years; and on Friday, March 5, 1993, I served on defendant the United States of America MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL DEPOSITIONS by mailing a true copy of the same to the office of John A. Kolar, Esq., Attorney of Record, Commercial Litigation Branch, Civil Division, United States Department of Justice, Post Office Box 261, Ben Franklin Station, Washington, D.C. 20044.

Executed this 8th day of March, 1993, at Los Angeles, California.

Glenn R. Bronson

PL. SUPP. EX. 101

EXHIBIT A

PL. SUPP. EX. 101

Exhibit A

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROCKWELL INTERNATIONAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 91-1362 C<br>(Judge Yock)<br><br>NOTICE OF DEPOSITIONS |

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Rules of the United States Court of Federal Claims, plaintiff Rockwell International Corporation will take the deposition upon oral examination of defendant United States of America, by the former employee Gregory Fess, on January 14, 1993, at the offices of Vorys, Sater, Seymour & Pease, 52 East Gay Street, Columbus, Ohio 43216, before an officer authorized to administer oaths.

PLEASE TAKE FURTHER NOTICE that, pursuant to Rule 30 of the Rules of the United States Court of Federal Claims, plaintiff Rockwell International Corporation will take the deposition upon

oral examination of defendant United States of America, by the employees or former employees named below, on the dates indicated, at the offices of Chadbourne & Parke, 1101 Vermont Avenue, Washington, D.C. 20005, before an officer authorized to administer oaths.

| Deponent | Date |
|---|---|
| James M. Barr | January 19, 1993 |
| John L. Meinhardt | January 20, 1993 |
| Troy E. Wade, II | January 21, 1993 |
| John C. Tuck | January 22, 1993 |
| W. Henson Moore | January 26, 1993 |
| James D. Watkins | January 27, 1993 |

Each deposition will begin at 9:30 a.m. and continue from day to day and on such adjourned dates as may be necessary until completed.

Dated: December 29, 1992

CHADBOURNE & PARKE
RICHARD J. NEY
WILLIAM J. KELLEY, III

William J. Kelley, III
Attorneys for Plaintiff Rockwell International Corporation
601 South Figueroa Street
16th Floor
Los Angeles, California 90017
(213) 892-1000

CERTIFICATE OF SERVICE

I certify under penalty of perjury that I am in the employ of Chadbourne & Parke, attorneys for plaintiff Rockwell International Corporation ("Rockwell"); my business address is 601 South Figueroa Street, 16th Floor, Los Angeles, California 90017; I am over the age of eighteen years; and on December 29, 1992, I served on defendant United States of America Rockwell's NOTICE OF DEPOSITIONS by mailing a true copy of the same to the office of Allen D. Bruns, Esq., Attorney of Record, Commercial Litigation Branch, Civil Division, United States Department of Justice, Attn: Classification Unit, 2nd Floor, 550 11th Street, N.W., Washington, D.C. 20530.

Executed this 29th day of December, 1992, at Los Angeles, California.

Patricia Meade

Patricia Meade

PL. SUPP. EX. 102

RECEIVED
SEP 3 1993
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ROCKWELL INTERNATIONAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 91-1362 C<br>(Judge Yock)<br><br>PLAINTIFF'S FURTHER STATUS REPORT WITH REGARD TO OUTSTANDING DISCOVERY MOTIONS AND REQUEST FOR DATE FOR ORAL ARGUMENT |

Pursuant to the Court's Order of August 24, 1993, plaintiff Rockwell International Corporation ("Rockwell") submits this status report regarding the four currently pending discovery motions.

After further discussions between counsel, Rockwell and defendant United States of America ("government") have agreed to proceed as follows with regard to the pending motions and respectfully request the Court as follows:

(1) Rockwell agrees to withdraw, without prejudice, its Motion to Compel Depositions, dated March 5, 1993, and its Motion

to Compel Interrogatory Answers, dated April 30, 1993, and requests that the Court permit those motions be withdrawn without prejudice.

(2) Rockwell and the government have not been able to resolve the issues presented in the two other pending motions, Rockwell's Motion for a Protective Order, dated March 16, 1993, and the government's Motion for Enlargement of the Discovery Period by Six Months, dated March 31, 1993, and therefore request that the Court reset those two motions for oral argument.

Rockwell advises the Court that in exchange for Rockwell's withdrawal without prejudice of the motions to compel described in paragraph (1) hereof, the government has agreed to enter into the stipulation that is attached hereto as Exhibit A. Rockwell has agreed not to depose any of the seven former Department of Energy officials named in Rockwell's Notice of Depositions, dated December 29, 1992; provided, however, that in the event the government is permitted to conduct discovery on issues not contained in the Joint Status Reports, dated January 17, June 15, September 14 and December 15, 1992, including, without limitation, issues relating to any alleged misrepresentations, fraud, breach of contract or failure of consideration, then Rockwell reserves its right to renew its notice of depositions of any or all of the seven former Department of Energy officials. In that event, recognizing that the individuals are former government officials, the government agrees that it will use its best efforts to schedule those

individuals for deposition and will not object to any of those depositions on the ground that the individual is or was a high-ranking government official.

Dated: September 2, 1993

Respectfully submitted,

CHADBOURNE & PARKE
RICHARD J. NEY
Attorney of Record
WILLIAM J. KELLEY, III
Of Counsel

Richard J. Ney by William J. Kelley
Richard J. Ney
Attorney for Plaintiff Rockwell
International Corporation
601 South Figueroa Street
16th Floor
Los Angeles, California 90017
(213) 892-1000

PL. SUPP. EX. 102

EXHIBIT A

# STIPULATION

With respect to the first award fee period in issue, October 1, 1988 through March 31, 1989 (the "89/1 period"), the United States hereby stipulates and agrees as follows:

1. In May 1989, the Department of Energy's ("DOE's") Manager of Albuquerque Operations (the Award Fee Determination Official or "AFDO") concluded that Rockwell International Corporation's ("Rockwell's") award fee for Plant Operations at the Rocky Flats Plant for the 89/1 period should be $5,176,482 and forwarded his conclusion to DOE headquarters for concurrence.

2. In June 1989, DOE headquarters advised the AFDO that it did not concur in his conclusion that the award fee should be $5,176,482.

3. In June 1989, DOE headquarters appointed Edward S. Goldberg Acting Manager of the Rocky Flats Office and directed that Mr. Goldberg and the Rocky Flats Office report directly to DOE headquarters. Prior to June 1989, the Rocky Flats Office and its Manager reported directly to the Albuquerque Operations Office.

4. DOE headquarters, in June 1989, directed Mr. Goldberg to review the award fee as arrived at by the AFDO in May 1989.

5. In July 1989, Mr. Goldberg proposed an award fee for Plant Operations at Rocky Flats for the 89/1 period in the amount of $3,628,622 to the AFDO.

6. DOE headquarters determined that the award fees for Plant Operations at Rocky Flats for the 89/1 period initially arrived at by the AFDO in May 1989, and that subsequently recommended by Mr. Goldberg, were both too high.

7. DOE headquarters mandated that the award fee for Plant Operations for the 89/1 period be $2,716,624, and caused the AFDO to issue a final award fee determination in that amount.

8. The $2,716,624 award fee for Plant Operations for the 89/1 period was determined by DOE headquarters.

With respect to the second award fee period in issue, April 1, 1989 through September 30, 1989 (the "89/2 period"), the United States hereby stipulates and agrees as follows:

9. In December 1989, DOE's Manager of the Rocky Flats Office (the Award Fee Determination Official or "AFDO") concluded that Rockwell's award fees for the 89/2 period should be $3,114,245 for Plant Operations and $628,982 for PRMP/PROVE and forwarded his conclusion to DOE headquarters for concurrence.

10. DOE headquarters determined that both the $3,114,245 award fee for Plant Operations and the $628,982 award fee for PRMP/PROVE for the 89/2 period that were forwarded by the AFDO were too high.

11. DOE headquarters mandated that the award fee for Plant Operations for the 89/2 period be $1,241,604, and

the award fee for PRMP/PROVE be $338,035, and caused the AFDO to issue a final award fee determination in those amounts.

12. The award fee for Plant Operations of $1,241,604, and the award fee for PRMP/PROVE of $338,035 for the 89/2 period were both determined by DOE headquarters.

FRANK W. HUNGER
Assistant Attorney General

DAVID M. COHEN
Director

JAMES M. KINSELLA
Assistant Director

JOHN A. KOLAR
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 307-0405

Attorneys for Defendant

Dated: September ___, 1993

CERTIFICATE OF SERVICE

I certify under penalty of perjury that I am in the employ of Chadbourne & Parke, attorneys for plaintiff Rockwell International Corporation; my business address is 601 South Figueroa Street, 16th Floor, Los Angeles, California 90017; I am over the age of eighteen years; and on September 2, 1993, I served on defendant the United States of America PLAINTIFF'S FURTHER STATUS REPORT WITH REGARD TO OUTSTANDING DISCOVERY MOTIONS AND REQUEST FOR DATE FOR ORAL ARGUMENT by mailing a true copy of the same to the office of Mr. John A. Kolar, Esq., Attorney of Record, Commercial Litigation Branch, Civil Division, United States Department of Justice, Post Office Box 261, Ben Franklin Station, Washington, D.C. 20044.

Executed this 2nd day of September, 1993, at Los Angeles, California.

Glenn R. Bronson

PL. SUPP. EX. 103

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROCKWELL INTERNATIONAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 91-1362C<br>(Judge Yock) |

DEFENDANTS' STATUS REPORT

Pursuant to the Courts Order of August 24, 1993, defendant submits this status report regarding the four currently pending discovery motions.

After further discussions between counsel, plaintiff Rockwell International Corporation and defendant have reached an agreement with regard to the pending motions as set forth in Rockwell's status report filed this day. Defendant concurs with the description of the agreement as set forth in Rockwell's status report.

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

DAVID M. COHEN
Director

JAMES M. KINSELLA
Assistant Director

John Kolar /s
JOHN A. KOLAR
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 307-0405

Attorneys for Defendant

Dated: September 3, 1993

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 3rd day of September 1993, I caused to be placed in the United States mail (first-class mail, postage prepaid) copies of the "DEFENDANTS' STATUS REPORT" addressed as follows:

Richard J. Ney
Chadbourne & Park
601 South Figueroa Street
16th Floor
Los Angeles, California 90017

______________________________

PL. SUPP. EX. 104

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROCKWELL INTERNATIONAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 91-1362 C<br>(Judge Yock)<br><br>PLAINTIFF ROCKWELL INTERNATIONAL CORPORATION'S RENEWAL OF ITS NOTICE OF DEPOSITIONS |

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Rules of the United States Court of Federal Claims, plaintiff Rockwell International Corporation's ("Rockwell's") September 2, 1993 status report, and defendant United States of America's September 3, 1993 status report, Rockwell will take the deposition upon oral examination, before an officer authorized to administer oaths, of defendant United States of America, by the former employees named below, at the offices of Chadbourne & Parke, 601 South Figueroa Street, 16th Floor, Los Angeles, California 90017, or at a time and place to be mutually agreed upon by the parties.

| Deponent | Date | Time |
|---|---|---|
| James M. Barr | April 25, 1994 | 8:00 a.m. |
| John L. Meinhardt | April 25, 1994 | 11:30 a.m. |
| Troy E. Wade, II | April 25, 1994 | 3:00 p.m. |
| John C. Tuck | April 26, 1994 | 8:00 a.m. |
| W. Henson Moore | April 26, 1994 | 11:30 a.m. |
| James D. Watkins | April 26, 1994 | 3:00 p.m. |

Each deposition will begin at the time and date indicated and continue from day to day and on such adjourned dates as may be necessary until completed.

Dated: March 29, 1994

CHADBOURNE & PARKE
RICHARD J. NEY
Attorney of Record
WILLIAM J. KELLEY, III
Of Counsel

Richard J. Ney
Attorney for Plaintiff Rockwell
International Corporation
601 South Figueroa Street
16th Floor
Los Angeles, California 90017
(213) 892-1000

CERTIFICATE OF SERVICE

I certify under penalty of perjury that I am in the employ of Chadbourne & Parke, attorneys for plaintiff Rockwell International Corporation; my business address is 601 South Figueroa Street, 16th Floor, Los Angeles, California 90017; I am over the age of eighteen years; and on March 29, 1994, I served on defendant United States of America PLAINTIFF ROCKWELL INTERNATIONAL CORPORATION'S RENEWAL OF ITS NOTICE OF DEPOSITIONS by mailing a true copy of the same to the office of John A. Kolar, Esq., Attorney of Record, Commercial Litigation Branch, Civil Division, United States Department of Justice, Post Office Box 261, Ben Franklin Station, Washington, D.C. 20044.

Executed this 29th day of March, 1994, at Los Angeles, California.

Olga Bernal

Olga Bernal

PL. SUPP. EX. 105

UNITED STATES COURT OF FEDERAL CLAIMS

ROCKWELL INTERNATIONAL CORPORATION, )
Plaintiff, )
vs. ) No. 91-1362 C
UNITED STATES OF AMERICA, ) (Judge Yock)
Defendant. )

ORIGINAL

DEPOSITION OF:

CHARLES EDWARD TROELL

Tuesday, March 2, 1993

9:30 A.M.

Reported by:
BARBARA K. HARRIS
CSR # 93

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025
310/477-8867 FAX 310/478-8412

Q. In response to Mr. Twining's inquiry to you, did Mr. Hill write this memorandum?
A. Probably. I suspect -- I don't remember it exactly, but I suspect what happened was I probably reconvened the PERB and made sure they all had the Goldberg input and any other additional input and said, "Hey, in light of this, let's go through this thing again." In fact, I'm almost certain I either reconvened the PERB or I had the major players in it, the head of ES & H, I'm sure, and probably Bob Heimer, who was the head of Operations and Production and Quality and some of those areas.
Q. Did you approve the memorandum that is Exhibit 49?
A. I don't recall. I don't recall. I suspect, knowing the way that I worked and everything else, it probably wouldn't have gotten to this form unless I had gone along with it. In fact, I might have even halfway dictated it, but I don't recall that. I just don't recall. I don't recall how it worked exactly.
Q. Take a minute to read through it and tell me if the text comports with your understanding.
A. My understanding of what? I mean --
Q. Let me put it this way, and see whether the text of this memorandum reflects accurately your thinking on the award fee after seeing the Goldberg input.
A. Well, I think the last two paragraphs there do

reflect what I said. My general understanding, that Goldberg was there, on the site, I hadn't been there on the site, and in residence, and, no question, he had greater insight into the conditions and operations of the plant and the actual performance during the period, because my understanding is he got exposed to it in far greater depth than I would have as chairman of the PERB who was responsible for looking at all these contracts at the site.

Q. Now, in your position on the PERB, were you getting input from people who were on this site?

A. Yes, in every instance, every contract, we had an area office at each and every one of the major contractors that had an award fee contract, and so those folks periodically and routinely made evaluations that I saw, and the entire PERB saw, as a matter of fact. So that wasn't unusual.

What was unusual was in this case you had a technical person as opposed to an administrative person who was recognized department wide as having a great deal of expertise in nuclear operations and environmental activities elsewhere as a senior -- as a more senior manager in the department.

As a matter of fact, this fellow Goldberg had been a deputy manager of field offices. He was the equivalent of a Culpepper who was one chair above me, as opposed to an Earl

believe Mr. Goldberg learned information about Rockwell's performance that was not available to the PERB.

A. I think I said it somewhat differently. I said he certainly had the opportunity and the access by being physically in residence, and having a number of people available to him, to review these kinds of things, than were available to the PERB.

Q. Do you know if, in fact, Mr. Goldberg learned new or different information than was available to the PERB?

A. He told me that he did.

Q. He told you that he did.

A. Because he was familiar with the PERB report, he had written -- not written, he had reviewed that and he saw some of the input into the PERB report, and he told me that he had discovered or found additional information that he thought had an impact on the evaluation, and his words were, I think, that he said, "I had an opportunity and saw some things that you folks didn't see, and didn't get."

Q. And I believe --

A. And I had no basis for disagreeing with that.

Q. And I believe you testified earlier that you recall a document in which Mr. Goldberg may have presented some of the new information that he learned; is that right?

A. I saw what I -- what I think I said was I saw a document, that was prepared by Goldberg or for him, that had

MR. KOLAR: Objection to the form of the question, use of a hypothetical.

A. No, I wouldn't have.

Q. And why wouldn't you have?

A. Why wouldn't I have accepted it? A PERB had done its evaluation, and unless somebody --- and you recall I talked to Goldberg, met with him, saw paper, and was convinced that he had additional light to shed on it, and I thought it was appropriate.

Q. It was also mentioned in the July 10th memorandum, and I think elsewhere, that the department's philosophy or application of guidelines was changing --

A. Expectations.

Q. -- and expectations were becoming more stringent on contractor performance.

A. That's correct. That was an additional factor.

Q. Now, would that alone have given you comfort in adopting a reduced award fee from what the PERB recommended?

A. The expectations changing, would that have given me -- is that what your question is?

Q. Yes.

A. I can't really say. I felt that Goldberg indeed did have additional information that hadn't been available to the PERB, and I felt, and as we paraphrased in that letter and you saw appear in several other letters, the

on-site presence and the additional information put him in a unique position, such that he should have been in a better position to judge and evaluate than those of us who weren't there. And I think that was the overriding consideration, and that's why I answered your hypothetical in the manner I did, too.

Q. In all your experience dealing with award fees, as chairman of the PERB, do you recall any situation, other than the Rockwell award fee, for the first six months of fiscal year 1989, where an area office manager proposed an award fee different from what the PERB recommended after the PERB had made its recommendation?

A. I'm going to be very sure I understand your question. In my experience as chairman of the PERB, do I recall any situation in which an area manager proposed a different award fee than the one that the PERB had passed judgment on, or had come up with?

Q. After the PERB came up with its number.

A. After the PERB. No, not officially. I do remember being challenged a couple of times by area managers who said, "You guys are being too tough on the contractor, and I would like to go talk to Romotowski or Twining about it," and I said, "Well, it's a free country, go talk to them."

I don't recall any situation in which the award fee

PL. SUPP. EX. 106

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA and
UNITED STATES OF AMERICA, ex rel.
JAMES S. STONE,

Plaintiffs,

vs. ) 89 M 1154

ROCKWELL INTERNATIONAL CORPORATION, et al.,

Defendants.

---

TRIAL TO JURY - DAY 15
TRANSCRIPT OF PROCEEDINGS

---

Proceedings held before the HONORABLE RICHARD P. MATSCH, U.S. District Judge for the District of Colorado, beginning at 8:30 a.m. on the 16th day of March, 1999, in Courtroom C-204, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs:

Maria T. Vullo, Esq.
Jeannie S. Kang, Esq.
Matthew Chevez, Esq.
Robert E. Montgomery, Jr., Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
Suite 2607
New York, New York 10019

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

A F T E R N O O N  S E S S I O N

(At 1:21 p.m. on March 16, 1999, with counsel for the parties present, the following proceedings were had:)

THE COURT: Be seated, please.

(1:22 p.m. - Jury present.)

THE COURT: You may inquire?

MS. BENSON: Thank you.

CROSS-EXAMINATION

BY MS. BENSON:

Q Good afternoon, Mr. Nelson. You were the manager for DOE at Rocky Flats; is that correct?

A From January of 1990 for about three years, yes. Correct.

Q For about three years. And, you indicated that you started at Rocky Flats about the last week in January or the third week in January?

A Yes, ma'am.

Q Okay. And, that was in 1990?

A Yes, ma'am.

Q And, the operating contractor at that time was EG&G?

A Correct.

Q Not Rockwell?

A Not Rockwell.

Q And, prior to coming to Rocky Flats, you had no prior experience with Rockwell, did you?

A No, I did not.

Q You were not at Rocky Flats or supervising in any role at Rocky Flats while Rockwell was the operating contract at Rocky Flats?

A That's correct.

Q Would you look in your notebook at Tab 1 which is Exhibit D118? It is a stipulated exhibit. Do you see, Mr. Nelson, that this is a copy of Appendix D to the contract, Rockwell International's contract, and it's Appendix D covering the award fee plan for the fiscal year 1989. Do you see that?

A Yes, ma'am.

Q And, do you see under introduction, it states, "The award fee determination official and then it has manager or anyone acting as manager Albuquerque operations shall evaluate the contractor's performance during each evaluation period and will determine the amount of the award fee to be paid to the contractor for the evaluation period."

A Yes.

Q Okay. Now, Mr. Nelson, you were not the manager of Albuquerque operations, were you?

A No, I was not.

Q And, you were not acting as the manager of Albuquerque operations, were you?

A No.

Q Okay. When you took the job at Rocky Flats, you didn't believe that you were going to be the determination official for Rockwell, did you?
A That's correct, I did not.
Q In fact, it never crossed your mind that you would be asked to be the fee determination official for Rockwell?
A I think that's correct, yes.
Q And, you didn't want to be the fee determination official for Rockwell, did you?
A No, I did not.
Q You resisted the appointment because you had no involvement with Rockwell's work at Rocky Flats?
A That's correct.
Q And, although you didn't know anything about Rockwell's performance at Rocky Flats at the time that you came to the plant, you did have a general knowledge of award fee contracts for DOE contractors, didn't you?
A Yes, I did.
Q And, that came from your work in the Nevada Operations Office?
A Yes, ma'am.
Q Would it be fair to say that the award fees were to be paid depending upon the level of the performance of the contractor?
A Yes.

should not be receiving an award fee?
A I think, yes, but that was the public's view. Yes.
Q And, you knew at the time that you came that the Rockwell award fee was a sensitive issue?
A Yes.
Q And, you knew it would undergo public scrutiny?
A Yes.
Q Now, if you could turn to Tab 10 in your notebook? This is an exhibit that Mr. Hesch showed you. This is where Mr. Twining appointed you as the fee determination official for Rockwell's performance under the contract for the period from April through September 30, 1989. Is that correct?
A That's correct.
Q Do you see the date on this letter, February 26, 1990?
A Yes.
Q Do you recall, Mr. Nelson, that that was the same date that you sent out your award fee determination letter to Rockwell?
A Yes.
Q So that if we take a look at Tab 13 in your notebook which is Exhibit A547 and this is a stipulated exhibit, this is the letter that you sent to Rockwell telling them what their award fee was. Is that correct?
A That's correct.
Q And, this letter is also dated February 26, 1990; is

that correct?
A That's correct.
Q Now, the amount of the award fee that you determined, Mr. Nelson, was a total of $1,579,639. Do you see that?
A Yes, it's the sum of those two numbers.
Q And, that was approximately half of the number that Mr. Simonson had recommended be awarded to Rockwell for this exact same period of time?
A Yes.
Q Now, do you see, Mr. Nelson, that in your letter you stated that the award fee approved by the DOE for payment to Rockwell is pursuant to an award fee plan previously developed to cover the period April 1, 1989 through September 30, 1989?
A Yes.
Q And, that was something that you were telling Rockwell when you sent this letter out?
A Yes.
Q And, in fact, Mr. Nelson, if you turn to the third page of that exhibit, this was the--you attached a performance evaluation report with your letter; is that correct?
A Yes.
Q And, in that letter, you stated the--or in that evaluation, you stated, "The inspected FPAs have been evaluated in accordance with the contract award fee plan."

A Yes.
Q Do you see that?
A Yes, ma'am.
Q Now, Mr. Nelson, at the time you sent out that letter, you had never read the DOE-Albuquerque handbook on award fees. Is that correct?
A I think--I don't remember, but I don't think I had read that.
Q You hadn't read the performance evaluation plan for Rockwell, is that correct?
A I probably had read the performance evaluation plan.
Q Do you have a specific recollection of reading it?
A No, I don't.
Q You had never met with or spoke with anyone from Rockwell at that time other than maybe a casual handshake?
A Correct.
Q You never convened a Performance Evaluation Review Board to look into or evaluate Rockwell's performance?
A I met with the board that had existed before.
MS. BENSON: Could I have Mr. Nelson's Court of Claims deposition? It was the 1992 deposition?
THE CLERK: This is a transcript of a deposition taken November 9, 1992.
Q (by Ms. Benson) Now, Mr. Nelson, do you recall that you had your deposition taken?

A Yes.
Q If you would turn to Page 75 of that transcript? Are you there?
A I'm there.
Q And, at Line 7, were you asked a question, "Prior to signing the February 26 letter to Mr. Sanchini, did you ever convene a performance evaluation committee to evaluate Rockwell's performance for the period in the second half of fiscal year, 1989?" Answer, "No."
Was that the question asked and the answer you gave?
A Yes, I believe it was. And, I probably remember it better then than I do now.
Q And, Mr. Nelson, you can put that away. Thank you. Although you cut the award fee in half from what was recommended by Mr. Simonson, you did not go back to the performance evaluation committee, did you?
A No, I did not.
Q Or the Performance Evaluation Review Board?
A That would be the same. I did not go back to the Performance Evaluation Review Board.
Q Is it your recollection, Mr. Nelson, that you had one meeting to discuss Rockwell's award fee prior to signing the February 26, 1990 letter?
A I don't remember having--what meetings I had.

Q Could you turn to Page 55 of the deposition transcript? Actually, if you'd start on Page 54 on Line 20?
A Okay.
Q And, could you just read to yourself from Line 20 on Page 54 through Line 4 on Page 55?
(Pause.)
A Okay.
Q Does that refresh your recollection, Mr. Nelson, that prior to sending out the award fee letter of February 26, 1990, you had one meeting to discuss Rockwell's award fees?
A One meeting with Mr. Bishop and Mr. Agee and probably one with Mr. Simonson.
Q One meeting, is that correct?
A Probably one of each. I don't remember.
Q Okay. Mr. Nelson, were you asked in that deposition, question, "You have mentioned one meeting that you had in February of 1990 to discuss Rockwell's award fee. Were there other meetings that you had other than that one?" Answer, "Prior to the determination?" Question, "Prior to the February 26 letter?" Answer, "Okay. I don't think so. No, I don't think so." Question, "There were no other meetings?" Answer, "I don't think so."
Were those the--
A Right. But, I said I may have talked it over with Dave Simonson, but I really don't remember doing that. And, that

still may be the case.

Q Okay. You don't really remember talking it over with Mr. Simonson?

A No, I don't. No, I don't.

Q And, it's not your recollection that Mr. Simonson was present at that meeting, is it?

A No.

Q Now, there was an individual named Mr. Agee present at that meeting?

A Yes.

Q If you could look at Tab 8 which is Exhibit A533?

A Tab 8?

Q Yes.

A Uh-huh.

Q This is a stipulated exhibit. Are you there, Mr. Nelson?

A Yes, ma'am.

Q This is a record of a telephone conversation; is that correct?

A Yes.

Q And, made by Mr. Agee?

A Uh-huh.

Q And, the subject was headquarters concurrence on the award fee. Do you see that?

A Yes.

PL. SUPP. EX. 107

CERTIFIED COPY

IN THE UNITED STATES

CLAIMS COURT

ROCKWELL INTERNATIONAL )
CORPORATION, )
Plaintiff, ) Case No.
vs. ) 91-1362C
THE UNITED STATES, ) Pages 1 - 114
Defendant. )

---

DEPOSITION OF:

ROBERT M. NELSON, JR.

MONDAY, NOVEMBER 9, 1992

10:25 A.M.

Reported by:
ROBERTA L. THIBODEAU
CA C.S.R. No. 8263
NV C.S.R. No. 358

TEARNEY & TEARNEY
Certified Court Reporters
1950 Sawtelle Blvd., Suite 320
Los Angeles, CA 90025
310/477-8867 FAX 310/478-8412

Q. Did anyone that day inform you that you would be the award fee determination official?
A. Fee determining official, no. For Rockwell?
Q. For Rockwell.
A. No. Certainly, I expected to be that for EG&G. But for Rockwell, no.
Q. You did not expect to be that for Rockwell; is that right?
A. It never even crossed my mind.
Q. Why was that?
A. Well, because I was going in as the manager of a plant with EG&G as the contractor. I expected to be that, and I didn't even -- it never crossed my mind what would be the situation with Rockwell.
Q. Because Rockwell was no longer the contractor?
A. Because Rockwell was no longer the contractor there.
Q. In your position in the Nevada office in January of 1990, who did you report to?
A. The manager. I was the deputy manager, and I reported to Nick Aquilina, the manager.
Q. Who did Mr. Aquilina report to?

Q. Mr. Nelson, I'm handing you a document that is being marked Exhibit 31, which is a memorandum from Mr. Barkmeier to Mr. Simonson dated November 7, 1989 --

A. Uh-huh.

Q. -- with an attachment entitled "Award Fee Performance Evaluation Review Board Recommendation."

A. Uh-huh.

(The document referred to was marked as Deposition Exhibit 31 for identification, and attached to and made a part of this deposition.)

BY MR. KELLEY:

Q. Would you please review this document and tell me if you've ever seen it before.

A. I think I've seen it before.

Q. When did you first see it?

A. I'm going to have to guess. Mid-to-late February of 1990.

Q. Who showed it to you?

A. I think I had a -- I had a review of -- before signing the award fee letter, which was the end of the month, by the staff that was there. And I have

to guess as to who that was. I believe it was Marshall Bishop and probably Terrel Agy and maybe others, but I don't recall. In reviewing the letter to Mr. Sanchini and my desire for them to tell me what is this all about, and -- and is this the right rating, I don't know that this document was exactly what we went through, but it was something. If not this document, then it was something very similar to this.

Q. Was Mr. Barkmeier at that meeting?

A. No. I believe Mr. Barkmeier had retired prior to that.

Q. Mr. Nelson, I'm handing you a document that is being marked Exhibit 32, which is a memorandum from Mr. Simonson to Mr. Tuck dated December 6, 1989 with attachments.

(The document referred to was marked as Deposition Exhibit 32 for identification, and attached to and made a part of this deposition.)

BY MR. KELLEY:

Q. Please review this document and tell me if you've ever seen it before.

A. I believe I have seen it.

making a recommendation for an award fee for the Rockwell contract for that same period of time.

Q. According to Exhibit 32, which is the award fee that Mr. Simonson had calculated for Rockwell?

A. There is a -- for the plant a $3,114,245 award fee recommendation. And for a special project we had called PRMP/PROVE a proposed award fee of $628,982 So the total would be the total of those two.

Q. Were those numbers discussed at the meeting you had in February of 1990?

A. I believe they were.

Q. Did you say Mr. Simonson was at that meeting?

A. I don't remember -- I did not say whether he was there, and I don't remember whether he was there or not.

Q. Did you ever talk to Mr. Simonson about Rockwell's award fee?

A. I don't remember. I may have. I don't remember.

Q. Did you discuss with Mr. Agy Rockwell's award fee?

A. I think so. I know Terrel was at that

meeting and reviewed with me where we were in that process, and that's where -- that would have -- that certainly would have been my intention to go through that with him at that meeting. So I think it was Mr. Agy.

Q. What did Mr. Agy tell you about Rockwell's award fee?

A. Certainly he would have told me the proposed number, and I really don't remember anything else, other than talking about the kinds of words that are shown on this exhibit as far as achievements and deficiencies.

Q. Did Mr. Agy tell you that anything in Mr. Simonson's evaluation had changed?

A. No, I don't remember that.

Q. Did Mr. Agy tell you that Mr. Simonson had changed the numbers that he had determined for Rockwell's award fee as shown in Exhibit 32?

A. I don't -- I don't think so. I -- I don't know what you mean by changed the numbers. I mean --

Q. In Exhibit 32 Mr. Simonson came up with the numbers you read before for Rockwell's award fee.

A. Uh-huh.

Q. Had those numbers changed?

from headquarters?

A. I don't think so, but I -- but it would not have been uncommon. And, in fact, in the current award fee boards that is with the EG&G contract, there is a headquarters representative on that board. I don't remember a headquarters person being there at that time, but it could have happened. I don't know. I don't think so. I really don't think so.

Q. Did you ever meet with the performance evaluation review board at Rocky Flats before signing the February 26th letter?

A. No. Most of them -- my recollection is most of them weren't there at that time.
Mr. Barkmeier, I believe, had retired. Several of the others had either transferred. In the time frame of the award fee period, April through September, the FBI raid occurred. There had been on the order of 50 people in the Rocky Flats office of DOE at that time. When I got there in end of January of 1990, many of those people through whatever -- through probably a number of reasons, had left that employ, retirements, transfers, to where in the spring of 1990 most of my office there was made up of detailees in from other field offices of the Department of Energy. And maybe only -- I think probably by the end of that spring, of

those 50 that had been there before, only about 20 remained.

So I had lost most of the people who had been really involved with anything prior to the January of 1990 time frame. The corporate memory of that office was -- was really in large part lost. So I -- I could not, even if I had wanted to, meet with most of that board.

I think -- I'm not even sure who was on all of that board, but I know Mr. Barkmeier was one -- was the chairman, and he had gone and had been replaced with Mr. Bishop. And so I really looked to the current people, Mr. Bishop and Mr. Agy, as corporate memory of what had transpired. And I may have talked some of the substance with Mr. Simonson, but I don't remember that.

Again, my -- most of my effort was to look to the future and trying to fix the problems that were there at the time I arrived.

Q. You have mentioned the one meeting that you had in February of 1990 to discuss Rockwell's award fee. Were there other meetings that you had other than that one?

A. Prior to the determination?

Q. Prior to the February 26th letter.

A. Okay. I don't think so. No, I don't think so.

Q. There were no other meetings?

A. Don't think so.

Q. Did you discuss it with anyone else before the February 26th letter?

A. I may have talked it over with Dave Simonson, but I really don't remember doing that. I mean, I say that because it would be normal for a manager and a deputy manager, principally a deputy manager who had been there before, to talk about it. I mean, I can say common sense would say I would -- I would have had that discussion. I don't remember having had that discussion.

Q. Did you ever discuss it with Mr. Agy other than at that meeting?

A. No, I don't believe so.

Q. About how many people were at that meeting?

A. I think -- the only ones I remember is myself, Marshall Bishop and Mr. Agy. I don't recall anyone else being there.

Q. How long did the meeting last?

A. I would have to guess on the order of an hour, hour and a half.

Q. When in February did the meeting take place?

A. It would have had to be in the last couple weeks of February. I would have been there a couple weeks and, obviously, this was something that had to be done, so it demanded the attention. As to a specific date, I don't know.

Q. Mr. Nelson, I'm handing you a document that is being marked Exhibit 33, which is entitled "Executive Summary," from Marshall Bishop to David Simonson dated January 10, 19' --

A. Must be '90.

Q. -- '90 I would take it.

A. I would certainly agree that has to be January 10, 1990.

(The document referred to was marked as Deposition Exhibit 33 for identification, and attached to and made a part of this deposition.)

BY MR. KELLEY:

Q. Have you ever seen this document before?

A. I don't think so.

Q. Let me draw your attention to the last sentence in the section entitled "Potential Problems."

Q. Prior to signing the February 26th letter to Mr. Sanchini, did you ever convene a performance evaluation review board to look into or to evaluate Rockwell's performance for the period in the second half of fiscal year 1989?

A. No.

Q. Prior to signing the February 26th letter to Mr. Sanchini, did you ever convene a performance evaluation committee to evaluate Rockwell's performance for the period in the second half of fiscal year 1989?

A. No.

Q. Mr. Nelson, I'm handing you a document that is being marked as Exhibit 38, which is a record of meeting by Mr. Agy dated February 26, 1990. And the time indicated is approximately 9 a.m.

(The document referred to was marked as Deposition Exhibit 38 for identification, and attached to and made a part of this deposition.)

BY MR. KELLEY:

Q. Please review this document and tell me if you have ever seen it before.

A. I've not seen it before; uh-huh.

think. That certainly would have been the intention.

Q. But didn't you state before that when you signed the letter, the performance evaluation report may have undergone some further revision?

A. Yes, but it wouldn't have gone out until it was -- I would have signed it if I was satisfied with the letter, subject to their making whatever final corrections probably a number of people, including Mr. Fess, had wanted to make. I don't -- I mean --

Q. Would you have --

A. I would not have made them had absolutely all corrections in prior to my signing it.

Q. Did you see a -- strike that.

Did you see the final package that went out on February 26th?

A. I really don't recall. Jean Finch is my secretary. Her name is there. If she had it, I certainly had an opportunity to.

MR. KELLEY: Let's go off the record.

(At 1:00 p.m. the deposition was adjourned for lunch recess.)

BY MR. KELLEY:

Q. Mr. Nelson, you were discussing earlier a meeting among yourself, Mr. Agy, and Mr. Bishop, and

perhaps others, in February of 1990 wherein you discussed Rockwell's award fee.

A. Uh-huh.

Q. How long did that meeting last?

A. I don't know for sure. As I think I mentioned, it was probably an hour to an hour and a half. That would be typical of a meeting we would have.

Q. You stated that you may have seen at that meeting two of the documents I showed you earlier, Exhibits 31 and 32; is that right?

A. Yes.

Q. Did you see any other documents at that meeting?

A. I -- there were probably some other documents. They may have been view graphs or -- or other kinds of things dealing with the Rockwell performance. But I don't -- I can't -- I don't know anything precisely. I can't point at any document or anything specific.

Q. Were there any documents from headquarters that you saw at that meeting?

A. I don't remember. It certainly -- I could have seen -- it could have had the Tuck memo there or a draft.

Q. The one dated February 22nd?
A. 22nd, or a draft of that if there were any. And I'm not saying there were. I don't know. But something like that certainly would have been at the meeting if it were available.
Q. Now, if you saw the February 22nd meeting, that would --
A. Give me --
Q. Excuse me, the February 22nd memo -- that would place --
A. Certainly place the time.
Q. -- the meeting sometime in the week prior to the February 26th letter. Is it possible the meeting took place during the week --
A. Yes, certainly.
Q. -- prior?
And other than that February meeting with Mr. Agy and Mr. Bishop, did you discuss with anyone at Rocky Flats Rockwell's award fee?
A. As I mentioned before, I can't think of any specific instance, but I certainly could have discussed that with Dave Simonson who was my deputy at the time.
Q. Did you review any documents relating to Rockwell's award fee other than the documents you

Q. Would you please compare the page labeled E 000079 --
A. Uh-huh.
Q. -- with the final version of the letter and tell me if you see any differences.
A. Do I need to go word by word? I mean, I -- I -- I can, I guess.
Q. Well, are there any substantive differences?
A. No.
Q. Do you see any differences in the text?
A. No.
Q. And was the draft that is labeled E 000079 prepared by headquarters?
A. Yes, I think so. I don't recognize it, and that's what the note says at the bottom.
Q. Whose handwriting is that note?
A. I have no idea.
Q. Would that be Mr. Agy's?
A. Could be. I don't know.
Q. Do you work with Mr. Agy very often at Rocky Flats?
A. He -- there are two people between he and I. Most of my dealing is with his boss's boss on administrative issues. So when there is a technical

discussion on some particular contracting thing that he's responsible for, he may be in the meeting, but other than that, almost never one-on-one with him.

Q. In the second paragraph of your paragraph of your letter to Mr. McNett is a reference to HEPA filters.

A. Uh-huh.

Q. Are they the filters that you were talking about earlier?

A. Yes.

Q. Mr. Nelson, I'm handing you a document that is being marked as Exhibit 43 -- excuse me, 44, which is a transmittal sheet, and behind it is a memorandum from you to Mr. Tuck dated July 17, 1990. Behind that is document marked "Draft." It appears to be a draft of a letter from you to Mr. McNett.

A. Uh-huh.

Q. And behind that appears to be another copy of your memorandum to Mr. Tuck dated July 17, 1990.

A. Uh-huh, with the record note on it.

/// ///

/// ///

/// ///

/// ///

the RFO meeting held on July 16, 1990.
A. Right.
Q. Do you agree with those?
A. Right. I think so.
Q. So those issues were not addressed?
A. These issues were not the technical issues.
Q. Did you ever discuss these issues with anyone at Rockwell?
A. No. No. The only contact I had with Rockwell was that one meeting.
Q. The meeting referred to here as taking place on July 16, 1990?
A. No. Wait a minute. Was that -- I'm not sure that was the date of the day that Rockwell came in and -- and presented their case. Whatever date that was was the only date -- I didn't read that paragraph to say that was their meeting.
Q. If you look on the first page of the exhibit, there's a reference to an oral presentation --
A. July 10th.
Q. -- July 10th of 1990.
A. Right. That was the one time I had contact with anyone in Rockwell.

Q. Is that the only time you had contact with anyone at Rockwell?
A. Yes, sir.
Q. On any matter or are you just referring to award fees?
A. No, just on any matter. The meeting specified in that last paragraph on E000010 was, to my recollection, the briefing my staff had or the meeting my staff had to review all of those issues raised by Rockwell earlier in the correspondence in the July 10th meeting. I don't think Rockwell was there.
Q. That was an internal meeting?
A. Internal meeting, yes, sir.
Q. And in that internal meeting, there was no discussion of the issues listed on the page labeled E 000010; is that right?
A. That's correct.
Q. Is it also true that there was no discussion of those issues in the meeting with Rockwell on July 10, 1990?
A. I don't -- I don't know whether that was true. I think in that -- I think in that meeting with Rockwell, Rockwell people did raise issues such as these here, these listed under the Rockwell position on that -- on that last page. But I also don't think

chief counsel up there. I asked a couple questions, like, "Who is on the award fee board?" I raised a number of questions, historic questions, like that. Maybe three or four. But that was all. Not talked to anyone who was involved with this process about this process.

Q. What do you mean by the award fee board?

A. The board that made the original recommendation in December of '89.

Q. The performance evaluation review board?

A. Yes. Yes. Because I was trying to remember who was on that, and that made me realize why I couldn't remember. They had all gone. Really most of them had gone by the time I got there.

Q. I believe you stated earlier that you did not speak to anyone on the performance evaluation review board prior to your signing the February 26, 1990 letter; is that right?

A. I -- well, I'm not sure I said it that way. I may have talked, as I said, to Mr. Simonson. I think he was certainly involved with that board. I don't know whether he was on the board. I can't remember. He was the manager, so he probably would have not been on the board. I'm not sure what role Mr. Bishop played. But I did talk to Mr. Bishop and

Mr. Agy, and Mr. Agy was probably the technical adviser to the board. So those are the only people I talked to.

Q. Do you recall what you discussed about Rockwell's award fee with Mr. Simonson?

A. What I would have done -- the answer is I don't remember any specific discussions. I remember wanting to know, as I mentioned before, how did we get to where we are. We obviously have some disagreement with headquarters, what is the background, and what is justified by the facts of Rockwell's performance. So in some context I know I would have talked to him about that. He had been in my place prior to my getting there.

Q. Would that have been at the February 1990 meeting with Mr. Agy and Mr. Bishop?

A. It could been, but probably -- as he was my deputy, probably was just the two of us at some other time. Typically we would meet every day.

Q. What did Mr. Simonson say?

A. Well, he just described how we -- where we got -- where we were in the process. I didn't -- I don't recall any more than that.

MR. KELLEY: I have no further questions.

PL. SUPP. EX. 108

UNITED STATES CLAIMS COURT

Case No. 91-1362 C

---

ROCKWELL INTERNATIONAL CORPORATION,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION DAVID P. SIMONSON
VOLUME I

December 10, 1992

Pursuant to Notice taken on behalf of the Plaintiff at 1719 Emerson Street, Denver, Colorado 80218, at 9:30 a.m., before Lori D. Porter, Registered Professional Reporter and Notary Public within Colorado.

Hanford. From that I moved into the managing organizations that were responsible for start-up of chemical processing facilities at Hanford, and then became responsible for all of the weapons--weapons materials projects at Hanford, which included not only the chemical processing of them, but--the fuel and the materials and the plutonium that came from the reactor, but also operations of the reactor itself, the productional reactor at Hanford.

Moved to Washington--back to Washington, D.C., where I was a deputy to the manager of the organization responsible for the--for the national program for production of nuclear material, nuclear material for the weapons program. That's uranium, plutonium--

Q. Who did you report to in that position?

A. Charlie Halsteadt. At the end of that time, I was for a short period of time temporarily assigned as the deputy to Jill Lytle, who had responsibility for the materials production program, but also was the waste management program for all of the defense waste from the Department of Energy. And then that was up until about three years ago, early October of three years ago, where I transferred to Rocky Flats.

Q. Do you recall what month it was that you were transferred to Rocky Flats?

A. It was either early October or very late in September.

Q. Was that considered a promotion?

A. It was--it was--there was no change in pay, and so the grade and stuff and structure that I had in Washington was the same as when I went to Rocky Flats.

Q. Who asked you to go to Rocky Flats?

A. John Tuck made the decision.

Q. Before you went to Rocky Flats, did Mr. Tuck talk to you about what the job would entail?

A. Briefly. And, in fact, I had been at Rocky Flats on and off, temporary assignments, for a month or two, and so I had had conversations with John Tuck during that period of time.

Q. In your conversations with Mr. Tuck before you actually--or leading up to your permanent transfer to Rocky Flats, was the subject of award fees part of those discussions?

A. I don't remember that being part of the discussion.

Q. Before you made your permanent transfer to Rocky Flats, were you aware that there was then pending

A. Well, they were mostly focused on the problems at Rocky Flats, the situation at Rocky Flats, and what we should be doing about them.

Q. Do you recall any discussion of award fees at that time?

A. I don't recall any, no, sir.

Q. What is Admiral Barr's background?

A. Admiral Barr is still in the Navy, I believe. He was in the Navy, was in the nuclear submarine service, and is--traditionally that position is held by military officers. And, you know, I don't know his background too well. He came in, did his stint, and went on to another assignment in the Navy. But he clearly had a--had experience in operations in nuclear facilities.

Q. So you went to Rocky Flats in August or September 1989; is that correct?

A. As I recall, it was the last part of September, first part of October.

Q. And how long was your tenure at Rocky Flats?

A. I'm still at Rocky Flats.

Q. You're still at Rocky Flats.

A. Yes.

Q. How long were you manager at Rocky Flats?

A. Four months, more or less.
Q. Who succeeded you?
A. Bob Nelson, Robert Nelson.
Q. Is Mr. Nelson still the manager today at Rocky Flats?
A. He is back again as a temporary manager at Rocky Flats, yes.
Q. You testified that prior to making your permanent move to Rocky Flats, you were out during the month or two earlier on temporary assignments; is that correct?
A. Yes, that's correct.
Q. During that period, did you have conversations with Mr. Goldberg about the Rockwell award fees?
A. Yes. I remember a couple conversations where Ed was just telling me what he had done and the recommendation he had made to Mr. Twining.
Q. Would you tell me what you recall about those conversations.
A. Basically, it was just a conversation with Ed, where he was indicating that he had made a recommendation to Bruce that was different than what Mr. Twining had recommended to Washington previously, and that Ed felt it was justified and was based on

PL. SUPP. EX. 109

UNITED STATES CLAIMS COURT

ORIGINAL

ROCKWELL INTERNATIONAL CORPORATION, :
Plaintiff, :
-vs- : No. 91-1362-C
UNITED STATES OF AMERICA, :
Defendant. :

September 23, 1994
10:00 A.M.

DEPOSITION OF:

ADMIRAL JON MICHAEL BARR

CENTRAL VIRGINIA REPORTERS
PO BOX 12628
ROANOKE, VIRGINIA 24027
(703) 380-5017

Q So critically is included?

A Criticality is down there in General.

MR. KOLAR: That's in the document for the second period; is that correct?

THE WITNESS: That's right.

A I mean, any of things in here is significant.

Q Do you have any reason to believe that Mr. Simonson was not aware of those items that you have mentioned, either in the document or that you mentioned orally?

A No, he would have had access to the same things that I did.

MR. KELLEY: I have no further questions.

MR. KOLAR: I have a couple.

EXAMINATION

BY MR. KOLAR:

Q Would you hand me 317 and both documents? You mentioned a gauge, the failure to calibrate gauges. Did you consider that a significant deficiency?

A Yes.

Q A significant problem?

PL. SUPP. EX. 110

CERTIFIED COPY



No. 91-1362 C

UNITED STATES CLAIMS COURT

-o0o-

ROCKWELL INTERNATIONAL CORPORATION, :
Plaintiff, :
vs. :
UNITED STATES OF AMERICA, :
Defendant. :

==========================================================

DEPOSITION OF

EDWARD S. GOLDBERG

Tuesday, November 10, 1992

Reno, Nevada

Reported by:

NANCY J. REIGLE, CSR #266, RPR, CP
CALIFORNIA CSR #7643

TEARNEY & TEARNEY
Certified Shorthand Reporters

Q But you never saw any documentation on that?

A I don't recall seeing it at this point in time. It's just something that I just don't recall. You will have to look at the files and see if there was a piece of paper that came back to the Rocky Flats office. I just do not recall it.

Q Did you ever find out what Rockwell eventually received as an award fee?

A I don't know, you know, just sitting here at this point in time I just don't know. Only thing I do know is that it was reduced, and I do not remember or recall that I saw what the final number was, and I don't know why I don't recall, but I just don't.

Q After you sent your recommendation to Mr. Twining, did you speak with anyone at Albuquerque about Rockwell's award fee?

A Mr. Twining and I might have had some discussions, but specifically I don't recall anyone else. He might have called, and I just don't specifically recollect what took place after I sent the recommendation to Mr. Twining.

Q Did Mr. Twining call you or did you call Mr. Twining?

A It could have been either way.

Q What did you two discuss?

A I don't recall any of the discussions. What I'm saying is that he could have called for clarifications and so on; I just don't recall.

Q Did he ever express to you whether he agreed or disagreed with your recommendation?

A I don't recall.

Q After sending your recommendation on Rockwell's award fee to Mr. Twining, did you ever speak with anyone at DOE headquarters about Rockwell's award fee?

A I don't remember. It would only have been if I did to the extent that I've done the job, and that's it. I would not have discussed any details, but I specifically do not recall talking to anyone at headquarters.

Q Prior to sending your recommendation on Rockwell's award fee to Mr. Twining, did you speak with Mr. Twining about Rockwell's award fee?

A Mr. Twining and I had many conversations. I don't recall specifically the ones where the award fee might have come up. I just do not. But we talked because he was responsible for supplying considerable assistance to me, and as the budget was part of that assistance he was interested in what we were doing,

'cause the money was coming out of his budget. So we had many conversations, and the award fee could have come up in those conversations and discussed what we were doing, where we were going, but I do not specifically recall any of those conversations.

Q Was it your understanding that Mr. Twining was to provide you assistance in connection with Rockwell's award fee?

A Not specifically. Mr. Barkmeier was handling that, and I don't recall that he asked for any assistance from Mr. Twining. I certainly did not.

Q Did Mr. Twining ever tell you what he thought should be Rockwell's award fee?

A I certainly saw what he had initially recommended, but beyond what was written in that document he did not, to my-- best of my knowledge recommend anything to me after we initiated the relook.

Q Did he ever recommend anything different from what he had had in his written recommendation?

A As far as I know he made a recommendation to headquarters after I made my recommendation to him, and I don't recall what that was.

Q Prior to sending your recommendation on Rockwell's award fee to Mr. Twining, did you speak to anyone from headquarters about Rockwell's award fee?

plan for that period. It would have been similar to this. There was a plan for that period. This is for the last period.

Q This document which is Exhibit 27 states it's for the evaluation period October 1989 through March of 1990.

A Right. And I was gone in September, so I didn't really get to look at this document.

Q Did you help prepare this document?

A No, not to my knowledge. I don't recall having any preparation input into that document.

Q Was that document prepared during your tenure at Rocky Flats?

A There may have been some work on it while I was there, but I didn't work on it.

Q The memorandum is signed by Mr. Barkmeier; did he work on it while you were at Rocky Flats?

A I specifically don't remember. He worked for me at Rocky Flats. When in particular they worked on that document I don't remember.

Q If he had worked on this document while you were at Rocky Flats, would you have been aware of it at the time?

A If he had worked on that I would have been aware, but I don't remember.