# In the United States Court of Federal Claims

No. 91-1362C

(Filed: January 17, 2007)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |
| **THE BOEING COMPANY, SUCCESSOR-IN-INTEREST TO ROCKWELL INTERNATIONAL CORPORATION,** Plaintiff, | ) | Cost-plus-award-fee contract; summary judgment; stipulations of fact; breach of obligation that award fee be determined by contractually designated official; damages |
| v. | ) | |
| **THE UNITED STATES,** Defendant. | ) | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |

Richard J. Ney, Chadbourne & Parke LLP, Los Angeles, California, for plaintiff. Of counsel was S. Jean Kim, Chadbourne & Parke LLP, Los Angeles, California.

John A. Kolar, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Donald E. Kinner, Assistant Director, and Donald Williamson, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

Rockwell Automation, Inc. ("Rockwell") had a contract with the United States Department of Energy ("DOE" or "the government"), providing that Rockwell would manage and operate the Rocky Flats Nuclear Weapons Plant ("Rocky Flats") in Colorado, under the overall supervision of officials of DOE. The term of the contract extended from June 30, 1975, to December 31, 1989. Rockwell brought this action in 1991, putting at issue the amounts of two fee awards payable to Rockwell under the contract for fiscal year 1989.

The case is strongly colored by events in 1989 and thereafter that arose from an investigation by the Department of Justice into potential environmental crimes and then by a *qui tam* action against Rockwell brought by a relator under the False Claims Act, 31 U.S.C. § 3730, in which the United States partially intervened. *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 793-95, 815 (10th Cir. 2002) (on appeal and cross-appeals, affirming a jury's verdict and the district court's ensuing judgment in the *qui tam* action, excepting one issue concerning the relator's ability to invoke the *qui tam* provision of the False Claims Act). In *Stone*, the jury found for the government and the relator on three segments of their joint claim under the False Claims Act. *Id*. at 796-97. In all other respects, the jury's verdict and the district court's judgment, as affirmed by the Tenth Circuit, were in Rockwell's favor. *Id*. at 796-97, 815.[1] Aspects of the *Stone* decision bind this court in its disposition of this case.

---

[1]The joint claim under the False Claims Act by the government and relator had been divided into ten separate time periods. The jury awarded plaintiffs approximately $1.4 million in damages on the three segments. *Stone*, 282 F.3d at 796. The jury found for Rockwell regarding the other seven time periods, and also found for Rockwell on the government's breach of contract claim. *Id*. The district court dismissed with prejudice the government's claims for common law fraud, payment by mistake of fact, and unjust enrichment. *Id*. The district court entered judgment in favor of plaintiffs for approximately $4.2 million, tripling the amount awarded by the jury on the three segments as to which the government and relator prevailed, pursuant to the court's authority under 31 U.S.C. § 3729(a). *Stone*, 282 F.3d at 797. The Tenth Circuit's affirmance applied broadly to the district court's judgment, as put at issue on the cross-appeals by Rockwell, the government, and the relator.

The one aspect of the district court's judgment that was not affirmed in *Stone* focused on the pre-filing disclosure that had been made by the relator. The Tenth Circuit remanded to the district court to determine whether the relator had satisfied the pre-filing disclosure aspect of the "original source" test under the statutory requirement that the *qui tam* relator have voluntarily provided pertinent information to the government prior to commencing suit. *See Stone*, 282 F.3d at 815. On remand, the district court determined that the relator had provided a key document to the government before suit was filed but discounted the significance of that document. On further appeal, the Tenth Circuit ruled that the district court had erred because the document was sufficient to satisfy the jurisdictional requirement of prior disclosure, and the court of appeals affirmed the district court's original judgment. *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 92 F. App'x 708 (10th Cir. 2004), *cert. granted in part*, 127 S. Ct. 35 (U.S. Sept. 26, 2006) (No. 05-1272).

The Supreme Court's grant of certiorari in *Stone* is limited to the first question presented by the petition, *viz*., "Whether the Tenth Circuit erred by affirming the entry of judgment in favor of a *qui tam* relator under the False Claims Act, based on a misinterpretation of the statutory definition of an 'original source' as set forth in 31 U.S.C. § 3730(e)(4)?" Petition for a Writ of Certiorari, *Rockwell Int'l Corp. v. United States*, No. 05-1272 (U.S. Apr. 4, 2006). The resolution of that jurisdictional question concerning a relator has no bearing on the instant controversy. The aspects of *Stone* that are pertinent here relate to the jury's verdict and the district court's judgment on claims put forward by the government as intervenor in *Stone*.

The present case was instituted in 1991 and, over its course, has been assigned seriately to six different judges. After significant delays, largely to allow the criminal investigation and the *qui tam* action to run to completion, the parties have filed cross-motions seeking summary judgment. Briefing of those motions has proceeded on the basis of (1) a stipulation of facts entered by the parties on September 22, 1993, (2) the judgment entered in the *qui tam* case, and (3) the results of the parties' discovery. The material facts are not in dispute, although the parties strongly contest the legal import of those facts.

## Background[2]

On January 8, 1975, Rockwell and the Atomic Energy Commission entered into a cost-plus-fixed-fee contract, Contract No. AT(29-2)-3533, for the management and operation of Rocky Flats. *See Rockwell Automation, Inc. v. United States*, 70 Fed. Cl. 114, 116 (2006) (the one prior reported decision in this case, addressing the extent to which the defendant should be granted leave to amend its answer and assert a counterclaim in this court).[3] This contract was subsequently redesignated as Contract No. DE-AC04-76DP03533 by DOE as successor to the Atomic Energy Commission. *Rockwell*, 70 Fed. Cl. at 116. In 1979, the parties modified the contract, converting it to a cost-plus-award-fee agreement. *Id.* The parties entered a number of later contract modifications that affected, *inter alia*, the method of determination of the award fee. *See*, *e.g.*, PX 1 (Modification No. M124), PX 2 (Modification No. M087), PX 3 (Modification No. M128).[4]

The award fees at issue cover the two halves of the 1989 fiscal year, namely the "89-1 period," from October 1, 1988 through March 31, 1989, and the "89-2 period," from April 1, 1989 through September 30, 1989. In February 1989, Rockwell and DOE executed Modification No. M128 addressing the award fees for these two periods. *See* PX 3 (Modification No. M128).

According to the contract as amended by Modification No. M128, the purpose of the award fees was to "provide an incentive . . . sufficient to encourage the attainment of, and to reward the Contractor for, increased proficiency in the performance of the contract." *Rockwell*, 70 Fed. Cl. at 116 (quoting PX 3 (Modification No. M128) at Attach. A, App. D, ¶ 1). Contract Modification No. M128 required that "[t]he amount of the award fee actually to be paid to the

---

[2]The recited factual elements have been taken from the parties' submissions and are undisputed, except where a factual controversy is explicitly noted.

[3]The government also sought to transfer to this court actions filed by Rockwell with DOE's Board of Contract Appeals, which request was denied. *See Rockwell*, 70 Fed. Cl. at 125-28.

[4]In this opinion, references to plaintiff's exhibits are to "PX __" and to defendant's exhibits are to "DX __." References to the factual stipulation entered by the parties are to "Stip. ¶ __."

Contractor shall be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations) in accordance with the provisions of subparagraph (b)(2) of this clause." PX 3 ¶ 1(b)(1). Subparagraph (b)(2) provided that "[d]eterminations of award fee will be made every six months or at the end of other such evaluation periods as the Award Fee Determination Official may determine." PX 3 at ¶ 1(b)(2).[5] Bruce Twining signed Modification No. M128 on behalf of the government, in his capacity as "Manager, Albuquerque Operations Office, Contracting Officer." *See* PX 3 at 4. Attachment A, Appendix D to Modification No. M128 provided that the Award Fee Determination Official ("AFDO") was to evaluate five to ten functional performance areas of the contract, assigning numerical grades as set forth in a rating plan. *See* PX 3 at Attach. A, App. D, ¶¶ 2-4.[6] The AFDO was then to determine the award fee by using those numerical grades and the weights assigned each functional performance area. *See id*. at Attach. A, App. D, ¶ 5. The maximum possible combined award fee for the 89-1 and 89-2 periods was $13,644,000 for plant operations and $1,938,600 for the Plutonium Recovery Modification Project/Plutonium Recovery Options Verification Exercise ("PRMP/PROVE"). *Id*. ¶ 1(b)(1).

On March 9, 1989, Admiral James D. Watkins became the Secretary of Energy. *See* Dept. of Energy, "Admiral James D. Watkins is sworn in as the sixth Secretary of Energy," *available at* http://www.energy.gov/news/2508.htm. Under Admiral Watkins, DOE "instituted a review process whereby each award fee plan and fee determination w[ould] come to [DOE's] Headquarters for review and concurrence prior to issuance to the contractor." PX 84 (Mem. from

---

[5]This subparagraph also specified that "[t]he Award Fee Determination Official shall notify the Contractor in writing of any changes in the duration of such periods thirty days in advance of the Contractor's commencement of performance in such period"; "[t]he award fee shall be determined subjectively by the Award Fee Determination Official based on the Contractor's performance in accordance with the Award Fee Plan set forth in Appendix D"; "[t]he Functional Performance Areas and Weightings in Appendix D may be revised in writing from time to time by the Award Fee Determination Official at his sole discretion without execution of an amendment to this contract"; "the Contractor will be consulted in advance by the Award Fee Determination Official"; and "[t]he amount of award fee, if any, earned by the Contractor, as determined by the Award Fee Determination Official, is not subject to appeal under the clause entitled 'Disputes' or to claim or suit in the United States Claims Court."

[6]Appendix D also stated that "[t]he Award Fee Determination Official (Manager or anyone acting as Manager, Albuquerque Operations) (AFDO) shall evaluate the Contractor's performance during each evaluation period and will determine the amount of award fee to be paid the Contractor for that evaluation period. Evaluation of the Contractor's performance will be based upon the Performance Evaluation Plans established for the evaluation period by the AFDO, after consultation with the Contractor." PX 3 at Attach. A, App. D, ¶ 2.

W. Henson Moore, Deputy Secretary) (Aug. 21, 1989)).[7]

As of May 1989, Rocky Flats and its manager directly reported to the Albuquerque Operations Office of DOE. Stip. ¶ 3. In May 1989, Bruce Twining, the Manager of Albuquerque Operations, the Award Fee Determination Official, concluded that Rockwell's plant operations award fee for Rocky Flats for the period from October 1, 1988, through March 31, 1989, ("the 89-1 period"), should be $5,176,482. Stip. ¶ 1.[8] Mr. Twining forwarded his conclusion to DOE's headquarters ("headquarters") for concurrence. *Id.*; *see* DX 32 (Mem. from Twining to Troy E. Wade, II, Acting Assistant Secretary for Defense Programs (May 31, 1989)). Rockwell never received that amount, but instead it eventually received a plant-operations award fee of $2,716,624 for the 89-1 period. *See* DX 67 (Letter from Twining to Dominick J. Sanchini, President, Rocky Flats Plant, Rockwell International Corp. (Sept. 27, 1989)).[9]

On June 6, 1989, approximately seventy agents of the FBI and EPA executed a search warrant at Rocky Flats looking for evidence of alleged environmental crimes being committed by Rockwell and possibly by government officials. Def.'s Proposed Uncontroverted Facts ¶ 19.[10] DOE formed a special team to provide it with an independent evaluation of operations and practices at Rocky Flats. Pl.'s Resp. to Def.'s Proposed Uncontroverted Facts ¶ 39. Undersecretary of Energy John Tuck removed Mr. Twining from substantive oversight

---

[7] The government was "unable to locate any indication of the exact date when the requirement of Headquarters concurrence became effective." Def.'s Supp. Br. at 11 n.6. Nonetheless, the policy change occurred after March 9, 1989, the date Secretary Watkins took office. *See* PX 58 (Dep. of David P. Simonson (Dec. 10, 1992)) ("Simonson Dep.") at 29:3 ("[a]fter Watkins took over"); DX 53 (Dep. of Bruce G. Twining (Feb. 23, 1993)) ("Twining Dep.") at 24:12-14 (confirming that the change occurred "[a]s of the time that Admiral Watkins became the Secretary").

[8] The government maintains that the use of "AFDO" in the Stipulation of September 22, 1993, "was not a short-hand expression for Mr. Twining, but rather for anyone acting as manager of Albuquerque." Def.'s Resp. to Pl.'s Proposed Uncontroverted Facts ¶ 22.

[9] The 89-1 period award amount of $186,591 for PRMP/PROVE remained constant, and it is not in dispute.

[10] This initial investigation never produced criminal charges. *See Abraham v. Rockwell Int'l Corp.*, 326 F.3d 1242, 1244-46 (Fed. Cir. 2003) (affirming an award to Rockwell by the Department of Energy Board of Contract Appeals of costs incurred by Rockwell in defending itself successfully against possible criminal environmental charges). Rockwell eventually did face new and different alleged violations of environmental regulatory requirements. *Id.* at 1245-46. Pursuant to a plea agreement dated March 26, 1992, Rockwell pled guilty to felony and misdemeanor violations of two environmental regulatory statutes, and a fine of $18.5 million was consequently imposed. *Id.*

responsibility over Rocky Flats. Second Am. Answer ¶¶ 56-57.[11] In June 1989, DOE appointed Edward Goldberg to be Acting Manager of Rocky Flats and directed that Mr. Goldberg report directly to headquarters. Stip. ¶ 3; DX 18 (Mem. from Undersecretary John C. Tuck to Twining and Goldberg (June 6, 1989)); DX 20 (Mem. from Tuck to Goldberg (June 9, 1989)); DX 29 (Mem. from Tuck to Twining and Goldberg (July 21, 1989)).[12] Thereafter, Mr. Twining no longer had direct supervision over, or substantive duties concerning, Rocky Flats. Stip. ¶ 3; DX 18 (Mem. from Tuck to Twining and Goldberg (June 6, 1989)); DX 29 (Mem. from Tuck to Twining and Goldberg (July 21, 1989)).[13] Instead, Mr. Twining's role was limited to ministerial functions and providing support to the Rocky Flats Plant Manager as needed. Stip. ¶ 3; PX 48 (Twining Dep.) at 126. On June 21, 1989, "headquarters advised [Mr. Twining,] the AFDO[,] that it did not concur in his conclusion that the award fee should be $5,176,482." Stip. ¶ 2; *see* DX 52 (Mem. from Troy E. Wade II, Acting Assistant Secretary for Defense Programs, to Manager, Albuquerque Operations Office (Jun. 21, 1989)) ("[I]t would be premature at this time to make a final determination until the Department of Energy investigation of environmental, safety, and health charges [is] resolved.").[14]

In June 1989, DOE's headquarters directed Mr. Goldberg to review the award fee as established by Mr. Twining in May 1989. Stip. ¶ 4. Mr. Goldberg was to consider new information that was being uncovered by the team he had brought to Rocky Flats. Def.'s Proposed Uncontroverted Facts ¶ 56. In July 1989, Mr. Goldberg proposed to Mr. Twining that an award fee for the 89-1 period for plant operations at Rocky Flats should be revised to $3,628,622. Stip. ¶ 5; *see* DX 58 (Mem. from Goldberg to Twining (Jul. 27, 1989)).

---

[11]The government avers that Mr. Twining was removed because the Secretary of Energy concluded that "[Mr.] Twining was a potential 'party' to the investigation underway at Rocky Flats." Def.'s Cross-Mot. at 6 (citing DX 17 (Dep. of Adm. James Watkins (April 29, 1994) at 27-29).

[12]According to the government, Mr. Goldberg was appointed "to have someone in charge [at Rocky Flats] who was not a 'party' to the criminal investigation, and who would not be perceived by the FBI as interfering with the investigation." Def.'s Cross-Mot. at 6.

[13]One minor exception to these limitations applied. As part of an interim reorganization of the Rocky Flats Area Office, the Manager of the Albuquerque Operations Office was to coordinate with the Acting Manager of the Rocky Flats Area Office on all production activities at the plant that would affect "the integrated weapons production complex." DX 20 (Mem. from Tuck to Goldberg (June 9, 1989)).

[14]The government now asserts that "Headquarters . . . took upon itself the function of . . . AFDO" regarding the award fee. Def.'s Resp. to Pl.'s Proposed Uncontroverted Facts at ¶ 32. The government contends that the use of the term "AFDO" in paragraph 2 of the Stipulation, quoted above, "was never intended as a substantive admission regarding who could act as the AFDO, and who could not." Def.'s Reply at 9.

The parties agree that Mr. Twining then adopted Mr. Goldberg's proposed revision to the award fee for the 89-1 period, but they disagree about Mr. Twining's motivation for that agreement. According to the government, "[i]n August 1989, Mr. Twining modified his original May 1989 recommendation to reflect the input by Mr. Goldberg, and recommended to DOE headquarters that Rockwell receive an award fee of $3,628,622 . . . for plant operations for [the] 89-1 [period]." Def.'s Proposed Uncontroverted Facts ¶ 61; *see* DX 60 (Mem. from Twining to John L. Meinhardt, Acting Assistant Secretary for Defense Programs (Aug. 8, 1989)). Plaintiff accepts that Mr. Twining adopted Mr. Goldberg's revised recommendation, but plaintiff suggests that Mr. Twining was merely "accepting what other federal employees" found. Pl.'s Resp. to Def.'s Proposed Uncontroverted Facts ¶ 61 (quoting PX 48 (Twining Dep.) at 90-91). The government avers that Mr. Twining in August 1989 believed that Mr. Goldberg was more fully informed about Rockwell's performance than Mr. Twining had been earlier in May. Def.'s Proposed Uncontroverted Facts ¶ 58.[15] By contrast, plaintiff asserts that Mr. Twining "did not believe he was in a position to offer an informed alternative to Mr. Goldberg's proposal." Pl.'s Resp. to Def.'s Proposed Uncontroverted Facts ¶ 58. The government maintains "Mr. Twining concluded that he . . . had graded Rockwell too high on [e]nvironmental, [s]afety and [h]ealth . . . performance in May 1989." Def.'s Proposed Uncontroverted Facts ¶ 60.

DOE's headquarters determined that the award fees for the 89-1 period at Rocky Flats in the amount initially developed by Mr. Twining in May 1989 and in the amount subsequently recommended by Mr. Goldberg were *both* too high. Stip. ¶ 6. In August 1989, the special team appointed by DOE's headquarters issued a report on its assessment of environmental conditions at Rocky Flats. Pl.'s Resp. to Def.'s Proposed Uncontroverted Facts ¶ 43. Headquarters mandated that the plant operations award fee for the first period be $2,716,624. Stip. ¶ 7.[16] In

---

[15]According to the government, Twining "made his initial . . . recommendation of an award fee" in May 1989. Def.'s Proposed Uncontroverted Facts ¶ 58. The plaintiff disagrees with this characterization, saying the "use of the word 'recommendation' is inconsistent with the government's [s]tipulation." Pl.'s Resp. to Def.'s Proposed Uncontroverted Facts ¶ 58.

[16]The government contends that Mr. Twining was comfortable with the downward score adjustments for the area of environmental, safety, and health made by Acting Assistant Secretary John L. Meinhardt. Def.'s Proposed Uncontroverted Facts ¶¶ 73-74 (citing DX 8 (Twining Dep.) at 111). In his deposition, Mr. Twining was asked whether he was "comfortable" with the grade that Mr. Goldberg gave, and he responded "yes." DX 8 (Twining Dep.) at 111. He was then asked whether he was "comfortable" with the still lower grade that headquarters gave, and he similarly said "yes." *Id.* He also testified that he was "comfortable" with the higher grade that his evaluation group had initially given. *Id.* at 111-112. The government's counsel then sought clarification:

> [Government's counsel]: Let me just clarify something. Is there a similar proviso to the other two answers you gave, that you were comfortable, at the time?
>
> [Mr. Twining]: Based on the information that was coming out

that connection, DOE's headquarters caused Mr. Twining to issue a final award fee determination in that amount. Stip. ¶ 7; *see* DX 65 (Mem. from John L. Meinhardt, Acting Assistant Secretary for Defense Programs, to Twining (Sept. 20, 1989)); *see also* DX 67 (Letter from Twining to Dominick J. Sanchini, President, Rocky Flats Plant, Rockwell Int'l Corp. (Sept. 27, 1989)).

In mid-September 1989, Secretary Watkins appointed David Simonson to be Manager of Rocky Flats, replacing Mr. Goldberg. Def.'s Proposed Uncontroverted Facts ¶ 76; *see* DX 34 (Press Release, DOE, *Watkins Names Simonson New Manager of Rocky Flats* (Sept. 12, 1989)). On October 13, 1989, Mr. Twining signed a memorandum purporting to "designate[] [Mr. Simonson] as the AFDO, effective immediately, for the Rockwell management and operating contract." *See* PX 37 (Mem. from Twining to Simonson (Oct. 13, 1989)). From that point onward, Mr. Twining had no further apparent role in the 89-2 period fee-determination process. PX 48 (Twining Dep.) at 133:11-14; *see* Def.'s Supp. Br. at 22-26.

"In December 1989, DOE's Manager of the Rocky Flats Office (the Award Fee Determination Official or 'AFDO') concluded that Rockwell's award fees for the 89-2 period should be $ 3,114,245 for Plant Operations and $628,982 for PRMP/PROVE." Stip. ¶ 9.[17] Mr. Simonson forwarded his conclusion to headquarters for concurrence. Stip. ¶ 9; *see* DX 35 (Mem. from Simonson to John C. Tuck, Acting Assistant Secretary for Defense Programs (Dec. 6, 1989)).[18]

---

> around Rocky Flats, I believe our PERB graded Rockwell too high on the ES&H when they met the first time.

*Id*. at 112.

Plaintiff notes that Mr. Twining testified that he did not recall any discussions with Acting Assistant Secretary Meinhardt regarding the lower award fee required by headquarters. PX 45 (Twining Dep.) at 95-96, 100. He testified that "at this point there were many more people looking at that plant in intimate detail than there had been before the raid, and that since Albuquerque was no longer in the loop and we didn't have access to the site, I didn't have any way to validate what they are finding. So I was accepting what other federal employees who were on site, were discovering during this period after the raid." *Id*. at 90-91.

[17]While the government states it "would agree to a proposed fact that tracks the precise language of [Stipulation ¶ 9]," it maintains that "Headquarters . . . took upon itself the function of 'acting as Manager, Albuquerque,' and therefore as AFDO." Def.'s Resp. to Pl.'s Proposed Uncontroverted Facts ¶ 37.

[18]The government describes this memorandum as "containing [Simonson's] preliminary view of Rockwell's performance[] and recommending an award fee." Def.'s Proposed Uncontroverted Facts ¶ 78.

DOE's headquarters determined that both the $3,114,245 award fee for Plant Operations and the $628,982 award fee for PRMP/PROVE for the 89-2 period that were forwarded by Mr. Simonson were too high. Stip. ¶ 10; *see* Def.'s Supp. Br. at 23-25 (describing the roles of persons at headquarters, including Robert W. Barber, Acting Director, Office of Safety Compliance, Peter Brush, Assistant Secretary for Environment, Safety and Health, Adm. Jon Barr, Deputy Asst. Secretary for Military Application, Defense Programs, and Undersecretary John C. Tuck).

Mr. Simonson expressed disagreement with the decreases in the award fee proposed by Admiral Barr. *See* Def.'s Supp. Br. at 25 (referring to a handwritten notation on DX 76); PX 63 (Dep. of Adm. Jon Barr (Sept. 23, 1994)) at 157:12-14 ("Mr. Simonson was concerned that his award fee proposal had not been accepted."). Shortly thereafter, "[a]round January 25, 1990," Robert Nelson was appointed Manager of Rocky Flats, replacing Mr. Simonson. Def.'s Proposed Uncontroverted Facts ¶ 79; Def.'s Supp. Br. at 25. DOE's headquarters mandated that the fee award for Plant Operations for the 89-2 period be $1,241,604, and that the fee award for PRMP/PROVE be $338,035. Stip. ¶ 11. DOE's headquarters caused Mr. Nelson to issue a final award-fee determination in those amounts. Stip. ¶ 11; *see* DX 79 (Letter from Robert M. Nelson, Jr., Manager, Rocky Flats, to Sanchini (Feb. 26, 1990)). The award fee for Plant Operations of $1,241,604, and the award fee for PRMP/PROVE of $338,035 for the 89-2 period were both determined by headquarters. Stip. ¶ 12.[19]

On October 2, 1990, Rockwell submitted a claim to the Contracting Officer seeking additional award fees for work performed during the 89-1 and 89-2 periods. *See Rockwell*, 70 Fed. Cl. at 117. The Contracting Officer denied the claim and Rockwell consequently filed an action in this court. *Id.* On June 12, 1991, Rockwell voluntarily dismissed that action without prejudice and on the same day filed a second claim with the Contracting Officer that was identical to Rockwell's original claim but with a new claim certification. *Id.* After waiting sixty days and not receiving a response from the Contracting Officer, Rockwell filed the complaint initiating this action on August 15, 1991. *Id*. The plaintiff alleges the award fees for the 89-1 and 89-2 periods were not determined in accordance with the contract terms. Compl. ¶¶ 32, 36. The plaintiff seeks damages for the difference between the award fees Rockwell actually received for the 89-1 and 89-2 periods and the award fees plaintiff avers Rockwell should have been awarded, plus interest. *Rockwell*, 70 Fed. Cl. at 117; Compl. ¶¶ 33, 37.

---

[19]The government contradicts paragraph 12 of the Stipulation by asserting that "Mr. Nelson testified . . . that, despite receiving input from other DOE officials, he ultimately decided for himself what amount Rockwell should earn for the 89/2 period." Def.'s Supp. Br. at 28 (citing DX 85 (Test. of Robert M Nelson, Jr., Transcript of Record at 3482-85 (Mar. 16, 1999), *United States ex rel. Stone v. Rockwell Int'l Corp.*, No. 89 M 1154 (D. Colo.))). This contention is implausible in light of documentary evidence in the record and the sequence of events addressed *infra* at 23-24 & n.28. Paragraph 12 of the Stipulation will be honored.

This case was closely linked with *Stone* from the outset. Extensive discovery proceedings in this action took place over a four-year period before the government decided to file a motion to intervene in the *Stone qui tam* suit, which motion was filed on November 14, 1995. *See Rockwell*, 70 Fed. Cl. at 118 & n.4. Although the government moved to stay this case on November 3, 1995, the case was not then stayed; rather, contentious discovery continued while the motion for intervention in *Stone* remained pending. *Id*. at 119. In addition, on July 17, 1996, the government was granted leave to file an amended answer in this case, asserting the affirmative defenses of estoppel and the special plea in fraud under 28 U.S.C. § 2514, as well as a counterclaim that Rockwell had breached its contract with DOE by fraudulent concealment and misrepresentations. Am. Answer ¶¶ 40-95. Finally, on March 20, 1997, the court granted a renewed motion by the government to stay proceedings in this case pending the resolution of *Stone* in the district court. Order of March 20, 1997 (Judge Yock).

The case remained stayed for over seven years while proceedings in *Stone* took place. At last, on October 4, 2004, plaintiff moved to vacate the stay because "the Tenth Circuit had resolved the appeal of all issues in *Stone* arguably relevant to this case." Pl.'s Renewed Mot. to Vacate Stay (Oct. 6, 2004). That motion was granted on January 18, 2005, over the government's objection, and discovery was reopened. Order of Jan. 18, 2005. Over nine months later, the government filed a motion for leave to submit a second amended answer. Def.'s Mot. for Leave to File a Second Amended Answer Adding Counterclaims and Amending Defenses to Rockwell's Claims (Oct. 3, 2005). That motion was contested and ultimately was granted in part and denied in part on March 10, 2006. *See Rockwell*, 70 Fed. Cl. at 120-25.

After the Second Amended Answer was filed, the pending cross-motions for summary judgment were submitted and briefed by the parties, and a hearing was held on September 21, 2006, to address the cross-motions. Subsequently, simultaneous supplemental submissions were made by the parties on October 30, 2006, and November 13, 2006, to address questions raised by the court at the hearing. The case is now ready for decision.

## Standards for Decision

### A. *Summary Judgment Principles*

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986); *Atwood-Leisman v. United States*, 72 Fed. Cl. 142, 147 (2006). The burden of establishing that no genuine issue of material fact exists rests with the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). An issue is "genuine" only if it "may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. In considering the existence of a genuine issue of material fact, a court must draw all inferences in

the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where cross-motions for summary judgment have been filed, a court must evaluate each motion on its own merits and resolve any reasonable inferences against the party whose motion is being considered. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). Both motions must be denied if genuine disputes exist over material facts. *Id*.

B. *Contract Interpretation*

"Contract interpretation is a matter of law, and thus issues of contract interpretation can be readily susceptible of resolution via summary judgment." *Record Steel & Constr., Inc. v. United States*, 62 Fed. Cl. 508, 518 (2004) (internal quotation marks and citations omitted); *see also Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1336 (Fed. Cir. 2006). "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) (quoting *Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 607 (2000)). Accordingly, to resolve the current dispute, the court must identify and apply "principles of general contract law." *Franconia Assocs.*, 536 U.S. at 141 (quoting *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411 (1947)).

The starting point for interpreting a contract invariably is the "plain language" of the agreement. *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). The court will "give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris v. Department of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998). The task of interpreting a contract must be performed "in a manner that gives meaning to all of its provisions and makes sense." *McAbee*, 97 F.3d at 1435. Only if the terms are "susceptible to more than one reasonable interpretation" are they ambiguous. *Id.*; *see also Massie v. United States*, 166 F.3d 1184, 1189 (Fed. Cir. 1999).

C. *Effect of a Stipulation of Facts*

The stipulation of facts entered by the parties in this case has a significant bearing on the cross-motions pending before the court. "A stipulation is a judicial admission binding on the parties making it[,] absent special considerations." *John McShain, Inc. v. United States*, 375 F.2d 829, 831 (Ct. Cl. 1967). "An express waiver made . . . preparatory to trial by the party or his attorney conceding for the purposes of the trial the truth of some alleged fact, has the effect . . . that the fact is thereafter to be taken for granted; so that the one party need offer no evidence to prove it and the other is not allowed to disprove it." 9 Wigmore, *Evidence* § 2588 (Chadbourn rev. 1981); *see also Vander Linden v. Hodges*, 193 F.3d 268, 279-80 (4th Cir. 1999) (same). However, a stipulation cannot bind the court on a point of law. *See Swift & Co. v. Hocking Valley Ry.*, 243 U.S. 281, 290-91 (1917); *Vallejos v. C.E. Glass Co.*, 583 F.2d 507, 511 (10th Cir. 1978); *Modeer v. United States*, 68 Fed. Cl. 131, 142 (2005), *aff'd*, 183 F. App'x. 975, 977

(Fed. Cir. 2006).[20]

The binding nature of a stipulation, absent special circumstances, deserves emphasis. Thus, "[t]he vital feature of a judicial admission is universally conceded to be its *conclusiveness* upon the party making it," but, nonetheless, in proper circumstances "the trial court has discretion to avoid the consequence of conclusiveness of an admission." 9 Wigmore, *Evidence* § 2590 (emphasis in original). As a practical matter, a court's discretion to obviate the results of a stipulation is quite limited. "In a real and legitimate controversy, a party should be left within the knot of his averments . . . , unless the [c]ourt can find an absolute demonstration from other evidence in the case, or from facts within judicial notice, like the laws of physics, etc., that under no circumstances could the averments and admissions be true." *L. P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co.*, 253 F. 914, 918 (7th Cir. 1918) (cited by 9 Wigmore, *Evidence* § 2590); *see also Estate of Quirk v. Commissioner of Internal Rev.*, 928 F.2d 751, 758-59 (6th Cir. 1991); *United States v. Harding*, 491 F.2d 697, 698-99 & n.1 (10th Cir. 1974).

## ANALYSIS

### I. The Pertinent Contractual Obligations

#### A. *Contractual Designation of the AFDO*

The contract required that "[t]he amount of the award fee actually to be paid to the Contractor shall be determined by the Award Fee Determination Official (Manager, or anyone acting as Manager, Albuquerque Operations)." PX 3 (Modification No. M128) at ¶ 1(b)(1). According to Boeing, "Bruce Twining was the manager of Albuquerque Operations at all relevant times[, and] [t]hus, by operation of the contract, he was also the AFDO." Pl.'s Reply at 4-5. Boeing asserts that only "if the position of Manager of Albuquerque Operations [were] vacant (*e.g.*, due to retirement or disability), the individual performing the Manager's duties (*i.e.*, 'acting as Manager, Albuquerque Operations') [would] serve as the AFDO." *Id*. at 4. The government concedes that Mr. Twining "retained the nominal title of AFDO for the 89-1 award fee period," Def.'s Supp. Br. at 10, but the government disputes that Mr. Twining was the only person who could function as the AFDO. Def.'s Mot. at 16. The government suggests Secretary Watkins, Mr. Goldberg, or "Headquarters Office of Defense, with concurrence of Secretariat" alternatively could also serve as AFDO. *See, e.g.,* Def.'s Mot at 24; Def.'s Reply at 3, 4; Def.'s Supp. Br. at 10; *but see* Def.'s Supp. Resp. at 8 ("[I]t was the Secretary who exercised the AFDO authority. . . . It was not a 'group' of DOE officials.").

By using the definite article "the," the contractual language strongly indicates that at any given time, one person would serve as the Award Fee Determination Official. *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) ("The consistent use [in the federal habeas statute] of the

---

[20]Although the parties have not argued that any aspects of the Stipulation address issues of law, the court has independently analyzed the Stipulation in that regard.

definite article in reference to the custodian indicates that there is generally only one proper respondent to a given prisoner's habeas petition."); *Webster's New Collegiate Dictionary* 914-15 (7th ed. 1970). If more than one such official were contemplated, the indefinite articles "an" or "a" should have been used. *See Works v. United States ex rel. McAlester-Edwards Coal Co.*, 262 U.S. 200, 208 (1923). Accordingly, the government's contention that more than one person could serve at any given time as the AFDO must be rejected. Additionally, the parenthetical contractual text specifies that the AFDO shall be the "Manager, or anyone acting as Manager, Albuquerque Operations." PX 3 ¶ 1(b)(1). This specificity does not preclude the AFDO from having responsibilities in addition to those attendant to being the Manager, Albuquerque Operations. However, the AFDO had to be serving as the Manager, Albuquerque Operations, either under an explicit designation or under an acting authority.

In further support of its contentions, the government places considerable weight on the proper grammatical classification of the word "acting." Def.'s Reply at 3-4. The government notes that the word "acting" can carry the meaning of "[h]olding an interim position; serving temporarily" only when it is used adjectivally. *Id*. at 3 (citing the *adjectival* definition of the word in *Black's Law Dictionary* (8th ed. 2004)). Here, however, the government asserts that the word "acting" is used "not as an adjective, but as a verb, specifically a present participle." Def.'s Reply at 4. As the government would have it, this usage "means that the award fee may be determined by anyone actually performing the function of the Manager." *Id*.; *see also Webster's New Collegiate Dictionary* 9 (providing that a definition for "act" when used as a verb is "to perform a specified function"). Thus, the government characterizes the contractual language as "not requir[ing] the Manager of Albuquerque Operations to be the Award Fee Determination Official" but rather "provid[ing] only parenthetical guidance on the officials who could serve as the AFDO," thus "permit[ting] an individual other than the person holding the manager title to 'act as the manager.'" Def.'s Mot. at 16-17. Reading the contract to embrace this "functional test," the government contends that no breach occurred.

This contention is unavailing. The government is correct that the word "acting" in context is used as a present participle. However, this classification does not support the grammatical distinction the government seeks to make. "[T]he present participle, if used as part of a verb phrase must *always* be used with one or more auxiliary verbs." William A. Sabin, *Gregg Reference Manual* ("*Gregg*") ¶ 1030(c) (6th ed. 1985) (emphasis in the original). In the context of this contract, the phrase "acting as Manager" does not function as a verb phrase because it lacks an auxiliary verb. Instead, the phrase is a participial phrase, comprising "[a] participle and its object and modifiers." *Gregg* ¶ 1801, at 393. A participial phrase is "used as an adjective," here modifying the indefinite pronoun "anyone" to answer the question *which one*. *Id*. ¶ 1801, at 387; *see also National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. at 479, 502 (1998) ("certain participial phrases can narrow the relevant universe in an exceedingly effective manner."). The government's "functional" test, Def.'s Reply at 4, does nothing to limit the identity of the person to whom "anyone" refers. Along these same lines, the Court of Claims previously read contractual language providing that a particular "decision . . . will rest with the officer *awarding* the contract" did not include the Chief of Engineers to whom

a contract-award decision was protested. *Southern, Waldrip & Harvick Co. v. United States*, 334 F.2d 245, 246, 249 (Ct. Cl. 1964) (emphasis added). Moreover, the word "Manager" in the phrase "acting as Manager" is capitalized, indicating a formal description of the position, *Scott, Foresman Handbook for Writers* ¶ 30b-4 (Maxine Hauston & John J. Ruszkiewicz eds. 4th ed. 1996); *see also Gregg* ¶ 313(e), not just an identification of functions. *See also Waldman v. Riedinger*, 423 F.3d 145, 149-51 (2005) (relying in part on the absence of capitalization in a contract's reference to "common stock" in holding that the term, as used, did not formally refer to a particular class of common stock).

Finally, as Boeing suggests, Pl.'s Supp. Br. at 4, the interpretation the government would have the court adopt is circular. *See, e.g.,* Def.'s Mot. at 17 ("'Anyone acting as Manager, Albuquerque' means any official of the DOE carrying out the same functions as Mr. Twining with respect to the subject matter in question."). The government resists this characterization, arguing that "[t]he determination of award fees is a sub-function of overseeing Rocky Flats" and that "[o]nce the Secretary effectively took over management of Rocky Flats, it was also in keeping with the plain language of the contract for the Secretary to exercise the AFDO role." Def.'s Supp. Resp. at 6-7. The government also argues that to require the Secretary formally to replace Mr. Twining as Manager, Albuquerque Operations, to change the identity of the AFDO, would be an "unreasonable . . . 'all or nothing' approach." Def.'s Reply at 5. However, the consequence of requiring a change in personnel is hardly unreasonable. In effect, the government's result-driven proffered interpretation would not only abrogate grammatical rules, it would vitiate nearly all limitations on the identity of the AFDO. A contract "interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (quoting *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)).

In short, the contractual description of the AFDO as the "Manager, or anyone acting as Manager, Albuquerque Operations," PX 3 ¶ 1(b)(1), means just what it says and cannot be stretched to encompass anyone performing some of the functions of the Manager.[21]

B. *The Secretary's Control Over Personnel Assignments*

Although Bruce Twining indisputably served as the Manager of Albuquerque Operations for the 89-1 award fee period and the contract required that he make the award fee determination,

---

[21]The court thus does not reach Boeing's argument that it should prevail even under the government's functional test. Specifically, Boeing avers that Mr. Twining was indisputably "'acting as Manager' over Rocky Flats when the 89-1 Period ended on March 31, 1989, or when he rendered his award fee determination on May 31, 1989," and that Mr. Simonson was indisputably "'acting as Manager' over Rocky Flats when the 89-2 Period ended on September 30, 1989, or when he rendered his award fee determination on December 6, 1989." Pl.'s Supp. Br. at 4-5.

the government argues that it was appropriate for the Secretary to divest Mr. Twining of award fee determination authority to avoid taint by a real or apparent conflict of interest or lack of impartiality. Def.'s Mot. at 23.[22] In support of this proposition, the government argues that the Secretary of Energy, by statute and regulation, possessed "plenary authority over personnel, organizational, and contracting decisions within the Department of Energy" and "reserved . . . the authority to exercise delegated authority directly whenever in his judgment the exercise of that authority was necessary or appropriate." *Id*. at 20. The government also contends that "the fact that the Secretary did not formally transfer Mr. Twining's nominal titles of 'Manager of Albuquerque' or 'AFDO' to some other designated official of DOE is not material." Def.'s Supp. Br. at 9.

This entire line of argument by the government is misplaced. The existence of authority in the Secretary over personnel decisions does not excuse DOE from contractual terms to which it is lawfully bound. An agreement that "designate[s] a particular [g]overnment official to make a certain factual determination must be strictly observed." *Southern, Waldrip*, 334 F.2d at 249-50; *see also General Elec. Co. v. United States*, 412 F.2d 1215, 1220 (Ct. Cl. 1969) ("[T]he internal administrative scheme whereby the Boston Procurement District was to defer to the Army Weapons Command concerning funding cannot diminish . . . authority" provided by the contract to the contracting officer.); *New York Shipbuilding Corp. v. United States*, 885 F.2d 427, 433-34 (Ct. Cl. 1967) (Where "the parties expressly chose and named a specific official . . . as the initial decider . . . [,] the [g]overnment could not unilaterally substitute another official."); *Williams Eng'g & Contr. Co. v. United States*, 55 Ct. Cl. 349, 365, 382-83 (1920) (holding that a contract was breached when the Secretary of Navy made a decision that the contract had entrusted to the Chief of the Bureau of Yards and Docks).

Moreover, the contract did not purport to abrogate the Secretary's authority over personnel decisions or prevent him from formally removing or replacing Mr. Twining as Manager, Albuquerque Operations. *New York Shipbuilding*, 385 F.2d at 434 (suggesting that contractual designation of the Nuclear Projects Officer "would not mean that the Maritime Administration could not change . . . the occupant of that post"). However, the Secretary was not permitted by the contract to displace the AFDO by informally "invest[ing] [AFDO] authority in himself . . . or in others of his choice," Def.'s Mot. at 17, as the government suggests. *Fischbach & Moore Int'l Corp. v. United States*, 617 F.2d 223, 226 n.7 (Ct. Cl. 1980) ("[W]here the contract or controlling regulations designate (without qualification) a specific officer or body as the one to render a contractual decision . . . , other persons (including higher officials) cannot displace the designated decision maker."). As Boeing notes, Pl.'s Supp. Br. at 10 n.6, the contract is replete with references to "the" AFDO, denoting that the AFDO was understood to be

[22]The government suggests that because "Twining knew that he, and possibly his subordinates at Albuquerque, were subjects of the criminal investigation[, a]ny fee awarded by Mr. Twining to Rockwell might have been construed as a favor to keep Rockwell from implicating him in criminal wrongdoing." Def.'s Mot. at 22.

a definite, identifiable person. *Webster's New Collegiate Dictionary* 914-15 (definition of "the"); *Padilla*, 542 U.S. at 435.

The government draws upon language in the court's opinion in *New York Shipbuilding*, 385 F.2d at 434 ("a decision by an official who would presumably would know much more about the local matter that these top officers"), to develop a purpose-oriented argument that headquarters personnel might better be "armed with full knowledge" about an award fee than the Manager, Albuquerque Operations. *See* Def.'s Mot. at 27-28. This argument in contravention of the contractual text reflects a comparable contention that was rebuffed in the same decision, *New York Shipbuilding*, on which the government relies. In that case, the Chief of Office of Research and Development, a Mr. MacCutcheon, made a decision contractually entrusted to the Nuclear Projects Officer. The government argued that "Mr. MacCutcheon knew as much about the subject as anyone." 385 F.2d at 434. The court concluded that what was relevant was

> not . . . the basis of Mr. MacCutcheon's actual experience as it may have been in 1965 [when Mr. MacCutcheon rendered his decision], but [rather] from the parties' standpoint [, the circumstances] when the contract was made in 1957. Looking forward from that time, the parties selected a particular officer on the reasonable assumption . . . that he was most likely to have the knowledge necessary to an informed decision. . . . That choice was locked into the contract and became a contractual term. As with other contract provisions, the agreement would not be automatically altered if the forecast proved incorrect in that . . . some other official turned out to know as much or more.

*Id*. at 435. Consequently, a change in circumstances might provide cause for a governmental official to seek modification of contractual terms or to name a different official to the pertinent post, but such a change does not automatically engender a change in the contractual terms or provide an excuse or reason to override them with impunity. The court "cannot rewrite a contract or insert words to which a party has never agreed." *American Capital Corp. v. Federal Deposit Ins. Corp.*, __ F.3d __, 2006 WL 3055912, *3 (Fed. Cir. Oct. 30, 2006). The Secretary's authority over personnel decisions could have been exercised by action to replace Mr. Twining as the Manager, Albuquerque Operations, but that action was not taken, at least with respect to the 89-1 award-fee period.

### C. *The Directive Requiring Concurrence of Headquarters in Award Fees*

When a particular official is contractually designated to make a subjective determination, as a general matter, that official must "put his own mind to the problems and render his own decisions." *See New York Shipbuilding*, 385 F.2d at 435. When the authorized official "expresses a definite opinion concerning the merits of a claim with knowledge of the relevant facts, a 'decision' has been made." *General Elec.*, 412 F.2d at 1221; *see also id.* ("[I]t seems clear that, as a responsible [g]overnment official, [the contracting officer] would have duly

investigated the matter before indicating his concurrence, as contracting officer, in a recommended course of action.").

However, where a contractually designated official "fail[s] to exercise his own independent judgment due to improper influence from another party, it would represent an abdication rather than an exercise of his discretion." *SIPCO Services & Marine, Inc. v. United States*, 41 Fed. Cl. 196, 220 (1998) (internal citations and quotations omitted). Here, the contract does not provide for concurrence by DOE's Headquarters. However, no breach of the contractual obligations would have occurred if the AFDO had sought and obtained concurrence from the headquarters. Alternatively, the parties manifestly could have amended the contract to include a provision calling for concurrence. Moreover, "there was no implied prohibition against" the AFDO "first obtaining or even agreeing with the views of others." *Pacific Architects & Eng'rs, Inc. v. United States*, 491 F.2d 734, 744 (Ct. Cl. 1974). However, when the determination was *mandated* by another, it cannot be said that the determination was the AFDO's own. *See Goltra v. United States*, 91 Ct. Cl. 42, 71-72 (1940) ("[T]he Chief of Engineers did not exercise his own judgment but was coerced . . . . [W]hen the letter was presented to him for his signature, he was forced to sign. [T]he plaintiff was entitled to an uninfluenced decision by the Chief of Engineers[,] and he alone could act. The Secretary of War had no authority under the contract to exercise the right conferred upon the Chief of Engineers."). In short, in circumstances such as these, "a contractor is entitled to a finding by the contractually agreed officer and . . . a decision by someone else is a nullity." *New York Shipbuilding*, 385 F.2d at 436. Accordingly, in this instance, the addition of a "requirement" that concurrence by DOE's headquarters be obtained did not, by itself, breach the contract. The governing consideration instead becomes one of whether the award-fee decision could be said to reflect the judgment of the contractually designated officer or someone else. *See Southern, Waldrip*, 334 F.2d at 250.

D. *Deference Concepts Derived from Administrative Law*

The government additionally suggests that principles of administrative law and separation of powers require that deference be given to a fee award decision made by the Executive Branch. Def.'s Mot. at 30 (citing *Hirsch v. United States*, 499 F.2d 1248, 1250 (Ct. Cl. 1974) (holding that "courts cannot substitute their judgment for those in the Executive Branch entrusted with the discretionary duties of appointment, supervision and promotion of the officers in the Executive Branch"). However, the Federal Circuit has opined that the deference due a fee award determination by a particular official stems "from interpretation of the contract terms," not from general separation-of-powers principles. *Cf. Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854, 859 (Fed. Cir. 1997) (the deference that a board of contract appeals must give to the determination of the Fee Determining Official turns on an interpretation of contractual terms, not on the Contract Disputes Act). The contract at issue here required that the award fee be determined subjectively by the AFDO, not by the Secretary of Energy or his headquarters staff. *See* PX 3 (Modification No. M128) ¶ 1(b)(2). Accordingly, the Secretary's mandated award amounts for periods 89-1 and 89-2, no matter how well-reasoned, cannot be sustained on administrative-deference grounds.

E. Breach of Contract

In sum, the contract required that "[t]he amount of the award fee actually to be paid" was to be determined "subjectively" by the Award Fee Determination Official. PX 3 (Modification No. M128) ¶¶ 1(b)(1), (b)(2). For the reasons described, this contractual language did not identify the Secretary of Energy or other personnel at DOE's headquarters as the Award Fee Determination Official. Indisputably, the two award fees Rockwell actually received for 1989 were not determined by the AFDO because, as stipulated by the government, Stip. ¶¶ 7, 11, the Secretary of Energy or his headquarters staff "mandated" the amounts for the 89-1 and 89-2 periods. *See John McShain, Inc.*, 375 F.2d at 831 (holding a stipulation to be "binding"); *Goltra*, 91 Ct. Cl. at 71-72 (holding that a decision coerced by an official's superior would not be treated as that official's decision). Therefore, the court concludes that by failing to comply with the contractual requirement that the designated AFDO determine the award fees Rockwell was to receive, the government breached its contract with Rockwell. *See General Elec.*, 412 F.2d at 1220; *New York Shipbuilding*, 885 F.2d at 433-34; *Southern, Waldrip*, 334 F.2d at 249-50; *Williams Eng'g*, 55 Ct. Cl. at 365, 382-83.

**II. Affirmative Defenses**

The question arises whether defenses are available to vitiate or preclude a remedy for the breach. The government raised the affirmative defense of estoppel in its amended answers, Am. Answer ¶ 40; Second Am. Answer ¶ 106, and it previously argued that this defense includes the affirmative defenses of impossibility, justification, and waiver. *See* Hr'g Tr. 48:19 to 49:3 (Feb. 8, 2006); *see also Rockwell*, 70 Fed. Cl. at 124-25.[23] In the court's earlier decision denying the government leave further to amend its answer to state those defenses explicitly because the government had unduly delayed making such a request, *see Rockwell*, 70 Fed. Cl. at 122-25, the government contended that the additional defenses were encompassed by the defense of estoppel. *Id*. at 124. At that time, the court, despite its doubts, permitted the government to "pursue its theory that estoppel embraces impossibility, justification, and waiver." *Id.* at 124-25. The government has accepted that invitation insofar as waiver is concerned, and has raised waiver and estoppel as defenses.[24]

In support of its position that "[t]he term 'estoppel' as a matter of law does encompass waiver," the government cites several precedents. *See* Def.'s Mot. at 30-32 (citing *Moncel Realty*

---

[23]The government raised the affirmative defenses of special plea in fraud and prior material breach in its answer. Second Am. Answer ¶¶ 107-08, 111-12. Boeing argues that *res judicata* now bars the government from asserting these affirmative defenses, based upon the jury verdict and resulting trial court's judgment in *Stone*. *See* Pl.'s Mot. at 25-32. In light of this contention, the government has announced it "will not pursue the affirmative defenses of prior material breach and the [s]pecial [p]lea in [f]raud." Def.'s Mot. at 4 n.3.

[24]The government has not pursued impossibility and justification as defenses.

*Corp. v. Whitestone Farms*, 68 N.Y.S.2d 673, 677 (N.Y. Sup. Ct. 1947) ("'Waiver' belongs to the family of 'estoppel.'"); *AFSCME, Council 4, Local 704 v. Department of Public Health*, 866 A.2d 582, 585 (Conn. 2005) ("Waiver is based upon a species of the principle of estoppel."); *Hanson v. Fidelity Mut. Ben. Corp.*, 13 A.2d 456, 460 (Del. Super. Ct. 1940) ("A waiver operates as an estoppel."). However, as this court previously observed, the "[d]ifferences in the scope and effect of these defenses are readily apparent." *Rockwell*, 70 Fed. Cl. at 125 n.10. Even the cases the government cites recognize that "there are essential differences" between waiver and estoppel. *See, e.g., Hanson*, 13 A.2d at 460. Among other things, "[e]stoppel is distinguished from waiver in that it [would] arise[] by operation of law to abate the rights and privileges of" Rockwell "where inequity would otherwise result due to prejudicial reliance of" DOE "upon some act, conduct, or failure to act by [Rockwell]." *Loyola Univ. of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 902 (7th Cir. 1993). More specifically,

> to apply equitable estoppel, these elements must be established: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Hercules, Inc. v. United States*, 49 Fed. Cl. 80, 88 (2001) (citing *Emeco Industries, Inc. v. United States*, 485 F.2d 652, 657 (Ct. Cl. 1973)). Those criteria for application of estoppel have not been met in this case.[25]

As to waiver, the government asserts that this defense would prevail upon a showing that "Rockwell's waiver was 'voluntary, knowing and intelligent . . . [and] done with sufficient awareness of the relevant circumstances and likely consequences.'" Def.'s Mot. at 36 (quoting *Reliance Ins. Co. v. United States*, 20 Cl. Ct. 715, 723 (1990), *aff'd*, 931 F.2d 863 (Fed. Cir. 1991) (alterations in original)). It contends that during 1989, Rockwell was told that Rocky Flats would report directly to the Assistant Secretary for Defense Programs rather than to Albuquerque and that DOE's headquarters had assumed control over the award fee determination process. Def.'s Mot. at 34-35. The government avers that Rockwell "acquiesced" to these

[25]DOE's decisions to involve headquarters in fee determinations and to alter the Rocky Flats reporting structure were not induced by Rockwell. According to the government, "[t]he Secretary took these actions in view of Mr. Twining's status as a 'party' to the criminal investigation in order to bypass Mr. Twining as far as substantive decisionmaking about Rockwell was concerned." Def.'s Supp. Br. at 4. Moreover, Rockwell's reaction to DOE's actions contributed little, if anything, to DOE's decisions respecting the award fees at issue. Pl.'s Reply at 25. Viewing the facts in the light most favorable to the government, it cannot be said that DOE "would not have so acted but for the conduct or representations of" Rockwell and that DOE "had no knowledge or convenient means of ascertaining the true facts which would have prompted [it] to react otherwise." *Loyola Univ.*, 996 F.2d at 902 (internal quotations and citations omitted).

changes. *Id*. at 34-36. The government calls this "failure to object . . . 'wholly inconsistent' with [Rockwell's] purported contract right to have the decision made by field officials," and contends that Rockwell "indicat[ed] its intent to abandon the [purported] contractual right." Def.'s Reply at 16 (citing *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 679 (7th Cir. 2004)). However, the undisputed record does not support these averments.

Rather than passively accepting DOE's actions requesting the award fees, Rockwell protested them, promptly and consistently. For example, the award fee for the 89-2 period, was finally made on February 26, 1990. DX 79 (Letter from Nelson to Sanchini (Feb. 26, 1990)). Rockwell promptly questioned the result in written comments dated May 3 and June 7, 1990, DX 80 (Mem. from Marshall L. Bishop, Director, Administration Division, Rocky Flats Office, to Nelson (July 17, 1990)), as well as in an oral presentation of July 10, 1990. *Id*. Rockwell's protestations were rejected. *Id*.[26] Thereafter, Rockwell submitted its claims to the Contracting Officer as required by the Contract Disputes Act and then brought the instant action. Nothing in this course of conduct demonstrates a waiver by Rockwell of its rights under the contract. In short, neither of the government's proffered defenses apply to vitiate or preclude a remedy for the breach.

## III. Damages

Having found that the government breached its contract with Rockwell by causing the award fee for the 89-1 and 89-2 periods to be mandated by DOE's headquarters rather than determined by the AFDO as the contract requires, the task in setting damages is to determine what the AFDO did or would have done absent the mandate from headquarters. That reconstruction effort is somewhat complicated by the interaction between DOE's managers at Albuquerque and Rocky Flats and DOE's headquarters in the aftermath of the search and seizure carried out at Rocky Flats in June 1989. Nonetheless, the record is relatively complete and allows a satisfactory sifting of materials to make the necessary determinations.

### A. *The 89-1 Period*

For the 89-1 period, the record shows four different amounts for the fee award to be granted Rockwell: (1) Mr. Twining's memorandum of May 31, 1989 (DX 32), reports "tentative findings" and lists a "[p]roposed" award fee of $5,176,482; (2) Mr. Twining's memorandum of

---

[26]Similarly, the award fee for the 89-1 period was made on September 27, 1989. DX 67 (Letter from Twining to Sanchini (Sept. 27, 1989)). Rockwell submitted a request for reconsideration on October 25, 1989, *see* DX 68 (Mem. from Twining to Meinhardt (Nov. 8, 1989)), which request was denied on November 14, 1989. DX 69 (Letter from Twining to Sanchini (Nov. 14, 1989)). By that early point, Rockwell was raising the issues that it now is pursuing in this litigation. *See* DX 68 (Mem. from Twining to Meinhardt (Nov. 8, 1989)) at 2 (Mr. Twining's comment to Mr. Meinhardt that Rockwell contested the improper influence on the AFDO of more senior officials at DOE).

August 8, 1989 (DX 60), "propose[s]" an award fee of $3,628,622; (3) an undated memorandum by Mr. Twining (DX 66) purports to "hereby determine an award fee of $2,903,215;" and (4) a letter sent by Mr. Twining to Rockwell on September 27, 1989 (DX 67) communicates that the award fee determined by DOE was $2,716,624.

The government stipulated that DOE headquarters "determined" and "mandated" the $2,716,624 award fee for the 89-1 period and "caused" Mr. Twining "to issue a final award fee determination in that amount." *See* Stip. ¶¶ 7,8. Therefore, the government may not now argue that that amount, set out in the letter of September 27, 1989 (DX 67), was subjectively determined by Mr. Twining. *John McShain, Inc.*, 375 F.2d at 831; *Goltra*, 91 Ct. Cl. at 71-72. Similarly, the undated memorandum (DX 66) cannot be taken as Mr. Twining's determination. Though it purports to refer only to the "plant" award, the stated amount corresponds to the total award for both plant and PRMP/PROVE contained in the headquarters-mandated letter of September 27, 1989. DX 67. The supporting documentation attached to the undated memorandum reflects a "recommended" plant award of $2,716,624. DX 66. Thus, the undated memorandum simply recites that which headquarters mandated, albeit with an error. Accordingly, the amount set out in the undated memorandum appears to add nothing of material value to the issues, and the memorandum consequently will be disregarded.

This process of elimination leaves as candidates for the 89-1 award fee, the amount of $5,176,482, as reflected in Mr. Twining's memorandum of May 31, 1989, to headquarters (DX 32), and the amount of $3,628,622, as reflected in Mr. Twining's memorandum of August 8, 1989, to headquarters (DX 60). The government argues that Mr. Twining's memorandum of May 31, 1989, did not provide Mr. Twining's final determination as to award amounts because the memorandum styled its contents as "tentative findings." Def.'s Supp. Br. at 11 (referring to DX 32 (Mem. from Twining to Wade (May 31, 1989)). "Tentative" means "not final," "provisional," or "uncertain," *Webster's New Collegiate Dictionary* 910, but the government stipulated that this memorandum contained Twining's conclusion. *See* Stip. ¶ 1.

The Stipulation is undoubtedly correct that Mr. Twining's memorandum of May 31, 1989, reflected his initial determination. The court, however, must take one step further along the path from that undisputed fact. The pertinent question becomes one of whether Mr. Twining subsequently changed his mind. In that respect, the government urges that Mr. Twining "subsequently adopted Mr. Goldberg's reduced recommendation of $3,628,622." Def.'s Supp. Resp. at 31 (referring to DX 60 (Mem. from Twining to Meinhardt (Aug. 8, 1989)). The amount set out in the memorandum of August 1989 manifestly reflected Mr. Goldberg's detailed assessment of circumstances at Rocky Flats. Boeing counters that Mr. Twining "simply did not have 'knowledge of the relevant facts' concerning the reductions made by Mr. Goldberg." Pl.'s Supp. Br. at 19. Boeing's argument proves too much, however. Mr. Twining's conclusions of May 31, 1989, also were based on much more than his own first-hand knowledge, largely because he relied on comments of and information supplied by his subordinates. *See id.* at 18 (describing the role of Rocky Flats personnel and the Performance Evaluation Review Board). Mr. Twining was permitted to rely on the advice of others in making his decision. *Pacific*

*Architects & Eng'rs*, 491 F.2d at 744. In short, the record establishes that Mr. Twining, faced with additional information – the findings of Mr. Goldberg who was "presen[t] on site during the past several weeks," DX 60 (Mem. from Twining to Meinhardt (Aug. 8, 1989)) – changed his mind. *See* PX 48(Twining Dep.) at 73:7-8 ("I would say there are details here [in Mr. Goldberg's letter] that I wasn't aware of."). Mr. Twining admitted that "[b]ased on the information that was coming out around Rocky Flats, [he] believe[d] [the Performance Evaluation Review Board] graded Rockwell too high on [environment, safety, and health] when they met the first time." DX 8 (Twining Dep.) at 112:8-11.

Boeing refers to Mr. Twining's decision of May 31, 1989, as "final and conclusive," Pl.'s Supp. Resp. at 6, and argues that "once a final decision is made, the government cannot undo it." Pl.'s Supp. Br. at 29 (citing *General Elec.*, 412 F.2d at 1221 ("[W]hen an authorized contracting officer expresses a definite opinion concerning the merits of a claim with knowledge of the relevant facts, a 'decision' has been made. . . . [T]he decision of a duly authorized contracting officer could not be . . . reversed by a successor contracting officer.")). *General Electric*, however, did not present a situation where newly discovered information caused the contractually designated decisionmaker to change his or her mind. Instead, that case involved multiple contracting officers with arguably overlapping authority, and the court found that the initial decision by one of the contracting officers to reimburse the plaintiffs for cost overruns could not be overridden by the subsequent decision of another contracting officer. *General Elec.* at 1218, 1221. In this case, only the AFDO, Mr. Twining, had authority to make the award fee determination, and Mr. Twining, not Mr. Goldberg, made the ultimate decision to reduce the award to $3,628,622. The controlling issue is whether the decisionmaker had the requisite evidence before him at the time he made his determination. *Southern, Waldrip*, 334 F.2d at 250 ("The controlling fact is that the contractor had this telegram before him at the time he made his determination."); *General Elec.*, 412 F.2d at 1221 ("We find, therefore, that Colonel McDermott was aware of the overrun situation . . . with knowledge of the relevant facts."). The uncontroverted evidence is that as of May 31, 1989, Mr. Twining did not have knowledge of all the relevant facts. Rather, upon receiving the new information reflected in Mr. Goldberg's findings, he was not barred by the contract from revising his initial determination.

That the memorandum of August 8, 1989, (DX 60) included the word "propose" does not mean that it did not contain Twining's conclusion. *Southern, Waldrip*, 334 F.2d at 249 (recognizing that a communication styled as a "recommendation" from a contracting officer to his superior was a determination when the contracting officer "had the responsibility of making the determination" and "[h]e carried out that responsibility."). "[T]he law presumes that when an [authorized official] acquainted with the underlying facts signs an internal document . . . that she has decided to express a definite opinion on the merits of the claim in the absence of contrary testimony or evidence." *Texas Instruments, Inc., v. United States*, 922 F.2d 810, 813-14 (Fed. Cir. 1990). Accordingly, the court finds that the final determination of Mr. Twining, the AFDO for the 89-1 period, was $3,628,622 for plant operations as set forth in his memorandum of August 8, 1989 (DX 60). Because Rockwell actually received $2,716,624 as its award fee for that period, Rockwell is entitled to damages of $911,998 for the 89-1 period.

B. *The 89-2 Period*

For the 89-2 period, Mr. Twining delegated AFDO authority to Mr. Simonson. *See* PX 37 (Mem. from Twining to Simonson (Oct. 13, 1989)).[27] Mr. Simonson's memorandum of December 6, 1989, (DX 35) (Mem. from Simonson to Tuck) reflects his conclusion. Stip. ¶ 9.

The government argues that because "Mr. Twining never made any recommendation for the 89/2 period, accepting [Boeing]'s position that only Mr. Twining could properly make the decision, there is no benchmark from which to measure damages for the 89/2 period, and [Boeing] has failed to establish any damages for that period." Def.'s Supp. Br. at 36. The government describes Mr. Simonson's award fee determination as "wholly nugatory under [Boeing's] theory" and asserts that "according to the logic of [Boeing]'s position, the only way to measure damages [would be to] tak[e] the difference between a Twining determination . . . and the corresponding Headquarters determination." *Id*. at 37. Consequently, the government's position is that Boeing has "failed to establish any damages whatsoever" for the 89-2 period because "[t]here is no way for the [c]ourt to determine what Mr. Twining would have recommended." *Id*.[28]

Boeing "initially alleged and continues to believe that [the] delegation [to Mr. Simonson] was in breach of contract," but "[Boeing] is not pursuing that breach because" it believes "no damages resulted." Pl.'s Reply at 5 n.3 (citations omitted). In response to the government's assertion that damages for the 89-2 period have not been established, Boeing offers several reasons to accept Mr. Simonson's determination of December 6, 1989, as "the proper benchmark." Pl.'s Supp. Resp. at 13. Boeing notes that the delegation to Mr. Simonson was either authorized or ordered by DOE headquarters. Pl.'s Supp. Br. at 21 (citing PX 80 (Dep. of Meinhardt (Apr. 26, 1994)) at 60:15-20); Pl.'s Supp. Resp. at 13 (citing PX 97 (Twining Dep.) at 130:6-7). Boeing also avers that Mr. Simonson's award fee determination of December 6, 1989,

[27] According to Boeing, "[t]he delegation was ordered by headquarters and headquarters worked with Mr. Simonson as the AFDO until the end of January 1990, when headquarters opted to replace him with someone 'a little more aggressive.'" Pl.'s Supp. Br. at 21. This averment is supported by the record. *See infra*, at 24.

[28] The government also refers to a subsequent delegation by Mr. Twining to Robert Nelson. *See* Def.'s Supp. Br. at 10; PX 85 (Mem. from Twining to Nelson (Feb. 26, 1990)). However, the award fee for the 89-2 period was essentially determined by headquarters prior to the delegation to Mr. Nelson. *See* DX 78 (Mem. from Tuck to Deputy Secretary, DOE (Feb. 22, 1990) (requesting Secretarial concurrence in the decrease in the award fee from that put forward by Mr. Simonson)). In this vein, the government concedes that "Mr. Nelson had [no] substantive involvement in determining the award fees." Def.'s Supp. Br. at 10. The Stipulation provides that "[t]he award fee for Plant Operations of $1,241,604, and the award fee for PRMP/PROVE of $ 338,035 for the 89-2 period were both determined by DOE headquarters" and not by Mr. Nelson. Stip. ¶ 12.

complied with every step of the award fee procedure required by the contract and described in the Handbook for Award Fee Performance and Evaluation Review Process (PX 53). Pl.'s Supp. Br. at 21; Pl.'s Supp. Resp. at 16.

Again, the contract provided that "[t]he Award Fee Determination Official (Manager or anyone acting as Manager, Albuquerque Operations) (AFDO) shall evaluate the Contractor's performance during each evaluation period and will determine the amount of award fee to be paid the Contractor for that evaluation period." PX 3 (Modification No. M128) at Attach. A, App. D, ¶ 2. By its argument, the government is endeavoring to hide behind its own breach. The government is correct that Boeing bears the burden of proving its damages. *See Restatement (Second) of Contracts* § 352 (1981). However, Mr. Twining's explicit, written delegation of his responsibilities to Mr. Simonson at the very least put Mr. Simonson in place as the acting Manager, Albuquerque Operations for purposes of the contract. Apart from Mr. Twining, headquarters also considered Mr. Simonson to be the AFDO under the delegation. *See* PX 80 (Dep. of Meinhardt (Apr. 26, 1994)) at 60:15-20, PX 82 (Mem. from Tuck to Deputy Secretary (Jan. 1990)), PX 83 (Mem. from Tuck to Deputy Secretary (Feb. 22, 1990)), DX 75 (Mem. from Barr to Acting Assistant Secretary for Defense Programs) ("The AFDO has determined and recommended"). Moreover, DOE's headquarters removed Mr. Simonson from his post when it became dissatisfied with his decision as AFDO. *See* PX 58 (Simonson Dep.) at 194:2-22; PX 63 (Dep. of Admiral Jon Barr (Sept. 23, 1994)) at 158:9-12 (Mr. Nelson replaced Mr. Simonson because "[i]t was felt that somebody with a little more aggressive attitude toward correction of deficiencies was needed."). Boeing has satisfied its burden of proof in this respect.

Clothed with apparent authority, Mr. Simonson had the relevant evidence before him at the time of his determination. *General Elec.*, 412 F.2d at 122; *Southern, Waldrip*, 334 F.2d at 250. Mr. Simonson had information from the Performance Evaluation Committee, the Performance Evaluation Review Board, discussions with Rockwell, discussions with persons at DOE's headquarters (including Admiral Barr), and communications with a safety team sent to Rocky Flats by DOE's headquarters. PX 58 at 129-33, 147-49, 161-62, 177-81, 184-85, 214-16 (Simonson Dep.). Mr. Simonson was aware of the reasons why Admiral Barr disagreed with him, and Mr. Simonson addressed those reasons in his determination. PX 58 (Simonson Dep.) at 193-94; *see* DX 35 (Mem. from Simonson to Tuck (Dec. 6, 1989)). Neither Admiral Barr's nor Undersecretary Tuck's memoranda identify any material evidence that was not before Mr. Simonson at the time of his determination. *Compare* DX 75 (Mem. from Barr to Acting Assistant Secretary for Defense Programs) and DX 77 (Mem. from Tuck to Deputy Secretary (Feb. 22, 1990)), *with* DX 35 (Mem. from Simonson to Tuck (Dec. 6, 1989)).

Accordingly, the court finds that the government is bound by Mr. Simonson's award fee determination for the 89-2 period in the amounts of $3,114,245 for plant operations and $628,982 for PRMP/PROVE. Rockwell actually received $1,579,639 (DX 79 (Letter from Nelson to Sanchini (Feb. 26, 1990)), and thus Boeing is entitled to damages of $2,163,588 for the 89-2 period.

## CONCLUSION

For the reasons set forth above, the plaintiff's motion for summary judgment is GRANTED IN PART and the government's cross motion for summary judgment is DENIED. Boeing is awarded damages in the amount of $911,998 for the 89-1 period and $2,163,588 for the 89-2 period, totaling $3,075,586, plus interest at the rate specified in 41 U.S.C. § 611, calculated from June 12, 1991 until receipt of payment from the government. The clerk shall enter judgment accordingly. No costs.

It is so ORDERED.

s/ Charles F. Lettow
Judge